PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

CASEY BOOME (NYBN 5101845)
MOLLY K. PRIEDEMAN (CABN 302096)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6627
    casey.boome@usdoj.gov
    molly.priedeman@usdoj.gov

STEPHEN MARZEN (NYBN 2007094)
YIFEI ZHENG (NYBN 5424957)
Trial Attorneys, National Security Division

    950 Pennsylvania Avenue, N.W.
    Washington, DC 20530
    Telephone: (202) 616-1051
    stephen.marzen@usdoj.gov
    yifei.zheng@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> LINWEI DING, <br><br> Defendant. | CASE NO. 3:24-cr-00141-VC <br><br> **UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO MODIFY PROTECTIVE ORDER** <br><br> The Honorable Vince Chhabria <br> Courtroom 4, 17th Floor <br><br> Hearing: 1:00 pm on March 19, 2025 |

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO MODIFY PROTECTIVE ORDER

3:24-cr-00141-VC

TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

FACTS ............................................................................................................................................3

The Protective Order, the Government's Confidentiality Designations and Productions, and the Parties' Negotiations to Adjust ................................................................................................3

    A    The Protective Order and Prompt Productions of GOOG Bates-Numbered Confidential Material ..........................................................................................3

    B.    The Government's De-Designations and (Re)production of Confidential Material and Discovery Material ..........................................................................4

    C.    The Government's Proposal to Reduce Defense Costs But Protect Confidential Material ..........................................................................................5

    D.    The Documentary Evidence of Linwei Ding's Non-Compliance with Confidentiality and Non-Disclosure Obligations ........................................................6

LEGAL STANDARD ....................................................................................................................9

Good Cause Must Be Demonstrated to Modify the Protective Order .........................................9

ARGUMENT ................................................................................................................................10

    I.    Ostensible Overdesignation Provides No Good Cause to Modify the Protective Order Because the Government Has Reviewed the Productions – Twice – and Will Correct any Misdesignations ..................................................12

    II.    The Court Should Not Add Another Confidentiality Tier Because Ding Should Not Review Confidential Material at Home ........................................12

CONCLUSION .............................................................................................................................14

**TABLE OF AUTHORITIES**

Page(s)

Cases

*Mohawk Industries, Inc. v. Carpenter*,
 558 U.S. 100, 130 S. Ct. 599 (2009)........................................................................................... 10

*United States v. Jinhua*,
 No. 3:18-cr-00465-MMC (N.D. Cal.)…………………………………………………………10

*United States v. Wang*,
 No. 21-CR-6108-FPG …………………………………………………………………………...11

Other Authorities

5 Wayne R. LaFave, Jerold H. Israel, Nancy J. King & Orin S. Kerr, Criminal Procedure
 § 20.3(l), at 515 (4th ed. 2015)…………………………………………………………………1

Statutes

18 U.S.C. § 1831(a)(1)-(3).................................................................................................................. 6
18 U.S.C. § 1832(a)(1)-(3).......................................................................................................... 4, 6
18 U.S.C. § 1835(b) ......................................................................................................................... 10
Pub. L. No. 114-153......................................................................................................................... 10

Rules

Fed. R. Crim. P. 16(d)(1) .................................................................................................................. 9

**PRELIMINARY STATEMENT**

Protective orders generally and in trade-secret cases particularly require courts to strike a balance between the burden of denying or restricting disclosure to the defense, on the one hand, and the risk of unrestricted disclosure, on the other hand. *See* 5 WAYNE R. LAFAVE, JEROLD H. ISRAEL, NANCY J. KING & ORIN S. KERR, CRIMINAL PROCEDURE § 20.3(l), at 515 (4th ed. 2015) ("In the end, as the Arizona Rule notes, the court must determine that the disclosure would result in a risk or harm outweighing any usefulness of the disclosure.'") (footnote omitted).

Defendant Linwei Ding's ("Ding's") motion to modify the stipulated protective order (Dkt. 13) presents narrow issues – namely, whether Ding himself should be permitted to review the trade-secrets-in-suit[1] and other Google LLC ("Google") trade secrets in his defense counsel's law offices without supervision and with his electronic devices and other means of taking notes; and whether Ding should be permitted to review confidential information other than trade secrets at home.

The government's productions to defendant are up to date and were reviewed document-by-document for proper protective-order designation. The document *corpus* in this economic-espionage case is fewer than 2,000 documents. Approximately 1,370 of those documents are technical documents that contain information that Ding copied from Google's network and secretly transferred to his personal Google cloud account.[2] Most importantly, the protective order has two tiers rather than three and thus no documents are limited to attorney's eyes only. Not only has Ding's counsel had access to the government's productions, but Ding himself has access as well. The only "burden" imposed on Ding's access by the protective order – to borrow his counsel's words – is "the need to drive to his counsel's office." Ding's Motion to Modify Protective Order, Dkt. 53, at 11.

Balanced against Ding's desire to reduce his commute is the risk that, if Ding is allowed unsupervised access in his counsel's offices to review trade secrets with his electronic devices and

---

[1] As in a patent case concerning infringement of the patents-in-suit, as opposed to other patents the plaintiff owns, by "trade-secrets-in-suit" we refer to the trade secrets in the indictment and which the government will prosecute at trial, as opposed to other trade secrets owned by the victim company and obtained or retained by the defendant from the victim company and others without authorization.

[2] Defendant's motion repeatedly refers to a universe of 4,400 confidential documents without acknowledging that the vast majority of those 4,400 files are duplicates or derivative (*e.g.*, thumbnail artifacts or metadata files) of the core 1,370 confidential documents.

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO MODIFY PROTECTIVE ORDER   1
3:24-cr-00141-VC

ability to take written notes, he will revictimize Google by taking photographs or handwritten notes, which could be transferred to the Ding's business associates in the People's Republic of China ("PRC"). Home access to Google's business proprietary documents other than trade secrets provides even greater opportunities for Ding to exfiltrate Google's confidential information.

Not only would defense counsel's protective-order modifications give Ding the means to exfiltrate Google confidential materials, but Ding has the motive. When Google caught Ding downloading Google documents the first time, Ding signed a self-deletion affidavit in which he falsely promised that he would delete all Google proprietary information in his possession. Ding's attestations in the affidavit were lies. Contrary to his sworn affidavit, Ding retained without authorization a treasure trove of Google trade secrets and confidential files that might never have been recovered but for law-enforcement intervention. To circumvent Google's sophisticated network controls, Ding copied and pasted Google trade secrets from Google's internal network into Apple Notes, saved the Notes in portable document format (.pdf), and uploaded the files to his personal cloud storage account. In a voluntary interview during execution of a premises warrant, Ding repeatedly lied about how many Google files he downloaded, why he downloaded them, whether he accessed them in the PRC, and whether he had another Google employee "badge in" for him in the United States to conceal the fact that he was in the PRC.

The current protective order (Dkt. 13), together with proposed modifications, strike a fair balance by (on the one hand) giving Ding and his counsel access to the entire defense production with the modest burden that Ding commute to his counsel's law offices, but (on the other hand) denying Ding the means to copy and exfiltrate Google's trade secrets and proprietary business information, which he has demonstrated a propensity to do.

In an (unsuccessful) effort to avoid this motion practice, or at least narrow the issues before the Court, the government offered (before Ding filed his motion) to permit Ding access to Confidential Material (*i.e.*, the trade-secrets-in-suit, trade secrets not in suit, and other Google proprietary business information) in his counsel's office on a secure laptop *without supervision*; provided, however, that Ding leave all electronic devices (phones, cameras etc.) with counsel before reviewing Confidential Materials (to prevent photographs of computer monitors), and that any notes taken by Mr. Ding remain on the

secure review laptop or otherwise in his attorneys' custody and control. Ding's counsel did not respond to the government's offer and instead filed this motion. In his motion, Ding seems to accept the government's offer to adjust the protective order, but Ding drops the critical *proviso* that he not have electronic devices or the ability to take written notes. The government does not agree, and the victim company does not agree, to give Ding unsupervised access to Google's trade secrets and business proprietary information with his electronic devices and ability to take and remove notes. Ding's motion essentially asks that the Court trust Ding. Ding's lies and concealment demonstrate that trust in him is misplaced.

**FACTS**

**THE PROTECTIVE ORDER, THE GOVERNMENT'S CONFIDENTIALITY DESIGNATIONS AND PRODUCTIONS, AND THE PARTIES' NEGOTIATIONS TO ADJUST**

The designated document population in this criminal proceeding is little more than four thousand documents. Most of those files are duplicates or derivative copies of a core set of 1,370 confidential documents. *See* Declaration of Casey Boome ¶¶ 2-3 ("Boome Decl."). Those 1,370 files represent the cache of Google confidential information and trade secrets that Ding secretly exfiltrated from Google's network and stored in his personal cloud storage account. *See id*.

Although defense counsel did not respond to the government's pre-motion offer to avoid "baby sitting" its client while at the same time preventing Ding from copying and exfiltrating Confidential Material, that offer remains on the table and the government suggests that the Court adopt it and deny any further modification of the protective order beyond permitting unsupervised document review in defense counsel's offices without electronic devices or personal notes.

Later in this proceeding, as we get closer to the October 14, 2025 trial date, the Court may want to make rulings to protect the confidentiality of trade secrets at trial, because the protective order does not speak to confidentiality at trial.

    A.    **The Protective Order and Prompt Productions of GOOG Bates-Numbered Confidential Material**

On January 6, 2024, FBI Special Agents executed a premises warrant at the residence of Linwei (a/k/a/ Leon) Ding and interviewed Mr. Ding outside his home. *See* Declaration of FBI Special Agent

Gregory Toole ("Toole Decl."), Ex. 3.[3] On March 5, a grand jury in the Northern District of California indicted Ding for four counts of trade-secret theft in violation of 18 U.S.C. § 1832(a)(1)-(3). On March 6, 2024, Ding was arrested.

Before the month of March 2024 was finished, the parties stipulated to a protective order (Dkt. 13) and the government produced the core 1,370 files with the bates prefix "GOOG," all designated as Confidential Material under the protective order. *See* Boome Decl. ¶ 3. The protective order has two categories – Confidential Material and Discovery Material. *See* Dkt. 13 ¶ 1. Confidential Material is information that is (a) "to be kept secret" (*i.e.*, business proprietary information) or (b) "is a trade secret." Dkt. 13 ¶1(a). Discovery Material consists of "all materials disclosed by the United States during discovery in this case." Dkt. 13 ¶1(b).

**B.     The Government's De-Designations and (Re)production of Confidential Material and Discovery Material**

On September 18, 2024, the government produced the 1,370 GOOG files again with a "US" Bates prefix as part of a larger production that included the content of Ding's Google cloud accounts.[4] While the original GOOG production numbered 1,370 files, the US production numbered 3,005 files because it included not only the original 1,370 files, but also additional files containing associated metadata and other artifacts of the 1,370 files. *See* Boome Decl. ¶¶ 4-5 To be specific, the 3,005 designated files in the government's fifth production (produced on September 18, 2024) included duplicate copies of the 1,370 designated GOOG files, 1,285 single-page thumbnail (.png) files (duplicating again the first page of most of the 1,370 GOOG files), and 91 metadata files. *Id*. ¶¶ 6-7. As such, 2,746 of the 3,005 designated files were either metadata files or duplicate copies of GOOG designated documents that the government produced to defense counsel in March 2024. The government's cover letter accompanying its September 18 production advised defense counsel that the designated US files included "substantial[] overlap with the previously produced GOOG files." *Id*. ¶ 4. Ding's motion elides the substantial duplication of

---

[3] Exhibits in the government's declarations are numbered sequentially across declarations to provide unique exhibit numbers and to avoid overlap with Ding's exhibits, which use letters.

[4] The 1,370 GOOG files were produced immediately after the initial indictment to give Ding prompt access to the core technical files. The government re-produced the GOOG files under the US Bates scheme when the government produced the content of the cloud storage account where the GOOG files were stored. *See* Boome Decl. ¶¶ 2-5.

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO MODIFY PROTECTIVE ORDER     4
3:24-cr-00141-VC

designated documents in the government's productions.

In the fall of 2024, the parties exchanged correspondence about protective-order designations and the government reviewed each of the 1,370 GOOG files, document by document. The review identified 83 files to produce without designation. The resulting de-designated re-production, which the government provided to defense counsel on November 26, 2024, included 278 files because of each file had a GOOG version, a US version, and associated derivative files. *See* Boome Decl. ¶¶ 8-11. Among the files the government de-designated on November 26, 2024 were all documents referenced in Exhibits C, D, and F to the Declaration of Grant Fondo.

Ding's protective-order motion identifies a single document – US-0012528 – that remains improperly designated as Confidential Material. If Ding's counsel had identified that erroneous designation before filing his motion, the government would have de-designated that document. *See* Boome Decl. ¶ 12.

In response to that inadvertent designation, the government reviewed again all 3,005 documents from the US production. As a result of that review, the government will de-designate an additional 109 files. *See* Boome Decl. ¶¶ 12-14. Approximately 60% of the documents are metadata files. Approximately 40% of the files are personal documents that are relevant for attribution to Ding but do not contain trade secrets or other Google confidential information. The mis-designation of those 109 documents thus could not have delayed or otherwise impeded the preparation of the defense.

| Second Re-Production (De-Designation) | |
|---|---|
| **Number of Files** | **Nature of Files** |
| 64 | Metadata (.json or .json.txt) files |
| 18 | HR-related documents pertaining to Ding's employment at Cadence (one of Ding's former employers) |
| 11 | Non-technical Google documents, such as job descriptions, interview outlines, and other notes |
| 16 | Non-Google-related personal documents, including two copies of the resume-like document attached as Exhibit A to the Fondo Decl. |
| 109 | TOTAL |

**C.    The Government's Proposal to Reduce Defense Costs But Protect Confidential Material**

On February 4, 2025, a grand jury in the Northern District of California returned a superseding

indictment that further specified the trade-secrets-in-suit (to seven categories in the superseding indictment from four categories in the original indictment) and charged Ding with seven counts of economic espionage in violation of 18 U.S.C. § 1831(a)(1)-(3) and seven counts of trade-secret theft in violation of 18 U.S.C. § 1832(a)(1)-(3).

On February 5, 2025, the government sent an e-mail message to defense counsel proposing a call to meet and confer about Ding's motion to modify the protective order. On a call later that day, the government suggested that Ding be allowed to review Confidential Material without supervision as long as Ding gave all electronic devices to counsel before reviewing Confidential Material and that any notes taken by him remained in the possession, custody, and control of the defense team at all times. Defense counsel did not respond to the government's offer. *See* Molly K. Priedeman Declaration ¶¶ 2-5.

### D. The Documentary Evidence of Linwei Ding's Non-Compliance with Confidentiality and Non-Disclosure Obligations

The evidence at trial will show that, between May 21, 2022 and December 2, 2023, Ding secretly uploaded a substantial cache of Google corporate files to his personal Google drive. *See* Superseding Indictment, Dkt. 44 ¶ 17. Ding was on notice of Google's security measures and data confidentiality policies, which he acknowledged by signing his Employment Agreement and Google's Code of Conduct and by completing required trainings focused on the importance of protecting Google's intellectual property. *See id*. ¶¶ 12-14. Ding attempted to circumvent Google's security measures by copying and pasting sensitive, internal Google content into Apple Notes on his Google-issued MacBook Pro laptop, converting the content into portable document format, and uploading the .pdfs to a personal Google Drive. *See id*. ¶ 17. In December 2023, while Ding was in the PRC raising funds for his startup company, another Google employee, at Ding's direction, badged in for Ding at Google's California offices to make it appear as though Ding was working from his normal workstation. *See id*. ¶¶ 22, 31.

On December 8, 2023, Google Global Investigations interviewed Ding and Ding signed a self-deletion affidavit ("SDA"), falsely promising that he had "searched [his] personal possessions, including all devices, accounts, and documents in [his] custody or control for any non-public information originating from [his] job at Google . . . [He] ha[d] permanently deleted and/or destroyed all copies of such information . . . As a result, [he] no longer ha[d] access to such information outside the scope of

1  [his] employment. Dkt. 44 ¶ 27.

2  On January 6, 2024, while FBI Special Agents executed a warrant to search Ding's residence, other agents asked Ding if they could interview him. *See* Gary Toole Declaration, Exhibit 3, at 1. Ding agreed. *See id*. The agents told Ding that he was not in custody or under arrest and that the interview was voluntary. *See id*. The interview was recorded. *See id*. Ding acknowledged that Google did not allow him to transfer files outside of Google or share information outside of Google about Google projects. *See id*. at 2. When asked if he ever let anyone else use his badge, Ding initially insisted that he never let anyone else use his badge. *See id*. at 4. Later in the interview, however, Ding admitted that he had a co-worker badge in for him, which meant that his initial representation to the agents was a lie. *See id*. at 6. Ding also acknowledged that he signed the SDA on December 8, 2023. Contrary to Ding's sworn promise to delete all Google non-public information, on January 6, 2024, when Ding spoke to the agents, Ding admitted that he still had Google files in his possession, which meant that Ding lied again. *See* Greg Toole Declaration, Exhibit 3, at 4.

The evidence at trial will also show that, shortly after Ding began secretly exfiltrating Google's trade secrets, he began discussing employment with Beijing Rongshu Lianzhi Technology Co., Ltd. ("Rongshu"), an early-stage technology company based in the PRC. *See* Dkt. 44 ¶¶ 18-20. Rongshu's business objectives included the development of acceleration software for machine learning on graphics processing unit ("GPU") chips (*see id*.) – technology that overlapped with the trade secrets that Ding stole (*see id* ¶¶ 2-7). Ding became Rongshu's Chief Technology Officer, but eventually left the company to found his own artificial intelligence ("AI")-focused startup company called Shanghai Zhisuan Technology Co. Ltd. ("Zhisuan"), all the while concealing his separate business ventures from Google, even as he continued to collect his full-time Google paycheck. *See id.* ¶¶ 18-23. On November 24, 2023, at an investor conference in Beijing, Ding explained to potential investors that the foundation of his company Zhisuan (and its product Lyceum) was its ability to "directly copy and upgrade" "Google's experience and technology." The image below shows Ding at the November 2024 Beijing

investor conference together with the machine translated text appearing above Ding's head.



Following the January 6, 2024 premises search at Ding's residence, FBI reviewed WeChat messages found on the Ding's phone of a group entitled "Zhisuan Technology-Chuxin Capital," a collection of Ding's Zhisuan colleagues. Their discussion, which took place between November 30, 2023 and December 4, 2023 included the following machine translated colloquy between Ding (dingyong198608) and a colleague:

```
dingyong198608: "Thank you for your attention. We will communicate again
later. [Joyful][Joyful][Joyful]"

wxid_sb2kzwve0r1j21: "Do we have more specific chip-specific performance
test reports and speed-up training cases?"

dingyong198608: "Yes, but it is confidential and cannot be shared directly
with everyone"

wxid_sb2kzwve0r1j21: "Let's sign an NDA? We'll use it for internal
evaluation."

dingyong198608: "@Yi Yixin This is a case study I did at Google before, not
information about our current project, so it's hard to share [Facepalm] I
signed a confidentiality agreement so you can watch it on the spot, but you
can't keep it."

wxid_sb2kzwve0r1j21: "Got it, I'll come over to see it later [happy]"
```

Toole Decl., Exhibit 5, at 1.

## LEGAL STANDARD

### GOOD CAUSE MUST BE DEMONSTRATED TO MODIFY THE PROTECTIVE ORDER

The parties agree that the Court may modify the protective order (Dkt. 13) for "good cause." Criminal Rule 16 authorizes courts "at any time" to enter or modify protective orders for good cause. FED. R. CRIM. P. 16(d)(1). Ding's civil cases put the burden on the movant to demonstrate good cause. *See* Dkt. 53, at 8 (citing cases). After relying on civil cases, Ding reverses field and asserts that in criminal cases the movant need not bear the risk of non-persuasion because the court need only "act for good cause." Dkt. 53, at 9. How a risk of non-persuasion functions if neither party bears it is not explained in Ding's brief. In any event, the parties agree that the Court may modify the protective order for good cause and the arguments on either side of this motion are not evenly balanced so that risk of non-persuasion should not do any work here.

Although the government agrees with the applicable legal standard, Ding's analysis is incomplete to the point of irrelevance because he asserts that the "primar[]y" function of a protective order is to protect witnesses and prevent perjury. Dkt. 53, at 9 (quoting 1966 advisory committee's notes); *see id*. at 11 ("Mr. Ding's proposed modification poses no meaningful risk to witness safety – the primary concern of Rule 16(d)(1).").

Contrary to Ding's contention, the primary function of protective orders in economic espionage and trade-secret cases is to protect trade secrets. To that end, protective orders in cases under the Economic Espionage Act of 1996 – such as this case – are governed not only by Criminal Rule 16, but also by statute. Ding's motion does not even cite the statute requiring protective orders in cases under the Economic Espionage Act.

In Section 1835, the Economic Espionage Act of 1996 requires courts to enter protective orders to safeguard trade secrets and provides an immediate interlocutory appeal by the United States (not the defendant) if an alleged trade secret is ordered to be disclosed:

> In any prosecution or other proceeding under this chapter, the court shall enter such orders and take such other action as may be necessary and appropriate to preserve the confidentiality of trade secrets, consistent with the requirements of the Federal Rules of Criminal and Civil Procedure, the Federal Rules of Evidence, and all other applicable laws. An interlocutory appeal by the United States shall lie from a decision or order of a district court authorizing or directing the disclosure of any trade secret.

*Compare Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100, 130 S. Ct. 599, 604-609 (2009) (disclosure orders adverse to the attorney-client privilege do not qualify for immediate appeal under the collateral order doctrine).

Twenty years later, in 2016, Congress amended the Economic Espionage Act of 1996 by passing the Defend Trade Secrets Act, Pub. L. No. 114-153 (May 11, 2016). Among other provisions, DTSA redesignated the prior paragraph as subsection (a) and added a new subsection (b) providing additional protective-order rights to trade secret owners (and not merely the government):

> **(b) Rights of Trade Secret Owners.—**
>
> The court may not authorize or direct the disclosure of any information the owner asserts to be a trade secret unless the court allows the owner the opportunity to file a submission under seal that describes the interest of the owner in keeping the information confidential. No submission under seal made under this subsection may be used in a prosecution under this chapter for any purpose other than those set forth in this section, or otherwise required by law. The provision of information relating to a trade secret to the United States or the court in connection with a prosecution under this chapter shall not constitute a waiver of trade secret protection, and the disclosure of information relating to a trade secret in connection with a prosecution under this chapter shall not constitute a waiver of trade secret protection unless the trade secret owner expressly consents to such waiver.

DTSA § 3(a)(2)(B), *codified at* 18 U.S.C. § 1835(b).[5]

## ARGUMENT

This District is the epicenter of trade-secret litigation and many cases present genuine and serious problems of how to produce and designate large collections of documents while at the same time preparing for trial and not letting document discovery become the main event. This case does not present those problems.

Compared to the more than six million documents produced to the PRC state-owned entity in *United States v. Jinhua*, No. 3:18-cr-00465-MMC (N.D. Cal.), the vast majority of which were

---

[5] The House Committee Report on DTSA's expansion of the protective-order requirements suggests that trade-secret defendants are not necessarily entitled to access the trade-secrets-in-suit in conspiracy cases under the Economic Espionage Act. *See* H.R. Rep. No. 529, 114th Cong., 2d Sess. 14-15 (Apr. 26, 2016) ("The provision is also intended to ensure that in a prosecution for conspiracy related to the alleged theft of a trade secret, the actual trade secret itself is not subject to disclosure to the defense, because the actual secrecy of the information that is the object of the conspiracy is not relevant to the prosecution of a conspiracy charge."), *reprinted in* 3 U.S. Code Cong. & Admin. News 209 (2016). Although this case alleges substantive violations and no conspiracy, that Congress saw no need for the defendant to have access to the trade-secrets-in-suit bears on the weight to be given to Ding's access request, especially his request to access Confidential Material at home to reduce his commute.

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO MODIFY PROTECTIVE ORDER      10
3:24-cr-00141-VC

designated as confidential by the producing (Taiwanese) corporate defendant, and the more than half million documents produced to the individual defendant in *United States v. Wang*, No. 21-CR-6108-FPG (W.D.N.Y.) (to be tried in Rochester beginning on May 19, 2025), which also included voluminous designated documents, Ding by his own admission bases his motion on about 4,400 documents. *See* Dkt. 53, at 3, 4, 6, 8, 9, 12 (Ding's motion refers to the 4,400 documents 14 times).

As explained above, however, even 4,400 documents vastly overstates the population in this criminal proceeding. As the government's production letters make pellucidly clear, the government produced the same core documents twice: once in March 2024 immediately after obtaining them (to give defense counsel immediate access) and again with metadata and artifacts as part of a production that included the content of the cloud account where the core documents were found. As a result, the 4,400 documents are overstated by more than double.

According to Ding's counsel, the two thousand-ish documents present two issues, which Ding conflates but the government will separate – those purported issues are (I) overdesignation and (II) burdensome access under the protective order.

With respect to ostensible overdesignation, the government is aware of its obligations under the protective order. The government reviewed the designations last fall, long before Ding filed his motion. Ding identified one additional document in his motion. In response, the government re-reviewed the entire collection. (At a standard document review rate of 50 documents an hour, the entire collection can be reviewed for proper designations by a single associate unfamiliar with the documents in less than a week.) Both of the government's reviews resulted in de-designations. None of the de-designated documents affect preparation of this case for trial. The misdesignated documents were almost entirely system files or personal documents. If the government mistakenly designates documents, we will correct the designation. But misdesignation supports a motion to comply with the protective order, not good cause to modify it.

With respect to Ding's request to add another tier to the protective order in order to separate trade secrets (a new "Highly Confidential Material" category) from non-trade-secret business proprietary information ( "Confidential Material"), that request presupposes that Ding should be permitted to review Google's business proprietary information at home. The conduct that got Ding

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO MODIFY PROTECTIVE ORDER           11
3:24-cr-00141-VC

indicted makes it risible to think he should be allowed to review Google trade secrets with his electronic devices or ability to take notes, even in his defense counsel's offices, and should surely not be allowed to take Google proprietary information home.

**I.  Ostensible Overdesignation Provides No Good Cause to Modify the Protective Order Because the Government Has Reviewed the Productions – Twice – and Will Correct any Misdesignations**

If true, defense counsel's overdesignation accusations would support an order that the government review its designations and correct them if necessary. Contrary to those accusations, however, *supra* pp. 4-5, the government reviewed the confidentiality designation of its documents last fall and de-designated 278 documents (not the 44 claimed by the defendant, *see* Dkt. 53, at 1). At no time did the government "tr[y] to shift the burden to Mr. Ding" (*id*. at 6, 7) to designate documents. The government did its work and simply asked Ding to let it know if it thought the government made a mistake so that the government could correct it. Rather than identify any other mistakes, the defendant found a misdesignated resume (*see* Dkt. 53, at 2) and made it the basis for this motion. In response, the government has now re-reviewed the entire production and will de-designate 109 more documents. None of the de-designations are technical documents affecting preparation of this case for trial. About 60% of the de-designations are system files and 40% are personal documents that are relevant for attribution but not offense conduct.

No document production is perfect. Mistakes will be made. The government is entirely confident that it will make mistakes in the future. But it will correct them. And mistaken designations are inadvertent departures from a protective order, not good cause to modify it.

**II.  The Court Should Not Add Another Confidentiality Tier Because Ding Should Not Review Confidential Material at Home**

Although Ding's proposed order lists four changes to the protective order, all four changes are motivated by one consideration – namely, to allow Ding to review documents other than the trade-secrets-in-suit at home. To enable Ding to review those documents at home, his counsel proposes (1) to split the definition to Confidential Material into Highly Confidential Material (which includes the trade-secrets-in-suit as well as other trade secrets) and Confidential Material (which includes documents that are not trade secrets such as business proprietary information). After splitting Confidential Material into

two categories, Ding (2) requires the government to re-designate all documents produced to date as well as all future productions into Highly Confidential, Confidential, and Discovery Material (the latter constituting documents that are not Highly Confidential or Confidential). (As an extra task, Ding's proposed order requires the government to identify the trade-secrets-in-suit for its trial exhibit list by May 15: "The government shall identify the Highly Confidential materials that it intends to use at trial on or before May 15, 2025.") Lastly, Ding asks (3) to review Confidential Material at home and (4) to review Highly Confidential Material in defense counsel's offices without supervision and with all of his electronic devices and free to take pictures or make written notes to take out the door.

If Ding should *not* be allowed to review Google confidential information at home, then no good cause exists to add an additional tier to the protective order. For if Ding should not take Google confidential information home, then he needs to review that information in his counsel's law offices. If all confidential information should be reviewed in defense counsel's offices – the trade-secrets-in-suit, other trade secrets, and business proprietary information – then the Court need not distinguish among those different categories of information: Ding can review all of them after a short commute to the firm.

Ding's counsel complains, on Ding's behalf, that "Mr. Ding should have access without the need to drive to his counsel's office or be under constant supervision." Dkt. 53, at 11. The basis for avoiding a short commute is Ding's counsel's blithe assertion that "[t]he government has not alleged, nor produced any evidence, that Mr. Ding ever actually used or disclosed the alleged trade secrets." Dkt. 53, at 11. Contrary to Ding's assertion, the government asserts and expects the evidence at trial to prove that Ding intended to use Google trade secrets for his own benefit and that of his PRC-based companies and the PRC government -- and would have done so if the government had not intervened. *See supra* pp. 6-8. Ding announced at a PRC investor conference that his PRC startup company would "directly copy" Google's "technology" to develop a computer acceleration platform for artificial intelligence suitable to China's national conditions. *Supra* pp. 7-8. Ding offered in an encrypted WeChat message to show his PRC colleagues Google confidential information notwithstanding that the information was protected by a "confidentiality agreement" with Google. *Supra* p. 8. Despite knowing the confidentiality rules and promising to comply with them, Ding repeatedly violated them and lied about it. His offense conduct provides good cause to tighten restrictions on his access to confidential information, not relax them.

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO MODIFY PROTECTIVE ORDER    13
3:24-cr-00141-VC

1    Even if good cause existed to create a new confidentiality tier – which it does not – the Court
2    would need to add not one confidentiality tier but two, for a total of three confidentiality tiers. The
3    Confidential Material produced by the government includes three categories: (1) the trade-secrets-in-
4    suit, (2) other trade secrets (which the government will not prosecute at trial to streamline the
5    presentation of its case-in-chief), and (3) business proprietary information. The protective order should
6    not permit Ding to review any Confidential Material at home. But if it did, he certainly should not be
7    allowed to review trade secrets that are not in suit, because they remain trade secrets entitled to statutory
8    protection under Section 1835.

*****

Rather than engage in extensive satellite proceedings to implement a reticulated scheme of confidentiality designations, Ding should review all Confidential Material in his counsel's offices, without supervision by an attorney or even paralegal, but also without his electronic devices or other means to copy and exfiltrate Google's trade secrets and business proprietary information.

### CONCLUSION

For the foregoing reasons, Defendant Linwei Ding's motion to modify the protective order (Dkt. 13) should be denied.

DATED: March 5, 2025                                  Respectfully submitted,

                                                      PATRICK D. ROBBINS
                                                      Acting United States Attorney


                                                      /s/_____
                                                      CASEY BOOME
                                                      MOLLY K. PRIEDEMAN
                                                      Assistant United States Attorneys

                                                      STEPHEN MARZEN
                                                      YIFEI ZHENG
                                                      Trial Attorneys, National Security Division