GRANT P. FONDO (SBN 181530)
*GFondo@goodwinlaw.com*
FARZAD FEYZI (SBN 343538)
*FFeyzi@goodwinlaw.com*
NIRAV BHARDWAJ (SBN 350829)
*NBhardwaj@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 Marshall Street
Redwood City, CA 94063
Tel: +1 650 752 3100
Fax: +1 650 853 1038

DARRYL M. WOO (SBN 100513)
*DWoo@goodwinlaw.com*
JESSICA HUANG FUZELLIER (SBN 315208)
*JHFuzellier@goodwinlaw.com*
DAVID RAPP-KIRSHNER (SBN 344494)
*DRappKirshner@goodwinlaw.com*
**GOODWIN PROCTER LLP**
525 Market Street, Floor 32
San Francisco, CA 94105
Tel.: +1 415 733 6000
Fax: +1 415 677 9041

Attorneys for Defendant
LINWEI DING

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:24-CR-00141-VC |
| Plaintiff, | **DEFENDANT LINWEI DING'S NOTICE OF MOTION AND MOTION TO SUPPRESS STATEMENTS AND REQUEST FOR EVIDENTIARY HEARING** |
| v. | |
| LINWEI DING, | |
| Defendant. | Date:      April 30, 2025 |
| | Time:      1:00 p.m. |
| | Courtroom: 4 (17th Floor) |
| | Judge:     Hon. Vince Chhabria |
| | 450 Golden Gate Avenue |
| | San Francisco, CA 94102 |

<u>**NOTICE OF MOTION & MOTION TO SUPPRESS**</u>

**TO THE COURT AND ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on April 30, 2025, at 1:00 p.m. or as soon thereafter as the matter may be heard at a time set by The Honorable Vince Chhabria in Courtroom 4 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Defendant Linwei Ding ("Mr. Ding"), will move this Court for an order to suppress statements under the Fifth Amendment to the United States Constitution and, as required, an evidentiary hearing relating to the illegal interrogation of Mr. Ding.

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the pleadings and papers filed in this matter, and on other such arguments or evidence as the Court shall deem proper.

Dated: April 7, 2025

Respectfully submitted,

GOODWIN PROCTER LLP

By: */s/ Grant P. Fondo*
GRANT P. FONDO (SBN 181530)
*GFondo@goodwinlaw.com*
DARRYL M. WOO (SBN 100513)
*DWoo@goodwinlaw.com*
JESSICA HUANG FUZELLIER (SBN 315208)
*JHFuzellier@goodwinlaw.com*
FARZAD FEYZI (SBN 343538)
*FFeyzi@goodwinlaw.com*
DAVID RAPP-KIRSHNER (SBN 344494)
*DRappKirshner@goodwinlaw.com*
NIRAV BHARDWAJ (SBN 350829)
*NBhardwaj@goodwinlaw.com*

Attorneys for Defendant
LINWEI DING

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND .................................................................................................. 2

      A.   At Least 18 Law Enforcement Officers Execute a Search Warrant at Mr. Ding's
           Home on January 6, 2024 and Remove him from his Home at Gunpoint ............... 2

      B.   FBI Agents Transferred Mr. Ding from the Police Car to an FBI Vehicle ............. 3

      C.   The FBI Believed Mr. Ding Had Committed A Crime Prior To Interrogating Him 3

      D.   Mr. Ding Was Not A Safety Risk & And The Townhome Was Quickly Secured
           For Officer Safety ............................................................................................. 4

      E.   FBI Agents Interrogated Mr. Ding in the Back of an FBI Vehicle for Over Three
           Hours ................................................................................................................ 5

      F.   Mr. Ding Referenced An Attorney But Law Enforcement Did Not Follow Up And
           Changed The Subject ......................................................................................... 6

III.  LEGAL STANDARD .......................................................................................... 7

IV.   ARGUMENT ....................................................................................................... 9

      A.   Mr. Ding Was Subjected to Custodial Interrogation As No Reasonable Person in
           Mr. Ding's Position Would Have Believed He Was Free to Leave ........................ 9

           1.   The *Kim* factors support finding that Mr. Ding was in custody for purposes
                of *Miranda*. .............................................................................................. 9

           2.   The *Craighead* factors also support finding that Mr. Ding was in custody
                for purposes of *Miranda*. ........................................................................ 17

      B.   Because Mr. Ding Was In Custody, *Miranda* Warnings Were Necessary Before
           Officers Initiated Questioning, But It Is Undisputed That Mr. Ding Never
           Received *Miranda* Warnings. ........................................................................... 20

      C.   The Court Should Also Suppress Mr. Ding's Statements Because He Was
           Interrogated After Invoking His Right to Counsel .............................................. 22

      D.   The Court Should Exclude All Evidence Stemming From The Government's
           Illegal Interrogation Of Mr. Ding As The Fruits Of The Poisonous Tree ............ 24

      E.   The Court Should Conduct An Evidentiary Hearing If The Government Contests
           The Material Facts In This Motion. .................................................................... 25

V.    CONCLUSION .................................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5

*Berkemer v. McCarty*,
   468 U.S. 420 (1984) ................................................................................................. 20

*Miranda v. Arizona*,
   384 U.S. 436 (1966) .......................................................................................... *passim*

*N.Y. v. Quarles*,
   467 U.S. 649 (1984) ................................................................................................. 16

*Rhode Island v. Innis*,
   446 U.S. 291 (1980) ................................................................................... 4, 21, 22

*Robtoy v. Kincheloe*,
   871 F.2d 1478 (9th Cir. 1989) ................................................................................. 22

*U.S. v. Bassignani*,
   575 F.3d 879 (2009) ................................................................................. 8, 11, 12, 15

*U.S. v. Bland*,
   908 F.2d 471 (9th Cir. 1990) ................................................................................... 20

*U.S. v. Blanford*,
   467 F.App'x 624 (9th Cir. 2012) ...................................................................... 17, 18

*U.S. v. Brobst*,
   558 F.3d 982 (9th Cir. 2009) ................................................................................... 17

*U.S. v. Craighead*,
   539 F.3d 1073 (9th Cir. 2008) ........................................................................ *passim*

*U.S. v. Daw*,
   No. CR-11-8035-PHX-GMS, 2011 WL 5520150 (D. Ariz. Nov. 14, 2011) ......................... 14

*U.S. v. Doe*,
   670 F.3d 1335 (11th Cir. 2012) .............................................................................. 24

*U.S. v. Ehrman*,
   No. 21-CR-00204-VC-1, 2022 WL 390716 (N.D. Cal. Feb. 9, 2022) ................................. 16

*U.S. v. Fouche*,
   833 F.2d 1284 (9th Cir. 1987) .......................................................................... 22, 23

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iii

*U.S. v. Fox*,
   216 F.Supp.3d 1225 (2016)...................................................................................... 13

*U.S. v. Griffin*,
   7 F.3d 1512 (10th Cir. 1993).................................................................................... 16

*U.S. v. Hammond*,
   263 F.Supp.3d 826 (N.D. Cal. 2016), *aff'd*, 740 F. App'x 573 (9th Cir. 2018) .................... 20

*U.S. v. Harrison*,
   34 F.3d 886 (9th Cir. 1994)........................................................................................ 8

*U.S. v. Heldt*,
   745 F.2d 1275 (9th Cir. 1984).................................................................................... 9

*U.S. v. Heusner*,
   No. 3:18-CR-02658-BTM, 2019 WL 5535767 (S.D. Cal. Oct. 24, 2019) ...................... 8, 18

*U.S. v. Hoang*,
   486 F.3d 1156 (9th Cir. 2007).................................................................................... 9

*U.S. v. Howell*,
   231 F.3d 615 (9th Cir. 2000).................................................................................. 9, 25

*U.S. v. Juv. Male*,
   133 F.App'x 422 (9th Cir. 2005) .............................................................................. 20

*U.S. v. Kim*,
   292 F.3d 969 (9th Cir. 2002).............................................................................. *passim*

*U.S. v. Kirschner*,
   823 F.Supp.2d 665 (E.D. Mich. 2010) ...................................................................... 24

*U.S. v. LaPierre*,
   998 F.2d 1460 (9th Cir. 1993).................................................................................. 22

*U.S. v. Lee*,
   699 F.2d 466 (9th Cir. 1982)............................................................................... *passim*

*U.S. v. Norris*,
   428 F.3d. 907 (9th Cir. 2005).................................................................................... 13

*U.S. v. Patane*
   542 U.S. 630 (2004)................................................................................................ 24

*U.S. v. Rodriguez*,
   518 F.3d 1072 (9th Cir. 2008)............................................................................. 22, 23

*U.S. v. San Juan-Cruz*,
   314 F.3d 384 (9th Cir. 2003).................................................................................... 20

iv

*U.S. v. Scharf,*
  608 F.2d 323 (9th Cir. 1978)................................................................................. 14

*U.S. v. Walczak,*
  783 F.2d 852 (9th Cir. 1986)................................................................................. 25

*Wong Sun v. U.S.,*
  371 U.S. 471 (1963)............................................................................................. 24

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.    INTRODUCTION**

3      In the early morning on January 6, 2024, law enforcement officers used a ram to break
4  through the front door of Mr. Ding's townhome, handcuffed him at gunpoint, and detained him in
5  the back of a marked police vehicle before transferring him to an unmarked FBI vehicle where he
6  was interrogated by FBI agents **for over three hours**. At all times, Mr. Ding was isolated from his
7  wife and child, who were permitted to return to the townhome for the duration of the search even
8  though Mr. Ding was not. *See generally* Declaration of Grant Fondo ("Fondo Decl."), Ex. A (Audio
9  Recording ("AR")).  There can be no dispute that the officers isolated Mr. Ding from his family for
10 the purpose of asking him questions relating to the allege crime, in an effort to seek confessions,
11 and that at that time the FBI believed Mr. Ding had committed the crime he was later charged with.
12 *See id.* Ex. D.

13     Despite the fact Mr. Ding did not pose a safety risk and his residence had already been
14 secured, the FBI kept Mr. Ding in the back of a locked car for over three hours, surrounded by
15 agents, for the sole reason of interrogating him in isolation. *Id.* Ex. B at 2. Not once during those
16 three hours did the agents advise Mr. Ding of his *Miranda* rights. *See generally* AR. In fact, the
17 agents never notified Mr. Ding that he was free to leave, go anywhere else, or terminate the
18 questioning.  *Id*. Rather, the agents' interrogation of Mr. Ding became increasingly confrontational,
19 and they asked Mr. Ding pointed questions regarding the government's investigation of him for
20 alleged trade secret misappropriation. *Id.* at 1:30:00–1:53:00. On several occasions, they questioned
21 Mr. Ding's truthfulness, and confronted him with allegedly incriminating evidence against him in
22 the government's possession. *Id*. When Mr. Ding referenced counsel, he was ignored. *Id*. at 8:00–
23 9:30. During the interrogation, the FBI obtained passwords to Mr. Ding's devices, permitting them
24 access to information they otherwise would not have obtained. *See* Fondo Decl. Ex. B at 4–5.

25     The FBI can question someone without a *Miranda* warning, but in this case the
26 "questioning" went far beyond what is permitted because it was a custodial interrogation in "a
27 setting from which a reasonable person would believe that he or she was not free to leave." *U.S. v.*
28 *Kim*, 292 F.3d 969, 973–74 (9th Cir. 2002).  As such, Mr. Ding was entitled to a *Miranda* warning,

1

1   which he did not receive.  Because Mr. Ding was not advised of his *Miranda* rights before or during

2   the three hours FBI agents interrogated him while he was in custody; because the government failed

3   to cease questioning and seek clarification from Mr. Ding after his reference to a lawyer; and

4   because the information on Mr. Ding's devices was obtained in violation of *Miranda* and ignoring

5   Mr. Ding's reference to counsel, all statements and information obtained during the interrogation

6   must be excluded, and the evidence obtained as a result of the passwords excluded.  To the extent

7   the government disputes the factual record set forth in this motion, Mr. Ding respectfully requests

8   the Court order an evidentiary hearing to resolve those disputes.

9   **II.     BACKGROUND**

10          **A.     At Least 18 Law Enforcement Officers Execute A Search Warrant At Mr.
11                   Ding's Townhome And Remove Him From His Home At Gunpoint.**

12          On Saturday, January 6, 2024, at approximately 6:00 a.m. PST, the FBI executed a search

13  warrant at Mr. Ding's townhome.  Fondo Decl. Ex. B at 2.  At least eighteen law enforcement

14  personnel from three different agencies (FBI agents, Santa Clara County Sheriff's Department

15  officers, and Fremont Police Department officers) were present to conduct the search and

16  interrogation.  *Id.* at 1–2.  The officers staged a marked Fremont Police Department vehicle outside

17  Mr. Ding's residence with its police lights on, and several other law enforcement vehicles were

18  also parked outside the townhome*.  Id.*  Officers then breached the front door with a ram after

19  knocking and announcing their presence.  *Id.*  Mr. Ding, who had been sleeping, was partially

20  dressed and walking down the stairs to respond to the knocking when the ram busted through his

21  front door.  *Id.* at 2.  Mr. Ding's wife and five-year-old son were also in the home at this time.  *Id.*

22          Upon information and belief, the agents approached Mr. Ding at gun-point, with their laser-

23  pointers shining on him.[1]  Mr. Ding was detained, placed in handcuffs, and escorted outside the

24  home, where it was cold and dark. *See* AR at 3:40 – 6:15. Upon information and belief, the agents

25  pushed Mr. Ding's face and body against a police vehicle before placing him in the back of a

26  Fremont Police car.  Mr. Ding informed the agents he needed his eyeglasses, he was not permitted

27

28  [1] If permitted to question FBI agents Samuel Chen and Gregory Toole, the defense believes the
    agents would confirm this event, and each event identified as "upon information and belief."

1  leave the car – instead, a different agent went into the home to retrieve them.  *Id*.  Mr. Ding remained

2  handcuffed in the back of the police car, with agents watching him.  *Id*.

3  **B.    FBI Agents Transferred Mr. Ding From The Police Car To An FBI Vehicle.**

4  While Mr. Ding was handcuffed in the back of the police car, FBI Special Agent ("SA")

5  Gregory Toole and SA Samuel Chen approached the vehicle and initiated the interrogation. They

6  told Mr. Ding that his "house is still being processed right now, so we're not going back in," and

7  would not permit Mr. Ding to reenter his home despite the fact that his wife and child were allowed

8  to return and remain there during the search. AR at 4:48–5:05, 5:20–5:51.[2]  SA Toole told Mr. Ding

9  that this process "is just standard procedure," that "this is not anything," and that Mr. Ding was

10 being transferred "for safety." *Id*. at 6:07–6:15.

11 Mr. Ding's handcuffs were later removed and several agents transferred him to an unmarked

12 FBI vehicle parked on a street adjoining the common ground in front of Mr. Ding's townhome.

13 Fondo Decl. Ex. B at 2. SA Toole and SA Chen escorted Mr. Ding to the FBI vehicle, and upon

14 information and belief, opened the door for him and closed it after he entered. *See* AR at 5:25–8:00.

15 SA Toole and SA Chen joined Mr. Ding in the vehicle – upon information and belief, SA Toole sat

16 in the rear seat adjacent to Mr. Ding and SA Chen sat in the front. Fondo Decl. Ex. B at 2.   The car

17 doors were locked for portions or all of the duration of the interrogation.  *See* AR at 3:09:20–

18 3:09:30 (agent stating he needs to unlock the sedan prior to letting Mr. Ding out of the car at the

19 end of the interrogation).

20 **C.    The FBI Interrogated Mr. Ding Believing He Had Committed A Crime.**

21 When SA Toole and SA Chen began their questioning of Mr. Ding, they already knew he

22 was the target of a criminal trade secret investigation. Indeed, in his affidavit in support of obtaining

23 the search warrant executed at Mr. Ding's townhome, SA Toole represented to the Court that he

24

---

25 [2] The government produced two different audio recordings of the FBI's interrogation of Mr. Ding.
   *See* Fondo Decl. ¶ 3. According to the government, one recording made by SA Chen is a truncated
26 version due to the recording device inadvertently being turned off or otherwise malfunctioning
   during the interrogation.  *Id*. The government has represented that the second version, recorded by
27 SA Toole, is a complete recording; however, the government did not produce a transcript. *Id*.  Some
   portions of the audio recordings are difficult to hear and thus transcribe. Those portions are marked
28 as "unintelligible" in the portions transcribed for this brief.  *Id*.  Mr. Ding reserves all rights to seek
   exclusion of these tapes as evidence.

3

1  believed Mr. Ding had committed the crime of Theft of Trade Secrets.  *See* Fondo Decl. Ex. D

2  ¶¶ 2–3 ████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████

4  ███████████████████████████████████  Consistent with this belief,

5  SA Toole and SA Chen focused their three-plus hour interrogation of Mr. Ding on his alleged

6  criminal acts, and asked questions directly related to their belief that Mr. Ding engaged in criminal

7  trade secret misappropriation. They also confronted Mr. Ding with a list of file names he allegedly

8  uploaded to his personal Google Drive, and with a copy of a Chinese patent he allegedly filed.

9  Fondo Decl. Ex. C at 4–6.  This was not a fact-finding inquiry; this was clearly an interrogation in

10 which FBI agents asked Mr. Ding direct questions that they should have known were "reasonably

11 likely to evoke an incriminating response" "in light of both the context of the questioning and the

12 content of the question." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).  There can be no doubt

13 that this was the agents' intention when isolating and questioning Mr. Ding, and that the

14 government intends to use these statements against him at trial.

**D.      There Was No Purpose In Isolating Mr. Ding Other Than To Interrogate Him – He Was Not A Safety Risk And His Townhome Was Quickly Secured.**

17      At no time did Mr. Ding pose a safety risk for the 18 law enforcement officers present at

18 his townhome on January 6, especially after the home was swept for weapons, persons, and all

19 other potential risks to officer safety. The officers knew, or should have reasonably known, that

20 Mr. Ding has no criminal history and that his townhome was being searched in relation to an

21 investigation into a non-violent offense.  *See* Fondo Decl. Ex. D ¶ 2. Law enforcement found no

22 weapons during the search of Mr. Ding's townhome – only his wife and five-year-old son. Fondo

23 Decl. Ex. B. In fact, **the FBI cleared and secured Mr. Ding's townhome in fifteen minutes**.  *Id.*

24 at 2 (emphasis added). After detaining Mr. Ding, FBI agents told him that they "know [he is] not a

25 dangerous person." AR at 6:07–6:15. But Mr. Ding was not allowed to reunite with his family.  The

26 only reason the agents did not permit this after the completion of the safety sweep and after

27 detaining him was so that they could interrogate him in isolation.

28

4

**E.    Mr. Ding Was Interrogated In The Back Of An FBI Car For Over 3 Hours.**

SA Toole and SA Chen proceeded to interrogate Mr. Ding in the back of the FBI vehicle for over three hours, from 6:16 a.m. to 9:31 a.m. *See* AR. At no point did these agents or any other law enforcement officers provide Mr. Ding with a *Miranda* advisement. Though SA Chen and SA Toole told Mr. Ding that "talking to [them]" is "completely voluntary" and that Mr. Ding "is free," Mr. Ding was never told he was free *to leave*, free to return home, or free to go anywhere else. AR at 8:00–8:25. In fact, every time Mr. Ding asked to go somewhere else – his residence, an FBI office, or any other law enforcement office – the agents refused. *See* AR at 8:25–9:28.

Mr. Ding remained in the backseat with the rear doors locked for the majority of the interrogation. *See* AR at 3:09:20–3:09:30. The only exception was an approximately eight-minute bathroom break where agents escorted Mr. Ding to the bathroom inside his residence, and back to the same car. *See* Fondo Decl. Ex. C at 5; AR at 2:08:00–2:16:00. During the interrogation, the scope of the agents' questioning of Mr. Ding included detailed questions about, for example, Mr. Ding's alleged plans to launch a start-up company, his travels to China, his notetaking process as a Google employee, his notes that he allegedly uploaded to his personal Google account, a China patent allegedly filed with Mr. Ding's name, and login passwords for various devices. *See* Fondo Decl. Ex. C. In several instances during the interrogation, the agents confronted Mr. Ding with evidence indicating guilt and challenged the veracity of Mr. Ding's statements. *Id*. at 4-6; AR at 1:30:00–1:53:00. For example, the agents showed Mr. Ding a log of file names that he allegedly uploaded to his Google Drive account and prefaced that the information Mr. Ding shared during the interrogation "do[esn't] exactly line up with some of the information that [the FBI] has":

| SA Toole | So some of the things that you've told us don't exactly line up with some of the information that we have. So, for example, you're saying that you just took notes and that you save them to the drive but it would be like a different generalized name and that those notes wouldn't be like an exact Google document. |
|----------|---|
| Mr. Ding | OK, sorry, sorry about that. It's not exactly Google. Because I didn't copy or drag you know you have. |
| SA Toole | So some of the information that we have appears as if you saved directly documents. PDF versions of actual Google documents onto the Google Drive, not as a typed note or not as a notes with screenshots as a direct file, so I can [give] a couple of examples. So you you … you might be able to clarify some of this, so a few of these records like for example this would be April 17th, 2023 and this would be your Gmail you will with your Google Drive. So for example like here this file name PSE has recorded instruction set architecture. These are |

| | one through seven. Couple quarter there one through seven. So those are like exact file names. Exact PDF file same with this like H100 competitive analysis PDF. |
| --- | --- |

AR at 1:33:00–1:36:00. SA Toole then warned Mr. Ding that it is a federal crime to lie to FBI agents: "So, you know, We're federal agents. We just want to remind you that it is actually a federal crime to lie to federal agents. So I I want to make sure you understand that." AR at 1:44:56–1:45:10. In another instance, SA Chen asked: "When you're taking these screenshots, with Google Confidential, doesn't that violate Google policy?" AR at 2:28:13–2:28:22. SA Chen's question sought an admission to eliminate or shortcut arguments directly related to the elements of the government's burden of proof regarding theft of trade secrets, notably whether the alleged trade secret information was not readily ascertainable through proper means.

During the interrogation, the agents also asked Mr. Ding to provide the passwords for electronic devices seized from Mr. Ding's townhome. AR at 1:56:00–2:07:35. Mr. Ding said he was concerned about providing his passwords as he did not understand whether the agents had a right to demand them. *Id*. Mr. Ding further clarified that he was "not volunteering here to provide [the FBI] all these kind of [ ] personal information" but he could do so "if [the FBI] have the right" to obtain such information from him. *Id*. This, after his reference to a lawyer, should have further triggered the agents to clarify if Mr. Ding was asking to talk to a lawyer, but they did not. Instead, the agents said that they had a right to seize the devices pursuant to a search warrant and that it would be convenient if Mr. Ding provided the passwords because it would allow the government to return the devices to Mr. Ding sooner. *Id*. The FBI took advantage of Mr. Ding's confusion about his rights and never told him the truth – that he could decline to give his passwords to them.

### F.    Mr. Ding Referenced A Lawyer But The FBI Agents Did Not Follow Up And Changed The Subject.

Approximately 25 minutes after being detained, and 9 minutes after SA Toole and SA Chen commenced their interrogation, Mr. Ding referenced a lawyer, telling the agents he wanted to leave the backseat of the police vehicle.  An abbreviated transcript of the interaction is below:

| SA Chen | We want to emphasize this talking to us. It's completely up to you. It's completely voluntary. We just want to ask you some questions kind of get your side of the story of what happened. |
| --- | --- |

| SA Toole | You, of course you're free. |
| Mr. Ding | Can they stay here? My wife and my son stay here. Stay at home. Can you just ah, just if you don't, you want to watch her, that's okay. You can get someone watch her at home and then I can go with you to the police office. That's okay – let's talk over there. And then if necessary, if you have any questions, I watch the movies – if I am uncomfortable **I can get a lawyer** – at anytime. |
| SA Toole | Of course. So just so you know, your wife and your son, they are inside. They're not out in the cold. They're just sitting inside. |
| Mr. Ding | Yeah, we can go to the office or anywhere that we can sit together. |
| SA Chen | Yeah, it's our office is not too close. It's a bit of a drive, so that's . . . . We don't want to inconvenience you and can. |
| Mr. Ding | We can go to any closed office. |
| SA Toole | If this is all right for you, we just have a talk here. |

AR at 8:00–9:30 (emphasis added).

Although Mr. Ding did not expressly state, "I want a lawyer," he was not required to in order to invoke his rights. The particular context here is important. Mr. Ding is not a U.S. citizen, and English is not his native language. The FBI did not seek clarity on what Mr. Ding meant by "I watch the movies" in reference to "I can get a lawyer." Instead, they changed the subject and refused Mr. Ding's request to be taken to the FBI office, where he would have felt more comfortable. AR at 8:00–9:30. Instead, the agents offered excuses for why they needed to remain in the FBI car where they proceeded with their interrogation. *Id*. Indeed, the agents could have sought clarity on Mr. Ding's reference to counsel, but the only clarifying questions they asked during the three-hour interrogation only pertained to information related to the government's allegations. *See, e.g.*, AR at 22:00–22:50 (regarding Mr. Ding's notetaking: "What do you mean by take notes? Like writing notes or like on a computer?"); *see also id.* at 22:00–22:50, 41:29–42:00; 1:06:30–1:07:15; 2:35:29–2:36:00 (asking Mr. Ding, "What do you mean?").

## III.    <u>LEGAL STANDARD</u>

It is well-established law that in the context of a "custodial interrogation," certain procedural safeguards are necessary to protect a defendant's Fifth and Fourteenth Amendment privilege against compulsory self-incrimination. *Miranda v. Arizona*. 384 U.S. 436, 439 (1966). Specifically, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards

1    effective to secure the privilege against self-incrimination." *Id*. at 444. Prior to a custodial

2    interrogation, a suspect must be informed of his rights as delineated in *Miranda*. *Id.*; *Kim*, 292 F.3d

3    at 973 (finding the obligation to give a suspect *Miranda* warnings prior to interrogation applies

4    only where ethe individual is "in custody"). To determine whether an individual was "in custody"

5    the court must "examin[e] all of the circumstances surrounding the interrogation" to "decide

6    whether there [was] a formal arrest or restraint on freedom of movement of the degree associated

7    with a formal arrest." *Id.* The court considers the "objective circumstances of the interrogation" to

8    "determine whether the officers established a setting from which a reasonable person would believe

9    that he or she was not free to leave." *Id.* at 973–74. "The court must examine the totality of the

10   circumstances surrounding the interrogation." *U.S. v. Bassignani*, 575 F.3d 879, 883 (2009)

11   (internal quotes omitted). In doing so, the Ninth Circuit considers (non-exhaustive) factors

12   enumerated in *Kim*, which include: "(1) the language used to summon the individual; (2) the extent

13   to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the

14   interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the

15   individual." *Kim*, 292 F.3d at 974.

16        In addition to the *Kim* factors, other factors that "may also be pertinent to, and even

17   dispositive of, the ultimate determination whether a reasonable person would have believed he

18   could freely walk away from the interrogators," include "(1) the number of law enforcement

19   personnel and whether they were armed; (2) whether the suspect was at any point restrained, either

20   by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether

21   the suspect was informed that he was free to leave or terminate the interview, and the context in

22   which any such statements were made." *U.S. v. Craighead*, 539 F.3d 1073, 1084 (9th Cir. 2008).

23   The *Craighead* factors are typically applied to scenarios in which a suspect is interrogated inside

24   or around his home.[3]

25   _____

26   [3] While *Craighead* pertained to a situation in which a suspect was interrogated inside of his home,
     courts have applied the *Craighead* factors to situations where a suspect was interrogated outside of
     his home. *See generally, U.S. v. Heusner*, No. 3:18-CR-02658-BTM, 2019 WL 5535767 (S.D. Cal.

27   Oct. 24, 2019) (suspect apprehended in car parked in parking lot of the apartment complex in which
     he lived and later interrogated by a fence towards the back of the parking lot). Here, Mr. Ding was

28   interrogated "in an FBI vehicle parked on Pandera Terrace adjoining the common ground in front
     of the building where the townhouse was located." Fondo Decl. Ex. B at 2.

It is the government's burden to demonstrate that *Miranda* warnings were given prior to a custodial interrogation, and that a defendant's statement was voluntary.  *U.S. v. Harrison*, 34 F.3d 886, 890 (9th Cir. 1994).  The government's burden to make this showing is "great" and this Court should "indulge every reasonable presumption against waiver of fundamental constitutional rights." *U.S. v. Heldt*, 745 F.2d 1275, 1277 (9th Cir. 1984) (internal citations omitted).

Further, an evidentiary hearing for a motion to suppress is necessary "when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist."  *U.S. v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000). A factual dispute is "material" if resolution of the dispute would change the outcome of the suppression analysis.  *See U.S. v. Hoang*, 486 F.3d 1156, 1163 (9th Cir. 2007).

## IV.   <u>ARGUMENT</u>

Because the government cannot meet its burden to establish that *Miranda* warnings were properly administered, or that Mr. Ding's statements to law enforcement were made voluntarily while under custodial interrogation, the Court should suppress all evidence of statements allegedly made by Mr. Ding to law enforcement agents on January 6, 2024, and exclude all evidence seized as a result of the FBI obtaining passwords from Mr. Ding during the interrogation.

### A.    **Mr. Ding Was Subjected to Custodial Interrogation As No Reasonable Person in Mr. Ding's Position Would Have Believed He Was Free to Terminate the Questioning and Leave.**

The questioning of Mr. Ding for approximately three hours and fifteen minutes in the FBI vehicle was a custodial interrogation requiring advisement of his *Miranda* rights prior to being questioned. Because Mr. Ding was interrogated outside of his home, the *Kim* factors are applicable as well.  The FBI not only pulled Mr. Ding from his home at gunpoint and placed him into a police car, but they then transferred him to a separate FBI vehicle that was parked nearby. Each of the factors enumerated in *Kim* as well as *Craighead* demonstrate that Mr. Ding was in custody for *Miranda* purposes at the time of his questioning.

#### 1.    **The *Kim* factors support finding that Mr. Ding was in custody for purposes of *Miranda*.**

##### a.    **First *Kim* factor: Language used to summon Mr. Ding.**

The language used by law enforcement to have a suspect come to speak with them is relevant to show the voluntariness of the suspect's interaction with them. "If the police ask – not order – someone to speak to them and that person comes to the police station, voluntarily, precisely to do so, the individual is likely to expect that he can end the encounter." *Kim*, 292 F.3d at 974-75. However, even if the individual voluntarily "comes to the police station or another location," that is not the end of the inquiry. *Id.* at 975. The circumstances can "become such that a reasonable person would not feel free to leave, [thus] the interrogation can become custodial." *Id.*

Here, there is no dispute that Mr. Ding did not drive to or walk into the police station, far from it. Rather, law enforcement broke through his front door with guns drawn and extracted him from his house.. The FBI agents would not let him return, would not take him to any FBI office, and effectively instructed Mr. Ding to sit in an isolated unmarked FBI car where FBI agents conducted their more than three-hour interrogation. SA Toole did so by informing Mr. Ding that he was being uncuffed so the agents could get Mr. Ding "out of here" to "have a little chat." AR at 3:30–4:10. SA Toole attempted to disguise this instruction as a voluntary act by concluding with the rhetorical question, "is that okay?" *Id.* However, SA Toole's phrasing indicated that Mr. Ding would be uncuffed as a condition upon his agreement to speak with the agents. The rhetorical question, "is that okay" did not convey a true choice for Mr. Ding. Nor was he ever advised that he could terminate the interrogation at any time. Indeed, Mr. Ding had just been startled awake by eighteen agents ramming through his front door with guns drawn. Fondo Decl. Ex. B at 1–2. Mr. Ding was still handcuffed in the back of a police car at this time and he was concerned about the safety of his family. *See* AR at 3:30–5:00. Hence, Mr. Ding replied by first asking about his son's whereabouts and whether Mr. Ding could return to his townhome. *Id.* Despite SA Toole acknowledging that Mr. Ding's wife and son were permitted to return to their home while the agents completed their search, the agents did not permit Mr. Ding to return to his home on grounds that "the house is still being processed right now, so we're not going back in the house." *Id.* at 4:52–5:10; 5:25–6:00. The search of the house for officer safety concluded after 15 minutes.

Instead of letting him back into the house, SA Chen said "we have a car over there, so we can just move you over there so you're not sitting in a police car." *Id.* at 5:30–5:40. Because he was

10

1    still handcuffed in the back of a police vehicle and the agents told him that he could not return

2    home, nor even be transported to an FBI office as later discussed, any objective person would

3    understand, as Mr. Ding did, that his only options were to remain in the police car or follow the

4    FBI agents' instruction to be "move[d]" to the FBI car. *Id.* Indeed the agents did not provide Mr.

5    Ding with any optional instructions outside the narrow parameters they set to facilitate interrogating

6    him in isolation. *See generally* AR. In other words, the agents summoned Mr. Ding with an

7    "instruction" that made it "plain that [Mr. Ding] did not voluntarily agree and accompany the

8    officers to the [FBI car]." *Bassignani*, 575 F.3d at 884 (finding officers' instruction to suspect to

9    "remove himself from the computer" and go to the conference room weighed in favor of finding

10   suspect was in custody).

11         The government will likely argue that the Mr. Ding voluntarily joined the FBI agents in the

12   back of their vehicle for the interrogation, and will likely point to the agents' statements to Mr. Ding

13   in which they said he was "not under arrest" and "not in custody." AR at 3:30–5:00. The

14   government will also point to the agents' statements to Mr. Ding after summoning him to their

15   vehicle, where they told him: "you, of course, you're free" and that "this talking to us – It's

16   completely up to you.  It's completely voluntary." *Id.* at 8:00–8:30.  But "[t]he mere recitation of

17   the statement that the suspect is free to leave or terminate the interview [ ] does not render an

18   interrogation non-custodial *per se.*" *Craighead*, 539 U.S. at 1087.  Rather, the Court "must consider

19   the delivery of these statements within the context of the scene as a whole." [4] *Id.*

20         *United States v. Lee* is instructive. There, the court held an interrogation was custodial even

21   though "when [the suspect] entered the [FBI] vehicle with the two agents[,] he was told he was free

22   to leave the car or terminate the interview at any time." *U.S. v. Lee,* 699 F.2d 466, 467 (9th Cir.

23   1982). In holding that "a reasonable person could conclude that Lee reasonably might feel he was

24   not free to decline the agent's request that he be interviewed," the court found "particularly relevant

25   was the fact that 'police investigators were in and around [the suspect's] house.'" *Craighead*,

26   539 U.S. at 1088 (citing *Lee*, 699 F.2d at 468). So too, these facts are relevant here. Mr. Ding's

27

28   _____

[4] To the extent the FBI's questioning of Mr. Ding was initially voluntary, it clearly no long was once Mr. Ding mentioned a lawyer, requested to leave the back of the FBI car and asked to go to the FBI office, or any other office.  *See* AR at 8:00–9:30.

1   home, inside and out, was surrounded by at least 18 law enforcement officers from three different

2   law enforcement agencies. *See* Fondo Decl. Ex. B at 1–2. Mr. Ding was escorted by SA Toole and

3   SA Chen from the police car to the FBI vehicle, where both joining him inside the locked car.

4         In actuality, Mr. Ding's situation is a *greater* indication of custody than in *Lee*. Unlike in

5   *Lee*, the FBI agents here never specifically told Mr. Ding that he was "free to leave the car" or that

6   he was "free to terminate the interview at anytime." *See Lee*, 699 F.2d at 468. Instead, SA Toole

7   and SA Chen's statements were equivocal, vague, and contradictory. In one instance they told Mr.

8   Ding he was "free" and that talking to them was "completely voluntary," but in the next moment

9   they rejected his request to return to his home (even though his wife and child were already

10  permitted to do so), and rejected his request to go to the FBI office or *any* office. AR at 8:30–9:30.

11  Where could Mr. Ding have gone? Without a cell phone in hand, isolated from his family, and

12  forbidden to return home, the FBI agents concocted an environment to ensure Mr. Ding remained

13  isolated with them, in their locked car, to be interrogated for over three hours. Only after over two

14  hours of interrogation in the back of the FBI vehicle did the agents finally let Mr. Ding exit the car

15  for a bathroom break. *See* Fondo Decl. Ex. C at 5. Even then, the FBI agents did not allow Mr.

16  Ding to be unattended – they escorted him inside his home to the bathroom, and then back to the

17  FBI vehicle. *See* AR at 2:08:00–2:16:00. Based on the entirety of the circumstances, a reasonable

18  person in Mr. Ding's situation would have believed that he was *not* free to leave or terminate the

19  interrogation at any time.  Indeed, it would have been wholly *un*reasonable for Mr. Ding to believe

20  he was free to leave. This factor weighs in favor of finding Mr. Ding was in custody.

21                    **b.    Second Kim factor: Extent to which Mr. Ding was confronted
22                            with evidence of guilt.**

23        The Ninth Circuit "ha[s] found a defendant not in custody when the officers did not attempt

24  to challenge the defendant's statements with other 'known facts' suggesting his guilt, they merely

25  asked him about the allegations." *Bassignani*, 575 F.3d at 884 (citing *U.S. v. Norris*, 428 F.3d. 907,

26  913 (9th Cir. 2005)). Here, the opposite occurred. The agents confronted Mr. Ding several times

27  with "known facts" to challenge Mr. Ding's statements including by showing Mr. Ding a copy of

28  a patent filed in China under Mr. Ding's name. *See* Fondo Decl. Ex. C at 6.

Further, in an approximately 25-minute segment, the agents challenged Mr. Ding's statements regarding his note-taking process while working at Google. *See generally* AR at 1:30:00–1:53:00. First, SA Toole challenged Ding's account regarding the extent of notes he would take by stating:

> [S]ome of the things that you've told us don't exactly line up with some of the information that we have. So, for example, you're saying that you just took notes and that … you save them to the drive but it would be like a different generalized name and that those notes wouldn't be like an exact Google document…. So some of the information that we have appears as if you saved directly documents. PDF versions of actual Google documents onto the Google Drive, not as a typed note or not as a notes with screenshots as a direct file, so I can [give] a couple of examples.

AR at 1:33:00–1:36:00. In support for the FBI challenging Mr. Ding's narrative, SA Toole showed Mr. Ding "a download list with multiple pages" of file names from Mr. Ding's personal Google Drive. Fondo Decl. Ex. C at 4–5. SA Toole argued to Mr. Ding that the file names from his personal drive seemed to have the exact same file names as certain Google documents, and suggested that Mr. Ding copied the Google documents rather than typed his own notes. AR at 1:33:00–1:40:00.

The interrogation became more confrontational over the dispute regarding the number of total files Mr. Ding used for the purpose of his notes while working at Google. AR at 1:43:00–1:49:00. SA Toole pressed Mr. Ding about his recollection regarding the notes files, suggesting that he might be lying. *Id.* In doing so, SA Toole again referred to the government's "known facts": "the amount of files that we have information on is a lot more than just like 20 or 30. We're looking in in the hundreds, maybe like maybe 600 unique note files." *Id.*; *Norris*, 428 F.3d. 907. When Mr. Ding responded that he recalled having a maximum of 50 files related his notes, SA Toole told Mr. Ding "that it is actually a federal crime to lie to federal agents." AR at 1:44:30–1:45:30; *see U.S. v. Fox*, 216 F.Supp.3d 1225, 1232 (2016) (finding law enforcement interview tactics weigh in favor of finding suspect was in custody where officer "challenged whether defendant was lying by presenting him with evidence of his guilt.").

After 15 minutes of pointed questions about Mr. Ding's notetaking and Google Drive files, SA Toole directly confronted Mr. Ding, saying "we just want to get to the truth of this." AR at 1:46:00–1:47:00. This supports a finding that Mr. Ding was in custody. In *Lee*, the Ninth Circuit

13

1   upheld a district court's suppression of statements obtained during a custodial interrogation

2   conducted without the giving of *Miranda* warnings where FBI agents questioned the defendant "in

3   a closed FBI car with two officers for well over an hour while police investigators were in and

4   around his house" and "for 15 minutes confronted [the defendant] with evidence of his guilt, and

5   told him it was time to tell the truth, but did not advise him of his rights." *Lee*, 699 F.2d at 468. The

6   court held that "in such circumstances a reasonable innocent person could conclude that he was *not*

7   free to leave." *Id*. (emphasis added). But Mr. Ding's situation far exceeds the interrogational nature

8   of that in *Lee*. Like in *Lee*, the FBI interrogated him in a locked car.  But here the agents interrogated

9   Mr. Ding for nearly three times the length as the defendant was in *Lee*, and presented Mr. Ding

10  with multiple pieces of alleged evidence against him over the course of this significantly lengthier

11  timeframe.  For example, in addition to showing Mr. Ding evidence of files that he allegedly

12  downloaded, the agents also presented Mr. Ding with evidence of a patent filed under his name for

13  a Chinese company, and questioned him about whether he was "worried that giving [his Google]

14  badge to someone else . . . might get [him] into trouble." AR at 2:49:00–2:51:00. This  factor weighs

15  in favor of finding Mr. Ding was in custody.

16              **c.       Third *Kim* factor: Physical surroundings of the interrogation.**

17              Courts have found defendants to be in custody where law enforcement officers interrogate

18  them in the back of a law enforcement vehicle.  *See Lee*, 699 F.2d 466; *U.S. v. Daw*, No. CR-11-

19  8035-PHX-GMS, 2011 WL 5520150, at *4 (D. Ariz. Nov. 14, 2011) (finding defendant in custody

20  where he was interrogated "inside a police vehicle, with an officer in the driver's seat and another

21  in the rear seat" and where "both officers were in plainclothes and the vehicle was unmarked.").

22  Indeed, the situation in *Lee*   -where the court found the defendant was in custody because that

23  defendant was questioned in the back of "a closed FBI car with two officers for well over an hour

24  while [FBI] investigators were in and around his house"  -was less egregious than the FBI's conduct

25  here.  *See Lee,* 699 F.2d at 468. Further, Mr. Ding was surrounded by officers who escorted him to

26  the back of the FBI car for interrogation.  *See U.S. v. Scharf*, 608 F.2d 323, 325 (9th Cir. 1978)

27  (finding defendant in custody where "he arrived at the front of his home that evening, [and] was

28  surrounded by the officers, who remained on the scene while [one officer] questioned him in the

1    police car.").

2      Mr. Ding was also isolated from the outside world, including his wife and child, during the

3    course of the interrogation, further evidencing custody. The "principal psychological factor

4    contributing to a successful interrogation is privacy—being alone with the person under

5    interrogation." *Miranda*, 384 U.S. at 449. Isolation is not just "the crucial factor that would tend to

6    lead a suspect to feel compelled to provide self-incriminating statements," but "one of the

7    distinguishing features of a custodial interrogation." *Craighead*, 539 F.3d at 1086–87 (citing

8    *Miranda*, 384 U.S. at 445–46).

9      To this end, *Kim* is instructive. There, the police kept Ms. Kim, who spoke limited English

10   as a second language, in her own store but "physically isolated from two family members who

11   could have provided both moral support and, given her limited English, a more complete

12   understanding of the overall situation." *Kim*, 292 F.3d at 977. The fact that Ms. Kim was in a

13   familiar environment, "considered in isolation, might weigh in favor of concluding that she was not

14   'in custody' during the questioning." *Id*. However, the Court concluded that "under all the

15   circumstances here . . . a reasonable person [in her position] would not have felt free to leave." *Id*.

16   (the defendant was in the store she owned, but it was overwhelmed with police presence and officers

17   "isolate[ed] defendant from the outside world," including her husband, which "largely neutralizes

18   the familiarity of the location as a factor affirmatively undermining a finding of coercion."). What

19   the FBI did to Mr. Ding was worse. They did not move Mr. Ding down the hall, to the garage, or

20   even outside in the backyard. Rather, Mr. Ding – who like Ms. Kim speaks English as a second

21   language (and at times with some difficulty) – was isolated from his family by being placed in law

22   enforcement vehicles. Similar to *Kim*, the agents here ensured Mr. Ding remained separated from

23   his spouse, who could have at least "provided both moral support and . . . a more complete

24   understanding of the overall situation." *Id*. Indeed, Mr. Ding's wife requested to review the FBI

25   warrants. *See* Fondo Decl. Ex. B at 3. This factor weighs heavily in favor of finding Mr. Ding was

26   in custody.

27       **d.**  **Fourth *Kim* factor: Duration of the detention.**

28   ███████████████████████████████████████████████

1    *See* Fondo Decl. Ex. E ¶ 65. The Ninth Circuit has noted that a "two-and-a-half hour

2    interrogation is at the high end" and "weighs in favor of finding that [the defendant] was in

3    custody." *Bassignani*, 575 F.3d at 886. In *Kim*, the Court found defendant was in custody when she

4    was interrogated for 45 to 90 minutes. *Kim*, 292 F.3d at 972. This factor clearly weighs in favor of

5    a finding of custody.

6                        **e.        Fifth *Kim* factor: Degree of pressure applied to detain Mr. Ding.**

7           This Court has held that handcuffs are a hallmark of a formal arrest. *U.S. v. Ehrman*, No.

8    21-CR-00204-VC-1, 2022 WL 390716, at *1 (N.D. Cal. Feb. 9, 2022). "[A] reasonable person

9    finding himself placed in handcuffs by the police would ordinarily conclude that his detention

10   would not necessarily be temporary or brief and that his movements were now totally under the

11   control of the police – in other words, that he was restrained to a degree normally associated with

12   formal arrest and, therefore, in custody." *Id*. Further, an overwhelming "presence of several

13   officers" and a "display of a weapon by an officer" support finding the suspect was in custody. *See*

14   *N.Y. v. Quarles*, 467 U.S. 649, 655 (1984) (respondent was in police custody within the meaning

15   of *Miranda* because at least four officers surrounded him during his interrogation.); *U.S. v. Griffin*,

16   7 F.3d 1512, 1519 (10th Cir. 1993) (citing the "threatening presence of several officers" and the

17   "display of a weapon by an officer" as factors to consider when making a determination of whether

18   a defendant has been placed into custody under *Miranda*.).

19          Here, immediately after ramming through Mr. Ding's front door to break into his home with

20   guns drawn and laser pointers facing him, Mr. Ding was detained, handcuffed, and placed in the

21   back of a police car. Fondo Decl. Ex. B at 2. Mr. Ding remained handcuffed for approximately

22   twenty minutes. *Compare id*. *with* AR at 0:00–7:00. Though Mr. Ding was not handcuffed while

23   in the FBI car, he was escorted by several FBI agents and instructed by the agents to enter the car.

24   *See supra* Section IV.A.1.a. In total, there were at least eighteen law enforcement officers on the

25   premises during the search and interrogation.  Fondo Decl. Ex. B at 1–2. And at least two agents,

26   SA Toole and SA Chen, escorted Mr. Ding until the completion of the interrogation. *Id*.; *see*

27   *generally* AR. This factor weighs in favor of finding Mr. Ding was in custody.

28

**2.    The *Craighead* factors also support finding that Mr. Ding was in custody for purposes of *Miranda*.**

The Ninth Circuit in *Craighead* delineated additional factors to consider in assessing when an interrogation of a suspect *in his home* is deemed custodial – a suspect is in custody when "the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a police-dominated atmosphere," such that a reasonable person in the suspect's shoes would not have felt free to leave. *See Craighead*, 539 U.S. at 1083. If the government were to argue that Mr. Ding was interrogated in or around his home such that *Craighead* applies, this would not change the conclusion that Mr. Ding was in custody.

**a.    First Craighead factor: The number of law enforcement personnel.**

"The presence of a large number of visibly armed law enforcement officers goes a long way towards making [ ] a police-dominated atmosphere." *Craighead*, 539 U.S. at 1085. Here, multiple visibly-armed law enforcement agents rammed through and broke Mr. Ding's front door and detained him at gunpoint. Fondo Decl. Ex. B at 2, 5. Indeed, at least 18 law enforcement officers participated in the process of detaining Mr. Ding, separating him from his family, and searching his home. *Id.* at 1–2. "[W]hen the number of law enforcement personnel far outnumber the suspect, the suspect may reasonably believe that, should he attempt to leave, he will be stopped by one of the many officers he will encounter on the way out. The suspect may also believe that the large number of officers was brought for the purpose of preventing his departure." *See Craighead*, 539 U.S. at 1084–85; *see also U.S. v. Blanford*, 467 F.App'x 624, 625 (9th Cir. 2012) (finding custody where two agents with concealed weapons came to the defendant's home); *U.S. v. Brobst*, 558 F.3d 982, 996 (9th Cir. 2009) (finding custody where three officers were present at the defendant's home). Here, Mr. Ding was surrounded by law enforcement officers, including at least two FBI agents who remained with him a locked FBI car throughout the hours-long interrogation.

**b.    Second Craighead factor: Whether Mr. Ding was restrained at any point.**

Mr. Ding was physically restrained when FBI agents detained and handcuffed him at gunpoint inside of his home, removed him from his townhome and away from his family, and

17

1   placed him in the back of a police car. Fondo Decl. Ex. B at 2; *see generally* AR. Even though his

2   handcuffs were removed prior to being transferred to the FBI vehicle, Mr. Ding was nonetheless

3   restrained amounting to custody because the agents only permitted him to move around for brief

4   periods and insisted on escorting and monitoring him at all times.  *See Craighead*, 539 U.S. at

5   1085–86. The FBI agents insisted on escorting and following Mr. Ding from the moment he was

6   detained inside of his home, including by escorting him from the police car to the back of the FBI

7   car. AR at 2:00–8:00. When Mr. Ding asked for his eyeglasses, the agents required him to stay put

8   while another agent retrieved the glasses from Mr. Ding's home.  *Id.* at 2:30–3:30. Mr. Ding was

9   kept in a locked FBI car for three-plus hours, with two agents inside with him at all times. The only

10  time Mr. Ding was allowed to leave the car was for approximately 8 minutes when he was escorted

11  to the restroom in his own home. *See* Fondo Decl. Ex. C; AR at 2:08:00–2:16:00. At all times, the

12  agents insisted on keeping Mr. Ding isolated from his family and within their presence and control.

13  *See Heusner*, 2019 WL 5535767, at *6 (defendant was in custody where "[f]or the duration of his

14  segregation, the two officers stood as sentinels between [him] and the sole exit to the premises.").

15          c.      **Third Craighead factor – Whether Mr. Ding was isolated from others.**

16

17          The "principal psychological factor contributing to a successful interrogation is privacy—

18  being alone with the person under interrogation." *Miranda*, 384 U.S. at 449. Isolation is "one of the

19  distinguishing features of a custodial interrogation." *Craighead*, 539 F.3d at 1086–87. Here, when

20  the agents first apprehended Mr. Ding, he was in his home with his wife and son. Fondo Decl. Ex. B

21  at 2. However, the agents immediately handcuffed Mr. Ding, removed him from his home and away

22  from his family, and isolated him in the back of a police car. *Id.*; *see* AR at 0:00–8:00. Mr. Ding

23  stated he was worried about the whereabouts of his wife and son; however, the agents informed

24  him that he could not return to his home – even though his wife and child were eventually permitted

25  to do so. AR at 4:45–6:00. Instead, they further isolated Mr. Ding in the back of a different car, an

26  unmarked FBI vehicle. *Id.* at 5:25–8:00. The agents kept Mr. Ding away from his wife and child

27  for over three hours while some agents interrogated him and others searched his home. *See* Fondo

28  Decl. Ex. C at 2.; *Blanford*, 467 F.App'x at 625 (finding custody, in part, because "[defendant]

                                                  18

answered the agents' questions when he was alone").

        **d.**        **Fourth *Craighead* factor: Whether Mr. Ding was advised of the right to leave or terminate the questioning.**

Where law enforcement tells a suspect he is not under arrest, that his statements are voluntary, and that he is free to leave at any time, it "reduces the chance that a suspect will reasonably believe he is in custody." *Craighead* 539 U.S. at 1087. Here, the agents told Mr. Ding that he was not under arrest, not in custody, and that "this talking to us – It's completely up to you. It's completely voluntary." AR at 8:10–8:30. While Mr. Ding was also told that he was "free," he was not specifically told that he was "free to go" and, importantly, the FBI refused to allow Mr. Ding to return to his home or go to any law enforcement office. *Id.* at 8:00–9:00. They treated Mr. Ding differently than his wife, who was permitted to remain in one room within the townhome, with access to the bathroom and kitchen, for the duration of the search. Fondo Decl. Ex. B at 2. After the initial safety sweep, the FBI could have placed Mr. Ding in the same room with his family while they conducted their search. But they chose not to, not because they viewed him as a safety risk. *See* AR at 6:05–6:15 ("we know you're not a dangerous person"). Rather, they specifically isolated him so that SA Chen and SA Toole could interrogate him, alone, in an FBI car.

As discussed above, with respect to the first *Kim* factor, even though the FBI statements ostensibly indicate that Mr. Ding was free to leave or terminate the questioning, considering the specific statements and the context and circumstances surrounding those statements, a reasonable person in Mr. Ding's position certainly would have felt he was *not* free to leave. *See supra* Section IV.A.1; *Craighead* 539 U.S. at 1087 ("The mere recitation of the statement that the suspect is free to leave or terminate the interview [ ] does not render an interrogation non-custodial *per se*"); *Lee,* 699 F.2d 466, 467–68 (finding suspect in custody and statements made in violation of Miranda rights where suspect interrogated by two FBI agents in the back of an FBI car parked in front of suspect's house even though he was "not forced into the car" and was affirmatively told he was "free to leave.").

In sum, considering the totality of the circumstances of Mr. Ding's interrogation, application of the *Kim* and *Craighead* factors strongly demonstrate Mr. Ding was in custody for

the purposes of *Miranda*. A reasonable person, cuffed at gunpoint, detained, and, in the presence of at least eighteen law enforcement officers, taken to the back of an FBI car to be interrogated for three hours with the doors locked, and told he could not go back into his home to see his family or to an FBI office, would not believe he is free to walk away and refuse FBI questioning. Mr. Ding had no reasonable egress as the doors to the car were locked and the area around and in his residence totaled eighteen law enforcement officers. *See U.S. v. Hammond*, 263 F.Supp.3d 826 (N.D. Cal. 2016), *aff'd,* 740 F. App'x 573 (9th Cir. 2018) ("In-home interrogation of suspect was custodial, and thus *Miranda* warnings were required under Fifth Amendment where there were 14 law enforcement officers, at least one of whom suspect saw holding a gun, suspect was placed in handcuffs prior to his interview, though they were removed during interview itself, suspect was isolated from his mother, sister, and niece, and he was interviewed while being only half-dressed, with multiple armed agents in his bedroom with the door closed"); *U.S. v. Juv. Male*, 133 F.App'x 422, 423 (9th Cir. 2005) (finding individual in custody under *Miranda* where he was placed in a government vehicle for interrogation conducted by two agents with the doors of the vehicle locked.); *Berkemer v. McCarty*, 468 U.S. 420, 437–38 (1984) (officers' efforts to block only means of egress from scene of interrogation may also indicate that suspect is in custody under *Miranda*.).

     **B.**     **Because Mr. Ding Was In Custody, *Miranda* Warnings Were Necessary Before Officers Initiated Questioning, But It Is Undisputed That Mr. Ding Never Received *Miranda* Warnings.**

     The government cannot demonstrate compliance with *Miranda* in this case. It is well-established that once a person is in custody, *Miranda* warnings must be given prior to any interrogation, *Miranda*, 384 U.S. at 444, which advise of each of the individual's "critical" rights. *U.S. v. Bland*, 908 F.2d 471, 474 (9th Cir. 1990). Specifically, *Miranda* requires "meaningful advise [*sic*] to the unlettered and unlearned in language which [they] can comprehend and on which [they] can knowingly act." *U.S. v. San Juan-Cruz*, 314 F.3d 384, 387 (9th Cir. 2003) (internal citations omitted).

     The government's obligation to provide *Miranda* warnings is "more than a mere procedural nicety or legal technicality." *San Juan Cruz*, 314 F.3d at 388. The recitation of such warnings is "an important constitutional norm upon which our system of criminal procedure and due process

20

1   jurisprudence has invested its faith and reliance." *Id.* at 388–389. *Miranda* warnings protect

2   individuals who are "swept . . . into police custody, surrounded by antagonistic forces, and

3   subjected to the techniques of persuasion . . . ." *Miranda*, 384 U.S. at 461. Indeed, the Supreme

4   Court recognized that "[t]he very fact of custodial interrogation exacts a heavy toll on individual

5   liberty and trades on the weakness of individuals." *Id.* at 455–456. Because custodial interrogation

6   creates "inherently compelling pressures which work to undermine the individual's will to resist

7   and compel him to speak where he does not otherwise do so freely," the prosecution may not use

8   statements stemming from such an interrogation unless it demonstrates the use of procedural

9   safeguards effective to secure the privilege against self-incrimination. *Id.* at 444, 467.

10      Mr. Ding did not receive *Miranda* warnings prior to being interrogated, or at any time

11  during his over three-hour long encounter with law enforcement on January 6, 2024. *See* Fondo

12  Decl. Ex. B at 1–2. Almost certainly the government will concede in its response to this motion

13  that Mr. Ding was not given any *Miranda* warnings. Nowhere is it in the three hour plus audio

14  recording or in any of the discovery provided by the government.

15      And there can be no dispute that Mr. Ding was interrogated to elicit an incriminating

16  response. *Rhode Island*, 446 U.S. at 301–302 (noting that the definition of interrogation for purpose

17  of *Miranda* safeguards extends only to words or actions on the part of law enforcement that they

18  should have known were reasonably likely to elicit an incriminating response). ▮▮▮▮▮▮▮▮▮▮▮

19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Fondo Decl.

21  Ex. D. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ¶ 4. Such information mirrors the government's

25  allegations in its subsequently filed superseding indictment. *Compare id.* ¶¶ 3, 4, 24, *with*

26  Superseding Indictment (Dkt. 44) ¶¶ 17, 22, 27. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28  ▮▮▮▮▮▮▮▮ Fondo Decl. Ex D ¶ 38. SA Toole and SA Chen nonetheless asked Mr. Ding direct

and confrontational questions regarding, for example, his Apple notes, files he allegedly downloaded from Google and/or uploaded to his personal drive, plans to launch and raise funds for a start-up company in China, and the use of his Google employee badge in the United States while he was in China. Given the circumstances of the government's coordination with Google to acquire facts underpinning its allegations against Mr. Ding prior to speaking with him, the FBI agents' statements clearly comprise statements that the agents "should know are reasonably likely to evoke an incriminating response" "in light of both the context of the questioning and the content of the question." *Rhode Island*, 446 U.S. at 300; *see U.S. v. LaPierre*, 998 F.2d 1460, 1466 (9th Cir. 1993). By "incriminating response," the Supreme Court was "refer[ing] to any response – whether inculpatory or exculpatory – that the *prosecution* may seek to introduce at trial." *Innis*, 446 U.S. at 301 (emphasis in original).

### C.    The Court Should Also Suppress Mr. Ding's Statements Because He Was Interrogated After Invoking His Right to Counsel

"If a suspect indicates in *any manner* that he wishes to consult with an attorney before speaking, there can be no questioning." *Robtoy v. Kincheloe*, 871 F.2d 1478 (9th Cir. 1989). Indeed, even where a suspect makes an ambiguous or equivocal statement without having waived his *Miranda* rights, the "interrogating officers [are] under a *duty to clarify* what [the suspect] meant—and if he meant he didn't want to talk, that right should [be] scrupulously honored." *U.S. v. Rodriguez*, 518 F.3d 1072, 1080 (9th Cir. 2008) (emphasis added). When faced with an ambiguous statement regarding the right to counsel, the officers "must seize all questioning, except that they may attempt to clarify the suspect's desire for counsel." *U.S. v. Fouche*, 833 F.2d 1284, 1287 (9th Cir. 1987). Only "[i]f the clarification reveals that the suspect does not want counsel, the interrogation may continue. *Id.* "The critical factor in determining the validity of the government's behavior [in response to a suspect's ambiguous or equivocal request for counsel] is whether a review of the whole event discloses that the interviewing agent has impinged on the exercise of the suspect's continuing option to cut off the interview." *Id.*

For example, in *Fouche*, the court found an equivocal request for counsel where the suspect "stated that he might want to speak to a lawyer." *Fouche*, 833 F.2d at 1289. There, the FBI

1   agents "scrupulously cut off questioning at the moment of [the suspect's] equivocal request for

2   counsel and clarified the defendant's wishes before proceeding with the interrogation." *Id.* at 1287.

3   The agents "stopped the interrogation immediately and allowed [the suspect] to leave the room to

4   make a telephone call." *Id.* at 1286. When the suspect returned, the FBI agents asked the suspect if

5   he understood his rights and if he wished to waive them, which he agreed to do. *Id.*

6       Here, the FBI agents told Mr. Ding that the agents "just want to ask [Mr. Ding] some

7   questions [to] kind of get [his] side of the story of what happened." AR at 7:00–8:41. The agents

8   also said "you, of course, you're free." *Id.* Mr. Ding responded:

9   > Can they stay here? My wife and my son stay here. Stay at home. Can you just ah,
>    just if you don't, you want to watch her, that's okay. You can get someone watch
10 >    her at home and then I can go with you to the police office. That's okay – let's talk
>    over there. And then if necessary, if you have any questions, I watch the movies –
11 >    if I am uncomfortable I can get a lawyer - at anytime.

12  *Id.* at 8:41–9:30. Mr. Ding's statement is admittedly not a clear statement of the invocation of his

13  right to a lawyer, but the fact that it is ambiguous and a bit confusing requires more than the FBI

14  did. Unlike in *Fouche*, here the FBI agents did not pause and seek clarification regarding Mr. Ding's

15  statements regarding going to the police office and talking over there, which they denied, and

16  "watch[ing] the movies" and that he can "get a lawyer – at anytime." Instead, the agents diverted

17  the conversation and provided excuses for why Mr. Ding could not leave the car to go to an office.

18  Indeed, an office would have provided a formal setting where a lawyer could have joined Mr. Ding,

19  unlike a locked law enforcement vehicle with two FBI agents.  Instead, the agents proceeded to

20  interrogate Mr. Ding for the next three hours during which they asked Mr. Ding to clarify several

21  of his other statements related to the government's trade secret allegations. *See, e.g.*, AR at 22:00–

22  22:50, 41:29–42:00; 1:06:30–1:07:15; 2:35:29–2:36:00. In other words, the FBI agents

23  conveniently decided when to ask Mr. Ding to clarify ambiguous statements and when not to.

24      Because the agents failed to make any effort to clarify Mr. Ding's statement regarding

25  counsel, they violated his Fifth Amendment rights. *Rodriguez*, 518 F.3d at 1080–1081. Therefore,

26  for this independent reason, all subsequent conversation between Mr. Ding and the agents should

27  be suppressed. *See generally id.* (reversing district court's denial of motion to suppress pursuant to

28  the clarification rule set forth by the Ninth Circuit in finding agent was under a duty to further

clarify defendant's ambiguous statement regarding invocation of right to counsel.)

**D.  The Court Should Exclude All Evidence Stemming From The Passwords Obtained By The Government Arising From Its Illegal Interrogation Of Mr. Ding As The Fruits Of The Poisonous Tree**

As a result of the *Miranda* violation, and failing to clarify his reference to counsel, the Court should also suppress Mr. Ding's statements regarding the passwords he provided for any electronic devices, and the contents of those devices. *See Wong Sun v. U.S.*, 371 U.S. 471 (1963). The defense recognizes the ruling in *United States v. Patane*, where the Supreme Court held that failure to provide *Miranda* warnings does not necessarily require suppression of physical fruits stemming from the suspect's statements. *See Patane*, 542 U.S. 630, 639 (2004) (holding that physical fruits of statements made in violation of *Miranda* rule need not be discarded as inherently tainted because Self-Incrimination Clause is not implicated by admission of physical evidence). However, *Patane* is distinguishable. There, law enforcement found a gun as a result of the defendant's unwarned statements in violation of *Miranda*. Because the fruit of the statements was a physical gun, which the court qualified as a "nontestimonial fruit" the court held the Fifth Amendment's Self-Incrimination Clause was not implicated. *Id.* at 637–38. To the contrary, courts recognize the disclosure of passwords for electronic devices as being testimonial. *See, e.g.*, *U.S. v. Doe*, 670 F.3d 1335, 1346 (11th Cir. 2012) (suspect's "decryption and production of the contents of [ ] hard drives would sufficiently implicate the Fifth Amendment privilege" because the "decryption and production would be tantamount to testimony by [suspect] of his knowledge of the existence and location of potentially incriminating files; of his possession, control, and access to the encrypted portions of the drives; and of his capability to decrypt the files"); *U.S. v. Kirschner*, 823 F.Supp.2d 665, 669 (E.D. Mich. 2010) ("forcing the Defendant to reveal the password for the computer communicates that factual assertion to the government, and thus, is testimonial—it requires Defendant to communicate 'knowledge,' unlike the production of a handwriting sample or a voice exemplar." "It is the 'extortion of information from the accused,' the attempt to force him to 'disclose the contents of his own mind' that implicates the Self–Incrimination Clause") (quoting *Doe v. United States*, 487 U.S. 201, 211 (1987)).

Here, Mr. Ding provided the passwords to the following electronic devices seized from his

home as a result of being interrogated, and after the FBI agents ignored his statement relating to counsel and implied they had the right to receive such information and that Mr. Ding would receive his devices back more quickly if he provided the passwords: 1) Red Apple iPhone 12; 2) Black Thinkpad Laptop; and 3) Silver MacBook Pro Laptop. *See* AR at 1:57:30–2:08:48; Fondo Decl. Ex. B at 4–5. (these devices are listed as items 2, 7, and 16). Mr. Ding did not want to voluntarily provide the passwords, and he was not sure the FBI agents had to authority to require him to do so. *See* AR at 1:57:30–2:08:48. Mr. Ding stated multiple times that he had concerns with providing the passwords. *Id.* The agents skirted Mr. Ding's questions and implied they had a right to receive the passwords by telling Mr. Ding that they could show him the search warrant granting them the right to search and seize the device. *Id*. The agents also claimed that even if Mr. Ding did not provide the passwords, they "can still work through it" but it would "take a lot longer for [the FBI] to do that." *Id*. at 1:57:30–1:58:15. Only under this context did Mr. Ding acquiesce and provide his passwords to the agents.

Because the disclosure of the passwords is testimonial in nature, and because the disclosure occurred during the FBI's improper custodial interrogation of Mr. Ding, without a Miranda warning and failing to further clarify his reference to a lawyer, the disclosures of the passwords and the all the evidence derived from the those devices – the resulting fruits – should be excluded.

### E.    The Court Should Conduct An Evidentiary Hearing If The Government Contests The Material Facts In This Motion.

Mr. Ding maintains the record before this Court supports suppression of Mr. Ding's statements.  However, to the extent the government sufficiently contests Mr. Ding's stated facts that are material to the resolution of this Motion, this Court should hold an evidentiary hearing to permit Mr. Ding to cross examine SA Chen and SA Toole because Mr. Ding has stated "facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist." *Howell*, 231 F.3d 615, 620; *U.S. v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986).

### V.    <u>CONCLUSION</u>

For the foregoing reasons, Mr. Ding respectfully requests the Court suppress all statements made by Mr. Ding to law enforcement agents during and after the execution of the search warrant

at Mr. Ding's residence on January 6, 2024, and exclude all the evidence obtained as a result of the

passwords obtained during the interrogation.

Dated: April 7, 2025                           Respectfully submitted,

                                               GOODWIN PROCTER LLP


                                        By:    /s/ Grant P. Fondo
                                               GRANT P. FONDO (SBN 181530)
                                               GFondo@goodwinlaw.com
                                               DARRYL M. WOO (SBN 100513)
                                               DWoo@goodwinlaw.com
                                               JESSICA HUANG FUZELLIER (SBN
                                               315208)
                                               JHFuzellier@goodwinlaw.com
                                               FARZAD FEYZI (SBN 343538)
                                               FFeyzi@goodwinlaw.com
                                               DAVID RAPP-KIRSHNER (SBN 344494)
                                               DRappKirshner@goodwinlaw.com
                                               NIRAV BHARDWAJ (SBN 350829)
                                               NBhardwaj@goodwinlaw.com
                                               **GOODWIN PROCTER** LLP

                                               Attorneys for Defendant
                                               LINWEI DING

1

**<u>CERTIFICATE OF SERVICE</u>**

2          I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the

3    United States District Court for the Northern District of California by using the CM/ECF

4    system on **April 7, 2025**. I further certify that all participants in the case are registered CM/ ECF

5    users and that service will be accomplished by the CM/ECF system.

6          I certify under penalty of perjury that the foregoing is true and correct. Executed on

7    **April 7, 2025**.

8

9                                                        */s/ Grant P. Fondo*
                                                          Grant P. Fondo

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

27
