CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

CASEY BOOME (NYBN 5101845)
MOLLY K. PRIEDEMAN (CABN 302096)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6627
    casey.boome@usdoj.gov
    molly.priedeman@usdoj.gov

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. 3:24-CR-00141-VC |
| Plaintiff, | ) **UNITED STATES' MOTION TO ADMIT** |
| v. | ) **INEXTRICABLY INTERTWINED EVIDENCE** |
| LINWEI DING, | ) The Honorable Vince Chhabria |
| Defendant. | ) Courtroom 4, 17th Floor |

U.S.' MOTION TO ADMIT INEXTRICABLY INTERTWINED EVIDENCE
3:24-CR-00141-VC

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND .................................................................................................1

    I.    Ding's Copying, Exfiltration, and Downloading of Google Documents That Included Trade Secret Information ..................................................................1

    II.   While Employed by Google, Ding Started Working for PRC-Based Company and Established a PRC-Based Startup Company .................................................2

    III.  Ding Downloaded the Stolen Documents and Continued to Copy Google Information ...............................................................................................................3

ARGUMENT ..........................................................................................................................4

    I.    Ding's Mass Exfiltration of Google Information, Creation of Additional Notes Containing Google Information, and InfiniCompute Demonstration Are Inextricably Intertwined with the Charged Offenses ...........................................4

    II.   Alternatively, Ding's Exfiltration and Copying Activities Are Admissible Under Rule 404(b) .....................................................................................................8

    III.  The Evidence the Government Seeks to Admit is Offered for a Proper Purpose and is Relevant and Not Unfairly Prejudicial ......................................................9

CONCLUSION.....................................................................................................................10

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Huddleston v. United States*,
    485 U.S. 681 (1988) .............................................................................................................. 9
*United States v. Anderson*,
    741 F.3d 938 (9th Cir. 2013) ................................................................................................ 8
*United States v. Banks*,
    514 F.3d 959 (9th Cir. 2008) ................................................................................................ 9
*United States v. Beckman*,
    298 F.3d 788 (9th Cir. 2002) ................................................................................................ 4
*United States v. Bucher*,
    375 F.3d 929 (9th Cir. 2004) .............................................................................................. 10
*United States v. Cherer*,
    513 F.3d 1150 (9th Cir. 2008) .............................................................................................. 9
*United States v. Daly*,
    974 F.2d 1215 (9th Cir. 1992) .............................................................................................. 8
*United States v. Hinton*,
    31 F.3d 817 (9th Cir. 1994) ................................................................................................ 12
*United States v. Montgomery*,
    384 F.3d 1050 (9th Cir. 2004) .............................................................................................. 6
*United States v. Shiah*,
    No. SA CR 06-92 DOC, 2008 WL 11230384 (C.D. Cal. Feb. 19, 2008) ............................ 5
*United States v. Vizcarra-Martinez*,
    66 F.3d 1006 (9th Cir. 1995) ................................................................................................ 7

**Rules**

Fed. R. Evid. 403 ........................................................................................................................ 11
Fed. R. Evid. 404(b).................................................................................................................. 9, 12

**INTRODUCTION**

Through this motion, the United States provides notice and moves for a pretrial order authorizing the admission of evidence related to: (1) the defendant Linwei Ding's ("Ding") exfiltration of over a thousand documents containing Google information between May 2022 to December 2023; (2) Ding's creation of Note files containing Google information from May 2023 to December 2023; and (3) Ding's use of Google's technology in an August 2023 product demonstration video for his PRC-based startup "Zhisuan."[1]  The Court should admit this evidence because it is inextricably intertwined with the charged conduct.  In the alternative, these acts are admissible under Federal Rule of Evidence 404(b).

**FACTUAL BACKGROUND**

Ding is charged in a fourteen-count indictment.  Dkt. 138 (Second Superseding Indictment).  In Counts One through Seven, Ding is charged with theft of trade secrets.  *Id.* ¶¶ 43-44.  In Counts Eight through Fourteen, Ding is charged with economic espionage.  *Id.* ¶¶ 45-46.  The charges stem from Ding's theft of 105 documents containing information from seven categories of Google trade secrets.

From 2019 to 2024, Ding was employed as a software engineer at Google, where he worked on Google's Artificial Intelligence ("AI")/Machine Learning ("ML") computing infrastructure.  AI/ML models require an enormous amount of computing power, and Google has developed large-scale computer systems to support AI/ML workloads, called AI supercomputers.  Google uses two specialized accelerators to support its AI computing infrastructure, Graphics Processing Units (GPUs) and Tensor Processing Units (TPUs).  Ding worked primarily on a component of the software for Google's GPU-based AI supercomputers.

**I.      Ding's Copying, Exfiltration, and Downloading of Google Documents That Included Trade Secret Information**

Between May 2022 and May 2023, Ding uploaded more than a thousand Google files from his corporate Google computer to his personal Google Drive account, including the 105 files containing the trade secret information charged in this case.  Prior to exfiltrating the information, Ding (1) accessed Google documents or internal webpages on his corporate Google account, (2) copied and pasted the

---

[1]  "PRC" shall refer to the People's Republic of China herein.

U.S.' MOTION TO ADMIT INEXTRICABLY INTERTWINED EVIDENCE
3:24-CR-00141-VC

contents into Apple Notes on his corporate device, and (3) saved the Notes as PDFs into various folders on his corporate device. Ding then exfiltrated the files from his corporate device to his personal Google Drive account on eight different dates, with the vast majority of the uploads occurring between May 2022 and May 2023. Ding stole trade secrets documents on four of those dates: May 21, 2022, June 1, 2022, June 3, 2022, and April 17, 2023. On December 14, 2023, Ding downloaded all the documents he had previously exfiltrated to his personal computer.

## II.    While Employed by Google, Ding Started Working for PRC-Based Company and Established a PRC-Based Startup Company

The timing of Ding's theft was not a coincidence. Unbeknownst to Google, in early May 2022, the same month that Ding uploaded over one hundred files from his corporate Google device to his personal Google drive, including documents containing trade secret information, Ding started interviewing with Rongshu, a PRC-based privacy chip company. Ding started working at Rongshu in November 2022. Within a month of starting at Rongshu, Ding was in active discussions with the CEO of Rongshu about starting a new company to create an AI supercomputing platform to support the training of large machine learning models. That company eventually became Zhisuan, a PRC-based company with the explicit goal of "replicating" and "upgrading" Google's technology. By the spring of 2023, Ding's efforts to launch Zhisuan and to exfiltrate documents from Google were fully underway. On April 17, 2023, the same day that Ding met with investors to pitch Zhisuan and told them he was in charge of the "entire supercomputing division" at Google and therefore knew "every detail" of Google's supercomputing infrastructure, Ding uploaded hundreds of Apple Notes from his corporate Google device to his personal account, including Notes containing trade secret information. Ding uploaded the files from a number of folders saved on his corporate device with titles mirroring different aspects of Google's AI computing infrastructure, including "MLFramework," "LLM," "Machine Learning," "AdAstra," "TCPDirect," "Lower Software," "Platform," "Hardware," and "TPU."

In May 2023, Ding applied to an Entrepreneurship Camp hosted by MiraclePlus, a PRC-based accelerator for early-stage startups. As part of the application process, in August 2023, Ding shared a video with a MiraclePlus employee in which Ding recorded himself running an ML-related system test on Google's internal cluster management system. In the video, Ding represents that the Google

technology he was using was a "product demonstration" for Zhisuan's product called "InfiniCompute" (the "InfiniCompute Demonstration").   At the end of August, Ding was selected to participate in the Entrepreneurship Camp for MiraclePlus.  On November 24, 2023, Ding presented on behalf of Zhisuan at a MiraclePlus investor conference in Beijing.

### III.    Ding Downloaded the Stolen Documents and Continued to Copy Google Information

On December 2, 2023, Google's systems detected that Ding had directly uploaded a number of Google files from his corporate computer to his personal Google Drive account.  On December 8, 2023, a Google investigator reached out to Ding and interviewed him regarding the December 2, 2023 uploads.  At the time, the interviewer was unaware that Ding had previously uploaded over a thousand files from his corporate device to his personal Google Drive account.  During the interview, Ding told the investigator that he had uploaded the documents as evidence of the work he conducted at Google and that he had no intention of leaving Google.  The investigator reminded Ding of Google's policies regarding confidential Google documents, and requested that Ding sign a Self-Deletion Affidavit indicating that he had deleted all Google-owned information from any non-Google systems.  Ding completed the Self-Deletion Affidavit the same day.  During the interview, Ding did not disclose that he had previously uploaded over a thousand Google documents from his corporate computer to his personal Google account, nor did he mention that he had been working for two separate PRC-based companies while employed by Google.

On December 14, 2023, six days after Ding's interview with the Google investigator, and after signing a Self-Deletion Affidavit agreeing to delete all Google confidential information from any non-corporate devices, Ding downloaded all of the previously exfiltrated Google information to his personal computer from his personal Google Drive account, including the 105 documents containing the Google trade secrets alleged in the Second Superseding Indictment.  The following week, Ding continued to meet with potential investors for Zhisuan.  On December 26, 2023, Ding told his manager that his last day would be January 5, 2024.  On December 29, 2023, Google received an anonymous tip indicating that Ding had presented at the MiraclePlus event in November.  Google terminated Ding's network access and locked his corporate computer the same day.

U.S.' MOTION TO ADMIT INEXTRICABLY INTERTWINED EVIDENCE
3:24-CR-00141-VC

After Ding's last mass exfiltration of Google documents in May 2023 until December 29, 2023, the day that Google cut off Ding's network access, Ding continued to access confidential Google internal files and continued to copy information from those files into Apple Notes at a frantic pace.  In December 2023 alone, Ding created 250 new Apple Notes on his corporate device, containing a broad swath of confidential Google information that he had copied from internal Google source documents, ranging from low-level software materials to higher level ML training infrastructure information.  Ding organized these Notes files into topic-focused subfolders on his Google-issued MacBook – the same process that he followed previously before uploading confidential and trade secret files to his personal cloud account.

Pursuant to a search warrant executed on January 13, 2024, the government reviewed the contents of three personal Google Cloud accounts controlled by Ding and identified over a thousand files containing confidential Google information, including the 105 documents the government identified as containing trade secret information from Trade Secret Categories One through Seven in the Second Superseding Indictment.

**ARGUMENT**

I.     **Ding's Mass Exfiltration of Google Information, Creation of Additional Notes Containing Google Information, and InfiniCompute Demonstration Are Inextricably Intertwined with the Charged Offenses**

Rule 404(b) generally governs evidence of "other acts."  However, other acts evidence "is not subject to Rule 404(b) analysis if it is 'inextricably intertwined' with the charged offense." *United States v. Beckman*, 298 F.3d 788, 793-94 (9th Cir. 2002) (internal citation omitted).  This kind of inextricable link can occur in one of two ways: (1) when "particular acts of the defendant are part of . . . a single criminal transaction," or when (2) the "'other act' evidence . . . is necessary [] in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *Id.* at 794 (internal citation omitted).

Here, because Ding's file uploads are all part of the same mass exfiltration, the proffered evidence is a part of the same transaction that serves as the basis for the charged conduct and bear directly on the charged crime.  From May 2022 to December 2023, Ding uploaded over a thousand

U.S.' MOTION TO ADMIT INEXTRICABLY INTERTWINED EVIDENCE
3:24-CR-00141-VC

4

Google documents to his personal accounts, including the 105 documents containing the alleged trade secrets. For nearly every stolen document, Ding executed the same process; he (1) accessed the Google source document in the Google network, (2) copied and pasted the contents into an Apple Notes file, (3) saved the Notes file on his Google-issued laptop in a subfolder named for the subject matter of the document, (4) converted the Notes file to .pdf, (5) uploaded the .pdf file to his personal cloud account, and (6) saved it in a similar folder structure in his cloud account.

Throughout Ding's exfiltration of Google's documents, Ding treated all of the stolen documents the same. Ding staged all of the stolen documents together in folders based on subject matter on his corporate device, uploaded the alleged trade secret documents alongside other stolen documents, and saved them together in folders on his personal Google drive based on subject matter. For example, on April 17, 2023, the day that Ding attended an investor event and uploaded hundreds of Google files to his personal drive, Ding uploaded a file called "PFC – Host Communication," a trade secret document, from a folder called "TPU," and within seconds he uploaded another file from the same folder that is not on the government's trade secret list called "Pufferfish Overview." Although Ding uploaded the over thousand Google files on eight different dates, he downloaded all the stolen documents, including the documents containing the alleged trade secrets, to his personal MacBook on the same date (December 14, 2023), about three weeks after he presented at MiraclePlus and less than two weeks prior to his resignation from Google. *See United States v. Shiah*, No. SA CR 06-92 DOC, 2008 WL 11230384, at *12 (C.D. Cal. Feb. 19, 2008) (holding that the Court could consider evidence of files taken by a defendant in a trade secret case that were not charged in the indictment because the conduct was inextricably intertwined with the theft of the alleged trade secret documents).

Ding's continued creation of additional Apple Notes from May through December 2023 was likewise part of the same criminal episode and in furtherance of the same criminal goals. Ding's creation of these Apple notes followed the same pattern as the charged conduct in this case. Between May 2023, the date of the last mass exfiltration, and December 2023, when Google terminated his access to internal networks, Ding continued to transfer confidential information from Google source documents into Apple Notes. At the same time, he continued to actively build Zhisuan in the PRC and

U.S.' MOTION TO ADMIT INEXTRICABLY INTERTWINED EVIDENCE
3:24-CR-00141-VC

tout his ability to "replicate" and "upgrade" Google's technology to potential investors and customers. The only difference between the Apple Notes created between May 2023 and December 2023, and the notes Ding actually exfiltrated, is the timing: Google caught Ding and locked his corporate device before he was able to exfiltrate the latest batch of Notes files. The Ninth Circuit has made clear that "the policies underlying rule 404(b) are inapplicable when offenses committed as part of a single criminal episode become other acts simply because the defendant is indicted for less than all of his actions." *United States v. Montgomery*, 384 F.3d 1050, 1062 (9th Cir. 2004) (cleaned up).

Ding's use of Google technology to create the InfiniCompute Demonstration in August 2023 is likewise part of the same transaction as the charged conduct. Ding created the video during the same timeframe as the charged conduct, after uploading all the trade secret files and other Google information, and prior to downloading all the documents to his personal device in December 2023. Ding relied on Google's technology to apply for the MiraclePlus Entrepreneurship Camp for the same reason he stole Google's trade secret files: to leverage Google's technology to benefit himself and Zhisuan.

Evidence of the full extent of the exfiltrated files, Ding's continued copying of sensitive Google information in to Apple Notes, and the InfiniCompute video is also "necessary [] in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012-13 (9th Cir. 1995). If the government limited its story solely to the alleged trade secret documents, the story would have gaps in time, place, and circumstances. "The jury cannot be expected to make its decision in a void—without knowledge of the time, place, and circumstances of the acts which form the basis of the charge." *See id.* (cleaned up). At trial, the government intends to introduce forensic logs that encompass the full breadth of Ding's uploads and Apple Notes creation timeline. If the government were required to somehow excise the full extent of Ding's exfiltration, it would leave holes in the narrative and the forensic evidence that would leave the jury guessing about key aspects of the story.

For example, evidence of Ding's full and attempted exfiltration is necessary context for the chronology and timing of Ding's actions. Evidence at trial will show that when Google interviewed Ding on December 8, 2023, he never mentioned that he had previously uploaded over a thousand

U.S.' MOTION TO ADMIT INEXTRICABLY INTERTWINED EVIDENCE
3:24-CR-00141-VC

Google files to his personal Google Drive.  Instead, six days *after* his interview with Google and signing an affidavit agreeing to delete all Google files from personal accounts, he downloaded over a thousand Google files to his personal computer, including all the files he had previously uploaded from his corporate device to his personal Google Drive account.  That same week, he attended investor meetings for Zhisuan and continued to stockpile confidential Google information at an alarming pace.  This story would not be "coherent and comprehensible" without all the facts related to Ding's exfiltration.

Moreover, the full set of stolen documents provides a more accurate depiction of the scope of Ding's exfiltration.  In *United States v. Anderson*, the Ninth Circuit found uncharged conduct that demonstrated the scale and process of the defendant's business operation was intrinsic to the charged conduct because "the larger and more sophisticated his operation was, the more likely it was that he knew what he was doing was illegal."  741 F.3d 938, 950 (9th Cir. 2013).  Here, the volume and thoroughness of Ding's uploads and continued copying of sensitive Google information likewise explain the breadth of his illegal conduct.  The fact that Ding uploaded over a thousand Google files and continued to carefully catalogue additional Google documents after his last mass exfiltration and prior to the termination of his access makes it more likely that "he knew what he was doing was illegal." *Id.* Moreover, the sheer scale of Ding's theft rebuts any argument that he mistakenly uploaded the trade secret documents at issue in this case. *United States v. Daly*, 974 F.2d 1215, 1216-17 (9th Cir. 1992) (holding that evidence concerning other acts that were relevant to rebut a defense was inextricably intertwined with charged acts).

The fact that Ding was passing off Google's technology, *i.e.*, the InfiniCompute Demonstration that Ding used during the MiraclePlus application process, just weeks prior to downloading the trade secret files to his personal computer also provides useful context about Ding's subsequent actions and is a critical part of the narrative.  Indeed, the government intends to introduce evidence of Ding's MiraclePlus presentation, where he assured investors that he could copy Google's technology.  Ding's misrepresentation of a Google system test as a "product demonstration" is an essential part of the story of how Ding managed to get his company accepted into MiraclePlus and how he intended to use the stolen Google information.

U.S.' MOTION TO ADMIT INEXTRICABLY INTERTWINED EVIDENCE
3:24-CR-00141-VC

## II.   Alternatively, Ding's Exfiltration and Copying Activities Are Admissible Under Rule 404(b)

Alternatively, the evidence related to Ding's full exfiltration and copying activities, as well as his InfiniCompute demonstration video, is admissible under Rule 404(b), which allows evidence of a "crime, wrong, or act" to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b).  The Supreme Court and Ninth Circuit have stressed that "Rule 404(b) is a rule of inclusion—not exclusion."  *United States v. Cherer*, 513 F.3d 1150, 1157 (9th Cir. 2008) (quotation omitted); *see also Huddleston v. United States*, 485 U.S. 681, 688–89 (1988).  Evidence is admissible under Rule 404(b) if it "(1) tends to prove a material point; (2) is not too remote in time; (3) is based upon sufficient evidence; and (4) in some cases, is similar to the offense charged." *United States v. Banks*, 514 F.3d 959, 976 (9th Cir. 2008) (quotation omitted).  Evidence demonstrating the full extent of Ding's exfiltration of Google's documents, his exfiltration attempts, and the product demonstration video are admissible under Rule 404(b).

First, the proffered evidence is relevant to a material element of the charged offenses: intent.  It establishes that Ding acted knowingly and intentionally, rather than accidentally or mistakenly.  Ding's calculated and methodical approach to organizing and exfiltrating over a thousand documents containing sensitive Google information, and the fact that he passed off Google's technology as his own, speaks to his deliberate, not accidental, approach to steal proprietary information, economically benefit from it, and cause injury to Google.

The timing and scope of Ding's exfiltration and copying of additional Apple Notes and staging for future exfiltration also goes directly to his intent.  The timing of Ding's actions, including copying sensitive Google files after informing his manager of his resignation and exfiltrating files on the very same day that he told potential investors he wanted to create a company like Google in China, as well as volume of documents stolen, goes directly to his intent to use the stolen trade secrets.  *See United States v. Bucher*, 375 F.3d 929, 934 (9th Cir. 2004) ("Culpable intent . . . can be inferred from the defendant's conduct and from the surrounding circumstances.") (quotations omitted).  Likewise, Ding's use of Google technology in the InfiniCompute "product demonstration" video submitted to MiraclePlus is highly relevant to his intent to steal Google's trade secrets.  The fact that Ding passed off Google's

technology as his own within months of uploading over a thousand Google documents, and prior to downloading the documents to his personal device, is a strong indication that Ding purposefully stole Google's trade secrets with the intent to use them for his, and Zhisuan's, benefit.

Second, the conduct is similar in nature and close in time to the charged offenses. Ding's theft of trade secret documents and other Google documents, his continued copying of additional Google information, and his creation of the product demonstration video, all occurred during the same timeframe. Between May 2022 and May 2023, the Google documents were comingled in nearly every upload by Ding, with some exfiltrated within the same minute. Moreover, Ding applied the same methods to steal, conceal, and exploit the information in the documents. Ding's ongoing creation of new Apple Notes using Google information likewise tracked the same pattern: Ding repeatedly copied Google confidential information into Apple Notes that he staged on his corporate device until he was ready to exfiltrate them. The only difference is that Google caught him before he was able to do so. Finally, Ding relied on Google's GPU-based supercomputer technology to create his product demonstration video for Zhisuan in August 2023. The video is highly relevant to the charged conduct, given that two of the seven categories of trade secret information in this case relate directly to Google's GPU-based supercomputers.

Third, the government can prove the conduct occurred. The government will present evidence including expert and lay testimony, forensic logs, and timestamps, showing that Ding uploaded the additional documents from his corporate Google account to his personal drive and continued to create new Apple Notes containing confidential Google information. The government will also introduce the InfiniCompute video at trial, along with Google witness testimony confirming that Ding relied on Google technology to create the video. This satisfies the requirement that a reasonable jury could find the acts occurred and were committed by Ding.

### III.    The Evidence the Government Seeks to Admit is Offered for a Proper Purpose and is Relevant and Not Unfairly Prejudicial

The proffered evidence satisfies the criteria of Federal Rule of Evidence 403 because none of the evidence is unfairly prejudicial and because the evidence is highly probative. Rule 403 provides that evidence, although relevant, "may be excluded if its probative value is substantially outweighed by the

U.S.' MOTION TO ADMIT INEXTRICABLY INTERTWINED EVIDENCE
3:24-CR-00141-VC

9

danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. In this case, there is no basis to exclude the proffered evidence under Rule 403.

As discussed above, the proffered evidence is highly relevant to Ding's intent and knowledge, and to a determination of whether he committed the charged crimes. The evidence is not unfairly prejudicial to him, however, because it does not tend to encourage the jury to make a decision on an improper basis. Further, there is no risk of unfair prejudice because the proffered bad acts are no more inflammatory than the charged conduct. Moreover, any prejudicial effect could be limited by a limiting instruction given by the Court. *See United States v. Hinton*, 31 F.3d 817, 823 (9th Cir. 1994).

<b>CONCLUSION</b>

For the foregoing reasons, the government respectfully requests the Court issue an order admitting the evidence of the full extent of Ding's mass exfiltration of Google's documents, his mass copying of Google documents in 2023, and his InfiniCompute Demonstration video as inextricably intertwined with the charged conduct. In the alternative, the government requests that the Court admit this evidence pursuant to Fed. R. Evid. 404(b).

DATED: September 9, 2025

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*Molly K. Priedeman*
MOLLY K. PRIEDEMAN
CASEY BOOME
Assistant United States Attorneys

U.S.' MOTION TO ADMIT INEXTRICABLY INTERTWINED EVIDENCE
3:24-CR-00141-VC