**VOLUME 2**

**Pages 164 - 264**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
   VS.                         )   **NO. 3:24-CR-00141-VC**
                               )
LINWEI DING,                   )
                               )
          Defendant.           )
_____)

                    San Francisco, California
                    Monday, December 8, 2025

              **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue, Box 36055
                    San Francisco, California 94102-3495
               **BY:  CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
                    **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    1301 Clay Street, Suite 340S
                    Oakland, California 94612-5217
               **BY:  MOLLY K. PRIEDEMAN**
                    **ASSISTANT U.S. ATTORNEY**

      (APPEARANCES CONTINUED ON FOLLOWING PAGE)

REPORTED BY:  Stephen W. Franklin, RMR, CRR,
              Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant:

GOODWIN PROCTER, LLP
525 Market Street
San Francisco, California 94105
BY:   **RACHEL M. WALSH, ATTORNEY AT LAW**
      **DAVID RAPP-KIRSHNER, ATTORNEY AT LAW**

GOODWIN PROCTER, LLP
601 Marshall Street
Redwood City, California 94063
BY:   **GRANT P. FONDO, ATTORNEY AT LAW**

GOODWIN PROCTER, LLP
Three Embarcadero Center
San Francisco, CA 94111
BY:   **NICHOLAS WILEY, ATTORNEY AT LAW**

<u>**I N D E X**</u>

Monday, December 8, 2025 - Volume 2

<u>**GOVERNMENT'S WITNESSES**</u>                                      <u>**PAGE**</u>  <u>**VOL.**</u>


<u>**SEGAL, ADAM MITCHELL**</u>
 (SWORN)                                                   168    2
Direct Examination by Mr. Chang                            168    2
Cross-Examination by Mr. Fondo                             226    2
Redirect Examination by Mr. Chang                          245    2

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 1 | | 176 | 2 |
| 2 | | 176 | 2 |
| 3 | | 196 | 2 |
| 4 | | 201 | 2 |
| 5 | | 209 | 2 |
| 6 | | 212 | 2 |
| 7 | | 204 | 2 |

**Friday - December 5, 2025**                                    **10:06 a.m.**

                              **P R O C E E D I N G S**

                                  ---o0o---

THE COURT:  I don't think there's any need for appearances.  We're all getting to know each other painfully well at this point.

Let me say a couple words before we begin.

With this witness I think it's, you know, I think the defense is moving to exclude the testimony in its entirety. That's not going to happen.  The government can have a China person testify, right?  On the other hand, it's pretty clear that the witness cannot test' -- it would not be appropriate for the witness to testify about some of the things in the report, and the government has conceded that in its response. And so the government has sort of laid out what it believes the witness should be able to testify to in its response, and the question is whether, you know, the testimony should be further restricted.  And I think there probably should be some further restrictions, but that will be -- you know, from my standpoint that's the purpose of today's hearing is not to decide whether to exclude or allow this expert, but to set parameters for the expert's testimony that won't cross the 403 line, that aren't beyond the -- that aren't beyond the scope of the case or his expertise or anything like that.  I mean, that's really the purpose of this from my perspective.  So I just wanted to share

that.

Any preliminary comments from you all before we get going?

MR. CHANG:  No.  That guidance is helpful, Your Honor, and we will heed it in today's presentation.

THE COURT:  Okay.  Great.  Go ahead and call up your witness.

MR. CHANG:  Good morning, Your Honor.  Again, Roland Chang for the United States.

The United States calls Dr. Adam Segal to the stand.

THE COURTROOM DEPUTY:  You can be seated.

Please raise your right hand.

ADAM MITCHELL SEGAL,

called as a witness for the Government, having been duly sworn, testified as follows:

THE COURTROOM DEPUTY:  Thank you.

Please state and spell your full name for the record.

THE WITNESS:  Adam Mitchell Segal, S-e-g-a-l.

DIRECT EXAMINATION

BY MR. CHANG

Q.   Good morning, Dr. Segal.

A.   Good morning.

Q.   Thank you for being here this morning.

Can you provide the Court with an overview of your educational history?

THE COURT:  Very brief.  Very brief.

THE WITNESS:  I have a BA in government from Cornell University, I have a master's in international relations from The Fletcher School at Tufts University, and I have a Ph.d. in government focusing on China from Cornell University.

BY MR. CHANG

Q.   What was the topic of your dissertation for your Ph.d?

A.   I focused on how four Chinese cities supported the first wave of Chinese tech firms in the PC and software industry, with a focus on high-tech zones.

Q.   And those four cities that you researched in your dissertation, did that include Shanghai?

A.   Yes.

Q.   Where do you currently work?

A.   The Council on Foreign Relations.

Q.   If I refer to the Council on Foreign Relations as CFR, will you understand me?

A.   Yes.

Q.   What is CFR?

A.   We are a nonpartisan independent foreign policy think tank.  We take no official position, no U.S. or foreign government money.

Q.   What is your current position at CFR?

A.   I'm the Ira A. Lipman Chair in Emerging Technologies and National Security, and I direct the digital and cyberspace policy program.

**Q.** How long have you held these two positions?

**A.** Except for the 14-month leave at the State Department, since 2014.

**Q.** You mentioned that you worked at the State Department for approximately 14 months. What did you do there?

**A.** I was a senior advisor in the cyber and digital bureau.

**Q.** What was your job as a senior advisor?

**A.** My primary role was writing the 2025 U.S. international strategy for cyber and digital policy.

**Q.** That's quite a mouthful.

What was the U.S. strategy on cyber? What is that document?

**A.** Essentially it looked at U.S. interaction with friends and adversaries around cyber issues, as well as digital trade and tech issues.

**Q.** Were you the primary drafter of this document?

**A.** I was.

**Q.** And this document was on behalf of the entire United States government?

**A.** Yes.

**Q.** Did that document involve research and analysis related to the People's Republic of China?

**A.** Yes.

**Q.** Can you explain for the Court the work that you are currently doing for CFR?

**A.** So I do primarily research on cybersecurity and cyberspace governance issues, as well as U.S.-China tech competition.

**Q.** What do you actually do on a day-to-day as a CFR researcher?

**A.** I have a longterm project that's looking at U.S.-China tech competition and the role of private sector technology enterprises. I have shorter-term projects around AI and global governance. I get asked by the press to comment on issues, public speaking and shorter writing.

**Q.** How do you conduct research for these positions at CFR?

**A.** I essentially do qualitative writing, uh, research. So reading of sources, government source, Chinese government sources, sources online, interviews and other analysis of open source material.

**Q.** As part of your qualitative research for CFR, is understanding whether certain entities are controlled, sponsored or managed by the PRC government an important fact?

**A.** Yes, a large focus is on which tools the Chinese government is relying on to pursue its technology goals.

**Q.** Do you currently hold any teaching positions?

**A.** I teach adjunct at the School of International and Public Affairs at Columbia.

**Q.** What course do you teach?

**A.** Cybersecurity and cyber conflict in the Indo-Pacific.

**Q.** Does that include China?

**A.**    Yes.

**Q.**    Have you held any visiting scholar positions in your career?

**A.**    As a graduate student I was a visiting researcher at the Shanghai Academy of Social Sciences and at Tsinghua, which is considered China's MIT.  I've been a visiting fellow at Hoover, at Stanford and MIT Center for International Studies.

**Q.**    Have you written any books related to PRC technology policy and cyber strategy?

**A.**    Three books.

**Q.**    Can you briefly describe them?

**A.**    Digital Dragon, which came out of my dissertation, looks at those four Chinese cities and industrial policy around Chinese tech policy.  Advantage:  How American Innovation Can Overcome the Asian Challenge looks at science and technology strategy in China, India, South Korea and Japan and U.S. policy responses, and The Hacked World Order looks at the international governance of cyber and digital issues.

**Q.**    Have you also written any articles on technology and cybersecurity issues related to the PRC?

**A.**    Yes, tens of issues and articles and chapters and edited volume says on Chinese technology policy.

**Q.**    What types of publications has your work appeared in?

**A.**    Foreign affairs, foreign policy, China Leadership Monitor, as I mentioned, some edited volumes, and then for the public

press for opinion pieces in the Wall Street Journal, the New York Times, Financial Times, Washington Post.

Q.   Have you ever testified to Congress regarding technology policy and cyberspace issues related to the PRC?

A.   Yes, six times.

Q.   What are the topics you've provided --

THE COURT:  I don't think that's necessary.  You can skip over that.

BY MR. CHANG

Q.   Have you ever briefed any U.S. Governmental agencies on PRC cyberspace policy and technology issues?

A.   Yes, the Commerce Ministry, the State Department, the Defense Department, the National Security Agency, Central Intelligence Agency and various House and Senate committees.

Q.   As part of your CFR job, do you also meet with Chinese policymakers, Chinese governmental policymakers, on technology and cybersecurity issues?

A.   Yes, we have deligations that often come to CFR.

Q.   And did you recently make a trip to China where you met with Chinese policymakers?

A.   I was in China three weeks ago for the first time since COVID.  And we met with the Ministry of Foreign Affairs, as well as the defense -- excuse me, the Development Research Council, which is the research arm of the State Council.

Q.   Do you have any foreign language skills that bear on your

training and expertise?

**A.** It was much better than before COVID when all opportunities to go to China were cut off, but I read and speak Chinese.

**Q.** As part of your research, do you also spend significant time in the PRC?

**A.** Again, I used to make two to three trips to China a year, but as I mentioned before, this last trip was the first time since 2019. Excuse me, 2017.

**Q.** Let's turn to this case now, Dr. Segal.

Have you been retained by the United States as an expert witness in this case?

**A.** Yes.

**Q.** Have you been retained previously by the government in other criminal matters?

**A.** Yes, three times previously.

**Q.** Can you walk through each of those examples briefly?

**A.** Currently engaged with Pangang Group, U.S. Government versus Pangang. I was engaged with U.S. Government versus Fujian Jinhua, and then 2012 with the U.S. Government versus Sixing Liu.

**Q.** Did you provide testimony in the Sixing Liu case?

**A.** Written testimony. I did not provide oral testimony.

**Q.** And then you also mentioned the Fujian Jinhua case. Was that in this courthouse?

**A.** Yes.

**Q.** Did you provide expert opinions in that case?

**A.** Yes.

**Q.** What were the topics you provided testimony on?

**A.** Similar to this case, why the technologies under discussion would be interest to the Chinese government, Chinese development plans and technology strategies, as well as my opinions about Chinese organizations and agencies about whether they were controlled by the Chinese government.

**Q.** As part of your engagement for the government in this case, did you prepare two expert reports?

**A.** Yes.

**Q.** I'd like to turn now to should be tab 1 in the binder in front of you.  It's exhibit 1.

        **MR. CHANG:**  It's also in the binder in front of you, as well, Your Honor, and defense counsel.

**BY MR. CHANG**

**Q.** Dr. Segal, do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** The list of documents that I examined.

**Q.** And if you just scroll through or skim through the rest of the document and let the Court know what the rest of the document is.

**A.** My expert testimony and my supplemental testimony.

MR. CHANG:  Government moves to admit exhibit 1 into evidence, Your Honor.

THE COURT:  I assume no objection?

MR. FONDO:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 1 received in evidence.)

BY MR. CHANG

Q.   Let's turn to exhibit 2 now.  It's the next tab.

Dr. Segal, what is this document?

A.   Sorry.  This is my supplemental testimony.

MR. CHANG:  Your Honor, government moves to admit exhibit 2 into evidence.

MR. FONDO:  Again, no objection, Your Honor, as to this hearing.

THE COURT:  Admitted.

(Trial Exhibit 2 received in evidence.)

BY MR. CHANG

Q.   All right. Dr. Segal, let's give some context for your testimony today.

MR. CHANG:  Ms. Hernandez, could you please pull up the demonstrative that the government has prepared with Dr. Segal?

BY MR. CHANG

Q.   Dr. Segal, have you prepared a demonstrative that will assist in your testimony related to the PRC government and

economy?

**A.**   Yes.

**Q.**   Is the slide deck in front of you, is that the first page of that demonstrative?

**A.**   It is.

         **MR. CHANG:**  Let's turn to page 2 of the demonstrative, please, Ms. Hernandez.

         **THE COURT:**  Before you get to that, could I ask you a question just before I forget about the Jinhua case?

     How long ago was that trial?

         **THE WITNESS:**  If I remember correctly, it was in 2024.

         **THE COURT:**  Okay.  So relatively recently?

         **THE WITNESS:**  Yes.

         **THE COURT:**  What do you remember about the evidence in that case about the interactions or connection between the Chinese government and the defendant?  I'm just kind of curious about what that was like in that case compared to this case.

         **THE WITNESS:**  Fujian Jinhua is a state-owned enterprise.

         **THE COURT:**  Okay.

         **THE WITNESS:**  So it --

         **THE COURT:**  So that was the -- was that --

         **THE WITNESS:**  That was a huge part of my argument.  And Fujian Jinhua is explicitly named --

THE COURT:  Okay.

THE WITNESS:  -- in Chinese development government documents.

THE COURT:  Okay.  And that -- and so the -- and the allegations in that case were that that company stole U.S. trade secrets?

THE WITNESS:  Yes.

THE COURT:  And the allegation -- and there was a conviction in that case, I take it?

MR. CHANG:  There was not, Your Honor.

THE COURT:  Oh, there wasn't.

Okay.  What happened in that case?

MR. CHANG:  There was -- I don't want to misrepresent.  I don't know.  I believe Judge Chesney issued an order.  It was a bench trial, so ...

THE COURT:  Yeah, but was there -- there wasn't a conviction?

MR. CHANG:  There was no conviction as I understand it, Your Honor.

THE COURT:  So she acquitted the defendant?

MR. CHANG:  I believe that's right, Your Honor.

THE COURT:  Okay.  And were there -- were there any written findings associated with that ruling by Judge Chesney?

MR. CHANG:  Yes, there is a written opinion on the allegations in that case, although my recollection is that the

findings did not relate to Dr. Segal's testimony.

THE COURT:  Okay.  And what were the trade secrets that were alleged to be stolen in that case?

THE WITNESS:  Had to do with semiconductor chip design.

THE COURT:  Okay.  And who was the victim of the theft?

THE WITNESS:  Micron.

THE COURT:  Okay.  And so it was the -- there wasn't -- there probably wasn't much of a dispute, then, about -- in that case about whether the theft of the trade secrets were for the purpose of helping the Chinese government, because the allegation was that the Chinese government was the entity that stole the trade secrets; is that right?

THE WITNESS:  So as far as I understand it when I spoke to the lawyers after the case, is that the Judge did not question the relationship between Jinhua and the State but had a question about what individuals knew or didn't know about that transfer.

THE COURT:  Got it.

Okay.  Thank you.

MR. CHANG:  And just to make sure the record is clear, my co-counsel reminded me the defendant was the entity in that case.  So it was a corporate defendant as opposed to an individual.

THE COURT:  A Chinese corporation?

MR. CHANG:  Yes.

THE COURT:  Okay.  A state-owned corporation?

MR. CHANG:  Yes.

THE COURT:  Got it.

Okay.  Thank you.

BY MR. CHANG

Q.   All right.  Turning back to the demonstrative that you prepared, Dr. Segal.  Do you recognize the graphic in front of you?

A.   Yes.

Q.   Is this the demonstrative that you prepared?

A.   Yes.

Q.   Okay.  Would it be helpful in assisting your testimony today?

A.   Yes.

Q.   All right.  Dr. Segal, at a high level, can you generally describe the governmental structure of the People's Republic of China?

A.   Yes, China is a one-party state under the rule of the Chinese Communist Party.

Q.   And let's walk through the different columns in this graphic.  Why don't we start with the party.  Does that column indicate to you?

A.   So the party is at the center.  The party supervises and

controls the other two branches and also appoints and removes and promotes individuals up and down the party structure and up and down the government structure.

Q.   You see a number of arrows pointing down from the Central Committee to some of the other committees.  What are those arrows meant to demonstrate?

A.   That supervision, and then the promotion and inspection of those people.

Q.   How does the Chinese Communist Party -- and if I refer to them as the CCP, will you understand me?

A.   Yes.

Q.   How does the CCP actually govern the country?

A.   So the CCP is the one authority in the Chinese government, in the Chinese state.  It primarily governs through the ability to appoint and remove people.  It also sets the direction of the Chinese economy, polity and society through five-year plans and other guidance.

Q.   Who leads the Chinese Communist Party?

A.   Currently Xi Jinping.

Q.   Let's talk through the next column to the right, the government branch.  Can you explain for the Court what's the role of the government in the People's Republic of China?

A.   So the government is implementing the party's plans.  It also issues guidelines and directions.  But Xi Jinping is at the top of both of them, the party and the state.  Li Qiang,

who's the Premier, which is the equivalent of the prime minister, is a member of the Standing Committee of the Politburo.  So, again, the highest-level officials will be party members.

**Q.**   You've used the term "party state" at least once or twice.  What was the -- what's the import of that term in the PRC?

**A.**   This overlap between party supervision and state implementation, as well as individuals often holding dual positions.

**Q.**   You also -- there's a box for the State Council in this case, and that's an entity we'll discuss later on this morning.  What is the State Council?

**A.**   State Council's like the cabinet.  It's where all the important central agencies are.  So the Ministry of Industry and Information Technology, the Ministry of Foreign Affairs, Ministry of Commerce, the State Asset Supervision Administration Commission.  That's kind of where all of these important central agencies come together.

**Q.**   Again, you see arrows pointing down from the State Council to the provisional governments.  What's that arrow meant to indicate?

**A.**   So the State Council supervises provisional governments, and the provisional governments are responsible for implementing policies that come out of the center.

**Q.**   Would you characterize the PRC party state as a government

with a high degree of centralized control or a low degree?

**A.**   High degree.  It is kind of a federal system in that there are municipal governments and district governments and provisional governments.  Governments often interpret central plans or look for ways that they can bring their comparative advantage to those central plans, but they don't have the ability to resist or decline to follow through or to oppose anything that comes from the center.

**Q.**   So, for example, if a provisional government wanted to implement a policy that was contrary to State Council directives, would that be possible?

**A.**   No.

**Q.**   You also mentioned that promotion works in a different way in terms of political hierarchy in the PRC.  Can you explain for the Court how promotion works in the PRC?

**A.**   Yeah.  Essentially officials are promoted based on a certain set of metrics around economic growth, social stability, often environmental concerns, and you make your way up the system.

So, for example, Xi Jinping started off in a municipality in Hebei.  He then went to a province, Zhejiang and Fujian, he went to a municipality in Shanghai, and then eventually he went to the Politburo.

So you are being promoted to the extent that you reach these metrics and achieve these goals that are set by the

center.

**Q.**   Would it be fair to characterize achieving or implementing the central government's goals as an important part of promotion for CCP officials?

**A.**   Yes.

**Q.**   Let's briefly talk about the third branch, the legislative branch.  What's the role of the legislature in the PRC?

**A.**   It's essentially a rubber stamp.  It approves policies from the party.  It meets fairly rarely.  I mean, meets annual -- at a determined schedule, but it's not in office like the Congress is all the time, and it just approves of policies from the party.

**Q.**   Has the National People's Congress ever not passed legislation from the party state?

**A.**   No.

**Q.**   All right. Let's move to the next page of the demonstrative.  Dr. Segal, do you recognize this page?

**A.**   Yes.

**Q.**   What is it?

**A.**   It's the administrative map of the People's Republic of China.

**Q.**   And will this assist in your testimony today?

**A.**   Yes.

**Q.**   Can you explain generally how the PRC is governed from an administrative perspective using the map, please?

**A.**   Yes.   So there are 22 provinces and five autonomous regions which are essentially provinces, and then there are four municipal areas that are governed as if they're provinces. They're at the same level as a province.

**Q.**   Why is that?

**A.**   Mainly because of size and importance to the economy.   So Chongqing, which is one of them, is a metropolitan area of over 30 million people and is extremely important to the development of the interior of China, because most of the economic growth over the last 30 years in China has been on the eastern seaboard.   Shanghai, the same, similar kind of argument. Fifteen million people, and it plays an incredibly important role in the development of the Yangtze River delta.

**THE COURT:**   The development of what?   Sorry.

**THE WITNESS:**   The river delta there.

**MR. CHANG:**   And for the court reporter, that's Yangtze.   That's Y-a-n-g-t-z-e.

**BY MR. CHANG**

**Q.**   All right.   Were there specific geographic regions you focused on as part of your expert opinions in this case?

**A.**   Chongqing and Sichuan, as well as Shanghai.

**Q.**   Can you just quickly point out where those are on the map? We were hoping to do a --

**THE COURT:**   I see it.

**MR. CHANG:**   Thank you, Your Honor.

All right.  We can take that down, Ms. Hernandez.  Thank you.

**BY MR. CHANG**

Q.   At a high level, again, Dr. Segal, how would you describe China's economy?

A.   China is a socialist market economy.

Q.   What do you mean by -- let's break down the first part of that statement.  What do you mean by it being a socialist economy?

A.   So there's still parts of the Chinese economy that are owned by the State.  There is a high degree of direction through Chinese policy, through the five-year plan, as well as more specific industry -- industrial policies around specific technologies.  State-owned enterprises still play a fairly important role in the economy.

Q.   What about the second part of that phrase, the market economy piece?

A.   So since 1978, when China opened up, there has been much greater space for private entrepreneurs and foreign enterprises to grow.  It's been a, really the most important part of China's economic development driven the growth there.  We have seen some backsliding the last five years under Xi Jinping, who has increased the control of the State, but the private sector is really where all the innovation happens in the technology sector.

**Q.**   How does the PRC government effectuate control over China's economy?

**A.**   So both directly through the state-owned enterprises and the policies; so guidelines, five-year plans.  Through state lending; so the banks, central banks, banks are controlled by the State.  Through a range of industrial policies that provide subsidies and funding.  And then implementation at the provisional and municipal level of these policies.

**Q.**   And I think it would be helpful for those of us who aren't as intimately familiar with the economy, how does that differ from the United States government's control, for example?

**A.**   The U.S. Government is a -- I mean, the U.S. economy is a totally capitalist economy driven by the private sector.  U.S. Government has ways of trying to shape that economy through tax breaks and subsidies for certain types of production.  Under President Trump and President Biden we do have some tools of industrial policy, for example investment in chips, but the scope is much smaller, and the economy is still primarily driven by the private sector.

**Q.**   You've mentioned five-year plans a couple of times, and we'll talk about that in a bit with respect to this case.

What is a five-year plan?

**A.**   A five-year plan broadly lays out the direction that the party thinks that China should go over five years.  So they're extremely long documents, 60-plus pages, but touch everything

on the economy, to society, to pol' -- to the political, and will set big themes for where China thinks it's going.

So we're just ending the 14th plan, 2021 to 2025.  That plan had a lot of focus, for example, in the economy around self-reliance and China increasing its technological capacities.  From early reporting inside of China about what's going to be in the 2025 -- excuse me, in the 15th five-year plan, China seems to will be doubling down on those themes.

**Q.**   Does the State Council and its commissions also issue specific development plans on certain technologies or sectors of the economy?

**A.**   Yes.

**Q.**   Have they issued any plans related to artificial intelligence?

**A.**   Yes.  So in 2017, the State Council issued the new generation artificial intelligence plan, which lays out goals for China's development.  Says that by 2025 the domestic market should be about a hundred billion, and that by 2030, China should be a world force in AI development and research.

**Q.**   Was there a follow-up plan to that plan in 2023, as well?

**A.**   There was a follow-up in 2023, and just this year there was an AI innovation-plus plan, which focuses on six different sectors of the economy.

**Q.**   You've also mentioned state-owned enterprises.  Briefly, what are those?

**A.**   Enterprises owned by the State.

**Q.**   Let's also talk about a concept that will be relevant to your opinions today, a concept of high-tech zones in the PRC. Do you know what those are?

**A.**   Yes.

**Q.**   How do you know what those are?

**A.**   They were in part the focus of my dissertation.

**Q.**   And have you been studying them for the last 30-plus years?

**A.**   Yes.

**Q.**   What is a high-tech zone in the PRC?

**A.**   So the Chinese leadership became worried in the mid '80s that they had missed out on the IT revolution, on the information technology revolution.  They sent a number of study deligations to the United States.  They came to Silicon Valley and Route 128 in Boston, and the lessons that they learned from Silicon Valley was you need to agglomerate and bring together universities, venture capital and private sector and private entrepreneurs into a kind of shared geographical space.  So the high-tech zones was an attempt to create those conditions by providing support for them.

**Q.**   Was this driven in part by a desire to recreate Silicon Valley in the PRC?

**A.**   Yes.

**Q.**   Let's break down each of the prongs that you mentioned

vis-a-vis high-tech zones.

First, universities.  What are the roles of universities in high-tech zones in the PRC?

A.    They play several roles.  I mean, the first is that they of course are training students, and the hope is that those students will then start their own companies, spinoff companies.  Universities will then often tailor the curriculum and the types of technologies that they develop or research to the industrial concerns of those high-tech zones.  They often hope the same thing from professors, that the professors will leave university's, spin off companies, and then the universities will often create or move specialized research institutes into the zones.

Q.    Are these universities public universities?

A.    Yes.

Q.    And does the CCP party state exercise any level of control or sponsorship over public universities in China?

A.    Yes, all public universities in China report to the Ministry of Education.  They have a party committee on the~-- inside -- in the campus in the university administration.  They appoint the leadership, and universities are supposed to support Chinese five-year plan and other development strategies.

Q.    Is there a single public university in China that's not controlled or sponsored by the CCP?

**A.**   No.

**Q.**   Let's talk about the second prong of high-tech zones that you mentioned, venture capital.  What's the role of venture capital in the high-tech zones in the PRC?

**A.**   The same role that it plays in Silicon Valley.  The venture capitalists are hoping to find investments that are 10, 20, a hundred times "X" that will pay off.  And we saw, you know, in the first wave of China's Internet development lots of foreign firms set up and invested in Chinese enterprises. There was a growth of the private sector in China around VC. That private sector has suffered recently, and there's been a larger role for state-guided funds, but the goals are the same as they are in the U.S. is to, you know, help fund technologies that can be commercialized at scale.

**Q.**   Are there state-owned or state-sponsored venture funds as part of high-tech zones?

**A.**   Yes.

**Q.**   And what are the role of those state-sponsored funds?

**A.**   They are looking to fund the technologies that are mentioned in state plans so that they can help support technology development inside of China.

**Q.**   Given the scope and sense of scale, how many high-tech zones are there in China today?

**A.**   I would guess hundreds.  I don't know for sure.  I suspect that every province has several, and then municipalities often

have high-tech zones or high-tech hubs or incubators of some sort.

**Q.**   And are these zones themselves, the ecosystem that you've just described for us, are those also controlled or sponsored by the PRC government?

**A.**   Yes.

**Q.**   Is there a single high-tech zone in China that you're aware of that isn't controlled or sponsored by the CCP?

**A.**   No.

**Q.**   Dr. Segal, as part of your work for this case, did you research the relationship between the PRC government and certain PRC entities?

**A.**   Yes.

**Q.**   Specifically, did you reach any opinions about certain entities associated with Zhisuan, the defendant's startup?

**A.**   I did.

        **MR. CHANG:**   For the court reporter, that's Z-h-i-s-u-a-n.

**BY MR. CHANG**

**Q.**   How did you reach opinions regarding the relationship between certain entities and the PRC government?

**A.**   I looked at the documents that the government provided me, I did open source supplemental research on those entities, looking at Chinese websites, looking at the descriptions of those entities in the Chinese press, as well as other

reporting, and based all of that on the research I've been doing for 30 years on Chinese technology development.

Q.   Did you conduct independent research in addition to the documents that the government shared with you?

A.   Yes.  Independently I investigated the organizations that the government asked me to look at, primarily open source research by looking at the Chinese reporting on those institutions, Chinese government documents, the websites, other databases, and referred back to other research in secondary literature in English about Chinese technology development.

Q.   Did your research include both Mandarin and English language documents?

A.   Yes.

Q.   And the research that you conducted for these opinions, is it consistent with the type of qualitative research you've been doing for the last 30 years as an academic?

A.   Yes.

Q.   Were the materials that you relied on as part of your research typical for the qualitative research you do in your field?

A.   Yes.

Q.   Let's first talk about --

        MR. CHANG:  And I might repeat myself, Your Honor, for the court reporter's benefit.

BY MR. CHANG

**Q.** Let's first discuss the Chongqing Mingyue Lake International Intelligent Industry Science and Technology Innovation Base. And that's C-h-o-n-g-q-i-n-g M-i-n-g-y-u-e, for the court reporter.

Dr. Segal, was this one of the entities that you looked at?

**A.** Yes.

**Q.** For the benefit of the court reporter, can we call this the innovation park?

**A.** Yes.

**Q.** Based on your~--

**THE COURT:** Can I interrupt and ask a question?

**MR. CHANG:** Yes.

**THE COURT:** Is this in reference to the entity that's described on page 3 of the supplemental report, the description begins on page 3?

**MR. CHANG:** Let me take a look.

Yes, in part. It describes the park, as well as the fund that's associated with the park.

**THE COURT:** Okay.

**BY MR. CHANG**

**Q.** Let me re-ask my last question, Dr. Segal, for the record.

For the benefit of the court reporter, can we call the Chongqing Mingyue Lake International Base the innovation park?

**A.** Yes.

**Q.** Based on your review of the evidence, what is your understanding of the relation between the innovation park and Zhisuan?

**A.** Zhisuan was in contact with the park about providing services, about compute services, as well as having an application to the vendor capital fund.

**Q.** As part of reaching this opinion, did you review documents found on the defendant's device?

**A.** Yes.

**Q.** I'm going to show you now a document that's been marked as exhibit number 3. It should be tab 3 in your binder. Bates number is AML185.

Dr. Segal, was this one of the documents that you reviewed in reaching your expert opinions?

**A.** Yes.

**Q.** What is it?

**A.** My understanding is it's a pitch deck that Zhisuan was using to find -- to seek for investment and partnerships.

       **THE COURT:** I'm sorry. This is exhibit 3?

       **MR. CHANG:** Yes. Should be tab 3 in your binder, Your Honor.

       **THE COURT:** Got it.

       **MR. CHANG:** Your Honor, government moves to admit exhibit 3.

       **MR. FONDO:** Objection, Your Honor. Lacks foundation,

hearsay.

THE COURT:  For purposes of this hearing it can come in.  Obviously none of this is relevant to what comes in at trial.

(Trial Exhibit 3 received in evidence.)

MR. CHANG:  Thank you, Your Honor.

Permission to publish?

THE COURT:  To whom?

MR. CHANG:  The audience and my co-counsel, Your Honor.

THE COURT:  You don't have to ask permission to publish.

MR. CHANG:  Okay.  Got it.  Thank you.

Old habit, Your Honor.

BY MR. CHANG

Q.   Let's turn to page 33 of this document.  You'll see the pagination on the bottom middle of the document.

What's -- can you explain, is this the innovation park that you were referring to as one of the entities that you looked at?

A.   Yes.

Q.   And based on your research and your expertise, what is the innovation park on this slide?

A.   It is the creation of Chongqing municipal -- excuse me, district government, so the district government of Chongqing,

creating a zone in the attempt to support technology and technology innovation inside of Chongqing.

Q.   And you mentioned the Xinjiang committee.  Is that a government committee?

A.   Yes, it's a branch of the Chongqing municipal government. The zone -- Xinjiang itself is a zone that was created by the State Council.

Q.   And what is a new area, for those of us who aren't as well versed in these terms?

A.   So it's the idea that you often have kind of on the outskirts of a city an area where there was no development, and so the Chinese, you know, turned these areas and created subsidies and other financial incentives for factories, different businesses, research institutes to move there.

Q.   Is this an example of -- is the innovation park an example of a high-tech zone that we discussed earlier this morning?

A.   Yes.

Q.   You also mentioned that you reached the understanding that the defendant was trying to build an AI model for this park.

          MR. CHANG:  Turn to page 37, Ms. Hernandez.

BY MR. CHANG

Q.   Let's focus your attention on the quote at the very top underneath the header.  It says, quote:  "Settle in Chongqing to help the rapid construction of the AI large model in Mingyue Chongqing, and empower SMEs."

Do you see that?

A.   Yes.

Q.   Was that language that you relied in part on for your opinion?

A.   Yes.

Q.   Based on your review of the evidence and your own independent research and training and experience, have you formed an opinion on whether the innovation park is substantially owned, controlled, sponsored or managed by the PRC government?

A.   I have.

Q.   What is that opinion?

A.   My opinion is that Mingyue Lake is substantially controlled, owned or sponsored by the People's Republic of China.

Q.   And how did you reach that?  Can you explain your process for reaching that opinion?

A.   Yes.

So I looked at Mingyue Lake's description of itself on its own website, where it talks about the management committee and its relationship to the State.  I looked at press reports which talk about the Xinjiang management committee's support of Mingyue Lake, as well, which included financial incentives, and then the management structure of the Mingyue Lake talks about the municipal government.

**Q.**   Were the materials that you relied on typical for research in your field?

**A.**   Yes.

**Q.**   And based on your experience, are you aware of a single park like this one being run without the sponsorship or control of the PRC government?

**A.**   No.

**Q.**   Next, you have a related opinion related to the Mingyue Lake Venture Fund.  Was this another entity that you looked at?

**A.**   Yes.

**Q.**   For the ease of the court reporter, I'll call it the VC fund.

Based on your review of the evidence, what is your understanding of the relationship between the VC fund and the defendant's startup?

**A.**   The defendant's startup, as far as I understand it, the defendant applied for support from the fund.

**Q.**   In other words, a capital investment from the VC fund?

**A.**   A venture capital investment, yes.

**Q.**   And based on your review of documents, your research and training and expertise, have you formed an opinion on whether the VC fund is substantially owned, controlled, sponsored or managed by the PRC government?

**A.**   I have.

**Q.**   What is that opinion?

**A.**   That the fund is substantially owned, controlled or managed by the People's Republic of China.

**Q.**   Can you explain your process for reaching that opinion?

**A.**   So in public databases that list venture capital funds it's listed as a state fund.  The website of the fund itself describes itself as the most important state fund in the Xinjiang district.  The management of the fund itself came -- had long careers in Chongqing government and the party.

**Q.**   Did you also draw upon your training and expertise for reaching this opinion?

**A.**   Yes.  All of this is consistent with the research I've been doing for the last 30 years about the role of government-guided funds.

**Q.**   And the sources that you reviewed and the process that you undertook, was this typical for research in your field?

**A.**   It was.

**Q.**   Really briefly I would like to show you exhibit 4.  If you will turn to that tab.  It's Bates AML81 at the bottom right.

Dr. Segal, do you recognize this document?

**A.**   I do.

**Q.**   What is it?

**A.**   It's a document from the management, administrative committee of Xinjiang area that talks about the role that state-owned enterprises and other parts of Chongqing government should play in supporting digital technologies in the area.

**Q.** Does that include artificial intelligence?

**A.** Yes.

**Q.** Was this document another one that you relied on in your expert report?

**A.** Yes.

**Q.** Is it your understanding that this document was on the defendant's devices?

**A.** That's my understanding.

**MR. CHANG:** Your Honor, government moves to admit exhibit 4 into evidence.

**MS. WALSH:** Same objection as before, Your Honor, but I recognize the Court's ruling.

**THE COURT:** Overruled.

(Trial Exhibit 4 received in evidence.)

**BY MR. CHANG**

**Q.** Okay. Explain --

**THE COURT:** It's admitted.

**MR. CHANG:** Thank you, Your Honor.

**BY MR. CHANG**

**Q.** Dr. Segal, what is this document?

**A.** It's a document that governments would issue essentially telling all the other parts of the government what their responsibilities is going to be. It, you know, lists specific technologies. It would suggest what those state-owned enterprise and municipal governments should do. It would also

be a signal to private entrepreneurs and companies that, oh, if you have technology -- a company that works in this area, Mingyue Lake is a place you should come, you should bring your company to, because there will be an overlap in the support you could get.

Q.   Have you reviewed hundreds of Chinese government documents like this in your career?

A.   Unfortunately, yes.

Q.   Next, let's talk about the Sichuan Tianfu New Area Innovation Research Institute.  Was this another PRC entity that you looked at?

A.   Yes.

Q.   Let's call it the research institute for the benefit of the court reporter.

Based on your review of the evidence, what is your understanding of the relationship between the research institute and Zhisuan?

A.   My understanding is Zhisuan was hoping to make the research institute a customer.

Q.   Did you form an opinion based on your process in this case on whether the research institute is substantially owned, controlled, sponsored or managed by the PRC government?

A.   I did.

Q.   What is that opinion?

A.   That the research institute is substantially owned,

controlled or managed by the People's Republic of China.

Q.   How did you reach that opinion?

A.   The research institute was founded by the Southwest University of Sichuan, which is a public university.  So that means it is under the supervision of the Ministry of Education.  It has a committee.  The research institute also has a committee that supervises it from the Tianfu area.  So that's part of the Chongqing government, and so it is substantially managed by two entities that are Chinese government entities.

Q.   In addition to that research, did you also draw upon your training and experience in reaching this opinion?

A.   Yes.  So consistent with what I've seen over the last 30 years about the role that university research institutes would play in supporting Chinese technology development broadly, but in this specific case specific tech zones.

Q.   I'd like to now turn your attention to, it's going to be exhibit 7.  It's in the back pocket of your binder.

        MR. CHANG:  It's in the back pocket, Your Honor.  It's a two-page document.

BY MR. CHANG

Q.   Dr. Segal, do you recognize exhibit 7?

A.   Yes.

Q.   What is it?

A.   My understanding, it's a potential customers list for Zhisuan.

**Q.** Is this -- is your understanding that this document was found on the defendant's devices?

**A.** That's my understanding.

**Q.** Was this a document that you relied on as part of your expert reports in this case?

**A.** Yes.

> **MR. CHANG:** Your Honor, government moves to admit exhibit 7, AML2627, into evidence.

> **THE COURT:** Any additional objections?

> **MR. FONDO:** No, Your Honor.

> **THE COURT:** Admitted.

(Trial Exhibit 7 received in evidence.)

> **MR. CHANG:** Ms. Hernandez, if you could turn to page 2 of exhibit 7.

**BY MR. CHANG**

**Q.** Dr. Segal, did you review this information as part of reaching your opinion on the Tianfu research institute?

**A.** Yes.

**Q.** And it notes here the research institute is, quote: "Relatively weak in AI and are also tasked by the State with establishing compute centers at institutions of higher learning," end quote.

Do you read that?

**A.** Yes.

**Q.** What is the import of research institutes in terms of

their relationship with the State on certain PRC technological goals?  Explain the context for a statement like this.

**A.**   So as the document states, they were tasked by the State -- so, I mean, the university and the government, the provisional and municipal government -- to provide compute to the other -- to institutions of higher learning in the area. And so they're playing a direct role in supporting government policies around specific types of technology, in this case AI and large compute.

**Q.**   To be helpful as a basis of comparison, how would this differ, for example, from the United States if there were certain goals the government was encouraging?  How would that be different in the PRC?

**A.**   So the U.S. Government would distribute investments in research institutes around American universities around specific technology.  So, for example, cybersecurity we have NSA Centers of Excellence and Research in a number of universities.  But universities would be free to pick and choose those technologies.  They wouldn't be assigned them by the State, and they would not be -- you know, the universities are not responding to or referring to kind of national plans on specific technologies.

**Q.**   And would there be a party committee in a U.S. university, for example, like there is in China?

**A.**   No, no party supervision or management.

**Q.**   Okay.  Let's turn now to the --

          **MR. CHANG:**  You can take that down, Ms. Hernandez.
Thank you.

**BY MR. CHANG**

**Q.**   Let's turn now to Lingang Group.  Did you conduct research
on this entity?

**A.**   Yes.

**Q.**   That's L-i-n-g-a-n-g for the court reporter.

     Based on your review of the evidence, what is your
understanding of the relationship between Lingang Group and
Zhisuan?

**A.**   My understanding is that Zhisuan was seeking investment
from Lingang Group.

**Q.**   Based on the process you undertook in this case, have you
formed an opinion on whether Lingang Group is substantially
owned, controlled, sponsored or managed by the PRC government?

**A.**   I have.

**Q.**   What is that opinion?

**A.**   That Lingang Group is substantially owned, controlled or
managed by the government of the People's Republic of China.

**Q.**   How did you reach that opinion?

**A.**   Lingang is a state-owned enterprise that's focused on
developing commercial and high-tech zones.  It describes itself
as a state-owned enterprise.  All public reporting on China in
Chinese and Chinese newspapers describe it as a state-owned

enterprise, public databases list it as a state-owned enterprise, and the website itself links back to the Shanghai Municipal Asset Supervision and Administration Commission, which is the agency that would supervise state-owned enterprises at a municipal level.

Q.   Are there specific state-owned enterprises devoted to different sectors in China?

A.   There are.  And as I said, this one is specifically focused on high-tech zone, commercial zone development.

Q.   Separately, Dr. Segal, were you asked to conduct research on the Shanghai International Talents Program?

A.   I was.

Q.   Why that program in particular?

A.   It's my understanding the defendant submitted an application for a talent fund being managed by the Shanghai Xuhui District Government.

Q.   What is the Xuhui District Government?

A.   It's a district of Shanghai.  So like New York City has boroughs, the districts of Shanghai would then administer policies that are promoted at the municipal level and the national level.

Q.   Before we dig into the evidence related to this issue, can you explain for those of us who aren't familiar with it, what is a talent program?

A.   A talent program is a government-led attempt to lure both

talent that left China and was working abroad to come back to China and either join research institutes, set up companies, teach.  In some cases foreign talent, so talent that was born outside of China, to come contribute to Chinese development plans and transfer their expertise and knowledge that they developed overseas.

Q.    These talent programs that you just described, are these government-sponsored programs?

A.    Yes.

Q.    Are there any talent programs that you're aware of that are not government sponsored in the PRC?

A.    Not that I'm aware of.

Q.    And is part of the purpose of the talent programs to attract technology and talent back to the People's Republic of China?

A.    Yes.

Q.    You mentioned that you looked at the Shanghai International Talents Program in particular.  I'm going to show you now exhibit 5.  It's tab 5 in your binder, Dr. Segal.  Let me know when you're there.

    Was this one of the documents that you reviewed as part of your expert analysis in this case?

A.    Yes.

Q.    What is it?

A.    My understanding is it's the defendant's application for a

talent program in Shanghai.

MR. CHANG:  Your Honor, government moves to admit exhibit number 5 into evidence.

THE COURT:  Further objections?

MR. FONDO:  No further objections, Your Honor.

THE COURT:  Admitted.

(Trial Exhibit 5 received in evidence.)

BY MR. CHANG

Q.   Let's walk through how these talent programs actually work.  How are they administered?

A.   So there's right now probably 10 that are administered at the central level.  So central agencies like the Ministry of Science and Technology will administer national ones, and then there are provisional and municipal level plans, excuse me, talent programs, that are administered at that level that will deal with the applications and then provide the support for the talent that returns.

Q.   Maybe this is an obvious question to you, but do people apply to be part of a talent program in the PRC?

A.   Yes, you apply to participate in the programs.

Q.   Based on your process in this case, have you formed an opinion on whether the Shanghai international Talent Program is substantially owned, controlled, sponsored or managed by the PRC government?

A.   I have.

Q.   What is that opinion?

A.   That the Shanghai talent plan is substantially owned, controlled, managed by the People's Republic of China.

Q.   Can you explain your process for reaching that opinion?

A.   So talent plans are government-led initiatives. Shanghai's five-year plan explicitly talks about its use of talent plans both for local and foreign and returning talent. This plan specifically was being administered by the Xuhui District, so a part of the municipal government, and the support that comes from the plans is provided by municipal and provisional governments.

Q.   How did you determine that it was administered by the Xuhui District?

A.   It -- an application was to -- submitted to the talent plan, and the talent plan as I mentioned before, is mentioned by the Xuhui District, as well as other districts have their own talent plans.

Q.   Okay.  Dr. Segal, were you also asked to provide an opinion explaining the PRC's AI ambitions, including policy pronouncements from the government?

A.   I was.

Q.   What is your opinion on this issue?

A.   That the Chinese leadership at the highest level has signaled the importance of AI to China's economic development. It has increasingly focused and invested large numbers --

large-scale capital in AI models.  It's designated Chinese firms as being national champions.  It's issued a series of policies in support of AI development.

**Q.**   Did you also review any evidence provided to you by the government in support of this opinion, related to this opinion?

**A.**   I did.

**Q.**   I'd like to show you now exhibit 6.  It's tab 6 in your binder.

Dr. Segal, was this one of the documents you reviewed as part of your expert process?

**A.**   It was.

**Q.**   What is it?

**A.**   My understanding, it's a pitch deck from Zhisuan.

**Q.**   Is this another document found on the defendant's devices?

**A.**   That's my understanding.

          **MR. CHANG:**  Your Honor, government moves to admit exhibit 6 into evidence.

          **THE COURT:**  Further objection?

          **MR. FONDO:**  Your Honor, just for clarification, when you say "further objection," you're saying in addition to the authenticity and hearsay objections?

          **THE COURT:**  In addition to the stuff you already mentioned regarding the other documents.

          **MR. FONDO:**  Nothing further, Your Honor.  Thank you.

          **THE COURT:**  Okay.  Admitted.

(Trial Exhibit 6 received in evidence.)

MR. CHANG:  Thank you, Your Honor.

BY MR. CHANG

Q.   Dr. Segal, was this one of the documents that you reviewed as part of your process?

A.   It was.

Q.   I'd like to turn to page 6 of this document.  Again, the pagination should be on the bottom middle of the deck.  Okay. If you -- page 5.  I guess my pagination is off by one. Apologies there.

MR. CHANG:  All right.  The text is small.  So Ms. Hernandez, can you blow up the first half of the screen, please?

Perfect.  Thank you.

BY MR. CHANG

Q.   You'll see that the pitch deck from the defendant's startup references a number of AI initiatives and plans.  Can you walk us through what these plans are at a high level?

A.   So the 2017 State Council Development Plan for the Next Generation of Artificial Intelligence was the one I mentioned earlier.  It was kind of the first really important description from the center about the role that AI would play in the Chinese economy and the support that the government would play, as well as highlighting some of the barriers that China faced, in particular around chips.

And on the other side is a series of administrative or interim measures kind of following up on those plans from specific agencies and ministries.  For example, the Cyberspace Administration of China, the DR -- the National Development Reform Commission.  These would all be under the State Council which we talked about earlier.

**Q.**   Let's talk about the 2017 State Council plan on the right. What's the practical effect of a State Council plan like this for provisional and municipal governments?

**A.**   It really tells them where their attention should focus. So it lays out the technology areas, the specific applications of AI, as I mentioned, the constraints that China saw itself facing, and tells them, you know, how their provisional level and municipal level plan should reinforce and respond to those central level concerns.

**Q.**   How does that differ from the United States, for example, a policy pronouncement from Congress or from the president?

**A.**   Well, most importantly, you know, states in the United States are governed by different parties.  So, you know, the president could, you know, for example, under ObamaCare some Republican states chose to not participate.  That would not be a choice for a province in China.

So while U.S. -- you know, a governor may choose to tap into the infrastructure build-out, they're not being, you know, promoted or moved to the next step based on how well they

respond to that thing, and they don't have any -- the Chinese side has -- the provinces have no independence.  They can't, you know, make a decision not to do what the central government tells them to do.

Q.   What would happen if a provisional governor said, hey, State Council, I'm not interested in implementing this plan?

A.   Never happened, but would probably be removed.

Q.   Based on your training and experience, why would PRC startups cite to State Council plans and development plans in their pitch materials?

A.   In my opinion, a private company or an entrepreneur would want to signal to provisional municipal district-level officials that this is how I can help you.  So again, if you're being promoted based on how well you achieve these goals, you've decided that, for example, that the city you work in has a, specific advantages around certain AI applications.  This company comes along and says, we have technology in that space. You're gonna want to reach out to them, perhaps support them and invest in them, and so a pitch deck would be a good way to signal that.

Q.   You've mentioned promotion a couple of times, but I want to drill down on that point.  Who are you talking about being promoted in this context?

A.   The -- you know, the mayor, the vice-mayor, the management committee in the district are all being pushed to the higher

levels of government.

Q.    And you've stated that the promotion criteria includes implementation of State Council plans?

A.    It includes -- we don't know exactly for sure what promotion criteria includes, but we know that reaching certain levels of economic growth, maintaining social stability, those types of things.  So one would have to assume that delivering on specific technologies that are mentioned in high-level plans would bolster your CV.

Q.    Finally, you had also mentioned chip constraints.  Were you asked to provide an opinion on chip constraints?

A.    I was.

Q.    Let's turn to page --

        MR. CHANG:  This is page 6, now, Ms. Hernandez.  If you could highlight the very top part above "Stability Drops", Ms. Hernandez, the header of page 6.

BY MR. CHANG

Q.    Before we dive into the specifics of this document, what is the environment vis-a-vis chip constraints for the development of artificial intelligence in the PRC?

A.    So it is the -- right now the biggest constraint to China's AI ambitions.  Beginning with the first Trump Administration and continuing through Biden and now the second Trump Administration, the U.S. Government has put export controls around the most sophisticated chips, and in

particular, chips that will contribute to China's AI development. And so this is -- the inability to access these chips is what the Chinese leadership talks about when they talk about developing self-reliance and independent capabilities in chips, and this is what Chinese entrepreneurs often talk about is the biggest barrier right now to development of AI in China.

**Q.** Was this document, was this one of the documents you reviewed in part for giving this opinion?

**A.** Yes.

**Q.** And what's the context around the statements in this document about pain points in the domestic industry? Quote: "Domestic models are limited by computing power and not accurate," end quote. What's the context around statements like that?

**A.** My understanding would be that the document is speaking both to the fact that, you know, Chinese chips are not as capable as foreign and U.S. chip models or chips, as well as the fact that AI companies can't access the foreign chips to help support their models, and so they are going to be limited compared to U.S. or other foreign models.

        **MR. CHANG:** Ms. Hernandez, you can take that down. Thank you.

**BY MR. CHANG**

**Q.** Final opinion that you provided.

        Dr. Segal, were you asked to provide an opinion on PRC

policies related to technology transfer and development?

**A.** I was.

**Q.** What is that opinion?

**A.** My opinion is that since the 1980s, and again in the '90s and 2000s, China is extremely worried about moving up the value chain.

So we all know of China as the factory to the world, but the Chinese didn't want to remain that. It's polluting. It's high energy intensive. And so China wants to move up the value chain and has used a range of government policies to do that. We see that very clearly in EVs and photoelectronic conductors and a whole range of technologies now.

China has primarily done that through massive investments in R&D, research and development, and science and technology, over 500 billion last year. So now the second largest investor in a whole range of science and technology.

It's massively expanding university education around science and engineering.

And then specific industrial policies. The most famous one in the U.S. was made in China 2025, which chose nine specific technology centers.

At the same time, China was working to absorb and transfer technology from the outside. Probably the most important tool in doing that was trading access to the domestic market for joint ventures in domestic research and development.

So if I was a foreign term, an American firm, who wanted to sell into the Chinese market, I was often partnered with a Chinese company, and over time technology was transferred as we set up supply -- you know, manufacturing lines together.

Also over the years, more pressure was put on U.S. firms to set up actual R&D institutes inside of China.  Probably the most -- the one that had the most impact was Microsoft R&D center.  You could go through and look at the startup -- the founders of many, many Chinese AI firms.  Many of them were either Microsoft or Google.

**Q.**   For these opinions, these last couple of opinions you provided on AI chip constraints and technology transfer, what was your process for giving those opinions?

**A.**   Again, so Chinese documents themselves.  The Chinese leadership is not shy about speaking about that, the challenges of China's development.  Chinese government policies refer to the restraints they're talking about.  There's a huge amount of, you know, secondary literature now in English written about China's AI development, and then Chinese researchers themselves.

**Q.**   Did you use that research grounded in your 30-plus years of training and experience?

**A.**   I did.

        **MR. CHANG:**   Thank you.  No further questions at this time, Your Honor.

THE COURT:  Okay.  So let me just ask you a clarification question.

THE WITNESS:  Yes.

THE COURT:  I think that in the papers, one of the things that you said that you wished for the witness to testify to --

MR. CHANG:  Yes.

THE COURT:  -- is that Mr. Ding's actions benefited the Chinese government.  I think I read something along those lines in your papers.  You didn't elicit a statement like that, a direct statement like that from the witness.  And it's possible that I misremember your papers, but just for clarity's sake, you do not intend to elicit an opinion from this witness that Mr. Ding's actions benefited or were intended to benefit the Chinese government?

MR. CHANG:  I do not -- let me look at my papers really quickly.  I want to make sure I'm being precise on this.

THE COURT:  Yeah, and I'll pull it up, too.  It may just be that I was inferring, but let's see.

MR. CHANG:  No, Your Honor.  The answer is "no" to your question on whether we intend to elicit testimony from Dr. Segal.  We may of course make arguments along those lines.

THE COURT:  Right.

MR. CHANG:  But not --

THE COURT:  But neither that Ding's actions were

intended to benefit the government or that they did benefit the government?

**MR. CHANG:** No, no.  Certainly no evidence from Dr. Segal about the defendant's intent.

**THE COURT:** Okay.

**MR. CHANG:** That's definitely not in the cards.

**THE COURT:** But I -- but I'm also asking about whether you intend to elicit from Dr. Segal any testimony about whether the activities did benefit or would have benefited the Chinese government.

**MR. CHANG:** No.  I do think it would be along the lines of the testimony he gave about why startups cite to those things based on his training and experience, orienting those types of statements in the defendant's documents with a broader geopolitical and economic context of the PRC.

**THE COURT:** Okay.  And then let me ask you one follow-up question.

So you testified about, you know, all these plans, and the five-year plan references AI, and there are all these specific plans relating to AI, and it's obviously a big goal of the Chinese government to develop AI and win the AI race.

Does that mean that anybody who wishes to make money in China, anyone who goes to China to try to make money off of AI, is benefiting the Chinese government?

**THE WITNESS:** You are certainly contributing towards

that goal that the Chinese government has stated is an important one to them.

THE COURT:  Can you think of an example of somebody who is trying to make money in China on AI who wouldn't be benefiting the Chinese government?

THE WITNESS:  I guess it depends how broadly you would define "benefit".  Right?

So the plans speak at such a level of abstraction that when China says it wants to be an AI power, you could theoretically argue that anyone who's contributing to that is contributing to that factor.  I would probably --

THE COURT:  I mean, given your testimony about how the tentacles of the CCP reach into basically every aspect of Chinese economic activity --

THE WITNESS:  Yes.

THE COURT:  -- and given that AI is such a priority for the CCP, doesn't it follow that anybody who is going to China to try to make money off of AI is acting in a way that is to the benefit of the Chinese government?

THE WITNESS:  That is increasingly the view.  I would say because the distinction between private actors and public actors has narrowed so much under Xi Jinping, there is increasingly the view that, yes, you cannot participate in that market without benefiting the Chinese government.

THE COURT:  And I assume you'd say the same thing

about any economic activity that is -- has been established as a priority of the Chinese government.  Right?  I mean, if the CCP has, in its five-year plans and other specific documents, identified a particular economic activity as a priority -- EVs, for example, right?  If you want to go make money in the EV industry in China, you're benefiting the Chinese government?

THE WITNESS:  Yes.

THE COURT:  Okay.  Thank you.

MR. CHANG:  Can I have some follow-up questions related to the Court's inquiry?

THE COURT:  Sure.

BY MR. CHANG

Q.   Okay.  Dr. Segal, you mentioned that in your testimony that China has a socialist market economy; is that right?

A.   Yes.

Q.   On the market economy piece, AI startups have a choice on whether to seek government funding or not, right?

A.   Yes.

Q.   Are there private venture funds out there that are providing funding for AI startups?

A.   Yes.

Q.   Are there private enterprises out there, Microsoft, other private actors in China that also funding AI startups?

A.   Microsoft probably not any longer, but --

Q.   Not Microsoft.  That's a bad example.

Are there private companies in China --

A.   Yes.

Q.   -- providing funding for AI startups?

A.   Yes.

Q.   So there are other private sources of capital that AI startups could solicit funding from?

A.   Yes.

Q.   Customers, as well.  Are there private enterprises in the People's Republic of China?

A.   Yes.

Q.   AI startups can sell to private customers?

A.   Yes.

Q.   And they can also sell to state-owned customers?

A.   Yes.

MR. CHANG:  Thank you.  No further questions at this time.

THE COURT:  I have a follow-up question.

Is it possible for an AI startup to go into China and succeed without interfacing in a meaningful way, a significant way, with the Chinese government or entities controlled by the Chinese government?

THE WITNESS:  It's -- I would say it is possible to succeed, but not to continue; that once you succeed, you attract the attention of the Chinese government.

THE COURT:  Can you elaborate on that?

THE WITNESS:  So you --

THE COURT:  Give an example or something.

THE WITNESS:  So, for example, DeepSeek, right, which is the company that we -- the one that kind of shocked U.S. firms by creating a competitor to ChatGPT.  They did it at a lower cost, we think.  They did it without U.S. chips for the most part.  That company was not connected to the State.  It comes out of a -- it's an investment firm.  The guy was very, very interested in AI.  He set up his own specific thing.  Had no -- probably no connections.  Although there are some people who have argued that there are some back channels, but I don't think so.  I think it was primarily private.

Once that breakthrough happened, he was -- you know, essentially they had a huge meeting with Xi Jinping and all of the tech entrepreneurs.  He was front and center.  And so the messaging from that meeting was, we expect the tech industry to support our goals.

So you can still build a company without any government support in China, but if you are going to be on the cutting edge, the government will find you.

THE COURT:  Okay.  All right.  Maybe we'll take a 10-minute break, and you can begin your cross-examination at 11:30?

MR. FONDO:  Your Honor, may I just ask one question?

THE COURT:  Yeah.

**MR. FONDO:**  It relates to a question you asked from counsel about benefit.

Oh, sorry.  Grant Fondo for the defense.

So in the report it says that he is going -- this expert, Dr. Segal, is going to be testifying that certain actions Mr. Ding took supported.

**THE COURT:**  Yeah, that's what I was -- that must be what I was thinking of when I asked the question.

**MR. FONDO:**  And -- okay.  And so is the -- I guess what I'd like clar' -- because it will assist in the cross-examination, like clarification are they not asserting that?

**THE COURT:**  Yeah, I took your statement to mean that you're not asserting -- you're not eliciting testimony that these actions supported or would have supported the Chinese government.

**MR. CHANG:**  Not testimony.  We certainly may make arguments along those lines --

**THE COURT:**  Right.

**MR. CHANG:**  -- based on the evidence that we present, including Dr. Segal's opinion.

**THE COURT:**  Right.  Got it.

Okay.

**MR. FONDO:**  Okay.  Thank you.

**THE COURT:**  Thank you.

All right.  We'll resume at 11:30.

MR. FONDO: Your Honor, could we get an extra five minutes? Given your Court's instruction, we just want to streamline a little bit.

THE COURT: Yeah, no problem. 11:35.

MR. FONDO: Thank you.

(A recess was taken from 11:23 a.m. to 11:39 a.m.)

THE COURT: All right. Take it away.

MR. FONDO: Thank you, Your Honor. Grant Fondo for the defendant, Mr. Ding.

**CROSS-EXAMINATION**

BY MR. FONDO

Q. So, good morning.

A. Good morning.

Q. We're almost -- still good morning, Dr. Segal. My name is Grant Fondo, and I represent the defendant. I'm going to be asking you a few questions this morning.

So I wanted to ask. The Judge was asking you questions about sort of when does private and public sort of, like can a company succeed without touching the public -- sort of the Communist Party and the China government.

So isn't it true that the banks are controlled by the government?

A. Yes.

Q. And transport is generally controlled by the government, sort of the rails of transportation?

**A.**   Yes.

**Q.**   And licensing to operate is controlled?

**A.**   Yes.

**Q.**   Okay.  So for an entity to even start up essentially in China, they need to use and rely upon some of those government entities, correct?

**A.**   Yes.

**Q.**   And you, in your -- when you were going through the entities when the government was referring to this you opined about a few different entities, such as Mingyue Lake innovation.  Are those -- you used the term "substantially controlled".  What do you mean by "substantially controlled"?

**A.**   Meaning that the management office of that zone is part of the municipal government, that it would appoint the people that were -- or the head of it would direct the types of technologies that it thinks it should develop and would coordinate the support and assistance from the other government agencies to make sure that that platform succeeded.

**Q.**   And when is it -- when is an entity not substantially controlled?

**A.**   A private company?

**Q.**   Well, any entity.

**A.**   Well, a private company would not be substantially controlled.

You know, there used to be a more vibrant group of

nonprofits and NGOs in China, although that space has significantly shrunk.

That would primarily be it.

Q.    All right.  And so it's your intentions to testify that these entities were substantially owned or controlled by the government?

A.    Yes.

Q.    And how is that different from -- you previously were opining in your first report that these were instrumentalities. How is that different than your prior -- your first report, excuse me, that used the term "instrumentality," which I understand you're no longer using?

A.    My understanding was that's a legal term of art and that the Judge would like the witness to decide on~-- excuse me, the jury to decide on that, and so I am providing my opinions on government support.

Q.    Okay.  Are you aware that the term "substantially owned" is in the definition of foreign instrumentality?

A.    Yes.

Q.    And whose decision was it to use the term "substantially owned"?  Was it yours or the government's?

A.    The government, but it's a phrase that I've used before in previous testimony.

Q.    The government asked you in relation to -- actually let me just pull it up -- to one of the exhibits, the PowerPoint, and

they asked you why would a startup reference a plan, a government plan, in a pitch deck.

Do you recall that testimony, that question?

A.   Yes.

Q.   And do you recall your testimony was to signal to officials this is how I can help you, something to that effect?

A.   Yes.

Q.   Isn't it true that every pitch deck sort of sells what this company can do to whoever its audience is?

A.   Yes.

Q.   That includes, if you invest with us we'll make you money, correct?

A.   Yes.

Q.   If you partner with us it will be a great partnership, correct?

A.   Yes.

THE COURT:  And actually I wanted to ask a clarification question about that.  I interpreted you to be saying, this is how I can help you is like, this is how I can help you get a promotion?  Is that what you're saying?

THE WITNESS:  Indirectly.

So I'm helping you achieve your goals.  I know you're going to have -- and so, yes, I can help you.  That's -- but I think the counselor is correct in that you are signaling, I can help you, you know, make money and I can help you achieve

whatever development plans you have, and I can make money.

**BY MR. FONDO**

Q.   All right.  But that also when -- in a pitch deck you reference a government plan.  Also companies, startups, when they issue -- let me rephrase the question.

When startups use pitch decks, they also try to identify market trends, aren't they?

A.   Yes.

Q.   Why is this product possibly going to be successful, correct?

A.   Yes.

Q.   And so citing to a government plan or focus is one of the ways that you can say this is a hot area, correct?

A.   Yes, and that government investment is probably following in its wake.

Q.   Well, regardless of whether there's government investment following in the wake, these plans also identify where there's going to be focus in that country on a particular industry, correct?

A.   Yes.

Q.   Okay.  That happens in the United States, too, correct?

A.   Yes.

Q.   All right.  I want to go back to your CV just briefly. You mentioned that you have connections in business, government and academia in U.S. and China, and I just wanted to focus on

the China part.

What are the connections that you have in the government in China?

**A.** I think that was referring to my previous research affiliations, as well as the types of dialogue that the attorney general is asking about, where foreign governments come through. I used to participate, which doesn't -- not any longer, in a longterm dialogue with the Chinese, which included government officials around cyber and digital issues. So when that CV was probably written, that would refer to that.

**Q.** When you say "cyber and digital issues," what are you referring to?

**A.** In that case, that dialogue was primarily around cybersecurity regulation inside of China as well as the United States, plus the international governance of cyber. So, you know, UN rules about responsible behavior in cyberspace.

**Q.** All right. You also mentioned during the government's questioning that you -- I think you were a visiting research scholar at a Chinese university, correct?

**A.** (Nods head.)

**Q.** All right. And what did you do there? It was four years, correct? Approximately four?

**A.** Inside of China? Yes.

**Q.** What were you -- what was the purpose of what you were doing there while you were in China?

**A.**   My dissertation research.

**Q.**   Okay.  And were you a student at that university?

**A.**   I didn't take classes.  I was essentially a visiting fellow, and having that research -- having that connection made my research much, much easier.

**Q.**   Okay.  So were you -- what I'm trying to understand is did you -- like in the U.S. sometimes you'll get like a stipend or something like that.  Did you get a stipend from that university?

**A.**   From -- my stipend was paid by Cornell.

**Q.**   By what?  Sorry.

**A.**   By my university.  I received no support at all financial from the Chinese university.

**Q.**   You haven't received any training in computer science, have you?

**A.**   No.

**Q.**   No training in supercomputers?

**A.**   No.

**Q.**   No training in GPUs?

**A.**   No.

**Q.**   No training in TPUs?

**A.**   No.

**Q.**   Okay.  No training in the technology behind managed learning?

**A.**   No.

**Q.** You don't have any training and experience starting a business, correct?

**A.** No.

**Q.** And you have no experience starting a business in China, correct?

**A.** No.

**Q.** Nor do you have any experience raising funds in China, correct?

**A.** No.

**Q.** So you mentioned prior expert testimony. There was one case that the government asked you about, I believe, and it's -- I may be mispronouncing, but it's the Pangang Group?

**A.** Yes.

**Q.** Am I pronouncing that correctly?

**A.** Pangang.

**Q.** Pangang. Okay. Thank you.

What's the scope of your expected -- have you given testimony in that case?

**A.** I have not. I have not done anything in that case so far except review some preliminary testimony.

**Q.** Okay. Do you have an understanding as to whether you'll be expected to testify in that case should it proceed?

**A.** I do not.

**Q.** Do you have an understanding as to what your -- what you -- like what subject -- well, let me ask you this: What

subject matter were you retained for?

**A.**   I think a similar set of issues around organizations inside of China and their relationship to the State, as well as technology development plans.

**Q.**   Okay.  And that was paid consulting?  You're getting paid for that?

**A.**   I am.

**Q.**   Okay.  And are you getting paid directly, or does your counsel get paid?

**A.**   No, I get paid directly.

**Q.**   Okay.  All right.  Will you -- just a couple of clarifications around what you are or are not testifying about.

You're not testifying about an entity called Sugon, correct, S-u-g-o-n?

**A.**   I'm not.

**Q.**   And currently you're not testifying about an entity called IDG; is that correct?

**A.**   I am not.

**Q.**   And you're also not testifying about an entity called INR Capital?

**A.**   I am not.

**Q.**   And you won't be testifying in any way relating to the alleged trade secrets in this matter, correct?

**A.**   Correct.

**Q.**   You haven't reviewed any of the trade secrets, have you,

the alleged --

A.   No.

Q.   Will you be testifying to any topics related to a company by the name of Xiaohonshu?

A.   I will not.

Q.   And you're not going to be testifying about any purported actual sales of technology by Mr. Ding, correct?

A.   Correct.

Q.   In your first report you referenced that you were asked about five entities, correct?

A.   Correct.

Q.   All right.  And who asked you to look at those five entities?

A.   The government.

Q.   What was -- were you familiar with any of these entities prior to being asked?

A.   Familiar with MiraclePlus.

Q.   Sorry, which one?

A.   MiraclePlus.

Q.   And what was the nature of your familiarity with MiraclePlus?

A.   I had read about its role in the Chinese startup environment and was familiar with the founders by reputation, not personally.

Q.   And the government identified these five entities for you,

correct?

A.    Yes.

Q.    Do you have an understanding as to why they asked you to look at MiraclePlus?

A.    My understanding was that there was some contact between the defendant and MiraclePlus.

Q.    So, in other words, they wanted to understand whether that was a entity substantially controlled by the Chinese government?

A.    Yes.

Q.    You also looked at Baishan Cloud, correct?

A.    Correct.

Q.    And in the same context, whether it was substantially controlled by the government?

A.    Correct.

Q.    And in both of those you found that they were not, correct?

A.    Correct.

Q.    How did you distinguish between those two entities and the other entities where you found they were substantially controlled by the PRC?

A.    MiraclePlus was a private startup incubator.  It may have had some government investments in it that I was not aware of, but I did not see any significant presence of a local government or provisional government managing it, no

representatives on the board of a provisional or local government.

Baishan I had some more doubts about.  It describes itself as a private company.  It seems to be fairly well tied into the -- the province Guizhou has big plans for cloud computing companies, but I did not see any evidence of management from the provisional or municipal level of Baishan.  So while I am not 100 percent certain that has not received any government assistance or subsidies, it did not seem controlled by the government.

**Q.** All right.  You -- in exhibit 1, your first report, you reference three technologies.  You represent AI, cloud and high-performance chip industries, correct?

**A.** Yes.

**Q.** All right.  Are you -- which, if any -- you're testifying that -- relating to AI policies, correct?

**A.** Yes.

**Q.** Are you testifying about cloud policies, as well?

**A.** I am testifying on China's science and technology infrastructure and policies specifically focused on AI.  I have also some knowledge about support of cloud.  But, no.

**Q.** You also referenced high-performance chip industries.  Are you testifying about high-performance chip industries?

**A.** No.

**Q.** All right.  You referenced information in some of the

PowerPoints that Mr. Ding allegedly put into those PowerPoints, correct?  That's ...

A.   I'm sorry, what do you mean by "information"?

Q.   Let me rephrase.  Let me actually just, I'll turn you to ... so let me just ask you more generally.

So you referenced in one of the exhibits that we've shown today there was reference to certain Chinese policies, China government policies, correct?

A.   Correct.

Q.   All right.  And you -- actually, let me strike that question.

In the documents that you've seen, is it correct -- well, let me focus you on the Shanghai talent program documents, okay, the applications.  Is it correct that you've seen none of the alleged trade secrets being disclosed in that application?

A.   That's correct.

Q.   And is it correct that you saw nowhere in this application that he had Google technology that he would use for China's benefits?

A.   That's correct.

Q.   Or that he would share with China?

A.   Correct.

Q.   He was just referring to his own talent and experience, correct?

A.   Correct.

**Q.** And that's pretty typical for people seeking investment from any private or public sector, correct?

**A.** Correct.

**Q.** You also referenced Mingyue Lake investment fund, correct?

**A.** Correct.

**Q.** All right. And in his -- so did you reference that he actually applied and received funds or was interested in?

**A.** My understanding was that he was applying.

**Q.** Oh. Were you aware that he received any funds?

**A.** I'm not aware.

**Q.** Okay. All right. Do you -- in that application, it's correct that he didn't disclose any of the alleged trade secrets in that application, correct?

**A.** I don't have any knowledge of that.

**Q.** All right. And to the best of your knowledge, he never transferred any of the alleged trade secrets to any of the PRC entities that you mentioned during your -- during the direct questioning by the government, correct?

**A.** I don't have any knowledge.

**Q.** I want to understand sort of what is the line that you draw when you are saying somebody sort of engages with the government. You talked about when a startup, can a startup develop without government.

So if somebody files an application, is that now relying upon -- and let me ask you -- let me rephrase that.

How would you describe the difference, in responding to the Judge's question, how would you describe the difference in your analysis from when something is private versus public; when someone is either seeking the help, applying, et cetera?

A.   I'm sorry.  I don't understand.  When you refer to some thing, are you referring to the company or the entity?

Q.   Sorry, the company.

A.   The company.

A private company would be owned by individuals or publicly listed.

Q.   Okay.  When does that company cross the line from being purely private, meaning in its activities, versus relying on government support, seeking government support, et cetera?

THE COURT:  I think you might be talking about two different things.  I think you're talking about a company like the defendant's, and you're talking about when something in China becomes an instrumentality.

THE WITNESS:  I could be.  I mean, I could try to answer.

I mean, I think you could remain private and still be dependent on the government, because as you I think asked earlier, most of the government -- most of the funding in China is coming from a state source, although there is private capital.  You are going to at some point interact with a government agency that controls resources that you need access

to.  And quite honestly in this space, given the importance that the center has given to it, it would be impossible not to attract attention.  You -- if you were successful and you had a technology that was of interest, the government would say to you, we are going to help you.

**BY MR. FONDO**

**Q.**   You mention in your response resources that you need. What types of resources are you referring to that are controlled by the government?

**A.**   Access to real estate, access to finance.  You would need help sometimes with personnel, since people still have what are called Hukou, registration permits, that tie to you certain parts of the country.  Ability to travel these days is harder to do for AI experts.  All those things you would have to have a relationship with the government for.

**Q.**   Okay.  I want to take you back to 2023.  You mentioned access to real estate.  What does that mean, and was that an issue in 2023?

**A.**   Well, locating the zone, that land is owned by the State, and the zones often would offer subsidies, rent breaks, things like that.

**Q.**   So when you say zones what are you referring to, the tech zones that you described?

**A.**   Yeah, Mingyue Lake or other places.

**Q.**   Okay.  All right.  Regarding the Shanghai talent program

that you testified earlier, do you have any idea how many people or entities apply for that annually?

**A.**   I don't.

**Q.**   Can you give some sense of quantity?

**A.**   I don't have it.  I don't have a scope.

**Q.**   Any sense of how rigorous the application process is?

**A.**   I don't.

**Q.**   Any sense of how rigorous the acceptance process is?

**A.**   I don't know those percentages.

**Q.**   Page 4 to 5 of your report, your first report which is exhibit number 1, you state you'll be testifying that PRC policymakers have sought to enable technology transfers from foreign sources to domestic firms through various legal and extra-legal means.

What is the scope of your opinion in the context of extra-legal means, and do you intend to testify about that?

Let me ... so, first, do you intend to testify in any manner in relation to what this is -- what's in that report on your topic?

**THE COURT:**   Can I interrupt for a second and maybe ask government counsel about that?  Because it was another question that I had, that that was in the report, it was also in the briefing, but it was not in the testimony today, the part about extra-legal means, about technology transfer through extra-legal means.  Right?

MR. FONDO:  Yes, sir.

THE COURT:  There was testimony about achieving technology transfer generally, but the extra-legal means part was not in there.  So I take it from that, that the government is not intending to elicit testimony from the Chinese government's desire to achieve technology transfer through extra-legal means?

MR. CHANG:  That's correct, Your Honor.

THE COURT:  Okay.  I would have disallowed that anyway, so you can skip that part.

MR. FONDO:  Thank you.

BY MR. FONDO

Q.   You -- previously we mentioned, or I asked you a question about the five entities that were in your first report.  Were you asked to analyze or review any others other than those five, plus the Shanghai talent program?

A.   (Shakes head.)

Q.   All right.  Let me just verify a couple of other.

So let me ask you.  So you've then more recently filed a supplemental report, correct?

A.   Yes.

Q.   That's behind -- exhibit number 2, correct?

A.   Correct.

Q.   Why did you feel the need to submit a supplemental report?

A.   My understanding is the government wanted me to clarify

some of the research processes I used in making my determination.

Q.   And the research that you ended up doing was mostly public -- you called it an open source, correct?

A.   Correct.

Q.   What do you mean by "open source"?

A.   Available on the web, what's available in secondary sources.  I was not relying on proprietary or other information.

Q.   And this is information that's available to anybody, then?

A.   Yes.

Q.   Okay.  Including the public?

A.   Yes.

MR. FONDO:  One moment, Your Honor.

I have no further questions of this witness, Your Honor, with just one point of clarification.

There are a couple of areas that I wanted to verify that he's not testifying about.  We can just do it through -- I'm happy to ask counsel, as well.

THE COURT:  Yeah, but let's do it while the witness is still on the stand just so we can have follow-up if we need it.

MR. FONDO:  All right.  So, Counsel, so -- and I pulled this primarily from our briefing, but I'm assuming Dr. Segal is not going to be testifying whether the U.S. has

accused China of engaging in a decades-long campaign of cyber-enabled industrial espionage?

THE COURT:  No, he's not.

MR. CHANG:  No, he is not, as we stated in our opposition papers.

MR. FONDO:  Thank you for verifying that.

Also about generalized testimony about China's business or regulatory landscape?

MR. CHANG:  No, not anything beyond what he provided this morning.

MR. FONDO:  Okay.  Thank you.

And then anything about the U.S.-China technology competition?

MR. CHANG:  No, not beyond what he provided this morning.

MR. FONDO:  Thank you.

THE COURT:  Okay.

MR. FONDO:  No further questions.

THE COURT:  Did you have any redirect?

### REDIRECT EXAMINATION

BY MR. CHANG

Q.   Dr. Segal, on cross defense counsel asked you about a number of private VC funds, including MiraclePlus and IDJ Capital.  You don't intend to provide an expert opinion on those entities; is that right?

**A.**    Correct.

**Q.**    But you may provide some information about those entities from your personal knowledge?

**A.**    Yes.

**Q.**    You also mentioned on cross that there are entities that the government asked you to look at that you concluded were not substantially controlled by the PRC government; is that right?

**A.**    Yes.

**Q.**    Is that fact indicative of the reality that not all entities in China are controlled by the State?

**A.**    Yes.

**Q.**    In fact, during the Court's questioning earlier this morning, you specifically mentioned the AI startup DeepSeek, D-e-e-p-S-e-e-k, as an example of an entities that was privately owned and run?

**A.**    Yes.

**Q.**    Defense counsel also asked about cloud policies and high-performance chip industries.  Are you familiar with both of those sectors in the PRC?

**A.**    Yes.

**Q.**    Describe that expertise or describe your understanding of those industries in the PRC.

**A.**    Not a primary research focus of mine, but researching all the other tech sectors that I have looked at, I have a general knowledge of the -- some of the policies in place to support

it, as well as some of the big Chinese tech firms that are involved in those spaces.

MR. CHANG:  Thank you.  No further questions at this time, Your Honor.

THE COURT:  Okay.  Any recross?

MR. FONDO:  Nothing else, Your Honor.

THE COURT:  Okay.

MR. FONDO:  Thank you.

THE COURT:  You can step down.  Why don't you stick around, though.

I think we can probably resolve this witness just by having a brief discussion.  I don't -- I think probably we don't need any further briefing or anything.  Why don't we have a quick discussion about it now.

And you can stick around and listen.  Might be helpful to the extent we set guidelines for you.

And just give me one second to look over my notes.

Okay.  So I think in large part Dr. Segal can offer the testimony that he offered.  His opinions are admissible in large part consistent with what he testified to today.  I think there are a couple potential limitations, though.

First, this is just a very small one, I think.  This concept of helping an official get promoted.  Like to the extent that the implication is that you can benefit a foreign instrumentality by helping a local official get promoted, I do

not think that is appropriate, and I -- you know, I mean, I'm happy to hear pushback from the government on is this, but my pretty strong inclination is that it would not be appropriate to make that implication as part of his testimony, and so I think I would be inclined to instruct the witness to stay away from the concept of helping local officials get promoted by offering them, you know, some benefit.

**MR. CHANG:**  Understood, Your Honor.

**THE COURT:**  The idea that people will get promoted if they sort of fulfill the goals of the CCP, that's fair game, but sort of the idea that if you are investing in -- you know, if you're sort of participating in some aspect of the economy that is consistent with the government's goals, that you're gonna help somebody get promoted, I think that is -- I think that's a bridge too far.

**MR. CHANG:**  Understood.  But the context around how it's a bottom-up system in terms of promotion and how the party state is structured, that's fair game?

**THE COURT:**  Yes.

**MR. CHANG:**  Just the additional step of promotion is off limits.

**THE COURT:**  That's what I was trying to say, yes.

**MR. CHANG:**  Okay.  That's okay with the government, Your Honor.

**THE COURT:**  Any comments on that?

**MR. FONDO:** No, Your Honor.

**THE COURT:** Now, getting to some bigger things, I'll do it in ascending order.

The next is probably this, you know, the issue that Mr. Fondo was asking Dr. Segal about, you know, instrumentally versus substantially controlled, owned, blah, blah, blah, right? There's no difference between those two things.

So you withdrew the -- you initially expressed an intent to have Dr. Segal testify that these entities were instrumentalities of the Chinese government, and then you withdrew that, presumably because you concluded that that would be having him testify about an ultimate issue, and you replaced it with having Dr. Segal testify that these entities were substantially owned, controlled, et cetera, by the Chinese government. Those two things are the same, right? So if you can't do one, you can't do the other, and I guess my inclination is that you should be able to do neither. That he can testify to all the stuff, you know, to -- he can testify about the industrial park, and he can testify about the talent program, and he can testify about the three entities and their relationship to the Chinese government, and he can testify about the Chinese government's involvement in them, but he cannot utter that -- he should not be allowed to utter that phrase, substantially owned, controlled, et cetera, et cetera, by the Chinese government.

In other words, testify to the facts, right?  These are facts that are sort of outside the purview of the jury.  It's appropriate expert testimony explaining how these entities work in China and their relationship to the government.  But that ultimate phrase that he uses I don't think he should be permitted to use, and it would be the same thing as saying they're instrumentalities of the government.

MR. CHANG:  Two responses, Your Honor.

So that in part, we were following the precedent that Judge Chesney set out in the Jinhua matter.  And so the testimony is very similar here and what she did permit given the briefing between the government and defense counsel in that case.

THE COURT:  Yeah.

MR. CHANG:  And so --

THE COURT:  I mean, I don't -- I just don't -- I think if we start from the premise that it's not appropriate for him to testify that they -- that an entity was an instrumentality of the Chinese government, then it is equally inappropriate for him to testify that the entity was substantially owned, controlled or directed by the Chinese government, or whatever the phrase was that he used.

MR. CHANG:  I hear the Court's concern.

Is the concern over the specific turn of phrase?  For example, "substantially controlled".  So if Dr. Segal were to

testify that for all intents and purposes, the park is controlled and supervised by the PRC and gives the facts, similar to the way he's provided --

THE COURT:  Well, I think if you look at the transcript, right, what you'll see is that, you know, you asked him his opinion:

"Do you have an opinion about whether this entity was substantially owned, controlled, directed, et cetera, by the Chinese government?

"Yes.

"What is your opinion?

"My opinion is that it was substantially owned, controlled, directed, et cetera, by the Chinese government."

I think that if you took that out and just included everything else it would be fine, because everything else was sort of very sort of matter-of-fact description about how things worked and the relationship between the government and the entity, without characterizing it in that same way.

Now, I know it's a -- you know, it might be a sort of difficult line to draw with precision is, but I can tell you now as I sit here -- and perhaps I would be able to provide further, you know, more precise guidance after reading the transcript, but I can tell you that my takeaway from it, you know, every time he got into a different entity, was that that prefatory part was inappropriate because it was no different

from saying that it's an instrumentality, but then his factual description of the situation was appropriate.

MR. CHANG:  Understood, Your Honor.

Can I get a brief moment to confer with my co-counsel on this point?

THE COURT:  Yeah.

MR. CHANG:  All right.  Thank you, Your Honor.

So I would say largely the government understands the Court's ruling, although we may disagree for the reasons cited in our paper.  That being said, we do believe we can abide by it during trial.

The clarification I would like to make, though, is, as your court has correctly discerned, this is a complicated area of control versus lack of control, and Dr. Segal's one of the world's experts on this topic.  So in terms of using colloquially speak -- for example, public universities, right? There's not a single one that he's aware of that's not controlled by the CCP or the PRC government.  He can use more colloquial terms that -- but just not that specific turn of phrase in terms of it being substantially controlled, managed or supervised.  Is that the ruling?

THE COURT:  Yeah, I mean, I think that that is what I have in mind.  It's -- and again, you know, it's difficult to figure out exactly how to draw the line, and we may, before trial we may want to look at some portions of the transcript

and look at some particular phrases to make sure it doesn't come too close to parroting the elements of the -- or the definition of "instrumentality" in the jury instruction, but basically what you said is correct is what I'm also envisioning.

MR. CHANG:  Okay.  Then we have -- then we will heed your guidance at trial, Your Honor.

THE COURT:  Okay.  And Mr. Fondo, any comments on that?

MR. FONDO:  Just I get a little bit nervous when he talks about colloquial.  Like, I think I understand the Court's direction fairly clearly and I do understand the line, and I think once you start getting into, like, colloquial terms and it's starting to get into, are you trying to get to the substantially owned within a different way.

THE COURT:  Yeah.

MR. FONDO:  And so that's what I would worry about possibly the direction of the government, but I don't have any concerns about your lines that you've drawn.

THE COURT:  Okay.  And it may be that there -- you know, we have to have some additional conversations about this before Dr. Segal takes the stand, and, you know, you can kind of go through the transcript of his testimony here today, and if there are any sort of close questions we can have a conversation about it.

Okay.  And then the biggest thing is the documents, Ding's documents or Zhisuan's documents, right?  And there's this objection that it's hearsay, and that's not well taken because experts can rely on hearsay.

**MR. CHANG:**  Correct, Your Honor.

**THE COURT:**  But I think that there is maybe a larger problem than that, which is once Dr. -- I assume -- just a preliminary question.  I assume the intent was not to get these documents admitted through Dr. Segal.

**MR. CHANG:**  No.

**THE COURT:**  Okay.

**MR. CHANG:**  This is --

**THE COURT:**  You're assuming that the --

**MR. CHANG:**  -- evidence don't apply at a *Daubert* hearing.  It's a different context.

**THE COURT:**  You're assuming that the documents have already been admitted through some other witness when you have Dr. Segal up on the stand testifying at trial?

**MR. CHANG:**  That's correct, Your Honor.

**THE COURT:**  Right.  Okay.  I figured that.

So, but once you get into the documents, right, you are getting into -- I mean, I think inevitably when Dr. Segal is testifying about these documents and the contents of these documents, he is testifying that Ding is, through his actions, is benefiting the Chinese government; that he -- or is trying

to benefit the Chinese government.  And I'm just, I'm not sure that -- I think that that is probably for the jury to decide, not for the expert to decide.

In other words, the expert can testify about how one would benefit the Chin' -- you know, how one's actions would benefit the Chinese government, and then the jury can look at Ding's specific actions and make a decision about whether Ding's specific actions fall into the category of things that the expert is talking about, but it's not clear to me at all why the expert should be permitted to testify about Ding's specific actions based on particular documents that you put in front of him.

MR. CHANG:  So a couple of points.

As Your Honor queried during this morning's proceedings, we will not be having Dr. Segal provide an opinion on what was Ding's intent and whether his actions actually did indeed support.

THE COURT:  Did or would have benefited the government, yeah.

MR. CHANG:  To be clear, we'll certainly make those arguments at trial, but that is not the role of Dr. Segal.

THE COURT:  Right.

MR. CHANG:  It is more similar and akin to what he was doing today, which is -- to be candid, Your Honor, this is what his expert testimony's intended to do is really to be a

contextual and expert guide for the jury, because jurors may not even be able to point out where China is on a map, much less where Zhisuan, Chongqing and Shanghai are.

And so references to State Council development plans, he needs to be able to explain the context behind that in terms of the import of those plans, what they mean, what they are.

THE COURT:  Yeah, and I don't -- and I understand that, and I don't have any issue with that.

MR. CHANG:  Yes.  And so was there specific -- I guess were there specific exchanges that --

THE COURT:  Yeah, so let's just -- I mean, it's basically anytime that Dr. Segal started -- when you put the stuff from Mr. Ding's devices in front of Dr. Segal --

MR. CHANG:  Okay.

THE COURT:  -- and started asking him questions about it.  Pretty much anytime that happened, it struck me -- and again, I would want to go back and look carefully through the transcript, but my takeaway was that crossed the line that I'm trying to articulate.

MR. CHANG:  Okay.

THE COURT:  Once he starts testifying about the content of these documents.

So for example, I'm looking at the talent program submission.

MR. CHANG:  Yeah, that's exhibit 5.

**THE COURT:** The personal statement. Yeah, exhibit 5. Let me see. What pages were we looking at? Oh, you know, this is not -- this maybe is not the --

**MR. CHANG:** Yeah.

**THE COURT:** -- best example.

Let's look at exhibit 3.

**MR. CHANG:** Okay. Let me pull that up, Your Honor.

**THE COURT:** I believe exhibit 3 was the one where Dr. Segal started pointing to references to the 2017 plan and the 2023 plan relating to AI.

**MR. CHANG:** That was actually a different version of the pitch deck, Your Honor. That was exhibit 7. This one has the slides about the innovation park and the defendant's startup providing compute for the park.

**THE COURT:** Yes.

So I think that when he -- when Dr. Segal is testifying about that, like what is the purpose of that testimony other than to try to show the jury that Ding was trying to help, or was helping or would have helped an instrumentality of the Chinese government?

**MR. CHANG:** The purpose is to give the jury context and background around these slides.

**THE COURT:** Around what he was doing, right?

In other words, Dr. Segal is testifying about what Ding was doing, what Ding was up to in China, and I just don't

understand why Dr. Segal should be testifying about what Ding was up to in China as opposed to what was up in China. And then through other witnesses presumably you can provide testimony and documentary evidence about what Ding was up to in China.

MR. CHANG: Okay. So I want to make sure I understand this, because this is a nuanced point. And so, for example, let's say exhibit 3 which we're talking about, this is the Zhisuan presentation. Part of why we showed this document to Dr. Segal is there are slides in here about the defendant providing compute to an innovation park, which we will assert is a foreign instrumentality. That's no surprise to anyone.

And so a juror seeing this deck is not gonna know, first of all, where the innovation park is, what's an innovation park, how it is the government's role in managing that.

THE COURT: But he doesn't need this deck to explain all of that. Dr. Segal doesn't need this deck to explain what the innovation park is, and where it is, and what it does and who it's controlled by.

MR. CHANG: Got it.

And so is the concern less with the document itself -- well, I guess the concern is more with the document itself and less with the testimony? Is that what I'm understanding is the concern?

THE COURT: Well, no, I think it's both, because when

you got into Mr. Ding's documents with Dr. Segal, that's when you started asking questions about what Mr. Ding was up to in China, and I think that the line that I'm trying to articulate is that testimony -- I'm not sure it's appropriate for Dr. Segal to get on the stand and testify to what Mr. Ding was up to in China.

MR. CHANG:  Got it.

   The purpose of that testimony is it orients the context around why he's looking at certain entities and how they're associated with the defendant.  They're not value judgments behind that or even opinions, I would say.  It's that the -- the document in many ways speaks for itself.

THE COURT:  Right; which is why I'm wondering -- the fact that the document speaks for itself sort of underscores the point that I'm trying to make.

MR. CHANG:  Okay.

THE COURT:  Which is that it doesn't -- it seems like it -- this is a China expert to come teach the jury about China.

MR. CHANG:  Correct.

THE COURT:  It's not an expert to come teach the jury about what Mr. Ding was up to in China.  What Mr. Ding was up to in China is like the central part of the case, and it presumably should be coming in through fact witnesses.  The purpose of the expert testimony as I see it is to help the jury

put into context what Mr. Ding was up to in China.  But that a China expert, I don't understand why a China expert should be coming and testifying to what Mr. Ding was doing in China.

MR. CHANG:  Understood.  And so let me just make sure I understand the Court's guidance and then I'll try to react to it thoughtfully, is if we had very similar testimony to today without the documents and then I guess excise the connection or why he was looking at certain entities, and -- but the other term in terms of what a park is and all that.

THE COURT:  You could say, you've been asked to give an opinion about this -- what's it called, innovation park?

MR. CHANG:  Mingyue Lake Innovation Park, yes.

THE COURT:  Just been asked to give an opinion about and a description about this innovation park.  Tell us about it.  He doesn't have to connect it to Mr. Ding, right, or what Mr. Ding was doing vis-a-vis that innovation park.

MR. CHANG:  Got it.

THE COURT:  And that strikes me as arguably outside the appropriate scope of an expert opinion about China.

MR. CHANG:  Okay.  Give me a second to confer.

THE COURT:  And then to the extent that it's not, you know, clearly outside the scope of any appropriate expert opinion about China, I'm concerned about its prejudicial effect, because once the expert starts testifying about what Mr. Ding was up to in China, what his interactions were with

this industrial park, what his interactions were with the talent program, then the -- it's almost like a natural~-- the only sort of natural conclusion to draw from that is that the expert is opining that Mr. Ding is benefiting the industrial park and that he's benefiting the Chinese government, and I think we all agree that that's not something that the expert should be testifying about.

So I guess that's -- I think that that -- the more I talk about it the more strongly I feel about it, that Dr. Segal should be limited to -- should not be permitted to testify about Mr. Ding's activities in China.

**MR. CHANG:**  And the concern is, I jotted down, scope and 403?

**THE COURT:**  Yeah.

**MR. CHANG:**  Okay.  Give me a second.

All right.  Your Honor, thank you for giving me the opportunity to confer with my co-counsel.

So I would say the government's position is that we are -- we understand the Court's guidance and we largely have no objections to it.  I would like to clarify a point that I do think is instructive on this particular issue.

So the deck that you referenced, I think this is exhibit 6, 224.  This is the one where the State Council -- page 5 of exhibit 6.

**THE COURT:**  Yeah.  Remind me what this document is

again.

MR. CHANG:  This is a pitch deck from the defendant's startup.

THE COURT:  To?

MR. CHANG:  Investors, potential investors.

THE COURT:  Okay.

MR. CHANG:  And so we heed your guidance.  Dr. Segal will not be opining on what Mr. Ding and his company was doing inside of China.  That being said, it would be helpful, for example, to orient the jury on why he's talking about a 2017 State Council plan or a 2023 follow-up plan.  And so referencing the fact that it's in a document and showing that as along with his testimony we feel like is -- you need that context, right?  Otherwise it's untethered to any evidence in this case and may be confusing to the jury.

And so we would ask that we're allowed to use documents that have been already admitted to guide his testimony, but he won't be opining on Mr. Ding or his company's actions, heeding the Court's guidance.

THE COURT:  Mr. Fondo, any comment on either that smaller point or the larger issues?

MR. FONDO:  So the smaller point -- well, let me start with the larger.

Larger issue is I understand the Court's order and obviously agree with it.  Wanted a clarification, but let me

get to that in a second.

As to the government's position, we think that is inconsistent with the Court's order and is outside the scope. I mean, he -- this expert can testify about what these entities are, these China entities are.  He doesn't even need to reference Mr. Ding.

THE COURT:  He can testify about the 2017 plan and the 2023 plan, and he can explain how -- what it is and what its name is and all that kinda stuff.

MR. FONDO:  Exactly.  And then if they have -- they can have the agent come in and say, did you find a reference to that plan.

THE COURT:  Yeah.

MR. FONDO:  So I don't think that -- I don't -- so I don't think that exception applies, or that carve-out.

THE COURT:  I agree with you about that.

MR. FONDO:  Okay.  I assume sort of -- this I'm sure it's subsumed in the larger context of your order, but in reference to this particular page, Mr. Segal opined that this was a signal to the local authorities, and I'm assuming that would --

THE COURT:  Of course.  That -- yeah, that's --

MR. FONDO:  I just wanted to clarify.

THE COURT:  That's definitely out of bounds.

MR. FONDO:  Thank you.

THE COURT: Okay. Anything else on this witness?

MR. CHANG: Nothing further from the government.

MR. FONDO: Nothing else from the defense.

THE COURT: Okay. So we have -- tomorrow is at 10:00 o'clock again; is that right?

MR. FONDO: Yes, Your Honor.

THE COURT: All right. Thank you for being efficient about that. We'll see you tomorrow.

MR. FONDO: Thank you, Your Honor.

MR. CHANG: One clarification for the record.

Other than the limitations we discussed, all of his other testimony is admissible?

THE COURT: All of the testimony that was offered today.

MR. CHANG: Yes.

THE COURT: Yes.

(Proceedings concluded at 12:34 p.m.)

### CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Sunday, December 14, 2025

_____

Stephen W. Franklin, RMR, CRR, CPE
Official Reporter, U.S. District Court