**VOLUME 3**

**Pages 265 - 356**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )   **NO. 3:24-CR-00141-VC**
                               )
LINWEI DING,                   )
                               )
          Defendant.           )
_____)

San Francisco, California
Tuesday, December 9, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

CRAIG H. MISSAKIAN
UNITED STATES ATTORNEY
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
**BY:  CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
     **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

CRAIG H. MISSAKIAN
UNITED STATES ATTORNEY
1301 Clay Street, Suite 340S
Oakland, California 94612-5217
**BY:  MOLLY K. PRIEDEMAN**
     **ASSISTANT U.S. ATTORNEY**

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

REPORTED BY:  Stephen W. Franklin, RMR, CRR,
             Official United States Reporter

**APPEARANCES**:  (CONTINUED)

For Defendant:

GOODWIN PROCTER LLP
525 Market Street
San Francisco, California 94105
BY:  **DARRYL M. WOO, ATTORNEY AT LAW**
**RACHEL M. WALSH, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 Marshall Street
Redwood City, California 94063
BY:  **GRANT P. FONDO, ATTORNEY AT LAW**
**FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 South Figueroa Street, Suite 4100
Los Angeles, California 90017
BY:  **LORA J. KRSULICH, ATTORNEY AT LAW**

**I N D E X**

Tuesday, December 9, 2025 - Volume 3

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 5 | | 288 | 3 |
| 6 | | 295 | 3 |

| DEFENDANT'S WITNESSES | PAGE | VOL. |
|---|---|---|

**POOLEY, JAMES**

| | | |
|---|---|---|
| (SWORN) | 268 | 3 |
| Direct Examination by Ms. Krsulich | 269 | 3 |
| Cross-Examination by Mr. Boome | 300 | 3 |
| Redirect Examination by Ms. Krsulich | 346 | 3 |

**Friday - December 5, 2025**                                    **10:06 a.m.**

**P R O C E E D I N G S**

**---o0o---**

THE COURT:  Okay.  I think we all know what case this is and who the lawyers are.

So I think that I can give pretty similar guidance today to the guidance that I gave yesterday.  It's very difficult to imagine ruling that this witness would not be permitted to testify, and, but the question is whether the testimony should be narrowed, perhaps in a somewhat similar way that yesterday's witness' testimony was narrowed.  So I really, I think that's going to be the question, and that's all the guidance I have at this point.

Anything from the lawyers before we begin?

MR. BOOME:  No, Your Honor.

MS. KRSULICH:  No, Your Honor.

THE COURT:  Okay.  Go ahead.

MS. KRSULICH:  Good morning.  The defense calls James Pooley.

THE COURTROOM DEPUTY:  Please raise your right hand.

**JAMES POOLEY**,

called as a witness for the Defendant, having been duly sworn, testified as follows:

THE COURTROOM DEPUTY:  Thank you.  Please state and spell your full name for the record.

THE WITNESS:  James Pooley, P-o-o-l-e-y.

MS. KRSULICH:  I have a binder of documents with exhibits that we may use for Mr. Pooley.

### DIRECT EXAMINATION

BY MS. KRSULICH

Q.   Good morning, Mr. Pooley.

A.   Good morning.

Q.   Please introduce yourself to the Court.

A.   My name is James Pooley.  I'm here to provide expert testimony to the extent the Court allows it.

Q.   Would you please summarize your educational background?

A.   I have an undergraduate degree in international affairs and a law degree, that I graduated in 1973, and later that year in this courtroom I was admitted to the Bar.

THE COURT:  This very courtroom?

THE WITNESS:  No, I think it was probably theceremonial courtroom.

THE COURT:  Up on the 19th floor.

THE WITNESS:  There were quite a few of us then.

THE COURT:  Probably, yeah.

BY MS. KRSULICH

Q.   Please tell the Court about your professional background and how you got involved helping companies with information security.

A.   Yeah.  In -- this was the early '70s when I came out here

for the first time from the East Coast where I have gone to school.  And the term "Silicon Valley" was just about six months old, and all of the rapid growth was happening at that time.  I -- my intention was to just be a trial lawyer doing everything that happened in a courtroom, and yet there were a lot of these cases that involved companies and people leaving one company and starting a new one and joining a competitor that involved trade secrets.  And believe it or not, this was in Palo Alto, there were very few lawyers in town at the time.  And so I ended up getting a lot of those kinds of cases.  And over time, having experienced a lot of that, I decided that I would write a short book about how to deal with the issues around information management and control, so that people would have a better idea of how to handle these sorts of things using the lessons that I had derived from, you know, the cases that I'd been involved with.

So that -- and that was in 1981, and it was published in 1982.  I -- my hope had been that by putting out for general consumption sort of the rules of the road in this area, that these cases would kind of dry up and go away, and instead, I ended up doing a lot more of it and continued my interest in it.  Was assigned as the trade secret expert lawyer on patent cases that had trade secret issues, and so I started doing patent litigation, as well.  And, but along the way I maintained my focus on trade secrets.

I did a second edition of that book in the late '80s and continued trying and working with trade secret disputes, both as a litigator and as an advisor, helping companies figure out how to manage, you know, manage these kinds of assets.  And over time I also developed a course, a legal course in trade secret management and law which I taught first at Santa Clara and then for a number of years at Berkeley and along the way became involved in a number of -- oh, and I published a treatise beginning in 1997 on trade secret law and management.

And then, having become involved in some national organizations and commissions and that sort of thing that were focused on public policy and intellectual property, I ended up getting appointed by the White House to act as the senior U.S. diplomat for intellectual property at the United Nations in Geneva.  So I ran the international patent system for five years, the Patent Cooperation Treat, which is where I learned as a frontline manager how trade secrets were actually managed day to day.

**Q.**   Mr. Pooley, could you tell us, could you back up a little bit and tell us about what WIPO is and the types of activities it does?

**A.**   Yeah, WIPO is the UN agency that's in charge of handling all of the intellectual property treaties, including the Paris Convention, and that was most important to me, the Patent Cooperation Treat.

THE COURT:  Ms. Krsulich, can I interrupt for a second to suggest that you just get straight to any experience or qualifications the witness has on assisting companies and actually protecting trade secrets?  I don't think any of this is necessary.  It's in the papers.

MS. KRSULICH:  Yes, Your Honor.

The WIPO --

THE COURT:  Did I pronounce your name correctly, by the way?

MS. KRSULICH:  Yeah, that's very good.

THE COURT:  Okay.

MS. KRSULICH:  The WIPO experience is his executive experience managing privacy systems.  So I'll touch on it briefly if I could and then go into the work consulting.

THE COURT:  Okay.

BY MS. KRSULICH

Q.   Okay.  Could you please talk about your business experience at WIPO and how you managed trade secrets in that context?

A.   Sure.

I mean, you know, I had been asked before I went to WIPO about -- occasionally I was asked to do something like this, which was provide expert testimony, because I had worked with companies for decades about how to handle these issues either after a litigation or in order to avoid the risk of litigation,

and I always turned those down because I didn't have what I felt was direct personal experience.

At WIPO I got that in very good measure, because our primary job other than to check the formalities of the patent applications that we received every year, our primary job was to ensure that each of these approximately 200,000 patent applications remained confidential, that the information in them remained at WIPO and did not get released until it was time for the application to get published 18 months after the original filing.

And to help make sure all that happened, I had a staff of about 400 people from -- because this was the United Nations, they were from about 60 different countries.  And so the challenges that we faced related a lot to the, not just the normal how do you handle people who have certain kinds of access for certain purposes, but how do you do that in a multicultural environment, because we had people from many different countries working at the -- working at the agency. So I had HR teams and IT people who helped us do deep risk analysis of the sort that I had been discussing with private companies before I came to do it myself, but over that space of five years, we did a lot of that very specific kind of work for our environment and addressed the kinds of challenges that any organization has where they're trying to maintain control over sensitive information and maintain its integrity.

Q.   When you returned from Geneva, please describe the type of
work that you came to do with private companies around their
information security systems.

A.   Yeah, most of that work after I returned in 2015 had to do
with the design of or improvement of information security
systems, and I was doing that for companies of all sizes and
across all different kinds of industries, although being
located out here, I imagine most of them were technology, what
we refer to as tech companies.

     And I wrote another brand new edition of my management
book that year, published that, published a major article
opening legislation for a federal trade secret civil statute.
And as a result of that, I was asked by the Senate Judiciary
Committee staff to work with them on the formation of the
wording of that statute, which became the Defend Trade Secrets
Act.

Q.   Would you give a few examples of the companies that you
worked with and the type of work that you did for those
companies?

A.   Well, most of the deep work that I've done for companies
like that is obviously confidential in terms of the
identification, but a couple of the -- a couple of the clients
that I have worked with have allowed me to mention and talk
about the relationship work that I've done.  One of those is
American Express, another one is Corning, the glass

manufacturer.

I also, when I came back, because I had pretty good personal relationships with the intellectual property heads at a number of major companies, I made arrangements to go out and spend a day with each of those companies and their teams, their internal teams, to sort of compare notes on methodologies for information protection control systems and management of these kinds of assets, data assets.

So those companies weren't really, you know, clients as such. We were engaging in an exchange. And they included IBM, 3M, Exxon, I think Siemens and Nike. Those are the ones that come to mind.

Q.   Have you worked directly with Google?

A.   No, I haven't.

Q.   And how have the companies that you worked with compare to Google?

A.   Well, I mean, I've worked with a number of software companies, for example, and so I'm pretty familiar with that, with that industry. I mean, into the distant past I did work with Apple a long time ago. And being here, as I said, I've done work with companies in various sectors of software, you know, back from the time when the products were issued on CDs, before the cloud and so on. But I've become very familiar, whether it's in software, I've worked with companies that are focused on innovation. And so one of the common features of

the work that I've done, whether it's in software or biotech or mechanical systems, you know, has to do with the choices that are made around the risk management of how you deal with sharing information among employees and with outsiders.

Q.   Mr. Pooley, have you been accepted as an expert on information security systems in federal court?

A.   Yes.

Q.   In how many cases have you been qualified by a court?

A.   Well, in the sense that where I've actually testified, probably in, you know, federal and state court probably four times at trial.  There have been several cases where challenge, like a *Daubert* motion, has been filed, and I've been allowed to testify in all of those cases.

Q.   What were the areas of testimony you were qualified to give testimony on?

A.   Oh, it's always been on reasonable efforts or reasonable measures, which is the federal, you know, the phrase that's used in the federal statute.

Q.   Are you offering any opinions about trade secret law in this case?

A.   No.  I'm very sensitive about that and try to be quite careful not to testify.  But I'm quite familiar with the law. I taught it, write about it, but I know the difference.  And what I'm trying to focus on is trying to be helpful in providing a background of what it is that businesses do to

approach the risk management that's inherent in having to share information within an organization.

Q.   Please describe what methodology you use when evaluating how organizations protect their confidential information.

A.   Well, the approach that I use, which is the same in my advisory work as it is in providing testimony as an expert, we look at basically three dimensions of the risk management process.  One is the perceived value of the information that's involved, the risk environment that it lives in, if you will, as a result of the business model of the company that owns the information, and then what sort of resources are available and what would be the costs or tradeoffs in various measures to mitigate those risks.

And that kind of structure comes from primarily the National Institute of Science and Technology standards for cybersecurity assessment and management that have been around since early 2014 and have been largely embraced by most major U.S. private companies as an approach, recognized approach, for analyzing information security measures.

Q.   Under this methodology, what is the first step an organization should take when implementing trade secret protection practices?

A.   Well, the first is to understand what it is that you're talking about, what is the information.  Because you can't know how to assess the risks and what sort of measures that might

appropriately reduce the risk without knowing what it is.  You also can't manage it if you're in a sharing environment, as most organizations are, you can't manage it unless you know what it is, so that you can explain it to the people who are given access to it, so that you can help them understand what it is that you deem to be important.

**Q.**   Is it your opinion that there are a set of measures that a company must implement?

**A.**   No, no.  In fact, I've often said that, you know, a check-the-box system is not, is not an appropriate way to address this issue, because every, every company's, you know, dataset or data assets are unique and they exist in a risk environment that's dynamic, and every company has a different set of objectives and priorities and resources.  And so the focus, rather than, you know, going through a checklist of must-haves, is usually what this company in this environment should ideally be doing to balance the risks that it has been able to identify against the need to share information and make certain information available.

So in that context there are certain things that everyone likes to do and does; for example, nondisclosure agreements and other kinds of basic communications and policies.  But ultimately it's about -- the answer to the question has to be deeply contextual to the situation that the business faces when it's trying to balance access with security.  And so it's hard

to say that there's any particular things that are either necessary or sufficient in the abstract.

Q.   Without reaching any conclusions about this case, would you please explain what "reasonable security measures" means within your profession.

A.   Well, it's -- I'll just sort of summarize what I said earlier.  It is a set of measures or actions that a company takes in order to appropriately balance the need for access with the need for security, focusing on the nature and scope of the information that they care about, the nature and scope of the risks that information faces in the course of its ordinary business, and then what measures might be available to the company to reduce, to reduce those risks.  And there are obviously a suite of things that companies might be able to do or can do, but if they're going about it in a reasonable, rational way, they will look at it in that way, in that sort of process as a matter of normal classical business risk management.

Q.   How do organizations balance usability and security when designing their information systems?

A.   Well, if they're being careful they do it very carefully in the sense that they think about what is the challenge, right, of having to give people access to information that you want to maintain within the organization you don't want to get -- go outside.  And so they will approach this in a way

that reflects their own priorities, their own appetite for risk, because simply because there was a risk doesn't mean that you have to eliminate it.  In fact, most risks can't ever be completely eliminated.

And so you need to look at companies, and what companies actually do is they look at what are those risks.  Where, if we provide, for example, ready access to an engineering database to all the engineers in the company, as opposed to segregating that database according to various projects that people are working on so they only get access to their own projects.  That represents one level of choice that a business makes among many choices that are involved in implementing this kind of strategy.

And another example of that choice is something that's called zero trust, where access is provided and controlled. For each inquiry that someone might make into a system, they have to provide not only their credentials, but also the reasons why in that particular instance they need access.  So just because they have a certain role doesn't mean necessarily you would have open -- get an open door into that data.

So there are a lot of choices that companies can make, and this is part of, this is why they call it management.

**Q.**   And focusing in, Mr. Pooley, on one of the risks.  What do studies show about employee willingness to share sensitive company information?

**A.**   Yeah.  Well, as I detailed in my disclosure, those surveys tend to show that employees have a, you know, fairly loose attitude about what information they're entitled to either share outside the organization or particularly to take with them when they go.  And this is something that's widely known within the security, information security industry, where the very basic and accepted principle is the most common way that information is lost, control over information is lost, is through employees.  And that and the surveys and studies that have been done indicate that those kinds of disclosures or leaks happen typically because of misunderstandings, and employees feel that because they had a role in creating something, they're supposed to be able to take an example with them, for example.

And this is what we see over and over again in the public studies that have been done.

**Q.**   And have you personally observed instances in which software engineers have retained personal possession of work-related documents?

**A.**   Oh, very definitely, yes.  I mean, I've been doing this work for 50 years now, plus, and working with a lot of engineers, software engineers in particular.  Because what they do is so easily portable, they tend to be, in my experience and that of others I think like me, they tend to be pack rats, and they don't feel comfortable unless they're -- unless they have

their work with them.  And because it can be stored on such a small device, it gets easy for them to do it.

And so this is just a reality that I think a lot of companies, most companies I'm aware of, recognize.  And so they take measures to try to make sure that people don't misunderstand and so that they know what's going on and can help their employees know what it is that they consider most important and ensure that they collect things when employees leave, et cetera.

So this is -- that reality is something that animates a great deal of the work that's done in information security.

Q.   Would you please describe any examples of this type of phenomena that you've observed?

A.   Well, I can in the abstract.  I mean, you know, there's a lot of examples that trail behind me in my career.

But what happens is typically employees who work on something and they feel they have invested in it like to take with them that information, and they -- and in my experience what they do is they tend to justify it to themselves because it's something that they've worked on that is a piece of them, if you will, and so they will want to have it with them. Whether they actually take it with them, I think most often that happens over time in the sense that they have this collection that exists, you know, maybe on a personal drive somewhere or on an old computer, and so they just have it, and

occasionally they will start collecting things when they know that they're about to leave and they want to have, you know, examples of their work.

This is, this just -- this is, again, I think recognized I think through most industries, and certainly in software-based industries, as a risk.

Q.   And how, if at all, does Google's work environment affect the analysis that you performed in this case?

THE COURT:   Before you answer that question, could I just ask you?  I'm looking through -- you just testified a bunch about surveys that show that employees have a loose attitude about, you know, taking stuff with them and whatnot. I was just looking for that in your report, and I couldn't find an opinion on that.  I'm wondering if you could help me find it.

THE WITNESS:   There's sometimes a Dell survey, I think.  Let me see.  Ah, yes.  Hopefully I have this here.

MS. KRSULICH:   If I could be helpful to the Court?

THE COURT:   Yeah, sure.

MS. KRSULICH:   The first paragraph on page 7 of his report, supplemental expert report.

THE WITNESS:   Yeah, the Dell end user survey is ...

THE COURT:   Got it.  Okay.  Thank you.

Go ahead.

BY MS. KRSULICH

**Q.**    Okay.  Mr. Pooley, how, if at all, does Google's work environment affect the analysis that you performed in this case?

**A.**    Well, Google has -- is kind of famous for and has articulated its intentional choice to have an open collaborative environment.  It's a company that prides itself on innovation.  And so the choice -- management has obviously made the choice that you get more innovation by allowing more collaboration among your engineers and creative people.

And so, for example, we see that Google information designated as confidential is available to every employee in the company.  Some might say, well, that's very unusual and that if you want to maintain control over your information, you should segregate it according to some various criteria, role-based criteria.  And indeed Google has another category called "Need To Know," where they sort of do that, but they -- but the general, the general choice that the company has made in terms of structuring access among its employees is a focus on collaboration and an open sharing of information within the company.  They're express about that.  It's one of the ways they recruit creative people.

**Q.**    I'd like to drill down now into some of your specific opinions.

Mr. Pooley, do you have an opinion regarding whether Google adequately trained its employees as to what constitutes

trade secrets?

**A.**    I think in -- yes, I do have an opinion, and that I think here they did not do the job you would expect given the kinds of risks and the sort of information that they're -- that they have identified as the alleged trade secrets in this case.  You would expect -- also, I mean, given that a lot of the documents that contain this information weren't labeled, and, you know, the company, I presume, was aware of how communications happened and also was aware, I have to assume, that a lot of its employees did not have English as a native tongue, that they would have really tried very hard in their training process and in the content of their training to help employees understand, in your job doing what you're doing, this is the kind of information that you really need to be cautious about and to be as precise about that as they could be and to elevate the importance of that kind of designating and understanding that kind of information.  In other words, what is it, so that you can recognize it when you see it, whether it has a label on it or not.  Obviously, as their policies indicated, it should have a label.  But if it doesn't, how do you make the determination that this is something that falls into one or another category of sensitivity?

     And the only training that I saw speaking to those kinds of issues was extremely high level and in my view could have been a lot more precise.

**Q.** What documents did you review in arriving at your opinions?

**A.** I reviewed some policies, I reviewed training materials, basically the content of training that was given on privacy.

Which was another thing. They packaged -- Google packages its training on confidential information of the company within a much larger package that addresses privacy issues primarily focused on its customers, the users that provide information to the company, to suppliers, partners and other colleagues within the company. And so that is the primary focus, and a very, very much secondary focus would be business information.

So the way in which it was presented provides, you know, some insight into how important Google perceived these particular aspects of its information security treatment to be.

**Q.** Are the types of documents that you reviewed in this case the types of documents that you would review in a professional engagement for a private company?

**A.** Oh, yes. These are all very familiar, the normal kinds of documents we deal with.

**Q.** Have you seen any evidence that Google is aware of engineers' habits to retain work-related information?

**A.** I have referred to at least one, one document. I think it was an interview of someone who might have been an HR at Google who recognized and expressed that, you know, the company knows that its engineers, a lot of its engineers, tend to favor

keeping information that they've worked on themselves, and I think she may have used the word "sentimental" about it, which struck a cord with me, because that's exactly the way that I have experienced particularly software engineers in the past.

Q.   Have you been qualified as an expert by a court to testify as to the adequacy of training materials?

A.   Only as a part of testifying about reasonable measures overall, because frequently where the issues are focused on employee sharing, as opposed to voluntary third-party sharing, training is usually a very important issue.

Q.   I'm going to go into some detail about one of the documents that you reviewed, and I'm going to be referring to defense Exhibit 5.

Mr. Pooley, this defense Exhibit 5 is in your binder at tab 5.  It's a presentation titled MSC Document Access.  Do you have it in front of you?

A.   Yes.

Q.   Have you seen defense Exhibit 5 before?

A.   Yes.

Q.   What is it?

A.   Well, it's an example of a, I think you would call it a diagram of hierarchy of information sensitivity, so that you can parse information according to different levels of sensitivity and security.

MS. KRSULICH:  The defense would offer Exhibit 5 into

evidence.

THE COURT:  Any objection?

MR. BOOME:  No, Your Honor.

THE COURT:  Admitted.

(Trial Exhibit 5 received in evidence.)

THE WITNESS:  I should also point out it appears on its face to be a draft, because it has some interlineations on the page that I'm looking at, which is page 3.

BY MS. KRSULICH

Q.   Mr. Pooley, if you could please join me at slide 3 in the presentation.

A.   Yes.

Q.   Please explain the MSCA Access Levels pyramid that we're looking at.

A.   This general approach is very common and popular, because it helps to identify how certain information can be more concerning or more sensitive than others and provides an opportunity to parse that information in a way that will allow people to put labels on things and to understand what they can or cannot do and what access may be provided, or not.  So we often see this pyramid presented as part of a policy document in many companies.

Q.   And what conclusions, if any, did you reach regarding the access levels described in this pyramid?

A.   Well, as I explained in my disclosure, the first

impression I had looking at this was that it was highly complex and a bit difficult to -- for mere laypeople to understand, and that it had more categories than is typical in my experience, and that, as I said, it seemed to be a bit of a draft rather than a final document. Those are the impressions that I got looking at this. It struck me as something that would be a challenge for some people to digest and understand.

Q. What observations, if any, do you have about the level 4 secret at the top of the pyramid?

A. Well, one issue that I sometimes run into in dealing with clients is they use the word "secret" as a label for a category of information all of which is secret, and that's what's happened here. I mean, I think the company would say level 3, and level 2, and level 1 and probably level 0 should all be potentially secret in the sense that we use the term, and yet they use the word "secret" for only the very top level. That's not a good thing in my view.

Q. Why not?

A. Because it leads to confusion, right? If someone says, where are your trade secrets, right, and you have a diagram that labels only things at the very top as secret, you could conclude that, well, the things below that level aren't really trade secrets, can't be, because otherwise you wouldn't use the term for just the top level.

And that's just an example of the kind of confusion that

we try to avoid.  Then when I'm working with companies we -- you know, I sometimes, if I find something like this I would say, we need to sort of revamp this, make it simpler, no more than three levels, and avoid using the word "secret," you know, as a label.

Q.   And Mr. Pooley, what observations, if any, do you have about the level 0 category at the bottom of the pyramid?

A.   Well, only what I've already mentioned.  I think it's notable that everything in this category was available by company policy to anyone who works at Google no matter what their position is, no matter what need they have for access to the information.  That's a remarkable approach for information that's designated as confidential.

Q.   How does your experience in designing information protection systems help you understand this pyramid?

A.   Well, I appreciate that there is here an effort to try to identify and put some definition on various levels of information which might be useful to some people who are -- who spend most of their time dealing with it.  What is most important to me when I see something like this is how, how that can be understood by rank and file members of the workforce, including people who -- for whom English is not their native tongue.

So it's helpful for me to see the way that the company separates the various categories that they've come up with and

to get an understanding of how employees, when looking at this, might or might not be able to clearly understand what the company might have meant by it.

Q. How did this pyramid inform your review of the alleged trade secret documents and their underlying source files in this case?

A. Well, as I understand it, most of the documents containing the alleged trade secrets were not labeled, didn't carry labels, and that most of the rest were confidential, that had labels were confidential, which puts them into the category of available to any one of the thousands and thousands of Google employees. And so that is, to me, an important, you know, aspect of understanding the data security environment at Google, and particularly how it would be understood by a member of the -- member of the workforce.

Q. Thank you. I am done referring to this document, so you can put it away in your binder if it makes some space up there.

Have you seen in Google's production any Google policies disseminated to employees on how documents are determined to be trade secrets?

A. I certainly have seen training materials. I think that's what it was. It could have been a policy. But, yes. The answer is yes, I've seen that.

Q. What is your understanding about when Google identified the trade secrets at issue in this case?

**A.**   I think they were, well, identified after or as of the time that the complaint was filed.  It's not like, I don't think they were identified as a set before the indictment.

**Q.**   And what opinions, if any, are you offering about how Google identified the alleged trade secrets at issue in this case?

**A.**   Well, my interest, my interest is mainly in how they identified or did not identify them to the workforce, which involves all those issues around training and labeling and so on.  And so that's the -- that's the way that I have primarily looked at them here.  How, how would someone as part of the general Google workforce understand or not understand this kind of information being sensitive and controlled.

**Q.**   And do you have an opinion about whether Google clearly identified its trade secrets to its workforce?

**A.**   Well, as I indicated earlier, I didn't see any of that in the documents.  What Google did was identify at a very high level of abstraction what kind of information it was interested in protecting and what its employees should know about, but that was very, very high level, and that's the challenge and the problem with that sort of broad statement to employees.  If it's not -- if you don't teach them exactly how to distinguish between the things that you really care about and everything else that they have general access to, you're creating an environment where you're on the one hand messaging to everybody

sharing all of this data among everyone is just fine, and yet there is some information that we want you to be particularly keen on, but I didn't see anywhere in the materials any specific training that would have helped a rank and file engineer understand exactly what that is.

Q.   I'm going to move now to a different opinion.

Do you have any opinions, Mr. Pooley, regarding whether Google maintained controlled access of its claimed trade secret information?

A.   I think, yes.  As I described in the disclosure and as I've already indicated here, Google provided very, very broad access, I mean, measured by the range of control that you can have, which goes all the way down to, as I said, the zero trust method of control.  But in many technology companies, the kind of access that we see at Google is highly unusual, because normally access to sensitive information is segregated, sequestered and saved for people whose positions demand access to it because they need to get it, and the rest of the information is out of bounds and they're not allowed, they don't have credentials for it.

So that was a -- that was a, you know, major observation for me.

Q.   What does "controlled access" mean in your industry?

A.   Well, in information security, controlled access is about making sure that only people who have a need to know do

actually have access to information.  So the principle of least privilege or need to know is a very core notion in security.  And so the tighter the security you want to have, generally speaking, the narrower the access privilege that any particular person within the company might have, and so you will try to arrange it in a way that maximizes the amount of control that you have.

On the other hand, if you're more interested in collaboration, then you will have more of an open-door approach to information access, and concomitantly an increase in security risk.

Q.   I'm going to be referring now to defense Exhibit 6.  This is actually loose in the binders that you -- that the Court has.

A.   That's what fell out?

Q.   And in your binder, Mr. Pooley.  Yes.

A.   Okay.

Q.   Mr. Pooley, have you seen defense Exhibit 6 before?

A.   I believe I have.  I know I've seen versions of it or a version of it.

Q.   And what is your understanding of what defense exhibit 6 is?

A.   I believe this document has something to do with the extent of access that was provided to particular kinds or particular documents in the Google system.  I'm not sure that I

remember the color coding scheme, but I think that's what this document was intended to get across.

MS. KRSULICH: Defense would move defense Exhibit 6 into the record.

THE COURT: Any objection?

MR. BOOME: It's not clear, Your Honor, that Mr. Pooley absorbed or considered this document.

THE COURT: Agreed, but it's admitted for purposes of this hearing, and we can sort out later what --

MR. BOOME: Understood.

THE COURT: -- how relevant it is to his testimony.

(Trial Exhibit 6 received in evidence.)

BY MS. KRSULICH

Q. Mr. Pooley, please explain the significance of the right-hand column of the spreadsheet as you understand it.

A. My understanding in general is that the right-hand column was -- is intended to designate or reflect a level of access within Google to the -- to each of the documents that it's referred to.

Q. And what conclusions, if any, did you reach from the spreadsheet?

A. Again, not remembering the color code scheme, I can only tell you my general observation was that the vast majority of this information was very widely available to hundreds or thousands of employees.

Q.   I am no longer going to be referring to defense Exhibit 6, so you can put it aside.

Have you seen any evidence, Mr. Pooley, that Mr. Ding hacked into Google's systems to access alleged trade secret documents?

A.   No, I don't understand that being an issue here.  I think he had access within the company to the information.

Q.   What is a data loss prevention system?

A.   Data loss prevention is usually referred to by the initials DLP as, it's a tool for providing notice when something is happening that shouldn't be happening with your information.  So there are systems that have been developed over the years that basically act as a sentinel to information being transferred from one point to another point and to put up a flag if there appears to be a problem.

Q.   What data loss prevention capabilities were considered standard in the industry in 2022 and 2023?

A.   Well, I think it's probably best to say that data loss prevention tools themselves were viewed as a standard.  Exactly how those tools get implemented at any given company depends on how -- we sort of refer to this as turning the dial on the system.  How sensitive is it going to be, and, you know, what keywords do you use?  I mean, we're all here I think familiar with electronic searching and the use of keywords.  You know, how many keywords are you going to use?  How do you select them

in a way that won't present too many false positives and won't give you an avalanche of flags that you can't possibly deal with.  So there is more of an art than science in that process.

There were also, as I understand it -- I'm not an expert in the specifics of these tools, but as I understand it, there, during that period of time, were available tools that would do their own analysis, intuitive analysis, using some form of artificial intelligence to identify the content of material that was potentially being exfiltrated or moved from one place to another.

And so it's -- exactly how DLP systems are implemented at a given company is a choice, and there's a wide array of possibilities in implementing them.

Q.   What is your understanding about the capabilities of Google's DLP system during the relevant time period?

A.   Well, my understanding as I explained in my disclosure, is that it appeared to be one that was based on keywords and, but did not, did not use the technology that would go in and automatically intuit the existence of information that was inherently sensitive.  That's another level of the technology. I didn't see evidence of that.

And again, let me point out, DLP tools don't solve the problem, they just put up a flag.  And so they're resource intensive.  You need people to look at the flags and find out what's going on.

**Q.** I'm going to move now to the final opinion that we're focusing on for your testimony today, and this involves events that took place in December 2023. Do you have an opinion, Mr. Pooley, about how Google handled the potential information exfiltration risk relating to Mr. Ding in December 2023?

**A.** Well, yeah. I've tried to address that in my disclosure.

The most remarkable aspect of that seemed to me was that having seen the information that they were concerned about at the time, they, Google, asked Mr. Ding to sort of self-certify that he had, you know, gotten rid of everything. Just had him sign a declaration and then finished it off, and they restored his access without any further investigation into whether he had engaged in any similar behavior and might have other documents in his possession.

So that, coupled with the, you know, the absence of a kind of traditional exit interview, where you take the opportunity to ensure that whatever misunderstanding might have developed over a period of time, whatever shortfalls there might have been in training, you can address that and get clear with the departing employee about what their obligations are at the moment and on a continuing basis, and ensure that you get everything back that you're supposed to have and that they don't have anything that they're not supposed to have.

And that, that process didn't happen here as far as I can tell, and there already was in the record somewhere, I'm not

precisely sure where, but I understand that there was somewhere in the record that Mr. Ding had transferred other information at an earlier time that was not investigated.

So I would have expected, with what the company knew at the time, they would have done -- you know, they would have done some forensics, they would have examined with Mr. Ding what he had done up until that point, not just with that one transaction, but at an earlier time, and that they would have had a very robust exit interview with him to try to clarify things.

**Q.** What conclusions did you reach about Google's departure procedures for Mr. Ding?

**A.** Well, again, I felt that it was a shortfall of what you would reasonably expect a company to do in a situation like that. Clearly they want to -- you would want to respond to something that you think is not appropriate, some behavior, but not to more deeply investigate it, not to sort of sit down with him and try to find out what the source of any confusion might have been and where other information might be located that the employee has and should be returned. All of those sorts of things, pretty important to do in a circumstance like this.

So I thought that was an unfortunate failure.

**Q.** And what is the role of an exit interview in the information security industry generally?

**A.** In general, it's to ensure that everything is clear about

what the company's expectations are and how the employee will act on the way out and on a continuing basis to respect the confidentiality of the company's information, to get clear on what all of that means, and to get any documents that the company -- that the employee might have collected over time, to get those returned.

Those are the things that you do in an exit interview.

**Q.**   Mr. Pooley, are you aware that the government produced Google policies and procedures on Friday?

**A.**   Uh, yes, yes.

**Q.**   Have you had an opportunity to review those documents?

**A.**   To the extent I could on the plane coming back last night, yes.

**MS. KRSULICH:**  Okay.  Pass the witness.

**THE COURT:**  Okay.  Cross-examination?

**MR. BOOME:**  Your Honor, would the Court allow a short break before cross-examination?

**THE COURT:**  Very short.  I was hoping that we were going to go until 11:45 and then break for lunch.

**MR. BOOME:**  That's okay, Your Honor.  We can start.

**THE COURT:**  Okay.  Is that okay with you?

**THE WITNESS:**  Certainly, Your Honor.

**THE COURT:**  Okay.

### CROSS-EXAMINATION

**BY MR. BOOME**

**Q.**   Good morning, Mr. Pooley.

**A.**   Good morning.

**Q.**   I'd like to talk about your qualifications briefly, sir.

You talked initially a lot about your legal experience as a trade secrets lawyer and frankly a pioneer in the field. You're not here to offer a legal opinion, are you?

**A.**   Not at all.  I try to be very careful about that.

**Q.**   You're not testifying about trade secrets law, correct?

**A.**   That's correct.

**Q.**   And so would you agree that your legal experience and legal training and your expertise as a trade secrets lawyer is irrelevant to your testimony here?

**A.**   No, not at all.  It's -- it provides very useful context for me to understand, appreciate and internalize the business process of risk management around trade secrets that I've described.

**Q.**   Your experience as a trade secrets or information security consultant --

**A.**   Uh-huh.

**Q.**   -- you said most of it is confidential; is that right?

**A.**   I mean the identification of the clients.  Yeah, I can talk about industries and so forth, but ...

**Q.**   And that's because you were retained as counsel for those companies?

**A.**   It's because in those engagements the client perceived the

value of engaging me as a lawyer so that they would have the protections of the privilege for our conversations about what they oughta be doing. And they saw value in that, so I was retained as a lawyer and acted effectively as a consultant.

Q. Does that mean that you can't talk about at trial or here today what you did for those clients, what types of business they are, what types of issues you wrestled with on behalf of those clients?

A. Well, I can talk -- as long as they're not identified, I can talk about what I did, to the extent I can remember it without referring to my record, sure.

Q. The companies that have allowed you to identify them as past clients are AMEX and Corning; is that right?

A. Yes. And actually AMEX is a continuing client. Corning is in the past.

Q. What type of work have you done for AMEX in terms of developing information security protocols?

A. Done strategic work around understanding what the company has in place, interviewing many managers about what their concerns are and what the sensitivity of the information that they work with is, et cetera, and examining the policies and protocols and training materials and all of that so as to help the company refine its approach to all of that.

Q. How is a company like American Express different from a company like Google in terms of the needs of their information

protection procedures?

**A.** It's a little bit different in a sense it's regulated, because it's a bank. And so it has certain, you know, restrictions on it. But in large part it's very similar because it -- it's customer facing. So it has all those customer concerns around privacy and so forth. And it develops software tool, analytic tools that are, you know, critical to its competitive success.

**Q.** The software companies that you worked for, you're not able to tell us who they were?

**A.** Not -- not by name. I mean --

**Q.** Can you tell us their size?

**A.** Well, I can say I have worked for Apple in the past. They're pretty big.

**Q.** When did you work for Apple, Mr. Pooley?

**A.** That would be in the '90s sometime. I -- there was a point when I was friends with the general counsel, and she called me one day and asked if I would be willing to represent Mr. Jobs in a deposition.

**Q.** So that's not an information security role; is that correct?

**A.** Oh, in that one that particular engagement wasn't. So, but in any event I became pretty familiar with what it was, how it was that Apple addressed trade secret controls.

**Q.** Let me try to address this a different way, Mr. Pooley.

Can you compare the size and scope of the software companies that you have experience working with in an information security role to the size and scope of Google?

A.    It almost certainly is smaller than Google, as Google is one of the very largest software companies in the world.  So I think I'm very safe, I mean, without going back, and I have a list of previous clients, without going back and reviewing it, I'm pretty sure that none of them would equal Google's size.

Q.    And we can agree that it's a relevant question because of the volume of data that Google is responsible for protecting and securing versus a much smaller software company?

A.    It could be, and you know, it's -- it depends in part on what -- how you measure the size of the company, too.  I'm thinking in terms of number of employees, and the scope and level of responsibility for protecting information might not change that much based on number of employees.

Q.    So just to recap your experience for data protection and security consulting, we have your confidential clients, your work with American Express and Corning, and your work for, was it -- it was two software companies?

A.    I know I've worked with many more software companies than two of varying sizes over the years, but I can't be precise about exactly what I've done for them without looking at my records.

Q.    And you mentioned IBM, 3M, Exxon, Siemens and Nike in the

context of you met with their leadership for a day to discuss information protection?

A.    Yes, we exchanged information about methodologies and protocols and that sort of thing.  It was perceived as a kind of a mutual benefit for -- to help me understand what they were doing and for them to better understand the approach that I was applying.

Q.    When was -- when did that day happen?  Can you give us a year?

A.    Those meetings would have been 2015, 2016, in that range.

Q.    I want to briefly touch on your world intellectual property organization experience, and I want to ask a question about the -- its fit to this case.

A.    Okay.

Q.    Can you explain a little bit about what happens to a patent application once it arrives at WEPO (phonetic)?

A.    Okay.  We usually pronounced it WIPO.

Q.    WIPO, I'm sorry.

A.    Yeah.  Anyway, what happens is we looked to make sure that the formalities were followed appropriately; that is, that the right names were put in the right places.

Q.    I'm sorry.  I should have been more precise in terms of data protection.

A.    Oh, okay.

        Okay.  What we did was ensure that the patent applications

were directed to a specific individual within a particular group, and that only that individual and that manage -- and the individual's manager had access to the -- had access to the application.  So, and that involved certain IT tools that would implement that kind of limited access.

Q.    200,000 patent applications a year, and the security task was to make sure that those 200,000 documents that came in over the course of a year remained accessible to the two people who needed to see them; is that fair?

A.    Well, two people couldn't see the 200,000, but the two people --

Q.    Right; each one.

A.    -- would look at the ones, would look at the ones that were relevant to them, and then we had to have, you know, rules around structure and communication among the employees that you would basically view as HR constraints, to ensure that the information in the application didn't somehow get out or become misused.  So we did access controls, we did training, we did IT controls, everything that we -- everything we could to avoid premature publication.

Q.    Is it accurate to say, Mr. Pooley, that with respect to those patent applications that you were responsible for, broad access in terms of editing documents, IT rating, using documents to create new technology, that those were not issues that you needed to deal with at WIPO?

**A.** I think that's generally true, that in WIPO it was a much more locked down environment, because we weren't an agency that was supposed to innovate, like Google is a company that's all about innovation. We were supposed to make sure that the information was tightly controlled so that it didn't get out until it was time.

**Q.** Because it's important to keep patent applications confidential until they're published, right?

**A.** It was my biggest nightmare.

**Q.** Okay. Mr. Pooley, I want to transition now to your reasonable measures opinion testimony in general. You -- I didn't notice a, an hourly rate in your disclosures in this case. Are you being paid for your work here?

**A.** I am, but not at my normal rate.

**Q.** Is it fair to characterize you, Mr. Pooley, as an advocate or a promotor of the concept of litigants using experts to opine about whether the victim of a trade secret crime or misappropriation took reasonable measures?

**A.** Not as you have expressed it. I have been -- I have published articles or white papers about the use of experts, and I was a co-author of the trade secret case management judicial guide which describes how experts are used on that particular issue. But I, you know, I don't advocate in the way that you have described it.

**Q.** You mentioned on direct examination that you have been

permitted to testify in civil cases exclusively, right?

A.   So far, yes.

Q.   And one of them was in Harris County, Texas, state court; is that correct?

A.   It was, yes.

Q.   Another case in the Northern District of Texas in 2024, a civil case?

A.   That's right.

Q.   And then in this courthouse in 2021, a civil case before Judge Chesney, correct?

A.   Oh, yes.

Q.   And you testified in all three of those cases?

A.   Yes.  I think there may have been another one, but I don't remember, another that went to trial.  I'm having trouble remembering.

Q.   And there have also been, Mr. Pooley, challenges to your opinion testimony as to reasonable measures in other cases that were granted; isn't that correct?

A.   Only, only to ensure that I did not speak as to legal conclusions.  But on the information that I was offering, I've never been barred from offering those opinions.

Q.   Well, you did -- you were engaged in the case of Beijing Meishe, M-e-i-s-h-e?

A.   Versus TikTok.

Q.   Versus TikTok, right?

**A.**    Yes, indeed.

**Q.**    And that case is in this courthouse before Judge Illston?

**A.**    It was.

**Q.**    And on September 2nd of this year she issued an opinion that states in part that you may not offer testimony, quote, "about the law of trade secrets, nor may he," meaning you, "offer a conclusion that plaintiff did not take reasonable measures."

Wasn't that her opinion excluding your opinion testimony?

**A.**    There was more to it than that, and if you read it in context because of what she -- what the Judge said I was allowed to testify to, it seemed clear to me that what she was talking about was the -- was a legal conclusion, but I could speak to the facts that, you know, the business process involved of what's reasonable or not.  That -- otherwise my testimony, I couldn't give it at all.

**Q.**    The order also stated that "if the defendant" -- you were working for TikTok in that case, right?

**A.**    I had been engaged by the lawyers from TikTok.

**Q.**    "If the defendants can establish that Mr. Pooley's consulting work includes relevant experience with software companies, Mr. Pooley may comment on measures he has advised clients to take and measures he would have advised companies like the plaintiff to take."  That's what you're referring to, that part of her order?

**A.**    No, there's more to it than that.  I don't have in front of me, but all I remember is when I read it in context, it appeared to me that what I had expressed to you earlier, that she was concerned that I not be able to speak to the legal conclusion about reasonable measures, but that I could speak to what businesses normally would do.

**Q.**    So do you expect to go to court in that case and offer an opinion as to whether the plaintiff took reasonable measures?

**A.**    No.  That case has been terminated.

**Q.**    So I'm not sure we're understanding each other on the order.

Judge Illston would not have allowed you to testify that Beijing Meishe, that you would not have been able to offer your opinion that they failed to take reasonable measures in that case?

**A.**    Actually, I don't believe that's true, because the way I read the order, her focus -- and obviously I think from our conversation here, I felt if the case had gone forward, there -- we would have had to have some clarification on it. But from what I understood, she was trying to get across her concern that I not speak from a legal perspective, but that I could, you know, provide useful information on the business issues involved in reasonable measures.

**Q.**    How about Zest Labs versus Walmart?  Weren't you also excluded in that case?

**A.**    I think, again, that was just an emphasis on the no legal opinions, as I remember.  I wasn't prohibited from testifying at all, I don't think.

**Q.**    And a case out of the District of Delaware in July of this year, Biohaven Therapeutics.  Your testimony was precluded, but the opinion stating why it was sealed.  Is there anything you can say without violating the sealing order?

**A.**    Well, I can't -- my opinion was not precluded as I understand it, but I don't have the file in front of me.  And in any event, yes, it's the order on the various motions there is under seal, but that as far as I know, I'm still supposed to testify in that case.

**Q.**    Mr. Pooley, I want to turn now to your opinion that Google failed to label its trade secrets as such and distinguish them from other confidential information that is not a trade secret.

**A.**    I think -- and I think what I've said was they didn't label information that was deemed to be -- that was in the alleged trade secrets.  Those documents were not labeled for the most part.  Some were labeled as confidential, and I understand just a very few were -- had a different kind of label, but most of the documents had no label at all.  And so that was my observation.

**Q.**    I think we'll come back to that, but I'm asking about a different opinion.  On page 7 of your report it says:  "It appears that Google did not make clear to its employees exactly

what it considered to be trade secrets."  It's on the same page you write that:  "I'm not aware of or seen any policies disseminated to employees, including Mr. Ding, on how documents are determined to be trade secrets or how they are assessed to be separate from other non-trade secret information."

Is that a fair reading of your opinion?

A.   Yes, it is.

Q.   Can you clarify what this means, Mr. Pooley?  What are you proposing that Google should have done here precisely?

A.   Well, a couple of things.

One is it should have more vigorously enforced its policy on labeling documents, because documents that were confidential or above were supposed to be labeled according to the policies, and yet we found out that most of the documents that contain the alleged trade secrets were not labeled at all.

And the other, the other thing that Google should have done, as I testified to earlier, is they should have provided better, more useful training to people in the workforce, including Mr. Ding, about how to distinguish sensitive information, information that the company really cared about, from other kinds of information.

Q.   So you're not saying that they should have had a separate category of information for trade secrets?

A.   Oh, no, no.  I'm not suggesting that they should have changed, other than I had a comment on the -- on that top

portion of the pyramid that they called secret, which I thought was a unfortunate choice for the reasons I already described. But, no, it's not typical that companies would -- that companies use the label "trade secret".  They usually use "confidential" or something like that on a document; "restricted," et cetera.

Q.   Well, help me, Mr. Pooley, because isn't that exactly what Google does here?  They -- in Mr. Ding's employment agreement it clearly states that trade secrets are among the categories of information that Google considers to be confidential, correct?

A.   They say that in the employment agreement, which is very common, but employees don't know what trade secrets are, and unless they think of the formula for Coca-Cola, and that's why companies typically in the operations, yes, when they're listing the kinds of things that constitute confidential information they want to be exhaustive, and so they include the word, the phrase "trade secrets," and they may also include things like mask works, even if they're not in the semiconductor industry, you know, because it just, there's a whole lot of verbiage that's added there as backup.

But what I'm trying to say here in what, in the part that you quoted, is that Google should have done more to help its workforce distinguish between the things that really, really mattered to it and the other information that was available to

**POOLEY - CROSS / BOOME**

everybody in the company.

**Q.**   Does that mean a training on what information meets the legal definition of a trade secret, as in valuable, secret, not publicly available?  You want employees to be able to recognize a legal trade secret?

**A.**   No, no.  I'm not saying that employees should be taught the law on trade secrets, which would not be very useful for them anyway.

What I'm saying is that to have training that really is helpful to employees and that helps avoid the kind of risk that we're talking about here, which is the risk that someone will take something that the company doesn't want them to take. They should have training about how to recognize that kind of information in their job, in their environment.  What is it that you're likely to run into?  Here's how to recognize it.

And, no, teaching them about trade secret law would not help them a bit.

**Q.**   So if Google had done what you propose, which is to train its employees that we've said there's this broad category of confidential information, but here's the stuff we really care about, what message does that send to the employees about the rest of the information that's not in that category?

**A.**   Well, it -- it's up to the company to tell them how you should -- how you should be treating it, and the messaging is whatever they decide to do, but they need some clarity.

And as to the confidential information, they should be telling their employees exactly what the policy is that applies to it and how to recognize confidential information in this example we're talking about here when it's not labeled.  How do you tell?  And that's what I was trying to get at.

Yes, we also want them to be able to recognize things that are extremely sensitive, but, you know, if you want -- if you want people to be aware of all of the things that matter to you in maintaining your competitive advantage, you want them to be able to discern on their own how to see those things and how to know what -- when they're dealing with something that is very sensitive or even somewhat sensitive.  How do they know if there's not a label on it?

And that's where I think the training here was not really sufficient, and the enforcement was not sufficient with the lack of labeling.

Q.   So I want -- I have one -- I want to pick on up that, but before we do, I have one question about whether you're applying your methodology consistent here, Mr. Pooley.

A.   Okay.

Q.   Because on the one hand you're advocating that Google should train its employees more specifically on what it considers to be really secret.  "What they really care about" are the words you used, right?

A.   Yes, but I don't want to be misunderstood.

It's not as if they should be training only about how to recognize information at the top of the pyramid, if you will, but to -- how to recognize information that should be protected in some way, but that doesn't have a label on it.  That's the kind -- that's the normal -- and to give training that focuses on that, as opposed to, you know, kind of burying it in with a lot of training that's focused on privacy and personal identification information, that sort of thing.

**Q.**   Okay.  So is it -- is your opinion, though, that they should have taught people how to recognize trade secrets without labels, or they should have taught people how to recognize trade secrets and the things they really care about more generally?  What is your opinion?

**A.**   Well, I'm -- not that they should teach them to recognize, quote, trade secrets as, you know, the law defines the term, but that they would teach them what is it, what kind of information do we care about that we need you to be particularly careful about when it's not labeled that way, and that's the -- and that could be something that, if it was properly labeled, would be secret.  It could be something, if it was properly labeled, would be confidential.  But you need to -- you need to at least get across some understanding with the workforce about how to do this on their own if the label's not there, and that's what I think they didn't do here.

**Q.**   So you've testified about the secret category in the MSCA

document, and your concern there was that it might suggest to the workforce that only that category of information was secret, correct?

A.   That's the source of confusion.  I gave that as an example, because that comes up from time to time, and I regularly, when it does, advise companies not to do that.

Q.   But you're also saying from your report that employees need to be taught how they are to separate trade secrets from non-trade secret information.

A.   Yeah.

Q.   Right?

A.   I don't have that in quotes when I use the word "trade secret".  They should be -- you and I know because we're lawyers that trade secrets apply to all sorts of information, including information that gives only a slight competitive advantage, but the layperson doesn't know this.  And so the whole purpose of this is to take, is to try to get across that the things that we view as trade secrets -- that is, information of competitive advantage to the company -- that that kind of information is appropriately identified to the workforce in terms that they can understand.  And usually that doesn't mean using the phrase "trade secret," it means using other terms.  But when you classify your information in your information classification system, that pyramid, when you use the word "secret," it can be confusing to people, because then

they would say, oh, that's supposed to be secret, nothing else is secret.  You don't want that kind of confusion.

Q.   You talked a moment ago about how do employees recognize in their own work what is worthy of protection.  Now --

A.   Sure.

Q.   -- we can agree that Google is a technology company, right?

A.   It is.

Q.   And we can agree that people go to work for Google, in part, for the opportunity to work on cutting-edge technology that's going to be secret?

A.   I'm sure they do.

Q.   And you said actually on direct examination that Google's what you characterize in the culture, is one of the reasons why they're able to attract talent to come to Google to innovate?

A.   That's right.

Q.   So did you consider in forming your opinion the subject matter expertise of the employees who are allowed to view the documents in this case?

A.   Indeed.  Yes, I did, in the sense that the kind of people that I had in mind and that I think we're dealing with are all very smart, experienced people, otherwise they can't get a job at Google.  And they come to the job with, you know, a set of understandings that we sometimes refer to as general skill and knowledge about how to do their job well.  You know, brand new,

you know, programmers increase their programming skills, et cetera, et cetera.  And when they leave, they still have this sense of personal skill and general knowledge.

And one of the challenges and the risks that Google has, and a company like Google would have, is in dealing with a population like that, trying to make sure that when those people leave, they're really, really clear about where the line is drawn between the general skill and knowledge that they're able to put in their toolkit and take to the next job and what they have to leave behind.

Q.   I think I'm asking about a slightly different phenomena, which is you acknowledge that Google has set up -- they have a three-tiered system:  Public, confidential and need to know, right?

A.   Yes.  That's somewhat different than the pyramid, but, yes.

Q.   So public is available to the public and doesn't need to be kept within the company, right?

A.   Right.

Q.   Confidential, Google says, needs to be kept within the company and not shared outside the company, right?

A.   Yes.

Q.   Need to know is confidential informations, but that needs to be restricted to employees who have a business need to know. Is that a fair characterization of Google's system?

**A.**   That's the system.  It's actually implemented, however, a bit differently than most places that I've seen.

**Q.**   But that's the system, right?

**A.**   That's the description that they have of the system.  But the need to know normally is -- normally is strictly determined by role, on a role-based system or, you know, being a member of a project, as opposed to, you know, being invited onto an e-mail list, for example.

**Q.**   Well --

**A.**   But you're right in describing those three levels.

**Q.**   And you do acknowledge that Google does implement document-level access restrictions on certain documents, right?

**A.**   I haven't seen that on these documents.  That is, credentialed, credentialed access by document?

**Q.**   Yes.

**A.**   I -- I don't recall seeing that on any of the documents here.

**Q.**   Is your opinion --

**A.**   Other than the general credentialed access to everything that the engineers would have.

**Q.**   So is it your opinion that the source documents -- you're familiar with that term and what I mean by that?

**A.**   I want to make sure, so why don't you tell me what you're thinking of.

**Q.**   Well, what's your understanding of the alleged trade

secret documents in this case?  What's your understanding of how they were created?

A.    How they were created originally --

Q.    Yes.  How --

A.    -- or how they were assembled into a --

Q.    So in this case, Mr. Ding is charged with possessing trade secret information contained in a series of PDF documents.

A.    Oh.

Q.    Did you understand that?

A.    Yes, yes.

Q.    Did you also understand that he created them by compiling Apple notes?

A.    Apple notes.

Q.    Correct?  Pasting from internal Google documents, creating Apple notes, and then sending them to his personal account.

Is that a fair characterization?

A.    Yes, I understand the process of what he did.  I wasn't sure if you were talking about how the original documents were -- came into existence.

Q.    And so when I refer to the source documents and when we refer to the source documents, what I mean is the internal documents from which Mr. Ding copied to create the alleged trade secret files.

A.    Yes, that was my understanding, too.

Q.    Is it your opinion whether Google took reasonable measures

to protect its trade secrets based on your understanding that those source documents were available to anyone inside of Google?

A.    Not all of them, but the -- I understand the vast majority of them were.

Q.    Can you tell us how many you understood to be available to broadly within the company, meaning all Google employees?

A.    Well, it would have been anything that fell within the category of confidential, and my understanding is that represents the large majority of the documents.

Q.    But what is that understanding based on?

A.    Conversations with counsel, but they're rooted in specific information in the record, but I don't remember what that was.

Q.    But Mr. Pooley, your opinion -- what's at issue is these trade secret documents, right?  That's -- you're opining whether Google took reasonable measures to protect these specific documents, correct?

A.    Well, the information in the documents.

Q.    Right.

A.    Trade secret protects the -- protects information.

Q.    The information in the documents, that's what you're here to opine on, on whether Google was reasonable in the measures it took to protect that information, correct?

A.    Yeah, the information that's been identified here.

Q.    And in this case what's relevant is the information

contained in the source documents, correct?

**A.**   I'm not sure what you mean by "what's relevant" is.  And I'm sorry.  Being a lawyer, I have trouble parsing that.

**Q.**   I'll rephrase my question.

**A.**   Okay.

**Q.**   So this case is about Mr. Ding taking information from specific internal documents that are enumerated in this case. Do you -- are we together so far?

**A.**   That sounds right to me.

**Q.**   And so the information protection protocols that Google took as to those specific documents are of primary importance in this case, right?

**A.**   I would agree with that.  That's primary importance, yes.

**Q.**   And they are also the focus of your opinion of whether Google took reasonable measures to protect the information in those documents?

**A.**   They're a primary focus.  There's other things that I focus on, but, yes.

**Q.**   Can -- but you can't tell us how many source documents are there in this case, Mr. Pooley?  Do you know that?

**A.**   I can't tell you the number, no, not offhand.

**Q.**   And you also can't tell us the access restrictions that apply to those documents?

**A.**   Only as I've already described them.  I understood that the vast majority of them were deemed confidential but were not

labeled as such.

Q.   So what does that mean?  I'm sorry.

A.   I'm sorry.  But were not labeled as such, and that there were a relative handful that had a higher classification.

Q.   Okay.  So I want to just make sure I understand the information on which your opinion in this case is based as it relates to the source documents.

So what I understand you to be saying is that you believe that the vast majority of source documents were in that category 0 that was available to the entire Google workforce. That's what you just said, right?

A.   And that was -- that's my understanding from counsel.  I haven't gone through and looked at all the documents.

Q.   What percentage -- so vast majority is all you can say? You can't give us a percentage of how many you believe were available to the whole workforce?

A.   No, I can't.

Q.   And can you give us a number or a percentage as to the source documents that were in higher classifications beyond available to the whole company?

A.   No.

Q.   Mr. Pooley, if you -- if Google were your client and they came to you to ask for advice on how they should protect these documents, would you ask to review the documents?

A.   Not necessarily, no.  I'm -- the -- usually when I deal

with companies about these kinds of systems, I will sit down with the relevant management and understand the categories of information that they are dealing with that are sensitive. What -- where that information gets reflected, who gets access to it and so forth, I usually look at policies, but I seldom look at source documents unless of the sort that we're talking about here, unless it's important to see an example of something that's kind of unusual in the way that the information is expressed or stored.

So that would be the exception. It has happened, but it would be exceptional.

Q. Is it fair to say you have not reviewed the source documents themselves? Not only have you not reviewed the data classifications, but you haven't looked at the source documents; is that correct?

A. I may have seen some, but I have not reviewed the source documents as such. I did not consider it necessary for my opinions.

Q. Can you give us your understanding, Mr. Pooley, of what information, what is the information in these source documents about, what part of Google's business?

A. It's been some time since I read the descriptions. I know I read some -- I read some documents that did describe the documents, the source documents, including some interviews, interview notes and that sort of thing. There was a name for a

project, but it's been a while.  So most recently I've been reading policies, not source documents.

Q.   You -- in your reasonable measures methodology you set out a basic approach where you're balancing the value of the information, the risk of loss and the cost of additional measures to protect the information, right?

A.   Yes.

Q.   And your opinion on whether Google took reasonable measures in this case is basically how did they do in that cost-benefit analysis?

A.   I think that's generally fair.

Q.   You also write that in assessing whether somebody has met the reasonable measures standard in your view, you need to look at the nature, value and use of the particular information, right?

A.   That's typical, yes.

Q.   That is critical.  It's the first prong in your cost-benefit analysis, right?

A.   Yes, and it --

Q.   Nature, value and use?

A.   In a categorical sense, right?  Not necessarily document by document.  But, yes, you do need to understand the scope and the nature --

Q.   So can you give us -- I'm sorry.

A.   Excuse me.  You need to understand the scope and nature of

the information.

**Q.**   So can you give us a sense of your understanding of the nature, value and use of the source documents in this case, the -- your understanding that you used in this cost-benefit analysis?

**A.**   Oh, I don't have an independent opinion about that.   I take it as a given that Google deemed this information to be important to it in some way, and so my opinions start with that assumption and talk about or address the way in which I believe it could have done a much better job, you know, maintaining control over that information.

THE COURT:   Mr. Boome, I think now might be a good time for a break.   How much longer do you have in your cross, do you think?

MR. BOOME:   Your Honor, I do have quite a bit more, if you'll allow it.   I think I do feel it's important given the testimony so far to explore Mr. Pooley's application of his methodology to the facts of the case, and I think I'd like to explore some of what I feel is missing in that factual application.

THE COURT:   Yeah.

MR. BOOME:   Can I get another 45 minutes, 60 minutes max?

THE COURT:   I'm going to give you another half hour, and let me tell you why.

You can step down, by the way --

**THE WITNESS:**  Thank you, Your Honor.

**THE COURT:**  -- while we're talking about this.

We'll resume at -- we'll plan on resuming at 12:30.  Okay?

But I'm just going to give you my tentative view of how I should rule on this case on this motion now, and you can kind of tailor your cross-examination to that.  And I'm happy to hear from the lawyers about whether you agree or disagree with it after the testimony is done, but I think it might be helpful to give you my tentative view.

I think that -- first of all, just a general comment about expert testimony.  I know that, you know, the decision whether to admit an expert opinion and certain aspects of an expert opinion are -- is a matter of discretion, and I know that different judges have different approaches to, you know, expert testimony.

My own general view is that lawyers tend to put too much -- shoehorn too much of their case into an expert opinion, and they attempt to elicit an opinion from an expert that is really sort of not just educating the jury about a particular subject matter, but shoehorning into that opinion testimony about the ultimate facts of the case.  And so my general approach is to try to prevent the parties from shoving an excessive amount of their case into expert opinions.

And that was reflected in my ruling yesterday about the

China expert, right, that the -- it was appropriate for the China expert to get on the stand in front of the jury and testify about the landscape in China and what was going on in China and what was going on in these particular places where Mr. Ding was operating, but it was not appropriate for the China expert to testify about what Mr. Ding was up to, right? That, by trying to get the China expert to testify about what Mr. Ding was up to, I think the government was trying to put too much of its case into the China expert's testimony.

I feel the same way here, that it seems entirely appropriate for Mr. Pooley to testify generally about what are the things that companies need to be thinking about when they set out to protect their trade secrets, what are good practices generally, what are bad practices.  I think even hypothetical scenarios.  Imagine you have a big company that has this -- that is in this situation.  You know, hypothetically, what would you advise a company to do to protect its trade secrets, properly protect its trade secrets in that situation.

But in terms of what was happening at Google, I think that it's similar to the China expert's testimony about what Ding was up to in China.  I think that it goes beyond the scope of an appropriate expert opinion, and that to the extent that you would argue that it's not technically beyond the scope, I think that under Rule 403 it's not appropriate.

I think the back and forth that just occurred about, you

know, these documents in Exhibit 6 kind of underscores why that is a good line to draw, generally speaking, with experts, and I think it's probably an appropriate line to draw here.

So my tentative ruling, and I'll tell you that it's a fairly strong tentative ruling, is that the witness can testify generally about companies and best practices and hypothetical scenarios relating to the preservation of trade secrets, but that he cannot testify about what was going on at Google.

So, again, I'm happy to hear pushback from you on that after the testimony is done, but I thought I would articulate that before the break, and then, Mr. Boome, you can sort of tailor the remainder of your cross-examination to it.

**MR. BOOME:**  Understood, Your Honor.  Thank you.

**MS. KRSULICH:**  Thank you, Your Honor.

**THE COURT:**  Why don't we plan to get back together at 12:30.  Thank you.

(A recess was taken from 12:03 p.m. to 12:36 p.m.)

**THE COURT:**  Okay.  Ready to resume?

**MR. BOOME:**  Your Honor, I have taken a chainsaw to the rest of my outline based on your tentative ruling.

**THE COURT:**  Okay.

**MR. BOOME:**  And I hope the Court would consider if that ruling changes, perhaps giving me more time on the back end?

**THE COURT:**  Sure.

**BY MR. BOOME**

**Q.**   Mr. Pooley, we ended by discussing the nature, value and use of the source documents in this case.  I want to change that now and speak at a higher level more generally about the push and pull between access and use.  Would you agree, Mr. Pooley, that broader access doesn't necessarily mean that the subject matter is not secret?

**A.**   I agree with that general statement.  I just don't understand the tension between access and use that you --

**Q.**   Access, restrictions and use.  So the more access restrictions, the more difficult it is for employees to use, iterate, invent, add to, refer to trade secret information, right?

**A.**   Now, I better understand your predicate.  That's fine, yes.

**Q.**   And so, for example, for a naissant trade secret in the very, very early stages of development, maybe there's a very small team working on the idea that will one day become a product.  Is that fair?

**A.**   That's one possible scenario.

**Q.**   And as the product goes further down the chain getting closer to release, at a company like Google, more and more people are going to need to be involved in contributing to that work.  Is that fair?

**A.**   Some different people will need to be involved typically

in that kind of process, sure.

Q.   For instance, speaking about Google's proprietary TPU, tensor processing unit chips, as an example.  As a new version of the chip gets ready to be released into Google's network of data centers, you understand that more engineers, data center technicians are going to need to be let in on that information.  Is that fair?

A.   Some aspects of it.  But normally -- and again, I haven't be studied how Google has acted on this particular issue, but normally you would involve people at the level that's required for what they are bringing to the process, and they wouldn't need to know everything that the preceding teams knew in order to do their job.

Q.   In a general sense, though, it's understandable that as a product gets ready to be released, for instance, you need to bring in software engineers to write code that would work with the chip, right?

A.   For a chip that is true.  There are a number of things that you need to do that will involve other disciplines than just those who conceived of and designed the chip to begin with.

Q.   And not only software engineers, but perhaps the folks who build the racks that the chips go into at the data centers?

A.   That's true, and in some cases those people would be involved from the beginning, because the design choices made

during the design phase will have to take into account those other aspects.

Q.   And so can we agree that just because the circle gets larger, the circle of access, doesn't necessarily make that secret any less valuable.  Can you agree with me on that?

A.   Oh, it certainly doesn't make it less valuable, it just enlargens or increases the risk, because the more people you have that are involved and that have access to information, then necessarily you have a greater amount of risk to control.

Q.   You'd agree that trade secrets are not much use to have if you can't use them and deploy them for the benefit of your company, right?

A.   You do want to use them to serve the purpose they were intended for, which is to increase the competitive advantage.

Q.   And so can you imagine, Mr. Pooley, a scenario where it may be perfectly appropriate for a company like Google, deploying a new chip in a network of more than a hundred data centers around the world, may need to involve a significant number of engineers in that endeavor?

A.   Of course.

Q.   Perhaps thousands?

A.   I don't know about thousands, but the concept of there being required some level of access by a greater number of people over time is pretty typical for that kind of product development.

**Q.** Mr. Pooley, I want to change gears now and talk about your opinion, which, I know this is not how you said it, but this is what I wrote, that basically software engineers take things.

**A.** Yeah, not all of them, but it's a tendency I've viewed, seen.

**Q.** So you said -- I want to clarify what you mean by that general opinion.

What I heard you say, and let me know if this is inaccurate, is that they feel like it's a part of them, their own work is a part of them, and they want to take it when they leave, right?

**A.** They feel attached to it, or as the woman from Google said, they feel sentimental about it.

**Q.** So the -- that motivation to take their own work product when they leave would not apply to information that is not that software engineer's work product. Is that fair?

**A.** Well, you know, some of the time what I've seen people take with them wasn't necessarily done by them personally but was done within a circle of people that they worked with, and they wanted to have that with them as context, for example. There are a number of different reasons I think that people use to justify taking that, but I think the most common is the one that you point out, which is if they wrote it themselves. So if they didn't write it themselves or they didn't perceive themselves as having helped to create this, then that wouldn't

be the primary reason for them to take it.

Q. There would be conceivably some other motivation to take information that is outside the scope of -- not the -- their own work product, right?

A. Yes, although the penumbra of what is work product can be pretty flexible.

Q. Were you aware that Mr. Ding is alleged to have taken about 1300 documents containing over 10,000 pages?

A. That sounds familiar to me, that range of numbers.  I couldn't verify it, but that sounds -- scale correct.

Q. Mr. Pooley, can I change gears now again to your discussion of the data loss prevention tool?

A. Sure.

Q. Have you -- as part of your consulting work, can you give us a sense of the size and scale of the companies that you've helped turn the dial correctly on their DLP systems?

A. They would tend to be larger ones.  Smaller, smaller companies usually don't -- the smallest companies, the startups and so forth, don't typically have that kind of tool installed at the outset.  So we're talking about more mature companies.

Q. Are you familiar with the concept of a relational database?

A. In general.  Not -- but I'm not a software technician.

Q. Are you familiar with how relational databases are used in data loss protection?

**A.** Again, at a very high level of abstraction. I understand there's a relationship, but you -- you know, I could not describe for you what it is.

**Q.** Can you just give us your current understanding of how relational databases are used in protecting a company's data?

**A.** All that I know -- this really is the extent of my knowledge given my background -- is that relational databases are often deployed as part of a data loss prevention tool.

**Q.** What function do they play in the overall system? How do they work?

**A.** That's something I can't tell you.

**Q.** Are you familiar with a product called BigQuery that's available to the public?

**A.** I remember seeing a reference to it in the materials in this case, yes.

**Q.** Can you tell us anything about it or how it works?

**A.** No, I can't.

**Q.** You're not familiar with it from your consulting with companies on data loss prevention?

**A.** No. Again, I'm not a product expert. I simply know the category.

**Q.** Are you familiar with a suite of threat detection tools that are referred to as Oslo, O-s-l-o?

**A.** I think I've heard of it, but I don't -- I couldn't tell you anything specific about it.

**Q.**    Are you familiar with the concept of an endpoint agent in terms of data loss prevention?

**A.**    At a very high level, yes.  Endpoints are the place where the data goes and stops.  So typically refer -- we're referring to smartphones, or tablets or laptops as endpoints.

**Q.**    And when we refer to an endpoint agent in the, kind of the digital forensics realm of data loss prevention and trade secret protection, what's your understanding of how that tool works?

**A.**    Again, we're skirting the boundaries of my expertise here, but I understand that kind of a concept to involve the ability to have something act within the endpoint to procure a result or to gather information and determine what to do.

**Q.**    So do I understand you correctly, Mr. Pooley, that your work with your clients in developing and managing their data protection systems has not involved relational databases including BigQuery, endpoint agents or algorithmic threat detection tools?

**A.**    Well, it hasn't involved me identifying which ones are the best ones for them to use, or deploying them or understanding their details, but I -- those issues come up in the discussion about what kind of investment to make in data loss prevention tools, including investment in the human resources needed to interpret the results of the tools' application.

**Q.**    So you're aware of the existence of these tools but

haven't actually kind of directed how they should be deployed at any specific company?

A.    Exactly, and that's not my role.  I'm not qualified for that.

Q.    And I mentioned algorithmic threat detection tools.  Do you have an understanding of what that means in the context of data loss prevention at a large technology company?

A.    I've heard the phrase, and I can only assume that it means what the words imply, that there is software that is designed to interpret the circumstances of a particular event.

Q.    If a company were to, as part of its data loss prevention regime, track access, log and track access to every document within its network, and record things like IP address, date and time, user, machine for every time any employee accessed a document, how would you view that type of protection tool?

A.    I'd probably want to know more about it.  It sounds -- that sounds pretty resource heavy, but I don't know without knowing the details.  And typically, you know, my participation in this is more of the designer, if you will, structural designer, and there's always IT people involved in the discussion of choosing and implementing DLP tools.

Q.    Let's turn now to your opinion about the lack of an exit interview.  And I don't think there's any other way to get to this topic without addressing the facts of the case specifically, but it may be a good example of a hypothetical

scenario that you might be asked about.

A.   Certainly.

Q.   So in this case, Mr. Ding, you're aware he notified his manager that he intended to resign on~-- and he sent that message on December 26, 2023, correct?

A.   That is consistent with what I remember.

Q.   And so that's the day after Christmas.  You're aware that his manager was on vacation?

A.   I don't remember that, but I assume it's possible.

Q.   And Mr. Ding never formally resigned or notified anyone other than his manager, who was on vacation, that he intended to resign.  Did you know that?

A.   All I knew was that he informed his manager.

Q.   Assume for a moment that there is a formal resignation process that exists at Google and that Mr. Ding didn't do it, he just notified his manager.  Can we assume those facts for my next series of questions?

A.   I'll assume whatever you ask me to.

Q.   So three days after Mr. Ding sent the resignation note to his manager, Google learned that he had made a presentation at a Beijing venture capital startup presentation on December 29th, correct?

A.   I think that's right.

Q.   And on that same day, Google learned about his exfiltration of what they believe -- Google believed to be

trade secrets and cut off his network access.  Is that your understanding of the facts?

A.   I understand his network access was cut off and then restored.

Q.   I'm proffering to you now that on December 29th his network access was cut off forever.

A.   Oh, a second time.  Okay.

Q.   The second time.

A.   Yes.

Q.   On December 29th, Google also learned that Mr. Ding -- about the December 8th, 2023, self-deletion affidavit in that interview.

Are you with me so far, Mr. Pooley?

A.   Google learned about it?

Q.   Yes, they went back to examine the self-deletion affidavit.

A.   Okay.  I'm confused, because I thought Google required the self-deletion affidavit.

(Simultaneous crosstalk.)

Q.   So I guess what I want to ask you is under these circumstances, having no formal notification to the company, only a note to your manager, who's on vacation, and then three days later Google getting information about the Beijing startup presentation, under those circumstances, the facts you weren't aware of, isn't it reasonable to skip the exited interview and

just call the FBI?

**A.**   I don't think so, honestly.  I mean, and maybe it's just my inclination towards management as a part of this process, but, and the experience that I've had with understanding how people make the kinds of stupid mistakes that they make that result in these kinds of disputes happening, it's, it seems to me, the first thing that one should do in a situation like that is to consider bringing in the employee to talk to them and find out what happened and why it happened.  And so that didn't occur.

And, you know, I couple that with, again, it's a little hard to divorce it from my observations about the level of training that he had or didn't have.  The chances in the context of the facts that we deal with here were such that the risk of misunderstanding was pretty high, and so I would think that as a management approach, the reasonable thing to do would be call the person in, find out what this was all about and what their side of the story is, what their explanation is.

It also gives a chance at that time to say, now, do you have anything, where is it, how do we get it back, et cetera.

**Q.**   Can you appreciate, though, Mr. Pooley, that after Google received information about the startup presentation, that Mr. Ding was representing himself to be a CEO of a company in the AI industry seeking venture capital funds in China, you could agree that Google might have some concerns about

Mr. Ding's honesty.  Is that fair?

**A.**   I don't dispute that they might have concerns.  The question from the management perspective is:  What do you do about it.  And here I think the -- if they're trying to manage their risk appropriately, and to ensure that they preserve their assets and, you know, get them back and so forth, I think the right thing to do at that moment would be to call in the employee and find out what was going on and what they had to say about it.  Whether they're telling you the truth or not, you will at least give them the opportunity to do that, if they're willing to do it, and to return whatever information they might have that you deem important.  And so that's why we usually presume that the first response to something like this is let's try to understand what happened.

**Q.**   In a circumstance like the one that Google faced on December 29th, would you be concerned that calling Mr. Ding in for an exit interview would pose some risk that he would go to China and never return with Google's trade secrets?  Is that a risk you would have considered?

**A.**   Well, as between the other choice, that and the other choice, you know, of going to the authorities, yes, I think it would be -- I think it would, from a management perspective, be better to maintain control over the situation and your ability to, you know, get something done about it from a business perspective as a first attempt.  The, what he did, you know,

with -- if the trade secrets were in China and they're there, you know, they're hard to extract.  But if there's a chance to bring him in and allow him to explain why he did what he did, if he's willing to do that, then that's of enormous value to the company.  I mean, and I'm speaking here abstractly, not necessarily Google.

**Q.**   Now, I want to go back in time to the December 8th interview with investigator Brad Fuller that you discussed on direct examination.  In a scenario like that, where a company has flagged an exfiltration and is conducting an interview, would you agree, Mr. Pooley, that the sensitivity of the documents that are at issue should be an important factor in dictating how the company handles the incident?

**A.**   It should be a factor, I assume, if they have a way of determining the sensitivity of those documents.

My only point was if you find somebody operating outside of the expected protocols with something like that, it, you know, is normal that you would conduct an appropriate investigation to see what else might have happened, so that you can assess the risk in its current state.

**Q.**   For instance, if the documents that the employee had taken were related to personnel or nontechnical processes within the company, you could see that that situation might be handled differently than technical valuable trade secret information. Is that fair?  You would probably handle those two exfiltration

scenarios very differently.

**A.**   I don't know if I know enough facts from your hypothetical, and you're putting labels on some -- one thing is valuable and the other isn't.  But generally speaking what I said before maintains -- I maintain, which is from a management perspective, if someone has -- you've discovered someone acting outside of your designated protocols in handling information, the best thing to do is to find out not just about that incident, but how they may have already been behaving outside of protocols, and it's not that difficult to do.

So, yeah, that's what -- that's my view on that one. Asking him just to do a, you know, sign a declaration and kind of do a self-certification was I think an appropriately light touch to take care of the whole thing.  They had an opportunity then to discover what had happened before, or at least bring to their attention what I think probably had already been reported into their system.

**MR. BOOME:**  All right.  I'm watching the clock, Your Honor, and this is my last batch of questions.

**THE COURT:**  Okay.

BY MR. BOOME

**Q.**   And it goes back, Mr. Pooley, to your opinion that -- you criticize in your report Google counsel, and I'm reading from page 8.  You said:  "It appears counsel needed other Google employees to respond to questions and then answer -- and their

answers were at times uncertain."

So you're criticizing Google counsel for not immediately recognizing trade secrets, and I'm wondering if you can help me understand some of your past clients or your -- or other instances where you've seen non-engineer corporate counsel having the ability to recognize trade secrets at a technology company with a vast array of trade secrets in their arsenal.

**A.** Yeah, I wasn't being critical, I was just being observant that the nature and the secret nature of information and sensitivity is not necessarily apparent, which is one of the consequences of not labeling things consistently so that there wasn't some clear and easy answer to all of these questions.

**Q.** Was it your understanding in evaluating that scenario of the government sending documents to counsel and asking counsel to help evaluate them, was it your understanding that those were trade secret documents, alleged to be trade secrets in this case?

**A.** I don't recall. I just -- all I remember is what I reported in my disclosure, that documents were sent and responses came back as I reported them.

**Q.** But you don't know what type of documents were sent, whether they were trade secret documents or, for instance, screenshots that Mr. Ding had taken on his own laptop?

**A.** All I knew is that they were information, and my impression is that it was information that was deemed by Google

to be secret or relevant to what Mr. Ding had done, and so the government was asking, what is this all about.

MR. BOOME:  Just one moment, Your Honor.

Thank you, Mr. Pooley.

Thank you, Your Honor.  Nothing further.

THE COURT:  Okay.  Any redirect?

MS. KRSULICH:  Briefly, Your Honor.

THE COURT:  Okay.

REDIRECT EXAMINATION

BY MS. KRSULICH

Q.  Good afternoon, Mr. Pooley.

A.  Good afternoon.

Q.  On cross-examination, do you recall that Mr. Boome asked you about access to the underlying source documents at Google?

A.  Yes.

MS. KRSULICH:  Could we please put up Exhibit 6, defense exhibit 6.

BY MS. KRSULICH

Q.  Exhibit 6 is the ACL mapping spreadsheet that shows the groups with access to the underlying documents?

A.  Yes, I -- yes, I see that.

Q.  Does seeing this document refresh your recollection as to whether Google restricted access to source documents to certain groups?

A.  Well, there was default access is what -- in other words,

as I understand it, these represent the groups that, as a matter of default, had access to the information that's referred to.

MS. KRSULICH:  No further questions.

THE COURT:  Okay.  I take it no recross?

MR. BOOME:  No, Your Honor.

THE COURT:  All right.  You can step down.  Thank you.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  All right.  I guess, Ms. Krsulich, I'll ask you.  Do you want to push back on my tentative ruling?

MS. KRSULICH:  I wouldn't put it as pushback, Your Honor, but I would like to address it.

THE COURT:  Pushback is always welcome.

MS. KRSULICH:  Okay.  Your Honor, it is appropriate for -- and I'll be brief, as I understand the tentative.

Your Honor, it is appropriate for Mr. Pooley to talk about Google documents, as his experience helps the jury put those documents in context.  This type of expert testimony is allowed by *Kumho Tire*, a Supreme Court case, and Mr. Pooley specifically has been allowed to testify in this respect with regard to the documents that he reviewed for the company at issue in prior testimony.

The proper way to limit expert testimony in this respect is to allow for cross-examination on the documents as we've

seen here today, to test the witness' knowledge and understanding about the documents, and to the extent that Mr. Pooley -- or there is a concern that he may be edging on legal issues, to offer a limiting instruction, which the parties have already proposed in the jury instructions that are pending before the Court.

The analysis that we -- the Court described and that I've seen in the opinions that allow Mr. Pooley to testify start out with the question of whether he's offering a legal opinion, whether he's offering a factual issue -- or opinion on a factual issue. The cases are clear that this question about whether reasonable measures are used is a factual question. So we overcome that hurdle about whether he's offering inappropriate --

**THE COURT:** I think it's probably better understood as kind of a mixed question of law and fact, whether somebody used objectively reasonable measures to protect their trade secrets. I mean, it's, first of all, it's an element of the offense, and, you know, their reasonableness is often partly a question of fact and partly a legal question depending on the context, right? So I don't -- to the extent that ...

And I guess more to the point is like, number one, to the extent that those courts say that it's not a question of law, it's a pure question of fact, I think I disagree with them. But more importantly, as I said earlier, it's -- you know,

courts have discretion to decide what to allow, you know, what to allow experts to testify about and how far their opinions can go, and my view is that once he starts talking about what happened at Google, he's coming too close to an ultimate issue that is really in the province of the jury, and all of that, evidence about what happened at Google can be elicited through nonexpert testimony, right?  It can be elicited from Google witnesses, from, you know, witnesses that they subpoena, witnesses that you subpoena.  It's -- you know, it's not -- you know, what actually happened at Google, what steps Google actually took or didn't take is something that can be elicited from fact witnesses.  It doesn't need to come from this witness.

And then on whether -- whatever Google did or didn't do, whether it was reasonable is for the jury to decide, and the jury can use the expert testimony about the industry generally, the field generally, to decide whether what Google did was reasonable.

And I just think that is a more appropriate way to think about the role of expert testimony in a trial, and I think that trials, as I said earlier, you know, the expert testimony has a tendency to, you know, envelop the trial, and, you know, that parties will try to put their case, way too much of their cases in through expert testimony, which has a tendency to be prejudicial, because the witnesses are hearing a lot of fact

evidence, hearing about a lot of factual evidence from the witness.

The other thing I will say about the Google-specific stuff is I think that it's pretty clear that some of what the witness said was happening at Google was unreliable. The, you know, to the testifying about this draft chart as if it had been disseminated to Google employees, that was not reliable testimony. You know, the testimony about the source documents and what -- how much access Google -- what access Google provided within the company to the source documents, the entire opinion is based on that, but it's based on a conversation he thinks he remembers he had with counsel. I mean, that's just not, that's not appropriate. That's not reliable.

So I think even if I didn't conclude that it -- it was sort of beyond the appropriate scope of his testimony and that it was, you know, prejudicial under Rule 403 to have him coming that close to the ultimate facts, I would conclude that much of his testimony about what was happening at Google is unreliable.

**MS. KRSULICH:** And, Your Honor, just very briefly.

To the extent that I can ease the Court's concerns at all about Mr. Pooley's testimony, the defense does not at this point have any plan to put in documents through Mr. Pooley. His testimony comes in after the jury will have heard from Google witnesses and documents will be admitted through Google witnesses.

THE COURT:  Right.  And that was the plan also with the China expert, but it's still the case that the expert is getting up and testifying about what was going on at Google. And I think, like I said, I think it's beyond the scope, I think it's prejudicial, and I don't think that much of his testimony was reliable about what was going on at Google.

MS. KRSULICH:  I understand, Your Honor.

And one other point briefly.

Federal Rule of Evidence 704, right, permits the expert -- there's nothing objectionable about the expert offering an opinion on the ultimate issue.  The goal there is just to put the documents in the context for the jury so they can understand.

THE COURT:  I understand that there's nothing categorically inappropriate about offering an opinion on an ultimate issue, but it's a matter of discretion.  As a matter of discretion, trial judges need to be careful that the expert is not really going down the scope of their opinion and not opining and testifying about something in a way that would be prejudicial.

MS. KRSULICH:  Thank you, Your Honor.

THE COURT:  Okay.  Anything from you?

So that -- at a minimum, that's my ruling, right?  So beyond that, is there anything else that you would argue to exclude?

**MR. BOOME:** Just one clarification and one additional argument.

On the clarification point, Your Honor. So you've outlined that Mr. Pooley will, based on your tentative ruling, be allowed to testify about industry practices or what he's seen with his clients.

**THE COURT:** Best practices.

**MR. BOOME:** Best practices.

Would that include -- because you've allowed hypotheticals provisionally. I think it would be inappropriate, for example, for Mr. Pooley to be given a hypothetical question that closely mirrors the facts of our case and then asked to opine whether that is consistent with reasonable measures.

Do I understand the Court's ruling?

**THE COURT:** Yeah. I mean, I think that there are two potential pitfalls with the hypotheticals. One potential pitfall is sort of a simple one, which is, asking a hypothetical and then asking if that is an objectively reasonable measure. And I think it would be appropriate to preclude the witness from saying that, but rather saying, I would advise my client to do more.

**MR. BOOME:** Understood.

**THE COURT:** Which sounds like it might have been something similar to what Judge Illston did.

**MR. BOOME:** Exactly.

Okay.  So I understand that part.

THE COURT:  But the second pitfall with hypotheticals, right, is you -- one could imagine a hypothetical that says, imagine own December 8th that the company discovers that an engineer went to China, whatever. You know, like a detailed mirroring the facts of the case.  And that obviously would not be appropriate either, right?  It has to be kept at a high enough level of generality to where the expert is testifying about best practices and not testifying about the specific facts of the case.

That sometimes is a hard line to draw, and I think we can deal with that during trial.

MR. BOOME:  Understood, Your Honor.

Okay.  So then my last point is that it was clear in my questioning on cross-examination about data loss prevention digital tools, relational databases, a publicly available tool called BigQuery, algorithmic threat detection, endpoint agents. These are the core of Google's data loss prevention system in this case.  Mr. Pooley --

THE COURT:  How they work and what they do are outside the scope of his expertise.  He made that clear.

MR. BOOME:  So I think if he's going to testify about what he would advise clients, that should be limited based on his admission.  I think he actually said, that's outside the scope of my expertise.  The trainings and employment agreements

and those types of issues are arguably, according to your ruling, within his expertise, but I think there should be a clear line based on his own admissions that those types of tools he should not be able to opine on.

THE COURT:  Well, but I think that what -- I think that you would -- I think what the defense would say is he can't testify on any particular tool, or how it works or, you know, what it does, but he can testify that he would advise a company in a particular situation to get a tool that accomplishes "X," right?  I mean, I don't think there would be anything wrong with that.  That seems like it's within the scope of his testimony and within the scope of his experience.

MR. BOOME:  But didn't he admit, Your Honor, that he's not familiar with how those tools function in the context of digital data loss prevention regimes?

THE COURT:  Yeah.  But, I mean, on a general level, you know, you need to get a tool that allows you to screen out for X, Y and Z, or whatever, right?  I mean, I don't see what would be wrong with him testifying at that level of generality.

MR. BOOME:  Then it's left for cross-examination to say, you don't know how these tools work, you've never advised clients on how to tweak them to make them more effective.

THE COURT:  I think so.

MR. BOOME:  Okay.

THE COURT:  Do you agree with that?

**MS. KRSULICH:**  Yeah.  What I heard Mr. Pooley say is that he advises his clients about the design of the tools and the requirements that he would expect his clients to have in place, but he -- like he admitted that he doesn't -- he's not familiar with the specific tools that Mr. Boome asked him about.  And so what he'd be testifying to is about the design of those systems and how he would advise clients, as Your Honor ...

**THE COURT:**  Yeah.

**MR. BOOME:**  I know we're all trying to avoid getting a transcript and briefing, but my recollection is that Mr. Pooley flatly said, I don't know how these tools work, I'm aware generally that they exist and I've worked with clients who have them.  But if you don't know how something works and what it does in a data loss prevention toolkit, how can you advise on how to use it, when to use it, if you don't even know what it does?

**THE COURT:**  Yeah.  Well, I think it suffices to say at this point that he can testify at a high gen' -- a level of generality about what he would advise the client to be able to accomplish, right?  But how to accomplish that and what tools to use, it seems clear from his testimony that he doesn't know that.

**MR. BOOME:**  Understood, Your Honor.  That's all I have.  Thank you.

MS. KRSULICH:  Nothing further.

THE COURT:  Okay.  So what's next?  We have a pretrial conference, further pretrial conference, next week; is that right?

MS. KRSULICH:  Yes, we're seeing you next week on the 17th.  The parties are submitting their joint pretrial statement tomorrow.

MR. BOOME:  And oppositions to the defendant's new motions in limine.

THE COURT:  Oh, there's new motions in limine?

MS. KRSULICH:  Yes, Your Honor.

THE COURT:  When are we meeting, Wednesday?

MS. KRSULICH:  The 17th, yes.

THE COURT:  All right.  Sounds good.  See you then.

(Proceedings concluded at 1:19 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Tuesday, December 16, 2025

_____

Stephen W. Franklin, RMR, CRR, CPE
Official Reporter, U.S. District Court