**Pages 1 - 64**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )
   VS.                             )   **NO. 3:24-CR-00141-VC**
                                   )
LINWEI DING,                       )
                                   )
          Defendant.               )
_____    )


                         San Francisco, California
                         Friday, January 23, 2026


                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue, Box 36055
                    San Francisco, California 94102
              BY:   **CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
                    **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    1301 Clay Street, Suite 340S
                    Oakland, California 94612
              BY:   **MOLLY K. PRIEDEMAN**
                    **ASSISTANT U.S. ATTORNEY**


      (APPEARANCES CONTINUED ON FOLLOWING PAGE)


REPORTED BY:   Stephen W. Franklin, RMR, CRR,
               Official United States Reporter

**APPEARANCES**:  (CONTINUED)

For Defendant:

GOODWIN PROCTER LLP
525 Market Street
San Francisco, California 94105
BY:  **DARRYL M. WOO, ATTORNEY AT LAW**
**RACHEL M. WALSH, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 Marshall Street
Redwood City, California 94063
BY:  **GRANT P. FONDO, ATTORNEY AT LAW**
**FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

**I N D E X**

Friday, January 23, 2026

| **DEFENDANT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **NOVAK, STEVE** | | |
| (SWORN) | 5 | |
| Cross-Examination by Ms. Priedeman | 5 | |
| Redirect Examination by Ms. Walsh | 45 | |

**Friday - January 23, 2026**                                    **2:00 p.m.**

**P R O C E E D I N G S**

**---o0o---**

THE COURT:  Okay.  Did the -- you get my message.
Did the defense want to do anything with Mr. Novak quickly
before we move to cross?

MS. WALSH:  No, Your Honor.  We're ready to proceed
to cross.  There may be some stuff that we want to cover on
redirect.

THE COURT:  Of course, yeah.

Okay.  Let's bring Mr. Novak up, then.

MS. PRIEDEMAN:  Your Honor, I do anticipate moving to
seal for a portion of the cross-examination, just to give the
Court a heads up.

THE COURT:  I should also tell you that I -- you
know, from reading the disclosure, I can't imagine that I would
even remotely consider excluding Mr. Novak on the ground that
he didn't have the proper training, skills or experience.  So I
would recommend just skipping that over and going to the
substance of his opinion.

MS. PRIEDEMAN:  Understood.  I just have ac couple
background questions if that's okay.

THE COURT:  Okay.

MS. PRIEDEMAN:  But that was what I was planning on
doing, Your Honor.

THE COURTROOM DEPUTY:  Please raise your right hand.

THE COURT:  You don't need to stand.

**STEVE NOVAK**,

called as a witness for the Defendant, having been duly sworn, testified as follows:

THE COURTROOM DEPUTY:  Please state and spell your full name for the record.

THE WITNESS:  My name is Steve Novak, N-o-v-a-k, and Steve, S-t-e-v-e.

THE COURT:  All right.  You may proceed.

**CROSS-EXAMINATION**

**BY MS. PRIEDEMAN**

**Q.**  Good afternoon, Mr. Novak.

**A.**  Good afternoon.

**Q.**  So I just have a couple preliminary questions, and then I'll get into the substance of your opinions.

When were you hired to work on this case, Mr. Novak?

**A.**  Three weeks ago.  I could get you an exact date if that would be useful, but ...

**Q.**  That's fine.

And how many hours have you worked so far on the case?

**A.**  As of early this morning, forty-seven hours.

**Q.**  And how many of those hours were spent reviewing the trade secret documents?

**A.**  It's I would estimate probably 33 or 34 of those,

something like that.

Q.   And then I looked at your resume.  Just a couple of quick questions about your background.

So it looks like from 1993 to 2008 you worked in more industry positions, is that roughly right?

A.   Yes.

Q.   And so from 1993 to 2000 you were working at AMD?

A.   Yeah, for almost seven years.

Q.   Okay.  And there you were primarily working on one of their CPUs; is that right?

A.   Multiple, and a Northbridge and ethernet interface.  So multiple projects there.

Q.   Were you involved in the architectural design phase for any of those chips?

A.   Absolutely, yes.

Q.   Which chips?

A.   So I was part of the start of the K6, AMD K6 chip.  I also was one of the leads on the Northbridge, one of the first Northbridges that AMD -- it was the first Northbridge that AMD created, which is a supplemental chip for its processor, and there was a -- those are the main ones.  Just stick with that.

Q.   Were those memory controllers that you just mentioned, or are those --

A.   So I worked on the Northbridge.  I worked on the memory control interface to the DDR interface, yes.

**Q.**   And then the first chip you said, the KM9 ASIC, is that a ...

**A.**   It's the K6.

**Q.**   K6.  Is that a memory controller, as well?

**A.**   No, that's a CPU.

**Q.**   CPU?

**A.**   That's an x86-based CPU.

**Q.**   And then since 2008 you've worked in consulting; is that right?

**A.**   Yes.

**Q.**   And since 2008, have you been involved in the architectural design of any chips?

**A.**   Yes.

**Q.**   Which chips?

**A.**   Um, there's been many.  As a contractor you work at many places.  Recently I've worked on an optical switch, lots of ethernet switches.  I've worked on a smart meter chip, the whole system design.  I mean, I could keep going.  There was a chip for a DNA -- reading DNA from a blood sample, a single chip.  I mean, I don't ...

**Q.**   Did any of those chips have programmable cores?

**A.**   Well, there were projects that use FPGAs, if that's what you're talking about.

**Q.**   Were you involved in the architectural design of any programmable cores of chips since 2008?

**A.**    You mean creating a chip with -- or using?

**Q.**    Designing the programmable core of a chip.

**A.**    Okay.  So the question is a little -- did I -- I have not worked on a -- creating a chip that's programmable, but I have used programmable chips in designs.

**Q.**    Okay.  So you have not been involved in the design phase of a chip with a programmable core; is that right?

**A.**    Well, I mean, I'm not sure if that's true.

So there are -- there's many ways of looking at that.  So I need a little more specifics.  There's chips that work with microcode with that is programmable.  There's, you know, embedded designs that can change based on a embedded memory that can change.  But typically what you mean with a programmable chip is an FPGA.  So I've not designed an FPGA, but I have worked with chips that have some amount of programmability inside of them.

**Q.**    You understand that Google's TPU chip has two different programmable cores, the tensor core and the barna core component, right?

**A.**    Yes.

**Q.**    Have you ever designed a chip that has a programmable core similar to either of those cores?

**A.**    So I need a little bit -- I mean, I've worked on designs with CPUs, and these are essentially interfaces to arithmetic units.  And so it's a very similar concept.  So, I mean, I

haven't worked on a -- specifically on creating a TPU exactly like Google has, if that's what you ...

Q.    Have you ever designed or worked on the design of a machine learning chip?

A.    I've worked on a project that is an AI-based chip, yes.

Q.    And which -- is that this -- which -- Cerebras?

A.    Cerebras, yeah, for three years.

So I worked on both of the main -- it's a wafer scale chip that creates AI support, as well as the companion chip that deals with bringing data in and out of that massive chip.

Q.    And were you -- you were working on a particular component of that chip related to memory; is that right?

A.    I mean, memory is throughout almost every design, so, I mean, I need to know -- like a memory -- I didn't work specifically on a memory interface for that, but there was memories I interfaced with, yes.

Q.    Okay.  Were you -- well, first of all, what kind of chip is that?  I forget the name again.  What type of chip is that?

A.    Cerebras is -- they actually use the whole wafer, and they create replicas of their basic arithmetic units, a matrix multiply throughout that whole massive wafer.  So that's the main design, but then there's companion chips and support chips, very similar to kind of the concept that, you know, one chip is not sufficient.  You have to have chips to help bring the data in and out of this massive engine.

Q.   Okay.  All right.  So I want to jump into your opinions, and I'm just going to jump into the different -- I know you have kind of high-level opinions and then specific to the categories, and I want to just talk about the categories.

I want to talk about Category 1.  And so one of the phases of chip design is architectural design, right?

A.   For a specific chip, yes.

Q.   And that phase is essentially where you determine the different components of the chip, like how many cores they're going to be and what the functions of those cores will be, right?

A.   So I -- can you be a little more specific, please?

I mean, there's -- like designing a chip is a multilayered step, right?  So, yes, that is the very first kind of high-level architectural level, but then you go into micro-architecture where you have to be very specific about the functionality and how it's implemented.  It's not --

Q.   Sure.  So my question was focused on that first phase, the architectural design phase of a chip.

A.   Okay.  We might have to clarify what you mean by that, because, I mean, it's a little vague, but ...

Q.   Sure.

Do you understand -- what do you understand by the term "architectural design phase" of a chip?

A.   Well, from my mind it works, you first have marketing

requirements, and then you have an architecture that comes from those marketing requirements.  And this is actually what, you know, a company like Intel would follow.  And then you would get to the MAS, which you see in some of the documents I've read through, which is the microarchitectural specification.  So it's kind of breaking down the larger architecture into microarchitecture.  And from there you implement your RTL, your behavioral --

**Q.**   Sure.

So I'm just focused on the first phase of chip describe when you're trying to say design a machine learning chip, right?  The first step is figuring out what the different components of the chip will be, what the functionalities of those components will be, how they will interact in the architecture of that chip design, right?

**A.**   Well, the very first step is to get buyoff on your high-level objective, which is kind of the marketing requirements.  So at the highest level, what are we trying to achieve with this project?  And so that's extremely macro.

**Q.**   Sure.

**A.**   I wouldn't call that design.

And the architecture breaks that down and says, okay, how are we going to do it?  How are we going to create these bigger pieces?  And that is not even design to me, from my perspective.  And it's not until you get microarchitexture

where you kind of break down each chip into its little pieces that you can actually dole out to injures.  That's when real design work for me works -- starts.

Q.   That's where your experience has been is getting after the architectural design phase to the implementation phase?  Is that what you're saying, Mr. Novak?

A.   That's not what I'm saying, no.

Q.   Okay.  So do you have an understanding -- so let's talk about Google, for example, and the TPU chip.  Do you have any understanding of what type of design and architecture design went into building the chip before they even got to the logic phase that you're talking about?

A.   Yes.

Q.   Can you talk about that, please?

A.   Sure.

So I've been -- it's not much different from a specialized processor.  So a GPU, a TPU, they're parts.  They're all processors.  It's how you concentrate it.  And these are essentially -- you know, a GPU is a graphics processor.  It's concentrating on the instructions to accelerate graphics.  This is accelerating matrix multiply functions.  That's what you need for AI functionality.  And so that's kind of a subset of what a CPU has an arithmetic unit, logic unit.  And so you take that and you optimize it for the functionality you need for AI.

Q.   Right.  And so that last part you said, when you're

optimizing the chip for the functionality of AI, that requires a lot of complex tradeoffs in terms of designing the different components, isn't that right, Mr. Novak?

**A.**   Absolutely.  There's a huge environment that you're working into, and it's constantly changing, and each individual might make slightly different choices that go down a completely different route and a different -- design choices.

**Q.**   Right.  And that determining those different tradeoffs in the architecture phase, that could last years for a specialized machine learning accelerator, right?

**A.**   I mean, it's -- things are running in parallel.  That's constantly evolving.  You know, I don't think you put everything on hold for years.  I think you have an initial architecture that you put together that you start working from that can be quite quick.  Depends on who's designing it and what experience they have.

    But it will last for years, yes.

**Q.**   Right.

**A.**   It will be constantly evolving and changing.  But I don't think -- it's not like a serial process.  You don't wait for the whole architecture to be completely defined before you go to the next step, the next step.  Nothing would work that way.

**Q.**   Okay.  And that's -- but that phase of deciding the different design tradeoffs, that can be quite a complex process, right?

**A.**   Absolutely, yes.

**Q.**   And do you understand that thousands of engineers worked on designing Google's TPUs?

**A.**   I would imagine so, yes.

**Q.**   All right.  So the information in Category 1 reflects a lot of those design choices and functionalities that Google worked on; is that right?

**A.**   They -- the fact that their system is all interconnected, proprietary, and each piece relies on the other piece, yes.

**Q.**   Well --

**A.**   So --

**Q.**   Sure.  Let's -- I want to talk about some specific documents.  Let's talk about the tensor core ISA documents.

**A.**   Okay.

**Q.**   So those documents span over a hundred pages together, right?

**A.**   I think more than that, and I think there's different versions of the ISA, as well.

**Q.**   I'm talking about the tensor core ISA for a TPU Version 4.

**A.**   Oh, Version 4.  Okay.  Yes.

**Q.**   Can you explain your understanding of a VLIW processor, Mr. Novak?

**A.**   Absolutely.

So in this case I believe in -- and I just recall the -- it's a very long instruction word.  And so in this case -- in a

normal processor you're kind of doing one operation at a time typically.  There's some exceptions with that.  But with VLIW, and similar with a graphics processor, there's many units that can be operated in parallel.  And so it's very similar to the microcode that I worked on before, which is you have a very long word, and each one of those fields -- in this case I think in this example it's 400 bits, and each field determines what unit -- the instructions and operands for each unit within that TPU, and, you know, what's active, what's not active in a very wide fashion.

So there's multiple things going on at a time.  Not just one, not a scaler, but you have multiple operations happening at -- simultaneously.  And so that's controlling that sequence.

**Q.**   Mr. Novak, did you prepare this glossary sheet here?

**A.**   I did.

**Q.**   So it says:  "VLIW, very long instruction word," comma "compiler scheduled instruction architecture."  What did you mean by "compiler scheduled instruction architecture"?

**A.**   Yeah.  So for a very long instruction word, you need it to be engineered from the software to run properly.  It's -- there's intricate dependencies between the different units, and a compiler needs to be aware of those.  A human really wouldn't be able to reasonably program -- like, for instance, a CPU is a scaler, so it does one instruction at a time.  And so you could run -- write assembly language and write a program that you,

yourself, can create and give to the processor to execute.  In a VLIW it's very difficult, because there's multiple units working in parallel, and to create optimized performance you really need a compiler that augments the human.  And so you have higher-level -- that's why you have a software stack.  You have a higher level kind of instructions, and those get decomposed into this VLIW instruction.

Q.   Okay.  And so does that mean that the VLIW architecture exposes more details about the hardware to the software?

A.   I mean, in a fashion.

I would have to understand kinda what you mean by that, but, sure.  I mean, I don't know if one exposes more than another, it's just a different set of operations.  So the way it functions is it has multiple units that can be working in parallel.  I'm not sure.  I mean, in a way, yes.

Q.   All right.  So you said in your report, Mr. Novak, that: "For the most part, an ISA constrains behavior, not construction; it leaves pipelines, buffers, arbitration, clocking, floorplan, power grid, instruction scheduling, firmware and system integration unspecified."  That's on page 9 of your report.

A.   Yeah.

Q.   Is that -- so is it your understanding that the ISA in this cases leads both pipelines and instruction scheduling unspecified?

**A.**    Largely, yes.

**Q.**    What do you mean by "largely"?

**A.**    I mean, there is internal -- there's so much complexity inside of this design.  So there is a high-level scheduling between instructions, but inside of this design there's pipeline stages and there's a lot of logic that needs to be optimized to go through a multiplier, for instance.  A multiplier could be multiple pipeline stages or it could be one.  You could implement -- this ISA could be implemented in a million different ways based on what you're optimizing if you're optimizing power, area, time to market and your timing.

And so I would have to -- I mean, two different people could create tons of different implementations of this same ISA.

**Q.**    Can you explain what you mean by that?

**A.**    Yes.  Two people looking at the same ISA could implement it.  The implementation could be significantly different between those two.  So, for instance, if I care more about time to market, I would do something different than if I wanted the most optimized power and area and timing for it.  It takes much -- orders of magnitude different effort to do a really fine quality job versus just a quick job.

And I have examples of that that I have in my report where I worked on a 64-bit multiplier, right?  And that can be -- that's something that can be synthesized back then probably in

a week.  Now, it can be done in literally minutes.  But we spent six months optimizing it to get 20 to 30 percent optimization in area and power.  And I'm sure, and I don't know because the 105 documents don't specify it, I'm sure that Google has created custom multipliers and adders that are extremely efficient.

Q.   But Mr. Novak, you would agree that the information in the documents in Category 1 includes information about the different design tradeoffs that Google has made that would be valuable to someone who was trying to build a machine learning accelerator?

THE COURT:  Try to slow down a little bit.

MS. PRIEDEMAN:  Sorry.

THE WITNESS:  Yes, there's definitely value in an ISA, absolutely.  I'm not contending that any of the 105 documents don't have any value.  They have value, especially to a large competitor, you know, like Microsoft or Meta, that's creating a similar.  But if you are me, for instance, and I walk out and I -- what can I do with these documents?  Not much, right?  I would say almost nothing.

So it's perspective and context.

THE COURT:  Could I ask you a question about that?

THE WITNESS:  Absolutely.

THE COURT:  Could you sell them to Meta if Meta were willing to commit the crime of purchasing trade secrets?

**THE WITNESS:**  I think Meta would be interested in them.  Yes, I do.  Absolutely.  I mean, I don't care what it was, they would be interested in it, right?  Working at these companies, they're interested in every little tidbit that they can possibly get.  So there is absolutely value.

The question is, you have to look at it compared to the whole value of the whole system, and I actually think it's quite trivial compared to, like the entire system is so complex and so complicated and interdependent, that getting these 105 documents I think has quite low value even for a company like Meta, and I would prefer to hire a few engineers from Google, which is fairly simple to do, instead of trying to do something illegal.

**BY MS. PRIEDEMAN**

**Q.**   So Mr. Novak, I just want to make sure I understand your opinion.  Your opinion is that these documents do have value, it's just that it might make sense for a competitor to do something -- sorry, let me back up.

You're not opining that these 105 documents don't have value; is that correct?

**A.**   That's not my opinion, no.

**Q.**   All right.  So I want to talk about another document, Exhibit 362, which is the memory system document.

**A.**   Okay.

**Q.**   So this document describes the memory system for Google's

TPU Version 4, right?

**A.**   You know, I don't have the numbers memorized with --
unfortunately.

**Q.**   I can --

        **MS. PRIEDEMAN:**  Let's pull it up, Ms. Hernandez,
Exhibit 362.

        **THE WITNESS:**  Oh, the PFC memory system.

**BY MS. PRIEDEMAN**

**Q.**   Right.

**A.**   Okay.

**Q.**   So this document, Mr. Novak, this has information about
the different memory instructions within Google's TPU
Version 4, right?

**A.**   Yes.  Yeah.  It's describing the memory hierarchy inside
of the PFC, yes.

**Q.**   And when you're designing a memory hierarchy for a machine
learning accelerator, there's a lot of tradeoffs you have to
make in determining the size and locations of the different
memories, right?

**A.**   Which are constantly changing based on your library, your
process, many -- and your other interdependent chips and
system, absolutely.  I would say between different generations
this is constantly changing, because you want to optimize this
to be the right size.  And also the technology for memory is
changing, as well.  And so as that's advancing, like the HBM,

the high bandwidth memories, constantly getting better and better, and those are third-party vendors.  And so you want to accommodate that extra bandwidth, and that requires you rejuggling.  It's a very delicate balance to get it right.

And by the way, it's not just science.  There's art there, as well.  And so not every decision is necessarily optimal, and you don't find out about that until the next generation and things change, everything changes again.  So there's this dance that's constantly happening, yes.

Q.   There's a lot of complex tradeoffs in designing a memory system, right, Mr. Novak?

A.   Absolutely.  And there's not one set that's the most optimal necessarily, right?  It's a progression, and it's -- to some degree there's a lot of subjectiveness to it, what's better.

Q.   And knowing the different design tradeoffs that Google has made for its memory system in TPU Version 4, that would be valuable information for a competitor who is trying to build its own machine learning accelerator, right?

A.   I think it would be interesting like for a Meta or Microsoft.  I think they'd love to see what their competitor is doing.  I am not sure they would actually change anything, because their environment, I imagine, I don't know for sure, is substantially different and has substantially different requirements and connections, and their set of decisions will

not mimic what this system does.  It's going to be a different setup.

But absolutely.  I think they'd love to see what other people are doing.  It's always nice.  Engineers are always trying to learn from others, for sure.

Q.   It would be a valuable benchmark for these companies, right, to see this information?

A.   Yeah.  Absolutely, yeah.

Q.   All right.  I want to talk about your opinions related to Category 2.  So Category 2 includes information about the physical design of TPU Version 6, right?

A.   Yes, yes.

Q.   So the documents in this category relate more to the physical design of the chip, right, Mr. Novak?

A.   Do you have a specific example that we can look at?

Q.   Sure.

MS. PRIEDEMAN:  Can you pull up Exhibit 377, please, Ms. Hernandez, and go to page 8.

THE WITNESS:  Because, I mean, physical -- I need kind of -- there's a lot of terms here.  I want to be precise.

BY MS. PRIEDEMAN

Q.   Of course.

A.   Pictures of floor plans are not physical, right.

Q.   Okay.  Well, let's --

A.   Yeah.

**Q.** So what would you describe -- so this is a different level than the documents in Category 1, right, that were describing different functionalities?

**A.** Sorry.

**Q.** No, go ahead.

**A.** This is almost like a marketing brief. I mean, it's a brief product overview, which is not physical design. It's not a design document. No one in design would use this document. This is more of a, if I remember it correctly -- sorry, I want to scroll down.

**Q.** That's all right.

**MS. PRIEDEMAN:** Can you go to page 8, please, Ms. Hernandez? If you can zoom in on the top, please.

**BY MS. PRIEDEMAN**

**Q.** Now, without getting into specific locations and details since we're in open court, can you describe what this graphic is showing?

**A.** Yes. This is from a layout CAD tool where someone has highlighted the top-level modules inside of the CAD tool. This is not a full layout. That person -- these are bounding boxes. These are not actually the actual routes or the placement of the gates, and these are kind of for informational sake, kind of catchy, to see where all the high-level modules are.

And so this on the left, I think, if I remember my terminology correctly, is the Viperfish Lite core, and then

there's the Ghostlite chip, and it's basically a marketing --
it's my eyes, sorry.  It's a marketing comparison between the
previous generation and the new generation and how much better
the new generation is, and that's the scope of this document.

Q.   And if you look at the graph on the right, this is
showing -- well, first of all, what is this showing on the
right, the different -- can you describe without talking about
where they're located, but what the different blocks are on
this graph?

A.   Sure.

So, I mean, first of all, the purpose of this is not to
show the different blocks, the purpose is to show the VLC on
top of the GLC.  So that's the primary reason for this with the
text on the right, kind of trying to tout how much better the
GLC is over the previous generation.  But sure, if you want to
go through the VPUs, the vector processing units, the matrix
multiply is kind of the bottom and the top, and there's
multiple smaller replications of that module.

Do you want me to keep going?

Q.   No, that's fine.

A.   Okay.

Q.   Mr. Novak, do you see on the bottom of the right-hand side
it says the die area, and then it has a specific number there?
Do you see that?

A.   Yeah.

**Q.**   And that's the area of the Ghostlite chip, right?

**A.**   Yes, it is.

**Q.**   And then if you look at the chart above, it's showing the location of each of the components on the Ghostlite chip and where they're located, right?

**A.**   The top-level modules, yes.  But I would not call this a floor plan, and it's -- yes, you can get some information from it, absolutely.

**Q.**   And do you understand, Mr. Novak, that at the time this document was taken, that the Ghostlite -- Google had not even announced the Ghostlite chip?

**A.**   Okay.

**Q.**   So Google had not published any information about Ghostlite whatsoever, and so --

**MS. WALSH:**  Your Honor, this is starting to sound less like exploring opinions and bases for opinions in *Daubert* and more like taking a deposition and getting --

**THE COURT:**  Isn't that kind of good for you?  I mean, it's sort of practice for the trial.

**MS. WALSH:**  Well ...

**THE COURT:**  I mean, it seems like she's helping you by preparing, reviewing your questions during cross-examination at trial.

**MS. WALSH:**  Well, I just wanted to raise that as an objection.

**BY MS. PRIEDEMAN**

**Q.**   So Mr. Novak, you would agree that there are also design decisions that go into determining the size and locations of different components on a chip, correct?

**A.**   I mean, that is true, but it's not relevant to this picture.  I mean, taking too much out of this picture is taking the wrong thing.  This is not the purpose of this.  People will take this to say, oh, wow, that's cool.  I don't think people are going to be taking out their rulers and measuring where things are.  I mean, it's not -- my opinion, sorry.  It doesn't seem to be giving a lot of valuable information beyond the text on the right-hand side, which is what it's trying to -- its purpose is for.

**Q.**   So Mr. Novak, setting aside the purpose.  You mentioned the ruler.  You could take a ruler and determine the exact size and location of these components, right?

**A.**   I don't know for what purpose, because it's a little misleading in terms of there's -- again, we're glossing over so much of the complexity that's underneath this.  We don't know how -- what the placement density is.  You know, there's a million, almost -- I'm a little exaggerating, but not much -- many constraints that can change what these bounding boxes are. These are not actually the exact sizes of the units, they show the bounding boxes.  That's where the logic has to stay within, but we don't see how much space is reserved for routing, for

power, for clocks.  There's so much that goes into this that I take some generic high-level conceptual, like, oh, wow, they've made the VPU much wider and bigger, but the document kind of already says that.  So it's saying that they're adding extra VPU because it seems to be a good thing.  I don't need to go and check it out on the -- this floor plan.

Q.   Right, understood.  But I understand your opinion that there is additional information that is not included in this diagram, right, Mr. Novak?  But you would agree that this information would be valuable to a competitor that didn't even know Google was going to announce a new version of its TPU chip, correct?

A.   Well, I mean, absolutely.  I mean, if you're talking about like a Meta or Microsoft, some large competitor, if they'd want to see this, absolutely.  There's no doubt.  They'd love to -- their curiosity just by itself, they'd want to see this.  But that's more strategic.  It's not really enabling them to create an implementation of this.

Q.   Understood.  But again, Mr. Novak, it would be helpful for a competitor who was trying to build a machine learning chip to see how the competitor is doing it so they could compare it against their own product, right?

A.   I can't think of any document that, if they could legally get, they wouldn't be interested in getting, right?  I mean --

           THE COURT:  Well, she asked you a somewhat different

question.  She didn't ask whether they would be interested in getting it.  She asked whether it would be helpful to them in comparing what they're doing to what Google is doing.

**THE WITNESS:**  Understood.

So the reason why my -- I wasn't trying to be flippant. They are interested in every document, because engineers are very creative, and they will pull out anything they can out of any diagram.  But that doesn't mean it's extremely helpful, right?  It -- I ...

**THE COURT:**  You're just saying it's a matter of degree.  You believe that Dr. Sanchez has greatly exaggerated the extent to which these documents could be used by somebody who either wants to build an AI supercomputer or improve their own existing AI super computer.  Is that the gist of it?

**THE WITNESS:**  Yes.  I think looking at the area and focusing on that, to say that you can get all this information and implementation details is overstating what value it has.

**THE COURT:**  In your report you asked -- you mentioned in a few different places when you're talking about specific documents that it would be better to kind of hire a group of engineers or a team of good engineers rather than trying to replicate this document, and I wanted to ask a clarification question about that, because my under~-- the understanding that I've developed from listening to the evidence at trial, including listening to Dr. Sanchez's testimony, is that if you

wanted to build an AI system, right, and you wanted to use these documents as kind of a starting point for building an AI system, you would still need to hire an army of engineers. Like you would need to do both things to build an AI system, and the -- it seems like -- but you kind of described it in your report as an either/or, either you get these documents or you hire a bunch of engineers.

And so I guess I was a little confused by that contrast that you were drawing given my understanding that you would need to do both. Like even if you had these documents, you would need to hire a bunch of engineers.

So can you kind of clear that up for me or further explain what you meant?

THE WITNESS: Yeah, no, I understand exactly what you're saying. It's very -- no, it's a good thought.

THE COURT: Well, you have to say that because I'm the Judge.

THE WITNESS: Well, no, I mean it.

The main reason that is the case is the more skilled and talented that engineer, the less valuable these documents will be. It's inverse. It's inverse what you think that --

THE COURT: That's interesting. Tell me more about that.

THE WITNESS: Yes. So if you need to look at these documents that means you -- I'm not saying there's no -- there

is value in these documents, there is interesting thoughts, but it's more of a reference and for conceptual reasons.  But most engineers think they can do did better.  Most engineers, especially a really talented engineer -- which, there are some superstars out there that are completely bright, and they do not accept someone else can do something better than that can do, and they're very confident with their skills.  And so for them to be constrained by another, a previous generation for instance, information, would go counter to what their whole hubris is, right?  Their whole idea is they can do it better.  They know how to do it, especially if they've been an AI company before.  Which is the main reason why you'd hire them, is this information is reflective of what is engineers' minds.  All this stuff, when you're working on this project, is in your mind for the part you're working on at least, right?

THE COURT:  And so what you're saying is that if you have a really sophisticated army of engineers you don't need this stuff or you need this stuff less.  That's what you would say, right?

THE WITNESS:  Yes.

THE COURT:  It would be less valuable to you if you had a really sophisticated army of engineers.  It would still have value, but a lot less, if you -- and I'm not trying to put words in your mouth.  I'm just trying to understand, so please don't hesitate to correct me if I'm misstating it.  But if you

have significantly less sophistication on the engineering side, these documents are gonna help you more.  You probably -- if you use them to build a system, it's probably not going to perform nearly as well as Google's system, but it will -- the less sophisticated you are, the more helpful these documents will be in your effort to build a system of your own?

THE WITNESS:  I think that's great.  Thank you, yeah.

THE COURT:  That's accurate?

THE WITNESS:  That's accurate.

THE COURT:  That's your opinion?

THE WITNESS:  Yes.

THE COURT:  Okay.  Thank you.

BY MS. PRIEDEMAN

Q.   So Mr. Novak, just understanding your opinion on the -- in your report when you talk about how you think it would be better to start from scratch, that's really just a -- that's an opinion about what you think would be the best approach from an engineering perspective?

A.   Again, I -- even to an experienced engineer I'm not saying these have no value, right?  I mean, these have -- all of this has value, the question is how much value.

I think the more experienced engineers -- and I don't think you need an army.  I think if you had a core of three to five engineers kind of spread out across disciplines, they could bring in an army.  Then they could guide -- and by the

way, this solution is not singular.  This is not a singularly -- if we looked at -- I would bet if you looked at Meta's solution or Amazon's solution you would see significant differences, and it probably works just as good.

And so for you to constrain yourself to someone else's concept -- because these are kind of in someone's head. There's going to be a main architectural team, and they're pushing this -- these ideas forward.  A different team will be thinking differently, and I think it's really kind of constraining.  They will use this to learn from it whatever they can, but it's not like they're going to be like, oh, we're going to redo it and make it all look like this.

So that's why I'm kind of -- maybe I'm losing track here. I'll just ...

**Q.**   No, that makes sense.  I think you're saying that it wouldn't make sense to replicate this wholesale, but it would be -- this contains valuable information that even a sophisticated engineer could learn from and potentially use and integrate different techniques in their own design; is that right?

**A.**   I mean, it would be hard to look at any document and not say that, right?  I mean, I haven't -- I've rarely seen a document that's technical that I can't get some learning from. So, yeah, I can't say "no" to that.

**Q.**   All right.  I want to ask you a couple questions about

Category 3.  So Category 3 is the soft -- it contains information related to the software design by Google for its TPU systems, right?

**A.**   Yes, I have to check it, but I trust that you stated that correctly.

**Q.**   And software engineers, when dealing with complex software design issues, sometimes designing a complex software can take quite a bit of time, right?

**A.**   Absolutely, yes.

**Q.**   And that's before you even get to the actual coding or source codes -- code phase, there's a lot of thought that can go into thinking about different techniques, how to solve different problems, things like that?

**A.**   So software's different than hardware, but you are right, but they tend to do less documentation and more coding before, because the consequences are less.  The consequences on hardware are extremely costly.  So there tends to be a balance there, but, yes, you are right.

**Q.**   And so talking about one particular document, Exhibit 383, which is the ICI resilient slice document.

**A.**   Okay.

**Q.**   Do you remember what this document's about?

**A.**   I could read my notes, but can we pull it up?

**Q.**   Sure.

          **MS. PRIEDEMAN:**  Thank you, Ms. Hernandez.

THE WITNESS: Okay. Yeah, I remember seeing this, yes.

BY MS. PRIEDEMAN

Q.   So what is -- can you explain what this document relates to?

A.   So the ICI is the inter-chip communication, and the resilient slice will be the concept that is pretty common, which is, you know, fault tolerance. In other words, if a connection between two parts goes down, you need to be -- you can't just say, too bad, the part doesn't work, you need -- because it's such a -- you know, it's an expensive system, that you can't go down just because one connection's gone down. So this is a description at a high level of what it would mean to reroute the connectivity or the communication between parts. So the resilient part is -- yeah.

Q.   And what is the component that this -- the failure -- sorry.

     When you say that it's dealing with failure, what's the component that fails that it's dealing with?

A.   Well, it's the connection between the TPUs. So it could be the interface, it could be the wires, it could be, you know, the receiving interface. It could be anything along that route.

     Again, I only have the 105 documents. I don't have the luxury of, you know, all the links and all, you know, being

able to talk to someone who kind of has been on the project.

I know resiliency.  I know fault tolerance, right?  It's a concept that every chip has to take care of.  But this is specifically resiliency on interconnections between TPUs.

Q.   And was there -- is there a particular device that it's addressing a failure for?

A.   I believe it's the interconnectivity, right?  The channel for communication between two TPUs, or, I mean, multiple TPUs.

Q.   So is this document dealing with OCS-related failures?

A.   I would have to look at it.  I mean, it's obviously mentioning OCS.  I need to flip through it to be able to answer your question.  I can't do it off the top of my head.

I thought it was mostly about internal.  I mean, so far it's just the ICI analysis.

MS. PRIEDEMAN:  So if you go up to the first page, Ms. Hernandez.

BY MS. PRIEDEMAN

Q.   So do you see it says:  "What is the product?  ICI resilient slice is a software solution that gracefully tolerates OCS-related failures in a TPU pod."

A.   Mmm.

Okay.  Yeah, I see that.

Q.   So if this -- so are you familiar with optical circuit switch technology?

A.   I am, yes.

**Q.** And so this software solution is a solution that essentially allows TPUs to communicate even when the optical circuit switch fails; is that right?

**A.** It's -- that sounds reasonable.

**Q.** And so in your report you said the diagrams on pages 6, 7 and 8 are instructive, and didn't you say that because that, it's talking about the algorithm and kind of the solving the issue for those failures?

**A.** Can I take a look?

**Q.** Sure, of course.

**MS. PRIEDEMAN:** Go to page 6, please.

**THE WITNESS:** Yeah. So it is a high-level instructive. You know, it's showing the interconnectivity between the nodes, and the little yellow "X" is showing that connection between those two nodes has gone down and it's showing it rerouting around that broken connection.

**BY MS. PRIEDEMAN**

**Q.** And so for someone who was building an AI supercomputer and planning to use optical circuit switches, this document would be a valuable -- would contain valuable information for a potential software solution, right?

**A.** It would, but not for this reason. I mean not for this diagram, but --

**Q.** Sure. Why would it be helpful? Why would it be valuable?

**A.** I think we go back to the fact that every document is

valuable to some extent.  Now, I don't think this is a novel concept.  This is not a novel concept that any connection, optical or not, has failures on it, and you need to create a scheme to work around that, and not only work around that, but work around congestion as well.  So these are not new problems.  These are problems that have been around for a very long time.  This is a new setting, a new environment, so I'm not saying there's nothing at all novel here, but these aren't, like, groundbreaking ideas.

Q.   But it would be valuable for a competitor to have this information?

A.   Yes.

Q.   All right.  Let's talk about Category 4.  So Category 4 contains information about Google's custom GPU servers, right?

A.   Yes.

Q.   And so when designing a custom GPU server there's tradeoffs, again, right, different types of tradeoffs.  But there's tradeoffs between cost, power and cooling techniques that someone would have to consider when building a custom server, right?

A.   And more, but, yes.  That's some of them, yeah.

Q.   Sure.  And so the documents in Category 4 reflect some of those design decisions and tradeoffs that Google has made, right?

A.   Yes, sure.

**Q.** And so, again, these -- this information would be valuable to a competitor that was trying to build its own AI supercomputer, because they could understand the different design decisions and tradeoffs that Google has made, right?

**A.** Well, you know what I'm going to say, right? Because every document so far, every one, all 105 documents have value, it's just how much value they have.

**Q.** All right. And then let's talk about Category 5 a little bit. So Category 5 talks about the software for Google's GPU systems, right?

**A.** Yes, specifically I think the RDMA ... anyways, I'll let you go before that, yes.

**Q.** It contains information about a technology called TCP Direct, right?

**A.** That's one of them, yes.

**Q.** Do you have an understanding of what TCP Direct is?

**A.** Yes. What I gather from the documents is that it's a way of bypassing the CPU -- so DMA is direct memory access, and typically it requires a CPU, the host, to be involved with that processing of the data and bringing it to the GPU. It's kind of an inefficient use of the CPU's time, and so there's ways around that, and this is one of them. It's a way of directly going from the NIC, network interface chip, to the GPU.

**Q.** And so a company that's trying to build an AI supercomputer, it's faced with different networking decisions,

right?

**A.**   Yes.

**Q.**   There's -- there is a lot of different networking technologies that a company could use to connect different GPUs to create a supercomputer, right?

**A.**   In theory, yes.

**Q.**   And same question as before.  There's different tradeoffs and design decisions in designing software for those systems, right?

**A.**   Yes, but this is specifically -- I mean, not to preclude where you're going, but, I mean, TCP is not a novel concept, RDMA is not a novel concept, and adding features to these is very common.

What's being done here, not that I fully understand it, because the 105 documents are not -- don't give me a full disclosure.  From what I can tell, it's a very kind of straightforward way of embedding additional information in ethernet packets and using the RDMA protocol.  And I'm not saying it's not smart, but I don't think someone would be like, ah, you know, I forgot that, right?  So I think these items are great, they do have some value, I just don't think they're groundbreaking, right?

**Q.**   Got it.

And then Category 5 also includes documents related to Asterfel, which is a project that shows how Google modified its

systems to meet the needs of a large cloud customer, right?

**A.** So the document itself -- I mean, I heard that from Mr. Sanchez's testimony, but, and the document itself doesn't give you the idea it's for another customer as far as I know, but, okay, yes.

**Q.** It shows how Google is willing to modify its systems to meet the specific requirements of a large cloud customer, right?

**A.** I didn't quite get it in isolation in a vacuum, but I accept that that would be the case.

**Q.** And if that is the case, that information would be valuable to a competitor that's trying to build an AI supercomputer targeting large language models, right?

**A.** Yes.

**Q.** All right. And then, so categories 6 and 7 relate to Google's custom SmartNIC, right?

**A.** Yes.

**Q.** And so in Category 6 there is a document.

    **MS. PRIEDEMAN:** Can you pull up Exhibit 438, please, Ms. Hernandez?

**BY MS. PRIEDEMAN**

**Q.** And so what's your understanding of this document, Mr. Novak?

**A.** I love this page, actually, because it purports to be microarchitecture, the U-architecture. And this is great,

because I was looking for this, because part of my task was seeing could I implement this if I wanted to, and this is the first document where I was like, okay, this is at a level that actually is something reasonable that I could start implementing from, and it actually has Intel's MAS, the microarchitectural spec, and this system view is showing kind of a table of contents of what the design needs to implement.

So, great.  I was looking forward this document.  And the green is what a vendor is supplying, and then the blue is what Google presumably is implementing.  And so, I mean, that's -- I was quite interested in this document, so I spent a little bit of time going through this document.

Q.   And do you understand, what's the difference between the GRT protocol and then the hardware implementation of GRT?

A.   Well, there is a GRT -- so there's two elements, and they talk with each other, I think, right?  Sorry, it's a little blurry here.  All of these -- I think it has both, both parts, right?  Obviously has a hardware portion, as well, right?  There's a Google reliable transport module inside of the hardware.

Q.   And do you understand, can you explain what the GRT protocol is?

A.   I need -- I would need to take a look more.  Off the top of my head it's kind of escaped me, but it's working with the ethernet protocol to make sure that it gets -- packets get

reliably sent back and forth between the units.  But I need -- would need kind of a little bit more time to get my head around it at this point.

Q.   It's a communication protocol, is that your understanding?

A.   Yes.

Q.   And Google has open-sourced the GRT protocol, right?

A.   I wouldn't know that, but ...

          MS. PRIEDEMAN:  And then can you go to page 8, please, Ms. Hernandez.

BY MS. PRIEDEMAN

Q.   And so can you explain what we're looking at here?

A.   Yes.  Well, I can and I can't.  Because again, I don't have the full -- this is, in my opinion, not the full microarchitecture, or I don't have the context for the whole microarchitecture, how all this is working.  You know, a lot of the definitions of, like Proto Engine and AC Coalesce I didn't see definitions for.  I didn't see -- understand that.  There's a lot of those, the triangular pieces are kind of muxes, and I don't see the description of the control for those.  You know, the pipeline stage is in between.

     Anyways, there's a lot of information here.  But I do see the CAMs, which are content addressable memories, I believe, and those are quite complicated, and those would definitely not be clear what they're doing and how they're looking things up without more information about the specifics about them.  So

from my perspective I look at this and like, can I implement this?  I don't have enough information to implement it.  That was my perspective.  I don't have enough information in my head to -- or really time to understand the full extent of the algorithm and what's involved here, because I don't have the full context.  So it's really hard for me to kind of, these piecemeal documents and try to connect all the dots.  So I might not be able to answer, you know, fully, you know, how everything works in these --

Q.   That makes sense.  You feel like you don't really have enough information about the GRT protocol.  Do you think if you knew more information about the GRT protocol that this might be valuable or helpful to you?

A.   No, it's not just the GRT protocol, it's all the pieces that this is interfacing with.  This is interfacing with a lot of different units, and it's -- like the CAM itself.  You can't just put a CAM and expect someone to implement it.  Like, that's not how it works, right?  So from this diagram itself I could not implement it.  I would have to ask additional questions.  And I believe that information is available.  I don't believe I have access to it.

Q.   Okay.  Do you think would this information be valuable to someone who was trying to build their own SmartNIC with a hardware implementation and GRT?

A.   By definition, yes.

Q.   Okay.  And then Category 7 focuses on the software used in Google's SmartNICs, right?

A.   Yes.

Q.   And this is complex software, right?

A.   Yes, it is.

Q.   It runs on both the SmartNIC and the CPU hosts?

A.   It requires lots of details to properly implement it, yes.

Q.   And again, lots of design decisions that have to be made to implement before even writing the source code for software like this, right?

A.   Yes.

Q.   And so you would agree that the documents in Category 7 would be valuable to a competitor who was just trying to design their own SmartNIC or software of their own?

A.   Yes.  With the same caveat that I've had all along, yes.

MS. PRIEDEMAN:  Your Honor, we would like to talk to Dr. Sanchez briefly at some point, but I don't know what the right timing of that is.

THE COURT:  Well, okay.  So as of now you're still moving to exclude this?  Because you haven't actually formally moved to exclude this expert other than to say that he wasn't disclosed on time.

MS. PRIEDEMAN:  That's true.

THE COURT:  So have you -- is part of your meeting going to be about whether you actually are going to move to

exclude this expert?

MS. PRIEDEMAN:  Yes, Your Honor.

THE COURT:  All right.  Do you want to do -- do you have any redirect that you want to do now before they have that meeting, or ...

MS. WALSH:  Yes, briefly, Your Honor.

THE COURT:  Okay.

### REDIRECT EXAMINATION

BY MS. WALSH

Q.   Good afternoon, Mr. Novak.

Counsel took you through some of the documents that are at issue in this case.  Even with those documents, what kind of work would be required to produce a working product?

A.   From what part?

Q.   So, for example, taking the ISAs from the TPU V4.

A.   Okay.  So just creating the TPU?

Q.   Correct.

A.   You want a full list or just a sampling?

Q.   Just a high-level overview of what would be required in order to create a working product.

A.   All right.  So you would need a microarchitecture document that would detail exactly the tradeoffs that you want to do at low -- at the implementation.  You'd need an interface that explains what all the pinout is and what interface this could be connecting to.  Because you're not just interfacing to

software, you're interfacing to all these neighboring chips and devices.

You would need to understand what your, you know, power requirements are and how you're going to achieve those.  And, you know, by breaking out individual piece -- you have to break out individual pieces of the TPU, because there will be many, so that individual engineers or teams of engineers can implement each one, and each one of those broken-out modules have to have their own requirements, their own interfaces defined, so that they can work reliably with each other.

Q.   And if you were successful in building, for example, a chip similar to the TPU V4, would that chip work with other systems?

A.   Not without -- you know, without -- it would not unless it was designed to do so.

Q.   Okay.  And if it were designed to work outside of, for example, Google's system, that would be a different design; is that correct?

A.   So you're saying if I somehow got a Google TPU --

Q.   Correct.

A.   -- and I took it outside, would it be useful?

Q.   Correct.

A.   No, it wouldn't be useful without all the support structure around it.

Q.   And if you did not have a team of sophisticated engineers

at your disposal and you are attempting to build a, for example, a TPU V4 from the ISA documents we've discussed, would that give you a meaningful head start on building a TPU V4 or a similar chip?

A.   If I was designing it, or ...

Q.   If -- so if someone who had these documents and they did not have a team of sophisticated engineers at their disposal.

A.   Okay.  And all they had is the ISA?

Q.   Correct.

A.   And they're -- I mean, this is a team effort.  This is not a single person achieving a TPU by any means.  So you would have to bring together a team, and presumably if -- I mean, it's hard to understand why that would be something that's even reasonable, right?  I mean, you need a whole team of people. And then the TPU's not sufficient to create a system.  So you could build a TPU you could sell potentially to others, but you'd have to have that interest in order to motivate that production.

          MS. WALSH:  Thank you, Mr. Novak.

          THE COURT:  Okay.  What do you want to do, take like a 15-minute break or something?

          MS. PRIEDEMAN:  Yes.

          THE COURT:  Okay.  So we'll resume at 20 after the hour.

          MR. CHANG:  Thank you, Your Honor.

(A recess was taken from 3:07 p.m. to 3:23 p.m.)

THE COURT:  All right.  What's next?

MS. PRIEDEMAN:  Your Honor, the government is moving to exclude Mr. Novak's opinion as to the repli -- whether or not this could be -- could be used to replicate wholesale Google systems because it's not the relevant standard, and we think it would confuse the jury.  The standard under Ninth Circuit precedent is that we have to show that there's independent economic value, and that has been defined as whether or not the information confers a competitive advantage on their owner.

THE COURT:  Right.

MS. PRIEDEMAN:  He testified that these documents all have value, his opinion is that there's just additional information needed to replicate systems.  And so by his own statements, whether or not you can use it to replicate is not relevant to.  It's a sliding scale of value, which is not the question, and so we think it would confuse the jury.  We'd have to have Dr. Sanchez come and testify in rebuttal, and they'd be fighting over how much value there is, which is not relevant.

THE COURT:  I think that you could be right about the trade secret counts, but it strikes me -- and actually I would go a little bit further, right?  I guess my take on the testimony that we just heard, right, is that it would actually further support a conviction of Mr. Ding on the trade secret

counts.

**MS. PRIEDEMAN:** Uh-huh.

**THE COURT:** Right?

But what about the economic espionage counts?  Mr. Ding -- you know, the jury has to find beyond a reasonable doubt that Mr. Ding intended to benefit the Chinese government or an instrumentality of the Chinese government, or knew he was -- his crime of theft of trade secret would benefit the Chinese government, right?  And it seems to me that if there was no realistic chance that Mr. Ding, even teaming up with a bunch of people in China, would be able to replicate the system, that undermines the argument that would foreclose the argument that he knew that his crime of theft of trade secrets would benefit China, right?  Like if it was not possible.

I don't know -- you know, I don't know if the witness was really saying it would be impossible to replicate it.  I think he was just saying that it would be extremely difficult to replicate it.  But if it's true that it would be extremely difficult to replicate, right, and you would need a lot of sophistication to replicate it, and even if you replicated it, it would be a vastly inferior product that wouldn't compete, it seems to me that that would support an argument from the defense that, by definition, Ding could not have known that his theft of trade secrets would benefit the Chinese government, because they couldn't, it couldn't benefit the Chinese

government.

MS. PRIEDEMAN:  So, Your Honor, our theory under the economic espionage counts is that -- and we have to prove that he intended to benefit foreign government or foreign instrumentality.

THE COURT:  Intended or knew, right?

MS. PRIEDEMAN:  Or knew.

THE COURT:  So I understand that, you know, you're gonna argue that, you know, in opposition to their motion for judgment of acquittal on the economic espionage counts, you're going to argue that there's enough evidence from which a jury could infer that Ding intended to help, intended to help the Chinese government, and there is enough evidence that would -- the evidence would allow a reasonable juror to conclude that beyond a reasonable doubt.  And you're gonna argue to the jury, here's this evidence that from which you can conclude beyond a reasonable doubt that Mr. Ding intended to benefit the Chinese government, and I understand that.  I get that.  And whether the evidence is enough on intent, I don't know.  I'm not sure yet.

But that's the argument you're gonna make to the jury about intent.

To the extent that you plan to argue to the jury that even if he didn't intend to benefit the Chinese government, he knew that his conduct would benefit the Chinese government, right,

if it was impossible to replicate Google's system in any way, then he could not have known that his conduct would benefit the Chinese government.

**MR. BOOME:**  Can I weigh in here?

**MS. PRIEDEMAN:**  Yes.

**MR. BOOME:**  Your Honor, I --

**THE COURT:**  And just to even put it more simply, you know, the less likely it is that Ding could have worked with others to produce an AI supercomputer, the less likely it is that he knew that his conduct would benefit China, the Chinese government.

So it seems like even if this testimony bolsters your case for theft of trade secrets and actually helps the government on theft of trade secrets, it may undermine the government's case for economic espionage.  That's -- I'm sort of thinking out loud here, but that's my big question, I guess.

**MR. BOOME:**  Well, the aspect of the Court's analysis that I don't understand from a burden of proof perspective is why, for economic espionage, the standard becomes, I can replicate this technology.  The way the government was viewing our theory, our legal theory on that, was if Mr. Ding stole the trade secrets intending to help build his company and to use them to put his company in a better position than they would be without the trade secrets, which it sounds like Mr. Novak agrees they would be ...

THE COURT:  How does that benefit the Chinese government?

MR. BOOME:  Because Mr. Ding was offering the services of his company to entities controlled by the Chinese government to help them achieve their goals.

THE COURT:  But if he -- but the way he was offering to help them achieve their goals -- I mean, I don't know if he was offering to help them achieve their goals.  The services he was offering to them, which you say were services that would help them achieve their goals, is AI supercomputing.

MR. BOOME:  Right.

THE COURT:  And if it is un -- if it's totally unrealistic to think that Ding could have created an AI supercomputer with his company, then that makes it less likely that Ding knew that his theft of the trade secrets would benefit the Chinese government.

MR. BOOME:  But if we can prove that Mr. Ding said he could assist, for instance, Mingyue Lake, the Chongqing high-tech zone, build an AI supercomputer and improve their AI infrastructure --

THE COURT:  Uh-huh.

MR. BOOME:  -- and we think so far the evidence has shown that he was at least making those promises or making that pitch to Mingyue Lake.

THE COURT:  Right.

**MR. BOOME:**  And if he was going to use Zhisuan to do so and Zhisuan was benefiting from the theft of trade secrets, or Mr. Ding intended to build Zhisuan based on stolen trade secrets and then offer the fruits of that theft to Mingyue Lake --

**THE COURT:**  What are the fruits of that theft?

**MR. BOOME:**  It would be Mr. Ding intended to build an AI supercomputer using Google's technology, and he intended to use his company to help Mingyue Lake.

**THE COURT:**  Right.

Let me put it a different -- let me put it a slightly different way.  I mean, I think it's more or less the same point, but put it a different way.

What if Mr. Ding was just a total BS artist, right?  The fact that -- and he was taking everybody for a ride, and his, you know, his speech at the investor conference was -- like, he knew that it was BS, he knew that he wasn't going to be able it build an AI supercomputer, but he wanted to get seed money for his company, right?  That seems, by the way, very plausible, and it seems to me that this witness' testimony, right, while supporting your~-- the trade secret counts, could also support a theory that Mr. Ding was a BS artist and sort of never really thought that he would be able to build an AI supercomputer, because look how hard it is, after all.  Look at everything that would be involved in building an AI supercomputer.  These

documents don't get you even close.

**MS. PRIEDEMAN:**  Your Honor, if I may?

Even if you're focused on the knowledge component of the economic espionage --

**THE COURT:**  Well, I'm now talking about whether it's intended or knew.  I mean, either way, right?  If, if Mr. Ding was simply being a BS artist in China --

**MS. PRIEDEMAN:**  Right, but --

**THE COURT:**  -- essentially trying to defraud people --

**MS. PRIEDEMAN:**  Right.

**THE COURT:**  -- into thinking that he was capable of building -- of replicating Google's system, which again seems quite plausible, I think a jury could conclude that based on the evidence that's come in so far -- then the testimony of this witness is quite helpful to Mr. Ding on the economic espionage count, right?

**MS. PRIEDEMAN:**  Well, I'm not sure, Your Honor, why the question of whether or not he replicated wholesale is relevant to that, right?  Because he could intend to benefit a foreign instrumentality with the trade secrets or know he could benefit a foreign instrumentality --

**THE COURT:**  Right.  But the only evidence is that he intended to benefit -- to the extent there is any evidence that he intended to benefit the Chinese government, to the extent

that there is any evidence from which a jury could conclude that beyond a reasonable doubt, it is that he intended to benefit the Chinese government by producing an AI supercomputer.

MS. PRIEDEMAN: So I would disagree with that, Your Honor, because the Mingyue Lake PowerPoint presentation, which is one of the foreign instrumentalities that he was pitching his business to, specifically says -- it says that they would do a wholesale examination of the computing infrastructure there, they would help with an R&D of chips, and there's multiple different layers.

So I think it doesn't -- even if he couldn't replicate the entire supercomputer, there is also other services and promises he was making to Mingyue Lake.

THE COURT: Right. But if it was totally unrealistic for anybody to think that he could replicate an AI supercomputer, which is what he was pitching, which is the primary thing he was pitching in China, doesn't that make it less -- doesn't that make it more likely that he, himself, knew that it was unrealistic that he would be able to build an AI supercomputer, and therefore doesn't it make it less likely that he intended to benefit the Chinese government?

MS. PRIEDEMAN: I guess I'll have to think about it a little bit more, Your Honor, but I do think there's a huge risk for jury confusion here and that it's going to turn it into a

trial about how much value there is.

**THE COURT:** Why? I mean, why can't you just get up at closing argument and say, as it relates to the trade secret counts, you know, the defense experts, the testimony of the defense expert supports our case and is further evidence beyond a reasonable doubt that Mr. Ding is guilty of theft of trade secrets. Because he said that this stuff has value. He said that Ding could have sold this stuff to a competitor for money. I mean, that's all you need.

**MS. PRIEDEMAN:** I think we need a jury instruction, then, saying that the government does not have to prove that Mr. Ding could have replicated a supercomputer to find value. We would assume the defense would not argue that.

**THE COURT:** I think the instructions already make that clear.

**MS. PRIEDEMAN:** Okay.

**THE COURT:** I think you can argue that, and it's not a complicated point.

**MS. PRIEDEMAN:** Okay. And I assume defense could not argue that because it cannot be replicated it's not valuable?

**THE COURT:** I think that's right.

And by the way, the expert didn't argue that. He never said because you couldn't replicate it it's not valuable, right?

**MS. PRIEDEMAN:** Right. I assume --

**THE COURT:**  He said, of course it's valuable.

**MS. PRIEDEMAN:**  Right.  I assume that's what defense wants to argue in closing argument, though.

**THE COURT:**  I don't know.  I mean, I -- if they wanted to argue that, then they probably wouldn't have put up a defense expert who says that of course it's valuable.

I don't know.  I mean, if it were only, if it were only theft of trade secrets, then maybe it would be a more difficult question of whether to exclude this witness, because I see your point that it's just further evidence -- they're disagreeing on something that doesn't matter for purposes of deciding whether Mr. Ding is guilty of theft of trade secrets, right?  So like if it were relevant, if this expert's testimony were relevant to the theft of trade secrets counts, it would almost be like to impeach Dr. Sanchez or sort of chip away, try to chip away at the credibility of Dr. Sanchez by attacking him for assigning too much value to these trade secrets or something, but ultimately it doesn't matter whether it was a lot of value or a little value or a medium amount of value, right?

So I think it would be difficult --

**MS. PRIEDEMAN:**  Yeah.

**THE COURT:**  You know, it would be a difficult question if these -- if the government had only charged theft of trade secrets, and it may well be that you could get the witness excluded, but I'm just not seeing -- with the presence

of the economic espionage counts, I'm just not seeing how you can get this witness excluded.

**MS. PRIEDEMAN:**  Can I ask Your Honor?

So in terms of the -- I'm just trying to -- to the argument about that the, whether or not it could replicate being relevant to his intent to benefit, I mean, couldn't he -- even if he knew he couldn't replicate it wholesale, he could still be intending to use the trade secrets to benefit a foreign instrumentality.

**THE COURT:**  I think that would be pure speculation. I mean, I don't know.  I don't think there's any evidence of that, right?  I mean, the only evidence -- I don't know.  I want to go back and look at those slide decks that you were just referring to.  But, you know, is there evidence that he intended to benefit the Chinese government in a way different from starting a company that was going to build an AI supercomputer?  I don't know, but that's the main takeaway from the evidence that you've put in, that to the extent he intended to benefit the Chinese government, it was by starting a company that was going to create an AI supercomputer.  And if it wasn't realistic for him to create an AI supercomputer, then it's, you know, it's less -- it's more likely that he was just a BS artist.

**MS. PRIEDEMAN:**  So do you mean it -- whether or not he could create an AI supercomputer, full stop, setting aside

the trade secrets, or whether or not he could create an AI supercomputer using the trade secrets?

**THE COURT:**  The latter.

**MS. PRIEDEMAN:**  Right.  But so I think he could still be intending to build an AI supercomputer without replicating it wholesale, by using the trade secrets to help him do that, and in turn benefiting the Chinese government, and we think there is evidence to --

**THE COURT:**  That's true, but the difference between Dr. Sanchez's testimony and -- I'm so sorry I'm blanking on the name.  It's a new witness.

**MS. PRIEDEMAN:**  Mr. Novak.

**THE COURT:**  -- Mr. Novak's testimony, is that -- is about how difficult it would be to use these trade secret documents to build an AI supercomputer.  And I didn't take Dr. Sanchez to be saying that you can take these 105 documents and, you know, go build an AI supercomputer.  I didn't -- he didn't say anything remotely like that, right?  But I do think that the difference -- Mr. Novak is saying it's not near -- it's way harder than Dr. Sanchez is suggesting, and, you know, it's not all that realistic to think -- I mean, he's not saying this explicitly, but the message of Novak's testimony is it's not all that realistic to think -- to imagine Ding building an AI supercomputer with these 105 documents.

And maybe he's right, maybe he's wrong, I don't really

know, but it seem -- that seems relevant to the espionage counts.

But Ms. Walsh, did you have anything you wanted to say?

**MS. WALSH:**  So I think that Your Honor's correct that it is relevant to the intent element.  I would also note that intent is an element in the trade secret theft.  It's intent to harm Google.

And so, you know, if the value of these documents is de minimis and, you know, can't really set you up as a competitor, we think that's also relevant to that count in terms of trade secret misappropriation.

**THE COURT:**  That you have to have the intent -- I'm pulling up the jury instructions again.

**MS. PRIEDEMAN:**  The intent is also tethered to the taking of the trade secrets, so I don't know.  I just ...

**THE COURT:**  Let me just look at ...

**MS. PRIEDEMAN:**  Yes.

**THE COURT:**  Yeah, so just looking at the elements, I mean, the second element is that the defendant intended to convert a trade secret to the economic benefit of himself or someone else, right, and that the -- I think that Mr. Novak's testimony supports that element, right, but then the fourth element is the defendant intended or knew that the offense would injure any owner of that trade secret.

So what you're saying is if he stole the trade secret

without the intent to build an AI supercomputer, but with the intent to defraud investors in China, that that would -- that that did not -- that does not involve an intent to harm Google.

MS. WALSH: I would not put it exactly in those words, but, yes, that's essentially the sum of it. It's not an intent to harm Google.

THE COURT: Although I don't -- you know, and I don't know about that. I would want to think about that a little more, but I think merely stealing trade secrets from a company is, in itself, harmful. Like taking a trade secret outside a company is itself harmful, probably. But I don't -- I'm not sure it matters, really, because I think that it seems fairly clear to me that, again, a jury could easily view this evidence and conclude that Mr. Ding was a BS artist who was trying to defraud people in China. Maybe that's wrong, maybe that's not true, but I think a jury could view this from reviewing this evidence conclude that. And that that's why he stole -- you know, that he stole Google's trade secrets in connection with that, that effort to defraud people in China.

And, you know, if that's right, that makes it less likely that he's guilty of economic espionage. And so I do think that Mr. Novak's testimony is relevant and not confusing, or its relevance outweighs the potential for jury confusion for that reason.

Okay. Anything else?

All right.  The testimony is -- the motion to exclude Mr. Novak's testimony is denied.

And Mr. Novak, we'll see you on Monday, I guess, or Tuesday, or something like that.

So we've got Chandra is sort of in the middle of his testimony.  I think you said you were almost done.  And then what's -- did y'all talk about Eskridge going out of order, or not?

**MR. BOOME:**  We're going to have Mr. Mahmood here in the morning, Your Honor, to start immediately after Mr. Chandra finishes, and then we're moving Mr. Kavuri after Mr. Mahmood.

**THE COURT:**  Okay.  So it sounds like the government will be ready to rest before the lunch hour probably.

**MR. BOOME:**  It depends on how long Mr. Chandra's crossed for, but it's conceivable.  I bet we go into the afternoon, but it looks like we should be resting by the end of the day tomorrow.

**THE COURT:**  Okay.  So the defense should have -- and the defense should have -- you still plan to call Eskridge first?

**MR. FONDO:**  Your Honor, I don't think we've finalized the order, but he's still on our witness list, expected witness list, at this point.

**THE COURT:**  Okay.  It seems probably like you should have Eskridge and Novak or Eskridge and another witness or two

witnesses ready to go.

**MR. FONDO:** Understood, Your Honor. I think we'll will have Compton here in part just because it sounds like now there will at least be some time Monday afternoon, so we can get him on and off.

**THE COURT:** Sorry, who?

**MR. FONDO:** Compton is the summary witness.

**THE COURT:** Okay. Summary witness. But you should probably have another witness ready.

**MR. FONDO:** Understood.

**THE COURT:** Okay. All right. Very good.

Anything else to discuss right now?

**MS. PRIEDEMAN:** I mean, I just think we will probably have Dr. Sanchez testify in rebuttal, as well, just so the Court is aware of that.

**THE COURT:** Okay.

**MS. WALSH:** And I think we still have yet to set a time to discuss jury instructions, if ...

**THE COURT:** Yeah. I mean, part of it depends on when I get you the jury instructions.

**MS. WALSH:** Fair.

**THE COURT:** But I think probably we should plan on doing that Monday after the trial day, right?

Because it doesn't seem -- what will -- it doesn't seem likely that -- I think we can kind of bank on closings not

being Tuesday, right?  Because if we think about what's -- let's assume for the moment that the defendant is not going to testify.  So if the defendant doesn't testify, the -- and of course it's up to the defendant whether or not he testifies, I'm just discussing for scheduling purposes.  It seems like the government could rest before lunch or just after lunch.  The defense will have -- we will start with its witnesses on Monday.  The defense will have witnesses on Tuesday.  The defense could be done by Tuesday, potentially, and then you would have Sanchez come back up.  Presumably the testimony would be relatively brief.

And I wouldn't make you close on Tuesday even if we had time.  So I think we can safely assume that closings will not happen before Wednesday at the earliest.  So we could do jury instructions on Tuesday after the trial day or Monday after the trial day, but I think probably, assuming I get them to you this weekend, it probably would be better to do them Monday.

Does that sound right?

**MR. FONDO:**  Yes.

**MS. WALSH:**  Sounds good.  Yes, Your Honor.

**THE COURT:**  Yeah.  And it -- you know, and it will take a fair amount of work on your part, because as at least Mr. Chang knows, I don't like to adhere to the language of the Ninth Circuit model instructions all the time for two reasons: One, it often doesn't fit the facts.  The model, the standard

model instruction often doesn't quite fit the facts of the case, and it's helpful to the jury to tailor the instructions more to the facts, the evidence that came in.  And, two, often the Ninth Circuit model instructions just copy verbatim language from Ninth Circuit opinions, and the language that was written in those opinions was never designed to be -- to go to a jury, right?  And unfortunately the model instructions, in my opinion, don't do a good enough job of translating the language into something that a regular person might actually understand.

So I'm working hard on the jury instructions and trying to, you know, do both -- accomplish both of those things without obviously making any substantive changes to the law.  So, but it will require all of us, a lot of work on all of our part, to make sure that I'm not inadvertently making any substantive changes to the law.  So, or missing anything about the evidence.

So it will require a lot of hard work.  It might require a couple of drafts.  So I think probably Monday is the time to do it, just like Monday at 4:00 o'clock.

**MR. FONDO:**  Your Honor, one other thing just for clarification.  Given that Google witnesses are still testifying, there is a possibility we will call Google witnesses.  So I just wanted to be clear about that.

**THE COURT:**  Understood.

Okay.  Thank you.

**MR. BOOME:**  Thank you.

(Proceedings concluded at 3:50 p.m.)

---o0o---

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Saturday, January 24, 2026

_____

Stephen W. Franklin, RMR, CRR, CPE
Official Reporter, U.S. District Court