**Pages 1 - 102**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )   **NO. 3:24-CR-00141-VC**
                               )
LINWEI DING, a.k.a. LEON DING, )
                               )
          Defendant.           )
_____)

San Francisco, California
Tuesday, January 6, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue, Box 36055
                    San Francisco, California 94102-3495
                BY: **CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
                    **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    1301 Clay Street, Suite 340S
                    Oakland, California 94612-5217
                BY: **MOLLY K. PRIEDEMAN**
                    **ASSISTANT U.S. ATTORNEY**


        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**



REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant:

                     GOODWIN PROCTER LLP
                     525 Market Street
                     San Francisco, California 94105
                BY:  **DARRYL M. WOO, ATTORNEY AT LAW**
                     **DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
                     **RACHEL M. WALSH, ATTORNEY AT LAW**
                     **COLETTE A. LOWRY, ATTORNEY AT LAW**

                     GOODWIN PROCTER LLP
                     601 Marshall Street
                     Redwood City, California 94063
                BY:  **GRANT P. FONDO, ATTORNEY AT LAW**

                     GOODWIN PROCTER LLP
                     601 South Figueroa Street, Suite 4100
                     Los Angeles, California 90017
                BY:  **LORA J. KRSULICH, ATTORNEY AT LAW**

**Tuesday - January 6, 2026**                                        **10:06 a.m.**

                                **P R O C E E D I N G S**

                                    ---o0o---

                (Defendant present, out of  custody.)

         **THE COURT:**  All right.  Good morning, everyone.  Happy New Year.

         **ALL:**  Good morning.  Happy New Year, Your Honor.

         **THE COURT:**  First question:  How do you feel about the temperature in the courtroom right now?  Too warm?  It's okay?

         **MS. KRSULICH:**  It's fine.

         **THE COURT:**  Okay.

         **MR. CHANG:**  It's good, Your Honor.

         **THE COURT:**  Usually, it's too cold in here, and I asked Bhavna to crank it up a few weeks ago, and I wanted to make sure you-all didn't think it was too warm.

         **THE OFFICIAL COURT REPORTER:**  I think it's too warm.

         **THE COURT:**  You think it's too warm?

                                (Laughter.)

         **THE OFFICIAL COURT REPORTER:**  Maybe when we get all the jurors in here, it might be a little too warm.

         **THE COURT:**  Yeah, it probably will be.  And you're working the hardest of anyone.

         Yeah, I think we should probably have it down a little bit, like sort of in between where we had it before and where we have it now.

Okay.  So let's talk about the jurors.  There was one juror -- was it -- Bhavna, was it Number 38? -- who requested a postponement because their car broke down or something.

**THE COURTROOM DEPUTY:**  Yes.

**THE COURT:**  Yeah.  Okay.  And that was somebody who we were planning on excusing -- tentatively planning on excusing for hardship anyway.  So I just wanted to flag that for you-all, that they've now requested a postponement.

Did anybody have any objections to the order that I put out?

**MR. CHANG:**  We'll both approach, Your Honor.

Also -- good morning, Your Honor.

Also, before we begin, the Jury Office just sent one additional questionnaire --

**THE COURT:**  Okay.

**MR. CHANG:**  -- in the last five minutes.

I haven't had a chance to review it, but they just sent that to all of us.

**THE COURT:**  Okay.  We'll probably just have that person -- has anybody had a chance to review it?  Probably not.

**MS. LOWRY:**  He lives in Bakersfield.

**THE COURT:**  He lives in Bakersfield?

**MS. LOWRY:**  Yeah.  He lives in Bakersfield -- I'm sorry.

He lives in Bakersfield, and he said that for that

reason, he would be unable -- he answered "yes" for being unable to serve.

THE COURT:  Okay.  I assume that we will -- he shouldn't be on the -- he shouldn't even be on the rolls if he lives in Bakersfield.  So I assume that that person will be excused, and we'll have the Jury Office straighten out their registration with them.

Anybody remember what juror number that is?

MR. CHANG:  Let me look this up.

THE COURTROOM DEPUTY:  78.

THE COURT:  78?

MR. CHANG:  78, Your Honor?

Yes, 78.

THE COURT:  Okay.  I guess one other thing before I ask you if you have any objections to my tentative rulings is that I'm not sure I've ever seen so many -- such a high percentage of the jurors asking to get out of jury duty because of hardship, and it was a little surprising to me.  I'm not exactly sure what's going on.  Maybe it's the length of the trial or post-holidays or something like that.

But I am a little concerned about the number of jurors we will have in the courtroom on Wednesday morning.  So I have asked the Jury Office to see if they can get us some more prospective jurors in here on Thursday, if necessary.  It may be that we'll be able to pick a jury from the people we have,

but I asked them to -- I haven't gotten a response from them yet, but what I've asked them to do is try to get us some more people in on Thursday.

So with that, any objections to my tentatives?

**MR. CHANG:**  Yes, Your Honor.  I thought it would be helpful -- so, big picture, the Government largely agrees with the tentative rulings in your order that was issued last night.

I had a suggestion for how to proceed with today's hearing is, is perhaps we could talk through each of the different categories of jurors that you've excused, so hardship, postponements, cause, as well as the last category about further information with the Jury Office.

If that works for Your Honor --

**THE COURT:**  Sure.

**MR. CHANG:**  -- that's how we would suggest proceeding.

**THE COURT:**  Great.

**MR. CHANG:**  Let's start with the hardships.

I would say -- like I said, overwhelmingly, the Government, as I stated at the outset, largely agrees with Your Honor's decisions on these jurors.  We agree that -- we shared the same concerns, actually, so I'm glad that you asked the Jury Office to bring in some more folks on Thursday just in case.

We thought it would be helpful to just walk through individuals that we had some objections to and then also folks

that we had flagged as potential hardships for your --

THE COURT:  Why don't you start with the objections that you have, and then we can go to people who you want to add.

MR. CHANG:  Okay.  Thank you.

So the first one was Juror Number 15.  He mentioned that he had a history of panic attacks, but he stated in the questionnaire that those were largely in the past and under control.

Our suggestion was that we should --

THE COURT:  Let me -- just one second.

MR. CHANG:  Yes.

THE COURT:  So I just pulled up the questionnaire.  Let me look at it.

[As read]:

". . . history of panic attacks.  They are mostly under control, but stressful situations can trigger anxiety and make it difficult to concentrate for long periods."

Okay.

MR. CHANG:  So our suggestion was we should at least have him come in because it seemed like that had been largely in the past and --

THE COURT:  I think that -- I think that probably makes sense.

Mr. Fondo, what do you think?

MR. FONDO:  Your Honor, we would -- we disagree.  But I would also note that it's not clear that this individual writes or speaks English fluently as well.

THE COURT:  Really?  Are you sure we're looking at the same one?

MR. FONDO:  I believe so.  Number 15.

THE COURT:  Yeah.  I don't see any -- oh.

[As read]:

"English is not my first language, and complex legal discussions are difficult for me."

Oh, yeah, I forgot about that.  I mean, that's -- I remember now that what I was thinking was this is no ordinary trial; right?  I mean, talk about complex legal discussions.  I mean, this whole thing is going to be a really complex discussion.  And if we have a person saying that "Complex legal discussions are difficult for me," this doesn't -- maybe there is some sort of trial that they could do, but this doesn't seem like the right one for them.

MR. CHANG:  We also saw that as well, Your Honor.  I will note that he's a software engineering manager and has been for the last six years and has a master's in computer science, and so I think it's at least worth calling him in.

Of course, if he does present with those language issues, we would excuse him for hardship or for cause on that

basis; but we think that on the basis of the questionnaire, he should at least come in.

THE COURT:  Okay.  We'll bring him in and include him in the pool.

So we'll not excuse Juror Number -- sorry.  Which?

MR. CHANG:  Juror Number 15, Your Honor.

THE COURT:  We'll not excuse Juror Number 15 for hardship at this time, on the papers at least.

MR. CHANG:  Thank you, Your Honor.

THE COURT:  Okay.  Who else?

MR. CHANG:  Juror Number 24.  This is -- she's ten weeks pregnant and flagged that she had nausea and fatigue.

THE COURT:  Right.

MR. CHANG:  We think we should at least have her come in.  She did answer "yes" to Question Number 10, which is the question about whether she'd be able to serve without hardship; and so on that basis, we think we should at least call her in and see if she's amenable to serving.

THE COURT:  What about the ADHD?  Does that bother you?

MR. CHANG:  That was not a concern unless during voir dire, of course, she provides further clarity on that issue, Your Honor.

THE COURT:  Okay.

Mr. Fondo?

**MR. FONDO:**  We agree.

**THE COURT:**  Okay.  Sounds good.  We will bring her in.  Remind me the juror number again?  24?

**MR. CHANG:**  24, Your Honor.

**THE COURT:**  Okay.  We will not excuse 24 for hardship on the papers.

Who's next?

**MR. CHANG:**  Juror Number 95, recent recovery from a bone marrow transplant.

**THE COURT:**  Sorry.  Hold on.  Let me -- let me get there.

95.  Okay.  You're going to say that there are no prolonged periods of physical exertion, so -- so why are we excusing them?

**MR. CHANG:**  Yes, Your Honor.  And also, he flagged that he was going to his sister's bachelorette.  So presumably, if he can attend that, he can sit here for a couple of weeks for jury service.  At least worth having him come in.  Of course, if the symptoms are more serious than described in the questionnaire, we would excuse him for hardship.

**THE COURT:**  Well, but what about the travel plans?  I mean, why shouldn't we -- I don't know -- when is January 22nd?  That's, like, a Thursday, I think.

**MR. CHANG:**  Yeah, it's a Thursday, end of the second week.  Remember, the 23rd is a dark day tentatively, and so

that actually fits with the three-day weekend.

So we actually thought that he may be able to serve, depending on when he has to drive to the bachelorette party. It's not a flight.  It's a driving-distance party.

**THE COURT:**  Okay.  Yeah, I mean, that's fine.  It might be that they would be entitled to a postponement, but I think it's probably fine to bring them in and talk more about that with them.

Is that okay with you?

**MR. FONDO:**  Your Honor, no, actually.  So I think postponement makes sense.  We're talking about someone that obviously had a pretty significant procedure.  I don't -- I don't know what's going to happen at the bachelorette, whether he's going to be sitting on the couch or what.  But it's prepaid.

But most importantly, Your Honor, I think there's just a real risk.  It's a serious procedure.  And there's obviously other things going on beyond just the transplant.  So we would recommend postponing it and have him serve another time.

**THE COURT:**  Okay.  Hold on a second.  Let me look at it a little more closely.

(Pause in proceedings.)

**THE COURT:**  I'm laughing at the answer to Question Number 26.

All right.  I think we can -- I think we can bring

them in and --

**MR. CHANG:**  Thank you, Your Honor.

**THE COURT:**  -- talk to them further.

**MR. CHANG:**  Those were the only objections from the Government.  We did flag two additional prospective jurors that we believe should be excused on hardship, but we can either talk about that now or we can wait.

**THE COURT:**  Yeah, go ahead.

**MR. CHANG:**  Okay.  Juror Number 32 noted that he is homeless.

**THE COURT:**  Yeah, I saw that.

**MR. CHANG:**  And he was not on the list of hardship excusals.

**THE COURT:**  Yeah.  But he doesn't -- he doesn't seem to be suggesting that his status as a homeless person precludes him from serving on the jury; right?  I mean, he's -- this person, you know, they -- they actually seem like they might want to serve upon learning that they get a per diem for their jury service and, I believe, can also be reimbursed for transportation.

Bhavna, do you know that?

I think they get some sort of transportation reimbursement or advance or something like that.

**THE COURTROOM DEPUTY:**  I'm not sure.

**THE COURT:**  Okay.

**THE COURTROOM DEPUTY:**  I can ask the Jury Office.

**THE COURT:**  Yeah.  We'll find that out before tomorrow.

But it's not obvious to me at all that this person doesn't want to serve because of -- because they're homeless.

**MR. CHANG:**  Understood, Your Honor.  We just thought because the individual is homeless, that that would be a hardship -- and unemployed as well, that having him serve would be a hardship.

**THE COURT:**  Okay.  I think we should -- I think we should bring them in.

**MR. CHANG:**  Okay.

And then the other one was Juror Number 37.  And this person actually may end up falling into that last category of having the Jury Office just call --

**THE COURT:**  Okay.

**MR. CHANG:**  -- this individual.

But he flagged that he is a full-time student, in response to Question Number 17.  We screened students, but he may have just fallen through the cracks.  I'm not entirely sure.  So...

**THE COURT:**  Yeah.  I feel like a lot of people fell through the cracks of -- or fell through the screen that we set for the Jury Office.  I'm not really sure what happened.

**MR. CHANG:**  I agree, Your Honor.  But -- so this one

was purely on the basis of him being a full-time student. We've excluded those folks from the jury pool.

MR. FONDO: Your Honor, I would note, he didn't seek a hardship, and I think we should have him come in and we can find that out.

THE COURT: Yeah, I agree. If they don't want out, that's fine.

All right. So that was hardships. Now, what about cause?

Or maybe I should go to Mr. Fondo and see. Let's stick with hardships --

MR. CHANG: Okay.

THE COURT: -- while we're in that mindset and see if Mr. Fondo has any objections to any of the other tentatives and if he has anybody to add.

MR. FONDO: Yes, Your Honor. So on the category of hardships, Juror Number 26, she's a single parent and her concern was childcare, but her child is 15. And so given the hours of when we're going to be in trial, I don't know that that should disqualify her.

THE COURT: Where is her -- okay. So [as read]:

"Son, 15 - School drop off: 8:15. Pick-up: 4:00. Sports: 6:00. Single parent household. No alternative adults available."

What does she do for a living?

**MR. CHANG:**  She's an elementary -- sorry, for the court reporter.  Elementary schoolteacher.

**THE COURT:**  That's also a pretty big deal to have to get a sub for a month.

**MR. CHANG:**  We agree, Your Honor.  We'd be inclined to excuse her for hardship.

**MR. FONDO:**  Your Honor, it would concern us that we're excluding schoolteachers based on their profession.

**THE COURT:**  Yeah.  Well, I think it's the combination of being a single parent and having a kid and having responsibilities for the kid and being a schoolteacher. I think that that -- and the length of the trial; right?

I think for all of those reasons, this person will be excused for hardship.

**MR. FONDO:**  All right.  Your Honor, the next one is Juror Number 46.  They have indicated they have a job that they're required to attend, but it's not clear that someone else can't do it or that they're not paid for jury service. And they also -- it appears that some of that work is at night, as I interpreted it.  So we just think that they shouldn't be excluded just on that grounds alone.

**THE COURT:**  Okay.  Well, where is their answer on that?  Oh, 15.

Oh, yeah, so they are a consultant for Oakland Unified School District and Hayward Unified, coordinating mandatory

state assessments and trainings.

[As read]:

"I'm the only person managing the evening ESL program at the Adults school."

MR. CHANG:  This juror also flagged back pain in Question Number 9 as well.

THE COURT:  I saw that, but I don't think that --

MR. CHANG:  Okay.

THE COURT:  I mean, they can stand.  If they need to stand during the trial, they're welcome to do that.

Aah, I see they went to UC Santa Cruz.

MR. CHANG:  Fellow Banana Slug.

THE COURT:  Yeah.

Yeah, I think we can bring this person in.  I have a feeling they will probably be able to articulate a hardship, but I tend to agree with you that we should bring them in.

So this is 46; right?

MR. FONDO:  Yes, Your Honor.

MR. CHANG:  Your Honor, may I be heard on this one?

THE COURT:  Sure, sure.

MR. CHANG:  So this is -- we agree with your hardship excusal.  We would also have concerns with cause on this juror based on the questionnaire.  We can discuss that when it comes time, but I did want to flag that.

THE COURT:  Oh, that's -- no, that's worth discussing

now, because the way I -- if I decided that I was going to excuse somebody for hardship, I didn't really look to see if they had a cause problem.  So let's discuss that now.

MR. CHANG:  Okay.  We believe that based on his questions and his responses -- in particular, I would flag the answer to Question Number 35, whether the individual has strong feelings about Google.  He stated under penalty of perjury, quote [as read]:

"Google is a big part of the fascist Tech Oligarchy that is moving to control all of U.S. society."

THE COURT:  Is that inaccurate?

(Laughter.)

MR. CHANG:  We would respectfully say that is inaccurate.

THE COURT:  Okay.

MR. CHANG:  And also, of course, Google is the victim company and the trade secret owner in this case.  And so for that response -- and there are a number of other responses -- but that response in particular, we believe that this individual should be struck for cause.

THE COURT:  Let me look at some of these other answers.

MR. FONDO:  So I assume, Your Honor, as well that if the Government had concerns about people who may not like

Google, the Government is going to share our concerns about everybody who expressed concerns about --

THE COURT: China?

MR. FONDO: -- China.

And that's a much more direct correlation than the alleged victim.

MR. CHANG: Yeah. I would say on that point, Your Honor, just so the Court has the Government's position on this, is not everyone who has a strong opinion on Google should be struck. As you -- I'm sure you saw going through the questionnaires, folks have very strong opinions on Google, on artificial intelligence and machine learning.

We do think there is a line that is crossed, though, in calling the victim company part of the fascist tech oligarchy under penalty of perjury. We believe that's enough to strike a juror for cause.

THE COURT: What if they came in and said, "Look, I hate Google, but that doesn't have anything to do with whether trade secrets were stolen from Google. And if trade secrets were stolen from Google, I'd be willing to convict and follow your instructions and follow the law"?

MR. CHANG: I would say there's enough on the papers to strike him. Of course, if he came in and said that, we might be in a slightly different situation. I just feel like this is the most egregious answer, if you look at some of the

other answers.  We have some concerns about whether this juror can be fair and impartial.

THE COURT:  Okay.

Mr. Fondo?

MR. FONDO:  We disagree, Your Honor.  And I think -- so I just think it's an overly aggressive position to take to exclude a juror in this context.

THE COURT:  Well, I mean, I guess I have a feeling that this juror probably will be excused for cause; but I think that -- you know, my philosophy with respect to cause -- right? -- is that when somebody is in the comfort of their own home, they're willing to spout off and not think too carefully about what they're saying.  When they come to the courtroom and they appreciate the gravity of the responsibility of jury service, they tend to be more thoughtful about their responses.

And I've had people who have said pretty outlandish stuff like this, who have come in and sort of made clear that they weren't thinking that carefully about what they were saying and that they are committed to serving.

I've had plenty of other people who came in and acted the same way in court as they acted on paper.  And I think this probably will be one of those people, but I -- but maybe not.  And I think that they could rehabilitate themselves.  So let's bring them in.

**MR. FONDO:**  Thank you, Your Honor.

The next one is Juror Number 68.

**MR. CHANG:**  Which juror?

**MR. FONDO:**  68.  This is the FedEx worker.  So this individual gets paid for 80 hours and then just, per company policy, it appears he just has to ask.  I don't know whether it would be granted to do the additional week or so.  But it doesn't seem like there's a per se bar for them.

**THE COURT:**  Okay.  So can you articulate a little more what it is -- what the policy appears to be?

**MR. FONDO:**  So the policy appears to be -- is -- as we understand it, is that they get 80 hours paid, which is, in this case, given the juror's jury selection, is going to be about -- or, sorry -- time is about six hours, is most of the -- hopefully most of the trial, but recognizing it's probably not all of it.

The letter, the FedEx policy says that if you need more time, you have to get permission from HR.  Given it's FedEx, it's a large company, they have a pretty liberal policy.

**THE COURT:**  I could call them.

**MR. FONDO:**  Excuse me?

**THE COURT:**  I could call FedEx.  I could call the general counsel's office and ask that they make sure that this person gets paid for their jury service.

**MR. FONDO:**  Exactly, Your Honor.  And so that's our

perspective, that it's probably pretty likely if he -- this juror asks, that the company would grant it.  And that's our interpretation of their policy.

THE COURT:  Were there any other issues with this juror?

MR. FONDO:  Not from a hardship perspective, no.

MR. CHANG:  Your Honor, I do have the policy in front of me.  It says that they will be paid for up to -- not to exceed 80 hours per calendar year unless more time is required by law.  And then if jury participation extends beyond ten days, you should contact human resources.

So that appears to be the standard FedEx policy, that after two weeks, they're not going to be paid unless there's some exemption.

THE COURT:  Okay.  I've had a lot of success with contacting general counsel's offices for large companies and getting them to agree that somebody should be paid for the entirety of their jury service.

MR. CHANG:  Understood.

On this juror, we also have cause concerns, then, if we are not going to excuse him for hardship.

THE COURT:  Okay.  Talk to me about those.

MR. CHANG:  This person has some very strong views in terms of the administration, which he's certainly entitled to, but he did note that it would be difficult for him to serve

impartially.

I would flag the response to Question 44, which is the open-ended sum-up question at the end of the questionnaire.  He writes, quote [as read]:

"Given we have a racist government in control currently, I don't have a lot of faith that this isn't necessarily a conjured-up charge or actually some excuse to offset some security shortcomings by the U.S. Government.  I'd like to take it at face value, but given the extremes of the current administration, it's hard to treat it with the attention it deserves and the impartiality."

**THE COURT:**  Seems like we should ask him if his views would change based on the knowledge that the case was brought three years ago or whatever it was.

**MR. CHANG:**  Okay.

**THE COURT:**  All right.  So we will bring Juror Number -- I agree about Juror Number 68.  Let's bring Juror Number 68 in.

Who's next?

**MR. FONDO:**  Your Honor, Number 84.  Number 84 is retired, married with someone --

**THE COURT:**  Sorry to interrupt.

This is making me feel like I've gone soft because usually I'm the one who is not terribly sympathetic to people's

hardship requests, but you-all are being more sympathetic -- or less sympathetic than I am, I guess.

Go ahead.  Sorry.

**MR. FONDO:**  No, no.  No problem.

So as to Number 84, this is an individual who's retired.  Their spouse is retired.  They apparently have a mother who is -- needs a fair amount of attention on two days a week.

**THE COURT:**  Oh, yeah.

**MR. FONDO:**  But there's no indication that the spouse could not cover for those two days a week.  And so we just think they should come in and we can learn more about what the actual situation is.

**MR. CHANG:**  We agree with the Court's ruling on this. He has a 99-year-old mother, and Monday and Tuesdays are his responsibility to feed, cleanse, and keep her company.  We think he should be excused for hardship.

**MR. FONDO:**  I would also note, in addition to the wife being at home, it appears that one of the -- oh, actually, I take that back.  So his wife is also retired and at home.  So there's clearly somebody there, a responsible adult who could cover those six hours for those two days.

**THE COURT:**  The other thing is that those -- we had those -- indicated that we would have tentative dark days of the 23rd and the 30th.  Is that what I said?

**MR. CHANG:**  That's right, Your Honor.

**THE COURT:**  I think that's confirmed now.  So I think those days will be dark.

And maybe we can tell this person that those days will be dark and they can switch days with their spouse or whoever else is responsible for caring for his mother.

So let's bring this person in.

**MR. FONDO:**  Thank you, Your Honor.

**MR. CHANG:**  I would flag a cause before we move on, then --

**THE COURT:**  Yeah.

**MR. CHANG:**  -- as well, Your Honor.

This person has some very strong opinions in terms of Question 40, as well as Question 44.

                    (Pause in proceedings.)

**THE COURT:**  I don't think those are a basis for cause.

**MR. CHANG:**  Understood, Your Honor.

**THE COURT:**  Now, he's -- the one answer is, Question 44 [as read]:

     "Since this is a case against a Chinese
    national, I do not think it is appropriate for me to
    participate in this case."

I mean, that's not correct; right?  It is not inappropriate for this person to participate in this case because the defendant is a Chinese national.  It may be that

they come in and express such strong views and articulate that they can't be fair.  But I don't -- I just don't think that that -- I don't think that these responses come close to a basis for excusing the person for cause on the papers alone.

**MR. FONDO:**  Thank you, Your Honor.

**THE COURT:**  So that is 86?  Am I right?

**MR. FONDO:**  84, I believe.

**THE COURT:**  84.  Okay.  So we'll bring 84 in.

All right.

**MR. FONDO:**  The next one is 98, Your Honor.

So this is an individual who expressed that they have severe ADHD --

**THE COURT:**  Yes.

**MR. FONDO:**  -- which makes it hard to focus.

So I think it's just a question of the degree.  And we've obviously had people with this issue on juries before, and so I just -- it's hard to assess is that something that really is going to preclude this individual from being a juror.

**THE COURT:**  I hear you.  I mean, I guess my view is that if somebody has severe ADHD and says that it'll interfere with their jury service, unless we think they're lying about their ADHD, like, we shouldn't bring them in.  That's my view.

**MR. FONDO:**  I understand, Your Honor.

If I could just -- we've had situations like that in the past and where, through discussion, the person has gotten

comfortable, "Well, if there's breaks, et cetera, I think I can do it."  And we've seen that in a number of different circumstances, not just with ADHD.  So that would be the only counterpoint that I would provide for the Court, and it's just hard to assess based on the response alone.

THE COURT:  Okay.  Any comments from --

MR. CHANG:  We agree with the Court's ruling, Your Honor.

THE COURT:  Okay.  Yeah, I think I'm going to excuse this person for hardship on the papers for the reasons I've stated.  So that is 98.

Okay.

MR. FONDO:  And then, sorry.  There's two more.  I went out of -- a little bit out of order.

THE COURT:  No, problem.

MR. FONDO:  I apologize.

So Number 13, this is a doctor who has a lot of patients lined up for the month.  But many of these doctor facilities have people who can cover; and they, in fact, address it so frequently, whether it's vacations or otherwise.  And so it's not clear to me that this person would not have someone who would be able to cover for them, particularly, again, we have -- it's not five -- we're not going five days a week most weeks and we do have a 10:00 to 3:00 schedule for jurors.

**THE COURT:** When's the last time you tried to get a doctor's appointment?

**MR. FONDO:** The other day, actually. I went on --

**THE COURT:** How far out in advance did you have to go?

**MR. FONDO:** It was over the holidays, so it was about two to three weeks.

**THE COURT:** That's amazing. That's remarkable.

In the Bay Area, the medical field is so impacted. I mean, if you're looking for a new primary care physician, you often have to wait six months for an appointment. And it's very hard to get in to see a doctor. And a lot of these facilities are understaffed and there's a shortage. And what they're doing is very important. They're actually helping people more than lawyers do. And so I would not -- I would be inclined to excuse this person for hardship.

**MR. FONDO:** All right, Your Honor. If I may, I just -- again, I'm concerned about excluding categories of people because -- so we're essentially saying that every doctor is -- essentially every doctor is probably going to get excluded and --

**THE COURT:** No, not necessarily. It depends what kind of doctor and what they articulate in their questionnaire responses.

But based on this particular response and this particular type of doctor, I think they should be excused.

**MR. FONDO:**  And then as to Juror Number 20, it just -- I understand why the Court struck this person.  But it's just not clear whether their company will allow for more than the time allotted, the two days; and so we just think it's worth asking whether they can get paid for the additional time or not, because clearly the company does provide some compensation for jury service.

**THE COURT:**  What about the hearing impairment?

**MR. FONDO:**  There's another juror that's also expressed a hearing impairment as well.  So if that concerns the Court, we should talk about that individual as well.

**THE COURT:**  Yeah.  I mean, it all depends what they say in response to their question; right?

**MR. CHANG:**  I have the employee handbook for her employer right here, Your Honor.  She's going to get paid for two days.  It's in Section 9.7.  She submitted it as documentation.

**THE COURT:**  Oh, yeah.  And I remember I looked up Bay Area Community Services because I was sort of on the fence about this one.  But I think the problem is, this is -- this is an organization that serves truly disadvantaged -- it's a non-profit.  It serves truly disadvantaged people, homeless people, people with serious mental health issues.  And to -- you know, there is no way that this company is going to be able to pay this person for their jury service for a month, and it's

going to be very disruptive to the services that this company provides.

So I'm excusing this person for hardship.

**MR. CHANG:**  Thank you, Your Honor.

**MR. FONDO:**  Understood, Your Honor.

And then I think, if I'm not going out of order here, the next category for us to address is the people that we think the Court should reconsider and excuse for --

**THE COURT:**  To add to the list?

**MR. FONDO:**  Yeah.

**THE COURT:**  Yeah.  Okay.

**MR. FONDO:**  So the first one is Number 18.  This individual says they'll be out of town from January 22nd through the 25th.  It's not clear --

**THE COURT:**  Number -- sorry.  Number what?

**MR. FONDO:**  Sorry.  Number 18.

**THE COURT:**  18?  Okay.  Where is their response?

**MR. FONDO:**  So their response is [as read]:

". . . I'll be out of town for" --

**THE COURT:**  In response to what question?

**MR. FONDO:**  Sorry.  I don't have the question number in front of me.

**MS. WALSH:**  I would guess Number 9, but let me double-check.

**THE COURT:**  They say they have a medical procedure --

oh, I see.  Okay.

[As read]:

". . . medical procedure scheduled for 12/23."

That's not an issue.

[As read]:

"And I'll be out of town from 1/22 to 1/25."

But they didn't specify what it is.  I mean, and they didn't -- if it's, like, some work trip that can be postponed or something.  And then, also, we'll be dark on the 23rd.  So I think this person is worth bringing in.

**MR. FONDO:**  Okay.  Understood, Your Honor.

**MR. CHANG:**  We agree, Your Honor.  Thank you.

**MR. FONDO:**  The other one was Number -- oh, sorry.  I already went through that one.

Yeah, 96.  Sorry.  This is a retired caregiver for someone who is a 25-year-old adult, and their wife works full-time.  So my understanding is that that person is taking care of, unfortunately, an adult full-time.

**THE COURT:**  Yeah.  I think the reason that I didn't put this person on the list is that it's just a little bit vague.

[As read]:

"All weekdays, I am responsible for taking care of my adult child who lives 1.5 hours away from my primary home."

But then there were some other answers.  Let me see here.

(Pause in proceedings.)

**MR. CHANG:**  Your Honor, just to --

**THE COURT:**  They say they're a full-time -- they also work full-time.

**MR. CHANG:**  Your Honor, just to remind you, because I had to remind myself, you flagged him as someone the Jury Office should reach out to to get a little bit more information.

**THE COURT:**  Oh, okay.  Yeah.  And I think that -- I think that the reason I flagged this person as -- to reach out to is:  Well, tell me a little bit more about your situation.  You say that you -- you say that you work full-time, but you also say that you take care of your adult child full-time who lives 1.5 hours away.  Can you explain a little more -- explain your situation a little more?

So I was going to propose to have the Jury Office call and ask them for a little more information and then sort of decide -- decide after that.  We could get on Zoom real quick in the afternoon, or something like that, and talk about the response and talk about whether to bring them in.

**MR. FONDO:**  That's fine, Your Honor.

**MR. CHANG:**  That works for the Government, Your Honor.

**THE COURT:**  Okay.  What else?  Anyone else?

**MR. FONDO:** That was it, Your Honor.

**THE COURT:** Okay. Now let's go to the cause excusals.

And you heard me articulate my philosophy about this. Does the Government have any objections to the six we identified as cause excusals?

**MR. CHANG:** Does the Court want to discuss postponement first, or do you want to --

**THE COURT:** Oh, sorry. Go ahead, yeah.

**MR. CHANG:** Okay.

**THE COURT:** I thought -- sorry. In my head, I had postponements and hardships together, so I thought we had covered that. But go ahead.

**MR. CHANG:** Understood. Apologies, Your Honor. We broke those up in our outline.

**THE COURT:** Okay.

**MR. CHANG:** On the postponements, we wanted to flag Juror Number 74.

**THE COURT:** 74. Okay.

All right.

**MR. CHANG:** And this individual flagged, in response to Question Number 12, that his wife is traveling for a work travel commitment and he's responsible for some childcare for the first couple of days of trial.

**THE COURT:** Yeah.

**MR. CHANG:** But unclear whether there's help, family,

et cetera.  And this person lives in San Francisco.

And so we think it's worth at least having the person come in tomorrow to see if getting childcare for those first couple of days of trial is a possibility.  They otherwise seem to be ready and able to serve.

**THE COURT:**  Okay.  I think that probably makes sense.

Mr. Fondo?

**MR. FONDO:**  We don't have a strong objection.  I think it's -- with young kids, it can be a challenge in this circumstance, but we're --

**THE COURT:**  Yeah.  Okay.  Yeah, I mean, if we're not -- yeah, I think it's worth having further discussions.  So we'll -- we will not excuse -- we will not give 74 a postponement on the papers.

**MR. CHANG:**  And then 97 we wanted to flag as a potential postponement.  This is -- this individual works as a nurse in the NICU, and also flag that she's taking antidepressants.  Could be a person for postponement or the Jury Office to reach out to and get a little bit more information.

**THE COURT:**  I think the antidepressant thing doesn't concern me.

NICU.  Was it Kaiser?  Yeah, Kaiser.

**MR. CHANG:**  Yes, Kaiser, Your Honor.  I believe -- yes, Kaiser for the last four months.

**THE COURT:** Yeah. I mean, you know, it may be that on the same logic that I used for that doctor, that this person should be excused for hardship, but they don't say much about it, and I think there's an argument for bringing them -- bringing them in to talk with them further about it.

I don't know. Mr. Fondo, what do you think?

**MR. FONDO:** I actually tend to agree with the Government on this one.

**THE COURT:** Yeah, I figure you do, looking at some of the person's substantive responses.

**MR. FONDO:** But I hadn't focused on it, to be honest with Your Honor. I think -- it's just hard to say.

I'd agree with you that the antidepressant is not an issue, unless there's something significant. It's just hard to say with the position, nursing position.

**THE COURT:** Yeah. Okay. I think we can excuse -- we can excuse this person for hardship. So we'll add 97.

All right. Anyone else?

**MR. CHANG:** Those are the only hardship prospective jurors that we wanted to discuss, Your Honor.

**THE COURT:** Any other hardship or postponement people?

**MR. FONDO:** No, Your Honor.

**THE COURT:** Okay. So then cause. Are there -- does the Government object to the six people I proposed to excuse for cause?

MR. CHANG:  Again, similar to hardship, the Government largely agrees with the Court's tentative.

There were a couple that we wanted to discuss.

THE COURT:  Okay.

MR. CHANG:  Juror Number 2.

THE COURT:  All right.

MR. CHANG:  We believe, based on the substance of the responses in his questionnaire, that he should not be struck for cause.

THE COURT:  Okay.  Let me refresh my recollection on this one.

(Pause in proceedings.)

THE COURT:  You don't think this person should be struck for cause?

MR. CHANG:  That's right, Your Honor.

THE COURT:  So their current job is chief technical officer -- right? -- for the company they work for?

MR. CHANG:  Yes.

THE COURT:  And they worked at Google for two different periods.  And, in particular, they worked as an AI software engineer at Google and, now, chief technology officer of an AI company.

Isn't that just too close to the -- too close to the facts of this case?  I mean, he might even have -- they might even have overlapped with the defendant.  I don't know how long

the defendant worked there.

**MR. CHANG:** Well, I would say the fact that someone has worked at Google or knows folks who work at Google is not disqualifying.

**THE COURT:** I totally agree with that. But I just thought this one was so close to what we're talking about here. I have a hard time -- I mean, I don't know what -- we'll see what the defense says about it but...

**MR. CHANG:** Yeah. I would say the key question is whether he can be fair and impartial. The last time he worked at Google was 2023. Yeah, 2023. So two and a half, three years ago.

And in Question Number 44 --

**THE COURT:** As an AI software engineer.

**MR. CHANG:** That's right, but there are a lot of -- as the Court will learn, there are a lot of AI software engineers at Google. We're talking thousands, maybe tens of thousands of people who are working on some component of Google's AI computing infrastructure, from a hardware, software perspective.

He does state, in response to Question 44 [as read]:

"I believe my prior work at Google should not bear significantly on this decision . . . ."

And he has some pretty thoughtful and nuanced answers about whether he can be fair and impartial in general in this

trial.

So we think he's at least worth coming in.  Obviously, if he comes in and says, "Look, I can't be fair and impartial," we would agree that he should be struck for cause; but we believe that he should be at last brought in and questioned on whether he can be a fair juror.

**THE COURT:**  Okay.

Mr. Fondo?

**MR. FONDO:**  Your Honor, we have the exact same concerns that you had, and that's why we were not surprised to see that --

**THE COURT:**  I'm going to excuse this juror for cause.

Who's next?

I was curious if you were going to say:  Well, I want a Google AI software engineer because a Google AI software engineer will know that my expert, Mr. Pflaum, is right that Google has not done a good job of protecting its trade secrets.

**MR. FONDO:**  I think, Your Honor, if I felt they had an unbiased view, we might agree with you on that; but it was clear from reviewing this that that is not -- we didn't view them as unbiased and open to it.  So...

**THE COURT:**  Okay.  Any other objections from the Government?

**MR. CHANG:**  Juror Number 14.

**THE COURT:**  All right.

**MR. CHANG:**  I assume -- and the Court, please correct me if I'm wrong, but I assume the response to Question 44 was what raised --

**THE COURT:**  Let me refresh my recollection.

(Pause in proceedings.)

**THE COURT:**  Oh, it was more 33, that -- I think that being exposed to news coverage about the case is not disqualifying automatically; but the specificity with which this person described the allegations gave me concerns that they -- they would probably be biased.

But I hear what you're saying.  I mean, you know, I guess the -- if we were to ask this person, "Look, are you able to" -- "are you able to apply the reasonable doubt standard and put the Government to its burden of proof and not assume that anything you saw in the news coverage or read in the news coverage was true, could you do that?"  And if they said, "Yes, I'm confident I could do that," then maybe we would not strike them for cause.

**MR. CHANG:**  That was exactly our thought, Your Honor.

**MR. FONDO:**  Your Honor, if I may, so, one, 23 obviously concerns us, their response, "Why wouldn't" -- regarding a defendant not testifying [as read]:

"Why wouldn't they want to defend themselves?  It makes them look guilty."

**THE COURT:**  But we have lots of people who said --

that's an example of what I was talking about before.  We have lots of people who say that, you know, sort of off the cuff when they're responding to a question like this; and then when we talk to them about it in the courtroom, they get it.  So that doesn't bother me.

MR. FONDO:  Okay.  And I do it in the overall context.

And then in addition, for the very reasons that you stated, the answer to 29 [as read]:

"I will not be fair in this case.  I already have an opinion" -- "a biased opinion on the conviction."

Frankly, I also don't want to be going through voir dire with all the other jurors there, having this juror discuss what they read in the paper and saw on TV.  And so -- and likewise --

THE COURT:  Well, we could -- I mean, that could be handled by saying, "You've indicated in your questionnaire response that you saw some coverage.  I don't want you to talk about that but," and then ask them questions about it.

MR. FONDO:  I think it would be hard to adequately probe someone's bias without getting into the substance of it and what they heard and what they saw.

THE COURT:  Okay.  All right.  I think this is a close question, but I'm going to excuse this person for cause on the papers.

(Co-counsel confer off the record.)

**MR. CHANG:**  My co-counsel did mention a suggestion.  I know Your Honor is well aware of it.  For someone like this, it could be someone we question outside the presence of the other jurors.

**THE COURT:**  I understand.  I'm a little less concerned about that and a little more concerned with the specificity of their response about the news coverage and the definitiveness of their response about whether they can be fair.

**MR. CHANG:**  Okay.  Understood, Your Honor.

Juror Number 107.

**THE COURT:**  107.  Okay.  Give me a moment.

(Pause in proceedings.)

**THE COURT:**  All right.

**MR. CHANG:**  You excused this juror for cause, and I wanted to understand the Court's thinking on this one.

**THE COURT:**  All right.  Let me refresh my recollection.

(Pause in proceedings.)

**THE COURT:**  Oh, it was Question Number 15, the English.

[As read]:

"I can read, write, speak English, but being my third language, sometimes finds hardship understanding what is being talk about."

And I thought that, again, particularly given the subject matter of this case, that probably is -- this is probably not the case for them, even if they are able to serve on some juries in some cases.

**MR. CHANG:**  Understood.  We thought that might have been the issue.

I would just note, she did complete the questionnaire and completed the responses.  Noted in response to Question --

**THE COURT:**  Yeah, but I just read the response to Question 15, and it indicates problems with English.

**MR. CHANG:**  Yeah.  But she is an admin assistant at UCSF, and the other responses are in English and relatively thoughtful and fulsome, if you look at the other parts of the questionnaire.  And so we think she's worth at least calling in.  Obviously, if she has the comprehension issues that you flagged, then she should be excused, but we think she's at least worth calling to come in.

**THE COURT:**  Okay.

Mr. Fondo?

**MR. FONDO:**  We share your concerns, obviously, about the language barriers.  It's not her second language.  It's her third language.

We would also flag the answer to Question Number 40, which says [as read]:

"U.S. should protect its intellectual property

from China or Chinese nationals.  Chinese are very clever, and given the chance, they always want to be on top."

**THE COURT:**  Yeah.  I don't necessarily know if that would be disqualifying.  It might be something to probe further.

But I guess I'm concerned enough about the language issue that I would excuse this person for cause.

Any other objections from the Government?

**MR. CHANG:**  Those are our only other objections to the cause excusals.

**THE COURT:**  Okay.  Any additional cause challenges?

**MR. CHANG:**  Yes.  Juror Number 45.

**THE COURT:**  All right.

**MR. CHANG:**  The responses to Questions 27, 28, and 29, which appear to be identical.

**THE COURT:**  Okay.  Anything else?

**MR. CHANG:**  That was the primary basis.

**THE COURT:**  Okay.  I don't think that those responses, on their own, are a basis for disqualifying somebody on the papers.

**MR. CHANG:**  All right.  Juror Number twenty- --

**THE COURT:**  When was this -- by the way, when was this case brought?  When was this case charged?

**MR. CHANG:**  It was -- the original date of indictment

was --

**MR. BOOME:**  March 2024.

**MR. CHANG:**  -- March of 2024, Your Honor.

**THE COURT:**  And when was Mr. Ding arrested?

**MR. BOOME:**  Right around that same time, Your Honor.

**THE COURT:**  Like December or something?

**MR. FONDO:**  No.  Same date, Your Honor.

**MR. BOOME:**  Same date.

**THE COURT:**  Same date.

Okay.  I assume nobody has any objection to saying during jury selection that the case was brought in March of 2024.

**MR. CHANG:**  No, Your Honor.

**MR. FONDO:**  No, Your Honor.

**THE COURT:**  Okay.

**MR. CHANG:**  Juror Number 29.

**THE COURT:**  Okay.

**MR. CHANG:**  So, wanted to flag the language issue. Went through and flagged, to the extent we could, anyone who answered "None of the above" to Question 8, which is the question about whether they can read, write, or speak English fluently.  This person responded twice, I believe, because they submitted two questionnaires "None of the above" for Question 8, so language issues.

And then separately, on Question Number 35, responded,

quote [as read]:

"I hate Google because they sell my personal information."

And then on Question 44 wrote, quote [as read]:

"I don't trust Google.  Maybe all is a lie."

And so for those two separate bases, language as well as the responses on Google, we would request that this juror be excused or stricken for cause.

**THE COURT:**  Okay.

Mr. Fondo?

**MR. FONDO:**  I don't share any of the concerns as far as the language issue.  I'm not sure I totally understood the point.  But regardless, I think he was able to answer the questions.

So, and then we disagree about the last point as well.

**THE COURT:**  Yeah, I think there is a potential language issue here, just from looking at the response to the language question and looking at the response -- the responses that they did give.

It also seems like this might be somebody who's just trying to get out of jury duty.

Yeah, I think we should bring this person in.

**MR. CHANG:**  Juror 42.  This is the individual, Questions 35 and 44.

And Question 35 states that Google is, quote

"A de facto monopoly with a great deal of unchecked power to mine general information."

Question 44 says, quote [as read]:

"I have little to no sympathy for Google."

**THE COURT:** Okay. I don't think that's a basis for disqualifying somebody on the papers.

**MR. CHANG:** Juror Number 75 is the last one.

**THE COURT:** Okay.

**MR. CHANG:** Apologies, Your Honor. I may have the wrong juror number. Let me take a look at my notes.

(Pause in proceedings.)

**MR. CHANG:** Juror Number 76, Your Honor. Apologies.

**THE COURT:** No, problem. Give me a sec.

(Pause in proceedings.)

**THE COURT:** Okay.

**MR. CHANG:** On the response to Question 39, he wrote that he would object to the very notion of theft of intellectual property and would instead prefer it described more plainly as unauthorized copying.

The defendant's been charged with theft of intellectual property. If the juror does not even believe in that notion, we believe they should be struck for cause.

**THE COURT:** Okay. I don't think that's a basis alone for excusing them for cause. I think that it would be appropriate to ask them about that, obviously.

**MR. CHANG:** That's it for the Government, Your Honor.

**THE COURT:** Okay.

Mr. Fondo?

**MR. FONDO:** Your Honor, as far as -- thank you.

As far as the cause list, I just had a question as to Number 105. There was some confusion on our end, which I think your office clarified. But I just want to make sure, 105 versus 49; or if I could get the name of the person that you're intending to exclude on that because they had the same last name, just different first names.

**THE COURT:** Brandon -- maybe I shouldn't say their name out loud --

**MR. FONDO:** I'm sorry.

**THE COURT:** -- on the record.

**MR. FONDO:** Okay.

**THE COURT:** So 105.

**MR. FONDO:** So that's the individual we thought you intended to exclude, and we're fine with that.

**THE COURT:** What gave you -- what gave you concern that I might have been mixing it up with some other juror?

**MR. FONDO:** There is some -- we thought there was some confusion with 49 and 105 as far as with the questionnaires, which, again, we got clarified late last night or this morning. I just wanted to be --

**THE COURT:** Okay.

**MR. FONDO:**  -- sure the record was clear on that.

**THE COURT:**  Let me just refresh my recollection.

(Pause in proceedings.)

**MR. CHANG:**  Your Honor, after you've had a chance to review, I'd like to make a brief statement on 105.

**THE COURT:**  Okay.

(Pause in proceedings.)

**THE COURT:**  Oh, yeah.  This -- no.  My intention was to exclude 105 because they work for -- they work in AI for Google's competitor.

**MR. FONDO:**  Okay.  So it's the individual that's 29 years old?

**THE COURT:**  Yeah.  The person who works for Meta --

**MR. FONDO:**  Okay.

**THE COURT:**  -- yeah, who's 29 years old.

**MR. FONDO:**  That was our understanding.  Okay.  That's fine.

**MR. CHANG:**  Your Honor, can you explain that ruling?  We actually thought you may have struck him for another reason.  So can you explain why working in the AI space is a cause excusal in this context?

**THE COURT:**  This is a trial about whether the defendant stole Google's AI trade secrets.  And a prospective juror works for Google's -- one of Google's primary competitors in the AI space.  And it's a trial about Google's trade

secrets.

MR. CHANG:  Understood.

THE COURT:  Okay.

MR. FONDO:  Thank you, Your Honor.

So, is -- we had -- so, as far as jurors that we would ask you to reconsider regarding cause, meaning we believe there's cause, Number 3.

So in particular, one, they own Google stock, but also --

THE COURT:  What?

MR. FONDO:  The response to Question Number 31 is they own Google stock, but more importantly, the responses to Question 36 and 37 we believe show a concerning bias.

THE COURT:  You said this is Juror Number 3?

MR. FONDO:  Correct, Your Honor.

THE COURT:  Okay.  I'm concerned that I might not have their full response here.

MR. CHANG:  His responses were only in the SurveyMonkey.  The PDF was incomplete, Your Honor.

THE COURT:  Oh, okay.  Let me go into that.

(Pause in proceedings.)

MR. FONDO:  Your Honor, we had also flagged the response to Question Number 23, just as an additional factor --

THE COURT:  Okay.

MR. FONDO:  -- recognizing your statements earlier

about that question.

**THE COURT:**  Let me just flip there real quick.

(Pause in proceedings.)

**THE COURT:**  Okay.  I'm finally on Number 3.  And then -- yeah, so I've got -- the version that I have, it goes straight from Question 16 to Question 45.  So I don't have it.

Can you read me the responses?

**MR. FONDO:**  Certainly.  In response to Question Number 23 about not testifying [as read]:

"Yes, you look guilty if you can't explain.  Truth will set you free."

31 is [as read]:

"I own Google stock."

36 is [as read]:

"U.S. innovates, China replicates, and Europe regulates."

Number 37 is, regarding Chinese nationals [as read]:

"Nationals need to be screened and monitored."

**THE COURT:**  Okay.  I think that that -- I think that that is not enough on its own to excuse somebody on the papers.

What else?

**MR. FONDO:**  Number 15, Your Honor.

**THE COURT:**  Number 15.  Okay.

**MR. FONDO:**  They've applied for a number of positions at Google.

**MR. CHANG:**  This is the software engineering manager we discussed at the beginning, Your Honor, with the history of panic attacks.

**THE COURT:**  Right.  Where did we come out on this person?

**MR. CHANG:**  That we would call him in.

(Co-counsel confer off the record.)

**MR. CHANG:**  I may have misremembered, but I --

**THE COURT:**  No.  I think you're right.

But, so where -- what's the basis for the cause challenge?

**MR. FONDO:**  They've applied to positions at Google a number of times, Your Honor.

**THE COURT:**  What answer is this?

**MR. FONDO:**  Number 30.

**THE COURT:**  Wait.  What juror are we talking about now?

**MR. FONDO:**  Juror Number 15.

**THE COURT:**  And the question is -- oh, Question 34.  Okay.

**MR. FONDO:**  It's Question 30, Your Honor.

**THE COURT:**  I think it's Question 34.

**MR. CHANG:**  It's Question 34, Your Honor.

**THE COURT:**  Yeah, I don't think this is a basis for a cause excusal.

**MR. FONDO:**  Your Honor, next is Juror Number -- let's see -- Number 49.

**THE COURT:**  Okay.

**MR. FONDO:**  Response to Question 26.

**THE COURT:**  26?  I think your numbering is off because that can't be the one.  That's the one about:  Has anybody close to you worked in the legal system?

**MR. FONDO:**  So let me -- I'll read you the response that concerns us.  I apologize if I have the numbering wrong.

[As read]:

"Yes.  I have strong political and belief founded in probability that, due to limited government resources, for any criminal case brought to a county or federal court, the accused is almost certainly guilty.  In my day-to-day job as a data scientist, I make countless more decisions with far less degree of perceived certainty than my expectations of criminal guilt.  I also believe government resources should not be used in efficient ways and spent on assessing" --

**THE COURT:**  Can we hold on a second?  I just think you might have the wrong -- so this is 49?

**MR. CHANG:**  Yeah.  I don't have that.

**MR. FONDO:**  Oh, sorry.  You know what?  Because we have the 105/49.  So that's my confusion.  I apologize,

Your Honor.

**THE COURT:**  Okay.

**MR. FONDO:**  I think you have this individual listed as 105.

**THE COURT:**  Okay.  And they're excused for cause already.

**MR. FONDO:**  Okay.

Number 53, Your Honor.

**THE COURT:**  Okay.

**MR. FONDO:**  Question Number 37.

**THE COURT:**  53, we're giving a postponement to.

**MR. FONDO:**  And then I think that's it, Your Honor.

**THE COURT:**  Okay.  All right.  So then we will -- I will instruct the Jury Office to call those three jurors, 55, 89, and 96, to get further explanation.

Do you want to leave it to me to decide whether to excuse them for hardship, or do you want to get on Zoom sometime in the afternoon?  Either one is totally fine with me.

**MR. FONDO:**  We're fine either way, Your Honor, defense.

**MR. CHANG:**  We are also fine either way, Your Honor.

**THE COURT:**  Okay.  Well, I'll hear back from the jury. If I think there's anything tricky about it, I'll get you all on Zoom to talk about it.  And if I think it's clear, I'll make a call one way or the other.

**MR. FONDO:**  Thank you, Your Honor.

**THE COURT:**  Okay.

**MR. CHANG:**  Thank you.

Do you know when -- does Your Honor have a sense of when the Jury Office may get back to you on the additional jurors for Thursday, if that may be a possibility?

**THE COURT:**  I don't.

Bhavna, do you know if we've heard back from them?

**THE COURTROOM DEPUTY:**  Yes.  So the SurveyMonkeys were sent out, and they will send over what they can tomorrow afternoon.

**MR. CHANG:**  Okay.  Thank you.

**THE COURT:**  Great.  All right.  Anything else?

I have at least one other thing to discuss, which is the Pflaum thing.

Anything else you-all want to discuss right now?

**MS. KRSULICH:**  Yes, Your Honor.  I have three housekeeping matters and one that's a bit more substantive for the Court.

**THE COURT:**  Okay.

**MS. KRSULICH:**  Should I list through them?

**THE COURT:**  Sure.

**MS. KRSULICH:**  Okay.

**THE COURT:**  Yeah, let's just have a list first.

**MS. KRSULICH:**  Okay.

**THE COURT:** Just rattle them off, and then we'll see if the Government has anything.

**MS. KRSULICH:** Great.

The first is just logistics related to voir dire and procedure for questioning and then --

**THE COURT:** Okay.

**MS. KRSULICH:** -- exercising strikes.

Second is scheduling for Mr. Pooley.

**THE COURT:** Sorry. Scheduling for who?

**MS. KRSULICH:** Mr. Pooley. He is a defense expert on --

**THE COURT:** Okay.

**MS. KRSULICH:** -- security.

And then the third is the detailed summary that the Court ordered the Government to provide regarding testimony that would require sealing and the timing of receiving that.

**THE COURT:** Okay.

**MS. KRSULICH:** And the fourth is some -- a question regarding redacting certain exhibits.

**THE COURT:** Sorry. Can you give me the last one again?

**MS. KRSULICH:** Redacting certain exhibits. Question and argument regarding that.

**THE COURT:** Okay. Any items from the Government, additional items from the Government to discuss?

**MS. PRIEDEMAN:** I think a couple additional items.

One would be defense's filing from last night regarding the relevancy of certain patents and publications.

And then...

**MR. BOOME:** And, finally, Your Honor, discussing our procedure for dealing with document objections outside the presence of the jury.

**THE COURT:** Okay. And then before we launch into those things, Bhavna asked me to confirm on the record which jurors are being excused for hardship or postponement, which ones are being -- which ones we're going to call, and which ones are being excused for cause.

**MR. CHANG:** Thank you, Bhavna.

**THE COURT:** And so everybody pay attention. So I'm going to do hardships and postponements at the same time. And I'll specify when it's a postponement. Otherwise, it's a hardship.

So hardships, Number 1. This is people who are being excused on the papers.

Number 1, Number 4, 6, 8.

12, 13, 17.

20, 21, 22, 23, 26, 27, 28.

35, 38.

47.

50; 52; 53, and that's a postponement; 56; 57; 58, and

that's a postponement; 59.

64, 65, 69.

73, and that's a postponement.

81, 83, 88.

91, 92, 93, 94, 97, 98.

100; 101, and that's a postponement; 102, postponement; 106, postponement.

And then, finally, 114.

Is that consistent with what you-all have now?

PJ, is that consistent with what you have?

(Discussion off the record between the law clerk and the Court.)

**THE COURT:** The other thing we could do is, if you need more time to confirm, you could spend some time looking at it at a break and confirm after the break.

**MS. KRSULICH:** Yeah, that makes sense.

**MR. CHANG:** That makes sense, Your Honor.

**THE COURT:** Okay. So let me just identify the people we're going to call and the cause excusals.

So we're going to call Number 55, 89, and 96.

And the cause excusals are 2, 14, 82, 103, 105, and 107.

**MR. CHANG:** Sorry, Your Honor. Can you repeat the last few numbers?

**THE COURT:** 82, 103, 105, 107.

**MR. CHANG:**  Thank you.

**THE COURT:**  And then Juror Number 78, we also said -- that was the one who says they live in Bakersfield; is that right?

**MR. CHANG:**  That's right, Your Honor.

**THE COURT:**  So that person will be excused as well.

Okay.  And you can look at your records, and if you think I missed something, we can talk about it after a break.  And we'll take a break pretty soon.

But let me just be transparent with you about Pflaum and what my current options that I'm weighing.  And I'm still undecided on Pflaum, but there's one option that I'm weighing that I wanted to give you an opportunity to give your thoughts on, if you like.

So Option A is to exclude him.  And as I said, I think that that is -- this is a very close question and that's a real possibility.

Option B is to allow him to testify.

Option 3 could be further *Daubert* testimony that we would do probably during the trial.  So the idea would be that the Government's expert would testify at trial.

Then we'd probably have the Government's expert stick around and testify in a *Daubert* -- in a further *Daubert* proceeding in the late afternoon.

And then, presumably, Pflaum would be there as well,

and Pflaum could have another opportunity to get on the stand in a further *Daubert* hearing to try to explain himself.

And I could make a decision after that whether to admit Pflaum or not.

And the thinking there -- and as I said, I'm undecided.  I'm still thinking about it.  I'm still researching.  I'm still going through his testimony and stuff.

But the rationale for that third option, for Option C, would be that it's -- you know, it is the proponent's burden to show that the proposed testimony is reliable, the proposed opinion is reliable; and the rationale would be that the defense has not yet met that burden and to give them another opportunity to do so in the manner that I just described.

So what are people's reactions to Option C?  I know that the Government prefers Option A and the defense prefers Option B, but what is your reaction to Option C?

**MS. PRIEDEMAN:**  My reaction to Option C is that, of course, it's the defense's burden to show that Mr. Pflaum is reliable, and they've had ample opportunity to do that.

The Government, at this point, has now filed four motions to exclude Mr. Pflaum.  Mr. Pflaum has supplemented his report, I believe, four times.

**THE COURT:**  So I understand all that, and that's a very reasonable argument.  I don't mean to dismiss it at all.

But I guess what I'm asking about is, if I go with

Option C, is there anything kind of procedurally problematic about that?  The reason I'm floating it as an option is I wanted to give you an opportunity to say:  No, you can't do it that way because X, Y, or Z.

**MS. PRIEDEMAN:**  Understood, Your Honor.

I do think there are procedural problems with that, one of them being, given Mr. Pflaum's report and his testimony thus far, introducing concepts that are completely unrelated to the technology at issue, if Mr. Pflaum is going to be allowed to testify, there are concepts and things that we would want to front with our expert.

For example, edge TPUs, they're not relevant to the technology in this case, as Your Honor knows.  But if Mr. Pflaum is allowed to testify, if he is allowed to talk about patents related to edge TPUs, given how complex that technology is, the Government would consider fronting some of those terms, some of that technology with Dr. Sanchez.  And so I think it would really shape how we front some of those concepts.

I think there's other examples of that as well. Mr. Pflaum, a lot of his testimony is based on unrelated processors, so CPUs, or other companies' technology that's not relevant.

Again, we'd like to keep this trial streamlined.  I don't think there's any point in fronting that or getting into

that in Dr. Sanchez's testimony, given how unrelated it is; but if we know, for example, Dr. Pflaum is going to testify, I think that there's -- it would make sense to front a lot of that so the jury is not hearing about it for the first time from Mr. Pflaum.

**THE COURT:**  That makes sense.  But couldn't we work around that by, like, having Sanchez testify towards the -- begin his testimony towards the end of the day?  He can begin his testimony, and then we can do the *Daubert* proceedings later in the day, and then he could -- Sanchez can wrap up his testimony the next day?

**MS. PRIEDEMAN:**  That --

**THE COURT:**  You'll know -- I mean, the idea would be, I would rule later that night, and you would -- and I would probably just say:  I'm excluding him or I'm allowing him and a written opinion to follow, or something like that.

**MS. PRIEDEMAN:**  Understood, Your Honor.

I think if the Court was going to go with this approach, I think it would make sense to maybe do the *Daubert* hearing before Dr. Sanchez starts testifying, just given the sealing portion of his testimony.  His testimony is already going to be a little disjointed, and we're doing that so it's not prejudicial.  But to introduce this as well, I think that would be -- it would be pretty disjointed.

**THE COURT:**  Okay.  And Sanchez is testifying -- like,

what's your ordering of witnesses at this point?

**MS. PRIEDEMAN:**  He's near the middle, I would say.

**THE COURT:**  Near the middle.

So who are your first several witnesses?  Like, do you have an order planned out by now?

**MS. PRIEDEMAN:**  I think we have not completely decided, but it would most likely be Mark Lohmeyer first.  He's a Google witness.  And then some of the other Google folks.

**THE COURT:**  Okay.

**MS. PRIEDEMAN:**  We haven't decided.  But I think he would -- I think Dr. Sanchez would probably go, like I said, kind of squarely in the middle.  So we're thinking potentially, like, at the earliest, the end of the first week.

**THE COURT:**  Okay.

**MS. PRIEDEMAN:**  And I think -- I mean, just, Your Honor knows how the Government -- I do think that Mr. Pflaum's testimony -- I'm not going to argue it.  You know all of the arguments.  But I do think for both sides, having clarity on whether or not Mr. Pflaum is going to testify will shape a lot of things.

**THE COURT:**  Ms. Krsulich, what do you -- oh.

**MS. WALSH:**  I'm sorry.

**THE COURT:**  You were standing up here just a second ago.

**MS. WALSH:**  She was, yes.

**THE COURT:**  Don't do that to me.

All right.

**MS. WALSH:**  Apologies, Your Honor.  Rachel Walsh for the defense.

So with respect -- I mean, as Your Honor noticed -- or noted previously, we would, of course, want to go with Option B with respect to Mr. Pflaum.

With respect to Option C, I don't think we see an issue with it procedurally, though a lot of Mr. Pflaum's testimony is going to be shaped by the way that Mr. -- or the way that Dr. Sanchez's testimony comes in because it is ultimately the Government's burden of proof to show that the trade secrets are trade secrets, et cetera.  And so he will, to some extent, be responding to what Dr. Sanchez says.

So we would probably favor doing it sort of in the middle of Dr. Sanchez's testimony, kind of as you first suggested, for that reason, and also because my understanding is that Mr. Pflaum is currently unavailable for the first week of trial.  Like, he's committed to be somewhere else on another engagement.  He's available after that.  But that's kind of the sort of procedural roadblock that we're running into.

**THE COURT:**  You weren't having -- planning on having Pflaum be here during Sanchez's testimony?

**MS. WALSH:**  So we were going to have him here the second week of trial, and we were going to provide him with

dailies.

THE COURT: Okay.

Okay. Any final comments from you?

MS. PRIEDEMAN: Your Honor, if the Court is going with Option C, I would want to think a little bit about when the timing would make sense, because now that I'm also thinking about it, I think that it will be very helpful for the Court to hear some of Dr. Sanchez's testimony.

THE COURT: That was the purpose.

MS. PRIEDEMAN: Yeah.

THE COURT: That was why I proposed it that way.

MS. PRIEDEMAN: Yeah. I think that it will be very clear that Mr. Pflaum's opinions are not reliable once you hear from Dr. Sanchez.

THE COURT: And I was also thinking that it would be most helpful, to hear Dr. Sanchez's testimony, to the jury. And then there may be some stuff that it doesn't make sense for him to say to the jury without knowing whether Pflaum is testifying; right?

And then so he could get on the stand in a *Daubert* hearing and you can have Sanchez say whatever he wants to say about Pflaum to me -- right? -- and then Pflaum can have one last chance to show that he knows what he's talking about.

That would be -- that was why I was -- that's why I came up with that procedure.

**MS. PRIEDEMAN:** Yeah. I understand all that, Your Honor. I think that -- just, like I said before, I think that just even looking at the filing from last night, the defense has narrowed the number of documents; but there's just a lot of -- there's so much nuance and unrelated technology in there that I think knowing if that's what's going to happen would be helpful for both sides to prepare.

**MS. WALSH:** And, Your Honor, with respect to last night's filing, we disagree that it's unrelated technology.

The standard for showing that something's a trade secret is whether it is known or readily ascertainable. And so you're also drawing on the knowledge of what an engineer would know or not know based on what's public and what they can do as a substitute technology and things like that.

And, you know, this would be a very different case if the trade secrets had been disclosed, you know, to the letter in public, but that's not the case here.

And so what we have presented is a narrowed list of some documents that we -- or the documents that we seek to admit in Mr. Pflaum's testimony that show that portions of the trade secrets are -- have been made public or they're readily ascertainable from basically what's out there and a few technological alternatives that somebody could seek that shows that the alleged trade secrets do not obtain value by being secret.

**THE COURT:** I understand.

Okay. I'll give it -- I'll keep working on it. I'll give it further thought, and I'll do my best to let you know -- well, certainly, at some point this week I'll let you know what my decision is, and I'll try to do it as soon as possible.

**MS. WALSH:** Thank you, Your Honor.

**THE COURT:** I understand that it's a difficult position to be in, not knowing whether that's going to be part of your case.

Okay. Maybe let's talk about -- let's talk about a couple more things before we break for lunch. And it sounds like we'll have to come back because you have some other stuff you want to talk about. But -- well, let's see how fast all this stuff goes.

So mechanics of voir dire, what do you want to know? Do you want to just sort of go through the outline of how it's going to go?

**MS. KRSULICH:** Sure, Your Honor, that would be helpful. We have some specific questions, but if the Court would orient us as to how you expect it to go.

**THE COURT:** Yeah. So we'll have -- it seems like we're going to have approximately 50 prospective jurors in here tomorrow, and they'll be lined up. Juror Number 1 is where Jim is sitting there, and Juror Number 8 is right in front of Jim, going all the way down. And then they'll be in the gallery on

the left side here, my left, lined up in order with Juror

Number -- what is it?  15? -- sitting closest to the aisle, and

then going down and then in that order.

And we'll start off with hardships.  I'll ask folks --

you-all will have an opportunity to introduce yourselves and

everything, and then I'll start off with hardships, and then

we'll sidebar to discuss any further hardship excusals.

And then I will -- and then we'll pass out a list --

do we have a list prepared of involved individuals?

**MS. KRSULICH:**  Yes, Your Honor.

**THE COURT:**  Okay.  We'll pass out that list to the

rest of the jurors after hardship excusals have been done so

they can look at it over the course of the day and see if they

think they know anybody.

And then I'll ask a few questions of my own, a few

raise-your-hand questions, and follow up with any jurors who

have questions or concerns.

I'll ask about language issues since -- you know, if

that doesn't come up in hardship, just to make sure that nobody

is concerned about language issues.

I think I'll ask a question or two about -- I mean,

I'll certainly ask a generic question or two about willingness

and ability to follow the law and follow my instructions.  And,

you know, your job is to find the facts and my job is to

instruct you on the law and you're required to apply the law as

I give it to you, and do you have any problem doing that.

I'll ask -- I'll probably ask a couple of general raise-your-hand questions about Google and your feelings about Google, feelings about China and Chinese nationals.

And that's already more than I usually do; right?  I like to turn it over to the lawyers as soon as possible and not -- you know, be less involved in it myself.  But that's already more than I usually do.

But are there any other topics you think it would be useful for me to hit with the jurors by way of a raise-your-hand question before turning it over to you-all?

**MS. KRSULICH:**  Would the Court consider any questions regarding media coverage and exposure to media?

**THE COURT:**  Sure.  Yeah.  I'm trying to think if there were any other themes that came out from the questionnaire responses that would be worth my touching on before we -- what about the Trump Administration?

**MR. CHANG:**  We would be okay with that, Your Honor.

**THE COURT:**  I mean, I don't know how many people railed against the Trump Administration.  But, you know, it could be worth my clarifying that these charges were brought in March of 2024 in response to some concerns being expressed about the Trump Administration.

**MR. FONDO:**  Your Honor, the only point I would have is that the current administration has continued to prosecute this

case.  So it has been endorsed by the current administration. So I think it would be a little bit misleading to imply otherwise.

**THE COURT:**  Well, by -- when you say "endorsed," you mean they're still prosecuting the case?

**MR. FONDO:**  They're still prosecuting the case.

**THE COURT:**  Isn't that self-evident?

**MR. FONDO:**  Yes.  Well, it is.  But if you're going to make a point about when it was started -- I guess I would go back to -- you asked the question earlier.  Maybe I -- apologies, but I'm sort of rethinking my --

**THE COURT:**  That's okay.

**MR. FONDO:**  -- my response, is that it sort of flags to the jury issues or concerns.

And these are individual issues.  We should hear about individual jurors' concerns.  But I don't know that we should be saying, "Don't worry, Jury.  This case was started before the current administration."

**THE COURT:**  Well, I mean, in a lot of criminal cases -- I don't do this, but in a lot of criminal cases, the indictment is provided to the jury; right?  So they know when the case was indicted.  I don't think -- I can't imagine that there's anything wrong with the jury learning when the case was indicted.

But I guess what I -- so here are the ground rules.  I

won't ask a general raise-your-hand question about the Trump Administration because I don't know if that many people railed against the Trump Administration in their responses; but to the extent that it comes up in voir dire, as you-all are doing voir dire, you have permission to ask the jury, you know -- a juror, "Does it alleviate your concerns to know that this case was brought in March of 2024?"  I don't think there's anything wrong with that.

Any other general raise-your-hand questions that you think I should ask the jurors before turning it over to you?

**MR. FONDO:**  Your Honor, if I could just go back to -- the other point is that this indictment has been superseded, and the economic espionage charges were brought, I believe, during the current administration.  So there are new, significant charges.

**THE COURT:**  When were the economic espionage charges brought?

**MR. FONDO:**  I believe they were after --

(Co-counsel confer off the record.)

**MR. FONDO:**  Yeah.  So it was after the administration took office.

**THE COURT:**  That's true.  But it was the same U.S. Attorney as before -- right? -- in February of 2025.

Yeah.  I mean, maybe we need to think a little -- because what we don't want to do is go down the rabbit hole

about when this was charged and when that was charged and who's in the U.S. Attorney's Office.  I mean, we don't want to go down that rabbit hole.

Do you have any comments on this?

**MR. CHANG:**  Your Honor, the Government generally agrees with the approach that you've suggested.

Our thoughts on this would be that we can let the dates speak for themselves.  And there should be some general questioning about the administration from the Court.  Not surprisingly, the Government may have some questions about the federal government, DOJ, and FBI as part of our voir dire as well.  But we don't think there needs to be additional commentary other than the fact of when the indictment was initially filed.

Like a question along the lines of what you suggested was actually not too dissimilar from something I was likely going to ask tomorrow, and so we believe questioning and comments along those lines would be appropriate.

**THE COURT:**  Okay.  Let me think a little bit more about that, and I'll -- I think probably -- one thing that this argues in favor of perhaps is me doing a question about Trump so that I can kind of control what is said about it, and -- but let me think about it a little more, and I'll get back to you.

**MR. FONDO:**  Thank you, Your Honor.

**MR. CHANG:**  Thank you, Your Honor.

No further suggestions for questioning from the Court, Your Honor.

**THE COURT:**  Okay.  And then so I'll ask some raise-your-hand questions.

It may be time to break for lunch at that point.  I'm not sure.  We'll see how it goes.

Oh, I forgot one thing.  After hardships -- right? -- we'll have each juror stand up and introduce themselves and, you know, say -- this is after hardships and before my general raise-your-hand questions.  We'll have each juror say their name, their town, their educational background, their current job or their most recent job.  And that's -- and then if they want to offer some fun fact about themselves, they can do that.

Mr. Chang has suffered through that before.

But it helps you get to know the jurors a little bit; right?  Help you identify who the clowns are.  And then I'll do my questions, and then I'll turn it over to you-all.

What did I say about -- what amount of time did I say I would give you-all for voir dire?

**MS. KRSULICH:**  One hour, Your Honor.

**THE COURT:**  Okay.  And like I said, if it's being used inefficiently, I'll cut you off before then; and if it's being used efficiently and I think it's appropriate for you to have more time, I'll let you go over a little bit.  I'm not going to be, you know, super tight about that.

And then we'll -- then we'll do -- then we'll probably let the jurors out.  Then we can argue about cause challenges, and then you can announce your peremptory challenges.

And we'll take a little break before you have to do your peremptory challenges.  So you can take a 15-minute break or something like that so you can look at your stuff.

**MR. CHANG:**  How many alternates does the Court intend on impaneling?

**THE COURT:**  I think we should have four alternates, given that we're, like, post-holiday and probably people are more likely to get sick and stuff like that.  Usually, I like to only have two, but I think we should have four in this case.

And we have to figure out a way for the four extra jurors -- or I guess it would be two extra jurors -- to sit comfortably.  I don't know if it's, you know, one of these chairs here, that we can give them a couple of these chairs and have them sit back there or maybe even up here or something like that.  We'll need to think about that.  But I don't want them sitting on those wooden benches.

**MS. KRSULICH:**  Is the Court anticipating all questioning happening before argument about cause strikes and peremptories?  There's no opportunity for additional questioning after that?

**THE COURT:**  Correct.

**MS. KRSULICH:**  Okay.

**MR. CHANG:**  Ms. Priedeman flagged a good point. There's going to be a fair amount of evidence shown on the TV screens.  So for the alternates, we just need to make sure they're in a position where they can see the evidence.

**THE COURT:**  Yeah.  I don't know if we can move that screen, if we can turn that.  I mean, if the jurors are sitting over there and we turn that screen, I don't know if that works.

**MR. CHANG:**  Possibly.  The only part is, obviously, portions are going to be -- portions of the testimony, the screens will be turned off for the gallery.

**THE COURT:**  Oh, yeah.

**MR. CHANG:**  So that may be -- I'm just not sure in terms of logistics, Your Honor.

**THE COURT:**  Yeah.  So we'll have to think about that. I guess that's one of the downsides of this courtroom, is we don't have quite the space, flexibility that we have in other courtrooms.

I'm moving in March, by the way, to Seeborg's courtroom, and Seeborg's moving up to Alsup's chambers.

Okay.  Well, I'll let you-all work with Bhavna on that and work with each other on that and see what you can figure out.

**MS. KRSULICH:**  Thank you for the guidance.

**THE COURT:**  Yeah.

So, yeah, then we'll do -- and some people do it where

there's a sheet, there's a peremptory sheet, and you pass the sheet back and forth in front of the jury.

I'd just rather use it as an opportunity to give the jury a break and have them mill around outside so you can just announce -- take turns announcing your peremptories.

**MS. KRSULICH:**  Okay.

**THE COURT:**  Okay.  That's voir dire.

**MR. BOOME:**  Your Honor, I see you looking at the list. Is there any way that I could ask that the documents issue just briefly get bumped to the top of the list before lunch?

**THE COURT:**  Sure.

**MR. BOOME:**  Thank you.  It'll be very brief.

So the parties, per your order, have exchanged -- regarding your November 25th order, the Government provided a list to the defendant, and Mr. Fondo provided a list of the exhibits where we agree.  So we now know where our outstanding disagreements are.

**THE COURT:**  Are you talking about redactions, or what are you talking -- which are you talking about now?

**MR. BOOME:**  I'm talking about the documents found on Mr. Ding's devices and in his accounts --

**THE COURT:**  Okay.

**MR. BOOME:**  -- and the foundation that the Government intends to lay for those exhibits.

You expressed a preference, Your Honor, that we not

have prolonged foundation and objection battles --

**THE COURT:**  Oh, yeah.

**MR. BOOME:**  -- in front of the jury, and so I wanted to suggest a procedure.

**THE COURT:**  Okay.

**MR. BOOME:**  You suggested that you'd be interested in a proffer from the Government about our evidentiary foundation on the areas where we have outstanding disputes, and so I wanted to ask about a time when we could do that.

If the Court -- I see the Court has a morning calendar on Friday.  If you have any time on Friday afternoon, I think this process will take about two hours, hopefully less.

If that's not a viable option for the Court, we expect Special Agent Valladao to testify most likely on Wednesday. And so Tuesday after the session or Wednesday before the session and/or, you know, maybe we break it up, those could also be options.  But I think Friday would be preferable unless that's not an option for the Court.

**THE COURT:**  I just don't remember, and I don't have my calendar in front of me because I left my iPad at home today.

Bhavna, are you aware of any obstacle to getting together Friday afternoon?  I know that our CMC calendar in the morning is gargantuan.

**THE COURTROOM DEPUTY:**  You have a meeting scheduled for 3:00 p.m.

**THE COURT:**  Well, why don't we -- let me ask you this: What about -- would Thursday work?  Thursday, we have only one hearing in the morning at 10 o'clock.  That hearing may go a while.  It may be, like, an hour-long hearing or something like that.  But we could do -- we could do, like, 1 o'clock on Thursday or something.

**MR. BOOME:**  Friday would be a strong preference or even during the trial as opposed to Thursday afternoon.

If that's the Court's best option, we'll make it work.

**THE COURT:**  Okay.  Let me see if I can make Friday work and I'll get back to you.

**MR. BOOME:**  Okay.  Thank you, Your Honor.

**MR. FONDO:**  Your Honor, if I may, just on that, so the Government is correct, we've been meeting and conferring, passing information back and forth.

What we still think is missing and would be helpful in advance of the either Thursday or Friday hearing -- and I think it is better to do it before the trial -- is if they could -- for the ones that are still in dispute, if they could provide sort of the proffer in advance to us, it's possible we could resolve some before we get here.  And so we would ask for that information in advance.

**THE COURT:**  I think that makes sense.  When can you provide -- so, in other words, you've only provided them the documents thus far?  You haven't provided them --

**MR. BOOME:** Yes. We can schedule -- depending on when the Court's going to set the additional hearing, we'll schedule a meet and confer before then.

**THE COURT:** Oh, you know what? Thursday afternoon doesn't work for me. I just remembered. So we'll figure out a way to do it Friday. And --

**MR. BOOME:** Before then, the parties will connect on --

**THE COURT:** So on Thursday, by close of business Thursday, you guys should meet and confer about -- the Government should share its proffer regarding these documents.

**MR. BOOME:** Understood, Your Honor.

**THE COURT:** Okay. And I'll get back to you with a time on Friday.

**MR. BOOME:** Thank you.

**MR. FONDO:** Thank you, Your Honor.

**THE COURT:** Okay?

Is now the right time to take a break? The court reporter has been going for a while now. And it sounds like -- you-all -- I mean, how much longer do you think we have? I'm happy to take a short break and come back.

**MS. KRSULICH:** Yeah. We have two pretty short matters that I think take less than -- I don't know -- five minutes, maybe even less than that. And then there's some argument we

want to have about the redactions, which may take a little bit longer, but maybe three minutes.

THE COURT:  Okay.  Why don't we just take a ten-minute break.  We'll resume at 12:05.

MS. KRSULICH:  Okay.

THE COURT:  And we'll wrap up before people can go off to lunch.

MS. KRSULICH:  Thank you, Judge.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 11:56 a.m.)

(Proceedings resumed at 12:11 p.m.)

THE COURTROOM DEPUTY:  Remain seated.  Come to order.  Court is back in session.

THE COURT:  By the way, one of the jurors who -- one of the three jurors who was on the list to call, the Jury Office already communicated with them, and they said that they don't -- their only concern is if their evening job would be interfered with.  And so they will not be excused.

Does anybody remember what juror number that was?

THE COURTROOM DEPUTY:  89.

THE COURT:  89.  So 89 will not be excused.

MR. CHANG:  Thank you, Your Honor.

THE COURT:  Okay.  All right.  What do you-all want to talk about next?  Pooley?

MS. KRSULICH:  Sure, Your Honor.

So we flagged at the second pretrial conference that Mr. Pooley has a conflict starting on January 23rd. We propose calling him out of order on January 22nd, which is a Thursday.

THE COURT: That's fine.

MS. KRSULICH: Okay. We expect the testimony to go about half a day for Mr. Pooley.

THE COURT: Okay.

MS. KRSULICH: We'll check that one off, then.

The second is --

MS. PRIEDEMAN: Sorry. Which day was that?

MS. KRSULICH: We propose Pooley going on the 22nd.

MS. PRIEDEMAN: Okay. I mean, I think it just depends where -- like, we would hope that we're at the end of our case; but if we're in the middle of a technical testimony, for example, I think that could be kind of problematic.

THE COURT: Well, we've got to -- he's not available after the 23rd, so --

MS. PRIEDEMAN: Okay.

THE COURT: -- we've got to figure it out.

MS. PRIEDEMAN: How long do you expect his testimony to be?

MS. KRSULICH: About half a day.

THE COURT: Okay. What's next?

MS. KRSULICH: Okay. On sealing, we've not received yet the detailed summary of testimony that would require

sealing.  So we understand that that would not be happening on the first day of court.

We -- but we would expect it -- right? -- if another witness is going to require sealing on the second day or third day, that the Court -- we would receive that detailed summary seven days in advance of that testimony.

THE COURT:  Is that realistic?

MS. PRIEDEMAN:  That's accurate.  That's the Government's plan and the Court's order.

The Government did have one question on that, Your Honor.  Looking back at the Court's order on that, the Court requested that the Government provide the outline of the sealed testimony to both defense and to the Court.  Did you anticipate that meant filing that?

THE COURT:  Yeah, I think you should file it.

MS. PRIEDEMAN:  Okay.

THE COURT:  Yeah.

MS. PRIEDEMAN:  Okay.

MS. KRSULICH:  And the third issue is this redactions issue.

MR. FONDO:  Your Honor -- I'll let you get caught up.

THE COURT:  Thanks.

(Pause in proceedings.)

THE COURT:  Okay.  Go ahead.

MR. FONDO:  Your Honor, there's an issue that the

parties have met and conferred about; we're not able to resolve.  So we thought we'd just raise it with you.

There is -- the Government seeks to submit two sets of exhibits that have salary and stock option information.  So there are certain documents that I believe they're trying to bring in to show that Mr. Ding worked at Rongshu.  And within that information is salary information and stock options.  We don't think that's relevant.  We understand the point about employment, but we don't think the amount of compensation is relevant in that regard.

And the second one is, they're doing the same thing with the Google financial records.  So they're planning on submitting a variety of exhibits that show how much he was getting in stock, cash, and bonus at Google; and that has -- from our perspective, has nothing to do with the charges in this case.

**THE COURT:**  Okay.  Mr. Chang?

**MR. CHANG:**  Your Honor, we disagree.  We believe that both sets of evidence related to those -- to Mr. Ding's salary is relevant.  I'll take them in turn.

On the first issue that Mr. Fondo raised, which is the Rongshu salary, part of -- part of this case here is that Mr. Ding started working for a competing technology company in the PRC while he was employed for Google.  And so showing that this company was indeed a legitimate company -- employment

documents, communications related to his employment, that he was getting paid for the company, it wasn't some made-up company -- that's all relevant and certainly probative to the charges.

THE COURT: What was the salary?

MR. CHANG: I don't know it off the top of my head.

I don't know it off the top of my head, Your Honor. I don't want to misspeak.

MR. FONDO: It's roughly about 10 to 12,000 a month, as I recall, something in that neighborhood, for -- at Rongshu.

THE COURT: Okay. And is the defense denying that Mr. Ding was trying to start this company and get paid a salary by this company?

MR. FONDO: So with Rongshu, he was hired as an employee.

THE COURT: Oh.

MR. FONDO: That's the first company.

THE COURT: Okay.

MR. FONDO: We are not contest- -- they're going to have evidence -- and we're not objecting conceptually to the idea of bringing in an employment agreement, for example, but there's no need to say how much he's making. That's the --

THE COURT: Why does it matter?

MR. FONDO: We just don't want to prejudice the jury. I don't know -- it does -- how much he was making does not have

any relevance to whether he was stealing trade secrets and doing so for the benefit of China.

THE COURT:  Okay.  So certainly not relevant to doing so for the benefit of China.  I think there's a lot that's not going to be relevant to the benefit of China.

But are you making a 401 or a 403 argument?

MR. FONDO:  Both.

THE COURT:  Okay.  What's the 403 part of it?

MR. FONDO:  Well, what they're trying -- so, taking -- what I think they're trying to show is, essentially, he's making a lot of money.  I'm sure that's the purpose they're doing it for Google is that he was making a lot of money, and somehow to prejudice the jury against him, both in the context it's a foreigner who's making a lot of money, but also just generally, this is someone who's making a ton of money, much more than a regular juror.  And I don't see why that's at all relevant to the case.

THE COURT:  He's an AI software engineer.  What do you think they're going to think about how much money he was making?

MR. FONDO:  You know, Your Honor, they can think all they want, but when they see numbers, it's different.

THE COURT:  Okay.  I don't know if I agree with you on 403, but I also am trying to figure out why the salary number is relevant.  I guess I'm not sure I have a handle on

that yet.

**MR. CHANG:**  I would say it provides motive and intent in terms of why Mr. Ding is stealing the trade secrets, evidence of the amount of money he's --

**THE COURT:**  Opportunity to make a lot of money in --

**MR. CHANG:**  Correct, Your Honor, yes.

**THE COURT:**  But then why -- what about the Google salary?  What's relevant about that?

**MR. CHANG:**  Yeah.  So the Google salary -- so Mr. Fondo conflated two different things.

I would say that's our argument on the Rongshu salary. It's for the reasons we laid out in terms of why it's relevant. And then in terms of the 403 and 401 argument, it's the evidence of intent and motive.

On the Google salary, we believe that that evidence is relevant and probative for a separate reason.  So one of the elements that the Government will have to prove up at trial is, of course, that the alleged information that was stolen -- or the information that was stolen is a trade secret.  The statute requires us to prove that Google, as the trade secret owner or the victim company in this case, took reasonable measures to protect that information.  I know the Court's well aware of that definitional element.

Multiple Google witnesses and Google executives will explain that there's a whole suite of employment agreements,

trainings, forensic tools, all sorts of things that they use to protect their intellectual property.  However, Google also has an open culture in terms of access to a wide number of documents for engineers; and they hire the best and the brightest and, in exchange for that, they pay them a lot of money.  That's part of the benefit of the bargain, so to speak. That's a reasonable measure for them, is they compensate their engineers well, they give them broad access, but then they expect them to follow their policies and procedures, to adhere to their training and to protect the intellectual property as required under the law.

**THE COURT:**  Yeah.  I mean, this is -- this whole discussion seems very unimportant to me.  I mean, I think people might be having a forest trees problem right now.

The jury is going to assume that Mr. Ding was making a lot of money with Google, and they're going to assume that he stood to make a lot of money in China, and none of this really matters.

But if we're being hypertechnical about it, I guess I understand your relevance argument as it relates to what he was being paid in China, and I'm not sure I understand the relevance argument -- the need to display to the jury his precise salary when he was at Google.

So that may be to the detriment of the defense; right? Because it could create a misimpression that he stood to make

way more money in China than he was making from Google.  But I think what he stood to make in China is relevant.

So what is it?  Do you want his Google salary -- his China salary is not going to be excluded.  Do you want his Google salary excluded?

**MR. FONDO:**  Yes, Your Honor.

**THE COURT:**  Okay.  It's excluded.

**MR. FONDO:**  And by "salary," you're talking bonus, stock, et cetera?

**THE COURT:**  Yeah.

**MR. FONDO:**  Thank you, Your Honor.

**THE COURT:**  And, obviously, it depends how the evidence comes in.  I mean, it may be that the evidence comes in in a way that it becomes relevant, or attorney argument makes it relevant, or something like that.  We'll see.

Okay.

**MR. FONDO:**  Thank you, Your Honor.

**THE COURT:**  Was there anything else?

**MS. KRSULICH:**  Nothing further, Your Honor, from the defense.

**THE COURT:**  Okay.

**MS. PRIEDEMAN:**  Just one other issue, Your Honor.

Based on the filing last night, the Government obviously needs some more time to go through the patents and publications and all of that.

I just wanted to get the Court's response on a few kind of high-level things that we haven't addressed. One of them is that a number of the publications and patents that the defense have provided were published after the date of the misappropriation in this case. That's not relevant to whether or not the information was public.

**THE COURT:** I don't think the fact that it was published after the alleged theft automatically disqualifies it because a patent can describe, you know, the prior art; it can describe what was known in the past and what is new. And so, you know, just the fact that it was published later does not automatically disqualify it. It depends on what the patent says.

**MS. PRIEDEMAN:** Understood, Your Honor.

There's a number of patents that, for more nuanced reasons, should be excluded because there's details that were not public at the time of theft, and I think Mr. Pflaum's report did not distinguish that whatsoever.

There is also another category, Your Honor, so --

**THE COURT:** Before you go to the other category, that reminded me of one other thing I wanted to say about Pflaum.

We were talking about Option A, Option B, and Option C; right?

Option B was allow Pflaum to testify, I think. But just to make totally clear, like, if we're going with Option B,

allowing Pflaum to testify, that is with an accompanying possibility that I would order the jury to disregard Pflaum's testimony after hearing Sanchez's testimony and after hearing Pflaum's testimony.

So if I decide that Pflaum is allowed to testify -- right? -- that doesn't mean that the jury is going to be allowed to consider it.  The jury might be told to disregard his testimony.

So given that, like, does the defense have any further comments about Option B versus Option C?

**MS. WALSH:**  Your Honor, I think we would still go with Option B.  We'd accept any guidance from Your Honor on sort of the metes and bounds of what Mr. Pflaum can and can't testify to.

**THE COURT:**  I mean, the problem is, I don't know if I'm capable of providing that based on what Mr. Pflaum has testified to so far and without having had the benefit of Sanchez's testimony.

**MS. WALSH:**  Understood, Your Honor.

**THE COURT:**  Okay.  All right.

Okay.  Sorry to interrupt you.

**MS. PRIEDEMAN:**  So the other related category, Your Honor, so just to back up, so Trade Secret Category 2, a lot of the documents relate to Ghostlite, which is TPU Version 6.

TPU Version 6 was not announced to the public until May of 2024, and there are documents -- basically, the version guide from Google and announcements from Google about TPU Version 6 -- well after the date of the misappropriation.

So understanding your position on the patents, that it's nuanced, I don't think this is nuanced.  Google hadn't announced it.  There's a relevance issue.  There's also a 403 issue.  It would be confusing to the jury.  I don't think any of the documentation published after the date of the misappropriation should come in.

**THE COURT:**  Okay.  Ms. Walsh?

**MS. WALSH:**  So with respect to Trade Secret Number 2 and Ghostlite TPU Version 6, I think that's the issue.  It's Version 6.  It is not the case, as far as I can tell or, you know, would understand, that Google basically redid the whole thing.  So there are commonalities between the different versions of the Ghostlite chips and, indeed, pretty much anything else that's developed and --

**THE COURT:**  But, I mean, you would have to show that it was publicly available before the theft of the trade secrets.  So by definition, shouldn't you be able to point to something from earlier?

I mean, the point of the patent -- the point I was trying to make about the patents -- right? -- is that the patents might point to something from earlier; right?  You

might be able to read a patent that issued later and learn from that patent that something was available earlier.

But that doesn't seem to apply to TPU Version 6.  I mean, if there was -- if there's something about TPU Version 6 and Google's announcements of TPU Version 6 that was in the public realm before the theft of the trade secrets, you should be able to point to that.

**MS. WALSH:**  So I think -- I'm sort of doing this a bit on the fly here, but I think the document in question, if I recall it correctly, describes some features that are common to TPU Version 5 and TPU Version 6.  And, again, I'm doing this on the fly here, so it's not --

**THE COURT:**  Yeah.  And I can't give anything more than general guidance; right?

**MS. WALSH:**  Sure.

**THE COURT:**  But my general reaction is this is -- TPU Version 6 is very different from the patents in that, you know --

**MS. WALSH:**  Understood.

**THE COURT:**  -- if -- and, I mean, let's put it this way:  The patents are a kind of shorthand way, potentially a shorthand way of showing what was in the public realm beforehand; right?

I mean, you could potentially have an expert go to the original sources, or whatever, and not have to reference the

patent.  But it doesn't seem like there would be anything wrong -- if the patent is clearly talking about something that was in the public realm before the theft of the trade secrets, it doesn't seem like there's anything wrong with using the patent.

And that can be established through witness testimony that, yes, the patent was issued after, but the patent is disclosing something that was in the public realm before. That's not hard for the jury to get.

But it does seem different with TPU Version 6 in that this is something that Google is announcing, and we have to separate out what was new from what was already publicly available.  And that's your job to do; right?

Unless Google's announcement explains that this aspect of TPU Version 6 was already publicly available, if that's the case, then maybe that's okay to use that.  But short of that, I just don't see how -- I don't see how an announcement about TPU Version 6 would be admissible.

**MS. WALSH:**  And so I think that's sort of the point here, is that there are features common between the different editions of the chip.

**THE COURT:**  But then why would you need -- then you show that there was a feature that existed in an earlier version of the chip.

**MS. WALSH:**  Because we're relying on Google's

documentation and what's publicly available with Google.

We'll take a look at this and take Your Honor's advice and, basically, what you've said --

THE COURT:  Okay.

MS. WALSH:  -- to heart, and we'll take a look at that.

THE COURT:  Okay.

MS. PRIEDEMAN:  Your Honor, just as to the patent point, as the Court was articulating the distinction, I just -- I want to push back a little bit, because I understand the Court's point; but our expert, when doing an analysis, cabined his analysis to what was in the public domain as of the date of the theft, which I think is the accurate time frame. And I think we'll be requesting a jury instruction on that too, just to be clear.

And so understanding your point that there could be things in later patents that were earlier -- that were available earlier, I think everyone should be relying on what was in the public domain earlier.

THE COURT:  Right.  But if a later-created document --

MS. PRIEDEMAN:  Right.

THE COURT:  -- shows that something was in the public domain earlier --

MS. PRIEDEMAN:  I see.

THE COURT:  -- then I don't see why that document

would not be admissible.

**MS. PRIEDEMAN:**  I see, Your Honor.  That argument is not articulated.  There's just a number of patents that are after the fact.  And the argument, as I understand it, is that this patent is in the public domain so it's public.

**THE COURT:**  Right.  And that would be wrong for the same reason that it would be wrong to put in an announcement about TPU Version 6, I think.

**MS. PRIEDEMAN:**  Right.

**THE COURT:**  Right?

The only point I was making is, you can't categorically say --

**MS. PRIEDEMAN:**  Right.

**THE COURT:**  -- that because a patent was issued after the theft of the trade secrets, it's inadmissible because it might help you learn about what was in the public domain before the theft of the trade secrets.

**MS. PRIEDEMAN:**  Understood, Your Honor.

The request from the Government, then, would be for the later patent dates, that the defense make a proffer of why it discloses something that was previously publicly available.

**THE COURT:**  Well, and that's something that Pflaum needs to do; right?  I mean, that's part of the problem with Pflaum, is he didn't necessarily seem to -- you know, whether in his report or in his testimony, he didn't necessarily seem

to have a good grasp of what was disclosed in these patents.

**MS. PRIEDEMAN:**  Understood, Your Honor.

To the extent Mr. Pflaum is not permitted to testify and the defense attempts to get some of these patents in through the Government's expert witness, we would object for the reasons that we've articulated, unless there is something in the patent, just because I think, big picture, again, this is going to be confusing to a jury if a pile of patents are admitted that are post the date of misappropriation and are not relevant to value and the public nature at the time they were stolen.

**THE COURT:**  Yeah.  I mean, I think that's fair. I think that if -- you know, whether it's coming through Pflaum or whether it's coming through cross-examination of the Government's witness, it would not be appropriate under Rule 403 for the defense to be cross-examining the Government's expert with a bunch of documents that don't disclose the presence of something in the public domain prior to the trade secrets.

And I think for efficiency and to streamline what is looking to be a long trial, it makes sense for them to make an offer of proof about that.  I agree with you.

**MS. PRIEDEMAN:**  Thank you, Your Honor.

And then the third just kind of high-level --

**THE COURT:**  And so -- but mechanically, how are we

going to make that happen before the trial or before Sanchez testifies?

**MS. PRIEDEMAN:**  Yes, Your Honor.  I think it would --

**THE COURT:**  I don't know.  There was a filing last night about patents.  I haven't looked at it.

**MS. PRIEDEMAN:**  Understood.  So --

**THE COURT:**  I don't know what it says.

**MS. PRIEDEMAN:**  That's the filing I'm referring to, Your Honor.  And there's a number -- just from looking at it for 20, 30 minutes, there's a number of patents that are post the date of misappropriation.

So I think it would make sense for defense to supplement this to the extent that there's publications after the date.

**THE COURT:**  Yeah, make an offer of proof with an explanation for what -- what is disclosed -- what does the patent disclose about the state of affairs prior to the theft of the trade secrets.

**MS. PRIEDEMAN:**  Yes, Your Honor.

**MS. WALSH:**  Your Honor, I don't necessarily agree that -- I don't know if there are specific examples that the Government wants to point to, but I don't necessarily agree that the patents postdated the date of the charged conduct. But I can certainly double-check, and we'll be willing to present whatever evidence we need to in order to get those in.

**THE COURT:**  Okay.  Well, for any patent that postdates the charged conduct, the defense must make an offer of proof as to what the patent discloses about the state of the world prior to -- or I should say about what was in the public domain prior to the alleged theft.  And probably, initially, that should come in the form of a filing, a written filing.

And when would you like to file that?

**MS. WALSH:**  I think this is something that will depend a lot on Dr. Sanchez's testimony.  So I think we would like to have the opportunity to hear what he says before that goes in.

**THE COURT:**  Well, I don't think -- I don't know if that's practical because Sanchez is going to -- especially if we go with Option C -- right? -- Sanchez is going to testify, and then Sanchez is going to take the stand later in the day on a *Daubert* hearing, and then Pflaum is going to take the stand later in the day on a *Daubert* hearing, and then Sanchez is going to get back on the stand the next day.

And part of what the Government is trying to do is prevent you from cross-examining Sanchez about patents that are irrelevant; right?  So I think you need to make your offer of proof before Sanchez takes the stand.

**MS. WALSH:**  Okay.  And do we --

**THE COURT:**  Only for a patent that was issued after the alleged theft of the trade secrets.

**MS. PRIEDEMAN:**  To be clear, we're talking about the

publication date of the patent, when it hit the public domain.

**THE COURT:**  Yeah.

And you're saying you're not sure there are any or many of those.  So --

**MS. WALSH:**  Correct.

**THE COURT:**  -- maybe this is not a big deal; but like I said, I haven't looked at the filing yet.

But I'm going to require the defense to make that filing -- make an offer of proof within seven days of today.

**MS. WALSH:**  Understood, Your Honor.

**MS. PRIEDEMAN:**  And then, Your Honor, the third kind of high-level category are these third-party ISA guides.  So these are extensive manuals.  There's Nvidia's ISA guide, and then there's a RISC-V ISA manual.  These are instructions for architectures for unrelated processors.  One of them is a CPU. One is a GPU from Nvidia.

It's the equivalent of saying, if one company disclosed how to make -- one brand disclosed how to make a car or one part of that car, then the other company's instructions how to make their own car engine are public.

There's just no -- I don't see any relevancy, and I think the 403 argument is very strong here and that, again, defense is going to introduce this manual that looks very complex, confuse the jury into thinking that something in Google's documents are in those documents, which is not what

they're saying.  They're just saying that it's the same type of information.

**THE COURT:**  Yeah, I don't know if I have the ability to provide any guidance on that in the abstract.

Did this come up in Pflaum's testimony?

**MS. PRIEDEMAN:**  It came up in his --

**THE COURT:**  In his *Daubert*?

**MS. PRIEDEMAN:**  I think he testified to it briefly, but frankly, just given the breadth of material, I didn't have a lot of time to cross him on it.

But if I'm understanding his testimony and the proffer and the filing from last night, it's not that it contains Google's trade secrets; it's that it's the type of information that other companies have published.  And I just think that general principle, I don't see any relevance.  And to the extent --

**THE COURT:**  Right.  And it would depend on whether that stuff that other companies have published discloses Google's trade secret; right?  I mean, I just don't know the answer to that without looking at the documents and hearing testimony about it.

**MS. PRIEDEMAN:**  Right.  I don't think that defense is making the argument or proffering that it discloses Google's trade secrets.  What Mr. Pflaum said in his report and, I believe, in his testimony and what I see in the proffer from

last night is that this is the same type of information.

So, for example, one of these says that it includes the use of a very long instruction word architecture, which is a type of processor.  So they're basically just saying, the fact that there is this type of processor shows that other companies -- if I'm understanding correctly.

So I guess just high level, we'd like some guidance from the Court that if there's not an argument that it's disclosing the actual trade secrets, just this argument that it's the same type of information is irrelevant.

**THE COURT:**  Again, it's not just disclosing the trade secrets, but it's about whether they are -- the trade secrets are attainable.  So the question is whether something about these documents that you're talking about now would enable someone to replicate Google's product or Google's system; right?

And as I sit here, without having read the filing from last night or reading the documents or hearing testimony about it, I guess I don't know what else to say about it.

**MS. PRIEDEMAN:**  Okay.  I just would flag that for the Court, that we will be objecting because we don't think there's any relevance or there can be a proffer that it actually discloses the trade secrets.

**THE COURT:**  Well, I mean, maybe the answer is that, you know, these third-party ISA guides should be included in

the offer of proof that's due in seven days.

**MS. PRIEDEMAN:**  That makes sense to the Government, Your Honor.

**MS. WALSH:**  And I think the Court hit on sort of what the purpose of those documents is, is it goes to the readily ascertainable portion.

Basically, our understanding of Dr. Sanchez's argument with respect to the ISAs is that somebody could basically make a chip from this ISA guide.

Well, there's other ISA guides out there; and, you know, those can be used also to make a chip, you know, based on what's publicly available and what an engineer would understand, just looking at that, and be able to kind of fill in the gaps and that sort of thing.

**THE COURT:**  That somebody could make a chip from Google's ISA guide?

**MS. WALSH:**  That is our understanding of Dr. Sanchez's argument.  And so it goes to show technological alternatives. It shows that the technology was readily ascertainable and that sort of thing.

It describes -- like, the description of these documents describes TPU block diagrams -- you know, that's similar to something that's in the trade secret documents -- printed circuit boards, and those sorts of things.  So that's kind of where we're going with that.

**MS. PRIEDEMAN:** Which ISA document is that?

**MS. WALSH:** So I think you mentioned the first two documents.

**MS. PRIEDEMAN:** No. I was talking about Exhibits 5109 and 5119, which are for different -- they're different processors.

So the fact that an ISA -- yes, there are publicly available ISAs, but those are for different technology, for different chips.

So I think the argument that's -- again, it's a confusing argument for the jury because I don't think anyone is arguing that Google's ISA is public. It's just not. Right?

So the fact that other companies have published their ISAs for different chips is just not relevant to the extent that you're trying to argue that that means that Google's is public, one.

So, two, I understand if there was an argument to be had that these publicly available ISAs disclose what's in Google's ISAs, but that argument is not being made.

So I worry, from a 403 argument, that they're trying to make that first argument but can't, and so want the jury to just kind of get confused.

**THE COURT:** Right. Well, I mean, all I can say in response to this at the moment is I, too, am very worried that the defense is -- and this is based on Pflaum's report and

Pflaum's *Daubert* testimony -- right? -- that the defense is preparing to use a lot of stuff that is not -- doesn't speak to whether -- that the defense is preparing to use a number of documents that don't speak to whether the alleged trade secrets were in the public realm.

So I share your concern.  I don't feel like I have a good enough grasp of, you know, these ISA guides and their significance to say much more than that, other than third-party ISA guides should be part of the offer of proof that is filed seven days from today.

**MS. PRIEDEMAN:**  Understood.  Thank you, Your Honor.

**THE COURT:**  Okay.  Anything else?  Did we go through the list?

**MS. KRSULICH:**  Yes, Your Honor, from the defense perspective.

**THE COURT:**  Okay.

**MS. PRIEDEMAN:**  Nothing else from the Government. Thank you, Your Honor.

**THE COURT:**  Okay.  Thank you.

**THE COURTROOM DEPUTY:**  Court is in recess.

(Proceedings adjourned at 12:44 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Tuesday, January 27, 2026

*Ana Dub*

_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter