**Pages 1 - 272**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )   **NO. 3:24-CR-00141-VC**
                               )
LINWEI DING, a.k.a. LEON DING, )
                               )
          Defendant.           )
_____)

San Francisco, California
Wednesday, January 7, 2026


**TRANSCRIPT OF VOIR DIRE PROCEEDINGS**


**APPEARANCES:**

For Plaintiff:
                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue, Box 36055
                    San Francisco, California 94102-3495
               BY:  **CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
                    **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    1301 Clay Street, Suite 340S
                    Oakland, California 94612-5217
               BY:  **MOLLY K. PRIEDEMAN**
                    **ASSISTANT U.S. ATTORNEY**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**




REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:  (CONTINUED)

For Defendant:
                      GOODWIN PROCTER LLP
                      525 Market Street
                      San Francisco, California 94105
             BY:  **DARRYL M. WOO, ATTORNEY AT LAW**
                  **DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
                  **RACHEL M. WALSH, ATTORNEY AT LAW**
                  **COLETTE A. LOWRY, ATTORNEY AT LAW**

                      GOODWIN PROCTER LLP
                      601 Marshall Street
                      Redwood City, California 94063
             BY:  **GRANT P. FONDO, ATTORNEY AT LAW**
                  **FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

                      GOODWIN PROCTER LLP
                      601 South Figueroa Street, Suite 4100
                      Los Angeles, California 90017
             BY:  **LORA J. KRSULICH, ATTORNEY AT LAW**


Also Present:        **Andrea Valladao, Federal Bureau of**
                        **Investigation**
                     **Veronica Hernandez, Paralegal**
                     **John Jay, Trial Technician**

**I N D E X**

Wednesday, January 7, 2026

**PROCEEDINGS**                                              **PAGE**

Jury Voir Dire                                                 10
Jury Voir Dire by Mr. Chang                                   141
Jury Voir Dire by Mr. Fondo                                   186
Jury Voir Dire                                                223
Preliminary Jury Instructions                                265

**Wednesday - January 7, 2026**                    **9:14 a.m.**

                    **P R O C E E D I N G S**

                           ---o0o---

        (Proceedings were heard out of the presence of the prospective jurors.)

        **THE COURT:**  Okay.  Hi, everybody.

        **MR. CHANG:**  Good morning, Your Honor.

        **THE COURT:**  Let's see.  So one thing I was being told as I was coming in is that Juror Number 67, I guess, showed up and just filled out a questionnaire this morning, or maybe he filled it out last night.

        But, apparently, just to let you know, he's raised a couple of additional concerns this morning.  One is that he wants to know if there's a smoking balcony, and two is that he is taking care of -- takes care of a neighbor or something like that.  So, just to flag that for you.

        Anything else regarding the jurors?

        Did we ever hear -- did the Jury Office ever hear back from the third juror?  We determined that one of the jurors -- that we had three jurors on the call list; right?  We determined that one of them would be coming in and didn't express any concerns about serving; one of them is being -- has already been excused; and then there was a third one.

        Bhavna, do you know?  Or we haven't heard back from them on that third one?

THE COURTROOM DEPUTY:  No.

THE COURT:  Okay.  Do we know if they're here?

THE COURTROOM DEPUTY:  I do not know.

THE COURT:  Okay.  Maybe you could -- could you message the Jury Office and find out?  I can't remember what number it was.

Okay.  Anything else about jury selection, since that's the most -- the thing most immediately in front of us?

MR. CHANG:  Good morning, Your Honor.

Just one more flag.  I do believe we got another questionnaire this morning from Juror Number 108.

THE COURT:  Okay.  I haven't looked at that yet.

Did you see anything in there that was concerning?

MR. CHANG:  I haven't looked at it yet, but one of my colleagues has.

There is a hardship potential for 108.  Let me grab it.  Apologies.  I printed it out, but I have not looked at it.

THE COURT:  No problem.

MR. CHANG:  On Question Number 45, flagged commute, and she's relying on her paycheck as part of her income.

THE COURT:  Okay.  Commute from Alameda County, if I recall correctly.

MR. CHANG:  That's right, Your Honor.

THE COURT:  Okay.  Anything else about jury selection?

MR. CHANG:  Nothing from the Government --

THE COURT:  No?

MR. CHANG:  -- Your Honor.

THE COURT:  Okay.  My description of the case, was that okay with everybody?

MR. CHANG:  Both sides proposed edits last night.

THE COURT:  Okay.  I haven't seen those.  What did you -- what do you propose?

MR. CHANG:  Let me look this up, Your Honor.

(Pause in proceedings.)

MR. CHANG:  And, Mr. Fondo, if you have your edit more readily --

MR. FONDO:  Just opening it --

MR. CHANG:  -- available.

MR. FONDO:  -- on my phone.

But, Your Honor, I can tell you, as far as on the defense side, there was a reference to -- well, let me just pull it up and I'll be more --

THE COURT:  Okay.

MR. FONDO:  -- specific.

MR. CHANG:  Yeah.  So the Government just suggested a revision to the last sentence of the first paragraph.

THE COURT:  Okay.

MR. CHANG:  We would change it from "two Chinese companies and the Chinese government" to "at least one Chinese company and entities controlled by the Chinese government."

THE COURT:  That's fine.

MR. CHANG:  Thank you.

MR. FONDO:  And, Your Honor, from the defense side, we had requested in the second -- second paragraph, second sentence, we requested that be taken out.  It starts with "In particular, the defendant."

THE COURT:  Sure.  You want me to remove that?

MR. FONDO:  Please.

THE COURT:  Sure.

MR. FONDO:  Yeah, the entirety of that sentence.

THE COURT:  Okay.

MR. FONDO:  Thanks.

THE COURT:  I thought you might want me to highlight that, but I'm happy to not do so.

MR. FONDO:  Okay.  Thank you, Your Honor.

THE COURT:  Okay.  Anything else on that?

MR. CHANG:  Not from the Government, Your Honor.

MR. FONDO:  Nothing more from the defense, Your Honor.

THE COURT:  Okay.  On Pflaum, I'm just going to give you my ruling now.

I do understand how hard it is to find an expert on this, and that's why I'm going to give Pflaum another chance -- or I should say, that's why I'm going to give the defense another chance to meet its burden of proving that the opinion is reliable.

But I don't think -- I can't definitively conclude that the opinion is unreliable, but I don't believe that the defense has met its burden of showing that the opinion is reliable. And because of all of the -- because this is a criminal case and because of all the difficulties associated with finding an expert who can testify to this issue, I will give the defense another opportunity to meet its burden in the way that I described yesterday. So that's my ruling on the Pflaum motion.

And so, ideally -- I mean, we don't have to have this conversation now, but we should have a more detailed conversation about precisely when all of that is going to happen. Like, figure out when the Government's expert is going to testify, try to nail down a specific day, and then schedule the *Daubert* testimony around that.

And then the procedure would be as I described last night -- yesterday, which is Government expert testifies at trial and then Government expert takes the stand afterwards in a *Daubert* -- in a further *Daubert* hearing and then Pflaum can take the stand in a further *Daubert* hearing.

**MS. PRIEDEMAN:** Your Honor, would the Government's expert be able to respond to Mr. Pflaum's further *Daubert* testimony?

**THE COURT:** We'll see how it goes. We'll see if I feel that that's necessary.

**MS. PRIEDEMAN:** Okay. Your Honor, just on this point, last night the Government received an email from defense counsel alerting -- saying that they're in the process of retaining a rebuttal expert to testify.

**THE COURT:** Right.

**MS. PRIEDEMAN:** So just wanted to raise that. Obviously, defense doesn't get a rebuttal expert, and it's way too late at this point.

**THE COURT:** Right. And I assumed that the Government -- I'm aware of this, of course, because the defense requested funding for it. And what I approved is a preliminary amount of funding to allow them to work with this potential expert and potentially have the expert help them at trial; right?

As to whether this person can testify, I was assuming that the Government would object, and I'll hear that objection and hear argument about it at a later time.

**MS. PRIEDEMAN:** Understood, Your Honor.

To be clear, the Government -- we received a C.V. this morning. We have no disclosure.

**THE COURT:** Like I said, I'll hear --

**MS. PRIEDEMAN:** Understood, Your Honor.

**THE COURT:** I'll hear all that argument at a later time.

Okay. Anything else that we should discuss about jury

selection or anything else?

MS. WALSH:  Not from the defense, Your Honor.

MS. PRIEDEMAN:  Not from the Government, Your Honor.

THE COURT:  Okay.  Bhavna, can you think of anything else that we need to tell them that we might not have told them?

THE COURTROOM DEPUTY:  The time for the Friday hearing.

THE COURT:  Oh, the time for the Friday hearing.

I think that'll be 1 o'clock.  And I have a -- I have a Zoom at 3 o'clock, I know.  So I'll have two hours.

Okay.  Why don't we have everybody take a break.

Bhavna, tell the Jury Office to send them down right at 9:30, and we'll be ready to begin.

Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 9:23 a.m.)

(Proceedings resumed at 9:49 a.m.)

(Proceedings were heard in the presence of the prospective jurors.)

THE COURTROOM DEPUTY:  Now calling Criminal Case 24-141, U.S.A. versus Linwei Ding.

Will counsel please state your appearances for the record, starting with the Government.

MR. CHANG:  Good morning, Your Honor.  Again, Roland

Chang, Molly Priedeman, and Casey Boome for the United States.

THE COURT:  Good morning.

MR. FONDO:  Good morning, Your Honor.  Grant Fondo for Mr. Ding.  And I'll let my colleagues introduce themselves.

MS. LOWRY:  Good morning.  Colette Lowry.

THE COURT:  Good morning.

MR. WOO:  Good morning.  Daryl Woo.  I'm one of the lawyers working with Mr. Fondo.

THE COURT:  And you-all will have a chance to introduce yourselves to the jury later, but for now, just make your appearances quickly.

MS. WALSH:  Good morning, Your Honor.  Rachel Walsh.

THE COURT:  Good morning.

MS. KRSULICH:  Good morning.  Lora Krsulich.

THE COURT:  Good morning.

MR. FEYZI:  Good morning.  Fred Feyzi.

MR. RAPP-KIRSHNER:  And good morning.  David Rapp-Kirshner.

THE COURT:  Good morning.

Okay.  And my name is Vince Chhabria.  I'm a district judge here for the Northern District of California.  And on behalf of the Northern District of California, I want to welcome you.

First -- I have a number of things, preliminary things to say to you; but first, we will have the courtroom deputy,

Bhavna Sharma, swear you all in as prospective jurors.  You need to take an oath about the questions that you're going to answer here today as prospective jurors; and then if you're picked as a member of the jury, you will, of course, take an oath as actual jurors towards the end of day.

So, Bhavna, take it away.

**THE COURTROOM DEPUTY:**  Please stand.

Please raise your right hand.

(The prospective jurors were duly sworn for voir dire examination.)

**THE COURTROOM DEPUTY:**  Thank you.  Please be seated.

**THE COURT:**  Okay.  Thank you.

And I know that you were all summoned to be here today.  You're not here by choice.  But we, nonetheless, very much appreciate your being here.

The jury system is a critical aspect of our democracy. It puts important decisions, decisions about conflicts between different members of the community, in the hands of people like you as opposed to the hands of the Government; right?  And that is one of the things that has allowed our democracy to last for so long.

And I think that every jury I've dealt with in my roughly 12 years in this job has come away really feeling that way about the service that they performed.  A lot of people started off not wanting to get picked on the jury coming in

here in the morning, like you are now, and hoping that you don't get picked.  But after serving, they came away feeling that the process worked really well, that they made a real contribution to our community by serving, and felt that it was an incredible learning experience.

And I can pretty much promise you that if you are one of those people who's sitting there right now hoping that you don't get picked, if you do get picked, you may be disappointed; but by the end, I am confident that you will be glad that you had the experience.

So let me start by introducing everybody who's affiliated with the Court, and then I'll allow the parties to introduce themselves to you.

Again, my name is Vince Chhabria.  As I mentioned, I've been on the bench now for almost 12 years.  I was appointed by President Obama back in 2014.  Before then, I was a lawyer in the San Francisco City Attorney's Office for about ten years.

You've met the most important person in the courtroom already, Bhavna Sharma, the courtroom deputy.  She's the one who keeps everything running properly around here.  And she'll be your main contact person for anything that you need throughout the course of the day or, if you're picked to serve on the jury, during the course of the trial.

We have Ana Dub is the court reporter who's furiously

taking down everything that I'm saying and will be furiously taking down everything that you're saying.

And then I have three law clerks.  You'll see them coming in and out of the courtroom.  One is P.J. Das, who's sitting right there.  And then two of my law clerks are sitting over there, Amelia Keyes and Jim Huang.

I'll allow now the parties to introduce themselves to the jury.

MR. CHANG:  Good morning, everyone.  Really nice to meet you.  Again, my name is Roland Chang.  I'm an Assistant United States Attorney in the U.S. Attorney's Office for the Northern District of California, based right here in our San Francisco office.

MS. PRIEDEMAN:  Hi, everyone.  My name is Molly Priedeman.  I'm also an Assistant United States Attorney in the Northern District of California.

MR. BOOME:  Good morning, everyone.  My name is Casey Boome.  I'm also an Assistant U.S. Attorney on this trial team, along with our last member.

MS. VALLADAO:  Hi, everyone.  Andrea Valladao.  I am an FBI agent.

MR. FONDO:  Good morning, everyone.  Thank you for coming.  My name is Grant Fondo.  I represent Mr. Linwei Ding.

I will let everybody else introduce themselves.  Then I'll be talking to you a little bit later today.

**MS. LOWRY:**  Good morning, everyone.  My name is Colette Lowry.

**MR. WOO:**  Good morning, everyone.  My name is Daryl Woo.  And as I said before, I'm one of the lawyers representing the defendant, Mr. Ding, here.

Some of us may not be here every day, in and out, as you might guess.  A lot of things have to happen outside of the courtroom.  So not all of us will be here every day, so we want to introduce ourselves right now.

**THE DEFENDANT:**  Hi.  I'm Linwei.

**MS. WALSH:**  Good morning.  I'm Rachel Walsh, representing Mr. Ding.

**MS. KRSULICH:**  Good morning.  My name is Lora Krsulich, and I'm representing Mr. Ding.

**MR. FEYZI:**  Good morning.  I'm Fred Feyzi.  I also represent Mr. Ding.

**MR. RAPP-KIRSHNER:**  And lastly, I'm David Rapp-Kirshner, and I also represent Mr. Ding.

**THE COURT:**  Okay.  Thank you.

All right.  Now, a number of you -- we went through your questionnaire responses.

One second.  Jim, my iPad is malfunctioning, and I can't pull up the questionnaires.  Can you grab that other iPad and see if I can -- see if that one works?

**THE LAW CLERK:**  Yes.

**THE COURT:**  Thanks a lot.

Good timing.  But anyway, we went through your questionnaire responses, and we saw that a number of you expressed some concerns about your ability to serve as a juror on this trial based on stuff that's going on in your life.  And I want to talk to you a little bit more about that.

First, let me go through the schedule again.  We identified the schedule in the questionnaire, but I'll go through it again.

First of all, the trial day.  Each day we begin at 9:30 sharp, which means that we have the jurors ready to come into the courtroom right at 9:30.  And what that means is that we encourage you all to arrive at the building by about 9 o'clock so that you can get through security.

We provide -- thank you.  We provide refreshments.

I might need a charger, also, because it looks like this one has 19 percent left.  Thanks.  Maybe I should make sure it works first.  Hold on, Jim.  Let's see here.

(Pause in proceedings.)

**THE COURT:**  Yeah, this one's working fine.  Thanks.

Where was I?  Oh, yeah.  We start right at 9:30, so we encourage you to arrive at 9:00 so that you can get through security, settle in.  We have coffee and a light breakfast prepared for you every morning so you can take a little time to have a bite and have some coffee.

We will usually take a break, a short break or two in the morning.  We will have usually about a 45-minute lunch break at around 12:30.  I mean, it kind of depends on where a witness is in their testimony and when is a good stopping point; but usually, we aim for around 12:30 lunch break, 45 minutes.  And then you come back in.  We'll do an afternoon break at some point.

And we will finish up sometime between 3:30 -- excuse me -- 3 o'clock and 3:30 every day.  So I can't promise you exactly when we will finish, but I can promise you that we'll have you out of here by 3:30.  And, again, it just depends on where a witness is in their testimony.  If we need to finish something up, it might be a little closer to 3:30 or it might be a little closer to 3:00.  But you have my promise that you'll be out of here by 3:30 every day, which will help you allow to attend to your affairs.

The only one exception to that is when during jury deliberations, after the trial is over and you're back there deliberating, if you collectively decide to stay longer than 3:30 on a particular day, that's up to you.  But other than that, you have my promise that you'll be out of here at 3:30 every day.

Now, the trial -- if you're picked for the jury, there's nothing to do tomorrow; there's nothing to do on Friday.  The trial will begin on Monday with opening statements

from the lawyers, and the Government will present its first witness.  Right?

And we will be in trial.  Start on Monday, the 12th. We'll be in Monday through Thursday, so the 12th through the 15th.  We will not be in -- oh, I'm sorry.  We'll be -- yeah, it'll be every day next week, the 12th through the 16th, all five days on that schedule.

Then the next week, the 19th is Martin Luther King Day.  That's a holiday, so we won't be in.  We'd be in Tuesday, the 20th; Wednesday, the 21st; Thursday, the 22nd; and then Friday, the 23rd, we'll be off.  Friday, the 23rd, will be a day for me to attend to my other couple hundred cases that I have pending.

And then we'll be back in on Monday, the 26th, and my best guess is that this will go through -- through that week to the 29th, to the 29th of January.  If the trial is not over by the 29th, we'll be off on the 30th and then resume on February 2nd.

My best guess -- we gave you kind of a conservative estimate of the trial lasting through February 6th.  I don't think that is very likely.  I don't think it's very likely that the trial is going to last that long.  And my best guess is it'll be over around the end of that third week, around the 29th of January.

So that's the schedule.

And now what I want to ask you all is:  If you have something going on in your life right now that makes it difficult or impossible to serve on this jury, I want you to raise your hand and I want to hear from you.  And let me just say a couple other things about that before I start hearing from you.

I know that this is a trial that is expected to last three to four weeks, and that is a significant commitment.  If you serve as a juror on this case, that is a significant act of public service and a significant sacrifice on your part.  But if you can't serve on this jury, that means you might get picked for one later -- right? -- in the year; and if that happens, we often have -- here in federal court, sometimes we have trials that are shorter than three or four weeks, but sometimes we have trials that are much longer.

And I don't know if anybody followed the Elizabeth Holmes trial from a couple of years ago in our court, but that trial, if I recall correctly, lasted about four months.  And there were 16 members of the community coming in every day for four months to hear evidence in that trial.  We had another trial down the hall a couple of months ago that lasted a couple of months.  And so it's kind of the luck of the draw, and this one falls, frankly, somewhere in the middle.

And so having said all that, if you could please raise your hand if you -- and I understand that everybody is required

to rearrange their lives; right?  It's a hardship on anyone who's serving.  So the question is not whether it would be a pain to scramble to rearrange your life.  I know that it will be for everybody.  The question is:  Would it be extremely difficult or impossible for you to serve as a juror in this case?

And if you could raise your hand, maybe we'll start with folks in the box here.  Does anybody want to --

(Show of hands.)

THE COURT:  Okay.  Let's go ahead and start with you. And the way we operate is we have two microphones, and we ask that when you're speaking, you go up to one of the microphones, identify yourself by your name and your juror number, and then let us know what's going on.

Why don't we go ahead and start with you.  Yeah, whichever microphone, either the microphone that's standing up over there or the one that's right here in front of P.J.

PROSPECTIVE JUROR YAFFE:  Hi.  My name is Ryan Yaffe. I do have an upcoming trip in January.

THE COURT:  Okay.  Mr. Yaffe, can you remind me your juror number?

PROSPECTIVE JUROR YAFFE:  Number 18.

THE COURT:  Number 18?  Okay.  I've got you here.

PROSPECTIVE JUROR YAFFE:  It was prepaid before the summons.  So, yeah.

THE COURT:  Okay.  Can you remind me the trip?  Was this the one where it was a driving trip?

PROSPECTIVE JUROR YAFFE:  No.  This is -- it's out of state.

THE COURT:  Okay.  What's the trip that you have planned?

PROSPECTIVE JUROR YAFFE:  Just travel.

THE COURT:  Okay.  Vacation?

PROSPECTIVE JUROR YAFFE:  Yeah, vacation.

THE COURT:  Okay.  And it's prepaid?

PROSPECTIVE JUROR YAFFE:  Prepaid, yeah.

THE COURT:  And what are the dates?

PROSPECTIVE JUROR YAFFE:  23rd through -- I'm sorry.  22nd through 25th.

THE COURT:  22nd through the 25th.

So the 22nd is Thursday, and the 25th is Sunday; right?

PROSPECTIVE JUROR YAFFE:  Yeah.

THE COURT:  So you're coming back Sunday.

When are you leaving on Thursday?

PROSPECTIVE JUROR YAFFE:  At 7:00 a.m. on Thursday.

THE COURT:  7:00 a.m. on Thursday.

And where are you going?

PROSPECTIVE JUROR YAFFE:  New York.

THE COURT:  And you said it's vacation; right?

**PROSPECTIVE JUROR YAFFE:**  Yeah.

**THE COURT:**  Okay.  All right.  Thank you.

I saw a couple other hands down here.  Why don't we go with you.

Bhavna, can you move the mic back so that people don't have to stand up on the stair when they're talking?

**PROSPECTIVE JUROR MAN-WILLRICH RAMOS:**  Good morning, Your Honor.  My name is Ariane Man-Willrich Ramos, Juror Number 24.  I'm currently four months pregnant, and I have a few OB appointments coming up this month.

**THE COURT:**  Yeah, I saw that.

First of all, how are you -- physically, how are you doing?

**PROSPECTIVE JUROR MAN-WILLRICH RAMOS:**  Thank you for asking.  My nausea is much better.

**THE COURT:**  Good.

**PROSPECTIVE JUROR MAN-WILLRICH RAMOS:**  Feeling less tired as I get into the second trimester.  But I can't reschedule the appointments because they're timed.

**THE COURT:**  Okay.  And can you tell me when the OB appointments are?

**PROSPECTIVE JUROR MAN-WILLRICH RAMOS:**  I have one tomorrow.  And I understand we're not meeting tomorrow.  And then I have one on the 27th and the 29th.  Those are already scheduled.

**THE COURT:**  27th and 29th.

**PROSPECTIVE JUROR MAN-WILLRICH RAMOS:**  Yes.

**THE COURT:**  And where are the appointments?  What time?

**PROSPECTIVE JUROR MAN-WILLRICH RAMOS:**  They're all at UCSF Medical Center.  The one on the 27th is at 1:00 p.m., and the 29th is at 2:30 p.m.

**THE COURT:**  Okay.  Thank you.

**PROSPECTIVE JUROR MAN-WILLRICH RAMOS:**  Thank you.

**PROSPECTIVE JUROR LATOOF:**  Good morning.  My name is Ashley Latoof.  I'm Juror 31.

I have two -- I live in Martinez, and I have two elementary-school-aged kids that I do pickup and drop-off for on Tuesdays, Thursdays, and Fridays.  I have to be there by 3:30 to pick them up and 8:10 to drop them off in the morning.

**THE COURT:**  Okay.  So Tuesdays, Thursdays, and Fridays.  Sorry.  Can you remind me?  You said they're in elementary school?

**PROSPECTIVE JUROR LATOOF:**  One's in elementary; one's in middle.

**THE COURT:**  Elementary and middle.  And so the 8:10 is probably not an issue, but the 3:30 is a problem; right?

**PROSPECTIVE JUROR LATOOF:**  (Nods head.)

**THE COURT:**  And I guess, let me ask.  So you alternate days with somebody?  Tell me a little bit more about

how that works.

PROSPECTIVE JUROR LATOOF:  Yeah, with my husband.  So we both work in San Francisco, and I work from home on those days that I do pickup and drop-off, and he works from home on days he does them.

THE COURT:  Okay.  And where do you work?

PROSPECTIVE JUROR LATOOF:  TEL HI Neighborhood Center in North Beach.

THE COURT:  And what do they do?

PROSPECTIVE JUROR LATOOF:  It's a non-profit community center.

THE COURT:  Okay.  And what about your husband?  What does he do?

PROSPECTIVE JUROR LATOOF:  He's in banking.  He works for East West Bank in Chinatown.

THE COURT:  Okay.  All right.  Great.  Thank you.

PROSPECTIVE JUROR DEVERA:  I am Averyl Devera.  I'm Number 33.  It's more like personal because I have anxiety --

THE COURT:  Okay.

PROSPECTIVE JUROR DEVERA:  -- during the process, during even receiving this summon and during the process answering the questionnaires.

THE COURT:  Okay.

PROSPECTIVE JUROR DEVERA:  And right now I'm freaking out being in the court.

THE COURT:  I think I remember you mentioned that.

So, that reminds me.  There will be an opportunity later in the process if anybody wishes to speak privately about something.

What we usually find is that everybody gets pretty comfortable with sharing stuff about themselves in open court; but if there is something that you believe that you want to speak with us privately about, there will be an opportunity later in the day to do that.

And I use the word "private" in quotes because our version of private is not all that private.  You would be speaking with me and the lawyers, and the court reporter would be taking down what you say.  But we can also -- we can also seal those records -- right? -- so that it's not part of the public record and you would, therefore, only be sharing with a few of us as opposed to so many of us.

So everybody keep that in mind, that there will be an opportunity later on in the day to do that.

But anyway, and so you -- it sounds like what you're saying is that you're already experiencing pretty significant anxiety just from being here for --

PROSPECTIVE JUROR DEVERA:  Yes.

THE COURT:  -- jury selection?

PROSPECTIVE JUROR DEVERA:  Even in the hospitals.  I must be honest, even the hospitals, like that, I get.

THE COURT: Okay. All right. Thank you very much, and I appreciate you standing up to say that.

PROSPECTIVE JUROR DEVERA: Yeah.

THE COURT: Okay.

Okay. Anyone else in the box?

(No response.)

THE COURT: All right. Thank you.

Let's start with, then, the first row back in the gallery here. Anybody in the first row?

(No response.)

THE COURT: All right. Anybody in the second row in the gallery?

(Show of hands.)

THE COURT: Thank you. Come on up.

PROSPECTIVE JUROR LIU: Good morning. I'm Noelle Liu, Number 49.

THE COURT: Sorry. Number 49?

PROSPECTIVE JUROR LIU: Yes.

THE COURT: Okay. Thank you.

PROSPECTIVE JUROR LIU: For the same reason the previous woman had stated, I also have anxiety, and it's on my medical record as well.

So, and I have something private I want to share with you later too.

THE COURT: Okay.

**PROSPECTIVE JUROR LIU:**  It's personal, so...

**THE COURT:**  Okay.  Thank you.

**PROSPECTIVE JUROR LIU:**  Thank you.

**THE COURT:**  Okay.  Anyone else in the second row?

(Show of hands.)

**THE COURT:**  Yes.

**PROSPECTIVE JUROR LEONG:**  Hi.  Kip Leong, Number 45.

I have just a general question.

**THE COURT:**  Sure.

**PROSPECTIVE JUROR LEONG:**  What if things are okay right now but, like, next week something happens at work and I'm really needed to go back to work?

**THE COURT:**  That is not something that we can deal with.  I mean, if you have anything in particular that you are anticipating -- right? -- that would come up at work, then that might be a reason to have a postponement of your jury service and, again, risk getting picked for a longer trial later in the year.

But it's not a situation where we can -- the way it'll work is there will be some alternate jurors, but we're picking people who we are confident can serve on the jury and participate in deliberations.

What do you do?  What's your job?

**PROSPECTIVE JUROR LEONG:**  So I work at Visa, and I'm in the Foreign Exchange Department, and we set the FX rates

that affect the system worldwide.  And we always have to have two people, at least minimum, to do the job.  And right now, the -- I'm Number 3.

So there are two people now who can do it.  A fourth one is on vacation until the 19th, and then we have an open position.

So if anything happens to those two next week, they might need me to fulfill those duties.  Maybe it's only one day.  It may be multiple days.  I don't know.  But it's a -- I'm the backup.

THE COURT:  Okay.  And, sorry.  You were Juror Number 45; right?

PROSPECTIVE JUROR LEONG:  Yes.

THE COURT:  Okay.  Thank you.

All right.  Anyone else in the second row?

(No response.)

THE COURT:  All right.  How about the third row?

(Show of hands.)

THE COURT:  Sir, come on up.

PROSPECTIVE JUROR PARKER:  My juror number is 67.

THE COURT:  Okay.  And you're Mr. Parker; is that right?

PROSPECTIVE JUROR PARKER:  Yes.  My first name is Phillip.

THE COURT:  Okay.  Thank you.

**PROSPECTIVE JUROR PARKER:**  I'm a full-time caretaker, and the patient that I take care of, his -- requires real seriously mobility needs.  Like, he's been in a power chair the last 12 years.

And I just had a recent death in my own family from last weekend, so I'm preparing for a funeral as well, which I don't have the date yet.

**THE COURT:**  Okay.  I'm sorry to hear that.  And you also -- my recollection from your questionnaire is that you work for FedEx; is that right?

**PROSPECTIVE JUROR PARKER:**  No.  I'm a full-time caregiver.

**THE COURT:**  Oh, you're a full-time caregiver.  Okay.  I got that -- oh, I'm mixing you up with Juror Number 68, I think.

**PROSPECTIVE JUROR PARKER:**  Oh, that's okay.

**THE COURT:**  Yeah.  Okay.  And tell me a little more about your caregiving job.

**PROSPECTIVE JUROR PARKER:**  Well, I've been doing that with him the last two to three years.  But in total, I did it for, like, 20, 25.  The first 20 with my mother.

So kind of had, like, a two-year layoff and then got introduced to my neighbor.  He's paralyzed for the last 13 years from an accident, from what he -- from my understanding.  And he have a tendency of having unexpected

seizures too.  So that's been, like, a carefully monitored thing at any given point in the day.  I don't know when.

So -- and he do have another person, but she's on a walker too.  So I carefully have to multitask and do that, so...

**THE COURT:**  Okay.  And is this through a particular company, or is this in-home care services?

**PROSPECTIVE JUROR PARKER:**  Yes.  In-Home Supportive Services through Alameda County.

**THE COURT:**  Got it.  Okay.  Thank you.

**PROSPECTIVE JUROR PARKER:**  Which I stay in Oakland, which is not too far from here, just across the Bay.  So, like, I take public transportation as well.

**THE COURT:**  Okay.  Okay.  Thank you.

Anyone else in that row?

(Show of hands.)

**PROSPECTIVE JUROR KESSLER:**  Good morning.  My name is Daisy Kessler, and I'm Juror Number 63.

And my reason for not being able to attend would be I'm starting a chemistry class, and it's on Tuesdays and Thursdays.  It starts the 13th.  So I'd probably have to hold off taking chemistry another semester, and I'm trying to go to nursing school.

And I'm also currently an EMT, and of my three shifts, only one is during the week, it's on Wednesdays, but they're

12-hour shifts and they're kind of hard to get covered.

THE COURT:  And the shift goes from when to when?  Is it overnight?

PROSPECTIVE JUROR KESSLER:  8:00 a.m. to 8:00 p.m.

THE COURT:  8:00 a.m. to 8:00 p.m.

And where do you take -- where do you go to school?

PROSPECTIVE JUROR KESSLER:  College of Marin.

THE COURT:  Okay.  All right.  Thank you.

PROSPECTIVE JUROR KESSLER:  Thank you.

THE COURT:  Okay.  Anybody from the next row?

(Show of hands.)

THE COURT:  Come on up.

PROSPECTIVE JUROR SANCHEZ:  My name is Eli Sanchez, Juror Number 68.

THE COURT:  Okay.  Hi.

PROSPECTIVE JUROR SANCHEZ:  Okay.  So my company only pays us for about 80 hours.

THE COURT:  Am I remembering right?  You're the --

PROSPECTIVE JUROR SANCHEZ:  I'm the FedEx guy.

THE COURT:  You work for FedEx?

PROSPECTIVE JUROR SANCHEZ:  Yes.

THE COURT:  Okay.

PROSPECTIVE JUROR SANCHEZ:  And then my wife is also unemployed currently, so it'd be a hardship to exceed that amount of time.

THE COURT:  Okay.  And the 80 hours that the company pays you, is that -- for jury service, is that your full salary, your full earnings?

PROSPECTIVE JUROR SANCHEZ:  They pay my full salary for those 80 hours, yes.

THE COURT:  Okay.  That's not a bad policy.  I mean, that's better than a lot of companies.

But FedEx is a pretty big company.

PROSPECTIVE JUROR SANCHEZ:  Yes.

THE COURT:  And it seems to me that they could afford to help their employees serve the community even more, if they need to.

And if I can get FedEx to agree to pay your full salary for the duration of the trial, would that be okay?

PROSPECTIVE JUROR SANCHEZ:  Yeah, that's fine.  I don't have no objection to that.

THE COURT:  I've had some success with that in the past.

PROSPECTIVE JUROR SANCHEZ:  All right.

(Laughter.)

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR SANCHEZ:  Thank you.

PROSPECTIVE JUROR THAREJA:  Hi.  I'm Juror 74, Rahul Thareja.

THE COURT:  Sorry.  What's your name?

**PROSPECTIVE JUROR THAREJA:**  Rahul Thareja.

**THE COURT:**  Okay.  Gotcha.

**PROSPECTIVE JUROR THAREJA:**  So currently, my wife is traveling next week, Monday through Thursday, and we have a two-year-old daughter.  So I'm going to be responsible for pickups and drop-offs.

**THE COURT:**  Where does your daughter go to daycare?

**PROSPECTIVE JUROR THAREJA:**  She goes to a preschool -- she's two years old -- in South San Francisco.

**THE COURT:**  In South San Francisco?

**PROSPECTIVE JUROR THAREJA:**  Correct.

**THE COURT:**  And when is drop-off?

**PROSPECTIVE JUROR THAREJA:**  9:00 a.m.  And then pickup's usually 4:00.

**THE COURT:**  Pickup is when?

**PROSPECTIVE JUROR THAREJA:**  4:00 p.m.

**THE COURT:**  And when is your wife going to be gone?

**PROSPECTIVE JUROR THAREJA:**  Monday through Thursday of next week.

**THE COURT:**  Okay.  Is there an option to drop your daughter off half an hour early at the daycare?

**PROSPECTIVE JUROR THAREJA:**  Potentially, but getting here is, like, lot of traffic, and that's kind of the hard part which I can't predict.

**THE COURT:**  I understand.

PROSPECTIVE JUROR THAREJA:  And subsequent to that, also, we typically split our pickups and drop-offs responsibilities.  So for four weeks, if I have to ask my wife to do all pickups, that's going to be really hard for her to manage.

THE COURT:  Yeah.  And what does your wife do?

PROSPECTIVE JUROR THAREJA:  She is a scientist in chemical development.

THE COURT:  Sorry.  A scientist where?

PROSPECTIVE JUROR THAREJA:  Scientist in chemical development.

THE COURT:  Okay.  What company does she work for.

PROSPECTIVE JUROR THAREJA:  Nurix Therapeutics.

THE COURT:  Okay.  And what about you?  What do you do?

PROSPECTIVE JUROR THAREJA:  An engineer, civil.

THE COURT:  And where do you work?

PROSPECTIVE JUROR THAREJA:  Mark MacDonald.

THE COURT:  Okay.  All right.  Thank you very much.

All right.  Anyone else in that row?

(No response.)

THE COURT:  Okay.  How about the next row?

(Show of hands.)

THE COURT:  All right.  Come on up.

PROSPECTIVE JUROR HERNANDEZ:  Hi.  Good morning.  My

name is Adaly Hernandez, and I'm Juror 87.

We have a family trip booked for January 27th through the 1st -- through the 31st.

**THE COURT:**  Okay.  And where are you all -- what's the occasion.

**PROSPECTIVE JUROR HERNANDEZ:**  Well, we're going to be celebrating my birthday.

**THE COURT:**  Oh, great.  Where are you going?

**PROSPECTIVE JUROR HERNANDEZ:**  Las Vegas.

**THE COURT:**  Good choice.  I was just there a couple of weeks ago.

**PROSPECTIVE JUROR HERNANDEZ:**  Yeah.

**THE COURT:**  All right.

**PROSPECTIVE JUROR HERNANDEZ:**  And --

**THE COURT:**  And, sorry.  You were going to say something else?

**PROSPECTIVE JUROR HERNANDEZ:**  Yeah.  And then currently my husband is in surgery right now.  And we're a family-owned bus- --

**THE COURT:**  Today?

**PROSPECTIVE JUROR HERNANDEZ:**  Yeah.

-- a family-owned business.  So I work in the office. I do the payroll, administrative, answering the phones and everything.  And he's going to be out for a couple of weeks. So my brother-in-law is out in the field, and I need to be in

the office.

      **THE COURT:**  Okay.  So it sounds like what you're saying is you don't have a problem with serving on a jury, but --

      **PROSPECTIVE JUROR HERNANDEZ:**  No.

      **THE COURT:**  -- it seems like the timing is not good for you?

      **PROSPECTIVE JUROR HERNANDEZ:**  Yes.

      **THE COURT:**  Okay.  All right.  Thank you.

      **PROSPECTIVE JUROR HERNANDEZ:**  Thanks.

      **PROSPECTIVE JUROR ALMUTAWAKEL:**  Good morning.

      **THE COURT:**  Good morning.

      **PROSPECTIVE JUROR ALMUTAWAKEL:**  My name is Enas. 77 number.

      **THE COURT:**  77.  Hold on.  Let me find you on the list.

      Okay.  Enas, how do we pronounce your last name?

      **PROSPECTIVE JUROR ALMUTAWAKEL:**  Almutawakel.

      **THE COURT:**  Okay.  Thank you.

      **PROSPECTIVE JUROR ALMUTAWAKEL:**  My reason is I don't understand very well English, so...

      **THE COURT:**  I saw that you mentioned that on your questionnaire and wanted to talk to you just to see.

      So the question is:  Have you had difficulty understanding anything that I've said here today?

PROSPECTIVE JUROR ALMUTAWAKEL:  Yeah, of course.

THE COURT:  Okay.  Okay.  Thank you very much.

PROSPECTIVE JUROR ALMUTAWAKEL:  Thank you.

THE COURT:  All right.  Anybody else in that row?

(No response.)

THE COURT:  Okay.  Next row.  Are we on to the last row?

(Show of hands.)

THE COURT:  All right.  Come on up, whoever wants to.

PROSPECTIVE JUROR LEANOS:  Hi.  My name is Anthony Ray Leanos, Juror Number 89.

Currently, I'm an on-call prep cook at the University of San Francisco; but because I'm on call, I'm also non-union, currently on unemployment.

Financially, I can't commit to four weeks.  It's just not legitimate for me to make that call and be able to pay my rent and afford --

THE COURT:  Okay.  You're an on-call what?  I'm sorry.

PROSPECTIVE JUROR LEANOS:  Prep cook.

THE COURT:  On-call prep cook.

PROSPECTIVE JUROR LEANOS:  Right.

THE COURT:  Are your shifts in the -- I seem to recall you saying that your shifts are in the evening.  Do I remember that correctly?

PROSPECTIVE JUROR LEANOS:  Generally, it's from 12:00

to 8 o'clock.

**THE COURT:**  12:00 to 8 o'clock?

**PROSPECTIVE JUROR LEANOS:**  Yes.

**THE COURT:**  Okay.

**PROSPECTIVE JUROR LEANOS:**  Thank you.

**THE COURT:**  Let me ask you a follow-up question about that.

I don't know how much the Jury Office talked to you-all about this, but if -- a couple of things.  One is, there is compensation.  It's minimal, but there is daily compensation for jury service and, I believe, also travel reimbursement if you're taking BART or driving in.  Right?  You get reimbursed for that.  There is minimal daily compensation for jury service.

In addition, if you live far away -- and I think that I have some discretion in defining what "far away" is -- we can pay for you to stay in a hotel in San Francisco for a part or all of your jury service.  So I wanted people to keep that in mind as well.

Does anything I said change your concerns?

**PROSPECTIVE JUROR LEANOS:**  No, not at minimum compensation, still wouldn't be able to afford bills.

**THE COURT:**  Okay.  Thank you.

**PROSPECTIVE JUROR LEANOS:**  Thank you.

**THE COURT:**  All right.  There was somebody else,

I believe, from the back row.

(Show of hands.)

THE COURT:  Come on up.

PROSPECTIVE JUROR LI:  Good morning.  My name is Jiawen.  My Juror Number is 99.

THE COURT:  Sorry.  99?

PROSPECTIVE JUROR LI:  99.

THE COURT:  Okay.  So, Ms. Li?

PROSPECTIVE JUROR LI:  Yes.

THE COURT:  Okay.

PROSPECTIVE JUROR LI:  My situation is, I received a second summon notice to the Alameda Superior Court.  And as I remember is they asked me to start reporting -- not reporting, but asked me to check on January 23rd and see if I get picked to report.  So I'm not sure.

And my second situation is I have a daughter, six-year-old, going to school, which only me and my husband, like, picking up -- dropping off and picking up.  And my husband work from 9:00 to 6:00, where even we pay extended care, he might not be able to make it to the school to pick her up because the extended care goes until 6:00, the last.

THE COURT:  Extended care goes until 6:00?

PROSPECTIVE JUROR LI:  Yeah.

THE COURT:  Okay.  Regarding the summons that you received from the Alameda County Superior Court, so you're

saying that, simultaneously, you're on jury duty in the federal court and in the state court?

**PROSPECTIVE JUROR LI:**  Yeah.  I might need to go buy a lottery because this is very rare.

**THE COURT:**  I wonder what you did to deserve that?

**PROSPECTIVE JUROR LI:**  I don't know.  I have no idea.

(Laughter.)

**THE COURT:**  But anyway, I can assure you that if you get picked for this jury, that will be a very good excuse for not --

**PROSPECTIVE JUROR LI:**  Right.

**THE COURT:**  -- for your other --

**PROSPECTIVE JUROR LI:**  That's the -- yeah.  Will I get, like -- can I use this one to excuse that one?  Or...

**THE COURT:**  Well, so what you can't do is, let's say you served on a jury in the state court system two months ago and then you get summoned to serve in the federal system. They're two separate systems, so you can't use your prior service in state court to get out of the federal jury service -- right? -- because they're two separate systems.

However, if you're in trial in federal court during the time that you're supposed to show up in state court, I guarantee you, you'll be able to get out of that.  If necessary, I will call the judge in state court.  But it won't be necessary.  You'll be able to just call them and tell them

what's going on, and you will be excused from your jury service.

**PROSPECTIVE JUROR LI:**  Yeah.  My second situation is just the kid, you know, dropping off and picking up.  That's it.

**THE COURT:**  Okay.  And you said drop-off was what time?

**PROSPECTIVE JUROR LI:**  I believe they have extended care in the morning too, but our issue is to pick it up.

**THE COURT:**  The pickup is the concern.

**PROSPECTIVE JUROR LI:**  Yeah.

**THE COURT:**  Okay.  All right.  Thank you.

**PROSPECTIVE JUROR LI:**  Thank you.

**THE COURT:**  Okay.  Let's see.  Anybody else in the back row over there?

(No response.)

**THE COURT:**  Okay.  And then are you all prospective jurors here?

(Heads nodding.)

**THE COURT:**  Yeah?  Okay.  Do any of you want to talk about --

(Show of hands.)

**THE COURT:**  Okay.  Come on up.

**PROSPECTIVE JUROR SUAZO:**  My name is Nancy Suazo.  I'm Juror Number 110.

**THE COURT:**  Okay.

**PROSPECTIVE JUROR SUAZO:**  And it's kind of similar to Juror Number 68.  I'm only allowed ten days for jury duty.

And also, it's like the beginning of the year, so I'm doing a lot of reporting for the State for our work.

**THE COURT:**  Okay.  Tell me who you work for, what your job is.

**PROSPECTIVE JUROR SUAZO:**  I work for a winery in Healdsberg called Rodney Strong.  So it's a family-owned winery.

**THE COURT:**  Rodney Strong?

**PROSPECTIVE JUROR SUAZO:**  Yes.

**THE COURT:**  Oh that's a big -- that's a big winery --

**PROSPECTIVE JUROR SUAZO:**  It's a pretty big winery.

**THE COURT:**  -- right?

**PROSPECTIVE JUROR SUAZO:**  Yeah.

**THE COURT:**  Yeah.  Okay.  And what's your -- what functions -- what's your job title and what do you --

**PROSPECTIVE JUROR SUAZO:**  I'm the maintenance administrative assistant.

**THE COURT:**  Okay.  And what are your responsibilities here at the beginning of the year?

**PROSPECTIVE JUROR SUAZO:**  Meter readings for the day.  And then I'm also -- since it's the beginning of the year, we're doing water reporting and, also, refrigerant reporting

for our chiller systems for the wine.  That's, like, usually --
it's between January and February that we start reporting.

THE COURT:  Okay.  And I guess I'll ask the same
question of you that I asked of Juror Number 68.  If the
company is willing to pay for three weeks, or however long it
ends up being, are you okay with that?

PROSPECTIVE JUROR SUAZO:  If -- you can ask that,
yeah.  That's fine, yeah.

THE COURT:  Okay.  Could you -- before the next break,
could you give Bhavna contact information for -- I already have
the contact information for Federal Express.  But if you could
give Bhavna contact information for your employer.

PROSPECTIVE JUROR SUAZO:  Yes.

THE COURT:  In particular, is there a -- do you know
if there's a general counsel at Rodney Strong?

PROSPECTIVE JUROR SUAZO:  It's just like our HR.  My
boss too, he usually advocates for me.

THE COURT:  We'll start with that.

PROSPECTIVE JUROR SUAZO:  Okay.

THE COURT:  Great.  Thank you.

(Show of hands.)

THE COURT:  Come on up.

PROSPECTIVE JUROR LAWSON:  Hi.  My name is Lacye
Lawson.  I'm Juror Number 111.

THE COURT:  Hi.

**PROSPECTIVE JUROR LAWSON:**  Hi.  I work at Highland Hospital, and we're going through, like, pay cuts.  So the floor staffing has been short for nurses.

**THE COURT:**  And Highland is in Oakland?

**PROSPECTIVE JUROR LAWSON:**  Oakland, mm-hmm.

**THE COURT:**  Yeah.  And you -- so you're a nurse.  What area do you work in?

**PROSPECTIVE JUROR LAWSON:**  Mother-baby.

**THE COURT:**  Sorry?

**PROSPECTIVE JUROR LAWSON:**  Mother-baby, postpartum.

**THE COURT:**  Okay.  And you said you-all have been going through a bunch of layoffs?

**PROSPECTIVE JUROR LAWSON:**  Yeah.

**THE COURT:**  Staff reductions?

**PROSPECTIVE JUROR LAWSON:**  Recently, I think starting the 6th, they're sending out pay cuts; but the floor has been short just because of vacation and the season.

**THE COURT:**  Okay.  Thank you.

**PROSPECTIVE JUROR LAWSON:**  Thank you.

**THE COURT:**  All right.  Anyone else from that final row there?

(No response.)

**THE COURT:**  Okay.  Thank you very much.

So what we're going to do now is we're going to play this annoying static for you.  And the purpose of the annoying

static is to allow me to speak with the lawyers over here at sidebar about all of your requests, and we don't want you to hear us.  So I apologize in advance for the static.  It should just take a couple of minutes, and then we'll be back to you.

Thank you.

(Discussion held at sidebar, not reported.)

**THE COURT:**  All right.  Give everyone a second to settle in.

Okay.  I'm going to read off the juror numbers who are being excused for what we refer to as hardship.  Please don't get up until I've finished reading off all of the numbers, but once I'm done, you all are free to go.

There are some of you that are not being excused for hardship.  And just to tell you a little bit about that, I mean, the discussion we had, I had with the lawyers was about whether this was, like, an inconvenience that is very unpleasant and difficult to deal with versus something that is really, really difficult or impossible to deal with.

And for some people, we didn't conclude that it rose to the level of hardship.  You will have an -- if you're not excused now, you'll have an opportunity to discuss it further with us later on.  But our preliminary conclusion was that it doesn't rise to the level of a hardship.

So the people who are excused are Juror Number 33, 63, 67, 77, 87, 89, and 111.  Thank you for coming in, and you-all

are free to go now.

(Prospective Jurors 33, 63, 67, 77, 87, 89, and 111 dismissed.)

**THE COURT:**  Okay.  Thank you.

So for the rest of you, let me talk to you a little bit about kind of how the rest of the day is going to go. All right?

The first thing I'm going to do is ask you all to introduce yourselves.

The second thing is that we're going to pass out a list of the names of the people who are involved in this case in any way.  And you'll each have a copy of the list, and you can take a look at it casually over the course of the day and see if you think you might know somebody on that list.  And if you think there's a possibility, you should raise your hand at any point to let us know.  Okay?

And then after that, I'll give you a description of the case, and I will probably ask a few general questions of you, kind of raise-your-hand type questions about jury service and the nature of the case, to find out whether any of -- anything about this case or anything about jury service generally is potentially problematic for you.

After I'm done talking to you, I'll turn it over to the lawyers, and the lawyers will have plenty of time to ask you follow-up questions.  Those might be general

raise-your-hand questions along the lines of the ones that I'm going to ask, or there might be specific questions to particular individuals based on your questionnaire response or something that you said to me or something like that.

After the lawyers are done asking you questions, you all will have a break.

By the way, at some point during that process, we'll probably take a lunch break; right?  And I'm not sure exactly what point along the process that will be, but at some point, you'll take a lunch break.

And then at the tail end of the process, after the lawyers have asked you their questions, then you will be able to take a break -- there will be an opportunity to speak with us in private after that, and then you'll take a break and we'll do our work, and then you'll come back and you'll know who the jury is.  You'll know whether you're on the jury or not.  So that's the process.

So I want to start -- yeah, you can go ahead and pass out the list.

So Bhavna is going to start passing out the list of people involved in the case.  And like I said, you don't have to look at that right away.  You can just casually look at it at some point during the day to make sure there's nobody who you think you might know.

And then we're going to go one by one, and this

perhaps may be a little annoying to some people, but just to start to get to know everybody a little bit.  I'm going to ask everyone to take turns coming up to the mic.

And I'm sorry.  You're going to be the guinea pig.

I'm going to ask everyone to come up to the mic and give us a few pieces of information about yourself.  Okay?  Your name; where you live; your educational background, like where you went to college or wherever, high school, college, whatever; your current job or, if you're not working, your most recent job; and then, finally, if you want to -- this is optional -- but if you want to, you can share a fun fact about yourself.

I'm trying to think about some of the fun facts we've had in the past.  I guess the most memorable was we had Brian Boitano, the Olympic figure skater, in here and he shared that he had a South Park song written after him.

But that's optional.  You don't have to share a fun fact about yourself if you don't want.

But so, again, your name, where you live, your educational background, what your current job is or, if you're not working, what your former job is, and then, if you wish, fun fact about yourself.

Take it away.  And start by -- when you say your name, also repeat your juror number.  That would be helpful.

**PROSPECTIVE JUROR MONTELINDO:**  Erik Montelindo, Juror

Number 1 [sic].  I'm retired.  I've been retired for about ten years.  I used to work as an investment consultant at TD Ameritrade.  And I went to San Jose State University, and I've lived in Silicon Valley my whole life.

THE COURT:  Great.

PROSPECTIVE JUROR MONTELINDO:  That's about it.

PROSPECTIVE JUROR EVERETT:  Good morning.  My name is Annemarie Everett.  I have a doctorate in physical therapy from UC San Francisco.  I practiced for about ten years, but now I work in tech as a product manager at a digital health start-up.

THE COURT:  What's the company called?

PROSPECTIVE JUROR EVERETT:  Vori Health.

THE COURT:  Okay.

PROSPECTIVE JUROR EVERETT:  Am I leaving anything out?

THE COURT:  Did you do education?  I can't remember.

PROSPECTIVE JUROR EVERETT:  Doctorate in physical therapy.

THE COURT:  Okay.  And where did you get that from?

PROSPECTIVE JUROR EVERETT:  UCSF.

THE COURT:  Okay.  Great.  Thank you.

PROSPECTIVE JUROR LAZARO FUENTES:  Hello.  Good morning.

THE COURT:  Good morning.

PROSPECTIVE JUROR LAZARO FUENTES:  My name is Ivan Lazaro Fuentes.

I currently live in Fremont.  And my education level would be I'm in college.  My current job position would be I work at Tesla.

THE COURT:  You work at Tesla.  And what's your job for Tesla?  What do you do?

PROSPECTIVE JUROR LAZARO FUENTES:  I am in the quality department.

THE COURT:  Okay.  And you said you're currently in college?

PROSPECTIVE JUROR LAZARO FUENTES:  Yes.

THE COURT:  Where do you go?

PROSPECTIVE JUROR LAZARO FUENTES:  I go to -- or not "go," but I take classes at Ivy Tech.

THE COURT:  Got it.  Okay.  Thank you.

PROSPECTIVE JUROR MIYASHITA:  Hi.  I'm Laura Miyashita, Juror Number 9.  And I'm from Oakland, California. I did my undergraduate at Boston University, and I work as director of brand and marketing strategy at UCSF Health.

THE COURT:  Great.  Thank you.

PROSPECTIVE JUROR POGOSYAN:  Hi my name is Vitaly Pogosyan.  I live in San Ramon.

THE COURT:  What is your Juror Number?

PROSPECTIVE JUROR POGOSYAN:  15.

THE COURT:  15.

PROSPECTIVE JUROR POGOSYAN:  One, five.

THE COURT:  Okay.  Got it.

PROSPECTIVE JUROR POGOSYAN:  I work as a software engineer and manager in tech, company Pure Storage, software and hardware company.  What else?  Oh, master's degree in computer science.  That's it.

THE COURT:  Okay.  Great.  Where did you get your master's degree from?

PROSPECTIVE JUROR POGOSYAN:  In Russia.

THE COURT:  Okay.  Great.  Thank you.

PROSPECTIVE JUROR BARTOS:  I'm Simon.  I went -- my Juror Number is 16.

THE COURT:  Okay.  Mr. Bartos?

PROSPECTIVE JUROR BARTOS:  Yes.

THE COURT:  Okay.

PROSPECTIVE JUROR BARTOS:  I went to University of Hawaii, Manoa.

THE COURT:  University of what?

PROSPECTIVE JUROR BARTOS:  Hawaii at Manoa and studied mechanical engineering.  And I work at an architecture firm.

THE COURT:  What's the name of the architecture firm?

PROSPECTIVE JUROR BARTOS:  Bartos Architecture.

THE COURT:  Okay.  Great.  Thank you.

PROSPECTIVE JUROR YAFFE:  Hi.  I'm Ryan Yaffe, Juror Number 18.

THE COURT:  Hi again.

**PROSPECTIVE JUROR YAFFE:**  Hi again.

My highest level of education is high school diploma from Mills High School, and I am a consumer lending operations analyst at Stanford Credit Union.

**THE COURT:**  Cool.  Okay.  And let me ask you about your flight.  You said that it was prepaid.

**PROSPECTIVE JUROR YAFFE:**  It's non-refundable.

**THE COURT:**  Okay.

**PROSPECTIVE JUROR YAFFE:**  And the hotel.

**THE COURT:**  Is it changeable?  Like, if you were to leave Thursday afternoon instead of Thursday morning.

**PROSPECTIVE JUROR YAFFE:**  I'm not sure.  The hotel would probably be fine.  I would have to check with the airline.  I don't think I opted for changes.

**THE COURT:**  Okay.  Because oftentimes, it's not -- it can be -- I mean, depending on the airline and all that stuff, it can be changeable if it's -- even if it's non-refundable.

**PROSPECTIVE JUROR YAFFE:**  Yeah.

**THE COURT:**  Could you try to check that during a break?

**PROSPECTIVE JUROR YAFFE:**  Yeah.

**THE COURT:**  Okay.  Thank you.

**PROSPECTIVE JUROR YAFFE:**  Thanks.

**THE COURT:**  All right.  Why don't we go to you.

**PROSPECTIVE JUROR BARKER:**  My name is Kayleigh Barker.

I'm 19.  I have two jobs.  I work for Hooray! Kids on Thursdays.

THE COURT:  What's it called?

PROSPECTIVE JUROR BARKER:  Hooray! Kids in the New Park Mall.  And I work for CVS and Costco on Friday and Saturday.  And my level is high school.

THE COURT:  Okay.  Graduated from high school?

PROSPECTIVE JUROR BARKER:  Yes.

THE COURT:  All right.  And what is your job for Costco?

PROSPECTIVE JUROR BARKER:  I test -- we test out samples that Costco has.  Yeah.

THE COURT:  Okay.  Great.  Thank you very much.

PROSPECTIVE JUROR MAN-WILLRICH RAMOS:  Good morning again.  Ariane Man-Willrich Ramos, Juror Number 24.  I am a nurse coordinator at UCSF Benioff Children's Hospital.  My highest level of education is a master's degree, which I got from UC Davis.

Thank you.

THE COURT:  Where do you live?

PROSPECTIVE JUROR MAN-WILLRICH RAMOS:  I live in Oakland.

THE COURT:  In Oakland.  Okay.  Great.  Thank you.

So you work at the place where you have your ob-gyn appointments?

**PROSPECTIVE JUROR MAN-WILLRICH RAMOS:**  Yes.

**THE COURT:**  Okay.  Great.

**PROSPECTIVE JUROR MAN-WILLRICH RAMOS:**  Convenient.

**PROSPECTIVE JUROR GONZALEZ HERNANDEZ:**  Hello.  My name is Debbie Gonzalez Hernandez, Juror Number 25.  I -- highest level is high school.  I went to Windsor High.  I'm from Northern California, Santa Rosa.  And I work as an activities coordinator at the Fountaingrove Lodge Terraces Memory Care.  So I work with dementia and Alzheimer's patients.

**THE COURT:**  Wow.  Thank you.

**PROSPECTIVE JUROR GONZALEZ HERNANDEZ:**  Thank you.

**PROSPECTIVE JUROR JULES:**  Hi.  My name is Demari Jules, Juror 30.  I am currently enrolled at Contra Costa College, trying to get my psychology degree.  And I work as a one-on-one behavioral tech with kids with autism and, like, anything across -- like, ADHD, anything.  So that's pretty much what I've been doing.  And I plan to become an educator.

**THE COURT:**  Where do you -- what school do you work at, or do you bounce around to different schools?

**PROSPECTIVE JUROR JULES:**  I work at Fairfax, but I live in Pinole.  So I'm, like, commuting every day.

**THE COURT:**  Oh, wow.

**PROSPECTIVE JUROR JULES:**  But other than that, yeah.

**THE COURT:**  Wow.  So what would happen -- I mean, do you have a particular student who you work with one-on-one

right now?

**PROSPECTIVE JUROR JULES:**  Yeah.  So I work with one kid one-on-one.  And then, like, let's say he's pretty independent for that period, then I'll go work with another student.  So I'm on my feet, like, all day.

**THE COURT:**  Yeah.  And what about, do they -- in Fairfax, in the school district, do they have enough flexibility to have a sub for you if you serve?

**PROSPECTIVE JUROR JULES:**  I would be worried about that, speaking transparently, yes.  I'm pretty, like, heavily relied on because, like, just for how much support I provide.  So, yeah, I would be worried about that.

**THE COURT:**  Okay.  All right.  Thank you.

**PROSPECTIVE JUROR JULES:**  Mm-hmm.

**THE COURT:**  Hold on one sec before we call the next person up.  You can sit down.

Bhavna?

(Discussion off the record between the Courtroom Deputy and the Court.)

**THE COURT:**  Okay.  Sorry.  Ms. Latoof?

**PROSPECTIVE JUROR LATOOF:**  Hello again.  My name is Ashley Latoof.  I am Juror 31.  I live in Martinez, California. I have a B.A. in journalism from Chico State.  I currently work at TEL HI Neighborhood Center in North Beach, one of the oldest non-profits in San Francisco.

THE COURT: What do they do? What does the non-profit do?

PROSPECTIVE JUROR LATOOF: We do a lot of things. We provide programs and services for people ranging in age from three months to 99 years old. So we provide early childhood education, after-school programming for schools in North Beach and Chinatown. We also do senior services and after-school care.

THE COURT: Great. And what's your particular job for them?

PROSPECTIVE JUROR LATOOF: I'm the marketing communications director.

THE COURT: Great. Thank you.

PROSPECTIVE JUROR COPI: My name is Margaret Copi, and I live in Oakland, and my juror number is 36. And I'm a psychiatrist. I did my undergrad in several different schools, mostly as a dance major. And I worked at Highland Hospital for a while in the indigent populations, and then I went into corporate medicine, and then I quit my corporate medicine job in April, and now I'm in private practice.

THE COURT: Great. Thank you.

PROSPECTIVE JUROR COPI: I wanted to ask you for one of those private interviews.

THE COURT: Okay. Sure. I thought you were going to be the first person to share a fun fact about yourself.

All right.  Well, maybe you will do so in private.  I will --
I'll mark you down.

All right.  Why don't we start with you in the --
closest to the aisle.  Yeah.  Thank you.

**PROSPECTIVE JUROR TSERENDOLGOR:**  Hi.  I'm Number 37.
My name is Dulamsuren Tserendolgor.  I'm currently in college,
studying industrial and systems engineering.  I live in
San Francisco.

Fun fact about me, I'm a bodybuilder.

**THE COURT:**  Okay.  Thank you for being the first to
share a fun fact.

What school do you go to?

**PROSPECTIVE JUROR TSERENDOLGOR:**  San Jose State.

**THE COURT:**  Thank you.

All right.  Next?

**PROSPECTIVE JUROR DAQIQ:**  My name is Fariha Daqiq, and
I'm Juror Number 39.  I live in Pleasant Hill, and right now
I'm not working.

**THE COURT:**  Okay.  And what -- have you had any jobs
in the past that might be interesting?

**PROSPECTIVE JUROR DAQIQ:**  Yeah.  I did work as
real estate agent and also as notary public, signing agent.

**THE COURT:**  Okay.

**PROSPECTIVE JUROR DAQIQ:**  And then I just retired.

**THE COURT:**  And I guess notary public, there's

probably less business for notary publics these days; right?

**PROSPECTIVE JUROR DAQIQ:**  Exactly.  After, you know, that COVID hit, my business just went down the drain, and --

**THE COURT:**  Yeah.

**PROSPECTIVE JUROR DAQIQ:**  -- I decided not to work anymore.

**THE COURT:**  Okay.  And you're speaking with an accent.

**PROSPECTIVE JUROR DAQIQ:**  Yes.

**THE COURT:**  But you seem to speak very good English.

**PROSPECTIVE JUROR DAQIQ:**  Thank you.

**THE COURT:**  You haven't had any trouble understanding anything that I've been saying here today?

**PROSPECTIVE JUROR DAQIQ:**  No.

**THE COURT:**  Okay.  Good.  Thank you.

**PROSPECTIVE JUROR DAQIQ:**  Oh, you're welcome.

**PROSPECTIVE JUROR McCARTHY:**  Number 42, David McCarthy.  I live in San Pablo.  I graduated from Maybeck High School, Berkeley.  I work for Ifshan Violins. I guess my official title under my pay stub would be repairs.

**THE COURT:**  Would be what?  Repairs?

**PROSPECTIVE JUROR McCARTHY:**  Repairs.

**THE COURT:**  Okay.  Thank you.

Maybeck High School.  We looked at that place for our son.  It seems like a wonderful high school.

**PROSPECTIVE JUROR McCARTHY:**  A bit expensive.

THE COURT:  Yes.

PROSPECTIVE JUROR WANG:  Ready?

THE COURT:  Yes.

PROSPECTIVE JUROR WANG:  Hi.  I'm Collin Wang.  I'm Number 43.  I am from Pleasanton, California, born and raised. I went to the University of Pennsylvania for undergrad, and I'm currently working at a start-up mental health clinic in Los Altos.

THE COURT:  What's the start-up mental health clinic called, and what do they --

PROSPECTIVE JUROR WANG:  It's called --

THE COURT:  -- do?

PROSPECTIVE JUROR WANG:  Sorry?

THE COURT:  And what do they do?

PROSPECTIVE JUROR WANG:  It's called Amaya Health. It's a severe mental illness outpatient clinic.  Yeah.

THE COURT:  Thank you.

PROSPECTIVE JUROR OBERON:  Hello.  John Oberon.  I went to school.  I eventually got my degree at Chico State, computer science.  Retired.  Last job was a start-up called Biotiles, or living walls, plants on walls, that type of stuff. Now I quilt.

THE COURT:  Okay.  Thank you.

(Laughter.)

PROSPECTIVE JUROR LEONG:  Hi.  Kip Leong, Number 45.

I was born in the Bay Area but grew up down near L.A.  Went to Cornell and studied electrical engineering.  I wasn't very good at that and got a job on Wall Street.  Got my M.B.A.  And then moved out here during the dot-com era and got laid off from that.  Got a job at Visa.  I've been there 24 years.  Now I'm in the treasury department doing FX.  And I think that's it.

THE COURT:  Great.  Thank you.

PROSPECTIVE JUROR KIMBALL:  Number 46, Justin Kimball, San Leandro.  I'm a teacher for Hayward Unified School District in the evening.  That's my second job.  My first job, I work for Oakland Unified School District as a testing specialist.

And fun fact, you might see me stand up once in a while because I've got two herniated disks in my back so I have some pain.

THE COURT:  I saw you mentioned that.  And there's no -- I just wanted to assure you, there's no problem with standing up however often and however long you want.

PROSPECTIVE JUROR KIMBALL:  Thank you.

THE COURT:  And then I wanted to ask you about --

PROSPECTIVE JUROR KIMBALL:  Yes.

THE COURT:  -- your Oakland Unified job.

PROSPECTIVE JUROR KIMBALL:  Yes.

THE COURT:  You said it was a testing specialist?

PROSPECTIVE JUROR KIMBALL:  Yes.  So --

THE COURT:  What does that mean?  What do you do?

**PROSPECTIVE JUROR KIMBALL:**  Sure.  So I train teachers, principals.  We load test settings for students.  Basically, we manage all aspects of State testing for Oakland Unified.  It's me and a colleague of mine that do that.

**THE COURT:**  So it's like the State standard-wide test?

**PROSPECTIVE JUROR KIMBALL:**  Yes.  It's for, like, English tests for the upcoming -- the English language tests will start in February; the physical fitness tests for the PFT, the physical fitness test, which we still do in California; the SBAC test, the science test.

We also have alternative tests for the special ed students that we work with.  And we have an ongoing English language entry test that's given to all students that enter in Oakland Unified who speak a second language.

**THE COURT:**  Got it.  Thank you.

**PROSPECTIVE JUROR KIMBALL:**  Thank you.

**PROSPECTIVE JUROR CHOW:**  Hi, Your Honor.  My name is Raymond Chow.  I'm Juror Number 48.  I currently reside in San Francisco.  I have a Ph.D. in aerospace and mechanical engineering from UC Davis.  I'm currently employed at Nvidia as a principal engineer, and prior to that, I was at AWS for four years.

**THE COURT:**  Great.  Thank you very much.

**PROSPECTIVE JUROR LIU:**  Hello again.  I'm Noelle Liu, Juror Number 49.  I'm from Pleasant Hill, California, but grew

up in Southern California.  I went to school at UC Irvine, got a biology degree.  And now I'm a medical technologist at John Muir Health in the East Bay.  In order to achieve that, I had to get a post-bacc licensure in medical technology.

And fun fact, I used to work for Cedars-Sinai.

**THE COURT:**  Great.  Thank you.

**PROSPECTIVE JUROR KULLBERG:**  My name is Amanda Kullberg.  I'm Juror Number 51.  I live in San Mateo.  Attended Sacramento State University and have my bachelor's degree in child and adolescent development and am currently a preschool teacher.

**THE COURT:**  Great.  Thank you.

**PROSPECTIVE JUROR NICKISON:**  Hello.  My name is Marita Nickison.  I'm Juror Number 54.  I live in San Mateo.  I have a bachelor -- excuse me -- bachelor's degree.  I'm currently self-employed -- it's more of a hobby than a full-time job -- as a CPR instructor.

**THE COURT:**  Oh, how did you -- how did you come about that job or hobby?

**PROSPECTIVE JUROR NICKISON:**  So I used to work in the pediatric intensive care unit in a hospital and back in the time when latex was a problem.  So I developed a latex allergy and I couldn't work in-patient anymore.

**THE COURT:**  Thank you.  And you said you got a bachelor's degree.  Where did you go to school?

PROSPECTIVE JUROR NICKISON:  San Jose State.

THE COURT:  Great.  Thank you.

PROSPECTIVE JUROR DEA:  My name is Joseph Dea, Juror Number 61.  I live in San Francisco.  I'm a retired graphic designer.  Went to school at UC Berkeley.

THE COURT:  And where did you -- when you were a graphic designer, were you self-employed or did you work --

PROSPECTIVE JUROR DEA:  I was self-employed, yes.

THE COURT:  Self-employed.  Okay.  Thank you.

PROSPECTIVE JUROR POIRIER:  Hi.  My name is Angelina Poirier.  I'm Juror Number 62.  I currently live in Richmond, California.  I went to school at Apex Tech in Manhattan.  I currently work for Weatherford BMW, which I've done for the last 17 years.

And fun fact, I like to work on cars.

THE COURT:  You like what?

PROSPECTIVE JUROR POIRIER:  Like to work on cars.

THE COURT:  Oh.  What do you do -- what's your job for BMW?

PROSPECTIVE JUROR POIRIER:  Service advisor.

THE COURT:  Oh, cool.  Thank you.

PROSPECTIVE JUROR GRAY:  Good morning.  My name is Staci Gray.  I'm Juror Number 66.  Highest level of education is some college.  I've worked for the Superior Court system for almost 30 years.  I actually just work across the street.

So fun fact, I've probably done more trials than everyone here, but I've never been a juror.

THE COURT:  Oh, so I bet you're one of the rare people who, even before serving, you're kind of excited at the prospect of serving as a juror.

PROSPECTIVE JUROR KESSLER:  Not until now.  This is actually, because of operations, really, really interesting because federal court does it way different than Superior Court.  But, yeah, I didn't want to be a juror before.

THE COURT:  I think that -- yeah, I mean, my -- from what everybody has told me, we -- I mean, we do have more resources and stuff; right?  So I'm not casting aspersions on the state court system, but everybody has told me that their experience serving in federal court has been much, much better than in state court.

PROSPECTIVE JUROR KESSLER:  Yeah.  I think from -- I was in Marin before I was here in San Francisco, and you don't hear any juror excuses there.  It's amazing.  Before that, for 25 years I was in Tulare, and it's every excuse under the sun.  I think it's just an economic, you know, situation.

THE COURT:  Yes.  Yeah.

PROSPECTIVE JUROR KESSLER:  But I haven't been in the courtroom for some time.  I'm the COO now over in San Francisco for Unified Family Court; but, yeah, it's always refreshing to be back in a courtroom.

**THE COURT:** And when did you work -- what years did you work for Marin Superior?

**PROSPECTIVE JUROR KESSLER:** I was in Marin from 2021 through July of 2024.

**THE COURT:** Okay.

**PROSPECTIVE JUROR KESSLER:** Yeah.

**THE COURT:** So Bhavna worked at Marin Superior, but I think it was before 2021.

Right? Yes?

**THE COURTROOM DEPUTY:** I left in 2021.

**PROSPECTIVE JUROR KESSLER:** I've heard Bhavna's name, but I don't know her.

**THE COURT:** Okay. All right. Great.

**PROSPECTIVE JUROR KESSLER:** All good things.

**THE COURT:** I'm sure it was all good things.

**PROSPECTIVE JUROR KESSLER:** Yeah.

**THE COURT:** All right. Thank you.

**PROSPECTIVE JUROR SANCHEZ:** Eli Sanchez, Juror Number 68. I live in San Mateo. I currently work for a FedEx office in Palo Alto, California. I've been doing that for about 29 years.

**THE COURT:** Great. And where -- what's your educational background?

**PROSPECTIVE JUROR SANCHEZ:** Oh. I have a bachelor's degree in English from the University of South Carolina.

THE COURT:  Great.  Thank you.

PROSPECTIVE JUROR SANCHEZ:  All right.

PROSPECTIVE JUROR GUTIERREZ:  Hi.  My name is Manuel Gutierrez, Juror Number 70.  I went to high school in Fremont and then I live in Fremont, Robertson High School.  And I am a manager at Living Spaces distribution center.

THE COURT:  Great.  Thank you very much.

PROSPECTIVE JUROR JOHNSON:  Hello.  My name is Kennedy Johnson.  I'm Number 71.  I'm from Hayward, California.  I graduated from St. Mary's College last year, also played college basketball there.

THE COURT:  Oh.

PROSPECTIVE JUROR JOHNSON:  Yeah.

THE COURT:  I know that the men's team gets a lot of attention.  Are you guys good too?

PROSPECTIVE JUROR JOHNSON:  This year, yes.  Last year we were okay.

THE COURT:  When you were on the team, you were just okay?

PROSPECTIVE JUROR JOHNSON:  No.  I was good.

(Laughter.)

THE COURT:  Okay.

PROSPECTIVE JUROR JOHNSON:  Yeah.  Got my bachelor's in business administration.  I currently work part-time as a girls youth basketball coach and a front-desk agent at a hotel

in Pleasanton.

And then fun fact about me is I also got summoned, again, for February, the beginning of February, by Alameda County.

**THE COURT:** By Alameda County?

**PROSPECTIVE JUROR JOHNSON:** Yeah.

**THE COURT:** For beginning of February?

**PROSPECTIVE JUROR JOHNSON:** Yes.

**THE COURT:** Okay. So maybe there'll be enough overlap where if you serve on this jury, we can get you out of that one.

**PROSPECTIVE JUROR JOHNSON:** Yeah, hopefully. We'll see.

**THE COURT:** Yeah. Thank you.

**PROSPECTIVE JUROR CONTRERAS GALLARDO:** Hi. My name is Ramon Contreras, Juror 72. And level of study is high school, Pittsburg High School, graduated in 1995. And I'm self-employee from Handyman, and I also got another job part-time as a chef in a Mexican restaurant.

**THE COURT:** Sorry. As a chef?

**PROSPECTIVE JUROR CONTRERAS GALLARDO:** Yes.

**THE COURT:** In a Mexican restaurant?

**PROSPECTIVE JUROR CONTRERAS GALLARDO:** Yes.

**THE COURT:** What restaurant is that?

**PROSPECTIVE JUROR CONTRERAS GALLARDO:** It calls

Los Gallos Express.  There is one in Pittsburg, Concord, and Pleasant Hill.

THE COURT:  Okay.  Great.  All right.  Thank you.

PROSPECTIVE JUROR THAREJA:  Juror 74, Rahul Thareja. I have a doctorate in geoengineering from University of Nevada Reno.  Currently working as a civil engineer for Mark Macdonald.

THE COURT:  Great.  Thank you.

PROSPECTIVE JUROR GREACEN:  Good morning.

THE COURT:  Good morning.

PROSPECTIVE JUROR GREACEN:  Chris Greacen, Juror Number 75.  I live in Oakland.  I have a B.A. from Boston University.  I am CEO of a small software consulting company.

THE COURT:  What's it called?

PROSPECTIVE JUROR GREACEN:  Called Lab Zero Innovations.

THE COURT:  Okay.  And what do you -- what's -- tell me a little bit about the company.

PROSPECTIVE JUROR GREACEN:  Design and build custom software for our clients.  We work with start-ups and big companies in Silicon Valley.  I negotiate contracts and hire people and fire people, basically.  Make sure my clients are happy.

THE COURT:  All right.  Got it.  Thank you very much.

PROSPECTIVE JUROR GREACEN:  Sure.

**PROSPECTIVE JUROR ESGUERRA:** Hello.  I'm Richard Esguerra, Juror 76.  I got my B.A. at the University of Southern California, communication and journalism.  I work for Giant Rabbit, a software development company with mostly non-profit clients, and before that was a development director at the Electronic Frontier Foundation.

**THE COURT:** Oh.  Interesting.  So how did you like working for EFF?

**PROSPECTIVE JUROR ESGUERRA:** Oh, it was great.  It was fantastic, yeah.  Very interesting work.  And I've been in a few of the courtrooms to watch litigation take place, yeah.

**THE COURT:** Yeah.  We often will get what's called amicus briefs, friend of the court briefs, from EFF; and I have to say, they're always very helpful.  They always -- whether I agree with them or not, they are always very helpful in sort of teaching us about the technology and the law and the privacy issues.

**PROSPECTIVE JUROR ESGUERRA:** Yeah.  The lawyers took a lot of pride in it.  And when I was on the advocacy side, I really appreciated having it put into that process and, yeah, really liked it.

**THE COURT:** Yeah.  Good lawyers.

Speaking of which, I don't think we've had a single lawyer yet; is that right?  That is highly unusual.  We'll see if we get one as the morning goes on.

Thank you.

**PROSPECTIVE JUROR ESGUERRA:**  Thank you.

**THE COURT:**  You're going to tell me you're a lawyer?

**PROSPECTIVE JUROR POSSIN:**  No.

**THE COURT:**  Okay.

**PROSPECTIVE JUROR POSSIN:**  Far from it.

Juror Number 79, Scott Possin.  I'm a park supervisor with East Bay Regional Park District.  I live in Richmond.  Certificate-level programs in college.

And let's see.  Fun fact.  Let's see.  I supervise four parks at work.  It's a great career.  A little bit challenging sometimes but --

**THE COURT:**  Yeah.  Which parks do you supervise?

**PROSPECTIVE JUROR POSSIN:**  -- a lot of fun.

Miller/Knox, Point Isabel, McLaughlin Eastshore, Brooks Island, Point Molate on the shoreline there.

**THE COURT:**  That sounds great.

All right.  Thank you.

**PROSPECTIVE JUROR HU:**  Good morning.

**THE COURT:**  Good morning.

**PROSPECTIVE JUROR HU:**  Chingyuan Hu, Juror Number 84, from Novato, Marin County.  Retired professor since 2018.  Was professor at Oregon State University, then move on to University of Hawaii as associate dean for research for the college ed and later on become assistant vice chancellor for

research.  I was the RIO, research integrity officer, for the University of Hawaii.

Let's see.  Fun fact, I get up Monday morning, drive from Novato to Milpitas to take care of my mother, 99 years old.

On Wednesday, I come back, pick up my wife on the way back from Oakland, who's taking care of our older daughter with two grandsons.  Came back home in the afternoon.

Thursday morning go down to Tiburon, take care of our two younger grandsons for younger daughter.

Come home Friday night.  Saturday and Sunday are ours.  And Monday again.

So I don't think I'm retired.  I'm more tired since my retirement.

(Laughter.)

THE COURT:  And I saw that.  You mentioned some of this in your questionnaire response, and are you going to be able to scramble to rearrange things for this period?

PROSPECTIVE JUROR HU:  I tried to get out, but I feel maybe I'm retired now, I should be helping the system, so...

THE COURT:  Okay.  Thank you very much.

PROSPECTIVE JUROR HU:  Mm-hmm.

PROSPECTIVE JUROR CHUHAK:  I'm John Chuhak, Juror Number 85.  I was in the U.S. Air Force Fire Department.  Then from there went and worked at NAS Alameda in the Fire

Department.  Then after it closed, I had my -- I bought cars for dealerships around the country.  Then I had my own business, and then I've been retired.

THE COURT:  Great.  Thank you very much.

PROSPECTIVE JUROR CHUHAK:  Martinez, California.

THE COURT:  From Martinez?

PROSPECTIVE JUROR CHUHAK:  (Nods head.)

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR FLYNN:  Hi.  My name's Kerry Flynn, and I live in South San Francisco.  I work for Levi Strauss & Co. as a senior executive assistant under the finance CFO team.

THE COURT:  Great.  And what --

PROSPECTIVE JUROR FLYNN:  Fun fact, I love to fish. How's that?

THE COURT:  You love to fish.  What kind of fishing?

PROSPECTIVE JUROR FLYNN:  All over the place.  We go to Quincy Lake, trout.  We go down to San Diego, bluefin, yellowfin, whatever you want.

THE COURT:  That's great.  I never had the patience for it.  I guess I shouldn't have become a judge if I didn't have the patience for fishing.

But what about your educational background?

PROSPECTIVE JUROR FLYNN:  Some college.

THE COURT:  Some college.  Okay.

**PROSPECTIVE JUROR FLYNN:**  And I've been a notary for about 29 years.

**THE COURT:**  Great.  Thank you.

**PROSPECTIVE JUROR FLYNN:**  Sure.

**PROSPECTIVE JUROR KELLY:**  Hello.  My name is Joe Kelly.  I am Juror Number 95.  I live in Novato, California, in Marin County.  I went to UC Berkeley for my undergraduate where I studied economics, and then I got a master's in business administration from University of San Francisco.

I currently work for a technology research and advisory company called Gartner.  I work as a consultant for them.  I do mostly consulting for market and growth strategy for commercial firms, usually technology-related firms.

**THE COURT:**  Great.  Thank you.

**PROSPECTIVE JUROR KELLY:**  Thank you.

**THE COURT:**  Is Juror Number 90 here?

Oh, okay.  Sounds like -- it looks like maybe you're seated a little out of order, but that's fine.  Not a big deal.  Go ahead.

**PROSPECTIVE JUROR LI:**  Hi again.  Jiawen Li, Juror Number 99.  I graduated from UC Davis with a degree in communication, and I'm currently a federal employee, work at Social Security Administration in Fremont.

**THE COURT:**  What do you do -- what do you do for the Social Security Administration?

**PROSPECTIVE JUROR LI:**  I'm a claims specialist.

**THE COURT:**  Oh, okay.  And tell me what that -- what does that mean, a claims specialist?  Is it sort of before they get to the hearing stage, you're considering people's claims and deciding whether to grant or deny their claims?

**PROSPECTIVE JUROR LI:**  Yeah.  It's before the hearing level, but my position can do it at reconsideration level, like a first level of appeal.  But I specialize in welfare, so it's supplemental security income.  So I'm serving, basically, low-income and disabled people.

**THE COURT:**  I see.  Thank you.

**PROSPECTIVE JUROR LI:**  I don't know if I can still add.  I just realized I have three medical appointments in a couple weeks on January 20th and 27th.  I have two on 20th and the 27th.  And I am diabetic, and I have to have a diabetic eye exam every year.  And, yeah, I have appointment with the Ophthalmology Department in Fremont, Palo Alto Medical Foundation.

**THE COURT:**  Okay.  All right.  When we get to the point where we have a private discussion, why don't you join us for -- why don't you participate in that.  Okay?

**PROSPECTIVE JUROR LI:**  Okay.  Thank you.

**PROSPECTIVE JUROR LAU:**  Hi.  Juror Number 104.  Name is Jaime Lau.  Education, master's in business science from Keck Graduate Institute.

**THE COURT:**  From where?

**PROSPECTIVE JUROR LAU:**  Keck Graduate Institute.

Currently, professional title is director of strategic engagements for Florence Healthcare.

**THE COURT:**  All right.

**PROSPECTIVE JUROR LAU:**  Fun fact, I have two Shibas. One's ten years old and one's a brand-new puppy.

**THE COURT:**  Oh, we have -- someone down the hall has a Shiba, and she brings the dog into work pretty much every day. So if you get picked for the jury, you'll get -- you can bring yours in and they can frolic together or something.

**PROSPECTIVE JUROR LAU:**  That'd be great.

**THE COURT:**  Okay.  Great.  Thank you.

**PROSPECTIVE JUROR PINALES:**  Good morning.  My name is Marina Pinales.  I'm Juror 108.  Highest level of education is high school diploma.  And I currently work for AAA in Hayward. I'm a customer service representative and I do sales as well. I do greeting at the front.  I'm a DMV technician.

**THE COURT:**  Okay.  Great.  Thank you.

**PROSPECTIVE JUROR PINALES:**  Thank you.

**PROSPECTIVE JUROR JUAREZ MENDOZA:**  My name is Brandon Juarez Mendoza.  I am Juror Number 10 -- 109.  I graduated from University of California Santa Cruz with a bachelor's in biochemistry, and I currently work at a histopathology laboratory in South San Francisco as a laboratory

assistant/technician.  And I live in San Francisco.

THE COURT:  I'm very happy to finally have a fellow Banana Slug in the courtroom.  When did you graduate from there?

PROSPECTIVE JUROR JUAREZ MENDOZA:  I graduated in 2023.

THE COURT:  2023.  Okay.  A little bit more recently than when I graduated from UC Santa Cruz.

(Laughter.)

THE COURT:  The place has changed a lot since '91 when I graduated, yeah.

Okay.  Thank you.

PROSPECTIVE JUROR KIMBALL:  '93, Your Honor.

THE COURT:  What?

PROSPECTIVE JUROR KIMBALL:  '93 from UC Santa Cruz.

THE COURT:  Oh, you're ninety- -- oh, I didn't catch that.  '93?

PROSPECTIVE JUROR KIMBALL:  Yeah.

THE COURT:  What college did you --

PROSPECTIVE JUROR KIMBALL:  It was from Merrill College --

(Reporter interrupts to clarify the record.)

THE COURT:  This is important.  Come up to the mic, please.

(Laughter.)

**PROSPECTIVE JUROR KIMBALL:**  Sorry about that.

Yeah, 1993, graduated.

(Reporter interrupts to clarify the record.)

**PROSPECTIVE JUROR KIMBALL:**  Juror Number 46.

So 1993, graduated from UC Santa Cruz, community studies, and it was Merrill College.

**THE COURT:**  Oh, I was Merrill College too and graduated in '91.  So did you live -- were you -- when were you in the dorms?

**PROSPECTIVE JUROR KIMBALL:**  Just the early part of '93 with -- you know, by the Merrill Moat.  I had to move off campus because of expenses.

So you remember the provost, John Isbister, I believe?

**THE COURT:**  Yes.  I mean, I don't think I had any interaction with him really, but, yeah, I do remember him. Yeah.

**PROSPECTIVE JUROR KIMBALL:**  Thank you.

**THE COURT:**  Thanks.

**PROSPECTIVE JUROR MORIARTY:**  Hi.  I'm Tara Moriarty and I am Juror Number 90.

**THE COURT:**  Okay.  Wait.  Hold on.  Let me get back to you.

Okay.

**PROSPECTIVE JUROR MORIARTY:**  I was -- I live in Daly City.  I've moved probably more than a dozen times throughout

my childhood, so I'm not really from anywhere.  I'm not an attorney, but I'm married into a family of attorneys and it kind of sucks because you can never win an argument.  I am the director of communications for the San Francisco Sheriff's Office.

And a fun fact about me, I was a news reporter and a reporter -- reporter and anchor for 25 years, and my last gig was at KTVU for ten years, and the last time I was in this building was to cover the Shrimp Boy trial.

**THE COURT:**  The Shrimp Boy trial.  And, yeah, I remember you from -- because I worked in the San Francisco City Attorney's Office, and I remember seeing you on TV.  And I did not know that you were in the Sheriff's Office now.  So how long have you been in the Sheriff's Office?

**PROSPECTIVE JUROR MORIARTY:**  About four years.

**THE COURT:**  Oh, okay.  So you must have overlapped with my former colleague Margaret Baumgartner then.

**PROSPECTIVE JUROR MORIARTY:**  Love her, yes.

**THE COURT:**  Yeah.  She and I did a trial together in this courthouse when I worked there, and we had a great time.

**PROSPECTIVE JUROR MORIARTY:**  Yes.  Very --

**THE COURT:**  She's a kick.

**PROSPECTIVE JUROR MORIARTY:**  Very good attorney.

**THE COURT:**  Yeah.

Okay.  Thank you.

**PROSPECTIVE JUROR MORIARTY:**  You're welcome.

Oh, also, I have one more question.  Can I go to the bathroom?  Is that okay?

**THE COURT:**  We're going to take a break.

**PROSPECTIVE JUROR MORIARTY:**  Okay.

**THE COURT:**  So you can go to the bathroom now if you need to, but we're also going to take a break as soon as everybody's done introducing themselves.

**PROSPECTIVE JUROR MORIARTY:**  Okay.

**THE COURT:**  But feel free to go now if you need to.

**PROSPECTIVE JUROR MORIARTY:**  Thank you.

**THE COURT:**  All right.  Are we done with everybody on that side?

All right.  Let's start over here.

**PROSPECTIVE JUROR SUAZO:**  My name is Nancy Suazo.  I'm Juror Number 110.  I went to high school.  Santa Rosa High School is my highest diploma.  Currently in the JC right now, the Santa Rosa Junior College.  I work for Rodney Strong Wine Estates.  I'm the maintenance administrative assistant for the maintenance department, and I am involved in a lot of stuff there.

I guess fun fact about me is that me and my husband used to do ballroom dancing.

**THE COURT:**  Great.  Where did you do that?  Just in the --

PROSPECTIVE JUROR SUAZO:  Arthur Murray.  There's one in Santa Rosa.  So there's a Arthur Murray studio.

THE COURT:  All right.  Thank you.

And remember to provide the contact information to Bhavna when we get to the break --

PROSPECTIVE JUROR PELLETIER:  Hi.  Julie Pelletier --

THE COURT:  -- which will be in just a couple of minutes.

PROSPECTIVE JUROR PELLETIER:  -- Juror 112.  I live in Fremont.  I work in Emeryville as the director of contracts for BioMed.  We're building pilot plant facilities across the country, a lot of procurements that are required to do that in construction.  I have a B.A. in communication and journalism from Northeastern.

And my fun fact is I'm not a lawyer, but I date one. So I win the arguments, though.

(Laughter.)

THE COURT:  That's a sign of a good lawyer, actually.

All right.

PROSPECTIVE JUROR FENG:  My name is Ziyu Feng, Juror Number 113.  Live in Fremont, California.  Graduated from UC Davis.  I am a hardware engineer working on the Renesas.

THE COURT:  Okay.  Working where?

PROSPECTIVE JUROR FENG:  Renesas.

THE COURT:  Okay.  And what sort of company is that?

**PROSPECTIVE JUROR FENG:**  Semiconductor.

**THE COURT:**  Okay.  And, Mr. Feng, you speak with an accent but you seem to speak well.  Just when anybody is speaking with an accent, I just want to make sure.  Did you have any -- have you had any difficulty understanding anything?

**PROSPECTIVE JUROR FENG:**  Sometimes.

**THE COURT:**  You have had difficulty?

**PROSPECTIVE JUROR FENG:**  Yes.  Sometimes, yeah.

**THE COURT:**  Okay.  And have you had difficulty understanding anything that I've said?

**PROSPECTIVE JUROR FENG:**  Not right now.

**THE COURT:**  Not right now but over the course of the morning?

**PROSPECTIVE JUROR FENG:**  Yeah, sometimes.

**THE COURT:**  Okay.  All right.  Thank you.

All right.  Is that everyone?

Okay.  So we will -- why don't we do this:  Why don't we -- for the folks who wanted to speak with us privately, why don't you stick around, and the rest of you can take a break.  And those of you who are going to stay and speak with us privately, you'll have a chance for a break afterwards as well.

I think you can plan on -- we can plan on probably taking about a 15- to 20-minute break.  Why don't we say that everybody should plan on being back in the courtroom at ten minutes to 12:00.  And then we'll plan on taking a lunch

break at around 12:30 or just a little bit after 12:30.

Bhavna, can they leave their stuff in here or do they need to take their stuff?  They can leave their stuff in here?

THE COURTROOM DEPUTY:  Yes, they can leave their stuff.

But just remember where you're sitting because when you come back, you'll be sitting in the same exact places.

THE COURT:  Except maybe, Ms. Moriarty, maybe you could find your proper seat, which would be next to -- which would be after Ms. Flynn.  I think you maybe should be on the -- yeah, on that -- closest to the aisle to put you in the proper numerical order.

So, everybody, you're all free to leave until ten minutes to 12:00, and then the two or three people who wanted to speak with us privately should stick around.

And I should clarify that not only can you leave, but you must leave because we'll be having private conversations in here.

PROSPECTIVE JUROR COPI:  May I leave and use the bathroom and come back quickly?

THE COURT:  Certainly.

Is it something that you need to discuss in private, or you just have a question about the process?

PROSPECTIVE JUROR JULES:  It was just about -- I don't know, me being the one-on-one aide and it being a priority, if

that creates conflict.  So I was just worried about that.

**THE COURT:**  Okay.  Well, why don't you stick around and we'll have a conversation about it privately --

**PROSPECTIVE JUROR JULES:**  Okay.

**THE COURT:**  -- just since you're here.

**PROSPECTIVE JUROR JULES:**  Okay.

**THE COURT:**  Okay.  Yes?

**PROSPECTIVE JUROR GUTIERREZ:**  I also do have a question, like, just to clarify.  Juror Number 70.

**THE COURT:**  What's your question?

**PROSPECTIVE JUROR GUTIERREZ:**  So just to clarify, you said this could take as long as three weeks?

**THE COURT:**  Yes.

**PROSPECTIVE JUROR GUTIERREZ:**  And it's every day?

**THE COURT:**  Yes, except for the 23rd and the 30th.

**PROSPECTIVE JUROR GUTIERREZ:**  And there's no specific time it would end, right, like every day?

**THE COURT:**  Yes.  It will -- you will be out of here no later than 3:30 every day.

**PROSPECTIVE JUROR GUTIERREZ:**  Okay.  Sounds good.

**THE COURT:**  Okay.  Thank you.

All right.  Give me one moment.

(Pause in proceedings.)

(Proceedings were heard out of the presence of the prospective jurors.)

(Prospective Juror Yafee present.)

**THE COURT:**  Okay.  So who needs to speak?  You had a question -- you had a private matter that you wanted to speak with us about?

**PROSPECTIVE JUROR YAFFE:**  I was just supposed to follow up with the flight, if I could make a change on it.

**THE COURT:**  Oh, yeah, right.  Are you trying to do that now?

**PROSPECTIVE JUROR YAFFE:**  I have it now.

**THE COURT:**  Okay.  Let's -- why don't we start with you since it's not a private matter.

When somebody needs to speak privately with us, we'll excuse everybody else from the courtroom and then you can speak privately with us; and those who have other private matters can just wait right outside the courtroom.  But since this is not a private matter, why don't you remind us of your juror number.

**PROSPECTIVE JUROR YAFFE:**  My juror number is 18.

**THE COURT:**  Okay.

**PROSPECTIVE JUROR YAFFE:**  And I do have the ability to make a change, but it says that there's zero flights available --

**THE COURT:**  Oh.

**PROSPECTIVE JUROR YAFFE:**  -- on Jet Blue if I make the change, yeah.

**THE COURT:**  All right.  Okay.  Thank you.

**PROSPECTIVE JUROR YAFFE:**  Thanks.

**THE COURT:**  You can come back at the designated time and we'll proceed.

(Prospective Juror Yaffe leaves the courtroom and Prospective Juror Jules is present.)

**THE COURT:**  Okay.  And you -- this is not a private matter; is that correct?

**PROSPECTIVE JUROR JULES:**  No.

**THE COURT:**  Remind me your juror number again.

**PROSPECTIVE JUROR JULES:**  Juror Number 30.

**THE COURT:**  Okay.

**PROSPECTIVE JUROR JULES:**  See, I was just worried about being the one-on-one support, me being, like, heavily relied on.  I don't know who would take my position.  I don't think there is anyone because I'm hired through an agency that then places me on that campus.  So I don't know if they would hire just someone for the days or throughout the weeks, but I know that would, like, really, like, uproot a lot of the stuff we've worked on to make sure behavior is on track, education is on track.  And that is just a concern I do have, but I don't know if that's enough to create conflict enough to participate.

**THE COURT:**  Do you have -- do you work during the summers?

**PROSPECTIVE JUROR JULES:**  No.

**THE COURT:**  Okay.  All right.  You can go ahead on the

break, and I'll talk about it with the lawyers.

(Prospective Juror Jules leaves the courtroom and Prospective Juror Kimball is present.)

**PROSPECTIVE JUROR  KIMBALL:**  Juror Number 46.

**THE COURT:**  And is this a private matter?

**PROSPECTIVE JUROR  KIMBALL:**  Well, I wanted to ask a clarifying question, if I may.

**THE COURT:**  Sure.

**PROSPECTIVE JUROR  KIMBALL:**  Is this where we discuss our concerns about the case with you?

**THE COURT:**  No.  We'll have plenty of opportunity to do that later.

**PROSPECTIVE JUROR  KIMBALL:**  Okay.  Then I'll take a break then.

**THE COURT:**  Okay.  Thanks.

(Prospective Juror Jules leaves the courtroom and Prospective Juror Liu is present.)

**THE COURT:**  All right.  So we have two people and then we have one person sitting in the back.

Hi.  Who are you?

**UNIDENTIFIED SPEAKER:**  I'm a reporter.

**THE COURT:**  Sorry?

**UNIDENTIFIED SPEAKER:**  I'm a reporter.

**THE COURT:**  Oh, okay.  Great.  This is going to be a private matter that we're going to discuss with these two

jurors, so I'm going to ask you to step out of the courtroom briefly.

And then for the two of you, why don't you come forward to the microphone first.

And why don't you step out, and when she comes out, you can come in to share your private matter with us.

**PROSPECTIVE JUROR LIU:**  I'm Juror Number 49.

**THE COURT:**  One second.  Give them a chance to shut the door.

**PROSPECTIVE JUROR LIU:**  I guess I forgot to mention a couple of things earlier.

**THE COURT:**  Sure.

**PROSPECTIVE JUROR LIU:**  I was kind of nervous.

I don't know if this first one is excusable because I know people have brought up a concern about not being paid from work, and I'm not a benefited full-time employee at this point so I won't get paid for missing out on work.

**THE COURT:**  Remind me who you work for again.

**PROSPECTIVE JUROR LIU:**  I work for John Muir Medical Center in Concord.

**THE COURT:**  Okay.

**PROSPECTIVE JUROR LIU:**  So that's one thing.

Another thing I forgot to mention is I recently found out I'm pregnant.  So I don't know if -- you know, I have to set up a prenatal appointment sometime in the next few weeks.

And I've also suffered multiple miscarriages in the past half year, so I'm trying not to increase that risk of it happening again in the next few weeks.  So, yeah, that's just a medical matter.

**THE COURT:**  Is that -- you mentioned anxiety earlier.  Is that where the anxiety is coming from or is that something separate?

**PROSPECTIVE JUROR LIU:**  No.  It's chronic anxiety that I have that I've had over the years, mm-hmm.

**THE COURT:**  Okay.  Thank you.

**PROSPECTIVE JUROR LIU:**  Mm-hmm.  Should I step out?

**THE COURT:**  Yeah, if you could step out and send her back in.

(Prospective Juror Liu leaves the courtroom and Prospective Juror Copi is present.)

**THE COURT:**  Okay.  You're all right.  Good timing.

**PROSPECTIVE JUROR COPI:**  Okay.  Everybody else is done?

**THE COURT:**  So this is our version of private.  I apologize.  If you could stand by the microphone.  Remind us your juror number.

**PROSPECTIVE JUROR COPI:**  36.

**THE COURT:**  36.  Okay.

**PROSPECTIVE JUROR COPI:**  I'm very interested in serving on a jury.  I've never done so.  I always get

eliminated.  But I wanted to just share a couple of things in case they concern you folks.

One is, I really need to get up and go use the bathroom at least every two hours.  Probably every hour is better, but today was getting pretty hard to pay attention.

THE COURT:  I'm really sorry.

PROSPECTIVE JUROR COPI:  I didn't think it was appropriate to get up and walk out, so I didn't.

But the other thing is I have OCD, and I can work very well and very thoroughly and very slowly.  I was worried about dementia, which runs in my family, and took a very extensive cognitive testing battery and came out brilliant except, you know, below the bell curve on speed.  I failed all the speed tests.  It was very consistent with OCD.  So I was a little relieved.

But, yeah, I'm not -- I'm not going to be -- you know, I want to look at everything and be very organized.  In some ways that's very good, and in other ways it slows everybody down, so...

THE COURT:  Okay.

PROSPECTIVE JUROR COPI:  Yeah.

THE COURT:  I'm happy to give the attorneys an opportunity to ask you any follow-up questions if they want, but I'll start by saying that I don't think that OCD is a disqualifier for serving on a jury.

**PROSPECTIVE JUROR COPI:**  All right.

**THE COURT:**  As for having to use the bathroom, I guess usually we will take breaks -- usually we will not go longer than two hours.  Usually we will take a -- well, I guess what I can say is, if you served on the jury, I could promise that we would never go longer than two hours.  Usually it'll be more like an hour and a half, hour and 45 minutes before a short break; but I can make a definite commitment to you that it'll be no longer than two hours.  And occasionally, I might forget but Bhavna would not forget.  So based on that, what's your reaction to that?  Thumbs-up?

**PROSPECTIVE JUROR COPI:**  Yeah.

**THE COURT:**  Okay.

All right.  Anybody else?  Any of the lawyers have any questions?

**MR. FONDO:**  No questions, Your Honor from the defense.

**MR. CHANG:**  One follow-up, Your Honor.

**THE COURT:**  Sure.

**MR. CHANG:**  I'll talk into the mic for the court reporter.

Thank you.  Thank you for your honesty.  Roland Chang, again, for the United States.  Really appreciate your time.

You mentioned the OCD, and just one question related to that.  The judge is going to instruct you on the law related to this case about reasonable doubt.  Not all doubt; right?

Judge Chhabria will instruct you on the law but, generally, a reasonable doubt is based upon -- a doubt based upon reason and common sense and is not based purely on speculation.

Do you think that would be an issue, given your OCD and the need to see everything and read everything?

**PROSPECTIVE JUROR COPI:**  No, I don't.

The fun fact I forgot to say was my father was a logician.

**THE COURT:**  He's a what?

**PROSPECTIVE JUROR COPI:**  My father is a logician -- was a logician -- logic -- a logician, and he was one of the authors on early computer language development, the binary language.  And when we were growing up, we had to switch sides in the argument.  We'd be arguing for something, "I want to go to this event," and then we'd have to take the other side.

**THE COURT:**  Oh, I'm going to start doing that with my kids.

**PROSPECTIVE JUROR COPI:**  Oh, my God.

**MR. CHANG:**  Okay.  Thank you for your honesty.

**PROSPECTIVE JUROR COPI:**  Yeah.  Yeah, yeah, yeah.

**THE COURT:**  You can send the next person in.

**PROSPECTIVE JUROR COPI:**  Okay.

(Prospective Juror Copi leaves the courtroom and Prospective Juror Li is present.)

**THE COURT:**  Hi.  Remind us your juror number again.

**PROSPECTIVE JUROR LI:**  99, Jiawen.

**THE COURT:**  99, okay.

**PROSPECTIVE JUROR LI:**  So I already scheduled -- so I scheduled appointment, like, before I received this summon notice, and so you can see how far is that; and if I reschedule, I'm not quite sure what's the next availability. And I am way overdue for my diabetes eye exam.  So I can reschedule it, but I just don't know the availability.

And also, I'll just give you a little bit information about our pickup issue too.  I live in San Lorenzo.  I mean, we -- my family live in San Lorenzo and my daughter goes to school in Castro Valley and I work in Fremont, as I said that before, and my husband also work in Newark.  So there's a bit of commute between the school and, you know, me and my husband.

So when I -- my concern is even the -- you know, the courthouse and, you know, like, we can get -- you know, leave here at 3:30 or even before, with the Bay Bridge traffic, I'm not quite sure, but my daughter has to be picked up by 6:00. So, yeah.

**THE COURT:**  Okay.  I mean, I don't think that that should be a problem.

**PROSPECTIVE JUROR LI:**  I hope not.

**THE COURT:**  Two and a half hours, you know, I mean, I can't --

**PROSPECTIVE JUROR LI:**  I have -- I have experience

with the Bay Bridge before, like going on, like, around maybe 3:00-ish or maybe a little bit earlier than that, I couldn't get home until, like, almost -- almost 6:00.  I would say 5:00 towards 6:00.

**THE COURT:**  Okay.

**PROSPECTIVE JUROR LI:**  Yeah.

**THE COURT:**  Okay.  Thank you.

**PROSPECTIVE JUROR LI:**  Okay.

(Prospective Juror Li leaves the courtroom and Prospective Juror Barker is present along with her mother.)

**THE COURT:**  Okay.  Give me one quick second, and then let's talk about the pending jurors.  And then we'll take -- we'll break until noon so that you can have a little bit of a longer break.  Okay?

Oh, yeah, come on in.

Okay.  So just to let everybody know, so remind me your number again.

**PROSPECTIVE JUROR BARKER:**  19.

**THE COURT:**  Juror Number 19.

Okay.  So this is Ms. Barker and her mother called and asked to come in to speak about Ms. Barker serving on the jury.

This is -- to remind everybody, Ms. Barker indicated on her questionnaire response that she had some cognitive deficits.  And so I'm assuming that that's why your mother has come in; right?

PROSPECTIVE JUROR BARKER:  Yes.

THE COURT:  Okay.  And so the question is:  Do you -- and your mother is free to speak also, but I'll just ask you for starters:  Do you believe that this would -- that your cognitive impairments would interfere with your ability to understand what's going on here in the courtroom?

PROSPECTIVE JUROR BARKER:  Yes.

THE COURT:  Okay.  Have you had difficulty understanding what's been happening in the courtroom here today?

PROSPECTIVE JUROR BARKER:  Yes.

THE COURT:  Okay.  All right.  Do the lawyers have any follow-up questions of Ms. Barker or her mother?

MR. CHANG:  None from the Government, Your Honor.

MR. FONDO:  None from the defense, Your Honor.

THE COURT:  Okay.  So we're going to take a break until noon, and you-all can step out.  And if you could, please, Ms. Barker, come back at noon and resume your seat, and then we will announce -- we will identify some jurors who will be excused.  Okay?  And I think you'll probably be one of them, but I just need to talk to the lawyers about it.  Okay?

PROSPECTIVE JUROR BARKER:  Okay.

THE COURT:  All right.  Thank you.

(Prospective Juror Barker leaves the courtroom.)

THE COURT:  Okay.  So give me just one second to go

through this list.

And, Bhavna, if you want to put out word, if you want to talk -- go out there and let folks know not to come back until noon.

THE COURTROOM DEPUTY:  Judge, do you want me to lock the door after I --

THE COURT:  Yeah.

THE COURTROOM DEPUTY:  Okay.  Thank you.

(Prospective Juror Man-Willrich Ramos enters the courtroom.)

THE COURT:  You have a private matter?

PROSPECTIVE JUROR MAN-WILLRICH RAMOS:  Yes.

THE COURT:  Okay.  Give me one second.  Okay?

PROSPECTIVE JUROR MAN-WILLRICH RAMOS:  Of course.  No problem.

(Pause in proceedings.)

THE COURT:  Okay.

PROSPECTIVE JUROR MAN-WILLRICH RAMOS:  Ariane Ramos, Juror Number 24.

I have a trip booked this weekend through next Tuesday just to Napa, but it's for my partner's birthday.  I didn't realize that was something I could also talk about in addition to my appointments.

THE COURT:  Through Tuesday?

PROSPECTIVE JUROR MAN-WILLRICH RAMOS:  Yes.

**THE COURT:**  Okay.  Thank you.

**PROSPECTIVE JUROR MAN-WILLRICH RAMOS:**  Thank you.

(Prospective Juror Man-Willrich Ramos leaves the courtroom.)

(Proceedings were heard out of the presence of the jury.)

**THE COURT:**  All right.  So I think we're probably going to have to call some more jurors in tomorrow.  I don't think -- I think it's going to be hard to avoid.  But why don't we go through the people who are continuing to ask to be excused for hardship or language or whatever.

I think that there is -- first is Juror Number 18, who says there are no flights available on Jet Blue to change his flight.  What do you-all think?  I have a hard time -- I mean, applying the standard that we've applied to others, I have a hard time justifying keeping him.

**MR. FONDO:**  So Mr. Fondo for Mr. Ding.

We would agree with Your Honor.  I think it's hard not to excuse him at this point.

**MR. CHANG:**  We're talking about Juror Number 18, Your Honor?

**THE COURT:**  Yes.

**MR. CHANG:**  I would say I'm on the fence similar to how we were before, Your Honor.  I get the flight situation.  There are a lot of flights to New York.  And we're dark most of the days he's gone.  So I would say I'm on the fence, but I

would defer to the Court.

**THE COURT:** Okay.  Number 19 obviously needs to be excused.

**MR. CHANG:** No objection from the Government.

**MR. FONDO:** No objection.

**THE COURT:** Okay.  I would be inclined not to excuse Number 24.  I feel bad, but I would be inclined not to excuse her.

**MR. CHANG:** We agree with Your Honor.

**MR. FONDO:** Same, Your Honor.

**THE COURT:** I'm on the fence about Number 30.  It's not something he raised before, but it's a little bit of a -- it's obviously a concern.  He's the one who's the tech support -- I mean, the one-on-one support kid -- guy at the school for autistic kids.

**MR. CHANG:** Yeah.  He's one where it sounds like he cares for some special needs children.

**THE COURT:** He's hired through an agency.

**MR. CHANG:** Yeah.

**THE COURT:** So it seems like the agency could potentially send somebody else in.

**MR. CHANG:** Maybe.  Yes, Your Honor.  I couldn't tell from the answers.  He might also be appropriate for a postponement; right?  A shorter trial would be less of a burden, given the caretaking responsibilities for young

children.

THE COURT:  Yeah.

MR. FONDO:  Your Honor, so we would disagree with excluding him or postponing.

THE COURT:  All right.  I'm going to keep him.

Ashley Latoof, Martinez, be there by -- needs to be there by 3:30.  Where did we end up with her?

I think we decided that we would give her an opportunity to talk more about it, and she didn't talk more about it.  That's Juror Number 31.

MR. FONDO:  So, I'm sorry.  Is there a question pending to us, Your Honor?

THE COURT:  I just think -- I was wondering if there's anything more for us to say about her.  I think -- she raised concerns at the beginning.  She didn't circle back and raise further concerns about the pickup, the Martinez pickup.

We were sort of on the fence about her but decided to keep her in.  I guess we should continue to keep her.

MR. FONDO:  The defense position has not changed on that.

THE COURT:  Okay.  All right.  We'll keep her for now.

Number 36 is okay based on our discussion with her.

What did -- Number 45, the finance manager, said he was worried about work.  Does anybody remember anything further about that?

**MR. FONDO:** Yes, Your Honor. If I may, he's the one who works for Visa. He was concerned that --

**THE COURT:** Oh, okay. Never mind. He's staying.

(Pause in proceedings.)

**THE COURT:** I think probably we need to excuse Juror Number 49 for hardship. Anybody disagree?

**MR. FONDO:** No objection, Your Honor. We understand.

**MR. CHANG:** No objection. We understand.

**THE COURT:** Okay. I'm still not inclined to excuse Number 74.

I think I would be inclined to excuse Number 99. I have some concerns about her, the thing about the eye exam and the thing about getting back to Martinez, or wherever it is, by 6 o'clock. I mean, it seems to me that she just really doesn't want to serve on the jury, and so I have a little bit of concern about her. But I think that everything she's articulated, including this medical issue, I think it would be hard to force her to be on this jury.

**MR. CHANG:** No objection from the Government, Your Honor.

**MR. FONDO:** No objection from the defense, Your Honor.

**THE COURT:** All right. So 99 will be excused.

**MR. CHANG:** Your Honor, it sounds like you're going in sequential order so I wanted to flag Juror 84, who you had excused for hardship on your tentative and then we talked about

him a bit yesterday.

THE COURT:  84?

MR. CHANG:  Yes, the one who's caring for multiple --

THE COURT:  Yeah.  He says he wants to serve.  Seems like a great guy.

(Pause in proceedings.)

THE COURT:  And then Number 113, I think we have a language problem.  Has to be excused for cause; right?

MR. FONDO:  No objection, Your Honor.

MR. CHANG:  No objection, Your Honor.

THE COURT:  All right.  So, still worried about Juror Number 18.  I think that -- I think that Juror Number 18 needs to be excused.  I don't think -- I don't think that's fair.

MR. CHANG:  Understood, Your Honor.

THE COURT:  It might mean that we need to call other jurors in tomorrow and so be it.

MR. CHANG:  Understood.

THE COURT:  Okay.

MR. CHANG:  We should probably do a math count at some point.

THE COURT:  Well, my count is that we have 47 right now, and we're about to excuse five, and that would get us down to 42.

MR. CHANG:  Okay.  Thank you, Your Honor.

THE COURT:  And then one of the things, we're planning

on having 16 jurors.  If we're really close, we could think about -- we can consider maybe only having 15 or 14 jurors.  We can think about that over the lunch break.

But why don't -- let me give you guys a ten-minute break.  The jurors can come back in and settle in if they want.

And, Bhavna, let them know we'll start -- we'll resume at 12:05 and then we'll do lunch at about 12:40.  Okay?

**MR. FONDO:**  Your Honor, sorry.  What time did you say lunch was?

**THE COURT:**  From my view of the clock, it's five minutes to 12:00.  So, anyway, ten minutes.  So 12:10.  We'll resume at 12:10.

Bhavna, you can let the jurors back in, and then we will -- or if you want to wait a few minutes, that's fine too.

And then we'll plan on doing lunch around 12:40, 12:45.

**MR. FONDO:**  Thank you, Your Honor.

**THE COURT:**  Thanks.

**MR. CHANG:**  Thank you, Your Honor.

**THE COURTROOM DEPUTY:**  Court is in recess.

**MR. FONDO:**  Oh, Your Honor, did you want objections -- the objections that I want to put on the record now, or we can do it later?

**THE COURT:**  Could we do it at the beginning of the lunch break?

MR. FONDO:  Certainly.  Thank you, Your Honor.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 12:01 p.m.)

(Proceedings resumed at 12:10 p.m.)

(Proceedings were heard in the presence of the prospective jurors.)

THE COURT:  Okay.  Hi, everyone.  Sorry.  We had a little bit of extra work to do, so I'm sorry about the delay.

So the following jurors are excused.  Please wait until I'm done rattling everybody off, and then we can -- and then you can go.  You're free to go.  Thank you for being here.

Juror Number 18, Juror Number 19, Juror Number 49, Juror Number 99, and Juror Number 113, you are excused.  Thank you very much for being here and you're free to go.

(Prospective Jurors 18, 19, 49, 99, and 113 excused.)

THE COURT:  Okay.  So now, as I mentioned, I'm going to have a little bit of a conversation with you-all about the case and about serving as a juror, and then we'll take our lunch break, and then I'll turn it over -- when you come back from lunch, I'll turn it over to the lawyers and they'll have an opportunity to ask you some questions.

First, just a quick comment about the role of the juror and the role of the judge.  So the role of the jury is to decide the facts, to decide what happened; right?  So you're going to be hearing a bunch of evidence.  You're going to be

hearing a bunch of witness testimony. You're going to be getting documentary evidence, and you're going to look at that evidence and you're going to decide the facts. You're going to decide whether the Government proved beyond a reasonable doubt the factual allegations that the Government is making; right?

My job as the judge is to provide the law to you; right? So I'll -- what I will -- at the end of the trial, I'll give you instructions on what a trade secret is, for example, and what facts you need to find beyond a reasonable doubt before convicting the defendant.

And you're required -- my job is to give you the law. Your job is to decide the facts. But you are required to apply the law as I provide it to you; right? So that's just the basic division of labor between the jury and the judge; right?

Let me talk -- let me give you a description of the case. I know you got a little bit of a description of it in the questionnaire, but I think it's worth kind of repeating what this case is about and then talking about it a little bit.

So it's a criminal case, as you know, brought by the United States Government. The Government accuses the defendant, Mr. Ding, of theft of trade secrets and economic espionage. Specifically, the Government alleges that the defendant, while he worked for Google, stole files containing information about Google's artificial intelligence computing infrastructure. The Government alleges that the defendant took

this information to benefit himself, at least one Chinese company, and entities controlled by the Chinese government.

The defendant has pleaded not guilty to the charges and is presumed innocent unless and until the Government proves the defendant guilty beyond a reasonable doubt.

The defendant has the right to remain silent and never has to prove innocence or present any evidence.

So I'll ask you some general questions about the case. From reviewing your questionnaires -- your questionnaire responses, some of you expressed strong views about Google one way or another as a company; right? Others expressed strong views about China one way or another or Chinese nationals. Some of you expressed strong views generally about the criminal justice system or law enforcement.

And I guess what I want to emphasize to you is that there is nothing wrong with having -- coming into the courtroom with particular views about these things, even strong views. We are not robots. We are human beings, and we can't just erase our brains when we walk into the courtroom; right? And so there is nothing wrong with coming in and serving as a juror even if you have strong views about the subject matter of the case. Right?

The important thing -- and the purpose of these questions that I'm going to be asking you and that the lawyers are going to be asking you, the important thing is: Can you

decide the facts of the case based on the evidence that you hear in the courtroom and can you follow the law and apply the law as I give it to you; or are your feelings about these matters so strong that you would become biased and you would be unable to do your duty of being a fair juror who decides the facts of the case based on the evidence that comes into the courtroom?  That's really the question.

So a lot of times we will get jurors who are nervous because they say, "Well, you know, I have negative feelings about law enforcement"; or, "I don't like the companies in Silicon Valley.  I don't like Google.  I don't like the role they play in society"; or, "I feel very strongly that Google is an agent of positive change with the work that it's doing, and does that make me disqualified to serve on the jury?"

The answer is no -- right? -- not necessarily, and it just depends on whether you can follow the instructions that I give you about how to serve as a juror.

So, nonetheless, if you have any doubts, if you're on the fence, if you're not sure that you're capable of serving as a fair juror, we're happy to hear from you and you shouldn't hesitate to share with us.  Okay?

So let me start -- I mentioned that people had some strong feelings -- some people had strong feelings about Google on the negative side and some strong on the positive side. And, again, this is a case about somebody who's worked as a

software engineer for Google and is accused of stealing stuff from Google.

Does the fact that this case involves Google, does that raise any concerns for you -- this is a raise-your-hand question; right? -- does that raise any concerns for you about whether you could be a fair juror in this case?

And I'll start with folks in the box.  Anybody in the box have any concerns that they'd like to share?

(Show of hands.)

THE COURT:  Come on up.

And if you're not -- maybe you think you could be fair but you think there's something that we should know that you want to elaborate on from your questionnaire response or something like that, that would be great too.

PROSPECTIVE JUROR EVERETT:  Sure.  I think it's just worth saying that I'm currently in the final stages of interviewing for a job at a Google subsidiary.

THE COURT:  Okay.

PROSPECTIVE JUROR EVERETT:  A spinoff company called Verily.

THE COURT:  Verily?

PROSPECTIVE JUROR EVERETT:  Mm-hmm.

THE COURT:  How do you spell that?

PROSPECTIVE JUROR EVERETT:  V-e-r-i-l-y.

THE COURT:  Okay.

**PROSPECTIVE JUROR EVERETT:**  And I have worked as a contractor for Google in the past as a physical therapist, but I was on-site working with Google employees.

**THE COURT:**  Okay.  And Verily, what does that company do and what job are you applying for?

**PROSPECTIVE JUROR EVERETT:**  Product management.  And they work in life sciences, but this particular product is around AI and health data.

**THE COURT:**  Okay.  And do you -- obviously, Google is not a party to the case --

**PROSPECTIVE JUROR EVERETT:**  Sure.

**THE COURT:**  -- right?

The Government is prosecuting the defendant, alleging that the defendant violated the criminal laws of the United States.  Google is -- the Government contends that Google is a victim in the case.

So I guess the question is:  Given that you're applying to -- for a job -- I'm not worried about the prior consulting, but given that you're applying for a job with a Google subsidiary, does that give you any concerns about whether you could be a fair juror, analyze the evidence objectively, and follow my instructions?

**PROSPECTIVE JUROR EVERETT:**  I don't know.  I think we're all biased in some way, and I can't unknow the things I know.  And I am incentivized to try to get a job, so I --

you know, I just think it's worth sharing that potential incentive.

THE COURT:  So let me ask you a follow-up about that. You're incentivized to get a job.  So is the idea that you're worried that if somebody found out -- somebody at Google found out you were on this jury and there was an acquittal, that that would interfere with your job prospects?

PROSPECTIVE JUROR EVERETT:  I have thought about that.

THE COURT:  Okay.  Okay.  Thank you.

PROSPECTIVE JUROR EVERETT:  Thank you.

THE COURT:  All right.  Anybody else from the box?

(No response.)

THE COURT:  No?

Okay.  How about anybody from the first row?

(No response.)

THE COURT:  Second row?

(Show of hands.)

THE COURT:  All right.  Come on up.

And as a reminder, remind us of your number and name.

PROSPECTIVE JUROR KIMBALL:  Sure.  Justin Kimball, Juror 46.

THE COURT:  UC Santa Cruz.

PROSPECTIVE JUROR KIMBALL:  Yes, UC Santa Cruz.

Guys, I'm really sorry, but I'm not a fan of Google. I think Google does a lot of terrible things.

Currently, they're developing the AI and they're working on cars that can drive without human drivers.  These are two things that are going to seriously disrupt our society, and just I really have problems with that.

I use Startpage for my search engine because I don't like Google tracking me.  I can't get it off my phone.  I feel it's a very big, powerful entity that has a lot of control.

THE COURT:  So, thank you.  I appreciate you sharing that.  I guess my response to you is:  Nothing that you just said has anything to do with the question of whether the defendant is guilty or not guilty.

PROSPECTIVE JUROR KIMBALL:  Well, if you take a cup from a stream of water, are you breaking the law?

THE COURT:  I don't understand that.

PROSPECTIVE JUROR KIMBALL:  Sure.  So for what -- I don't -- I'm not a scientist.  Okay?  I'm just a teacher.  But, you know, when you're designing code and designing -- because this is an engineer who was doing his -- his work -- like, when I develop my lessons at school and I change schools, I don't -- I can't, like -- I bring my lessons with me wherever I go.  So I don't see how code, words, numbers, symbols rearranged one way is a secret, another way is not when that person developed it.

So I just -- I have a problem with that idea of -- you know, because if we apply it to my case, I teach in

Oakland.  Okay, I've done a lesson here.  Oh, I can't bring it to my Hayward class and teach it there.

THE COURT:  Right -- and so.

PROSPECTIVE JUROR KIMBALL:  So just, I --

THE COURT:  If I could just --

PROSPECTIVE JUROR KIMBALL:  Go ahead.  Sorry.

THE COURT:  -- ask you a follow-up question about that.

So teaching at an Oakland class, teaching at a Hayward class --

PROSPECTIVE JUROR KIMBALL:  Yes.

THE COURT:  -- it would be -- I'm glad you brought that up.

So it would be pretty silly -- right? -- if you weren't allowed to use your Oakland lesson for your Hayward class; right?

PROSPECTIVE JUROR KIMBALL:  Yes.  Yes.

THE COURT:  And so the question is this:  So if I'm a juror -- right? -- and I go in, and the case -- they're prosecuting you for committing a crime of using your Oakland lesson for your Hayward class -- right?

PROSPECTIVE JUROR KIMBALL:  Yes.

THE COURT:  -- and I think that's ridiculous that you should be prosecuted for that, but there is a law that was passed by the legislature that says it is a crime for somebody

to use their Oakland lesson for the Hayward class -- right? -- what I would say to that is:  I think this is ridiculous, but my role as a juror is to follow the law; and if, in fact, you used your Oakland lesson for your Hayward class, I would have to vote to convict you.

And if I found that the Government had proved beyond a reasonable doubt that you had used your Oakland lesson for your Hayward class, I would say, "I disagree with that law.  I think it's ridiculous, but I'm going to do my job as a juror and I'm going to vote to convict you."

And so --

**PROSPECTIVE JUROR KIMBALL:**  That's ridiculous, though.

**THE COURT:**  That is our system.  And so the question is:  Can you be a participant in our system in that way, or are you announcing here that you're refusing to be a participant in that system because you disagree with any law that would prevent somebody from stealing stuff from Google?

**PROSPECTIVE JUROR KIMBALL:**  So Google is a very big, evil company.  So I'd have problems with that.  But as I indicated in my questionnaire, there are other issues with the case that I have problems with too, so...

**THE COURT:**  Okay.  All right.  Thank you.

**PROSPECTIVE JUROR KIMBALL:**  Thanks, Your Honor.

**THE COURT:**  All right.  Oh, yeah, we had one more person in that row.

**PROSPECTIVE JUROR CHOW:**  Hi, Your Honor.  Raymond Chow, Juror Number 48.

**THE COURT:**  Yes.

**PROSPECTIVE JUROR CHOW:**  I thought I should disclose that I do have some personal relationships with product managers at Google directly developing AI infrastructure technologies.

And I myself have been in high-performance computing for the past 20 years, so I've been doing cloud computing for the past ten and doing a lot of, essentially, AI infrastructure architecture for the past five, so...

**THE COURT:**  Okay.  So the fact that you -- let's take the second part of that first -- right? -- the fact that you have so much personal experience in engineering in general and AI infrastructure in particular; right?

The fact that you know a lot about the topic is not -- does not automatically disqualify you from serving as a juror on this case; right?

And I guess the question is:  How much knowledge do you have about Google's AI infrastructure in particular?

**PROSPECTIVE JUROR CHOW:**  Not too deep.

**THE COURT:**  Okay.

**PROSPECTIVE JUROR CHOW:**  As I mentioned, I was at AWS for four years, so I was focused on their technologies.

**THE COURT:**  Okay.

PROSPECTIVE JUROR CHOW:  But I'm at Nvidia now.  We're a partner with Google.  Obviously, we supply them with a lot of hardware, so...

THE COURT:  Okay.  You're a partner with Google?  Explain that again.

PROSPECTIVE JUROR CHOW:  I mean, Nvidia supplies --

THE COURT:  Oh, yeah, right, right.  Nvidia, that's right.

Okay.  And then you said that you have personal relationships with a number of product managers at Google.  That is through your work?

PROSPECTIVE JUROR CHOW:  Yes.

THE COURT:  Okay.  And did -- would -- do you think that you would have the ability to -- again, Google is not a party to the case -- right? -- but Google contends that the defendant stole its trade secrets; right?  And so is the relationship you have with these product managers the kind of relationship that would make you uncomfortable ruling -- finding one way or another in this case?

PROSPECTIVE JUROR CHOW:  No, I don't think so, but I thought it should be good that I disclose this.

THE COURT:  Yeah, it's a great thing to disclose.  I appreciate that.

Okay.  And then let me see if I had any other follow-up questions for you.

Can you describe a little more the personal relationships you have?  I mean, are they professional relationships or are they "hang out on the weekend" type of relationships?

**PROSPECTIVE JUROR CHOW:**  Yeah, they all started as professional relationships; but due to, you know, attendance at conferences, and things like that, where we would hang out and -- I mean, we're on What's -- WhatsApp chats together and things like that; right?  So...

**THE COURT:**  Okay.  Got it.  Thank you very much.

**PROSPECTIVE JUROR CHOW:**  Sure.

**THE COURT:**  All right.  Next row, anybody have -- and, again, the question was:  Anybody have any question about the fact that this case involves Google?

(Show of hands.)

**PROSPECTIVE JUROR WANG:**  I have a thought after --

**THE COURT:**  Go ahead.  Why don't you come up and remind us of your number.

**PROSPECTIVE JUROR WANG:**  Collin Wang, Number 43.

It was after Mr. Santa Cruz here talked about the stream.  I just want to -- I was just wondering, like -- or I'm just concerned about my own role as a juror, if there were to be laws that maybe I believe are unreasonable, like, personally and that's the reason why the person would be convicted, yeah.

**THE COURT:**  Yeah.  So, for example, I mean, this will

often come up with the drug laws; right?  And somebody may have a very strong, negative view of the drug laws in the United States and believe that drugs should not be criminalized; right?  And then they'll come into the courtroom and they'll be asked to serve on a jury where somebody is being prosecuted for violating the drug laws.

And the question is -- your job as a juror is to decide what happened; right?  Your job as a juror is not to decide what the law is or what the law should be.  Your job is to decide what happened and then apply the facts as you find them to the law as I give it to you.

So that's the -- so, hence, the example I gave about using the lesson from Oakland when you move over to Hayward; right?  The job of the juror is to decide what happened; and even if they disagree with the law, they -- if they believe beyond a reasonable doubt that the defendant violated that law, the duty is to find the defendant guilty of violating that law.

**PROSPECTIVE JUROR WANG:**  Okay.  That's helpful.  Thank you.

**THE COURT:**  Okay.  Thank you.

All right.  Third row?

(No response.)

**THE COURT:**  Next row, fourth row?

(Show of hands.)

**THE COURT:**  Come on up.

**PROSPECTIVE JUROR GREACEN:**  Hi.  Chris Greacen, Juror Number 75.

Google was a client of my company's from 2017 to 2020.  Some amount of revenue came from Google, and that should be acknowledged.

**THE COURT:**  Yes, thank you for -- thank you for sharing that.

Do you believe that that -- the fact that Google was previously a client of your company would interfere with your ability to decide the facts fairly in the case?

**PROSPECTIVE JUROR GREACEN:**  No.

**THE COURT:**  Okay.  Thank you.

Okay.  Next row?  Or same row?  Come on up.

**PROSPECTIVE JUROR THAREJA:**  Juror 74.

Full disclosure, I hate big tech and --

**THE COURT:**  Sorry?

**PROSPECTIVE JUROR THAREJA:**  I'm not a fan of big tech and social media.  I'm not on any of those, and I refuse to.  I feel like they're off to in some way profit off advertising to all of us in each and every way.  And living in the Bay Area, that's front and center every day.  So that's my personal belief.

**THE COURT:**  Okay.  And thank you.  That is exactly the kind of thing that is helpful to hear.

Again, Google is not a party in the case.  You're not

asking to be -- to find in favor of Google or against Google; right? The accusation is, by the Government, that the defendant violated a criminal law. Google happens to be the alleged victim in the case.

Do you believe that your general feelings about big tech would interfere with your ability to be a fair juror and consider -- objectively consider the evidence that comes in?

**PROSPECTIVE JUROR THAREJA:** I don't believe so.

**THE COURT:** Okay. Thank you very much.

Okay. Next row?

(No response.)

**THE COURT:** All right. Back row?

(Show of hands.)

**THE COURT:** Come on up.

**PROSPECTIVE JUROR KELLY:** Hello. Joe Kelly, Juror Number 95.

**THE COURT:** All right.

**PROSPECTIVE JUROR KELLY:** I should disclose that the company I work for currently, Gartner, we have ongoing contracts with Google from a consulting perspective. Due to NDAs, I can't share the specific nature of those consulting engagements, but they account for a significant portion of my team's revenue last year and we anticipate it to continue this year.

And then on a personal level, on any given day,

depending on market conditions, 5 to 10 percent of my net worth is tied up in Google stock, so...

THE COURT:  Okay.  And let me ask you about the contracts with Google.  I know you said you have NDAs and so you can't describe them with specificity, and that's fine.  But how much personal involvement do you have in the implementation of these contracts with Google?

PROSPECTIVE JUROR KELLY:  So we've had four contracts over the past year that I am aware of.  I worked on two of them, and I worked on the proposal for a third.

THE COURT:  Okay.  And so all of the stuff that you've just told us -- I mean, again, I know I'm sounding like a broken record -- right? -- but Google is not a party.  It's a question about whether the defendant beyond a reasonable doubt violated this criminal law that the Government is accusing him of violating.

Does the fact that it involves Google, does that -- do you think that would interfere with your ability to be fair and objective in analyzing the evidence and deciding whether the Government had proved its case beyond a reasonable doubt?

PROSPECTIVE JUROR KELLY:  No, I don't think it would affect my ability.

THE COURT:  Okay.  And so the people that you deal with at Google, you wouldn't have any discomfort if they learned that you were on a jury that concluded that

the Government didn't prove its case beyond a reasonable doubt against this defendant?

**PROSPECTIVE JUROR KELLY:**  I wouldn't be happy if they found that out, but I don't think it would have an impact on my job, no.

**THE COURT:**  Okay.  Thank you very much.

**PROSPECTIVE JUROR KELLY:**  Thank you.

**THE COURT:**  Okay.  Anyone else back there?

(No response.)

**THE COURT:**  No?

Anyone else here?

(No response.)

**THE COURT:**  Okay.  No?

All right.  Let me ask -- let me ask another question, and this is about China; right?  Again, the allegation -- obviously -- the allegation is that Mr. Ding -- well, Mr. Ding is a Chinese national.  He worked at Google, and he's alleged -- the Government alleges that he stole trade secrets from Google and went back to China with them.  And the Government further alleges that he sought to benefit not only himself but entities of the Chinese government.

These are all allegations.  The Government is required to prove them beyond a reasonable doubt.  But I guess I'll just ask.  The fact that this involves China and an allegation about somebody who -- an allegation that somebody was helping the

Chinese government, does that give you any concerns about your ability to serve as a fair juror?

And, again, I'll start with the folks in the box.

(No response.)

THE COURT:  No?

Okay.  How about -- I'll just -- rather than go by rows, I'll just ask:  Anybody back in the gallery have any concerns about that?

(Show of hands.)

THE COURT:  Good.  Thank you.

I saw a so-so signal.  Why don't you come up and tell us what you're thinking.

PROSPECTIVE JUROR CHUHAK:  Juror 85.

THE COURT:  85?

PROSPECTIVE JUROR CHUHAK:  Yeah.

Just from my time in the military, not that it was China, it was anybody that did anything to the United States, I might be a little biased.  But, I mean, just because he's from China, don't make no difference.

THE COURT:  Yeah.  Okay.  So --

PROSPECTIVE JUROR CHUHAK:  Just throwing it out there.

THE COURT:  Yeah, no, I appreciate that.

And I guess the question is:  Regardless of what country somebody is from and regardless of --

PROSPECTIVE JUROR CHUHAK:  I don't care about that.

THE COURT:  -- what country is involved, you think you'd be able to look at the evidence that comes into the courtroom and assess it objectively?

PROSPECTIVE JUROR CHUHAK:  As long as it wasn't, like -- I don't even know how to describe it -- like, military, anti- -- you know, to use it back against us.

THE COURT:  Uh-huh.  Okay.

PROSPECTIVE JUROR CHUHAK:  But, you know, China doesn't make any difference.  It's...

THE COURT:  Okay.  I appreciate that.  Thank you.

(Pause in proceedings.)

THE COURT:  All right.  Anyone else from the gallery?

(Show of hands.)

THE COURT:  Come on up.

PROSPECTIVE JUROR HU:  Chingyuan Hu, Number 84.

THE COURT:  84.

PROSPECTIVE JUROR HU:  I need to disclose, I helped the University of Hawaii establish dozen of MOUs to collaborate with the University in China.  I have quite a few students in China.  I still work with half a dozen of them right now.  So I have a very close relationship with them.  Although I was raised as -- I was a KMT member in Taiwan, I was born and raised in Taiwan and indoctrinated by the KMT as anticommunist.

THE COURT:  Okay.  Thank you.

(Show of hands.)

THE COURT:  One more over here, it looks like.

PROSPECTIVE JUROR GUTIERREZ:  Manuel Gutierrez, Juror 70.

THE COURT:  70?

PROSPECTIVE JUROR GUTIERREZ:  Yeah.

THE COURT:  Okay.

PROSPECTIVE JUROR GUTIERREZ:  And just one thing that would, I would say, make me biased is just that, you know, a Chinese nationalist, you know, was trusted with sensitive information or data; and to do that, to, you know, steal it and take it to their country, you know, that's something that would make me biased.

THE COURT:  Yes.  So, in other words, you have strong negative feelings about somebody who would do that?

PROSPECTIVE JUROR GUTIERREZ:  Yeah.

THE COURT:  Yes.  And so the question is, though -- I mean, your job as a juror is to decide whether the person did that -- right? -- and whether the Government proved beyond a reasonable doubt that the person did that.

So if you conclude that the person -- beyond a reasonable doubt that the person did that, that it would make sense to have strong negative feelings about them; right?

I mean, we have all different kinds of cases in the court system.  We have murder cases.  We have sexual exploitation cases.  We have all sorts of bad things that

people are accused of doing.  And if you're a juror and you conclude beyond a reasonable doubt that they did it, it would make sense to have strong negative feelings about them.

But the job is to decide whether they did it -- right? -- to decide whether the evidence shows beyond a reasonable doubt that they did it.  And do you think that you could do that job?

**PROSPECTIVE JUROR GUTIERREZ:**  Yes.

**THE COURT:**  Okay.  Thank you very much.

**PROSPECTIVE JUROR PELLETIER:**  Hi.  Juror Number 112.

I described some of this.  My job is working for a federal contractor.  I've been in government contracting for 25 years, and obviously, I have a lot of knowledge of foreign participation, foreign vendors, foreign involvement.  And all I'm saying is, I do -- our work is to scan to prevent this type of situation.  So that's --

**THE COURT:**  Interesting.  Could you tell me a little bit more about that?

**PROSPECTIVE JUROR PELLETIER:**  Well, in light of all the executive orders that are coming down, we are -- we have to do a lot of evaluation of anyone we work with to make sure that they don't have foreign funding from Chinese participants; right?

**THE COURT:**  I see.

**PROSPECTIVE JUROR PELLETIER:**  So that's part of my

job.

THE COURT:  Okay.  But do you have any -- so to make sure that they don't have foreign funding from Chinese nationals or from Chinese entities?

PROSPECTIVE JUROR PELLETIER:  It's against the federal acquisition regulations that are flowed down.

THE COURT:  Got it.  But you're not specifically involved in sort of detecting theft of trade secrets?

PROSPECTIVE JUROR PELLETIER:  I'm in the legal compliance group, so our job is to surveil potential people that we work with -- procurements, buyers, and all that stuff -- and do the scanning.  So we work with the government to make sure that we understand what their role is, what work they're working on, and what they're handling.

THE COURT:  Okay.  So sort of surveil them at the front end?

PROSPECTIVE JUROR PELLETIER:  Yes.

THE COURT:  Like research them at the front end?

PROSPECTIVE JUROR PELLETIER:  At the front end of the research, yes.

THE COURT:  At the front end and while they're doing their work?

PROSPECTIVE JUROR PELLETIER:  At the front end before they begin their work.

THE COURT:  Before they begin their work.

**PROSPECTIVE JUROR PELLETIER:**  Yes.

**THE COURT:**  So you're screening them?

**PROSPECTIVE JUROR PELLETIER:**  Correct.

**THE COURT:**  Okay.  Great.  Thank you.

**PROSPECTIVE JUROR PELLETIER:**  Yep.

**THE COURT:**  Okay.  Anyone else on the China issue?

(No response.)

**THE COURT:**  Okay.  What about -- I mean, there are a lot of people here who have been involved -- who have involvement in software; right?  Software engineers, some people who have had some involvement, as we discussed with one juror just a second ago, involvement with AI infrastructure.  That, as I mentioned, I mean, it's not a disqualifier -- right? -- just that you have knowledge of the issue.

But does anybody feel like -- does anybody feel like their knowledge of or involvement in software engineering or AI is so significant that it might interfere with their ability to be a fair juror in a case like this?

(No response.)

**THE COURT:**  Okay.  This is the last question I'll ask you-all, and then you'll be able to take your lunch break, but please raise your hand if you have concerns.

What about the criminal justice system generally?  We had a number of questions on the questionnaire about, you know:  Do you have any concerns about the reasonable doubt standard?

Do you have any questions about the defendant not testifying?

Do you have any concerns about the defendant not testifying?

Right?

And, you know, again, we're not robots, we're human beings, and so it's natural to have an immediate reaction of, "Well, I mean, reasonable doubt, that's kind of tough"; or, "I think the defendant should speak for himself," or something like that; right?  But as we've discussed throughout the day, your job as a juror is to follow the instructions that I will give you and to apply the law, whether you agree with it or not; right?

And so one aspect of the law, a very significant aspect of the law is the reasonable doubt standard. The Government has to prove its case beyond a reasonable doubt.

Another significant aspect of the law is that the defendant -- it cannot be held against the defendant for not testifying and the defendant doesn't have the burden and doesn't have to put on any evidence.  The burden always remains on the Government.

So I guess having heard this discussion here today, does anybody have any kind of strong feelings about the criminal justice system or the standard involved or the rules involved, or anything like that, that give you concern that you might not be able to do your job as a juror in this case?

(No response.)

THE COURT:  Don't be shy.

(Show of hands.)

THE COURT:  Okay.  We've had a discussion already so I don't think I need to hear further from you.

Anybody else?

(No response.)

THE COURT:  Okay.  Great.  So we're now ready for a lunch break.  Why don't we take a half-hour lunch.  We'll resume at 1:15.  And, actually, let's make it 1:30.  You guys have been in here for a long time.  You've been paying close attention.  Let's make it 1:30.

There's a cafeteria downstairs.  There are also a number of good places right outside.  Outta Sight Pizza is a great place where you can get some slices.  What's some other quick food?  There's banh mi sandwiches -- right? -- right near --

PROSPECTIVE JUROR:  Chinese, Golden Kim Tar.

THE COURT:  What?

PROSPECTIVE JUROR:  Chinese, Golden Kim Tar.

THE COURT:  What's it called?

PROSPECTIVE JUROR:  Golden Kim Tar.

THE COURT:  Golden Kim Tar.

PROSPECTIVE JUROR:  Salty's sandwiches.

THE COURT:  Salty's Deli on Van Ness is really good.  A couple other great places, but they'll take longer, so you

probably shouldn't go.

And we'll see you back here at 1:30.  And, again, you can leave your stuff here if you want to.  Thank you.

**THE COURTROOM DEPUTY:**  All rise.

**THE COURT:**  And, actually, Juror Number 5 and 46, if you could stick around just for one second.

(Pause in proceedings.)

**THE COURT:**  Okay.  Great.

So it just dawned on me that for the two of you, if -- there's at least a possibility you'll get excused, and I thought rather than making you come back after lunch, I would talk to the lawyers about it now for a minute.  So if the two of you could step outside briefly, and I'll have a conversation with the lawyers.  They may wish to ask you follow-up questions and we may call you back in for that, but if you could step outside for just a moment.

**PROSPECTIVE JUROR KIMBALL:**  Thank you, Your Honor.

(Proceedings were heard out of the presence of the prospective jurors.)

**THE COURTROOM DEPUTY:**  Please be seated.

**THE COURT:**  Okay.  I think that Ms. Everett, Juror Number 5, probably needs to be excused.  Does anybody disagree with that?

**MR. CHANG:**  Sorry, Your Honor.  Let me confer with my colleagues real quickly.

THE COURT:  And if people want to ask follow-up questions of the jurors, they can.

MR. CHANG:  On Juror Number 5, the Government would like to ask additional follow-up questions to flesh out the Google issue that the Court questioned her about.

THE COURT:  Sure.  What's -- does the defense have a position on Juror Number 5?

MR. FONDO:  We'll wait and see how the questions go, Your Honor.

THE COURT:  Okay.  And then I'm guessing that everybody will agree that Juror Number 46 needs to be excused.

MR. CHANG:  We agree, Your Honor.

MR. FONDO:  Your Honor, we would like to ask some follow-up questions of 46.  I understand the Court's concern.

THE COURT:  There's not a -- there's not a scenario where I would change my mind that Juror Number 46 needs to be excused for cause.  He's -- I'm not going to say what he is --

MR. FONDO:  Understood.

THE COURT:  -- but he's not fit to serve on the jury.

Okay.  So, Bhavna, could you let Juror Number 46 know that he's excused and ask Juror Number 5 to come back in for some questions?

(Pause in proceedings.)

(Prospective Juror Everett enters the courtroom.)

THE COURT:  Okay.  Ms. Everett, the lawyers wanted to

ask you some follow-up questions.  So if you could take whichever mic you would like to take.

MR. CHANG:  Thanks again for being here today and for sharing your thoughts and your honesty.  We really appreciate it.  I just had a couple of follow-up questions.

You mentioned that you're applying for a job at a Google subsidiary and close to the final stages.  Can you give a little bit more clarity on timeline and how far along you are in that process?

PROSPECTIVE JUROR EVERETT:  I believe I have my final interviews of the scheduled group of interviews tomorrow.

THE COURT:  Got it.  Good luck.

PROSPECTIVE JUROR EVERETT:  Thank you.

(Prospective Juror Everett leaves the courtroom.)

(Proceedings were heard out of the presence of the prospective jurors.)

MR. CHANG:  Having heard -- and I won't repeat what the Court said about Google, but having heard the Court's instruction to the jurors about listening to the evidence with an open mind and following his instructions, do you think that you'll be able to do that in this case?

PROSPECTIVE JUROR EVERETT:  Yes.  I disclosed it because it felt close enough to a potential conflict of interest that I thought everyone should know.

I'll admit it wouldn't feel great to, you know, have

it come out later if I acquitted the defendant and, I mean, to your point, that it feels a little uncomfortable to me.  And so I would do my best to be fair, but I -- in selecting a jury, I'm not sure I would select me.  It just feels -- it feels like a conflict of interest.

**MR. CHANG:**  Understood.  And, again, I appreciate you sharing that, especially in open court.

But would you be able to be fair?  I know it's a little uncomfortable, but there's a difference between, you know, uncomfortable or if you're able to set those aside and follow Judge Chhabria's instructions on the law and listen to the evidence.  Do you think you'll be able to do that?

**PROSPECTIVE JUROR EVERETT:**  Yes.

**MR. CHANG:**  Okay.

**THE COURT:**  Could I ask -- let me ask it in a slightly different way.  So there was a gentleman -- I can't remember the juror number, but there was a gentleman who said that he has some -- his company has some contracts with Google.

**PROSPECTIVE JUROR EVERETT:**  Mm-hmm.

**THE COURT:**  And so part of his -- a portion of his revenue is from Google stock; and he deals with -- in implementing these contracts, he deals with Google people.  And I asked him, I said, "Does that mean you would be uncomfortable with them finding out that you voted to acquit in a case like this?"  And he said, "I'd rather them not find it out."  Right?

"It would not be comfortable for me to find it out, but it wouldn't affect how I would do my job as a juror."

And is that -- is that kind of what you're saying to Mr. Chang?  Am I interpreting that right?

PROSPECTIVE JUROR EVERETT:  Yeah, I think that's fair to say.

And anyone who works for Google or an Alphabet company has a significant portion of their compensation tied up in equity as well, and that would be my situation as well.

THE COURT:  Okay.  All right.  Thanks.

MR. CHANG:  One final question, Your Honor.

And thank you again.

Again, having heard the evidence and following Judge Chhabria's instructions, if you believe that the evidence shows that the Government has not proven its case beyond a reasonable doubt, would you be okay acquitting the defendant?

PROSPECTIVE JUROR EVERETT:  Yes, I think I would be.

MR. CHANG:  Thank you.

THE COURT:  Mr. Fondo?

MR. FONDO:  Thank you, Your Honor.

Thank you.  So let me ask you -- you said you think you may be able to.  So if this interview, for example, gets extended, would you have concerns if Google found out that you were on this jury and then it ultimately led to an acquittal?

PROSPECTIVE JUROR EVERETT:  Yeah, it would concern me.

I mean, again, to the other juror -- potential juror's point, like, you don't want your brand-new company to find out that you cost them a lot of money potentially.  So it would feel a little public because there's only 12 of us.

MR. FONDO:  Thank you for being honest with that.

And what about -- you mentioned that your compensation will now all be with Google, correct, if you change jobs?

PROSPECTIVE JUROR EVERETT:  Yes, it would be.  And equity is Alphabet stock; it's not Verily stock, so...

MR. FONDO:  I'm sorry.  It's Alphabet stock?

PROSPECTIVE JUROR EVERETT:  (Nods head.)

MR. FONDO:  Okay.  And so would it -- if you had to make a decision that you thought might hurt the value of your new employer's stock, do you think that would -- might cause you just even the slightest bit of pause or worry?

PROSPECTIVE JUROR EVERETT:  I would know I was voting against my own retirement plan, you know, but --

THE COURT:  Well, let me interrupt and ask a follow-up question about that because, again, this is a case -- this is a criminal case brought by the Government against the defendant; right?  This is not a case where Google is suing the defendant for money damages --

PROSPECTIVE JUROR EVERETT:  Right.

THE COURT:  -- right?

And so it's not obvious to me that Google stands to

gain or lose anything based on the result of this case.

so I guess my question to you is:  Does that change the way -- would that change the way you would think about it? If there were no, like, direct financial consequences for Google as a result of this case, would that -- would that change your view of the case?

**PROSPECTIVE JUROR EVERETT:**  Sure.  But in my understanding, IP is not devoid of connection to financial gain for a company.

**THE COURT:**  Right.

**PROSPECTIVE JUROR EVERETT:**  So...

**THE COURT:**  Okay.  Any follow -- anything further, Mr. Fondo?

**MR. FONDO:**  Yes.

So do you have a feeling this is just not the right case for you to be a juror on?

**PROSPECTIVE JUROR EVERETT:**  I mean, I'll be honest. When I got the email questionnaire, I sort of chuckled and said, "Well, there's no way they're going to want me on this one."  So it just feels -- I feel too -- I don't think I would not follow the law; but I just think about myself and my demographics and the potential conflicts, and it just felt like not the right one, honestly, so...

**MR. FONDO:**  Okay.  And do you have concerns that you just might not be a hundred percent unbiased?  We all have

biases, we all have interests, and so I'm not being critical. I'm just asking the question.

**PROSPECTIVE JUROR EVERETT:**  I don't think anyone is unbiased, and I think we all pause when we're, you know, incentivized in different ways.  And I want to be able to be fair, and I want the defendant and the prosecution to feel that they've chosen an unbiased jury, and that's why I care about disclosing it.  I think you should have all the information and make choices; and if you have other choices of people that don't give you pause, then I want you to have the opportunity to choose those people.

**MR. FONDO:**  Thank you.

**THE COURT:**  Anything further from you, Mr. Chang?

**MR. CHANG:**  No further questions from the Government, Your Honor.

**THE COURT:**  Okay.  Thank you.  You can go to the lunch break and come back at 1:30.

**PROSPECTIVE JUROR EVERETT:**  Thank you.

(Pause in proceedings.)

**THE COURT:**  So we'll have a chance to talk about cause challenges later.  My initial inclination is not to excuse her for cause.  My initial reaction is that that person is awesome, and that's exactly the kind of person that we want in our jury pool.  And it may be -- may very well be that the defense exercises -- uses a peremptory challenge on her.  But open,

thoughtful, wants to follow the law, wants to do her job as a juror despite the fact that it would make her somewhat uncomfortable.

So the only concern I have is, like, the financial thing.  Like, I am not -- I'm assuming that this case has no financial consequences for Google one way or the other.  It's not like Google's going to get its IP returned to it as restitution of its IP as a result of a conviction in this case, but I wanted to make sure I'm not missing anything.

**MR. FONDO:**  Your Honor, one of the issues is:  Is this information that was taken trade secrets?  And so if there's a ruling and acquittal where all the information that's allegedly stolen is deemed not a trade secret, there is a -- I think that could have an impact on the value -- the alleged value of those assets, and so I do think that there is a potential economic impact here.

**THE COURT:**  Okay.  Isn't that pretty attenuated, though?

**MR. FONDO:**  I don't think so, Your Honor.  According to what I understand the Government is going to be doing, is going to be bringing in a bunch of people that tell the jury how important and valuable these trade secrets are and how protected they are, the crown jewels, et cetera.  And so I don't think we're talking about, you know, a little pen here.

**THE COURT:**  But all the verdict means is that

the Government didn't prove one element of its case beyond -- all an acquittal means is that the Government didn't prove one element of its case beyond a reasonable doubt.  Nobody knows what that is; right?

MR. FONDO:  Well, I think if -- that's correct, Your Honor.  I mean, it also depends on where the evidence comes in and how, sort of, the testimony comes in because there's often different elements that are attacked more vigorously than others.

So I agree with you that the jury is not -- you know, it's not going to be a verdict that says, "It's not a trade secret because," or a conviction for the trade secrets; but I do think there is -- there's -- if there is an acquittal here, and one of our significant defenses is this information is not a trade secret, I think there is a potential implication.

THE COURT:  Okay.  I understand that argument.

What about the fact that she appears to think that, like, a verdict one way or another in this case would -- could affect the value of her stock?

MR. FONDO:  Well, I think that in some ways matters more than the reality of it.

THE COURT:  Right.  Is there anything we can do about that?

MR. FONDO:  Well, I --

THE COURT:  Because I don't think -- a verdict is not

going to affect Google's stock; right?  I mean --

MR. FONDO:  So I -- so there's a lot of -- yeah, I mean, there's a -- obviously, Google is a huge company, and I'm not going to play prognosticator about whether it will or will not, but I think --

THE COURT:  I'm going to play prognosticator and say a verdict is not going to affect Google's stock one way or the other.

MR. FONDO:  All right.  Well, I don't think we can tell her that.  I think -- I do not think we can tell a juror, "By the way, however you rule on this, it's not going to impact X, Y, and Z."  We would feel very uncomfortable about that.

And so I think the issue is:  How does she -- whether her perception is valid or not, it's the perception that she walks into the jury room with.

THE COURT:  Mm-hmm.  Yeah, that's -- I think, that's the biggest concern.  I think she's great, and like I said, that's exactly the kind of person we want in the jury pool, and I think she would be a fair juror.  My only concern is this perception that she appears to have that it would have a financial impact on her directly.

MR. CHANG:  Your Honor, may I be heard?

THE COURT:  Yeah.

MR. CHANG:  So we agree with all the points that you've made in terms of this juror being a prospective awesome

juror, in your words; seems very thoughtful, has some nuanced answers about how she could serve and follow the law, regardless of her views or perspective. And so we agree on that point.

We also agree that it's -- that this is a criminal case; right? We're not -- this is not a civil case where Google is a party. Any connection, to the extent there is one, to the finances would be extremely attenuated in our opinion.

And, again, Your Honor correctly noted, if there was an acquittal in that hypothetical, we don't know why the jury reached an acquittal. It could be because we didn't meet our burden of proof. It could be because on a specific element. There's multitudes of possibilities.

THE COURT: Yeah, that's --

MR. CHANG: Yeah.

THE COURT: I agree with all that.

The question is -- like, she seems to have this misperception about the financial impact, and so the question is: How do we deal with that? Or do we just excuse her because she's operating under this misimpression?

I mean, I tried to correct it a little bit; and she pushed back, which I appreciated; but, you know, I think she seems to be under the impression now that it could affect her Google holdings; right? Right? The ones that she would have if she were employed by this company?

MR. CHANG:  I don't recall her specific answer, but she did say she could acquit if we didn't meet our burden of proof, and so we think that answer alleviates any concerns.

THE COURT:  But another way of putting it is:  She thinks she's operating under a financial conflict of interest.

MR. CHANG:  Yes, and that's not true in our -- in our --

THE COURT:  I think you're right that it's not true.

But I've never quite had a situation like this before. I don't know how to deal with it.

I'll tell you what.  Take a half an hour lunch break. We'll resume.  We'll discuss this further when we discuss cause challenges for all the jurors.  Okay?

MR. CHANG:  Okay.

THE COURT:  All right.

MR. FONDO:  Thank you, Your Honor.

MR. CHANG:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  Court is in recess.

(Luncheon recess taken at 1:04 p.m.)

**AFTERNOON SESSION**                                    **1:37 p.m.**

(Proceedings were heard in the presence of the prospective jurors.)

THE COURT:  Okay.  Hi, everybody.

A couple of small things before I turn it over to the lawyers.  First of all, Federal Express and Rodney Strong

Winery will be paying for the entirety of your jury service if you're selected.

And, number two, one of the jurors asked a question about why isn't Google bringing this case. And I can't -- I can't really say too much about that other than to say, this is a criminal case and -- a federal criminal case and only the Government brings federal criminal cases. A private party can't bring a federal criminal case.

So with that, I will turn it over to the lawyers.

Mr. Chang?

**MR. CHANG:** Thank you, Your Honor.

Good afternoon, everyone. Thanks again for being here. We really, really appreciate it.

I'll introduce myself really quickly. My name is Roland Chang. I'm an Assistant United States Attorney in the U.S. Attorney's Office for the Northern District of California based here in San Francisco.

As we mentioned at the outset, I'm joined by my colleagues, AUSA Molly Priedeman and Casey Boome; and then at the very end of our table is our special agent from the FBI, the Federal Bureau of Investigation, Ms. Andrea Valladao. Our collective job is to investigate and prosecute federal crimes. We are all civil servants and government employees, and together we will be presenting this case to you on behalf of the United States of America.

First, we wanted to just repeat what Judge Chhabria said at the outset of today's day.  Thank you for being here. Jury service is one of the main ways that our citizens participate as part of the Democratic process and it's one of the highest callings for our citizens in terms of public service.

From reading through the questionnaires very carefully, we all appreciate that jury duty never really comes at a good time.  I know a number of you have childcare responsibilities, elderly parents, other folks, friends to take care of, work responsibilities; and so we really, really deeply appreciate you being here.  We know some of you took a long drive, took public transit, and traveled a long way, so thank you.  I know you did not have a choice in being here, but I wanted to say thanks.

Second, we have listened very carefully as you have answered the questions by Judge Chhabria and provided us additional information through your questionnaires and in court today.  I will not repeat his questions, but there may be some additional follow-up on some of his topics; and we also have additional questions for some of the jurors who are here -- prospective jurors who are here today.

Third, the questionnaires that you-all filled out have a lot of questions -- thank you for doing that -- including some that relate to personal experiences and personal beliefs.

I know that some topics might be hard to talk about, so thank you for everyone who included personal information and personal beliefs.

The reason we circulated the questionnaire is that we want to make sure that everyone on the jury can be fair and impartial in this trial.  Everyone in this room -- the United States, Mr. Ding, his lawyers, and the judge -- we want this trial to be fair and impartial, decided by jurors who are fair and impartial.

One additional thing that I wanted to say and we often say is, it's totally okay to have a strong opinion, to have an opinion and have a perspective on the various issues and questions we ask you about.  That's the great part of being an American citizen.

Our questions will be focused on whether, perhaps, because of those opinions, this might not be the right jury for you, it might not be the right trial for you, and making sure that you can be fair and impartial to the Government's case as well as Mr. Ding's case.

To that end, I only have one request for you this afternoon, which is, I ask that you be honest with us and tell us the truth.  There are no wrong answers in this voir dire portion.

Also, as Judge Chhabria mentioned at the outset, if any of you have a private concern that you would like to raise

outside the other members of the jury, please let us know and we would be happy to do that.

Finally, I may be calling out specific jurors as part of my questioning process. I always say this up-front: Please don't be offended if I call you and please don't be offended if I don't call you.

All right. Let's start with some basic questions. Little icebreaker, so to speak. Does anyone watch TV shows or read books about the police or the criminal justice system?

(Show of hands.)

**MR. CHANG:** I love those shows. They're great. They're great movies. *Law & Order, Suits*, does anyone watch any of those shows?

(Show of hands.)

**MR. CHANG:** Great.

I will say, sorry to disappoint up-front, that you'll find out very quickly that real-life lawyering is often not like the TV shows. My friends always ask me if lawyering is like being in *Suits* and I tell them sadly, "No." There's usually not a dramatic ah-ha or gotcha moment and no surprise witness who's running in, you know, at the 29th minute of the 30th minute of an episode with some new evidence that they found in some hidden locker that no one ever saw.

Instead, your job, as Judge Chhabria explained, as jurors will be to determine this case, to listen to the

evidence and apply the law to the facts that you hear.  Use your common sense.

Does anyone here not think that they can do that, that they cannot use their common sense to listen to the evidence carefully and follow the law that the Court instructs you with?

(No response.)

MR. CHANG:  Great.  Thank you.

All right.  Let's move on to the next topic.  So as Judge Chhabria stated at the outset, Google is not a party to this case.  I just wanted to be very, very clear about that.

As I said at the beginning, my colleagues and I, we represent the United States.  We are all federal prosecutors and civil servants.  We are not Google employees.  We do not represent Google.  We do not work for Google.  So I want that to be very, very clear to everyone.

That being said, the victim company in this case is Google.  As the Court has explained, the Government has alleged that the defendant, Mr. Ding, stole files containing trade secret information from Google, and the defendant himself was a former software engineer at Google.

During this case, you will hear right here on the stand, if you're selected for the jury, from a number of Google employees, including software engineers, senior executives, and security personnel.  You will see hundreds of Google files that the Government alleges that the defendant stole from Google

containing trade secret information.

And so these questions are really from the Government's perspective and from everyone's perspective, we want to make sure that people who hear that testimony, look at those documents, can review it with a fair and open mind so that Mr. Ding gets a fair trial and the Government gets a fair trial.

Many of you have expressed an opinion on Google, and the judge spent some time asking about those for some specific individuals. We just had some additional follow-up for some of the additional jurors. So I'll be calling out a couple of numbers. I'll go one at a time to try to be efficient. And I'd just like to have a conversation with you and get a little bit more on your perspectives.

So I wanted to start with -- and I apologize if I can't -- if I scan the room, this is a big room, if I don't see you at first. Just go to one of the two mics that's closest to you.

Let's start with Juror Number 42, please.

Juror Number 42, good afternoon. Thank you for being here.

In your questionnaire, you expressed some views about Google and we just wanted to hear a little bit more about those and if you could give us some more color on what you meant by your thoughts on Google.

**PROSPECTIVE JUROR McCARTHY:**  Well, first off, I remember they were rather short.  I had a cold.

**MR. CHANG:**  I hope you feel better.

**PROSPECTIVE JUROR McCARTHY:**  If you want, I guess the best way to explain it is this is not -- these were not coming simply from the opinions of what you see in the everyday news cycles and the criticisms that have come out.

I might as well say right up-front, when I was 20, I joined active political groups, and I stayed with it for 12 years until the group self-dissolved.  My politics have remained the same and my politics have very much been the driving force behind why I have criticisms of Google, of at least the way that tech companies have utilized AI.

The other, what I felt was probably more the boilerplate questionnaires around the legal system, that is where my opinions come from, even if what I put down in the questionnaires were rather short.

**MR. CHANG:**  Okay.  Thank you for your honesty and thank you for sharing that.

Can you give us a little bit more information about what are your opinions about Google?  I don't think -- I understand the participation in groups and then you have some perspectives, but if you could share what those opinions are.

**PROSPECTIVE JUROR McCARTHY:**  The opinions are that Google is no longer the company of a -- how should I say? --

fairly decently made search engine.  It is one of the biggest,
most powerful tech companies in the world, and there are very
much things beyond just sort of the opinions about data mining.
They are also engaged in what's actual surveillance systems
that they lease out to other governments.  They do defense
contracting.  That's one thing.

Their involvement in AI is -- for all the other
criticisms you might have about that, about the data mining,
about other aspects.  There are many.  It's a huge company.
There's so many divisions that you probably -- that even
employees probably don't know all of them -- is that AI systems
make simply all those -- the capacity of what they could do
before AI is now exponentially stronger.  You can do what they
were doing before, but now you have computers that are capable
of doing it at a million times faster.

MR. CHANG:  Okay.  So it sounds like you have some
views on Google as well as artificial intelligence.

PROSPECTIVE JUROR McCARTHY:  Well, artificial
intelligence is a tool, but I think for most of the tech
industry, it is a tool that is not being used for -- how shall
we say? -- the common good.

MR. CHANG:  Understood.  Thank you, again, for your
honesty.

As you may understand, this case involves both Google
and AI.  And when I say "AI," it's artificial intelligence,

just to make sure we're all on the same page.

Is there anything about those views about Google that you just expressed that might impact your views on a case like this, one where Google is the victim company?

**PROSPECTIVE JUROR McCARTHY:** Well, quite frankly, as someone who is -- was/is involved in political activism, you can say -- you can -- for my opinion, considering the nature of Google, you can -- whatever the laws may be, you can consider them not actually a victim from a political perspective.

And, I mean, if I wanted to, I could just come in and go for jury nullification. It's a thing that's been done before. It's a thing that people continue to say on many different areas of the political sphere, if you are in those spheres and listen, which involves social media, or simply out in actual organizations, so...

**MR. CHANG:** Okay. So it sounds like you might not be able to completely set aside those views in a case like this one?

**PROSPECTIVE JUROR McCARTHY:** No.

**THE COURT:** Well, let me -- can I ask a follow-up question about that?

**MR. CHANG:** Yes, Your Honor.

**THE COURT:** I guess the question is, Mr. McCarthy -- we sort of discussed this with some other jurors; right? And you have some -- have very strong feelings about -- negative

feelings about Google and what it's doing and the effect it's having on the world.  And as I've said, we're not robots and you're entitled to come in with those views and that doesn't -- that in itself doesn't disqualify you from serving as a juror on a case like this.

The question is:  If I give you instructions saying that if you find Fact A and Fact B and Fact C beyond a reasonable doubt, then you must convict the defendant of this crime -- right? -- are you capable of following those instructions?

**PROSPECTIVE JUROR McCARTHY:**  I think that I probably more likely would have my own ax to grind, and that is the honesty of it.

**THE COURT:**  Okay.  Thank you.

**MR. CHANG:**  Thank you for your time, Juror Number 42.

Next I wanted to call Juror Number 76.

Good afternoon.

**PROSPECTIVE JUROR ESGUERRA:**  Good afternoon.

**MR. CHANG:**  Thanks for being here.

**PROSPECTIVE JUROR ESGUERRA:**  Yes.

**MR. CHANG:**  Similar question to before.

Thank you for filling out the questionnaire.  We appreciate you doing that.

**PROSPECTIVE JUROR ESGUERRA:**  Mm-hmm.

**MR. CHANG:**  You had some opinions on Google, and we

wanted to understand those a little bit more.  And so if you wouldn't mind sharing those with us, we'd appreciate it.

**PROSPECTIVE JUROR ESGUERRA:**  I share some of the same criticisms.  I would say also Google is a kind of a monopolist company.  I think that a lot of its behavior, probably corporate behavior, would or should be -- should have been prevented by a more robust antitrust regulation.  So I feel -- that's -- yeah, I feel pretty strongly about that with regard to Google, yeah.

**MR. CHANG:**  Okay.  This is not an antitrust case. I'll state that up-front.

**PROSPECTIVE JUROR ESGUERRA:**  Yes.

**MR. CHANG:**  I think I can tell everyone that.

Is there anything about those views and opinions that might affect your deliberation in a case where Google is the victim company?

**PROSPECTIVE JUROR ESGUERRA:**  Yeah, I think it's possible.  I would say that the thing that's sitting in the back of my mind is actually a little bit more about -- possibly about policies and regulations around trade secrets and also intellectual property in general.  I know these are -- these are all distinct areas of law, as I understand it, but I tend to think of them as integrated concepts as a person involved in technology; that a lot of these are mechanisms of not controlling, but limiting or affecting the movement of ideas.

And so, yeah, as a technology person, I've thought a lot about this. I've been involved in advocacy around this since the Electronic Frontier Foundation, so those are ideas that I feel pretty strongly about, and I -- they will -- I know they'll have to come into play. I will not -- I won't be able to separate them when evaluating, I would say, outside mechanics of -- like around the case. So it's -- yeah.

**MR. CHANG:** Got it. And thank you for sharing that. I did notice that you had some answers about that, and so let's talk about that, and we can then springboard maybe back to the Google issue.

So you mentioned that you had some thoughts on intellectual property. Can you explain those to us?

**PROSPECTIVE JUROR ESGUERRA:** Yeah. I would say succinctly that I think intellectual property protections of the last maybe -- well, it's hard to give it a time span, but they tend to be, I think, over-robust and actually protect corporate interest more than the public interest and that the laws and policies should -- in order to better serve the public interest, should be more relaxed.

And the application of these laws, it depends on -- obviously, on the details and on the setting, but is unjust in some cases, improper, non-beneficial in -- yeah, in a lot of contexts. Copyright especially, but I would argue the same for patent law and a couple other -- and other venues like that,

yeah.

**MR. CHANG:** Okay. And, in particular, you mentioned some concerns about the concept of theft.

As the Court has explained, the Government has alleged that the defendant stole trade secrets; right?

**PROSPECTIVE JUROR ESGUERRA:** Yes.

**MR. CHANG:** It's a theft of trade secrets case. Of course we have to present the evidence and meet our burden, but explain a little bit more what were your concerns about even the concept of theft, which is the charge here.

**PROSPECTIVE JUROR ESGUERRA:** Sure. Yeah. I mean -- so, again, this is coming from -- a bit from what I would understand to be a pretty radical technologist standpoint, but that ideas are not stealable. So I think it depends a lot on -- obviously, the devil's in the details. I don't -- I'm not sort of trying to make entire categorical statements about this, but I think it's a tricky notion to say that there are certain ideas that should not be -- that should not be moved, should not be shared with others.

And so in a lot of contexts like -- the intellectual property context or the copyright context is the strongest. It's the place where I would most oppose the idea that these things can be stolen. They can be copied and reproduced in a way that is unauthorized or -- and that can also -- like, there's a category that can be illegal, but I have a reflexive

kind of allergy to the idea of theft of these things, of something that could be boiled down to an idea.

So I -- obviously, I don't know the facts of this case.  Again, it's not a categorical thing, but these are -- these are beliefs that I have and ideas that I have about this, yeah.

MR. CHANG:  Okay.  My next question will be -- you've heard Judge Chhabria explain and the Court explain that you'll get instructions at the end of the case, if you're selected as a juror, on what the law is.  There is a statute on theft of trade secrets.  Would you be able to set aside those views and follow the law that the Court provides you with?

PROSPECTIVE JUROR ESGUERRA:  I would -- oh, let me --

THE COURT:  And I think the better way to ask the question is:  Do you think you would be able to follow the law despite those views?

I mean, setting aside those views is kind of -- that's an artificial concept; right?  Nobody sets aside their views.  But in my job every day -- right? -- I have to issue rulings that are despite my views.  Sometimes I wish that I could rule to the contrary, but I can't, and that's the question that is being asked.

PROSPECTIVE JUROR ESGUERRA:  Yeah.  I think -- depending on how the facts come out, I don't know if we'll be asked to determine whether a thing is a trade secret.  Is that

part of the -- I don't know.  Maybe that's not something that can be answered anyway.

THE COURT:  That's okay.  You will be asked to determine if something is a trade secret.

PROSPECTIVE JUROR ESGUERRA:  If something is a trade secret?

MR. CHANG:  That's correct.

THE COURT:  Within the -- not within your view, within your definition --

PROSPECTIVE JUROR ESGUERRA:  Right.

THE COURT:  -- but within the definition of this congressional statute.

PROSPECTIVE JUROR ESGUERRA:  Right.  I've been an activist on these issues for a long time.  I sense that I would have a hard time not thinking about this in terms of what I would -- what I want to be true about those statutes and about those -- about these facts.

But I would put in, obviously, as much effort as possible, but I feel like the -- I've worked with a lot of lawyers and the devil is always in the details in terms of what we could write or say, and it would apply here too.  I feel it's hard for me to anticipate, but, yeah, my sort of, like, study and backgrounding in these issues has put me in a pretty -- in a place of pretty strong advocacy about this, so...

MR. CHANG:  Understood.

So it sounds like it would be difficult for you to put those opinions aside, given the facts and law of this case?

PROSPECTIVE JUROR ESGUERRA:  I agree, yes.

MR. CHANG:  It sounds like your opinions will overpower, perhaps, the other evidence and law that you hear in this case?

PROSPECTIVE JUROR ESGUERRA:  I would -- I would try not to.  I understand what the duty is as a juror, but, yeah, there's -- I have enough opinions about -- enough strong opinions about enough aspects of this that I do -- I sense that I will -- I might find it to be hard, yeah.

MR. CHANG:  That would be a "yes" to the overpower question?

PROSPECTIVE JUROR ESGUERRA:  Yes.

THE COURT:  "Yes" or "might"?

PROSPECTIVE JUROR ESGUERRA:  More like might, yeah.

THE COURT:  He said "might."

MR. CHANG:  Perhaps this might not be the best case for you to serve as a juror on?

PROSPECTIVE JUROR ESGUERRA:  Perhaps, yeah.  I mean, it is very interesting, but -- but I think that maybe that is part of the challenge or what -- you know, anyway.

MR. CHANG:  Yeah.  And, you know, one final question. Perhaps maybe in this type of case, you can't be a hundred

percent impartial?

PROSPECTIVE JUROR ESGUERRA:  Yes, possibly.

MR. CHANG:  All right.  Let's talk about -- actually, give me a second, Your Honor.

THE COURT:  Sure.

(Pause in proceedings.)

MR. CHANG:  So let me ask you a hypothetical question. Let's say you are presented with facts that meet the legal definition of a trade secret as instructed by the Court. Again, he is the authority on all that.  Would you be able to follow those instructions?

PROSPECTIVE JUROR ESGUERRA:  Yes, I would try.

MR. CHANG:  Let's talk about Google.  It sounds like your views on Google might -- will color the way that you view the evidence in this case.

PROSPECTIVE JUROR ESGUERRA:  It might, yes.

MR. CHANG:  Okay.  Will it be difficult to put those strong opinions aside on this case?

PROSPECTIVE JUROR ESGUERRA:  I think it depends a lot on what the -- on the nature of the thing that's being alleged as a trade secret.  I think that's -- if I try to project ahead, that's -- that's where I feel I'll -- I have the most imagined tension with.

MR. CHANG:  Okay.  Let's -- thank you for your time. We appreciate your honesty.

Let's move on to Juror Number 68, please.

Juror 68, good afternoon.

**PROSPECTIVE JUROR SANCHEZ:**  Hello.

**MR. CHANG:**  Thank you for being here.

You also expressed some opinions on Google, and we wanted to better understand them.  So if you could share us -- share a little bit about what those are, please.

**PROSPECTIVE JUROR SANCHEZ:**  Yeah.  I'm not -- I do believe there's been some free speech limitation and suppression of information since the current Administration took power again, and I'm not exactly a fan of the political contributions they've made to that same political group.  So there's a mistrust in Google definitely.

That being said, I don't see that -- that doesn't necessarily affect this case.  I could separate the two.

**MR. CHANG:**  Would your views on Google impact your perspective in a case like this one where Google is the victim company?

**PROSPECTIVE JUROR SANCHEZ:**  No, because this -- I believe the Government is bringing these charges and not necessarily Google, so I can definitely separate my opinions of Google versus the case at hand, I think.

**MR. CHANG:**  Okay.  Juror -- thank you for your time.

**PROSPECTIVE JUROR SANCHEZ:**  Okay.

**MR. CHANG:**  Juror 108, please.

Good afternoon.

PROSPECTIVE JUROR PINALES:  Good afternoon.

MR. CHANG:  Thank you for being here.  We really appreciate it.

Similar question to some of the prior jurors.  You expressed some opinions on Google, and we wanted to better understand those.

PROSPECTIVE JUROR PINALES:  Yeah, not that I'm as much educated on those topics as the folks that have spoke before me, but just a general dismay for, you know, big tech and the effects that AI is having on environment and on the general population, although from, you know, what I've learned today, the role of the juror, everything like that, I don't think that that would have any impact on my role as a juror.

MR. CHANG:  Okay.  So are you telling us that you'd be able to be fair and impartial and follow the instructions that the Court gives you?

PROSPECTIVE JUROR PINALES:  Correct.

MR. CHANG:  Okay.  Thank you.

PROSPECTIVE JUROR PINALES:  Mm-hmm.

MR. CHANG:  All right.  Let's move on.  There's just a handful of jurors we wanted some more clarity on some of the responses in your questionnaire and get a little bit more information beyond what's on the paper, so I'm going to call these jurors in no order at all.

Juror Number 84, please.  Good afternoon.

**PROSPECTIVE JUROR HU:**  Good afternoon.

**MR. CHANG:**  Thank you for being here.

In your questionnaire you expressed some concerns about this case, given the nature and the different parties involved; and so we just -- we wanted to first better understand what your concerns were about possibly serving as a prospective juror in this case.

**PROSPECTIVE JUROR HU:**  I can't remember what I wrote down there anymore.

**MR. CHANG:**  That's totally fair.

**PROSPECTIVE JUROR HU:**  My feeling was because, you know, I'm Chinese and this is, you know, a case against a Chinese national, I'm not sure whether, you know, I should be sitting in here.

**MR. CHANG:**  Got it.  Other than that -- and it is -- those facts are indeed true.  I guess knowing the facts that you've been shared now by the Court, as well as your role as a juror, that concern, in particular, do you think you'll be able to serve as a fair juror and unbiased juror in this case?

**PROSPECTIVE JUROR HU:**  Positive.

**MR. CHANG:**  Positive?  Okay.

You also expressed some views on Google, and wanted to better understand those as well.

In particular, you just had some concerns about

Google's power and impact.  And when it's a -- Google is a victim company in this case, and I wanted to see if you thought that that would potentially affect your ability to serve.

**PROSPECTIVE JUROR HU:**  I don't have a specific or particular concern.  It's just that, you know, I read a lot about, you know, these companies.  And Google is so dominating.  And in the situation now, they're controlling everything of -- I do search every day, I use Google, and, you know, it's looking at what I -- what I do, what I did.  And so Google's influence on the society is so great, I'm just a little bit worried.  That's my concern.

**MR. CHANG:**  Understood.  And as we said, there's no wrong answers here.  We're just asking for some honesty.

Is there anything about those views, about Google's influence, in your opinion, that might impact your ability to serve on this -- on this jury?

**PROSPECTIVE JUROR HU:**  I don't think so.

**MR. CHANG:**  Okay.  All right.  I don't have any further questions for you.

**PROSPECTIVE JUROR HU:**  Thank you.

**MR. CHANG:**  Thank you.

Juror Number 104, please.

Good afternoon, Juror 104.  Thank you.

You mentioned in your questionnaire that you -- it seems like you've read quite a bit of press coverage related to

this case.  I don't want you to get into the specifics of the coverage and what you read or haven't read, but just wanted to understand, you know, maybe the amount.

You know, is it one article versus -- you said you were following the case daily.  I just wanted to understand what is the extent of the knowledge without getting into the specifics of what you specifically read, if that makes sense.

**PROSPECTIVE JUROR LAU:**  Yeah.  I mean, headlines come up all the time, so you're reading through those headlines and reading through those, just opening it up and seeing and following what's going on out of curiosity just because I'm also in the tech industry and seeing, like, how did he manage to do this.  Or, you know, I don't know how to go too much into details or not, but just normal reading on a day-to-day basis out of curiosity.

**MR. CHANG:**  Understood.

I guess the daily part of it was a little bit of the follow-up -- right? -- that made it sound like it was something you were following very closely, and so we wanted to better understand that part of the answer.

**PROSPECTIVE JUROR LAU:**  Yeah.  I mean, at this point it happened a while ago, so I don't remember all the details, but it was one of those that just piqued curiosity and so I just kept reading about it.

**MR. CHANG:**  Okay.  And then you also expressed some

concerns based on that on whether that may affect your ability to be impartial, and so I wanted to better understand that as well.

**PROSPECTIVE JUROR LAU:**  Yeah.  So you have to think about the timing of the situation in that, also because I am Chinese and of -- how do I put this?

The experiences that I've had, feeling like I've been targeted so much recently because of my nationality.  I feel like there's been judgments made around being a Chinese person, even in the professional space, that I don't -- my immediate reaction of those kinds of articles was like:  Well, there's another person getting targeted unfairly.  How do you know that this is true, that he actually stole something or that -- that someone isn't just saying, "Hey, he happens to be Chinese, and therefore, let's pin it on this person"?

It was one of those reactions where it kind of -- I was intrigued to see where it was going because you could see how the world was turning and how everything around me was about me just being -- having black hair and getting people looking at me, or walking in Chinatown and having those kind of sentiments around me.

And so for me, it's where I don't know that I can honestly be able to look at this completely unbiased because it's the Government, again, coming in and trying to target another Chinese person, whether or not they're nationals.

THE COURT:  Can I interrupt and ask you a question about -- so when somebody reads news coverage about a case, when a prospective juror reads news coverage about a case, we want them to say exactly what you just said -- right? -- which is:  How do we know that this is true?  We don't want them -- we don't want people assuming that anything they read in the news coverage is true.

We want -- and we want them coming in and saying, "I'm not assuming anything is true because the burden is on the Government to prove its case beyond a reasonable doubt."  Right?  So, so far so good in terms of the press coverage that you may have read about this case.

The question, I guess, is -- you have this concern. And as I have said a number of times, we all have views about the role of the Government and things the Government has done and patterns that the Government may have engaged in that we don't like or that we do like.  And there's nothing wrong with having those views.

The question is -- you're starting at the right place; right?  How do we know any of this happened?  The Government hasn't proven anything yet.  But then the question is:  If you sit here for three weeks and you see the evidence come in and you believe beyond a reasonable doubt that this is -- that the Government has proved its case, would the fact that the defendant is a Chinese national, like, interfere with your

ability to reach that conclusion to convict?

**PROSPECTIVE JUROR LAU:**  To be honest, I don't know. And the reason why I'm saying that is because there's a part of me that will always still question whether or not this is just yet another situation where we're getting targeted unfairly. And even if I agree that the -- maybe the law is incorrect, it feels like by answering in a certain way, it would only proliferate that law to make it look like it's still going to continue on.

And so there's a lot of things around what's going on right now that I don't agree with, and I don't know that I can keep that out from my final decision for this case.

**THE COURT:**  So what you're saying is that if you firmly believe beyond a reasonable doubt that the defendant committed a crime, you might not be able to vote to convict?

**PROSPECTIVE JUROR LAU:**  I think in certain situations, the answer would be yes.  In this specific case where -- I mean, my mother recently just got scammed out of lots of money. We weren't able to catch the person.  So that's technically a theft.  And the only way that I could get around that situation was to have to cope with it and to say:  You know what? I guess good for you that you were able to steal the money and, unfortunately, pound on someone who is completely a victim in this case.  But that's life; right?

And some big companies like this, if that happened to

them, they can recover better and more quickly than someone like my mother, and yet there's no protection for her.

So for me, it's where -- I want to say, yes, I would be able to; but at the same time, there's a certain part of me that's just like I don't know.  I'm not really sure until, I guess, the case happens.  I don't know how I would be able to answer.

**THE COURT:**  Would you go into it committed to trying your best to follow my instructions and follow the law and do your duty under the law?

**PROSPECTIVE JUROR LAU:**  Yeah, I think so.

**THE COURT:**  Okay.

**MR. CHANG:**  I don't have any further questions for this juror.  Thank you.

Juror 45.

**PROSPECTIVE JUROR LEONG:**  Hi.

**MR. CHANG:**  Thank you for being here.

I noticed that you were nodding along as Juror 104 was talking, and so I just wanted to understand if you had some thoughts you wanted to share with us on this issue.

**PROSPECTIVE JUROR LEONG:**  Yeah, I kind of agree with a lot of what she said.  My feelings are maybe along the same lines.  I question -- my question is about the genesis of this case.  Who brought it forward?  When did all this happen?  What are the motivations of all the parties involved?  And is

this -- can we look at it just as this one isolated case with the facts as presented, or is it really a reflection of very public politicized and sensitive topics of AI and China?

MR. CHANG: Thank you again for your honesty for sharing that.

It's a similar question to the one the Court just asked Juror 104. Do you think you would be able to come in and listen to the evidence, though, with a fair and open mind?

PROSPECTIVE JUROR LEONG: I would, but at the back of my mind, I would question -- I would -- unless the motivations were made clear, I would wonder about that, and I would have maybe a dissenting opinion if I didn't agree with something.

MR. CHANG: So it sounds like you might not be able to put those opinions aside a hundred percent?

PROSPECTIVE JUROR LEONG: I mean, I can logically weigh the evidence presented. And if I had no choice but to go with whatever is the logical outcome, then so be it.

MR. CHANG: Understood.

THE COURT: But that stuff would be the stuff -- those concerns that you've expressed would be on your mind?

PROSPECTIVE JUROR LEONG: Yeah.

THE COURT: Yeah. Okay.

MR. CHANG: It would be a similar question to the one the Court asked. So let's say, hypothetically, the evidence did show that the Government had met its burden beyond a

reasonable doubt.  Would you be able to set aside those views and reach a verdict?

**PROSPECTIVE JUROR LEONG:**  Yes.

**THE COURT:**  Could you remind me your name and juror number again?  I apologize.

**PROSPECTIVE JUROR LEONG:**  Kip Leong, Number 45.

**THE COURT:**  45?

**PROSPECTIVE JUROR LEONG:**  Yes.

**THE COURT:**  Thank you.

**MR. CHANG:**  Excuse me a second, Your Honor.

(Co-counsel confer off the record.)

**MR. CHANG:**  Apologies, Juror 45.  I have a couple of follow-up questions.

So one of your roles as a juror will be to listen to the evidence, look at the documents that you hear in this case, and reach a verdict.  Some of that evidence may answer those questions, some of it may not; right?  It just depends on what comes in.

Would you be able to reach a verdict if you aren't able to, for example, understand the motivations of how the case was charged or those types of decisions?

**PROSPECTIVE JUROR LEONG:**  Yeah.  I mean, each court case is like an encapsulated bucket of proceedings and evidence, and that's all we have to go on; right?  We shouldn't -- we can't let our outside biases influence the

outcome in contradiction of what is presented to us; right?

MR. CHANG:  Understood.

Okay.  Thank you.  No further questions.

All right.  I wanted to now move on to the topic of artificial intelligence and machine learning, which we've spent a little bit of time on but -- but I wanted to give some more context to the jurors.

So I just wanted to define some terms for everyone. AI is artificial intelligence.  I know for a lot of you, that's very obvious, but I just wanted to make sure we're on the same page.  And then ML is machine learning.  You know, those are abbreviations we'll be using quite a bit.

Just by a show of hands, how many folks have used an AI chatbot before?

(Show of hands.)

MR. CHANG:  Wow.  How many folks have seen AI content on their social media?

(Show of hands.)

MR. CHANG:  Okay.  Wow.

All right.  Well, I wanted to state out front that this case is not about whether AI is good or bad for humanity. We'll leave that question for another day and someone much smarter than me.

As the judge has explained, this case is about the threat of trade secrets and economic espionage.  Specifically,

the Government has alleged that the defendant, while working at Google, stole files containing information about Google's AI computing infrastructure.

So, in other words, this case will deal with the hardware and software and information related to that hardware and software that companies like Google developing AI use to build their large language models and products that you see.

What I often tell people is, you know, you say, "What does my dog like to eat?" in ChatGPT; or "Where should I go on vacation?"  This case is about the underlying computing infrastructure that supports the chatbot that a lot of us see, or at least part of it.

In particular, you'll hear a lot of information about Google's Tensor Processing Units.  Those are called TPUs.  And so I wanted to explore a little bit from the prospective jurors whether anyone has such strong views on AI, whether it's good or bad, positive, good, neutral, that would prevent them from being fair in this case.  And so I'm going to call out a couple of jurors just to better understand their thoughts on this issue in particular.

So I'll start with Juror Number 25.

**PROSPECTIVE JUROR GONZALEZ HERNANDEZ:**  Hello.

**MR. CHANG:**  Hi.  Good afternoon.

**PROSPECTIVE JUROR GONZALEZ HERNANDEZ:**  Good afternoon.

**MR. CHANG:**  You mentioned you had some opinions about

AI, and I wanted to better understand those today.

**PROSPECTIVE JUROR GONZALEZ HERNANDEZ:**  Yeah, of course.  I just feel like we need more regulation on artificial intelligence.  I feel like it is a very dangerous tool when placed in the wrong hands.  But for the most part, we use it day-to-day basis.  Like you said, we see it on social media.  But that's about it.

**MR. CHANG:**  Okay.  Knowing that this case will relate in part to the computing infrastructure related to AI, is there anything about your views or opinions on AI that would impact your views in this case?

**PROSPECTIVE JUROR GONZALEZ HERNANDEZ:**  I don't believe so.

**MR. CHANG:**  Thank you.

**THE COURT:**  While you're flipping through, could I ask another question?

**MR. CHANG:**  Yeah.

**THE COURT:**  Mr. Chang asked one of you about media coverage, and that was going to be a question that I was going to ask everybody before and I forgot.

Does anybody else think they may have seen news coverage about this case?

(Show of hands.)

**THE COURT:**  One, two.

Okay.  If you saw news coverage about this case, and

I think I know what the answer is for Ms. Moriarty, but if you saw news coverage about this case, would you be comfortable following my -- would you be able to follow my instruction, which is that you are not to treat anything that you saw as actually having happened, you're not to consider the news coverage, you can only decide the case based on the evidence that comes in in the courtroom?  Can you raise your hand if you would have a problem -- if you think you'd have a problem following that instruction?

(No response.)

THE COURT:  Okay.  Thank you.

MR. CHANG:  Juror Number 7.

PROSPECTIVE JUROR LAZARO FUENTES:  Good afternoon.

MR. CHANG:  Good afternoon.

You mentioned you had a computer science background, and we just -- we wanted to better understand what you do at Tesla and what type of computer science work you do in your day-to-day job.

PROSPECTIVE JUROR LAZARO FUENTES:  Well, when it comes to computer science, I believe -- well, first off, I'm from the quality department so I'm using some, like, sort of tech to, like, jot down, like, quality defects with certain models and report back to -- or jot them down and somebody else will take care of, like, repairing them.

MR. CHANG:  Okay.  I'm going to ask you more of an

open-ended question.  We've talked a lot about different topics, including the Court's questions, my questions.  Is there anything about the various topics we've discussed that raises any concerns from your background, your opinions, your thoughts?

**PROSPECTIVE JUROR LAZARO FUENTES:**  No concerns.

**MR. CHANG:**  Thank you.

**PROSPECTIVE JUROR LAZARO FUENTES:**  Thank you.

**MR. CHANG:**  Give me a minute, Your Honor.

**THE COURT:**  Sure.

(Pause in proceedings.)

**MR. CHANG:**  All right.  Juror Number 43.

**PROSPECTIVE JUROR WANG:**  Afternoon.

**MR. CHANG:**  Good afternoon.

Earlier this morning you explained that you had some concerns about -- let me make sure I get the language right.  I want to make sure I'm accurate -- that I think, quote, "laws are unreasonable."  I wanted to better understand what you meant by that statement.

**PROSPECTIVE JUROR WANG:**  I think I, in that moment, just wanted more clarity on my role as a juror in the sense that, I mean, there are just laws that I would find unreasonable.  I wouldn't put it past myself to hear some of -- some reasoning from either side and thinking, "Well, I don't agree with that law."

But in having heard that the primary -- like, my role is to follow the instruction and listen to the facts and take the law as the law, that's something I think I can do on both sides equally, if that makes sense.

**MR. CHANG:** It does.

And so the Court did -- has mentioned this a couple of times, but at the end of the trial, he will provide you with the law. Let's say you disagree with the law. Do you think you'd be able to follow the Court's instruction?

**PROSPECTIVE JUROR WANG:** I think so. And I hesitate because I don't foresee myself disagreeing so, like -- so vehemently with, like, all of the evidence. At the end of the day, I don't think that I would think that the final verdict is, like -- that I would disagree with every law that was presented to me. Does that make sense?

**MR. CHANG:** It does.

Can you give us some examples of the types of laws you find unreasonable?

**PROSPECTIVE JUROR WANG:** No. I think that just I would echo a lot of what people have said here today in terms of -- I mean, I just think that inherently Google, as a monopoly, has powers that I myself can't even articulate; but just that inherently, in the power that it has, it has the capacity to be predatory.

And also me being Chinese, I acknowledge that I have

my own unconscious biases regarding, like -- like, in the back of my head, I also think about who's being targeted, why they're being targeted, why certain cases get this sort of treatment relative to others.

But having said all of that, I -- again, I think that -- I didn't really answer your question because I just don't have specific laws in mind, but I do think that on both sides, I would -- I have biases on all ends, I believe, and I think that I could set aside -- or despite all of them, I would be able to follow protocol, follow my role as a juror.

**MR. CHANG:** What -- I wanted to probe a little bit more on the Google concerns that you raised.

**PROSPECTIVE JUROR WANG:** Sure.

**MR. CHANG:** It sounds like you have some opinions on Google, which is, again, totally okay.

Would that influence the perspective you come at in terms of considering the evidence in this case?

**PROSPECTIVE JUROR WANG:** I don't think so, no.

**MR. CHANG:** All right. Thank you. No further questions.

All right. Let's call...

(Pause in proceedings.)

**MR. CHANG:** Juror Number 76, I know we talked for quite a bit, but I have only one or two questions for you, and then we can...

Juror 76, you said that you had some views on whether certain information could be a trade secret.  And in particular, I wanted to ask you if the information that's presented, without getting into the specifics other than what I just shared five, ten minutes ago, if you disagreed that the information that's being claimed to be a trade secret could be a trade secret, from a philosophical, moral perspective, would you still be able to reach -- render a verdict as a juror in this case?

**PROSPECTIVE JUROR ESGUERRA:**  I would find that difficult, I think, yeah.

**MR. CHANG:**  It sounds like you can't promise that you'd be able to set those feelings aside.

**PROSPECTIVE JUROR ESGUERRA:**  I cannot promise.

**MR. CHANG:**  Thank you.  No further questions.

**PROSPECTIVE JUROR ESGUERRA:**  Thank you.

**MR. CHANG:**  All right.  As Judge Chhabria explained at the outset, you know, the defendant is presumed innocent and there's no presumption of guilt or inference of any kind that may be drawn if the defendant does not testify.  The judge will explain that to you.  The law does not require a defendant to take the stand and testify.  That's the law.

Does anyone have any concerns with that principle in general?

(No response.)

MR. CHANG:  Okay.  I see no hands.

All right.  I'm going to ask some more broad-reaching, open-ended questions.

Now, we've talked about a lot of different topics.  I called out some specific jurors.  I didn't call out others. And I wanted to make sure I gave people an opportunity to speak their mind, share their opinions with us because that's really important to both the Government and to the defendant here. And so I wanted to ask an open-ended question.

Based on the various topics that we've asked you some questions about, does anyone have any concerns or feelings or opinions that they would like to share with us at this time?

(Show of hands.)

MR. CHANG:  Yes, you have to come to the mic for madam court reporter's benefit.

THE COURT:  Could you remind us again your name and juror number?

PROSPECTIVE JUROR COPI:  36, Margaret Copi.

THE COURT:  Thank you.

PROSPECTIVE JUROR COPI:  I think there are some laws and there are some penalties that are inherently immoral, and I believe that every person -- it is incumbent on every person to follow their own ethics if they believe that it is in contradiction to morality -- if the law is contradictory to morality.

And I think that stealing is pretty universally agreed to be a bad thing if you're looking at it from a moral point of view.  So that's kind of very clear.  In terms of what should be secret, that's not clear at all.

And I think a lot of the questioning, it depends, it depends on a lot of the concrete content of the case.  I don't know.  It's really hard -- I mean, listening to everybody and their comments and they raise very interesting, very good questions.

I think I wrote on my form that if I -- that I could not serve on a jury with a capital offense, with a capital crime because I would not find someone -- even if I thought they were guilty of the crime, I would not find for them to be convicted.

It's my impression that there are some situations when juries don't agree with penalties and juries can say, "Okay, these are the facts.  Yeah, this person did these things, but we don't agree that that should be illegal and we do not agree with -- we do not agree with the penalty," that there's some recourse in that.

**THE COURT:**  Let me jump in and talk a little bit about the issues of penalties because we haven't spoken about that yet; right?

So, first of all, let me separate out capital cases and non-capital cases --

**PROSPECTIVE JUROR COPI:** Yeah.

**THE COURT:** -- since you mentioned capital cases; right?

And obviously, this is not a capital case.

**PROSPECTIVE JUROR COPI:** Right.

**THE COURT:** But in a capital case, the way it works is that the jury decides whether the defendant is guilty beyond a reasonable doubt, and then the jury decides whether the defendant should get the death penalty. And so in capital cases, the lawyers have to ask the jurors all kinds of questions about whether they believe in the death penalty and stuff because it's the jurors who will be the ones who will be deciding -- will be deciding whether the person gets the death penalty.

Okay. But in all other cases, it works differently. In all other cases, including this one, the decision about guilt is for the jury. The decision about the punishment is for the judge at a later time after learning a lot more facts and circumstances and information about the defendant and background and all that kind of stuff; right?

So in a case like this, it's not -- the jury -- you will be instructed by me not to speculate about what the penalty might be and not to -- not to consider penalty when deciding on the question of guilt or innocence, because -- or I should say guilty or not guilty, because that is a job for the

judge at a later time.

Does that help?

**PROSPECTIVE JUROR COPI:**  Yes.

**THE COURT:**  Okay.

**MR. CHANG:**  Similar question.  I know you want to get back to your seat, and I promise it will be soon.  I will try my best.

One of the -- one of the questions I have for you is that, as a juror, you have to promise that you will follow the law that the Court instructs you with at the end of the trial, even if it conflicts with your personal, moral, or philosophical beliefs.  Can you promise to do that?

**PROSPECTIVE JUROR COPI:**  I think that hinges on what is reasonable doubt.  If it's clear-cut, yes, definitely.  If it's not very clear, it's going to be harder, yeah.  As a lot of people have said, it'll be difficult in some situations or in some conglomerations of evidence, yeah.

**THE COURT:**  When you say it's not -- "if it's not very clear," do you mean if it's not very clear whether the defendant is guilty?

**PROSPECTIVE JUROR COPI:**  Yes.

**MR. CHANG:**  Let me follow up on the reasonable doubt issue.  I've explained that before.

So the burden is reasonable doubt, but it's not all doubt.  Would you be able to -- and the judge, again, will give

you that instruction at the end of the case on how it's defined.

Would you be able to follow that instruction or would you have -- would you have to follow some personal, moral -- if it conflicted with your personal, moral, or philosophical belief, you would follow that instruction instead?

**PROSPECTIVE JUROR COPI:**  I think that's two different questions.  Whether I would follow a law if I thought it was immoral, it depends how egregious it is.  If I just think it's a rather silly law and it shouldn't be a law, I can find -- I would have no problem finding someone violated that law.

I'm sorry.  Can you repeat the question?

**MR. CHANG:**  Yeah, yeah.  No.  And apologies if the question was confusing.

Let's break that up into a couple of parts.  And so the first part was you have some views on certain laws may or may not be moral or --

**PROSPECTIVE JUROR COPI:**  Right.

**MR. CHANG:**  -- work with your belief system, which is totally fair.

My question is whether if -- I'm not going to get into the specifics of what the statutes are and all that, but let's say the law, at the end of this case, you feel like it conflicts with your personal and moral beliefs.  Could you promise to follow the law as instructed by the judge?

**PROSPECTIVE JUROR COPI:**  If the law conflicted with my beliefs, yes, I could follow the law unless it was very egregious.

**MR. CHANG:**  Let's say you think it's very egregious under your personal belief and moral system.

**PROSPECTIVE JUROR COPI:**  Yeah.

**MR. CHANG:**  Could you still follow the law?

**PROSPECTIVE JUROR COPI:**  No.

**MR. CHANG:**  The next question that you raised is about reasonable doubt.  Would you be able to follow the Court's instruction about what that is as defined in the law?

**PROSPECTIVE JUROR COPI:**  I hope so.  I think so. I think reasonable doubt is, by definition, not very definite, you know.  What does one person think is reasonable is different from what the next person thinks is reasonable.

**MR. CHANG:**  Thank you.  No further questions.  You can go back to your seat.

**PROSPECTIVE JUROR COPI:**  Thank you.

**MR. CHANG:**  Juror 71.

**THE COURT:**  Mr. Chang, I'll just let you know that your hour has expired.  If you want to take a couple minutes -- a few minutes to wrap up, go ahead.

**MR. CHANG:**  Thank you, Your Honor.  Appreciate it.

Good afternoon, Juror 71.

**PROSPECTIVE JUROR JOHNSON:**  Good afternoon.

MR. CHANG: Thanks for being here.

In your questionnaire, you had some thoughts about many of the topics that we covered today, and so I wanted to just better understand the concerns you raise about artificial intelligence.

And as I said, this case is not about the chatbots that we all see or those things, but it is about the artificial intelligence computing structure that supports a lot of that. And so knowing that information, I just wanted to first understand what your thoughts were on AI in general.

PROSPECTIVE JUROR JOHNSON: Yeah. I think for me, just being a recent college graduate and kind of being in this new world of AI, I see both the pros and cons of it, how it can be helpful. But then I also see that -- there does -- there needs to be some legal, just regulations regarding it over just the overuse of it and misuse, depending on how it's being used, and then also the implications regarding the world and the environment and everything.

So I see where it can come in handy, but also I can see where it could be a danger to just other factors or implications of society.

MR. CHANG: With those perspectives, would you be able to be open-minded when it comes to considering the information and evidence related to AI in this case?

PROSPECTIVE JUROR JOHNSON: Yeah, I'm willing to be

open-minded.

MR. CHANG:  You also mentioned some concerns about just the criminal justice system, and I wanted to better understand those as well.

PROSPECTIVE JUROR JOHNSON:  Yeah.  I think, if I remember correctly, the question was regarding if I believe the criminal justice system is fair.

And I said it just depends, just because from just knowing my history and then just American history regarding people of color and just different cases, like watching movies or seeing documents and stuff, and just knowing of just different cases where it's not necessarily always fair, depending on just certain environments and the scenarios.

But also regarding the justice system, I don't think it's always fair regarding the person, depending on the context, so...

MR. CHANG:  Understood.  Thank you for your honesty.

Would you be able to -- using those perspectives that you just shared, would you be able to come in as a juror and listen to the evidence carefully and follow the instructions that the Court has provided?

PROSPECTIVE JUROR JOHNSON:  Yes.

MR. CHANG:  Your Honor, if you could give me two minutes to confer with my co-counsels to make sure we don't --

THE COURT:  Sure.

MR. CHANG:  -- have any wrap-up questions, and then I can be done shortly.

(Co-counsel confer off the record.)

MR. CHANG:  Thank you again, everyone.  I know it's been a really long day.  I know you weren't here voluntarily, and so we do appreciate it.  At this point I don't have any further questions, and I look forward to seeing some of you over the next coming weeks.

THE COURT:  Okay.  Thank you.

I think it's probably a good time for a short break before we turn it over to the defense.

Just as a matter of scheduling, I would expect that we'll have most of you out of here by around, I'm going to guess, 4:30.  And for those of you who are picked for the jury, we'll have you for a little bit longer just to get you oriented, but that -- just so that I can set your expectations about that.

So why don't we take a break for ten minutes, and we will resume -- or eight minutes, let's say, and we'll resume at 2:50.

THE COURTROOM DEPUTY:  All rise.

(Recess taken at 2:42 p.m.)

(Proceedings resumed at 2:58 p.m.)

\\\

(Proceedings were heard in the presence of the prospective jurors.)

THE COURT:  Okay.  Mr. Fondo?

MR. FONDO:  Thank you, Your Honor.

So thank you all again.  I know it's been a long day. We'll try to get you through here relatively quickly.

Again, my name is Grant Fondo.  My colleagues and I are here to represent Mr. Ding, and so let me have my colleagues one last time just introduce themselves to you.

THE COURT:  Let's skip that.

MR. FONDO:  Skip that?  All right.

THE COURT:  We had introductions already.

MR. FONDO:  Okay.  So this is an extremely important part of the process, and we appreciate your attention.  You've been great and we thank you for that.

I'm going to ask you a bunch of questions.  Some -- I will try to get to as many of you as possible.  If I don't, please don't feel offended.  You'll probably feel relieved. But I will try to ask a bunch of questions so we can learn a little bit more about all of you.

And I apologize if I ask a question that's a little bit probing.  As you've seen, that's part of what we do, and we just want to learn more about you.

But I'm going to start out with maybe a little bit of an easier one.  So how many of you worked from home during

COVID?  If you could just raise your hands.

(Show of hands.)

**MR. FONDO:**  Okay.  For those of you that worked from home during COVID, did your company sort of -- towards the tail end of the COVID period, did your company -- did any of you have to come back into work through your company policy?

(Show of hands.)

**MR. FONDO:**  All right.  So I'm going to try -- let me ask you, Juror -- I apologize.

**PROSPECTIVE JUROR FLYNN:**  Me?

**MR. FONDO:**  Yes, please.

And so you had to come back to work.  How did you feel about that?

**PROSPECTIVE JUROR FLYNN:**  Kerry Flynn, Number 86.

**MR. FONDO:**  So thank you, Juror 86.

So how did you feel about having to come back to work?

**PROSPECTIVE JUROR FLYNN:**  I was actually looking forward to it because being home, I felt so isolated, so it was fine.  And it was a slow comeback.  They brought us back Tuesday, Thursday; and then they moved it to Tuesday through Thursday.  And so I was fine.  It was nice to see everybody and, you know, actually work with somebody.

**MR. FONDO:**  Well, I'm glad it worked well for you.

Were there any others in your office that maybe did not necessarily want to come back as much as the company wanted

them to come back?

**PROSPECTIVE JUROR FLYNN:**  Oh, yeah, there were several.

**MR. FONDO:**  And just tell me about that.

**PROSPECTIVE JUROR FLYNN:**  They really didn't, so they went and applied for other jobs and went elsewhere, unfortunately.  And if they didn't want to come back, that was kind of our company's way of going, "Okay.  You know, we're weeding out the ones that don't want to come back, you know, and we'll have the ones that do want to stay and actually work here in person."  So...

**MR. FONDO:**  Thank you.

**PROSPECTIVE JUROR FLYNN:**  Sure.

**MR. FONDO:**  I know there was a couple of other hands. Did anyone have -- for those that raised their hand, anyone not necessarily was superexcited about coming back?

(Show of hands.)

**MR. FONDO:**  If you will, please.

**PROSPECTIVE JUROR POGOSYAN:**  Hi.  Number 15.

I wasn't necessarily happy to come back to the office. I was actually happy to work from home or at least, you know, from time to time visit the office, like once a week or something like this.

Then it changed to, you know, part-time, like three days, then to four days, and then eventually to

five days.

MR. FONDO:  So, thank you.  Appreciate that.

I know there's one or two other hands.

Oh, please.  Did you want -- you're all set.
Thank you.

(Pause in proceedings.)

MR. FONDO:  I think you're Juror Number 9; is that
correct?

PROSPECTIVE JUROR MIYASHITA:  Yes, correct, Juror
Number 9.

So our company was just this year in which managers
have to come back to the office three days a week.  My team is
remote throughout the U.S.  So even my direct reports are not
in the state, and I go into the office often to be on Zoom
calls.

MR. FONDO:  And you said many of your colleagues are
now remote?

PROSPECTIVE JUROR MIYASHITA:  Yes.

MR. FONDO:  And --

PROSPECTIVE JUROR MIYASHITA:  We hired remote starting
during COVID.

MR. FONDO:  During COVID.  And that was a change from
what you had done prior to COVID; correct?

PROSPECTIVE JUROR MIYASHITA:  Correct.

MR. FONDO:  And fair to say, were -- those people,

they chose to be remote?

**PROSPECTIVE JUROR MIYASHITA:**  They were hired as remote employees, that was a condition of their employment, but it's pretty much getting -- well, they got extensions if they were managers, but now that's getting redacted after the one-year extension.  Employees who are staff can continue to be remote.

**MR. FONDO:**  Thank you.

**PROSPECTIVE JUROR MIYASHITA:**  Yeah.

**MR. FONDO:**  Did anyone else -- before I move on, did anyone else want to respond to that question?

(No response.)

**MR. FONDO:**  So let me go to Juror Number 37.

Yes.

**PROSPECTIVE JUROR TSERENDOLGOR:**  Number 37, Dulamsuren Tserendolgor.

**MR. FONDO:**  I'm sorry.  What?

**PROSPECTIVE JUROR TSERENDOLGOR:**  Oh, my name.

**MR. FONDO:**  Yes.

**PROSPECTIVE JUROR TSERENDOLGOR:**  Yeah.  What was the question?

**MR. FONDO:**  I'm sorry.  I didn't ask a question yet.

**PROSPECTIVE JUROR TSERENDOLGOR:**  Oh.

**MR. FONDO:**  I just wanted you to introduce yourself.

So tell me a little bit about yourself.  What do you

do in your spare time, assuming you have some spare time?

PROSPECTIVE JUROR TSERENDOLGOR:  Yeah.  I study history in my spare time.  I'm at the gym most of the time.  I go hiking.

MR. FONDO:  You mentioned you study history.  What kind of history do you study?

PROSPECTIVE JUROR TSERENDOLGOR:  I currently study Mongol history.

MR. FONDO:  Historic, meaning like long time ago, or more modern?

PROSPECTIVE JUROR TSERENDOLGOR:  Long time ago, Genghis Khan.

MR. FONDO:  And you have -- when you -- I understand you're a student; correct?

PROSPECTIVE JUROR TSERENDOLGOR:  Mm-hmm.

MR. FONDO:  When you get out, what is it -- what type of job are you looking for?

PROSPECTIVE JUROR TSERENDOLGOR:  Process engineering.

MR. FONDO:  And could you explain to me what process engineering is?

PROSPECTIVE JUROR TSERENDOLGOR:  Basically, you're engineering a process of how to do certain things.  So my professional background is in -- working in semiconductor.  So I've been part of the process of designing, like, testing RF equipments.

**MR. FONDO:**  And in that job, are sort of the rules of the road concrete or is it more flexible in that type of job?

**PROSPECTIVE JUROR TSERENDOLGOR:**  Depends on what you're doing.  So if it's -- like, if it's in a manufacturing setting, it's more concrete; but if it's, like, a floor management or just process of, like, manufacturing equipments, it can be more flexible.  It just depends on the -- on the nature of the work.

**MR. FONDO:**  And which are you more interested in?

**PROSPECTIVE JUROR TSERENDOLGOR:**  I don't really have any particular choice.  It just depends on the project.

**MR. FONDO:**  Let me ask you if -- in this case, if there's 12 jurors and 11 jurors want to have voted to find Mr. Ding guilty beyond a reasonable doubt, do you think -- if you believe differently, do you think you could withstand that pressure and hold your ground or do you think that eventually that pressure might push you over the edge, even if -- over to the other side, even if you didn't believe it?

**PROSPECTIVE JUROR TSERENDOLGOR:**  It depends on the evidence, I think.  It depends.

**MR. FONDO:**  So explain that to me.

**PROSPECTIVE JUROR TSERENDOLGOR:**  If it endangers him in some type of way, if -- I mean, like the conviction, or if there's clear bias or, like another juror said, if I feel like the government is, like, picking on him because of his race

or -- then I feel like I would feel a pressure.  I don't know.
It just depends on the situation.

MR. FONDO:  Well, let me ask you this:  If -- so we want you to vote the way that you believe the facts have been demonstrated to you.  And so if you felt that based on the facts that had been presented, that Mr. Ding was not guilty, even though everybody else disagreed with you, do you think you could stand your ground and vote accordingly?

PROSPECTIVE JUROR TSERENDOLGOR:  I think so.

MR. FONDO:  Thank you.

Juror Number 44, please.

PROSPECTIVE JUROR OBERON:  John Oberon, 44.

MR. FONDO:  You seemed kind of excited when I called you.  Were you?

PROSPECTIVE JUROR OBERON:  Sorry?

MR. FONDO:  Sorry.  So just tell me -- I understand you are retired; correct?

PROSPECTIVE JUROR OBERON:  Yes.

MR. FONDO:  So tell me a little bit about what you do in retirement.

PROSPECTIVE JUROR OBERON:  In retirement?

MR. FONDO:  Yeah.

PROSPECTIVE JUROR OBERON:  I quilt.

MR. FONDO:  You quilt?

PROSPECTIVE JUROR OBERON:  Yes.

**MR. FONDO:** And do you do anything else?  Any other, like, outdoor activities, group activities, charitable activities, teaching, anything like that?

**PROSPECTIVE JUROR OBERON:** Aging parents.  Married for 30 years.  So my wife is -- that's -- that's what we do.  We go to -- we play golf.  Sometimes I talk to other friends and colleagues.

**MR. FONDO:** Are you enjoying retirement?

**PROSPECTIVE JUROR OBERON:** Yeah.  It's a journey. It's different.

**MR. FONDO:** All right.  Well, thank you.  I hope your journey is good.

**PROSPECTIVE JUROR OBERON:** Thank you.

**MR. FONDO:** All right.  I wanted to -- a number of you -- you were all asked the question about whether if the defendant failed to testify, whether it caused you some concern so I wanted to ask a couple of you -- a couple of you a little bit more about that.

So, Juror Number 9, if you could come up to the mic.

**PROSPECTIVE JUROR MIYASHITA:** Yes, Juror Number 9.

**MR. FONDO:** Thank you for coming up.

So I believe you said [as read]:

"While it's the defendant's right, I find it less forthcoming for the defendant to not testify, raising some questions in my mind."

Could you tell me about that?

**PROSPECTIVE JUROR MIYASHITA:** Yeah.  I mean, as I've been thinking about it today, I guess it's a bit of an unconscious bias around that.  But I think that, given that that is the right of the defendant to not testify and understanding that that shouldn't be part of my decision-making, I think that I could be unbiased around that.

**MR. FONDO:**  Thank you.  Don't go yet.

**PROSPECTIVE JUROR MIYASHITA:**  Sorry.

**MR. FONDO:**  So you mentioned in response to a question that you were familiar with another case sort of somewhat related to this.

**PROSPECTIVE JUROR MIYASHITA:**  Correct.

**MR. FONDO:**  And does that -- do you have any concerns about the general nature of that case without getting into too much detail?

**PROSPECTIVE JUROR MIYASHITA:**  Right.  No.  I mean, it just -- I was not familiar with this case at all, but I guess reading headlines from that other case, which I had followed a bit more closely, not in depth, it just seemed like there were potentially some similarities in what was being brought forward.

**MR. FONDO:**  Thank you.

**PROSPECTIVE JUROR MIYASHITA:**  Okay.

**MR. FONDO:**  Juror Number 30, please.

**PROSPECTIVE JUROR JULES:**  Hello.  Demari Jules, Juror 30.

**MR. FONDO:**  Thank you.

I think you said you maybe had some concerns about a defendant not testifying.  Could you elaborate on that?

**PROSPECTIVE JUROR JULES:**  Well, I mean, it kind of points you to, like, if someone doesn't want to speak and say, like, "Oh, I guess I'm not guilty," it makes you question why.  I guess it's just more curious, not like that would build any bias to make me not want to make a decision or follow the law or anything, but yeah.

**MR. FONDO:**  Would it trouble you if you sat through the case of a trial and the Government put on all its evidence, you've heard the case is going to go on for a couple of weeks, would it trouble you if after hearing everything and, you know, hearing these accusations made against Mr. Ding, would it just cause you a little bit of pause if he didn't get up and personally answer to those questions?

**PROSPECTIVE JUROR JULES:**  Well, no.  I think that's why he has the team of lawyers; right?  Like, he has people to speak for him and protect him, and he has the right to not testify.  If anything -- yeah, no.  Yeah.  Yeah.

**MR. FONDO:**  Okay.

**PROSPECTIVE JUROR JULES:**  Sorry.

**MR. FONDO:**  Well, thank you.

Can we get your commitment that you can honor that, that obli- --

**PROSPECTIVE JUROR JULES:**  Yeah.

**MR. FONDO:**  Thank you.

Juror 104.

**PROSPECTIVE JUROR LAU:**  Hi.

**MR. FONDO:**  Hi.  Tell me a little bit about what you do when you're not working.

**PROSPECTIVE JUROR LAU:**  What I do?

**MR. FONDO:**  What are your hobbies?

**PROSPECTIVE JUROR LAU:**  Lately, a lot of Facebook, a lot of playing with my dogs.  I'm taking a class in AI right now, getting certificates in AI.

**MR. FONDO:**  And where are you taking that class?

**PROSPECTIVE JUROR LAU:**  Kellogg.

**MR. FONDO:**  In response to Question Number 30, which you said that if they aren't testifying, then they are scared of something, that it's causing them not to testify, and I want to better understand what you meant by that.

**PROSPECTIVE JUROR LAU:**  Oh.  It's kind of like me up here right now not wanting -- a little scared to talk.  So if they are not testifying, there's got to be some reason, whether good or bad.  I don't know.

**MR. FONDO:**  So could you think of good reasons why they might not want to testify?

**PROSPECTIVE JUROR LAU:** Good reasons for -- you mean, like, in this -- specifically in the case for why they wouldn't want to testify?

**MR. FONDO:** Yeah. In any case why somebody might exercise their constitutional right not to testify.

**PROSPECTIVE JUROR LAU:** Fear of being misinterpreted, fear of what could have been intentionally good could be thought of being incorrect. Do you need more?

**MR. FONDO:** No. That's -- I appreciate your sharing that with us. Thank you so much.

Juror Number 3.

**PROSPECTIVE JUROR MONTELINDO:** I'm Number 1.

**MR. FONDO:** Oh, you're Number 1. Sorry.

**THE COURT:** No. Number 3.

**PROSPECTIVE JUROR MONTELINDO:** I'm 3?

**THE COURT:** Yeah, you're 3. You're in Seat Number 1, but you're Juror Number 3.

**PROSPECTIVE JUROR MONTELINDO:** Sorry.

**THE COURT:** It's very simple.

**MR. FONDO:** So you -- sorry. You stated in response to your questionnaire that you own Google stock.

**PROSPECTIVE JUROR MONTELINDO:** Yeah.

**MR. FONDO:** Do you own -- I don't want to know your net worth or anything, but do you own a decent amount of it for you, personally?

PROSPECTIVE JUROR MONTELINDO: Yeah.

MR. FONDO: And do you think it would -- would it cause you any concern to vote to -- against Mr. Ding -- sorry -- with Mr. Ding, that there are no, for example -- let me rephrase that. That's a bad question.

So do you have any concerns that it might impact -- your decision-making during the trial might be impacted in any way by a concern about whether your Google stock would go up or down based on your decision?

PROSPECTIVE JUROR MONTELINDO: It's a criminal case; right?

MR. FONDO: Yes.

PROSPECTIVE JUROR MONTELINDO: So I don't think so.

MR. FONDO: You have -- in response to one of your questions, you said, "Nationals -- Chinese nationals need to be screened and monitored." What do you mean by that?

PROSPECTIVE JUROR MONTELINDO: I just think the U.S. should win the AI race. That's pretty much...

MR. FONDO: And what do you mean by that?

PROSPECTIVE JUROR MONTELINDO: I feel that the U.S. is more of a free society and should be more -- we should be in charge of AI.

MR. FONDO: And that's the U.S. government, the U.S.; correct?

PROSPECTIVE JUROR MONTELINDO: They should regulate

it, yeah.

MR. FONDO:  And you said national -- I want to better understand.  You said, "Nationals need to be screened."  What do you mean by "screened"?

PROSPECTIVE JUROR MONTELINDO:  Just for citizenship and so forth.

MR. FONDO:  And then "monitored."  What did you mean by "monitored"?

PROSPECTIVE JUROR MONTELINDO:  Monitored?  That's a tough question.  They should be -- if they're not a U.S. citizen, they should be scrutinized more.  I don't have any specifics on that.

MR. FONDO:  So if the individual is not a U.S. citizen, does that cause you to potentially treat them differently regarding these types of issues?

PROSPECTIVE JUROR MONTELINDO:  No.

MR. FONDO:  So when you say "monitor," though, can you identify more, like, specific?  Like, what is the type of monitoring that you're referring to?

PROSPECTIVE JUROR MONTELINDO:  That they follow the law, U.S. laws.

MR. FONDO:  And do you think they have -- that if somebody is not a U.S. citizen, they should be even more careful than a U.S. citizen about following the law, given that they're not a U.S. citizen?

**PROSPECTIVE JUROR MONTELINDO:**  Yes, I do.

**MR. FONDO:**  Why is that?

**PROSPECTIVE JUROR MONTELINDO:**  I think they're a guest in the country, and they should -- they should follow -- they should act like a guest.

**MR. FONDO:**  And what does "act like a guest" mean? What do you mean by that?

**PROSPECTIVE JUROR MONTELINDO:**  I don't think they should -- they don't have the same right to express their political views as a U.S. citizen would.

**MR. FONDO:**  And if they did not act like a guest, in your mind, would that cause you concern?

**PROSPECTIVE JUROR MONTELINDO:**  Yes.

**MR. FONDO:**  What type of concern?

**PROSPECTIVE JUROR MONTELINDO:**  Well, they should be scrut- -- they should be checked out by the State Department or the FBI, according to the law.

**MR. FONDO:**  Okay.  Thank you.

Juror Number 9.

You know what?  I apologize.  I think I've already asked you.  You're lucky.

All right.  Juror Number 51, if you could introduce yourself.

**PROSPECTIVE JUROR KULLBERG:**  I'm Juror Number 51, Amanda Kullberg.

MR. FONDO: In your questionnaire -- and thank you, by the way, for coming up.

In your questionnaire, you said that you feel like people from outside the country are taking U.S. jobs and housing. Can you explain that?

PROSPECTIVE JUROR KULLBERG: I just said that due to things that I've seen online in the past.

MR. FONDO: You've seen what? Online what?

PROSPECTIVE JUROR KULLBERG: Just, like, history and news that I've seen. I don't have any specific, but just like -- just like how our -- one of our biggest concerns between the two are, like -- sorry -- I think just the different systems that we have and kind of like our other fellow juror said, bringing those systems that they have in their country over to ours might not align with everything that we agree with.

MR. FONDO: And do you feel that them coming into the country, that they are, in fact, taking -- people from outside the country are taking U.S. citizens' jobs, and does that cause you concern?

PROSPECTIVE JUROR KULLBERG: Yes.

MR. FONDO: And is that a policy you don't agree with, about letting them in the country?

PROSPECTIVE JUROR KULLBERG: Not not letting them in the country.

MR. FONDO:  I'm sorry, what?

PROSPECTIVE JUROR KULLBERG:  Not -- it's not to not let them in the country.  It's just, like, when it comes to those types of issues.

MR. FONDO:  Okay.  So the concern -- well, let me ask you this:  You said in response to kind of the general question that "Is there anything that might cause you some concern about a bias or anything of that nature," you said that you might not be a hundred percent -- be able to be a hundred percent fair.  Why is that?  Is that part of this -- is that part of the reason?

PROSPECTIVE JUROR KULLBERG:  Yes.

MR. FONDO:  Okay.  Can you explain that a little bit more?

PROSPECTIVE JUROR KULLBERG:  Sorry.  I get so nervous up here.

MR. FONDO:  Take your time.

PROSPECTIVE JUROR KULLBERG:  I think -- can you repeat that question?  I'm sorry.

MR. FONDO:  Can I repeat it?

PROSPECTIVE JUROR KULLBERG:  Yes.

MR. FONDO:  Sure.  Just -- and by the way, there's no wrong answer here.  Please, I just -- I want you to be comfortable.  I apologize if this is making you nervous and I get it.  Public speaking is always kind of nervous, especially

with a microphone in front of your face.

But you had expressed concern that you might not be able to be 100 percent fair in a case involving -- and I want to understand why you might not be able to be a hundred percent fair in this case.  Is that because Mr. Ding is not a U.S. citizen?

PROSPECTIVE JUROR KULLBERG:  No, it's not because he's -- not because of the U.S. citizen.

MR. FONDO:  Okay.  So what is it that you said you might not be -- why you might not be 100 percent fair?

PROSPECTIVE JUROR KULLBERG:  Well, actually, can I take that back a little bit?  Maybe it will be because if not a U.S. citizen, because I did say that -- it just has to all be fair.  Sorry.  Oh, my God.

I think it goes back to what I was thinking about laws and regulations of different -- different countries, and so it just goes off with their beliefs and how they deal with that law.

MR. FONDO:  And when you say "they," who is "they"?

PROSPECTIVE JUROR KULLBERG:  The people -- the people from different -- from other countries.

MR. FONDO:  Sorry.  The people who what?

PROSPECTIVE JUROR KULLBERG:  People from not in the U.S.

MR. FONDO:  All right.  So you've heard -- we've

talked about, like, not every juror is the best juror for every case.

PROSPECTIVE JUROR KULLBERG:  Mm-hmm.

MR. FONDO:  I'm a high school baseball coach and -- in my free time; and if somebody was plowing a baseball field to make a baseball -- parking lot, I might not be the best juror for that case.  I think I would be fine for many others.

Do you have a concern that you've -- given what you've heard today, that you might not -- this might not be the right case for you to be a juror?

PROSPECTIVE JUROR KULLBERG:  I think some of my personal biases and then also my educational level of, like, the systems of AI and all of that part of it.

THE COURT:  Well, let me try and ask the question a different way.

Your education level I don't think matters at all. Everybody has a right to serve on a jury, regardless of their education level.

But on this issue of your questionnaire responses, I guess -- I think the right way to ask the question is that, you've come in here today and you've learned a little bit more about what this case is about and you've learned a little bit more about the role of a juror in a trial; right?  This is the role of the judge and this is the role of the juror, and it's really the role of a juror to decide what happened; right?

So -- and as I've said, views we may have on China, Chinese nationals, immigration generally, immigrants taking jobs generally, none of that disqualifies you from being a juror in a case like this or any other case; right?

So the question is:  Having heard everything that you've heard today about the role of the juror and understanding that what your job is, is to decide what happened in this particular case, the Government is accusing this person of doing a particular thing and the Government is required to prove that allegation beyond a reasonable doubt.  And the question is whether this -- it's not about China.  It's not about immigrants.  It's about one particular individual who's here in this courtroom and one particular set of facts and allegations about that individual.

And so the question is:  Do you think that you could focus on those facts and that evidence and that individual in reaching a verdict in the case?

**PROSPECTIVE JUROR KULLBERG:**  Yes, I do.

**THE COURT:**  And do you think that you could -- if you have -- if you feel that the Government has not proven its case beyond a reasonable doubt, would you have any problem voting not guilty because the defendant is a Chinese national?

**PROSPECTIVE JUROR KULLBERG:**  No.

**THE COURT:**  Okay.  Thank you.

**MR. FONDO:**  May I follow-up, Your Honor?

THE COURT:  Sure, briefly.

MR. FONDO:  Yeah.  So you paused for a second, and I just want to know why you paused as you did.

THE COURT:  Probably because my question was long and complicated.

PROSPECTIVE JUROR KULLBERG:  Just processing what -- everything so I answer it right.

MR. FONDO:  Okay.  Thank you.

All right.  Juror Number 16.

PROSPECTIVE JUROR BARTOS:  Juror 16, Simon Bartos.

MR. FONDO:  Can you tell me a little bit about your job.  What is it you do on a day-to-day basis?

PROSPECTIVE JUROR BARTOS:  I do technical coordination, comparing mechanical, plumbing, electrical plans to the architectural plans, making sure they're all lined up.

MR. FONDO:  And what type of architectural plans are we talking?  Is it commercial?  Industrial?

PROSPECTIVE JUROR BARTOS:  Mainly schools.

MR. FONDO:  Schools.

And, Mr. Bartos, I asked -- I've asked this question of others as well.  If you were one of the jurors selected and the there were 11 jurors who believed that the Government had proven its case beyond a reasonable doubt and you, based on the facts, did not believe they had met their high burden, do you think you could stand your ground or do you think you would

have trouble with the pressure from 11 others who want to go home?

**PROSPECTIVE JUROR BARTOS:**  I can stand my ground.

**MR. FONDO:**  Okay.  Thank you.

Juror Number 62.

**PROSPECTIVE JUROR POIRIER:**  I'm Juror 62, Angelina.

**MR. FONDO:**  Hi.  Good afternoon.

You mentioned you had prior jury experience that could influence you in this case.  Could you explain?

**PROSPECTIVE JUROR POIRIER:**  I was -- before I knew what the case was about, I just served on a jury in Martinez, and that was for a breaking and entering, and they dismissed me because I was recently involved in a breaking and entering, but this is completely different.

**MR. FONDO:**  And, generally, how was your experience as a juror?

**PROSPECTIVE JUROR POIRIER:**  It was good.

**MR. FONDO:**  And without telling me what the verdict was, did -- was a verdict reached?

**THE COURT:**  She said she was dismissed.

**PROSPECTIVE JUROR POIRIER:**  Oh, I was dismissed.

**MR. FONDO:**  Oh, I'm sorry.  I apologize.

Okay.  Thank you.

You had --

**THE COURT:**  Which is why her experience as a juror was

fine.

(Laughter.)

**MR. FONDO:**  Well, so in response to one of the questions, you said [as read]:

"If they have already started other companies, ones using this tech, that should be evidence enough of stolen technology."

What did you mean by that?

**PROSPECTIVE JUROR POIRIER:**  I'm sorry.  It was a while ago when I answered that.

**MR. FONDO:**  Sure.  Sorry.

In response to one of your questions -- one of the questions in the questionnaire, you responded [as read]:

"Maybe.  If they have already started other companies, ones using this tech, that should be evidence enough of stolen technology."

What did you mean by that?

**PROSPECTIVE JUROR POIRIER:**  Well, I figured if tech is already a patented system and somebody else has their hands on it that's patented, then I would think that would be enough evidence, but I'm not -- I don't know the system and I'm not familiar with how it all works.

**MR. FONDO:**  Okay.  Thank you.

Juror Number 75.

**PROSPECTIVE JUROR GREACEN:**  Good afternoon.  Chris

Greacen, Juror 75.

**MR. FONDO:**  Good afternoon.

In response to one of the questions relating to the theft of U.S. intellectual property by China or Chinese nationals, you answered [as read]:

"I understand both the history of theft and that there is an incredible amount of nuance in this area."

What did you mean by that?

**PROSPECTIVE JUROR GREACEN:**  I mean, let's see here. There's a lot of proven software that has been stolen across the world many times, and that people do this for a lot of different reasons, and some of those reasons aren't necessarily bad.  And there are things that -- practices that companies take in the way they organize their systems and their software which become best practices in the way things happen everywhere.

And it's really just a matter of time and business decisions that allow that evolution to happen, and the nuance happens all over the -- all over the picture there.

**MR. FONDO:**  Okay.  Thank you.

Juror Number 79.

**PROSPECTIVE JUROR POSSIN:**  Hello.  Juror 79, Scott Possin.

**MR. FONDO:**  In response to the Question 44, which was,

"Is there anything about the subject matter of this case or points covered in the questionnaire that essentially would create a question in your mind whether you could be fair and objective," you had a response and I can read it to you, or are you familiar with what the response is?

**PROSPECTIVE JUROR POSSIN:**  If I remember, I think I might have had some strong words on that.  I have to -- I was sick at the time when I wrote that, and I think that did maybe change a little bit how I -- I think the prospect of coming in here today was daunting.

I feel great.  I'm here today.  And I want to say that, like, the subtext that I really wanted to put on there was that I would have to look at the merits of each case, and I feel 100 percent solid that I could be a fair and impartial juror today, regardless of what I -- you know, I might have written that day.

**THE COURT:**  And can I -- I just want to make a comment about that.  I mean, it's very different, you know, sitting in your own home responding to a questionnaire online than it is coming to the courtroom and spending the day learning about the process and learning about the role of the juror, and I think we all understand that.  And not as much thought goes behind the responses to the questions in the written questionnaire, and sometimes people choose different kinds of language, and we totally understand that.  And that's why we call you in here to

ask follow-up questions and talk things through.

**PROSPECTIVE JUROR POSSIN:**  Thank you, Your Honor.

**MR. FONDO:**  Thank you.  I appreciate you clarifying that.  Thank you.

Juror Number 85.

**PROSPECTIVE JUROR CHUHAK:**  85, John.

**MR. FONDO:**  Good afternoon.  Thank you for your time.

You responded to one of the questions that you are more likely to believe law enforcement.

**PROSPECTIVE JUROR CHUHAK:**  Yes.

**MR. FONDO:**  And that's more likely to believe law enforcement than the average witness?

**PROSPECTIVE JUROR CHUHAK:**  Well, just because of my prior work.  We worked hand in hand.

**MR. FONDO:**  Okay.  Do you -- do you believe that law enforcement always tells the truth?

**PROSPECTIVE JUROR CHUHAK:**  My experience is, yes, but you see stuff on TV and stuff where obviously it's not.

**MR. FONDO:**  And do you believe that law enforcement always gets it right?

**PROSPECTIVE JUROR CHUHAK:**  For the most part.

**MR. FONDO:**  Given your belief that law enforcement tells the truth all the time --

**PROSPECTIVE JUROR CHUHAK:**  I said for the most part.

**THE COURT:**  He didn't say that.

**PROSPECTIVE JUROR CHUHAK:**  Yeah, that's what I said.

**THE COURT:**  Please try not to put words in the mouths of the jurors.

**MR. FONDO:**  I apologize, Your Honor.  I wasn't trying to do that.

So do you think you could fairly evaluate all the testimony in this case?

**PROSPECTIVE JUROR CHUHAK:**  Yes.

**MR. FONDO:**  Okay.  Thank you.

**THE COURT:**  Could I ask you a question, Mr. Chuhak?

**PROSPECTIVE JUROR CHUHAK:**  Yeah.

**THE COURT:**  I'm sorry.  Did I mispronounce your last name?

**PROSPECTIVE JUROR CHUHAK:**  Close enough.

**THE COURT:**  Okay.  I just happened to notice, this is not too important, you said [as read]:

"Two people at your court are police officers, and the head of the clerks" --

**PROSPECTIVE JUROR CHUHAK:**  I believe so.

**THE COURT:**  [As read]:

-- "is my best friend's daughter."

Who is the head of the clerks?

**PROSPECTIVE JUROR CHUHAK:**  I know her.  Maybe Kristen.  Does that ring a bell?

**THE COURT:**  Kristen Mellon?

PROSPECTIVE JUROR CHUHAK:  Yeah.

THE COURT:  Oh, okay.

PROSPECTIVE JUROR CHUHAK:  And then her dad's Rick Seib.  So that's who I hang out with.

THE COURT:  Oh, okay.  Your best friend is Kristen's dad?

PROSPECTIVE JUROR CHUHAK:  One of them.

THE COURT:  Oh, okay.  Great.  Kristen used to have Bhavna's position.

PROSPECTIVE JUROR CHUHAK:  Right.

THE COURT:  She was here for almost ten years and now she's elevated to the supervisor of the clerks.

Okay.  Thank you.

PROSPECTIVE JUROR CHUHAK:  Thanks.

THE COURT:  I was just curious.

MR. FONDO:  Juror Number 75, please.  Oh, you're back.  Sorry.

PROSPECTIVE JUROR GREACEN:  75, Chris Greacen.

MR. FONDO:  Sorry.  I apologize.

You mentioned that Google is a former client; correct?

PROSPECTIVE JUROR GREACEN:  Yeah.

MR. FONDO:  Were they, you know, a significant client, a minor client?  Could you sort of --

PROSPECTIVE JUROR GREACEN:  Small but long, a couple of years.  I want to say 2017 to 2020.  I don't think I have

any active contracts or NDAs with them right now.  Small team working there every day for that duration.  And I think, in general, it was smaller than our typical engagement, typical client relationship.

           **MR. FONDO:**  Thank you.

           Are you intending to try to get more work from them in the future?

           **PROSPECTIVE JUROR GREACEN:**  Would, but I have no active conversations or leads or anything like that.  It was a good client, good work that we did, high impact, and something that I can point to and leaders within the organization, not dealing with AI or infrastructure or anything in the neighborhood we're talking about here, would recognize that work, would remember the work that we did, and would allow some conversation to happen.  But, yeah, I would work for Google again.

           **MR. FONDO:**  Would -- if there is -- if the jury -- if you are on the jury and the jury came back with a verdict of not guilty, would that cause you any discomfort or concern about future relationships with Google?

           **PROSPECTIVE JUROR GREACEN:**  I don't think so, and I don't think it would affect any odds or chances of reengaging with the people I know there, and -- but who knows.  You know, it's a -- people could read that a different way.  The optics aren't in my control.  And I would feel good about any

particular outcome if I was involved with that.  I could act with integrity.

MR. FONDO:  Thank you.  Appreciate that.

Let me ask a little bit more of a broader question. How many of you consider yourself pretty strong rule followers?

(Show of hands.)

MR. FONDO:  If you could raise your hands a little bit.

THE COURT:  Rule followers.

MR. FONDO:  Rule followers.

How many of you -- is that better?

Okay.  I'm so not used to being told to speak up. This is just so unusual for me.  So let me repeat the question.

So how many of you believe that you are strong rule followers?

(Show of hands.)

MR. FONDO:  Quite a few.

Okay.  Is there anybody that wants to talk about it who hasn't spoken very much?  I don't want to keep hitting the same people.

(No response.)

MR. FONDO:  If I told you the rule was you needed to speak up, would you volunteer to speak up?

All right.  Juror Number 5, you raised your hand; correct?

**PROSPECTIVE JUROR EVERETT:**  Yes.

**MR. FONDO:**  Okay.

**PROSPECTIVE JUROR EVERETT:**  Annemarie Everett, Number 5.

**MR. FONDO:**  So tell me about that, about your response.

**PROSPECTIVE JUROR EVERETT:**  I am the daughter of an engineer, and he liked rules and we liked rules in our house growing up and I always followed them.

I don't think -- I mean, I've made unconventional choices in my life, but I think I've generally followed the law and rules when they were, you know, something that affected my day-to-day life.

I don't break rules just to break them, but, you know, I generally don't -- don't like to rebel for the sake of rebelling, I guess.

**MR. FONDO:**  Okay.  Thank you.

Sort of following up on that, is there anybody here who has never violated a company policy before?

(Show of hands.)

**MR. FONDO:**  Okay.  Why don't we start with you all the way to the right.  I think you are Juror Number 113.

**PROSPECTIVE JUROR PELLETIER:**  112.

**MR. FONDO:**  112.  I'm sorry.

**PROSPECTIVE JUROR PELLETIER:**  Julie, 112.

I am in the legal and compliance arm of the organization, so it would be very unnatural for me to not follow all the rules.

MR. FONDO:  Thank you for your honesty.  I appreciate it.

PROSPECTIVE JUROR PELLETIER:  Mm-hmm.

MR. FONDO:  And then Juror, is it 110?

PROSPECTIVE JUROR SUAZO:  Well, I follow -- Nancy Suazo, 110.

I, you know, pretty much follow all the rules there because I am, like, head of the safety coordinator for my job too.  So I have to follow the rules a lot to set an example for everybody else.

MR. FONDO:  Okay.  Thank you.

Has anybody here been at a company where there was an allegation that somebody stole trade secrets from that company?

(Show of hands.)

MR. FONDO:  The rule follower; right?

PROSPECTIVE JUROR PELLETIER:  Yes.  Again, I'm in the legal and compliance area, so I've worked for Northrup and NASA and now a bioindustrial company.  At Northrup, there was a whistleblower case that came in that genre.

MR. FONDO:  Okay.  Thank you.

PROSPECTIVE JUROR PELLETIER:  Yep.

MR. FONDO:  Anybody else?

(No response.)

**MR. FONDO:**  How many people here believe that employees would never copy or keep documents unless they had a shady intent or bad intent?

(No response.)

**MR. FONDO:**  So is there -- is there anyone who has -- sorry.

Is there anybody who has not been asked questions that would like to be asked a question or would like to share information?  I don't mean to put you on the spot, but we do -- this is important, your participation; and you've all participated wonderfully just being here.

But are there any others that would like to be heard?

(Show of hands.)

**MR. FONDO:**  Yes, sir.  Thank you.

**PROSPECTIVE JUROR JUAREZ MENDOZA:**  Juror Number 109, Brandon Juarez Mendoza.

I just haven't been asked a question but I've been, like, listening; and I would -- I have, like, a lot of the similar -- like, being asked, like, if I were to be impartial and, like, set biases aside and follow, like, the rules given by the judge, I think I would be able to do that, but I just haven't been asked anything in particular.

**MR. FONDO:**  Well, thank you for coming up.  We really appreciate it.

Is there any other question you wished I had asked you?  Like you were sitting in the corner over there and saying, "I wish he asked me that"?

**PROSPECTIVE JUROR JUAREZ MENDOZA:**  No, not really.

**MR. FONDO:**  Okay.  What about -- let me ask you the question about if you were the sole juror.  There was 11 jurors who were voting to convict and you were the one voter who believed that the Government had not met its burden.

**PROSPECTIVE JUROR JUAREZ MENDOZA:**  I think I would feel like -- I would question, like, my own, like, thoughts about the case.  Like, maybe, like, I'm seeing it a little bit differently than everyone else.  Like, maybe I'm not seeing it correctly or maybe I am seeing it correctly and, like, other people -- like, if I'm the only one that doesn't see it the same as everyone else, then maybe there's something that I'm missing.  Then I might be more inclined to believe the other 11 than to stand my ground.  I guess it would kind of depend on, like, how -- on, like, how strongly the facts were given and, like, how strongly I believed the facts that were given in the case.

**MR. FONDO:**  Have you ever had a situation where, whether it's your friends or colleagues, everybody said, "We should do it this way," and you said, "We should do it another way," and where you were right?

**PROSPECTIVE JUROR JUAREZ MENDOZA:**  Yeah.  And usually,

like -- like, for example, like, if we all decided to go to one place and I didn't want to go, then I would probably just, like -- I would leave them be and I would, like, go somewhere else.

MR. FONDO:  What about, like, at work?  So let's take -- have you had a situation where you didn't have that option just to opt out?  Have you ever had that type of situation?

PROSPECTIVE JUROR JUAREZ MENDOZA:  I don't -- I don't think so.

MR. FONDO:  And if -- do you think -- getting back to sort of the core of that original question, do you think that you -- if you believed that the other 11 were just wrong, do you think you could withstand that pressure, even knowing that everyone wants to go home, it's Friday, 4 o'clock, et cetera?  Do you think you could stand your ground on that?

PROSPECTIVE JUROR JUAREZ MENDOZA:  Yeah.

MR. FONDO:  Okay.  Thank you.

Juror Number 95.

PROSPECTIVE JUROR KELLY:  Juror Number 95, Joe Kelly.

MR. FONDO:  So you mentioned that Google -- that you currently have Google contracts.  Is it your hope that those contracts continue going forward with Google?

PROSPECTIVE JUROR KELLY:  Yes, definitely.

MR. FONDO:  Okay.  And are those -- those contracts

are important to you?

**PROSPECTIVE JUROR KELLY:**  Very much so, yes.

**MR. FONDO:**  Okay.  Thank you.

**PROSPECTIVE JUROR KELLY:**  Thank you.

**MR. FONDO:**  One moment, please, Your Honor.

**THE COURT:**  Sure.

(Pause in proceedings.)

**MR. FONDO:**  Juror Number 90, please.

**PROSPECTIVE JUROR MORIARTY:**  Juror Number 90, Tara Moriarty.

**MR. FONDO:**  Thank you for coming up.

You mentioned that you work for the Sheriff's Office; correct?

**PROSPECTIVE JUROR MORIARTY:**  Yes.

**MR. FONDO:**  How would you feel -- if you were a juror and that jury voted to acquit Mr. Ding, how would you feel about going back to your office the next day?

**PROSPECTIVE JUROR MORIARTY:**  I would have a lot of work to do.

**MR. FONDO:**  Setting aside the work that's been piling up on your desk, how would you feel as far as going back to a law enforcement office and saying that you were part of a jury that acquitted a defendant?

**PROSPECTIVE JUROR MORIARTY:**  I would have no problem with that.

**MR. FONDO:**  Thank you.

Thank you, Your Honor.

**THE COURT:**  All right.  Thank you.

Okay.  Let's see.  So now -- as I mentioned, now that both sides have asked you questions, we're going to excuse you from the courtroom.  We're going to do our final bit of work that we need to do before we pick a jury.

So I will say, though, Juror Number 5, Ms. Everett, I thought of a couple more questions that I want to ask you just to make sure that you can be a fair juror in this case, so if you could stick around for a minute.

So the rest of you, why don't you -- why don't you take off and come back in half an hour.  So come back at quarter after 4:00.  And at that time or very shortly thereafter we'll be ready to tell you who's on the jury.  Thank you.

**PROSPECTIVE JUROR JULES:**  Actually, I had a quick question.  So if I'm -- so, basically, me and my brother are the sole providers of the household with my aunt; and I just -- like, I don't -- I'm completely unbiased.  I know I would be able to remain that.  It's just the financial part.  I'm very -- like, if it's going to lean into the next month, that is where I'm very, like --

**THE COURT:**  If you're picked, I can definitely call your employer and do whatever I can to convince them to pay you

for your service.

**PROSPECTIVE JUROR JULES:**  Okay.  Thank you.

**THE COURT:**  And for you as well.

**PROSPECTIVE JUROR POIRIER:**  I got the number too.

**THE COURT:**  Okay.  Great.  I won't be able to call until probably tomorrow; but if you're picked, I'll do whatever I can.

Okay.  And then I would like to clear the courtroom for this portion just to make sure that the juror is totally comfortable answering these questions.

(Proceedings were heard out of the presence of the prospective jurors.)

(Prospective Juror Everett present.)

**THE COURTROOM DEPUTY:**  You may all be seated.

**THE COURT:**  Okay.  Thank you.

So I've been reflecting on this one a lot because it's a complicated question, and I thought of a few more questions to ask you, and then afterwards maybe the lawyers will ask you a few more questions too.  Sorry about that.

So the first is about the financial impact.  You were talking a little bit about financial impact; right?

**PROSPECTIVE JUROR EVERETT:**  Sure.

**THE COURT:**  So I guess my question is:  If you sat through this trial and it became apparent to you that how the verdict comes out could, in fact, impact Google's stock, would

that make you more concerned about your ability to be an unbiased juror?

**PROSPECTIVE JUROR EVERETT:**  Maybe I'll take a step back and say, I -- I have very strong principles about fairness myself.  I think I am capable of being unbiased.

We also just established I'm a rule follower; and I think for that reason, my primary concern is being really up-front in disclosing potential conflicts that anybody could find in my background or my current activities because I don't want that to be an issue that comes out later or to -- I want to give everyone an opportunity to make the choices they want to make.

So I know that I have a lot of integrity around something like a responsibility as a juror.  I think I would still vote with what I believed the facts to be, even if it did potentially impact, in the short term, my financial life.

**THE COURT:**  Okay.  That's kind of what I expected you to say.

But, so let's think of it in different terms.  It sounds to me that what you're concerned with is the perception. Like, you're confident that the reality is that you're going to do it -- you're going to be an unbiased, fair juror no matter what and you're not worried about the consequences for you.

There is a concern about the perception; right?  How would the lawyers or the defendant or anybody else perceive it

if you had a financial interest in the case; right?

And so having established that your concern is the sort of perception of fairness that others might have, if there's one scenario where you sit through the trial and it becomes kind of obvious to you that the outcome of the trial might affect Google's stock --

**PROSPECTIVE JUROR EVERETT:**  Mm-hmm.

**THE COURT:**  -- and there's another scenario where it becomes obvious to you as you sit through the trial that the outcome is not going to affect Google's stock --

**PROSPECTIVE JUROR EVERETT:**  Sure.

**THE COURT:**  -- right?

So with the second scenario, do you become less concerned about the perception issue that we've been talking about?

**PROSPECTIVE JUROR EVERETT:**  Oh, absolutely. Absolutely.  I mean, I -- to be completely transparent, I think about what I would want as a defendant or what I would want as U.S. Attorney, and it's potentially picking people around potential landmines like this.  They don't know me.  I don't know them.  You know, I can say that I will be fair and I believe that I can be, but I think -- I think they should be allowed to make that call themselves.

**THE COURT:**  Yes.

And then the last question is -- all right.  So you

said you have an interview tomorrow?

PROSPECTIVE JUROR EVERETT:  Mm-hmm.

THE COURT:  So what if you got picked today for the jury, you have your interview tomorrow, and they tell you tomorrow, "You're hired"?  Like, doesn't that -- doesn't that create kind of a different situation for us?  What do you think about that situation?

PROSPECTIVE JUROR EVERETT:  So my immediate reaction is, I have to tell my potential new employer that I can't start for four weeks because I'm on a jury that involves their parent company.  I wouldn't say that obviously, but that I'm on a jury.

THE COURT:  Right.

PROSPECTIVE JUROR EVERETT:  So that's not great.  But, you know, being at work and knowing -- I would probably have to interact with them in some way, just like in my day job, I'm probably going to be working 6:00 to 8:00 a.m. and 5:00 to 7:00 p.m. around jury service; right?  I'm not anticipating them to say, "Okay.  Great.  We'll pay you.  Come back in a month."  I -- it would be a little weird to be kind of on both sides of things.

THE COURT:  At that point you're on a jury where your employer is a subsidiary of the alleged victim in the case.

PROSPECTIVE JUROR EVERETT:  Yeah.  It's technically a spinoff company, but we are still under the parent Alphabet

company.

THE COURT:  Oh, I see.  So it's not a subsidiary of Google.  It's a part of the Alphabet family?

PROSPECTIVE JUROR EVERETT:  It started as Google X in a Google project, and then they spun it out a few years ago.

THE COURT:  I see.

PROSPECTIVE JUROR EVERETT:  But it's still -- I still take the Google bus to work with everybody else.

THE COURT:  Got it.

PROSPECTIVE JUROR EVERETT:  Let's put it that way.

THE COURT:  Okay.  That's helpful.

Okay.  Thank you.

After hearing those questions and answers, does anybody want to ask any further ones?

MR. CHANG:  None from the Government, Your Honor.

THE COURT:  Okay.

MR. FONDO:  None, Your Honor.

THE COURT:  Okay.  Thank you.  You can come back at 4:15.

(Prospective Juror Everett leaves the courtroom.)

(Pause in proceedings.)

THE COURT:  Okay.  So I will hear cause challenges now.  I'll go back and think about the cause challenges after you make them, and then I'll come back and I'll tell you who's being excused for cause, and then you can do your -- you can

make your peremptories.

So you want to start with the Government?

**MR. CHANG:**  Yes, Your Honor.

Do you mind if I talk here or should I move the podium back?

**THE COURT:**  I don't care.

**MR. CHANG:**  Okay.  Our first cause challenge is Juror Number 36.

**THE COURT:**  Okay.

**MR. CHANG:**  She stated that she would follow her morals as opposed to the law in certain situations.

**THE COURT:**  I am not inclined to agree with that challenge.  I think that she made very clear that if it's very egregious, like -- and she brought up the death penalty, but there's no -- she didn't say anything to suggest that there would -- that would present an issue in this case.  So I would not be inclined to excuse her for cause.

**MR. CHANG:**  My recollection is she also had some concerns about what's secret or not, and based on her personal philosophical views, those seem to be pretty strongly held; and it sounded like from the tenor and context of her questioning, she would have trouble following your instruction on the -- the legal instruction that you provide at the end of the trial.

**THE COURT:**  Okay.  Any response from the defense?

**MR. FONDO:**  Yes, Your Honor.

We would disagree.  We think she was just incredibly thoughtful.  She was honest.  She's sort of soul searching in a sense, and she was just saying that -- and I think that if -- essentially saying if the rule -- I'm not going to rephrase what she said, but I don't think she's anywhere close to cause. I think she was just being honest and unbiased and saying these are not easy decisions, essentially.

THE COURT:  I agree with you, and I think the phrase "soul searching" is very apt.  I think that was -- there were several people who were kind of doing that on the fly in their comments, and I think she was one of them.

I am confident that she is -- is -- will make as good an effort as anybody else would to follow the law and do her best and do her duty as a juror.  So that challenge is denied.

MR. FONDO:  Thank you.

THE COURT:  What's the next one?

MR. CHANG:  Juror Number -- Prospective Juror Number 42.

THE COURT:  Okay.  I would be inclined to grant that one.

MR. CHANG:  It's on the basis of -- so we raised some concerns on the papers, and then in the courtroom, he doubled down on those views essentially in terms of being fair and impartial with Google being a victim company.

THE COURT:  Any objection from the defense on that

one?

MR. FONDO:  No, Your Honor.

THE COURT:  Okay.  He will be excused for cause.

I said I was going to go back and think about it, but so far I felt pretty confident on both of those so I thought I would just go ahead and say it.

MR. CHANG:  Okay.  The next one is Juror Number 76.

THE COURT:  Okay.

MR. CHANG:  We spent quite a bit of time with him, and ultimately, his view was that he had pretty strong philosophical views about whether intellectual property could even be intellectual property essentially and --

THE COURT:  Let me interrupt you for a second.

MR. CHANG:  Yeah.

THE COURT:  I was listening pretty carefully to what he said and it's on the record, and I think that's -- I think it's a tricky one.

What's the defense's view?

MR. FONDO:  Your Honor, I -- it's a little bit like the prior one, which was, although more involved and more kind of technical analysis --

THE COURT:  You mean a little bit like --

MR. FONDO:  36.

THE COURT:  Yeah.  Not like the one -- not like 42 --

MR. FONDO:  No, no.

THE COURT:  -- but like 36.  Okay.

MR. FONDO:  What I mean by that, Your Honor, is he was very forthcoming.  He was honest.  He was struggling with it, but he -- you know, he was asked a number of times "Could you basically essentially follow the law," and I think he said yes. I think he is -- and I just don't think he rises to the level of cause to strike him.

THE COURT:  Yeah.

MR. CHANG:  I will say my colleagues took some very detailed notes.  I was obviously up here listening.  He did state on the record that he could not promise he could follow the law if he disagreed from a philosophical standpoint that certain information should be a trade secret.  That was --

THE COURT:  The problem with this person is that he -- he's obviously a very thoughtful, honest person, smart person. And he made some statements that, viewed in isolation, you would say, "Okay.  This guy can be a juror"; and then he made some other statements when viewed in isolation, give you concern about whether he can be a fair juror.  And it kind of depended on who was asking him questions and -- which is why judges sometimes don't like to have lawyers do voir dire but I do like it.

I think that's -- this is a tricky one, and I'm going to think a little bit more about it during our break.

MR. FONDO:  Okay.  Thank you, Your Honor.

**MR. CHANG:** Thank you, Your Honor.

(Pause in proceedings.)

**MR. CHANG:** Juror 104, Prospective Juror 104.

**THE COURT:** Yes.

**MR. CHANG:** It seems like she --

**THE COURT:** Same thing. I listened pretty carefully. I -- what she said is on the record. I agree that it maybe is a bit of a close question, but what's the defense's view?

**MR. FONDO:** Your Honor, we don't think there's grounds for cause. I, frankly, don't remember her saying anything that was sort of as close a call as maybe some of the other ones that has caused you some concern, but I'd have to check my notes.

**THE COURT:** I mean, this one, it was kind of -- kind of the same thing. Like, it depended on who was asking her questions and how the questions were being asked.

But at one point she said, "I would go into it committing to doing my duty." At another point she said -- sort of earlier on she said, "I don't know if I could."

You followed up with her and you asked her a question, Mr. Fondo, and her response to that question was pretty reassuring. I don't remember exactly what your question was and what her answer was, but it was pretty reassuring. Maybe I'll go back and look during the break, but I think this one is a close question.

Anything further you want to say about that, Mr. Chang?

MR. CHANG:  Just to put on the record, I'm looking again at the notes of my colleagues, but she did say at some point on the record that she doesn't know if she can keep her personal views separate from the decision, couldn't say she could be fair, and she wants to be able to say that she could convict if the evidence supported beyond a reasonable doubt but essentially could not say that.

THE COURT:  Yeah.  I mean, again, her answers were a little bit all over the map depending on the way the question was slanted.

MR. FONDO:  Your Honor, my recollection, also, she -- was that she said if the facts determined that the person was guilty, she could find them guilty.

THE COURT:  Yeah.

MR. FONDO:  So I don't think -- I don't think she said anything that's grounds for cause.

THE COURT:  Okay.  Any other challenges?

I'll take that one under submission.

Any other challenges from the Government?

MR. CHANG:  Juror Number -- Prospective Juror Number 45.

(Pause in proceedings.)

MR. CHANG:  Let me find my notes, Your Honor.

THE COURT:  I don't think this one is close.  I mean, I don't think 104 is close, but 45 is not close.

MR. CHANG:  Okay.

THE COURT:  His concerns were much, much less significant than 104's.  That challenge is denied.  If you want to put anything on the record about it later, you can, but I'm not going to -- I'm going to deny that challenge.

MR. CHANG:  Understood.

Nothing further from the Government, Your Honor.

THE COURT:  Okay.  Any challenges from the defense?

MR. FONDO:  Yes, Your Honor.

I think you said you're considering Number 5, so we won't I won't -- I don't need to argue that anymore.

THE COURT:  But to be clear, I mean, it's not obvious to me that you would challenge Number 5.  So to be clear, you're challenging Number 5?

MR. FONDO:  We are challenging, yes, Your Honor.

THE COURT:  Okay.

MR. FONDO:  We're also challenging Number 48, Your Honor.

THE COURT:  48?

MR. FONDO:  Yeah.

MR. CHANG:  Really quickly, Your Honor, just for record purposes, we've talked extensively about 5.  So we share -- our view is that she stated carefully she could be a

fair and impartial juror and she should be allowed to be a potential juror.

THE COURT:  Okay.  What about the final question that I asked her?  I'm actually less concerned about the money because I think it is going to become obvious to her during trial that this is not going to have any effect on Google's stock or whatever.

What about the final question that I asked her about, like, "Let's say you get hired by this company tomorrow and then you're on a jury."  She made some clarification about the relationship between the two companies, but you're on the jury and you're working for this company.  Isn't that, like -- what would we say if she responded to the questionnaire by saying, "I work for this company.  This company is a spinoff of Google and it's part of the Alphabet family"?

MR. CHANG:  I don't think that's necessarily disqualifying per se.  And, frankly, I don't quite understand the relationship between the spinoff company and Google.

THE COURT:  I mean, my concern was alleviated a little bit --

MR. CHANG:  Yeah.

THE COURT:  -- when she said it was not a subsidiary but, rather, was -- I was under the impression that it was a subsidiary of Google, but now -- but it's a spinoff but she takes the Google bus to work.

MR. CHANG:  Yes.  And she says -- just my recollection is, in the questionnaire she says it's a spinoff.  I have no idea, sitting here -- standing here today, what the exact corporate relationship is between those two entities.

THE COURT:  Okay.

MR. FONDO:  Your Honor, if I may just comment on that.

THE COURT:  Yeah.

MR. FONDO:  So my understanding too is she gets stock -- Google stock as compensation.

THE COURT:  I think she said that she would get Google stock if she got the job.

MR. FONDO:  Yeah.

THE COURT:  Yeah.

MR. FONDO:  And so that's -- I mean, again, I don't necessarily fully appreciate the corporate structure, but that's sort of unusual if there's not a corporate relationship, and so that's part of our concern.

THE COURT:  Okay.

All right.  Sorry.  What was the next one?

MR. FONDO:  Number 48.  This was the engineer at Nvidia, technical marketing engineer.

THE COURT:  Yes.

MR. FONDO:  We have a concern, one, he's pretty close to the technology at issue in this case.  I don't know if there's going to be trade secret concerns also about sharing --

him getting access to or seeing all the various information. Nvidia is also a very significant partner with Google.  And so those are our concerns.

THE COURT:  Okay.  Response?

MR. CHANG:  This prospective juror said he does not have a deep understanding of Google's technology.  His main flag was Nvidia does do some work with Google, they're both very large companies, and then he's friendly with some product managers at Google.  We don't think he should be struck for cause.

THE COURT:  I agree with you.  That challenge is denied.

MR. FONDO:  Your Honor, and then the last one is 95.

THE COURT:  Okay.  And, I mean, we know what he said. It's sort of a similar -- similar challenge to 5 and the one we just talked about.  What was it?  42?

MR. FONDO:  Correct, Your Honor.  In some ways I would say -- I don't know which is more significant, but it's certainly significant, Your Honor.  He does most of his work for Google; he's been doing it for, I think he said, two years; and the plan is to continue to do so.  And so we have a --

THE COURT:  Well, he has ongoing contracts with Google, but he made very clear, and I think he was -- one of the jurors was, like -- had a complete understanding that there's no financial implication for Google to this case;

right?  There's no impact on Google's stock or whatever.  I can't remember which juror that was.  Maybe it was Juror Number 3.

**MR. FONDO:**  It was, I think, Your Honor.

**THE COURT:**  I think he -- I think Mr. Kelly, Number 95, expressed that recognition as well.  And he made very clear that even though he knows people there and interacts with people there as part of his professional life, he would -- it would not affect his ability to serve as a fair juror.

So I guess I'm not -- as long as we don't think that a financial -- sort of this relationship, the fact that he derives revenue from Google is categorically excluding, I'm not sure it would be appropriate to exclude him.

I guess the question is, he has these contractual -- he has these contracts where he -- that he works on for his company and those contracts are with Google, and so that's a portion of his revenue.  Is that in and of itself, like, categorically disqualifying?

**MR. FONDO:**  Yeah.  And we take the position it is, Your Honor.  Someone who is that -- the alleged victim here is -- sounds like most of their revenue for his team -- it's not just him but his team -- is generated from these Google contracts, and that's a continuation going forward.  Customers try to make, you know, clients happy.  Sorry.  Whatever.  Suppliers try to make --

THE COURT: I have no concern about that. That was one thing that was clear from this juror's demeanor and everything he said, that he will do his job and he will not be trying to make his client happy in this case. That, I'm very confident about.

MR. FONDO: I respect that, Your Honor, but I'm just -- but we still have the same position that we're concerned about that relationship.

THE COURT: Okay. Response.

MR. CHANG: We agree with Your Honor. We don't think it's disqualifying here. And you had some pretty thoughtful questions for him about whether it would affect his ability. He said on the record something to the effect of, "No, it wouldn't affect my ability to be fair and impartial."

And he did note Google probably wouldn't be happy if they found out this jury acquitted, but he said it wouldn't have an impact on his job.

THE COURT: Okay. So I'm going to think about that one too. So I'm going to think -- I'm still thinking about 76 and 104, the Government's challenges; and 5 and 95, the defense's challenges, and I'll let you know when I come back out.

And I'm going to give you-all until 4:20 to plan your peremptory challenges, and you have -- you have -- I will not give you much time as the sheet is passing back and forth,

maximum of probably 90 seconds.  So plan ahead, and I'll be back out here at 4:20.

And, Bhavna, why don't you tell the jurors that it's going to be more like 4:30.

And you have the sheets?  Which you don't need to fill out the sheets, but you can just -- that'll tell you which order you announce your peremptory challenges in.

MR. FONDO:  And, Your Honor, did you make a final decision as to how many jurors?

THE COURT:  I think 16.  I think we can -- I think we have the numbers for 16.  I'm not a hundred percent sure, but I'll let you know when I come back.

MR. FONDO:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 4:12 p.m.)

(Proceedings resumed at 4:25 p.m.)

(Proceedings were heard out of the presence of the prospective jurors.)

THE COURTROOM DEPUTY:  Come to order.  Court is back in session.

THE COURT:  Okay.  So, as I mentioned, I will be excusing Juror Number 5 and Juror Number 76 for cause, will not be excusing Juror Number 95 or 104 for cause.  I -- that -- by my count, that leaves us with 38 people.

And I would be inclined to excuse two more people for

hardship.  One of them is Juror Number 30, Mr. Jules, who provides one-on-one support to autistic kids at the school and is concerned about getting paid.  I think that with an agency like that, it's very unlikely that I can convince them to pay him.  So I would be inclined to excuse him.

And Juror Number 31, Ms. Latoof, who on her current schedule has to be there by 3:30 -- be in Martinez by 3:30 on Tuesday, Thursday, and Friday for pickup.

**MR. CHANG:**  Let me confer with my co-counsel.

(Pause in proceedings.)

**MR. CHANG:**  Your Honor, the Government has no objections to both.  We agree with your ruling.

**THE COURT:**  Okay.

**MR. FONDO:**  And we do object, Your Honor.  So, and let me actually -- we have the other objections I want to make sure we get on the record too.

But, Your Honor, we went through the whole hardship things.  We just don't think at this point that they have -- as you said, it may be a challenge, but I don't think it's an impossibility.  I don't think it's a hardship.

**THE COURT:**  Okay.  I think it's -- I think it's pretty rough.  I'm going to excuse Number 30 and 31 for hardship grounds -- on hardship grounds.

And then you said you wanted to put your other objections on the record.  Shall we do that now before we

forget?

MR. FONDO:  Yeah, we should.

THE COURT:  Is it possible to do it after we pick the jury?

MR. FONDO:  Yeah.

THE COURT:  Okay.  Let's do that then.

Okay.  So any last thoughts about -- I mean, I lean towards having 16 jurors just because I worry about post-holiday illness; and I think if we have 14 jurors, we're all going to be -- it's going to be three very nervous weeks about whether we're going to get the trial done.  So I'm still inclined to have 16 jurors.  Anybody have any last thoughts about that?

MR. CHANG:  We agree with Your Honor.

THE COURT:  Okay.

MR. FONDO:  No objection, Your Honor.

THE COURT:  Okay.  So then let's start doing the peremptories.  And remind me, who goes first?

MR. CHANG:  I actually don't know, Your Honor.

THE COURT:  Can you give me the sheet, Bhavna?

THE COURTROOM DEPUTY:  I did.

THE COURT:  I know.  I lost it.  Sorry.  Do you have another one?

MR. FONDO:  I think it's the Government, Your Honor.

THE COURTROOM DEPUTY:  I only printed three --

THE COURT: Thanks.

THE COURTROOM DEPUTY: -- and I wrote on this.

THE COURT: All right. So the Government goes first.

(Pause in proceedings.)

MR. CHANG: For our first peremptory, Juror Number 36.

THE COURT: Okay. Ms. Copi.

All right. And does the Government have -- does the defense have the next two?

MR. FONDO: Sorry. What, Your Honor?

THE COURT: Oh, defendant has the next one.

MR. FONDO: Yeah. The next one would be Juror Number 3.

THE COURT: Okay. Government?

MR. CHANG: Juror Number 43, Your Honor.

THE COURT: All right. Number 43, Mr. Wang.

And then the defense has two.

MR. WOO: Your Honor, to be clear, these go in order right in the box. So, like, exercising a strike on, like, 112 --

THE OFFICIAL REPORTER: I'm sorry. I can't hear you, sir.

MR. WOO: I'm sorry.

THE COURT: No. Because we have 36 jurors --

MR. WOO: Yeah.

THE COURT: -- and we're going to pick 16 of them, and

so if everybody uses all their challenges, then it will apply to everyone.  It'll apply to the whole universe.

MR. WOO:  I see.  So it doesn't matter who's sitting in -- the lower numbers don't matter then because if you strike somebody like Number 1 or --

THE COURT:  If we had more than 36 jurors, then, yes, striking the last juror would not matter.

MR. WOO:  Right.  But if we struck somebody at the end of the spectrum, Number 112 or whatever the highest number is, that person -- is that a wasted challenge because the first, you know, in order, 1 -- the lowest numbers, you know, 3, 5, 7, 9 --

THE COURT:  It's the lowest -- the lower -- the lowest numbers are the first to get seated, if that's what you're asking me.

MR. WOO:  That's what I'm asking.  Sorry, Your Honor.  Thank you.

MR. RAPP-KIRSHNER:  Your Honor, there are 16 jurors, including the alternates --

THE COURT:  Right.

MR. RAPP-KIRSHNER:  -- and then there are 16 total that will be challenged; correct?

THE COURT:  No.  There will be -- no.  There will be 20 because there are two challenges -- each side gets two extra challenges for the alternates.  So it's a total of 36.

MR. CHANG:  And my understanding for the alternate challenges are just to the alternate jurors; correct, Your Honor?

THE COURT:  Yes.

MR. CHANG:  Thank you.

THE COURT:  All right.  So the defense is Number 4 and Number 5.

MR. FONDO:  So we will strike Jurors Number 9 and 15.

THE COURT:  All right.  9 and 15.

All right.  The Government has a challenge now.

MR. CHANG:  45.

THE COURT:  All right.

Now the defense has two.

MR. FONDO:  44 and 48.

THE COURT:  44 and 48.

All right.  And now the Government has one.

(Pause in proceedings.)

MR. FONDO:  Juror -- Your Honor, there was an issue. We have a concern about the two jurors most recently struck by the Government.  They're both Asian jurors.

THE COURT:  Okay.  Remind me who they are again.

MR. FONDO:  So it is Mr. Collin Wang and then --

THE COURT:  What are the numbers?

MR. FONDO:  43 and 45.

THE COURT:  Okay.  And you're -- do you want to

articulate your concern a little bit more?

MR. FONDO:  Certainly, Your Honor.  There's very few Asian American jurors in this jury pool percentage-wise and --

THE COURT:  Really?

MR. FONDO:  I'm sorry.  What?

THE COURT:  Really?

MR. FONDO:  There's not a lot, Your Honor.

THE COURT:  Huh.  Okay.

MR. FONDO:  I mean, I don't think there's a lot, and certainly of Chinese descent, and so -- and these are both of Chinese descent and the defendant is Chinese.

THE COURT:  Both Chinese descent and what?

MR. FONDO:  And the defendant is Chinese.

THE COURT:  Oh.  Okay.  So you believe that they -- you're making a *Batson* challenge?

MR. FONDO:  Correct, Your Honor.

THE COURT:  Does the Government want to articulate race-neutral reasons for excusing these jurors?

MR. CHANG:  Yes, Your Honor.  Let me confer with my colleagues briefly.

(Pause in proceedings.)

MR. CHANG:  On Juror Number -- can I start or should we wait?

THE COURT:  Sure.  43.

MR. CHANG:  Yes.  Juror Number 43, so on the

questionnaire he stated that he holds negative feelings to the extent, quote -- thank you, court reporter -- quote [as read]:

"I hold negative feelings to the extent that Google is a monopolist and that its reach impinges on its consumers and employers."

And then during questioning today when asked about whether he would be able to follow the law in certain circumstances, he expressed some concerns about that, some skepticism.  And so for those reasons, we exercised our peremptory.

THE COURT:  What was the skepticism he expressed about being able to follow the law?  Do you remember any more detail about that?

MR. CHANG:  So he was one of the individuals who had some concerns about laws being unreasonable and whether he would be able to follow them.

There was some additional questioning where he -- I would say he walked back those questions -- those responses a bit, but we have some concerns about that in addition to his very, very strong views on Google in terms of it being a monopolist.  And so for those reasons, we exercised our peremptory.

THE COURT:  Okay.  And then what about 45?

MR. CHANG:  So 45 was one we discussed yesterday as well.  He has some very strong Administration views.  This is

the individual who wrote in his questionnaire three times, quote [as read]:

"The current Administration uses the law to punish" -- "to favor their friends, punish their enemies, and enrich themselves.  The military and law enforcement are blindly following corrupt orders," end quote

And then today when questioned, we -- one of the issues he raised was wanting to know the motivation behind the prosecution's charging process, how the Government decided to bring the case.  As the Court correctly ruled in *Mills*, that's off limits in a criminal case.  And so for those separate reasons, we exercised our peremptories.

**THE COURT:**  Okay.  Your response from the defense.

**MR. FONDO:**  Yes, Your Honor.  As to the first juror, 43, the juror actually sort of corrected their statement -- "correct" is not the right word, but they stated that they could follow the law.  They could not think of any law that he did not agree with and that he said he could follow the law, and he found no examples of any types of laws unreasonable.  So I don't think that that -- their stated basis.

I would also note that the first -- two out of the first three are Chinese individual -- people, Chinese people that they've stricken.

**THE COURT:**  Why did you strike Raymond Chow?

(Pause in proceedings.)

**MR. FONDO:**  Oh, let me just check.  Which juror number is that?  Sorry.

That's the Nvidia person, Your Honor?

**THE COURT:**  Yeah.

**MR. FONDO:**  For the same reasons that we expressed cause -- concerns about the cause.  Very strong relationship between Nvidia and Google and he has very strong relationships there.

**THE COURT:**  Okay.  So the *Batson* challenge is overruled.

And I will just remark that I found, both from my observation in the courtroom and from going through this list, there's actually a pretty high concentration of Asian American prospective jurors.  I was surprised to hear you say that the percentage was very low.  I thought it was unusually high, actually, just based on my history of observing jury pools here in federal court.

But, anyway, those challenges are overruled.

What's next?  Oh, the Government was working on Number 9.

**MR. CHANG:**  Yes.

**THE COURT:**  And the Government was working for a long time on Number 9, so I need your challenge on Number 9.

**MR. CHANG:**  Juror 68.

THE COURT:  Okay.  Juror 68.

Okay.  Two for the defense.

MR. FONDO:  Your Honor, Jurors 66 and 75.

THE COURT:  All right.  One for the Government.

MR. CHANG:  Juror 84.

THE COURT:  84.  Okay.

MR. FONDO:  Your Honor, the defense chooses 79 and 85.

THE COURT:  79 and 85.

Okay.  Government's final challenge before we get to have the jury in and then we pick the alternates.

MR. FONDO:  Your Honor, if I may, just -- let me just verify, but my understanding is 84 is also Chinese.

THE COURT:  Yes.  Are you making a challenge?

MR. FONDO:  Yes, we are.

THE COURT:  Okay.  What is the Government's basis for excluding 84?

MR. CHANG:  So this was a juror that we raised questions about yesterday on the record just based solely on the papers, so we had some concerns about his ability to be fair and impartial.

THE COURT:  What was it based on the papers?

MR. CHANG:  I don't recall -- I think yesterday I raised a concern about the questions in the last page of the questionnaire; but, in general, he had some very strong opinions about allegations of IP theft against Chinese

nationals.  In particular, in response to Question 40, he said, quote [as read]:

> "Most cases of U.S. IP theft against Chinese nationals were proven to be either witch hunt or racial discrimination."

THE COURT:  Okay.

MR. CHANG:  And then I would say today he expressed similar concerns about the -- similar to the types of concerns that he raised in his juror questionnaire in terms of just, in general, prosecutions involving these types of allegations and having a perspective on it that raised some concerns about his ability to be a hundred percent fair and impartial.

THE COURT:  Really?  I don't remember that in the discussion with him today.  I mean, it's possible I'm just not remembering something, but he seemed very solid to me today.  That was my takeaway from our discussion with him.

MR. CHANG:  He also had some strong views about Google in terms of its influence on society.  I do think those two issues in combination -- he did walk them back today.  We agree with Your Honor.

That being said, how strong those opinions were, "witch hunt" is quite a strong word to use.  And so for those reasons, in addition to the answers provided on the record, were why we decided to exercise a peremptory.

THE COURT:  Okay.  Now, so let's talk about the

mechanics of a *Batson* challenge for a second.  Because, obviously, when this usually comes up is on a habeas petition or on an appeal or something like that; right?

And the -- I mean, I guess what -- my inclination is to deny this -- deny the challenge provisionally without prejudice to you moving for a mistrial and, you know, going through the -- going through the jury pool and, you know, comparing the things that were said by people the Government didn't exclude to things that were said by people the Government did exclude, you know, white people the Government didn't exclude compared to Asian people the Government did exclude.

That would be my inclination -- right? -- is to deny the challenge without prejudice to you filing a motion for a mistrial.  But is there some other way you would propose that I go about this?

MR. FONDO:  Well, Your Honor, we would suggest that their request be denied to strike that juror.

THE COURT:  The request to strike the juror?

MR. FONDO:  Correct.  And all three.  It goes to our request as to all three.

THE COURT:  I understand that.

(Pause in proceedings.)

THE COURT:  I'm not going to deny their challenge as to the first two.

What do I have to find to deny their challenge; right? What do I have to find?  Do I have to find that it was race based?  Do I have to find that it was racially discriminatory?

MR. FONDO:  So, Your Honor, I don't have the exact provision in front of me, so I don't want to misstate it, but -- but I think that it's -- these jurors were stricken because of their nationality.

THE COURT:  And I don't think I can deny their peremptory challenge unless I find that they were stricken because of their nationality.

I'm concerned about Juror Number 84.

MR. CHANG:  I will say, Your Honor, I want to be careful about how I characterize what I said yesterday, but we had some very serious concerns given the "witch hunt" language and racial discrimination under penalty of perjury.  I do believe we moved for a cause strike yesterday based solely on the papers, and that's very strong language to call a criminal prosecution a witch hunt.  I don't think anyone else used such strong language.

THE COURT:  Well, they weren't calling your criminal prosecution a witch hunt; right?

MR. CHANG:  But our case is a case of IP theft against a Chinese national.  It's exactly the kind of case he's calling a witch hunt.

THE COURT:  And he is saying most cases of U.S. IP

theft against Chinese nationals were proven to be either witch hunting or racial discrimination?

MR. CHANG:  Correct, Your Honor.

THE COURT:  Query how inaccurate that is, but the challenge is denied.  It's without prejudice to filing a motion for a mistrial.

MR. FONDO:  Thank you, Your Honor.

THE COURT:  Okay.  So who's up next?  I lost track.

MR. FONDO:  I think we are.  Is that correct?

THE COURT:  What number challenge are we on, Bhavna?

THE COURTROOM DEPUTY:  15.  I think the Government's next.

THE COURT:  So defense did 13 and 14?

THE COURTROOM DEPUTY:  Yes.

THE COURT:  Okay.

THE COURTROOM DEPUTY:  79 and 85.

THE COURT:  All right.  So this is your last challenge for who's going to be on the jury before we get to the alternates.

(Pause in proceedings.)

MR. CHANG:  Juror Number 16.

THE COURT:  All right.  Juror Number 16.

And now the last one for the defense before we get to the alternates challenge.

MR. FONDO:  Juror Number 90.

THE COURT:  All right.

Okay.  So I'm going to announce -- I'm going to rattle off the numbers of the people who I think are the jurors, and everybody go through their lists.  Everybody follow along.  Okay?

Is everything okay?

MR. FONDO:  I think so, Your Honor.

THE COURT:  Okay.

MR. FONDO:  Sorry about that.

THE COURT:  It's okay.

All right.  So Juror Number 7 would be Juror Number 1; correct?

Juror Number 2 will be Juror Number 24.

Juror Number 3 will be Juror Number 25.

Juror Number 4 will be Number 37; right?

Number 5 will be 39.

Number 6 will be 51.

Number 7 will be 54.

Number 8 will be 61.

Number 9 will be 62.

Number 10 will be 70.

Number 11 will be 71.

And Number 12 will be 72.

And so now we have to pick four alternates, and the Government has the first challenge.

(Pause in proceedings.)

THE COURT:  By the way, I won't read the jury -- the preliminary instructions today.  I'll give them just the very basics and read them the preliminary instructions on Monday morning.

(Pause in proceedings.)

THE COURT:  All right.  We need the Government's first challenge.

MR. CHANG:  74, Your Honor.

THE COURT:  Okay.  And defense's first challenge?

MR. FONDO:  95, Your Honor.

THE COURT:  Okay.

MR. WOO:  I'm sorry to interrupt, Your Honor.  I parked across the street and they close at 5:00.

THE COURT:  No problem.  See you on Monday.

MR. WOO:  The door's locked.

THE COURT:  Or whenever.

MR. WOO:  Thank you, Your Honor.

MR. RAPP-KIRSHNER:  I'll lock it after you.

THE COURT:  All right.  Government has -- Government's final challenge to the alternates?

MR. CHANG:  108, Your Honor.

THE COURT:  Okay.  108.

And final challenge for the defense.

MR. FONDO:  112, Your Honor.

THE COURT:  All right.  So then the alternates are, Juror Number 13 will be 86.

Juror Number 14 will be 104.

Juror Number 15 will be 109.

And Juror Number 16 will be 110.  She can bring us some wine at the end of the trial.

Is that right?  Did I rattle off the jurors correctly?

MR. FONDO:  Your Honor, I believe so, but could we just have a moment to double-check that?

THE COURT:  Yes.

MR. FONDO:  Thank you.

(Pause in proceedings.)

MR. FONDO:  Your Honor, I have confirmation from our team that we're in agreement.

THE COURT:  Okay.  Bhavna, you can start letting them back in.

And the Government, if they have an issue, they can let me know at sidebar.

THE COURTROOM DEPUTY:  Okay.

THE COURT:  I'll be right back.  I'm just going to go get my instructions.  You can let them in.

(Pause in proceedings.)

(Proceedings were heard in the presence of the prospective jurors.)

THE COURT:  Mr. Chang, did you confirm that I called

it out right?

MR. CHANG:  I believe so, Your Honor.

THE COURT:  Okay.

(Pause in proceedings.)

THE COURT:  Okay.  Welcome back.

We've been working hard while you were gone to pick a jury, and we have done so.  I'm going to announce the 16 people who were selected for the jury.  If you're -- if you get passed up, that means you're not on the jury, but please don't get up to leave.  Please wait until I announce everyone.

So, Juror Number 1 -- or let me put it this way:  Here are the people on the jury:

Juror Number 7, Mr. Lazaro Fuentes.

Juror Number 24, Ms. Man-Willrich Ramos.  Did I get that right?

PROSPECTIVE JUROR MAN-WILLRICH RAMOS:  Close enough.

THE COURT:  Close enough?  Okay.  I'll practice over the next three weeks.

Juror Number 25, Ms. Gonzalez Hernandez.

Juror Number 37 -- where's Juror Number 37? -- Ms. -- can you pronounce your name for me?

PROSPECTIVE JUROR TSERENDOLGOR:  Dulamsuren Tserendolgor.

THE COURT:  Tserendolgor?

PROSPECTIVE JUROR TSERENDOLGOR:  Yeah.

THE COURT:  Close enough?

PROSPECTIVE JUROR TSERENDOLGOR:  Close enough.

THE COURT:  Okay.  Juror Number 39, Mr. Daqiq -- sorry -- Ms. Daqiq.

PROSPECTIVE JUROR DAQIQ:  Mm-hmm.

THE COURT:  Juror Number 51, Ms. Kullberg.

Juror Number 54, Ms. Nickison.

Juror Number 61, Mr. Dea.

Juror Number 62, Ms. Poirier.  "Poirier"?

PROSPECTIVE JUROR POIRIER:  "Poirier."

THE COURT:  Poirier.  And I'll contact your -- I'll contact your office tomorrow first thing.

Juror Number 70, Mr. Gutierrez.

Juror Number 71, Ms. Johnson.

Juror Number 72, Mr. Contreras.

Juror Number 86, Kerry Flynn.

Juror Number 104 Ms. Lau.

Juror Number 109, Mr. Juarez Mendoza.

And Juror Number 110, Ms. Suazo.

You will be the jurors in the case.  So I'll ask the 16 of you to sit tight.

And to the rest of you, I want to thank you very much for your conscientious responses, for paying such close attention, and being such good members of the community by coming in here and participating meaningfully.  You have now --

are now discharged from your jury service and you're free to go.

(Remaining prospective jurors excused.)

**THE COURT:**  Okay.  Great.

So now we're going to rearrange you.  We're going to put you in the seats that we're going to have for you at trial.

And then usually I read a bunch of preliminary instructions to the jurors after they've been selected.  It's been a long day, so I'm not going to do that with you.  I'm only going to give you the bare minimum that you need to guide your behavior starting now.

But, in any event, so -- let's see.  So we can move Juror Number 7 over to the first seat and you will become Juror Number 1.

And then, Juror Number 24, you can move to Seat 2 next to him and you'll become Number 2.

Juror Number 25, Ms. Gonzalez, you'll move up to Number 3 right behind your current seat.

And then, Juror Number 4, you'll move up to Seat Number 4.  You can sit right there.  That's you.  Sorry.  I meant Juror Number 37, you can move up to Seat Number 4.  You'll become Juror Number 4 now.

And then, Juror Number 39, you'll be next to her.

Juror Number 51, you're next.

And then, Juror Number 54, you're in the seat at the

end.

Juror Number 61, you'll come sit in the front row closest to me here because you'll be Juror Number 8 now.

And then Number 62, Juror Number 62 will be Number 9.

Juror Number 70 will be next and will become Juror Number 10.

71 will become Juror Number 11.

72 will become Juror Number 12.

86 will be Juror Number 13.

104 will become Juror Number 14.

109, you'll be Juror Number 15.

And, 110, you'll be Juror Number 16.

Do you want to grab some chairs for them?

Okay.  That sounds good.  You can sit just in the front bench there.  We will have more comfortable chairs for you during the trial, but you'll be sitting roughly in that area on some more comfortable chairs.  Okay?

All right.  So I'm tempted to say congratulations, but you're probably not feeling that way right now.  I do believe that you will find this to be a very positive experience and feel like you will have made a good contribution, and I'm looking forward to spending the next several weeks with you.

The first thing I'm going to do is have Bhavna swear you in.  Now that you have been picked as jurors, you have to be sworn in as jurors, so I'll have Bhavna do that.

THE COURTROOM DEPUTY: Members of the jury, please rise and raise your right hand.

(The jurors were duly sworn to try this case.)

THE COURTROOM DEPUTY: Thank you. Please be seated.

THE COURT: Okay. So let's talk one more time about scheduling because it's possible that you were paying less attention before than you are now about scheduling of the trial.

So as I mentioned at the beginning of the day, we start the trial day at 9:30 sharp. And so what that means is we have you ready to come in -- Bhavna will have you ready to come in and take your seats at 9:30 sharp. The lawyers get here earlier. I get here earlier. Any work that we need to do outside the presence of the jury, we try to get it all done in the morning or the night before so that we don't have to waste any of your time having a bunch of sidebar conversations or asking you to leave the courtroom while we discuss something.

Okay. So we bring you in at 9:30 sharp, have a break or two in the morning. We'll have a lunch break usually at around 12:30 and usually around 45 minutes, but that's flexible. Then we usually have a break in the afternoon and -- or maybe two sometimes, and we'll finish between 3:00 and 3:30 p.m.; right?

And what I said this morning and I'll say again is that the exact time that we finish for the day always depends a

little bit on the flow and do we need a witness to finish up, what else do we need to get done.  So it'll be sometime between 3:00 and 3:30, but I will not keep you here after 3:30.  You can count on being -- walking out of the courtroom 3:30 or earlier.

So because we start right at 9:30, I ask you -- we ask you to aim to get in the building -- come -- arrive at the building by 9 o'clock to get through security.  And, again, we'll have coffee and light breakfast for you and there'll be snacks in there throughout the day, but coffee and light breakfast for you in the morning.  So feel free to sit and relax and get settled and enjoy that.

We'll be going through the coming weeks.  Next -- we will not have anything tomorrow.  We'll not have anything on Friday.  You will come back on Monday and we'll start the trial on Monday.

We'll be in on Monday, Tuesday -- we'll be in every day next week, all five days next week, the 12th through the 16th.

Then the following week, the 19th is MLK day, so that's a holiday, we'll be off.

And then also that Friday, the 23rd, we will not be in, so you'll have that day off.  Okay?

And the following week we'll resume on Monday the 26th, and we'll be in Monday, Tuesday, Wednesday, and Thursday.

And then, again, if the trial is still going at that point, you'll have Friday off, Friday the 30th will be off, and then we would resume on Monday, the 2nd.  But I think there is a chance that -- a decent chance that the trial will be over by the 29th.

So that is the schedule.  Does anybody have any questions about the schedule?

**A JUROR:**  Not the schedule, but for reporting, do we come to that room or your room, or where do we meet?

**THE COURT:**  I will have -- Bhavna is -- when we're done here, Bhavna is going to take you back and she's going to orient you and talk to you about -- exchange contact info with you and give you badges and show you where to go.

Okay.  So, as I said, you know, there are a bunch of preliminary instructions that I will -- that I usually read at this point.  I'm going to skip over most of them and read most of them on Monday morning while everybody is fresh.  Okay?  But I do need to talk to you just a little bit about your conduct as jurors now that you have been sworn in.

So the first thing is just keep an open mind throughout the trial.  Do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

Second, if you have a smartphone or a watch, please turn it to airplane mode and silence it and silence any alerts

and alarms during the trial.

Third -- and as we go on, it becomes more and more important.

Third, because you must decide this case based only on the evidence that comes in at trial and on my instructions as to the law that applies, you must not be exposed to any other information about the case or to the issues it involves during the course of your jury duty.  So until the end of the case or until I tell you otherwise, do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, over the phone, by text, over social media, computer, email, whatever.  Right?  No -- no forms of social media.  No forms of communication at all.

And let me say something in particular about social media.  Even -- even something as innocent as, "Oh, my God" or "OMG, I just got picked for a jury today" -- right? -- that's fine in theory, but you never know what somebody is going to say in response to that, and you -- it's possible that you will -- somebody will say something that's not appropriate for you to hear.  So no comments whatsoever on social media about your jury duty.  Okay?

By the way, talking about this case and talking about your jury duty, talking about the lawyers, talking about the

judge, et cetera, that also applies to communicating with your fellow jurors until I give you the case for deliberation; right?  You are not supposed to start talking about the witnesses or what happened in the case or how you feel about the case, you're not allowed to do any of that while the case is going on.  It only -- you're only supposed to start talking about the actual case once the closing arguments are done and I've given you your final instructions, and then you go in there for deliberations.  Okay?

And this restriction on communications applies also to family members, your employer.  Now, of course, you have to be able to communicate to people that you're going to be tied up for the next several weeks.  So it's not that you can't tell your family members or your employer that you have jury duty for the next three to four weeks.  You can.  But then inevitably people will start asking you follow-up questions.

For example, they might ask, "Well, what court is it in?"  You can say it's in federal court, that's fine.  But then they'll start asking, "Is it a criminal case?  Is it a civil case?  What's the subject matter of the case?  Who are the lawyers?  Who's the defendant?"

Some people might start asking those questions and you should not answer any of those questions; right?  You can say that you have jury duty in federal court.  You can talk about what your schedule is expected to be.  But for any follow-up

questions, even for household members, you should just respond by saying that, "I am under strict instructions from the judge not to say anything more about the case."  Okay?

Obviously, don't talk to the media.  Don't talk to any of the people involved in the trial, the lawyers, the defendant, the agent, nothing like that.

And that reminds me, you'll be going down to the cafeteria, you'll be walking down the hallway, you'll be in the elevator, and you might run into the lawyers or the defendant or the agents, or whatever, and they're under strict instructions from me not to have any sort of even slight communication with you.  So don't think they're being rude if they start to walk in the elevator and they see that you're in there and they step out and wait for the next car or if they don't make eye contact with you in the hallway or whatever.  They're not being rude.  They're just trying their best to follow my instructions not to have any sort of communication with you whatsoever.

Okay.  Do not watch, read, listen to any news or media accounts or commentary about the case or anything to do with it.  And if -- don't do any research, like consulting dictionaries, searching the Internet, looking at other reference materials.  Don't make any sort of investigation or in any other way try to learn about the case on your own.  Don't do any research about the law, the people involved, the

witnesses, the lawyers until after you've been excused as jurors.  Right?

And if you happen to read or hear -- if you accidentally happen to read or hear anything about the case in the media, turn away, turn it off or put it down immediately and just report to me what you did see or what you did hear or report to Bhavna what you did see or what you did hear, and we'll handle it.

These rules protect each side's right to have the case decided only on the evidence that comes in inside the four walls of this courtroom.  Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process.  If you do any research or investigation outside the courtroom or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete, or misleading information that has not been tested by the trial process.

Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information that's not presented in court, you will have denied the parties a fair trial.

And remember, you've taken an oath just now to follow these rules and it's very important that you follow the rules.  A jury who violates these -- a juror who violates these restrictions jeopardizes the fairness of the proceedings, and a

mistrial could result that would require the entire process to start over.  So if you come to learn that any juror is exposed to outside information or has prejudged the case or anything like that, please notify me immediately.

The other question that I often get is:  Can we take notes?  The answer is yes.  And you'll be provided a pen and paper -- a pen and a pad to take notes.  I will encourage you not to take too many notes and don't get too focused on notes at the expense of focusing on the witnesses.  Ultimately, your memory is what controls.  So I'll talk to you more about that on Monday, but I know that's a question that often comes up right away.  So you will have a pad and paper -- a pad and pen and you will be able to take notes.

So I think that's it for now.  Unless anybody has any additional questions for me, Bhavna can take you back, get you oriented, answer a number of your questions.  I'll be back there in a moment too if you have any additional questions for me.

But other than that, we will see you on Monday morning to begin this trial.  Okay?  Thank you.

**THE COURTROOM DEPUTY:**  All rise.

(Proceedings were heard out of the presence of the jury.)

**THE COURT:**  Okay.  Be seated.

Is there anything else -- I think that Mr. Fondo wanted to put some objections from jury selection on the

record.

And then is there anything else we need to talk about today, or can everything else wait until Friday when we next meet?

**MR. FONDO:**  Your Honor, I just have the two objections relating to the sidebar, and that's it for today.

**THE COURT:**  Go ahead.

**MR. FONDO:**  So we just wanted -- the Court struck Juror Numbers -- provided hardship exemptions for Jurors Number 67 and 111 based on the type of services -- we believe the type of services that they provided to others, sort of healthcare-type related, and so we expressed our objection that we think it essentially penalizes our client from not having those types of healthcare providers on the jury.

**THE COURT:**  Right.  And my response to that was it was not -- it was not a blanket healthcare provider exception but it's based on the -- it was based on the totality of the circumstances for each of those two jurors.

Were there other objections to put on the record?  I can't remember.

**MR. FONDO:**  Not that have --

**THE COURT:**  I feel like there was one.

**MR. FONDO:**  I appreciate you asking.

Are there any others?

I don't think so, Your Honor, that we haven't already

stated.

THE COURT:  Well, if you remember, you can always put it on the record next time we meet.

MR. FONDO:  Thank you, Your Honor.

THE COURT:  Yeah.

Anything else to discuss right now?

MR. CHANG:  Nothing from the Government, Your Honor.

MR. FONDO:  Nothing from the defense, Your Honor.

THE COURT:  Okay.

All right.  Thank you very much.  We'll see you Friday at 1:00.  Is that what we decided?  Yeah.  Okay.

MR. CHANG:  That's right.

THE COURT:  All right.  Thank you.

MR. CHANG:  Thank you.

MR. FONDO:  Thank you, Your Honor.

(Proceedings adjourned at 5:25 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Wednesday, January 28, 2026

_Ana Dub_

_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter