**Pages 1 - 77**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
    VS.                            )   **NO. 3:24-CR-00141-VC**
                                   )
LINWEI DING, a.k.a. LEON DING,     )
                                   )
            Defendant.             )
_____)

San Francisco, California
Friday, January 9, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

CRAIG H. MISSAKIAN
UNITED STATES ATTORNEY
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
BY: **CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
**ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

CRAIG H. MISSAKIAN
UNITED STATES ATTORNEY
1301 Clay Street, Suite 340S
Oakland, California 94612-5217
BY: **MOLLY K. PRIEDEMAN**
**ASSISTANT U.S. ATTORNEY**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant:
                         GOODWIN PROCTER LLP
                         525 Market Street
                         San Francisco, California 94105
                  BY:  **DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**

                         GOODWIN PROCTER LLP
                         601 Marshall Street
                         Redwood City, California 94063
                  BY:  **GRANT P. FONDO, ATTORNEY AT LAW**


Also Present:        **Andrea Valladao, Federal Bureau of
                          Investigation
                     Veronica Hernandez, Paralegal**

**Friday - January 9, 2026**                                        **1:15 p.m.**

P R O C E E D I N G S

---o0o---

(Defendant present, out of custody.)

**THE COURT:**  All right.  So let's chat about that juror real quick, Juror Number 104, the mission-critical juror.

What's the defense's position on whether she should be excused?

**MR. FONDO:**  We do not believe she should be excused, Your Honor.  I'm happy to articulate why.

**THE COURT:**  I don't think -- I agree with you.  I mean, I don't -- I think that there are plenty of other -- I mean, people make big sacrifices for jury selection, and this company can make a much smaller sacrifice than others make to allow their employee to serve on the jury.

So I'd be inclined to call them and tell them no and say, "By the way, I trust that you're paying this juror for her service."

**MR. FONDO:**  Yeah, I would agree, Your Honor.

**MR. CHANG:**  As you may suspect, though, the Government believes that the basis submitted is valid for a hardship excusal.

**THE COURT:**  Well, you say "as you may suspect."  I didn't suspect that.

**MR. CHANG:**  Okay.

**THE COURT:**  I mean, I know that you want her off for other reasons, but I would not expect you to say that that's a valid hardship excusal.

**MR. CHANG:**  I just think, given the rubric we applied for the hardship excusals, if we had known this information, it obviously would be a possible postponement, given the burden on her.  And --

**THE COURT:**  Okay.  Yeah, I don't agree with that.  And it also is significant that we didn't learn about it until after she was picked; right?  So --

**MR. CHANG:**  Understood, Your Honor.

**THE COURT:**  Okay.  So I'm not going to excuse her.  So I think that's that.

Should we just go to these documents, then?

**MR. FONDO:**  Your Honor, I think we have one or two housekeeping matters --

**THE COURT:**  Sure.

**MR. FONDO:**  -- if it's okay to knock those out first.

**THE COURT:**  Yeah.

**MR. RAPP-KIRSHNER:**  Thanks, Your Honor.

First, on the record we just would like confirmation from the Government that it does not intend to call any witness or show exhibits the first week of trial that would require sealing of the court.

**MR. BOOME:**  No, I don't think that's right.  The first

week of trial?

**MR. RAPP-KIRSHNER:**  Yeah.  So Docket Number 201 required seven days' notice of any --

**MR. BOOME:**  Oh, sorry.  Sealing the courtroom.

**MR. RAPP-KIRSHNER:**  Yes.

**MR. BOOME:**  Not sealing exhibits.

**MR. RAPP-KIRSHNER:**  Sorry if I misspoke.  Yes, sealing the courtroom.

**MS. PRIEDEMAN:**  Your Honor, as I noted previously, I think it's possible that Dr. Sanchez, the earliest he would testify would be a week from today, so that's seven days from today.  We'll be filing the list per the order later today, Your Honor.

**THE COURT:**  Okay.

**MS. PRIEDEMAN:**  I do think it's more likely that he will testify early in the next week, but out of an abundance of caution, we'll, of course, comply with the Court's order.

**THE COURT:**  Okay.  What else?

**MR. RAPP-KIRSHNER:**  Great.

And then, also, we would like to request the option for a closed Zoom link for our experts to attend trial remotely for the days they are not testifying.

**THE COURT:**  No problem.

**MR. RAPP-KIRSHNER:**  That's it.

**THE COURT:**  Anything else?

**MR. BOOME:**  No, Your Honor.

**THE COURT:**  Okay.  So do we just go through these --

**THE COURTROOM DEPUTY:**  Can I ask a clarifying question about the Zoom link?

**THE COURT:**  Yeah.

**THE COURTROOM DEPUTY:**  Will that be with video or without video?

**THE COURT:**  Do you-all have a preference?  Does it matter?

**MR. FONDO:**  We would prefer video, but I don't know the logistical headaches associated with that.

**THE COURT:**  I'm happy to do video unless it makes it significantly harder for court staff.

**MR. FONDO:**  Thank you, Your Honor.

**THE COURTROOM DEPUTY:**  Thank you.

**THE COURT:**  Okay.  So what documents would you like to talk about?

**MR. BOOME:**  Your Honor, you have a binder up there of the documents, and we have Ms. Hernandez -- Veronica Hernandez here, who's going to be our paralegal at trial, to help us show some other exhibits that might be helpful for the Court, as you look at the documents in the binder, to also maybe see the chats that are relevant.

**THE COURT:**  Great.

**MR. BOOME:**  And we can talk about those together.

So I want to thank defense counsel for -- we had a productive meet and confer, and I think we've crossed off some good number of items off the list for you to decide today.

**THE COURT:**  Okay.

**MR. BOOME:**  So can we start with --

**MR. FONDO:**  Excuse me.  If I may be heard?

**THE COURT:**  Yes.

**MR. FONDO:**  One thing, Your Honor.  So we have reached agreement on -- the documents that we are not objecting to today pursuant to this hearing is -- I want it clear that you issued your order on 11/25/25.  We took that order to heart. We have interpreted that order in light of a variety of documents which we have -- there's probably 30, 40, 50 -- that we have spent a lot of time with the Government.  I think both sides have worked very much in good faith.  And we've agreed that pursuant to that order, you are ruling these are coming in.  So we intend to file -- I think it's probably a stipulation, something to that effect.

Related to that, the Government has withdrawn a number of exhibits.  They did not -- they withdrew them for a variety of reasons, including maybe strategic reasons.  They did not do the analysis that we did for compliance with your order.

So if it's okay with the Court, we're going to submit something that basically says, if they change their mind and

decide to reenter these exhibits, they'll let us know and we'll have the opportunity to present it to the Court to object.

**THE COURT:** Sounds great.

**MR. FONDO:** Okay. Thank you, Your Honor.

**MR. BOOME:** Okay. Your Honor, can we start with 1177? This is a letter of employment, an offer letter that the defendant received from Yuan Ye on June 17th of 2022.

For some background on this, Ms. Hernandez, could we go to page 9 of Exhibit 1130, please.

**MR. FONDO:** So do you have a binder for us?

**MR. RAPP-KIRSHNER:** Yes.

**MR. FONDO:** We can share it.

**MR. BOOME:** And, Your Honor, this is just some background for how --

**THE COURT:** Can I -- this is something that's been bugging me for, like, 12 years and I just -- it popped back into my mind.

But, Bhavna, on the appearance sheets, I would love to have the names of the paralegals and the agents also so that I remember everybody's name in the courtroom and know who's who.

Okay.

**THE COURTROOM DEPUTY:** I will.

**MR. BOOME:** So, Your Honor, we're leading up to how Mr. Ding gets this in his email inbox.

On the screen now is page 9 of Exhibit 1130. That's

Mr. Ding's chat with Yuan Ye, the CEO of Rongshu.

**THE COURT:** Okay.

**MR. BOOME:** And you can see there Mr. --

**THE COURT:** I assume this is translated.

**MR. BOOME:** Yes, yes.

**THE COURT:** Okay.

**MR. BOOME:** This is the translated version.

At the top, the defendant says -- Mr. Ye says [as read]:

"Linwei, give me your personal email address. I'll send you the equity agreement."

Mr. Ding provides his email address.

**THE COURT:** Okay.

**MR. BOOME:** So the document, 11- -- that -- the offer letter was found in that email account.

**THE COURT:** Okay.

**MR. BOOME:** On June 13th, Mr. Ye sent the defendant an email containing the equity agreement that he's asking about here.

**THE COURT:** Okay.

**MR. BOOME:** Four days later, on November [sic] 17th, the defendant sent -- excuse me -- Yuan Ye --

**THE COURT:** June 17th?

**MR. BOOME:** -- June 17th, the defendant -- Yuan Ye sent the defendant an email containing this offer letter, and

the email is Exhibit 1007.

If you could bring that up, Ms. Hernandez.

(Pause in proceedings.)

**THE COURT:**  And, Bhavna, I just meant for trial.  When we're having trial, I like to know everybody -- be reminded of everybody's name in the courtroom.

**MR. BOOME:**  So at the top of the exhibit there, Your Honor, we saw the attachment, "Letter of Intent for Employment," and that's Exhibit 1177.

**THE COURT:**  Okay.

**MR. BOOME:**  This is --

**THE COURT:**  It's not on my screen yet.

Oh, are you asking me to look at the document in the binder now?

**MR. BOOME:**  No.  I'm asking for 1007.

**THE COURT:**  1007?

**MR. BOOME:**  Yes.

**THE COURT:**  Okay.

**MR. BOOME:**  So [as read]:

"Re:  Rongshu - Letter of Intent for Employment."

And the testimony in evidence at trial will be that this letter, the exhibit before you, was attached to this email.

And this follows a string of chat communications

between the defendant and Yuan Ye which started on May 6th, 2022, in which Mr. Ding had a job interview with Yuan Ye for employment at Rongshu, and this is the culmination of that process.

THE COURT:  Okay.

MR. BOOME:  So the Government would seek to offer the letter of employment as evidence that the defendant received an offer to become the chief technology officer of Rongshu to work in Beijing.

Later in time, the evidence will show that Mr. Ding went to Beijing in November of 2022.  Chats with Yuan Ye show them discussing when he should report to the office.  His first day was November 14th, 2022.  So Mr. Ding acted on this offer letter, he accepted it, and he actually started working for Rongshu and was paid by the company.

THE COURT:  Okay.  And so the dispute about -- the admissibility dispute is regarding this document at Tab 1177?

MR. BOOME:  That's correct, Your Honor.

THE COURT:  Okay.

MR. BOOME:  So if the Court would like to hear -- I think what I've outlined is an adequate foundation; but if the Court's interested in any other specific information, I'd be happy to answer any questions.

THE COURT:  And then -- so, yeah, I guess I should just get specificity on what is the objection to the

admissibility of this document.

**MR. FONDO:**  Certainly, Your Honor.

So, one, it's a hearsay objection and a 403 objection. So this was sent, but it was not -- this is not a signed agreement, nor am I aware -- and I may have misunderstood the Government on this.  I don't think there's something -- there's a responding email that says, "I accept the terms of this agreement."  I could be wrong on that.

Likewise, the time frame about when he started working was a number of months after this time.

So our objection is as stated, and they're trying to get it in for the truth of the matter asserted.

**THE COURT:**  So, in other words, this is hearsay because it was a document written by -- by what's their name?

**MR. FONDO:**  Rongshu.

**THE COURT:**  Ye?

**MR. FONDO:**  Written by Rongshu.

**THE COURT:**  By Rongshu, submitted to Ding.  And it's a letter that asserts that -- it is inviting them to join -- it's inviting him to join Rongshu, and here are the terms under which you will join Rongshu.

And you're saying that that -- I assume Ye is not testifying.

**MR. FONDO:**  Correct.

**THE COURT:**  And that that is, itself, hearsay because

it's being offered to show that they invited him to join Rongshu?

**MR. FONDO:**  Correct, Your Honor.

**THE COURT:**  Okay.

**MR. BOOME:**  Well, the hearsay issue, there's two ways around that.

Number one is that the defendant did act on this by actually going to Beijing and speaking with Yuan Ye about showing up at Rongshu and beginning to work for him.  There are photos that the Government will introduce in evidence showing the defendant speaking behind a banner that says "Rongshu Welcome Party 2023" along with Yuan Ye.  So he clearly went there with Yuan Ye, and travel records show that he was in Beijing at the time.

**THE COURT:**  Right.

**MR. BOOME:**  He acted on this document and adopted it. So that is one way around the hearsay issue.

The other way is that, if we want to go for a non-hearsay purpose, it's that the defendant believes that he is being offered a position -- to show his understanding that he's being offered a position as the chief technology officer of Rongshu.  I don't think we need to get there.  I think he acted on the document, and the evidence will show that.

**THE COURT:**  Could I ask a question about this email exchange here?

So I'm looking at this October 4th email from Ding back to Ye, and he says [as read]:

"I have modified the contract.  Can you help me check the parts that are not in line with principles of the previous documents?  I have marked and modified them."

First of all, there's nothing -- there's no objection to the admissibility of this email, I assume.  I mean, this is a party admission; right?

MR. FONDO:  As to what Mr. Ding is saying?

THE COURT:  Yeah.

MR. FONDO:  Yes.  Correct.

THE COURT:  Okay.  So this letter -- are you saying that this letter came after this email exchange, or is this the letter that he was talking about during that October 4th email?

MR. BOOME:  Let's go down to the beginning of this email exchange, please, Ms. Hernandez.  That's the restricted equity agreement that Mr. Ye asked about on November 13th.

Let's go up, please.

So this says [as read]:

"Hello, Linwei.  Attached is the letter of intent for employment.  Your starting time will be adjusted."

This is -- this is where the letter was attached.

THE COURT:  I see.  So he's not -- on October 4th,

he's not referring to this letter; he's referring to some other document?

MR. BOOME:  I'm not sure that's a hundred percent clear, Your Honor.  But either way, he was offered a job at Rongshu, this letter is evidence that he was offered the job, and he took it by going to work for Rongshu.

THE COURT:  Okay.  Hold on a second.

(Pause in proceedings.)

THE COURT:  But he responds in July by saying [as read]:

"The attachment is the agreement that I have initially revised, but there are definitely some problems in it.  I feel very burnt out about revising this agreement.  It seems inappropriate to give me such an agreement full of traps to revise, or . . . ." blah-blah-blah.

So I don't -- I guess I don't -- what does this letter give you that the email exchange doesn't give you --

MR. BOOME:  I understand --

THE COURT:  -- which seems admissible?

MR. BOOME:  I understand all that back-and-forth about agreement.  I think that's about the equity agreement, which we're not seeking to admit.

We want to show when he received the offer from Rongshu, because around this time, Your Honor -- he started

talking to Yuan Ye on May 6, 2022.  He receives the offer on June 17th, 2022.  In between those two dates is the first date of our exfiltration of trade secret files.

So the timing is --

**THE COURT:**  Right.  But this e-mail -- it appears that this email exchange is admissible; right?  So I'm just trying to figure out what this letter gets you that the email exchange doesn't already give you.

**MR. BOOME:**  It gets the position, chief technology officer; where he's supposed to report to work, in Beijing; the salary he's being offered.  It shows this is a real job.  This is a significant undertaking that Mr. Ding is --

**THE COURT:**  Well, but what tells us that he acted on this?  I mean, I'm looking at the email; right?  And the email is saying -- in the email, he's expressing a number of objections to this, it appears.  So --

**MR. BOOME:**  I don't think it's to this.  An email would come in; and if the defendant wants to point out that, no, he had objections to this and he didn't agree to these terms, then that's fine.  But nothing about that makes the letter inadmissible because the evidence --

**THE COURT:**  I guess what I'm saying is, your primary theory of admissibility is that he adopted this letter.  He acted on this, and it shows that he adopted this letter.  But I'm seeing these emails where he's objecting to aspects of the

letter, so I'm confused.

MR. BOOME:  Well, Your Honor, there's -- so --

THE COURT:  It appears that he's objecting to aspects of this letter.

MR. BOOME:  The acting on the letter and adopting it gets us around the hearsay issue.

But the fact that the defendant received this offer to be the chief technology officer of a Chinese technology company right around the time that he begins exfiltrating over a thousand Google documents and sending them to his personal Gmail account is relevant for why he's doing those things.

THE COURT:  Well, I understand that it's relevant, but I'm -- I understand why it's relevant, but I'm hung up on the hearsay.  Like, I'm hung up on -- I'm not getting your argument that he adopted this letter.

MR. BOOME:  So if we forget that for a second and just say on this date, the defendant interviewed for a job with a man named Yuan Ye from Rongshu to be the chief technology officer of this company; on June 13th, he received this letter that told him he was offered a job with a salary in Beijing; and meanwhile, he continues to stockpile Google trade secrets, aren't we then admitting this for its effect on the defendant to explain part of his motivation for exfiltrating those documents?

THE COURT:  Maybe, but you were arguing to me just a

second ago that he adopted it.

**MR. BOOME:**  No, Your Honor.  I said there were two ways we could get around the hearsay issue.  The first is adoptive admission, by acting on it, and the second is for effect on the listener.

**THE COURT:**  Okay.

**MR. BOOME:**  So I think either one is sufficient, whether it comes in for the truth or not.

**THE COURT:**  So, in other words, he thinks he has a job with this company and so he starts downloading files.

**MR. BOOME:**  Yes.

**THE COURT:**  Okay.

**MR. FONDO:**  Your Honor, I think that you pointed out that the email says something very different; that after this date, he's saying, "I don't like the letter.  I don't like the terms of employment."

I also think they're making a -- that may be their theory and I understand, but this is -- this -- one, we think the exfiltration occurred -- there was -- he was copying notes well before the date identified by the Government.  And also, he's rejected it, and so it's not clear that he is going to actually take this position.

**THE COURT:**  Could I see the subsequent email exchanges?

(Pause in proceedings.)

**THE COURT:** Is this the first page of it or is there another page?

**MS. HERNANDEZ:** There's more.

**THE COURT:** If you could keep going.

(Pause in proceedings.)

**MR. BOOME:** I read that to be a discussion about the equity agreement, which was pretty complicated and we're not seeking to admit.

It doesn't matter whether he was actually offered a $100,000 salary or the job as CTO. I think what's relevant here is that he believed he was offered that position and the timing of when he --

**THE COURT:** And why do you need the agreement -- the letter for that? Why doesn't the email show that?

**MR. BOOME:** Well, the email says, "Here's your offer letter," but there's nothing about the terms of the engagement in the email.

**THE COURT:** But I thought you said the terms of the engagement didn't matter.

**MR. BOOME:** The terms of the -- the truth of the terms of the engagement don't matter, but the fact that the defendant is reading this letter that says, "We want you to be the chief technology officer of our company."

**THE COURT:** Okay. I'm not going to -- I'm going to think about that one for a bit.

What's the next one?

**MR. BOOME:**  The next one is Exhibit 1107, Your Honor.

**THE COURT:**  1107.

(Pause in proceedings.)

**THE COURT:**  Okay.

**MR. BOOME:**  It's also evidence that he took the job. It's a screenshot of a paystub from Rongshu dated April 16th, 2023.

**THE COURT:**  The stuff we were just looking at, was that from 2022?

**MR. BOOME:**  Yes.

**THE COURT:**  Okay.

**MR. BOOME:**  But he moved -- he went to China in November of 2022 and stayed there until March of 2023 --

**THE COURT:**  Okay.

**MR. BOOME:**  -- continuing to work for Rongshu.

And, Ms. Hernandez, could we go to page 225 of Exhibit 1131, please.

(Pause in proceedings.)

**MR. BOOME:**  And down one page, please.

So, Your Honor, this is -- you can't see anything on this page because it's a -- takes a whole -- the screenshot that the defendant sent takes the entire next page.

So you can see here the defendant is sending a message on February 16th of 2023.

**THE COURT:**  Okay.

**MR. BOOME:**  Shoot.  I'm sorry.  That's the wrong page. I'm sorry, Ms. Hernandez.  That's page 287.

So, Your Honor, this is a chat between the defendant and a recruiter based in the PRC named Julian, who helped introduce him to Yuan Ye and helped him get the job and the interview with Rongshu.

**THE COURT:**  Okay.

**MR. BOOME:**  This is the defendant sending Exhibit 1170, as a screenshot, in the chat with Julian.

And if we can go up one page, Ms. Hernandez, just to see the sender.

You see the defendant sent that on April 17th, 2023, which is consistent with the date on the paystub of April 16th, 2023.

**THE COURT:**  Okay.

**MR. BOOME:**  So we're seeking to admit the screen shot, Exhibit 1107.

**THE COURT:**  And so the screenshot is -- so this is the screenshot.  And he sent this to the recruiter?

**MR. BOOME:**  Yes.  And it was saved on his device.

**THE COURT:**  Okay.  And you're just saying that this is --

**MR. BOOME:**  This is where it comes from.

**THE COURT:**  -- this is an adoption again?

**MR. BOOME:**  Yes.

**THE COURT:**  Okay.  Go ahead, Mr. Fondo.

**MR. FONDO:**  So, Your Honor, I think consistent with your order, I think, given that -- he didn't comment on it, but we agree that he did forward it.  We were not -- when we looked earlier today, we did not appreciate that he had forwarded it.

**THE COURT:**  Okay.  So this will be admitted.

**MR. BOOME:**  Okay.  And let's stay in this chat, Ms. Hernandez, and go to page 79, please.

So, Your Honor, this is still the defendant's chat with the recruiter Julian --

**THE COURT:**  Okay.

**MR. BOOME:**  -- who arranged his employment with Rongshu.

And the exhibit we're going to discuss now is 1085.

**THE COURT:**  1085.  All right.

**MR. BOOME:**  And it's two pages, Your Honor.  The first page is the translation, and the second page is the original source file.  It's a photo of a People's Republic of China identity card.

**THE COURT:**  Okay.

**MR. BOOME:**  And there's some notes overlaid on the photo.

**THE COURT:**  Yeah.

**MR. BOOME:**  Those were in the original.  And they say

[as read]:

"[December 6, 2022]  It is only for Linwei Ding to apply for a residence permit."

This is evidence of the defendant's intent to arrange for residency in China, to move to China to pursue his employment with, first, Rongshu and then Zhisuan.

THE COURT:  Yeah.  Can you remind me again just -- this is -- I'm embarrassed that I'm asking this question, but he was arrested in December of '24?

MR. BOOME:  Arrested in March of 2024.

THE COURT:  March of '24?

MR. BOOME:  Yes.

THE COURT:  Searched?

MR. BOOME:  January '24.

THE COURT:  January of '24.

And Google goes to the FBI in, like, December of '23 or something?

MR. BOOME:  Two days before the search.

THE COURT:  Okay.  All right.

Okay.  Got it.  Thank you.

MR. BOOME:  And so I wanted to point Your Honor to the third chat down, where the recruiter says that -- they're discussing household registration.

[As read]:

". . . household registration filing has been

approved, and now they need to prepare the

materials. . . ."

This is December 8th --

**THE COURT:**  Uh-huh.

**MR. BOOME:**  -- 2022, which matches up with the date on the photo, December 6, 2022.

And so we would seek to offer this chat in combination with Exhibit 1085 --

**THE COURT:**  Okay.

**MR. BOOME:**  -- as evidence.

**THE COURT:**  Mr. Fondo?

**MR. FONDO:**  Your Honor -- sorry.  Your Honor, a couple things.  And is it okay that I keep bouncing back and forth?

**THE COURT:**  Yeah.

**MR. FONDO:**  Okay.  So, one, it's not attached; so we don't know that this is exactly what they were talking about.

Two, there's handwritten -- handwriting on the document.  We don't know whose handwriting that is.  And nor is it self-evident that this has anything to do with this case, Your Honor.

**THE COURT:**  Where does the photo come from?

**MR. BOOME:**  The photo comes from Mr. Ding's hard drive, external hard drive, found in his home on the day of the search.

**THE COURT:**  Okay.  And there's no indication --

there's no indication where the photo came from, like who sent it to him or whether he took it himself or anything along those lines?

**MR. BOOME:**  Not that I'm aware of, standing here, Your Honor.

**THE COURT:**  Okay.

**MR. BOOME:**  But the fact that it was a PRC identity card with text apparently put on by somebody, whoever created the photo, saying this is for Linwei Ding to apply for a residency permit --

**THE COURT:**  Yeah.  Okay.

**MR. BOOME:**  -- we think that meets the bar.

**THE COURT:**  Okay.

**MR. FONDO:**  Your Honor, I don't think -- I'm not aware that we even know whose identity card it is.

**THE COURT:**  Okay.

**MR. FONDO:**  There's no photo on it or anything.

**THE COURT:**  Okay.  I understand.  I'll think about it.

Next?

**MR. BOOME:**  Next is Exhibit 1025, Your Honor.  The background on this one is...

Do you have that in your binder, Your Honor?

**THE COURT:**  It doesn't look like it.

**MR. BOOME:**  Okay.  I'm sorry.  That's my fault.  I can -- it's on the screen right now.

**THE COURT:**  Okay.

**MR. BOOME:**  So the background on this is, after the defendant goes to China in November of 2022 and begins working at Rongshu with Yuan Ye, shortly thereafter they --

**THE COURT:**  Could I get a hard copy of this document? You don't have one?

**MR. BOOME:**  No, Your Honor.  I'm sorry.

**THE COURT:**  Go ahead.

**MR. BOOME:**  So shortly after moving to -- or going to China in November 2022 and beginning to work for Yuan Ye at Rongshu, Yuan Ye and the defendant start to create a separate business plan which eventually becomes Zhisuan, the defendant's artificial intelligence supercomputing platform company.

This document was the first written iteration of that business plan, and I want to explain a little bit about where it comes from.

Ms. Hernandez, if we could go to page 203 of Exhibit 1130.

This is, of course, a translated version, Your Honor.

**THE COURT:**  Why is all this stuff highlighted?  Is that redacted?

**MR. BOOME:**  No.  The highlights are the translator's interpretation of track changes.  So it's track changes in a Word document.

**THE COURT:**  Okay.

**MR. BOOME:** And so if the Court has 1025S, which should be next to that exhibit in the binder, you can -- you should be able to see the track changes.

**THE COURT:** I'm not able to determine what is in track changes. But, anyway, go ahead; continue.

**MR. BOOME:** So this is where this comes from, Your Honor, is the defendant, near the top, says to Yuan Ye -- this is after they've been speaking for nearly a year now. They began their relationship in May of 2022 -- he says [as read]:

"Do you have our business plan . . . ."

Yuan Ye says [as read]:

"No. Business plan of what?"

Yuan Ye says [as read]:

"Plan C?"

And the defendant says [as read]:

"Yes."

**THE COURT:** Wait. Sorry. Who says what? That was a little confusing to me. So who is saying -- so the defendant is saying [as read]:

"Do you have our business plan now?"

**MR. BOOME:** Yes.

**THE COURT:** Then Yuan Ye is saying [as read]:

"No. Business plan of what? Plan C."

And then the defendant says [as read]:

"Yes."

And then Yuan Ye says [as read]:

"No."

**MR. BOOME:**  So then on -- at page 271, Yuan Ye sends the defendant an initial draft of "Thoughts on Plan C."  That's there in the middle of the chat.

**THE COURT:**  Yeah.

**MR. BOOME:**  That's an initial draft of the document that you have.

**THE COURT:**  Okay.

**MR. BOOME:**  So this is when Yuan Ye sends it to the defendant.  And at page 273, two pages down, the defendant sends it back to the -- to Yuan Ye with the track changes.

So the version that you have on the Bench is the version that you see right here in the middle of the chat, "Thoughts on Plan C."

So here, we have the defendant -- defendant receiving a draft from Yuan Ye of the business plan that they just discussed, Plan C.

**THE COURT:**  Yeah.

**MR. BOOME:**  And the version that Yuan Ye sent to the defendant had no track changes, and the version that the defendant sent back to him did have track changes, which, in the Government's view, indicates the defendant edited the document.

**THE COURT:**  And the version in this 1025 is the version that the defendant sent back to --

**MR. BOOME:**  Correct.

**THE COURT:**  -- Yuan Ye?

**MR. BOOME:**  Correct.

**THE COURT:**  Okay.  All right.

**MR. BOOME:**  Oh, I'm sorry, Your Honor.  I forgot one additional thing, which is another connection to this document, which is that the Google logs that show uploads from the Google network to places outside the network show that the defendant uploaded Exhibit 1025 from his Google corporate laptop to his personal Cloud account on May 7th of 2023, which is a few months after this discussion.

**THE COURT:**  Okay. Mr. Fondo?

**MR. FONDO:**  Your Honor, so this was one that we had missed this morning -- I apologize -- meaning we did not understand the Government was going to be discussing.  So I apologize for that.

But I think -- so the objection would still be hearsay and 403.

**THE COURT:**  Okay.  It appears this will be admissible under the framework set forth by my order, but I'll take it under submission and think about it a little more.

**MR. FONDO:**  Thank you, Your Honor.

**MR. BOOME:**  And, Your Honor, in case your version

didn't have track changes --

THE COURT:  It didn't.

MR. BOOME:  Okay.  The one on the screen now should show them.

THE COURT:  Yeah, I see that.

(Pause in proceedings.)

THE COURT:  Okay.

MR. BOOME:  Okay.  The next is Exhibit 1029, Your Honor, "Key Questions for Zhisuan."  This one has a bit of a long windup --

THE COURT:  Okay.

MR. BOOME:  -- if you'll bear with me.

But to give you a preview of what I'm about to say, so "Thoughts on Plan C" is the initial genesis of the business -- the separate business plan between Yuan Ye and the defendant.

THE COURT:  Okay.

MR. BOOME:  Plan C eventually becomes Zhisuan.

Ms. Hernandez, can we go to Exhibit 1130 at page 295.

So, eventually, what I'm about to show you is the defendant -- the defendant says to Yuan Ye:  How about we spend a little bit of money and get help with our business plan?

That's what he says to Yuan Ye in the chat.

THE COURT:  I'm not -- it's not up right now.

Okay.

MR. BOOME:  In the middle [as read]:

"If the BP is ready, send me a copy.  How about we spend a little money and get help to get an agency write one for us?"

THE COURT:  Okay.

MR. BOOME:  And then at page 318 of this same exhibit, at the bottom, Yuan Ye says [as read]:

"Somebody may come at 3:00 p.m. on Monday, to talk with us about the BP for Plan C."

So the following Monday is March 20th.

THE COURT:  Okay.

MR. BOOME:  That's the same day that a separate chat begins between the defendant, Yuan Ye, and representatives of I&R Capital.

THE COURT:  Okay.

MR. BOOME:  That's Exhibit 1155.  So let's go there.

Thank you, Ms. Hernandez.

So in this chat -- it goes on for several weeks -- Yuan Ye, the defendant, and the I&R Capital representatives work on a version of the business plan that's not disputed.  At least the parties agree that, under your order, that version of the business plan is admissible.

The exhibit number for the end result of this back-and-forth between the defendant, Yuan Ye, and I&R Capital is Exhibit 1137.  And that's in your binder, but we can --

If we can show it on the screen, Ms. Hernandez,

because we're...

So this is what -- this one's not disputed under your order.  This is the initial pitch document that Yuan Ye and the defendant created with I&R Capital, and the chat shows that it was circulated to a number of investors.

And I&R Capital's job was to send this document around and then provide feedback from the investors to Yuan Ye and the defendant.

That feedback is captured in the "Key Questions for Zhisuan" document, which is 1029.

**THE COURT:**  Okay.

**MR. BOOME:**  The defendant --

**MR. FONDO:**  Excuse me.  Which -- the exhibit you're showing, what exhibit number is that?

**MR. BOOME:**  That was 1137.

**MR. FONDO:**  Thank you.

**MR. BOOME:**  It's entitled "The Teaser."

**MR. FONDO:**  So I don't -- I think we objected to this.  I don't remember agreeing to this one.

**MR. BOOME:**  Okay.

(Pause in proceedings.)

**MR. BOOME:**  Okay.  Well, sorry about that.  I misunderstood.

But now you have some of the background, Your Honor.

**THE COURT:**  Okay.

**MR. BOOME:**  So I'll talk a little bit more about how this document was created, then.

**THE COURT:**  Okay.  "This document" meaning the seed round financing document?

**MR. BOOME:**  Yes.

**THE COURT:**  Okay.

**MR. BOOME:**  Yes.  That's also in your binder, Exhibit 1137.

**THE COURT:**  Okay.

**MR. BOOME:**  And we'll do "Key Questions for Zhisuan" after this.

**THE COURT:**  Okay.

**MR. BOOME:**  So in Exhibit 1155, the I&R Capital chat, there are multiple versions of this document sent back and forth between representatives of I&R, Yuan Ye, and the defendant.  The defendant edits multiple drafts of this document, and the final version that we translated that's before you kind of starts being discussed at page 19 of Exhibit 1155, Ms. Hernandez.

(Pause in proceedings.)

**MR. BOOME:**  Sorry.  Could you go up to 18, please.

So this is the chat between Yuan Ye, the defendant, and the I&R Capital team who helped them create this document.  They've been sending versions back and forth.  Yuan Ye sends one here at -- on April 10th, 2023.

The next page, please.

In this page, Yuan Ye says [as read]:

"@Linwei" -- meaning the defendant -- "when you wake up, take a look at the teaser.  If it's okay, we will start sending it to the investment firms."

The defendant responds [as read]:

"Okay.  I will check it today.  I was a bit busy yesterday."

He says [as read]:

"I checked it.  No problems, but the 'XX' inside needs to be filled.  Thank you.  Kunjie Jiao."

Kunjie Jiao is I&R Capital.

And then they go on.

Next page, please.

They discuss the name for the company.  Fine-Grained Supercomputing is an option.  The defendant suggests Zhisuan, and that's what they agree on.

THE COURT:  Okay.

MR. BOOME:  Next page, please.

Yuan Ye, at the bottom, Your Honor, he says [as read]:

"Please provide a PDF version of the file."

And on the next page, Kunjie Jiao sends it right there, "Zhisuan Teaser."  That's the one we have translated.

THE COURT:  Okay.

MR. BOOME:  So the defendant acknowledged -- Yuan Ye

says [as read]:

  "Take a look at it when you wake up."

 He says [as read]:

  "I looked at it.  There are no problems."

 This is after extensive edits in this chat and in the chat with Yuan Ye.

 **THE COURT:**  Okay.  Got it.

 **MR. BOOME:**  I'll stop there.

 **MR. FONDO:**  So, Your Honor, similar objections to previously, which is that he did not -- he's not the one who ended up forwarding this document.

 **THE COURT:**  Okay.  I understand that objection.

 **MR. FONDO:**  And it's hearsay.

 **THE COURT:**  Okay.  Go ahead.

 **MR. BOOME:**  Would you like to hear anything else about this document, Your Honor?

 **THE COURT:**  Nope.

 **MR. BOOME:**  Okay.

 **THE COURT:**  So now we're on 1029?

 **MR. BOOME:**  Yeah.

 **THE COURT:**  And you're saying that after this teaser was circulated --

 **MR. BOOME:**  Yes.

 **THE COURT:**  -- they were getting feedback from investors?

**MR. BOOME:**  That's right, Your Honor.

And I'm sorry.  Just to correct one thing.  So the Zhisuan teaser that -- and I don't know if you've already made your decision, so stop me if you've decided that this is admissible, but the defendant does send it to other people.

**THE COURT:**  Okay.

**MR. BOOME:**  And he sends it --

**THE COURT:**  I'm not sure that matters, but okay.

**MR. BOOME:**  Okay.  Just for the record, he sends it to a separate investor, in Exhibit 1154 on page 7.

**THE COURT:**  Okay.

**MR. BOOME:**  And so now we're on "Key Questions for Zhisuan."

So after the pitch document goes out to investors, I&R Capital starts scheduling meetings with investors for the defendant and Yuan Ye, including with Baidu, Sequoia Capital, IDG Capital, and Sinovation Ventures.

At page 26 and 27 of Exhibit 1155, Ms. Hernandez, please, at the top there, Your Honor, we can see some feedback starting to come in from the investors.  And the "Key Questions" document is received at page 40 of this chat.

In the second line there --

**THE COURT:**  Yeah.

**MR. BOOME:**  -- [as read]:

"Linwei, check this."

Or, I'm sorry.  "Key Questions for Zhisuan."

**THE COURT:**  Yeah.

**MR. BOOME:**  And as you can see from the document itself, it contains feedback about what the investor's view was.  The date it was sent to the defendant was April 21st.

Metadata from Google, their Web protect log that shows uploads off the network, shows that the defendant saved this to his Google computer and then uploaded it to linweidin@gmail.com on May 7th.

The reason this is -- it's not offered for the truth. It's offered for its effect on the defendant.  We don't claim that he edited this document.  This is him receiving --

**THE COURT:**  This is not an adoption argument?

**MR. BOOME:**  No, no.

**THE COURT:**  Okay.

**MR. BOOME:**  This is -- the timing is significant here. By April 21st of 2023, the defendant had exfiltrated all the alleged trade secret documents in the case.

**THE COURT:**  By when?

**MR. BOOME:**  By April 17th of 2023.

**THE COURT:**  Okay.

**MR. BOOME:**  Part of the feedback that the defendant receives in this document is, quote [as read]:

"Technology" -- and this is on the first page, subsection 2 -- "The content should clearly

articulate what we are doing; it is acceptable to provide a detailed explanation and then summarize, but overly broad statements are insufficient.  For example, we can describe in detail the work done at Google and how that is replicated at Zhisuan."

Starting from this time, the defendant -- between this time, receiving this feedback, and the time Google cut off the defendant's network access on December 29th, 2023, he visited internal sensitive documents, copied them, and created over 1300 new Notes files that the Government says he never got the chance to exfiltrate because Google cut off his access.

So this is evidence that he received this feedback, took it to heart.  This is less than a month before he applies for MiraclePlus and begins being much more explicit in his MiraclePlus marketing material about his intent to replicate and upgrade Google's technology.

**THE COURT:**  Okay.

Go ahead, Mr. Fondo.

**MR. FONDO:**  Your Honor, I think -- so it appears the Government's trying to admit this because of -- to show that he understood the feedback.  I think that connection is pretty attenuated, to say the least.

The Government will concede -- will certainly point out at trial that he copied a lot of documents over many years. There wasn't some direct correlation.  And I think to try to

keep saying, "Well, he downloaded some documents; it's kind of in the same window of when he had this meeting or that meeting or sent something to somebody else," I think is too -- far too attenuated to be --

THE COURT:  So it sounds like you're not making a hearsay objection to this.  You're saying that it's a 40- -- it should be excluded under 401 or 403?

MR. FONDO:  Well, both, Your Honor, because they're trying to admit it to show -- show that he reacted to something, and we're saying that there's no real evidence that he -- I mean, you can't have something --

THE COURT:  But it's not offered -- none of this is offered for its truth; right?  So it's not a hearsay issue to begin with; right?

MR. FONDO:  Well, I think they are offering it for the truth, Your Honor, so we state that objection but --

THE COURT:  The truth of what?

MR. FONDO:  Well, they just talked --

THE COURT:  What statement are they -- what statement are they offering it for the truth of?

MR. FONDO:  Well, they were talking -- I'm sure they're going to reference about, "We can describe in detail the work done at Google."  I'm sure they're going to refer to that.

THE COURT:  Well --

MR. FONDO: And they're going to say that -- I mean, that's what their theory is.

THE COURT: But this is a -- this is a report on what investors were saying; right? It's investor feedback. You guys can describe in detail the work done at Google; right?

MR. FONDO: But this is -- this is a doc- -- this is a document created by someone else who is not testifying.

THE COURT: Right.

MR. FONDO: So they are -- so I think it's hearsay. They're trying to get around it by saying that it is not for the truth of the matter asserted. I disagree with that but understand it.

What I'm saying is that the exception that they're trying to get around, for essentially the effect on the listener and that he acted in some way, I think is just way too attenuated. Usually, it's, you know, the house is on fire and then he leaves. That's the type of correlation. Here, their correlation is that there's a reference in here about describing the technology and so he went out and downloaded some documents, but the times don't work.

THE COURT: Okay.

Okay. Next document?

And, by the way, it's very -- it's way better to do as much of this as possible before trial with documents like this. And if there's any other category of documents that we should

be doing this for, I'll find time to do it.

These are the kinds of things that I don't want us to be doing in the middle of trial while the jury is waiting for us.  So let me just reiterate that.

Go ahead.

MR. BOOME:  Okay.  Your Honor, 1176.  So going forward in time now, the defendant applies -- parts ways with Yuan Ye and goes and pursues Zhisuan on his own.  And the first thing he does is apply to the MiraclePlus entrepreneurship camp.

THE COURT:  Yes.

MR. BOOME:  There's abundant evidence that he did that from his email account.  There is an application confirmation email.  There's an interview invitation.  There's a congratulations email.  And then, finally, there's an email that attaches Exhibit 1176, the camp commitment letter.

THE COURT:  Okay.

MR. BOOME:  If we could bring up, please, Ms. Hernandez -- why don't we...

If you let me, Your Honor, I'll show you a couple of those emails leading up to this.

So let's go to 1010, Ms. Hernandez.

This is the application confirmation from linweidin@gmail.com.

THE COURT:  Okay.

MR. BOOME:  And then let's go to 1014, please.

This is "Congratulations and welcome!"  Now, it's August 25th.

And then the following day he gets sent 1176.

And that is in Exhibit 1013, please, Ms. Hernandez.

So the commitment letter is attached to this email. The text -- the one, two -- third paragraph down, Your Honor, says [as read]:

"Specific fund investment matters will be initiated immediately after the signing of the camp commitment letter.  Please keep the investment-related terms strictly confidential."

So the commitment letter is a requirement to be a part of the program.  It sets out the basic understanding that if you're accepted into this program, you sign this commitment letter, and you agree to give 7 percent equity of your company to MiraclePlus in exchange for an investment of about 300,000 U.S. dollars.

**THE COURT:**  Okay.

**MR. BOOME:**  And so the camp commitment letter is the encapsulation of that offer.

**THE COURT:**  Okay.

**MR. BOOME:**  And it's relevant, obviously relevant.

And as far as hearsay, again, the truth of -- the truth of what is being asserted in the document, as in that MiraclePlus will actually convey 300,000 U.S. dollars in

exchange for 7 percent of the company and here are the terms of your engagement with the entrepreneurship camp, the truth of those statements doesn't matter.

What matters is that the defendant received this, believed that this was an opportunity available to him, and continued to pursue it by, three months later, presenting at the investor conference in Beijing.

**THE COURT:**  Okay.  Mr. Fondo?

**MR. FONDO:**  A number of things, Your Honor.

One is, the emails that the Government just showed you -- 1010, 1014, 1013 -- I think have been withdrawn. I think they're hearsay.  So they're relying on hearsay to sort of corroborate this email, and it's --

**MR. BOOME:**  The emails?

**MR. FONDO:**  Yeah.

**MR. BOOME:**  The emails -- none of the emails were a part of this ruling.  Those were recovered from his -- his email account.

**MR. FONDO:**  My understanding is you withdrew those.

**MR. BOOME:**  No.

**MR. FONDO:**  Okay.  Well, we have a misunderstanding.

We would argue that those are hearsay.  These are just emails to him.  And -- at least some of the three that we just observed.

The other thing is that --

**THE COURT:** Well, so the argument about that, I assume, is that none of this is being admitted for its truth but to show the effect on Mr. Ding; is that --

**MR. BOOME:** Yes.

**THE COURT:** Okay.

**MR. FONDO:** And so we would, again, disagree about the temporal connection, Your Honor. The Government mentioned that three months later he submitted -- I think you were referring to probably the video -- but submitted something to MiraclePlus. We think, again, it's attenuated, the timing. I think the Government is trying to extend -- you know, to show the effect on the listener, trying to extend that temporal limit out too far.

**THE COURT:** Well, why isn't that an argument -- I mean, this applies to your argument about 1029 also, I think. Why isn't that just an argument to the jury? I mean, if it's not being offered for its truth and you say that it doesn't do a good job of showing the effect on the listener, I mean, you're free to argue that to the jury; right?

But it seems like there's a reasonable argument that it does show the effect on the listener. So why isn't that enough to admit it? And why aren't your arguments better made to the jury?

**MR. FONDO:** Because I think you're the gatekeeper, Your Honor. You could -- you could -- whether -- so I

Case 3:24-cr-00141-VC    Document 370    Filed 01/31/26    Page 45 of 78    45

recognize that it's not -- there's not a -- if it's more than three days later kind of thing.  But at some point, it gets too attenuated.  It's also -- and they have to show that more direct correlation.  I think, frankly, that's your job.  That's why we're bringing the objection.

I also think it is -- listen, they want to get that information in; right?  They are trying to show that he received money, and they're trying to show that relationship with MiraclePlus.  And so I understand why they're trying to get around the hearsay problem that they have, but they are trying to get that information in front of the jury.

And I do think it has to -- I do think it has to be more correlated than some event took place down the road.  Usually, when this takes place, it's like, "Oh, thank you.  I received it.  I'm going to go.  I'll be there tomorrow," kind of thing.  It's not that something happened three months later and, therefore, it must be because of this letter.  Because there could be superseding events that took place.  There could be delays, et cetera.  These terms could be different than what he eventually went into.  And that's why you need much more of a temporal and more of a direct connection, from our perspective.

**THE COURT:**  Okay.  It sounds like we may now have an issue about the admissibility of these emails as well, Exhibit -- what is it?  1013?

**MR. BOOME:** It's a string of emails. 1009, Ms. Hernandez.

This is from March of 2022, Your Honor. This is the first evidence of any contact between anyone from MiraclePlus and the defendant. We're not offering this for its truth. It's not -- it doesn't matter what is said here is true. It's the fact that the defendant is receiving this correspondence from somebody from MiraclePlus.

The sender of this email is also significant, Xuwen Cao, because when the defendant created a video that he called a product demonstration that was, in fact, a video of him using a Google platform, he sent it to MiraclePlus through their application portal, and Xuwen Cao was the person who opened that, according to metadata from the file itself.

**THE COURT:** Okay.

**MR. BOOME:** So nothing in this email is offered for its truth. It's the fact that it was sent to him by this specific person and it's the first contact between him and anyone at MiraclePlus.

**THE COURT:** Okay.

**MR. FONDO:** And the video, Your Honor, that they're referring to took place months later. It's not as if it happened the next day.

**THE COURT:** Okay.

**MR. BOOME:** Should we go to the next email,

Your Honor?

THE COURT:  Sure.

MR. BOOME:  So you saw the application submitting confirmation.

THE COURT:  Yeah, but show it to me again just to...

MR. BOOME:  1010.

THE COURT:  Okay.

MR. BOOME:  1011, please, Ms. Hernandez, inviting him to interview.

THE COURT:  Okay.

MR. BOOME:  There's multiple instances in Google's logging data of the defendant visiting and uploading things to apply.miracleplus.com, the email address in this letter -- in this email.  I'm sorry.  The Web address in this email.

THE COURT:  Got it.

MR. BOOME:  And then 1014 is a congratulations and some information about scheduling for the camp portion, which is the lead-up to the investor presentation.  We have travel records showing the defendant actually traveling to China for the time period that is indicated in this congratulations and camp schedule letter.

THE COURT:  Okay.

MR. BOOME:  And then, finally, 1013, which you've already seen, where the camp commitment letter is attached.

THE COURT:  Okay.

**MR. BOOME:** So we're not offering it for the truth of any of the assertions in there, but it shows his engagement with MiraclePlus and explains a lot of his subsequent conduct in terms of travel to China, uploading things to that apply.miracleplus.com --

**THE COURT:** Okay.

**MR. BOOME:** -- pursuing the program.

**THE COURT:** All right.

What else?

**MR. BOOME:** Are we moving on to the next -- okay.

Exhibit 1051 is a business license from Zhisuan, the company that the defendant founded. On the face of it, we can see the legal representative is listed as Linwei Ding. Date of establishment, October 17th, 2023, so a little more than a month before the investor presentation.

And, Ms. Hernandez, if you could please bring up page 226 of Exhibit 1135.

And the Court should see the defendant sending this; so there again, here, we have the sender at the bottom, the time of the message, and then on the next page, please, the business license.

This is a chat between the defendant and the people who are helping him prepare for the MiraclePlus event.

**THE COURT:** Okay.

(Pause in proceedings.)

**THE COURT:** And so who's sending this business license to whom?

**MR. BOOME:** The defendant is sending the business license as a screenshot in the chat with the folks who are helping him prepare marketing material, slideshows, investor presentation materials in preparation for MiraclePlus.

**THE COURT:** Okay. And so this is an adoption theory?

**MR. BOOME:** Yes, Your Honor, I think this one is an adoption theory.

**THE COURT:** Okay.

(Pause in proceedings.)

**THE COURT:** Okay. Mr. Fondo?

**MR. FONDO:** Your Honor, we -- it's a foreign document that is not certified, and we don't think him forwarding it is sufficient to get it admitted, Your Honor.

**THE COURT:** But he's sending it, saying, "Is this okay," meaning "Is this the one that I should be using"; right? I mean, why isn't he adopting it? Why isn't he showing that he's adopting this --

**MR. FONDO:** I understand --

**THE COURT:** -- as his own?

**MR. FONDO:** I understand the Court's --

**THE COURT:** Okay.

**MR. FONDO:** -- point on it, but we still maintain our objection.

**THE COURT:** Sure. Okay.

All right.

**MR. BOOME:** All right. And where did we land, Mr. Fondo, on the 1001, the investor -- investment agreement signed by the defendant?

**MR. FONDO:** And remind me -- excuse me for one moment, Your Honor.

**THE COURT:** Sure.

(Co-counsel confer off the record.)

**MR. FONDO:** So, Your Honor, just for clarification, pursuant to the Court's order, we have assumed that if the client -- if the document is signed by Mr. Ding, that you view that as admissible.

**THE COURT:** Yes.

**MR. BOOME:** Okay. So, Your Honor, we have -- we have a series of documents. I think we've crossed about half of them off the list in terms of dispute.

**THE COURT:** Okay.

**MR. BOOME:** But I want to tell -- I want to give you some information about where the rest come from.

**THE COURT:** Okay. So, sorry. Where are we with 1001? Is that what we're talking about right now?

**MR. BOOME:** We're moving on from that. I don't think we're disputing that one anymore.

**THE COURT:** Okay.

**MR. BOOME:**  But there were -- so the next batch of documents are the official legal agreements that come with the defendant's and Zhisuan's participation in MiraclePlus.  It's the investment agreement in which his company -- the investment agreement says that Zhisuan will receive about a $700,000 investment in exchange for 7 percent of the company.

**THE COURT:**  Okay.

**MR. FONDO:**  Sorry.  Which document is it you're referring to?

**MR. BOOME:**  This is 1001.

**MR. FONDO:**  Oh.

**MR. BOOME:**  It's signed by the defendant on behalf of the company and signed by a representative of MiraclePlus.

There are a number of other documents, including employment agreements for two employees, confidentiality agreements for two employees, and a number of shareholder agreements, where the defendant signs on behalf of the company and the shareholders, in which he basically agrees to enter into this contract with MiraclePlus.

**THE COURT:**  Okay.

**MR. BOOME:**  We don't have a dispute about the investment agreement or the shareholder agreements that the defendant signed.

**THE COURT:**  Mm-hmm.

**MR. BOOME:**  We don't have a dispute about the

defendant's employment agreement and the defendant's confidentiality agreement.

THE COURT:  Okay.

MR. BOOME:  The disputed documents are the employment agreement and the confidentiality agreement for the two employees.

And so let me just say -- let me show the Court where these documents came from, and then I'll get into the substance of the documents themselves.

If we could please go to Exhibit 1182, Ms. Hernandez.

This is an email, Your Honor, from a gentleman from Fangda -- Fangda Law.

THE COURT:  Okay.  To be clear, I don't think I have this --

MR. BOOME:  Oh, I'm sorry, Your Honor.  This is on the screen.  I'm showing you where the documents come from.

THE COURT:  Okay.

MR. BOOME:  So this is an email from a lawyer that the defendant received.  There are MiraclePlus representatives attached.  It says [as read]:

"Please find attached the complete set of finalized and signed documents for this project for retention."

All the legal agreements related to Zhisuan's participation in MiraclePlus were attached to a ZIP file in

this email --

**THE COURT:**  Okay.

**MR. BOOME:**  -- including all the ones that are not disputed.

So let me show you one that is.

Let's go to 1184.  And, I'm sorry, Ms. Hernandez. Before we go -- before we talk about this, can you please go briefly to 1001, the signed investment agreement.  I want to show the Court one of the appendices at the very end.  I think it's the second-to-last page.

So this is the investment agreement that's not disputed, signed by the defendant, and it lists these two employees that we're about to talk about.  So the defendant did sign this document, acknowledging that these two individuals are employees.

**THE COURT:**  Okay.

**MR. BOOME:**  And so now if we go back to 1184, it's a confidentiality agreement for one of the individuals listed in the appendix.

**THE COURT:**  Okay.

**MR. BOOME:**  Of particular interest to the Government here are confidentiality terms that require the employees not to take documents that belong to the company and include the company's technology.  I think it's significant that the defendant had his employees sign those types of agreements,

which indicates his knowledge of confidentiality provisions in general.

THE COURT:  Okay.

MR. BOOME:  So, you should have the source.

I think these documents are disputed, Your Honor, because if we go to page -- if you go to the last page, the signature page, they're signed by the employee, and they're signed on behalf of the company with a company seal, but not a signature.

THE COURT:  Okay.

MR. BOOME:  And I think that's where the disagreement is, because the defendant didn't put his hand, his signature, on these documents.

THE COURT:  Okay.

MR. BOOME:  Our position is, given the other five or six documents where the defendant signs his signature with the company seal on behalf of the company, in the investment agreement, in the shareholders agreements, that establishes sufficiently that he is the company and when the stamp and seal goes on this document, it's him adopting the document with these employees.

THE COURT:  Okay.

MR. BOOME:  So, additionally --

THE COURT:  And, again, these were -- this came from -- these documents all came from that email from the

lawyer and it was found on his devices, found in his email account?

**MR. BOOME:**  In his email account.

**THE COURT:**  In an email account.  Okay.

**MR. BOOME:**  And the final -- the final point that I will make about these, Your Honor, is that the defendant sent drafts of both the employment and the confidentiality agreement to these employees himself, labor contract and confidentiality. He sent the agreements to them.  We don't have them -- we don't have any chats where they send back signed versions, but the signed versions make it into this email in the ZIP file from the lawyer.

**THE COURT:**  Okay.  Go ahead, Mr. Fondo.

**MR. FONDO:**  Our position is that he did not sign these documents.  This is not a case against the company.  The company is not a defendant.  He's an individual who's the defendant.  And, therefore, we think these are hearsay.

**THE COURT:**  Okay.  Anything else?

**MR. BOOME:**  Not from me, Your Honor.

**THE COURT:**  No.  I mean, any other documents?

**MR. BOOME:**  Oh, yes.

**THE COURT:**  Remember, I have a hard stop at 3:00.

**MR. BOOME:**  Okay.  Let's -- I think we actually only have three more doc- -- four more -- five more documents.

(Laughter.)

**MR. BOOME:**  Okay.  353.

**THE COURT:**  353?

**MR. BOOME:**  Yes.

**THE COURT:**  That's not in my binder.

**MR. BOOME:**  It should be the first one, Your Honor.

**THE COURT:**  Oh, yeah.  Okay.

**MR. FONDO:**  Your Honor, may I talk to counsel?  Maybe I could short-circuit this a little bit.

**THE COURT:**  Okay.

(Discussion off the record.)

**MR. BOOME:**  So, Your Honor, this document is an English version of the Zhisuan marketing materials.

**THE COURT:**  Okay.

**MR. BOOME:**  It was created and sent by the defendant to a MiraclePlus representative in a chat on November 29th of 2023.

**THE COURT:**  Okay.

**MR. BOOME:**  In that chat, the MiraclePlus representative asked the defendant to translate the contents of the demo-day speech into English and pay attention to professional terms.

**THE COURT:**  Okay.

**MR. BOOME:**  The defendant turned around and asked one of his employees to do it.  Not one of the two that signed official agreements.  So this is, like, a part-time --

**THE COURT:**  Okay.

**MR. BOOME:**  -- different employee.

She said she would handle it.

She sends the defendant back a version of this document.  She says, "Take a look and tell me if it's right."

The defendant says, quote, "Thanks," and then he sends it to the MiraclePlus representative after that.

So he gets the message he needs to do this, he asks her to do it, she does it, she sends it to him, and he sends it back.

**THE COURT:**  Okay.

**MR. BOOME:**  And it substantially mirrors the language of his other Zhisuan marketing materials.  It's just the only document we have that's in English.

**THE COURT:**  Okay.  Mr. Fondo?

**MR. FONDO:**  We object.  We do not think it's an adoption by the defendant.

**THE COURT:**  Okay.  What else?

**MR. BOOME:**  Next is 1034.  So, Your Honor, this one kind of needs to be viewed together with 1143.  These are two versions of -- after the MiraclePlus presentation when the defendant gave his speech at the conference, the next step was to go on an investor -- kind of an investor tour, and Exhibit 1143 was the primary vehicle by which the defendant did that.  1143 is not disputed.

**THE COURT:** Okay.

**MR. BOOME:** But it's important that these two documents are nearly identical, except for the very last section.

**THE COURT:** Okay.

**MR. BOOME:** So 1034 is a version of the main presentation that was specifically made for Mingyue Lake, an industrial innovation park that's one of our PRC instrumentalities.

**THE COURT:** Okay.

**MR. BOOME:** And the part that is specific to Mingyue Lake begins at page 32.  32, 33, and till the end of the presentation is like an add-on section for this.

**THE COURT:** Okay.

**MR. BOOME:** This is where the defendant and his company express what they think they can do for the industrial innovation park and how they can provide services that will be consistent with the mission of the industrial innovation park.

**THE COURT:** Okay.

**MR. BOOME:** The version of the chat that -- sorry. The version of the document that we translated was sent in a chat.

If we could go to page 125 of Exhibit 1135, please, Ms. Hernandez.

The bottom, Your Honor [as read]:

"@Linwei, right now we need you to finalize one
for Chongqing."

Chongqing is where the industrial park is.

**THE COURT:** Okay.

**MR. BOOME:** The defendant sends the document.

And then on the next page, please.

That's the one -- that's the translated document that you just -- you're looking at right now.

[As read]:

"I changed the titles on every page."

Next page, please.

Next page.

So he indicates that he edited it; he changed it.

There's also substantial evidence that a meeting actually happened in Chongqing with the leadership of this group and that the defendant was there.  That evidence includes a chat between the defendant and the owner/founder of MiraclePlus, where he says [as read]:

"I'm going on November 9th to meet with the
leader of Mingyue Lake."

There's a number of chats -- a number of chats indicating that this meeting with the leadership of Chongqing is going to occur, and the defendant's Google devices are geolocated in Chongqing around the time of the meeting.

So in terms of the hearsay argument, it doesn't really

matter whether these statements are true.  It's the fact that the defendant said them and represented them that is evidence of his intent, what he intends to do with his company and, by implication, the alleged trade secrets that were stolen.

THE COURT:  Okay.

MR. BOOME:  And I'll just say one more thing, which is, although the other PowerPoint presentation for Zhisuan, 1143, is not disputed, these two are substantially the same, and there's more than a hundred pages of intensive editing of the main presentation and this presentation in a chat, Exhibit 1135.

The defendant sends multiple versions back and forth, discusses changes, sends a QR code for his contact information that goes into the presentation.  He sends possible images that should go into the presentation, and he couldn't have been more -- he's more involved in this document than any other that we have in this case.

THE COURT:  Okay.  So adoption theory again?

MR. BOOME:  Adoption theory.  But at the end of the day, Your Honor --

THE COURT:  You think he wrote --

MR. BOOME:  -- we don't even think --

THE COURT:  You think he wrote it?

MR. BOOME:  We don't think these statements -- some of these statements are even true.  But it's the fact that he said

them that is evidence of what he intended to do with his company and the trade secrets.

THE COURT:  Right.  But I'm wondering -- like, for this, it seems like he's the primary author of this presentation.  So the concept of adoption doesn't even necessarily come in.  It's like he said this stuff, it seems like.

MR. BOOME:  Right, he said this stuff.

THE COURT:  Okay.  Mr. Fondo?

MR. FONDO:  Your Honor, we maintain our objection.  We don't necessarily agree.  I understand the Court's position. We don't agree that he said this.

We also don't agree that it's an adoption.  We also don't agree that it goes to his intent.

THE COURT:  Okay.

(Pause in proceedings.)

THE COURT:  Okay.  Thank you.

Next?

MR. BOOME:  The next document is 1018.  This document, Your Honor, is not offered for the truth.  It is -- Dr. Segal discussed this document during his *Daubert* testimony.  This is a document circulated by an arm of the Provincial Government where the industrial innovation park sits.

THE COURT:  Okay.

MR. BOOME:  And it is explaining the objectives of the

industrial innovation park and directing state-owned enterprises and others to assist in making this a success.

THE COURT:  Okay.

MR. BOOME:  This document was sent to the defendant on September 27th of 2023, which is less than two weeks before the meeting with the leadership of this industrial innovation park. It was sent to him in a chat by one of his employees, not yet in -- not-yet-signed agreement, but one of the women who would become his employee.

She said, "Check it out.  This is a government fund. Maybe we can" -- in sum and substance, you know, "Maybe we can get in on this investment capital and let's see what they need."

The defendant says, quote, "Okay."

And then he saves a copy of it to his personal computer on October 9th.

THE COURT:  Okay.  Mr. Fondo?

MR. FONDO:  So, one, Your Honor, I think the statements that they're referring to are hearsay.

Two -- those are the communications I'm referring to by his purported employee but who the Government admits was not an employee at the time.  The Government -- if you recall, the Government submitted signed documents that showed they were employees in late November of 2023.  This predates it.  So I don't think the Government can have it both ways on that point.

And then responding "Okay" is not a -- is not adopting anything; it's not admitting anything.  And so we don't believe --

**THE COURT:**  I don't think they're saying they have an adoption theory on this one.  I think they're saying that this is just effect on the listener it shows.  It's not offered for its truth.  It's offered to show -- to explain why he did what he did next.

**MR. FONDO:**  Well, but I don't think they've made a direct correlation.  Just because they got a brochure of something, there's -- I don't think that necessarily correlates to what he did next, Your Honor.

**THE COURT:**  Okay.

**MR. FONDO:**  I think that's an insufficient link.

As I've stated before, Your Honor, I think the Government has -- they have a problem with this evidence in that they have nobody who's going to testify about -- none of this -- there's nobody coming in who's going to explain in first-person knowledge who these people are, what their roles are, what happened.  And so they're trying to connect -- create these links to try to get past that, and I think that's inappropriate in this context as to 1018.

**THE COURT:**  Okay.  Thank you.

Next?

**MR. BOOME:**  1052.  It's just a screenshot of a

business card of a person named Weng Wei from the

Lingang Group.  This is one of the -- this is a state-owned

investment fund.  This one is very quick, Your Honor.

This is part of our evidence of the defendant's

connection to this organization.  There's a chat with Lu Qi,

the founder of MiraclePlus, in which the defendant says that he

met with Weng Wei from the Lingang Group and he had ideas about

our technology and he is considering investing 10 million yuan

if we can show X, Y, Z.  So that chat -- that's the defendant's

statements in the chat.

And this business card, this is a screenshot -- or a

photo of a business card that was found on the defendant's hard

drive in his house, and it doesn't -- not for the truth, but it

is evidence that the defendant met with someone who identified

themselves as Weng Wei.  It's just circumstantial evidence that

the meeting occurred with this person -- with a person claiming

to be this guy.

**THE COURT:**  Okay.  Got it.

Any objection to this one?

**MR. FONDO:**  So, Your Honor, one, the conversation that

they reference I think is hearsay, so I don't think it can be

relied upon for this purpose.

In addition, we think that it's -- this is simply a

screenshot of a business card, and I think it's too attenuated.

**THE COURT:**  Okay.  What about -- so it seems like it

depends on the conversation, the chat conversation that you were referring to.

**MR. BOOME:**  The statements I relayed to the Court were the defendant's statement in the chat.

**THE COURT:**  I see.  Okay.

**MR. BOOME:**  "I met with Weng Wei from the Lingang Group, and here's what he told me."

**THE COURT:**  I see.  Okay.

**MR. FONDO:**  And, Your Honor, I would submit that that's double hearsay.  He's referring to what somebody else told him.

Excuse me.  That is hearsay.  What he is -- he was sharing what somebody else shared with him, and so I would submit that that's hearsay, what somebody else told him.

**THE COURT:**  And I think what they're saying is, again, it's not for the truth; it's to show why he did what he did.

Okay.

**MR. BOOME:**  1002.  This is an unsigned strategic cooperation agreement with the Zhisuan Tianfu Research University.

**THE COURT:**  Okay.

**MR. BOOME:**  It's part of our evidence of the defendant's intent to provide services to this institute.

**THE COURT:**  Yeah.

**MR. BOOME:**  It was sent to the defendant in a chat

with some of his Zhisuan colleagues.  In that chat, the defendant says that he will look at it right away and indicates that he thinks the company should sign the agreement; and they discuss which seal to use to sign the agreement, although we don't have a signed -- we don't have a signed copy.

THE COURT:  Okay.

MR. BOOME:  The other evidence of -- this is not offered for its truth.  It's offered to show the defendant's -- effect on the listener and the defendant's intent to provide assistance to this entity.

There's other evidence of the defendant's intent with regard to this specific university because in the MiraclePlus slideshow where the defendant lists the entities with whom Zhisuan has a signed cooperation agreement, this is one of the entities listed.

THE COURT:  Okay.

MR. BOOME:  And also, in the document that the Court reviewed in connection with the motion, the key -- the potential customers for Zhisuan document that the defendant edited also lists this university among the potential customers for Zhisuan.

THE COURT:  Okay.

All right.  Mr. Fondo?

MR. FONDO:  Thank you, Your Honor.

So we would object again, Your Honor, for the same

basis we provided before.  It's an unsigned document.  It was forwarded to him.  So we don't think he adopted it, nor do we think there's the connection of him acting on it.

**THE COURT:**  Okay.

All right.  Is that it?

**MR. BOOME:**  Last document is 1026.

**THE COURT:**  Okay.

**MR. BOOME:**  The source document here indicates that it's a signed document with a seal on it.  The context here, Your Honor, is sometime after MiraclePlus in December, the defendant submitted an application to a Talent Plan which was sponsored by the Shanghai Municipal Government.

**THE COURT:**  Yeah.

**MR. BOOME:**  The Talent Plan application is not in dispute.

This is a letter from one of his employees, who has a signed employment agreement by this time.  In a chat, they discuss that the defendant can't be in China for the time when it's -- the -- they call it a defense of his Talent Plan application.  So when he's supposed to meet and interview for the Talent Plan application, he can't be in China.  So his employee sends this -- Mr. Ding and his employee discuss the fact that she will send this to the Talent Plan -- the people who run the Talent Plan so that she can be present for him and discuss the application.  The chats between the defendant and

this employee, whose name is Luxi, discuss how the defendant can't be in China.

He says [as read]:

"You just go for me. 'Rooting for you.'"

And she sends him the document in the chat, and he agrees that she can do the defense for him.

THE COURT:  Okay.

MR. BOOME:  So I think in terms of hearsay, at this point she is an employee acting within the scope of her employment, defending -- appearing for the defendant to try to get this Talent Plan application approved.

THE COURT:  Okay.

MR. FONDO:  Your Honor, one point of clarification. The Government keeps saying that certain documents are not disputed.  I think what he's saying is it's not disputed that they've been admitted.  But I just wanted it clear for the record that we have disputed those, and you have overruled --

THE COURT:  Got it.

MR. FONDO:  -- our objections.

Thank you, Your Honor.

So, same position here, that there's no adoption here and that she's not authorized to send it.

THE COURT:  What do you mean "she's not authorized to send it"?

MR. FONDO:  Let me rephrase -- let me rephrase that,

Your Honor.

So those employment agreements were not signed by Mr. Ding, so we don't believe that those -- that employment agreement comes in, and so that's the basis of what I mean by that.

THE COURT: Thank you.

MR. FONDO: I understand that there is another document that references their employment, but that's my position -- that's the basis --

THE COURT: Okay.

MR. FONDO: -- of what I was trying to say.

THE COURT: All right. So based on the offer of proof that was just made, I think we already agreed you withdrew your objection to 1107.

1177, I'm not sure. I want to go back and think about it some more. I found it a little bit confusing.

1085 is admitted as an adoption.

1025 is admitted as an adoption. Or I should say, admissible, I mean, assuming the appropriate foundation is laid; right?

1137, admissible as an adoption.

I am unsure about 1029. I want to go back and think about that one some more. I found that a little more confusing.

MR. BOOME: That's the key questions?

**THE COURT:**  "Key Questions for Zhisuan."

1176, admissible, non-hearsay purpose.  Same with the emails that were the foundation for it, 1009 to 1014.

1051, admissible, adoption.  I think also probably non-hearsay purpose.

The two employment agreements with the seal without the signature, admissible.  I don't know if it's right to call it an adoption or a statement by him.  I mean, I think, again, it probably should be -- it's probably best understood as a statement by him; but to the extent it's not, it's adopted by him.

**MR. BOOME:**  Does that also apply to the confidentiality agreements for the same individuals with the same seal?

**THE COURT:**  Yes.

353, the Zhisuan marketing materials, again, same thing.  I think it's admissible because it's a statement by him; but to the extent it's not a statement by him, it's an adoption.

1034, same.  Admissible, the same two alternative reasons.  Also, I don't -- I don't think those are being offered for the truth of the matter.  So I think it's kind of three independent bases for admission of 1018 -- sorry, not 1018 -- 1034.

Remind me what 1018 was again.

**MR. BOOME:**  1018 is the --

**THE COURT:**  Oh, yeah, the objectives of the park.

**MR. BOOME:**  Yes.

**THE COURT:**  That's admissible, not offered for its truth.

1052, same thing.  Admissible, not offered for truth, and the chat that accompanies it.

1002, I'm not sure.  I want to go back and think about that some more.

1026, admissible.  I think it's the employee acting within the scope of their employment.  It's also an adoption. So that's admissible.

But I want to go back and think a little more about 1177, 1029, and 1002.  I think those were the three I said I wanted to go back and think about; right?

**MR. FONDO:**  Yes, Your Honor.

**MR. BOOME:**  Your Honor, can -- would you be able to -- 1029, in our view, is a fairly important document, the investor -- the "Key Questions" investor feedback.  If there's any more information I can provide or if -- I don't know if you're wrestling with the hearsay issue in terms of --

**THE COURT:**  So, yeah, one of the things I was wrestling with was -- and I have to leave in two minutes.  But one of the things I was wrestling with -- I don't have to leave, by the way.  I just have a Zoom from 3:00 to 3:30.  So

if you really need to talk to me at 3:30, I can come back out -- is that this document -- who was this document created by again?

        MR. BOOME:  I&R Capital.

        THE COURT:  I&R Capital.  Based on I&R Capital's meetings with investors.  And so there's two layers of hearsay; right?  One is:  Here is what I&R Capital said to Ding; right?  But it's also, the layer before that is:  Here is what the investors said to I&R Capital.

        And this document is describing what the investors are saying to I&R Capital, and I think that it's being offered for the truth of the fact that the investors are saying these things to I&R Capital.

        MR. BOOME:  I don't think I made that argument, Your Honor.  I think our --

        THE COURT:  But I think that is inevitable; right?  You're -- the point is, investors are saying this to I&R Capital, and I&R Capital is conveying this to -- to the defendant, and then the defendant is acting on it.

        MR. BOOME:  I don't think we --

        THE COURT:  But it depends on the truth of the investors saying that to I&R Capital, I think.

        MR. BOOME:  I think the way we characterize it is, this is a document sent to the defendant by somebody who was trying to help him raise money, and the defendant understands

it to be feedback from investors.

**THE COURT:** Right.

**MR. BOOME:** It doesn't matter whether the investors --

**THE COURT:** But the document is purporting to report on feedback from investors; right? Here is what these investors said.

**MR. BOOME:** But we don't care whether that's actually true or whether the investors actually said it. What matters is that the defendant sees this document, believes it's feedback from investors that says, "You need to be more specific about how you're going to replicate Google," and then goes on to be more specific about how he's going to replicate Google, while he continues to stockpile documents and hone his MiraclePlus presentation.

**THE COURT:** Okay.

**MR. BOOME:** So we are not -- we are not seeking to offer and won't argue that investors actually said these things or that this is actually what the Chinese investment bank community thought of Zhisuan. It's that the defendant received this document from his finance partner and received and read and understood this document.

**THE COURT:** Right. Okay.

**MR. FONDO:** Again, Your Honor, so two things. I agree with the double hearsay concerns. But, in addition, this is one of the documents where it was particularly attenuated.

They were basically saying that because of this document, he went out and downloaded more documents -- the timing doesn't work that directly -- and then he refines something.  But they don't -- there's not that correlation where you see a refined document issued -- drafted two days later, as far as I'm aware, Your Honor.  So I think it's just too attenuated to rely on that basis.

MR. BOOME:  One of our best pieces of evidence is going to be a photo of the defendant at the MiraclePlus presentation standing at the Zhisuan booth and above his head there will be a translated banner that says, "We Can Build" -- "We Can Replicate and Upgrade Google's Technology."  And that's several months after receiving this.

THE COURT:  It sounds like that evidence is way better than this evidence.

MR. BOOME:  I agree, Your Honor, but it doesn't make it inadmissible just because it's not as good as the rest.

THE COURT:  I understand.

Okay.  I'll go back and think about those, the final three.

And is there anything else we need to deal with?  Do I need to come back at 3:30 to talk to you about anything else?

MS. PRIEDEMAN:  We just wanted to talk about the scheduling of the *Daubert* hearing.  I know you have one minute. I'm hoping it's not -- we were thinking Tuesday, the 20th,

tentatively, since Mr. Pflaum is unavailable the first week of trial.

MR. FONDO: Well, I think he's unavailable part of that Tuesday as well.

MS. PRIEDEMAN: He's also unavailable till 3:00 p.m., but I -- so I don't know. I guess we can talk about that later but just --

THE COURT: Well, we need Sanchez and Pflaum, right, to --

MS. PRIEDEMAN: So I think it's unlikely that Professor Sanchez will testify the first week. I think that Tuesday is probably most likely. So -- and I'm not quite sure what to do about Mr. Pflaum's unavailability but...

THE COURT: Okay. Well, it might be -- if Sanchez is going to -- it seems like we need to nail down more clearly when Sanchez is testifying. And given this mid-trial *Daubert* hearing, like, you just need to -- you need to commit to when Sanchez is testifying and work your other witnesses around that.

So when's Sanchez going to testify? Tuesday or the --

MS. PRIEDEMAN: It's planned for Tuesday, the 20th.

THE COURT: Okay. And so you're saying that Pflaum is not available part of Tuesday?

MR. FONDO: Correct.

THE COURT: Why?

**MR. FONDO:** I don't --

Do you know why?

**MR. RAPP-KIRSHNER:** I'm not sure.

**MR. FONDO:** I'm not sure, Your Honor. We can check on why. But he's in the middle of another trial right now.

**THE COURT:** Okay.

**MR. FONDO:** I don't know if it's related to that or something else. I just -- we asked for his availability next week, and he shared that with us.

**THE COURT:** Okay. Is it the morning that he's not available or --

**MR. RAPP-KIRSHNER:** 12:00 to 3:00, I believe.

**MR. FONDO:** 12:00 to 3:00.

**THE COURT:** Okay. So what may have to happen is you may have to figure out how to call Sanchez on Friday or Wednesday.

**MS. PRIEDEMAN:** Well, Mr. Pflaum is unavailable that entire first week of trial as well.

**THE COURT:** Oh, I see. So it may be that you need to figure out how to call Sanchez -- or does Pflaum need to be here for Sanchez's testimony, or can he look at the realtime transcript?

**MR. FONDO:** Well, we were going to use the Zoom. I don't know -- I think, actually, he will be physically here, actually, I think in the Bay Area.

**THE COURT:** Okay. Well, I'll just ask you-all to figure that out. But there needs to be a definitive time that Sanchez is testifying. And I'm not sure if Pflaum needs to be here for that, whether the preference is to have him look -- I mean, it seems like it might make more sense for Pflaum to be here for that.

**MR. FONDO:** That would be our preference.

**THE COURT:** So it might need to be Wednesday instead of Tuesday, or maybe it starts Tuesday afternoon, or I don't -- or maybe it starts Tuesday morning and then he interrupts his testimony and you call another witness or something.

You-all will have to figure it out, but it'll have to be definitive so that we can plan.

**MS. PRIEDEMAN:** Understood, Your Honor.

**THE COURT:** Okay.

**MR. FONDO:** Thank you.

**THE COURT:** Thank you.

**MR. BOOME:** Thank you.

**THE COURTROOM DEPUTY:** Court is adjourned.

(Proceedings adjourned at 2:59 p.m.)

---oOo---

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Saturday, January 31, 2026




_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter