**Volume 1**

**Pages 1 - 195**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                )
   VS.                          )   **NO. 3:24-CR-00141-VC**
                                )
LINWEI DING, a.k.a. LEON DING,  )
                                )
          Defendant.            )
_____)

                        San Francisco, California
                        Monday, January 12, 2026


**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                        CRAIG H. MISSAKIAN
                        UNITED STATES ATTORNEY
                        450 Golden Gate Avenue, Box 36055
                        San Francisco, California 94102-3495
                   BY:  **CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
                        **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

                        CRAIG H. MISSAKIAN
                        UNITED STATES ATTORNEY
                        1301 Clay Street, Suite 340S
                        Oakland, California 94612-5217
                   BY:  **MOLLY K. PRIEDEMAN**
                        **ASSISTANT U.S. ATTORNEY**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:  (CONTINUED)

For Defendant:

          GOODWIN PROCTER LLP
          525 Market Street
          San Francisco, California 94105
    BY:  **DARRYL M. WOO, ATTORNEY AT LAW**
        **DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
        **RACHEL M. WALSH, ATTORNEY AT LAW**
        **COLETTE A. LOWRY, ATTORNEY AT LAW**

          GOODWIN PROCTER LLP
          601 Marshall Street
          Redwood City, California 94063
    BY:  **GRANT P. FONDO, ATTORNEY AT LAW**
        **FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

          GOODWIN PROCTER LLP
          601 South Figueroa Street, Suite 4100
          Los Angeles, California 90017
    BY:  **LORA J. KRSULICH, ATTORNEY AT LAW**

Also Present:      **Andrea Valladao, Federal Bureau of**
       **Investigation**
      **Vernonica Hernandez, Paralegal**
      **John Jay, Trial Technician**

# I N D E X

Monday, January 12, 2026 - Volume 1

| PROCEEDINGS | PAGE | VOL. |
|---|---|---|
| Preliminary Jury Instructions | 12 | 1 |
| Opening Statement by Mr. Boome | 22 | 1 |
| Opening Statement by Ms. Krsulich | 58 | 1 |

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **LOHMEYER, MARK SEBASTIAN** | | |
| (SWORN) | 78 | 1 |
| Direct Examination by Ms. Priedeman | 78 | 1 |
| Cross-Examination by Ms. Krsulich | 116 | 1 |
| Redirect Examination by Ms. Priedeman | 134 | 1 |
| Recross-Examination by Ms. Krsulich | 137 | 1 |
| | | |
| **ADKINS, HEATHER LYNN** | | |
| (SWORN) | 138 | 1 |
| Direct Examination by Mr. Chang | 139 | 1 |

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 282 | | 97 | 1 |
| 286 | | 96 | 1 |
| 296 | | 93 | 1 |
| 305 | | 92 | 1 |
| 308 | | 94 | 1 |
| 756 | | 178 | 1 |
| 799 | | 179 | 1 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 800 | | 174 | 1 |
| 801 | | 180 | 1 |
| 824 | | 173 | 1 |
| 875 | | 168 | 1 |
| 891 | | 182 | 1 |
| 5193 | | 126 | 1 |
| 5402 | | 129 | 1 |
| 8000 | | 138 | 1 |

**Monday - January 12, 2026**                                **9:04 a.m.**

                          **P R O C E E D I N G S**

                               ---o0o---

(Proceedings were heard out of the presence of the jury.)

            **THE COURT:**  Okay.  Is there anything that the parties need to discuss with me?  Usually, the first day of trial, there's a bunch of stuff.  You guys all have it together?

            **MR. FONDO:**  Your Honor, good morning.

            We do have one item we'd like to discuss.

            **THE COURT:**  Okay.

            **MR. FONDO:**  We wanted to discuss a briefing schedule relating to the motion for a mistrial.

            **THE COURT:**  Okay.

            **MR. FONDO:**  We proposed a schedule -- we haven't had a chance to check with the Government on it, but we did propose a schedule last night of seven days -- the defense will submit something seven calendar days after receipt of the final transcript.  That includes the Friday hearing.  And then the Government will have seven days to oppose, and then defense will have five days for a reply.

            **THE COURT:**  Fine with me.

            Is that okay?

            **MR. CHANG:**  Your Honor, we got this request from defense counsel shortly after 11:00 p.m. last night.

            As Your Honor knows, the jury has been impaneled and

sworn in.  And so our preference is, given where we are, that this can be an issue that can be resolved and grouped in with the other post-trial motions.  And that's our position on this issue in particular.

THE COURT:  Why isn't that right?  I mean, normally, you would either -- I mean, when you get a Batson challenge, you would either deny the challenge; or if you don't do that, it would -- it would normally be raised in a post-trial motion.

Is there any reason not to do it that way this time?

MR. FONDO:  So we're fine with that schedule.

THE COURT:  I mean, I know that I kind of blurted out it's denied without prejudice to filing a motion for a mistrial; but on reflection, why not just do it as part of the post-trial motions?

MR. FONDO:  That's fine, Your Honor.  And I would just note that we did object at the time.

THE COURT:  Yes.

MR. FONDO:  And so -- but, yes, that's fine.  If the Court would prefer we brief it after the trial, we're happy to do that as well.

THE COURT:  Okay.  We'll just do it as part of normal post-trial motions then --

MR. FONDO:  Okay.

THE COURT:  -- if necessary.

MR. FONDO:  Thank you.

MR. CHANG:  One issue from the Government, Your Honor.

The parties exchanged demonstratives and slides for today's opening statements.  The first slide in the defendant's opening statement -- and I assume Your Honor has not had the opportunity to look at it, so I have a hard copy of it.

THE COURT:  Okay.

MR. CHANG:  If you wouldn't --

THE COURT:  Sure.

MR. CHANG:  -- wouldn't mind, pass it up to Ms. Sharma.

(Document handed up to the Court.)

THE COURT:  Okay.

MR. CHANG:  So the Government would like to lodge a formal objection to this first slide of the demonstrative.

As Your Honor may know, a trend in the white collar bar has been to quantify or illustrate during jury addresses what is the "beyond a reasonable doubt" standard.

Our position is that the Court should exclude such a demonstrative.  This is the kind of demonstrative that essentially tries to quantify the reasonable doubt standard, and courts have said -- for example, the Supreme Court has said, quote [as read]:

"Attempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury."

That's *Holland v. United States*, 348 U.S. 121.  It's a 1954 case.

And the Ninth Circuit, for its part, has found structural error when reasonable doubt was quantified on a scale of 1 to 10.  That's *Reed vs. Roe*.  It's a memorandum disposition, 100 F.3d 964 Ninth Circuit case from 1996.

And other circuits, including the Third and the Tenth, have essentially said that that's incorrect to try to quantify or illustrate the reasonable doubt standard.

As Your Honor is well aware, you will be instructing the jury on what reasonable doubt is, and we believe that that is sufficient and appropriate for a case like this.

**THE COURT:**  Okay.  The objection is overruled.

I don't see anything wrong with the chart.  Obviously, the chart doesn't attempt to quantify the reasonable doubt standard, and I'm assuming that the defense will not do that in its opening statement.  And if it does, you can object.

**MR. CHANG:**  Thank you, Your Honor.

**THE COURT:**  Anything else?

**MS. KRSULICH:**  Nothing further from the defense.

**THE COURT:**  Did I impose time limits for opening statements?

**MS. KRSULICH:**  You did not, Your Honor.

**THE COURT:**  How could I have forgotten to do that?

(Laughter.)

MS. KRSULICH: We're all reasonable people, Your Honor.

THE COURT: I don't know about that.

(Laughter.)

THE COURT: How long do the parties estimate their opening statements are?

MR. CHANG: The Government's will be about 45 minutes, Your Honor.

MS. KRSULICH: Same.

THE COURT: Okay. That's probably what I would have imposed, so that sounds good.

Okay. I am going to -- sorry.

MR. CHANG: One more issue --

THE COURT: Yeah.

MR. CHANG: -- that my colleague reminded me of.

Defense has filed another administrative motion to consider whether a party's materials should be sealed. We would request that we sort out sealing issues post-trial at this point, given the work that's involved in the day to day of a trial.

THE COURT: Oh. Yeah, I forgot -- we ran out of time before I could talk to you about sealing on Friday --

MR. CHANG: Yes.

THE COURT: -- right?

Yeah. I mean, the question is -- and as I sit here, I

**PROCEEDINGS**

don't remember -- I had it on the agenda to talk to you, and then we ran out of time.  As I sit here, I don't remember what guidance I was planning to give you regarding sealing.

I think that -- I think that what I was going to say is that the Government's, like, in the ballpark enough on what it's sealing and what it's not sealing that any sort of minor changes that we need to make to what is sealed and what is not sealed, we can work it out after trial.

I think that's what I was prepared to say.  But let me just go back and look at that, and I'll -- if I need to raise anything with you, I'll raise it at the end of the trial day today.

**MR. CHANG:**  Great.  Thank you, Your Honor.

**THE COURT:**  Okay.

**MS. KRSULICH:**  Your Honor, there's one issue related to that.  On Slide 21, there's a side-by-side comparison of an alleged trade secret document and something in a public patent filing.  We're planning to refer to that image during opening. Just want to make sure that there's no issue with showing that to the gallery or whether we need to just focus it on the jury.

**MS. PRIEDEMAN:**  That's fine to show it publicly.

**MS. KRSULICH:**  Okay.

**THE COURT:**  Okay.  All right.  Sounds good.

I will -- we'll have the jury -- we'll have the jury ready to come out right at 9:30, assuming all the jurors have

arrived by then.  Okay.

MR. CHANG:  Thank you, Your Honor.

MS. KRSULICH:  Thank you.

THE COURT:  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 9:11 a.m.)

(Proceedings resumed at 9:36 a.m.)

(Proceedings were heard out of the presence of the jury.)

THE COURT:  We have one juror straggling a little bit late, so he's getting it together, and Bhavna will bring them in in just a minute.

MR. CHANG:  Thank you, Your Honor.

THE COURT:  And remember, I need to still give them their preliminary instructions since I didn't do that at the end of the day on Wednesday.

(Recess taken at 9:37 a.m.)

(Proceedings resumed at 9:40 a.m.)

(Proceedings were heard in the presence of the jury.)

THE COURTROOM DEPUTY:  Please be seated.

THE COURT:  Okay.  Welcome back, everybody.

Quick note first for Jurors 15 and 16.  If you are having difficulty seeing the witness from where you're seated, you should not hesitate to move your chairs.  And you can push that screen back a little bit to angle yourself in a way that you can see the witness.

And if you need help resituating that equipment or anything, just let Bhavna know.  Okay?

All right.  So at the end of the day on Wednesday when you were selected, I did not read to you all of the preliminary instructions because it had been a long day, and I told you I would start the day today by doing that.  So let me give you your preliminary instructions.

You will get a full copy -- each of you will get a full copy set of written instructions at the end of trial for your deliberations.  That will include a lot more.  That'll include these preliminary instructions that I'm giving you now, as well as a number of substantive instructions on the elements of the offenses that the Government is charging.

So don't worry about the fact that you don't know all that stuff now.  Your job will be to pay attention to the evidence, pay attention to the facts, and you'll get a detailed set of written instructions from me at the end of trial on the law.

## PRELIMINARY JURY INSTRUCTIONS

**THE COURT:**  So when you deliberate, as we discussed on Wednesday, it'll be your duty to weigh and to evaluate all the evidence received in the case and, in that process, to decide the facts.  You will be required to apply the law as I give it to you to the facts as you find them, whether you agree with the law or not.  And you must decide the case solely on the

evidence and the law before you.

Perform these duties fairly and objectively and impartially. You should not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances. Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases. That includes unconscious biases.

And I know you saw a video about unconscious bias in the Jury Office.

Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention. And like conscious bias, unconscious bias can affect how we evaluate information and make decisions.

I'll repeat what I told you on Wednesday about the charges in the case and the presumption of innocence.

This is a criminal case brought by the United States Government. The Government accuses the defendant of theft of trade secrets and economic espionage. Specifically, the Government alleges that the defendant, while he worked for Google, stole files containing information about Google's artificial intelligence computing infrastructure.

The Government alleges that the defendant took this information to benefit himself, at least one Chinese company,

and entities controlled by the Chinese government.

The defendant has pleaded not guilty to the charges and is presumed innocent unless and until the Government proves the defendant guilty beyond a reasonable doubt.  The defendant has the right to remain silent and never has to prove innocence or present any evidence.

Now, we talked a lot about how you need to focus only on the evidence that comes into this courtroom.

What is evidence.  The evidence that you're to consider in deciding what the facts are consists of:  One, the sworn testimony of any witness; two, any exhibits received in evidence; and, three, any facts to which the parties have agreed.

That third type of evidence is called a stipulation, and it's where the parties agree that a certain fact exists and you should treat that fact as having been proven.  So along the way, we may inform you of some stipulations that the parties have reached.

What is not evidence.  The following things are not evidence and you should not consider them in deciding what the facts are.  Questions, statements, objections, and arguments by lawyers are not evidence.  The lawyers are not witnesses.  You have to consider a lawyer's questions to understand the answers of a witness, but the lawyer's questions themselves are not evidence.

Similarly, what the lawyers are going to say in their opening statements or in their closing arguments at the end of trial and what they say at other times throughout trial, it's intended to help you interpret the evidence, but what they say is not evidence.  If the facts as you remember them differ from the way the lawyers state them, then your memory controls.

Number two, any testimony that I instruct you to disregard is not evidence.

And number three, anything that you have seen or heard while the Court is not in session or may see or hear while the Court is not in session is not evidence, and you're to decide the case solely on the evidence received in trial.

Now, let's talk for a minute about direct and circumstantial evidence and the difference between those two things.  I'm going to read you an instruction, but it's a little bit hard to follow, so I'll give you kind of a concrete example after I read you the instruction.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence, that is, proof of one or more facts from which you can find another fact.

And you are to consider both direct and circumstantial evidence.  Either can be used to prove any fact.  The law makes no distinction between the weight to be given to either direct

or circumstantial evidence.  It's for you to decide how much weight to give to any particular evidence.

And let me give you an example of the difference between direct and circumstantial evidence.  Let's say you wake up in the middle of the night and you look out the window and you see that it's raining or you wake up in the middle of the night and you hear rain coming down; right?  That is direct evidence that it rained last night.  So if you come in and you testify that "I woke up and I heard it raining or I saw it raining," that is direct evidence that it rained last night.

On the other hand, let's say you wake up in the morning and you look out the window and you see that the ground is wet; right?  That is not direct evidence that it rained last night, but it is circumstantial -- the fact that the ground is wet is, of course, strong circumstantial evidence that it rained last night.  And if you testify to that at trial, you're providing circumstantial evidence.

So, again, you're -- it's up to you to decide how much weight to give to each type of evidence, but the law draws no distinction between the two types of evidence.

There are rules of evidence that control what can be received into evidence during the trial.  When a lawyer asks a question or offers an exhibit in evidence and a lawyer on the other side thinks that is not permitted by the rules of evidence, that lawyer may object.  If I overrule the objection,

the question may be answered or the exhibit may be received. If I sustain the objection, the question cannot be answered or the exhibit cannot be received. Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer would have been.

And as I mentioned, sometimes I may order that evidence be stricken from the record and that you disregard or ignore the evidence. And that means when you're deciding the case, you must not consider the evidence that I told you to disregard.

Let's talk about the credibility of witnesses. In deciding the facts of the case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

And in considering the testimony of any witness, you may take into account a number of things: the opportunity and ability of the witness to see or hear or know the things they testified to; the witness's memory; the witness's manner while testifying, although keep in mind that different people have different reactions to the pressure of testifying in a courtroom; the witness's interest in the outcome of the case, if any; the witness's bias or prejudice, if any; whether other evidence contradicted the witness's testimony; the reasonableness of the witness's testimony in light of all the

evidence; and any other factors that you find bear on the believability of the witness's testimony.

Again, you must avoid bias, conscious or unconscious, when evaluating the testimony of a witness.

Sometimes a witness may say something that is not consistent with something else they said.  Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose to believe -- you may choose not to believe anything the witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What's important is how believable the witnesses were and how much weight you think their testimony deserves.

Now, on Wednesday I did read you a lengthy instruction about your conduct as jurors, and I won't read that entire

instruction to you again.  But I do want to remind you, and I will continue to remind you during the trial, about your duty as jurors -- right? -- because it's really important.

If anybody tries to communicate with you in any way about this trial or the subject matter of this trial, you should not respond, and you should report that to Bhavna or me immediately.

You should not have any communications with anybody else about this case -- right? -- about the evidence you're hearing, about the nature of the case, and you should not allow anybody else to communicate with you.

Obviously, people may ask you, like, "How long do you think you have left in the trial?" or "How long do you think you'll be gone?  When do you think you'll be coming back to work?"  You can answer those kinds of scheduling questions, but any follow-up questions that may be asked of you by household members, by people at work, or by anybody else, you should just say that I have ordered you not to respond further to any questions about the case; right?

And you should not be communicating about this case in any way, on email, on social media, over texts, over the phone, or in any way at all.

Finally, you need to make sure that you're not exposed to any type of outside information.  If you see any media report that you think might be about this case, turn away

immediately and let us know that you were exposed to something.

Don't try to do any of your outside research on the facts of the case, any of the places involved, any of the people involved, anything like that.  No Internet research.

It's very important, it's critical that you decide the case only based on the evidence that you hear in this courtroom.  And if any juror violates that restriction, that could cause a mistrial and it would require the whole process to start over.

Now, at the end of trial, you'll have to make your decision based on what you recall of the evidence.  You will not have a written transcript of the trial in the jury room.  So I urge you to pay close attention to the testimony as it is given.

Now, the next question is always:  Okay.  We won't have a transcript, but can we take notes?  And as I said to you on Wednesday, you can take notes.  You'll each have a pad and pen available to you.  If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to begin your deliberations.  Okay?

Also, don't let note-taking distract you from being attentive.  You know, in law school, I was always someone who sat kind of towards the back of the class, and I would look down and I would see the students in the front of the class were furiously trying to write down everything that the

professor was saying.  And I always thought:  They can't really be absorbing everything the professor is saying if they're furiously trying to write down everything the professor is saying.  And I think that's even more true of a jury trial, where you need to be evaluating the witnesses; right?

And so I urge you not to take too many notes, not to try to take anything down.  It will only cause you to miss something important in trial.  Make sure to pay attention to the questions the lawyers are asking and the way the witnesses are answering.

Also, although you won't have a trial transcript in the jury room, if you decide during your deliberations that it's important to hear certain testimony again, you can request that testimony to be read back to the jury.

And the way that would work is we would bring you all back into the courtroom, and the court reporter would read the testimony aloud.  And keep in mind also that even if you request that a particular portion of testimony be read back to you, I may order that a larger portion of the testimony be read back to you to ensure that you're reminded of the full context and to protect the fairness for both parties.

So whether or not you take notes, you should be relying on your own memory of the evidence.  Notes are only to assist your memory, and you should not be overly influenced by your notes or the notes of your fellow jurors.

So those are the preliminary instructions.  You'll get those along with a number of other instructions at the end, as I said.

So now we will begin with opening statements from the parties.  And after that, the Government will call its first witness.

So, Mr. Boome.

**MR. BOOME:**  Thank you, Your Honor.

Good morning, everyone.

Your Honor, is there anywhere I can see what slide we're on?

Can this monitor be turned on, Bhavna?

### OPENING STATEMENT

**MR. BOOME:**  Good morning.  This case is about the defendant's theft, his greed, and his lies.

While the defendant worked for Google, he stole thousands of pages of confidential documents about Google's artificial intelligence supercomputing technology.  This is technology that Google invented and that it doesn't share with the outside world.

While he did that, while he stole those documents and while he worked for Google, he secretly founded his own artificial intelligence supercomputing company in China, and he promoted that company and pitched it to --

**THE COURT:**  Hold on a second, Mr. Boome.

(Discussion off the record.)

**MR. BOOME:**  As the defendant stole those documents from Google and continued to work for Google, he secretly founded his own artificial intelligence supercomputing company in China, and he pitched it to investors by telling them that he could replicate Google's technology.

This is the defendant on a stage in Beijing, China's capital city.  The date is November 24th, 2023, and the defendant's giving a speech to a room full of investors about his AI start-up company.

He told the crowd on that day that his company could create a product for artificial intelligence supercomputing that was better and faster that anything else that existed in China at the time.

He told the crowd that he was one of only ten people in the entire world who could build a product like this, and he could do it because of his experience at Google.

He told the crowd that when he worked for Google, he was the architect, he led the teams who built Google's artificial intelligence supercomputers, and he told the crowd that he could copy that technology in China.

The evidence will show, members of the jury, that while he was on this stage, the defendant's secret was that he was not who he said he was.  He was not the architect of Google's artificial intelligence supercomputers, and he wasn't

a former Google employee at all.

As he stood there on that stage in Beijing, he was still working for Google as a mid-level software engineer.  And for the 18 months leading up to this presentation, this moment on stage, the defendant had been stealing over 1200 documents containing proprietary technology, including trade secrets, about Google's AI supercomputers.

This is technology that it took Google engineers more than a decade to develop.  It's technology that Google keeps secret.  And the evidence will show that the defendant knew that when he took it.

While the defendant stole these documents and while he continued to work for Google the entire time, he secretly founded the start-up company that he's on stage talking about right here.  And he hid it all.  He hid it all from Google.  And during this trial, you're going to hear some of the extraordinary things the defendant did to keep this all a secret while he stockpiled the documents and founded his company.

You'll hear, for example, that the defendant lied to a Google investigator about the documents he had.  You will hear that he impersonated a senior-level Google executive.  You'll hear that he deleted evidence from his Google computer once he found out that he was caught.  And you will hear the way he hid this trip to China from Google.

He's on stage here in November of 2023.  And before he left for China, he gave his Google access badge to his former intern, and he told her to scan that badge for him on the Google campus in Sunnyvale to make it look like he was showing up for work when he was actually here, pitching his company to investors, claiming that he had invented a product that could replicate Google's technology.

I want to be very clear about something.  It's not a crime to leave a big company like Google and go start a business.  It's not a crime to leave a company like Google and go start a business in China.  That's not what this case is about, and that's not why we're here.

But what you can't do is take technology, proprietary technology that doesn't belong to you, that you didn't create, that was invented by other people, technology that is the life's work of other people, you can't take that technology, build a business based on it, and try to make money for yourself.  You can't take that technology to build your business and then offer to help a foreign government build the very same technology that you stole.  That's why we're here and what this case is about.

Before I go further, it's been almost a week since we met last.  I want to reintroduce myself.  My name is Casey Boome.  My colleagues Molly Priedeman and Roland Chang and I are Assistant United States Attorneys.  We work here at

the U.S. Attorney's Office in San Francisco, and we're the lawyers who represent the United States Government in this case.

At the end of our table is Veronica Hernandez. She's a paralegal on this case. She also works with the U.S. Attorney's Office, and she'll be managing a lot of the exhibits and the evidence that you'll all see during this trial.

And next to her, in between Mr. Chang and Ms. Hernandez, is FBI Special Agent Andrea Valladao. She is the lead investigator in this case from the beginning.

This opening statement is our opportunity to preview for you the evidence that you're going to hear during this trial, and so I want to lay out for you the topics that we're going to cover.

First, we'll talk about the technology that the defendant stole, why it's valuable, and what makes it a trade secret. We'll talk about how Google protected that technology, how the defendant stole it. We'll talk about the evidence that shows what he intended to do with it after he stole it. And, finally, we'll talk about how the defendant hid it all, his theft of the documents and his secret AI company in China.

So, first, the technology. As you probably remember from jury selection, this case is about AI technology. And I remember when Mr. Chang asked you all during jury selection how

many of you had had some experience with something like a ChatGPT or a Gemini or a Claude, the chatbots that we can access on our phones and computers that can make us a video that doesn't exist in the world before, or we can ask questions and get intelligent responses.  Those types of applications that we have on our phones, those chatbots, those are artificial intelligence applications.

The technology in this case focuses on artificial intelligence supercomputers.  You can't have those applications like the ChatGPTs of the world without AI supercomputers to make them work.  These are not the types of computers that you can go to Costco or Best Buy and buy off the shelf.  These are massive computers that take up entire buildings, and they'll set you back a few billion dollars if you're in the market for one.

So why is all this computing power required for artificial intelligence?  The answer to that question is that it takes a lot of computing power to make AI smart, to make AI intelligent.  ChatGPT does not start out as the amazing tool that some of us have experienced on our phones.  It needs to be trained first.  And the thing that gets trained when you make an AI bot like ChatGPT is called a model.

An artificial intelligence model starts out as just empty space on a giant supercomputer, and that's when the machine learning process begins.  And in this process, the

model takes in an incredible amount of data, text, video, photos, documents, the Internet, everything.  It ingests, it processes that data, it organizes it, and it learns from it so that when you ask ChatGPT a question, you get the intelligent response that feels and looks like human intelligence.

So if you wanted to see one of these supercomputers, you would go to a place like this.  This is one of Google's data centers.  And during this trial, the Government's first witness is going to be Mark Lohmeyer.  He is a Google executive who's in charge of Google's AI business strategy, and he's going to explain that Google has more than 100 data centers like this all across the world.

If you went inside, you would see something like this.  What we're looking at here are rows and rows and rows of computer servers and tens of thousands -- thousands upon thousands of ultra high-powered computer chips that are specially designed for AI and machine learning.

What Mr. Lohmeyer will explain is that Google uses its data centers and the computers in them for its own AI work, like training Gemini, which is Google's AI chatbot.  But what it also does is it rents out, it leases the computing power in these data centers to other companies.

And the reason why I'm mentioning this is because part of what this case is about is the technology that the defendant stole.  The economic value of that technology is an important

part of this case.  So that's why I mention that the AI supercomputing business is growing fast all around the world. There's a lot of competition.  In the United States, there's competition between Google and Microsoft and Amazon.  Companies based and headquartered in China also compete for this business because they have data centers all around the world.

What makes a company in this business stand out is its technology.  And the name of the game is speed, reliability, and efficiency.  How much reliable, fast supercomputing power can you deliver for your customers for the lowest possible cost.  That's what this technology is about.

The documents that the defendant stole in this case contained information about the computer chips that go into these data centers, the connections between those chips that allows them to communicate, and the specialized software that organizes the work that the chips do and gets them to work as one supercomputer.

You're going to hear that the technology that goes into building these data centers is the result of decades of work by thousands upon thousands of Google engineers and a lot of investment by the company.

And the evidence in this case is going to show that the defendant's goal was to just skip all that, skip the time, skip the investment, skip the hard work, and just steal the technology so he could use it for himself for his AI start-up

company.  And that's what this case is about.  That's what the charges in this case allege.

I'm going to talk for a little bit about those charges now.  The defendant is charged with seven counts of theft of trade secrets and seven counts of economic espionage.

And before I mention some things about the charges, I want to remind you quickly about something that you learned during jury selection, which is that it's the judge in the case that will give you your legal instructions.  And that'll happen at the very end of the case when Judge Chhabria instructs you on what the law is.  So that's not what I'm doing now.  I'm just giving you a high-level preview of some of the concepts you'll hear about, and I hope that that will help you put some of the evidence in context.

Theft of trade secrets means stealing technology that is valuable, secret, and protected, intending to use it for the benefit of somebody other than the owner.  And in this case, what we intend to prove is that the defendant stole Google's AI technology and intended to benefit himself and the company that he founded secretly in China.

The economic espionage charges are similar.  What they're about is stealing a trade secret knowing or intending that stealing that trade secret will benefit a foreign government or any organization controlled by a foreign government.  And in this case, we're talking about

the government of China because that's where the defendant went with these trade secrets.

Espionage is in the name of the crime, but this is not a case about spying.  Mr. Ding is not James Bond, and you will not hear any type of evidence like that in this case.  It's about what Mr. Ding intended to do with the trade secrets when he stole them and kept them.

We are the Government.  We have the burden of proof in this case, and we intend to meet that burden by proving to you that the defendant's guilty beyond a reasonable doubt.  But there are some things that we don't have to prove, and I want to mention a couple of them now.

We do not have to prove that the defendant gave the trade secrets to anyone.  We don't have to prove that he shared them with anyone.  We don't have to prove that he actually successfully used them to build a product for his start-up company.  What matters for these charges is what the defendant intended to do with the trade secrets at the time he stole them and at the time he kept them.

So why seven counts of each charge?  It's because there are seven trade secret categories in this case, seven categories of information, each relating to a different aspect of Google's AI supercomputing technology.

And I cannot sugarcoat this part for you because it is true that when it's time for you to learn about these trade

secrets and learn about the documents and learn about the technology in each category, this case is going to get very technical and it's going to get very complicated; but I promise you, you're going to have expert guidance the entire time.

You're going to hear from a very senior-level Google engineer who helped to develop this technology and who uses it every day.

And you're also going to hear from an independent expert. His name is Daniel Sanchez. He knows the Bay Area because he got his Ph.D. from Stanford University. And for the last 13 years, he's been a professor at the Massachusetts Institute of Technology, or MIT, where he teaches computer science and electrical engineering. He also works in MIT's artificial intelligence laboratory.

So Professor Sanchez and the Google engineers will explain when they testify that the technology in the documents that the defendant stole is valuable and it cannot be found anywhere else except Google.

These witnesses who testify about the technology are going to walk you through each trade secret category, and I quickly want to highlight them for you here. This is just a preview. You don't have to remember this now. You'll hear a lot more about these categories later.

But at a high level, Categories 1 through 3 are about a computer chip specifically designed and invented by Google

for artificial intelligence and machine learning.  It's called a Tensor Processing Unit, or a TPU.  Categories 1 through 3 are the supercomputers that Google makes with these chips.

Categories 4 and 5 are about the supercomputers that Google makes with a different type of chip called a graphics processing unit, or a GPU.  Unlike the TPU which Google invented, Google did not invent the GPU.  They purchased the GPUs that go into their data centers from other companies.  So the technology in Categories 4 and 5 is about how Google turns those chips into a supercomputer for artificial intelligence.

Categories 6 and 7 is about high-speed networking technology that allows all those servers that we saw in the data center to communicate with the data center network.

When it comes time for you to make your decision in this case -- first, you will learn that there are 105 documents.  105 of the documents that the defendant stole make up each of these trade secret categories.  There are certain documents that belong with each category, and we're going to lay that all out for you during this trial.

But the important thing that you have to know is that when it comes time for you to make your decision, what you'll have to decide is whether there is at least one trade secret in each trade secret category.  You're not going to have to go and decide together whether every single one of those 105 documents contains a trade secret.  What you'll be asked to find is

whether there's at least one trade secret in each category.

Something else you'll learn about from Dr. Sanchez and the Google engineers is that some of the technology in these documents is available in public.  That's because Google publishes some of the information about its AI supercomputer technologies on its website and in academic research papers. Google also patents some aspects of its AI technology.

But what you'll hear is that Google does not make public and, instead, keeps secret and protects information that gives the company a competitive advantage.  And that's what was in the documents that the defendant stole.

Another thing that you'll hear from Judge Chhabria during your legal instructions -- and I'm going to give you a quick preview of it here -- is that a trade secret can be a combination of information that is secret, combined with information that is publicly known.  And that's exactly what the case is here.

Some information in the trade secret documents for each category is publicly available, and other information in those documents is secret and only available from Google.  It's the combination of that information in each document and in each trade secret category that matters.  The combination of that information is secret and valuable and protected, and that's what makes it a trade secret.

Let's talk about what Google did to protect its

confidential technology.  Google protects this information because it's valuable to the company and because Google wants to use it for itself and they want to keep it from their competitors.

Another reason I'm mentioning how Google protects this information is because, remember, a trade secret has to be valuable, secret, and protected.  And so part of this case is going to be about what Google did to protect the information that the defendant stole.

You're going to hear during this trial from a witness named Heather Adkins.  She is an executive in charge of security engineering at Google.  And what she's going to explain is that Google has a security system in layers.  She calls it a layered security system.  And there are three layers that she's going to tell you about:  trainings and policies, physical security, and computer and network security.  I'm going to briefly preview the testimony you'll hear for each layer right now.

So, first, as to trainings and policies, this is how Google conveys to its employees what they can and can't do with the company's sensitive technology that the company has invented and the company protects.

Ms. Adkins will explain that Google employees receive a very clear message, and that message is summarized like this: Google is a company with a lot of confidential and secret

technology.  It's a technology company that invents things and innovates, and when you come here as an employee, we want you to be a part of that.  You should come here and help the company innovate.  You should grow your own career by learning new things.  But there's a very clear and a very simple rule that everyone has to follow:  You cannot take the company's secret technology outside the company.  It's a very simple bargain.

The defendant took all those trainings, the defendant signed all those agreements, and the evidence in this case will show that he ignored all the trainings and violated the agreements that he signed when he brazenly stole more than 1200 documents, more than 14,000 pages containing the company's proprietary information.

Physical security.  The goal of the physical security system at Google is pretty simple.  It's just to make sure that only trusted people are authorized to be on the Google campus, and that includes their data centers.  The way they do that is by requiring employees to scan a badge to enter the buildings and use the elevators.  They require that visitors are registered.  And there are also some surveillance cameras at entry points, and you're going to see some of that video during this case.

Next let's talk about network security and computer security.  You're actually going to see a video in this case

that will show you what it takes to log into a Google computer and get into the Google network where the company's technology and confidential information is stored.  The way that process works is, first, sit down at your Google computer, enter a username and password.  That gets you into the laptop, but it doesn't get into the network where the technology and documents are stored.

There's another step you have to take to get into the network, which involves entering another set of username and password, more credentials.  And then you have to touch your finger on a specialized device that Google gives to all its employees.  It plugs into your laptop and it scans your finger to make sure that you are a real person and you are the right person, a trusted employee.

Once you take those steps and you can get into the network where the documents and technology are stored, pretty much everything that goes on in that network is tracked and logged by the security system.  Documents that are visited by Google employees, every document that's printed, shared, uploaded, downloaded, all that activity is logged and tracked by the security system.  It goes into a database, and it's used by an automated threat detection system to try to detect and find out when something is going wrong, if there's any threat to the company's data from the inside or from the outside.

So with all this in place, with this system, what I

want to talk about now is how the defendant managed to get around it to take 1200 documents outside the company.

During this trial, you're going to hear from a witness from the Google security team, and his name is Matt Linton. Matt Linton was part of the team that responded and initially was a part of Google's internal investigation of the defendant once they found out what he was up to. He'll explain that the way the defendant created the documents that he stole helped him avoid detection by Google's security system.

So let's walk through the steps that the defendant took to get these documents containing Google's proprietary technology off the network.

His first step was to go to the internal documents in the Google network that contained the confidential and the trade secret technology. He visited these documents, but it wasn't these source documents that he transferred off the network. Instead, what he did was he copied information from the internal documents. He copied text, he copied diagrams, tables, schematics, you name it. Everything in the documents that he wanted to take, he copied and pasted them into the Apple Notes application on his Google work computer.

Apple Notes is like a digital notebook that comes standard on Mac products, on Apple products like the one Google gave the defendant to do his work.

He pasted the information from the source documents

into the Apple Notes, and when he had what he wanted, he converted them to PDFs and uploaded them off the network.

PDFs are a type of document that's easy to send digitally from place to place.

Once he had the PDFs, he sent them from his Google computer, uploaded them to a personal cloud account that he controlled, linweidin@gmail.com.

Mr. Linton will explain that while the defendant copied the confidential and trade secret information from the source documents, he did not copy a lot of the identifying information for those documents.

For instance, many of the documents the defendant stole from had confidentiality markings on them.  He didn't copy those.  Many of the documents the defendant stole from had the names of the authors, the names of the inventors on the documents, but he didn't copy that either.

And what Mr. Linton will explain is that the absence of that identifying information made it more difficult for the automated security system to find out what the defendant was up to when he was transferring files off of the Google network to his personal account.

Another witness you'll hear from about how the defendant stole the documents is an independent expert named Andy Crain.  He is a computer forensics expert.  And he's looked at the digital evidence that was recovered in this case,

and what he'll explain to you is that in total, over the course of about a year, between May of 2022 and May of 2023, the defendant transferred 1,255 documents, a total of over 14,000 pages, including more than 4,000 individual screenshots, from his Google computer to this personal cloud account.

105 of those documents are the trade secret documents that this case is going to focus on, 105 from that group.

Now I want to change gears and talk about the evidence you'll see in this trial that shows what the defendant intended to do with the information he stole from Google.  And the reason that you'll get to see some of this evidence, and it will include -- it'll include all the things that the defendant was trying to hide from Google at the time.  It'll include evidence about the things he said and the things he did as he was founding his start-up company, his artificial intelligence start-up company in China and marketing that company to investors.

And the reason you'll get to see this information at this trial is because Special Agent Valladao and her team got a search warrant for the defendant's home, his computer, his phone, some of his other electronic devices, and the cloud account that he sent the trade secret documents to.

When Special Agent Valladao testifies later in the trial, she'll walk you through a timeline that's apparent from the evidence that she recovered, and it starts in 2019 when the

defendant joined Google as a software engineer.

About a year later, a little more than a year later, the defendant started looking for a job in China. And there's nothing wrong with that. Not a crime. But the timing here is important for the following reason: The defendant started communicating with a recruiter in China about finding a job in August of 2020. Remember that date, August of 2020.

What you'll see is that between the time he was hired at Google until right around August of 2020, he hardly made any Notes files on his Google laptop. He started creating Notes files by copying from internal Google documents right around the time he started talking to that recruiter in China.

He initially didn't get the jobs that he interviewed for, but he kept at it until he found a company based in Beijing called Rongshu. It was a technology company based in China called Rongshu. The defendant interviewed for that company in May of 2022. He interviewed to become the company's chief technology officer.

And there's something else in this case that happened in May of 2022. It was the first time that the defendant uploaded a large batch of confidential and trade secret documents from his Google computer to his personal cloud account.

The defendant took the job. He got the job. He flew to Beijing in November of 2022 and started working as Rongshu's

chief technology officer.  By this time, by November of 2022, he had uploaded an additional 500 documents, including more than 50 of the trade secret documents in this case.

But soon after he arrived in Beijing, the defendant and the CEO of Rongshu started a new business plan.  They had a new idea for an artificial intelligence supercomputing company that was called Zhisuan Technology.  They started trying to raise money for this company.

And you're going to hear about something that happened on April 17th of 2023, when the defendant and his partner had a big meeting with a Chinese investment bank, a big investment bank based in China.  It was on the day of this meeting, when they met with this -- these investors to pitch the artificial intelligence supercomputing company, that the defendant transferred the largest batch of confidential and trade secret documents in the case, nearly 400 documents in total and over -- and 50, exactly 50 of the trade secret documents in this case.

But the month after, in May of 2022, the defendant broke away from his business partner and he took over the company himself.  He took over Zhisuan Technology himself and he became the company's CEO.  The first thing he did was apply for the MiraclePlus program.

Before I talk about MiraclePlus, I just want to make clear, this whole time, the defendant was still working

full-time for Google.  He never told Google that he had become the CTO of Rongshu in Beijing.  He never told Google that he had founded his own AI start-up company because, as you'll hear from Google witnesses, had he told them that, he would have been fired and his access to Google's technology would have been terminated.  So this whole time he's working for Google, collecting his Google paycheck, and still has access to Google's confidential internal information.

So MiraclePlus.  You'll hear during this trial that MiraclePlus is a start-up incubation program, and what you'll hear is that that means it is a program where start-up company founders apply.  If they get accepted, they'll get investment capital.  They'll get introductions to investors and help making a business plan and pitching that business plan to investors.

You'll hear about some things that the defendant did during his application process to this program, and I'm going to mention two of those things right now.

First, as part of his application, the defendant needed to submit a product demonstration video for the product that he claimed his company could build.  But instead of doing that, what he did was he took his Google work computer and he took a video of some Google technology running on his computer. He took that video and he sent it to MiraclePlus, claiming that it was a product demonstration video for a product that his

company had created.

The second thing he did during the application process that you'll learn about is he faked a professional reference from a senior-level Google executive.  During his application to MiraclePlus, they asked him for a professional reference.  The name the defendant gave was Aamer Mahmood.

The real Aamer Mahmood is a senior-level Google executive, very high up the food chain at Google, like the defendant's boss's boss's boss's boss or maybe even more layers than that.

The defendant gave MiraclePlus Aamer Mahmood's name and he gave them an email address, aamermahmood@gmail.com.

You're going to hear from the real Aamer Mahmood during this trial.  He will tell you he has never met the defendant.  He doesn't know the defendant.  The defendant never asked him to be a reference for him.  And he's going to say that aamermahmood@gmail.com is not his email address.

The defendant made it up.  It's a complete fake.  The defendant created it so that he could communicate with MiraclePlus pretending to be Aamer Mahmood.  And you will see some of the emails that the defendant exchanged with MiraclePlus pretending to be his boss's boss's boss.

So the fake product demonstration video and the fake reference worked.  The defendant got into the program.  And you'll see the investment agreement, the contract that he

signed with MiraclePlus during this trial.

That contract says that the defendant promises to give 7 percent equity in Zhisuan, his company, to MiraclePlus in exchange for 5 million yuan.  The yuan is the Chinese currency. And you'll learn that at the time, 5 million yuan was worth a little more than 700,000 U.S. dollars.

So the culmination, the culmination of this program, the MiraclePlus program, was that speech that you saw at the beginning of this presentation.  This is the investor conference in Beijing, the MiraclePlus conference that took place on November 24th, 2023.

Special Agent Valladao will show you some of the evidence that she found that shows what the defendant planned to say to the investors that day and how he planned to pitch his company at this meeting.

You will hear, in the defendant's own words, a video of what he planned to say to the investors.  You'll hear him say that his company can create a product that can connect tens of thousands of computer chips into one and make them work like a supercomputer.  You'll hear him say he was one of only ten people in the world who can do this because he worked at Google and he built Google's supercomputers and he can replicate Google's technology in China.

I want to talk for a little bit about the things the defendant said he could do to help groups and organizations

controlled by the government in China develop their AI technology.  But, again, here, it's important that I pause and say that it's not a crime to want China to succeed.  It's not a crime to want to help China.  That's not what the economic espionage charges in this case are about.

What they're about, again, is stealing technology that doesn't belong to you, that you didn't invent, stealing secret technology invented by other people and owned by someone else, and then trying to help a foreign government create the same technology that you stole.

And the reason that this trial's going to focus a lot on entities and organizations that are controlled by the Chinese government is because that's where the defendant went with this information.

So some of the evidence you'll hear, about how the defendant intended to help these organizations, you'll hear that he tried to create partnerships between his company, Zhisuan, and a government investment fund, a state-run research university, and a government-sponsored high-tech zone.  And when it comes -- and I'll talk about what that means in a second.

When it comes time to learn about how the government in China directs the economy and how these organizations are connected to the government, you're going to have expert guidance during that part of the case too.  This time from Adam

Segal.  Dr. Segal is an academic, he works at the Council on Foreign Relations, and he's an expert on the government and the technology industry in China.

And what he's going to explain is that the Chinese government, the government in Beijing, directs and controls the national economy in a way that's much different than the government interacts with the economy here in the United States.  He'll explain that the government controls state-run universities and charts a course for where it wants the economy to go.

And Dr. Segal will explain that most recently, artificial intelligence technology and artificial intelligence supercomputing technology is a major priority for economic development in China.  And one of the ways that the government promotes the development of this technology is by something called high-tech zones.

Dr. Segal will explain what those are.  And he'll actually tell you a story about something that happened here back in the 1980s, when a group of government officials from China came to Silicon Valley.  And what they wanted to do was learn about how and why Silicon Valley was successful.

Dr. Segal will explain --

**MS. KRSULICH:**  Objection, Your Honor.

**THE COURT:**  Overruled.

But I'll just remind everybody that the lawyers'

statements are not evidence, and you'll -- the statements that the lawyers make are designed to help you understand the evidence, but what really matters is the evidence that comes in at trial.

You can proceed.

**MR. BOOME:**  So what Dr. Segal will explain is that when these officials came here to Silicon Valley, their goal was to learn about what made Silicon Valley successful.  And when they went back to China, they started high-tech zones to try to replicate the recipe for success that they saw.

So what they brought together, as Dr. Segal will explain, is they brought together universities, they -- universities, venture capital, private sector businesses, and spaces for technology companies to grow.  That's what a high-tech zone is.  So the government brings all those things together and tries to innovate.

Dr. Segal will explain that all of these high-tech zones are controlled and sponsored by the Government.  And you'll see evidence that the defendant tried to build -- offered to build an artificial intelligence supercomputer for one specific high-tech zone in a place called Chongqing.  And you'll hear a lot more about that during the trial.

While the defendant was on the stage, giving this presentation, he actually -- he made reference to the high-tech zone, the state-run university, and the government investment

fund that he was seeking to create partnerships with.

But now I want to transition and talk about some of the other ways that the defendant told this crowd why his company could do what he claimed it could do.

So you see him here in this photo standing behind a giant white screen giving a speech to a room full of investors. And I want to show you one of the other slides that appeared behind him.  This is obviously a translated version, an English translation of the original Mandarin.

[As read]:

"Why we can do it.  We developed Google's tens-of-thousands-of-cards compute platform, replicate and upgrade it, and then build a platform adapted to domestic conditions."

What you'll learn is that the tens of thousands of cards compute platform, what that means is an AI supercomputer that connects tens of thousands of chips.

In this slide, the defendant stood on stage behind these letters that say [as read]:

"Replicate and upgrade.  We developed Google's technology, and we can replicate and upgrade it."

The red text was in the original.  That's not something we added.

I want to look at another presentation that the defendant prepared to pitch his company, and I want to look at

the way he describes his experience.  He says [as read]:

"Fewer than ten people worldwide have built or can build tens-of-thousands-of-cards compute platforms, and Mr. Linwei Ding is one of them."

Down in the next section, he says [as read]:

"The ten-thousand-scale compute platforms (60,000-TPU and 26,000-GPU) developed by the teams led by Mr. Linwei Ding at Google are currently being used by Google Research, Anthropic, DeepMind, and OpenAI.  Therefore, he is fully capable of replicating and upgrading Google's tens-of-thousands-of-card platforms and building compute platforms adapted to China's national conditions."

What you'll hear and what you'll learn during trial is that the reference to 60,000 TPU and 26,000 GPU, that means supercomputers with 60,000 TPUs and 26,000 GPUs.

The message is:  The defendant, Mr. Linwei Ding, has built these systems before and he can replicate it in China.

You're going to hear during this trial from a man named Ravi Kavuri.  He is an executive at Google who worked above the defendant.  He was the defendant's boss's boss's boss, but he's familiar with the defendant's work.

And Mr. Kavuri will explain that the way the defendant describes his experience and his capabilities here is

absolutely false.  He did not do the things that he said he did.  He did not build a 60,000-TPU supercomputer.  He did not build a 26,000-GPU supercomputer.

And I don't say that, you know -- I don't mean to demean the defendant's actual experience as a software engineer at Google.  I am 100 percent certain that I would be fired on Day One as a low-level software engineer.  So I'm not mentioning -- I'm not mentioning this to demean the defendant's experience.  But the reason I'm mentioning it is because it is a fact that the evidence will show in this case that this is not who the defendant was.  He didn't have this experience.

But what he did have by the time he said these things was the stolen trade secret documents that contained information about Google's TPU-based supercomputers and GPU-based supercomputers.

Sorry.

Okay.  Finally, I want to talk to you about the things the defendant did to hide what he was up to from Google, hide his theft of the documents, and hide his creation of his start-up company in China.

First, he lied to a Google investigator about the fact that he had these documents.  That happened in December of 2023 when the defendant was interviewed by a Google investigator about some documents that he had uploaded in early December of 2023.

Now, remember, this was about a week after he gave that speech in Beijing.  And the documents that the investigator reached out about were not the trade secret documents in this case.  It was something different.

At the time of this interview, Google had not yet found out about the 1200 documents the defendant had stolen containing the trade secrets in this case.  So this interview was about something totally different.  But here's what happened.

The investigator thought, based on the documents the defendant uploaded in December, it looked like the defendant was trying to leave the company and he was trying to collect names of high-level Google engineers to take with him to try to recruit when he left.

The defendant assured the investigator a week after his speech in Beijing that he had no intention of leaving the company.

The investigator reminded him that it was not allowed to take confidential, proprietary information off the Google network, and the defendant assured the investigator that he understood.  And not only that, he signed a sworn statement promising that he had no Google confidential information anywhere on his personal devices or personal accounts.

Let's take a look at the document he signed.  This is -- he signed this and sent it to the investigator on

December 8th, 2023.  It says [as read]:

"I have searched my personal possessions, including all devices, accounts, and documents in my custody or control for any non-public information originating from my job at Google (except personal information).

"I have permanently deleted or destroyed all copies of such information.  And as a result, I no longer have access to such information outside the scope of my employment."

At the bottom, he swears he's "attesting to the truth of these representations and I may face discipline or termination if anything proves untrue."

Six days later, six days after he signed this document, he went into that personal cloud account where he had his secret stash of more than 1200 documents, including the trade secret documents in this case, he copied every single one of them, and made a backup copy on his personal computer.  That was December 14th, six days after he signed this.

I mentioned earlier, when he was on that stage in Beijing giving the speech to the MiraclePlus crowd in November of 2023, he didn't have his Google access badge with him in China because he had left it with his former intern, and he told her to swipe the badge on Google's Sunnyvale campus while he was gone so that it would make it look like he was showing

up to work while he was actually on the stage in Beijing, raising money for his start-up company that he said could copy Google's technology.

You're going to hear from the defendant's former intern, the woman in this photo.  She's seen here right after swiping the defendant's badge at one of Google's access points.  She'll explain to you what the defendant said to her to convince her to do this for him, and she'll tell you that she scanned his badge more than a dozen times while he was in China, pitching his company to investors.

Finally, things kind of started unraveling for the defendant on December 29th of 2023, about a month after that speech in Beijing.  That was the day when Google received information that the defendant had presented, that he made that presentation on stage.  They found out that he was still a Google employee.  They identified him, found out who he was, found out he was still a Google employee with access to the company's confidential information, and they immediately cut off his network access.

You'll hear from Matt Linton, that security -- from the security team, who I mentioned earlier.  He'll walk you through everything that happened after Google found out about defendant's presentation.

But the first thing they did was cut off his network access.  A few hours later, the security system detected the

defendant's computer trying to log into the system, but the access was denied.  It was rejected.

So the defendant came into the Google campus in Sunnyvale at about 7:00 a.m.  He showed up, sat down at his desk, and he tried to log into the network again, but he was denied again.

What he did next, after he found out that something was up, he went to the place in his computer where he had the PDF documents stored, including the trade secret documents, the PDF documents that he had uploaded to his personal cloud account, and he deleted the copies of those documents from his Google work computer.

He deleted those documents from his computer, but he kept the copy in his personal cloud account, and he kept the copy on his personal computer, the backup copy that he made.

And that's exactly where Special Agent Valladao and her team found them, and that's why you'll get to see these documents during this trial.

Last thing I'll mention about the documents.  Because Google cut off the defendant's network access and locked him out of his computer on December 29th, 2023, he never got the chance to upload more than 1300 new Notes files containing information that he copied from sensitive internal documents and created on his MacBook.

Let me be clear about that.  The defendant uploaded

the last trade secret document from his Google computer to his personal cloud account on April 17th of 2023.  We already talked about that part.

Between April 17th of 2023, when he uploaded that last trade secret document, until December 29th, when Google cut off his network access, he kept right on visiting internal documents and creating Notes files containing sensitive information.  You'll hear during this trial he created 1300 new Notes files between April and the moment Google cut off his access.

The technology in this case is going to be complicated, but the evidence is going to show that the rest of this case will be very simple.  It's about the defendant's theft, his greed, and his lies.

The evidence during this trial will show that the defendant wanted more from his career than his own knowledge and experience could earn for him, so he stole and he lied to get what he wanted.

The evidence will show he stole and he lied to make himself rich, to make his company successful, and to help government-controlled organizations in China meet their AI technology goals.

And because the information he stole was Google's trade secrets, at the end of this trial when I get one more chance to speak with you, I'm going to ask you to deliver the

only verdict that will be supported by the facts and the evidence and the law, and that's a verdict that the defendant, Linwei Ding, is guilty of all the charges in this case.

Thank you.

**THE COURT:** Okay. Thank you.

We'll hear from Ms. Krsulich after the break, but I think it would be a good idea to take a ten-minute break.

Let me remind you of a couple of things.

Number one, you're not to speak with anybody about this case or the substance of the case, and that includes with each other, until you begin your deliberations after all of the evidence has come in and after you've heard closing argument from the lawyers; right? So resist the temptation to chat about the case or speculate about the evidence with each other now.

Also remember, if you have a notepad, if you were taking notes, don't -- never leave them in the courtroom. Always bring them back with you.

And with that, we'll take a break until 11:00 a.m. We'll hear from the defense, and then we'll begin to hear from the Government's first witness, and then we'll take a lunch break at around 12:30 or something like that.

All right. Thank you.

**THE COURTROOM DEPUTY:** All rise.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  All right.  Thanks.

Quick note for the court security officer.  I noticed a few people coming in and trying to watch and there wasn't enough seating for them.

We cordoned off a portion of the court so that nobody would be able to see the jurors' screens during the trial, but there's nothing that's going to be shown today that people need to be prevented from seeing on those screens.  So if anybody else comes in and they want to have a seat, they're welcome to sit in the part of the courtroom that's cordoned off for the purpose of watching, I think, any of the proceedings today.

Correct?

Okay.  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 10:54 a.m.)

(Proceedings resumed at 11:09 a.m.)

(Proceedings were heard in the presence of the jury.)

THE COURT:  Okay.  All yours, Ms. Krsulich.

MS. KRSULICH:  Thank you, Judge.

#### OPENING STATEMENT

MS. KRSULICH:  This case is about power.  This case is about --

THE COURT:  Hold on a second.

(Discussion off the record.)

MS. KRSULICH:  Well, you all heard my opening line

now; right?

This case is about power.  It's about what happens when two powerful entities come together and target a single individual.

The Government and Google made up their mind about who Linwei Ding was, and then they went about getting the evidence to prove up what they had already determined.

Now it's your responsibility.  That's why we're here. It's your job.  They are treating starting a business in China as if it is a crime.  They are treating Google's rules as if they are the criminal rules of the United States of America.

You will look at all the evidence, what it actually shows and what it doesn't, and you will decide whether Google and the Government went too far, whether Google and the Government got it wrong.

Linwei Ding worked at Google for four years.  During that time, he kept notes, like many employees do.  Toward the end of the time at Google, he started a business in China.

When Google learned about what Linwei was doing, they made an assumption.  They assumed that Linwei's notes, the notes that he had been taking for four years as an employee, contained Google's trade secrets.  They assumed that Linwei must have taken the notes with bad intent, to harm Google and the United States, to pass those notes to the Chinese Communist Party.  They made assumptions.

The evidence will show that those assumptions were wrong.

Yes, Linwei took notes while he was a Google employee. Yes, he started a business in China. But what is the connection between those two things? Linwei never used his notes to build his business. You will hear no evidence that Linwei's notes were used to harm Google or that they involved military secrets or technology that was barred from China or that he transferred any of his notes to anyone, let alone the Chinese Communist Party.

While that might make for a more interesting story, that's not what happened here. You've heard -- a birthplace and a business address in China does not turn conduct into a crime. You've heard the Government point to things that Linwei did that violated Google's rules.

Look, we are not going to tell you that Linwei was a Google rule follower. But breaking workplace rules, even Google's rules, does not make someone a criminal.

The Government wants you to take workplace issues and turn them into federal felonies. That's a big leap. And in a criminal case, those leaps are not allowed. These are serious charges, and the Government must prove each and every element beyond a reasonable doubt.

You are not here to decide whether Linwei violated Google's rules. That is not a crime. You are not here to

decide whether Linwei should have told Google about his business.  That also is not a crime.  You are not here to decide whether Linwei was a bad employee.  Thankfully, you can be a bad employee and that is not a crime.

The Government may focus on those things.  We ask you to focus on the charges and the evidence and whether the Government has met its burden beyond a reasonable doubt.

Mr. Jay, if you could turn to Slide 2, please.

This is not an employment case.  This is a criminal case.  In a criminal case, the Government must prove all its charges beyond a reasonable doubt.

Beyond a reasonable doubt is the highest standard in our justice system.  It does not mean more likely than not.  It does not mean probably, I think so, or I'm pretty sure.  It means the Government has proven, through evidence, that you have no reasonable doubt that Linwei committed each of the crimes he is charged with.

That is a heavy burden, and it is meant to be a heavy burden.  The Government must show you with real evidence that the only reasonable conclusion that can be drawn from what Linwei took and saved in his notes was an intent to steal Google trade secrets.  The evidence will show that they cannot do that.

Now, before I go further, I wanted to take a moment to thank you.  Jury service is one of the highest forms of service

that you can give to your country.  And that's why we all stand when you enter the courtroom, out of respect for that service.  And it's been quite moving for me to be able to do that for you.  So I want to thank you, and Linwei wants to thank you for the time that you've taken to consider this case and that you will take.

Important decisions like the ones you're going to make today are not left to the Government or to the corporations, big corporations.  They're made -- they're left to you.  And so we thank you for your service.

I want to, again, reintroduce my client -- our client, Linwei Ding.  You may see in the documents that he sometimes goes by Leon at work.  I know him as Linwei, so I'm going to talk to him as Linwei.

Linwei is a software engineer.  He was born in China.  In 2010, when he was 23 years old, he came from China to the United States for school.  He has lived in California ever since.  He put down roots in the Bay Area.  He bought a townhouse in 2018.  He became a Green Card holder, a lawful permanent resident in 2021.

After school, he moved from Los Angeles to Silicon Valley; and in 2014, he started working at different technology companies in the Bay Area, including at Cadence and Illuvatar.

In 2019, Google hired Linwei as a software engineer.

At Google, Linwei worked on technology that helps Google's data centers run.  He took copious notes about his work and about other personal stuff.  You will hear that for engineers, note-taking is not a crime or evidence of a crime.  Notes are how work gets remembered, how problems get solved, and how ideas take shape.

Linwei was a notetaker -- is a notetaker, like other engineers.  At Google, Linwei was provided with an Apple MacBook.  All MacBooks come preinstalled with Apple Notes. Apple Notes works on your phone, but there's also an Apple Notes application that comes preinstalled on a MacBook.  It looks like this on the screen.

Linwei typed out notes in Apple Notes.  He also copied and pasted Google information into his Apple Notes.

Google did not tell Linwei that he could not use Apple Notes, and Linwei used that application on his Google work computer.

Linwei created, saved, and uploaded notes to his personal Google Drive using Google products with Google credentials in ways that Google systems monitored in real time. Google Drive is software that is owned by Google.

The evidence will show that Linwei started taking notes on his first day at Google in 2019, in May of 2019.  He started uploading notes to his personal Google Drive in 2021.

You will hear that while Linwei was doing this,

creating notes and uploading them, Google was watching.  Google monitors every download, every upload, every screenshot on an employee work computer.  The evidence will show that for more than four years, Google never told Linwei that there was anything improper about the documents that he was accessing.  Google never told Linwei to stop taking notes.  You will hear that Google saw Linwei uploading his notes to his Google Drive and Google said nothing.

Linwei worked at Google throughout the COVID pandemic.  During the pandemic, he began exploring other job options.  He connected with a recruiter.  After looking for a job for a while, the recruiter connected Linwei to Rongshu, a cybersecurity company in China.  Linwei accepted a job with Rongshu in November of 2022.  The evidence will show that Linwei did not use his Google notes for his work at Rongshu.

In 2023, Linwei began talking about a business idea for a company called Zhisuan.  The evidence will show that at this time, Google knew that Linwei was in China.  You heard Mr. Boome say Linwei hid it all.  Linwei received emails saying that some of his access was being restricted.  He received emails from Google, his employer, saying that they knew he was working from China.  But Google didn't say anything more than that.

In March of 2023, Linwei got an invitation to participate in MiraclePlus.  It's a private incubator program

in China that helps new start-up companies get off the ground. It's like a boot camp for entrepreneurs or private companies. Linwei applied to MiraclePlus in May of 2023. He submitted a short video as part of that application. He recorded and uploaded that video using his Google work computer. The Government does not claim that that video contains any Google trade secrets.

He uploaded another video in August of 2023. He created and uploaded that video from his Google work computer. The Government does not claim that that video contains any Google trade secrets.

In October 2023, Linwei applied to the MiraclePlus program -- or Linwei's application was accepted in October 2023. And in November 2023, Linwei presented at that MiraclePlus conference. You saw the picture when Mr. Boome put it up for you.

That was not a private conference. There were hundreds of people in the audience at that conference. He presented in an auditorium filled with people about his idea for a business project -- for a business.

There is no allegation that Linwei told anyone about trade secrets in that presentation or that he said anything about trade secrets in his presentation at the MiraclePlus conference. He was presenting a business idea in front of hundreds of people.

This entire time, no one from Google questioned Linwei about why he was in China or why he was taking notes.

Then in early December 2023, Linwei received a notice from Google about transfers that he made to his Google Drive account. This was the first time in Linwei's four years working at Google that anyone talked to him about his notes or his uploads, the first time.

These transfers in December 2023 did not involve any of the documents at issue in this case. What did they involve? Linwei's personal biography and other links that he had taken about his work that he was working on and about other people that he had worked with. That's what triggered Google's system to talk to Linwei in December of 2023.

The documents, there were lists of projects that he had worked on. And Linwei spoke with a Google employee. You'll hear from him. His name is Brad Fuller.

Mr. Fuller told Linwei that the files that they discussed, the ones talking about his employment, they should be deleted. Mr. Fuller did not ask Linwei about his Apple Notes or his prior uploads.

Mr. Fuller then unlocked Linwei's accounts and allowed Linwei to get back to work. What does he say? "You'll get back to work within an hour."

Linwei stopped uploading files to his Google Drive after he talked to Mr. Fuller on December 8th, 2023. There are

no uploads to Linwei's Google Drive after December 8th, 2023.

Linwei backed up his Google Drive onto his personal computer.  The backed-up documents were the same documents that had been stored in his Google Drive since April 2023.

On December 26, 2023, you will hear that Linwei told his boss, Yihua Ding, that he intended to leave Google.

On December 28th, Google learned about Linwei's MiraclePlus presentation.  The next day, December 29th, Google locked all of Linwei's devices and suspended his accounts.

No one talked to Linwei about the suspension.  No one talked to Linwei about the presentation.  No one talked to him at all after that.

On January 4th, a Google contractor went to Linwei's house and asked for Linwei's Google laptop.  Linwei gave it to him.  "Here's my laptop."

Two days later, the Government sent the FBI and 18 law enforcement officers to Linwei's house, and they rammed down his door.  They took everything in his house.  And they didn't talk to him at all.  No one at Google conducted an exit interview.

And then, after that, and after the arrest, they went about collecting the evidence that they needed to prove their case.  And that's why we're here today.

We are here now for you to look closely at this evidence.  At the end of the case, one of your tasks is going

to be to decide -- to be to decide whether what was in Linwei's notes was a Google trade secret.

What is a trade secret?  A familiar example is the recipe for Coca-Cola.  It's not known outside the company. It's kept under lock and key, reportedly, in a secure vault in Atlanta; and the reason that it's secret is because if it were to get out, anybody could copy it.

At the end of this case, Judge Chhabria is going to instruct you on the law for what qualifies as a trade secret; but for now, I'd like to give you a scorecard that you can use to help keep track as we go through all the evidence in this case.  Some of you may want to write this down to refer to later.

There are three boxes you need to check to decide if information is trade secret.

The first is:  Is the information actually secret?

The second is:  Did Google take reasonable measures to protect it?

And the third is whether keeping it secret actually made it valuable.

A couple things to notice about this scorecard.  Not all confidential information is trade secret.  It needs to be secret, but it also needs to be valuable because it's secret.

So one example of that is an employee personnel file. It's like where they keep your resume and your pay stubs and

like other personal stuff.  That information is confidential to a company, but it's not trade secret, because although the company wants to keep it private, like, there's no competitive advantage from another person having it.  So not all confidential information is secret.

The other thing I want to point out to you about this is that the Government is saying that Linwei took 155 trade secrets.  That's a lot of information.  Hold the Government to its burden for each and every alleged trade secret.  If the Government is going to prove beyond a reasonable doubt, they must show you that the information in the document is secret, that it's protected, and that it's valuable because it's secret.

The standard here is beyond a reasonable doubt, and it's difficult, particularly in a case involving complex technology like this one.  But if the Government does not answer those questions for you, the only reasonable verdict is not guilty.

Let's now zero in on each part of this scorecard. What evidence are you going to hear about whether the information was secret?  You are going to hear that some of the technology has been around for a really long time.  For example, the idea that chips need to be connected so they can talk to each other, that's not a trade secret.  Connecting chips like that is basic, well-known computer engineering.

You are also going to hear about Google patents.  This is not a patent case.  There's not much you need to know about these patents other than how they relate to trade secrets, which is what this case is about.  There is no overlap between patents and trade secrets.

Trade secret is information that a company keeps private because it gives them an advantage.  They protect it by not telling anyone about it.

A patent is very different.  With a patent, a company tells -- chooses to tell people in the public about their technology; and in return, the Government gives them something.  It gives them a monopoly over that technology.  So there's an exchange.

You cannot keep something secret and private at the same time -- or, sorry.  You cannot keep something secret and public at the same time.  They're two different things.

If the same idea shows up in a patent, it is no longer secret because patents are public documents that anyone can read.  So if the Government says this is trade secret but the same information appears in a patent, those two claims conflict.

In this case, you will hear about examples where information in Linwei's notes that the Government is claiming is trade secret also show up in Google's patents.  Because Google made that information public, it cannot be trade secret.

I put up one example.  On the left, you have a figure from one of Google's patents, something that Google chose to make public.  And on the right, you have a picture of something from one of the alleged trade secret documents.

This picture raises a point that's worth highlighting.  Just because information looks technical does not mean it's trade secret.  Google publishes lots of technical information in patents.  Those are not trade secrets.

Why would Google make this information public?  First, it helps other companies trust and use Google systems and become familiar with Google's products.

Second, by speaking first, Google shows it invented the ideas first so others can't later claim that they invented them and sue Google.

Let's zero in on the second part of the scorecard, whether Google took reasonable measures to keep the information secret.  This matters because how a company treats information tells you how much it values it.  If Google truly believed that the material in Mr. Ding's notes was trade secret, you would expect clear targeted protection.  Instead, you will hear about a security system that works like a smoke alarm that goes off 6 million times a day.  When everything is an alert, nothing is.  Google was watching and did nothing.

You will hear from Mr. Ding's expert, James Pooley, that the first rule of protecting trade secrets is to identify

what they are.  What are your trade secrets?  Google didn't do that.

Most of the documents in this case weren't even marked "Confidential."  Some of the documents were marked "Confidential" when they obviously should not have been, like this cartoon.  I mean, it may be funny or may be not funny, I don't know, but it's not trade secret.  This excerpt is from one of the documents that Google and the Government are claiming is trade secret.  It's a cartoon.

You also have to look at what Google did in real time. When Mr. Ding uploaded notes to his personal Google Drive, Google saw it happen.  Mr. Ding wasn't hiding what he was doing.  The DLP system, Google's data loss prevention system, it flagged it.

This is a -- what I put up on the screen is an exhibit.  It's Exhibit 3.  This is all of the information that Google collected about Mr. Ding's uploads for years, logging when things were being uploaded, and Google did nothing.

That tells you just about everything you need to know. This information wasn't treated like a trade secret at the time.  Google's only calling it one now.

The third question you need to ask yourself:  Was this information valuable because it was secret?  Google's data centers are not a recipe that you can copy.  It's a massive, massive, tightly integrated system built over decades at the

cost of billions of dollars.  It's designed to work as a whole.

Think of this case like pointing to a single puzzle piece from a complex puzzle and calling it valuable.  Outside the puzzle, it does nothing.  Inside Google's systems, it fits because everything else is already there.

You may hear from the Government that simply knowing what Google technology is or what it uses has value, but the evidence will show that simply knowing what Google uses doesn't make that technology valuable.

For example, it has been widely reported that Google uses Nvidia computer chips, just like other start-ups, universities, and competitors across the industry.  This is not a secret.  And simply knowing this does not give anyone enough information to replicate Google's data centers.

What creates value isn't isolated facts.  It's the billion-dollar system around them.  And without that system, the evidence will show this information has no independent economic value, and that means it's not trade secret.

We've gone through the three questions that you'll answer at the end of the case when deciding if the information in Linwei's notes is a trade secret.  The evidence will show that the answer to each of these questions on the scorecard is no.  The information was not secret, Google did not take reasonable measures to protect it, and the information is not valuable because it was secret.  It has no economic value

outside of Google.

Now, the Government's burden does not end there.  This is not a possession case.  The Government must show beyond a reasonable doubt that Linwei took his notes with bad intent.

The additional questions you have to answer about Linwei's intent are for the seven counts of theft of trade secrets.  Did Linwei intend or know that his offense would harm Google?  Did Linwei intend to convert the trade secret information to the economic benefit of someone other than Google?  And for the seven counts of economic espionage, did Linwei intend or know that his actions would benefit a foreign government or foreign instrumentality?

The evidence will show that the only reasonable answer to each of these questions is no.  The forensic evidence will be helpful in helping you answer these questions.

Forensic evidence is a digital record that shows what happened, when it happened, and what did and, more importantly, what did not happen.

Because Google tracks everything, the forensic evidence here is unusually precise, down to the second.  The experts can tell you exactly when Linwei opened notes, when he took screenshots, when he created notes, when he edited them, uploaded them, and downloaded them.  You'll have it to the second.

There's very little dispute about what those records

show.  Pay attention to the evidence about how long Linwei stored and sat on the information in his notes.

Let me show you one example.  This is from one of the alleged trade secret documents, the TPU ICI document.  You already heard Linwei started working in May of 2019.  The first note that the Government alleges is trade secret was created on December 4th, 2020, almost -- more than a year and a half after he started working at Google.

That note was not opened again until September 5th, 2021.  That was the last open date.  It's nine months after the note was created.

Another nine months went by.  On June 20, 22nd -- June 2022, June 3rd, 2022, Linwei uploaded that note to his Google Drive.  He never looked at it in his Google Drive.  We know because we have the forensic records.  He never looked at it.  And then he downloaded it on December 14th.  He backed it up on his personal computer.

At close, we will ask you the simple question:  Is that how you expect someone to behave if they think they're sitting on valuable information?  Is that how you expect someone to behave if they are sitting on Google trade secrets that they intend to use, waiting three, four years and not even opening it?

You also want to pay attention to how Linwei was going about building his business in China.  To hear the Government

tell it, Linwei was building Google 2.0 in China.

Listen, the evidence will show Linwei was far from it. Over many months, Zhisuan was never a functioning company.  It existed mostly on paper.  The presentation you will see, the documents you'll see, those are business fantasy goals.

The evidence will show that Linwei came nowhere close to replicating Google's system.  What he built was based on his know-how, not any Google trade secrets.

I also want you to keep in mind what Google knew about Linwei's whereabouts.  Linwei did not mask his IP address when he was in China.  That's what you would do if you're trying to hide where you were online.  Linwei didn't do that.  Although it is true that he had someone swipe his badge for him while he was in China, the evidence will show that Google knew exactly where he was.

The Government may point out that some Chinese officials attended Linwei's MiraclePlus presentation.  There is no evidence Mr. Ding worked with them, shared information with them, or acted at their direction.  There are financial accounts.  There's no information -- there's no evidence of any financial -- finances, money passing between Google -- or between Linwei and anyone else.  Appearing in the same photo is not economic espionage.

Finally, you will not hear any evidence that Linwei expressed any interest at all in harming Google.  You may hear

Google employees testify that AI is generally very important to Google and that if it got in the wrong hands, it could hurt Google.  But what Linwei was doing did not cause Google to lose customers, in the United States or anywhere else.  Google's stock price did not rise and fall with Linwei.  Google still has access to the documents it is claiming as trade secret, and is not -- and it is not claiming that those documents are no longer trade secrets because of anything that Linwei did.  It is going to claim that those documents are still private.

So, members of the jury, when this case is over, we believe the evidence will be clear that the Government has not met its heavy burden.  As Judge Chhabria will instruct you, that heavy burden is entirely on the Government.  It must prove every element of every charge beyond a reasonable doubt.  Hold them to that standard.

When you apply the law to the evidence, we believe that there is only one possible just verdict in this case, and that's not guilty.

Thank you.

**THE COURT:**  Thank you.

The Government can call its first witness.

**MS. PRIEDEMAN:**  The Government calls Mark Lohmeyer, Your Honor.

 (Witness enters the courtroom and steps forward to be sworn.)

**THE COURTROOM DEPUTY:**  Please raise your right hand.

**MARK SEBASTIAN LOHMEYER**,

called as a witness for the Government, having been duly sworn,

testified as follows:

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.

Please state and spell your full name for the record.

THE WITNESS:  Mark Sebastian Lohmeyer.  M-a-r-k,

S-e-b-a-s-t-i-a-n, Lohmeyer, L-o-h-m-e-y-e-r.

**DIRECT EXAMINATION**

BY MS. PRIEDEMAN:

Q.   Good morning, Mr. Lohmeyer.

A.   Good morning.

Q.   Where are you currently employed?

A.   I work for Google.

Q.   And how long have you worked at Google?

A.   About three years.

Q.   What is your current title?

A.   I'm the VP and GM of AI and computing infrastructure.

Q.   I want to ask a little bit more about that in just
a minute, but first, can you tell the members of the jury a
little bit about your educational background?

A.   Sure.  I have a bachelor's and a master's degree in
electrical engineering and computer science from the
Massachusetts Institute of Technology.

Q.   Can you give the members of the jury just a brief

high-level overview of your career before you landed at Google?

**A.**    Sure.  So I spent about a little bit under 30 years in the computing industry, computing and systems industry.

Prior to Google, I worked at a company called VMware for about eight years.  I was the general manager of one of their product areas.

And then for four years before that, I worked for a company called Cisco, which does networking.

And prior to that, a number of other companies, kind of in the core computing systems, large-scale computing systems, and cloud computing space.

**Q.**    All right.  I want to ask you a little bit about your job at Google, but before I do that, I would imagine most of the jurors are familiar with Google, but at a high level, can you describe Google's core services and products?

**A.**    Sure.  So at a very high level, you can sort of think about Google having two large business areas.  The first is the consumer business.  So this is probably something that we're all familiar with.  If you think about Google Search or Gmail or Google Photos or YouTube, those are all consumer-facing products.

And then the second part of our business is an enterprise business.  So this is selling cloud computing services to companies.  So the end customer there would be someone like, let's say, a Home Depot or a Walmart or an AmEx or someone like

that.

Q.   And when you say "enterprise," do you mean companies?

A.   Yeah, just companies; right?  So we would think about them as companies, yeah.

Q.   All right.  Mr. Lohmeyer, can you tell the members of the jury a little bit about what your job responsibilities at Google are?

A.   Sure.  So I'm responsible for the overall product strategy and sort of business results for the products in my portfolio.  And the products in my portfolio are AI infrastructure products, which I think we'll talk a little bit about more here, as well as our overall computing products and systems.

So I drive the -- I work closely with customers.  I understand their requirements.  I use those requirements to decide what we're going to build next into our product portfolio.  I do things like look at the market landscape, the competition.  I not only set the product strategy, but I also do things like set pricing and discounting strategies that we would charge customers for those solutions.

Q.   All right.  There's a lot to break down there, so I'm going to ask some follow-up questions.

Before I do that, can you just tell the members of the jury, how many people are on your team currently, Mr. Lohmeyer?

A.   So it's about 900 roughly.

Q.   And you've mentioned computing, and I think you said cloud

computing once.  Can you define what cloud computing is?

**A.**   Sure.  So cloud computing is -- provides companies the ability to effectively rent computing services almost like a utility.

So let's take the Home Depot example.  If you're Home Depot and you're building an application to maybe sell things to consumers like yourselves, instead of them building that application and running it in their own data centers on their own computing systems, they could come to a place like Google Cloud and rent those computing systems from us instead.

**Q.**   And does Google offer as a service cloud computing?

**A.**   Yes, Google offers cloud computing services.  We call this business Google Cloud.

**Q.**   And why might a customer want to use Google's cloud service versus using their own computing services?

**A.**   Sure.  So, you know, for many companies, building these computing systems is not necessarily their core competence, so they would look to work with a company like Google Cloud as a partner to provide those capabilities to them.

In addition, when they come to work with Google Cloud, they can pay for those cloud computing services over time.  So they don't have to pay for them all up-front and then, you know, have that large bill come up at the start.  They pay for it as they use it.  So it works better for many companies economically.

And then, finally, we have a broad range of cloud computing services.  And so if you're a company and want to build an advanced application, you can take advantage of all those underlying services that we provide to build it.

Q.   And you mentioned that part of your job responsibilities are driving business strategy for Google's AI infrastructure. I'm going to ask you about some of those terms.

First, can you -- just the term.  Can you define the term "computing infrastructure" for the members of the jury?

A.   Yeah.  So computing infrastructure, maybe if I'll use an analogy, if you think about, like, your laptop or your desktop, that's a computer; right?  It has in it a CPU, some memory, some storage, and you run applications on it.

What we're talking about here for cloud computing infrastructure is a much larger and much more sophisticated at-scale version of that.  So you would have --

(Reporter interrupts to clarify the record.)

THE WITNESS:  At scale, yes.  A much larger at-scale computing infrastructure.

It has in some sense those same components, but it's deployed in a much, much larger scale.  And then businesses can run their applications on top of that large-scale computing infrastructure.

BY MS. PRIEDEMAN:

Q.   And is one of the services that Google offers on Google

Cloud an AI infrastructure?

A.    Yes, it is.

Q.    Can you explain to the members of the jury what the term "artificial intelligence" refers to?

A.    Sure.  At a high level, AI is just referring to the ability of a computer or computing systems to perform tasks that a human brain would typically be able to do.

Q.    What about the term "machine learning"?

A.    So machine learning is a little bit more specific, ML or machine learning.  It refers to the process by which a computer is able to look across a large amount of data, so maybe text or photos or videos, and use that to understand the relationships between all of that data to train a model, and that model is then used to deliver those AI services.

Q.    Can you give some examples of what machine learning can be used for?

A.    Sure.  So we probably all use this to a certain degree in our daily lives.  If you think about AI chat, so Google Gemini or ChatGPT, you can ask questions; it can give an answer; you can interact with it in a very natural human-like way.  So that's one.

Another would be photo editing or photo generation.  You can take a photo of your family.  Maybe there's somebody in the background, and you can say "Remove that person in the background," and it'll create a new photo without that person

in the background.  Video generation, might have played with some of these things as well.

So there's all these sort of consumer-oriented use cases for AI, but there's also many enterprise use cases across a broad range of industries.

So, for example, if you think about healthcare, AI can have the ability to maybe look at an X-ray image of someone's back and give some indication of what it thinks might be -- you know, might be wrong there.

Q.   Thanks for explaining some of those examples.

Can you explain at a high level how machine learning works?

A.   Sure.  So the basic idea behind machine learning is that you're basically asking these large-scale computing systems to look across a very broad range of data, and then it's basically training itself on that data and looking for patterns and it's identifying patterns within that data.

And so -- and then that is used to create a model, and then that model can then be used within these applications for these AI use cases that I talked about before.

So that first step is referred to as training the model. You know, what people would typically do is train it on kind of like all the text on the Internet; right?  And so it understands all the relationships between that text, how sentences are structured, how paragraphs are structured.

That's all sort of --

(Reporter interrupts to clarify the record.)

**THE WITNESS:**  And then uses that to create a model which understands all of those relationships so that when you ask that model a question, it can respond to you in a human-like way.

**BY MS. PRIEDEMAN:**

Q.   And when you say "model," what are you referring to, Mr. Lohmeyer?

A.   So a model is basically a mathematical model that captures the -- all the relationships within that data that it's been trained on.

So if it's been trained on text, it's capturing the relationships between all of those texts in a sentence, in a paragraph, in a document.

If it's being trained on photos, it can, for example, understand that "Hey, I've seen a thousand cats before, and so when I see a cat again in a photo, I can identify that as a cat."

Q.   So, Mr. Lohmeyer, I'm going to ask you to talk a little slower --

A.   Okay.

Q.   -- just for our court reporter and so the jury can capture everything that's happening.

A.   Sorry.  Will do.

**Q.** So you mentioned the example of photographs and cats. I'm wondering if -- earlier you mentioned an example about X-rays and the use of machine learning.

**A.** Mm-hmm.

**Q.** Can you explain to the members of the jury how a model might be trained to recognize an X-ray?

**A.** Sure. So it's the same basic process. So during this training stage, you would effectively look at thousands, tens of thousands, maybe hundreds of thousands of images of an X-ray of someone's back. And then you would also have text associated with those images that says, hey, this person has scoliosis, and maybe this person has arthritis in their lower back, and map that to the image. Likewise, you would also look at images of a healthy back.

And so it's trained on so many of these images that over time, the model effectively learns the relationship between what that image of the X-ray of the back looks like and what the -- what condition that person may or may not have.

**Q.** How long, for example, would it take to train a model like the model that you just explained, Mr. Lohmeyer?

**A.** So these are -- it can take months to train these frontier or leading-edge models, you know, months of training across these very, very large-scale computing systems because you effectively have to analyze so much data in parallel, it just takes that long to do that much computing.

**Q.**   I want to pivot a little bit.

What does the term "AI" or "artificial intelligence supercomputer" refer to?

**A.**   So an AI supercomputer refers to the complete computing system that does what we were just talking about.  You can think about it as having maybe three core layers to it.

The first and lowest layer is effectively the hardware layer.  So this is things like the GPUs or TPUs, storage, and networking that connects them all together.  So that's, like, the physical -- physical hardware.  You can actually see that -- right? -- in a data center.

On top of that, you have the management software layer.  So this is software that effectively manages that underlying hardware and ensures that the applications that run on top of it have really good reliability, really good performance, really good security.  And so think about that as the middle layer.

And then the topmost layer is the actual model itself.  So this would be the text model for a chat application or a photo model for image editing or a video model for maybe video editing.

**MS. PRIEDEMAN:**  Ms. Hernandez, can you please pull up Demonstrative Exhibit Number 1 just for the witness, please.

**BY MS. PRIEDEMAN:**

**Q.**   Mr. Lohmeyer, does this graphic represent the different

components of an AI supercomputer that you just described?

A.   Yes.  Yes.

Q.   Would this exhibit assist you in explaining your testimony to the jury?

A.   Sure.  I can walk through it a little bit here more.  This is helpful.

Q.   Just give me one minute, Mr. Lohmeyer.

          MS. PRIEDEMAN:  Permission to publish to the jury, Your Honor.

          THE COURT:  Any objection?

          MS. KRSULICH:  No objection.

          THE COURT:  Go ahead.

BY MS. PRIEDEMAN:

Q.   So you mentioned the different layers of the AI supercomputer.  Can you just, at a high level -- does this graphic represent those --

A.   Yes.

Q.   -- different layers?

A.   Yes.

Q.   Let's start at the hardware layer.  Can you walk the members of the jury through the hardware layer?

A.   Sure.  So the hardware layer starts with the boxes that you see that say "Server" on them.  So those are servers. Think about it as a tray that the CPUs sit on.

     Within that you see something called accelerators, TPUs,

or GPUs.  TPU stands for Tensor Processing Unit, and a GPU stands for a graphics processing unit traditionally.

And so within that server tray, you would have multiple of those TPUs or GPUs sitting in that tray.

And then all of those servers would sit in a -- basically a rack.  So think about trays in a rack.

And then all of those chips, those TPU or GPU chips, are connected together to each other over that high-performance network you see in green there on the bottom.

So that -- the servers, the accelerators, and the high-performance network, think about all of that as the hardware layer.  You can literally go into a data center.  You can see those, all of those elements.

Above that you see the different shades of blue, and those are all different elements of the software layer that I was referring to before.  And I can go into more detail if you need it, but think about those as all part of the software layer.

**Q.**   Thank you.

And has Google built artificial intelligence supercomputers?

**A.**   Yes, we have.

**Q.**   Are there other companies that also build artificial intelligence supercomputers?

**A.**   Yes.

**Q.**   Approximately how many companies are there in the

United States that build artificial intelligence supercomputers comparable to the ones that Google has built?

A.   So the main ones would be the other large cloud providers in the U.S.  So, for example, AWS or Microsoft Azure.  There are a few smaller companies as well.

Q.   What are some of the challenges in creating artificial intelligence supercomputers?

A.   So these are very, very large-scale, very technically sophisticated systems, and so it requires deep technical expertise and innovation at sort of every level of the stack you see here.

Q.   What are some of the things that Google does to try to distinguish its AI supercomputers from competitors?

A.   So we have been designing -- building and designing these AI supercomputer systems for over a decade now.  So, for example, as you see in this picture here, the TPUs, or Tensor Processing Units, that's a specific piece of -- it's a chip that's specifically designed by Google to meet the unique needs of AI workloads.  And we've been doing that for over ten years now, over seven generations of this technology.  So we have a deep expertise in the actual chips themselves.

We also have expertise in all of the other hardware elements you see represented here; so, for example, the large-scale network that can connect all these chips together to create that -- to create that supercomputer, as well as the

system software layers on top.

In each of these areas, you have fairly meaningful engineering teams comprised of, you know, Ph.D.s and other folks that are designing each of these elements.  And then we're also bringing them together into these very, very large-scale systems.

And to be able to do that with really great performance, with a high level of reliability, if you think about services being built on top of these, high security and scale, that's a very challenging engineering problem.

**Q.**    All right.  I want to talk a little bit more about the hardware layer of Google's artificial intelligence supercomputers.

You mentioned TPUs.  You said those are Google's custom chips.  And then you also mentioned GPUs.  Can you talk about the difference between TPUs and GPUs?

**A.**    Sure.  So first, TPUs are designed within Google, as I mentioned.  For GPUs, we leverage technology from Nvidia, so these are Nvidia GPUs.

And probably the simplest way to think about the difference is GPUs are a little bit more general purpose, so they're good for AI workloads, but they're also good for other things like graphics processing.

And then TPUs are very, very specifically designed for the needs of AI.  So as a result, they're optimized more for that

class of workloads and can deliver performance and TCL benefits for those workloads.

Q.   And are both TPUs and GPUs, are those computer chips?

A.   Yes, they're chips.

MS. PRIEDEMAN:  Ms. Hernandez, can you please pull up Exhibit 305.

BY MS. PRIEDEMAN:

Q.   Mr. Lohmeyer, do you recognize what this is?

A.   Yes.  So this is a TPU chip.

MS. PRIEDEMAN:  Your Honor, I'd move to admit Exhibit 305.

MS. KRSULICH:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 305 received in evidence.)

MS. PRIEDEMAN:  May we publish to the jury?

THE COURT:  Yes.

Anything that's admitted, you don't have to ask permission to publish.

MS. PRIEDEMAN:  Thank you, Your Honor.

BY MS. PRIEDEMAN:

Q.   So, Mr. Lohmeyer, is this an example of one of the TPU chips we were discussing?

A.   It is.

Q.   Approximately how many TPU chips would be used to create one of the supercomputers we've been discussing?

**A.**    So in a single supercomputer, you could have thousands or potentially even tens of thousands of chips being used.

**MS. PRIEDEMAN:**  Ms. Hernandez, can you please pull up Exhibit 296.

**BY MS. PRIEDEMAN:**

**Q.**    Mr. Lohmeyer, do you recognize what's depicted in Exhibit 296?

**A.**    Yes.  So this is a server tray that we were talking about before.  This is the motherboard that the chips sit on top of and are connected into.

**MS. PRIEDEMAN:**  Your Honor, I'd move to admit Exhibit 296.

**MS. KRSULICH:**  No objection.

**THE COURT:**  Admitted.

(Trial Exhibit 296 received in evidence.)

**BY MS. PRIEDEMAN:**

**Q.**    So, Mr. Lohmeyer, looking at this picture, how many -- how many of the TPU chips you were discussing would be in this server that we're looking at here?

**A.**    Four.

**MS. PRIEDEMAN:**  Ms. Hernandez, can you pull up Exhibit 308, please.

**BY MS. PRIEDEMAN:**

**Q.**    Mr. Lohmeyer, do you recognize what's in this picture?

**A.**    Yes.

Q.    What is it?

A.    So this is a rack that I was talking about before.  And so in the racks sit multiple of those trays.  And you can sort of see them stacked up here.  You can also see the cable connections between all of those chips and those trays in the rack.

So in the prior picture, when you saw that network box on the lower part of it, those -- those are represented here physically with --

MS. PRIEDEMAN:  Just give me one second, Mr. Lohmeyer.

THE WITNESS:  Yes.

MS. PRIEDEMAN:  I need to ask to admit Exhibit 308 before the jury can see it.

MS. KRSULICH:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 308 received in evidence.)

BY MS. PRIEDEMAN:

Q.    All right.  Maybe it would be helpful, I think, to give that explanation again, now that the jury can see the picture.

A.    Sorry.

Yeah.  So this is -- this is a rack, and you can see in this rack multiple of those trays that you saw before stacked on top of each other here in the rack.  And then if you see, for example, those yellow cables, those are basically connecting those trays and those chips to each other in the

rack.  That's the -- if you think about the earlier picture we showed, that's the network that was the lower part of that first picture.

Q.   And is this -- just to contextualize this, is this part of the artificial intelligence supercomputer we've been discussing?

A.   Yes.  This is part of the arti- -- so you would have multiple -- it is part of that, and then you would have multiple of these racks actually connected together to each other to create these large-scale AI supercomputers.

        MS. PRIEDEMAN:  Ms. Hernandez, can you please pull up Exhibit 286.

BY MS. PRIEDEMAN:

Q.   Mr. Lohmeyer, do you recognize what this photograph is?

A.   Yes.

Q.   What is it?

A.   It's a Google data center.

Q.   Is it -- is it the -- what exactly inside the Google data center are we looking at?

A.   So basically what we're seeing here now is multiple of those racks as you look down the row here.  So you can see the trays, you can see the network connections, and you can see sort of the scale of what a supercomputer physically entails.

        MS. PRIEDEMAN:  Mr. Lohmeyer, I'm going to interrupt you one more time because I still need to move to admit

Exhibit 286 before the jury can see it.

MS. KRSULICH:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 286 received in evidence.)

BY MS. PRIEDEMAN:

Q.   Sorry to interrupt.

A.   Sorry.

Q.   Please continue your explanation.

A.   Sorry.  Yeah.  So this is -- it's a Google data center. What you're seeing here is multiple of these racks in a row. And this gives you a bit of a sense for the physical scale of an AI supercomputer.

Q.   And you mentioned this would be in a Google data center; is that right?

A.   That's right.

MS. PRIEDEMAN:  Ms. Hernandez, can you pull up Exhibit 282.

BY MS. PRIEDEMAN:

Q.   Mr. Lohmeyer, do you recognize what this is?

A.   Yes.

Q.   What is it?

A.   It is a Google data center from the outside.

MS. PRIEDEMAN:  Your Honor, I'd move to admit Exhibit 282.

MS. KRSULICH:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 282 received in evidence.)

BY MS. PRIEDEMAN:

Q.   So when you -- when you previously mentioned Google's data centers, is this an example of one of those data centers?

A.   That's right.

Q.   What would be contained in one of these data centers?

A.   So within these data centers, you would have what we saw in the prior picture.  You'd have, you know, rows and rows and rows of these large-scale computing systems.

And you can get a little bit of a sense for the scale of these buildings.  If you look at the -- sort of the vehicles on the bottom right, you can see these are very large-scale buildings that are filled with thousands, tens of thousands, maybe even hundreds of thousands of these AI chips.

Q.   And the pictures we were looking at were of TPUs.

Do GPU chips look similar?

A.   The physical chip looks similar, yes.

Q.   Do the supercomputer structure, does that look similar as well?

A.   At a high level, it's -- yes, it looks similar.

Q.   Does one AI supercomputer have both GPUs and TPUs in it?

A.   No.  So you would have one or the other.  So a single supercomputer or a single cluster, like we showed you before, that would either be all TPUs or, separately, all GPUs.

**Q.**    And we're just looking at one data center in this picture.

**A.**    That's right.

**Q.**    Can you give the members of the jury a sense of the scale of Google's data centers?

**A.**    So we have over a hundred data centers around the world, in different cities in the U.S. and in different countries. And the physical scale is fairly large here. So, you know, hundreds of thousands of square feet per data center, potentially.

**Q.**    I want to back up a little bit, Mr. Lohmeyer. We've been talking about the mechanics of the AI supercomputers and looking at the data centers. But can you explain to the members of the jury how an AI supercomputer is different from a regular computer.

**A.**    Sure. So the -- how would I describe it? So the scale -- the scale of the systems is just much, much larger. So if you think about a normal computer -- right? -- like your desktop or your laptop, it's a relatively small-scale system. You can run applications locally, or you can connect to the Internet and run applications. We're all familiar with that.

As we just saw here, these are very, very large-scale systems that are required, basically, to process in parallel this large amount of data for training these models and then also be able to process a large amount of requests coming in if you're using an AI-powered application to serve those models as

part of a service.  So they're much, much larger scale.
They're able to process data in parallel with really, really
high performance.

Q.    And when you say "process data in parallel," at a high
level, why is that important for machine learning?

A.    So for machine learning to work well, it effectively has
to be trained on a very large amount of data.  That's how it
sort of gets its intelligence.  And so you need to be able to
basically process and analyze that data, a large, large amount
of data, and so you need these large-scale systems to be able
to do that in a reasonable time frame.

Q.    How long would it take to train a machine learning model
on a regular computer that you could buy at --

A.    It's hard to even calculate it because it -- I mean, years
and years and years, if that.

Q.    And just, I want to make sure you -- Mr. Lohmeyer, I have
to finish my question before you answer.  So I'm just going to
try --

A.    Yeah.

Q.    -- one more time, just for the record.

A.    Okay.

Q.    How long would it take to train a machine learning model
on a regular computer you could buy at, say, Best Buy?

A.    Decades.

Q.    All right.  I want to pivot and talk specifically about

Google's TPU chip that we've discussed a little bit.

Does Google design its own TPU chips?

**A.**   We do.

**Q.**   And how long has Google been designing its own TPU chips?

**A.**   For around ten years.

**Q.**   Why did Google decide to develop a TPU chip?

**A.**   So we were, at the time -- this was ten years ago -- looking at the amount of processing power it would take -- someone actually did a little thought experiment, and they said:  What if we wanted to enable every user of Google Search to be able to interact with Google Search through voice as opposed to typing it into their computer for just a few minutes every day?  So think about every user of Google Search, you know, asking a question for a few minutes every day.  How much processing power would it take with the CPUs of that day, with the computing systems of that day, how much processing power would that take?

And when they did the math, it would have taken as much computing power as Google had deployed in its entire history to date just to do, basically, voice-to-text for a few minutes every day.

So it was pretty clear that the traditional approach to computing, traditional CPUs wouldn't work for that specific use case.  And so from that thought experiment, the idea of a TPU, or a Tensor Processing Unit, was born, which is:  How can we

create this very customized, very specific chip specifically designed for those AI-like tasks or workloads?

Q.    You've said CPU a few times.  Can you just define what a CPU is?

A.    A CPU is a central processing unit.  So that's what would sit in, like, your desktop or your laptop, and it processes instructions sort of in sequence.

Q.    Are there -- has Google developed multiple generations of its TPU chip?

A.    We have.

Q.    How many different versions are there?

A.    So we are currently on our seventh generation.

Q.    Are the different versions related to each other?

A.    They build on each other, and they get more performant in each new generation.

Q.    Does Google continue to use its older versions of its TPUs?

A.    We do.

Q.    Why is that?

A.    Because there's such high demand for these AI services that we need to make use of, you know, as many of the TPUs as we can to provide those services to consumers.

Q.    How does Google use its TPU chips?

A.    So we use it in sort of two high-level ways.

      First, we use TPU chips for training these models.  So

that's what we were talking about before, where you're training a large model like Gemini for text, which you might have used, or Imagen for images or Veo for videos, where you're basically looking across a large dataset and training that model.  That's for the first piece.

The second piece is called inferencing.  So this is where you're using a model that you previously trained to respond to an input from a user.  So, for example, if you would go to our Gemini app, or you think about ChatGPT as a comparable offering, when you type in a question into the Gemini app and it responds to you, that's inferencing.  We're also using TPUs to provide those responses.

**Q.**   Can you just explain a little bit what Gemini is at a high level?

**A.**   Sure.  So Gemini is one of Google's -- it's a leading multimodal model, so it supports -- we use it in a broad range of Google services.  So, for example, we use it to power our search offerings.  We use it within other Google offerings, like Gmail, for example.  So we use it on the consumer side of our business, supporting applications that folks like yourself might use.

We also use it within our enterprise Google Cloud business that provides services to companies like we talked about before.

**Q.**   Does Google sell its TPU chips?

A.   We use them internally to power our own services, and then we provide them as a cloud service through Google Cloud.

Q.   Can you explain what it means when you provide TPUs as a cloud service?

A.   Sure.  So it basically means a company, like let's say Anthropic, could come to us and say, "We would like to use those TPUs for a year or for two years."  And they would pay us for those -- that service as they're using it.

Q.   So they wouldn't actually be able to purchase or own the chip; is that right?

A.   No.  When we're brought in as a cloud service, they're basically renting it from us.

Q.   Have other companies developed chips that are similar to Google's TPUs?

A.   Yes.  So our competitors have -- are working to develop similar chips.  So AWS has something -- AWS has something called Trainium.  They're on their third generation.

     And then Microsoft Azure has something called Maia, which is a little bit earlier on.

     But we have been developing our own in-house chips for longer than any of those other companies.  As I had mentioned before, we're on our seventh generation now.

Q.   When you say "AWS," what are you referring to?

A.   AWS refers to Amazon Web Services.  It's a competitor to Google Cloud.

Q.   Approximately how many different teams have worked on developing Google's TPUs?

A.   So there are many people involved in developing these TPU systems.  You know, hundreds, if not thousands of engineers over many years.

Q.   And do you have a sense of how much Google has spent on the development of its TPU chips?

A.   Tough to estimate the exact amount, but easily it's in the billions, if you think about the number of people involved over this many years and -- but not only the people involved that are creating these great products but also the capital, the purchase of the chips that we then deploy in our data centers. So it's a significant investment.

Q.   All right.  I want to talk a little bit about Google's use of GPUs.  You mentioned that Google purchases GPU chips from Nvidia.

Does Google -- are there aspects of Google's GPU supercomputers that are unique to Google?

A.   Yes.  So we start with Nvidia GPUs, like our competitors do, so the actual chips themselves and some of the hardware around that.  But then we look to add value to our cloud customers through additional hardware capabilities and software capabilities that we effectively wrap around those chips from Nvidia.

Q.   You answered this question a little bit, but how does

Google use its GPU supercomputers?

**A.** How -- sorry. Can you say that --

**Q.** How does Google use its GPU supercomputers?

**A.** So we primarily use the GPU supercomputers to provide them as a cloud service to our enterprise customers in Google Cloud. So they could basically train or serve models on that infrastructure.

**Q.** Can you give an example of what an enterprise customer might use Google's GPU supercomputer for?

**A.** So if I just -- I give one example that maybe somebody might be familiar with. If you think about Spotify, if you've used the Spotify music serving -- service on your phone, so that service is -- so you're accessing the music on your phone. That service is running in Google Cloud, and so we would basically stream that music from Google Cloud to your phone.

Also, if you think about it's giving you recommendations about what songs you might like next, that could be powered by something like a GPU supercomputer.

**Q.** So Spotify, in that example, would be using Google's hardware; is that right?

**A.** That's right. And Google Cloud.

**Q.** Do other companies offer GPU-based supercomputers in the cloud?

**A.** They do.

**Q.** How does Google's GPU supercomputer compare to other

companies' supercomputers?

A.   You know, we like to think it compares very favorably. What we -- even though everyone's building it based on the same Nvidia chips and some of the Nvidia hardware, we look to differentiate and add value in the software on top of that hardware.

And that software is really important to ensure the reliability of these systems so they don't go down for users and to ensure great performance.

So if you think about when you go to one of these AI applications, you ask it a question, you'd like to not have to wait too long for it to come back.  So performance is really, really important.  Security is important.

And so all of these areas, we look to enhance and augment the base Nvidia GPUs with these additional software services.

We also leverage some of our own networking technology to connect these Nvidia GPU-based systems together.

Q.   You mentioned reliability.  Why does reliability matter for these AI supercomputers?

A.   It's -- it's -- reliability is really, really important. So if you think about what we were talking about before of you've got to train the model and then you have to serve the model, you can sort of see why reliability is important for both of those dimensions.

If you think about training the model, if the training

task takes, let's say, three months -- right? -- if you got, like, halfway through it and then you had a failure and had to restart, you would have lost a month and a half of time. Right?

So the reliability of these systems is super important so you can complete those training jobs as quickly as possible and not waste time and money. So it's important for training.

It's also important for serving or inferencing -- "inferencing" is the technical term we sometimes use -- because if you think about AI, it's getting built into these applications that we're all using. If those aren't available, that can affect people's lives -- right? -- if you don't have the ability to go in and do some of the things that we talked about before.

Q. And I asked you a question about the number of people who worked on Google's TPU chips. I'd like to ask you the same question about Google's GPU-based systems.

Do you have a sense of how many different teams have worked on building Google's GPU systems?

A. Yeah. It's a, you know, similar order of magnitude. Large number of teams; hundreds, if not thousands, of engineers over many years.

Q. And do you have a sense of how much Google has invested in building its GPU-based systems?

A. It's hard to know the exact number, but, again, it's

easily in the billions, using sort of this -- thinking about it the same way as I described before for TPUs.

Q.   And I asked you about the different versions of the TPU chip.  Understanding that Google doesn't make a GPU chip, are there different versions of GPU-based products that Google offers in the cloud?

A.   Yes, there are.

Q.   Can you talk a little bit about that?

A.   Sure.  So Nvidia delivers different versions of their GPU chips.  We then take those versions and we deploy them in our data centers and offer them as a service to our customers.

So, for example, a few years ago, there -- what they were providing was something called the Hopper chip, or the H100, and so we delivered that to our customers.

Since then, they've moved on to Vera -- sorry -- Blackwell, the Blackwell chip.  And now they're most recently shipping generation is called Rubin or Vera Rubin.

So they have every -- roughly once a year to every year and a half, they'll come out with a new generation of these GPUs that improves their performance, improves the cost-effectiveness, et cetera.

Q.   All right.  I want to go back and talk a little bit about Google's data centers.

Where are Google's data centers located?

A.   So we have data centers in many different countries around

the world.

**Q.**   And approximately how many data centers?

**A.**   So there's, you know, easily over 100 data centers in, I think, around 50 different countries around the world.

**Q.**   And where are Google's customers located?

**A.**   We have customers all over the world.

**Q.**   And do you have data centers in every state in the country?

**A.**   We do not have data centers in every state in the U.S.

**Q.**   Do you have users of Google's artificial intelligence and machine learning products in every state in the country?

**A.**   We do.  If you think about something like Gmail, probably that's being used in every -- every state in the U.S.

**Q.**   And how does Google serve those customers?

**A.**   So we serve them from that smaller number of data centers. So, for example, if I take the Gmail example, if you're a user of Gmail and say you're living in -- I'm making this up -- in Missouri where we don't have a data center but we do have a data center in Ohio, we would perhaps serve that customer that's sitting in Missouri from our Ohio data center.

**Q.**   And does Google use its data centers to provide services to users or customers in different countries as well?

**A.**   We do.

**Q.**   Does Google have data centers in mainland China?

**A.**   We do not have data centers in mainland China.

Q.   Does Google Cloud serve Chinese companies?

A.   We do.

Q.   Tell me how that works.

A.   So there are a number of Chinese companies that are effectively multinational companies; so they're headquartered in China, but they're looking to provide services to companies and to consumers in different countries around the world.  And so those Chinese companies might look to run those services on Google Cloud in those other countries where they don't have a data center themselves.

Q.   And does Google compete with companies that are located in China?

A.   Yes.

Q.   Can you explain that?

          MS. KRSULICH:  Objection, Your Honor.

          THE COURT:  Overruled.

          THE WITNESS:  We do.  So there are both cloud companies in China -- for example, Alibaba Cloud -- and there are also computing hardware companies in China -- for example, Huawei -- that we compete with.

BY MS. PRIEDEMAN:

Q.   And how does Google compete with those companies if Google doesn't have data centers in mainland China?

A.   Yeah.  So if you think about, for example, Alibaba Cloud, they're headquartered in China.  They're a Chinese company.

But they also have data centers in other countries and regions around the world.  So, for example, they have a data center in Singapore.  Google also has a data center in Singapore.  And so in those cases, we might end up competing with them for customers in that area.

Q.   Has China developed a competitive product that compares to Google's TPUs?

A.   So nothing as advanced, but they are working on chips, AI chips.

Q.   All right.  Mr. Lohmeyer, did you review the documents at issue in this case alleged to be trade secrets stolen by Mr. Ding?

A.   I did.  I looked at -- there was a long list of documents, and then I double-clicked into maybe 10 or 20 of them.

        THE COURT:  Ms. Priedeman, before we continue, it seems like we're kind of switching topics.  Is now a good time to break for lunch?

        MS. PRIEDEMAN:  Sure.

        THE COURT:  Okay.  Why don't we break for lunch.  We will resume at 1:15.

        I'll just remind you to bring your notepads with you back to your jury room, and do not discuss the case with each other or with anybody else, and don't try to do any research about the case on the Internet or anywhere else.

        And enjoy your lunch break.  We'll see you back here.

We'll be ready to walk you in right at 1:15.  Thank you.

THE COURTROOM DEPUTY:  All rise.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Okay.  Thank you.  You can step down.

Anything anyone needs to discuss with me before we break for lunch?

MS. KRSULICH:  No, Your Honor.

MR. BOOME:  No, Your Honor.

THE COURT:  Okay.  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Luncheon recess taken at 12:30 p.m.)

AFTERNOON SESSION                                    1:20 p.m.

(Proceedings were heard in the presence of the jury.)

THE COURT:  All right.  Take it away.

BY MS. PRIEDEMAN:

Q.   All right.  Hello, again, Mr. Lohmeyer.

A.   Hello.

Q.   I'm going to return to the questions that I was just starting to ask before the break.

So I had asked if you reviewed the documents at issue in this case alleged to be trade secrets stolen by Mr. Ding, and I believe you said you reviewed them.  You had opened some of the files and reviewed the file names; is that correct?

A.   That's right, yeah.  I saw the list of the names of the documents and then double-clicked on a number of them.

**Q.** What level of detail did you review the documents?

**A.** Not -- not super deep, but kind of in looking at the ones that I did, it was pretty clear there was very specific technical information there.

**Q.** And at a high level, what did the documents that you reviewed relate to?

**A.** So I would say there were sort of three large categories of things they covered.

The first was the TPU chips and the systems around the TPUs, the second was GPU-based systems, and then the third was relating to SmartNIC technology.

**Q.** And at a high level, can you describe to the members of the jury what SmartNIC is?

**A.** Sure. So NIC, N-I-C, stands for network interface card. If you think about, like, your desktop from maybe ten years ago, you'd, like, plug an Ethernet cable into the back of it to connect it to the network. It was connecting into a network interface card. So that's the sort of -- the type of technology.

But a SmartNIC, what makes the NIC smart, it's actually that that card has on it additional processing capabilities. And what this allows us to do is basically offload the main CPU or GPU or TPU of the system so that that main processing unit is able to be used fully for the application, and then you run some of the other tasks, like security or network processing,

on this SmartNIC.

So that's what sort of makes it smart.  It has this additional capability.  And this can help improve the overall performance and security and reliability of that whole system.

MS. PRIEDEMAN:  Ms. Hernandez, can you pull up Demonstrative Exhibit 1, please.

BY MS. PRIEDEMAN:

Q.   Mr. Lohmeyer, this is the diagram we looked at earlier.

What layers of the AI supercomputer did the documents you review relate to?

A.   So it covered the TPU-based systems, so the chips; the servers that they went into; how they're networked together; and some of the system-level capabilities on top is the first area.

The second area is the same thing but for GPU-based systems.

And then the third area, you don't see it fully on this slide, but basically, that SmartNIC would sit within that server, and those SmartNICs are connected to each other that allows all those servers to be connected to each other across that network on the bottom there.

Q.   Were there also software documents that you saw in the documents?

MS. PRIEDEMAN:  All right.  Ms. Hernandez, you can pull that down.

(Reporter interrupts to clarify the record.)

THE WITNESS:  Yes.

Sorry.

BY MS. PRIEDEMAN:

Q.   Mr. Lohmeyer, in your role as an executive at Google, are you responsible for understanding the competitive landscape in which Google Cloud operates?

A.   I am.

Q.   Do you have an understanding of how Google would be impacted if a competitor company were able to produce a product comparable to Google's TPU chips and systems?

A.   I do.

MS. KRSULICH:  Objection.

THE COURT:  Overruled.

BY MS. PRIEDEMAN:

Q.   How would it impact Google?

A.   So if a competitor were able to offer comparable systems, we would either have to reduce our price to match whatever they're charging for them, or we could -- or if we didn't, we would potentially risk losing customers if they were able to offer a similar capability at a lower price.

Q.   And do you have an understanding of how Google would be impacted if a competitor company were able to market a product comparable to Google's GPU products?

A.   Same sort of -- same sort of thing.  If they were able to

market something that's comparable but at a lower cost, we would -- this is a highly competitive market, so customers are always looking at the capabilities and then how much do I have to pay for their capabilities, as you might imagine.

So if someone is able to offer the same or similar capabilities but at a lower cost, we would have no choice but to lower our cost to match it or we would risk losing that customer to the competitor.

**MS. PRIEDEMAN:**  No further questions, Your Honor.

**THE COURT:**  Okay.  Thank you.

Any cross?

**CROSS-EXAMINATION**

**BY MS. KRSULICH:**

**Q.**   Good afternoon, Mr. Lohmeyer.  My name is Lora Krsulich. I represent Mr. Ding.

Everything you testified about is public; right?

**A.**   Everything that I test about -- testified.  I'd have to think through each specific point, but I think so.

**Q.**   Google is one of the largest technology companies in the world; correct?

**A.**   We are one of the largest companies in the world.

**Q.**   Google has tens of thousands of employees?

**A.**   Yes, we do.

**Q.**   How many employees work on AI and the computing infrastructure business?

**A.**   As I mentioned before, it's in the hundreds, if not thousands.

**Q.**   It's hundreds of thousands?

**A.**   No.  Sorry.  Not hundreds of thousands.  Thousands.

**Q.**   Okay.  And different teams handle different parts of Google's system; correct?

**A.**   Different teams do handle different parts of the system.

**Q.**   It took thousands of people to build Google's AI system?

**A.**   Yes, over the last ten years.

**Q.**   Google spends billions of dollars on data center technology every year?

**A.**   We do invest significantly, yes.

**Q.**   Data centers are one of Google's biggest and most expensive efforts?

**A.**   I'm not sure if it's the biggest and most expensive, but it's a significant investment.

**Q.**   What is involved in building one of the data centers?

**A.**   Can I ask a clarifying question?  You mean the physical data center?

**Q.**   Go ahead.  Physical, software.

**A.**   I'm not familiar with the physical -- how the physical data centers are built.

**Q.**   Okay.  What about the software that goes into the data centers?  What goes into building that?

**A.**   Significant engineering investment.

**Q.**   You need people to find the property -- right? -- to build the data center?

**A.**   I'm not responsible for the data centers themselves.  So I don't know the -- I'm not responsible for that area.

**Q.**   Do you know how many people work in a data center?

**A.**   I don't.  That's a different part of the team.  That's not within my responsibility.  I'm responsible for the systems that go inside the data centers.

**Q.**   Okay.  Do you know how often the equipment in the data centers get replaced?

**A.**   Not specifically, no.

**Q.**   Do you know how often you need to replace the chips in the data center?

**A.**   So, as I mentioned before, we would typically deploy a system, and then we leave it there to sell as a service to our customers or to use internally for an extended period of time.

**Q.**   How often does Google come out with new chips?

**A.**   So we will come out with new TPU chips roughly every one to two years.

**Q.**   One to two years.

And how many data centers does Google have around the world?

**A.**   As I mentioned before, it's over a hundred.

**Q.**   Each data center takes multiple years to build?

**A.**   Again, I'm not responsible for the build of the physical

building data center.

Q.   You joined Google in 2023?

A.   Yeah.  Roughly three years ago.

Q.   Some of the trade secret -- alleged trade secret documents, they predate your time at Google; right?

A.   I'm not familiar with the specifics of the documents and the dates on the documents.

Q.   Oh.  So when you were testifying, you weren't talking about the documents; right?

A.   No.  I mean, I saw the list of the documents, but I didn't go through the specific dates on them.

Q.   Before your testimony here today, had you ever opened one of the documents?

A.   Yes, I did.

Q.   Sorry.  Prior to preparing for your testimony today?

A.   Prior to preparing for the testimony, I don't believe so; but I didn't -- I'm not a hundred percent sure because I -- there was a long list of documents and I only double-clicked on maybe 10 or 20 of them.  But I -- so I'm not sure.

Q.   So outside the context of this case, you don't think you ever looked at any of the documents?

A.   Outside the context -- again, it's tough for me to say because there were so many documents.  It's possible I came across some of them prior, but I mean, there were hundreds of documents, so I don't know.

Q.    What is open source software?

A.    So open source software is software that is provided under what's called an open source license.  And what this means is that anyone can basically see that code and can use it -- can use it and compile it for their purposes.

Q.    Does Google make some of its software open source?

A.    We do make some of our software open source.

Q.    Google's AI infrastructure is designed to work together; correct?

A.    Can you be a little bit more specific?  I'm not sure.

Q.    Sure.

        MS. KRSULICH:  Mr. Jay, would you please pull up Demonstrative 1.

        Oh, for Mr. Lohmeyer.  Mr. Lohmeyer's Demonstrative 1.

        Would the Government pull up Demonstrative 1?
Thank you.

BY MS. KRSULICH:

Q.    This is the demonstrative that you used during your --

A.    Oh, yeah.

Q.    -- testimony.

A.    Mm-hmm.

Q.    The different layers that you talked about, Mr. Lohmeyer, they all work together; right?

A.    We design them to work together as a system.

Q.    So the cluster manager works together with the system

**LOHMEYER - CROSS / KRSULICH**

software?

A.   Yes.   Yes.   They're not required to work together, but they -- we optimize them to work together across that system.

Q.   They work together.

The system software works together with the servers; correct?

A.   The system soft- -- yes, it does.   Again, it's a separate layer, but from an engineering perspective, we build each layer and then we optimize across those layers as well.

Q.   The system is optimized to work together?

A.   That's correct, yes.

Q.   Each part of the system depends on the other parts?

A.   Yes, they do.   It works as an end-to-end system.

Q.   Your testimony was about AI's -- Google's AI infrastructure generally, not about the specific documents in this case; right?

A.   Yeah.   My testimony was about the overall AI systems and things that we talked about earlier.   And as I mentioned, I did look at the list of documents, and I double-clicked on a few of them specifically.

Q.   You double-clicked on a few?

A.   I mean, I -- sorry.   I looked into the contents of the document to get a sense for what was in there.

Q.   Okay.   And this case is about those specific documents. You understand that?

**A.**   Yes.

**Q.**   The documents in this case don't cover everything Google does; correct?

**A.**   That's correct.

**Q.**   So you testified that if a competitor were able to gain access to Google's TPU chip, it could harm Google?

**A.**   I think what I said is that if a competitor was able to enable similar capabilities to what Google has and offer that at a lower price point in the market, that we would have -- because it's a competitive market, customers can choose, we would either have to lower our prices and, therefore, lose revenue and margins; or if we would keep our prices the same and a competitor has something that's roughly similar at a much lower cost, then we would risk losing that customer and risk losing the entire business.

**Q.**   What do you mean by "enable similar capabilities"?

**A.**   Similar capabilities to either the TPU-based systems or the GPU-based systems.

**Q.**   Where are Google's TPUs fabricated?

**A.**   I think that's -- I think that's confidential information.

**Q.**   Okay.  How much does it cost to fabricate Google's TPUs?

**A.**   I'm not familiar with the details of how much it costs to fabricate them.

**Q.**   How many people are involved with fabricating them?

**A.**   I'm not deep into the area of chip fabrication, so I'm not

sure.

Q.   So you testified that if a competitor were to gain access to the design of a SmartNIC, it could use it to create a competitive product; is that right?

A.   If a -- if a competitor had -- was able to offer similar capabilities to what we offer with either the TPU-based systems or the GPU-based systems, similar capabilities but at a much lower price point, because this is a very competitive market, we would then have to respond.

So we would either have to reduce our prices to keep that customer, which for Google would mean lower revenue and lower margins; or if we would keep the prices where they were, we would risk that customer going to the competition.

Q.   And similar capabilities, are you talking about the data centers?

A.   No.   I'm talking about the actual services based on those systems.

Q.   So if someone were to replicate all of Google's services, that might be harm to Google?

A.   I wouldn't want to comment on all Google services.   But specific -- but specific TPU -- TPU systems or GPU systems with similar capabilities, again, this is a very competitive market, so it could have that -- it would have that risk.

Q.   And you testified that Amazon Web Services is one of Google's competitors?

**A.**    They are.

**Q.**    And Microsoft is one of Google's competitors?

**A.**    Microsoft Azure, yes, in the cloud.

**Q.**    Your business is worth billions of dollars; is that correct?

**A.**    I don't know if I can share the specific revenue, but it's a large-scale -- yeah, Google Cloud is a multiple-billion-dollar business.

**Q.**    Your testimony did not identify a single trade secret document that alone is worth billions; right?

**A.**    I'm not familiar with the specific contents of those documents, and I'm not an expert on what "trade secret" means.

**Q.**    Okay.  Fair to say none of the documents in this case are worth billions of dollars?

**A.**    I wouldn't necessarily say that or know that.  The revenue associated with the products is in the billions of dollars, and so there is certainly a risk to the business of that order of magnitude if a competitor had similar capabilities.

**Q.**    When it comes to hardware, Nvidia is a competitor of Google?

**A.**    No.  They're actually a partner of ours.  So we work very closely with them.  We actually -- in some ways, we're a customer of theirs.  We buy their chips and their systems, and then we deploy them in Google Cloud, and we use that to provide services to our customers.

**Q.**   So Google did not develop Nvidia's GPUs?

**A.**   We did not develop, no.  We buy them from Nvidia.

**Q.**   Google is not claiming that Nvidia's GPUs are Google's trade secret information; right?

**A.**   Again, I'm not an expert on specific -- what was specifically proposed from a trade secret perspective; but from a simple business perspective, the way it works is that we're a customer of Nvidia.  So we basically buy chips from them.  We also buy some additional hardware from them.  We deploy that into systems in our data centers, and we deliver that as services -- cloud services to our customers.  We charge the cloud customers for the services based on those systems.

And then those systems also include Google intellectual property that helps differentiate those from the competition.

**Q.**   Google announced TPU v5e in August 2023; is that right?

**A.**   I don't know the specific date there.

**MS. KRSULICH:**  Mr. Jay, would you please pull up Exhibit 5193 for Mr. Lohmeyer and the Court.

**BY MS. KRSULICH:**

**Q.**   Mr. Lohmeyer, are you familiar with Exhibit 5193?

**A.**   Yes.  This looks like a blog that I probably helped write.

**Q.**   What is it, Mr. Lohmeyer?

**A.**   It's a blog that announces two new coming products that you can see in the headline here.

**Q.**   What are the company products that it's announcing?

**A.**    So it's announcing Cloud TPU v5e, which at that point in time was the latest TPU-based system that we were making available to customers.

And it also announces what's called the A3GA.  So A3 is our product name for the service that is based on the Nvidia GPU.  So A3GA means we're going generally available to our customers for that product based on the Nvidia chips with our additional value around it.

**Q.**    How do you recognize this document?

**A.**    The headline just looks familiar to me.

**Q.**    And what is the date on the document?

**A.**    August 2023.

    **MS. KRSULICH:**  If you could scroll to the second page, please.

**BY MS. KRSULICH:**

**Q.**    And this is a document that you authored?

**A.**    Yes.  It was authored between myself and Amin, who is my manager.  And a team worked on creating the content in the document.

    **MS. KRSULICH:**  Your Honor, move to admit Exhibit 5193 into evidence.

    **MS. PRIEDEMAN:**  No objection.

    **THE COURT:**  Admitted.

    (Trial Exhibit 5193 received in evidence.)

    **MS. KRSULICH:**  Permission to publish to the jury?

THE COURT:  Go ahead.  You don't need to ask permission.

MS. KRSULICH:  Thank you.

BY MS. KRSULICH:

Q.   Google also announced multislice technology in August 2023; correct?

A.   I would have to look at the following pages of the document.

Q.   Let me help you.  So on page 6, 5193006.

A.   Yes.

Q.   Okay.  So Google also announced multislice technology in August 2023?

A.   Yes.  We announced it's in preview; that's right.

Q.   Multislice technology allows users to easily scale AI models beyond the boundaries of physical TPU pods up to tens of thousands of chips?

A.   That's correct.

Q.   Can you explain what that means?

A.   So as we were talking about before, we have these large-scale TPU pods in a single physical pod, like we saw a picture of.  There are thousands, 8,000 or 9,000 chips specifically in a pod.

The interesting thing is that for these really large-scale training jobs, sometimes you need to span multiple pods.  So you need to go from, let's say, 8- or 9,000 chips to tens of

thousands of chips.  And so this software allows us to run those training jobs across multiple of those large-scale pods.

Q.   That technology was available to all Google Cloud customers starting in August 2023?

A.   So I don't know the specifics of all.  Basically, it says -- so this announcement says "preview."  Typically, in preview, we'd make it available to a small subset of customers to get their feedback.

Q.   In the following month, it was made available to all Google customers?

A.   It would be made available to all customers when we go GA, generally available.

Q.   Okay.  Do you recall when that happened?

A.   I don't.  Sorry.

Q.   Google announced TPU vF -- or, sorry -- v5p in December 2023.  Does that sound right to you?

A.   If you could -- if you could show me the document and confirm it, yeah.

Q.   Sure.

        MS. KRSULICH:  Mr. Jay, could you please pull up Exhibit 5402.

BY MS. KRSULICH:

Q.   Mr. Lohmeyer, are you familiar with Exhibit 5402?

A.   I am familiar with the headline and -- yes.

Q.   Okay.  What is it?

A.    It's announcing TPU v5p and the AI Hypercomputer.

Q.    And how do you recognize it?

A.    It looks like a headline that I'm familiar with.

Q.    What is the date on the article?

A.    December 2023.

Q.    And are you the author of this blog post?

A.    I believe I am.  If you could --

        MS. KRSULICH:  Scroll down, please.

BY MS. KRSULICH:

Q.    That's you?

A.    That's correct.

        MS. KRSULICH:  Your Honor, may I move to admit this exhibit?

        MS. PRIEDEMAN:  No objection.

        THE COURT:  Admitted.

    (Trial Exhibit 5402 received in evidence.)

        MS. KRSULICH:  May I publish to the jury?  Oops. Sorry.

        THE COURT:  It's okay.

        MS. KRSULICH:  Bit of formality.  Apologies.

BY MS. KRSULICH:

Q.    This blog post established that TPU v5p was publicly -- or was announced in December of 2023.

A.    Yes.  If you could go to the details, it would be more specific, but I believe so.

Yes.  It says [as read]:

"We're excited to announce TPU v5p."

Q.   This was available to all customers -- TPU v5p was available to all Google Cloud customers as of December 2023?

A.   I can't tell from this page whether it was GA or preview at this time.

Q.   Either way, it was made available to some folks outside of Google; right?

A.   Yes.  It was -- well, to be specific, we announced it. Sometimes the actual availability comes a little bit later.  So it's just a marketing announcement of that.

MS. KRSULICH:  Sorry, Mr. Jay, but could we please go back to Exhibit 5193.

BY MS. KRSULICH:

Q.   Google announced an A3 VM powered by Nvidia H100 Tensor Core GPUs in August 2023; correct?

A.   If you could show me that here, I could confirm it.

Q.   Okay.  Let's go to page 8.  Do you see it?

A.   So -- aah, yes.  Sorry.  Yes.  It says [as read]:

"A3 VMs, which are based on the Nvidia H100, will be generally available next month."

Q.   What is an A3 VM?

A.   So A3 VM, it's a Google Cloud service that we offer to cloud customers that is based on the underlying Nvidia GPU that you see here, the H100 GPU.

**Q.** A3 enabled users to scale models to tens of thousands of Nvidia H100 GPUs; correct?

**A.** Yes.  We enabled them to run at those scales.

**Q.** And this would be available next month, meaning September 2023?

**A.** So we -- normally, we'll announce something publicly and we'll give an indication of when we expect it to be generally available, and then we try to hit that future date.  And sometimes we do, sometimes we don't.  But the goal would be to make it available at the date that we announced.

**Q.** Okay.  Google does not sell its SmartNICs; correct?

**A.** We do not sell our SmartNICs separately.  We use them within those systems.

**Q.** Now, in December 2023, Google also released a product called the Dynamic Workload Scheduler.  Do you recall that?

**A.** I'm familiar with the Dynamic Workload Scheduler capability.  I don't remember offhand the specific date.

**Q.** Please tell me about the Dynamic Workload Scheduler?

**A.** So the Dynamic Workload Scheduler, it's a piece of software that provides a capability within Google Cloud that allows our cloud customers to specify the start date and end date that they would like to consume a certain number of either TPUs or GPUs.

So for these AI-based systems, sometimes, let's say you have a research team of scientists and they want to run an

experiment.  They want to make sure that they have the GPUs or TPUs they need for a very specific period of time and that no one else can take them away from them while they're using them.

So DWS allows them to -- it's kind of like scheduling a hotel room, start date, end date, and how much you get.  And then the customer would only play Google Cloud for those services when they're actually using them.

Q.   Dynamic Workload Scheduler is a resource management and job scheduling platform?

A.   It is.

Q.   It is built on Google Borg technology?

A.   I'm not familiar with the underlying technology platforms that it's based on.

Q.   You published that it is built on Google Borg technology?

A.   Okay.  If you could show me, I'm happy to take a look.

Q.   Let's see.  I think this is 5193 at page 8.  If not, I'll get back to you on that.

MS. KRSULICH:  5193, 008.  It's the document titled "Dynamic Workload Scheduler."

Sorry, I must have the exhibit wrong.  No worries. I'll move on.

BY MS. KRSULICH:

Q.   Mr. Lohmeyer, you give many public presentations on behalf of Google; right?

A.   I give presentations, yes.

**Q.**   You give presentations at industry conferences?

**A.**   I do.

**Q.**   And customer and partner events?

**A.**   I do.

**Q.**   You never reveal Google confidential information in those presentations, do you?

**A.**   No.  I focus on explaining the capabilities and functionality of the system that differentiates us from the competition that would encourage a customer to choose us compared to somebody else.

**Q.**   What is the AI Infra Summit?

**A.**   The AI Infra Summit is an industry-level event that -- I don't know how long they've been doing it, but I presented at one last year.

**Q.**   You delivered the keynote there; right?

**A.**   I delivered one of the presentations.

**Q.**   How many people attended?

**A.**   I don't remember offhand.  Hundreds, maybe thousands.

**Q.**   Oh, thousands.  Okay.

Your presentation's available online?

**A.**   I think they recorded it, yes.

**Q.**   And you agree, it's a public presentation?

**A.**   It is public.

            **MS. KRSULICH:**  Mr. Jay, could you please pull up the video presentation.

BY MS. KRSULICH:

Q.   This is you at the summit, Mr. Lohmeyer?

A.   That's me.

Q.   These are your slides, first one?

A.   Yes.

Q.   What does it say at the top right-hand corner of your slide?

A.   "Proprietary and Confidential."

Q.   Your slide says "Proprietary and Confidential"?

A.   It says that.

Q.   This is you presenting at that AI summit in front of thousands of people?

A.   That is me, yes.

Q.   Why is your slide marked "Proprietary and Confidential"?

A.   It's a good question.  Probably someone forgot to remove it.

Q.   They forgot?

A.   Yeah.

        MS. KRSULICH:  No further questions.

        THE COURT:  Any redirect?

        MS. PRIEDEMAN:  Just a few questions, Your Honor.

                    REDIRECT EXAMINATION

BY MS. PRIEDEMAN:

Q.   Mr. Lohmeyer, defense counsel showed you a few product announcements that you authored, on cross-examination; right?

**A.**   Yes.

**Q.**   Can you talk about, at a high level, what type of information those public announcements contained?

**A.**   So, typically, the goal of these public announcements is to get our potential customers excited about the new products that we're launching and to have them choose us versus the competition.  So we're really thoughtful about what we put in there.  We want to provide the right level of information that allows the customer to make a good decision.

This is typically sort of high-level capability and how that capability differentiates us from the competition.  But we're also very thoughtful about how deep we go.  Obviously, we don't want to provide very, very detailed information that a competitor could use against us.  So we're always trying to strike that balance correctly.

**Q.**   Is there an approval process that you have to go through at Google before you publish an article like that?

**A.**   There is, yes.

**Q.**   Can you tell the members of the jury what that approval process looks like?

**A.**   It's fairly robust.  So there is a team of people that create the document.  Each specific technical claim in there, we have to validate that it's technically true and accurate. The document itself gets reviewed by multiple VPs across different functions to confirm, you know, that they agree that

that is correct information.

Typically, I'll be involved in the review.  Sometimes my manager will also be involved in that review.  Because we want it to, obviously, have the biggest impact in the marketplace, really help our customers understand the value of our solutions in a compelling way.  We obviously want it to be factual.  But, again, we also want to make sure we don't reveal too much technical details, kind of in the weeds, because then one of our competitors could take that and try to replicate that technology.

Q.   And just high level, to give some context to some of these product announcements, the TPU product announcement, was that a product announcement for one of the TPU cloud products you were talking about earlier?

A.   It was.

MS. KRSULICH:  Objection.  Leading.

THE COURT:  Overruled.

BY MS. PRIEDEMAN:

Q.   Did that announcement contain detailed specifications about the internal organization, design, and programming interface of Google's TPU chips?

A.   It did not contain those specific details.

Q.   Why not?

A.   Because we would not want that to get into the hands of our competitors that they could use against us.

And an analogy I would use here is, if you think about, like, an automobile manufacturer announcing a new car, you know, they would say, "Hey, it's got this much horsepower.  It can go this many miles per gallon.  It's got these all-season tires."  Those are all things that help the customer make a purchase decision.  But they wouldn't go into the specifics of how the engine was actually designed.

We kind of take the same approach.

MS. PRIEDEMAN:  No further questions, Your Honor.

THE COURT:  Any recross?

MS. KRSULICH:  Mr. Jay, could we please put up that video of Mr. Lohmeyer at that conference one more time.

### RECROSS-EXAMINATION

BY MS. KRSULICH:

Q.   No competitors were present at this conference?

MS. PRIEDEMAN:  Your Honor, objection.  This hasn't been admitted into evidence, nor is there an exhibit number.

THE COURT:  Overruled.

MS. KRSULICH:  Your Honor, I would move to admit a screenshot of this exhibit -- of this -- of the screen as it is right now into evidence.

THE COURT:  Any objection?

MS. PRIEDEMAN:  Yes, Your Honor.  We have not been given this exhibit.  It's not on the exhibit list.  There's no exhibit number.

THE COURT:  Okay.  I'll admit it for now, and you can move to strike it later, and we can discuss it later.

MS. KRSULICH:  And we can mark it as 8000.

(Trial Exhibit 8000 received in evidence.)

BY MS. KRSULICH:

Q.   Competitors were present?

A.   Competitors were present, yes.

MS. KRSULICH:  No further questions.

THE COURT:  Okay.  Thank you.  You can step down.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  And the Government can call its next witness.

MR. CHANG:  The United States calls Heather Adkins to the stand.

(Witness enters the courtroom and steps forward to be sworn.)

THE COURTROOM DEPUTY:  You can be seated.

Please raise your right hand.

HEATHER LYNN ADKINS,

called as a witness for the Government, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.

Please state and spell your full name for the record.

THE WITNESS:  Heather Lynn Adkins, H-e-a-t-h-e-r,

L-y-n-n, A-d-k-i-n-s.

**DIRECT EXAMINATION**

BY MR. CHANG:

Q.   Good afternoon, Ms. Adkins.

A.   Good afternoon.

Q.   Where do you currently work?

A.   I currently work at Google.

Q.   Can you move the mic down so we can better capture your voice?

A.   Is this better?

Q.   A little bit higher, please.

A.   Is that better?

Q.   Yes, perfect.

A.   Okay.

Q.   I'll ask the question again.

Good afternoon, Ms. Adkins.  Where do you currently work?

A.   I currently work at Google.

Q.   How long have you worked at Google?

A.   For about 23 1/2 years.

Q.   At a high level, can you please walk the jury through the different jobs that you've had at Google for the last 23 1/2 years?

A.   So my first job at Google was what we call a systems administrator.  So I worked on the computing systems at Google, keeping them online, upgrading software.

But my primary responsibilities in the early days were cybersecurity, so ensuring the security of our systems.  And that role has grown over time as the company has grown.  So I began to manage teams.  Those teams grew over time, and today I'm the vice president of security engineering.

Q.   You mentioned that your current job is vice president of security engineering.  What does your day-to-day job look like?  What are your roles and responsibilities?

A.   So my roles and responsibilities are ensuring that Google has the policies, standards, the strategies for keeping the company safe, for building secure products, and for securing the information that the company holds.

Q.   You mentioned the term "security engineering."  Some of us may not be familiar with that term.  What does that term mean within Google?

A.   So security engineering is a field.  We often hear it called cybersecurity sometimes.  And the purpose of security engineering is to ensure the computing systems, when we build them, are safe from hackers, for example, or people committing fraud.

You have to design systems securely, very similar to how you would design a car that's safe.  Car manufacturers have engineers that do safety, and security engineering in the computing field is very similar.

Q.   How large is the security engineering team that you lead?

**A.**    Well, at Google, total, we have over 8,000 people that work on cybersecurity.  My direct team is about a thousand of those, but I oversee the strategy for the whole company.

**Q.**    Let's turn now to Google's investigation of the defendant, Linwei Ding.

Are you familiar with that investigation?

**A.**    Yes.

**Q.**    How are you familiar with it?

**A.**    So in late December of 2023, I was given an executive notification of an incident that my team was investigating, and that's the first time that I became aware of it.

**Q.**    What initial information was provided to you in that notification?

**A.**    So we'd received some information that Mr. Ding had been presenting at an investor conference in China and that some of the information presented there looked like he had started a company in the AI space, and we began to look at kind of what the implication of that might be.

**Q.**    Was there anything about that initial information that was shared with Google that raised any concerns at all?

**A.**    Well, in December of 2023, like today, artificial intelligence is the area of innovation kind of top of mind for companies like Google.  We've been investing in AI for a long time, and the information that was being presented at this conference suggested that Mr. Ding's new company was related to

that and that there might be information that he had from his time at Google that might be used to help that company.

MS. KRSULICH:  Objection.

THE COURT:  Overruled.

BY MR. CHANG:

Q.   You mentioned that you received an executive notification. By the time you received that notification, had Google categorized the seriousness of the investigation?

A.   We had.  Very quickly after receiving the information that this presentation had been done, within a few hours, the investigation team had been able to pull together quite a lot of information about Mr. Ding's internal company behaviors, so digital records, and we knew enough by that point to assign our highest severity on the incident.

Q.   What is that severity level?

A.   It's Severity Level 0.  So the smaller the number, the higher the severity.  But it is our highest level.

Q.   Can you explain what that means in terms of how Google categorizes its internal investigations?

A.   So we -- you know, the company's quite big, and we do a lot of investigations when they're brought to our attention.

And one of the things we do is we look at the seriousness of each one so that we know where to spend most of our time. And so we look at the elements of a case, and if it reaches a certain threshold, we will assign it a higher severity.

Q.   You also mentioned that the investigation was elevated to your level.  As the leader of 8,000-plus people, is every investigation elevated to your level?

A.   I don't see every investigation, no.

Q.   What types of investigations are typically elevated to you?

A.   Typically, Severity 0, so our highest level.  Typically, these have the most serious implications for the company.

Q.   You received the notification.  What did Google do next?

A.   So we received the notification.  The investigation began almost immediately once we did.  And the investigation team began pulling Mr. Ding's digital records from our internal systems and badging records from our physical security systems, began looking more into this investor conference and starting to put together a picture of what might have happened.

Q.   Let's talk through each of those buckets of data that you just mentioned.

     Forensic records.  What, if anything, did Google learn from looking through the defendant's forensic records at the company?

A.   So forensic records, these are digital records, so records of how Mr. Ding's work computer was used, the internal websites and documents that were accessed by him.  And through that, we began to learn that Mr. Ding had a pattern of accessing our internal documents and creating personal notes in an

application called Apple Notes.

So Apple Notes is installed by default on Apple computers, and you use it to -- you know, you can type in it; you can put pictures.

He had been copy/pasting text out of our internal documents into these Apple Notes.  We also began looking at the digital records on the work laptop assigned to him, and we found that in these Apple Notes, he had interwoven information from different documents and then actually created PDF files out of the Apple Notes.

We then saw that he had taken those PDF files and sent them to a personal Gmail account.  So we were able to see quite quickly a pattern of activity of taking internal information and sending it outside the company.

**Q.**   You also mentioned badging records.  Can you explain what those are at a high level?

**A.**   So every Google employee is given a physical badge.  It's about the size of a credit card.  It has your picture on it and your name, and it's used to swipe into the doors, the physical doors at our offices.  So when you would come into the office at the morning, you would swipe.

What we found when we looked at the badging records for Mr. Ding is that there was a period of time where he was physically badging into his assigned work office but that the digital records from his systems access was in a different

country.

And this is kind of an anomalous situation.  It's not normal for that to happen.  So we also looked at the video camera recordings of the doors where Mr. Ding had badged into and found that someone else was using that badge at those times.

Q.   Based on the information that you obtained as part of your investigation, what action did Google take first?

A.   So shortly -- in fact, just a few hours after receiving the information about the external conference, we had known enough to turn off Mr. Ding's access to our internal resources.  So websites, document repositories, we turned that off.

And then shortly after that, we also disabled his ability to use the laptop assigned to him.

Q.   Why did Google do these various actions that you just described?

A.   Disabling system access is a standard practice when we can substantiate unusual activity, and we take that action so that no additional activity can be taken.

Q.   As part of its investigation into the defendant, this investigation that you're testifying about this afternoon, did the company interview the defendant?

A.   So we did not interview Mr. Ding in this period of time.  This is towards the end of December of 2023.  And that's for a few reasons.

The first is that another thing we found during the investigation is that Mr. Ding had been investigated previously in late November, early December of the same year and interviewed by one of the investigators.  So we had the data from that interview.

We also were aware that, you know, Mr. Ding was still in possession of the laptop assigned to him.  And one of the calculations we made was that if we interviewed Mr. Ding, he might sort of cover his tracks, so to speak.

And I should say that in our early investigation in late December, we did find evidence of Mr. Ding moving files into the trash folder on his computer and deleting them.  So we wanted to not sort of trigger any other behaviors like that.

Q.    In addition to shutting off Mr. Ding's access, the defendant's access to Google systems and his laptop, did Google decide to do anything else?

A.    We were very concerned about what we were seeing, and particularly that Mr. Ding had sent information to a personal Gmail account.  Now, we couldn't see precisely what that content was because it is a personal Gmail account.

And so because of the severity of the issue, the type of information involved, and the fact that it went to a personal Gmail account, we did make a decision to refer this to law enforcement.

Q.    Before I ask you about that, I would like to explain that

concept to the jury.

Does Google run Gmail, for example?

A.   So Gmail is one of our consumer-based products, yes.

Q.   But as a company, why can't you look at an employee's personal Gmail account, for example?

A.   So when you sign up for a Gmail account with us, it is governed by the terms of service.  And if you want to access user's data, you need legal process for that, and we abide by that.  Even though we run Gmail and, I think, probably could technically go access it, we treat employee personal accounts like consumer accounts and go through legal process to look at them.

Q.   Is that also true for Google Drive accounts which are often associated with Gmail accounts?

A.   Personal drive accounts, yes.

Q.   All right.  So you mentioned that Google decided to refer the matter to law enforcement.  Around what time period was that?

A.   I think it was the first week of January.  We're dealing with the holiday period.  So I think by the time we got it, it was between January 3rd and 5th.  I forget which date.

Q.   How common is it for Google to refer matters to law enforcement?

A.   Generally speaking, on all topics, I'm sure it happens regularly.  But for these kinds of incidents related to, you

know, intellectual property, it's not that common.  I would say maybe one or two a year.

**Q.**   Is that one or two a year for IP matters?

**A.**   Yeah.  I'm generalizing a little bit, but, yeah, it's not that common.

**Q.**   Why did Google decide in this case to refer the case to law enforcement?

        **MS. KRSULICH:**  Objection.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I mentioned the severity.  Our investigation found, you know, large volumes of our intellectual property involved, accessed, copy/pasted, put into Apple Notes, PDFs, and sent out to Gmail.  So the volume there was concerning.

        We were concerned about what looked like Mr. Ding starting another company and potentially the information he took being used for that.

        And then, also, we wanted to understand very clearly what data was going into the Gmail account so that we could have a clear picture of what information had been taken.

        And then on top of this, we're in an era of AI, artificial intelligence.  This is a highly competitive market generally, and we were very concerned about sensitive information going out.

\\\

BY MR. CHANG:

Q.   Finally, did Google take any personnel actions against the defendant?

A.   We terminated employment of Mr. Ding mid-January.

Q.   I'd like to turn back now to your day job, which is leading the security engineering team at Google.  I'd like to talk more about that function for the ladies and gentlemen of the jury.

Can you explain, high level, what are the different categories of work that your team does at Google?

A.   I'll keep this high level because we do a lot of stuff.

Three main areas we work on, first and foremost, what are the strategies and policies that we want to have as a company when we're working on cybersecurity, and that includes the conduct of employees as well.

The second is actually building security systems that can help Google stay safe.  And I would include in that the security of all the laptops we give employees, for example.

And, finally, we run a set of operations that help us understand anomalous behaviors on the systems.  So we're always looking out for things that the systems are doing that they shouldn't be doing and investigating those.

So these are kind of three broad categories of work.

Q.   What Google products and services does your team support?

A.   So we support everything Google makes.  And I think one

way of thinking about Google's technology is a little bit like, I don't know, like a pancake in that we've a set of infrastructure that we build and run that underpins the whole company.

My teams work on securing that bottom pancake, if you will.  We then build the services that you might have heard of -- Gmail, Android, Chrome -- we build that on top of that core infrastructure that sits underneath everything.

So the products we work on really covers just about everything.

Q.   So your team is responsible for protecting the bottom layer of the pancake?

A.   Correct.

Q.   Approximately how many Google employees does your team support?

A.   All of them.  We have about 180,000, 190,000 full-time employees.  And then on top of that, we also have a workforce of temporary workers, contractors, and vendors, and we also secure them.

Q.   How many temporary vendors, contractors does Google employ?

A.   It's approximate because it changes all the time, but it's, you know, probably somewhere between 300- and 400,000, total, on top of the -- well, total, including the full-time employees.

THE COURT:  Mr. Chang, when you get to a good spot, let's take our afternoon break.

MR. CHANG:  This is a good point, Your Honor.

THE COURT:  Okay.  Why don't we take a ten-minute break, and we'll resume at 20 minutes after the hour.

MR. CHANG:  Thank you.

THE COURTROOM DEPUTY:  All rise.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Okay.  Thank you.  You can step down, and you can be back on the stand at 20 after the hour when we bring in the jury.

Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 2:13 p.m.)

(Proceedings resumed at 2:23 p.m.)

(Proceedings were heard in the presence of the jury.)

THE COURT:  Okay.  You can resume, Mr. Chang.

MR. CHANG:  Thank you, Your Honor.

BY MR. CHANG:

Q.   I believe where we left off was number of Google employees.  Can you provide that number again?

A.   So we have somewhere between 180,000 and 190,000 full-time employees, and then on top of that, vendors, temporary workers, and contractors, and that's roughly, total, somewhere between 300- and 400,000.

**Q.**   Total in the company?

**A.**   Total, mm-hmm.

**Q.**   Is that a "yes"?

**A.**   Yes.

**Q.**   For the Madam Court Reporter.

**A.**   Thank you.

**Q.**   Where are those Google employees and contractors located in the world?

**A.**   All over.  All over the world.  We operate offices in over 60 countries, and we have individuals working remotely in probably more than that.

**Q.**   How many offices, approximately, does Google have?

**A.**   It depends on how you count an office.  Is it a building or a campus?  We operate in over 60 countries.  It's probably hundreds, many hundreds of offices.

**Q.**   The global headquarters are right here in our district, the Northern District of California?

**A.**   Correct.  Down in Mountain View, California.

**Q.**   About an hour away on a good day?

**A.**   On a good day with good traffic, about an hour, yeah.

**Q.**   Do these employees generally work from a physical Google office, remotely, or both?

**A.**   Most of our employees work in a physical office.  That's true of our full-time employees, as well as our extended workforce, the contractors, temps, and vendors.  But we do have

people who work remotely as well.

Q.   From a security perspective, does it matter whether an individual is in a Google office or working remotely?

A.   We've designed the security systems such that the laptop that you receive as a Google employee or the workstation can be secured, no matter where you're working; and we do that -- first, during COVID, that became very important when people were working from home; but also, a lot of people travel for business.  And so we've designed the security in mind so that as people travel around, they're getting a high level of security, no matter where they are.

Q.   You mentioned that your team secures the bottom level of that pancake.  Can you explain to the ladies and gentlemen of the jury the amount of information and data that your team is protecting on a daily basis?

A.   It's hard to put it into terms.  Our, kind of, company mission is to organize all the world's information, make it universally accessible.  That means every person who has a Gmail account, every cloud customer, and then, of course, we have the internal documents that we create and our source code.  So we're talking trillions and trillions and trillions of files.  It's a very large amount of information.

Q.   Let's talk about Google's internal company data because that's most relevant for today's case.

     With data all around the world and employees around the

world, how has Google designed its electronic security systems for internal company data?

**A.**   We've had to think about a few things.  The first is we take what's known as defense in-depth, or a layered approach to security.  A good analogy in the real world is a castle.

If you think about a castle, there's usually walls around the castle.  There might be a mote, a drawbridge.  You typically have a tower inside the castle to put things inside you want to keep safe so that if any part of the castle is breached, you still have some protection.

It's the same with computing systems.  We don't just secure computers and the data in one way.  We create lots of ways to protect them.  We call this layered defense or secure in-depth.

The other thing we've had to consider is that we're an innovation company.  And I remember early in my career, my default was don't let anybody have access to anything.  That's the clearest way to secure something.  But I've learned, you know, over the career, and now it's kind of part of the standard advice in cybersecurity, is you have to balance the access to the information and how it's useful with how locked down it is.  If you lock something away, you can't use it.

So we've had to carefully consider the trade-offs also in our layered defense model of how information gets accessed and how many people can.

Q.   How has Google decided to strike that balance?  Can you walk through, high level, what are the types of controls that the company has in place?

A.   Well, first and foremost, every employee at Google has an identity, and you log in with that identity every day.  The analogy here would be when you log into your bank account, you have an email address probably that you put in the username field.  That identity is verified when you're hired.  We do background checks, criminal history checks, education checks, that sort of thing.  And you get your identity when you become an employee.

To log in, you also need a password and you also need a physical security token.  So this is just the basic fundamental identity.

We also give employees a laptop or a workstation that we manage and we secure, and this is the system on which all business should be done.  And we secure that system to a high degree, again, using the defense in-depth model.

We also have internal websites or internal document repositories, and we work hard to secure those systems as well and to make sure that only people who should be accessing them can access them.  That's a very high-level description.

Q.   Let's talk through each of those different layers that you just discussed.

I'd like to start first with the identity piece.

A.    Mm-hmm.

Q.    How does Google verify identities for its employees?

A.    Again, we rely a lot on background checks.  We look at identity documentation like driver's licenses, passports, that sort of thing, to make sure the person getting hired is the person that is working for us.

Q.    Let's talk next about the workstation.  Is that a laptop? a desktop?  What kind of computers does Google issue to its employees?

A.    It depends on a lot of personal preference, actually, by the teams.  You can get a desktop, so you think, like, a big box that sits underneath the desk.  Some employees have those. Some employees have laptops.  And some employees might even have virtual systems that exist in the cloud.

     These are all more or less configured with the same level of security.

Q.    Do you know what kind of workstation the defendant had while he worked at Google?

A.    I know that he had a laptop.  He might have had additional systems as well.  But kind of primary work was happening on a laptop.

Q.    And how does Google source its laptops?  Do they buy them from Walmart or Amazon?

A.    We buy them from qualified vendors.  So we allow Google employees to prefer a Mac, so this is a machine made by Apple.

Some employees prefer to use a Windows system, so we would qualify one of the standard vendors on the market, configured a certain way. We would only buy a certain configuration and distribute it. And we also issue Linux systems, which, again, we buy on the market as well.

Q. What, if anything, does Google do with the machines that it purchases from qualified vendors?

A. So we begin to qualify the software also that goes on the system. We only allow certain versions, certain types of software, and we configure that.

We also configure the systems such that we can see everything happening on the system as well. So every application software that you run gets logged. Every website that is visited is logged. We make digital records of all of this activity, when you log into the system, when the system reboots, et cetera. So we have a very strong understanding of what happens on the system.

And we also configure it to control what kind of software can run.

Q. Finally, you mentioned two-factor or two-step authentication. Can you explain what that means for a Google work device.

A. So I mentioned that every Google employee is given a security token. This is a small USB-based token. You plug it into your computer, and it -- when you log in, you provide your

identity, username, your password, and you physically activate this security key in your computer.  This acts as what we call a second factor.  If you've heard of two-step verification or two-factor authentication, this is what does that for the employee.

Q.   Does Google buy this two-step authentication key off the open market?

A.   So the security key technology itself is an open standard, and vendors make these.  But we source the ones that Google uses.  We work closely with a manufacturer to manufacture them for ourselves.

Q.   Why doesn't Google buy them off Amazon, for example?

A.   Well, it's an example of how seriously we take security. We want to be able to control the supply chain for that identity verif- -- identity verifier because we understand how important it is to the security of our system.  So we go above and beyond.

Q.   Before I forget, do you require employees to use a username and password when they log on to a work -- Google work laptop?

A.   Yes.  So let's say you're getting up in the morning and you open the laptop.  There'll be a username and password that you enter to get access to the laptop in the morning.  Most of our employees work on our internal systems through a web browser, such as Google Chrome, and there is an additional

**ADKINS - DIRECT / CHANG**

once-per-day login that happens through there.

Q.   On the YubiKey or the two-factor key that you mentioned, how often does a Google employee have to reauthenticate their presence?

A.   It's at least once a day, so approximately every 20 hours, but we may activate a second authentication, just depending on conditions.

Q.   Why does Google require its employees to use company computers and reauthenticate their identity every day?

A.   We believe philosophically that all business should be conducted on Google systems.  And one of the reasons for that is that we want to have a very clear understanding of what's happening on our systems with our data, and the only way that we can guarantee the ability to see that is to control the system on which it's happening.  So that's one reason.

Q.   Okay.  We've talked through the computer and the two-step authentication key.  I'd like to talk about network security.

Let's say a Google employee has their work laptop, they put in their username and password, they touch the key, put that code in.  How do they actually do their work?

A.   Most Google work happens through a web browser, so similar to the way that you might use a computer to access, say, a personal email account on your own computer.  They'll use that for email, calendar.  We have document repositories that are Web-based.  Even, kind of, writing and reviewing source code

happens primarily through a web browser.

There are some alternative ways to do things as well, but most employees are using the web browser for the primary experience.

Q.   Can you explain to the members of the jury what security systems are built into the web browser and network of Google's corporate network?

A.   Well, there's like a thousand things because it's a very complicated set of technologies.  But at a high level, we do application security.  So we want to make sure the web browser that is getting used is very secure.  We make sure that the websites that are hosting the information for our internal company are also secure.

And then there's an element of how the employee uses the application that we have to secure as well.  This becomes very important when we think about the document repositories that we have.  Not everyone has access to all information at Google. We're dealing with millions or billions of documents at the company, and so we have to make sure that the right information is available to the right people at the time.

Q.   For network security, does Google have any tracking of what an individual employee is doing in a document repository at any point in time?

A.   Yes.  So we keep a digital record of every time an employee accesses a document, if they print that document,

download that document, what they do with that document if it's on their local computer, and we keep a record of all of that.

Q.   You mentioned different forms of tracking, including the computer and the network.  Can you give the members of the jury the volume of logs or data that Google is tracking vis-à-vis its internal company employees?

A.   It's trillions of digital records every day.  We have a very large workforce.  I think 300- to 400,000 people.  They're accessing hundreds of internal websites every day.  So you're dealing with a lot of information.

Q.   Is there a human being reviewing all of those trillions of logs every day?

A.   No.  We'd need trillions of humans to do that.  So we've employed a lot of systems that allow us to sift through that data looking for anomalies and patterns, and we rely on technology, which sometimes works and sometimes doesn't, but we rely on technology to sift through that.

Q.   Can you explain how that database works, how it works to identify these anomalies that you've just explained?

A.   So the simplest way that we've deployed is simple pattern matching, and this requires us to sort of predict the kind of behavior we want to detect -- and sometimes you can predict that and sometimes you can't -- and then to write a little program that will automatically pattern match in the digital records that anomaly.  And then it gets surfaced for a human to

look at.

That's the simplest way to understand it.

Q.   Okay.  Does Google rely on any -- a single control to protect all of its internal company data?

A.   No.  Again, we look at the security model as that layered defense, so there's never any one control protecting the data.

Q.   I'd like to also talk about how you balance privacy for employees and all of the tracking that you just discussed.

Is Google looking at what every single employee is doing at every single second of every day?

A.   No.  That would be very creepy.  But what we do want to do is make sure we have a strong digital record and are clearly surfacing patterns of activity we know should be investigated, but we're not sitting there tracking what every employee does every second of the day.

Q.   But the information is logged?

A.   The information is logged and readily available.

Q.   Okay.  In addition to the controls that we just discussed, does Google also have something called a data classification system?

A.   Yes, we do.

Q.   Can you explain what that is?

A.   So we have a lot of different kinds of data at Google.  We have, if you think about it, Gmail.  We have -- you know, on behalf of Gmail users, we are storing very sensitive user data

for them.  We also have intellectual property.  And so we need ways to say that certain data has certain sensitivity.  So we have a data classification system that helps employees understand those levels of sensitivity.

Q.   At a high level, can you explain what Google's data classification system is?

A.   So we have three very high-level concepts in the data classification.  The first of these is public, so data that can be public.  The second is confidential.  So this is data that we think is suitable for anyone in the company to see but only inside the company, not the public.

And the third category is what we call need to know.  And this is a flexible concept where, if you think about it, you have a need to know this information and, therefore, you have it.  But it doesn't mean everyone in the company has it.  It's a subset of people.

Q.   How long has Google had data classifications in place?

A.   I think we put them in place probably in the 2004-2005 era, right around when we went public.

Q.   Did you help develop that system?

A.   I did.

Q.   And it remains in place today?

A.   It does.

Q.   Okay.  Why are there these three different categories within the company for data?

**A.**   Well, to reflect the fact that we have lots of different kinds of data, and also to signal to employees how they themselves should conduct themselves with regard to that data.

**Q.**   Why did Google create three levels as opposed to 500 or 100 or some other larger number, given the amount of data?

**A.**   We have such a diversity in the company that if we created 500 labels, 100 labels, or even what we find when you get to 20 or 25, nobody remembers what they all are.

So we needed a system that if you were a very busy engineer, a very busy Googler, you had a simple concept to lean back on:  whether something was public, available to the whole company, or not available to the whole company.  And it was just a simpler model that we could scale across more people.

**Q.**   Let's focus on the confidential and need-to-know data classifications that you mentioned.

**A.**   Mm-hmm.

**Q.**   How is a Google employee supposed to know if a document or file is confidential or need to know?

**A.**   So we do recommend that when creating a document, people put a label on them.  This doesn't always happen.  If you're thinking billions of documents, millions of documents that we create, sometimes people don't label them.  But that is kind of the first thing you could look at.

Really what we advise employees their responsibility is,

is to look and understand the content of the document.  And they're making a very simple choice:  Is this public information, or is it not public information?  And if it's not public, how many people should see it?

And so we rely a lot on the content, as well as kind of best practices around labeling as well.

**Q.**  I wanted to break down different parts of the answer there.

You mentioned labeling.  Do Google employees make mistakes?

**A.**  In labeling?

**Q.**  Yes.

**A.**  Yes.  I've made mistakes in labeling, certainly.

**Q.**  Do they sometimes overlabel a document?

**A.**  Yes.

**Q.**  And sometimes underlabel?

**A.**  Yes.

**Q.**  Because they're human beings?

**A.**  Because they're human beings.

**Q.**  Okay.  You also mentioned that because of these categories, there's the role of the content.  Can you further explain that concept of the content being important for data classifications?

**A.**  So the -- let's say you're looking at a document and, you know, let's say you're wondering:  Who should I share this

with?  We rely a lot on the expert judgment of the people working at Google to know what they should be doing with that content.

Now, first and foremost, if it's an internal document, don't take it outside the company.  That's kind of the first and foremost golden rule.

But aside from that, how you handle information inside the company really should be based on your understanding.  And if you don't understand what's in the document, you should ask the person who owns the document what the right sharing groups or the right people to share with is.

Q.   Can you explain whether common sense is part of how Google has designed its data classification system?

A.   I would say so.  The people we're hiring at Google are experts in their field.  They know this material probably better than anyone else on the planet.  It's -- if you're -- if you are in a particular field working on a particular technology, you have a lot of understanding about that technology and how it -- how it's being developed in your field, how it should be used, and whether or not it's specific to a company or not specific to a company.

And because of that, we do rely a lot on good judgment and common sense.

Q.   You mentioned that Google employees cannot take confidential and need-to-know documents outside of Google.

Would that include uploading them onto a personal Gmail or cloud account?

A.    Yes.

Q.    Okay.  You also talked about the role of a document owner for data classifications.  Can you explain to the members of the jury how a document owner -- what's the role of a document owner for a document at Google?

A.    So in our Google Drive product, which is what most Google employees are using for creating documents, the document owners -- typically, the person who created the document -- they will also bring in collaborators onto that document who become editors.

The document owners and the editors are the ones who typically would label the document if they have but, also, are the people who should be deciding, you know, broadly who it gets shared with internally to the company as well.

Q.    How does Google actually implement this data classification system that you just explained for us?

A.    Again, the classification system itself is written in policy, and we teach employees about it through our trainings and reinforce it through training.  The implementation of it happens when the information is created and managed in our document repository systems.  I mentioned Google Drive.  We also have internal websites.  And so this is the way that it gets effected in the system.

**Q.**   Is your team responsible for putting together those policies?

**A.**   For the policies, yes.

          **MR. CHANG:**  I'd like to take a look at those -- one of those right now.

          Ms. Hernandez, can you please pull up Exhibit 845.

          875.  My apologies.  Wrong number.

**BY MR. CHANG:**

**Q.**   Ms. Adkins, do you see the exhibit in front of you?

**A.**   Yes, I do.

**Q.**   Do you recognize this document?

**A.**   I do, yes.

**Q.**   What is it?

**A.**   So this document is titled the "Data Classification and Handling FAQs."  FAQ means frequently asked questions.  So this is a document that we've put together as part of our policy program that answers questions that Google employees frequently ask about this particular policy, the data classification policy.

          **MR. CHANG:**  Your Honor, the Government moves Exhibit 875 into evidence.

          **MS. KRSULICH:**  No objection.

          **THE COURT:**  Admitted.

     (Trial Exhibit 875 received in evidence.)

\\\

BY MR. CHANG:

Q.   Okay.  Before we begin talking about some specifics of this document, are you the executive sponsor of this document for all of Google?

A.   Yes, I am.

MR. CHANG:  All right.  Now that the members have this document in front of them, Ms. Hernandez, can you please turn to page 2 of 875 and highlight the question at the top [as read]:

"Why do we have data classifications?"

And the answer as well.  Thank you.

BY MR. CHANG:

Q.   Ms. Adkins, can you explain, what's the purpose of this question and answer in the FAQs?

A.   So we've included here some background information for employees on why we have the data classifications at Google.

Number one, not all information is appropriate for everyone at the company and for a broad audience.  So we want to give Google employees some background information on why we created this, and we want to explain why.

We have an obligation for our users, who trust us -- our customers, our partners, the world -- to keep information secure.  We also have intellectual property and trade secrets that we don't want leaked to competitors.

So this gives -- the idea here is to give employees who

may not think about it all the time a little bit of background on why we care about this problem.

MR. CHANG:  Thank you.

Ms. Hernandez, let's try a split screen now.  If you could highlight the bottom of page 4 and the top of page 5 of Exhibit 875, the [as read]:

"How do I know whether information is

Need-To-Know or Confidential?"

And the answer.  Then the answer on the top of page 5, please.

Thank you.

BY MR. CHANG:

Q.   Ms. Adkins, can you explain -- let me read the question, and can you explain what's the purpose of this incorporation in the FAQ?

The question is [as read]:

"How do I know whether information is

Need-to-Know or Confidential?"

What's the purpose of including this question in Google's policies?

A.   We want to give some clear guidance to employees on how to assess need-to-know and confidential information.  As I mentioned, the content of a document is very important for understanding whether it's confidential or need to know.

We point out here that the information may be labeled,

such as in the header of a document or at the top of emails, and that that is the best practice.

But we also point out to employees very clearly that sometimes you run across things that aren't labeled; and if you're not sure about the sensitivity, you should ask the document owner or the site owner before doing anything with that information, such as sharing it around.

Our purpose here is to sort of highlight to employees that, look, we have a lot of information at the company and sometimes people make mistakes or they don't label things.

We also give a few examples here that, you know, when you should not be sharing things out to a broad audience, for example.

And then, finally, we wrap up with this concept that the sensitivity of the document really is based on the content.

MR. CHANG:  Ms. Hernandez, if you could highlight the bottom of page 9 of this exhibit [as read]:

"Can I share NTK or Confidential information externally?"

If you could highlight -- yes, thank you.  Make sure the jury has that in front of them.

BY MR. CHANG:

Q.   Ms. Adkins, what's the purpose of including this question in the FAQs?

A.   We want to send a very clear policy message to employees

that NTK, or need-to-know, information and confidential information cannot be shared outside of the company. That means you can't take the company -- you know, the information outside. And, you know, similarly, you can't just make it public. There is a process for publishing, for example.

So we wanted to be very, very clear that NTK and confidential means keep it inside.

Q. You've mentioned a publishing process a few times. At a high level, can you describe that for us?

A. We have Googlers who do research inside Google and then publish. We also write open source software and we publish. There is a process for that that takes that information through Google's legal team, our communications and press teams, and management over the organization before that information can be made public.

Q. Before I move on to the next document, if I could just turn to the first page of this exhibit at the very top.

MR. CHANG: Ms. Hernandez, if you could just highlight the dates at the top of page 1.

BY MR. CHANG:

Q. What's the date of Exhibit 875, Ms. Adkins?

A. There are three dates on here. I'm going to look at the "Edited" and "Last reviewed."

This roughly reflects the time when this version of the FAQ document was created, so it's roughly between May and

September of 2020.

Q.   And you're the person -- are you the person who's responsible for finalizing these documents at Google?

A.   I -- I give the final sign-off on all publishing internally, yeah.

Q.   Has this document been updated since 2020?

A.   Yes.

Q.   I'd like to show you now Exhibit 824.

     Ms. Adkins, do you recognize this document?

A.   Yes.  This is another version of the FAQ.

Q.   Do you know if this is the 2022 version?  Are you familiar with that document?

A.   I am familiar with this document, and it is a later version than the one we just looked at.  Probably 2022 sounds about right.

          MR. CHANG:  Your Honor, permission to admit 824 into evidence?

          MS. KRSULICH:  Objection, Your Honor.  There's no date on the document.

          THE COURT:  Overruled.  It's admitted.

     (Trial Exhibit 824 received in evidence.)

BY MR. CHANG:

Q.   All right.  Let's move on.

     You've mentioned other than the FAQ, there's also policies in place.  Can you explain at a high level what policies Google

has related to data security?

**A.** So we actually have three types of policy documents. We have a high-level Policy, with a capital P, Policy. We have guidelines, which give you a little bit more detail on policies. And then you have these FAQs, which we've just looked at, that's got a lot of detail. High-level policies on data security. We have a Data Security Policy.

MR. CHANG: Let's take a look at one of those.

Exhibit 800, please, Ms. Hernandez.

BY MR. CHANG:

**Q.** Ms. Adkins, what is this document?

**A.** This is our Data Security Policy from roughly around March of 2020.

**Q.** Are you the executive sponsor of this document for all of Google?

**A.** I am.

MR. CHANG: Government moves Exhibit 800 into evidence?

MS. KRSULICH: No objection.

THE COURT: Admitted.

(Trial Exhibit 800 received in evidence.)

MR. CHANG: I want to make sure the ladies and gentlemen of the jury can see the document.

Let's talk about what the purpose of this document is. Ms. Hernandez, if you could highlight the "Overview"

section on page 1, please.

BY MR. CHANG:

Q.    Using that as a guide, Ms. Adkins, can you explain what's the purpose of this policy that you're the sponsor for?

A.    So this policy is where we lay out these three broad categories of classifications:  the public, confidential, and need to know.  And this is the introduction to that concept.

MR. CHANG:  Ms. Hernandez, if you could highlight the very last paragraph of page 1.  I know there's some footer blocking it, but the text is still readable.  Thank you.

BY MR. CHANG:

Q.    The last paragraph says [as read]:

"Use good judgment in handling data according to its category.  If data does not have a security label, handle it according to the nature of the data. For example, unlabeled Need-to-Know data needs to be handled consistent with Need-to-Know requirements."

What does the word "handle" or "handling" mean in this paragraph?

A.    So "handle" here means anything you might do with information or data.  So copy, print, share, move, memorize, and repeat.  "Handling" is a general term.

Q.    Okay.  Does this document also include examples of what's need to know or confidential for Google employees?

A.    Yes, it does.

**Q.**   Okay.   Let's walk through each of the different categories.

          **MR. CHANG:**   Ms. Hernandez, if you could please highlight the bottom of page 2 and the top of page 3, "Need-to-Know data," and then the text above "Confidential data."   Split screen, please.   Top of page 3 for the next -- yes.

          And then if we could highlight the text at the bottom -- yes.   And drag -- yes.   And then the top of page 3.   Thank you.

          Yeah, it's not going to fit.   Okay.   Well, hopefully the --

**BY MR. CHANG:**

**Q.**   Let's go through need to know first.   What are some of the examples of need-to-know data included in Google's Data Security Policy?

**A.**   So need-to-know data, just as a reminder, is data that should not be available to everyone at Google; and the number of people is really variable, depending on the type of data.

          But some examples might be user data, for example.   So we don't want people looking at your Gmail.   Product design information is another example.   Information about our business partners, potential mergers and acquisitions, and legal matters are other examples as well.

**Q.**   Okay.  Let's look through the examples for the confidential data.

        **MR. CHANG:**  Ms. Hernandez, if you could highlight the bottom of page 3.  Great.

**BY MR. CHANG:**

**Q.**   Ms. Adkins, using the policy, can you explain for the members of the jury what are examples of confidential data at Google?

**A.**   So, again, this is data that we would be -- it would be appropriate for anyone inside the company to see.  So this might be information discussed at our company meeting.  We call that TGIF for "Thank goodness it's Friday."  It could be new versions of our products which are about to launch, but not publicly available, but we want Google employees to try them out.  That would be another example.

     And there is engineering information, technical information, scientific information that we make available to the company so that we can build our products and innovate.

**Q.**   Finally, let's go through examples of public data.

        **MR. CHANG:**  Ms. Hernandez, if you could highlight the top half of page 4 of Exhibit 800.

**BY MR. CHANG:**

**Q.**   Ms. Adkins, can you walk the members of the jury through what are examples of public data at Google?

**A.**   Again, this is information we would be happy for the

general public to see.  So if you've ever read a blog post we've published or a press release from Google, this is public information.

Q.   Okay.  You mentioned up-front that this was the 2020 version of the Data Security Policy.

Has Google updated it since then?

A.   Yes, we have.

MR. CHANG:  Ms. Hernandez, if you could pull up Exhibit 756 for the witness.

BY MR. CHANG:

Q.   Ms. Adkins, what is this document?

A.   This is also our Data Security Policy.  You see it as it exists when it's published on our internal website.  And it's from March 2023.

Q.   Are you the executive sponsor of this document for all of Google?

A.   Yes, I am.

MR. CHANG:  Government moves 8- -- 756 into evidence.

MS. KRSULICH:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 756 received in evidence.)

BY MR. CHANG:

Q.   All right.  We've talked through the FAQs and the policies.

And you mentioned that there's another layer, which are

the guidelines.  Can you remind us, what are those?

A.    So, again, we have policy at the top.  That's this document here which gives you a very basic understanding of the classifications.  Guidelines give employees more specifics. And then, of course, we have the FAQs, which give you a lot of information.

So the guidelines sit in the middle and are really meant to just augment the policy with more detail.

Q.    Okay.  Showing an example of a guideline.

MR. CHANG:  Exhibit 799, Ms. Hernandez.

BY MR. CHANG:

Q.    Ms. Adkins, do you recognize this document?

A.    Yes, I do.

Q.    What is it?

A.    This is our data classification guidelines.  And based on the edited and reviewed dates, it's somewhere between 2018 and 2020.

MR. CHANG:  The Government moves to admit 799.

MS. KRSULICH:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 799 received in evidence.)

BY MR. CHANG:

Q.    Has this document also been updated since -- actually, before I move on, what's the date on this document?

A.    Somewhere between 2018 and 2020.

Q.   Has it been -- has this document been updated since 2020?

A.   Yes.

Q.   I'd like to show you Exhibit 801.  What is this document?

A.   So this is a different document.  This is the data categorization guidelines.  So this is not the data classification guidelines.

But this guideline document gives Google employees guidelines on how to categorize data.

Q.   What's the date of this document?

A.   2023, January.

        MR. CHANG:  Government moves 801 into evidence.

        MS. KRSULICH:  No objection.

        THE COURT:  Admitted.

    (Trial Exhibit 801 received in evidence.)

        MR. CHANG:  All right.  You can take that off the screen, Ms. Hernandez.

BY MR. CHANG:

Q.   You've mentioned the data classification guidelines, FAQs, and policies.

Do some groups within Google also create additional levels of security?

A.   They do.  And this is by design because we have so many different teams across Google.  You can think 400 -- 300-, 400,000 people, they're working on hundreds of products.  We want to give the business units some flexibility into how they

label documents if that's something they choose to do.

I mentioned this need-to-know concept is very flexible, and so they may choose, you know, within a particular product area, to implement something more specific on top of it.

Q.   Are you familiar with the machine learning systems and cloud AI organization known as MSCA?

A.   Yes.

Q.   Has that group created different data classification levels at Google?

A.   So, historically they have, yes.

Q.   Have you reviewed documents laying out their overview of data organization?

A.   Yes, I have.

MR. CHANG:  Ms. Hernandez, if you could show Exhibit 891 to the witness.

BY MR. CHANG:

Q.   Do you recognize this document?

A.   Yes, I do.

Q.   What is it?

A.   So this is the first page of a training kind of slide deck for employees to define the access levels and help them figure out what kinds of access levels on the information handled by this particular business unit is.

MR. CHANG:  Government moves 891 into evidence.

MS. KRSULICH:  No objection.

THE COURT: Admitted.

(Trial Exhibit 891 received in evidence.)

MR. CHANG: Let's turn to page 2 of Exhibit 891, Ms. Hernandez.

BY MR. CHANG:

Q.   Ms. Adkins, have you reviewed this page before today's testimony?

A.   Yes.

Q.   Can you explain to the members of the jury what information is being described on page 2 of this document?

A.   Yes.  There's a lot here.

What you see here is how the MSCA organization wants their levels of sensitivity to be described.  If we start at the bottom of the pyramid with Level 0, you can see here this is fairly broad access.  Anyone can access Level 0 information inside the company.  So this roughly equates to our confidential label.

As you move up the pyramid, the levels become more restrictive.  So Level 1 might be information suitable for all of Google engineering.  Level 2 is restricted to the platforms extended team; Level 3, to platforms restricted; and then Level 4 is a highly restricted group that there might be multiple kinds of groups with small numbers of people in them.

And the idea here is that as information becomes needed to be protected, it kind of moves up the pyramid.

Q.   You mentioned that Level 0 would roughly -- would be roughly equivalent to the confidential data classification.

What would the other levels in the pyramid be equal to in Google's data classification system?

A.   They would all be equivalent to need to know.

Q.   All right.  Let's move on to another topic.

You've mentioned that a Google employee has to use a Google-issued laptop, enter their username and password, touch the key, reauthenticate, get onto the network.

Can any Google employee access any Google document on the company network?

A.   They can only access the documents that are available to them and that they can find.

Q.   Can you explain that concept for us?

A.   So if you're -- you know, we have trillions and trillions of documents -- billions of documents probably is more accurate.  But when you go into Google Drive into the document repository, you can't just search for and access anything.

If you've been given access to that document, it's been shared with you or shared with an access group you're in, then you'll have access to it.

Q.   Are these known as access control levels or lists within Google?

A.   Those are two terms we've used, yeah.

Q.   Why are these restrictions in place?

**A.**   Again, not all information inside the company is suitable for everyone to see.  Some is and some aren't.  And so we restrict the data based on who should see it.

**Q.**   Can you explain how these access controls work?  How are they managed at Google?

**A.**   So the groups are managed not centrally.  They're managed by the teams who create and own these documents.  So anybody at Google can create an access group.  Perhaps I'm working on a project with five people.  I'd create an access group with my five people and share the documents with those five people.

And so the groups that get managed at Google, it's done at a very federated system.

**Q.**   Can you explain that word, "federated system"?  What do you mean by that?

**A.**   Meaning we delegate responsibility down to the product teams who know their products best and who really have the subject matter expertise to know who it should be shared with.

**Q.**   If a company employee does not have access to a restricted document, for example, can they request access to it?

**A.**   They can request access, yes.

**Q.**   Does Google maintain a record of when an employee requests access for a restricted document?

**A.**   Yes, we do.

**Q.**   Have you and the company team put together a demonstrative chart related to the alleged trade secret documents in this

case?

A.   Yes, we have.

MR. CHANG:  Ms. Hernandez, if you could please display Demonstrative Number 2 for the witness.

BY MR. CHANG:

Q.   Ms. Adkins, what is this document?

A.   So this is a summary document that was put together to describe the different places where Mr. Ding had sourced information from -- so our internal websites, our internal documents -- and the place they ended up after he copied them into Apple Notes and then created PDFs.

So, a little complicated, but what we're trying to represent in this summary is kind of how the different information ended up in different places and, also, what the general content of that was.

MR. CHANG:  Your Honor, permission to display to the jury?

MS. KRSULICH:  No objection.

THE COURT:  Go ahead.

BY MR. CHANG:

Q.   All right.  There's a lot of information in this demonstrative, and I want to make sure that we can walk the jury through it.  Let's start --

THE COURT:  But also, I'll just note that it's almost 3:15.  So depending on how long this particular thing takes,

PROCEEDINGS

now might be a good time to break for the day.

**MR. CHANG:**  Yeah, now would be a --

**THE COURT:**  What do you think?

**MR. CHANG:**  Now would be a good time to break for the day.

**THE COURT:**  Okay.  All right.

Okay.  Very good.  So we finished our first trial day.  Things have gone relatively smoothly.  Thank you for being so attentive.

A couple of quick notes.  Again, you're going home for the first time after your first trial day.  No communications about the trial or its subject matter with anybody in your household or with anybody else.  No Internet research or any other type of research on any of the subject matter.  Please bring your notes back with you.  Don't communicate with each other about the trial.

And then we will -- as you can see from how today has gone, we try our best to not waste any of your time; right?  So you've seen that we haven't had a bunch of sidebar discussions back here about evidence.  You've seen that we've lined you up and brought you in right on time -- right? -- right when we're supposed to.

So the goal is to make sure that we're not wasting any of your time during the trial day, and my hope is that each day will be just like this.  Occasionally, we may have to have a

sidebar conference.  Occasionally, we may have to excuse you from the courtroom to discuss something; but we work earlier in the morning and later in the day to minimize those interruptions to keep you on schedule.

By the same token, please do your best to arrive on time and be ready to come into the courtroom at the time that's been designated by me so that we're not wasting the other jurors' time and everybody else's time.  And so, again, I'll encourage you to aim to arrive at the building by around 9 o'clock so that you can get through security, get yourself settled and all of that, and we'll be ready to bring you in right at 9:30 tomorrow.

Thank you.

**THE COURTROOM DEPUTY:**  All rise.

(Proceedings were heard out of the presence of the jury.)

**THE COURT:**  Okay.  Thank you.  You can step down, and I'll chat with the lawyers.  You should probably exit the courtroom since you're a witness so that you don't hear my discussion with them.

(Witness stands down and exits the courtroom.)

**THE COURTROOM DEPUTY:**  Please be seated.

**THE COURT:**  So I think it's probably worth, at the end of each day, kind of flagging some issues to you that come up throughout the day so that I don't forget about them.

So a couple of things.  And I think all of these

questions or comments/concerns are from the opening statements.

In the Government's opening statement, you referred to this concept of:  You don't need to make a finding as to all of the trade secret documents.  You just need to make a finding as to one trade secret in each category.

And I was curious.  I haven't looked at the proposed jury instructions in a long time, but to the extent that you're going to be arguing to the jury "You don't need to find all of these documents are trade secrets; you just need to find that one document in each category is a trade secret or one compilation of documents in each category is a trade secret," is there an instruction that says that, to the extent the jury is doing that, it has to agree which document it is?

**MR. BOOME:**  I believe that's exactly right, Your Honor.  So this is a joint stipulated jury instruction that lays out the concept of one trade secret is necessary per category.

**THE COURT:**  Okay.

**MR. BOOME:**  But I believe that is included -- and Ms. Krsulich will correct me if I'm wrong -- that the jurors need to agree on what particular trade secret for each category they unanimously find.

**THE COURT:**  Okay.  I just wanted to flag that as an issue for -- I assumed that the instruction needs to make that clear, and I wanted to flag it just in case your proposed

instructions didn't make that clear.

MS. KRSULICH:  Thank you.

THE COURT:  The next comment is just for the defense.

During your opening statement, you made a comment when you started talking about the Government's search --

MS. KRSULICH:  Yeah.

THE COURT:  -- of Mr. Ding.

You made a comment along the lines of:  They never even spoke with him, or they never even asked him questions.

And that raised alarm bells for me with respect to the fact that I suppressed his statements.  They did talk to him; right?  And you said something that implied that they never asked him questions.

I think it was a fairly minor thing in the grand scheme of things, but I just wanted to warn you that you were sort of dancing close to the line of opening the door to Mr. Ding's statements and you should be careful about that going forward.

The other flag that I had from your opening statement was, you made a comment about that the jury will learn that engineers tend to take stuff.  And I just want to make sure that you are reminded of the limitations on Pooler's testimony.

Pooler is not allowed to testify about engineers' typical practice of taking notes and stuff like that.

MS. KRSULICH:  That was not clear to me, Your Honor,

for Mr. Pooley's testimony.  So --

THE COURT:  Pooley?  Sorry.  I called him Pooler.

MS. KRSULICH:  No.  Yeah.  That was not clear to me, Your Honor.  I'd have to go back and check the order.

THE COURT:  Okay.

MS. KRSULICH:  I didn't understand that.

THE COURT:  It wasn't specifically written in the order.  I'm 99 percent sure that I made a comment about it on the day that Pooley came and testified.  But, in any event, it's clear from the order that his testimony is limited to best practices -- right? -- and it's not about what engineers tend to do or not do.  And that is outside the scope of appropriate testimony for him.  So I wanted to just make that clear, since you alluded to that very, very briefly in your opening statement.

MS. KRSULICH:  Thank you, Your Honor.  I appreciate you making that clear.  That was not understood.

THE COURT:  Okay.

MR. BOOME:  Your Honor, I know that we're still wrestling with Mr. Pflaum's potential testimony, but I believe he also offered that bit of information for his proposed testimony, and we have that same objection.

THE COURT:  There's no way that Pflaum is going to be -- whether Pflaum is allowed to testify or not, there's no way he's going to be allowed to testify to that.

**MR. BOOME:**  Thank you.

**THE COURT:**  Okay.  Anything else anybody needs to discuss today?

**MS. KRSULICH:**  Your Honor, just a matter of procedure, the witness is sequestered?  Because she's in direct testimony, so...

**THE COURT:**  Yes.  She shouldn't be talking about her testimony with the lawyers.

**MS. KRSULICH:**  Okay.  Thank you.

**THE COURT:**  That's true of all the witnesses.

And what else?  Anything else?

Give me the plan.  Who are the next few witnesses scheduled to testify?

**MR. BOOME:**  So Ms. Adkins will, obviously, continue tomorrow.  After Ms. Adkins, we'll call --

**THE COURT:**  Roughly, how long do you-all think you have left?

**MR. BOOME:**  I'm going to look at Mr. Chang here.

**MR. CHANG:**  Another 30 minutes or so.

**THE COURT:**  Okay.  Adkins.

**MR. CHANG:**  Best guess, Your Honor.

**THE COURT:**  Okay.

**MR. BOOME:**  After Ms. Adkins will be Matt Linton from Google's security team.

**THE COURT:**  Okay.

**MR. BOOME:** After Matt Linton will be our digital forensics expert Andy Crain.

And after Andy Crain will be Brad Fuller from the Google investigations team.

And after that, we expect Ariana Tortorici to testify.

And I don't think there's any world in which we get past there tomorrow.

**THE COURT:** And who's that?

**MR. BOOME:** She is one of the leaders in Google's human resources department, and she's going to discuss Mr. Ding's employment agreements and things like that.

**THE COURT:** Okay. Mr. Ding's employment agreements. I mean, can't you all stipulate to the admission of Ding's employment agreements? What does she need to testify about?

**MR. BOOME:** Once again, I find myself turning to my colleague, Mr. Chang, about the details.

**MR. CHANG:** She walks through the HR agreements and the incorporation of the provisions.

She was also involved in the investigation from an HR perspective. And so it's not testimony we expect to be lengthy, and we'll be mindful of the Court's guidance, but having someone from the HR side talk through that will be helpful.

**THE COURT:** Okay. And then after Tortorici, do you have a plan as -- I know you said that there's no way we're

going to get to anybody else tomorrow, but do you have a plan as to the ordering of the witnesses after that?

MR. BOOME:  Probably our case agent, Special Agent Valladao, will go after Ms. Tortorici.

THE COURT:  Okay.  And then Sanchez?

MR. BOOME:  I don't think so, Your Honor.

THE COURT:  Oh, okay.

MR. BOOME:  I don't think so.

MS. PRIEDEMAN:  Dr. Segal.

MR. BOOME:  Dr. Segal will be after.

THE COURT:  That's the China expert?

MR. BOOME:  Yes, Your Honor.

THE COURT:  Okay.  That's helpful to get a sense.

Okay.  Very good.  Anything else?

MS. KRSULICH:  No.  Our understanding of Your Honor's order is that -- sorry, Casey.  I didn't mean to cut you off.

MR. BOOME:  No.  It's okay.  Go ahead.

MS. KRSULICH:  The standing order is that the Government should disclose the witnesses for the next 48 hours every evening.  Is that an accurate understanding?

Okay.

MR. BOOME:  We did have one concern, Your Honor, about the defendant's opening statement in regards to your order that there should be no suggestion that Google brought the case against Mr. Ding.  And our concern was based from what I recall

to be the opening theme that, you know, this is about two powerful --

THE COURT:  Yeah.

MR. BOOME:  -- entities, Google and the Government, coming together to, you know, do an injustice upon Mr. Ding.

And the Government's view is that that was, if not skating close to the line on your order, outright stepping over it, and we'd like to get some clarity on where we go from here with that issue.

THE COURT:  Yeah.  I forgot -- I flagged that for discussion too, and I forgot to bring it up.  But I did flag that, and I agree with you.

I mean, I don't know if we need to debate whether it crossed the line or it skated close to the line, but it was definitely one of the two.

And I think that I established pretty clearly that the motivation for bringing the case and what prompted the Government to bring the case is not really -- is not part of this trial.

And so I think that probably -- what you said at opening probably did cross the line, and I will shut it down if it repeats itself in examination of witnesses.

All right.  Anything else?

MR. BOOME:  Nothing else from the Government, Your Honor.

PROCEEDINGS

Thank you.

THE COURT: Okay. Thank you.

MS. KRSULICH: Thank you.

THE COURTROOM DEPUTY: Court is in recess.

(Proceedings adjourned at 3:27 p.m.)

---oOo---

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Monday, January 12, 2026

_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter