**Volume 2**

**Pages 196 - 414**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,      )
                                 )
        Plaintiff,      )
                                 )
  VS.      )  **NO. 3:24-CR-00141-VC**
                                 )
LINWEI DING, a.k.a. LEON DING, )
                                 )
        Defendant.      )
_____)

San Francisco, California
Tuesday, January 13, 2026

### TRANSCRIPT OF JURY TRIAL PROCEEDINGS

**APPEARANCES:**

For Plaintiff:
                  CRAIG H. MISSAKIAN
                  UNITED STATES ATTORNEY
                  450 Golden Gate Avenue, Box 36055
                  San Francisco, California 94102-3495
          **BY:  CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
              **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

                  CRAIG H. MISSAKIAN
                  UNITED STATES ATTORNEY
                  1301 Clay Street, Suite 340S
                  Oakland, California 94612-5217
          **BY:  MOLLY K. PRIEDEMAN**
              **ASSISTANT U.S. ATTORNEY**

      **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
            CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant:

                          GOODWIN PROCTER LLP
                          525 Market Street
                          San Francisco, California 94105
                    BY:   **DARRYL M. WOO, ATTORNEY AT LAW**
                          **DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
                          **RACHEL M. WALSH, ATTORNEY AT LAW**
                          **COLETTE A. LOWRY, ATTORNEY AT LAW**
                          **NICHOLAS C. WILEY, ATTORNEY AT LAW**

                          GOODWIN PROCTER LLP
                          601 Marshall Street
                          Redwood City, California 94063
                    BY:   **GRANT P. FONDO, ATTORNEY AT LAW**
                          **FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

                          GOODWIN PROCTER LLP
                          601 South Figueroa Street, Suite 4100
                          Los Angeles, California 90017
                    BY:   **LORA J. KRSULICH, ATTORNEY AT LAW**


Also Present:        **Andrea Valladao, Federal Bureau of**
                          **Investigation**
                     **Veronica Hernandez, Paralegal**
                     **John Jay, Trial Technician**

**I N D E X**

Tuesday, January 13, 2026 - Volume 2

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **ADKINS, HEATHER LYNN (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 210 | 2 |
| Direct Examination resumed by Mr. Chang | 210 | 2 |
| Cross-Examination by Ms. Krsulich | 238 | 2 |
| Redirect Examination by Mr. Chang | 278 | 2 |
| Recross-Examination by Ms. Krsulich | 287 | 2 |
| | | |
| **LINTON, MATT** | | |
| (SWORN) | 289 | 2 |
| Direct Examination by Mr. Boome | 289 | 2 |
| Cross-Examination by Mr. Rapp-Kirshner | 344 | 2 |
| Redirect Examination by Mr. Boome | 402 | 2 |

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1 | | 300 | 2 |
| 2 | | 329 | 2 |
| 5 | | 314 | 2 |
| 6 | | 338 | 2 |
| 7 | | 300 | 2 |
| 13 | | 309 | 2 |
| 14 | | 309 | 2 |
| 15 | | 330 | 2 |
| 18 | | 303 | 2 |
| 27 | | 342 | 2 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 42 through 57 | | 326 | 2 |
| 58 | | 283 | 2 |
| 59 through 217 | | 326 | 2 |
| 741 | | 236 | 2 |
| 823 | | 355 | 2 |
| 885 | | 223 | 2 |
| 5921 | | 375 | 2 |
| 5922 | | 379 | 2 |
| 5923 | | 392 | 2 |
| 5924 | | 380 | 2 |

**Tuesday - January 13, 2026**                                    **9:07 a.m.**

                        **P R O C E E D I N G S**

                              ---o0o---

(Proceedings were heard out of the presence of the jury.)

        **THE COURT:**  We don't need to make everybody rise every day at trial.  People can remain seated when I come in throughout the trial.

        I had one question.  I know you-all had something to talk about as well.  But I noticed that you-all have a disagreement about how I should instruct the jury about transcripts of foreign language recordings, or at least when you submitted your proposed jury instructions, you had a disagreement about that.

        Is there still a disagreement about that, or is everybody on the same page about translated documents and transcripts of recordings and stuff like that?

        **MR. BOOME:**  Your Honor, my understanding is that we have a -- we have reached an agreement to a stipulation that we hope to file today for -- that the translations are fair and accurate except for a few exhibits that the parties have agreed to disagree on, and those won't be -- won't be an issue.

        **THE COURT:**  Okay.

        **MR. BOOME:**  But I think -- I think we are good, but I'll let Ms. Krsulich --

        **MS. KRSULICH:**  That's --

THE COURT:  So when you say "won't be an issue," you mean you've agreed to disagree on some and those are going to end up not being admitted?

MR. BOOME:  Either not being admitted or if --

THE COURT:  Not being offered?

MR. BOOME:  Not being offered.  And if the Government does feel that one of them needs to be offered, we understand we need to call our translation expert to come authenticate his translation.

THE COURT:  Okay.

MR. FONDO:  That's accurate, Your Honor.  I think there's one we're still discussing, but everything else has been resolved.

THE COURT:  Okay.  Very good.  All right.

MR. FONDO:  Or we have an agreement, I should say.

THE COURT:  Right.  So that means as to those, I can just give the instruction that does not involve disputes about the translation?

MR. BOOME:  Right.

THE COURT:  Okay.

MR. FONDO:  Correct, Your Honor.

THE COURT:  All right.  Great.  Thanks.

What did you all have?

MR. BOOME:  I just had a quick logistical question, Your Honor.  So for Mr. Linton and Mr. Crain, who are

testifying today, Matt Linton is a Google security manager and Andy Crain is the Government's digital computer forensics expert.

THE COURT: Yeah.

MR. BOOME: And we're going to be using some PowerPoint slides for those witnesses. Just a quick question on your preference. Should we mark the entire presentation as one demonstrative exhibit? Does that work for the Court and for defense?

THE COURT: I personally don't care.

MR. BOOME: Okay.

THE COURT: Do you care, Bhavna?

THE COURTROOM DEPUTY: Let me think about it, and I'll talk to parties.

MR. BOOME: Okay. Thanks.

MS. KRSULICH: That's great.

(Co-counsel confer off the record.)

MR. BOOME: Oh, yes. Thank you.

Ms. Priedeman just reminded me that there will be two slides in Mr. Crain's presentation where we will be requesting for the first time to turn off the gallery monitors so that we can show exhibits that will be sealed.

THE COURT: Okay.

MR. BOOME: And there's a filler slide that says "Next slide contains sealed material," so we hopefully won't have any

issues.

THE COURT:  Okay.  And for that, I don't think it's necessary for me to instruct the jury.  The jury doesn't even have to know that the gallery monitor is being turned off.

I mean, at some point -- right? -- when we clear the courtroom, I'll give the jury an instruction about how the Government contends that this stuff is trade secrets and the defense disagrees and I have no -- I take no position on it, but in an abundance of caution, we're clearing the courtroom, given the Government's contentions.

But as to -- I don't think I need to say anything to the jury about stuff that's not being shown to the gallery; right?

MR. BOOME:  As long as we can logistically do that and I can know when they're off so that I can go to the next slide.

MR. RAPP-KIRSHNER:  Yeah, I understand there is a logistical issue which requires the manual switching on and off of the gallery monitors, so it might be slightly disruptive.

THE COURT:  But there can just be a signal saying, "Bhavna" -- or you can just say, "Bhavna, can you hit the switch," or whoever needs to hit the switch.  I mean, that's all you need to say.

MR. RAPP-KIRSHNER:  That works for us, Your Honor.

MR. BOOME:  Sure.  Whatever.  We're happy to -- whatever you say, Ms. Sharma, we will do.  Just let us know.

**MR. RAPP-KIRSHNER:** Similarly, the defense may show a couple cross exhibits that require to be treated confidentially and not shown to the gallery, but we'll similarly let you know ahead of time.

**THE COURT:** Okay. Sounds good.

Anything else to discuss?

**MR. BOOME:** Not now, Your Honor.

**THE COURT:** Great. There were no midnight filings last night or anything that I need to worry about?

**MR. BOOME:** There were no midnight filings.

I guess while we're here --

**THE COURT:** Yeah.

**MR. BOOME:** -- I wanted to talk about Special Agent Valladao's testimony in light of our other hearing.

**THE COURT:** What other hearing?

**MR. BOOME:** Our other hearing on the documents and the admissibility and the foundation for those documents.

And now that we have some guidance from the Court, I am thinking about how to make her direct examination as efficient as possible so we don't waste a lot of time with unnecessary belabored foundations.

And so I wanted to ask, for example, if there is a document where the defendant extensively edited the document, like one of the Zhisuan PowerPoint pitch decks, is it

acceptable for -- as we're on Special Agent Valladao's direct examination, to enter a chat into evidence where the document is discussed and then, rather than go through the pages one by one where Mr. Ding edits, have Special Agent Valladao summarize the exhibit:  "Did Mr. Ding edit this document?  Where did this final version come from?"  Admit the exhibit.

**THE COURT:**  I think that sounds fine, but what's your -- what's your position on it?

**MR. FONDO:**  Your Honor, I think it probably depends, but generally, probably fine.

**THE COURT:**  Okay.

**MR. BOOME:**  Okay.  That's helpful.  Thank you.

That's really the only question I had because, as I'm thinking through how to structure her direct, I wanted to understand what everybody's expectations were about those foundations.  But that's really helpful.  Thank you.

**THE COURT:**  Okay.  Then, yeah, I'll encourage you to talk further with the defense about it, if you need to, and raise it with me in advance if you need to.

And like I said, that meeting that we had on Friday, going through those documents, I think was very productive.  It makes it much better for the 16 members of the community who are sacrificing a lot of their time to serve.

So I just want to encourage anybody, if you need to do that with any other documents or discuss any other evidentiary

issues, please bring them to my attention, you know, as soon as you can.

**MR. FONDO:**  Thank you, Your Honor.

**MR. BOOME:**  Should we discuss WeChats?

**MR. FONDO:**  Yeah.  I was actually -- yes, let's do that.

**THE COURT:**  Okay.

**MR. BOOME:**  Okay.  So, Your Honor, the Government intends to offer through Special Agent Valladao some WeChats in their entirety and some, only pages.

**THE COURT:**  Okay.

**MR. BOOME:**  The ones that we intend to offer in their entirety are entirely relevant, in our view.  They're only about either preparation for MiraclePlus or about fundraising for Zhisuan.

There are other chats that are very lengthy, and not every portion is relevant.  So we spoke with Ms. Sharma about how to manage those chats logistically in terms of entering exhibits when we're only entering pages.

And the proposal that I think is a good idea is to admit the cover page and then individual pages on the record. "Your Honor, we move to admit page 34 and 35 of Exhibit 1178." And then only those pages will be in evidence.  And when it comes time to send the exhibit back to the jury, we'll provide only the pages that have been admitted into evidence, along

with the cover page.

THE COURT:  I mean, mechanically, that sounds fine to me.

MR. BOOME:  Great.

THE COURT:  Does that sound fine to you?

And then, obviously, there's a question of just making sure that, you know, the rule of completeness is adhered to. And the defense can insist that other pages be --

MR. BOOME:  Sure.

THE COURT:  -- admitted when the Government is seeking to -- is offering these chats if it's necessary to give the jury the complete picture.

MR. BOOME:  Absolutely.  And there's no issue from us there.

And then our view on the back-and-forth nature -- some of these chats include three, four, or more individuals.  All of them include Mr. Ding, of course.  Our view is that the statements by Mr. Ding are admissible as party opponent statements, and the statements of the others in the chat are either admitted to explain what he's responding to and what he's saying or for their effect on Mr. Ding.

THE COURT:  Okay.

MR. FONDO:  Your Honor, related to that last point, that's our understanding from the hearing as well.

And so what I'd like to try to resolve with counsel in

advance, but I think we need a little bit of guidance, is that a lot of those WeChats are in that same context. And based on the hearing on Friday, my understanding is you would find those WeChats admitted based on those evidentiary foundations as laid by --

THE COURT: Admissible.

MR. FONDO: Yeah, admissible.

THE COURT: Yeah.

MR. FONDO: So with that -- and we maintain our objection as to that, but with that recognition, we'll work tonight to try to get through that to resolve that.

Relatedly, I'm assuming that our -- if they present these exhibits, I'm assuming our objections from the last six months on these things are still relevant.

THE COURT: A hundred percent.

MR. FONDO: Okay. And so I don't have to restate them?

THE COURT: No.

MR. FONDO: Okay. Thank you.

And then as to the rule of completeness, I guess maybe we should talk about what pages you're going to put in in advance. Or you can tell me -- I know there's a couple very large WeChats. And if you can tell me the pages you want, I can probably tell you in advance whether that's fine or whether we're going to want something broader than that. And I'm happy

to do that tonight.

There's only like four or five large ones -- right? -- that you're talking about?

MR. BOOME:  Right.  Yeah, we could discuss that tonight.

THE COURT:  Okay.  Good.

MR. BOOME:  Okay.

THE COURT:  All right.  We'll see you in 15 minutes.

MR. FONDO:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 9:17 a.m.)

(Proceedings resumed at 9:30 a.m.)

(Proceedings were heard out of the presence of the jury.)

THE COURT:  All right.  Everyone's here and Bhavna's getting them ready.

(Proceedings were heard in the presence of the jury.)

THE COURT:  Okay.  Welcome back, everybody.  Thank you for being ready to come in on time.

We can resume.

MR. CHANG:  Thank you, Your Honor.

(Witness enters the courtroom and steps forward to be sworn.)

THE COURT:  Hi.  You can have a seat.  And I'll remind everyone that you're still under oath.

And you can proceed.

MR. CHANG:  Thank you.

**HEATHER LYNN ADKINS**,

called as a witness for the Government, having been previously duly sworn, testified further as follows:

**DIRECT EXAMINATION   (resumed)**

BY MR. CHANG:

Q.   Good morning again, Ms. Adkins.

A.   Good morning.

Q.   Yesterday we were on a demonstrative.  Before we turn back to that document, I wanted to ask some follow-up questions on several of the topics we discussed yesterday with ladies and gentlemen of the jury.

First, you mentioned that when Google first learned of the defendant's conduct in China in late December, there was an earlier investigation.  You referenced an earlier investigation.

Can you explain to members of the jury what that earlier investigation in December was about?

A.   So I believe it was late November, early December of 2023. Our detection systems had seen a pattern of activity that looked anomalous.  This was related to documents that Mr. Ding had accessed and moved off of our systems.  That triggered an investigation.

Now, at the time, that did not rise to the same severity as the one later in December, but that did trigger an investigation that led to an interview with Mr. Ding.

Q.   If you can recall, what were the types of documents that were flagged in that earlier December investigation?

A.   So these documents -- and I don't remember the exact content of them, but they triggered alerts for us around sensitive technologies, artificial intelligence, that sort of thing.

Q.   Was there -- was there an interview conducted of him as part of this investigation?

A.   I'm sorry?

Q.   Was there an invest- -- was there an interview conducted as part of this earlier investigation?

A.   There was.  A Google investigator interviewed Mr. Ding.

Q.   What was the result of that investigation?

A.   The investigator concluded, after speaking with Mr. Ding, that he had been doing this in the course of his work and that it wasn't what we might consider malicious in any way.  It was sort of a -- sort of a misunderstanding of the policy or not -- not following policy.

     And, typically, what we do in those cases is we ask the employee to sign a self-assertion that they have deleted the information, and then we do coaching on the policy after that.

     And that's what happened here.

Q.   The defendant signed the self-deletion document?

A.   Yes, he did.

Q.   At that point in time, that earlier investigation, was

Google aware of the defendant's Apple Notes uploading and creation activity?

A.    No.   I don't think that we had enough -- enough of a hint to go look for that, so I don't think we saw that at the time.

Q.    Can you explain why not during that earlier December, late November time period?

A.    So the late November, early December time period was really focused on a set of activity related to internal access of our documents; and we -- as a result, we didn't know to look on the laptop at Apple Notes.  So there wasn't enough of a hint for us to pull on that thread in the investigation.

Q.    Pivoting off of that topic, yesterday you mentioned that Google has a lot of logs when it comes to internal company data and employee activity; is that right?

A.    Yes.  And "logs" being digital records.  We call them logs.

Q.    Thanks for that explanation.

And then you mentioned that Google uses systems to sift through that log, that a human being is not looking at the trillions of logs that are being generated.

Can you explain --

        MS. KRSULICH:  Objection.

BY MR. CHANG:

Q.    -- at a high level how those systems work?

        MS. KRSULICH:  Objection.  Leading.

THE COURT:  Hold on one second.

MS. KRSULICH:  Objection.  Leading.

THE COURT:  Overruled.

THE WITNESS:  I'm sorry.  Can you ask the question again?

BY MR. CHANG:

Q.   Yes.  Can you explain at a high level how Google's systems work to sift through the data that you described for the jury yesterday?

A.   So at a high level, we collect what we call telemetry information.  So this is information about, let's say, an access to a website.  We'll record the website, the time it was accessed, who accessed it.  That'll make a digital record.

All of those digital records are collected centrally into our systems, and then we run software programs we write and build over that data to sift through based on these patterns that I mentioned, patterns of activity that we are looking for.

That's a very simple explanation.

Q.   Can you give an example of a couple of the types of telemetry -- I can't speak -- telemetry matching systems that Google has built to look through that information?

A.   So, for example, we might look for an anomalous pattern. For example, if we see someone logging into a Google system located in Europe and also located in the United States and in a time frame where it's impossible to have traveled those

distances at that time, that would be an example of an anomalous behavior.

Another might be if we had somebody download information onto their work laptop and then immediately upload it to a Gmail account, that might be -- you know, a personal Gmail account, that might be something that triggers as well.

Q.   Is another factor that the system looks at whether an employee is leaving the company?

A.   If we have enough signal that an employee is leaving the company, that might factor into the alert as well.  We do know that when people are wrapping up their employment, their behavior on the systems change.  So that is a helpful signal for us sometimes.

Q.   I wanted to go back to that answer you just gave because I want to make sure I understand it.

How does the system track if an employee is directly downloading a company file and then uploading it to a personal account?

A.   So we have a technology built into the web browser called Web Protect, and it can see information as it gets kind of downloaded in a web browser and then uploaded again.

Q.   Was there anything about the method the defendant took the information off of the Google system that made it harder for your systems to detect his actions?

A.   So Mr. Ding was accessing our internal company systems

through a web browser.  He would then copy/paste information.  So he would sort of highlight, like, a paragraph or copy a picture and then put that into Apple Notes.  And then from the Apple Notes, quite some time later, he made a PDF version of the note and uploaded that.

So the exact mechanism we would use to track a download/upload wouldn't be able to track that activity.

Q.   All right.  We talked -- we spent a lot of time on data security policies, guidelines, and FAQs yesterday.

Were all of those in place between 2019 and 2023 when the defendant worked at Google?

A.   Yes.

MR. CHANG:  All right.  Let's turn now to Demonstrative Number 2.  Ms. Hernandez, do you mind displaying that?  I believe we published this already yesterday.  Make sure that -- yeah.  Thank you.  I know the screens take a little bit of time.

All right.  If you could turn to a certain page within that exhibit, Ms. Hernandez.  It's the pages we discussed this morning, and so this would be the bottom of page 2, top of page 3.  Thank you.

BY MR. CHANG:

Q.   Okay.  I believe we just introduced the document yesterday, and there's a lot of information so I want to make sure you can explain it to the jury.

Q.   What is this demonstrative exhibit that you and the Google team put together?

A.   So this is a summary of information, and the idea here is just to make it a little more easy to understand what's happening.

We've taken the understanding of the source documents that Mr. Ding had accessed --

Q.   Sorry to interrupt.

A.   Yeah.

Q.   Can you explain what a source document is?

A.   Sorry.

Q.   Yes.

A.   Our internal documents -- a source document in this context means where the information came from in our internal systems.  So it could be an internal document or an internal website, for example.  That's the source of the information.

Q.   So that's the exhibit number that's listed in the "Source Document Exhibit Number"?

A.   Correct.  So each source document has a number associated with it in the fourth column.

Q.   Okay.  Apologies, again, for interrupting.  Can you continue with your explanation?

A.   So what we want to be able to see here is which of our internal documents and content in those documents ended up in a PDF file that Mr. Ding uploaded to his personal account.  And

so we can kind of see the flow of information there.

The file name that Mr. Ding uploaded is in the column marked "Alleged Trade Secret File Title."

And so what we're trying to show here is that data was copied out of the source document into the alleged trade secret file.

Q.   And that column is the one right next to the "Source Document" to the left?

A.   Correct.

Q.   The "Alleged Trade Secret File Title"?

A.   Correct.  So the "Exhibit Number" column relates to the "Alleged Trade Secret File Title," mm-hmm.

Q.   I notice that for this document, the "Ghostlite-at-2022-06-pinned.pdf" --

A.   Mm-hmm.

Q.   -- there are two source documents listed under the "Source Document Exhibit Number" column.

What's going on there?

A.   Right.  So it's a little difficult to see it in this format, but the document at the top that says "377 - Ghostlite-at-2022-06-01," that is a file that Mr. Ding uploaded to his personal account.

The information in that file that he took comes from two different source documents at Google:  Number 90, which you see on the top graphic, and Document Number 172, which you can see

in the bottom graphic as well.

Q.    Okay.  And then what's the column next to the "Source Document Exhibit Number" titled "Google Access Control Levels"?

A.    So what we're representing here are either the access groups or individual employees, sort of signaling individual employees that were granted access to these documents.

So, for example, you see for Document Number 90, "Deepsea-Restricted."  Deepsea-Restricted is a group.  It has a specified number of Google employees in that group.  They are given access to this document.

We also see for Document 90, if you look on the second graphic, the very last bullet point there, we've indicated "Individual Employees."  And that means that in addition to a group, individual named employees were also added.

This is just a different mechanism for adding people to the groups -- or to the documents.

Q.    And were these the Google access control lists or levels that were in place at the time of the defendant's theft?

A.    Yes.  I believe we were able to map back the access control groups at the time of, I believe, its first access of the document, yes.

Q.    Thanks.

And these ACLs, as I understand they're called, were these the access control lists that you were describing for the jury yesterday afternoon?

**A.**   Yes.

**Q.**   Okay.  One more question on this and then we can move on.

I noticed above "Individual Employees," it says "Seven Group Hangouts" for Source Document Number 90.

What does that mean?

**A.**   So a Hangout is a Google product.  It's a bit like a chat application.  So if you've ever used WhatsApp or Signal, you can create groups with your friends to chat with your friends.  Hangouts is a Google product, and we used that at the time to communicate with each other.  So we might create Hangout groups with other employees, and then that Hangout group can also be granted access to a document.

So what we're saying here is that as opposed to showing all seven groups, they have very strange names in the system, but we're just saying here there were seven groups that had been added to the document.

**Q.**   Okay.  Let's talk about the last column on the right, "Markings."

What information is being conveyed in that column?

**A.**   So the "Markings" column is showing what markings were on the document, the source document inside Google's systems.  So for Document 90, we are saying it did have markings.  It was marked "L3 Restricted; Confidential and Proprietary."  And that's in the document as Mr. Ding would have seen it when he accessed it on our internal systems.

Q.   The L3 Restricted, can you explain what that means?

A.   The L3 Restricted on this document refers to the levels that the MSCA team had put in place.  We talked about that yesterday.  This is a need-to-know label according to their pyramid of levels.

MR. CHANG:  Thank you, Ms. Hernandez.

Can you please turn to page 5 of this demonstrative, please; and if you could highlight the bottom half, starting at Category 3 on the left for the jurors.  Thank you.

BY MR. CHANG:

Q.   All right.  For a couple of these documents, you'll see that under "Google Access Control Levels," it says [as read]:

"Piper-Group-Default-Access."

Are you familiar with that group?

A.   Yes.

Q.   What is it?

A.   This is a group that you are added to when you want to use a system that we call Piper.  Piper is used for document management, source code management at Google.  It's used by a lot of employees at Google.  It's one of our main systems.

And so by default, when you're granted access, this is the default access group.

Q.   How large is the Piper group?

A.   It's large.  I think somewhere between 160,000 and 180,000 active employees.  That's an approximation.

Q.   Let's talk about access.  That's quite a bit of people.

Does the fact that this document is open to a lot of people at Google mean that Google treats it less confidentially?

A.   No.  Again, this is not all of the employees at Google. This Piper-Group-Default-Access is a need-to-know group.  It is not a confidential group.  And as a result, it is restricted to the people who are authorized to be in that group.

Also, if no other access control setting is done, this is the default one that gets put into place.

Q.   In terms of the broader access, does it also mean -- does the fact that a document is open to a lot of people mean that Google views it as less valuable?

A.   Not at all.  The relationship between access control groups and value, it's not that the smaller of the -- you know, the smaller the group, the more valuable the data is.  And, in fact, information only has value if people can use it.

And so when we are building technologies and we want them to be able to be used by multiple teams, multiple products, the reality is you have to have that open for innovation to happen.

Q.   Does the fact that a certain document is open to a large group mean that Google employees can take it off the system?

A.   No.  Confidential and need-to-know information needs to be kept on Google's systems.

Q.   Let's also talk about the markings.  Most of these

documents have markings. Some don't. As you can see, there's some "No" responses in that column.

Can you explain whether having markings tells an employee whether they can take a document off the system?

A.   As we looked at in the policies yesterday, the sensitivity of the content is determined by the content itself. We recognize that employees make mistakes. They don't label things or they label things incorrectly. And this is why we ask them to use common sense, their good judgment, their expertise in determining the sensitivity.

If you run across something that's unlabeled, it doesn't mean that you can take it off the system.

MR. CHANG:   Ms. Hernandez, please take down the demonstrative.

BY MR. CHANG:

Q.   All right. Let's turn now to trainings. You referenced those a couple of times yesterday.

A.   Mm-hmm.

Q.   At a high level, can you explain what's the role of training within Google's data security environment?

A.   So we do an annual security and privacy training for employees. We do this to create awareness about cybersecurity, but we also use it to train employees on the expectations of how they conduct themselves using our systems.

And so we use it to create awareness about the policy and

put scenarios in front of them so that they can relate the policy to their day-to-day work as well.

Q.   Is the security engineering team that you lead responsible for drafting and implementing the policies and guidelines that underpin this training for all Google employees?

A.   Yes.

Q.   Let's take a look at some training.

        MR. CHANG:  Ms. Hernandez, can you please pull up Exhibit 885.

BY MR. CHANG:

Q.   Ms. Adkins, what is this document?

A.   So this is a document version of our online training. When you take the training, it's a bit like moving through a website, a little bit like -- you know, you can kind of click around and interact with this.  This is a document version of that that employees would take.

Q.   Have you had the opportunity to review this document before today?

A.   Yes.

        MR. CHANG:  Government moves 885 into evidence.

        MS. KRSULICH:  No objection.

        THE COURT:  Admitted.

    (Trial Exhibit 885 received in evidence.)

        MR. CHANG:  All right.  Let's talk through the data security portions of this training.

Ms. Hernandez, if you could turn to page 11.

**BY MR. CHANG:**

**Q.** Explain to the members of the jury this portion of the training and what's the purpose.

**A.** So this portion of the training introduces employees to our data security policy. That's the policy that lays out what public, confidential, and need-to-know means. And we provide this here so that everyone in the company has a basic understanding of these concepts.

We also list here some -- some key tips of what to do day to day in your job. Properly labeling is one of those. Setting in the appropriate access settings. And we -- this very final bullet here says [as read]:

"Don't take any Confidential or Need-to-Know Information . . . ."

**MR. CHANG:** Let's move on to the actual training content.

Ms. Hernandez, if you could do a split screen -- I'm hoping this works -- 12 and 13. All of 12 and the top half of 13, there's some text.

Okay. Perfect. Why don't we highlight the scenario in 12 first because it's a little hard to read on the screen.

Okay. Can you highlight the text, please. We don't need the graphic.

Thank you.

BY MR. CHANG:

Q.   All right.  Before we get into the content of the training, how is the training structured?

A.   The training is structured in that we give a bit of instruction.  So, for example, the data security policy that we just looked at, you get a bit of instruction, and then we present some scenarios or quizzes to you.

What we're looking at here now is part of the quiz.  It presents a scenario and then asks the Google employee to choose the right -- the right answer.

Q.   Okay.  So let's talk to this first scenario, which is on page 12 of Exhibit 885.  It says [as read]:

    "Mazer, a marketing manager in YouTube, has
    spent several weeks working on a Google Need-to-Know
    slide deck that he plans to present at a big team
    meeting next week.  Mazer shares the deck with
    Soleil, a TVC graphic designer, who is working on the
    project and helping design the deck.  To meet the
    presentation deadline while also traveling overseas
    to another Google office, Soleil shares the deck with
    their personal Gmail account for easier access."

    Question [as read]:

    "What is the problem with this situation?"

Can you explain to the jury what's the purpose of this training scenario and what it's intended to teach employees?

**A.**   So what we're trying to lay out here is a scenario where there is a need-to-know slide deck, so this is a slide deck not shared with the whole company.  Mazer is working on this in YouTube and shares it with Soleil, who's presumably a vendor or a contractor.  And that's okay.  They're working on this project together and both of them have a need to know.  Soleil has then shared out the slide deck with their personal Gmail account.

And what we're trying to do here is put a scenario in front of a Googler, or a Google employee, who's taking this training to assess whether or not they understand the policy around this.

**Q.**   What's the correct answer in this quiz?

**A.**   So you see the correct answer here with the arrow by it at the bottom [as read]:

"Soleil shouldn't share out the Need-to-Know deck with their personal Gmail account."

**Q.**   Is there also an explanation included as part of the quiz?

**A.**   Yes.  If you get the right answer, you see the explanation on the right.  And here in bold, we see emphasized that [as read]:

". . . corporate data should remain on Google corporate accounts.

**Q.**   On the quiz, do you essentially have to select the right answer to move on?

**A.**   Yes.  We don't let you proceed forward if you get the wrong answer, so you are challenged to try again.

**Q.**   You cannot fail the quiz, so to speak?

**A.**   Right.  Nobody can fail the quiz.  Everybody has to go through it and pass, yeah.

**Q.**   Okay.  Let's talk through the second scenario.

       **MR. CHANG:**  Ms. Hernandez, page 14.  And if you could highlight the text.  It's a little hard to read.  Thank you.

**BY MR. CHANG:**

**Q.**   All right.  It reads [as read]:

        "Mazer searches in Moma for information about YouTube's office location to prepare for an upcoming meeting.  In the Moma search results, he notices a slide deck titled, 'Internal analysis of YouTube content classifiers.'  Mazer isn't working on the project, but he clicks on the deck out of curiosity.  The deck is not labeled, and as Mazer begins reading the deck, he quickly realizes it contains sensitive information that appears to be Need-to-Know.

        "Mazer shares the deck with his friend Darius on the accounting team, with the following note:  'Thought you might find this deck interesting.  Looks sensitive so I wouldn't share it outside of the company!"

        And the question is [as read]:

"Is it appropriate for Mazer to share the deck

with Darius?"

Ms. Adkins, can you explain what's going on in this challenge and what's the purpose of this training slide?

**A.**   So Mazer is searching in Moma.

Now, Moma is our internal Google search.  That's how you find information inside of the company.

And so Mazer is searching in Moma, presumably to find the office location for one of our YouTube teams, and because it's YouTube related, has run across other documents or websites related to the internal analysis of YouTube content classifiers.  Mazer opens it up.  The deck is not labeled, but Mazer realizes -- by looking at the content, Mazer knows it's sensitive and that it appears to be need-to-know.  So Mazer's made that assessment.

Mazer then shares it with somebody in accounting.  This person in accounting does not work on YouTube, does not need to know this deck.

So what we're trying to convey here is a scenario where you've run across some unlabeled information, you've assessed the content.  Sharing with somebody who has no need to know is not appropriate.  And that's the scenario we're trying to lay out.

**Q.**   What's the correct answer to this quiz question?

**A.**    It's highlighted here at the bottom with the arrow, that

Mazer suspects the information could be need-to-know, and Darius is not working on the project, so it's not appropriate to share.

Q.   There's an explanation at the bottom.  What's the explanation for why that's the right answer?

A.   I don't see that.  I'm sorry.

        MR. CHANG:  Ms. Hernandez, the text is a little cut off, but we have the first sentence.  Starting with "That's right!"

        Great.

BY MR. CHANG:

Q.   Can you see it now?

A.   Yes, I can.

    So the additional text that you would get when you successfully answered this would highlight our policy that the right thing to do here would be to let the owner of the slide deck know that it's been overshared.

        MR. CHANG:  All right.  One more challenge scenario.  Ms. Hernandez, page 16 and 17, split screen again.  If we could highlight just the text, no graphics, for readability.

        Great.

BY MR. CHANG:

Q.   All right.  It's Mazer again.

        [As read]:

        "Mazer decides to resign from Google to pursue

his true passion, stand-up comedy.  However, he doesn't want to leave all his work product behind, just in case the comedy thing doesn't work out.  So he decides to download copies of several of the Google Confidential documents that he created.  He also redacts the names and dates from all of these documents before he forwards them to his personal Gmail account."

The question reads [as read]:

"Can Mazer take these redacted copies of Google Confidential information with him when he leaves Google?"

Ms. Adkins, what is the purpose of this scenario?

A.   So the purpose of this scenario is to highlight to Googlers, Google employees, just because you have worked on something inside the company doesn't mean that you can take it with you when you leave the company.

And so the scenario here is, you know, Mazer wants to retain this information, you know, in case comedy doesn't work out.  The downloading of this and sending to his personal Gmail account is not appropriate.

Q.   What's the correct answer to this quiz question?

A.   You see it highlighted here with the arrow.  The answer is "No."  These are confidential documents.  Mazer knows that. And even though Mazer created them in the course of working for

the company, Mazer is not allowed to take them.

Q.   Is there an explanation for that response below?

A.   Yes.  Again, if you get the right answer, we reinforce the policy by pointing out that the work you do for Google remains at Google.

MR. CHANG:  Ms. Hernandez, can you highlight the "That's right!" portion.  It's a little hard to read.  On the top, yes.

BY MR. CHANG:

Q.   Is there any information in this quiz scenario about whether corporate information can be sent or taken off Google's systems?

A.   Yes.  Again, the work that you do for Google needs to remain here, which means don't print, copy, forward, share with personal accounts, or otherwise take it.

Q.   We talked -- we spent quite a bit of time on FAQs yesterday.

Are there also FAQs in these trainings?

A.   Yes.  That's one of the ways we convey information, is to reinforce those FAQs in the training as well.

MR. CHANG:  Ms. Hernandez, if you could highlight the text on the top of page 18 of this exhibit.  Thank you.

BY MR. CHANG:

Q.   Great.  Are we looking at an FAQ?

A.   Yes.  You see the questions in the training there at the

bottom.

Q.   Okay.  You'll see in the very first paragraph, it reads [as read]:

          "It is important to remember that personal accounts -- such as personal email or cloud storage devices -- may not be used to access Confidential or Need-to-Know information."

          Why is this at the very top of the FAQs?

A.   We think this is a very important policy to make sure that Google employees see and understand that your corporate account is where you do your work and your personal account is not appropriate for that.

Q.   You also see that there are some questions here, and so I wanted to walk through two of them.  The first question reads [as read]:

          "Googlers want to learn for themselves, reading design documents, product pages, et cetera, that are open on Moma to other employees.  Is that okay?"

          What's the purpose of this question and explanation?

A.   This is a question we get frequently from Googlers. Because they understand that not all information is accessible within Google, is it okay if something is open, if they can read it.  The answer is yes.

          A lot of engineering information, for example, is necessary in order to be a successful engineer at Google.  And

for that reason, we do make information available, for example, to the engineering community.  That's okay to read.  That's all right.

What we make a distinction on is what you do after you've read the information.

If you access a need-to-know document and it doesn't have access controls, you still have to treat the material appropriately, let the owner know that it may be too broad if it is sensitive.  You should not share it.  You should not take it to your Gmail account.

Q.    Final question in the FAQs.

MR. CHANG:  Ms. Hernandez, page 20.

BY MR. CHANG:

Q.    The last question is [as read]:

"What about engineers browsing code, which is NTK?"

Before I ask you about this question, is "NTK" need-to-know there?

A.    Yes.

Q.    Okay.  Explain to members of the jury what's the purpose of this final question.

A.    So "code" in this question refers to source code.  That's the -- that is what engineers write that becomes software that we run on our systems.

The software engineers, or SWEs, as you see in the answer

here, are given general access to our source code base.  And, again, this is for legitimate business purposes in order to write code, build our products, and otherwise do the engineering job at Google.

Not everyone at Google has access to the source code.  The engineers are given access, but someone in marketing or legal is not.  And we want to highlight here the purpose of giving access to that code.  It's to do research, to connect dots between business silos so that one product building a cool thing can also leverage that in another product, for example.

But we also want to highlight here that in being given this access, there is an expectation that you handle it appropriately, that you not share it.  And the reason for that is that we want to be able to maintain our trade secrets and claims on our code, and we want to make sure Googlers, Google employees who take this training see that.

Q.   You mentioned trade secrets.  In the last sentence of that paragraph, it says [as read]:

> "We want to be sure to be able to maintain trade
> secret and similar claims for our code, as well as
> protect our proprietary business interest, and so
> restricting disclosure and sharing, and making sure
> that the use is for legitimate business purposes, is
> key."

Why are those specific categories of information

called out there?

**A.**   Again, we want to be very -- we want to take the opportunity during the training to be very clear with our software engineering community that there is an expectation on their personal conduct to help us maintain our trade secrets.

        **MR. CHANG:**  Okay.  Ms. Hernandez, one final page in this document.  Can you turn to page 60 -- 97 of Exhibit 885, and if you could highlight the text for readability. Thank you.

**BY MR. CHANG:**

**Q.**   Ms. Adkins, what's this final page of the training deck we were just looking at?

**A.**   So as you have successfully taken the training course, this is the very last thing that you see.  There's actually a "Yes" button right below this.  And so by clicking "Yes," you finish your training, you get certified for the year.  But also by clicking "Yes," you certify that you've reviewed and understand the training and that you agree to comply by our policies.

**Q.**   Those policies include the guidelines, FAQs, and policy documents we discussed yesterday?

**A.**   That's correct.

**Q.**   Okay.  This training, if you look at the very bottom with the print there under the HTTP, there's a 2020 date stamp there.

Is it your understanding that this was the training in place around 2020?

A.   Yes.

Q.   Has the training been updated since 2020?

A.   Yes.

Q.   Okay.  Let's look through just one more copy of a training, Exhibit 741.

Ms. Adkins, what is this document?

A.   So this is the same training in 2022.  What you're looking at here is an internal document where we collaboratively edited the training.  So it's in a different format, but it is the same training, just from two years later.

Q.   And I know the formatting is a little wonky, but it's in a PDF format, but how does the training actually look to a Google employee?

A.   Again, this is kind of an internal process document where we edited the training; but when you take the training, it is in that e-learning module and you're clicking through subsequent pages as you navigate through the training.

MR. CHANG:  Government moves to admit Exhibit 741 into evidence.

MS. KRSULICH:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 741 received in evidence.)

\\\

BY MR. CHANG:

Q.   All right.  I won't go through all the scenarios again, but I do want to show members of the jury.

MR. CHANG:  Ms. Hernandez, if you could go to page 13 and 14 with a split screen of Exhibit 741.

BY MR. CHANG:

Q.   It's Mazer again with a scenario.

Have you had a chance to review the scenarios in Exhibit 741?

A.   Yes.

Q.   Are they largely the same, if not identical, to the ones we just spent a couple minutes talking about?

A.   That's correct.  We see the marketing manager in YouTube one on the left, and you can see here the correct responses and many of the text elements that we saw in the previous training example.

Q.   I notice that for this one, you see some feedback if you select the wrong answer.

Can you explain what's going on there?

A.   Yes.  It's a little bit difficult to interpret here, but on the left side, you see a table:  "Correct," "Response," "Feedback."  And the far right column there, the "Feedback," shows you the different text you'd get if you selected different things in the training.

So, for example, if you get it correct, then you would see

the -- this is really difficult to see because it's split, but the table on right, you would see that.  But if you got it wrong, you would see the other feedback elements.

Q.   Thanks.

MR. CHANG:  Ms. Hernandez, if you could go to page 68 of Exhibit 741.

BY MR. CHANG:

Q.   Does this training also include a similar certification to the one we just discussed?

A.   Yes, it does.

MR. CHANG:  And if we could go back to the cover page, page 1.

BY MR. CHANG:

Q.   What's the date of this training document?

A.   So we finalized it in October of 2022.

MR. CHANG:  No further questions at this time.

THE COURT:  Okay.  Any cross-examination?

MS. KRSULICH:  Yes, Your Honor.

### CROSS-EXAMINATION

BY MS. KRSULICH:

Q.   Good morning, Ms. Adkins.

A.   Good morning.

Q.   My name is Lora Krsulich.  I am an attorney for the defense.

Google has a system for categorizing documents that are

confidential?

A.   We have a classification system that classifies public, confidential, need-to-know.

Q.   And there's another system for classifying documents, the MSCA system?

A.   So they have taken our need-to-know concept and built a level of classification specific to their business unit.

Q.   So there are two labeling systems?

A.   Again, I would think of them not as two, but as supporting one another.  The business unit is authorized to create additional granularity if it's appropriate to do so.

Q.   Google uses different labels for its documents?

A.   Public, confidential, need-to-know are the ones in our policy.

Q.   Some documents are labeled confidential?

A.   Yes.

Q.   Some documents are not labeled confidential?

A.   Other documents might be labeled public or need-to-know.

Q.   And some documents are labeled not confidential?  They're not labeled at all?

A.   There are certainly documents that don't get labeled, but by default, the nature of the content dictates the sensitivity of the document.

Q.   So you have documents labeled confidential and documents not labeled, and your testimony is that they should be treated

the same?

A.    I think we expect, as we've seen laid out in policies in the training, that common sense, good judgment are things we expect Google employees to use when assessing sensitivity.

Q.    So confidential documents and documents without labels need to be treated the same?

A.    Correct.  For example, they shouldn't be sent to personal Gmail accounts.

Q.    One purpose of having labels is to tell all employees how sensitive information is?

A.    That is one mechanism.  But, again, we advise employees that also the nature of the content is important.

Q.    Not every document is labeled accurately?

A.    That's correct.  Sometimes people make mistakes.

Q.    Some documents that are not confidential are labeled confidential?

A.    I can imagine that happens, yes.

Q.    Like cartoons?

A.    Possibly.

Q.    Some documents that are confidential are not labeled?

A.    Yes.  Again, sometimes, you know, people get the labels wrong or they forget.

Q.    And the purpose of labeling is to instruct Google employees as to how to treat documents?

A.    So the purpose of the label is to give guidance to users

of the document as to the sensitivity.  But, again, we don't want to rely just on the label, but also the assessment by experts who work with them every day of what the sensitivity is.

Q.   Google does not mark every trade secret as a trade secret; correct?

A.   That's correct.

Q.   There is no consistent label that tells an employee "This document is a trade secret"?

A.   That's correct.

Q.   If information is confidential, it can be shared with all Google employees?

A.   The confidential label does mean it's appropriate for all employees.

Q.   What about contractors?  Can confidential information be shared with contractors?

A.   So there is a nuance here in how our systems are configured.  Generally speaking, yes.  Some of the document repositories restrict access to the extended workforce, so not just contractors but vendors and temps.

Q.   Is it suitable to share confidential information with contractors?

A.   It may be.

Q.   Is it suitable to share confidential information with temporary employees?

**A.**   It may be.

**Q.**   For confidential information that's suitable to share with all full-time employees -- you testified that Google has 180,000 to 190,000 full-time employees?

**A.**   Depending on the time, correct.

**Q.**   So Google's confidential information is shared with up to 190,000 of its employees?

**A.**   It could be, mm-hmm.

**Q.**   How many engineers does Google employ?

**A.**   Oh.  I don't actually know.  But I would say it's roughly half of the employee population or roughly right around half.

**Q.**   Google employs engineers in the United States whose first language is not English; correct?

**A.**   I believe that's true, yes.

**Q.**   How many temporary vendors and contractors does Google have?

**A.**   Again, it really depends on when you're counting, but it's probably at least as many full-time -- as we have full-time employees at certain times.

**Q.**   You testified that Google has between 300,000 and 400,000 temporary vendors and contractors?

**A.**   Incorrect.  The total population of the workforce is between 300 and 400,000.  So about 180,000 full-time.  Another kind of 100 to 200,000 extended workforce.

**Q.**   Google manages trillions and trillions and trillions of

files?

**A.**    Across all of our data that we store on behalf of users across the world, in addition to our business data, we're looking at trillions and trillions of assets.

**Q.**    And Google has approx- -- or has billions of internal documents?

**A.**    Millions or billions.  A 27-year-old company, very information driven, we write a lot of code, we write a lot of documents.

**Q.**    The employee who creates a document is the person who is responsible for labeling it?

**A.**    The data owner and also the people who work in that document as well.  The way the document repository works is you typically have a working group, your project group, your team group, who collaborate on documents together.

Now, if you're the document owner, you probably created it; but other people contribute content to it, they contribute changes.  And so while we talk about the document owner and the data owner, there is kind of a team responsibility element to it as well.

**Q.**    So it's a -- there's not one person responsible for labeling all the documents; right?

**A.**    Correct.

**Q.**    Each individual employee decides how documents should be labeled?

**A.**   This is why we provide the training to people to understand the labels.  But, yes, if you've created a document, our policy says you should label that document.

**Q.**   And it's the employee's responsibility to label the document?

**A.**   Yes.

**Q.**   The employee who creates the document is the person who chooses who has access to the document?

**A.**   It's the same as with the label question.  The way the document repository works is that the access control groups -- depending on the setting of the document, the access control groups can be set by the team or the working group who is collaborating on the document together.

Now, sometimes that can be further restricted so it's just the owner; but typically, what we want to enable is a whole project team to be able to manage that document repository for themselves.

**Q.**   There's not one person at Google who decides who has access to what documents?

**A.**   Correct.  That would be infeasible for one person to do for billions of documents.

**Q.**   It's each employee's responsibility to determine who has access to which documents; right?

**A.**   It is the responsibility of employees who are interacting and handling information to assess the sensitivity.

Q.   And it's their responsibility to determine who has access to the document; correct?

A.   If they are in a position to do so; for example, if they're the document owner or if they are a collaborator or an editor on the document.  But they are still required to abide by our policies.  They can't just unilaterally determine they can make information public or take it to a Gmail account.

Q.   It is the document owner's responsibility to determine who has access to the document; correct?

A.   Again, it's -- it highly depends on the situation.  It could be the document owner.  It could be other collaborators on the document as well.

Q.   Could be a group process?

A.   It could be.

Q.   Could be one person?

A.   Could be -- you know, for example, in -- in the MSCA leveling, it could be guidance given by the business unit as well.

Q.   The list of people who have access to a document, that's called an access list?

A.   You'll hear it called an access level or an access list. There are a few terms here that are interchangeable.

Q.   Google has human accounts who could access materials?

A.   That's correct.  And a human account is the identity we would assign to an employee.

Q.   And Google also had non-human accounts who could access materials?

A.   Correct.  We will sometimes give accounts to an automated process so that when the automated process runs, we know that it was the automated process that did something.  Sometimes you hear this called "a bot."

Q.   So access groups could include humans, and they could also include bots?

A.   Correct.  If there was an approved business process that had a legitimate purpose to access information, the bot might also be in the access group.

Q.   Occasionally the access lists on documents are overpermissive?

A.   I think sometimes people make mistakes in adding access groups.  I think that's fair.

Q.   And sometimes the access lists are overpermissive; isn't that right?

A.   If the access -- sorry.  Can you ask the question again?

Q.   Yes.

     Occasionally the access lists on documents are overpermissive?

A.   I think the right phrasing there would be, sometimes we have people in the groups who may no longer be working on projects, if that's what "overpermissive" means.

Q.   Do you recall meeting with the Government in this case?

**A.**    Yes.

**Q.**    Do you recall telling the Government that occasionally the access lists on documents are overpermissive?

        **MR. CHANG:**  Objection.  Hearsay.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Sorry.  Can you ask the question again?

**BY MS. KRSULICH:**

**Q.**    Do you recall telling the Government that occasionally the access lists on documents are overpermissive?

**A.**    So, again, I think the context there is probably that the access groups have people in them -- there's more people in them, perhaps, than work on the project still.

**Q.**    Ms. Adkins, I'm asking a slightly different question.

**A.**    Mm-hmm.

**Q.**    Do you recall telling the Government that occasionally the access lists on documents are overpermissive?

**A.**    I don't -- I don't recall making the statement, but I also don't not recall making the statement.  I guess I don't remember.

**Q.**    If I show you a document, would it refresh your recollection?

**A.**    Yes.

        **MS. KRSULICH:**  Mr. Jay, can we please pull up, just for the witness and the Court, CX6303 at page 5.

\\\

**BY MS. KRSULICH:**

**Q.**   Have you had an opportunity to read the document, Ms. Adkins?

**A.**   Yes.

**Q.**   Did the document refresh your recollection as to what you told the Government?

**A.**   Yes.

**Q.**   What did you tell the Government?

**A.**   Again, here, the note taken is occasionally the access lists on documents could be overpermissive.

         **MS. KRSULICH:**  Please take the document down, Mr. Jay.

**BY MS. KRSULICH:**

**Q.**   Overpermissive means that people who are not authorized to access confidential documents can access them?

**A.**   I think not authorized is perhaps overstating it.  But I think it's fair to say that you may have an access group where there are people inside who are no longer working on the project.

     Now, they're obviously authorized because they're in the group and somebody made that decision.  But it's, you know, possible through the course of business, you know, perhaps they've moved business units or kind of no longer need access. That does happen.

**Q.**   Sometimes more people have access to a document than was intended?

**A.**   Yes.

**Q.**   And with Google's tens of thousands of employees, that could be a lot of people; right?

**A.**   It could be.  And this is one of the reasons why we do the training for everyone, so that if they find themselves in a situation where they've been given access they don't need, they know how to handle that information.

**Q.**   One reason a document could be shared with a big group is because it was a mistake?

**A.**   Yes.

**Q.**   Another reason a document could be shared with a big group is because that when the document was created, it wasn't sensitive; correct?

**A.**   I'm sorry.  Can you ask the question again?

**Q.**   Another reason a document could be shared with a big group is because when the document was made, it was not sensitive?

**A.**   That's possible.

**Q.**   Another reason a document could be shared with a big group is because when the document was made, it was not sensitive, but sensitive information was added and the access level did not change?

**A.**   That's possible.  I imagine that does happen.

**Q.**   You've reviewed certain of the alleged trade secret documents?

**A.**   Some of them.

Q.   At least one of the source documents appeared to have been overshared; right?

A.   I'm sorry.  Can you ask the question again?

Q.   At least one of the source documents in this case that the Government is alleging is a trade secret appeared to have been overshared?

A.   I would need to see the document to know for sure.

Q.   Do you recall telling the Government that at least one of the source documents appeared to have been overshared?

A.   I don't recall either way.

Q.   If I showed you a document, would it refresh your recollection?

A.   Mm-hmm.

     MS. KRSULICH:  Mr. Jay, could you please pull up CX6304-0001.

BY MS. KRSULICH:

Q.   Please read the document to yourself.

A.   (Witness examines document.)

     Mm-hmm.  I've read that.  Thank you.

     MS. KRSULICH:  Please take it down, Mr. Jay.

BY MS. KRSULICH:

Q.   Did that document refresh your recollection?

A.   Yes.

Q.   You told the Government that one of the trade secret documents in this case was overshared; right?

**A.**    Yes.

**Q.**    Google has three categories of information:  public, confidential, and need-to-know?

**A.**    Those are the classifications in our policy, yes.

**Q.**    The MSCA -- is it "MSCA"?

**A.**    MSCA, yeah.

**Q.**    The MSCA group has another set of labels?  We talked about those.

**A.**    Again, the MSCA team chose to build a taxonomy on top of the need-to-know group, yes.

       **MS. KRSULICH:**  Mr. Jay, could you please pull up Exhibit 891-0002.  This document was already admitted yesterday so it can be shared with the jury.

**BY MS. KRSULICH:**

**Q.**    What you see on the screen are the other set of labels that MSCA created?

**A.**    That's correct.

**Q.**    And this classification group is based on levels?

**A.**    Yes.  The team, the MSCA team chose levels in this case.

**Q.**    Which labeling system controls, the Google three levels or the MSCA five levels?

**A.**    I'm sorry.  I didn't understand the question.  I'm sorry.

**Q.**    Sure.  So if a document is labeled under the three levels at Google -- public, confidential, and need-to-know -- and it's also labeled with MSCA levels, what label controls?

**A.**    They should roughly align.  So, for example, if you had the document Google Confidential, that would roughly map here to Level 0.  Need-to-know would be the others.

**Q.**    So if a document was labeled confidential, Level 0 alignment, and also labeled Tier 3, Level 3, there's a mismatch; right?

**A.**    There could be.  In that case, you would go with the most sensitive one or ask the document owner what the right thing to do is.

**Q.**    Mr. Ding was either in the MSCA team or working directly adjacent to them?

**A.**    That's my understanding.

**Q.**    This MSCA system applies to at least some of the Google documents; right?

**A.**    Yes.  In particular, the ones the business unit is responsible for.

**Q.**    It does not apply to all of them?

**A.**    To all of the documents at Google?  No, it does not.

**Q.**    The words "need to know" do not appear on this pyramid; correct?

**A.**    That's correct.  But also "confidential" does not.

**Q.**    Oh.  Confidential also does not appear on this pyramid?

**A.**    That's correct.  What we see here are the MSCA levels that they have laid out.  If I remember correctly, this slide deck does cover the others as well.

**Q.**   What do you mean?  I'm sorry.

**A.**   The three that we cover in our policies:  the public, need-to-know, and confidential.

**Q.**   So the same slide deck covers the MSCA levels and it also covers the three levels that you were talking about earlier?

**A.**   Correct, because they really are part of the same conceptual framework.

**Q.**   A Level 0 document has unrestricted access?

**A.**   Correct.  And that means confidential in the sense of open to -- anyone can access in the company.

**Q.**   It says "Anyone can access"; right?

**A.**   Correct.

**Q.**   Access is unrestricted?

**A.**   Correct.

**Q.**   Access is given to vendors --

**A.**   Correct.

**Q.**   -- for Level 0?

Are Level 0 documents public?

**A.**   Confidential.  The context here is anyone inside the company.

**Q.**   It doesn't say that, does it?

**A.**   Not on this slide, it does not, no.

**Q.**   If a document has no label, is that Level 0?

**A.**   If -- again, if a document has no label, our company policy is that it is confidential by default.  You should

assess the content, understand how to handle it before doing anything with it.

Q.   So if a document has no label, which level should it fall under?

A.   If it has no label, the content should be assessed and a label should be applied.

Q.   Level 1 documents are available to all Google engineers?

A.   Correct.  Eng-fulltime is the group here, and this is Google engineering, which is a subset of the employees.

Q.   And that's about 90,000 people?

A.   If we're to assume half of Google is engineering, that's roughly right.  It may not be exact.

Q.   Level 4 is the highest level of restriction on this pyramid?

A.   Correct.

Q.   None of the alleged trade secret documents in this case were labeled with the highest level of restriction; correct?

A.   I would have to refresh the list to know for sure.

            MS. KRSULICH:  Mr. Jay, could you please put up Demonstrative 2.

BY MS. KRSULICH:

Q.   This is the Government's demonstrative.  If you'd like to take the time -- some time to scroll through, are any of the document -- the question is:  Are any of the documents labeled Level 4?

**A.**   We could move pretty quickly if you just want to -- a couple of seconds on each page.

(Witness examines document.)  Thank you.

**Q.**   None of the documents are marked Level 4; right, Ms. Adkins?

**A.**   Correct.  I see Level 3 and Level 2 and a lot of confidential.

**Q.**   None of the documents are marked Level 4; right?

**A.**   Correct.

**Q.**   Mr. Chang testified -- or Mr. Chang, when he was asking you questions, he said that most of the documents had a label on them.  Do you recall that?

**A.**   Yes.

**Q.**   By my count, there are 173 -- 175, and 100 of them do not have a confidential label on them.  They don't have any label at all.  Does that match your understanding?

**A.**   I haven't counted them.

**Q.**   You haven't counted them?

**A.**   I haven't counted in this document, no.

**Q.**   I don't want to count them right now, but if I represent to you that a hundred of the documents are confidential -- are not labeled, that would mean that most of the documents are not marked "Confidential"; right?

**A.**   If they're -- sorry.  Can you ask the question again?

**Q.**   Sure.  If a hundred of the documents have no label on them

at all, that means most of the documents that are alleged to be trade secrets in this case have no marking on them and are not confidential; right?

A.   I don't think a lack of marking necessarily implies they're not confidential.  Again, you have to assess the nature of the documents in order to understand the sensitivity.

Q.   Most of the documents in this case are not labeled at all; right?

A.   I would say most of the documents in this document -- if you assert to me the numbers, which could be checked -- I would agree are not marked, but that does not mean they're not sensitive.

        MS. KRSULICH:   Could we scroll up to the first -- sorry.  Could we please scroll up to the first page of this document, the demonstrative.

BY MS. KRSULICH:

Q.   The third column, it reflects the "Alleged Trade Secret File Title"; right?

A.   Correct.

Q.   You testified that that is the file name that Mr. Ding gave to the documents?

A.   I don't remember if Mr. Ding gave these names to the documents or if this is the way the system created them.  That mechanism, I'm not familiar with.

Q.   You testified that the third column is the file name of

the documents as they were uploaded; correct?

A.   What we're trying to say here is this is the file.  Again, I don't remember if the system created the name that way, if it ended up in Mr. Ding's personal account in this way.  I'm not familiar with how the files got named.

Q.   Okay.  You testified that the Piper-Group-Default-Access was for all employees?

A.   No.  This is a group that you enter into when you get access to Piper.  A lot of employees do use Piper, so this is a large group.  I don't know if it's literally everyone in the company.

Q.   You testified that the Piper group is accessible to 160,000 to 180,000 employees?

A.   I believe that's correct.

Q.   Would it surprise you to learn that Daly City -- the population of Daly City is 102,000 people?

A.   I don't know much about Daly City, so...

Q.   What about Palo Alto?

A.   I don't know.

Q.   The population of Palo Alto is 70,000 people.

A.   Okay.

Q.   So these documents that the Government is alleging are trade secrets in this case were shared with more people than the population of Daly City and Palo Alto?

A.   We're a very large company.  We operate in over 60

countries.  We have a global population.  I don't know how that would compare to cities.

Q.   Do temporary employees have access to the Piper group?

A.   If they're in a role in their temporary role where that's necessary, they may be in there, yes.

Q.   So temporary employees may have access to the Piper group?

A.   If it's specific to the job that they're doing, it's possible.

Q.   What about contractors?  Do contractors have access to the Piper group?

A.   Again, if contractors are working in a role on a project where it's required, they might.

MS. KRSULICH:  Could we scroll down a couple of pages, whoever's controlling the demonstrative now, please.

BY MS. KRSULICH:

Q.   So let's take a look at this third row on the sheet.  It says "Level 3 Restricted"; correct?

A.   You're looking at Exhibit 376; is that correct?

Q.   Yes.

A.   Yes.  It says "L3 Restricted," yes.

Q.   It also has a confidential label?

A.   Correct.  So in the document, you would probably see "L3 Restricted" and somewhere in the document also "Confidential and Proprietary."

Q.   And your testimony is that employees are supposed to know

which one applies; right?

**A.**   Yes.  You're supposed to be able to assess the content and understand its sensitivity.  And if you see kind of multiples, you know, certainly, the L3 Restricted would be a signal of sensitivity; and if you're very confused, you should ask the owner.

**Q.**   This group is shared with the Level3_Restricted access group?

**THE COURT:**  I think you meant to say "this document is."  Fair?

**MS. KRSULICH:**  Excuse me.  Thank you, Your Honor.

**BY MS. KRSULICH:**

**Q.**   This document is shared with the Level 3 access group?

**A.**   Correct.  That's the fourth bullet in the list.

**Q.**   It's also shared with Deepsea-Restricted?

**A.**   Correct.

**Q.**   The Ghostlite-Team?

**A.**   Correct.

**Q.**   Feldy-Staff?

**A.**   Feldy-Staff, yeah, mm-hmm.

**Q.**   Npi-Ops?

**A.**   Correct.

**Q.**   Csco-Plc-Gate-Approval-Directors?

**A.**   Correct.

**Q.**   Ghostlite-Gcd?

**A.**   Correct.

**Q.**   Kamrant-Managers?

**A.**   Correct.

**Q.**   Seven Group Hangouts?

**A.**   Correct.

**Q.**   And Individual Employees?

**A.**   Correct.

**Q.**   Okay.  And this is one of the alleged trade secret documents?

**A.**   Yes.

         **MS. KRSULICH:**  Mr. Jay, could you please take me to Exhibit 891, page 15.

**BY MS. KRSULICH:**

**Q.**   Ms. Adkins, Google creates document templates; right?

**A.**   Some teams use templates, yes.

**Q.**   The document templates automatically apply a confidential label; correct?

**A.**   I'm not sure I would universally state that.  People create templates of different kinds.  Some might have labels in them by default and some may not.

**Q.**   The templates that we're seeing on the screen, they automatically come with a confidential label; right?

**A.**   Let me just read this document.

         (Witness examines document.)  Yes.  So this comes from our Data Security Policy.  We provide some templates that would

give you a basic confidential or basic need-to-know.  But there are many different templates that get created by teams across the company.

Q.   So for these templates, "confidential" is automatically populated into the document; right?

A.   That's correct, yeah.

Q.   And for these templates, "need-to-know" is automatically populated into the document?

A.   If you use the template, yes.

Q.   So a confidential label can be automatic, not intentional?

A.   If you use this template, the slides that you get automatically have a confidential label on them.

Q.   For --

A.   Yeah.

Q.   Excuse me.  I didn't mean to cut you off.

A.   Go ahead.

Q.   Okay.  So a confidential label could show up on a public presentation?

A.   Yes.  If you use this template and then it went through our pub approved process and became public, you might see the confidential label.  That's an example of a mistake.

Q.   In some cases, an employee will use a template and the label is already there?

A.   If the template has the label in the template, yes.

         MS. KRSULICH:  Mr. Jay, you can take this document

down.  Thank you.

**BY MS. KRSULICH:**

**Q.**  Google has a culture of knowledge sharing and collaboration?

**A.**  I think it's fair to say that knowledge sharing and collaboration is part of our culture, mm-hmm.

**Q.**  From a security standpoint, broad internal access to documents increases the risk of distribution to those not intended to have access; correct?

**A.**  This is one of the risks we have to manage with innovation, collaboration culture.  I would say it's one of the risks we manage.

**Q.**  And Google understands that risk; right?

**A.**  We understand the trade-offs and understand that, you know, there are times when people make mistakes; there's times when it -- it, you know, doesn't get it right.  But, again, this is why we have this layered defense model so that we're not relying just on any one control to make sure we're managing risk properly.

**Q.**  The cost of protection was that it could slow the business down; right?

**A.**  Can you ask the question again?

**Q.**  The cost of protection was that it could slow the business down; right?

**A.**  I'm not sure I would necessarily agree with that

statement.

**Q.**   Do you recall telling the Government that the cost of protection was that it could slow the business down?

**A.**   I don't recall phrasing anything that way.

**Q.**   If I showed you a document, would it refresh your recollection?

**A.**   Yes.

**MS. KRSULICH:**  Mr. Jay, could you please put up CX6302-002.

**THE WITNESS:**  (Witness examines document.)  So I think --

**MS. KRSULICH:**  Sorry.

Mr. Jay, could you please turn the document -- take the document down.

There's no pending question.

**BY MS. KRSULICH:**

**Q.**   Did that refresh your recollection, Ms. Adkins?

**A.**   Not entirely.

**Q.**   Google made a choice not to encrypt sensitive documents?

**A.**   So that's a tricky question because the way encryption works is you encrypt data at various stages of its life.  We encrypt all data when it's being transmitted over networks.  We also encrypt all data when it's stored at rest.  And we do this for compliance and regulatory reasons.  So it depends on the context of the question.

**Q.**    With Mr. Chang, you went through a series of common examples in a training --

**THE COURT:**  Ms. Krsulich, can I interrupt for a second --

**MS. KRSULICH:**  Yes.

**THE COURT:**  -- just to try and figure out when we should take our break?

Do you have a rough estimate of how much longer you have?

**MS. KRSULICH:**  Your Honor, this is fine to take the break now.  I have maybe a half an hour left.

**THE COURT:**  Oh, okay.  All right.

Why don't we take our morning break.  We'll break for 15 minutes and resume at five minutes after the hour.

Remember to bring your notes with you, and remember all my admonitions about not having conversations about the case or doing any research, Internet or otherwise, about the case.  We'll see you in 15 minutes.

Thank you.

**THE COURTROOM DEPUTY:**  All rise.

(Proceedings were heard out of the presence of the jury.)

**THE COURT:**  All right.  Thank you.

You can step down.  If you could be back up on the stand at five minutes after the hour, we'll bring the jury back in then.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 10:52 a.m.)

(Proceedings resumed at 11:07 a.m.)

(Proceedings were heard out of the presence of the jury.)

MR. BOOME:  Your Honor, could I address something very quickly?

THE COURT:  Yeah.

MR. BOOME:  I was thinking about your earlier comments on not advising the jury about turning off the gallery monitors.

We thought about that further, and I think since the jury's understanding is that those TVs are on, we're concerned that not acknowledging that they're being turned off might have the effect of the jurors believing that everyone in the gallery is seeing these documents that we're alleging to be trade secrets.

So it would be the Government's preference that we do acknowledge that we're turning them off with the instruction that it's not evidence that they're being turned off.  It's a protective measure based on the Government's allegations.

THE COURT:  Okay.  Any objection?

MS. KRSULICH:  I think we're making assumptions about what the jury is thinking and not thinking, and adding the instruction calls additional attention to it that's unnecessary.

THE COURT:  Okay.  I think we're going to pass on it for purposes of just turning off the gallery screen.  I don't think it's necessary.  I tend to agree that it's kind of getting too into the weeds compared to what the jury is probably thinking about.

MR. BOOME:  Okay.

THE COURT:  If you want to put an objection on the record later about that, go ahead and do so.

MR. BOOME:  It's not a big deal, Your Honor.  I just -- in a jury -- in the Government's closing argument, we may want to mention that the TVs were off, is that permissible, when those documents were shown in light of your instruction at that point?  We don't want to get in the weeds, but I think that is --

THE COURT:  I think that's fine.  I don't think there's anything wrong with mentioning that in your closing argument.

(Pause in proceedings.)

(Proceedings resumed at 11:10 a.m.)

(Proceedings were heard in the presence of the jury.)

THE COURTROOM DEPUTY:  Please be seated.

THE COURT:  Okay.  You may resume.

BY MS. KRSULICH:

Q.  Ms. Adkins, before the break, I asked you if there was no label on a document -- sorry.  I'll rephrase the question.

If there's no label on a document, it's confidential by default; right?

A.   If there's no label on a document, the sensitivity of the document is determined by its content.

Q.   So let's be clear.  If documents are not marked, they could be public; right?

A.   It depends on the content.

Q.   If not marked, a document could be public; right?

A.   Again, it depends on the content.

Q.   So it depends on the content, meaning it could be public?

A.   Or it could be --

MR. CHANG:  Objection, Your Honor.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  Or it could not.

BY MS. KRSULICH:

Q.   It could be public or it could not?

A.   Correct.

Q.   You walked through a series of examples of training with Mr. Chang.  Do you recall that?

A.   Yes.

Q.   The employee would walk through the training and then they'd get a "Correct"; right?

A.   If they got the correct answer.

Q.   Okay.  And the training is based on experiences that

happen in real life; right?

**A.** I would say the trainings are based on things we feel are very important in the policy that we want to get clear with the employees.

**Q.** So those trainings are based on, like, fantasies that you made up, or they're based on real life?

**A.** Some of them are probably based on common mistakes we see employees make.

**Q.** So some of the trainings are based on common mistakes that you see employees make; right?

**A.** In some cases.

**Q.** And one of the trainings involved uploading documents to a Google Drive; right?

**A.** One of those scenarios did, yes.

**Q.** So it's a common scenario for employees to upload documents to a Google Drive; right?

**A.** No. I think that's a mischaracterization. But I think it's fair to say that we have seen employees make that mistake before. I wouldn't characterize it as common.

**Q.** The trainings were created before Mr. Ding ever started working at Google; right?

**A.** We've had mandatory security and privacy training for quite some time. I'm pretty sure it predated Mr. Ding as well.

**Q.** The trainings are there because employees are human; right?

**A.**    The trainings are there because we have -- for a few reasons.  Number one, we are obligated, for various compliance regulatory reasons, to have security and privacy training.  But we do leverage that training to make sure that our employee base understands our policies.

**Q.**    Your employees are humans; right?

**A.**    Yes, we employ humans.

**Q.**    And humans can make mistakes?

**A.**    That's correct.

**Q.**    Google frequently saw in software engineering that employees who are sentimental about their work would try to keep it or, similarly, would try to keep a portfolio of their work; isn't that right, Ms. Adkins?

**A.**    So we do see an element of sentimentality.  I would give, internships are probably a primary example of this.  You come to Google for three months; you work on a project; you put a lot of your personal self into it.  And we do see people take the documents they write and author, that they -- their source code they've written and authored.

When we see this, we follow up, remind them of the policy, ask them to delete it.  But it typically revolves around the stuff they've directly worked on.

**Q.**    Do you recall telling the Government that Google frequently saw in software engineering that --

        **MR. CHANG:**  Objection, Your Honor.  Hearsay.

THE COURT:  Sustained.

BY MS. KRSULICH:

Q.   Google has a program known as the 20 Percent Program?

A.   We have an informal program known as 20 Percent Program.

Q.   The 20 Percent Program, it was meant to give employees freedom to innovate and expand their knowledge base?

A.   That sounds about right.  The program is called 20 Percent because the idea is 20 percent of your time.  So hypothetically, one day a week, for example.  And the idea here was to spawn new ideas and to get people working across business lines.

It's not formal in the sense that you sign up and you track your time in a time sheet.  I've never taken 20 Percent time at Google.  That would be a lot of time now, a whole year probably.  But some of our employees do take advantage of that.

Q.   Google gathered information that could show what happened almost every second of the day on an employee device?

A.   Yes.  This is the detailed telemetry I mentioned that we centralize that kind of trillions and trillions of telemetry data points every day.

Q.   Google recorded almost every file printed?

A.   Yes, file printing is one of the things we record.

Q.   Google logged every website visited?

A.   Website visits are something we record.

Q.   Google logged every time an employee created a file?

**A.**   It depends on where the file is created.  In some of our document repositories, that's certainly true.  We see files on laptops.  That's certainly true.  There might be cases where it's not.

**Q.**   Mr. Ding's uploads from his Google computer to his Google Drive triggered DLP flags?

**A.**   In some cases, our DLP -- that's data loss prevention -- technology pattern-matched certain keywords on the files in some cases.

**Q.**   So Mr. Ding's uploads triggered the DLP flags; right?

**A.**   I would say triggered and flags, their nuance here is important.  The DLP system is one of these pattern-matching systems.  So, for example, if you had a document that had a keyword in it, a record of that gets made.  Whether that gets flagged for a human review depends on the nature of the situation.

**Q.**   Mr. Ding's uploads triggered Google's DLP system; right?

**A.**   Again, some of the documents matched.  I would use matched, not triggered.

**Q.**   Okay.  Some of Mr. Ding's uploads matched the DLP system?

**A.**   The DLP system matched keywords in some of Mr. Ding's uploads.

**Q.**   And that was before December 2023; right?

**A.**   Correct.

**Q.**   And matches are alerts in the data loss prevention system?

**A.**   Matches are the system recognizing that a keyword is in the file.  Now, that happens all the time.  If you think about the amount of information we are managing in Google, you can have what are called false positives.  So you match something, but it doesn't actually match what you intended to match.

And so for this reason, we consider matching kind of an event.  We make a record of it.  But that doesn't necessarily mean that it triggers an investigation.

**Q.**   Google's DLP system was matching all the time?

**A.**   We don't turn the system off.

**Q.**   How many matches per day?

**A.**   I don't know.

**MS. KRSULICH:**   Mr. Jay, could you please pull up Exhibit 875.  My understanding is that this was admitted yesterday so it can be published to the jury.

**BY MS. KRSULICH:**

**Q.**   Ms. Adkins, could you please remind the jury what this document is?

**A.**   This is our frequently asked questions, part of our policy suite around data classification and handling.

**Q.**   And this document is dated September 2020?

**A.**   The edited date here is September of 2020.

**Q.**   And that would reflect Google's policy as of September 2020?

**A.**   It's roughly correct.

MS. KRSULICH: Mr. Jay, could you please scroll to 875-006.

BY MS. KRSULICH:

Q.   At this time, in September 2020, Google was exploring automatically labeling data in Google's storage systems and in Google Drive; correct?

A.   That is correct.

Q.   Google did not implement automatic labeling at that time?

A.   So if we kind of rewind time a little bit, we're looking at September 2020.  This is before the advent of artificial intelligence that we have now.  What we're saying here is that we were already exploring opportunities for using AI to auto label, but a lot of that technology had not yet been invented.

This is a frequently asked question we get from Google employees, is why couldn't you just do it automatically.  But the reality is the technology, while we were exploring it, did not exist at the time.

Q.   My question was slightly different.

Google didn't implement automatic labeling in September 2020; correct?

A.   Yes, because it didn't exist.

Q.   Your testimony is that automatic labeling did not exist in 2020, September 2020?

A.   The ability for us to determine the sensitivity of content in an automated system.  So, for example, to read a document to

know it's -- not a human, but a computer to read the document, determine its sensitivity, and put a label, the correct label on it, that technology was not available to us at the time.

Q.   Automatic labeling was not available to Google in September 2020; right?

A.   Like I said, we did not have the technology to automatically determine the sensitivity of a document and put a label on it.  We had not invented that yet.

Q.   You had not invented it, but your testimony is that no one had invented automatic labeling as of September 2020?

A.   We did not have --

MR. FONDO:  Objection, Your Honor.  Misstates prior testimony.

THE COURT:  Sustained.

BY MS. KRSULICH:

Q.   Was automatic labeling available to Google in September 2020?

A.   We did not have technology that would have integrated into our storage systems at the time, no.

Q.   Do you have any personal knowledge as to whether Mr. Ding hacked into any silos to access the documents?

A.   I know of no knowledge of hacking into silos.

Q.   You have no knowledge that Mr. Ding hacked into any silos?

A.   I don't think so, no.

Q.   You talked a bit about Moma.  How many Google employees

have access to Moma?

**A.**    Moma is our internal kind of home page, if you will.  So by default, everybody can visit Moma.  It has a search box at the top and information that's displayed for employees on it as well.

**Q.**    You said everyone can access Moma?

**A.**    Everyone can access the basic home page, yes.

**Q.**    Google contractors have access to Moma?

**A.**    Yes.

**Q.**    Google temporary employees have access to Moma?

**A.**    They have access, yes.

**Q.**    Google contractors are not Google employees?

**A.**    Google contractors are not the same thing as full-time employees.

**Q.**    Google tells all users with access to Moma that they may browse Moma for the purpose to learn; right?

**A.**    I believe that applies to the full-time employees.  If you are a temporary worker, vendor, contractor, the work you're permitted to do in our systems is limited by your contract.  So it may be appropriate, depending on your role.

**Q.**    Google tells full-time employees with access to Moma that they may browse Moma for the purpose to learn?

**A.**    If that is part of a legitimate business process.  So, for example, if you are working on a technology and there's another technology that -- company that would enhance your work, that

would be appropriate.  It would not be appropriate to read about a technology and then apply it to start another business, for example.

MS. KRSULICH:  Mr. Jay, could you please put up Exhibit 824 at page 5.

BY MS. KRSULICH:

Q.   There's a question here.  It says [as read]:

"Can I browse Moma for the purposes of learning . . . ."

Do you see that?

A.   Yes, I do.

Q.   And it says [as read]:

"Generally, yes."

A.   Mm-hmm.

Q.   The document also states [as read]:

"Moma is a valuable tool for supporting our culture of knowledge sharing and collaboration."

That's right?

A.   That's correct.

MS. KRSULICH:  Thank you, Mr. Jay.  You can take that down.

BY MS. KRSULICH:

Q.   Google employees could access internal Google documents using Google Chrome?

A.   Yes.  The web browser we use inside of Google is

Google Chrome, and if the documents are Web-based, that's how you would access them.

Q.   If someone is working from home, they have access to the same information as if they were in the office; correct?

A.   That is generally true.  There are some roles that are even more sensitive where physical access is required, but that's generally true.

Q.   So it's generally true that you don't need to be in the office to access more high-level data?

A.   Again, it's contextual.  There are certain jobs where that is not the case.

Q.   You've designed the security system such that the laptop that you receive as a Google employee or the workstation can be secured, no matter where you're working; right?

A.   That's correct.

Q.   And that became very important during COVID when people were working from home?

A.   Certainly, yes.

Q.   People get a high level of security, no matter where they are; right?

A.   That is our goal.

Q.   Exit interviews are a standard security practice?

A.   We do not use the exit interview as part of our security program.

          MS. KRSULICH:  No further questions for Ms. Adkins.

THE COURT:  Thank you.

Anything on redirect?

MR. CHANG:  Yes, Your Honor.

**REDIRECT EXAMINATION**

BY MR. CHANG:

Q.  Good afternoon -- or good morning still.  Losing sense of time.  Good morning again.

On cross, you spent a significant amount of time talking about labeling and access control lists.

Does Google rely on a single one of those types of controls for its data security?

A.  No, we do not.

Q.  Why not?

A.  Because we know people make mistakes.  They may mislabel or label -- leave the labels off.  We also know that the access groups, while well-intentioned, sometimes people do make mistakes.  And that's, you know, one of the reasons why we have the monitoring systems we do, so that we can see if something does happen.  But there are other layered controls in there as well.

Q.  You also discussed that there is broad access granted to Google software engineers, for example, to information?

A.  To some information, mm-hmm.

Q.  To some information.

Can you explain why that is?

**A.**    So coming back to this idea that we build a common core infrastructure, I think yesterday I talked about pancakes. You've got this underlying infrastructure that everyone builds on top of.

So in order to build a product at Google, you have to know how the bottom pancake works.  So the broad information we give to software engineers is really about the core infrastructure. If you want to build a product, you have to know how it works. And that is a fairly large amount of infrastructure.

The other reason is that we make innovations in one part of the business.  So let's say when we were building Gmail for the first time, we came up with novel methods of storing a lot of data for a lot of people.  That might be very useful in our Photos product, where we also store a lot of data for a lot of people.  If the Photos team didn't know what the Gmail team had done, they would have had to reinvent it.  So that's another reason why we might share information across silos.

**Q.**    You also mentioned that some of the documents in this case had access to a larger number of people.

Can you explain what that actually means in terms of accessing a document, you know, whether you have to go to a specific link?  How would you find it?  Just walk through logistically what broad access actually means.

**A.**    Yeah.  I think just because you're in an access group doesn't mean you're going to be able to easily find a document.

It doesn't mean that you know it exists.  It doesn't mean that it's going to be something that you ever access.

The way most employees work with information is within their working groups, project teams, organizations, and information they're readily accessing.

So if you were to go to, say, Moma, which is our internal website, and put in a search term, it doesn't mean you'll necessarily find a document you have access to.

Q.   You also talked about the Deepsea-Restricted group, which we didn't have an opportunity to talk about.  What is that? Are you familiar with that group?

A.   So I have a high-level understanding.  Deepsea is a code name for an internal technology, and there's a team that works on it.  And the dash, restricted, implies it's got a specific set of people in it.

Q.   You also spent some time talking about specific documents on Demonstrative Number 2.

MR. CHANG:  Ms. Hernandez, if you could reshow Demonstrative Number 2, that would be great.  And, in particular, let's turn to the page that has Exhibit Number 58. That should be...

Oh, thank you.

Ms. Hernandez is faster than I am.  Okay.  Great.

BY MR. CHANG:

Q.   Do you remember having a discussion about Exhibit 58?

**A.**   This is the last line on this page that we're looking at?
Yes.

**Q.**   Okay.  I would like to now show Exhibit 58 to the witness.

        **MS. KRSULICH:**  Objection, Your Honor.  Misstates
testimony.  I didn't ask about this.

        **MR. CHANG:**  I may have the number wrong.

        **THE COURT:**  I also am not remembering the
conversation.

        **MR. CHANG:**  It may be the wrong number.

        **THE WITNESS:**  It may be the wrong one, then.  Okay.
Sorry.

        **MR. CHANG:**  90.  Apologies.  90.

        Yes, 90 on the bottom of page 2, Ms. Hernandez.

        That's the right number.  Apologies.  That was on me.

        **THE WITNESS:**  Yes.

**BY MR. CHANG:**

**Q.**   Do you remember talking about Exhibit 90 with defense
counsel?

**A.**   Yes.

        **MR. CHANG:**  Ms. Hernandez, if you could pull
Exhibit 90 just for the witness.

**BY MR. CHANG:**

**Q.**   Ms. Adkins, have you seen this document before today?

**A.**   I don't recall.

**Q.**   Looking at Exhibit 90 now that you just talked about, is

there anything about the markings on this document that is instructive for whether this is the kind of document you could take outside of Google?

**A.**   So this is the kind of front -- probably the first page that you would see going into a slide deck.  We see here a number of elements.  The --

**MS. KRSULICH:**  Objection, Your Honor.  Lacking foundation.

**THE COURT:**  Overruled.

**THE WITNESS:**  You see "Ghostlite Development Entry" here.  And then in red, at the bottom, you see [as read]:

"Shared with:  Level3_Restricted."

You also see an "IMPORTANT" element, you know, [as read]:

"Like other internal eng docs, this content cannot be shared with customers!"

These are clear direction on sharing.

And then also, in the upper right, in very light gray text, you see "Proprietary and Confidential" above the fish icon.

**MR. CHANG:**  Thank you.

Let's turn now to Exhibit 58.

**THE COURT:**  Were you wanting the jury to see that, or were you seeking admission of that document?

**MR. CHANG:**  The Government moves to admit Exhibit 58.

**MS. KRSULICH:**  The witness lacks foundation to talk

about the document.

THE COURT:  Overruled.

MR. CHANG:  Okay.

THE COURT:  Admitted.

(Trial Exhibit 58 received in evidence.)

MR. CHANG:  We need to use the switch, Ms. Sharma, please.

THE COURT:  The gallery monitors?

Okay.  So what's happening now is, this is a document that the Government alleges is a trade secret.  And so when we show you documents that the Government alleges is a trade secret, we're going to turn the monitors off for the members of the audience in the gallery.

The fact that we're turning the monitors off, you should not interpret that as reflecting a view by me whether the document is a trade secret or is not a trade secret.  And the defense disputes that many of these documents, or perhaps all of these documents, are trade secrets.  But we're, nonetheless, concealing it from the gallery in an abundance of caution because of the fact that the Government alleges that they are trade secrets.  Okay?

So don't read anything into that other than that we're doing it in an abundance of caution because of the Government's allegations.  But at all times, the burden of proof remains on the Government to prove that any of these documents are trade

secrets.  Okay?

MR. CHANG:  Thank you, Your Honor.

BY MR. CHANG:

Q.   Okay.  Is this document, Exhibit 90, one of the exhibits cited in Demonstrative Number 2 that we were previously looking at?

A.   Yes.

Q.   Is this one of the source documents cited in Demonstrative Number 2?

A.   Yes.

Q.   Okay.  Looking at the first page, can you explain to the jury, based on this cover page, whether this is the type of document that would be appropriate to take outside of Google?

A.    This would not be appropriate to take outside of Google. The slide deck is marked "Confidential" in the upper right hand above the fish.  And also, very clearly again [as read]:

     "Shared with:  Level3_Restricted."

     And there's the important tag about the content not shared.  This one says "outside with customers," but generally speaking, the "Shared with:  Level3_Restricted" is very clear.

Q.    I'd like to show you another one of the source documents.

MR. CHANG:  Exhibit 58, Ms. Hernandez.

BY MR. CHANG:

Q.   Ms. Adkins, do you see that in front of you?

A.   I do.

**Q.**   Okay.   Is this exhibit one of the -- another one of the source documents cited in Demonstrative Number 2?

**A.**   Yes.

**Q.**   Before today, have you had a chance to review this document?

**A.**   I don't recall having seen this document.   I'm not in the need-to-know group, so I've probably not seen it before.

          **MR. CHANG:**   Government moves to admit 58.

          **MS. KRSULICH:**   She doesn't recall seeing this document, Your Honor.

          **THE COURT:**   Overruled.   It's admitted.

          **MR. CHANG:**   Ms. Sharma, same process.   Good.

**BY MR. CHANG:**

**Q.**   Okay.   This document is one of the documents in the demonstrative as Exhibit 58, and this is one of the documents in the demonstrative that has broad access.

     Based on the markings, what can you tell about the document's sensitivity?

**A.**   So we see the marking at the bottom [as read]:

          "Shared with:  Level2_TI."

     That's a specific mailing list.   That would be a need-to-know group.   And, again, we see the "IMPORTANT" tag here.   This would not be a document appropriate to take outside of Google.

          **MR. CHANG:**   All right.   You can take that down,

Ms. Hernandez.

**BY MR. CHANG:**

Q.   There was also several questions about contractors that Google hires.

Can you explain whether the contractors that Google hires sometimes work in technical roles?

A.   Sometimes.  We have contractors who work in our data centers, for example.  They work with our hardware.  We might hire a contractor to create a very specific piece of software for a project.  We use contractors for content review, for many technical roles, yeah.

Q.   Are contractors sometimes granted access to Google intellectual property, depending on what their job is?

A.   Depending on what their job is, they may be, yes.

Q.   Are they sometimes granted access to code documents?

A.   Sometimes.

Q.   There are also questions about the uploads on the defendant's device, his work device.

Did any of Mr. Ding's pre-December, pre-November 2023 uploads flag the DLP software to cause a human being at Google to review them?

A.   Again, we had matches, but none of that triggered a threshold for human review that I'm aware of.

MR. CHANG:  No further questions.

THE COURT:  All right.  Any recross?

MS. KRSULICH:  Very brief, Your Honor.

**RECROSS-EXAMINATION**

BY MS. KRSULICH:

Q.   Ms. Adkins, you mentioned the Deepsea access group.

A.   Yes.  I believe we just covered that, yeah.

Q.   There are 24,984 people in the Deepsea access group; right?

A.   Well, we talked about the Deepsea-Restricted group.  I don't know the difference in numbers between the two.

Q.   You don't know the difference in numbers on the access group?

A.   I don't have that memorized, no.

MS. KRSULICH:  Mr. Jay, could you please pull up Exhibit 90.

BY MS. KRSULICH:

Q.   In the top right-hand corner, it says "Proprietary and Confidential"?

A.   In light gray, yes.

Q.   Is that part of the document template that we talked about?

A.   I'm not familiar with how this was created, so I couldn't comment on that.

Q.   Proprietary is different than confidential?

A.   Proprietary is not part of our classification system.  The sensitivity on sharing policy refers to the confidential side.

Q.   There's another system now, proprietary?

A.   I don't -- I don't know where teams get proprietary from.
I'm sorry.

Q.   Okay.  So you've got proprietary, confidential, and
Level 3?

A.   Our policies use confidential.  Again, I don't know where
teams get proprietary from.

Q.   There's nothing confidential about this picture; right?

A.   As a Google employee, when I look at it, I would say this
is a need-to-know document.  This picture here has internal
mailing list names, it has Google employee IDs.  Ghostlite
could be an internal code word.  The signal I would get, as a
Google employee looking at this, is that this would be
need-to-know.

Q.   This picture that you're looking at on your screen, this
is a Google trade secret?  Just the picture.

A.   I didn't say that.  I think it's need-to-know.  I'm not an
expert in this area.

Q.   Just the picture on the screen is need-to-know?

A.   It's part of a slide deck that is need-to-know, and there
are elements here, such as code names, mailing lists, things
that would tell me the rest of this document would be
need-to-know, yes.

Q.   And you just said you're not an expert in this area?

A.   I'm not an expert in this particular technology area.  I'm

not an expert in all of Google's technology.

MS. KRSULICH:  No further questions.

THE COURT:  Okay.  Thank you.  You can step down.

(Witness excused.)

THE COURT:  And the Government can call its next witness.

MR. BOOME:  Your Honor, the Government calls Matt Linton.

(Witness enters the courtroom and steps forward to be sworn.)

THE COURT:  Come on forward.

Take a seat up there.

THE COURTROOM DEPUTY:  Please raise your right hand.

**MATT LINTON**,

called as a witness for the Government, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.

Please state and spell your full name for the record.

THE WITNESS:  My name is Matt Linton, M-a-t-t, L-i-n-t-o-n.

**DIRECT EXAMINATION**

BY MR. BOOME:

Q.   Good morning, Mr. Linton.

A.   Morning.

Q.   Where are you employed, sir?

**A.**   I'm employed at Google.

**Q.**   What's your role there?

**A.**   My role is the regional lead of security response and forensics.

**Q.**   Before we talk more about your specific role, can I ask you to give the members of the jury an overview of your professional experience before you started working at Google?

**A.**   Sure.  I've been at Google for 12 years.

Prior to that, I was at NASA Ames Research Center in Moffett Field, California.  While I was there, most recently I was the deputy computer security official, sort of responsible for administrative oversight of the computer security policies and procedures.

And then prior to that, I was an incident response engineer and a security engineer who worked on computer science research and development projects.

**Q.**   In total, how long were you at the NASA Ames Research Center?

**A.**   14 years.

**Q.**   What does the NASA Ames Research Center do?

**A.**   It is one of NASA's best fundamental research and development facilities.  They do computer science research, robotics research, small missions.  Kepler mission, for example.

**Q.**   In total, how long have you been in the cybersecurity,

data security, and incident response fields?

**A.**   About 25 years.

**Q.**   Okay.  Let's talk about what you do now at Google, Mr. Linton.  Remind us again what your role is.

**A.**   Regional lead of security response.

**Q.**   What are your main responsibilities in that role?

**A.**   So our team is a team of on-call engineers.  We are paged or brought into the picture if the detection team thinks that somebody is trying to break into Google, data theft is occurring, nations' data attackers are trying to hack into us.

We work in three eight-hour shifts globally.  So the Americas; Australia covers Asia-Pacific; and then EMEA, Europe and Middle East, is Zurich.

**Q.**   So your work is focused on the Americas region?

**A.**   I manage the Americas region, and I'm one of the technical leads for the global team.  So there's about 54 of us globally that are the on-call kind of emergency response defense for cybersecurity.

**Q.**   How many professional staff at Google do you manage?

**A.**   I directly manage 17.

**Q.**   Are you familiar with the defendant, Linwei Ding?

**A.**   I am.

**Q.**   Did you know him by a different name -- or did you know of him by a different name when he worked at Google?

**A.**   Yeah.  He went by Leon Ding at Google.

**Q.**   When was the first time you became aware of the defendant?

**A.**   I became aware of Leon on December 29th, 2023.  That was the post-Christmas holiday kind of on-call shift.

And on December 29th, during our handoff from the European team to us, they told my on-callers that we had a serious event that needed to be assessed; and as the supervisory person, they brought me in to the handoff as well.

**Q.**   Was that unusual?

**A.**   It is unusual.  They don't typically invite me directly to the handoff unless there's something important and urgent going on.

**Q.**   Okay.  Can you tell us what you remember about that day, December 29th, at a high level, the information you learned about the defendant?

**A.**   So when I joined the handoff from the Zurich team to us, they were already well into investigating a case that had been escalated to them.

That case, they had come into some information that a Google employee was potentially overseas in China sort of soliciting VC funding, start-up capital for a company that they were founding, but that that person was still working at Google in our AI division and that the presentation seems to match the work that they do at Google, which was very concerning.

**Q.**   And did you identify that person?

**A.**   We did.  We researched and we found Leon Ding was that

person.

Q.   Did you take any steps to verify the presentation in China?

A.   Yes.  We looked for where we could locate the employee using forensic techniques to locate the computer hardware they were issued, did some forensic analysis, looked in our badging location system, generally looked at all the data available to us.

Q.   You mentioned that the -- some overlap between the presentation in China that you learned about and Mr. Ding's current role and responsibilities at Google.

Can you explain for the members of the jury why that was concerning from a data security perspective?

A.   So from a data security perspective, we found that the role listed in Leon's employment profile was building our computing networks to do AI processing.  And the images that we were able to find, kind of publicly taken images of the investor forum, it seemed like his company was involved in competing work directly in that field.

Q.   Before we get into some of the more -- a more detailed discussion of what you learned on December 29th, can you give us a high-level overview of your findings before we go further?

A.   Yes.  So by the time we did our 8:00 a.m. handoff, the Zurich team had already investigated, and they had confirmed the location of his computer that was being actively used by

him was definitely in China.

We had investigated a prior minor event that he was involved in on December 2nd.  And within the first hour, we had gathered enough information to see that there was a risk to Google's data.

We then locked his access to our internal networks and systems while we continued to investigate.  That's a standard procedure.

We continued investigating.  There were discrepancies in badging that were concerning that we needed to answer.  There were also, as we dug deeper and deeper, kind of more and more files with file names that appeared very concerning to us that looked like internal and highly sensitive data.

Q.   What was concerning about what was happening to those files?

A.   Those files were being uploaded to a personal Gmail account outside of Google's control that appeared to be in the control of Mr. Ding.

Q.   Okay.  I want to talk about some things you mentioned more specifically, Mr. Linton.  You mentioned a badging discrepancy. I'd like to ask you about that.

What were the sources of information available to you in your investigation that you examined to discover this badging discrepancy?

A.   So part of our defensive strategy for Google involves

logging kind of everything we can on employee computers basically throughout the use of the computer.

And so when we began investigating, we looked at the actual usage of his corporate laptop, which was online and being used.  We looked at the IP addresses that it was connecting to Google from.  That's kind of the Internet address that it's using.  We looked at the time and day of use.

We look in our corporate badging logs, which is the badge that you swipe when you enter the office at the day.  We looked in access logs relating to our internal documents, et cetera.

**Q.**   Surveillance video?

**A.**   Surveillance video as well, yes.

**Q.**   Okay.  First let's discuss the device location information that you looked at.

Are there rules about which devices Google employees can use to do their work?

**A.**   Yes.  Google employees are required to use a Google-issued device that is monitored by Google in order to do their work.

**Q.**   What type of Google-issued computer did Leon Ding have during the relevant time period that we're discussing right now?

**A.**   He had a Google-issued MacBook Pro.  He also had another MacBook Pro that was older.  He'd been there for about four years, so he'd upgraded his laptop in that time.

**Q.**   Do you remember about when that upgrade happened?

A.    Somewhere around mid-2022, I believe.

Q.    Are all Google devices password-protected?

A.    All Google devices are password-protected, yes.

Q.    And when an employee uses their Google device to log into the network, how does the network know which device and which employee is logging in?

A.    We have a really neat security system that does sort of a cryptographic proof of whose system is checking into it at any given time.  You can only get into our internal data if you have a Google-issued system that has been cryptographically signed by Google, and each computer has a unique cryptographic signature.

Q.    What's the primary goal of those authentication procedures that you just mentioned?

A.    Protecting our data and our users.

Q.    And by doing what, specifically, as it relates to the devices?

A.    By ensuring that only authorized Googlers are able to get to their data and to get to our internal networks.

Q.    So when a properly authenticated device with the right person using it gets into the Google network, what types of things does the security system track about that?

A.    So in order to protect us against hacking threats, we really have to log and keep track of everything that's going on on our issued computers at any time.  So we have a number of

what we call endpoint agents that watch all of the activity on the computer.

We keep track of what software is run, time and date, IP address that it's being used from, the wireless networks that it was connected to at the time. We keep track of all the documents that were opened, files read and written.

Q. I want to ask you about one of those things you just mentioned, which is IP address.

Can you tell the members of the jury just very briefly -- I know there's a longer version of this answer.

A. Okay.

Q. But just very briefly, what is an IP address?

A. Very briefly, it's how your computer connects to the Internet. And it's sort of analogous in its uniqueness to, like, the ZIP code of where you are in the world.

Q. Does that mean it can be used in part to give an approximate geographic location of where that device is at a given time?

A. Yes, we routinely use it for that.

Q. Do I understand you correctly, Mr. Linton, that every time a Google employee logs in with their Google device to the network, the security system logs the date, the time, the device, the employee, and an approximate geographic location?

A. That is correct.

Q. Where does this information go once it's tracked?

**A.** We have a very large database that we collect that information into to centralize it so that we can write rules to detect abnormalities.

**Q.** Okay. And does Google preserve and save the device location logs that it collects in the security system?

**A.** Yes, we do.

**Q.** How long do you save them for?

**A.** At minimum of four years and maximum of as long as we can.

**Q.** And is that one of the sources of information you looked at to discover this badging discrepancy that we talked about?

**A.** Yes.

**Q.** Okay. So let's talk about the other half of the equation there and then we'll compare them. So now let's talk about the access badges.

Can you tell the members of the jury what the rules are about badging in, badging out, and access badges at Google?

**A.** So every employee is issued a unique access badge that gets them in through the front doors and to, kind of, any of the labs or workspaces that they use. These have a unique identifier that kind of tags to their username so that we can tell who's authorized to enter our buildings, who's not, and which doors they've entered throughout the day.

**Q.** Can any employee with a badge get into anywhere on the Google campus or in a data center?

**A.** No. There are restricted spaces where you have to be

authorized to enter the space specifically.

Q.   Can you give us an example of something that might apply there?

A.   Yeah.  So, for example, the network closets where all the wiring is, I'm not an electrician and I'm not a network admin, so I'm not allowed to go into the network closets.  You have to be one of those folks to enter.

Q.   What information about who badges where and when is recorded by the security system?

A.   We record the time and date that a badging event occurred, the door, the human-readable name for the door and the building that it occurred in, the employee's badge ID who issued the door open event, and then the user who it was -- who it was assigned to at that time.

Q.   How long does the security system retain that information?

A.   Minimum of four years and maximum of as long as we can.

Q.   Okay.  As part of your investigation, did your team obtain the defendant's badge access records for the period of June 1st, 2023, to December 29th, 2023?

A.   That's correct.

Q.   Did you also obtain his device location records for the same time period?

A.   Yes, we did.

Q.   And have you reviewed Exhibit 1 and Exhibit 7 before your testimony today?

**A.**    I have.

**Q.**    Is Exhibit 1 the badge access log?

**A.**    It is.

**Q.**    And Exhibit 7, the device locations?

**A.**    Yes.

          **MR. BOOME:**  So, Your Honor, we'd like to move those into evidence, but instead of showing the exhibits to the jury, we'd like to use the PowerPoint.  Since they're Excel spreadsheets, they're a little unwieldy.

          **THE COURT:**  Objection?

          **MR. RAPP-KIRSHNER:**  No objection, Your Honor.

          **THE COURT:**  Admitted.

     (Trial Exhibits 1 and 7 received in evidence.)

          **MR. BOOME:**  So if we could bring up Mr. Linton's PowerPoint, please.  Thank you.

**BY MR. BOOME:**

**Q.**    Okay.  Mr. Linton, can you orient us as to what we're looking at here in Exhibit 7, the device location log?

**A.**    This is a subset of the device locations for Leon Ding's activity from November 2nd all the way until November 18th.

**Q.**    Can you briefly take us through the columns that are shown here?  And this is just some of the columns in the entire exhibit, for clarity.

     Can you walk us through the ones that are shown here and what they mean?

**A.** So the "First Seen" column there, that's the time and date with a date stamp of exactly the first time we saw the defendant using that IP address. And "IP" is the actual IP address that we saw.

You can sort of think of this as each time we observe someone in a new location that we haven't seen them in recently, that's the first seen time.

"Country and Administrative Locality," that's as fine grained as we can get at determining roughly geographically where in the world that IP address was.

**Q.** I want to ask you to focus on one particular part here and tell us what you see happening between November 2nd and November 6th -- 8th?

**A.** So November 2nd, that's line 1979, we see a location entry using an IP address in San Francisco, California. And then the following day, we see the first IP address from China.

**Q.** All right. And we've gone further ahead in time. Can you tell us what you see happening here and identify the dates and the location that's relevant?

**A.** So on December 6th, that's late in the evening Pacific Time, we see the last China IP address being used. And then three days later, on December 9th, we see the first use again of U.S.-based IP addresses.

**Q.** Between November 2nd, 2023, and December 9, 2023, where were the defendant -- where was the defendant's Google-issued

device?

A.    The Google-issued device was being actively used in China between those two dates.

Q.    Anywhere else other than China between those two dates?

A.    No.

Q.    All right.  Regarding this period of time that we just discussed when Mr. Ding's devices were in China, did you compare these logs to the badge access logs?

A.    Yes, we did.

Q.    I'd like to bring those up now.  This is Exhibit 1, a portion of -- a few columns of Exhibit 1 for clarity.

Can you walk us through briefly what each column shows?

A.    So this is output from our badge access logs.  On the first column, "Time," that's, again, the exact time and date stamp down to the second that a badge event occurred, so walking in through a door.

The second row, "Badge," that's the numeric identifier assigned to the employee's badge itself.

The third row is the user to whom the badge has been issued by Google security.

And then "Location" is the human-readable name of the door.  So, for example, SVL-MAT3, that's the Matilda 3 building in Sunnyvale, so U.S. Sunnyvale MAT3.

Q.    I want to ask you about this portion in time.  What does this section of the badge activity log show?  Forget the

highlight for a second, just the big chunk.

A.   So this section shows a series of badge entries for Leon Ding's employee badge.

Q.   Between November 3rd, 2023, and December 8th, 2023?

A.   Yes, between November 3rd and December 8th.

Q.   And one of the -- one of the rows is highlighted.  During your investigation, did you obtain surveillance video for the specific badge entry event that is highlighted now?

A.   We did.  We were trying to resolve the discrepancy between the machine being in China and the badge entry being in Sunnyvale, so we pulled surveillance footage to see if we could actually visualize a person entering the door.

Q.   And is the video surveillance footage from the highlighted badge entry, is that Exhibit 18?

A.   Yes.

Q.   Have you reviewed it before your testimony today?

A.   Yes, I have.

MR. BOOME:  Your Honor, we move Exhibit 18 into evidence.

THE COURT:  Any objection?

MR. RAPP-KIRSHNER:  No objection, Your Honor.

THE COURT:  Admitted.

(Trial Exhibit 18 received in evidence.)

BY MR. BOOME:

Q.   Okay.  Mr. Linton, give us a little orientation as to what

we're looking at before I press play.

**A.**   So this is surveillance footage of the interior of the door to the MAT3 or -- yeah, MAT3 building in Sunnyvale. You're just viewing Google employees badging in and entering the facility.

**Q.**   Okay.  And I'm going to go back quickly so we can see the time.  And as we're watching the video, can you let us know when you see this time and the person that we should focus on?

**A.**   Yes.

(Video was played but not reported.)

**THE WITNESS:**  So the 17:52, that's 9:52 a.m. in Pacific Time.  This is a random Google employee entering.  You can see they swipe their badge before they open the door.

And this is another pair of employees entering as well.

And then right after that pair of people enter, right here, that's the exact moment of the badge swipe for Leon Ding's employee badge, that person who just walked through the door.

**BY MR. BOOME:**

**Q.**   Okay.  Oh, I'm sorry.

Did you identify the person?

**A.**   We did.

**Q.**   What, if any, professional relationship did she have to Mr. Ding?

**A.**   We identified that as Yuqing Ren.  That was Leon's intern

at the time.

Apologies if I pronounced it wrong.

**Q.**   Oh, and I'm sorry.  I have one more question because this initially confused me.  The date says 04/12/2023.  Is it April or is it December?

**A.**   That's December 4th.  Timestamps are like the bane of all forensics people.  There are so many different ways to --

**Q.**   Thank you.

**A.**   -- to render them.

**Q.**   Mr. Linton, I want to change gears now and ask you more generally about some other things that are tracked by the security system.  We talked about device location and badge activity.

Can you give us a sense of, as you go through your workday at Google, what other types of activity is logged and recorded and saved by the security system?

**A.**   So as I go to work in the morning, you know, I'll park. I'll walk in through the front door of my office.  My badge in to the front door will be logged.  If my elevator has a badge reader, the elevator will also log my badge.

As I go up and sit at my desk, when I unlock my laptop -- because I also have a MacBook laptop.  When I unlock it, the fact that I successfully entered my name and password will be logged.  Then I authenticate to our network.  My network authentication is logged.  I have to touch a little

cryptographic key to prove my employee status.  That also gets logged.

Then as I'm going about my day, I'm going to open my e-mail, which is in Gmail.  Then when I open my e-mail, for example, all of my e-mail activity is logged in my browser.  It logs that I went to Gmail.

If I open any internal documents, it gets logged in multiple places.

And then any software I download, execute, anything I run on my computer is logged with time, date, software name, et cetera.

**Q.**   How about uploading or downloading documents?

**A.**   Uploading and downloading is definitely logged.

**Q.**   This is all stored in the database?

**A.**   It's all stored in a large database.

**Q.**   For every employee around the world?

**A.**   Every employee.

**Q.**   Can you give us a sense, if you can estimate, on the average day at Google, how many data points, logs does the security system capture?

**A.**   We log about 3 trillion events per day.

**Q.**   So is there -- is it possible for a human security team to effectively use and analyze that data?

**A.**   It would be 100 percent impossible for a human to keep up with logs at that speed.

Q.   What is Google's solution?

A.   We have a series of software tools that we use to read the logs on a constant basis.  They make associations between the logs, and then the software tools are programmed to try to find anomalies in the logs that might be an attacker or, you know, data abuse or things like that.  And then they sort of try to make a good determination of how likely it is that something bad is going on and escalate that to the human analysts for review.

Q.   Changing gears, Mr. Linton, we've heard about the places where documents are stored within Google.  Can you remind us of the two locations where most of the documents that Google employees use to do their work are stored?

A.   The two primary locations we use for documentation, the first of them is basically Google Workspace.  It's Google Drive, Google Sheets, Docs, all of the consumer-level tools that you'd be familiar with.

There's a second one we refer to as G3 Docs.  That's a documentation system that's part of our internal source code repository that stores docs alongside the actual source code to make it easier to update for, you know, new releases.

Q.   Does the security system track access to documents in both locations?

A.   Yes, it does.

Q.   What are the logs focused on G3 called?

**A.**   G3 Docs is primarily tracked by a system we call Uber Proxy.

**Q.**   And what's the name of the logging system for the corporate workspace?

**A.**   That's Drive activity logs.

**Q.**   As part of your investigation of the defendant, did you obtain his Drive activity logs and Uber Proxy logs for the entirety of his employment with Google?

**A.**   Yes, we did.

**Q.**   Did you provide those logs to the FBI?

**A.**   Yes, we did.

**Q.**   What happens if an employee tries to navigate to a document that they don't have access permissions to actually see?

**A.**   In either system, they'll receive an access denied message.  In G3 Docs, it's a little more cumbersome to obtain access to.  You have to go find the owner.  In Google Docs, it's a little easier because that's a consumer product and you get a little button that says "Request Access" and you can click it and request access from the owner.

**Q.**   Does Google maintain a record of when an employee requests access to a document?

**A.**   Yes.

**Q.**   Did you obtain the defendant's records for documents that he requested access to in the corporate workspace?

A.    Yes, we did.

Q.    For the entirety of his employment with Google?

A.    Yes.

Q.    And I want to ask you about -- first, about Exhibit 13 -- Exhibits 13 and 14.

Is Exhibit 13 Drive access requests that were denied?

A.    Yes.

Q.    And Exhibit 14 Drive access requests that were granted?

A.    Yes.

Q.    And what format is this data in?

A.    It outputs into, like, a spreadsheet format.

Q.    Okay.  And are Exhibits 13 and 14 the Drive access requests and granted for the defendant for his employment at Google?

A.    Yes.

        MR. BOOME:  Move to admit those exhibits, Your Honor.

        MR. RAPP-KIRSHNER:  No objection.

        THE COURT:  Admitted.

    (Trial Exhibits 13 and 14 received in evidence.)

BY MR. BOOME:

Q.    Have you prepared a demonstrative video to illustrate the process of logging into a Google-issued computer and trying to access documents in the network?

A.    Yes.

Q.    At a high level, what does it show?

A.    It shows my colleague Gary logging into his Google-issued laptop and then authenticating, navigating to our internal document system, and looking for some documents.

Q.    Will working with this video assist your testimony in describing what the process is like?

A.    I think it will, yes.

        MR. BOOME:  Ms. Hernandez, could you please pull up Demonstrative Number 4.

BY MR. BOOME:

Q.    And as we go through the video, Mr. Linton, if you could just give us some basic signposts about what parts of the process you're seeing.

A.    Sure.

Q.    And then I'll ask some follow-up questions later.

A.    All right.  So, you know --

        MR. BOOME:  Let's press play, please, Ms. Hernandez.

                (Video was played but not reported.)

        THE WITNESS:  Right here, he's opened his laptop and he's typing in his username and password.  That's the same way that anybody would unlock their computer in any corporate environment.

    And then once he's unlocked the screen, you'll see him successfully logged into his operating system.  Then he's going to load a browser and start trying to go into our corporate intranet.

So when he tries to go to our corporate intranet, he is going to get presented with a log-in prompt here. This is the Google log-in for our stuff. He has to enter his username and password again.

Good password, Gary.

And then you can see him touch that little metal key there. That's the cryptographic key. It requires a human touch to prove that you're present when you're making the request, and that's a safety measure against abuse.

He's looking in our internal employee portal for some documentation. This is an overview page for the Deepsea team. This is kind of like a high-level overview of what they do.

And then he's clicked a link and gotten a "Permission Denied" message to their more detailed documentation.

Now he is going to search for different documents.

And this is a different team's "What are we and what do we do?" overview page. And then they've linked to a Google doc here.

And this is the access denied page for a Google doc where you can explain why it is that you need access to that thing, and then when you hit "Request Access," the owner gets an email saying you would like access.

BY MR. BOOME:

Q.   Thank you, Mr. Linton.

We've heard about document access controls and

restrictions and access groups.

When an employee is added to an access group to be given access to a document, does that mean, for instance, that the document gets pushed onto their desktop or emailed to them?

A.   No.  It gives them permission to go see the doc without getting an access denied message.

Q.   Do you still have to know where the document is?

A.   Yes.

Q.   What does that mean, knowing where the document is at Google?

A.   Well, usually, at Google, it means you are involved in something and you need to find that file and learn from it. And you search for it, or a colleague sends you a link to it and says, "Hey, this is where our documentation is stored."

Q.   And so -- and you mentioned a link.  Is that because documents at Google are Web-based?

A.   All of our documentation is pretty much Web-based in our intranet.

Q.   So you access documents with links?

A.   Yes.

Q.   Not necessarily like a Windows folder with a document in it?

A.   No.  It's pretty much all links to internal sites that people send each other by design.

MR. BOOME:  Okay.  Thank you, Ms. Hernandez.  If we

could go back to the PowerPoint, please, for these next questions.

**BY MR. BOOME:**

**Q.**   You mentioned earlier -- early in your investigation on December 29th, when you found out about the defendant's presentation in China, you discovered that he had been uploading some documents.  And I want to ask you about how you found out about that.

What part of Google's security system tracks uploads off the network?

**A.**   We have a tool called Web Protect that sits in your browser, and it looks for all document uploads anywhere, including off of our corporate Internet.

**Q.**   When was Web Protect launched at Google?

**A.**   Web Protect was launched in mid to late 2021.  That was its very first version.

**Q.**   Does it only track uploads off the network, or are there other events or actions that it tracks?

**A.**   So it tracks pretty much any data going off the network from within the browser, so cuts and pastes of texts, file uploads, et cetera.

**Q.**   For instance, if a person on their Google laptop entered some text into an external website, would that be tracked by Web Protect?

**A.**   Yes.  The tool just looks for data leaving the network.

Q.   As part of your investigation, did you obtain Web Protect logs associated with the defendant from August 2nd, 2021, to December 29th, 2023?

A.   Yes, we did.

Q.   And are those logs Exhibit 5?

A.   Yes.

Q.   Have you reviewed it today before your testimony?

A.   I have.

MR. BOOME:  Move to admit Exhibit 5, Your Honor.

MR. RAPP-KIRSHNER:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 5 received in evidence.)

BY MR. BOOME:

Q.   And I mentioned the start date August 2nd, 2021.  Why is that the start date for the Web Protect logs?

A.   Web Protect was a new data loss tracking system that we had just finished building, and so Web Protect logs didn't exist prior to that date.  It didn't -- Web Protect itself didn't exist prior to that date.

Q.   Okay.  For the record, I've published a slide with -- showing portions of Exhibit 5.

Mr. Linton, can you orient us as to the information in this image.  And let's start with Columns A, B, and C, please.

A.   So this is a portion of a Web Protect log.  A is pretty much always the exact time and date that an activity took

place.  B and C, those are orienting you to the user who is doing the activity.  So B is the email address of the person, and C is, like, their local login, the name that you would type when you log into the computer.

Q.   Let's jump ahead to E.  What does E show?

A.   E shows whether it was, you know, file uploads or, for example, cut and paste of data, different types of data.

Q.   This is the thing that Web Protect is recording?

A.   Yeah.  So in these cases, all of these, it is a file upload.

Q.   And how about -- let's go back to Column D now.  What does that column mean?

A.   D is the profile user name.  So this is the person who's logged into the browser itself.  And you can see here, it's star, star, star @gmail.com.

There was a design choice that was made earlier on when we built this tool to restrict the personal Gmail accounts of our employees away from the response team for privacy reasons.

Q.   Okay.  And let's -- and I'm sorry.  So is Column D, "Profile User Name," is that the place where the information is coming from or going?

A.   Profile user name is the browser that's being used to do the Web Protect transfer.  So this -- in this case, it is someone logged into a personal browser profile on their corp machine.  Corporate.  So corporate-issued.

Q.   Okay.  So let's take us through J and K, please.

A.   So J is the remote domain that the data is going to.  You can see in this case it's drive.google.com.  That's Google Drive.  If it were Dropbox, for example, it would say dropbox.com in Column J.

Q.   And how about Column K?

A.   Column K, that is the name of the content.  So for a file upload event, that's the name of the file that is being uploaded.

Q.   Okay.  So taking this row as an example, can you kind of synthesize all the information that you see from the Web Protect logs and tell us what it actually means is happening?

A.   So this row is, Leon Ding logged into this computer using a browser that's connected to a Gmail account that's going to be a personal account, because we don't use Gmail for our corporate business.  It's a file upload to a Google Drive belonging to that Gmail account, and the file is called "BarnaCore Instruction Set Architecture" with a PFC at the beginning.

     Everything before where it says "PFC," that's, like, the folder location on the computer itself that the file is coming from.

Q.   Okay.  So let's go through that one more time.

     So on the right-hand side here, which part is the file

name?

A.    The file name is "PFC - BarnaCore Instruction Set Architecture."

Q.    And what does folder path mean?

A.    The folder path is, you know, on your computer, when you have a desktop and you create a folder on the desktop, like "My Pictures," the folder path would be your name/my desktop/my pictures."

Q.    So can you tell by the data in this Web Protect log what was the name of the subfolder where this document was stored?

A.    So the subfolder was under "Users/leonding," so that's the login folder for Leon Ding.  And then he had a folder called "Documents" with a folder called "Notes" inside, another folder called "TPU," and then underneath that folder was this file.

Q.    I want to ask you again about something you mentioned in Column D, the asterisks before the Gmail.

Why are those asterisks there instead of the actual -- the full name of the personal account?

A.    So a lot of the security tooling that we build is also intentioned with employee privacy concerns.  And initially, in the early versions of Web Protect, there were concerns that we would overcollect.  Someone would upload their health insurance record from a corporate machine to their doctor's office.  And so a privacy control was put in place to restrict the actual Gmail account that the data was going to so that we wouldn't

know, you know, the employee's personal email name.

Q.   Okay.   So as you explained, this row shows the BarnaCore Instruction Set Architecture document going from Mr. Ding's corporate laptop to a personal account?

A.   Correct.

Q.   But the personal account is a Google account?

A.   The personal account is a Gmail account, which is run by Google, yes.

Q.   Right.   Run by Google?

A.   Yes.

Q.   Hosted by Google.   Sorry.

A.   Yeah.

Q.   So why can't Google just go in and see inside the personal account and see what's there?

A.   There is a policy that absolutely forbids my team from looking into consumer accounts, no matter what.   I could be fired for looking.

Q.   And is that a rule not only for outside users but also for employees who have personal accounts?

A.   That's correct.   It doesn't matter that it's an employee's personal account.   It's still a personal account.   I'm not allowed to look in it.

Q.   Have you examined this entire Web Protect log, Mr. Linton?

A.   I have.

Q.   All of Exhibit 5?

Q.   When you examined this log during your investigation, what, if anything, concerned you about the file names that you saw?

A.   When we were investigating this log during the initial investigation, I could already kind of tell from the file names that a lot of them were, you know, identical matches for programs that Google was working on at the time that were in our AI unit.  You know, Tensor, BarnaCore, Pufferfish, and Deepsea, they all match internal code names that I knew to be AI-related work.

Q.   Is Web Protect kind of always on, always recording stuff?

A.   It is.

Q.   Is there a human analyst watching, like, a ticker as it goes by?

A.   It would be impossible for a human to watch that many events go by.  It's a big company.

Q.   So how does this factor into the overall security system?

A.   Web Protect logs about 6 million events a day, so about 70 per second.  And just like the security event logs, we have software that's designed to try to go in and sift through those millions and millions of records a day to identify important events.

But especially at the time Web Protect was launched, because it was a very new capability, we were still tuning it; it was still learning.  And so Web Protect is mainly used as an

audit log so that we can go back and audit what has been happening.

**Q.** All right. And so did -- did the system -- after recording Mr. Ding's upload of these files that you mentioned, did it notify a human investigator to follow up?

**A.** No. These uploads were not raised to a human investigator.

**Q.** Can you help us understand the factors about these specific documents that were being uploaded? What was it about these documents, if anything, that affected the system's ability to find out what was in them?

**A.** Yeah. We did a review during this case of why we didn't get any human analyst uploads from Web Protect, because we would have wanted to. We found a couple of key factors.

Aside from the volume -- right? There's a large volume of data per day to go through -- one of the things we found was that his particular method of creating these files was to cut and paste data from internal Google documents into his local Apple Notes software that came with his Mac top and then export them into these PDFs. And when that happened, it was stripping away contextual information that Web Protect would otherwise rely on to know where from internal to Google the data came from.

And part of our Web Protect alerting is knowing, hey, this data came from, you know, the internal repository of AI stuff.

And when the information was cut and pasted out and kind of created separately on its own inside an Apple Note, Web Protect lost all that context.

Q.   Things like Google identifiers of the authors of documents?

A.   Google identifiers of the authors.  You know, the folder that the document came from might have been relevant to Web Protect, but it didn't know, based on the PDF, where it had come from.

Q.   Meaning internal folder?

A.   Internal folders, yeah.

MR. BOOME:  Your Honor, I see you maybe -- this would be a good -- if you're looking for a time to stop or --

THE COURT:  Roughly, how long do you have left on this direct?

MR. BOOME:  I'd say about 20 minutes, Your Honor.

THE COURT:  Okay.  Yeah.  Why don't we take a lunch break, and we'll resume at ten minutes after the hour, ten minutes after 1:00.

Remember to bring your notes with you and remember all my admonitions, and we'll see you at ten minutes after 1:00.

THE COURTROOM DEPUTY:  All rise.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Okay.  Mr. Linton, you can step down. Please be back on the stand at ten minutes after 1:00 so that

we can bring the jury in.  You'll already be there.

THE WITNESS:  Yes, sir.

THE COURT:  Thank you.

And then very briefly.  So the two documents that we -- where we turned off the screens for the gallery -- right? -- those were cover pages for documents that the Government contends are -- please be seated.

Those were cover pages for documents that the Government contends are trade secrets, but there was nothing on those particular pages that you were showing to the witness that anybody could argue is a trade secret.  And so why were -- why did we prevent people in the gallery from seeing those pages?

MR. BOOME:  That's a good point, Your Honor.  I actual- -- I think the intention was, initially was to go through some of the content of the documents; but for whatever reason, that didn't happen.

So I think we'll be more mindful of that in future. If we're only going to show, like, the cover page, for example, we could come up with a different strategy.  But it wasn't our intention to do it that way initially.

THE COURT:  Okay.  I understand.  I mean, those things happen.  But it is important for the public to have access to as much of the trial as possible.  And the public has a right to access to as much of the trial as they can have without

revealing Google's trade secrets.  And so they should have had access to those documents.

And so, yes, I would ask you to please be much more mindful of that next time before asking to conceal something from the public.

MR. BOOME:  Understood, Your Honor.

THE COURT:  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Luncheon recess was taken at 12:26 p.m.)

**AFTERNOON SESSION**                                    **1:13 p.m.**

(Proceedings were heard in the presence of the jury.)

THE COURT:  All right.  You can resume.

MR. BOOME:  Thank you.

BY MR. BOOME:

Q.   Okay.  Mr. Linton, we finished by talking a little bit about I think what you called the defendant's method of exfiltration.

What do you mean by that term?

A.   So the ways that the files were taken off of our internal systems and sent outside of our network, that's what we refer to as exfiltration.

Q.   And I believe, just a quick review, you mentioned going to source documents and then Notes files.

And then what were the next steps?

A.   We found that he would go to a source file from our

internal network and he would copy and paste text.  Just, you know, Control C on your computer.  And then he would open an Apple Note locally on his Mac workstation, paste the content of the internal documentation into that.  Then he would export that content from Apple Notes into a PDF file and organize it into a documents folder on his corporate machine.

**Q.**    I want to ask you about the first step.  You mentioned source document -- copying from source documents, going into the Apple Notes application.

Was Google able to identify the internal source documents that Mr. Ding visited to create his Apple Notes on his MacBook?

**A.**    Yes, we were.

**Q.**    How did you manage to identify those source documents?

**A.**    We used what's called a forensic timeline.  That's when we kind of put everything that happened on the computer workstation into a second-by-second ordered event.  And we were able to go and see -- you center on the creation of the note file, so the creation of the PDF file, and then you look back at the events that happened just prior.  And we were able to find internal documents that he had visited just prior to creation of the notes doc.

Then we compared the content of each of the PDFs to the content of the internal source that he had visited prior to its creation, and we were able to manually verify exact content cuts and pastes.

Q.   Thank you, Mr. Linton.  That was a lot, but let's go -- we'll go a couple steps there.

So you said when you -- the point when you compared the content, you said the PDF and the source file.  What do you mean by "the PDF"?

A.   So the PDF is the file that he created on his own workstation, his corporate workstation, that was later emailed -- or sent to his Gmail account.

Q.   And you mentioned something called an Apple Note creation date.

A.   Correct.

Q.   What is that, and why was it relevant for the process you just described?

A.   The Apple Note creation date is the date stamp.  It's the time and date that an Apple Note file was created that's recorded by Apple Notes as you create the Notes file.

Q.   Okay.  And did you -- after identifying the source documents that Mr. Ding visited, did you obtain copies of those source documents as they existed around the time that Mr. Ding accessed them?

A.   Yes, we did.

Q.   And did you provide those to the Government?

A.   Yes.

Q.   To the FBI?

A.   Yes, we did.

Q.   Are those Exhibits 42 through 217?

A.   Yes.

        MR. BOOME:  Okay.  Your Honor, two of them are already admitted but we'd move to admit the rest of the group in evidence now.

        THE COURT:  Any objection?

        MR. RAPP-KIRSHNER:  No objection.

        THE COURT:  Admitted.

        (Trial Exhibits 42 through 57 and 59 through 217 received in evidence.)

BY MR. BOOME:

Q.   Okay.  Mr. Linton, a couple of kind of random housekeeping things before we move on to the next big topic.

        As part of Google's investigation of the defendant's conduct, did you obtain his Google -- the Google-issued MacBook that he used to make these notes and PDFs, et cetera?

A.   Yes, we did.

Q.   Did you create an image of it?

A.   We did.

Q.   And did you find Notes files on that image?

A.   Yes, we did.

Q.   And prior to your testimony today, have you reviewed Exhibits 886, 1146S through 1149S, and 1170S?

A.   Yes.

Q.   Are those copies of the Notes files that you found on

Mr. Ding's laptop?

A.   Those are copies of some of the notes, yes.

Q.   Some of the Notes files, yes.

     MR. BOOME:  So, Your Honor, we're just identifying and authenticating those now, and we'll possibly admit them later with another witness.

     THE COURT:  Okay.

BY MR. BOOME:

Q.   Mr. Linton, does the security system that you've been telling us about keep track of when a Google employee using their Google computer logs into a personal, say, Gmail account?

A.   Yes, we are able to track that.

Q.   Are you able to see which accounts a Google employee is accessing?

A.   Not always.

Q.   In this case, were you able to identify some of the personal Google accounts that Mr. Ding accessed using his Google MacBook?

A.   Yes, we did identify a number of different personal accounts.

Q.   Okay.  I'm going to put some on the screen, and will you let us know if these are among the accounts that you observed Mr. Ding access?

A.   Yes, we did see all four of those.

Q.   And I want to ask you about the last one,

aamermmmood@gmail.com.  Did that one stand out to you for any particular reason?

A.    That did.  When we were doing forensics, we noticed that the first three email addresses were -- you know, appeared to us to be permutations of his name.  The last one actually appears to be the name of the vice president of the product area that Leon worked in, Aamer Mahmood.

Q.    Okay.  Changing gears now to December of 2023 -- oh, I'm sorry.  We'll come back to December '23.  Forgive me.

     Did there come a time when Mr. Ding notified his supervisor that he intended to resign from Google?

A.    Sort of.  We found a chat message from Leon to his manager, I think it was on the 26th, that said, "I intend to resign.  My last day will be January 5th."  But his supervisor was on paternity leave at the time and wasn't expected back until after the 5th.

     We didn't see any other of the typical things you would expect from someone resigning, like going to the HR portal and saying, "I resign.  Here's when my last day will be."

Q.    And have you reviewed a copy of this chat between the defendant and his manager where he informed his manager of --

A.    Yes.

Q.    -- what you just told us?

     Is that Exhibit 2?

A.    Yes.

MR. BOOME:  Your Honor, move Exhibit 2 into evidence.

THE COURT:  Any objection?

MR. RAPP-KIRSHNER:  No objection, Your Honor.

THE COURT:  Admitted.

(Trial Exhibit 2 received in evidence.)

BY MR. BOOME:

Q.   Okay.  Can you walk us through the date and the parties to the conver- -- to the chat, please.

A.   So this is a chat message that we pulled out of our forensic artifacts from Leon to his manager.  It's just prior to noon on the 26th.  And he said [as read]:

"Hopefully you had a great time with your family.  I will leave Google in two weeks.  My last day will be January 5th . . . ."

And then it says [as read]:

". . . take your time and I will come back to the office later after your vacation."

Which I think vacation refers to the paternity leave.

Q.   Did Mr. Ding do any of the other things an employee is supposed to do to formally resign?

A.   No.

Q.   Or formally notify the company of an intent to resign?

A.   No, not that we have any record of.

Q.   Is part of Google's security system a tool that tracks web browser history on Google computers?

**A.** Yes.

**Q.** What's that part of the system called?

**A.** We call that the footprints logs.

**Q.** And at a high level, what types of things does it track?

**A.** We call it footprints because it kind of tracks your footprints as you're going about your day browsing, so what internal sites you visited, what things you searched for in your browser, kind of what -- anything you're doing in your browser on a day-to-day basis.

**Q.** And this is just the corporate browser?

**A.** This is just your Google corporate browser, yes.

**Q.** Does it show access to documents?

**A.** It will show access to documents, yes.

**Q.** Did you obtain, as part of your investigation, Mr. Linton, the defendant's footprints log, the browser history for January 2023 to December 29th, 2023?

**A.** Yes.

**Q.** And have you reviewed it before coming to court today?

**A.** Yes, I have.

**Q.** Is that Exhibit 15?

**A.** Yes.

      **MR. BOOME:** We move that into evidence, Your Honor.

      **MR. RAPP-KIRSHNER:** No objection.

      **THE COURT:** Admitted.

    (Trial Exhibit 15 received in evidence.)

BY MR. BOOME:

Q.   All right.  I'd like to take a look at that.

Okay.  This is some of the columns in a much larger spreadsheet.  Can you tell us what these two columns show?

A.   These show the exact date and time that a browser visited a particular page, like a web page in our documentation portal, and the title of the web page or documentation is in Column E. You can see two of the rows that say "403 permission denied," that's the title of the access denied page, so that's an attempt to visit a document that you don't have access to.

Q.   Okay.  And just to orient as to date, we saw the email with Mr. Ding -- sorry -- the chat message Mr. Ding sent to his manager on the 26th?

A.   Correct.

Q.   And we're two days later on December 28th now?

A.   Correct.

Q.   Fair to say Column E shows the names of the internal documents the defendant was visiting two days after his resignation note?

A.   That is correct.

Q.   I've highlighted a couple of rows here for you.  Anything jump out to you about the names of these particular files?

A.   The names of these particular internal documents do match file names that we found that had been sent out to his personal drive.

Q.   And, again, these aren't the files he sent to the drive. What are these?

A.   These are the files he created in his Apple Notes that were then, yeah, sent.

Q.   The source documents?

A.   The source documents, yes.

Q.   Okay.  And I think you already touched on this, but I wanted to just clarify.  Let's look at the top two of the 403 permission denied.

"Permission denied - Pufferfish," what does that tell you?

A.   That tells me that someone tried to visit the Pufferfish team documentation and didn't have authorization and they were denied access.

Q.   And --

A.   Leon, in this case.

Q.   -- not just anyone.

A.   Yes.

Q.   Whose logs are these?

A.   These are Leon's logs.

Q.   Do you know what Pufferfish stands for?

A.   Pufferfish is one of the internal code names for a generation of our AI computing chip.

Q.   The TPU?

A.   TPU, yeah, Tensor Processing Unit.

Q.   Okay.  Okay.  So by this time, December 28th, 2023,

Web Protect had already captured Mr. Ding sending a large volume of documents to his personal account; right?

A.   Yes.

Q.   This is after that?

A.   Correct.

Q.   Okay.  And as part of your investigation, were you -- was Google asked to identify some of the source documents, meaning the internal Google documents that Mr. Ding visited in December of 2023?

A.   Yes.

Q.   And are those identified as Exhibits 218 to 276?

A.   Yes.

Q.   Did you provide those to the Government?

A.   Yes, we did.

     MR. BOOME:  And we're just identifying and authenticating those at this time, Your Honor.

     THE COURT:  Okay.

BY MR. BOOME:

Q.   Okay.  And our last topic today, Mr. Linton, I want to go back to the first thing we discussed.

     December 29th, 2023, starting from the time when you learned about the defendant's presentation in China, take us back to that day.  That was the Friday after Christmas.  What do you remember about who was working and what happened when you learned about that tip?

**A.**   Yeah.   So Friday after Christmas, that's normally a very quiet period at Google.   Our team was doing our usual on-call schedule.   And then just as soon as the handover came in on the 29th from Zurich, when we looked at the case in front of us already, the data that had been gathered about Leon being in China, potentially presenting our secrets there, when we found additional logs information showing the Web uploads, we were extremely concerned.

We locked his access to internal corporate resources within an hour, which is functionally immediately in these time frames that we're working in.

**Q.**   How many people were working with you on this when you got notified about the --

**A.**   Functionally, all of our team for a holiday period.   It was about 12 people globally.   We had about six in the United States.   And then we continue working 24 hours a day on a case like this.   So it was three in Sydney, Australia; three in Zurich, Switzerland; and then six in the U.S. that continually analyzed logs and investigated until we knew for sure what had happened.

**Q.**   Have you prepared a timeline of the events of December 29th to help with your testimony today?

**A.**   Yes.

**Q.**   Okay.   I want to go through that with you now.

Take us through the first entry on your timeline.

**A.**    So this is the time and date, 12:22 a.m. -- that's Pacific Time -- that we first learned about his presentation at MiraclePlus.

**Q.**    And, sorry.  Just to orient, "MiraclePlus," what do you mean?

**A.**    MiraclePlus was the name of the sort of big investor conference in China where people were seeking to get venture capital for their start-ups.

**Q.**    Okay.  What was the next thing that happened?

**A.**    So you can see just a little after an hour later, we suspended the access to our internal network.  That's -- he can still log into his Mac laptop at the time, but he can no longer log into any of our internal systems.

**Q.**    And 2:02 a.m.?

**A.**    2:02 a.m., we see a few sporadic attempts to access documents inside our internal network that are denied because of the lock that we had just issued.

**Q.**    And -- sorry.  And just to be clear, who -- from the defendant's computer or from somewhere else?

**A.**    It's from Leon's computer, yeah.  We're not 100 percent sure if it's him or not at the time because sometimes automated refreshes happen.

**Q.**    I see.

7:16 a.m., what happened?

**A.**    So at 7:16 a.m., we see a badge-in as Leon into the Google

office in Sunnyvale.  It's actually a guest badge that we saw at the time -- or a -- we call it a temporary badge.  It's when you go to reception and you say you've lost your badge and you need a temporary replacement.

We see him badge into the office at that time.

**Q.**   Did you also look at surveillance video?

**A.**   We did, yes.

**Q.**   Was it him?

**A.**   It definitely was him at that time.

**Q.**   What happened at 7:30?

**A.**   So at 7:30, we see many repeated accesses from Leon on his corp. issued Mac.  You know, he still has his log-in to the Mac at the time, but we see access denied, access denied over and over again to a bunch of internal corporate resources.

**Q.**   Orient us about what he's prohibited from getting into now.

**A.**   So at this point, he only has access to his Mac and a browser, and that's so that he can still contact Google and start trying to, you know, talk to the security team.

He's no longer allowed any access to our engineering documentation system.  He's no longer allowed any access to Google Drive, Google Workspace.  He can badge into the campus to visit the security team and he can chat with us.  That's about it.

**Q.**   And 8:05?

**A.**   So 8:05, after about a half hour of various things, he visited his profile page.  He visited -- Ghost/tech stop is our tech support page.

After about half an hour of his access being denied to all these internal sites, we see evidence from our logs on the Mac OS called Santa that he moved the notes folder, which was the top-level folder that contained all of the Apple Notes he'd been collecting over the year, he moved it into the trash on Mac and deleted the trash.

**Q.**   Okay.  You mentioned Santa logs.  First, before we go into the logs themselves, tell us what Santa is and how it works.

**A.**   So Santa's another one of those endpoint agents that we have on things.  We built it for the Mac.  We actually named it Santa because it's supposed to tell us if a Mac computer is being naughty or nice.  It's one of the security team jokes.

And so Santa logs everything that is done on a Mac computer.  It logs file creations.  You know, if you create a PDF, it logs the time and date and location.  If you delete something, it logs that.  It logs software that you run.

We use Santa on Mac to trace down attackers who are running malware, and we also use it to keep accountability for where files are.

**Q.**   Did you, as part of your investigation, obtain the defendant's Santa logs for all of the various MacBooks he had at Google from --

A.   Yes.

Q.   -- 2019 to 2023?

A.   Yeah, covering both his first issued company Mac and his second one.

Q.   Did you provide all those to the FBI?

A.   We did.

Q.   I want to ask you about just a subset of all the Santa logs.  Did you also prepare a subset of Santa logs focusing only on the December 29th activity?

A.   We did.

Q.   And have you reviewed that before testifying today?

A.   Yes.

Q.   Is that Exhibit 6?

A.   Yes.

        MR. BOOME:  Can we move Exhibit 6 into evidence, Your Honor?

        THE COURT:  Any objection?

        MR. RAPP-KIRSHNER:  No objection.

        THE COURT:  Admitted.

    (Trial Exhibit 6 received in evidence.)

BY MR. BOOME:

Q.   Okay.  Okay.

    Exhibit 6 is now on the screen.  Can you walk us through the columns briefly and tell us what we can learn from it?

A.   So Column A should be pretty familiar by now.  It's the

exact time and date stamp that the activity occurred.

Column B, that's the name of the computer that it occurred on.  Because, remember, these logs are covering 100,000 Macs.

The name of this computer was Leon Ding MacBook Pro 2, so that's the Mac that he was issued at that time and date.

And then you see category is "Delete."  That's a deletion event that's logged.  And source file path is the actual file that was deleted at that time.

Q.    We've been kind of following this file around, but --

A.    Yeah.

Q.    -- is this the same file, based on what you see here, that we saw uploaded previously on the Web Protect logs?

A.    That is the same file we see uploaded in Web Protect.

You can also tell from this file, you can see how very close the timestamps are to one another, that this is a bulk delete.  So this is indicative of someone who has dragged and dropped a whole folder to the trash.  It's not someone deleting a file at a time.

Q.    Okay.  Now, after moving -- tell us about the difference between what happened at 8:05:12 and 8:05:6?

A.    So --

Q.    Sorry.  8:05:12 and 8:05:18.

A.    Yeah.  So, you know, most operating systems are designed to be a little helpful.  When you move an item into the trash, it's not deleted.  In case you accidentally deleted it, they

want you to be able to recover it quickly.

So when you move the notes folder into the trash, you're just sort of putting it in line to be deleted later.  When you empty the trash, that causes the operating system to permanently delete the file in an unrecoverable way.

Q.   And is that what happened at 8:05 and 18 seconds, according to the Santa logs?

A.   Yeah.  The two events are six seconds apart.  So that's pretty characteristic of someone just dragging a folder in the trash and then immediately deleting it.

Q.   What happened at 8:31?

A.   At 8:31, we issued what we call a mobile device lock, which is a complete lock of the entire Mac laptop.  It pops up a screen saying you have to call security.  You can't do anything with it anymore.

Q.   Were you able to do that without getting your hands on his actual MacBook?

A.   Yeah.  We manage all of our machines remotely.  We're a global company with people all around the world, and we want to be able to manage these computers quickly, wherever they are in the world.

Q.   8:32?

A.   So one minute after we issued the lock of the MacBook, rendering it functionally useless, he left the campus.  He got up from work and left.

Q.   How do you know that he left the campus at that time?

A.   Surveillance video of him leaving the campus.

Q.   And, finally, 8:48?

A.   So about ten minutes after he left the campus, we removed the last piece of access he had to Google, which was his employee badge.  We invalided it so that he couldn't come back in through any doors.

Q.   Did Mr. Ding at any point try to communicate with anyone about getting his access back after he was locked out on December 29th?

A.   I recall him sending messages to his manager.

Q.   Have you reviewed an email between -- that Mr. Ding sent to his manager on December 29th about his access issue?

A.   Yes.

Q.   Is that Exhibit 27?

A.   Yes.

        MR. BOOME:  Move 27 -- I'm sorry.

        Let's show it to the witness, please, Ms. Hernandez, Exhibit 27.

BY MR. BOOME:

Q.   Is this the email you're referring to, Mr. Linton?

A.   Yeah, that's the one.

        MR. BOOME:  Your Honor, move 27 into evidence.

        MR. RAPP-KIRSHNER:  No objection.

        THE COURT:  Admitted.

(Trial Exhibit 27 received in evidence.)

**BY MR. BOOME:**

**Q.**   Okay.  If you could just walk you through the sender, the recipient, and what you know about the recipient.

**A.**   So the sender, it says Leon D and then dingyong198608. That's one of the Gmail addresses that we saw usage of from our corporate computer, so that's a Gmail address that belongs to Leon.  It's to his manager and cc'd to his Google corporate account.

And then it's -- he's just asking:  Hey, could you call the security team?  I think there has been a mistake.  My account was suspended.

So he's sort of telling his manager:  Something's wrong and I don't know.  My account's blocked.  Can you get it unblocked for me?

**Q.**   Now, based on what you know about everything that had happened up to this point, can you identify a reason why Mr. Ding is sending this email from his personal account instead of his corporate account?

**A.**   Yeah.  His corporate account would be completely inaccessible to him at this point, so he would have to send this email from a personal account.

          **MR. BOOME:**  Okay.  If we could go back to the PowerPoint, please, Ms. Hernandez, to the timeline.

\\\

BY MR. BOOME:

Q.    I want to ask you, Mr. Linton, based on what you told us about the events of December 29th, it sounds like you progressively increased the restrictions on Mr. Ding's access.

Can you tell us why things happened that way on December 29th?

A.    So when we begin an investigation, we begin our investigations kind of giving the employee the benefit of the doubt.  And so we will usually do a little bit of investigation first.  And then if it seems like they really are doing something wrong, we restrict their access to the more sensitive internal documents, but then we leave their laptop usable still so they can contact us so we can talk to them.

We'll usually have a company investigator from a different team reach out to them and say, "What were you doing?  Can you explain why you did this activity?"

And because they may be any Google place anywhere in the world, they need their laptop to do that.

At some point, though, if we begin to worry that not only are they definitely doing something dangerous but that they're going to potentially delete files that are relevant to the investigation or, you know, if we think maybe there's an attacker on the machine, some hacker from a foreign military, we may go ahead and lock the machine entirely.

But that's why that happens in progressively more severe

steps.

Q.   And just to be clear, no hackers from a foreign military involved here?

A.   No.

Q.   But you did see deleting files?

A.   Correct.  Yes.  And that's why we would want to eliminate any further file deletion.

        MR. BOOME:  Thank you, Mr. Linton.

        No further questions, Your Honor.

        THE COURT:  Okay.  Any cross-examination?

        MR. RAPP-KIRSHNER:  Yes, Your Honor.

### CROSS-EXAMINATION

BY MR. RAPP-KIRSHNER:

Q.   Good afternoon, Mr. Linton.  My name is David.  I'm one of Mr. Ding's attorneys.  I'd like to thank you for your time today.

    You first began meeting with the Government around January 5th, 2024; is that correct?

A.   January 5 is the day after we made what we call a law enforcement referral via our law enforcement legal team.

Q.   And you met with the Government that day?

A.   I don't recall exactly.  It's been a while.

Q.   But around that time, you met with the Government?

A.   Yeah, we made a referral, as directed by our legal team, around that time, yes.

Q.   And since then, you've personally met with the Government over a dozen times; correct?

A.   I haven't counted, but I have had to explain our logs to them, yes.

Q.   And several of those meetings was also to prepare for your testimony; correct?

A.   Correct.

Q.   Google, your employer, asked you to meet with the Government on those occasions; correct?

A.   I'm representing Google here, yes.

Q.   You've never met with me before; correct?

A.   I don't recognize you.

Q.   And you've never met with anyone from the defense team before?

A.   I -- it would be hard for me to say.  I actually kind of have a really bad memory about faces, but I don't think so.

Q.   Were you aware that the defense team asked Google on more than one occasion if we could meet with you to ask you some questions about the case?

A.   No, it doesn't ring a bell.

Q.   And Google counsel attended nearly all your meetings with the Government; is that correct?

A.   They prefer to come with us, yeah.

Q.   And during at least one of those meetings with the Government, you were also joined by the Government's

forensic expert, Mr. Andrew Crain; correct?

**A.**    I recall answering questions, yeah.

**Q.**    Okay.  Mr. Linton, you're an engineer; correct?

**A.**    Correct.

**Q.**    In your experience, is it common for engineers to retain old documents?

**A.**    No.

**Q.**    But you yourself retain plenty of old documents; correct?

**A.**    From previous employers, no.

**Q.**    Do you recall on May 30, 2024, tweeting [as read]:

> "I have a folder on my desktop named 'Old
> Desktop,' inside which is a bunch of stuff and a
> folder named 'Old Desktop,' inside which is still
> more" --

**MR. BOOME:**  Objection, Your Honor.  Hearsay.  Improper impeachment.

**THE COURT:**  Overruled.

BY MR. RAPP-KIRSHNER:

**Q.**    [As read]:

> -- "inside which is still more stuff and a
> folder named 'Old Desktop.'  I don't even know how
> many layers deep it goes at this point."

**A.**    Yeah.  My personal desktop at home with years of family photos on it, I don't really have time as a busy person to go through and delete old photos and -- you know, I just -- not on

my personal machine.

Q.   Okay.  You oversaw Google's investigation into Mr. Ding's alleged actions; correct?

A.   Correct.

Q.   Is it fair to say that it was a comprehensive investigation?

A.   I believe so.

Q.   Are you aware that Mr. Ding is accused of misappropriating 105 trade secret documents from Google?

A.   I'm aware that this is a trade secret theft trial.

Q.   Do you generally know which of those 105 documents are?

A.   I know what the documents involved are.

Q.   Okay.  Throughout my questioning, I may refer to those documents as the alleged trade secret documents.  Will you understand that, moving forward?

A.   Yes.

Q.   You testified about this on direct a lot, but is it fair to say that Google logs nearly every action taken by its employees on Google-issued laptops?

A.   That's a fair statement.

Q.   For instance, Google logs all Web activity from Google-issued laptops; correct?

A.   Yes.

Q.   And that includes all web browser activity?

A.   That includes web browser activity from the corporate

browser and related to our corporate documents.

Q.   And Google can even track when employees clear their web browser history; is that correct?

A.   Can we track when they clear their browser history?  We get browser clear events.

Q.   Google also tracks all Google Drive activity; correct?

A.   We do, yes.  Drive activity logs.

Q.   And that includes actions such as viewing files, creating files, and deleting files in the Drive; correct?

A.   That's correct.

Q.   Google also logs nearly all operating system activity; correct?

A.   Correct.

Q.   Any time a file is created or saved to the hard drive of a Google-issued laptop, that log of that information gets generated; correct?

A.   We're talking about the MacBooks with Santa installed?

Q.   Yeah, the Google-issued MacBooks.

A.   Yes.

Q.   And, again, any time a file gets deleted on a Google-issued MacBook, that also gets logged?

A.   Correct.

Q.   What about USB drive activity?  Any time a USB drive is plugged into a Google-issued laptop, that information is also logged; correct?

**A.**   That is logged.  And also, you're required to get permission to use USB devices.

**Q.**   So, basically, any time an employee presses a key on a Google-issued laptop, that information gets stored somewhere?

**A.**   I think "presses a key" would be a little much.

**Q.**   Got it.

**A.**   There are plenty of operating system-level events that -- you know, 3 trillion logs a day would turn into, you know, a trillion trillion logs a day if we logged every key press.

**Q.**   Now, not only does Google log all this information, but it also centrally analyzes all the information through a query engine called F1; is that correct?

**A.**   F1 is the name of the storage back end for all of the logs.  We do have a querying engine attached to it, and we can run kind of database queries against it.

**Q.**   Got it.

And all of the types of information we were just discussing, all of the logs, you and your team reviewed them in conducting the investigation of Mr. Ding's activities?

**A.**   Yes, we reviewed the logs for this case.

**Q.**   You never found any evidence that Mr. Ding transmitted an alleged trade secret document to any person outside of Google; correct?

**A.**   Can you rephrase?  I'm not sure what you mean.

**Q.**   Yeah.  Throughout the course of your investigation over

the past two years, you found no evidence that Mr. Ding transferred an alleged trade secret document to anyone outside of Google; correct?

A.    We wouldn't be able to know that for sure because he transmitted them to himself via his personal drive, and we lose visibility at that point, yeah.

Q.    I'm just asking about what you and your team personally reviewed, which, according to your testimony, is the Google side of things, all of those logs we just discussed.

A.    Yeah.  I don't recall seeing any direct shares to third parties that weren't potentially himself.

Q.    And you testified that your investigation began roughly on December 29th, 2023?

A.    That's correct.

Q.    So that's about two years since then?

A.    Yes.

Q.    Is it fair to say that Google's AI-related files are their crown jewels?

A.    Not their only crown jewels, for sure.  It's a pretty large company.

      "Crown jewels" is kind of the name of a program that we colloquially refer to as.  I don't think we have a specific, these are only -- you know, the only secrets and these aren't.

Q.    Yeah.  I'm not saying they're necessarily the one and only crown jewels, but are they considered a crown jewel, as that

term is used colloquially?

A.   Yeah, colloquially.

Q.   And is it also fair to say that AI-related files are the most valuable intellectual property at Google?

A.   That, I couldn't tell you.

Q.   Do you recall telling the Government that artificial intelligence files are crown jewels, that is, the most valuable intellectual property at Google?

A.   I would need to see the context that that was said in. I'm not sure.

Q.   If I show you a document, might that refresh your recollection?

A.   Sure.

       MR. RAPP-KIRSHNER:  Mr. Jay, can you pull up CX5907.

       THE WITNESS:  (Witness examines document.)

BY MR. RAPP-KIRSHNER:

Q.   Does this refresh your recollection?

A.   That does look familiar.  It looks like the context, we were talking about the data signals.

Q.   Got it.

     You testified that Mr. Ding created the alleged trade secret documents by copying certain Google information into the Apple Notes application on his Google-issued MacBook; correct?

A.   Correct.

Q.   And you also testified that that Google source information

found in the Google documents came from internal Google repositories; correct?

A.    Correct.

Q.    And so is it okay if I refer to these internal documents from which Mr. Ding is alleged to have sourced information as the source documents?

A.    Yes.  I'll try to remember that.

Q.    Okay.  Great.

I believe there are about 175 source documents at issue. Does that sound about right?

A.    It sounds in the right ballpark.

Q.    And, again, these source documents came from Google's corporate drive and G3 repositories; correct?

A.    Correct.

Q.    Is it true that Mr. Ding was authorized to access each source document?

A.    I can't say every single source document.  He was authorized to access many of them through his job, which was as an engineer building AI systems.

Q.    Did you uncover any evidence where Mr. Ding circumvented access controls to gain access to a source document?

A.    No.

Q.    None of these source documents were behind additional firewalls or passwords, were they?

A.    That's not really how Google works.  We don't do

additional firewalls or kind of segmenting networks in that way. They were behind our standard set of protections, so the very strong protection of logging into your operating system; the second factor; then, again, the strong protection of having to get through this Uber Proxy that we call it.

Once there, you have to be authorized to be in the right access group to get to G3 Docs because G3 Docs still requires you to be authorized to use it, the tool. Then from there, you have to have access to the file itself.

Q. Got it.

So once you go through those standard Google authentication steps, after that point, there aren't additional passwords for any of the source documents; correct?

A. Passwords specifically? No. There can be additional checks and additional controls.

Q. You just testified that you found no evidence Mr. Ding ever exceeded the scope of his authorized access; correct?

A. I didn't say "exceeded the scope of his authorized access." We didn't see him circumventing any access controls with technical measures.

Q. Sorry. That was my mistake. Thank you for the clarification.

Let me ask it a different way. You've seen no evidence that Mr. Ding ever hacked Google's system to gain access to a document he shouldn't have?

A.   No.

Q.   And you also testified that Mr. Ding requested certain documents and was denied?

A.   There were documents he requested access to and was denied, yes.

Q.   And Mr. Ding never sought to go around those denials improperly?

A.   I couldn't answer that question.  You know, there are ways that he could seek that, I'm sure, that wouldn't have been visible to me.  I see no evidence of hacking.

Q.   So once a Google employee opens up a document in G3, there are no additional pop-up messages that concern the confidentiality level of that document; correct?

A.   We wouldn't need a pop-up because the confidentiality levels typically are either labeled on the document itself or there's one broad confidentiality level that applies to all Google docs, which is just confidential.

Q.   Got it.

So excluding those two things, there are no pop-up warnings about the confidentiality of a document that is opened?

A.   At the time Leon was collecting these documents, that functionality didn't exist, although it does now.  We do have an additional system that gives pop-up warnings.

Q.   Is it fair to say that Google emphasizes a culture of

knowledge sharing and collaboration?

**A.**   Google is a collaborative company, yes.

         **MR. RAPP-KIRSHNER:**  Mr. Jay, could you pull up Exhibit 823 for Mr. Linton.

         And can you scroll to the top, please.

         **MR. JAY:**  First page?

         **MR. RAPP-KIRSHNER:**  Yes, please.

**BY MR. RAPP-KIRSHNER:**

**Q.**   Do you recognize this document?

**A.**   Yes, this is part of our Data Security Policy pages.

**Q.**   And you've reviewed this document before?

**A.**   I'm familiar with our policies.

         **MR. RAPP-KIRSHNER:**  I'd like to move to admit this document.

         **THE COURT:**  Any objection?  I thought it was already in but...

         **MR. BOOME:**  No objection.  I thought -- I -- isn't this one already in?

         **MR. RAPP-KIRSHNER:**  I believe a different iteration of this document was in, a different version.

         **MR. BOOME:**  Either way, we have no objection, Your Honor.

         **THE COURT:**  Okay.  Admitted.

      (Trial Exhibit 823 received in evidence.)

         **MR. RAPP-KIRSHNER:**  Thank you.

Mr. Jay, could you scroll down to page 8, I believe.

**BY MR. RAPP-KIRSHNER:**

**Q.**   Do you see at the very bottom there it says [as read]:

"Moma is a valuable tool for supporting our
culture of knowledge sharing and collaboration"?

**A.**   I do see that it says, although, if you could page back one page, the very first thing -- one more forward to the one you were just zooming in on.

The very first page, like the very first sentence says having access to information does not imply you have permission to share it.  I just wanted to point that out.

**Q.**   Does Google's culture of knowledge sharing and collaboration impact its treatment of confidential information?

**A.**   The way I would describe it is that Google's culture of knowledge sharing is meant to prevent Googlers from making the same mistake twice.  So when one Googler has -- sorry.  Google employee.  We call them "Googlers."  We're a weird place.

It's meant so that if one person develops a particularly efficient bit of code in their product, other Google employees would be able to use that knowledge and leverage it to build more efficient code in the product they're working on.  So it is about sharing best practices; sharing, you know, information about how to do things more efficiently or how to find experts at the company you may need to work with.

**Q.**   Got it.

**A.**   It doesn't really apply to confidentiality.  That's sort of a separate thing.

**Q.**   Got it.

        **MR. RAPP-KIRSHNER:**  Mr. Jay, if you could scroll down to the top of the next page.

**BY MR. RAPP-KIRSHNER:**

**Q.**   There it talks about confidential information.  The first sentence begins with [as read]:

        "However, while there is a lot of information shared with Googlers that is Confidential, and therefore appropriate for a broad audience . . . ."

    Do you see that?

**A.**   I do.

**Q.**   What does this broad audience entail?

**A.**   I don't actually know.  The person who wrote that piece of the policy is one of our policy team members.

    It does also say right below that [as read]:

        "If you're viewing a document or internal website, and aren't sure of the sensitivity, ask the owner before sharing it."

    Which is a pretty clear guideline.

**Q.**   Got it.

        **MR. RAPP-KIRSHNER:**  Your Honor, I'd like to pull up a document that is alleged to be -- contain trade secret information and that may require scrolling through.  So,

therefore, it may not be appropriate for public viewing.

THE COURT:  Okay.  That sounds fine.

Maybe now would be a good time to take our afternoon break.  How much more time do you have with this witness?

MR. RAPP-KIRSHNER:  I estimate anywhere between 45 minutes and an hour.

THE COURT:  Okay.  It's definitely time to take our afternoon break, then.  So why don't we resume at five minutes after the hour.

Our courtroom clock continues to be off.  I'm going to go by Apple's time.  So we'll resume at ten minutes after 2 o'clock.  Ten minutes after 2:00, which is about 16 minutes from now.

All right.  Thank you.

THE COURTROOM DEPUTY:  All rise.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Okay.  Thank you.  You can step down.

THE WITNESS:  Thank you.

THE COURT:  Be back on the stand at ten after.

And I assume that Bhavna will help you get ready to not show those documents on the screen.

MR. RAPP-KIRSHNER:  Perfect.  Thank you.

(Recess taken at 1:54 p.m.)

(Proceedings resumed at 2:11 p.m.)

(Proceedings were heard in the presence of the jury.)

BY MR. RAPP-KIRSHNER:

Q.   Mr. Linton, before we begin, I'd just like to help Ms. Dub, our court reporter here, to ensure that we're not speaking over each other.  So I'll try my best not to begin a question until you're done speaking if you can try your best not to answer a question until after I'm done speaking.  Is that okay?

A.   Yeah, I'll do my best.  Sorry.

          MR. RAPP-KIRSHNER:  Mr. Jay, could you please pull up Exhibit 43.

BY MR. RAPP-KIRSHNER:

Q.   Mr. Linton, are you familiar with this document?

A.   It looks familiar.

Q.   This is a document entitled "TensorCore Instruction Set Architecture Pufferfish.PDF."

     Is this a source document?

A.   That looks like one of the source documents.  I would need my matrix to validate that.

Q.   I can represent that, unless the Government disagrees, I believe this is a source document that you authenticated --

A.   Mm-hmm.

Q.   -- previously.

          MR. RAPP-KIRSHNER:  So I would move to admit it into evidence.

          THE COURT:  Any objection?

MR. BOOME:  It's in evidence, Your Honor.

THE COURT:  Okay.

BY MR. RAPP-KIRSHNER:

Q.   Mr. Linton, are you familiar with instruction set architecture?

A.   Broadly, I know what that is.

Q.   That's a type of documentation regularly kept by Google; correct?

A.   It's a type of engineering documentation.

Q.   Sometimes that's abbreviated as ISA; correct?

A.   It could be.

Q.   Let's take a look at this document.

MR. RAPP-KIRSHNER:  Mr. Jay, if you could just scroll through.

BY MR. RAPP-KIRSHNER:

Q.   It appears to be 114 pages.  Does that sound about right, Mr. Linton?

A.   I'll take your word for that one.  It's long.

Q.   In this 114-page document, there's not a single confidentiality label anywhere; is that correct?

A.   I would need the whole document to make that determination, but I haven't seen any yet.

MR. RAPP-KIRSHNER:  Mr. Jay, if you could just continue scrolling for 20 more seconds.  We don't need to prolong this.

And please let me know if you do see a confidentiality label.

That's probably enough.

**BY MR. RAPP-KIRSHNER:**

**Q.** So based on what we've seen, there's no confidentiality label anywhere on the pages we viewed just now; correct?

**A.** I see no explicit confidentiality label, which means the confidentiality of this doc would be assumed to be Google internal confidential.

**Q.** This document was located on Google's G3 repository; correct?

**A.** Yes.

**Q.** It's easy to add a confidentiality warning to a G3 document; correct?

**A.** A confidentiality label would be just a part of the document.

**Q.** But the author of the document could easily create that in G3; correct?

**A.** It doesn't require any special permission to create a label.

**Q.** Yet no confidentiality label was added to this document; correct?

**A.** That appears to be the case, yes.

**Q.** Let's take a look at another instruction set architecture that was identified as a source document.  That's Exhibit 46.

And I believe this has already been admitted into evidence.

THE COURT:  Okay.

BY MR. RAPP-KIRSHNER:

Q.   This document is entitled "BarnaCore Instruction Set Architecture."

As you view the first page here, there's not a confidentiality label on it; is that correct?

A.   I do not see one.

MR. RAPP-KIRSHNER:  Mr. Jay, if you could just scroll through for about ten seconds.

BY MR. RAPP-KIRSHNER:

Q.   Mr. Linton, you have not seen a confidentiality label so far in this document; correct?

A.   I have not.

Q.   If there was a confidentiality label, would it be up top?

A.   Sometimes they're at the footer of a page.  Sometimes they're at the top of the page.  It could be either.  It could be in the title.

MR. RAPP-KIRSHNER:  Mr. Jay, could you scroll to the very last page.

BY MR. RAPP-KIRSHNER:

Q.   There's no confidentiality label on the footer here, is there?

A.   I do not see one.

Q.   Okay.  And then I'd like to look at just one more ISA.

MR. RAPP-KIRSHNER:  Mr. Jay, could you pull up Exhibit 47.

BY MR. RAPP-KIRSHNER:

Q.   So this is a source document entitled "TensorCore Instruction Set Architecture JFC DFC."

Mr. Linton, there's no confidentiality label on this first page; correct?

A.   I do not see an explicit label.

MR. RAPP-KIRSHNER:  Mr. Jay, could you please scroll for about ten seconds again.

And then, Mr. Jay, could you please scroll to the bottom.

BY MR. RAPP-KIRSHNER:

Q.   Mr. Linton, there's no confidentiality label in any of these pages we've just viewed; correct?

A.   I haven't seen any.

Q.   Mr. Linton, isn't it true that roughly 100 of the 175 source documents had no confidentiality markings on them whatsoever?

A.   Almost all of the documents had either an access control explicitly set or a confidentiality marking.

Q.   But I asked just about the confidentiality label.

A.   Oh.

Q.   Isn't it true that 100 of the 175 source documents had no

confidentiality label?

A.    I don't know if the number is a hundred.  That seems high.  But a number of them had no labeling.

Q.    Isn't it true that Google designated its most confidential documents as L4 Secret?

A.    That's not a Google-wide designation.  That's a designation that was used by the particular AI team that designated some of their files that way.

Q.    So for some of these files, the most confidential document label would be L4 Secret; correct?

A.    There was a subset of them where the owner of the documents made their own kind of more granular classification scheme than we usually use.  They had four levels.  All of them were pretty secret, but I think L4 was only accessible to individual precleared people.

Q.    And none of the 175 source documents had that label; correct?

A.    Not that I recall, although a number of the documents were only accessible to individuals.

Q.    So wouldn't the most confidential documents be the crown jewels of Google?

A.    Again, that's kind of a colloquial term we use.  We don't really have, like, the crown jewels.  We have a lot of product areas, some of which you may consider -- like, self-driving car material for Waymo would be highly sensitive.  AI material for

Cloud would be highly sensitive.  You know, each teams have what they consider to be their most sensitive-type stuff.

MR. RAPP-KIRSHNER:  Mr. Jay, could you please pull up Exhibit 79, an additional source document.

BY MR. RAPP-KIRSHNER:

Q.   Now, this document does have a confidentiality label; correct?

A.   Yes.

Q.   And it says "Visibility:  Confidential" right there in the first page; correct?

A.   Correct.

Q.   This label appears nowhere else in the 44-page document; correct?

A.   That's the header of the document.  So I would need to look at all 44 pages to know if it's anywhere else, but that is the header.

MR. RAPP-KIRSHNER:  Let's scroll through about ten pages, Mr. Jay.

BY MR. RAPP-KIRSHNER:

Q.   So in those ten pages, Mr. Linton, there's not an additional confidentiality label; correct?

A.   I haven't seen any beyond the one on the first page.

Q.   So if an employee were to copy text from, say, the fifth page, the confidentiality label wouldn't come with it; correct?

A.   That would be correct if they cut and paste from the fifth

page onward.

Q.   Let's look at one final source document.

          MR. RAPP-KIRSHNER:  Mr. Jay, could you please pull up
Exhibit 65.

BY MR. RAPP-KIRSHNER:

Q.   There's no confidentiality label on this title page,
Mr. Linton; right?

A.   I do not see a confidentiality label.

Q.   So upon viewing the first page, there's nothing to
indicate the level of security right away?

A.   I don't think I can agree with that because we do have a
standard default policy that technical and engineering material
is supposed to be, at minimum, confidential unless it has been
marked public explicitly.

     So just looking at this page where it says "Technical Deep
Dive," I would assume this is marked -- or I would assume that
this is confidential as a file.

Q.   If we go to the next page, you'll see in the top right,
there's a faint watermark, it appears, which states
"Proprietary and Confidential."

     Do you see that?

A.   I do.

Q.   This label is part of the PowerPoint template; correct?

A.   There are so many -- like any other company, there are so
many PowerPoint templates.  This is a PowerPoint template that

a team used that has this label in it, yes.

Q.   But it appears to be part of the background of the slide in this particular document.  Is that fair to say?

A.   I -- I don't know.  I mean, it's there.  Often I see red. I don't know if this was printed differently or the red got stripped when it was produced.

Q.   Let's say it was part of the background, essentially a watermark.  If someone were to copy the body text, that label wouldn't be copied along with it; correct?

A.   Yeah, cutting and pasting and removing the background would probably remove that label.

        MR. RAPP-KIRSHNER:  Mr. Jay, could you please turn to Exhibit 875, which I believe was already admitted by the Government.

BY MR. RAPP-KIRSHNER:

Q.   Mr. Linton, do you recognize this document?

A.   I do.  That is our data classification FAQs.

Q.   And --

A.   Which is sort of a clarifier for employees.

Q.   And to be clear, this is not a source document?

A.   I don't recognize it as a source document.  It's just our Data Security Policy.

Q.   And this is not an alleged trade secret document; correct?

A.   Correct.

Q.   You have no record of Mr. Ding ever uploading this

document to his personal drive; correct?

**A.**   Not that I can recall.

**Q.**   And this is just an internal Google document?

**A.**   This is a document that outlines how we expect people to handle data at Google.

**Q.**   There's prominent text in the -- underneath the title that says [as read]:

"Important:  Confidential.  Do not share externally."

Do you see that?

**A.**   I do.

**Q.**   Did I read that right?

**A.**   Yes.

**Q.**   So someone at Google had the ability to put this specific confidentiality label in this document; correct?

**A.**   Whoever wrote the document included that text.  That's not a -- it's not, like, a superset of the document, like a label. It's part of the document.  So someone wrote the phrase "Do not share externally" in the document.

**Q.**   This specific label, though, it doesn't appear on any source document; correct?

**A.**   I recall some of the source documents having confidential, yes.  They did say confidential in them.

**Q.**   I'm talking about this particular label as formatted and presented here, which includes the exclamation point,

"Important," in bold, "Confidential.  Do not share externally."

A.    I recall some of the documents having similar-looking warnings.  You know, whether someone put an exclamation at the beginning or the end, that's a matter of their stylistic choice.

Q.    What about the phrase "Do not share externally"?  That doesn't appear on any of the 176 source documents; correct?

A.    I recall at least one source document saying "Cannot be shared with customers."

Q.    But nothing with the words "Do not share externally"; correct?

A.    I would need to review them all to know for sure. Warnings to not share can come in many forms.  They all essentially mean don't share.

Q.    Mr. Linton, Google employees are authorized to access documents on the account level.  Is that fair to say?

A.    I need a little bit more clarification on that.

Q.    Yeah.  In other words, once an employee is logged into their Google laptop correctly, they have access to everything authorized for them?

A.    When you are logged into the Google network, things that you have been authorized to access are available to you?

Q.    Yes.

A.    Yes.

Q.    Some of the source documents here were shared with

thousands of employees; correct?

A.   Correct.

Q.   Some of the source documents here were shared with over 100,000 employees; correct?

A.   Correct.

Q.   They were shared with contractors; correct?

A.   I don't recall them being shared with contractors.

Q.   They were shared with temporary workers; correct?

A.   I don't recall temp workers.

Q.   What about interns?

A.   It's possible some of them were shared with interns if they were interns working on AI-specific teams because they would have needed that access.

Q.   We looked at a document earlier entitled "TensorCore Instruction Set Architecture Pufferfish.PDF."

A.   Mm-hmm.

Q.   At the time Mr. Ding allegedly accessed that document, it was shared with the entire Piper-Group-Default-Access group; correct?

A.   That's correct.

Q.   How many employees are in that access group?

A.   So the way that our source code repository works is there's one group that gives you permission just to use the tool at all.  That's Piper-Group-Default-Access.  And then we have what are called silos.  So a silo is when you restrict it

down more to that.

And kind of the best analogy I can give for this is if you think of our source code repo as, like, a sports stadium, like it's Levi's Stadium, Piper-Group-Default-Access is getting a ticket through the gate.  It now means you have access to the stadium itself.  And then owners of specific pieces of source code repo, they can create, like, a virtual VIP booth, and the VIP booth is what we call a silo.

And so when I looked at the Pufferfish, that specific document, I saw evidence that that team had created a silo. They had intended for that data to be accessible only to, kind of, a VIP group, but they made a typo in their access rule and it wasn't effective, which made the effective access control the stadium.

Q.   And to be clear, that stadium is the entire Piper-Group-Default-Access group; correct?

A.   Yes.  So they had intended it to be restricted down to a tighter group, and they messed up.

Q.   That group has over 170,000 full-time Google employees in it; correct?

A.   That's correct.

Q.   Aren't there also contractors and interns in that group?

A.   It is possible to be added, but that's not a default.

Q.   How many members were in that group in 2023?

A.   I don't have an accurate count of that on me at the

moment.

Q.   Would there be a record of that?

A.   It would be difficult to backtrack that far.

Q.   So it'd be difficult to find out who had access to this document in 2023?

A.   It would be difficult to give you a complete list from me right now.

Q.   Okay.  Completeness as to who had access to this document in 2023; correct?

A.   Who was in Piper-Group-Default, yeah.

Q.   And, therefore, who had access to this document?

A.   Yes.

Q.   Let's talk about the timeline here for a second.

     Mr. Ding started working at Google in 2019; correct?

A.   Correct.

Q.   Mr. Ding created his first note in the Apple Notes application in May 2019; correct?

A.   Correct.

Q.   And then he created Apple Notes regularly and continuously throughout his entire time at Google; correct?

A.   Correct.

Q.   By my count, Mr. Ding created roughly 3,500 Apple Notes during his time at Google.  Does that sound about right?

A.   That sounds in the right ballpark, yes.

Q.   And of those 3,500, only 105 are being alleged as trade

secrets here; correct?

A.    Correct for the trade secrets, but many, many, many of the files were confidential Google internal information.

Q.    Many were, but many weren't as well; correct?

A.    I don't have an exact ratio for you, but there were thousands that were -- over 1,000 that were internal information.

Q.    And you looked at every other document to ensure it was Google confidential information?

A.    We looked at the file names and the source the material came from to determine it was Google internal.

Q.    Apple Notes is a default program on Google-issued MacBooks; correct?

A.    It comes with Mac OS operating system.

Q.    So does that mean Apple Notes is preinstalled on Google-issued MacBooks?

A.    It would be, yes.

Q.    And employees are allowed to access the Notes application?

A.    Certainly, yes.

Q.    And you've reviewed some of the notes Mr. Ding created as part of your investigation; correct?

A.    Correct.

        MR. RAPP-KIRSHNER:  Mr. Jay, could you please pull up Exhibit 5921.

\\\

BY MR. RAPP-KIRSHNER:

Q.   Mr. Linton, are you familiar with this document?

A.   I haven't memorized this note, no.

Q.   It appears to be a note; correct?

A.   It does appear to be an Apple Note in the format that they were extracted in.

Q.   If I were to show you, say, Mr. Ding's Web Protect upload log and there was a file path with this title, that would help refresh your recollection as to whether this was a note taken by Mr. Ding?

A.   Sure.

Q.   Okay.  Okay.  Great.

     Just a note on this document.  It is Exhibit 5, which is the full Web Protect log.  You see that in the current sheet we're looking at?

A.   Yes.

Q.   I did filter it to remove duplicates and to ensure there are only uploads to non-corporate accounts to the Google Drive domain.

A.   Mm-hmm.

Q.   So I have that on the second sheet here.

     This is about the number of uploads you detected; correct?

A.   That is correct.

Q.   So I'm --

A.   It's in the ballpark.

**Q.** I'm going to use this summary list moving forward, if that's okay.

**A.** Yes.

**Q.** So soft skills appears right there; correct?

**A.** I do see it, yes.

**Q.** And it was stored in the notes file within Mr. Ding's --

**A.** Yes.

**Q.** -- Google-issued laptop?

So we can reasonably say it was a note taken by Mr. Ding?

**A.** Yes, that's a good inference.

**MR. RAPP-KIRSHNER:** I'd like to move that exhibit into evidence, please.

**MR. BOOME:** No objection, Your Honor.

**THE COURT:** Admitted.

**THE COURTROOM DEPUTY:** Which exhibit number is that?

**MR. RAPP-KIRSHNER:** So we had that as 5921.

(Trial Exhibit 5921 received in evidence.)

**MR. RAPP-KIRSHNER:** And if you could please put that on the screen again.  Thank you.

**THE COURTROOM DEPUTY:** Is it being shown to the public as well?

**MR. RAPP-KIRSHNER:** This one can be shown to the public.  Thank you.

**BY MR. RAPP-KIRSHNER:**

**Q.** So turning back to this note, you just confirmed it

appeared to be one of the notes uploaded to Mr. Ding's personal Google Drive; correct?

A.   Correct.

Q.   Does this note contain any Google confidential information?

A.   Sorry.

(Witness examines document.)  I don't see anything readily sensitive.  It seems to be a note he was making to himself about performance on his own team.

Q.   And other than the reference to his own team, is there anything related at all to the alleged trade secret documents?

A.   Does not appear so.

MR. RAPP-KIRSHNER:  Mr. Jay, could you please pull up Exhibit 5922.

BY MR. RAPP-KIRSHNER:

Q.   I can represent that this note also appears in the log we just viewed at, if that's okay, to make things go a little --

A.   Yes.

Q.   -- quicker.

A.   Yes, I'll accept.

Q.   This note seems to be entitled "Leadership expectations at G" or at these that's the first line; correct?

A.   Mm-hmm.

Q.   Is there any Google confidential information in this note?

A.   There likely is.  It looks as though it was cut and pasted

from a Leadership Expectations at Google doc, which would be part of our performance management set of documentation.  That would be default Google confidential unless you got permission from the document owner to send it to yourself.

**Q.**   Got it.

     **MR. RAPP-KIRSHNER:**  I'll pause to see if there's any concern from the Government with showing this document to the public or discussing the contents.

     **MR. BOOME:**  No, Your Honor.

**BY MR. RAPP-KIRSHNER:**

**Q.**   So this document could potentially be the same level of confidentiality as the alleged trade secret documents; correct?

**A.**   It -- I'm not sure I can compare them to one another.

     I can say that our expectation for employees would be that if they wanted to send a copy of this somewhere that was outside of Google, that they would get permission from the document owner.

     That's kind of the default level of expectation, is if you don't know and it doesn't have a marking and you're not the one who wrote it, you ask.

     If you are the one that wrote it, you go through a process we call "pub approve" to get publication approval for it.

**Q.**   So I'll read one line here.  In the middle of the first page, it says [as read]:

     "Leaders are expected to bring excellence to

their leadership roles and uphold the cultural fabric that makes Google great."

Did I read that correctly?

A.   It sounds like it, yes.

Q.   And you're saying that could be confidential Google material?

A.   Well, the whole document -- and you can see there's images missing.  And so the header that says "Image missing due to not having a file reference point" indicates that there probably was additional diagrams in there.  Not having the diagrams up in front of me, I can't tell you whether or how confidential those diagrams were.

But I can tell you, like, the cut and paste of an internal file, even if it's performance management stuff, Google might consider that confidential and internal.  I know our HR department would be the ones that would make that adjudication.

Q.   And that could be the same confidentiality level as an alleged trade secret document?

A.   It's possible some of the content could be similar in -- in the base level of confidentiality.

Q.   You'll notice at the bottom of the first page, there's a link that begins with "Go."

A.   Mm-hmm.

Q.   What is that a link to?

A.   So Go is our internal reference portal.  It's like -- you

can name anything a Go link.  So that link is Go Google School for Leaders.  That's probably an internal career development site, would be my recollection.

Q.   By "internal," you mean someone has to be logged into Google on their Google account to access that document?

A.   I can't see where the link goes to, but our -- having been to leadership school at Google, it was an internal-only program.

Q.   To the extent there is an internal link, can you -- strike that.

Internal links cannot be accessed by someone who's not logged into a Google computer; correct?

A.   That's true.

Q.   So if this were to be an internal link and this document made its way outside of Google, someone who clicked on that link couldn't get very far; correct?

A.   That's the way we expect the system to work.

Q.   They wouldn't be able to access any of the information on that link because they were outside of Google; correct?

A.   If the link points to an internal site, then you require valid access to Google to get to it.

MR. RAPP-KIRSHNER:  I'd like to admit this document.

MR. BOOME:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 5922 received in evidence.)

THE COURT:  What exhibit is it again?

MR. RAPP-KIRSHNER:  I had that as 522 -- or 5922.
Excuse me.

THE COURT:  Okay.

MR. RAPP-KIRSHNER:  Mr. Jay, could you pull up 5923,
I believe should be the next document.

BY MR. RAPP-KIRSHNER:

Q.   This is the last note I'll show.  I'll also represent that
this was in the list of uploads to a non-corporate account.

Is the information in here confidential Google
information?

A.   I would need to ask the owner.  By default, it's
considered confidential unless you ask the owner and they say
that it's publicable.

Q.   Are you aware that *The Culture Map* by Erin Meyer is a
book?

A.   No.  I haven't read it.

MR. RAPP-KIRSHNER:  I'd like to admit this document
and publish it to the jury if it's not shown already.

MR. BOOME:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 5924 received in evidence.)

THE COURT:  What's the exhibit number again?

MR. RAPP-KIRSHNER:  That will be 5924.

THE COURT:  Thanks.

**BY MR. RAPP-KIRSHNER:**

**Q.**   I just asked you whether you were aware *The Culture Map* was a book by Erin Meyer.

**A.**   No.

**Q.**   I have it right here.  Is this book confidential Google information?

**A.**   I doubt it.  But, again, I didn't write it, and I'm not the owner, so I'm not qualified to judge that.  My guess is, since it's a published book, it's not confidential internal.

**Q.**   So just to confirm, we looked at three notes that were uploaded to Mr. Ding's personal Google Drive; and at least one, possibly two, did not have any confidential Google information in them?

**A.**   Potentially not.

**Q.**   And none of the three appeared related to the alleged trade secret documents; correct?

**A.**   They don't appear to be sensitive AI materials, no.

**Q.**   Let's go back to the timeline surrounding Mr. Ding's creation of notes.

Mr. Ding created the first alleged trade secret document in Notes in December 2020; is that correct?

**A.**   I would need to see my timeline in front of me to tell you for sure.  It sounds in the right ballpark.

**Q.**   Mr. Ding then created about 37 alleged trade secret documents in Notes in 2021.  Does that sound about correct?

**A.**   Sounds about right.

**Q.**   So all of these notes, then, would predate 2022; correct?

**A.**   If they were created in 2020, they would predate 2022.

**Q.**   The final alleged trade secret document was created in Apple Notes in April 2023.  Does that sound correct?

**A.**   Yes, that sounds about right.

**Q.**   So we can say that all alleged trade secret documents predate May 2023?

**A.**   I'm not sure if I can 100 percent say that.  I don't have my files in front of me.

**Q.**   You're not aware of any alleged trade secret document that was created in, say, November 2023; correct?

**A.**   I would honestly need to see my documents.  This is thousands of files we're talking about now.

**Q.**   And no alleged trade secret document was created in December 2023?

**A.**   December is very close to his -- there were -- I don't know.  I really need to see my timeline to answer that.

**Q.**   You testified that Mr. Ding exported his Apple Notes as PDFs; correct?

**A.**   Yes.

**Q.**   Exporting as a PDF is a common way to get information out of Apple Notes; correct?

**A.**   I'm not a hundred percent sure how often people do that.  It's an -- it's a way that Apple Notes provides to save

information, yeah.

**Q.** So he was able to export just through the Apple Notes program?

**A.** Yes.  The Apple Notes program natively supports saving a file as a PDF.

**Q.** He didn't need any external software to get those documents from within Notes to the PDF form?

**A.** No.

**Q.** Mr. Ding -- strike that.

You testified that Mr. Ding created Apple Notes regularly throughout his time at Google; correct?

**A.** That seemed to be his pattern, yes.

**Q.** And he even created some notes right through the end, in December 2023; correct?

**A.** Correct.

**Q.** Those notes were never exported as PDFs; correct?

**A.** I'd need to see my evidence timeline for that.

**Q.** Let's talk about Mr. Ding's uploads to his personal Google Drive account.

I believe you testified that the logs of this activity were what we were looking at, Exhibit 5, the Web Protect logs; is that correct?

**A.** Web Protect, yes.

**Q.** I'm going to pull it up now.  Just one second.

**A.** Thank you.

Q.   Okay.  Good to go.

So the first entry in this log appears to be August 19th, 2021; correct?

A.   Correct.

Q.   And I can show you that right now, we're filtering from oldest to newest.

A.   Mm-hmm.

Q.   So that's the first time Web Protect detected an upload to a non-corporate drive; correct?

A.   Well, Web Protect didn't exist before August.  So that's the first log we have involving Web Protect as a tool.

Q.   The first three documents from their title names do not appear to contain Google confidential information.  Is that fair to say?

A.   From the file name alone, they appear to be personal, although we have seen in the past sometimes people will try to hide confidential information inside files that are named to appear personal, but I'll go with these are likely personal documents.

Q.   That didn't happen here, though, did it?

A.   Not that I'm aware, no.

Q.   You didn't find any evidence that he intentionally renamed a file to conceal the information?

A.   No.  I just wanted to make sure it was clear that the file name is kind of an indicator, but it's not conclusive as to

what the content of the file is.

Q.   But during your investigation, generally the file names reflected the type of information contained in that document?

A.   Yeah, they generally did.

Q.   It would be possible, as you just referenced, to rename the document to conceal the contents; correct?

A.   Yes.  We've seen people do that before.  Web Protect is still capable of identifying sensitive information despite the file name, but it's a thing to be on the lookout for.

Q.   But that did not occur here; correct?

A.   Not that we've seen.

Q.   You just testified that based on the titles, you suspect these may be personal uploads; correct?  The first three?

A.   The first three look personal.  They appear to be medical records; possible, like, a travel document, like a visa.

Q.   So we can agree that he uploaded both personal and allegedly Google information to his personal drive; correct?

A.   Yes.

Q.   We'll scroll down to the bottom here.

So by my count, there are roughly -- if we exclude the top row, which is the title right there, there are approximately 1,796 rows in this document.

A.   It appears that there are 1,700 rows.

Q.   And that reflects the amount of uploads to Mr. Ding's personal drive; correct?

A.    It's not exactly the same number I came up with, but this is a spreadsheet that you've done some sorting in, and it's in the right ballpark.

Q.    Right ballpark?

A.    Yeah.

Q.    And we'll say around 1,700, around 1,800.

Only 105 of those are being alleged as trade secrets in this case; correct?

A.    That seems accurate to me.

Q.    And as you just testified, these uploads include personal information and personal files; correct?

A.    Some seem to be personal, others definitely seem to be Google proprietary and internal only, and some are uncertain. For example, "Screenshot 2023 December 1st," I don't know what that's a screenshot of.  It could be something incredibly sensitive internally, or it could be a screenshot of his health information.

Q.    You testified on direct that a -- I believe you characterized it as a minor security incident arose in early December 2023 involving Mr. Ding; is that correct?

A.    Yeah.  December 2nd.

Q.    And prior to that point, there were no additional security incidents involving Mr. Ding; correct?

A.    We didn't see any in our system.

Q.    So by that time, he had worked at Google roughly

four years, and his first incident occurred in December, early December 2023; correct?

A.   Correct.

Q.   Following that incident, one of your colleagues, Mr. Fuller, had a conversation with Mr. Ding; correct?

A.   Correct.  That's part of our standard process.

Q.   And that conversation occurred on approximately December 8th, 2023.  Does that sound right?

A.   Sounds about right.  So in a process where we, you know, have a detected exfil, what we call, you know, data leaving Google, our standard process is to have someone from Brad's team go contact the Googler and ask them, "What were you doing? Why did you do this upload?"  Et cetera.  And it can take some time to get ahold of people, so a few days is not an unusual delay.

Q.   And Brad here would be Brad Fuller?

A.   Yes.

Q.   After Mr. Ding spoke with Mr. Fuller on December 8th, he didn't make -- strike that.

     After Mr. Ding met with Mr. Fuller on December 8th, he didn't upload a single document to his personal Google Drive containing Google information; correct?

A.   I would need to see my timeline to verify that.

Q.   At least based on the log here, which you represented was more or less accurate, you'll see there's only a single

document uploaded after December 2nd, 2023; correct?

A.    That's what I see in front of me.

Q.    And based on the title name, is it fair to assume that this is a personal document?

A.    Yes.

Q.    So that does not contain Google information?

A.    I would not anticipate it containing Google information. I would anticipate that being personal.

Q.    So after Mr. Ding met with Mr. Fuller on December 8th, he did not upload any further document to his personal Google Drive containing Google information?

A.    What I would say is we don't see any Web Protect uploads from his corporate Mac to any of his personal sites in this log.

Q.    If he did upload something, it would appear on the Web Protect log; right?

A.    We should see it in the Web Protect from his corporate machine, yes.

Q.    So the absence of a log entry implies that there was no upload?

A.    The absence of the log entry implies there was no upload from his corporate machine to anywhere else.

Q.    Yeah.  Mr. Ding left Google in early January 2024; correct?

A.    Correct.

**Q.** There was no flurry of uploads at that time; correct?

**A.** Not that we saw.

**Q.** He didn't export any additional notes as PDFs at that time; correct?

**A.** I'd need to see my evidence files.

**Q.** When your colleague, Mr. Fuller, confronted Mr. Ding, it concerned an upload of roughly 66 documents; is that correct?

**A.** That's about right.

**Q.** None of those 66 documents are asserted as trade secrets; correct?

**A.** Not the ones I recognize here, no.

**Q.** And at that point, Mr. Ding had already been storing roughly 1,700 documents to his personal Google Drive; correct?

**A.** That is correct.  We had missed that.

**Q.** And that was across at least two and a half years; correct?

**A.** The bulk of it was across a one-year period.

**Q.** You testified on direct about DLP software.  That stands for data loss prevention software?

**A.** Typically, yes.

**Q.** Is it fair to say in 2019 Google's DLP software was in its middle phases of maturity?

**A.** Web Protect didn't exist in 2019.  We released it in August of 2021.  So it didn't exist then.

**Q.** Web Protect is a log of non-corporate uploads; correct?

**A.**   Yes.

**Q.**   So there was nothing in place to detect non-corporate uploads prior to that point?

**A.**   There was a more rudimentary system where we had analysts hunt for uploads and try to look for them in, like, browser history logs.  But Web Protect was sort of the long-running program to put a good DLP tool in place.

**Q.**   And how long was that rudimentary program in place?

**A.**   I don't know.  We have a team called the Insider Task Force, that you would have to ask their tech lead about that.

**Q.**   The DLP system generates a log entry any time a rule is broken; correct?

**A.**   The DLP logs any kinds of rule that we write for it.

**Q.**   Could you explain what a rule is?

**A.**   So in a DLP system, data loss prevention or protection, you can record content that's being uploaded to somewhere; right?  You can record that it was uploaded and the time.  And you can also write rules to kind of text search within the content for what we call keywords.

And a keyword can be the name of the project, you know, Pufferfish, for example.  And the DLP can be programmed -- oh, sorry.  The DLP can be programmed to create an additional alert or raise a more severe alert when it matches those things.

**Q.**   Did you share the DLP rules with employees?

**A.**   We do not share the DLP rules with employees.

THE COURT: Mr. Rapp-Kirshner, could I ask you roughly how much longer you have? I was thinking we might do another five-minute break.

MR. RAPP-KIRSHNER: Yeah. I'd say I have about 20 to 30 minutes left.

THE COURT: All right. Let's just do a quick five-minute break. Maybe not go all the way back down to Judge Breyer's courtroom but stick around here. Everybody stretch your legs, stuff like that. We'll come back in in five minutes.

THE COURTROOM DEPUTY: All rise.

(Proceedings were heard out of the presence of the jury.)

THE COURT: All right. Back in five.

THE COURTROOM DEPUTY: Court is in recess.

MR. BOOME: Your Honor, with 20 to 30 more minutes of cross and some redirect, could we get your blessing to send the next witness home?

THE COURT: Yeah.

MR. BOOME: Thank you.

(Recess taken at 2:52 p.m.)

(Proceedings resumed at 2:58 p.m.)

(Proceedings were heard in the presence of the jury.)

THE COURT: All right. We can resume.

MR. RAPP-KIRSHNER: Thank you.

While we're back on the record, I'd just like to

clarify.  I had moved to admit an Exhibit 5924.  It should be 5923.  It should be caught in the transcript, but I just want to clarify that on the record.

THE COURT:  Great.  Thank you.

(Trial Exhibit 5923 received in evidence.)

BY MR. RAPP-KIRSHNER:

Q.   Mr. Linton, we were talking about Google's DLP system before we took the break; correct?

A.   Correct.

Q.   And you had given a brief explanation of rules.

One of the rules that could be triggered is the detection of a label in a document; is that correct?

A.   Correct.

Q.   Could you give us an example of a label?

A.   A label might be something as simple as a keyword.  So we'll -- for example, we'll use the word "Pufferfish"; right?  You could write a rule that says:  Log an alert whenever someone has a document upload with the word "Pufferfish" in it.

Q.   We just looked at a couple documents that I believe had the word "Pufferfish" in them.  Did that trigger a log?

A.   I don't know if Pufferfish specifically was one of the DLP rules we had in place.  I was kind of using that as an example.  But we did have logged DLP signal rules, yeah.

Q.   Is the word "confidential" a DLP signal rule?

A.   I don't believe we can use confidential at a DLP signal

because the word itself occurs too often in regular, you know, talking between people.

**Q.**   Google's DLP system detected every single one of Mr. Ding's non-corporate uploads; is that correct?

**A.**   Well, detected is a -- kind of a trade word.  What are you asking?

**Q.**   Sure.  Let me pull up Exhibit 5.

**A.**   We logged them all.

**Q.**   Yeah.  That's a detection.  There is a -- Mr. Ding made an upload, and DLP system logged that event because it broke a rule.  Is that correct to say?

**A.**   Well, not necessarily.  So Web Protect logs all uploads, period, all of them.  It will additionally flag whether they violated a DLP rule, but it logs them all.

**Q.**   Does Web Protect have the ability to deny an upload?

**A.**   It did not during any of this time period.

**Q.**   You testified that source code was also a -- the presence of source code was also a rule in Google's DLP system; correct?

**A.**   I don't remember saying that.

**Q.**   Apologies if not.

Is the presence of source code a rule in the DLP system?

**A.**   I don't believe we have a keyword just for "source code," but we do have keywords that are intended to trigger on source code.

**Q.**   You testified that Mr. Ding uploaded about 66 documents in

November and December of 2023 which prompted the minor incident with Mr. Fuller; correct?

A.   That was December 2nd, yes.

Q.   Isn't it true that those were only flagged and escalated through DLP because they contained personnel information?

A.   If I recall, for that December 2nd event, we got the escalation because one or two of the 66 files did have a working DLP alert by that time.

Remember, from 2021 August, Web Protect was in its infancy.  We were working out a lot of bugs.  A lot of detections were unreliable.  And so the human analysts didn't see many, many detections.

Web Protect logs 6 million events a day, and there are about a dozen analysts available to look at them.

So by December 2023, December 2nd, it did flag two of the files based on keyword hits and escalated that in front of a human analyst.  It was a little bit better of a system by then, I would say.

Q.   And those keyword hits were related to personnel information; is that correct?

A.   I would need to see it in front of me to tell you what the keyword was.  I can take your word for it if --

Q.   One of the uploads was Mr. Ding's own personnel page from Moma Teams; is that correct?

A.   I do recall that, yes.

Q.    So Mr. Ding's own biographical page set off the DLP system in December 2023?

A.    It seems a little weird, but personnel pages are considered Google confidential because they reveal team structures and how teams are oriented.  And also they can contain the personal information of your teammates.  So, like, we don't want people sending their teammates' cell phone numbers outside of our company without their consent, for example.

Q.    And those two hits on December 2nd, 2023, those are the only two, let's call them, flags that the DLP system had about any of Mr. Ding's uploads; correct?

A.    I don't think I can characterize it that way because detections work in kind of events, not in individual files. December 2nd was the first time the collection of his activity across a short period of time met the right conditions to raise an escalation to us.

Q.    But his upload of an alleged trade secret document never warranted an escalation; correct?

A.    I wouldn't say they didn't warrant an escalation because we very much wish we had seen it at that time.  I can say that the system was more immature when the trade secret documents were exfiltered, and I can say that we were still tuning the rules.  And unfortunately, the software we were building missed it when he uploaded the trade secret documents, and I very much

wish it hadn't missed it.

Q.   Thank you.  Let me rephrase that question.

The upload of an alleged trade secret document never led to the escalation of a DLP alert; is that correct?

A.   No automated DLP alert was escalated to an analyst based on that.

Q.   Mr. Linton, are you aware that the Government has grouped the 105 alleged trade secrets into seven distinct categories?

A.   I have seen that.

Q.   And you're familiar with the seven categories?

A.   Broadly, yes.

Q.   Were the documents in each category ever stored together separate from any other document?

A.   I'm not sure I understand what you mean.

Q.   Let me strike that.

The Government grouped the 105 source -- alleged trade secrets into seven distinct categories; correct?

A.   I believe so.

Q.   And those categories contained a list of several to over a dozen alleged trade secret documents?

A.   I -- I have seen the file.  I'm not actually a trade secret expert, so I'm more of an expert in telling you what happened and when it happened.

Q.   Yes.  I'm only asking you to testify as to what you saw.

A.   I have seen a document that had them categorized in

groups.

Q.    And those groups, did you ever see each group stored as a separate unit in any of the file listings that you reviewed?

A.    Do you mean did Leon categorize them that way?

Q.    Yes.

A.    Not that I'm aware of.  He was categorizing them in a different way.  So when he had notes, his subfolders were categorized kind of by topic.  So there would be a topic for how our internal servers are managed.  There was a topic for how our security works, which was really concerning to me as an incident response person protecting Google.  There was a category for, you know, TPU, a folder called TPU.  That was how the notes were categorized as we see them in the Web Protect uploads.

Q.    Were the source documents for each alleged trade secret category ever stored separately from the other categories?

A.    He stored all of his notes together in his Apple Notes subfolder.

Q.    That was a --

A.    Or you mean by Google?

Q.    Yes.  That was a bad question.  My apologies.

So the source documents from Google, were they ever stored and organized in a manner that reflects the alleged trade secret categories compiled by the Government?

A.    I don't think I can really answer that.  I'm sorry.

**Q.**   I'd like to talk about badging next.

Are you aware that Mr. Ding visited Google's Beijing office multiple times in 2023?

**A.**   Yes.

**Q.**   And that's because he badged into that office; correct?

**A.**   Correct.

**Q.**   So you have logs of him badging into that office on August 30th, 2023, and you have a log of him badging into that office on August 31st, 2023?

**A.**   I would need to see our badge logs in front of me, but there are logs of him badging into that office, yes.

**Q.**   He also logged into that office -- excuse me -- badged into that office on September 7th, 2023; correct?

**A.**   I would need to see it, but I'll assume that's correct.

**Q.**   Earlier you testified about a summary document that showed badge activity starting in September.  Do you recall that demonstrative?

**A.**   Yes.

**Q.**   That cut off all of his China badging entries; correct?

**A.**   I don't know what you mean by it cut off his --

**Q.**   They were not reflected in the log you testified about; correct?

**A.**   The log we produced was complete.  We produced badging logs back to the beginning of his employment.

**Q.**   Yeah.  I'm just talking about the demonstrative you

testified about.  That excluded all of his badging activity in the China office; correct?

A.   Can you show it to me?  Or, I mean, it covered November through December, so...

Q.   Are you aware Mr. Ding also attempted to visit the Beijing office in 2022?

A.   That doesn't ring a bell to me.

Q.   By badging into the Beijing office on those multiple occasions in 2023, is it fair to say that he was not trying to conceal those visits to the Beijing office?

A.   I'm not sure I can say whether anybody was trying to conceal anything or not.  It implies that he was in the Beijing office.  That's really all I can judge from it.

Q.   I'd next like to talk to you about the demonstrative you testified about regarding the December 29th, 2023, timeline.

A.   Mm-hmm.

Q.   What day of the week was December 29, 2023?

A.   If I recall, it was Friday.

Q.   Friday.  And that's obviously a weekday; correct?

A.   Correct.

Q.   Are Google employees expected to work on weekdays?

A.   Well, Friday, the 29th, I believe was a company holiday because it followed Christmas and Christmas fell on a weekend, I think.  Or, no, sorry.  Christmas would have been three days prior.  So we typically work weekdays, although you will find

many people who are on vacation on the 29th.

Q.   And at that point in time, did Google have a return-to-office policy?

A.   Yes.

Q.   So in-office attendance was encouraged?

A.   Yes, it was encouraged.

Q.   And Mr. Ding had logged into the Google office the day prior to the 29th; correct?

A.   I'd need to see that in front of me.

Q.   On December 29th, 2023, Mr. Ding was still an employee of Google; correct?

A.   That's correct.

Q.   And on your demonstrative, you testified that he entered the Google campus at 7:00 a.m. on a weekday; correct?

A.   That's correct.

Q.   Is that a normal time to enter a workplace on a workday?

A.   It's a little earlier for most Googlers, but, yes, it's a normal time.

Q.   And he -- once he got into the office, he attempted to log into the network; correct?

A.   That's correct.

Q.   Would an employee do that on a normal workday?

A.   Yes.

Q.   You've testified that Mr. Ding uploaded the alleged trade secret documents to his personal Google Drive; correct?

**A.**    Correct.

**Q.**    In the two years investigating this, you found no evidence that Mr. Ding ever shared these alleged trade secrets to anyone other than himself; correct?

        **THE COURT:**  That's been asked and answered.  I think we need to move this along.

**BY MR. RAPP-KIRSHNER:**

**Q.**    You monitored Mr. Ding's Google email; correct?

**A.**    His corporate email, yes.

**Q.**    He never emailed an alleged trade secret to anyone?

**A.**    Didn't see evidence of that.

**Q.**    You testified that Google monitors USB activity; correct?

**A.**    Yes.

**Q.**    He never transferred an alleged trade secret document on a USB; correct?

**A.**    We did not see evidence of that.  We are, however, prohibited from looking at what was done after they went to his personal Google Drive.  I would have absolutely no way to know whether he emailed them to people from his personal drive, whether he copied them to USB from his personal laptop.  Zero visibility by policy.

**Q.**    Understood.  I'm just asking, what you personally saw during the course of your two-year investigation is that there was no evidence they were shared?

        **THE COURT:**  This question has been asked and answered

multiple times now.  I'm going to have to ask you to move things along.

MR. RAPP-KIRSHNER:  No further questions, Your Honor.

THE COURT:  Okay.  Redirect?

### REDIRECT EXAMINATION

BY MR. BOOME:

Q.    Mr. Linton, Mr. Rapp-Kirshner asked you about badging in from Beijing.  Did you see any badging in from Beijing around the time of the MiraclePlus presentation that you discussed?

A.    Not that I recall.

Q.    Where was Mr. Ding's badge at the time he was speaking at the MiraclePlus conference?

A.    We saw, I believe, four different badging events in Sunnyvale, California, MAT3 building, during that period of time.

Q.    By who?

A.    By his intern.

Q.    Mr. Rapp-Kirshner also asked you about Mr. Ding's continued note creation on his Google laptop after he uploaded the last alleged trade secret file.

Do you have any idea how many notes he created on his laptop between that time and December 29th?

A.    I would need to see my evidence logs to give you the count.

Q.    Mr. Rapp-Kirshner asked about -- he pointed out there was

no flurry of uploads leading up to the defendant's last day at Google on December 5th.  Do you remember him asking you about that?

A.   I do.

Q.   If Mr. Ding had wanted to do a flurry of uploads of his notes files on January 1st, 2nd, 3rd, or 4th, could he have done so?

A.   On January 1st, 2nd, 3rd, or 4th, a flurry of uploads from his Mac laptop?

Q.   After December 29th, could he have done that?

A.   He could upload anything he had already saved to his Mac up until -- oh, no.  Sorry.  29th?  No, he could not have because we locked --

Q.   Why?

A.   -- his Mac.

Q.   Why couldn't he --

(Simultaneous speaking; court reporter interrupts.)

THE WITNESS:  Because we locked his Mac with an MDM lock.  So he had no access to his Mac from the 29th onward.

BY MR. BOOME:

Q.   Mr. Rapp-Kirshner showed you a number of sort of personal notes files, soft skills, leadership expectations, culture map.  Remember that?

A.   Yes.

Q.   On direct examination, I asked you about the files you saw

being uploaded from Mr. Ding's corporate computer to his personal account and I asked you about the ones that gave you concern from a data security perspective.

Were you talking about soft skills and leadership expectations?

A.    Not at all.

Q.    What were you talking about?

A.    I was talking about the files that contained the names of internal Google GPU technology, so TPU, Pufferfish, Deepsea. Borg A100 was a very concerning one to me.  There was a set called "Low Ass," which is engineering documentation about how we secure our data centers, which the security team is very sensitive about.

Essentially, it was all of the files related to internal AI-related programs and Google's operations and security.

Q.    About how many unique files with those types of names did you see in Mr. Ding's Web Protect log?

A.    I went line by line, spent a whole day doing it, and found 1100 documents that appeared to me to be Google internal confidential and highly worrisome.

Q.    Not counting soft skills, biographical page, culture map, or leadership expectations?

A.    No.  I even ignored things like screenshot without 100 percent looking at every image just because I was focused on the content of those files.

MR. BOOME:  This is my last block of questioning, Your Honor, but I do need to bring up the sealed Exhibits 43 and 46.

If that's okay, Ms. Sharma.

And if we can put them side by side, Ms. Hernandez, that would be great.

BY MR. BOOME:

Q.   Okay.  Mr. Linton, you're not a software engineer; is that right?

A.   Correct.

Q.   Do you -- do you work on Google's TPU technology?

A.   I do not.

Q.   Okay.  Just looking at these documents, even with your background, what can you tell us about the general topic of these documents?

A.   So the general topic of these documents, to me, they are engineering schematics for how a chip works.  TensorCore and BarnaCore I know to be TPU variants, different versions of the TPU chip.  And, to me, it looks like they're describing in detail exactly how those chips work so that a software developer could integrate with them or manipulate their functionality.

Q.   Did Google invent TPUs?

A.   As far as I know, we did, yes.

Q.   Can you get them anywhere else besides Google?

**A.**   We don't sell them.  We rent them.

**Q.**   And these documents, as you said, are about how those chips work?

**A.**   It is how they function.  So an architecture, an instruction set architecture.  Not a software engineer, but working in security, I kind of get exposed to lots of different branches.  It's kind of the recipe, it's the instruction set for how the chip works.

**Q.**   Looking at these documents and based on your training as a Google employee, should these documents be sent to a personal Gmail account?

**A.**   Absolutely not.

**Q.**   But, Mr. Linton, there's no confidentiality markings.  How could you possibly know that?

**A.**   (A) the policy says I'm to treat it as confidential unless I get permission from the document owner, and (b) it is clear to me that this is really hardcore engineering documentation for something the company considers really important.  Just, like, as a matter of common sense, I would expect to get in trouble if I sent this to my personal account.

          **MR. BOOME:**  Thank you.

          Nothing further, Your Honor.

          **THE COURT:**  All right.  Any recross?

          **MR. RAPP-KIRSHNER:**  No, Your Honor.

          **THE COURT:**  All right.  You can step down.  Thank you.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  And I guess that means it's a good time to break for the day.  Thank you for being so attentive.  We will see you tomorrow at the same time.  Remember to bring your notebooks with you and remember not to discuss the case with anybody else, including each other, and not to do any of your own independent research.  We'll see you tomorrow.

Thank you.

THE COURTROOM DEPUTY:  All rise.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Okay.  One brief note.  Please be seated.

Briefly, I'll just say -- and this is kind of for both sides -- I'm going to start cracking down more on repetitive questions, belaboring points, beating dead horses.  I think that it's not fair to these 16 members of the community to beat dead horses.  Their time is valuable.

So I just want to notify both sides that I'm going to be more actively jumping in in the event that -- in the event that I conclude that you're not using the jury's time wisely.

Other than that, is there anything to discuss?

MS. PRIEDEMAN:  Your Honor, I just wanted to address timing of witnesses.

THE COURT:  Yeah.

MS. PRIEDEMAN:  It's a little bit hard to predict, but

I think it is possible that Dr. Sanchez could go as early as late Thursday or Friday. So I just wanted to put both the Court and defense on notice.

THE COURT: Okay. So let's talk that through. So late Thursday or early Friday. And then -- but do I remember correctly that Pflaum was not available on Friday?

MS. PRIEDEMAN: Yeah. So I spoke to Ms. Walsh a little bit, and I think it makes sense for the *Daubert* hearing to happen next week, would be, I think, our -- I don't want to speak for Ms. Walsh, but I think that's the proposal.

THE COURT: So Sanchez would come testify on late Thursday or Friday. You would exclude any questions along the lines of, "Well, if the defense's expert testified to X, Y, or Z, what would your response be to that?" There's going to be none of that in his testimony in the Government's case-in-chief.

Then you want to do the *Daubert* hearing sometime next week where Sanchez would testify about Pflaum's opinion and about Pflaum's *Daubert* testimony. And then Pflaum would testify.

MS. PRIEDEMAN: Yes, Your Honor.

THE COURT: Okay.

MS. PRIEDEMAN: And I do want to say that we understand the Court's order about the portion of Dr. Sanchez's testimony that we anticipate asking the Court to be closed for.

We sent -- as of last week, I thought it was very, very unlikely that he would testify this week; and so yesterday when it looked like things were going quickly, we filed it.  I just --

THE COURT:  No problem.

MS. PRIEDEMAN:  I will own that.

I still think it's unlikely that the sealed portion of his testimony, which would be at the very end of his testimony, I think that's more likely to be next week, but we have given that --

THE COURT:  Okay.  But you've got his -- so you've got the sealed portion of his testimony kind of sequestered, and it's at the end of his testimony?

MS. PRIEDEMAN:  Yes, Your Honor.  I will flag for the Court that in terms of any redirect, it is impossible for me to predict.

THE COURT:  Of course.

MS. PRIEDEMAN:  I will anticipate I will likely need to request some type of sealing.

THE COURT:  No problem.  But we're going to minimize the sealing, and if we have to bring people in and out, we'll bring people in and out so that they can be exposed to as much of the trial as reasonably possible.

But that sounds good to me.  So as far as scheduling the *Daubert* hearing, let's see, Monday is a holiday; right?  So

it seems like Tuesday would be the time -- Tuesday after court, after the trial day would be the time to do the *Daubert* hearing probably?

MS. WALSH:  Yes.  Mr. Pflaum has cleared the conflict that he had on Tuesday afternoon.

THE COURT:  Okay.  Great.

MS. WALSH:  In terms of other scheduling, I believe he can be available on Friday.  I don't know about Thursday because that kind of was not something that we checked with him to -- for him to observe Dr. Sanchez's testimony.  But I could check that.  And so that's --

THE COURT:  Okay.  Well, it is what it is.  I mean, if he has to look at the realtime transcript of Sanchez's testimony on Thursday, then so be it; but hopefully, he can be here.

MS. WALSH:  Sure.

THE COURT:  Okay.  And then I think we should plan on meeting regarding jury instructions next week at some point as well.

As we sit here now, like, do you have -- does the Government have a rough estimate of when -- keeping in mind what I just said, that I'm going to be intervening much more aggressively to cut off questioning if it gets repetitive, and keeping in mind that you-all are going to sit down and plan out your directs and your crosses in a way that's going to avoid

repetition, what is your best estimate of when the Government will be ready to rest?

**MS. PRIEDEMAN:**  I think it's -- I think it is too early to predict that, Your Honor, but I think there's a world in which we could rest next week.

**THE COURT:**  Okay.  All right.  Well, I think we should plan on doing -- we'll kind of see -- we'll see how we're doing, but maybe we will plan on -- let me look at my calendar.

(Pause in proceedings.)

**MS. PRIEDEMAN:**  I did forget, Your Honor, that I understand that Mr. Pooley is going to be testifying on the 22nd.

**MS. WALSH:**  Mr. Pooley is actually going on the 21st.

**MS. KRSULICH:**  Sorry, Rachel.  It is the 22nd.

**MS. WALSH:**  It is the 22nd.  I'm sorry.

**THE COURT:**  22nd?

**MS. WALSH:**  Yep.

**THE COURT:**  Yep.

**MS. PRIEDEMAN:**  So I was not factoring that into our estimation.

**THE COURT:**  Right, right, right, right, right.

**MS. PRIEDEMAN:**  That may throw a wrinkle in it.

**THE COURT:**  Okay.  Well, we'll see.  I would like to -- I mean, obviously, the way we'll do jury instructions is I'll put out my draft jury instructions, which will be based on

what you all submitted, and we'll work off my draft.  And so part of the responsibility is on me.  But I think we should aim to do jury instructions, you know, next week sometime.  But as I look at my calendar now, I'm not exactly sure when, so I'll get back to you on that.

**MS. WALSH:**  Your Honor, could we get some clarity on what you're envisioning for the *Daubert* hearing?  Because you mentioned Dr. Sanchez testifying --

**THE COURT:**  Yeah.

**MS. WALSH:**  -- at the *Daubert* hearing --

**THE COURT:**  Yeah.

**MS. WALSH:**  -- about -- or please go ahead.

**THE COURT:**  Yes.  I wanted -- first of all, I want the benefit of hearing Sanchez's trial testimony to help me evaluate whether the defense has met its burden or to help give me the ability to evaluate whether the defense is going to be able to meet its burden regarding Pflaum.

Then, in addition, I think that it would be useful to have Sanchez testify specifically about Pflaum's *Daubert* testimony -- right? -- specifically about Pflaum's opinion and the *Daubert* testimony that he gave.

And as I've made clear, my concern is simply that Pflaum has not shown that he knows this material well enough to testify as an expert about it.  I'm less concerned with his background and his training and his experience, and I'm more

concerned with simply whether he knows this material enough; right?

I mean, I think back to my Monsanto Roundup case, where we had all these general causation experts about whether Roundup is capable of causing cancer. And we had a couple of experts who certainly had the training and the background to offer an opinion about whether it's capable of causing cancer, but they took the stand in a *Daubert* hearing and they didn't know the material. They didn't know what they were talking about. They were making stuff up. And so I excluded them for that reason.

And the concern is whether the defense has shown or can show that Pflaum knows this material well enough to testify as an expert about it. And so I think that the opinion, his written opinion is obviously something that I could hear from Sanchez about, but I'm mainly interested in the *Daubert* testimony that he gave and what does that reveal about Pflaum's understanding, or lack thereof, of the material.

And so I want to hear from Sanchez on that, and that's obviously not something he can testify to in front of the jury.

And then Pflaum will have one last chance and the defense will have one last chance to meet their burden to show that Pflaum has a reliable opinion that he can offer.

Does that make sense?

**MS. WALSH:** Yes, Your Honor.

THE COURT:  And so the idea would be that on Tuesday, we'll hear from Sanchez first.

MS. WALSH:  Okay.

THE COURT:  After the trial day, we'll hear from Sanchez.  And then we'll hear from Pflaum.

MS. WALSH:  And will we have an opportunity to cross-examine Dr. Sanchez in the *Daubert* hearing or --

THE COURT:  Sure.

MS. WALSH:  Okay.

THE COURT:  And I think probably what I'll do -- I'm going to think about time limits.  I think probably -- you know, I think it'll probably be something along the lines of -- at the *Daubert* hearing, probably something along the lines of half an hour on direct, half an hour on cross for Sanchez, because I will have already gotten the benefit of his trial testimony.

That's off the top of my head, but you can think about it and tell me what you think.

And then we'll hear from Pflaum.  Okay?

MS. WALSH:  Okay.

THE COURT:  Anything else to discuss right now?

All right.  Thank you.  See you tomorrow.

THE COURTROOM DEPUTY:  Court is in recess.

(Proceedings adjourned at 3:28 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Wednesday, January 14, 2026

_Ana Dub_

_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter