**Volume 3**

**Pages 415 - 652**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    )
  VS.                               )   **NO. 3:24-CR-00141-VC**
                                    )
LINWEI DING, a.k.a. LEON DING,      )
                                    )
          Defendant.                )
_____)

                          San Francisco, California
                          Wednesday, January 14, 2026

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue, Box 36055
                    San Francisco, California 94102-3495
               BY:  **CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
                    **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    1301 Clay Street, Suite 340S
                    Oakland, California 94612-5217
               BY:  **MOLLY K. PRIEDEMAN**
                    **ASSISTANT U.S. ATTORNEY**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant:

GOODWIN PROCTER LLP
525 Market Street
San Francisco, California 94105
BY:   **DARRYL M. WOO, ATTORNEY AT LAW**
**DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
**RACHEL M. WALSH, ATTORNEY AT LAW**
**COLETTE A. LOWRY, ATTORNEY AT LAW**
**NICHOLAS C. WILEY, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 Marshall Street
Redwood City, California 94063
BY:   **GRANT P. FONDO, ATTORNEY AT LAW**
**FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 South Figueroa Street, Suite 4100
Los Angeles, California 90017
BY:   **LORA J. KRSULICH, ATTORNEY AT LAW**

Also Present:        **Andrea Valladao, Federal Bureau of**
**Investigation**
**Veronica Hernandez, Paralegal**
**John Jay, Trial Technician**

## I N D E X

Wednesday, January 14, 2026 - Volume 3

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **CRAIN, ANDREW** | | |
| (SWORN) | 437 | 3 |
| Direct Examination by Mr. Boome | 437 | 3 |
| Cross-Examination by Mr. Rapp-Kirshner | 466 | 3 |
| Redirect Examination by Mr. Boome | 480 | 3 |
| Recross-Examination by Mr. Rapp-Kirshner | 483 | 3 |
| | | |
| **FULLER, BRADLEY** | | |
| (SWORN) | 485 | 3 |
| Direct Examination by Mr. Chang | 485 | 3 |
| Cross-Examination by Mr. Rapp-Kirshner | 512 | 3 |
| | | |
| **TORTORICI, ARIANA** | | |
| (SWORN) | 518 | 3 |
| Direct Examination by Mr. Chang | 518 | 3 |
| Cross-Examination by Ms. Krsulich | 550 | 3 |
| Redirect Examination by Mr. Chang | 559 | 3 |
| | | |
| **VALLADAO, ANDREA C.** | | |
| (SWORN) | 576 | 3 |
| Direct Examination by Mr. Boome | 576 | 3 |

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 277 | | 495 | 3 |
| 278 | | 501 | 3 |
| 279 | | 508 | 3 |
| 280 | | 510 | 3 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 314 | | 607 | 3 |
| 328 | | 633 | 3 |
| 349 | | 623 | 3 |
| 358 through 462 (Sealed) | | 593 | 3 |
| 570 | | 594 | 3 |
| 571 | | 594 | 3 |
| 737 | | 535 | 3 |
| 739 | | 529 | 3 |
| 740 | | 543 | 3 |
| 759 | | 475 | 3 |
| 764 | | 468 | 3 |
| 767 | | 465 | 3 |
| 768 | | 465 | 3 |
| 769 | | 471 | 3 |
| 775 | | 592 | 3 |
| 776 | | 595 | 3 |
| 778 | | 589 | 3 |
| 779 | | 590 | 3 |
| 794 | | 617 | 3 |
| 795 | | 549 | 3 |
| 805 | | 543 | 3 |
| 811 | | 537 | 3 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 834 | | 581 | 3 |
| 835 | | 581 | 3 |
| 836 | | 581 | 3 |
| 837 | | 581 | 3 |
| 838 | | 581 | 3 |
| 871 | | 490 | 3 |
| 892 | | 525 | 3 |
| 1025 | | 642 | 3 |
| 1085 | | 636 | 3 |
| 1085S | | 636 | 3 |
| 1097 | | 633 | 3 |
| 1097S | | 633 | 3 |
| 1100 | | 631 | 3 |
| 1107 | | 634 | 3 |
| 1130, page 1 | | 625 | 3 |
| 1130, page 34 | | 629 | 3 |
| 1130, page 169 | | 638 | 3 |
| 1130, pages 199 through 203 | | 639 | 3 |
| 1131, pages 1 through 5 | | 630 | 3 |
| 1131, page 79 | | 635 | 3 |
| 1132, page 1 | | 616 | 3 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1132, page 15 | | 618 | 3 |
| 1132, pages 292 through 295 | | 620 | 3 |
| 1132, pages 284 through 287 | | 624 | 3 |
| 1133 | | 613 | 3 |
| 1137 | | 647 | 3 |
| 1155 | | 644 | 3 |
| 1177 | | 627 | 3 |
| 1196 | | 544 | 3 |

**Wednesday - January 14, 2026**                    **9:16 a.m.**

P R O C E E D I N G S

---o0o---

(Proceedings were heard out of the presence of the jury.)

THE COURTROOM DEPUTY:  Remain seated.  Come to order.
Court is back in session.

THE COURT:  All right.  Hi.  Sorry about that.  I was
dealing with an IT issue.

Anything to discuss this morning?

MS. PRIEDEMAN:  Two things related to Dr. Sanchez and
Mr. Pflaum, Your Honor.

THE COURT:  Okay.

MS. PRIEDEMAN:  Just as we're looking at scheduling
over the next few days and going into next week, just wanted to
confirm that for Dr. Sanchez, we can continue to talk to him
and prep him while he's on direct examination, given that he's
an expert witness.  Obviously, once he's on cross, we would not
do that.  But given everything that's going on, I just wanted
to confirm our understanding.

THE COURT:  Sounds fine to me.

Any objection?

MS. WALSH:  So my --

THE COURT:  Obviously, it applies to both sides.

MS. WALSH:  So my understanding is that's not
generally what's done.  When somebody is up on the stand,

they're up on the stand; but, I mean, if --

THE COURT:  I don't have a problem with talking to an expert during their direct about making sure that the topics -- you know, they cover the topic adequately or something like that.  It's not a problem.

MS. WALSH:  Okay.

MS. PRIEDEMAN:  And the other issue I wanted to talk about, Your Honor, is -- I believe it was Defense's MILs 22 through 25 which relate to the 199 patents and publications that they moved to preadmit.

Defense filed the supplemental filing last night. The Government is planning on filing a response tonight --

THE COURT:  Okay.

MS. PRIEDEMAN:  -- so we can talk about it.

But I think there's a little bit of a misunderstanding about the purpose of this filing.

So the Government's understanding was that we were trying to narrow the window and understand the publications and patents that would be admitted through either Mr. Pflaum or Dr. Sanchez to avoid litigating relevance and objecting --

THE COURT:  Right.

MS. PRIEDEMAN:  -- in the presence of the jury.

From speaking to defense counsel, I understood that they understood this filing just to be limited to Mr. Pflaum's testimony and that they may rely on exhibits outside the scope

of what the parties have been discussing.

THE COURT:  No.  I mean, my understanding was never that it was limited to Pflaum's testimony.

There are a number-- as I think I said, I am very concerned that the defense is going to try to put in a number of documents that have no relationship to this technology in order to confuse the jury.  And I'm going to be the gatekeeper of that, and I want to see an offer of proof as to each of those documents.

MS. PRIEDEMAN:  Understood, Your Honor.  So I think there is -- I think -- the Government will file something tonight.  I think there's a number of exhibits that the Government will agree are admissible.  There's the prior exhibits discussed in our response to the original MIL that is the -- some of the publications and patents discussed in Dr. Sanchez's report that we've said are admissible.

And then I think we're talking about probably, like, 20 or so exhibits left that I would propose that after the Court has reviewed the Government's filing, we discuss and have some argument on those.

THE COURT:  Yeah, sounds good.  So we can try to do that sometime later this week probably.

MS. PRIEDEMAN:  And then the Government's hope is to then create a list of those exhibits; and if the defense is going to attempt to introduce a publication or patent that is

not on the list, we would ask that they proffer that prior to the -- outside the presence of the jury.

THE COURT: Yes. And this is the entire universe of documents that the defense might try to put in to show that the information contained in the alleged trade secrets were publicly available; right? So it's any of those documents.

And I wonder if the right thing to do is require the defense to supplement its filing, to the extent that you did not include all those documents and only documents that you would try to get in through Pflaum. I wonder if I should require you to supplement your filing tonight and then have the Government respond tomorrow or something like that.

MS. WALSH: We can do that, Your Honor. We disagree that it's necessary to sort of preadmit everything --

THE COURT: It's not about preadmit. It's about determining whether there are 401/403 problems with putting in these documents. And that's something we can determine in advance or we will likely be able to determine in advance with respect to most of them.

MS. WALSH: Understood. And, I mean, the goal not here -- is not to confuse the jury here.

What we might seek to cross Dr. Sanchez on depends to some extent on what he says.

THE COURT: Mm-hmm.

MS. WALSH: And, you know, especially not only on

issues of public availability, but value of the technology, you know, sort of anything else that he might try to say on the other elements of trade secrets. And so --

THE COURT: I understand.

MS. WALSH: -- that's what we're --

THE COURT: But I gather that you have this stockpile of documents at the ready that are designed to try to cast doubt on whether the information contained in the alleged trade secrets was publicly available, and I want an offer of proof as to all of those documents that you might potentially use --

MS. WALSH: Understood, Your Honor.

THE COURT: -- whether it's in cross-examination of Sanchez or a direct of Pflaum or otherwise.

MS. WALSH: Okay.

THE COURT: And then, finally -- I mean, I think this is obvious, but I'll just say it out loud. Like, you should not -- when you're cross-examining Sanchez, you should not assume, "Oh, I'll be able to get this in through Pflaum" or "I'll be able to get this in through this other expert we've identified." You should not operate on the assumption that either of those two experts are going to be allowed to testify. And if there's anything you need to try to establish in this subject matter, you should be trying to do it.

I just want to make sure you know, that you're on notice, that you should be trying to do it through

cross-examination of Sanchez.

MS. WALSH:  Understood, Your Honor.

THE COURT:  Okay.  Anything else?

MS. PRIEDEMAN:  Just the last point, obviously, the Government is going to be moving to exclude the late noticed expert.  I'm not sure what the -- if you -- if the Court wants just argument on that or briefing on that or what the proper --

THE COURT:  You can file a motion, and then I'll let you know if I need any further discussion of it.

MS. PRIEDEMAN:  Thank you, Your Honor.

THE COURT:  Okay.  What else?  Anything else?

MR. BOOME:  I think Mr. Rapp-Kirshner has an issue with some of the content of Mr. Crain, the Government's computer forensic expert's proposed testimony.

THE COURT:  Okay.

MR. RAPP-KIRSHNER:  Yes, Your Honor.  We're moving to -- we would like to exclude three demonstratives and related testimony that concerns something apparently called a Voicemod app.

THE COURT:  Okay.

MR. RAPP-KIRSHNER:  We're moving on 401 and 403 grounds, as well as exceeding the scope of any disclosed opinion.

THE COURT:  Okay.

MR. BOOME:  Can I give you some background, Your Honor?

THE COURT:  Sure.  Maybe you could hand up the demonstratives to me first.

MR. BOOME:  Or we could show it to you.

THE COURT:  Sure.  That's fine too.

MR. BOOME:  Could we bring up Mr. Crain's slide show, please, Ms. Hernandez.

THE COURT:  Is Crain the next witness, by the way?

MR. BOOME:  Yes, Your Honor.  He's first up this morning.

THE COURT:  All right.

MR. BOOME:  So, background here before the slides is, Your Honor's familiar with the Aamer Mahmood situation.

The Government alleges and we will introduce evidence and emails to show that the defendant communicated with MiraclePlus pretending to be Aamer Mahmood from a fake email account that he created.

THE COURT:  Right.

MR. BOOME:  And in those communications between the defendant and MiraclePlus, MiraclePlus requested a video interview with the person who they believed to be Aamer Mahmood.

THE COURT:  Okay.

MR. BOOME:  The defendant responded and said, "I think

a phone call would be better."

THE COURT:  Okay.

MR. BOOME:  And they scheduled a phone call, the defendant and MiraclePlus, for August 21st, 2023.

THE COURT:  Okay.

MR. BOOME:  On August 20th, Mr. Ding downloaded -- Mr. Crain will testify that on August 20th, Mr. Ding downloaded an app on his computer called Voicemod.

And forgive me.  I'm going to have to skip ahead here.

Okay.  So this is from the Santa logs that Mr. Linton introduced into evidence yesterday.  The same day that the defendant deleted the PDF copies of the alleged trade secret files from his Google-issued MacBook, he also deleted, according to this section of the Santa logs, which are already in evidence, an application called Voicemod.

THE COURT:  Okay.

MR. BOOME:  This is not expert testimony.  Mr. Crain downloaded the Voicemod app and used it himself.  He called his wife with it.  And he'll testify that this is it, and it's an app you can put on your Mac computer and you can use it to change the sound of your voice during a phone call.  It's not specialized testimony.  He's just going to say, "This is the app that I've used recently.  This is how it works," and move on.  That's it.

THE COURT:  Okay.  What did you say about when

Mr. Ding downloaded the Voicemod app?  Did you say it was the day before the phone call?

MR. BOOME:  That's correct, Your Honor.

THE COURT:  And the phone call happened?  Or do you have evidence that the phone call happened?

MR. BOOME:  We don't.

THE COURT:  Okay.  And Crain is -- you've noticed him as an expert on -- as a forensics expert --

MR. BOOME:  Yes.

THE COURT:  -- right?

And they have an argument that it's outside the scope of the notice, and you're saying that it didn't need to be part of the notice because it's not expert testimony?

MR. BOOME:  Yes.  He has firsthand experience that's not related to his specialized training about what this app is because he's used it.  And that's all we're asking him to testify about.  There won't be any technical details about how it works.  He's just going to simply say -- explain what this thing is that Mr. Ding deleted based on his personal knowledge.

THE COURT:  And did you disclose him as a lay witness?  It seems like what you're saying is this is lay testimony.

MR. BOOME:  Yes.

THE COURT:  This is not expert testimony.

MR. BOOME:  Yes.  No, we didn't -- we disclosed his expert testimony under -- under the rules; but we did not

include this piece -- this piece of his testimony in his disclosure.

THE COURT:  What is the -- generally, like, what is his opinion that he's offering?

MR. BOOME:  As to this?

THE COURT:  As an ex- -- no.  As a forensics expert, what is the opinion that he's offering?

MR. BOOME:  His opinion -- oh, he'll walk through -- this is just -- this is a small, small piece of his overall testimony, Your Honor.

THE COURT:  Right.

MR. BOOME:  This is --

THE COURT:  I understand.  What is his --

MR. BOOME:  His opinions -- he's going to walk the jury --

THE COURT:  High level, what's his opinion that he's offering?

MR. BOOME:  He's going to walk through the forensic evidence that shows that Mr. Ding visited internal Google repositories of information, copied that information into his Apple Notes, converted them to PDF, and then uploaded them to his personal Gmail account.

He will explain kind of his metadata analysis of how many pages, how many screenshots were embedded.  He'll walk the jury through a visual comparison of how one particular note

file was created.

And then, finally, he's also analyzed the -- what I called in opening statement the fake product demonstration video, the InfiniCompute video, where we allege Mr. Ding videotaped Google technology and then uploaded it to MiraclePlus.

**THE COURT:** Okay.

**MR. BOOME:** Mr. Crain will show --

**THE COURT:** And did the disclosure --

**MR. BOOME:** Yes.

**THE COURT:** -- lay out all of that?

**MR. BOOME:** It did lay out all that.

And to be frank, Your Honor, the Voicemod app --

**THE COURT:** Just noticed it in preparing for --

**MR. BOOME:** -- it was a late discovery on our part, honestly.

**THE COURT:** Yeah.

**MR. BOOME:** But, so that's why we didn't disclose it, and I'm owning that right now.  We hadn't connected the dots with the Aamer Mahmood situation and the Voicemod app.  That kind of happened later in our investigation.

So we are limiting his testimony on Voicemod to what he, as a -- as any one of us could do, which is just using this app and explaining what it is.

**THE COURT:** Okay.

**MR. RAPP-KIRSHNER:** Yeah. So talking about the scope of his proposed testimony, it sounds like this is expert testimony. It sounds like he did download it and test it in preparation of his testimony. I don't believe he had preexisting knowledge of it before this issue, but you can correct me if I'm wrong.

**THE COURT:** Well, I mean, the part of it that is expert testimony is that he sort of examined and determined when the Voicemod app was downloaded and when it was deleted and, you know, that it says Voicemod; right? That part of his -- that's part of his forensic expert testimony.

**MR. RAPP-KIRSHNER:** Yes, which --

**THE COURT:** But then the additional part -- right? -- is explaining what Voicemod is.

And so I gather from what you're saying that your objection is to, like, explaining what Voicemod is?

**MR. RAPP-KIRSHNER:** To both, Your Honor. We're not disputing that he's qualified and properly disclosed opinions as to forensic events, but not this specific forensic event.

**THE COURT:** I see.

**MR. RAPP-KIRSHNER:** He submitted three separate disclosures, 15 exhibits, and not once did he reference this.

**THE COURT:** Okay.

**MR. RAPP-KIRSHNER:** In fact, he had an exhibit, Exhibit I to his initial report, which showed the deletions on

December 29th, and this specific app deletion was nowhere to be found.

THE COURT:  Okay.

MR. RAPP-KIRSHNER:  Based on 302 reports, it seems like the Government was aware of this in at least mid to late December.  If they were to supplement his expert disclosure and say he would offer an opinion on that, we would have had time to review, analyze the veracity, the truthfulness of his claims, but that 302 just got produced last week, and the first time we heard he would testify about any of this was two nights ago when we received the demonstrative.

I'm also not aware of any exhibits showing the download date of this software, and I'm also not aware of any exhibits showing actual use, and I'm also not aware of any claim there is actual use of the software.

THE COURT:  Okay.  What we're going to do, since it's 9:30, is we'll discuss this further during a break.

I mean, how long do you expect Crain's testimony to last?

MR. BOOME:  It's not going to be terribly long, Your Honor.  I think up to -- it'll probably take about 30 to 40 minutes to get to this point.

THE COURT:  Okay.  And did you say you had objections to other demonstratives?

MR. RAPP-KIRSHNER:  Just these three slides pertaining

to this specific application.

THE COURT:  These three slides pertaining to this specific issue.  Okay.

Sorry.  Were you going to say something?

MR. BOOME:  I -- I'm just kind of doing a thought experiment, as I stand here, and thinking in terms of whether this is expert testimony that needed to be disclosed.

The Santa logs are already in evidence.  They're not difficult to read.  Mr. Linton read them for us yesterday.

THE COURT:  What about the part about --

MR. BOOME:  When he downloaded the app, I concede that is expert analysis.  But everything other than that in terms of he deleted -- he deleted the app on this date, because we can see it right here in this record, and what the app is, is there any reason why Special Agent Valladao couldn't look at the logs and point this out --

THE COURT:  Right.

MR. BOOME:  -- and say, "I used the Voicemod app. Here's what it is"?

So I don't think there would be any objection to that, and I don't think the situation should be different just because Mr. Crain is also offering separate and different expert testimony.

THE COURT:  Mm-hmm.  What is the -- I mean, obviously, it's prejudicial to your client in the sense that it's further

evidence that is not good for him.

But in terms of preparing to address it, what is the -- what is the prejudice that you've suffered from not learning about this until a couple of days ago?

MR. RAPP-KIRSHNER:  Yeah.  We haven't had a chance to run it by our forensic expert.  He hasn't had a chance to see whether it was actually used.  He hasn't had a chance to analyze the capabilities of this.

THE COURT:  But you said -- so there was -- you said you didn't get the 302 until a couple of days ago?

MR. RAPP-KIRSHNER:  Last week, Your Honor.

THE COURT:  Last week.  Okay.  So why weren't you able to run it by your forensic expert last week?

MR. RAPP-KIRSHNER:  Truthfully, the 302 is buried in a stack of other 302s.  It mentioned that they had discussed this, but not -- it was one sentence in a 302, and it didn't have any indication that Mr. Crain would actually testify about this, that this would be an issue at trial.

That only came two nights ago when this demonstrative was disclosed.

THE COURT:  Okay.

MR. BOOME:  They've had the Santa logs for more than two years, and they've had a complete image of Mr. Ding's laptop since -- I don't know -- almost a year now.

THE COURT:  Okay.  I'm going to go.  I'm going to take

a quick break.

Bhavna, you can start getting the jury ready.

And I'll come out and let you know whether that's in or out.  Okay?

**MR. RAPP-KIRSHNER:**  Thank you.

**THE COURTROOM DEPUTY:**  Court is in recess.

(Recess taken at 9:33 a.m.)

(Proceedings resumed at 9:35 a.m.)

(Proceedings were heard out of the presence of the jury.)

**THE COURT:**  Okay.  I'm going to exclude that testimony.  I think it was disclosed too late, and -- I think it was a close question, but I think it was disclosed too late.  And in a complicated case like this where there are a million different technical issues to understand and prepare for, it would be unfair to the defense to require them to scramble to deal with it.  So I'm going to exclude that testimony.

**MR. BOOME:**  Can we have a minute to take those --

**THE COURT:**  Of course.

**MR. BOOME:**  -- slides out of our --

**THE COURT:**  Yeah.

**THE COURTROOM DEPUTY:**  All rise.

(Proceedings were heard in the presence of the jury.)

**THE COURTROOM DEPUTY:**  Please be seated.

**THE COURT:**  Okay.  Welcome back, everybody.

I'm sorry we delayed things for a little bit.  We were

dealing with a couple of evidentiary issues.

And Mr. Boome has gone to get the Government's next witness, so he'll be in in just a second.

All right.  The Government can call its next witness.

MR. BOOME:  Thank you, Your Honor.  The Government calls Andrew Crain.

(Witness enters the courtroom and steps forward to be sworn.)

THE COURT:  Go ahead and have a seat.

THE COURTROOM DEPUTY:  Please raise your right hand.

ANDREW CRAIN,

called as a witness for the Government, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.

Please state and spell your full name for the record.

THE WITNESS:  Andrew, A-n-d-r-e-w, Crain, C-r-a-i-n.

DIRECT EXAMINATION

BY MR. BOOME:

Q.   Good morning, Mr. Crain.

A.   Good morning.

Q.   Where do you work currently, sir?

A.   I work for a firm called Berkeley Research Group, or BRG for short.

Q.   What's your role there?

A.   My job title there is managing director, which means I run

a practice group of consultants.

Q.   Do you have a particular focus in terms of the type of work that you do for BRG?

A.   Yes.  My group handles computer forensics work.

Q.   How long have you been working for BRG?

A.   I've been working for BRG about seven and a half years now.

Q.   Can you give us a brief overview of your educational background?

A.   Sure.  I have an undergraduate degree.  I also have a law degree.  I have some private investigator licenses in the State of California and Texas.  And I've done a lot of computer forensics training over the years.

Q.   Can you also outline your professional experience before you joined Berkeley Research Group?

A.   Sure.  So I've been doing computer forensics work about -- and investigative work about 25 years now; and before BRG, I worked for a couple of other private sector consulting firms doing very similar work.

Q.   So in total, how many years total doing the type of work you do now in the computer forensics field?

A.   25, going on 26.

Q.   Could you define that term for us, Mr. Crain, "computer forensics"?

A.   Sure.  So computer forensics is the preservation and

interpretation and analysis of computer evidence, so digital evidence, things like files on computers, phones, cloud accounts.  We're looking into, sort of, what activities the computer user has performed.

Q.   Can you give the members of the jury a couple examples of the types of investigative work you've done on cases over the years involving computer forensics?

A.   Sure.  So the primary type of case I do are cases involving allegations of trade secret misappropriation, but I've also done a wide variety of other cases:  fraud, embezzlement, insider trading, et cetera.

Q.   Have you ever testified as an expert witness before, Mr. Crain?

A.   Yes, I have.

Q.   Including in federal court in this courthouse?

A.   Yes.  I've testified in some other cases in this courthouse.

        MR. BOOME:  Your Honor, the Government offers Mr. Crain as an expert in the field of computer forensics.

        THE COURT:  Okay.

        MR. RAPP-KIRSHNER:  No objection.

        THE COURT:  You can proceed.

BY MR. BOOME:

Q.   Mr. Crain, you were retained by my office to assist us with computer forensics analysis in this case; is that right?

**A.** That is correct.

**Q.** Can you explain for the members of the jury what you were asked to help us with particularly in this matter?

**A.** Sure. My team was asked to analyze a set of digital evidence related to Mr. Ding and try to understand his computer activities with a specific focus on documents that the United States alleges are trade secrets.

**Q.** Are those the 105 alleged trade secret files in this case?

**A.** That's correct, 105.

**Q.** I want to ask you about the materials you've reviewed.

**MR. BOOME:** Ms. Hernandez, could we bring up Mr. Crain's demonstratives, please.

**BY MR. BOOME:**

**Q.** And, Mr. Crain, just for background, have you prepared a series of slides to assist with your testimony today?

**A.** Yes, I did prepare slides.

**Q.** All right. Can you tell the members of the jury about the things -- the evidence that you examined in forming your opinions in this case?

**A.** Sure. So they fall kind of into the four major buckets I've outlined on the slide: first, the list of alleged trade secrets that we just discussed; second, a forensic image that my team created of the Google-issued MacBook that Mr. Ding used; third, various evidence that we received from the FBI pursuant to a search warrant that pertains to Mr. Ding's

personal MacBook and personal Google Drive account; and then, finally, a set of logging that Google maintained, again relative to Mr. Ding's computer activities.

**Q.**   I want to ask you about the computer -- the forensic image of Mr. Ding's Google laptop that you and your team created.

When you do something like that, make an image of a computer, how do you ensure that the image you copy matches the image -- matches the data on the computer itself?

**A.**   Sure.  So there's a technology in computer forensics called hash values, where a hash algorithm is essentially a computation where we can copy a piece of evidence, like a laptop, and the tool will calculate this value called a hash value.  Think of it like a fingerprint value.  It's a unique identifier.  It's highly, highly accurate.  It reads the hash value of the original evidence that we're copying, and then we can recalculate that same hash value against the copy that we've made, and it helps us ensure that we have a true and accurate copy of the evidence.

**Q.**   If a document on your -- your copy and a document on the original device have the same hash value, what does that mean?

**A.**   That means they're identical.

**Q.**   And, Mr. Crain, you mentioned part of what you considered was logging maintained by Google.  I want to ask you to describe the logging in a little more detail.

**A.**   Sure.  So I've listed those here.

Santa is logging that is very granular and detailed about Mr. Ding's Google-issued MacBook.  So it's tracking things like files being created, files being modified, files being deleted.

The second bullet here, Uberproxy and Drive activity, pertains to source repositories at Google, like shared documents that many people can access, and these logs show which documents Mr. Ding viewed and when.

The third one, WebProtect, tracks, essentially, documents moving off of Mr. Ding's laptop.  I should say Google-issued laptop.  For example, when he uploaded documents to his personal Google Drive account.  So that's tracking that kind of activity.

And then, finally, Footprints is essentially browser history.  It's Google's storing the computer's browser activity, where Mr. Ding went on the Internet using his Google-issued laptop.

**Q.**   After considering all that evidence, did you form a series of opinions about Mr. Ding's activity as it relates to the 105 alleged trade secret files in this case?

**A.**   Yes, I did.

**Q.**   Can you outline those opinions for us?  And I'll be your assistant with the slides as you go through.

**A.**   Sure.  So we can summarize those kind of in four major bullets, which I've outlined on these following slides, the first being that Mr. Ding compiled information from documents

stored in these Google repositories by copying and pasting content from those documents into Apple Notes that were stored on his Google-issued MacBook.

Q.   Before we go any further, can you give the members of the jury just a quick definition and background on Apple Notes?

A.   Sure.  So Apple Notes is a program that's built in, by default, to an Apple computer.  Just like the name sounds, it's essentially like a notebook.  You can create different notes. You can put those notes in folders.  You can take text notes, but you can also insert pictures or other objects.  So it's kind of a rich notebook solution.

Q.   And can you walk us through your second opinion, please, Mr. Crain?

A.   Sure.  So after Mr. Ding had compiled this information in his Apple Notes, he then created PDF copies of those Apple Notes and uploaded the PDF copies to his personal Google Drive account.

Q.   And your third opinion?

A.   So after uploading them to his personal Google Drive account, at a later date, he then downloaded those PDF copies from his personal Google Drive account onto his personal MacBook.

Q.   And finally, your opinion related to December 29th, 2023?

A.   So on December 29th, 2023, Mr. Ding deleted the PDF copies that were stored on his Google-issued MacBook.

**Q.** Mr. Crain, in forming those opinions, how were you able to organize and analyze all of those disparate sources of data that you told us about earlier to make sense of it all?

**A.** So we essentially consolidated or connected all of these different disparate sources of evidence using a timeline where we could weave together things from the logs, things from Mr. Ding's computer, things we got from the FBI, so that we could really see things in kind of a chronological stack and you could make sense of what went on, regardless of where each clue came from in the evidence.

**Q.** Is that what we see here, your -- what you're calling the "Master Timeline"?

**A.** Correct. I called that the "Master Timeline" in my report. This screen shot is an excerpt of that. You can see I've color-coded things using the legend in the upper-right corner corresponding to those evidence sources that I reviewed that we talked about a minute ago.

**Q.** Okay. I'd like to ask you to now walk us through your analysis regarding the first step, going to internal Google repositories and creating Apple Notes files.

**A.** Sure. So this just shows an example of how we can do that. We can start by looking at the Apple Notes database on Mr. Ding's Google-issued laptop.

And here we're focused on a particular Apple Note called "Fabric Topology for Astrophel." And that database shows us

when the note was first created.  So that's the first line.  It shows us when the note was last modified.

Salute.

And then I mentioned how with Apple Notes, you can insert objects.  Mr. Ding inserted a lot of screenshots into these notes that he compiled.  And the screenshots on an Apple computer by default get a file name that includes the date and time that the screenshot was taken.  So we're able to use all of those embedded screenshots to basically understand the additional editing work that went on.

And that's what I have pictured here.

Q.   Okay.  Can you walk us through how you determined what internal Google files the information in Mr. Ding's Apple Notes came from?

A.   Sure.  So this is a good example of how I said we stacked up all the different evidence sources into a timeline.  So the blue lines on the screen are the same lines that we saw on the prior slide, but now I've added in some of the Footprints logging, which is in purple.  And that shows us that in the minutes just before and during his creation of the Fabric Topology for Astrophel, he was visiting a document on the Google network called "Fabric Topology for Astrophel."  And I've got that highlighted in yellow.

        MR. BOOME:  And, Ms. Sharma, if you could, please.

\\\

BY MR. BOOME:

Q.   What was the next step to -- well, tell us about the next step in your analysis, Mr. Crain.

A.   So the next step --

Q.   I'm sorry.  After identifying the source document and the note file that it corresponded to, what was next for your analysis?

A.   So the next step, then, is to try to look at these documents side by side, that is, the Apple Note with the name Fabric Topology for Astrophel and that Google source file with the same name, to try to see what are the similarities between the two documents.

So I've just excerpted here a screenshot on the left-hand side of the Apple Note from Mr. Ding's Google-issued MacBook of that Fabric Topology for Astrophel note, which I believe is Trial Exhibit 514, and then, on the right side, the Fabric Topology for Astrophel document that was on the Google source repository.  And I got that, Trial Exhibit 53 there noted at the bottom.

Q.   And just to be clear, the image on the left is from Mr. Ding's Apple Notes file that your team found on his laptop --

A.   Correct.

Q.   -- his Google laptop?

And on the right-hand side is the alleged trade secret

file that you got from the Government?

A.   Correct, as stored on the Google network.

Q.   As stored on the Google network.

Okay.  And we're back in...

After going to internal Google documents and copying information into Apple Notes, what was the next step for these documents for Mr. Ding?

A.   So then, as I mentioned in the sort of summary of my opinions, Mr. Ding exported copies of many of these Apple Notes out of the Apple Notes program into PDF copies.

And so we can know this because of the Santa logs.  And I've got an excerpt of that here.  The Santa log is showing us that these PDF files are being written, or created, at the times indicated in the left-hand column.

So here, I'm showing some from April 16th, 2023.  And it's the PDF file that you can see in the rightmost column which has its folder path leonding, his profile, his documents folder, a Notes subfolder and other subfolders, and then sort of the final component of that is the file name of the PDF that's being created.

Q.   And so this folder structure and the documents inside them, where were those living before Mr. Ding deleted them?

A.   Those were living on his Google-issued MacBook.

Q.   Okay.  What did he do next?

A.   So then the next step was for Mr. Ding to upload these

PDFs from his Google-issued MacBook to his personal Google Drive account associated with the address linweidin@gmail.com.

Q.   Where did you get that information?  How were you able to determine that that's what happened?

A.   So we determined that from two sources.  One is WebProtect, that logging I talked about that tracks essentially uploads off of the Google laptop.  That's pictured in the box in the center of the screen where we see a file upload happening, again, at the date and time indicated in the leftmost column, going to drive.google.com.  And then we can see in the right side what's being uploaded, Fabric Topology for Astrophel.pdf.

That evidence is then also separately corroborated by metadata that lives in Mr. Ding's personal Google Drive account.  That's what's called JSON metadata.  And I have that pictured in the black box in the upper right.  But those two things essentially corroborate each other.

Q.   Can you give us a quick primer on what metadata is and what it shows, at least as it pertains to your analysis here?

A.   Sure.  Metadata is just a fancy word that means data about data, and it's -- maybe to use an example, if I had a copy of my resume, the metadata of my resume would include things like its file name, its size, its hash value, the folder it's stored in, the date it was created, the date it was modified, et cetera.

Q.    Thank you.

Okay.  I want to ask you about this slide.  If you could walk us through the table that you've created here and explain for the members of the jury what it shows.

A.    Sure.  So this table just tallies the number of files -- I should say the number of PDF files uploaded from Mr. Ding's Google-issued laptop to his personal Google Drive account. And, again, this comes from the WebProtect logging.

Q.    Focusing particularly on the 105 alleged trade secret files in this case, were you able to determine where in Mr. Ding's personal cloud account those files were stored?

A.    Yes.  The 105 alleged trade secrets were uploaded to two folders inside of Mr. Ding's personal Google Drive account, one called "Comp" and one called "Comp2."

Q.    And what does this table show with regard to those subfolders?

A.    So this is similar to the table on the prior slide, but now we're focusing just on the Comp and Comp2 folders in his personal Drive account, and so we're showing the count or the tally of files uploaded by month and year to those two subfolders.

Q.    And can you explain the further breakdown here, Mr. Crain?

A.    So here, I've just broken it out to highlight the days on which the larger volumes of uploads occurred, and we just see some dates there in the spring and summer of 2022, as well as

some dates in spring of 2023.

Q.   And with particular focus on the alleged trade secret files, what have you shown us here?

A.   So this is very similar to the prior slide, but now just focused on the 105 alleged trade secret documents, showing the dates that they were uploaded to Mr. Ding's personal Google Drive account and the count or tally by day.

Q.   And so just to be clear -- I'm going back to the previous slide -- the alleged trade secret files, are they among this group of files that are stored in Comp and Comp2?

A.   Exactly.  They're within that larger total that got uploaded to Comp and Comp2.

Q.   I want to ask you about your analysis of some of the statistics related to these PDF note files that you analyzed.

Can you walk us through this slide, please?

A.   Sure.  So I just did some further tallying on what's contained essentially within these documents that got uploaded to the Comp and Comp2 folders in the personal Google Drive account.  So in total, those documents were 14,721 pages.  And if we limit that just to the 105 alleged trade secret documents, that totaled 2,425 pages.

And then in the bottom part of the slide here, I've just tallied the number of screenshots that were embedded into those files.  We talked a little bit earlier about the screenshot embedding.  So at the total of files uploaded to Comp and the

Comp2 folders, we had 4,374 screenshots and, within the 105

alleged trade secret files, 655 screenshots.

Q.   Okay.  I want to ask you now about December of 2023.  Tell us what happened then to these files.

A.   So on December 14th of 2023, the Comp and Comp2 folders from Mr. Ding's personal Google Drive account were downloaded to his personal MacBook.  And we know this from basically the browser history records on the personal MacBook, as well as, again, metadata contained in the personal Google Drive account.

Q.   And what files specifically, what groups of files did Mr. Ding back up to his personal computer?

A.   So the download of the Comp and Comp2 folders from the personal Google Drive account to the personal MacBook contained 1,255 PDF files, which included all of the 105 alleged trade secrets.

Q.   Did Mr. Ding delete the 1,255 PDFs and 105 alleged trade secret files from his cloud account when he downloaded them to his personal computer?

A.   No.

Q.   Did you see evidence of any other materials on December 14th, 2023, also being downloaded to his personal computer along with the alleged trade secret files and the rest of Comp1 and Comp2?

A.   No.  The only thing I saw being downloaded was the Comp and Comp2.

Q.   No evidence that this was a backup of the entire cloud account?

A.   I did not see that.

Q.   Just these two folders?

A.   That's correct.

Q.   Okay.  Fast-forwarding now, Mr. Crain, to December 29th, can you tell us what your analysis shows about that date?

A.   Sure.  So as I mentioned in the sort of summary of the opinions I developed, the Santa logs show that on December 29th, 2023, Mr. Ding deleted the PDF copies of his Apple Notes from his Google-issued MacBook.

Q.   In the next series of slides, Mr. Crain, you've created some visualizations of some of the steps in the process that you've told us about, including the note creation, uploads, and downloads and deletions.

Can you walk us through what this kind of EKG-looking graph shows?

A.   Sure.  This one just shows in that EKG format, if you will, the volume of Apple Notes being created by week from the period of August 2019 through December 2023.

And I should clarify.  This is the creation of Apple Notes that ultimately became part of the Comp and Comp2 folders in his personal Google Drive account.

Q.   The folders where the Google-related files were stored?

A.   Correct.

**Q.**   Okay.  Can you walk us through this visualization, Mr. Crain?

**A.**   Sure.  So here, we're looking at several different activities that I've described, from uploading, downloading, and deleting on, essentially, a bar graph format.  So the blue rectangles showing when the PDFs were being uploaded, and, again, we see those dates in spring and summer of 2022, as well as the dates in spring of 2023.  And I've just called out in the gray boxes what the volumes were on some of those days.

And then as we move to the right-hand side of the graph, the cylinder showing the download event on December 14th to the personal MacBook and then, finally, the red triangle on December 29th showing the deletion of the PDFs from the Google-issued MacBook.

**Q.**   For the download cylinder, download from the cloud to his personal computer, we see 1,255 files, but we see about 509 deletions.

Were you able to determine or make sense of the difference in the number of files there?

**A.**   Yes, I was.  Mr. Ding was issued a new laptop by Google in about May of 2022, so the 2022 uploads and PDF creation took place on his older Google-issued MacBook, whereas the 2023 activity took place on the newer, newly issued Google-issued MacBook.  So when we came to December of 2023, not all of those PDFs were even on that computer.  About half of them were on

the computer, the 509 and the 50 alleged trade secrets.  So that's what got deleted at that time.

Q.   Mr. Crain, can you remind us, when was the date on which the defendant uploaded from his Google computer to his cloud account the last alleged trade secret file?

A.   I believe that date is April 17th, 2023.

Q.   And were you asked to analyze -- starting from April 17th and going forward until December 29th, were you asked to analyze Mr. Ding's continued Apple Note creation on his Google MacBook?

A.   Yes, that was something that we looked at.

Q.   Can you walk us through that analysis and tell us what this graph means?

A.   Sure.  So here again, in the EKG format, we're showing the volume of Apple Notes that are being created or modified from the date April 18th, 2023, until the end of December 2023.  So we're looking at this Apple Note activity on the Google-issued MacBook after that last upload event you asked me about.

Q.   The tallest peak here, about what date is that occurring approximately?

A.   Mid-September of 2023.

Q.   And over on the left, there's a series of numbers.  What do those numbers mean?

A.   That's the volume.  The vertical axis is the volume of files being created or modified.

Q.    In kind of plain English, what does this peak mean here in terms of the date and the numbers of Apple Notes that are being created or modified?

A.    It means around that week of September 18th, there was on the order of 170 Apple Notes created.

Q.    And have you tallied the totals here for us in a simpler way?

A.    Yes.  So, again, focusing on that period from April 18th, 2023, and later, we saw that 1,322 Apple Notes were created and 1,349 Apple Notes were modified.

And in the bottom of the screen, I've just broken that out with a specific focus on December of 2023 and some very specific dates at the end of December 2023, showing the number of notes created and the number of notes modified.

Q.    Before we move on from this slide, can you clarify for us the distinction and the overlap between creation date and modified date for these Apple Notes?

A.    Sure.  So just to use an example, if I were to create an Apple Note today, its creation date would be today and its last modification date would be today.  If then tomorrow I made some more changes to that Apple Note, its created date would still be today, but now its last modification would be tomorrow.

So there's overlap between these two things; that is, all of the 1,322 notes created in this period were also last modified; or we could probably explain it more simply by saying

that the 27 difference between the numbers, those were notes that were created before April 18th but then got modified in this time window.

**Q.** Thank you.

Okay. Let's go through a quick example of the methodology that Mr. Ding used for the continued note creation.

Can you walk us through this example, please?

**A.** Sure. So this is going to follow the exact same methodology that we looked at earlier with the "Fabric Topology for Astrophel" note. Now we are looking at a note called "Ghostfish Software Review for Planning Entry," and we see from the Apple Notes database that it was created on December 28th, 2023, some screenshots were taken in the couple of minutes following that that are embedded in the note, and then the note is last modified.

**Q.** Sorry. I jumped the gun.

**A.** It's okay. It's about an eight- -- seven- to eight-minute window for the creation and screenshot embedding and last modification of that particular Apple Note.

**Q.** Okay. And the next step in your analysis, identifying the Google source document for this note?

**A.** Yep. So same as the prior one we looked at, now we look at the other sources of evidence, again, chronologically stacked with the Apple Notes evidence. And we are looking at the exact same blue lines on the screen that we saw on the

prior slide, but now we've, again, folded in log entries from the Footprints log that show when Mr. Ding is visiting a file called "Copy of Ghostfish Software Review" on the Google network.

MR. BOOME:  And, Ms. Sharma, last one.

BY MR. BOOME:

Q.   Did you compare the Google source file Ghostfish Software Review to an Apple Notes file that you found on Mr. Ding's computer?

A.   Yes.  So, again, just like we talked about in the prior example, now we do a side-by-side comparison.  So on the left-hand side of this slide, we see an excerpted portion of the Apple Note with that name, Ghost- -- excuse me -- Ghostfish Software Review for Planning Entry, Trial Exhibit 656; and on the right-hand side we have an excerpted portion of the document Ghostfish Software Review for Planning Entry from the Google network, Trial Exhibit 74.

Q.   And, again, this happened, Mr. Ding created this note on December 28th, 2023?

A.   Correct.

Q.   What happened with regard to his access to the Google network the following day?

A.   My understanding is that his access to the network, and subsequently his access to his Google-issued MacBook, was cut off on December 29th.

**MR. BOOME:**  Thank you, Ms. Sharma.  We're done with that.

**BY MR. BOOME:**

Q.   Okay.  Mr. Crain, I want to change gears now.  We're going to move away from the Apple Notes and the PDF creation.  I want to ask you about one particular video file that you were asked to analyze called "InfiniCompute Demo."

Can you tell us what type of file this is and what you were asked to analyze with regard to this particular file?

A.   Sure.  So this file is what's called an MP4 file, and I have the file name at the top of the slide.  That's a video file.  It's a compressed format, so it's an audio-video. You know, could be a movie or a video.

So we were asked to analyze specifically the Google Drive metadata -- I should clarify -- the metadata from Mr. Ding's personal Google Drive account about this video, and then also see what else we could understand about this video from the other sources of evidence that we had.

Q.   Can you walk us through the steps in your analysis in kind of tracking this video's history and access over time?

A.   Sure.  So I've laid this out in timeline format again.  So the first finding was that on August 19th, 2023, at the 06:54 timestamp, the video by this name was uploaded to Mr. Ding's personal Google Drive account.

Q.   Where did you -- what information did you look at to

determine that, and were you able to tell where it came from?

A.   That finding comes from the WebProtect logging which, again, is tracking data uploaded from the Google-issued MacBook.  So this file came from Mr. Ding's Google-issued MacBook.

Q.   Okay.  And what happened August 19th at 6:58?

A.   So about four minutes later, the upload process completes, and now the file is stored in his personal Google Drive account.  We find this -- we found this second bullet point in the metadata that comes from his personal Google Drive account. And at the time that the document is uploaded, it's classified as private or its sharing permissions are set to "PRIVATE."

Q.   What does that mean?

A.   It just means that at that point, only the owner of the account -- in this case, Mr. Ding -- would be able to view that video file.  It's private to his account.

Q.   Okay.  What happened about two minutes later?

A.   So the Google Drive metadata then shows us, two, two and a half minutes later, the permissions on the video file were changed and it's changed to something called "ANYONE_WITH_LINK," which is essentially a public document or a public video at that point.  It'll be assigned a sharing URL, and anyone with that link can now view the video.

Q.   How does somebody -- so this is stored in Mr. Ding's personal Google account.  How can somebody use a link to see a

video that's stored in Mr. Ding's account?

**A.**   Mr. Ding could give that link to someone, or just as a more just generic example, like if I had a document like this, I could put it on my website or publicize it any way that I wanted.

**Q.**   And that's a functionality that exists in Google Drive?

**A.**   Correct.

**Q.**   You told us that the permission was changed from private to anyone with link.  Based on what you understand about the way the Google Drive permission structure works, who can -- who's allowed to change a private file to anyone with link?

**A.**   Most specifically, the owner of the file.  So in this case, that would be Mr. Ding.

**Q.**   And can you take us forward about four minutes.

**A.**   Sure.  So then the metadata from Mr. Ding's personal Google Drive account recorded that the video had now been viewed, but it was viewed using Mr. Ding's work-issued account, leonding@google, not his personal account.  So this is consistent with testing whether the permission change worked and could -- the video could, in fact, be viewed by someone other than his personal account.

**Q.**   I'm going to ask you about something that you observed regarding miracleplus.com.

**A.**   So a couple of minutes later, we see browser activity to several URLs at the domain miracleplus.com.

**Q.**   Where did you look in the logging to determine that there was browser activity to miracleplus.com?

**A.**   That came from the WebProtect logging, which, again, tracks the uploads.  So I've excerpted here just some lines from WebProtect that, again, show the date in the far left, August 19th.  We see the upload of the file as the first line in what I've excerpted.  And then we see visits to apply.miracleplus.com where, in that middle line, WebProtect has recorded the transmission of text data to that -- to that website.  Excuse me.

**Q.**   Do I understand correctly, Mr. Crain, that the first row on this WebProtect excerpt is the video going from the Google computer to the personal Drive account?

**A.**   You have that correct.

**Q.**   And the next two are text being entered from Mr. Ding's Google computer to apply.miracleplus.com?

**A.**   Correct, as that computer visited that website.

**Q.**   Okay.  Okay.  What was the next step in the timeline, Mr. Crain?

**A.**   So a couple of minutes after that, at 7:10 on August 19th, we have an Apple Note, again back on Mr. Ding's Google-issued laptop, being modified; and notably, that Apple Note now contains the sharing link to the video as stored in his personal Google Drive account.

**Q.**   What does this slide show?

**A.**   So this is an excerpt of a translated copy of that Apple Note that I was just describing, Trial Exhibit 1170.  And I've used this arrow here to show this is the sharing link.  And what you've just highlighted in a red box, that's the document identifier, the unique document identifier for this video file as stored in Mr. Ding's personal Drive account.

**Q.**   So if you clicked on this link, it would take you to the InfiniCompute demo video --

**A.**   That's correct.

**Q.**   -- in Mr. Ding's personal cloud account?

**A.**   That's correct.

**Q.**   And, again, this note file was saved where?

**A.**   The note file was on his Google-issued MacBook.

**Q.**   Okay.  What's the next step in our timeline, Mr. Crain?

**A.**   So, now, a couple of days later, on August 22nd, the metadata from Mr. Ding's personal Google Drive account where this video is stored recorded that the file was viewed by a different user, someone named Xuwen Cao.

**Q.**   And our final step.

**A.**   So then on November 27th, we had another viewing event, again recorded in the metadata of Mr. Ding's personal Drive account, that Xuwen Cao viewed the video again.

**Q.**   Based on your analysis and the timeline that you just walked us through, what is your opinion regarding how the person identified as Xuwen Cao was able to view the

InfiniCompute video stored in Mr. Ding's personal cloud account?

**A.**   Obviously, I don't have Mr. -- Mr. or Ms. Cao's computer, but I think the most likely explanation is that they would have the URL, the sharing link.

**Q.**   The sharing link that we saw from the note on Mr. Ding's computer?

**A.**   Correct.

        **MR. BOOME:**   Okay.   Thank you, Ms. Hernandez.   We are done with the demonstratives.

        Can I ask you now, please, to bring up, just for Mr. Crain and the parties and the Court, 767 and 768.

        Thank you.   We can do one at a time.

**BY MR. BOOME:**

**Q.**   So, Mr. Crain, do you recognize 767 --

        **MR. BOOME:**   Is it actually possible to do them side by side?

**BY MR. BOOME:**

**Q.**   I think you know what's coming, so, Mr. Crain, you can take it away.   And can you tell us at a high level whether you recognize these and what they are?

**A.**   Yes, I recognize them.   These are exhibits to the report that I prepared in this matter.   They're very similar.   The one on the right is essentially a consolidation of all of the metadata and dates for the 105 alleged trade secret documents.

And then on the left is the same thing with the addition of some extra Apple Notes.

To clarify, on Mr. Ding's Google-issued laptop, he sometimes created multiple copies of -- or I should say multiple notes with the same name, and so I've just called -- they're not really duplicates because the content is sometimes different, but they're what I called duplicate names.  So the one on the left just adds in where there were any duplicate names to one of the 105 alleged trade secrets.  Those are also listed.

**Q.**   Okay.  Did you create both of these exhibits, 768 and 767?

**A.**   Yes.

**Q.**   And what information did you use to compile and summarize in these two exhibits?

**A.**   The same stuff we've been talking about.  So maybe we want to kind of scroll out to the right, we'll see Column B is when the note was created -- again, that comes from the Apple Notes database on his Google-issued MacBook -- when the Apple Note was last modified, when the Apple Note was last opened.  So those all come from the Apple Notes database.

Column E, when the PDF copy of that note was created, we obviously got that from the Santa logs.

Column F, when the PDF was uploaded to the personal Google Drive, that's WebProtect and the metadata from the personal Drive account.

And then, finally, Column G, when the PDF was deleted, again, drawn from the Santa logs.

Q.   Sort of the full life cycle of each alleged trade secret file from start to finish?

A.   Yeah.  It's trying to basically be able to see everything on one page.

MR. BOOME:  Your Honor, the Government offers 767 and 768 as summary exhibits.

MR. RAPP-KIRSHNER:  No objection.

THE COURT:  Admitted.

(Trial Exhibits 767 and 768 received in evidence.)

BY MR. BOOME:

Q.   And we're not going to go through both of them in detail, but I just want to ask you to help us understand better the duplicate note concept.

MR. BOOME:  So if we could pull up just 768, please, Ms. Hernandez.

BY MR. BOOME:

Q.   And now that the jury can see it, would you mind just giving them a quick orientation to what each column shows?

A.   Sure.  So the name of the note is in Column A.

And we can look down at lines 6 and 7 to see an example of what I meant with the duplicate names.  We have two notes with the same name.  And so inside the Apple Notes database, there's actually what's called a record ID.  It's kind of a unique

identifier for that Apple Note.  I appended the record IDs in brackets so that we could distinguish which one we're talking about or which dates go with which ones.

And then the rest of the columns are, like I described earlier, talking about when the note was created, modified, opened, when the note got PDF'd, when it got uploaded, and then, ultimately, when it got deleted.

**MR. BOOME:**  Thank you, Mr. Crain.

No further questions, Your Honor.

**THE COURT:**  Okay.  Any cross-examination?

**MR. RAPP-KIRSHNER:**  Yes, Your Honor.

#### CROSS-EXAMINATION

BY MR. RAPP-KIRSHNER:

Q.   Good morning, Mr. Crain.

A.   Good morning.

Q.   My name is David Rapp-Kirshner.  I am an attorney for Mr. Ding.

A.   Nice to meet you.

Q.   Mr. Crain, you're being paid as an expert witness by the Government; correct?

A.   Correct.

Q.   And the Government is paying you over $700 an hour for your work on this case; is that right?

A.   You have the rate correct.  I would clarify, they pay my firm that amount, not me.

Q.   Where you're a managing director; correct?

A.   Correct.

Q.   How much have you billed to date on this case?  Just a rough estimate.

A.   I would estimate between 200 and 250,000.

Q.   You're being paid as an expert witness by the Government, but you've worked for Google in the past; correct?

A.   I have done some other projects for Google in the past, yes.

Q.   You've represented Waymo, for instance, in the trade secret case *Uber vs. Waymo*; correct?

A.   I would not think that I represented them, but, yes, I did testify on that side of the case.

Q.   You were retained by Waymo?

A.   That's correct.

Q.   And Waymo is owned by Google; correct?

A.   I don't know the exact ownership structure.  It's certainly affiliated with.  It may be owned by.  I don't know.

Q.   Do you recall how much you billed to Google in that matter?

A.   I don't.  That was almost ten years ago.

Q.   Berkeley Research Group, that's a large global consulting firm; correct?

A.   That's correct.

Q.   Berkeley Research Group has over 40 offices worldwide; is

that correct?

A.    That sounds right.

        MR. RAPP-KIRSHNER:  Mr. Jay, can we please turn to Exhibit 764.

BY MR. RAPP-KIRSHNER:

Q.    Mr. Crain, are you familiar with this exhibit?

A.    Yes.  This is a report exhibit.

Q.    This appears to be Exhibit H to your initial disclosures; is that correct?

A.    I think that's right.

        MR. RAPP-KIRSHNER:  I'd like to move to admit this.

        MR. BOOME:  No objection.

        THE COURT:  Admitted.

    (Trial Exhibit 764 received in evidence.)

BY MR. RAPP-KIRSHNER:

Q.    So these tables purport to show the storage of uploads to Mr. Ding's personal Google Drive; correct?

A.    I think that's right.  I don't remember this exhibit perfectly from memory but...

    Can we go to the top so I can see the bold?

    Yeah, so this is just an item count by subfolder within the account on the left and then with a narrowing towards the alleged trade secrets on the right.

Q.    Got it.

    So the table on the left shows the total number of uploads

in each folder; correct?

A.   Yeah, correct.

Q.   And then the table on the right shows the total number of alleged trade secret documents within each folder; correct?

A.   Correct.

MR. RAPP-KIRSHNER:  Mr. Jay, could you scroll down to a row that says "Comp\TopDocs" on the left.

BY MR. RAPP-KIRSHNER:

Q.   It says there, there are 16 documents in that folder; correct?

A.   Correct.

Q.   And that's, again, the total amount of documents in that folder; correct?

A.   That should be, yes.

MR. RAPP-KIRSHNER:  And then, Mr. Jay, could you turn to the column on the right for the same folder, again, "Comp\TopDocs."

BY MR. RAPP-KIRSHNER:

Q.   And that says 21; correct?

A.   It does.

Q.   So there are 21 alleged trade secrets in a folder that contains only 16 documents?

A.   Yeah.  Something's going on there.  I don't know what's going on there.

Q.   So that's an error?

**A.**    It might be.  I don't exactly know what's going on there.

**Q.**    Are you aware of any other exhibits containing an error?

**A.**    No.

**Q.**    Mr. Crain, are you aware that Mr. Ding began working at Google on May 13th, 2019?

**A.**    That sounds correct.

**Q.**    And he created his very first Apple Note on his Google-issued MacBook that very same day; correct?

**A.**    I think that's correct.

**Q.**    That note was entitled "Work Tools"?

**A.**    That, I don't know from memory.

        **MR. RAPP-KIRSHNER:**  Mr. Jay, could you pull up Exhibit 769.

**BY MR. RAPP-KIRSHNER:**

**Q.**    Do you recognize this exhibit?

**A.**    Yes.

**Q.**    Is this Exhibit M to your initial disclosures?

**A.**    It looks like it.

**Q.**    And it reflects all Apple Notes recovered from Mr. Ding's two corporate-issued laptops; correct?

**A.**    I believe it would just be the first -- or, excuse me -- the second laptop.  I didn't examine the first laptop.

        **MR. RAPP-KIRSHNER:**  I'd like to move this into evidence.

        **MR. BOOME:**  No objection, Your Honor.

**THE COURT:**  Admitted.

(Trial Exhibit 769 received in evidence.)

**MR. RAPP-KIRSHNER:**  Mr. Jay, could you filter --
apologies.  Could you filter Row C from oldest to newest.

**BY MR. RAPP-KIRSHNER:**

**Q.**   So this reflects that there were notes from 2019, so
presumably this also includes his initial Google MacBook.  Is
that safe to say?

**A.**   I think that's safe to say.

**Q.**   And so you confirmed that his first note was created on
his very first day at Google on 5/13/2019; correct?

**A.**   Correct.

**Q.**   And it says there that note was "Work Tools"; correct?

**A.**   I see that, correct.

**Q.**   And then he created another one called "Work Accounts";
correct?

**A.**   Looks like two days later, yes.

**Q.**   Okay.  I'm going to turn to Exhibit 767, but I think it's
easiest if I grab my laptop for this.

Mr. Crain, do you see that in front of you?

**A.**   I do.

**Q.**   And you testified about this chart on direct; correct?

**A.**   Correct.

**Q.**   Could you please remind the jury what this chart shows?

**A.**   This is a compilation of the metadata and dates for the

105 alleged trade secrets.

Q.   Great.  I'm going to now sort this from oldest to newest.

All right.  It looks like it already is.

Mr. Crain, according to this table, the first alleged trade secret document was created on December 4th, 2020; is that correct?

A.   Correct.

Q.   And that was over three years before Mr. Ding was terminated from Google; correct?

A.   Just -- yeah, just a little more than three years.

Q.   So now I'm scrolling to the bottom, which would be the latest-in-time note created, and that reflects a date of April 14th, 2023; is that correct?

A.   Correct, the bottom line.

Q.   And, again, that's over eight months prior to when he was terminated from Google; correct?

A.   Correct.

Q.   Mr. Crain, are you aware the Government alleges that Mr. Ding began corresponding with a company called Rongshu in May of 2022?

A.   I've -- I'm familiar with the Rongshu.  I didn't know the date.

Q.   Isn't it true that over half of these notes were created before May 2022?

A.   I'm sorry.  You said that the Rongshu communications were

May of '22?

Q.   Correct.

And, sorry.  It might not be -- or, yeah.  Yes, over half of them were created before May of 2022; is that correct?

A.   That looks -- I see, sort of looks like 56, 57.  That's, like, the break, depending on when in May, so on the order of half.

Q.   And Mr. Ding isn't alleged to have actually started working at Rongshu until October 2022; correct?

A.   Again, I didn't know that date.

Q.   You state it in your initial disclosures; correct?

A.   I may.  I didn't recall that date from memory.

Q.   Mr. Ding created 89 of the 105 alleged trade secret documents before October 2022; correct?

A.   I would need to count it up, but I'm not disputing that.

Q.   So I highlighted that, and if you can see at the bottom of the screen there, it says, "Count:  89"; correct?

A.   I see that, correct.

Q.   So that would reflect 89 of the 105 documents were created before Mr. Ding started work at Rongshu; correct?

A.   I follow you.  Correct.

Q.   And you testified earlier that the final alleged trade secret document was created on April 14th, 2023; correct?

A.   Yeah.  We looked at that a moment ago.

Q.   And that predates Mr. Ding's time at a company called

Zhisuan; correct?

A.    Again, I don't remember the date that he started Zhisuan from memory, so maybe you could help me there.

Q.    It was roughly around that time.

So let's say, he created no new notes after May of 2023; is that correct?  Apologies.  No new trade secret documents after May of 2023; is that correct?

A.    I think that's correct, with, obviously, April 14th being the last one.

Q.    You testified that Mr. Ding exported certain notes as PDFs; correct?

A.    Correct.

Q.    And the last time he exported any note as a PDF was roughly in the spring of 2023; correct?

A.    I guess I don't know that from memory.  Certainly, the last time he exported PDFs that got uploaded to his personal Drive account, that would be correct.

MR. RAPP-KIRSHNER:  Mr. Jay, could you please pull up Exhibit 759.

BY MR. RAPP-KIRSHNER:

Q.    Mr. Crain, do you recall this document?

A.    Yeah.  This looks like Exhibit C to my opening report.

MR. RAPP-KIRSHNER:  I'd like to move to admit this document.

MR. BOOME:  No objection.

THE COURT: Admitted.

(Trial Exhibit 759 received in evidence.)

MR. RAPP-KIRSHNER: Mr. Jay, if you could sort the first column there, "Time," from newest to oldest, or perhaps Z to A might work.

BY MR. RAPP-KIRSHNER:

Q. So does this accurately reflect the last time Mr. Ding exported these -- any -- strike that.

Does this accurately reflect when Mr. Ding exported -- last exported any note as a PDF?

A. I believe so.

Q. So the last time he exported any note on his Google-issued laptop to a PDF was April 16th, 2023; correct?

A. I think that's correct.

Q. You testified that Mr. Ding continued creating notes up through December 2023; correct?

A. Correct, in the Apple Notes program.

Q. In fact, you had an entire slide on that; correct?

A. Yes.

Q. I believe it was Slide 29.

MR. RAPP-KIRSHNER: Ms. Hernandez, is there any way you could pull up Slide 29, please?

BY MR. RAPP-KIRSHNER:

Q. This would be the slide; correct?

A. I guess.

Q.   And, again, this reflects notes created by Mr. Ding within the Apple Notes application on his Google-issued MacBook from April 2023 to and through December 2023; is that correct?

A.   Correct, with the clarification of April 18th specifically.

Q.   None of these notes that are contained in the slide are being asserted as trade secrets; correct?

A.   That's my understanding; that's correct.

Q.   None of these notes were ever uploaded to Mr. Ding's personal Drive; correct?

A.   Correct.

Q.   None of them were even exported as PDFs; correct?

A.   Correct.

Q.   And Mr. Ding never deleted these notes; correct?

A.   That's correct.

Q.   They existed entirely in the Notes application within his Google-issued MacBook; correct?

A.   That's correct.

Q.   Mr. Crain, you examined forensic evidence from Mr. Ding's personal Google Drive account; correct?

A.   Yes.

Q.   And part of that metadata that you examined was "Viewed by me" date?

A.   Correct.

Q.   That reflects the last time a document was viewed within

Google Drive; correct?

A.   Correct.

Q.   Am I correct that the metadata is -- for that "Viewed by me" column is automatically populated whenever a document gets uploaded to Google Drive?

A.   I think that's right.  Like, sometimes you'll see it just match the upload date.

Q.   And that doesn't indicate that the document was necessarily opened in Google Drive, but it corresponds with the upload in that particular instance; correct?

A.   I think that's correct.

Q.   So of the 105 alleged trade secret documents, only four of them were actually viewed in Google Drive; correct?

A.   At a time or date later than their upload, that's correct.

Q.   And the latest those four documents were ever viewed in Google Drive was May 9th, 2023; correct?

A.   That date, I don't remember from memory.  Sorry.

Q.   Does that sound about right?

A.   I don't know.  I know that's in my report.  I just -- I don't remember that date out of my head.

Q.   Would showing you your initial disclosure refresh your recollection?

A.   Yes.  I know it's in there.

     MR. RAPP-KIRSHNER:  I believe that is 5952, Mr. Jay.  Could we show that just to the witness, please.

BY MR. RAPP-KIRSHNER:

Q.   Do you have that in front of you?

A.   No.  The screen is black.

Q.   Okay.  We'll come back to that.

Mr. Crain, you also opined and testified that Mr. Ding downloaded the alleged trade secret documents onto his personal MacBook around December 14th, 2023; is that right?

A.   Correct.

Q.   Amongst that download were over a thousand documents; correct?

A.   I believe that number is 1,255.

Q.   So roughly 1,255 documents Mr. Ding downloaded to his personal MacBook, but only 105 of those are being asserted as trade secrets; is that right?

A.   I think that's correct.

Q.   So the majority of those documents he downloaded are not --

THE COURT:  We've established that.  You can move on. You don't need to repeat it.

BY MR. RAPP-KIRSHNER:

Q.   Mr. Ding never transferred an alleged trade secret document once he downloaded that onto his personal MacBook; correct?

A.   Not that I know of.  I did not have a full image of that computer to analyze.  So with that caveat, I'm not aware of

that.

Q.   And you don't have any evidence he definitively even viewed an alleged trade secret document once he downloaded that onto his MacBook; correct?

A.   I don't have that affirmative evidence.  Same caveat, I did not have a full image of the computer to analyze.

Q.   Mr. Crain, are you aware that the Government has grouped the 105 alleged trade secret documents into seven specific groupings?

A.   I think I've heard that.  I don't really know much about that but...

Q.   So you don't know the groupings of those documents?

A.   Certainly not from memory.

Q.   Okay.  Mr. Crain, you testified about a video entitled "InfiniCompute Demo" video; correct?

A.   Yes.

Q.   In fact, you had a slide on that.  I believe it was Slide 46.

A.   I think there was several slides, yes.

        MR. RAPP-KIRSHNER:  Ms. Hernandez, are you able to pull up Slide 46?  Thank you.

BY MR. RAPP-KIRSHNER:

Q.   Is this the correct slide?

A.   This is, I think, the end slide that has everything about that video, yes.

**Q.**   That video doesn't contain any alleged trade secrets; correct?

**A.**   I don't believe the video file is one of the alleged trade secrets.  I don't -- I can't speak to its content.

**Q.**   And you've seen no evidence that this video was downloaded by anyone; correct?

**A.**   That's correct.  I don't think I know that.

           **MR. RAPP-KIRSHNER:**  Mr. Jay, do we have Exhibit 5952?

           Okay.  No worries.

**BY MR. RAPP-KIRSHNER:**

**Q.**   You found no forensic evidence that Mr. Ding ever shared an alleged trade secret document with anyone outside of Google; correct?

**A.**   I think that's correct.  Again, same caveat that I answered a couple questions ago.

           **MR. RAPP-KIRSHNER:**  Thank you.

           No further questions.

           **THE COURT:**  All right.  Any redirect?

           **MR. BOOME:**  Yes.  Very brief, Your Honor.

                    **REDIRECT EXAMINATION**

**BY MR. BOOME:**

**Q.**   Mr. Crain, Mr. Rapp-Kirshner and you discussed just now the fact that Mr. Ding didn't really do much with the alleged trade secret files once they arrived in his Drive account.

           I think you testified he looked at four of them after

downloading them; correct -- uploading them?  Excuse me.

A.   Correct.

Q.   Based on your forensic analysis of all the evidence that you saw, can you outline for the members of the jury the other opportunities that the defendant had to view the exact same information in those alleged trade secret documents?

A.   Sure.  I mean, he could view them on an ongoing basis inside the Apple Notes program on his Google-issued MacBook, he could look at the PDF copies that he created that were stored on the Google-issued MacBook, or he could look at them on his personal MacBook once they were downloaded there.

Q.   When he uploaded them to his personal cloud account, he still had the notes file on his Google computer; right?

A.   Correct.

Q.   And he still had a PDF copy of those Notes files on his Google computer; right?

A.   Correct.

Q.   And under normal circumstances -- talking about the PDFs now on his Google computer.  Under normal circumstances, would you be able to see whether -- from metadata, whether those PDF files were opened and viewed by Mr. Ding?

A.   Yes.  So his Google-issued computer was a Mac, and the Mac, in its search index, something called Spotlight stores a metadata value called "Last Opened."  So that's what we primarily look at to understand, you know, if a document has

been opened and viewed and when.

Q.    Were you able to look at that last opened metadata field for the 509 files, including 50 alleged trade secret files, that were on Mr. Ding's Google-issued MacBook?

A.    No, because when the PDF files got deleted at the end of December of 2023, the Mac clears out that metadata from the Spotlight index.  So the last opened information goes away when the document is deleted.

Q.    Because Mr. Ding deleted the 509 PDFs, we can't tell whether he opened them --

A.    That's correct.

Q.    -- before he deleted them?

Mr. Rapp-Kirshner started to ask you a question that went something like:  Mr. Ding created no new notes after April 13th, 2022.  And then he changed the question before you answered, limiting the question to only the alleged trade secret files.

I'd like you now to answer the question that he asked you first about whether it is true that Mr. Ding created no new Notes files after April 13th, 2023?

A.    No, that's not correct.  And we talked about that a little bit in my slides, that the Apple Notes -- I should say, Mr. Ding continued creating Apple Notes up through the end of December 2023.

Q.    Where did he get the information that he created those

Apple Notes with right up until December 29th, 2023?

**A.**   Again, by viewing documents in the Google source repositories.  We talked about that with the Ghostfish file in the direct.

     **MR. BOOME:**  Thank you.

     No further questions, Your Honor.

     **THE COURT:**  Any recross?

     **MR. RAPP-KIRSHNER:**  One quick question.

     **THE COURT:**  Go ahead.

                    **RECROSS-EXAMINATION**

**BY MR. RAPP-KIRSHNER:**

**Q.**   Mr. Crain, you just testified about ways Mr. Ding could have viewed notes after uploading them or downloading them; correct?

**A.**   Yes.

**Q.**   You saw no evidence that he actually did that other than those four of the 105 trade secret documents that were viewed on or before May 9th, 2023, in his Google Drive; correct?

**A.**   That's correct.  That's the four that I affirmatively know about.  But we just talked about on redirect that that clue is gone from the Google-issued MacBook, and then, as I answered your prior questions, I did not have a full image of his personal MacBook to analyze.

     **MR. RAPP-KIRSHNER:**  Thank you.

     No further questions.

**THE COURT:**  Okay.  Thank you.

So why don't we take our morning break.  We'll break for 15 minutes and resume at 11:05.  Remember to bring your notepads with you, not to discuss matters with each other, not to do any independent research, and we'll see you at 11:05.

**THE COURTROOM DEPUTY:**  All rise.

(Proceedings were heard out of the presence of the jury.)

**THE COURT:**  Okay.  Anything to discuss?  No?

**MR. BOOME:**  No, Your Honor.

**THE COURT:**  Okay.  See you in a bit.

**THE COURTROOM DEPUTY:**  Court is in recess.

**THE COURT:**  Oh, we figured out during Crain's testimony that we didn't have his initial -- or at least we couldn't find his initial expert -- his initial disclosure.  We had the supplemental, had the rebuttal, but didn't have the initial.

Can you just make sure that you have filed all reports from any experts who are going to be testifying?

**MR. BOOME:**  Yes, Your Honor.

**THE COURT:**  Thanks.

(Recess taken at 10:50 a.m.)

(Proceedings resumed at 11:06 a.m.)

(Proceedings were heard out of the presence of the jury.)

**THE COURT:**  Want to have your witness waiting on the stand?

MR. CHANG:  Sure.

(Witness enters the courtroom and steps forward to be sworn.)

THE COURT:  Hi.  You can go ahead and have a seat, and we'll wait for the jury to come in.

THE WITNESS:  No problem.  Thank you.

(Proceedings were heard in the presence of the jury.)

THE COURT:  Okay.  The Government can call its next witness.

MR. CHANG:  The United States calls Bradley Fuller to the stand.

THE COURTROOM DEPUTY:  Please raise your right hand.

BRADLEY FULLER,

called as a witness for the Government, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.

Please state and spell your full name for the record.

THE WITNESS:  Bradley, B-r-a-d-l-e-y; Fuller, F, as in "Frank," -u-l-l-e-r.

DIRECT EXAMINATION

BY MR. CHANG:

Q.   Good morning, Mr. Fuller.

A.   Good morning.

Q.   Did you previously work at Google?

A.   I did.

**Q.**   When did you leave the company?

**A.**   I left the company this last year, 2025, December 7th.

**Q.**   About a month ago?

**A.**   Yes.

**Q.**   How long were you at the company?

**A.**   I was at the company for over 11 years.

**Q.**   At a high level, can you walk the jury through the various jobs that you had in the 11-plus years at --

**A.**   Absolutely.  I started out as a regional security specialist, moved into a senior specialist, and then after that I moved into investigations, and then I became a senior investigator for the last three years.

**Q.**   How long were you on Google's investigations team?

**A.**   Approximately ten years.

**Q.**   Can you walk the jury through the various jobs that you had in the investigations team?

**A.**   Yeah.  So my original job as an investigator was to look into assets, so stolen items, issues around our campuses, things like people that weren't supposed to be there, et cetera.  I did a lot of investigations in that space.

Then I moved into a new space and became a global investigator, which I looked at global incidents in the cybersecurity space, as well as the physical space.

Following that, I became a senior investigator where I focused on process improvement, improving the overall posture

the company had towards data security, and I worked on the highest level of investigations in the data security space at Google.

Q. You mentioned your last job at the company was senior investigator. How long did you have that title for?

A. A little over two and a half years, coming up on three years.

Q. Approximately how many investigations did you work on during your time at the company?

A. Over 2,000.

Q. Was one of the categories of investigations that you worked on data security or cybersecurity investigations?

A. Yes, it was.

Q. Explain, at a high level, what were those types of investigations at Google?

A. Yeah. So there's two main categories in that space that we look into, number one being leaks of information. That's when someone takes information, not necessarily a document, but takes information and releases confidential information out to the public.

The second is exfiltration. Exfiltration is when data moves off of our domain and goes somewhere else. For example, if you were to take a document and move it into your personal Gmail account that belongs to Google and is confidential --

        (Reporter interrupts to clarify the record.)

THE WITNESS:  If you take a document and then you move it off our corporate systems, our network, and you put it in your personal Gmail account and that document is a confidential or Google-owned document, that is something we look into as that is a violation of our policies.

THE COURT:  Try and speak a little more slowly for the court reporter, please.

THE WITNESS:  Absolutely.

BY MR. CHANG:

Q.   I was about to echo the judge.  Madam Court Reporter gave me a nice look.  If you wouldn't mind slowing down for her benefit.

A.   Absolutely no problem.

Q.   Thank you.

In your decade plus at Google, approximately how many cybersecurity or data investigations did you work on that resulted in the company concluding that an employee was intentionally taking sensitive information from Google?

A.   1 to 2 percent of my investigations.

Q.   Let's turn now to this case.

Are you familiar with a former Google employee by the name of Linwei or Leon Ding?

A.   Yes, I am.

Q.   How do you know Mr. Ding?

A.   I conducted an investigation into some of Mr. Ding's

activity on our corporate network in December of 2023.

Q.   Let's start with the beginning of that investigation.  How did it first come to your attention as an investigator?

A.   Yes.  Our security engineering teams detected that Mr. Ding had moved approximately --

THE COURT:  Slow down a little bit.

THE WITNESS:  -- 66 files off of our corporate system, and I received an escalation from their team and one of our intake teams.

BY MR. CHANG:

Q.   You mentioned that there were 66 files identified.  Were you shared information regarding those 66 files?

A.   Yes.  I was given the titles of those 66 files, I was given whether or not Mr. Ding was leaving the company at the time, and I was given the information -- prior to it coming to me, there's two other teams Mr. Ding interacted with, and I was given those interactions.

Q.   Did you review that information before you started your investigation?

A.   I did.

Q.   You mentioned that you received some information from other teams at Google.

A.   Correct.

MR. CHANG:  I'm going to now have Ms. Hernandez show just to the witness Exhibit 871.

BY MR. CHANG:

Q.   Mr. Fuller, what is this document?

A.   This document is part of the interaction that Mr. Ding had with our intake team.  It is a form that we have our employees fill out when they have moved documents off of our systems.  It gives the employee the opportunity to explain what happened.

Q.   Did Mr. Ding fill out this form?

A.   He did.

MR. CHANG:  Your Honor, Government moves 871 into evidence.

MR. RAPP-KIRSHNER:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 871 received in evidence.)

MR. CHANG:  Ms. Hernandez, let the jury see it, but the text is quite small.  So if you wouldn't mind blowing up the "Business Purpose Question" and "Business Resource Question" portion of the text of 871, please.

BY MR. CHANG:

Q.   All right.  Mr. Fuller, can you explain what these questions and responses are on this form that was sent to Mr. Ding?

A.   Absolutely.  First one being "Business Purpose Question," that is a question we ask employees when the files are moved to say:  Did you have a business purpose for doing this?  Did someone give you permission to move these files?  Was there a

partner that needed these files?  So we're looking for those answers when we ask that question.

The second one is the "Business Resource Question."  This relates to:  What kind of resource is this?  Is this a confidential document?  Is this something that is a public document?

And, again, in this case, Mr. Ding had 66 documents.  So the purpose of these questions was to try and figure out what had moved.

Q.   Okay.  Did Mr. Ding provide a response?

A.   He did.

Q.   Okay.  Do you mind reading his response to the Business Purpose Question?

A.   Yes.

[As read]:

"I want to keep a record of my working experience as an update record.  There are also some of my personal document like my patents in the previous company as a record.  I did not notice any confidential information.  I exposed the data only to myself."

Q.   And then if you could read his response to the Business Resource Question, please.

A.   [As read]:

"I transferred to the my personal Google Drive.

It is not a business resource."

Q.   Okay.  I also would like to direct your attention to the "Notes" portion of this form.

MR. CHANG:  Ms. Hernandez, it's the third-to-last row of Exhibit 871.  Thank you.

BY MR. CHANG:

Q.   It says [as read]:

"Possible infil, hence, was routed to GI."

Just wanted to make sure we explain those terms to the members of the jury.  What's an infil?

A.   An infil, we refer to it as infiltration.  It means that when you join Google, you get a job at Google, you receive a laptop; and when you receive that laptop, you take documents that are owned by you or maybe another company and place them on your laptop, your corporate laptop.

So as far as our investigation route goes, we do not want that to happen.  Google tries to be above reproach, and if we see another company's data enter our systems, we try and get it out immediately.

Q.   Okay.  Is that what's referred to as an infiltration of information?

A.   That's correct.

Q.   Okay.  And why was this flagged as a possible infil in the beginning stages?

A.   Based on our detections, it looked like there were some

documents owned by Mr. Ding.  Plus, when the teams had reached out to Mr. Ding, he had offered that information up, that some of those documents were patents from former companies, two other companies.

Q.   Okay.  There's also an acronym of "GI."  What does that stand for?

A.   That's Global Investigations.  Now we are Security Investigations and Assessments, but that was the name at the time that I interacted with Mr. Ding.

Q.   Okay.  All right.  So this was one of the forms you looked at.

At the time you received this initial information regarding the investigation, had any account restrictions been placed on Mr. Ding's access?

A.   Yes.  Mr. Ding had a CAA access restriction, which means that Mr. Ding had no access to any of our applications.  So if you have a Gmail address, your Google Drive, any of your documents, Mr. Ding was cut off from access to those.

Q.   Prior to the investiga- -- prior to the investigation reaching you, had Google also categorized the seriousness of the investigation?

A.   Yes, they had.

Q.   What was that categorization?

A.   Priority 1, Severity 1.

Q.   What does that mean in plain English?

**A.**   Yep.  Priority 1 means that it is a mid-level escalation. We go from P0 to P3.  We hardly ever see any P3s.  But from P0 -- so this was a mid-level investigation at the time that this investigation was escalated.  That means that we are not aware of any trade secrets; we're not aware of anything that is of high concern at the time of escalation.

**Q.**   I would like to ask you to slow down again for the --

**A.**   Yes.

**Q.**   -- benefit of our court reporter.

Thank you.

All right.  Let's take a look at another document.

        **MR. CHANG:**  Ms. Hernandez, can you please pull up Exhibit 277 just for the witness.

        Okay.  And if you could go to the --

**BY MR. CHANG:**

**Q.**   Well, first of all, do you recognize this document, Mr. Fuller?  What is it?

**A.**   I do.  This is the email thread that our intake team started with Mr. Ding and concludes with me being added.

**Q.**   Okay.  I'd like to direct your attention to the last two pages.

        **MR. CHANG:**  If we could do a split screen, Ms. Hernandez, of pages 5 and 6 of 277 for the benefit of the witness.

\\\

BY MR. CHANG:

Q.   What is this?  What are these last two pages?

A.   These last two pages are some of the questions that were asked by our intake team to Mr. Ding, and then also the conversation between them where it explains the security policies, what data he had transferred.  So it gave him all the information up-front.

Q.   Okay.  You mentioned that you were added to this thread later in time.

A.   That's correct.

        MR. CHANG:  Government moves 277 into evidence.

        MR. RAPP-KIRSHNER:  No objection.

        THE COURT:  Admitted.

    (Trial Exhibit 277 received in evidence.)

BY MR. CHANG:

Q.   All right.  Let's walk through this email, now that the members of the jury have it in front of them.  Let's start with the first email.

    What's going on in the initial outreach to Mr. Ding?

A.   Yeah.  So in the initial outreach, you're seeing our Data Transfer Response and Recovery team reach out to Mr. Ding and let him know that we are reviewing a recent data security incident involving himself.

    It tells him that he's transferred business data, and it gives him the opportunity to review that data and then also

explains and gives the policies to Mr. Ding.  So it gives him the policies and lets him know that all work data is considered non-public, meaning it should not be transferred off of our systems.

Q.   You'll see that --

MR. CHANG:  If we could highlight for a second, Ms. Hernandez, the red text, the "Action Required" portion of the email.

BY MR. CHANG:

Q.   What form is that portion of the email referring to?

A.   That's the form we discussed previously.  That is the form that gives Mr. Ding an opportunity to explain:  again, give that business justification, the business reason, and what kind of resources he transferred.

Q.   That was the form we were just looking at?

A.   That's correct.

Q.   Okay.  If we could go back to the email, please.

Okay.  So we see the email.  And then turning your attention to the second page of -- or page 6 of Exhibit 277, you see some language regarding Google's Data Security Policy.

Is this standard language in an investigation of this sort?

A.   Yes, it is.

Q.   And why is this language included in this script to the employee?

**A.** It's included in the script to the employee because we want the employee to have the opportunity to review our data security policies and be fully -- fulfill their obligations to their confidentiality agreements when they join the company.

**Q.** Was there additional correspondence with Mr. Ding after this initial form email?

**A.** Yes.

**Q.** Okay. Let's look at the next email in this thread.

**MR. CHANG:** Ms. Hernandez, if you wouldn't mind scrolling up, and we'll do a split screen again of pages 3 and 4, and then we'll do 4 and 5, but let's start with 3 and 4.

Thank you.

**BY MR. CHANG:**

**Q.** Mr. Fuller, can you explain to the jury what's going on in the subsequent email in the thread?

**A.** Yeah. So this is, again, the same team reaching out. This is part of that -- part of that thread again. They give Mr. Ding examples of the documents, some of the documents he had transferred to really call out, "Hey, these are probably inappropriate to take," and then they ask him a series of questions following that.

**Q.** Okay. You'll see in the middle of page 3 of the exhibit, there's a number of files there.

**MR. CHANG:** Ms. Hernandez, if you could highlight the portion beginning with "A100" for the benefit of the jury.

BY MR. CHANG:

Q.   What are these list of documents here?

A.   Yeah.  So these documents are from presentations, process documents, mail that Leon had received.  There's also Moma pages, which contain employee information, employee data, like their desk space, their phone number, things like that.

Q.   Did Mr. Ding respond to this email with some responses?

A.   Yes, he did.

Q.   Okay.  I won't walk you through all of them, but let's look at the second part of the email.  Again, you see there's some language about Google's data security policies and classifications.

Is this standard language in these types of investigations?

A.   Absolutely.

MR. CHANG:  And then if you could turn to page 5 of Exhibit 277, Ms. Hernandez.

Okay.  Ms. Hernandez, if you could highlight the top portion of the email through -- yes, thank you.

BY MR. CHANG:

Q.   All right.  The question reads [as read]:

"After reviewing this information and the data, does that data that you transferred (or attempted to transfer) include any work-related data?"

Did Mr. Ding provide a response to that question in his

email?

**A.**   He did.

**Q.**   What was his response?

**A.**   [As read]:

"No.  After checking them, they do not contain the workforce data or confidential data."

**Q.**   Okay.  All right.  Let's walk through what happens next after this email.

**MR. CHANG:**  Ms. Hernandez, if you could turn to page 2 of Exhibit 277.

**BY MR. CHANG:**

**Q.**   You'll see an email from Mr. Ding where he writes [as read]:

"It seems that I have the access rights issue and they are blocked by the security team."

This is on December 6, 2023.  Was this before this had been escalated to you or shortly before it had been escalated to you?

**A.**   That's correct.

**MR. CHANG:**  Okay.  All right.  Let's move up to page 1 now, Ms. Hernandez.

**BY MR. CHANG:**

**Q.**   Then you see your email added on December 6.  Was this around the time you got this investigation assigned to you, so to speak?

**A.**   Yes.

**Q.**   Okay.  What did you do first when this investigation was assigned to you?

**A.**   First thing I did is I reviewed the materials involved with the escalation, and then I reached out to Mr. Ding directly.

**Q.**   You mentioned that you received some WebProtect logs as part of that initial escalation.

Can you explain to the jury exactly what you received?

**A.**   Yeah.  So I received a spreadsheet that had the list of documents, the size of the documents.  It basically detects and shows what went out of our systems, what was uploaded out of our systems via the Web.

**Q.**   Are you familiar with the WebProtect system at a high level?

**A.**   I'm not an engineer, but at a very, very high level, I am.

**Q.**   Okay.  Was it standard for you to receive a WebProtect log in an investigation like this one?

**A.**   Yes.

**Q.**   Why didn't you go back and look at all of Mr. Ding's historical WebProtect activity?

**A.**   We don't do fishing expeditions at Google.  So I want to make it very clear, we trust our employees.  We start from a place of trust for every investigation we do.  We assume best intent and then we work from there.

So when we receive an escalation, we review that escalation with the employee.  Many times, as I had mentioned previously, the 1 to 2 percent that we see, a lot of them are benign.  We look at them, we talk to the employee, we get a reasonable explanation back, a trustworthy explanation back, and we close the case.

Q.   Okay.  All right.  So you reach out to Mr. Ding on the 7th.  Were you able to get in touch with him?

A.   Originally, no.  It took some time, but Mr. Ding eventually reached out to me after I set up a calendar invite.

MR. CHANG:  Ms. Hernandez, can you show Exhibit 278 just to the witness.

BY MR. CHANG:

Q.   Mr. Fuller, what is this?

A.   This is the calendar invite I sent Mr. Ding.

Q.   Did he accept?

A.   Not initially, but he eventually did accept, yes.

MR. CHANG:  Government moves 278 into evidence.

MR. RAPP-KIRSHNER:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 278 received in evidence.)

BY MR. CHANG:

Q.   All right.  So this is -- I see a link there that says [as read]:

"Join with Google Meet."

Can you explain to the jury what Google Meet is?

A.   Google Meet is our internal chat messaging system.  So if I need to meet with my boss and my boss lives in a different state, we jump on what's called a videoconference call.  And that's what Meet does.  It really sets up all those calls. It's our primary, kind of, meeting application that we have at Google.

Q.   Did you hop on that videoconference with Mr. Ding?

A.   I did.

Q.   Okay.  Let's set the scene.  What were your initial impressions as you joined the call?

A.   My initial impressions was that Mr. Ding was not in the office at the time.  I also had noticed that the room that Mr. Ding was in was very dark.  I also noticed that Mr. Ding was putting on his glasses as he joined the call, and he appeared, from my perspective, as slightly disheveled.

Q.   What -- let's start -- let's set the scene for the jury. What happened after the two of you hopped on this videoconference together?  What were the initial parts of the conversation about?

A.   So as part of my work as an investigator, we like to set up ground rules with our employees when we start conversations.

So, number one, we always talk about, first, confidentiality.  We want to make sure the employee understands what their obligations are in regard to the conversation and

what I will do with the information following the conversation.

So, for example, I make certain assurances to Mr. Ding that I will keep things at a confidential level.

The other thing that I will say is we talk about antiretaliation. Excuse me. Antiretaliation protects me and Mr. Ding in the conversation. And we have policies at Google that protect people, when they're a part of an investigation, from any form of retaliation.

The last thing I spoke to Mr. Ding about and the third thing that I always speak to our employees about is honesty. So when I meet with -- when I met with Mr. Ding, I explained to him that I expect him to be honest with me and that I was going to be honest with him, and that I wasn't going to hide anything from him. I was going to tell him exactly what I knew, and I expected him to give me honest answers back.

Q.   Did Mr. Ding acknowledge those ground rules?

A.   Yes.

Q.   Let's talk about the documents. Did you ask Mr. Ding about the 66 documents --

A.   I did.

Q.   -- that you --

For the court reporter.

A.   Yeah.

Q.   Did you ask Mr. Ding about the 66 files that we've been discussing this morning?

**A.**   Yes.

**Q.**   What was Mr. Ding's response to you?

**A.**   Mr. Ding's response was that he kept them for personal reasons.  He also said that he was going to utilize them at a later date, if he were to apply for a new job elsewhere, as evidence of his work.

**Q.**   Did you respond to him or give him any guidance on that issue?

**A.**   I did.  I told him that several of the documents that were not his personal documents were Google owned and confidential due to the data that was within them.

**Q.**   What was Mr. Ding's response to that?

**A.**   Mr. Ding was understanding.  He agreed to cooperate.

**Q.**   Okay.  Did he raise any objections to your explanation?

**A.**   No objection.

**Q.**   Did you also talk to Mr. Ding about Google's data security policies?

**A.**   I did.

**Q.**   What did you tell him about them?

**A.**   I told Mr. Ding about the three different classifications we have, so public, confidential, and we have another classification.  Excuse me.  My brain is a little bit foggy for a second.  But we have public, confidential, and non-public information.  And we look at these things and we explain them to all employees at the onset.  Need-to-know.  Excuse me.

**Q.**   Did Mr. Ding acknowledge understanding of those policies?

**A.**   He did.

**Q.**   Did he raise any objections?

**A.**   No objections.

**Q.**   Okay.  During that conversation, did you have the opportunity to ask Mr. Ding if he was looking for a new job?

**A.**   Yes, I did.

**Q.**   What was his response?

**A.**   On multiple occasions, no.

**Q.**   During that conversation with Mr. Ding, what was your evaluation of his demeanor?

**A.**   I found Mr. Ding to be trustworthy and honest at the time. I -- he was cooperative.  He agreed to do anything that I -- that I had asked him to do as part of our investigation, anything to clean up what he had done.  He was very, very cooperative.

**Q.**   Did it appear to you that he was telling the truth?

**A.**   Absolutely.

**Q.**   Let's talk about the other parts of the call after you talked about the files.  Was there any additional discussion besides discussion about the files and the policies and him leaving the company?

**A.**   We did talk about the infiltration as well.

**Q.**   Okay.  Walk us through that discussion.

**A.**   Yeah.  So I explained to Mr. Ding that we don't allow

other companies' documents or data on our systems.  That's to be above reproach as a company.  We talked about that in detail.  He explained to me that his -- the documents are former -- from two former companies that he had been employed by.  And I explained to Mr. Ding that it was inappropriate to have those on our systems, and he agreed to remove them.

Q.   Okay.  What, if anything, did you tell Mr. Ding during that videoconference about next steps for the investigation?

A.   So I explained to Mr. Ding that as far as next steps go at the conclusion, that I wanted him to review our data security policies so that he fully understood his obligations to Google.

I also informed him that we would need him to sign what's called a self-deletion affidavit.  We have all employees sign these if they're a part of a data security incident.

And so those were the two next steps that I had given to Mr. Ding.

Q.   I just got a note from my colleagues.  I want to make sure the record is clear.  How did Mr. Ding answer when you asked him if he was looking for a job?

A.   He said, no, he was not seeking additional employment and, no, he did not have another job.

Q.   All right.  Before you ended, you mentioned the self-deletion affidavit and a reminder of the policies.

Did Mr. Ding ask any questions about that?

A.   No.  He had no questions regarding the SDA, self-deletion

affidavit.

Q.   Did he agree that he was going to sign it?

A.   Yes.

Q.   Finally, before that call ended, were there any concluding remarks that you gave Mr. Ding?

A.   Yes.  There were two.  I informed Mr. Ding that if he had any questions about the self-deletion affidavit, he could reach out to me directly and I could connect him with a member of our legal team if he had any questions.

The second thing that I told Mr. Ding, and I tell this to every single Googler I interact with or have an interview with, I said, "If you wake up tomorrow and you realize you have something else that you haven't told me, any other documents, reach out to me and let me know."

Q.   Is this a standard script you've said to hundreds, maybe thousands of Googlers?

A.   Thousands of Googlers.

Q.   When you gave that opportunity to Mr. Ding, did he give you any additional information?

A.   None.

Q.   Did he tell you that he had started an AI start-up in China?

A.   No.

Q.   Did he tell you that he had worked as a chief technology officer for another technology company?

**A.**   No.

**Q.**   Did he tell you that he had uploaded hundreds of Apple Notes with Google information on them?

**A.**   No.

**Q.**   After that interview, what happened next?

**A.**   After that interview, I followed up with an email to Mr. Ding.

          **MR. CHANG:**  Ms. Hernandez, if you could please show Exhibit 279 just to the witness.

**BY MR. CHANG:**

**Q.**   What is this document?

**A.**   This is the email I sent in follow-up to my conversation with Mr. Ding.

          **MR. CHANG:**  Government moves 279 into evidence.

          **MR. RAPP-KIRSHNER:**  No objection.

          **THE COURT:**  Admitted.

     (Trial Exhibit 279 received in evidence.)

**BY MR. CHANG:**

**Q.**   Let's walk through your email first.

     Explain what you were telling Mr. Ding in the follow-up email to the videoconference.

**A.**   Yeah.  So every time I talk to a Googler, I try and send a follow-up email.  For one, I want to make sure that there's a record and they know this is what we talked about and, also, these are the next steps I want you to take.

So as you can see here, in terms of -- I informed him that -- I talked to him about the documentation he moved to his personal Gmail account.  I asked him to review our Data Security Policy again and familiarize himself as much as possible with the policy and Google's data classifications.

And as a reminder, I gave him, again, as a summary of the conversation is that Google work products or internal resources should never be shared outside of the Google domain without proper approval.

I attached to this email also the self-deletion affidavit I spoke about and requested that he sign it.  I had mentioned to him that it requires action, acknowledgment, and signature.

Q.   Did Mr. Ding send back the self-deletion affidavit?

A.   He did.

Q.   Is that the attachment that you see at the top of this document under -- right next to "Attachments"?

A.   Yes.

MR. CHANG:  Ms. Hernandez, if you could pull up 280 just for the witness.

BY MR. CHANG:

Q.   Mr. Fuller, what is this document?

A.   This is the self-deletion affidavit that Mr. Ding signed.

MR. CHANG:  Government moves 280 into evidence.

MR. RAPP-KIRSHNER:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 280 received in evidence.)

MR. CHANG:  Ms. Hernandez, if you could do a split screen of pages 1 and 2.

BY MR. CHANG:

Q.   Mr. Fuller, whose signature is that on the second page?

A.   Mr. Ding's.

Q.   Let's just walk through the self-deletion affidavit at a high level.  Can you --

MR. CHANG:  Ms. Hernandez, if you could highlight just paragraphs 4, 5, and 6 of the self-deletion affidavit.

BY MR. CHANG:

Q.   Okay.  Mr. Fuller, can you walk us through the paragraphs of the self-deletion affidavit?

A.   Yes.  Do you want me to summarize or read?

Q.   Summarize would be great.

A.   Okay.  Number 4, Point 4 in the self-deletion affidavit is informing Mr. Ding that we expect him to search his personal possessions, all devices, accounts within his custody for any of our documents, not just the ones in this escalation.  We want him to review all his accounts for these things.

5, it asserts that Mr. Ding has permanently deleted anything that he has found.

And 6 is "Other than in the scope of my work duties at Google," he's not transferred Google non-public information to any other person or entity outside Google, and then he promises

and agrees to never use or disclose Google non-public information.

Q. Okay. Thank you.

After you received the email from Mr. Ding with the self-deletion affidavit, what did you do next?

A. Next, I just reviewed my case file, updated it, and closed the case.

Q. Why did you decide to close the case?

A. I decided to close this case because I found Mr. Ding to be trustworthy, and with the information I had at the time, he had answered my questions; he had complied and signed the SDA.

Q. At some point after that interview with Mr. Ding, did you learn that he was leaving the company?

A. I did.

Q. When did you learn that?

A. The week of Christmas of 2023.

Q. At that point, I understand other folks at Google became involved in the investigation.

Were you involved in it at that point, late -- Christmas, late 2023?

A. No. By that time, I had taken on more cases. I was not part of any further investigation into Mr. Ding. I did some supporting actions, but that is it.

Q. What were the supporting actions that you did?

A. I worked with a vendor company to retrieve Mr. Ding's

devices from his house.  So I hired a company to go to his house, knock on his door, and request all Google's property, so that would be his laptop, his phone, his badge.

Q.   Did he provide all that information?

A.   He did.

MR. CHANG:  Thank you.

No further questions at this time.

THE COURT:  Okay.  Any cross-examination?

MR. RAPP-KIRSHNER:  Yes, Your Honor.

**CROSS-EXAMINATION**

BY MR. RAPP-KIRSHNER:

Q.   Good morning, Mr. Fuller.

A.   Good morning.

Q.   My name is David Rapp-Kirshner.  I'm an attorney with the defense.  I'm going to ask you a series of questions.

You've met with the Government on several occasions over the past year; correct?

A.   Over the past six months, yes.

Q.   And you've discussed your trial testimony here today with the Government; correct?

A.   Yes.

Q.   Google, your former employer, asked you to meet with the Government on those occasions; correct?

A.   Yes.

Q.   And Google counsel sat in on your meetings with

the Government; correct?

A.   Yes.

Q.   You've never met with me before; correct?

A.   No.

Q.   And you've never met with anyone from the defense team before; is that correct?

A.   Other than Mr. Ding, no.

Q.   Mr. Fuller, you testified about these 66 documents that came to your attention following uploads in November and December 2023; correct?

A.   Correct.

Q.   Is it okay if I refer to those as the 66 files or the 66 documents?

A.   Absolutely.

Q.   You'll understand what I'm referring to?

A.   (Nods head.)

Q.   So you stated that Mr. Ding uploaded these to his personal Google account; correct?

A.   That's correct.

Q.   That account was dingyong198608@gmail.com; correct?

A.   That's correct.

Q.   And this upload was flagged by Google's data loss prevention system because it hit on employee personnel information; correct?

A.   I cannot speak to all of the DLP rules that were violated,

but, yes, that would have been one of them.

Q.   And one of these personnel pages was Mr. Ding's very own Google bio page; correct?

A.   Yes.

Q.   None of these 66 files are being asserted as trade secrets in this case; is that correct?

A.   No.

Q.   You --

A.   Not that I'm aware of.

Q.   On Exhibit 277, there was --

THE COURT:  Can I just interrupt?

MR. RAPP-KIRSHNER:  Yes.

THE COURT:  You asked "Is that correct?" and he said "No."

Did you mean to say "yes"?

THE WITNESS:  I meant to say "yes," and that's why I said "Not that I'm aware of," yeah.

THE COURT:  Okay.

THE WITNESS:  Yes.

THE COURT:  Just wanted to clarify that.

THE WITNESS:  Thank you.

MR. RAPP-KIRSHNER:  Thank you, Your Honor.

BY MR. RAPP-KIRSHNER:

Q.   We looked at Exhibit 277, which was an email from Google to Mr. Ding which listed several file names.  Do you recall

that?

A.    Yes.

Q.    None of those file names listed on the email are being asserted as trade secrets; correct?

A.    The files in that email, no.

Q.    They're not being asserted as trade secrets; correct?

A.    Correct.

            THE COURT:    That's what he just said.

BY MR. RAPP-KIRSHNER:

Q.    The alleged trade secret documents were uploaded to a different personal Google account; correct?

A.    I was not part of that investigation, I want to make clear, so I don't know the details fully on that side of it. So to answer your question, I'm not aware.

Q.    One of the other files among the 66 files was a document entitled "Projects Leon Whole.PDF"; correct?

A.    Correct.

Q.    And that included records of projects Mr. Ding worked on; correct?

A.    I assume so, yes.

Q.    On December 8th, 2023, you spoke to Mr. Ding about those 66 specific uploads; correct?

A.    Yes, I did.

Q.    And you did not discuss a single alleged trade secret document during that conversation; correct?

A.    No.

Correct, yes.

Q.    Following your call with Mr. Ding, you sent him the self-deletion affidavit; correct?

A.    Correct.

Q.    Before you sent that to him, did you read it out loud on your call with Mr. Ding?

A.    No.

Q.    Did you go over each and every provision of the self-deletion affidavit on your call with Mr. Ding?

A.    No.

Q.    Now, the self-deletion affidavit, is that a common form at Google?

A.    Yes.

Q.    So it wasn't drafted specifically for Mr. Ding?

A.    It's drafted to address these security incidents.  So not specifically for Mr. Ding, but it's drafted so that it covers all incidents, yeah.

Q.    And it wasn't modified for Mr. Ding's incident, was it?

A.    No, it was not modified.

Q.    Following your interaction with Mr. Ding on December 8th, Mr. Ding did not load -- upload any further files containing Google information to any personal Drive account; correct?

A.    I'm not aware.

Q.    And during the course of your investigation, you never --

you found no evidence that those 66 files were shared to anyone other than Mr. Ding; correct?

**A.**   During my investigation, no.

**Q.**   During your investigation, you didn't find evidence?

**A.**   Correct.

**Q.**   Just to clarify the wording on that.

And during the course of your investigation, you personally found no evidence that any of the alleged trade secret documents were shared with anyone; correct?

**THE COURT:**   I think he's established that he wasn't involved in that part.   You can move on.

**BY MR. RAPP-KIRSHNER:**

**Q.**   So no personal knowledge?   That's my final question.

**A.**   No.

**MR. RAPP-KIRSHNER:**   Thank you.

**THE COURT:**   Any redirect?

**MR. CHANG:**   No redirect, Your Honor.

**THE COURT:**   All right.   You can step down.

And the Government can call its next witness.

(Witness excused.)

**MR. CHANG:**   Apologies, Your Honor.   The witness is in the building.   She's coming up.   We expected a longer cross-examination, and so that's the holdup, but she's coming up right now.

**THE COURT:**   Okay.   If she's not here in a minute or

two, you can just call your next witness and switch the order of the next two witnesses.

MR. CHANG:  Thank you, Your Honor.

(Witness enters the courtroom and steps forward to be sworn.)

THE COURTROOM DEPUTY:  Please raise your right hand. You can pour yourself water first.

THE WITNESS:  Thanks.

THE COURTROOM DEPUTY:  Please raise your right hand.

ARIANA TORTORICI,

called as a witness for the Government, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.

Please state and spell your full name for the record.

THE WITNESS:  Sure.  Ariana Tortorici, A-r-i-a-n-a. Spell?  Yeah.  A-r-i-a-n-a, last name T-o-r-t-o-r-i-c-i.

DIRECT EXAMINATION

BY MR. CHANG:

Q.    Good morning, Ms. Tortorici.

A.    Good morning.

Q.    Where do you currently work?

A.    I currently work at Google in Mountain View.

Q.    How long have you been at Google?

A.    I've been at Google since 2005.

Q.    What is your current job at Google?

**A.**    I am a director of employee relations.

**Q.**    At a high level, can you walk the jury through the various jobs you've had at the company?

**A.**    Sure.  In 2005, I joined and I was in a staffing operations role, all within HR.  And then I was in that role for a couple of years, and then I moved into a people programs role, which is also an HR role, for the contingent workforce program.  And then I moved into the employee relations team in 2011, and I've been on employee relations since then.

**Q.**    Put the mic a little bit closer.

**A.**    Oh, yeah.

**Q.**    Yes.

**A.**    Okay.

**Q.**    For the benefit of the court reporter again.

**A.**    Yes.

**Q.**    Yes.

**A.**    Yeah.

**Q.**    Thank you.

What is your current title at the company?

**A.**    Director of employee relations.

**Q.**    How long have you had that job?

**A.**    I've been director since -- for five years.

**Q.**    What does that job entail?

**A.**    Yeah.  So at a high level, I set the employee relations strategy for the U.S., Canada, and Latin America.  On a

day-to-day basis, what that looks like is I manage a team of about 47 employees, their employee relations partners and employee relations managers.

And the core responsibilities focus on handling workplace concerns and investigations. So when employees raise concerns about potential HR policy issues, my team will meet with the employees, gather information. They will figure out, basically, what they think happened, and then we'll figure out whether any of the conduct violates our policies. They will make recommendations to the business.

Then once the business makes a determination as to what's going to happen, then they will support the business on carrying that through.

So what that could be is somebody raises concerns. We feel like they -- we substantiate inappropriate conduct. There's a violation of policy. And we might recommend a warning, so we would recommend that to the business.

The business would -- if they accept that recommendation, we would then help by drafting the warning and delivering that, with the business, to the -- to the subject.

Q.   As the leader of the employee relations team for the Americas, are you familiar with Google's human resources policies?

A.   Yes.

Q.   Are you familiar with the offer letters and employment

agreements?

**A.** Yes.

**Q.** As well as trainings for new employees?

**A.** That's right, yes.

**Q.** And are you also familiar with Google's Code of Conduct and training associated with the same?

**A.** Yes.

**Q.** Let's turn now to the defendant in this case, a former Google employee by the name of Linwei or Leon Ding.

**A.** Yes.

**Q.** Are you familiar with that individual?

**A.** I am.

**Q.** How did you first become aware of Mr. Ding?

**A.** Sure.  So I guess one of the other areas that our team covers -- so I'll just back up for a second.

We also support -- so in addition to leading our own investigations, we also provide investigation support to our other investigations teams at Google.  So we've got security investigations, regulatory affairs investigations, and we will provide HR support.

So as they are carrying forward their investigation, if they need some sort of HR support, whether that's pulling employee records or placing an employee on administrative leave, drafting warnings, helping support terminations, our team would be involved.

And so that leads me to this particular case.  I was looped in -- one of my direct reports at the named Danielle had been looped in to provide that support in early January of 2024, and then she brought me in.  So she elevated the concern and brought me into the details.

Q.   Let me make sure I understand that.  There's a lot to unpack there.

A.   Yeah.

Q.   One of your direct reports got looped into an investigation involving Mr. Ding --

A.   That's correct.

Q.   -- to provide HR support?

A.   Correct.

Q.   And this was elevated to you?

A.   Mm-hmm, yes.

Q.   Is that a "yes"?

A.   Yes.

Q.   Are you usually looped into investigations at Google?

A.   So my team handles thousands of cases a year, and so we -- I'm not looped in on every single one.  But typically, with my direct reports, I am meeting with them on a regular basis, so I'm typically aware of what they're working on, what they're involved in, how they're spending their time.

And then I'm also usually made aware or looped in to support or oversee cases where, you know, there's -- it's a

high-visibility case; there are senior -- you know, senior managers or executives involved; whether we have -- you know, sometimes on outside misconduct cases.  There's a whole variety of reasons why I might be looped in.  If there's an escalation potential, either internally or externally, or if we're going to need to support -- you know, if we need to put more resources on a case, for example.

So there's a number of reasons why I could be looped in or where I get more detail about a case than typical.

**Q.**   Why were you looped into this investigation?

**A.**   In this particular case, I was looped in because there were some concerns -- well, it was a bit -- there was sort of an extra piece to it.

So there was a concern that we had an employee that -- where we were looking at a potential conflict of interest situation where the employee had taken -- or there was concerns that the employee had taken confidential information and had been spending significant time in China.

And why that -- there was sort of this other component where there were also concerns that he had given his badge to other employees in the Bay Area to badge in for him in our Bay Area locations while he was out of the country.  And we were probably going to have to support that as well.  So it was -- and that's uncommon.

So I was looped in for those reasons.

Q.   In your experience as a leader on the HR team at Google, how often was an allegation related to badging raised in the investigations you supported?

A.   For something like this, I would say I can remember, like, one additional case that I was looped in on.  So I would say it's very uncommon.

Q.   Okay.  As part of being looped into the company's investigation of Mr. Ding, did you have an opportunity to review the defendant's human resources records?

A.   I did, yes.

Q.   When did the defendant start working at Google?

A.   He started on May 13th of 2019.

Q.   Have you had a chance to review his offer letter and employment agreement?

A.   I have, yes.

        MR. CHANG:  Ms. Hernandez, if you could please display Exhibit 892 just for the witness.

BY MR. CHANG:

Q.   Ms. Tortorici, what is this document?

A.   Yes.  This is one of our standard offer letters.  So this is the offer letter that was sent to Mr. Ding, and it was dated February 19th of 2019.

        MR. CHANG:  Government moves to admit Exhibit 892 into evidence, Your Honor.

        MS. KRSULICH:  My apologies.  May I just -- could we

scroll through the document just so I could see the full document, please?

No objection, Your Honor.

**THE COURT:**  Admitted.

(Trial Exhibit 892 received in evidence.)

**BY MR. CHANG:**

**Q.**   All right.  Great.  The jury can see it.  Thank you.

What were the terms of -- without getting into any specific numbers, what were the terms of Google's initial offer of employment for the defendant?

**A.**   Sure.  Yes.  So typically, in our offer letters -- so in this case, Mr. Ding was being offered a position of software engineer.  And then all of our offer letters also cover our compensation information, high-level benefits information; and then there's some additional sections as well, confidential and proprietary information.

But in terms of compensation, our compensation package is made up of three different areas:  salary, bonus, and then equity or stock.

And in this particular case, Mr. Ding also received a sign-on bonus.

For salary, that's the base -- salary, that's how much you're going to make annually.  Bonus target will be based on your level.

So in this particular case, he would have been -- the

target would be 15 percent of his base salary.  So he, you know -- and that's all sort -- it's sort of backward-looking because it's based on your performance, whether you hit that amount, go over or under.

And then equity is --

THE COURT:  One second.

MS. KRSULICH:  Move to strike, Your Honor, based on relevance and the motion in limine.

THE COURT:  Overruled.

THE WITNESS:  So continue?

BY MR. CHANG:

Q.   You can continue, Ms. Tortorici.

A.   Okay.  And then in terms of equity, that's how many stock units you'll be receiving.  And that's more forward-looking because stock vests over a period of time and, obviously, will be -- will -- can change based on the amount of the stock at the time that you're granted and then at the amount that it -- at the time that it vests.

Q.   Did the initial offer letter to Mr. Ding include any information about Google's confidential and proprietary information?

A.   Yes, it did.

MR. CHANG:  Ms. Hernandez, if you could highlight the second-to-last paragraph.  Thank you.

\\\

BY MR. CHANG:

Q.   What's going on in this paragraph?

A.   So this covers a couple of different things.  One, it makes clear to our employees that they are being offered the role based on their skills and experience and not based on any confidential, proprietary, or trade secret information from prior companies or third parties.  And we just make it clear that if an employee -- or if they -- the person accepts the offer, we don't want them to disclose any of that information internally.

And then, likewise, once they become an employee at Google, they will become aware of and come across confidential, trade secret, and proprietary information related to Google's operations, products, and services.  And so this directs them -- there's also another employment agreement that we direct them to which covers more information about this, and they need to sign that as a condition of their employment.

So in addition to the offer letter, they have to sign our employment agreement as well.

Q.   Is this language standard in Google's offer letters?

A.   It is, yes.

Q.   Have you reviewed hundreds, maybe thousands of these offer letters?

A.   Yes.

Q.   Okay.  Did the defendant accept the offer to join Google

as a software engineer?

A.   He did, yes.

        MR. CHANG:  I'd like to show the jurors the signature on the second page, Ms. Hernandez.  If you could highlight the bottom of page 2 of Exhibit 892.

        Thank you.

BY MR. CHANG:

Q.   What's the date of his signature?

A.   This is February 20th of 2019.

Q.   As part of joining the company, did Mr. Ding also sign a separate employment agreement?

A.   He did, yes.

Q.   Is every Google employee required to sign an employment agreement?

A.   They are, yes.

Q.   Have you had a chance to review that before today?

A.   I have.

        MR. CHANG:  Ms. Hernandez, if you could please display 739 for the exhibit -- for the witness.

BY MR. CHANG:

Q.   Ms. Tortorici --

A.   Mm-hmm.

Q.   -- what is this document?

A.   This is our employment agreement.  That's the short name for it.  At the top, you'll see it's a longer name.  It's

"At-Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement."

All of our employees are required to review and sign this document.  And it goes through a number of -- of areas.  So, yes.

Q.   Is this the employment agreement that Mr. Ding signed?

A.   It is, yes.

MR. CHANG:  Government moves 739 into evidence.

MS. KRSULICH:  Similar request, Your Honor, just to scroll through so I can see the full document.

No objection, Your Honor.

THE COURT:  Admitted.

(Trial Exhibit 739 received in evidence.)

BY MR. CHANG:

Q.   Okay.  All right.  Does this employment agreement include any sections on Google's confidential information?

A.   It does, yes.

MR. CHANG:  Ms. Hernandez, if you could highlight paragraph -- Section 2 of the employment agreement under "Confidential Information."

Thank you.

BY MR. CHANG:

Q.   All right.  Is this section of the employment agreement in every single Google employment agreement?

A.   Yes, it is.

**Q.** Can you walk through the three paragraphs that are in the section, please?

**A.** Sure. Yes. So the first section, again, confidential information is very important. This is -- so that's why this is at the top of the document as Number 2.

The first section defines Google confidential information because it's then referred to throughout the rest of the document. But this defines Google confidential information as any information in any form that relates to Google's business and is a trade secret, is proprietary information, or that is otherwise legally protectable.

It also provides a number of examples. It's not an exhaustive list, but it -- the point here is to cover this so that there aren't questions. But there -- it's Google's non-public information that relates to Google's actual or anticipated business, products, or services. It can include technical data, research, development, software, hardware, inventions, user data. And these -- again, these are examples.

And makes clear at the top here -- and you'll see this sort of throughout here and our trainings -- that if somebody is uncertain or wants clarification as to whether or not material constitutes Google confidential information, that they should seek written clarification, in this case, from Google's legal department.

**Q.** Section 2(b) is entitled "Nonuse and Nondisclosure."

At a high level --

A.   Yes.

Q.   -- what is in this paragraph?

A.   Yeah.  So this -- we -- this makes clear that all employees are to hold Google confidential information in strict confidence and trust, and that they will take all reasonable steps to prevent any unauthorized use or disclosure of Google confidential information, and that they shouldn't use Google confidential information for anything other than the benefit of Google in the scope of their employment, and they shouldn't disclose it without any -- without prior written authorization from Google.

It also talks about anything that a Googler creates or generates in connection with their employment, all of that information belongs to Google.

And also goes over what could happen if they violate this policy, which is it could lead to disciplinary action, up to and including termination or legal action -- and/or legal action.

Q.   Finally, there is a section titled "Former Employer Information/Definition of Google Property."

A.   Mm-hmm.

Q.   What is the purpose of this paragraph?

A.   This is, again, just to reinstate -- and this is also covered in a couple of different places as well.  But we don't

want our prospective employees bringing in any proprietary information from other companies.  So, again, this is stating that the employee will not use or disclose or bring onto our facilities or our systems any proprietary information, trade secrets, or non-public material belonging to any prior employers or third parties.

MR. CHANG:  Let's highlight Section 4, "Conflicting Employment," Ms. Hernandez.  It's on the bottom of page 2.

BY MR. CHANG:

Q.   Ms. Tortorici, is there also a "Conflicting Employment" section in this agreement?

A.   Yes, there is.

Q.   At a high level, what is that section?

A.   This is stating that our employees will not engage -- will not become employed with or engage in any other business-related activity that directly relates to Google's business, any -- the business that we're involved in, that we plan to become involved in, and -- or otherwise conflicts with our business interests.

Q.   Finally --

A.   Sorry.

Q.   Go ahead.

A.   Again, it's just there's also, if there's any questions about that or if they have an interest in external employment, they need to go to our ethics compliance team to review that.

**Q.** Finally, Section 5, "Return of Google Property and Information," is this also a standard provision in Google's employment agreements?

**A.** Yes, it is.

**Q.** What's the -- explain this section to the jury.

**A.** So this outlines, at the beginning of someone's employment, what will happen at the time that they leave Google, whether they're terminated or leave voluntarily.

The employee is agreeing to not take with them, not retain any information, materials, documents. They will not retain anything -- any Google confidential information when they leave. They also agree to return any Google property or confidential information on or before their last day of employment, and that they won't keep, re-create it, or share it with any third party.

And then it also explains that if they do have anything, if anything happens to be stored on their personal devices -- so their computers, mobile, cloud or other storage medium -- that they need to tell Google about that. They will then work with Google to ensure that that information is retrieved by Google and then deleted, permanently deleted.

**Q.** Did Mr. Ding sign this agreement?

**A.** He did.

**MR. CHANG:** Ms. Hernandez, if you could just show the signature on the top of page 6.

Thank you.

BY MR. CHANG:

Q.   When was Mr. Ding's first day of work at Google?

A.   He started on May 13th of 2019.

Q.   As a new employee, did he have to sign any additional agreements?

A.   He did, yes.

Q.   What documents did he have to sign?

A.   We have a -- our employees need to review and sign an acknowledgment that they have reviewed and agreed to our Code of Conduct, and there's also another, like a proprietary information checklist that they need to acknowledge and that just rein- -- sort of underscores that they can't bring anything in from -- no confidential information, trade secret, or proprietary information from other companies, and it takes them through a checklist just to make sure that they're -- that we're asking them if they've brought anything so they can disclose it at that time.

Q.   Did Mr. Ding sign the Code of Conduct?

A.   He did.

        MR. CHANG:   Exhibit 737, just for the witness.

BY MR. CHANG:

Q.   Ms. Tortorici, what is this document?

A.   This is our -- the Google Code of Conduct that he -- that Mr. Ding reviewed and acknowledged.

MR. CHANG:  Government moves 737 into evidence.

MS. KRSULICH:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 737 received in evidence.)

MR. CHANG:  Ms. Hernandez, if you could show Mr. Ding's signature on page 10 of the exhibit.

Thank you.

BY MR. CHANG:

Q.   All right.  Like the employment agreement, does the Code of Conduct include any sections on confidentiality?

A.   Yes, it does.

MR. CHANG:  Ms. Hernandez, if you could highlight Section IV of the Code of Conduct that Mr. Ding signed.  It starts at the bottom of page 5.  Starting with Section IV, "Preserve Confidentiality."  The text is slightly difficult to read on the screen.

Thank you.

BY MR. CHANG:

Q.   Okay.  At a high level --

A.   Mm-hmm.  Yes.

Q.   -- what is this section of the Code of Conduct?

A.   Yeah.  So this section, again, reminds our employees that confidential -- that when confidential information leaks -- right -- Google -- there's a lot of press about Google. There's a lot of questions and interest in what we're doing,

how we're doing it.  And so this just underscores that any leaks of -- to press, or otherwise, can hurt product launches. It takes away our competitive advantage.

It also covers -- this outlines some additional things. So in addition to not revealing confidential information, there's a couple of other things that our employees must do with confidential information, so properly securing and labeling documents or disposing of Google confidential information, safeguarding confidential information that we receive from third parties, and then taking steps to keep our trade secrets and other confidential intellectual property secret.

**Q.**    Is there also a separate section within the Code of Conduct on intellectual property?

**A.**    There is, yes.

**MR. CHANG:**  Ms. Hernandez, if you could highlight Section V(a), which is at the middle of page 6 of Exhibit 737.

**BY MR. CHANG:**

**Q.**    Ms. Tortorici, is this the section on intellectual property in the Code of Conduct?

**A.**    Yes, it is.  Yeah.

**Q.**    In addition to requiring employees to sign the Code of Conduct, does Google also require its new employees to complete any training required -- related to the code?

**A.**    Yes.  They're -- once an employee starts, they're enrolled

in a number of required trainings, one of which is the code of conduct training.

Q.   Did Mr. Ding complete this training?

A.   He did.

Q.   All right.  Let's pull up Exhibit 811.

Ms. Tortorici, do you recognize this document?

A.   Yes, I do.

Q.   What is it?

A.   This is a PDF version of our code of conduct training that was live at the time that Mr. Ding completed it.  This isn't -- the way that this appears is just the PDF version because it's an interactive -- like, you take the training on a computer and it's interactive.  There are scenarios.  And so this is just the text of the scenarios.

Q.   Did your team actually check and pull the exact version of the training that Mr. Ding completed?

A.   We did, yes.

MR. CHANG:  Government moves to admit 811 into evidence.

MS. KRSULICH:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 811 received in evidence.)

BY MR. CHANG:

Q.   All right.  Let's walk members of the jury through the training.

Before we get into the content, how is the training actually structured?  I assume it's not a PDF.

A.   Correct.  Yes.  So it's -- you log in, and it's -- you would take it on your computer.  And it's scenario-based, so you basically read a scenario, click through the responses, and then move on to the -- to the next scenario.  So it's an attempt to keep our -- keep the employee engaged while they're going through their required trainings.

Q.   Is this training mandatory?

A.   It is, yes.  This is mandatory every other year for all employees.

MR. CHANG:  If you could go to page 12 of Exhibit 811, Ms. Hernandez.

Page 13, actually.

And if you could highlight the text again for readability for the jury.

BY MR. CHANG:

Q.   Okay.  The scenario reads [as read]:

"A Googler starts a video sharing business similar to YouTube while working at Google as a software engineer on Chrome.  What should the Googler do?"

A.   Mm-hmm.

Q.   What's the purpose of this slide?

A.   This is to test the Googler's knowledge of our conflict of

interest -- the conflict of interest section of our Code of Conduct. And, again, the scenario is at the top, and then it gives the employee the option of which to select. So if -- you'll see, if they -- there's three different options: Do not proceed, proceed with caution, or proceed. Regardless of what the employee selects, it will come up with the same feedback.

So in this particular case, the correct response is "Do not proceed," and very clearly states that starting your own business or working for an outside company that offers services or products that compete with Google violates our conflict of interest policy.

And, again, if you're unsure whether outside business -- whether the outside business that you want to start or work for competes with Google, that they can check with our ethics and compliance team.

**Q.** In other words, you have to get the right answer to move on?

**A.** In this particular case, you need to -- yes. So regardless of what answer in this -- for this particular question, whatever answer that you select, it would come up with the same feedback, so everyone would see this response. And then you would move on to the next scenario.

**MR. CHANG:** Let's turn to page 28 of the training, Ms. Hernandez. Highlight the text, again, for readability. Thank you.

BY MR. CHANG:

Q.   The situation reads [as read]:

"A Google accountant is at a local financial and accounting professionals networking group.  After hearing that the accountant works for Google, several members ask if the rumors that Google is considering investing in a local technology company are true.  Which of the following are appropriate resolutions?  Select all that apply."

Ms. Tortorici, what is the purpose of this training slide?

A.   So all of our training slides are designed to provide the Googlers with real-life examples of what could come up, to not only test their knowledge, but also provide responses so that they understand how to appropriately approach these scenarios.

In this particular case, again, people are interested in what Google is doing and what's happening.  So oftentimes, being out, if people find out that you work for Google, they'll ask a lot of questions.  And, again, this gives different options about what a Googler could do in this situation.

[As read]:

"Answer that the rumors aren't true.

"Confirm that the rumors are true, but not provide any details.

"Ask each person to reach out to them separately because they can't share that type of information

publicly."

Or the correct answer being [as read]:

"Respond to the question by stating that they can't share any information about Google's future business plans."

And then, again, on this particular one, if they click an incorrect answer, they would need to click the correct answer. And for any of the responses, everybody would get the same feedback or what the Googler should do, which is in the next section.

Q.   Is there also feedback given for the responses?

A.   Yes.

Q.   Is that the text that we see at the bottom?

A.   That's the text, yes.

Q.   It reads [as read]:

"All Google employees have the duty not to disclose the Company's confidential information. Unless you're 100 percent certain it's already been disclosed by the Company, you should assume all Company information, especially information about our users, customer, or partners . . . ."

And then I won't read the rest of it.

Is this the feedback that every Google employee --

A.   Yes.

Q.   -- sees when they take this training?

**A.**    Yes, that's correct.

**Q.**    Along with this training that we just discussed, the code of conduct, is there a certification at the end of it?

**A.**    Yes, mm-hmm.

        **MR. CHANG:**  Ms. Hernandez, if you could highlight the bottom of page 50 and the top of page 51 in Exhibit 811.  And if you could highlight the certification and the text for readability.

        Thank you.

**BY MR. CHANG:**

**Q.**    Ms. Tortorici, is this the certification window that Mr. Ding had to certify?

**A.**    Yes, that's right.

**Q.**    Okay.  In addition to this training, did Mr. Ding complete any other training as part of his onboarding process?

**A.**    Yes, he did.

**Q.**    What other -- what other training did he complete?

**A.**    He completed a privacy and information security training. And then there's -- those are the two that I think are most relevant.  There's also some other trainings.  We have individual contributors take a -- like a harassment training. So there's different required trainings.

    The code of conduct is required every other year, and then the privacy and information security training is every year.

**Q.**    We already discussed the privacy and information and

security training --

A.   Okay.

Q.   -- with someone else, but was that training that Mr. Ding completed?

A.   Yes, mm-hmm.

Q.   Is that training also mandatory?

A.   It is, yes.

Q.   As part of preparing for trial, did you and your team gather Mr. Ding's training records?

A.   We did, yes.

        MR. CHANG:  Ms. Hernandez, if you could pull up Exhibits 805 and 740 at the same time just for the witness.

        805 and 740.

BY MR. CHANG:

Q.   Ms. Tortorici, what are these documents?

A.   These are Mr. Ding's training records.

        MR. CHANG:  Government moves to admit 740 and 805.

        MS. KRSULICH:  No objection.

        THE COURT:  Admitted.

    (Trial Exhibits 740 and 805 received in evidence.)

BY MR. CHANG:

Q.   Did your team also prepare a summary exhibit that focuses just on the code of conduct and privacy and information security training?

A.   Yes, we did.

MR. CHANG:  Ms. Hernandez, if you could pull up our summary Exhibit 895.  Is it 896?

1196.  Sorry.  I was off completely.

BY MR. CHANG:

Q.   Ms. Tortorici, do you recognize this document?

A.   Yes, I do.

Q.   What is it?

A.   This is Mr. Ding's training records for both the code of conduct and privacy and information security trainings that he completed while employed at Google.

Q.   Is this essentially a compilation of those last two documents we were looking at?

A.   It is, yes.

MR. CHANG:  Government moves to admit 1196.

MS. KRSULICH:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 1196 received in evidence.)

BY MR. CHANG:

Q.   Okay.  Walk us through what is being shown in this summary exhibit.

A.   Yeah.  So for these trainings, it will show when he was enrolled in these trainings and that he had completed all of them.  They're all required trainings, as mentioned.  He -- and here's the dates which -- when he completed each of them and the status, that he passed all of them.

Q.   Did Mr. Ding complete all his code of conduct and privacy training?

A.   He did.

Q.   You mentioned that the privacy and information security training is mandatory.

A.   Yes.

Q.   What happens if you don't complete that training?

A.   Yeah.  So if you don't complete the privacy and information security training, of course, you're sent reminders, your manager is sent reminders; and within a very short time, you start to lose access to Google systems.

So within, I think, a period of seven days, you will have -- you will be locked out of systems, and the only action you'll be able to take is to take the training.

Q.   Have you also pulled or looked at some of the specific trainings that Mr. Ding completed based on the time of when he completed them?

A.   Yes.

MR. CHANG:  Ms. Hernandez, if you could do split screens of 885 and 741.  These have both previously been admitted.

BY MR. CHANG:

Q.   Ms. Tortorici, do you recognize these two training --

A.   Yes.

Q.   -- decks?

**A.**   Yes, I do.

**Q.**   Are these the training decks from the time period of when Mr. Ding completed his privacy and information security training?

**A.**   Yes, that's right.

**Q.**   Okay.  At some point, did you become aware that Mr. Ding sent a resignation email to his manager?

**A.**   Yes, I did.

        **MR. CHANG:**  If you could show Exhibit 2 to Ms. Tortorici.  It's previously admitted, Ms. Hernandez.

        Highlight the text if you would not mind.

**BY MR. CHANG:**

**Q.**   Ms. Tortorici is this the resignation message that you previously reviewed?

**A.**   Yes, it is.

**Q.**   Okay.  Is a message like this one the correct way to resign from Google?

**A.**   So partly.  So it is -- it is -- giving your manager a heads-up and talking to your manager if you have a plan to leave the company and resign is part of the process.  But that's only one step.  There's actually many other steps that you need to take before -- you can't just send a message to your -- to your manager.  There's actually some formal steps that you need to take in order to resign from the company.

**Q.**   Are there specific forms you have to fill out?

**A.**   Yes.   And there's a site that you go to and it outlines all the requirements.

          **MR. CHANG:**   Exhibit 825, just for the witness, Ms. Hernandez.

**BY MR. CHANG:**

**Q.**   Ms. Tortorici, what is this document?

**A.**   This is a PDF of the site that we have.   It's an internal site that's called "Leaving the company," and it's information for employees or for managers who have employees that are leaving.   And it outlines some reminders and then the steps that an employee needs to take in order to process their resignation.

          **MR. CHANG:**   Ms. Hernandez, if you could highlight the portion beginning with "Important" all the way down to the text above "Managers."

**BY MR. CHANG:**

**Q.**   Is this the standard language that's on this site for "Leaving the company"?

**A.**   Yes, it is.

**Q.**   Explain to the members of the jury what's the purpose of this section of the website.

**A.**   Yeah.   So when you go to the site, there are -- there's some intro text, and then sort of in bright red lettering, it says [as read]:

          "IMPORTANT:   Confidentiality and company

documents."

And in bold, it's a reminder for our employees that they can take personal materials, like photos and information related to benefits, but anything related to work needs to remain here and can't be taken with them when they leave.

And it reminds them that even after they leave, they are bound by the confidential -- confidentiality obligations that they agreed to when they joined Google that is covered in the employment agreement, and reminds them that if we determine that they've taken any confidential or need-to-know information or other Google property, that they could face consequences, including legal action.

So -- and it kind of spells it out beyond that.  So very specifically, not retaining or disclosing any Google confidential or need-to-know information and covers what that is, again, reminding them that they can't copy any of that information to anywhere that they could access it after they leave Google; they can't share information with their personal accounts; and they are still subject to -- again, to the obligations regarding any inventions as well.

And the copy of the confidentiality agreement can be -- will be provided to them as a reminder of their continued obligations.

Q.   You mentioned personal accounts.  Would that include a personal Gmail or personal Google Drive?

A.    Yes, that's correct.

Q.    At some point did the company terminate Mr. Ding?

A.    Yes.

Q.    Were you involved or aware of that process?

A.    I was, yes.

        MR. CHANG:  Exhibit 795 just for the witness,
Ms. Hernandez.

BY MR. CHANG:

Q.    Ms. Tortorici, what is this document?

A.    So this is a document -- when we are terminating an
employee for misconduct, this document is filled out.  It's a
"Justification of Termination for Misconduct."  And in this
case, Danielle from my team, who was looped in initially,
completed this document.

        MR. CHANG:  Government moves to admit 795 into
evidence.

        MS. KRSULICH:  No objection.

        THE COURT:  Admitted.

     (Trial Exhibit 795 received in evidence.)

        MR. CHANG:  Ms. Hernandez, again, for readability and
the jury's eyes, if you could highlight just the "Rationale"
portion down to the "Conflict of Interest."

BY MR. CHANG:

Q.    Why did the company terminate Mr. Ding's employment?

A.    Yeah.  So after investigation, we found that Mr. Ding

violated our Code of Conduct and conflict of interest policies by founding a technology company which competes with Google, acting as the CTO at another company -- technology company that competed with Google, and submitting an application for a patent for technology that related directly with his role at Google.

            **MR. CHANG:**  Thank you, Ms. Tortorici.

            No further questions at this time.

            **THE COURT:**  Okay.  Any cross-examination?

            **MS. KRSULICH:**  Yes, Your Honor.

                        **CROSS-EXAMINATION**

**BY MS. KRSULICH:**

**Q.**   Good morning, Ms. Tortorici.

**A.**   Good morning.

**Q.**   My name is Lora Krsulich.  I represent the defendant.

     Your team handled thousands of cases of misconduct?

**A.**   Mm-hmm.

**Q.**   Is that right?

**A.**   Yes.  Or allegations of misconduct, yeah.

**Q.**   Okay.  Thousands?  Okay.

**A.**   Mm-hmm.

**Q.**   You met with the lawyers for the Government before your testimony today?

**A.**   I did, yes.

**Q.**   Google lawyers were also present?

**A.**   Yes.

**Q.**   You haven't met with me?

**A.**   Right.  That's right; I have not.

**Q.**   You haven't met with any of the lawyers for the defense?

**A.**   I have not.

**Q.**   You testified about employee badging?

**A.**   Yes.

**Q.**   Isn't it true that there were a lot of instances in which employees were flagged in Google's security system for downloads or badging issues?

**A.**   I'm not aware.  My team is not the security team, so I -- I was speaking to cases that I was looped in on.

**Q.**   Do you recall telling the Government that there were a lot of instances in which employees were flagged in Google's security system for downloads or badging issues?

**A.**   Yes.  I mean, I guess there's a number of cases, but I'm not aware of specifics.  So there's cases where -- there's a number -- so we have a lot of tools internally.  Again, I don't -- I'm not on the security team, so I don't have the details.  And -- but there are things that we're made aware of.

So people being flagged, that could be any number of things.  I've actually had somebody on my team that was flagged for something as well.

**Q.**   Someone on your team was flagged for issues?

**A.**   For, like, accessing -- like, if you access a tool or you

might -- yeah, there's all kinds of tools.  Yeah.

Q.   So isn't it true that there were a lot of instances of employees who were flagged for badging issues?

A.   Badging issues?  I'm not sure about badging issues.  I mean, that's -- that would be separate, I think.

Q.   Okay.  And do you or do you not recall telling the Government that there were a lot of instances in which employees were flagged in Google's security system for downloads or badging issues?

A.   Not badging issues, but probably downloads.

Q.   Okay.

A.   Yeah.

Q.   Do you recall telling the Government that?

A.   I -- I remember talking about that, yeah.

Q.   Okay.  And you told the Government that there were lots of --

        MR. CHANG:  Objection, Your Honor.  Asked and answered.

        THE COURT:  Overruled.

BY MS. KRSULICH:

Q.   You told the Government that there were lots of instances in which employees were flagged in Google's security system for downloads or badging issues; right?

A.   I don't recall saying anything about badging.

Q.   If I showed you a document, would it refresh your

recollection?

**A.**    You can show me a document, sure.

        **MS. KRSULICH:**  Mr. Jay, could you please pull up 6203-001.  Just for the witness.

**BY MS. KRSULICH:**

**Q.**    Ms. Tortorici, please read it to yourself and then let me know when you're done.

**A.**    (Witness examines document.)  Okay.

        **MS. KRSULICH:**  Please take the document down, Mr. Jay.

        **THE WITNESS:**  Sure.

**BY MS. KRSULICH:**

**Q.**    Has your recollection been refreshed?

**A.**    I remember the conversation, yes.  I don't -- to be perfectly honest, I don't remember saying anything about badging issues.  That wasn't what I was speak- -- what we were speaking about at the time.

**Q.**    Did the document refresh your recollection?

**A.**    I remember the conversation, yeah.

**Q.**    So isn't it true that you told the Government that there were a lot of instances in which employees were flagged in Google's security system for downloads or badging issues?

        **MR. CHANG:**  Objection, Your Honor.  Misstates prior testimony.

        **THE COURT:**  This has now been -- she's now answered this question.  She doesn't remember it that way.  You can move

on.

MS. KRSULICH:  Thank you, Your Honor.  I'll move on.

BY MS. KRSULICH:

Q.   Google asks exit interview questions to gather employee feedback; right?

A.   In what context?

Q.   Google asks exit interview questions?

A.   We don't usually have exit interviews with employees who are exiting.  We have a lot of employees that are leaving all the time, so we don't have -- we don't -- as a standard practice, we don't have exit interviews.

Q.   But Google does have an exit packet with a survey; right?

A.   I think for employees that -- I think we do -- so for all employees that exit the company, we send them an exit packet. And a lot of that is information about, like, what happens with your benefits and what will happen with your stock.

I think for employees that are terminated for misconduct, they do not receive exit interview questions.

Q.   So Google only sends an exit packet with questions to employees who are terminated voluntarily?

A.   Yes.

Q.   It does not send an exit packet with questions to employees who are terminated involuntarily?

A.   That's right.  I mean, everybody gets an exit packet. I think for voluntary resignations, we send -- there's a couple

of questions that we ask.

**Q.**   So everybody gets a packet --

**A.**   Yes.

**Q.**   -- but some people get the questions and some people don't?

**A.**   Yes.

**Q.**   Google never meets in person with employees for an exit interview; right?

**A.**   Not for an exit interview.  I mean, I don't know if -- I can't say never.  That's not our -- part of our typical process.

**Q.**   Exit interviews present an opportunity to discuss problems with an employee; right?

**A.**   Problems with an employee.  In what -- typically, that wouldn't be -- I mean, the -- the -- sorry.  Can you clarify?

**Q.**   Sure.

So just based on your experience --

**A.**   Yeah.

**Q.**   -- in HR --

**A.**   Yep.

**Q.**   -- an exit interview presents an opportunity to talk with the employee; right?

**A.**   Yes.  We don't -- we have too many -- we don't do that on a one-by-one basis because we have a lot of people that are exiting, and we don't -- we don't typically do that.

Q.   But, generally, based on your knowledge of the field, exit interviews are used to provide an opportunity to talk to employees when they're leaving; right?

A.   They can, yeah.

Q.   And an exit interview -- you agree with me that exit interviews could clarify, particularly for engineers, what they can and cannot take to their next job?

        MR. CHANG:   Objection, Your Honor.   Calls for speculation.

        THE COURT:   Overruled.

        THE WITNESS:   Can you repeat the question?

BY MS. KRSULICH:

Q.   Sure.

     You would agree with me that exit interviews could provide an opportunity, particularly for engineers, to clarify what you can and cannot take to your next job?

A.   That information would -- is covered -- there's a place where people can continue to ask questions after they leave; but that information would be shared with them in the exit packet, like reminders about confidentiality, what they can and can't take.

Q.   So would an exit interview provide an opportunity to clarify what an engineer can and cannot take with them?

A.   Possibly, yeah.

Q.   So talk --

A.   I mean, if -- sure, yeah.  Talking with someone, they could -- sure.  Yeah.

Q.   Talking with someone, it can clarify what you can --

A.   Sure.

Q.   -- and cannot take?

A.   Sure.

Q.   You agree with me that engineers can still practice their profession using experience gained from working at Google?

A.   Yes, as long as they're not using any Google confidential or proprietary information.

Q.   Once they are a Google employee -- oh, sorry.

     They can work somewhere else -- right? -- once --

A.   Of course.  Yeah, yeah, of course.

Q.   Can exit interviews clarify -- sorry.  I'll strike the question.

     You're not aware of any exit interviews being performed with Mr. Ding?

A.   I'm not, no.

Q.   You were involved in the decision to terminate Mr. Ding?

A.   The business typically makes the decision.  So the investigations team usually works with the business to make a determination.  So we were providing -- my team was providing HR support.

Q.   So you were involved in some way?

A.   Yes, mm-hmm.

**Q.** When was Mr. Ding terminated?

**A.** He was terminated via email on January 17th, and I think his last day in our system just to process final payment, I think, was on January 19th.

**MS. KRSULICH:** Could you please pull up, Mr. Jay, Exhibit 795, which has been admitted.

Could we please highlight the reasons for termination.

**THE WITNESS:** Mm-hmm.

BY MS. KRSULICH:

**Q.** Nothing in Mr. Ding's termination letter states that he was being terminated for taking confidential documents from Google; correct?

**A.** That's correct.

**Q.** Nothing in the termination letter says that he's being terminated for taking trade secrets from Google; correct?

**A.** That's correct.

**Q.** Mr. Ding was terminated because Google assumed at that time that Mr. Ding was a competitor?

**A.** Is that a question?

**Q.** Yes.

**A.** We found that he violated our Code of Conduct and conflict of interest policies.

**Q.** This termination justification states that Mr. Ding was terminated for founding Zhisuan, which Google believed at the time might compete with Google; right?

**A.**   Correct.

**Q.**   This termination letter states that Mr. Ding was terminated for holding the role of CEO -- CTO at Rongshu, which competes with Google; correct?

**A.**   Correct.

**Q.**   And it states that Mr. Ding was terminated for submitting an application for a patent; right?

**A.**   Correct.

        **THE COURT:**  Ms. Krsulich, I want to get a sense of how much longer.  I'm trying to figure out if we should bring this witness back after the lunch break or if we can finish up.

        **MS. KRSULICH:**  There would be no need to -- a few more questions.

        **THE COURT:**  Okay.

**BY MS. KRSULICH:**

**Q.**   Are you aware that Google determined that Mr. Ding's patent did not contain any Google proprietary information?

**A.**   I am not aware.

        **MS. KRSULICH:**  No further questions, Your Honor.

        **THE COURT:**  Okay.  Thank you.

        Any redirect?

        **MR. CHANG:**  Briefly, Your Honor.

                    **REDIRECT EXAMINATION**

**BY MR. CHANG:**

**Q.**   Ms. Tortorici, defense counsel asked you about your

awareness of downloading or badging issues.  I wanted to make sure the record was correct on that.

A.   Sure.

Q.   Other than Mr. Ding's badging incident, based on your career at Google, how many other incidents are you aware of where an employee asked another employee to badge on their behalf?

A.   I think I've only been made aware of one other situation or something's been escalated to me.  But I'm not on the security team, so that -- but that's my awareness.

Q.   You've been at Google for over a decade?

A.   Yes.

Q.   As a standard practice, does the company conduct exit interviews with its departing employees?

A.   No, we do not.

          MR. CHANG:  Thank you.

          No further questions.

          THE COURT:  Anything further?

          MS. KRSULICH:  Nothing further, Your Honor.

          THE COURT:  All right.  Thank you.  You can step down.

                    (Witness excused.)

          THE COURT:  All right.  Let's see.  Why don't we plan on breaking until 20 minutes after the hour, 20 minutes after 1:00.  We'll return from the lunch break then, and the Government will be ready to call its next witness.

Thank you.

THE COURTROOM DEPUTY:  All rise.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Okay.  Anything to discuss?

MR. BOOME:  Yes, Your Honor.

THE COURT:  Okay.

MR. BOOME:  I'd like to ask the Court to reconsider the suppression ruling on Mr. Ding's statement because we've seen now, in Ms. Krsulich's opening statement, she said, and I'm quoting from the transcript [as read]:

"On January 4th, a Google contractor went to Linwei's house and asked for Linwei's Google laptop. Linwei gave it to him.  'Here's my laptop.'

"Two days later, the Government sent the FBI and 18 law enforcement officers to Linwei's house, and they rammed down his door.  They took everything in his house.  And they didn't talk to him at all.  No one at Google conducted an exit interview."

And this last line of cross-examination is more on that theme of, if anyone had just spoke to poor Mr. Ding, we could have resolved this misunderstanding. And that is just a flagrant mischaracterization of the truth and the actual facts.

And now that this theme is continuing to be repeated, the Government needs to be able to respond and

bring in at least some portion of Mr. Ding's statement so that we can counter this narrative, which is misleading and not consistent with the facts.

**THE COURT:** Okay. Response?

**MR. FONDO:** Your Honor, I think that misstates the record and the context of -- relating to interviews or non-interviews of Google have nothing to do with interviews or non-interviews of -- sorry.

**THE COURT:** I disagree. The theme of the opening statement was that these two powerful entities got together to persecute Mr. Ding, which, incidentally, was contrary to my pretrial rulings to even strike that theme because the motivation for a prosecution is for the judge to examine, not for the jury to examine.

And it was -- they were very much woven together, with the opening statement pounding away at the theme that Google and the Government did this together and they never talked to Mr. Ding; they never gave him a chance to explain himself.

And I guess I was -- and the quote that Mr. Boome read from the opening statement makes clear that those two things were intertwined. And so I was quite surprised at the amount of time that the defense spent examining this witness about exit interviews, and I'm surprised that it came up at all, frankly.

And I do think that there is a serious concern that

you opened the door to something relating to the Government questioning Mr. Ding.

Now, I don't even know -- I mean, I didn't even -- when I issued my ruling, I didn't even examine what Mr. Ding said.  I assumed there were some statements that Mr. Ding made to the agents that reflected consciousness of guilt, but I didn't examine that.  I just ruled that the statements are suppressed.

You know, it does seem that the Government should be able to cure the misimpression that the defense has created that nobody gave Mr. Ding a chance to explain himself.  And, you know, whether that's by putting in all of his statements that he made to the agents when his house was being searched or whether it's something short of that, I'm not really sure.  And I think that's something that we can give some thought to over the lunch break and talk about afterwards.

But I do think that at this point, the Government is entitled to cure -- to put in something to cure the misimpression that the defense has created.

And I'm just thinking out loud, so take what I'm saying with a real grain of salt here, but it may just be that, you know, there could be testimony about how, while the search warrant was being executed, Mr. Ding was given a chance to explain himself.  It may just be that we would leave it at that.  I don't know.

Part of it is that I don't -- again, like I said, I don't know how inculpatory Mr. Ding's statements were, how much they reflected consciousness of guilt when he was speaking with the agents.

MR. BOOME:  So Mr. Ding initially lied and then slowly sort of progressively started admitting that he did take Notes -- Notes files from Google.  And he denied his association -- first denied his association but then denied getting paid by Rongshu.  There was a lot of -- I think it is consciousness of guilt.  Minimized his connection to Zhisuan and Rongshu, and then also admitted, after he -- the agents had gotten him to admit that he actually did take Google information with him, he admitted that he took it for his career, for the next steps in his career.

And so --

THE COURT:  Well, I think he said something like that in response to the earlier investigation too.

MR. BOOME:  Right.  This was specifically about the alleged trade secret files.

THE COURT:  Right.  So I don't know.  I mean, I think -- my tentative view, as I sit here, is that the Government is entitled to do something to cure that misimpression.  I'm not sure it should be to admit the entirety or maybe even any of Mr. Ding's statements.  But I think there may be a way to allow limited testimony about this that cures

the misimpression without putting in the entirety of Mr. Ding's statements.

But I will tell the defense right now, if this trend continues, the entirety of Mr. Ding's statements will be coming in at trial. And you've already -- I warned you about this once when -- after opening statements at the end of the first day of trial, and I'm not sure you're heeding my warning.

But I want to be very clear that Mr. Ding's statements are in grave danger of coming in in their entirety.

**MR. FONDO:** Thank you, Your Honor. We were not trying to --

**THE COURT:** I don't need to get into your motivations. What happened at trial speaks for itself.

And so the question is: How are we going to cure the misimpression that you've created?

**MR. FONDO:** May I just --

**THE COURT:** Give some thought to that over the lunch break.

**MR. BOOME:** We will.

**MR. FONDO:** Your Honor, may I just be -- so I am a little bit confused about -- so Mr. Fuller testified and said, like, "I asked Mr. Ding, and I had that conversation with him, and he explained what happened."

So there's -- I think the jury has an impression that he did, in fact, speak with Google. And I think the Government

will say --

**THE COURT:**  That was the earlier investigation.

**MR. FONDO:**  Correct.  Agreed.  Agreed.

So -- and then with the -- the exit interview point is twofold.  One is that they don't have an exit interview.  Maybe we went further than you would like, Your Honor.  That's clear.

But I do think there's a difference between saying Mr. Ding did not further meet with Google and have a conversation, did not have a chance -- sort of that second chance, if someone pushed him on it, based on what they found, meaning Google versus the Government.  And I think that that's the distinction.

So we're not trying to say that --

**THE COURT:**  Right.  But the whole theme was the Government and Google barreled ahead and persecuted Mr. Ding without giving him a chance to explain himself.

**MR. FONDO:**  So I think that -- well, I understand what you're saying, Your Honor.  I just think that there's -- it's an important distinction.  If we were crossing a Government agent and we were making that implication, I understand that, but I think it's different when it's an employer.

And then also in this context --

**THE COURT:**  A little different, but it's you who intertwined Google and the Government in your opening statement, so...

I mean, I think that -- I understand your position, and I will think about it further over the lunch break, and maybe I will come back and conclude that nothing needs to be done.  But I suggest that you start thinking about some sort of limited measure that can be taken to address this concern.

**MR. FONDO:**  Okay.

**THE COURT:**  And propose something at the end of the lunch break.

And why don't you be back at -- I'll meet you at quarter after the hour to discuss this further.

**MR. BOOME:**  Thank you.

**MR. FONDO:**  Your Honor, sorry.  One other thing.  I apologize.

We have -- I think, the agent is testifying next, and I think there's one evidentiary issue we wanted to address with you in advance.  I think it'll be fairly brief, if that's okay.

**THE COURT:**  Okay.

**MR. FONDO:**  So the Government, I believe, is going to be seeking to admit Exhibit 1150, which is a WeChat with Mr. Ding.  I raised this issue last week as well, but I don't think in the context of getting a ruling from the Court --

**THE COURT:**  Okay.

**MR. FONDO:**  -- because it was relating to another document.

But there's a WeChat on the third page of Exhibit 1150

where Mr. Ding states what somebody else told him, and we would take the position that's double hearsay and should not be admitted.

THE COURT:  Okay.  What's the exhibit number?

MR. FONDO:  It's 1150.

THE COURT:  And you said third page?

MR. FONDO:  Third page, yes, Your Honor.  It's about two-thirds of the way down.

THE COURT:  Doesn't seem like it's being offered for its truth.  It seems like it's being offered for the effect on Mr. Ding and effect on his motivations.  That's my gut reaction, just looking at it quickly.

Why is this -- why is this hearsay?

MR. FONDO:  Well, Your Honor, I think it is being admitted for the truth.  They want to get that information in front of the jury, and so I just respectfully disagree.

THE COURT:  Okay.  Any comment from you, Mr. Boome?

MR. BOOME:  I agree with Your Honor.  Lingang Group is one of the PRC-controlled entities that Dr. Segal, the China expert, will talk about.

This conversation shows at least Mr. Ding's understanding, as he is conveying it to the founder of MiraclePlus, that he's had a discussion with Weng Wei and they're considering an investment.

What's relevant is not whether that conversation is

true, but it's a reflection of Mr. Ding's intent to partner with the Lingang Group, and that's what's relevant for the economic espionage charge.

THE COURT: Okay.

MR. BOOME: So we won't offer the --

THE COURT: Thanks for bringing it to my attention. The objection is overruled.

MR. FONDO: Your Honor, one other thing related to that. So I think Your Honor had indicated -- so when these WeChats come in, could we just get a curative instruction that the statements that are by other individuals are not for the truth of the matter asserted? Because I think that was the import -- and I'm not trying to put words in your mouth, Your Honor. But that was my understanding, most of these are being admitted not for the truth of the matter asserted, meaning statements by others.

THE COURT: Meaning statements by others --

MR. FONDO: Correct.

THE COURT: -- not statements by Mr. Ding.

MR. FONDO: Correct, Your Honor.

THE COURT: Any objection to my giving them an instruction that the statements by other people in these chats are admitted not for the purpose of showing whether the statements are true or not, but for the purpose of showing their effect on Mr. Ding?

**MR. BOOME:**  Yes.  Or helping the jury understand what Mr. Ding is saying, responding to, et cetera.  That sounds right to us, Your Honor.

**MR. FONDO:**  Thank you, Your Honor.

**THE COURT:**  Okay.

**THE COURTROOM DEPUTY:**  Court is in recess.

(Luncheon recess was taken at 12:52 p.m.)

**AFTERNOON SESSION**                                    **1:16 p.m.**

(Proceedings were heard out of the presence of the jury.)

**THE COURT:**  Okay.  So thinking about it further over the lunch break, I mean, the tricky thing about this is that if it were not for the opening statement -- right? -- there would have been nothing -- there would have been no flags set off by Ms. Krsulich's questions of the witness about exit interviews; right?  Because the exit interview thing goes to whether Google did an adequate job of protecting its trade secrets; right?

The only reason it legitimately raises flags is that it harkens back to a theme struck by the defense in opening statements that it was not permitted to strike -- right? -- based on my pretrial rulings.  And so it makes it tricky.

And as I sit here right now, I'm not sure at this moment if anything should be done about it or if we should just wait and see if the defense does anything else to raise this theme of, you know, Google and the Government conspiring to persecute the defendant and not give him an opportunity to

explain himself.

So that's kind of where I'm at right now.

MR. FONDO:  We're fine with that, Your Honor.  We understand the Court's admonishment and we will not try to cross that line.

MR. BOOME:  Your Honor, our view is that the bell has been rung here and the content of -- Mr. Ding sat with the agents for more than two hours and got every opportunity to explain everything that he wanted to about this.

Part of what he said also explains why the FBI took further steps and continued investigating and ultimately led to charges three months after the interview.

And I'm just concerned with where we'd be if we only said something like "Mr. Ding was given an opportunity to explain himself."  That almost kind of even begs more questions.

THE COURT:  No, I think you're probably right about that, but I'm just saying I'm not even sure that is needed right now.

MR. BOOME:  Okay, Your Honor.  Well, we'd appreciate the opportunity to bring it up later if anything comes up and --

THE COURT:  Hundred percent.

MR. BOOME:  Okay.

THE COURT:  Okay.

MR. FONDO:  Your Honor, may I ask a clarifying question somewhat related to this?

THE COURT:  Sure.

But in the meantime, Bhavna, you want to go round up the jury?

MR. FONDO:  I intend to ask the agent whether Mr. Ding provided the passwords.  That was at that same day.  And so if you think that gets even close to the line, I will just not ask it.

THE COURT:  Whether he provided the passwords?

MR. FONDO:  Passwords to the devices.

THE COURT:  We had a discussion about this.

MR. FONDO:  You said -- yeah, and you let the evidence -- you let the passwords come in because you thought it was not part of the custodial interrogation --

THE COURT:  Right.

MR. FONDO:  -- and did not implicate the same rights.

THE COURT:  Right.  And so you're intending to ask the Government's witness whether Mr. Ding provided the passwords?

MR. FONDO:  Correct.  Whether -- yeah.

THE COURT:  And --

MR. FONDO:  Well, whether -- yeah, some version of that.

THE COURT:  And what does that go to?  Like, whether

he provided the passwords or not, what does that -- what issue does that go to in the trial that is for the jury to decide?

MR. FONDO:  Well, it's just -- it's a common one asked by defense, and it's just to show that he did provide them.

THE COURT:  Mm-hmm.

MR. BOOME:  It's like the opposite of consciousness of guilt.  So I think that would be an example of the defen- -- if the defense is allowed to ask that, the jury will understand that there was some interaction between the agents and defendant and they will wonder:  Well, if they took his passwords or he gave them their passwords, why didn't they speak with him?  Why didn't they ask him for their side of the story?  And then we're in the same place again.

THE COURT:  I think that -- I don't think the jury -- whether Mr. Ding gave his passwords to the agents or not sort of in a vacuum is not a particularly relevant thing in this case.  It's not relevant to whether he -- given all of the other evidence we've heard, it's not particularly relevant to any of the elements of either offense.

And given the concerns that have been created by the defense's opening statement, I'm not going to allow that question.

MR. FONDO:  Understood.

THE COURT:  Okay.  Anything else?

MR. BOOME:  No, Your Honor.

**MR. FONDO:**  No, Your Honor.

**THE COURT:**  Okay.  Agent Valladao, do you want to -- is it Valladao?

**THE WITNESS:**  Yes.

**THE COURT:**  Okay.  Thank you.

(Pause in proceedings.)

**MR. BOOME:**  Your Honor?

**THE COURT:**  Yeah.

**MR. BOOME:**  I want to make sure that I'm remembering correctly something you instructed earlier regarding explaining why the FBI moved so quickly for a search warrant from the Google referral to the January 6 search.  The reason was because the FBI found out that Mr. Ding had a one-way ticket booked to Beijing.  I recall we discussed that perhaps in another context, but I want to make clear that I'm intending to ask that in terms of explaining the reason for the urgency in the search warrant.

**THE COURT:**  Well, I -- so, unfortunately, I would have to go back and look.  I thought that -- I thought that I had said that that could not come in, but I do wonder if now it can, in light of the -- in light of the defense's opening statement.

**MR. BOOME:**  I think there's been some implication that the Government is kind of jumping when Google says jump, and explaining that there was an independent reason for that is

important.

THE COURT:  And how did the FBI learn that there was a one-way ticket?

MR. BOOME:  Checking travel records.

THE COURT:  Not from Google?

MR. BOOME:  No.  No.

THE COURT:  Okay.  Comments?

MR. FONDO:  Your Honor, we would agree with your prior ruling.  We think it opens up another door and it's going to require more testimony, more evidence, et cetera.  So we don't think it's relevant to the --

THE COURT:  One second.

MR. FONDO:  We don't think it's relevant.  It's a 403 issue as well.

THE COURT:  Okay.  I understand.  I think, if I recall correctly, it was a 403 ruling that I had last time.  It's possible I'm misremembering, but I think that I said that that could not come in.  But I believe that in light of the opening statement, that the 403 balance changes and it's appropriate to ask that question and to give that answer.  I trust it will be a very brief exchange.

Okay.

(Proceedings were heard in the presence of the jury.)

THE COURTROOM DEPUTY:  Please be seated.

THE COURT:  Okay.  Who's the Government's next

witness?

MR. BOOME:  Our next witness is FBI Special Agent Andrea Valladao, Your Honor.

THE COURTROOM DEPUTY:  Please raise your right hand.

**ANDREA C. VALLADAO**,

called as a witness for the Government, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.

Please state and spell your full name for the record.

THE WITNESS:  Andrea, A-n-d-r-e-a; Catalina, C-a-t-a-l-i-n-a; last name Valladao, V-a-l-l-a-d-a-o.

**DIRECT EXAMINATION**

BY MR. BOOME:

Q.   Good afternoon, Special Agent Valladao.

A.   Good afternoon.

Q.   How are you currently employed?

A.   I'm a special agent with the FBI.

Q.   How long have you been with the FBI?

A.   Since December of 2020.

Q.   Can you outline for the jury your educational and professional background before you joined the Federal Bureau of Investigation?

A.   Yes.  I have a bachelor's degree in microbiology and a Ph.D. in immunology.  And previous to joining the Bureau, I

worked as an innovation development manager at the University of Washington.

Q.   Do you have a particular focus in terms of the casework you do at the FBI?

A.   I do, yes.  I'm assigned to a counterintelligence squad focusing primarily on economic espionage and theft of trade secrets.

Q.   How long have you been investigating those types of suspected offenses?

A.   Since approximately September of 2021.

Q.   What is your role in this case involving Linwei Ding?

A.   I'm the lead agent in charge of this investigation.

Q.   I'd like to ask you about the first time you became aware of the defendant.

Can you tell us how you first learned about Linwei Ding?

A.   We -- my office received a law enforcement referral from Google on January 4th, 2024.

Q.   What is a law enforcement referral, generally speaking?

A.   Enforcement referrals are when we receive information from either individuals or companies when they think that they themselves or someone else has been a victim of a crime.

Q.   Particularly your squad, who focuses on this type of offense, can you estimate for the members of the jury about how many reports from businesses or companies your squad gets every year about suspected criminal theft of trade secrets?

**A.**   We get a lot.

      **MR. FONDO:**   Objection.   Relevance.

      **THE COURT:**   Overruled.

      **THE WITNESS:**   I can't tell you an accurate number, but we get a lot of referrals.

**BY MR. BOOME:**

**Q.**   Is there an established process for companies to refer concerns about trade secret theft to the FBI?

**A.**   Yes.   They can do it multiple ways.   We have an online portal where they can submit referrals, or we also -- we have -- we go and give briefings to companies, so we have relationships with these companies where they can know that they can come to us if there is any issues, and this is across companies in the Bay Area.

**Q.**   Can you give us a high-level summary of the information you received from Google in the law enforcement referral that you received on January 4th?

**A.**   Yes.   We received information of Mr. Ding's employment at Google, as well as the allegation that he had stolen Google proprietary information.   So that included the WebProtect log that had -- it's the log with the list of files that he had uploaded to his personal account.   We received badging logs, as well as location logs of Mr. Ding's devices.

    And we also received a copy of his self-deletion affidavit, as well as information on the MiraclePlus event and

then Rongshu, which was one of the companies that he -- that Google thought he had been involved with.

Q.   Did you take any steps to verify the information you received?

A.   Yes.  So we do two prongs whenever we receive referrals like that.  We talk to the victim company to learn more about the alleged trade secrets, learn more about their practices of security of those trade secrets.

And then we also do our independent investigation to verify the facts in this case, whether there was a company called Rongshu and a MiraclePlus event and verify Mr. Ding's identity.

Q.   Did you do all those things before taking any further investigative steps?

A.   We did, yes.

Q.   Did there come a time when after receiving the referral, you obtained a search warrant?

A.   Yes.

Q.   What were the areas and places you were authorized to search under the warrant?

A.   We were allowed to search Mr. Ding's residence, as well as his own person and any devices that were found in himself or the residence.

Q.   When did you execute the search warrant?

A.   On January 6th, 2024.

Q.   Two days after receiving the referral?

A.   That's correct.

Q.   Was there any particular reason that you and your team moved quickly in this case?

A.   Yes.  We had information that we obtained that Mr. Ding had booked a one-way ticket to China and he was set to leave on January 7th.

Q.   So you searched the day before?

A.   Correct.

Q.   Where did you obtain the information about the ticket?

A.   That's from our own internal databases.

Q.   Was the defendant present when you searched his house?

A.   He was, yes.

Q.   I'm not going to ask you about everything that you found during the search, but I want to focus on a few items.

     Did you and your team recover an iPhone 12?

A.   Yes.

Q.   And a MacBook Pro?

A.   Yes.

Q.   And also a My -- something known as a My Passport hard drive?

A.   Yes.

Q.   Did you see those items at the search location at Mr. Ding's residence?

A.   I did, yes.

**Q.**   You were there?

**A.**   I was there.

        **MR. BOOME:**  Ms. Hernandez, if we could bring up Exhibits 834 through 838 just for the witness.

**BY MR. BOOME:**

**Q.**   And I know you've reviewed these before our testimony today; is that correct?

**A.**   I have, yes.

**Q.**   Do these fairly and accurately show the devices that we just discussed as they were found in Mr. Ding's home?

**A.**   Yes, they do.

        **MR. BOOME:**  Move to admit 834 through 838, Your Honor.

        **MR. FONDO:**  No objection, Your Honor.

        **THE COURT:**  Admitted.

    (Trial Exhibits 834, 835, 836, 837, and 838 received in evidence.)

        **MR. BOOME:**  Okay.  Can we please publish, Ms. Hernandez, 834 and 835 side by side.

**BY MR. BOOME:**

**Q.**   What do these photos show, Special Agent Valladao?

**A.**   Those are photos of Mr. Ding's cell phone.  So on the left you have the phone where it was found the day of his residence, and on the right is just a close-up image of that phone.

        **MR. BOOME:**  And, Ms. Hernandez, can we move now, please, to 836 and 837.

**BY MR. BOOME:**

**Q.**   Special Agent Valladao, were you involved in actually seizing and processing this evidence as well?

**A.**   I was, yes.

**Q.**   What item of evidence do we see here?

**A.**   That is his personal MacBook Pro.

**Q.**   Is that a MacBook Pro, Model A2485 with Serial Number WNPVP4HJ5X?

**A.**   That's correct.

        **MR. BOOME:**  838, please, Ms. Hernandez.

**BY MR. BOOME:**

**Q.**   What do we see here, Special Agent Valladao?

**A.**   The yellow item, that's the external hard drive, My Passport hard drive that was found in Mr. Ding's residence, and that's where it was found.  And right next to it, that's his PRC passport.

        **MR. BOOME:**  Okay.  Your Honor, I'd like to read, if there's no objection, some stipulations that the parties have agreed to, but not filed yet, as to the devices.

        **MR. FONDO:**  No objection, Your Honor.

        **THE COURT:**  Okay.  Go ahead.

        You may recall at the beginning of trial, I was talking to you about what is evidence.  And there are a couple of different kinds of evidence.  There's witness testimony, there's documentary evidence, and then a third type of evidence

is a stipulation that the parties agree to, stipulation about certain facts that the parties agree to.

And they're about to read you some stipulations now, and you should consider those facts as having been proven at trial.

**MR. BOOME:**  Thank you, Your Honor.

The parties agree that the Government obtained an accurate forensic extraction of an Apple iPhone 12 with Serial Number F18DK8YT0DXY seized from Linwei Ding's residence on January 6, 2024.

The parties agree that the Government obtained an accurate forensic extraction of a MacBook Pro, Model A2485, with Serial Number WNPVP4HJ5X, seized from Linwei Ding's residence on January 6, 2024.

And, finally, the parties agree that the Government obtained an accurate forensic extraction of a My Passport hard drive with Serial Number WXA1A4705LNR seized from Linwei Ding's residence on January 6, 2024.

**BY MR. BOOME:**

**Q.**   Special Agent Valladao, are those the three devices that we just discussed?

**A.**   Yes.

**Q.**   What is a forensic extraction?

**A.**   That is when we make a true and accurate copy of the contents inside the device.

Q.   Does that include things like documents and videos and photos?

A.   That's correct.

Q.   Including metadata about those files?

A.   Yes.

Q.   Like hash values and creation date, et cetera?

A.   Yes.

Q.   Okay.  In this photograph that we're looking at now, what is just to the left of the My Passport hard drive?

A.   That's Mr. Ding's PRC passport.

Q.   When you say "PRC," can you explain what you're referring to?

A.   Yeah.  People's Republic of China.

Q.   What is Mr. Ding's citizenship status as it relates to the PRC?

A.   He's a citizen.

Q.   Citizen of China?

A.   That's correct.

Q.   And what is his status in the United States?

A.   He's a lawful permanent resident in the U.S.

Q.   During your search of the defendant's home, did you find any evidence of bank accounts in China belonging to Mr. Ding?

A.   We did, yes.

Q.   What evidence did you find?

A.   We found two things.  There were -- there was a notebook

that had passwords and accounts, and one of them was listed as

Bank of China.  And there was a separate document that also

listed a China Merchants Bank account.

Q.   Are you, as an FBI agent, able to obtain financial records

from banks in China like China Merchants Bank or Bank of China?

A.   I am not, no.

Q.   Why not?

A.   The FBI does not have jurisdiction outside of the

United States, so any legal process needs to be done in the

United States.

Q.   In addition to searching Mr. Ding's residence and his

electronic devices, the ones we just looked at, did you also

obtain search warrants for some Google accounts that belonged

to Mr. Ding?

A.   We did, yes.

Q.   Do those include linweidwork@gmail.com?

A.   Yes.

Q.   Linweidin@gmail.com?

A.   Yes.

Q.   Dingyong198608@gmail.com?

A.   Yes.

Q.   And aamermahmood@gmail.com?

A.   Correct, yes.

Q.   What types of accounts are those?

A.   They're email accounts.

Q.   So they're at Gmail; right?

A.   Yes.

Q.   So hosted by Google?

A.   That's right, yes.

Q.   Is there anything else other than email involved in those accounts?

A.   Yes.  They have all of the services that Google provides, such as Drive -- Google Drive, so Calendar, Maps, anything that would come with a Gmail account.

Q.   What is Google Drive?

A.   It is an online storage platform.  You can use it -- it's kind of like Dropbox.  You can use it to store files, documents, photos.

     MR. BOOME:  Your Honor, I'm going to go back to the stipulations.

     The parties agree that the Government obtained true and accurate copies of the contents of the following accounts belonging to Linwei Ding on the dates indicated below.

     Number 1, linweidin@gmail.com received on January 16th, 2024.

     Number 2, dingyong198608@gmail.com received on January 16th, 2024.

     Linweidwork@gmail.com received on February 14th, 2024.

     And aamermahmood@gmail.com received on October 24th, 2025.

**BY MR. BOOME:**

**Q.**    Okay.  Special Agent Valladao, in reviewing the evidence, did you find any evidence indicating that the defendant had transferred information from Google into one of those personal accounts?

**A.**    Yes.

**Q.**    Can you tell us about that, please.

**A.**    Yes.  When analyzing the drive of the linweidin@gmail account, we were able to find the files that match by name to the files that Google had indicated were -- contained their proprietary information.

**Q.**    Where were those files located?

**A.**    They were, as I said, on the -- on the Google Drive, on his personal Google Drive.

**Q.**    For the linweidin account?

**A.**    That's right, yes.

**Q.**    What was the process that you undertook to determine whether the files you found in that account were the same files that WebProtect showed leaving Google?

**A.**    We -- so because we could see the files, we would -- we reviewed them.  So we open the file, look at the content.  We also looked at the WebProtect logs to see when they were uploaded and checked those dates, checked the names.  And then we also asked Google for their source documents.  That way we can compare the files that they came from.

Q.   Based on where you found the files in the linweidin account, can you tell the members of the jury whether there was anything significant about the way they were stored, as far as your investigation?

A.   Yes.  All of the files were stored in two folders.  So on his Google Drive, there was two folders.  One of them was called Comp and the other one was named Comp2, and all of the files that we found that were uploaded from Google systems were stored in those two folders.

MR. BOOME:  Ms. Hernandez, could we bring up 778, please, Exhibit 778.

BY MR. BOOME:

Q.   And this is just -- only you can see this now, Special Agent Valladao.

Can you tell us, at a high level, what this is?

A.   This is a summary exhibit that I created listing the folder structure of the Comp and Comp2 folders on Mr. Ding's account.

Q.   Does this show the organization of the files taken from Google and stored in this account?

A.   It shows the organization of the folders in which the files were found.

MR. BOOME:  Your Honor, move to admit 778 as a summary exhibit.

MR. FONDO:  No objection, Your Honor.

**THE COURT:**  Admitted.

(Trial Exhibit 778 received in evidence.)

**BY MR. BOOME:**

Q.   Can you explain for us, Special Agent Valladao, on the left there's some -- on the left and the right column, there are some slashes and different names of folders.

Can you help us understand what those mean?

A.   Yes.  So the comp folder is the parent folder, and then inside of it there's subsequent folders.  So, for example, "CheatSheet," that's the name of one folder.  Then there's also "CODE," that's a different folder.  And then within CODE, there were subfolders.  So, for example, CODE, inside of that folder, you would have BorgletCode, another folder, and then BorgletProber, and so on down the list.

Similar in Comp 2.  That one was mostly single folders except for Platform, which inside of it had a folder called "TPU."

**MR. BOOME:**  Thank you, Ms. Hernandez.

Can we move to 779 now, please, just for the witness.

**BY MR. BOOME:**

Q.   Okay.  Can you explain what this is?

A.   Yeah.  So this is now listing all of the folder contents, meaning the titles, in the files that were contained inside these Comp and Comp 2 folders.

Q.   Did you create this summary exhibit --

**A.**   I did, yes.

**Q.**   -- from your analysis of the account?

**A.**   I did.

        **MR. BOOME:**   Your Honor, move to admit 779.

        **MR. FONDO:**   No objection.

        **THE COURT:**   Admitted.

    (Trial Exhibit 779 received in evidence.)

        **MR. BOOME:**   Okay.  Ms. Hernandez, can we go, please,
to -- let's go to the bottom of page 15.

**BY MR. BOOME:**

**Q.**   And I'll ask you, Special Agent Valladao, to explain what
this shows.

**A.**   Yeah.  So -- so you zoomed in, so I can't see, but
I believe the parent folder is Comp2.  So on the left-hand
side, you'll see the parent folder and then "Platform-TPU."
That means that it's found on the "Platform" folder.  Inside of
that, there's a different folder called "TPU."  And all of
those files listed there are found inside that TPU folder.

        **MR. BOOME:**   Can we zoom back out, please,
Ms. Hernandez.

**BY MR. BOOME:**

**Q.**   And sorry.  We couldn't see Comp2 before but --

**A.**   That's right.

**Q.**   To be 100 percent clear, the account linweidin@gmail.com,
is that associated with the defendant's employment at Google in

any way?

**A.**   No.  It's his personal account.

**Q.**   Of the documents that are listed in the entirety of Exhibit 779, all 18 pages, I believe, how many of them matched the names of files that you saw in the WebProtect logs leaving Mr. Ding's Google computer and going up to the linweidin account?

**A.**   All of them did.

**Q.**   Special Agent Valladao, in this case, we've heard there are 105 alleged trade secret documents divided into seven categories.

Are they included, those 105 documents --

        **MR. BOOME:**  And can we just see the whole document now, Ms. Hernandez.

**BY MR. BOOME:**

**Q.**   Are they included in this Summary Exhibit 779?

**A.**   They are, yes.

        **MR. BOOME:**  Can we pull up 775 just for the witness, please, Ms. Hernandez.

**BY MR. BOOME:**

**Q.**   Do you recognize this, Special Agent Valladao?

**A.**   I do.

**Q.**   Can you tell us what it is?

**A.**   It's another summary exhibit listing the alleged trade secret files, so the 105, by category and their exhibit number.

Q.   Okay.  And just to be clear, this is -- now we're not talking about the folder structure anymore; we're talking about the alleged trade secret categories.

A.   That's right.

        MR. BOOME:  Okay.  Your Honor, move to admit 775.

        MR. FONDO:  No objection.

        THE COURT:  Admitted.

     (Trial Exhibit 775 received in evidence.)

BY MR. BOOME:

Q.   Okay.  Can you walk us through the columns of information?

A.   The first column lists the trade secret category, and then the second column is the exhibit number of each individual file, and then the third column is the name of the alleged trade secret file.

Q.   How many total categories?

A.   There's seven of them.

Q.   Did you recover in your search all of the documents that are listed -- all 105 documents that are listed in Exhibit 775?

A.   I did, yes.

Q.   Are those Exhibits 358 through 462?

A.   Yes.

Q.   The alleged trade secret documents from the linweidin@gmail.com account?

A.   That's correct.

        MR. BOOME:  Your Honor, the Government moves to admit

Exhibits 358 through 462 as sealed exhibits.

MR. FONDO:  No objection, Your Honor.

THE COURT:  Admitted.

(Trial Exhibits 358 through 462 (Sealed) received in evidence.)

BY MR. BOOME:

Q.   We looked at Exhibit 779, which had 18 pages of files listed as they were organized in subfolders.  You testified that these 105 are part of those.

But as to the others, do Exhibits 569 through 655 represent some of the other files, not the alleged trade secret files, that were also in Comp1 and Comp2?

A.   Yes.

MR. BOOME:  Okay.  Your Honor, we're just identifying those now but not asking to admit them into evidence.

THE COURT:  Okay.

MR. BOOME:  Except for 570 to 571.

Can we please show just the witness 570 to 571.

BY MR. BOOME:

Q.   Special Agent Valladao, do you recognize these?

A.   I do, yes.

Q.   Were these stored along with the alleged trade secret documents in Comp and Comp2?

A.   They were.

Q.   Can we generally describe them as non-technical documents

containing Google's leadership training materials?

A.   Yes.

MR. BOOME:  Admit these into evidence, Your Honor.  We move to admit these.

MR. FONDO:  No objection.

THE COURT:  Admitted.

(Trial Exhibits 570 and 571 received in evidence.)

BY MR. BOOME:

Q.   Special Agent Valladao, we've heard during this trial about how the defendant compiled the information contained in the alleged trade secret documents.  We've heard it before, but I want to ask you some questions about it now.  So can you just give us a 30-second reminder of the steps in that process.

A.   Yes.  Mr. Ding accessed internal Google source documents from which he copied information into Apple Notes on his Google-issued computer, laptop, and then made those Apple Notes into PDF files, which then he uploaded to his personal Google Drive account.

Q.   Have you reviewed all the alleged trade secret documents, the Notes files, and the PDF files that they correspond to?

A.   I did, yes.

Q.   Are the Notes versions of the alleged trade secret documents Exhibits 463 to 567?

A.   Yes.

MR. BOOME:  And, Your Honor, we're just identifying

those right now.

BY MR. BOOME:

Q.   Did you obtain the Google source documents that Mr. Ding used to create the alleged trade secret files?

A.   I did, yes.

Q.   Where did you get them?

A.   Google provided them.

Q.   Did you compare the Google source documents to the content of the 105 alleged trade secret documents?

A.   I did.

        MR. BOOME:  Can we show Exhibit 776, please, just to the witness, Ms. Hernandez.

BY MR. BOOME:

Q.   What is this, Special Agent Valladao?

A.   It's a summary exhibit that I created listing the alleged trade secret files with their corresponding Apple Note and corresponding Google internal source document.

        MR. BOOME:  Move to admit 776, Your Honor.

        MR. FONDO:  No objection, Your Honor.

        THE COURT:  Admitted.

    (Trial Exhibit 776 received in evidence.)

        MR. BOOME:  Okay.  We'll zoom in, please, Ms. Hernandez.

BY MR. BOOME:

Q.   And then, Special Agent Valladao, I'll ask you to explain

how to use this summary exhibit.

**A.**   Yes.   So the two columns on the left, that's the alleged trade secret file title, as well as its exhibit number.   The middle two columns are the Apple Notes and the exhibit number. And then on the columns on the right, that's the source document title with the source -- with the exhibit number.

And so when you go by rows, you can see that the alleged trade secret file corresponds to an Apple Note of the same name, and then that corresponds to the source document that Google provided.

**Q.**   The ones that Ms. Hernandez has blown up for us here, there's a one-to-one, source to trade secret?

**A.**   Correct.

**Q.**   Did you see -- did you see any files that were different?

**A.**   Yes.   So there's a lot of files that only were created based on one source document.   There's others that had multiple source documents that -- from where information was copy-pasted to create that alleged trade secret file.

**MR. BOOME:**   Can we go down to Exhibit 394, Ms. Hernandez.   Or let's go to ViperLite, 378.

**BY MR. BOOME:**

**Q.**   And as Ms. Hernandez brings that up, can you tell us what's different about this particular alleged trade secret document and how it was created?

**A.**   Yes.   So you can see right there in the middle ViperLite,

Exhibit 378.  That one has one, two, three, four -- five source documents from where information came from.

So as you go -- as you're reading this, then all of those source documents correspond to that one alleged trade secret file.

Q.   As part of your investigation, did you conduct an actual manual review of the alleged trade secret documents and the Google source documents?

A.   I did, yes.

Q.   I'd like to ask you about that now.

Before we do that, I want to ask you, were there any Google source documents that you excluded from this summary exhibit?

A.   I did, yes.

Q.   Can you tell us which ones and why?

A.   Yes.  There were two alleged trade secret files that Google had indicated some source documents were Moma, came from Moma directory.  And what this means, that as Google explained, Moma is their internal search tool.  And these particular source documents were just definitions of common words used in engineering field, so they were not sensitive Google information.

Q.   I want to show an example of just one of them, since we've heard about them during the trial.

MR. BOOME:  Can we bring up Exhibit 176, please,

Ms. Hernandez.

BY MR. BOOME:

Q.   Is this an example of one of the Moma source documents?

A.   That's right, yes.  So there's a concept there and --

Q.   Oh, sorry.  Hold on.

A.   I'm sorry.

MR. BOOME:  It's not admitted -- oh, I'm sorry.  I'm sorry.  This is already in evidence.  I forgot to tell you, Ms. Sharma.  Sorry about that.

BY MR. BOOME:

Q.   Sorry, Special Agent Valladao.  Go ahead.

A.   So, yeah.  So you can see there on the top, it's -- the concept is "Annualized Swap Rate," and then it just has the definition of what that is.

Q.   And you said not particularly sensitive.  Are there any alleged trade secret files that are only from these Moma definition pages?

A.   No.

MR. BOOME:  Ms. Sharma, I'm going to ask Special Agent Valladao now about some of the comparisons.  Can we hit the switch, please.

Okay.  And can we bring up exhibits already in evidence 407 and 70 side by side, please, Ms. Hernandez.

BY MR. BOOME:

Q.   Special Agent Valladao, these are already in evidence.

Can you tell us what they are?

**A.**   Yes.  So the document on the left is the document that was found on Mr. Ding's personal Google Drive account, and the document on the right is the internal Google source document that was identified as having been the source of the information in the alleged trade secret file.

**Q.**   Which one has the Google logo and the confidential/proprietary marking on it?

**A.**   That's the internal Google source document.

          **MR. BOOME:**  Ms. Hernandez, can we go to page 5 of each document, please.

**BY MR. BOOME:**

**Q.**   Can you walk us through how you conducted your comparison of these documents?

**A.**   Yes.  When I was comparing the documents, I was looking for information from the source document that ended up in the alleged trade secret document, so I was looking for words that were the same or diagrams.  And so I compare them side by side, and as you can see here, starting with that first paragraph where it says "Endurance," it is -- the wording is exactly the same.  So it's a copy-paste of that paragraph, followed by the figure below it, and then followed by the next paragraph.

          **MR. BOOME:**  Let's go to page 6, please, of the -- of both documents.

\\\

**BY MR. BOOME:**

**Q.**   Can you walk us through these pages?

**A.**   Yes.  So on the left-hand side, you have the rest of the paragraph that we saw previously on the previous page of the source document, followed by the figure copy-pasted and then the next part of the document.  Again, the title's the same, the bolding, and then it's just the bullet points.  So comparing it, you can see that it's a copy of the source document.

**Q.**   How long is this alleged trade secret file, the one on the left?

**A.**   The one on the left is, I believe, about 150 pages.

**Q.**   Did you review the whole thing?

**A.**   I did.

**Q.**   How much of it was copied from the Google source document on the right, Exhibit 70?

**A.**   It's about 90 percent.

**Q.**   I want to go to a comparison at the end of each document.

        **MR. BOOME:**  Can we go to 121 of 407, Ms. Hernandez, and 58 of 70.

**BY MR. BOOME:**

**Q.**   So now we're much farther down in the documents.  Can you walk us through this comparison?

        I'm sorry.  We need to go back -- we need to go up one page to 120 of 407, Ms. Hernandez.

**A.** Yes. So similarly, that's -- this is another part of the document. On the right-hand side, you can see the source. On the left-hand side, you can see the title, "Tractor Interface," followed by the next paragraph and then the bullet points, even down to where it says "Tractor HW spec" and includes the links that were also found in the source document.

**Q.** And let's go to 121 of 407.

Okay. So, Special Agent Valladao, how many source documents went into Exhibit 407, the alleged trade secret file?

**A.** It was only one.

**Q.** Just this -- it was one-to-one here?

**A.** Yes.

**Q.** I want to look at an example of some different -- another document that had multiple source documents.

**MR. BOOME:** Can we bring up 377 and 172, please, Ms. Hernandez.

**BY MR. BOOME:**

**Q.** Okay. Can you orient us as to which document is which?

**A.** Yes. Same as the previous one, the one on the left is the alleged trade secret document that was found on Mr. Ding's personal Drive account, and the document on the right is the Google internal source document.

**MR. BOOME:** Can we scroll down -- if we can. Can we scroll on these, Ms. Hernandez, or do we need to go page by page?

Okay.  Let's go to page 4 of 172, please.

BY MR. BOOME:

Q.   Okay.  Can you please walk us through the comparison.

A.   Yeah.  So this is the first slide of the source document where information was copied from.  So you can see that it has the title of the slide, "Product Overview," and you can see that on the left-hand side.  The text and the bullet points, even down to the date, it's all the same text.  And then, also, the figure on the right-hand side is also copied over on the alleged trade secret file.

MR. BOOME:  Let's go to page 5 of Exhibit 172, please, Ms. Hernandez.

BY MR. BOOME:

Q.   What is -- what is this?  This page is different.

A.   Yeah.  So some of the source documents were Word documents.  Other ones were PowerPoint presentations, such as the one you're seeing now.  When Google provided the source documents, if there were any notes or comments on those documents, we would get them as well.

And this is an example of some of the notes that were included in that source document.  Reviewing the trade secret files, some of them would have those notes copied to them, other ones wouldn't.  So in this case, this was not copied over.

Q.   Let's go to the following page of 172, please.

**A.**   This -- yeah.  So this would be the next slide of the source document.  You can see the title "Performance," and then the rest of the slide is copied over, so "Top Line Performance" as well as the figure and the wording underneath that figure as well.

**MR. BOOME:**  Okay.  Let's keep scrolling in 172, Ms. Hernandez, until we see "Ghostlite Chip Functionality."

Okay.  Next page, please.  Okay.

**BY MR. BOOME:**

**Q.**   So we're at the bottom of 377 now.  Can you walk us through the comparison?

**A.**   Yes.  So, same thing.  Mr. Ding would tend to keep the title, so you saw there "Ghostlite Chip Functionality," and then the title of this next slide is "Architectural Overview."

So if you --

**Q.**   Let's go to the next page of 377, please.

**A.**   Yes.  So in this case, the bullet points where the text was copied over first, and then that was followed by the figure that you see down there on the bottom on the left-hand side.

**Q.**   I'm not going to ask you to explain this technology to us, Special Agent Valladao, but just at a high level, what is Ghostlite?

**A.**   It is Google's TPU Version 6.

**Q.**   The Tensor Processing Unit?

**A.**   Yes.

MR. BOOME:  Let's go to page 3, please, of 377 and the next page of 172.  And page 11 of 172, please.

BY MR. BOOME:

Q.   At the time Mr. Ding transferred the alleged trade secret document here to his personal cloud account, had Google even acknowledged the existence of the Ghostlite Chip?

A.   No, I don't believe it had been.  They hadn't made any mention of it.

MR. BOOME:  Let's please move ahead to page 10 of 377, Ms. Hernandez.

BY MR. BOOME:

Q.   And now we're going to -- okay.  So before we change source documents, can you tell us what is significant about this portion of the alleged trade secret document on the left?

A.   Yes.  So you -- you can see there where it says "Package," so that's, again, part of the source document, and then underneath that there's a new title.

So Mr. Ding would -- as I mentioned, he would keep the titles of the documents.  And so this is an indication that this is a different source document.

Q.   And let's go to that source document now.

MR. BOOME:  Ms. Hernandez, can you switch out our image on the right to Exhibit 90 in evidence, please.

BY MR. BOOME:

Q.   Okay.  Tell us what you see copied here and what you don't

see copied here.

**A.**   Yeah.   So on the right-hand side is the internal source document Google provided.   You can see the title "Ghostlite Development Entry" as well as the description and the self-link.   Both of those were copied over.

Nothing else about this initial slide, including the date or any of the contact information or confidentiality restrictions, was copied over.

**MR. BOOME:**   Let's move ahead to page 17 of 90, please, Ms. Hernandez.

**BY MR. BOOME:**

**Q.**   Okay.   Where do we see "Product Overview" in the alleged trade secret document?

**A.**   Yeah.   So right underneath the title of "Ghostlite Development Entry," that's where you can see "Product Overview" and then the wording that starts with "Similar to Previous Generation" and the bullet points which you see on the right -- right-hand side.

**Q.**   Can we go to 11 of 377, please.

**A.**   And this is the remaining of that text on the slide, as well as the figure.

**Q.**   Okay.   And last two pages.

**MR. BOOME:**   Ms. Hernandez, can we please go to 26 of Exhibit 90 and 14 of 377.

\\\

**BY MR. BOOME:**

**Q.**   All right.  Is this the end of the -- end of the line for this document?

**A.**   It is, yes, for the alleged trade secret document.

**Q.**   For the alleged trade secret document?

**A.**   Yes.

        **MR. BOOME:**  Okay.  Thank you, Ms. Hernandez.  We can take these down, and we can go back up.

**BY MR. BOOME:**

**Q.**   I'm going to change gears now, Special Agent Valladao, and ask you about some of the things that you found during your review of the evidence that you obtained pursuant to the search warrants that you told us about in Mr. Ding -- from Mr. Ding's devices and accounts.

Did you come across any chat communications?

**A.**   I did, yes.

**Q.**   Was there a specific type of chat communication that you reviewed for this case?

**A.**   Yes.  WeChat conversations.

**Q.**   Can you tell us -- give us an orientation about WeChat, what it is, how it works?

**A.**   Yeah.  So WeChat is a chat application similar to WhatsApp or Signal.  You can create groups, talk to individual people. You can transfer files, photos.

        **MR. BOOME:**  Ms. Hernandez, can you bring up

Exhibit 314, please?

**BY MR. BOOME:**

Q.   Do you recognize this, Special Agent Valladao?

A.   Yes.

Q.   What is it, at a high level?

A.   It is a photo of the screen of Mr. Ding's laptop.

Q.   How did the FBI get this photo?

A.   This was taken on the day of the search of his residence.

MR. BOOME:   Your Honor, we move to admit 314.

THE COURT:   Any objection?

MR. FONDO:   No objection.

THE COURT:   Admitted.

(Trial Exhibit 314 received in evidence.)

**BY MR. BOOME:**

Q.   And so, sorry.  Just to clarify, which device is this photo of?

A.   It's Mr. Ding's MacBook Pro laptop.

Q.   His personal or his Google?

A.   His personal laptop.

MR. BOOME:   Okay.  Can we show the profile picture, please, Ms. Hernandez.

**BY MR. BOOME:**

Q.   How did you identify this as a WeChat profile?

A.   So this is just -- it shows the application WeChat on his laptop, and it shows Mr. Ding's account, his photo, and it

would be to enter the account.

Q.   Okay.  I'd like to now ask you about some of the chats that you reviewed.

Before we do, for some orientation in time, when did Mr. Ding start working at Google?

A.   2019.

Q.   Did you come across any communications during your investigation indicating that at some point he started speaking with a recruiter based in China?

A.   Yes.

MR. BOOME:  Can we bring up Exhibit 1133.

THE COURT:  And now might be a good time for me to instruct the jury on the WeChat exchanges.

MR. BOOME:  Yes, Your Honor.

THE COURT:  So you're going to see, I think, a number of WeChat exchanges between Mr. Ding and others, and I want to give you an instruction about how to consider those exchanges; right?

So there will be things that Mr. Ding said and there will be things that other people said in these chat exchanges; right?  The things that Mr. Ding said, you can consider them for any purpose that you find relevant to this case.

For the things that other people said, you're allowed to consider them for a limited purpose.  You are not to consider -- you know, they are not being shown to you --

the Government is not showing these statements from others to you to try to prove that what those people said was true; right?

So if somebody says to Mr. Ding "It's a warm day today," the Government is not showing it to you to prove that it was a warm day that day, and you're not to consider it for that purpose.

The things that other people said in these chats you're to consider for a limited purpose.  Number one, to show the effect that the statements had on Mr. Ding; right?  Or, relatedly, to help you -- help provide context for the things that Mr. Ding was saying in the chats.

So the stuff that other people say you're to consider for those limited purposes.

And with that, I wonder if now is a good time for our afternoon break.

**MR. BOOME:**  It is, Your Honor.  Thank you.

**THE COURT:**  Okay.  So we'll resume at 25 minutes after the hour.  25 minutes after 2:00.  Thank you.

**THE COURTROOM DEPUTY:**  All rise.

(Proceedings were heard out of the presence of the jury.)

**THE COURT:**  All right.  Thank you.

You can step down, Agent Valladao.  If you could be back on the stand at 25 after.

And anything to talk about?

**MR. BOOME:**  I have a quick logistical question, Your Honor, about managing these WeChats since we have an original Mandarin version and a translated version.

**THE COURT:**  Yes.

**MR. BOOME:**  I'm wondering if just for efficiency, maybe one time we can explain to the members of the jury that all these were in -- these were originally in Mandarin and we're going to show the translated versions, but they should understand that the original were Mandarin and these are translations that the parties have agreed are accurate.

**THE COURT:**  That sounds good.

**MR. FONDO:**  No objection, Your Honor.

**THE COURT:**  Okay.

**MR. BOOME:**  And when I admit the exhibit -- when I offer the exhibits in evidence, both the source and the translated?  Or -- both the source --

**THE COURT:**  I think it probably makes sense for the China-language version and the English version to go in as an exhibit.

**MR. FONDO:**  Your Honor, my only hesitation with that is that --

**THE COURT:**  Oh, yeah.

**MR. FONDO:**  You know where I'm going with this?

**THE COURT:**  Yeah.  I think probably just the English should go in; right?

MR. FONDO:  I think so, Your Honor.

THE COURT:  Yeah.  Okay.

MR. BOOME:  No problem.

THE COURT:  All right.

MR. BOOME:  Thank you.

THE COURT:  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 2:14 p.m.)

(Proceedings resumed at 2:26 p.m.)

(Proceedings were heard in the presence of the jury.)

MR. BOOME:  Your Honor, before we go further and discuss the chats, if it's all right with the Court, I'd like to read a stipulation about the Mandarin-to-English translations that were involved.

THE COURT:  Go ahead.

MR. BOOME:  And it's a little bit lengthy, but both parties have agreed it probably makes sense to read the whole thing right now, if that's okay.

THE COURT:  Sure.

MR. BOOME:  The parties agree that the trial exhibits marked with an AML Bates prefix in the amended exhibit list filed on December 23rd, 2025, contain fair and accurate English-language translations of Mandarin-language source documents.  Each translated document is grouped with the corresponding source document on the trial exhibit list.  For

example, Exhibit 1011 is a translated document with an AML Bates prefix and Exhibit 1001S is the corresponding Mandarin source document.

This stipulation excludes Exhibit Numbers 1020, 1193 through 1194, and certain phrases identified below from pages 3, 131, and 169 of Exhibit 1178.

The parties further stipulate and agree to the following corrections to certain phrases in the English-language translations on pages 3, 131, and 169 of Exhibit 1178.

With respect to page 3 of Exhibit 1178, the parties agree that the line currently translated as, quote, "I've returned to the U.S.; there are some financing matters here," is correctly translated as, quote, "I've returned to the U.S.; there are some fundraising matters here," end quote.

With respect to page 31 of Exhibit 1178, the parties agree that the line currently translated as, quote, "It's okay. Computer resources can be provided first," end quote, is correctly translated as, quote, "Money is not an issue. Compute needs to be given at first," end quote.

And, finally, with respect to page 169 of Exhibit 1178, the parties agree that the line currently translated as, quote, "Director Zhang, internally we discussed with MiraclePlus and accept the plan for a subsidiary to acquire the parent company," end quote, is correctly translated

as, quote, "Director Zhang, internally we discussed with Qi and accepted the plan for a subsidiary to acquire the parent company," end quote.

**BY MR. BOOME:**

**Q.**   Okay.  Special Agent Valladao, we ended by asking -- I ended by asking you about whether you recovered communications involving the defendant speaking with a recruiter in China. And I asked Ms. Hernandez to please bring up Exhibit 1133.

Okay.  Special Agent Valladao, what is this?

**A.**   This is the first page of a WeChat communication between Mr. Ding and a person self-identified as Julian Li.

**MR. BOOME:**  Your Honor, we move to admit the first two pages of this chat.

**THE COURT:**  Objection?

**MR. FONDO:**  No objection, Your Honor.

**THE COURT:**  Admitted.

**BY MR. BOOME:**

**Q.**   Okay.  Since this is the first WeChat we've seen, can you give us --

**MR. FONDO:**  Actually, I'm sorry.  Excuse me.  So I do -- I apologize.  I do have an objection.  For the rule of completeness, we'd want the entire thing admitted.

**MR. BOOME:**  No problem at all, Your Honor.

**THE COURT:**  Okay.  The entire thing will be admitted.

(Trial Exhibit 1133 received in evidence.)

MR. BOOME:  Let's go to the top portion, please, Ms. Hernandez.

BY MR. BOOME:

Q.   And can you give us some orientation as to what -- this is how a lot of these WeChats are going to look.  Can you just give us an orientation about what this header shows on each one?

A.   Yeah.  So it shows information about the conversation, including who's participating in the -- in this group chat, the number of messages, the first and last date and time stamp of the messages.

And so for the number of participants, you can see where it says "Display names."  You can have a -- when you sign up for a WeChat account, you get a WeChat user ID, and then you can also have a display name, which is like a nickname.  So in this case, you can see dingyong198608.  That's Mr. Ding's WeChat user ID.  And then the other two, Julian Li is a display name, and the following set of characters that start with a W, that would be Julian Li's WeChat user ID.

So even though it says there's three participants, there's really only two people involved in this chat, so it's Mr. Ding and Julian Li.

Q.   And the first and last message sent dates, can you tell us about those?

A.   Yes.  So these conversations started on August 28th, 2020,

and the last message was sent on December 18, 2023.

MR. BOOME: Okay. Thank you, Ms. Hernandez.

And let's go down to page 2, please.

Okay. Thank you.

Can we bring up 1132, Ms. Hernandez.

BY MR. BOOME:

Q. Okay. Special Agent Valladao, this is just for you now.

For this chat with Julian, the recruiter, how long was that chat in total?

A. It was about 700 pages.

Q. Okay. And so is it broken up into different sections?

A. It is, yes.

Q. Can you explain how that works?

A. Yes. When reviewing the chat, there was -- the chat started in August of 2020, and then there was a period of time where COVID came around and they were discussing COVID. So after that, it picked up again, conversations in 2021 about a job search, so...

Q. Is that where Exhibit 1132 begins?

A. That's right.

MR. BOOME: All right. So, Your Honor, I move to admit page 1 of 1132.

THE COURT: This is not something that just got admitted in its entirety?

MR. BOOME: No, Your Honor. There are three --

because the Julian chat is so lengthy, it's broken into three

smaller sections.

THE COURT:  Got it.  Okay.

MR. BOOME:  There's a lot of -- there's a lot of

nothing, but -- so I'm only seeking to admit certain pages

unless the defendant would like more in evidence.

MR. FONDO:  No objection at this time, Your Honor.

THE COURT:  No objection to admitting --

MR. FONDO:  Page 1.

THE COURT:  -- page 1 of this exhibit?

All right.  It's admitted.

(Trial Exhibit 1132, page 1, received in evidence.)

MR. BOOME:  Okay.  Let's show it to the jury.

BY MR. BOOME:

Q.  And then can you show us whether you see a document being

sent in the middle bottom portion of this WeChat.

A.  Yes, I do.

Q.  Can you point it out for us?

A.  Yes.  On the very bottom right there of your screen,

Mr. Ding, user ID dingyong, he sends a file called Resume6.pdf.

Q.  Did you recover this file, Resume6.pdf?

A.  I did, yes.

Q.  Where did you recover it?

A.  On Mr. Ding's linweidin Google Drive account.

Q.  Now, how do you know that the document you found with this

name in that account is the same one that's being sent in this chat?

A.    I looked at the hash values of documents.  And how Mr. Crain explained before, the hash value is like a digital fingerprint, and so you're able to -- each file has a unique hash value, and using our forensics tools, I was able to search for hash values across all our evidence items and see where a specific hash value is found.

Q.    In the chat?

A.    That's right.

Q.    So during your testimony today, every time we discuss a document coming from a chat, is that the process that you undertook?

A.    It is, yes.

Q.    Okay.  Let's bring up 794, please.

      Is this the Resume6 from the WeChat?

A.    It is, yes.

          MR. BOOME:  Your Honor, we move to admit this into evidence.

          MR. FONDO:  No objection.

          THE COURT:  Admitted.

      (Trial Exhibit 794 received in evidence.)

BY MR. BOOME:

Q.    Okay.  Did you review -- based on your review of the chats with Julian, the recruiter, was there any evidence that the

defendant applied for jobs in China around this time?

A.    Yes.

Q.    Did he conduct any interviews?

A.    He did, yes.

Q.    Can you summarize the initial results of the interviews that the defendant discusses with Julian in this chat?

A.    Yes.  So for a time period of about a year, Mr. Ding interviewed with six different companies in the PRC; and in all instances, he was rejected from those applications.  So he did not get any of the jobs he applied to.

Q.    For certain jobs, was there feedback provided regarding the reasons why Mr. Ding wasn't hired?

A.    There was, yes.

        MR. BOOME:  Can we go to page 15 of Exhibit 1132, please, just for the witness.

BY MR. BOOME:

Q.    Does this page of Exhibit 1132 include some of the feedback regarding a job application?

A.    Yes.

        MR. BOOME:  Okay.  Your Honor, we move to admit page 15 of 1132.

        MR. FONDO:  No objection, Your Honor.

        THE COURT:  Admitted.

    (Trial Exhibit 1132, page 15, received in evidence.)

        MR. BOOME:  Ms. Hernandez, if we could highlight the

one, two -- third message down and Mr. Ding's response.

BY MR. BOOME:

Q.   Okay.  Can you walk us through this, please?

A.   Yes.  So this is a message that Mr. Ding received from Julian on May 28th, 2021, and this is feedback from a company called Meituan, which is one of the companies that he had applied to for a job.  And the feedback was that he was not suitable for the position, and the reason was that they didn't think that Mr. Ding had enough experience in GPU R&D, "R&D" being research and development.

    And Mr. Ding replies [as read]:

        "Okay, thanks."

Q.   Okay.  Let's jump ahead now in time to May of 2022.

    MR. BOOME:  Ms. Hernandez, can you pull up 292, please, page 292 of Exhibit 1132.

    Let's go down to the next page just for the witness.

BY MR. BOOME:

Q.   What's happening in this section of the chat?

A.   Mr. Ding sends a screenshot to Julian.

Q.   Involving potential --

A.   Another feedback from another company.

    MR. BOOME:  Your Honor, we move to admit 292 to 295.

    MR. FONDO:  Objection, Your Honor.  Hearsay.

    THE COURT:  Overruled.

\\\

(Trial Exhibit 1132, pages 292 through 295, received in evidence.)

MR. BOOME:  Okay.  Ms. Hernandez, can we go back to the previous page just so we can see the sender.

BY MR. BOOME:

Q.   And can you read the date on which the message was sent, please, Special Agent Valladao?

A.   Yes.  So Mr. Ding sent this message on May 23rd, 2022.

Q.   Okay.  And now let's go to the next page.  And why does this look different than the rest of the chats?

A.   So this would be a screenshot or a photo that Mr. Ding sent instead of a text message.

MR. BOOME:  Ms. Hernandez, can you zoom in on the box in the middle, the dark box with the white text.

BY MR. BOOME:

Q.   Can you tell us about this particular feedback?

A.   Yes.  So this is feedback regarding another application for a job that Mr. Ding had submitted.  And the information he received was that Google's internal infra is self-developed, has a high degree of integration and maturity, and its employee may not be well adapted when going to other companies.

MR. BOOME:  Let's zoom back out.

BY MR. BOOME:

Q.   Can you tell us whether there was anything significant in your investigation about the date on which this message was

received by Mr. Ding?

**A.**    Yes.  So this message says it was sent on a Thursday.
Mr. Ding sent this screenshot on May 23rd, 2022, which
I believe it was a Tuesday.  And so the previous Thursday would
have been May 18th, 2022.

**Q.**    Would it refresh your recollection about the dates to take
a look at a May 2022 calendar?

**A.**    That would be great.

**Q.**    Once you've had a look about the dates, I'll take the
calendar back and then...

**A.**    (Witness examines document.)

**Q.**    Thank you.

       Okay.  So the message indicates it was sent on a Thursday.
Can you walk us through the dates?

**A.**    Yes.  So, yeah, looking at the calendar, so May 23rd, when
he sent this message, was a Monday.  So the previous Thursday
would have been May 19th of 2022.

**Q.**    What happened two days later after May 19th, 2022?

**A.**    That is the first time that Mr. Ding sent uploads to his
Google personal Drive account that included alleged trade
secret files.

**Q.**    While Mr. Ding was --

       **THE COURT:**  Can I interrupt for a second?

       **MR. BOOME:**  Yes, Your Honor.

       **THE COURT:**  Agent Valladao, I'm looking at this

exhibit.  I'm a little confused by the fact that it says July at the top of it.  Could you explain that?

THE WITNESS:  Yeah.  So that's -- I mentioned the display name.  So that would have been the name of the person that sent that message.  Their name was July.

THE COURT:  Okay.  Thank you.

BY MR. BOOME:

Q.   Did you find any evidence that during this job search, Mr. Ding considered beginning his own company?

A.   During this time period, yes.

MR. BOOME:  Can we show Special Agent Valladao Exhibit 349, please.

BY MR. BOOME:

Q.   Do you recognize this?

A.   I do, yes.

Q.   What is it?

A.   It is a file that was recovered from Mr. Ding's personal Google Drive account in one of the Comp or Comp2 folders.

Q.   And without reading from it, can you give us a high-level summary of what it's about?

A.   It seems to list points about how to start a company.

MR. BOOME:  Move to admit 349, Your Honor.

MR. FONDO:  Objection, Your Honor.  I think it mischaracterizes the document.

THE COURT:  Overruled.  You can deal with that on

cross.  It's overruled.

And it's admitted.

(Trial Exhibit 349 received in evidence.)

MR. BOOME:  Ms. Hernandez, can you zoom in on the section that says "Vision."

BY MR. BOOME:

Q.  Special Agent Valladao, can you walk us through, at a high level, the section that says "Vision" here and what you can tell from it.

A.  Yes.  So there is -- there's references to Google.  It lists having a culture in management like Google, a tech island like Google.  And then high-level requirements, it seems to be what type of product -- engineering product to build.

MR. BOOME:  Ms. Hernandez, can we go back to Exhibit 1132 starting at page 284, please, back to the Julian chat.

BY MR. BOOME:

Q.  Did there come a time when Julian, the recruiter, introduced Mr. Ding to a company known as Rongshu?

A.  Yes.

Q.  Is that what we're going to see in pages 284 to 287 of this chat?

A.  That's right.

MR. BOOME:  Your Honor, we move to admit 284 to 287 of Exhibit 1132.

MR. FONDO:  No objection, Your Honor.

THE COURT:  Admitted.

(Trial Exhibit 1132, pages 284 through 287, received in evidence.)

BY MR. BOOME:

Q.  Can you identify for us where in this document Julian suggests Rongshu?

A.  Yes.  So on the very top, the first message on that page -- and that's April 29, 2022 -- Julian tells Mr. Ding that there's a start-up company, and he wants to know if he's interested in talking to them.

MR. BOOME:  Let's go down to 285, please, Ms. Hernandez.

BY MR. BOOME:

Q.  What do you see --

A.  Yes.

Q.  -- here related to Rongshu?

A.  Yes.  So right there in the middle portion, Julian sends two files, both with the name of Rongshu Lianzhi.  So it seems to be, like, company profile and the introduction to the company.

Q.  Let's go to page 286, please.  Does Julian mention a specific person in connection to Rongshu?

A.  Yes.  The third message down, 4/30, Julian tells Mr. Ding that Mr. Yuan from Rongshu Lianzhi wants to chat with him.

**Q.**   All right.  And was there an interview scheduled?

**A.**   There was, yes.

         **MR. BOOME:**  Let's go to the top of page 287, please, Ms. Hernandez.

**BY MR. BOOME:**

**Q.**   Can you tell us where the interview between the defendant and Rongshu is scheduled?

**A.**   Yes.  So right there, Julian is suggesting if they could chat on the 6th, which would be May 6th of 2022, and Mr. Ding agrees to that.

**Q.**   Did you see correspondence directly between the defendant and Yuan Ye beginning on May 6th?

**A.**   Yes.

         **MR. BOOME:**  Can we bring up Exhibit 1130.

**BY MR. BOOME:**

**Q.**   Is this the beginning of that correspondence?

**A.**   That's correct.

         **MR. BOOME:**  Your Honor, we move page 1 of 1130 into evidence.

         **MR. FONDO:**  No objection, Your Honor.

         **THE COURT:**  Admitted.

     (Trial Exhibit 1130, page 1, received in evidence.)

**BY MR. BOOME:**

**Q.**   Okay.  Can you walk us through the participants in this chat, please.

**A.** Yes. So the participants are Mr. Ding and then Yuan Ye. Again, there's the display name Yuan Ye and then the WeChat user ID, which is the one that has the extra numbers attached to it.

**Q.** Based on everything you reviewed in your investigation, can you tell us who Yuan Ye is?

**A.** Yes. He's an executive at Rongshu, which is a technology company based in the PRC. He's a chairman of Rongshu and was listed as Mr. Ding's direct supervisor.

**Q.** Did you find any evidence indicating whether the defendant got the job that he interviewed for at Rongshu?

**A.** Yes.

**MR. BOOME:** Ms. Hernandez, can we bring up 1177, please, second page, for Special Agent Valladao.

**BY MR. BOOME:**

**Q.** Do you recognize this?

**A.** I do.

**Q.** What is it?

**A.** It's a letter of employment offer from Rongshu to Mr. Ding.

**Q.** Do you know how Mr. Ding got it?

**A.** Yes. He received it via email.

**Q.** From who?

**A.** From Yuan Ye.

**Q.** On what date?

**A.**    On, I believe it was, June 17th of 2022.

**MR. BOOME:**  Your Honor, we move to admit Exhibit 177 [sic].

**MR. FONDO:**  No objection.

**THE COURT:**  Admitted.

(Trial Exhibit 1177 received in evidence.)

**MR. BOOME:**  Ms. Hernandez, can you blow up the Sections I, II, and III, position, reporting, and salary and benefits.

**BY MR. BOOME:**

**Q.**    Special Agent Valladao, can you walk us through the terms of the offer that Mr. Ding received?

**A.**    Yes.  So he was being offered the position of chief technology officer for Rongshu.  There's the reporting time of September 2022.  Based on the email that he received, the reporting time was flexible.  There's the reporting address, which would be the work location, and that's where Rongshu is located in Beijing.  And then for reporting, the direct supervisor is listed as Yuan Ye.

**Q.**    And was there a salary and benefits associated with the job?

**A.**    Yes.  He was offered a base salary listed there 100,000 RMB, which would be roughly 14,000 U.S. dollars per month, and then it also seems to include benefits such as insurance and paid leave.

**Q.**   Did you find any evidence indicating whether the defendant accepted the job offer?

**A.**   Yes.

**Q.**   When did he actually start working for Rongshu?

**A.**   He's -- the date that he first reported was on November 14th of 2022.

**Q.**   Did Mr. Ding stay in touch with Yuan Ye between the time he received this offer in June and the time he started working for Rongshu in November?

**A.**   He did, yes.

**Q.**   I'd like to go back to the chat between the defendant and Yuan Ye.

     **MR. BOOME:**  Ms. Hernandez, if we could bring up Exhibit 1130 at page 34, please.

**BY MR. BOOME:**

**Q.**   Special Agent Valladao, have you reviewed this section of the chat before?

**A.**   I did, yes.

**Q.**   Do the defendant and Yuan Ye discuss confidentiality requirements here?

**A.**   They do, yes.

     **MR. BOOME:**  Your Honor, we move page 34 of 1130 into evidence.

     **MR. FONDO:**  No objection.

     **THE COURT:**  Admitted.

(Trial Exhibit 1130, page 34, received in evidence.)

**BY MR. BOOME:**

Q.   Can you tell us which portion of the document -- well, just walk us through the confidentiality portion here.

A.   Yes.  So this part of the conversation took place in mid-August of 2022.  Yuan Ye -- by this time, Mr. Ding had been invited to be part of software meetings with members of Rongshu, and Yuan Ye is asking him if he has heard of this library of Google and whether they -- he -- Mr. Ding would be up to telling the software group meeting about this library at Google.

Mr. Ding's response was that it was best to talk when he got back.

When Yuan Ye asked if there were any confidentiality requirements, his response right there at the bottom says that [as read]:

> "The documents related to it are subject to such
> requirements, but the knowledge is not after one left
> the job."

MR. BOOME:  Ms. Hernandez, can we go back to Exhibit 1131, the chat with Julian.  I'm sorry.  We haven't admitted 1131 yet.

**BY MR. BOOME:**

Q.   Okay.  So is this -- this is Part 3 of the Julian chat; is that correct?

**A.**   That's right.

**Q.**   Okay.  On what date does this section of the chat with Julian begin?

**A.**   It looks like November 13, 2022.

**Q.**   The day before the defendant started at Rongshu?

**A.**   That's right.

        **MR. BOOME:**  Okay.  Your Honor, I'd like to admit pages 1 through 5 of Exhibit 1131.

        **MR. FONDO:**  No objection.

        **THE COURT:**  Admitted.

    (Trial Exhibit 1131, pages 1 through 5, received in evidence.)

**BY MR. BOOME:**

**Q.**   Special Agent Valladao, can you -- we're going to go through the first five pages of this chat.  Can you explain what it shows about the defendant's first day at Rongshu?

**A.**   Yes.  So in this page, you can see Mr. Ding, two messages down, he's asking Julian Li for the address of the company. And then on the bottom of that page, Julian sends him the address of where he -- he needs to report to.

**Q.**   In Beijing?

**A.**   That's right.

        **MR. BOOME:**  Let's go to the next page, please, Ms. Hernandez, and the following page.

\\\

BY MR. BOOME:

Q.   Okay.  So what's the date of this message Mr. Ding is sending?

A.   That's November 14th of 2022.

MR. BOOME:  And let's go to the image he sent on the next page, and if we could zoom in.

BY MR. BOOME:

Q.   What does the image show?

A.   Yeah.  So that's a search for Rongshu, and so that shows building -- one of Rongshu's building in Beijing.

MR. BOOME:  Okay.  Can we bring up Exhibit 1100.

BY MR. BOOME:

Q.   Do you recognize 1100?

A.   I do, yes.

Q.   What is it?

A.   That is Mr. Ding's business card at Rongshu.

MR. BOOME:  I'd offer 1100 into evidence, Your Honor.

MR. FONDO:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 1100 received in evidence.)

BY MR. BOOME:

Q.   What is the title listed on the business card?

A.   CTO.

Q.   There's an email address, linwei.ding@rongshu.link.  Were you able to get a search warrant for the contents of this

account?

**A.**   I could not.  Rongshu is based in the PRC, and as such, we are not able to serve legal process there.

        **MR. BOOME:**  Ms. Hernandez, can we bring up, please, Exhibit 328 and Exhibit 1097.  I'm sorry, 1097S.

**BY MR. BOOME:**

**Q.**   Do you recognize these?

**A.**   I do, yes.

**Q.**   What are they?

**A.**   They are photos that were recovered from Mr. Ding's My Passport hard drive from his residence.

**Q.**   Did you review metadata for these photos?

**A.**   I did, yes.

**Q.**   Can you recall when they were taken based on the metadata?

**A.**   Yes.  They were -- the photos were created on January 18th of 2023.

**Q.**   And do you see the defendant in both of them?

**A.**   I do.

        **MR. BOOME:**  Your Honor, we move to admit Exhibits 1097S and 1097, as well as 328.

        **MR. FONDO:**  I'm sorry.  What was the last part you just said?  As well as?

        **MR. BOOME:**  328.  Exhibit 328 on the left.

        **MR. FONDO:**  No objection, Your Honor.

        **THE COURT:**  Admitted.

(Trial Exhibits 1097, 1097S, and 328 received in evidence.)

MR. BOOME:  Okay.  Let's go to 328 first.

BY MR. BOOME:

Q.   Can you point out the defendant and Yuan Ye for us, please?

A.   Yeah.  So in this photo, Mr. Ding is the one standing on the stage wearing yellow, and Yuan Ye would be the person on the left-hand side in the very corner wearing a black button-down shirt.

Q.   As we are looking at the screen, the right-hand side?

A.   Yuan Ye is on the right-hand side, yes.

Q.   And let's go to -- let's go to 1097, the translated version.

Who's the speaker now?

A.   So the speaker in this photo is Yuan Ye, and Mr. Ding is now sitting on the right-hand side.  And the photo says [as read]:

"2023 Annual Welcome Party of Rongshu Lianzhi."

Q.   Did you find any evidence that the defendant actually received a salary from Rongshu?

A.   Yes, we did.

MR. BOOME:  Can we bring up 1107, please, Ms. Hernandez.

\\\

BY MR. BOOME:

Q.   What is this?

A.   This is also a photo that was recovered from Mr. Ding's My Passport hard drive.

Q.   And at a high level, what does it show?

A.   It shows -- seems to be a screenshot of his Rongshu email that shows his pay slip.

MR. BOOME:  Offer 1107 into evidence, Your Honor.

MR. FONDO:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 1107 received in evidence.)

MR. BOOME:  Let's go to the top half for the date and the message.

BY MR. BOOME:

Q.   [As read]:

"Linwei Ding, hello!  Thank you for your hard work this month.  Here is the detailed salary breakdown for this month."

Let's go to the bottom, the chart.  During this time when the defendant was in China working for Rongshu, was he still employed at Google?

A.   He was, yes.

Q.   Around this time frame in late 2022, did you recover any evidence during your investigation indicating the defendant was seeking official residence or household registration in China?

A.    Yes.

        MR. BOOME:  Let's go to Exhibit 1131, please,
Ms. Hernandez, page 79 just for the witness, kind of the middle
top.

BY MR. BOOME:

Q.    Is that what's discussed here in this chat --

A.    Yes, it was.

Q.    -- household registration?

        MR. BOOME:  Your Honor, we move to admit page 79 of
1131.

        MR. FONDO:  No objection.

        THE COURT:  Admitted.

    (Trial Exhibit 1131, page 79, received in evidence.)

BY MR. BOOME:

Q.    Can you point out the portion where the household
registration is discussed?

A.    Yes.  So on the bottom -- the last message right there
that you see right now, Julian Li, on December 8th, 2022, tells
Mr. Ding that the household registration filing has been
approved and then they just need to prepare the materials.

        MR. BOOME:  Ms. Hernandez, let's bring up Exhibit 1085
and the source document side by side, please.

BY MR. BOOME:

Q.    Do you recognize these?

A.    I do, yes.

Q. Can you tell us where you found them and generally what they are?

A. Yes. They were -- it's a photo found on Mr. Ding's My Passport hard drive, and it references application for a residence permit.

Q. Just for context, when was the communication we just looked at from Julian, when did that take place about the household registration?

A. That was December 8th of 2022.

Q. And the date on this photo is what?

A. This photo was created on December 6, 2022.

MR. BOOME: Move to admit Exhibit 1085S and 1085, Your Honor.

MR. FONDO: No objection.

THE COURT: Admitted.

(Trial Exhibit 1085 and 1085S received in evidence.)

BY MR. BOOME:

Q. Can you explain how the side-by-side works here with this particular translated document?

A. Yes. So on the left-hand side, you can see the translation of the source photo. The source photo has an identity card, and then on top of it is a handwritten note, and then overlaid on top of that is a digital time-stamped message.

And so when you look at the translation, you can see that it's translated that that ID is a People's Republic of China

identity card.

The piece of paper handwritten says [as read]:

"For Ziroom leasing only."

And then the time stamp, the digital time stamp dated December 6, 2022, says that [as read]:

"It is only for Linwei Ding to apply for a residence permit."

Q. Is that stamp on -- in the original source document?

A. It is, yes.

Q. Okay. I'd like to change gears now and ask you, did there come a time when the defendant and Yuan Ye, the CEO of Rongshu, started discussing a new business plan?

A. They did, yes.

Q. Can you tell us about that a little bit?

A. Yes. Around -- I believe this was around February of 2023, they started discussing building a company and creating a business plan.

MR. BOOME: Ms. Hernandez, can we now go to Exhibit 1130, the chat between the defendant and Yuan Ye, page 169, please.

BY MR. BOOME:

Q. Is this the portion of the chat where they begin discussing a new plan?

A. It is, yes.

MR. BOOME: Your Honor, we move to admit page 169.

MR. FONDO:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 1130, page 169, received in evidence.)

BY MR. BOOME:

Q.   Can you tell us what part of this chat you see the defendant and Yuan Ye discussing a new business?

A.   Yes.  So on the top portion, the first message by Yuan Ye, he's talking about post-GPT, so right when ChatGPT came out. He's mentioning that the path towards AGI has been opened.  And AGI is a reference to artificial general intelligence.

And then he says that it's time to build a team now, as well as whether there's any core people that Mr. Ding thinks that they can bring into the team.

Q.   What was the context of their discussion before this portion of the chat?

A.   I'd have to --

Q.   Regarding ChatGPT.

A.   I'd have to look at it again.

MR. BOOME:  Let's go down so we can see Mr. Ding's response, please, Ms. Hernandez.

THE WITNESS:  Yes.  So his response is that he said okay, and then he was going to think about what type of people they need in the early stage and how they should do that.

BY MR. BOOME:

Q.   As their discussions about this business continued, did

you find any evidence that they discussed creating a business that operated both in China and internationally?

A.   Yes.

Q.   Can we go to page 199 of this same exhibit, please.

And did that portion of the conversation that I just described, did that occur at pages 199 to 203?

A.   That's right, yes.

MR. BOOME:  Your Honor, we move to admit those pages of Exhibit 1130.

MR. FONDO:  No objection, Your Honor.

THE COURT:  Admitted.

(Trial Exhibit 1130, pages 199 through 203, received in evidence.)

BY MR. BOOME:

Q.   Okay.  At the top, February 13th, 2023, Yuan Ye says [as read]:

"The final description from TikTok is what we just mentioned:  How to do it both domestically and internationally."

And then there's a screenshot posted.  Can you --

A.   Mm-hmm.

Q.   -- take us to the portion of that screenshot that discusses the TikTok model?

A.   Yes.  So the last paragraph on that screenshot, it mentions that Nvidia's flagship lines, they're not allowed to

be sold in mainland China.  And so the way that big technology companies in China can -- that they can learn from TikTok and separate their Chinese business from their oversea business, so building teams and data centers outside of China.

**Q.**    Let's go down to see Mr. Ding's response, please, to the next page, on the top.

**A.**    Yes.  So Mr. Ding receives that screenshot, and then his response is that he feels like they're the ones who understand this.  And then also on the last message right there that you can see, he says that [as read]:

>        "The idea is the same as what we had in mind at
>     the beginning."

**Q.**    And let's go to the next page, please, 201.  Can we go to Mr. Ding's first message, February 13th at 12:50 p.m.

>     [As read]:

>        "Just out of curiosity, where did you see this?
>     The analysis in it seems to be in perfect agreement
>     with ours."

Did you find any evidence that the defendant and Yuan Ye started to formalize their business plan in written documents?

**A.**    Yes.

**Q.**    Tell us about that.

**A.**    There was a document where they were -- called "Thoughts on Plan C" that we recovered from Mr. Ding's personal Drive account that seems to lay the foundation of that business plan.

Q.   Let's go to page 203 of the Yuan Ye and Ding chat, same exhibit.  Is that the first page where they discuss this business plan?

A.   Yes.

MR. BOOME:  Your Honor, we move to admit page 203.

MR. FONDO:  No objection, Your Honor.

THE COURT:  Admitted.

BY MR. BOOME:

Q.   Okay.  You mentioned Plan C.  Can you show us --

A.   Mm-hmm.

Q.   -- show us how you learned that?

A.   Yeah.  So right there, so Mr. Ding's first message on this page, he's saying [as read]:

"Do you have our business plan now?"

And Yuan Ye's response was [as read]:

"Which business plan?  Plan C?"

To which Mr. Ding responds [as read]:

"Yes."

Q.   Did you find a document that references Plan C?

A.   Yes, I did.

Q.   Is that Exhibit 1025?

A.   Yes.

MR. BOOME:  Can we bring that up, please, Ms. Hernandez, just for the witness.

And let's do a source side-by-side here, please, because

of the changes.

**BY MR. BOOME:**

Q.   Okay.  Without reading from it, just since you can -- only you can see it now, what is this document?

A.   It's a document titled "Ideas on Plan C," the document that we found on Mr. Ding's personal Google Drive account.

Q.   The original source document appears to have track changes.  Can you explain whether you learned from reading the chats how that happened?

A.   Yes.  So, initially, Yuan Ye sent the first version of this document to Mr. Ding, and then Mr. Ding later on sent this document that we recovered from his account and it had track changes on them, so this would be Mr. Ding's edits.

Q.   And so we're only going to admit the translated version here, but how are the track changes reflected in the translated version of this document?

A.   The translated version has highlights where the track changes are in the original Mandarin document.

          MR. BOOME:  Okay.  Your Honor, we move to admit 1025.

          MR. FONDO:  No objection, Your Honor.

          THE COURT:  Admitted.

     (Trial Exhibit 1025 received in evidence.)

          MR. BOOME:  Let's just show 1025 to the jury, please, Ms. Hernandez.

\\\

BY MR. BOOME:

Q.   We're not going to discuss this at length, but just at a high level, can you describe what we see in the document as the layers of the business that they are discussing?

A.   Yes.  And, again, the highlights are the track changes.

And this document seems to lay out what would be a product with layered architecture.  So Point Number 1 would be the compute layer, referring to some sort of hardware.  And then Layer Number 2, the model layer, has reference to large language models.  And then Layer Number 3 would be the application layer, so general applications.

Q.   So after making this business plan between themselves, did you see any evidence that they took another step to start working with financial companies to raise money?

A.   I did, yes.

Q.   Can you give us some context there before we look at some additional documents?

A.   Yes.  Mr. Ding asked that now that they had the beginnings of this business plan, that it would be a good idea to bring in a company to help them actually create a better business plan and help them with the investing.

Q.   And what company did they eventually bring in to do that?

A.   It's called I&R Capital.

Q.   Did you recover separate -- a separate chat containing communications between Yuan Ye, the defendant, and

representatives of I&R Capital?

**A.**    I did, yes.

**Q.**    Based on the chats that you reviewed, what was I&R Capital's role?

**A.**    They are -- they seem to be a consulting firm that advises early stage companies on how to get investment.

**Q.**    Is the chat involving I&R, the defendant, and Yuan Ye, is that Exhibit 1155?

**A.**    Yes.

**Q.**    Is that chat about anything else other than this fundraising project?

**A.**    It is -- no.  It's only about -- solely about that.

        **MR. BOOME:**  Your Honor, we move to admit 1155 in its entirety.

        **MR. FONDO:**  No objection, Your Honor.

        **THE COURT:**  Admitted.

    (Trial Exhibit 1155 received in evidence.)

**BY MR. BOOME:**

**Q.**    Okay.  Let's just look at the participants here.  And can you identify the names that you recognize and tell us who they are.

**A.**    Yes.  So going through it again, remember, there's the WeChat user ID as well as the display name.  So at the top is the user ID starting with the chat room, that would be the ID of this group.  And then you've got Mr. Ding, Ding Yong, and

one, two, three -- four individuals, and then Yuan Ye.  And then you have the display names of those user IDs.

So the participants in this chat are Mr. Ding, Yuan Ye, and then members of I&R.

**Q.**   Including Kunjie Jiao?

**A.**   Correct.

**MR. BOOME:**  Let's go to page 17, please, Ms. Hernandez.

**BY MR. BOOME:**

**Q.**   Okay.  I want to focus on the bottom and ask you to point out discussion about the potential name of the company.

**A.**   Yes.  So this is April 10, 2023.  They've been discussing the business plan.  And then Yuan Ye, at this point in the conversation, has various options about what they could call the company, one of them being Fine-Grained Supercomputing.

**Q.**   Fine-Grained Supercomputing, Smart Supercompute Utilization, and Emergent Supercomputing?

**A.**   Correct.

**Q.**   Let's go to the next page.  And sorry.  One more down, page 19.

And where is the discussion about -- do they eventually decide on a name?

**A.**   They do, yes.

**Q.**   Can you show us where that happens?

**A.**   Yes.  So the last three messages on this part of the chat,

Ye Yuan asks Mr. Ding if -- what he thinks of the name Fine-Grained Supercomputing, to which Mr. Ding replies that he thinks it sounds great.

And then on the following page, he goes on to say that if you -- if he wants to use two characters, so two Mandarin characters, that they could call it Zhisuan.

MR. BOOME:  Ms. Hernandez, can you bring up 1137, please.

BY MR. BOOME:

Q.   Do you recognize this?

A.   I do.

Q.   What is this?

A.   So this is the final business plan that was created by I&R Capital in this chat, so...

Q.   Can you give us -- I don't want to go through chat by chat, but can you give us an overview, based on your review of 1155 and the chat between Yuan Ye and the defendant, the defendant's involvement in creating this document?

A.   Yes.  There was extensive editing.  So I&R Capital created a draft of what became this teaser and then asked both Yuan Ye and Mr. Ding to put in the technical terms and to create edits and make sure that it was accurate to what they wanted for their business plan.

MR. BOOME:  Your Honor, the Government moves 1137 into evidence.

THE COURT:  Any objection?

MR. FONDO:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 1137 received in evidence.)

MR. BOOME:  Ms. Hernandez, can we go to "Project Introduction."

BY MR. BOOME:

Q.   And can you tell us basically what they're trying to accomplish with this business plan?

A.   Yes.  So this is -- they created this, what they call -- it's named Zhisuan teaser.  So they would be presenting it to companies that would be interested in financing Zhisuan.  So they're looking for seed round financing in the number of 5 to 8 million dollars.  So they would be using this to go to investors and pitch the idea of the company.

MR. BOOME:  Let's zoom back out, please, Ms. Hernandez.  And can we go to the second page, the middle of the three squares, please, on the top.

BY MR. BOOME:

Q.   Can you just point out for us what this document says the capabilities of Zhisuan are?

A.   Yes.  So it shows -- on the top, it says [as read]:

        "Support large-scale computing power."

And at the bottom part of that -- of that middle section, it says [as read]:

"Zhisuan can support a supercomputer of 20,000

GPUs . . . ."

MR. BOOME:  Thank you, Ms. Hernandez.

Can we zoom back out.  And let's go down to the team

members.  Thank you.  And let's go to the portion where the

defendant -- yeah, that's fine.  That's great.

BY MR. BOOME:

Q.   Okay.  Where is the defendant listed?

A.   In this early version, he's listed as the CTO of the

company.

Q.   And the four individuals that are referenced by first

initial and last name on the bottom, were you able to identify

any actual person matching the description of one of these?

A.   Yes.  M. Ma is a reference to a current Google employee by

the name of Zhiyao Ma or Mazy Ma.

Q.   After I&R Capital, the defendant, and Yuan Ye created this

plan, what was the next step?

A.   It was to meet with potential investors.

MR. BOOME:  Can we go back to Exhibit 1155, please,

Ms. Hernandez, page 22.

BY MR. BOOME:

Q.   Can you point us to the chat here where the investor

meetings are discussed?

A.   Yes.  So right there in the middle, Kunjie Jiao sends a

message saying -- telling Mr. Ding and Yuan Ye that he

scheduled a meeting with Sinovation Ventures for them to discuss the company.

MR. BOOME:  Let's go to page 23 now, please.

THE COURT:  Sorry.  I didn't hear the last part you said.

THE WITNESS:  For them to discuss this teaser.

THE COURT:  Thank you.

MR. BOOME:  Next page, please.

BY MR. BOOME:

Q.   Can you point out if you see a discussion about a meeting with a company called IDG Capital?

A.   Yes.  The last three messages, again, Kunjie Jiao, he says that he scheduled IDG for Friday at 1:30 p.m. to visit their company.

MR. BOOME:  Okay.  And before we discuss IDG further, let's go to page 26.  And we're just going to the bottom to see when this message was sent.  April 13th, 2023.

And then we'll go to the top of the next page, please.

BY MR. BOOME:

Q.   What is this message at the top of page 23?

A.   Yeah.  So this is after they met with Sinovation Ventures. And Kunjie Jiao is telling the group that the feedback was that many technical points haven't been explained.  They do think there's market demand for the product, but the implementation details need to be explained in more depth.

THE COURT:  Mr. Boome, sometime in the next few minutes, whenever you get to a good breaking point, we'll wrap up for the day.

MR. BOOME:  We were just about to head into the IDG meeting, Your Honor, so I think this is a perfect time.

THE COURT:  Okay.  Sounds good.

All right.  So that'll do it for today.  Thank you very much.  Remember to bring your notebooks back with you, leave them in the courtroom, and no discussing the case with anybody, no doing your own research.  And we'll see you back here tomorrow morning.  Thank you.

THE COURTROOM DEPUTY:  All rise.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Okay.  You can step down.  Thank you.

(Witness steps down from the stand.)

THE COURT:  Anything to discuss before we take off for the day?

MR. FONDO:  Yes, Your Honor, just one thing.

I had objected to one of the WeChats, and I saw your reaction.  I want to explain it but also, in part, because I think the context is relevant.

THE COURT:  Okay.

MR. FONDO:  I think that the Government is using these statements for the -- some of these statements for the truth of the matter asserted, and so that's why I objected to that one

in particular.  It was a screenshot.  And so I just want to alert the Court to that, that that's a concern of ours, and we think that they are overstepping, essentially, the Court's ruling.

THE COURT:  Okay.  It is something that I've been paying attention to as they're going through these chats, and my take so far was that it all seemed to be legitimately part of an effort to kind of show what Mr. Ding did next or show the effect that it had on him, but I will keep that in mind.

Is there anything you want to say about the specific objection that you made?  Because I remember looking at it and thinking it was fine, but I don't remember, as I sit here, what it was.

MR. FONDO:  So I don't have it in front of me, Your Honor, but I recall that it had specific information in it, and then the Government elicited that information not in the context of what did he do next but just sort of like that information was important to the narrative of the story.  And so I think it was being used for the truth of the matter asserted.

THE COURT:  Okay.  Again, as I sit here, I don't remember it, but I didn't -- everything that's come in so far, I have not felt that way about, but I'll do my best to stay vigilant about it as these screenshots keep coming up.

MR. FONDO:  Understood, Your Honor.  And I will --

**PROCEEDINGS**

with that sort of understanding, I will not jump up and down every time.  So, I understand your position on that, but we did want to --

            **THE COURT:**  Okay.  But if you think there's something significant, don't hesitate to state your objection, but with the understanding that the objection is preserved as to all of these --

            **MR. FONDO:**  Thank you, Your Honor.

            **THE COURT:**  -- documents, yeah.

            **MR. FONDO:**  Appreciate it.

            **THE COURT:**  Okay.  Anything else?

            **MR. BOOME:**  Nothing from us, Your Honor.  Thank you.

            **THE COURT:**  All right.  Thank you.

            **THE COURTROOM DEPUTY:**  Court is in recess.

                    (Proceedings adjourned at 3:21 p.m.)

                                ---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Thursday, January 15, 2026

*Ana Dub*
_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter