**Volume 4**

**Pages 653 - 852**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )
  VS.                              )   **NO. 3:24-CR-00141-VC**
                                   )
LINWEI DING, a.k.a. LEON DING,     )
                                   )
          Defendant.               )
_____    )

                         San Francisco, California
                         Thursday, January 15, 2026


**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue, Box 36055
                    San Francisco, California 94102-3495
              BY:   **CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
                    **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    1301 Clay Street, Suite 340S
                    Oakland, California 94612-5217
              BY:   **MOLLY K. PRIEDEMAN**
                    **ASSISTANT U.S. ATTORNEY**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant:

GOODWIN PROCTER LLP
525 Market Street
San Francisco, California 94105
BY:  **DARRYL M. WOO, ATTORNEY AT LAW**
**DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
**RACHEL M. WALSH, ATTORNEY AT LAW**
**COLETTE A. LOWRY, ATTORNEY AT LAW**
**NICHOLAS C. WILEY, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 Marshall Street
Redwood City, California 94063
BY:  **GRANT P. FONDO, ATTORNEY AT LAW**
**FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 South Figueroa Street, Suite 4100
Los Angeles, California 90017
BY:  **LORA J. KRSULICH, ATTORNEY AT LAW**

Also Present:        **Andrea Valladao, Federal Bureau of**
**Investigation**
**Veronica Hernandez, Paralegal**
**John Jay, Trial Technician**

**I N D E X**

Thursday, January 15, 2026 - Volume 4

| **GOVERNMENT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **VALLADAO, ANDREA C. (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 674 | 4 |
| Direct Examination resumed by Mr. Boome | 674 | 4 |
| Cross-Examination by Mr. Fondo | 778 | 4 |
| Redirect Examination by Mr. Boome | 843 | 4 |
| Recross-Examination by Mr. Fondo | 849 | 4 |

**E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 334 | | 726 | 4 |
| 336 | | 752 | 4 |
| 340 | | 726 | 4 |
| 341 | | 726 | 4 |
| 342 | | 726 | 4 |
| 346 | | 726 | 4 |
| 347 | | 726 | 4 |
| 348 | | 726 | 4 |
| 353 | | 732 | 4 |
| 463 through 567 | | 676 | 4 |
| 656 | | 772 | 4 |
| 674 | | 772 | 4 |
| 774 | | 770 | 4 |
| 777 | | 677 | 4 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 780 | | 683 | 4 |
| 869 | | 696 | 4 |
| 1001 | | 704 | 4 |
| 1001S | | 708 | 4 |
| 1002 | | 758 | 4 |
| 1003 | | 760 | 4 |
| 1004 | | 717 | 4 |
| 1004S | | 717 | 4 |
| 1009 | | 687 | 4 |
| 1010 | | 688 | 4 |
| 1011 | | 688 | 4 |
| 1013 | | 688 | 4 |
| 1014 | | 688 | 4 |
| 1018 | | 751 | 4 |
| 1026 | | 766 | 4 |
| 1026S | | 766 | 4 |
| 1029 | | 685 | 4 |
| 1034 | | 747 | 4 |
| 1038, pages 41 and 42 | | 731 | 4 |
| 1051 | | 703 | 4 |
| 1052 | | 756 | 4 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1068 | | 806 | 4 |
| 1077 | | 734 | 4 |
| 1078 | | 734 | 4 |
| 1079 | | 734 | 4 |
| 1080 | | 734 | 4 |
| 1081 | | 734 | 4 |
| 1082 | | 734 | 4 |
| 1124, pages 51 through 56 | | 804 | 4 |
| 1125 | | 719 | 4 |
| 1127 | | 681 | 4 |
| 1128 | | 735 | 4 |
| 1135 | | 719 | 4 |
| 1136 | | 726 | 4 |
| 1143 | | 738 | 4 |
| 1149 | | 702 | 4 |
| 1150 | | 753 | 4 |
| 1154 | | 679 | 4 |
| 1156 | | 726 | 4 |
| 1158 | | 722 | 4 |
| 1160 | | 763 | 4 |
| 1169 | | 833 | 4 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1170 | | 692 | 4 |
| 1175S | | 694 | 4 |
| 1175 | | 695 | 4 |
| 1176 | | 691 | 4 |
| 1178, pages 1, 33, and 35 | | 749 | 4 |
| 1184 | | 711 | 4 |
| 1184S | | 711 | 4 |
| 1184 | | 714 | 4 |
| 1184S | | 714 | 4 |
| 1185 | | 714 | 4 |
| 1185S | | 714 | 4 |
| 1186 | | 714 | 4 |
| 1186S | | 714 | 4 |
| 1187 | | 714 | 4 |
| 1187S | | 714 | 4 |
| 1188 | | 714 | 4 |
| 1188S | | 714 | 4 |
| 1189 | | 710 | 4 |
| 1189S | | 710 | 4 |
| 1190 | | 710 | 4 |
| 1190S | | 710 | 4 |

<u>**I N D E X**</u>

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 1191 | | 711 | 4 |
| 1191S | | 711 | 4 |
| 1192 | | 711 | 4 |
| 1192S | | 711 | 4 |
| 6005 | | 794 | 4 |

**Thursday - January 15, 2026**                          **9:05 a.m.**

# P R O C E E D I N G S

---o0o---

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:** Remain seated. Come to order. Court is back in session.

**THE COURT:** Okay. Hi. I understand that you all have a couple of things. I have a couple of things for you as well.

First of all, we have lost Juror Number 3.

**THE COURTROOM DEPUTY:** 2.

**THE COURT:** 2? Oh, sorry. Juror Number 2. She called this morning and was having morning sickness. She told Bhavna initially that she thinks she's going to be late because she has morning sickness, and she thinks she'll be ready to leave momentarily but she thinks she'll be late. And Bhavna said okay. And then she called Bhavna back and said that it got worse and that she was laid up and that she -- you know, she would try to come later if she's needed. And based on that, I told Bhavna to tell her that she's excused.

So we lost Juror Number 1. Everybody -- Juror Number 3 -- sorry. We lost Juror Number 2, and then everybody will move down one number accordingly. So that's Number 1.

Number 2, I was reading the defense's filing about the publicly available information. Not the one from last night, but the one from the night before. And I was really struggling

to figure out how I was going to prepare to rule on those.

So I don't know if y'all have any guidance on that or if, at a minimum, you can tell me which ones the Government is challenging and which ones the Government isn't at this point.

But it's going to be -- you know, it's going to be challenging for me to prepare in advance.  I mean, I'll have to learn a lot, I think, from you all when we discuss these documents, but I want to do my best to prepare in advance for our discussion.

So are you ready to tell me which ones you plan to challenge?

**MS. PRIEDEMAN:**  Your Honor, I don't have it in front of me.  I basically have the filing ready to go and was going to file it later today.  I don't have it memorized.

**THE COURT:**  Okay.

**MS. PRIEDEMAN:**  I can tell you there's a couple of categories.  There's four or five documents that we're not going to challenge which are basically the product announcements and things like that that I don't think are all that relevant, but I think --

**THE COURT:**  Yeah.  I mean -- and I think that I should add that the test is, is there a colorable argument --

**MS. PRIEDEMAN:**  Right.

**THE COURT:**  -- that, you know, this document discloses some aspect of the trade secret; right?  If there's a colorable

argument, then, you know, it comes in and it's subject to -- the parties can fight about it at trial.  But my concern is that for some of these documents there may not be a colorable argument that it discloses any portion of the trade secrets.

**MS. PRIEDEMAN:**  Right.  And, frankly, even for the product announcements, I'm not -- I don't think there is a colorable argument.  But I think, if you're being generous, if there's some minimal relevance, and I think looking at 403 balancing, I think it's fine to let those in.  I think that's kind of one category.  So there's four or five of those documents.  We already didn't object to, I think one of them that came in at trial.  So there's that category of documents.

Then there's the patents.  And, again, I don't have my notes, so I think we can have a more fulsome discussion when I've filed it later today.  But the majority of the patents are either patents that were filed in China where the U.S. version -- so the U.S. -- there's patent families, as I understand it.  So there's a version that's filed in the U.S. and then a version in China.  So for the vast majority of the China patents, the U.S. patent is already on the exhibit list, and the Government has already stipulated to its relevance or admissibility.

And so the argument there would be a 403 argument.  If defense wants to point out that there's a version of that patent published in China, I think that's fine.  But to admit,

like, an essentially identical version of the patent, I think, suggests that there's more published than there actually is, if that makes sense.

So it's basically the same patent, it's just the Chinese version versus the U.S. version.

THE COURT:  I'm not sure I follow.  But, you know, what we could do is -- what I was hoping to do is spend some time over the lunch hour reading over this stuff -- because Sanchez might start testifying today; right?

MS. PRIEDEMAN:  Right.  So my proposal, Your Honor, would be that we file what we were planning to file.  It's basically ready.  I can do my best to try to file it over the lunch break if I can get it together.

But, frankly, I think it's unlikely Sanchez starts today.  It's possible he starts this afternoon.  But even if he starts --

THE COURT:  Right.

MS. PRIEDEMAN:  -- he won't be very long, and it'll still be direct.  So my proposal would be you look at the filing we file today and we have our more fulsome discussion tomorrow morning before court.

I also, frankly, think it's unlikely that his cross starts tomorrow.  His direct is --

THE COURT:  Okay.

MS. PRIEDEMAN:  -- quite long.

**THE COURT:** It's quite long.

Okay. That sounds like a good plan.

**MS. PRIEDEMAN:** Okay.

**THE COURT:** All right. Thank you.

And you all had some things to talk about?

**MR. BOOME:** Yes, Your Honor. Thank you.

I wanted to clarify your ruling from yesterday about the Voicemod --

**THE COURT:** Yeah.

**MR. BOOME:** -- issue. The Government understood you to be prohibiting us from asking about that during the expert testimony of Andy Crain. And in an abundance of caution, I thought it was very clear, but I wanted to disclose that I am planning to ask Special Agent Valladao to pop up Exhibit 6, which is already in evidence, which is the Santa log showing the things that were deleted from the MacBook on December 29th, and ask her to point out where the Santa logs show the Voicemod app being deleted and to explain what the Voicemod app is from her own personal knowledge.

No digital forensic testimony about when it was used, when it was downloaded. Purely what is within her knowledge pointing out something that is in a piece of evidence that the defense has had since early 2024.

**THE COURT:** But if that's all the testimony that comes in about it, what's -- what's its relevance?

I mean, I understand it's highly relevant when you learn that he downloaded it the day before his phone conversation with -- with the Google -- I mean, with the --

**MR. BOOME:**  Yes.

**THE COURT:**  -- China person.

**MR. BOOME:**  I have a good answer for that, Your Honor, because I've been thinking about it over -- tonight.  The jury will hear from Aamer Mahmood.  They'll hear his voice.  And the jury will also hear the defendant's voice in two videos that we intend to play for the jury, his MiraclePlus rehearsal video and also the InfiniCompute video where he describes what he claims is his product.

And the jurors will wonder when they see the email between the defendant pretending to be Aamer Mahmood and MiraclePlus:  How did he pull off this phone call?

And the Voicemod -- the presence of the Voicemod application on his computer helps to explain that.

Defense can argue the Government hasn't shown that he ever used it when he downloaded it.  It could have been on there for other reasons.  We can argue this is one possible way he could have pulled this phone call off.  And I think that's a fair use of evidence that's been disclosed for almost two years now, well within the rules of evidence, no prejudice to the defense.

**THE COURT:**  Okay.

MR. RAPP-KIRSHNER:  Yeah.  We disagree, Your Honor. If there's no evidence of the download, there's no evidence of any use.  All you're left with is a deletion on a log when a lot of files --

THE COURT:  There is evidence of the download because it was deleted; right?  I mean, it had to be downloaded at some point if it was deleted.

MR. RAPP-KIRSHNER:  I'm not sure of the forensic record, but it could have come preinstalled.  It --

THE COURT:  Voicemod?

MR. RAPP-KIRSHNER:  I'm not sure, Your Honor, but that's one possibility.  I agree it's likely -- it's probably unlikely.  But still, without any evidence of use or specifically the timing of the download, I think that's one of the critical factors that could potentially link it.  But without any of that context, it's entirely speculative, obviously prejudicial, if he's trying to answer a question for the jury, but they're able to make their own conclusions based on the evidence that's properly admitted.

THE COURT:  Okay.  I think I understand the objection. It's overruled.  That testimony is allowed.

What else?  Anything else to discuss this morning?

MR. BOOME:  Nothing else from the Government, Your Honor.

MS. WALSH:  Your Honor, with respect to Dr. Sanchez's

testimony, we have taken a look at the disclosure regarding anticipated courtroom closure that the Government filed on Monday.  I think we're fine with the closure itself, with the usual caveats that, you know, we reserve the right to argue that that material is not a trade secret.

**THE COURT:**  Yeah.  And when we close the courtroom, I'll repeat that --

**MS. WALSH:**  Sure.

**THE COURT:**  -- concept to the jury.

**MS. WALSH:**  Understood.

But looking a little bit closer at the filing, it raises a couple of issues with respect to disclosures in Dr. Sanchez's report.  Specifically in paragraph -- or Subsection 1 --

**THE COURT:**  Subsection 1 of his report or -- what am I looking at?

**MS. WALSH:**  Subsection 1 of the U.S.'s filing -- United States' disclosure regarding anticipated courtroom closure.  I'm sorry, I don't have the docket number.

**THE COURT:**  That's okay.  Hold on one second.

All right.  I've got it right here.  It's just taking a second to open up.

**MS. WALSH:**  Sure.

**THE COURT:**  All right.  What section did you say?

**MS. WALSH:**  Subsection 1.  The first sentence, which

I'm not going to read because there's some redacted material in there.

We -- you know, the testimony will be what it'll be; and we don't have that yet, of course.  But we would object to that because it's not disclosed in Dr. Sanchez's report.  That document is discussed, I think, at pages 21 and 22 of his report, and there's no mention of routing in TPU before and the specific items that are redacted there.

THE COURT:  All right.  Give me a second just to look at it.

MS. PRIEDEMAN:  Sorry.  What -- can you just tell me which portion of the disclosure you're talking about?

MS. WALSH:  Paragraph -- or Subsection 1 on Exhibit 361.

MS. PRIEDEMAN:  I'm sorry.  What page of the report?

MS. WALSH:  So that document is discussed, I believe, at pages 21 and 22.

THE COURT:  All right.  Let me look at Sanchez's report.

You said -- where do you think this is addressed in his report?  And is this his rebuttal report or his initial report?

MS. WALSH:  This is his initial report.

THE COURT:  Okay.

MS. WALSH:  Exhibit 361 is discussed at 21 and 22.

THE COURT: All right. So Subsection B discusses the exhibit that we're talking about?

MS. WALSH: Correct.

THE COURT: Okay. Okay. I think it's adequately disclosed in the report. That objection is overruled.

MS. WALSH: And then another paragraph at page 2 of the disclosure dealing with Exhibit 402.

THE COURT: Sorry. I'm looking now -- again, not at -- not at his report but at the disclosure that was filed earlier this week; is that right?

MS. WALSH: Correct.

THE COURT: Okay. I'll go back to that. New document management system, and I'm struggling with it a little bit, so apologies.

MS. WALSH: Yeah. Been there.

THE COURT: All right. Okay.

Back on the disclosure that was filed earlier this week. Which Subsection?

MS. WALSH: So Subsection 6 at the bottom of page 2.

THE COURT: Okay.

MS. WALSH: That is addressing Exhibit 402. The, I think, third sentence down at line 22, "Dr. Sanchez will also testify about tables showing different cooling systems and their performance and physical characteristics," et cetera, on -- through the end of the next sentence. That document is

addressed at --

**MS. PRIEDEMAN:**  It's page 47 of his report.

**MS. WALSH:**  Yeah.

-- page 47 of his report.  And we believe that -- I think on -- over to page 48.  And, again, we don't see that disclosure with respect to cooling.

**THE COURT:**  All right.  Let me spend some time looking at that.

I think you said page 47.

**MS. WALSH:**  Yes, that document is discussed at page 47 on through page 48.

**MS. PRIEDEMAN:**  It's the AdAstra-Mechanical document, Your Honor.

**THE COURT:**  Got it.

(Pause in proceedings.)

**THE COURT:**  Okay.  That objection is overruled. I think it's been adequately disclosed.

**MS. WALSH:**  Okay.

**THE COURT:**  Any others?

**MS. WALSH:**  Not at this time.

**THE COURT:**  Okay.  All right.  Anything else to discuss this morning?

**MR. FONDO:**  Yes, Your Honor.  So just a couple of issues, Your Honor.  One is we'd like to ask the Court to remind the jurors not to read anything in the newspaper.  There

was something -- there was a report last night about the argument about the testimony -- sorry -- the --

THE COURT:  Opening?

MR. FONDO:  No.  Actually, more the interrogation issue.  And --

THE COURT:  Oh.

MR. FONDO:  -- and the admissibility.  And, also, the Government made representations about what was reflected in his statement, and we want to make sure that the jury is not reading those types of articles.

THE COURT:  Sure.  I'm happy to do that.  What -- did it appear in one of the legal papers?

MR. FONDO:  It appeared --

THE COURT:  Law360?

MR. FONDO:  That I'm most worried about.

THE COURT:  As good of a job as they do at Law360, I don't think we have to worry too much about any of the jurors reading it.

MR. FONDO:  I don't recall --

THE COURT:  No offense if Law360 is listening right now.  But I'm happy to -- happy to reiterate the admonition.

MR. FONDO:  Thank you, Your Honor.

Two other issues.  One is Mr. Fuller testified yesterday.  We received a late disclosure after he testified that Google had paid his hotel -- for his hotel.

**THE COURT:** Okay.

**MR. FONDO:** In light of our discussions with Your Honor last night, we're not going to ask to bring him back, we're not going to raise an issue about it, but we just want to alert the Court that, obviously, that's information we need to get in advance of the witness testifying. We obviously don't want to have to pull somebody back.

**THE COURT:** Yeah. And, you know, I suppose a discussion could be had about whether it's appropriate to cross-examine a witness on whether Google paid for their hotel, but I think that -- you know, I think that probably is fair to ask that question, and so that information should be disclosed in advance to the defense.

**MR. BOOME:** We understand, Your Honor. And it was just an oversight. We apologize for the late disclosure, and we offered to discuss bringing him back if defense felt it was necessary.

**THE COURT:** Yeah. I don't -- it doesn't seem necessary to bring him back just for that because, in the grand scheme of things, it's a really small issue. But I do think it's fair for the defendant to receive that information and to be able to ask a question about that.

**MR. FONDO:** Thank you, Your Honor.

Lastly, just wanted to flag for the Court, we have a little bit of concern about Special Agent Valladao's testimony

as far as that she's going a little bit too far, as far as characterizing what the evidence is and what it means, and so we just want to alert the Court to that. And --

THE COURT: And what somebody meant when they said something --

MR. FONDO: Correct.

THE COURT: -- I think is another issue to flag -- right? -- is that there is a little bit -- and I don't think it's -- I think it's less of Valladao's problem and more an issue with the way some of the questions were asked yesterday.

But, you know -- I don't remember any specifics now, but I seem to recall there were some questions that seemed like they were -- you know, they would cause Agent Valladaos to speculate as to what somebody meant -- what somebody intended by what they said, and so I think it's important to be -- to watch out for that as well.

MR. BOOME: Understood, Your Honor. And I 100 percent agree that that is not a Special Agent Valladao problem but probably the attorney who was doing the questioning.

THE COURT: Oh, I said Valladaos. Sorry. Valladao.

MR. BOOME: No problem.

MR. FONDO: Thank you, Your Honor.

THE COURT: Okay. Great. We'll see you in about three minutes.

THE COURTROOM DEPUTY: Court is in recess.

(Recess taken at 9:25 a.m.)

(Proceedings resumed at 9:48 a.m.)

(Proceedings were heard in the presence of the jury.)

**THE COURTROOM DEPUTY:**  Please be seated.

**THE COURT:**  Okay.  Welcome back.

You can resume your testimony.

**MR. BOOME:**  Thank you, Your Honor.

<u>**ANDREA VALLADAO**</u>,

called as a witness for the Government, having been previously

duly sworn, testified further as follows:

<u>**DIRECT EXAMINATION (Resumed)**</u>

**MR. BOOME:**  Ms. Hernandez, can you please bring up 776

in evidence?

**BY MR. BOOME:**

**Q.**  Special Agent Valladao, we discussed this yesterday.  This

is your summary exhibit.

Can you remind us quickly what it is?

**A.**  Yes.  This is the summary exhibit with the alleged trade

secret files, their corresponding Apple Note, and the

corresponding internal source document from Google.

**Q.**  I wanted to ask you about the names of the documents in

the alleged trade secret column and the Apple Notes column.

Let's start with the Apple Notes column.

There's a number after each note name.  Can you tell us

what that is and where it comes from?

**A.**   That is the identifier that the Apple Note gets on the Apple Notes database.  So each note gets a unique identifier, and that's what's on the brackets.

**Q.**   So was that there in the original file name or added afterwards?

**A.**   It was added afterwards just as a reference.

**Q.**   Okay.  Thank you.

        **MR. BOOME:**  And, Ms. Hernandez, can we go now to the alleged trade secret file title?  And if you could --

thank you.

**BY MR. BOOME:**

**Q.**   Can you break down the different sections of the file names for the alleged trade secret files?

**A.**   Yes.  So you have the beginning section up till the dash where it says "at."  So right before the dash, that's the name of the file.

     And then after that, the dash and the rest of that is metadata that was added by our processing -- our forensics tool when we process the files.

**Q.**   Have you compared some of the alleged trade secret files to the notes files in the next column?

**A.**   I have, yes.

**Q.**   How do they compare?

**A.**   They're the same.

        **MR. BOOME:**  Your Honor, at this time the Government

moves to admit the Notes files versions of the alleged trade secret documents Exhibits 463 to 567.

THE COURT:  Any objection?

MR. FONDO:  No objection, Your Honor.

THE COURT:  Admitted.

(Trial Exhibits 463 through 567 received in evidence.)

BY MR. BOOME:

Q.   I asked you yesterday about Exhibit 349.

MR. BOOME:  If we could pull that up quickly, Ms. Hernandez.  This is in evidence.

BY MR. BOOME:

Q.   Are you aware -- did you analyze metadata for this particular file?

A.   I did, yes.

Q.   Can you tell us what you learned from the metadata about the creation and other actions with respect to this file?

A.   Yes.  So this file was also an Apple Note created on Mr. Ding's Google-issued laptop.  That Apple Note was created on May 25th of 2021.  It was last modified on April 20th of 2022.  And then it was uploaded to his Google Drive account on May 21st of 2022.

MR. BOOME:  And, Ms. Hernandez, can we move now to Exhibit 777?  This is not yet in evidence.

BY MR. BOOME:

Q.   Do you recognize 777, Special Agent Valladao?

**A.**   I do, yes.

**Q.**   What is it?

**A.**   It's a summary exhibit that I created with the alleged trade secret files by category and their corresponding source documents.

        **MR. BOOME:**  Your Honor, the Government moves 777 into evidence.

        **MR. FONDO:**  No objection, Your Honor.

        **THE COURT:**  Admitted.

    (Trial Exhibit 777 received in evidence.)

**BY MR. BOOME:**

**Q.**   Just a quick orientation.  We're familiar with these concepts, but can you tell the members of the jury how to read this document?

**A.**   Yes.  So it's similar to the previous one except that it doesn't have the Apple Notes.  So you have, on the left-hand columns, the alleged trade secret file and their exhibit number.  On the right-hand columns, there's the corresponding source document and exhibit number.  And then, at the very leftmost column, that's the category that those trade secret files are.  So each page has one category in them.

**Q.**   Thank you.

    Okay.  Let's go back to discussing your review of some of the evidence in the case, the chats and the documents.

    We finished by discussing the Zhisuan teaser document

created in the I&R Capital chat.

Did you find any evidence indicating that the defendant later sent that document to any other person?

A.   I did, yes.

Q.   Where did you find that evidence?

A.   In a different WeChat conversation.

MR. BOOME:   Ms. Hernandez, can we bring up Exhibit 1154, please?

BY MR. BOOME:

Q.   Without reading from it, can you summarize what this chat is about?

A.   Yes.   So it's a -- a conversation with one other person, self-identified as -- or I guess I can't say it, but --

Q.   When you say "self-identified," you mean who they say they are in the chat?

A.   That's right.

Q.   Because you don't know this person?

A.   Yes.

Q.   Okay.

A.   Self-identified as Yikang Lee.   And it's a conversation about meeting and then exchanging some of the Zhisuan files that Mr. Ding had.

MR. BOOME:   Your Honor, Government moves 1154 into evidence.

MR. FONDO:   No objection.

THE COURT: Admitted.

(Trial Exhibit 1154 received in evidence.)

MR. BOOME: Let's go to page 7, please, Ms. Hernandez.

BY MR. BOOME:

Q.   And who does the other party to this chat, other than Mr. Ding, say they work for?

A.   IDG Capital.

Q.   And do you see in this document where Mr. Ding sends the Zhisuan teaser?

A.   Yes.  In the middle, Mr. Ding's second conversation that -- right there on April 12, 2023, he sends a file named "Zhisuan teaser.PDF."

MR. BOOME: Can we briefly bring up 1137, in evidence, Ms. Hernandez?

BY MR. BOOME:

Q.   Is this the document that was sent in the chat we just looked at?

A.   That's right, yes.

Q.   And based on your review of all the chats and the other evidence in this case, what is IDG Capital?

A.   It is a consulting firm to provide consulting for start-up companies to get finance -- financing investment.

MR. BOOME: Ms. Hernandez, can we bring up, please, Exhibit 1155, in evidence?  And let's go to page 24.

\\\

BY MR. BOOME:

Q.   Special Agent Valladao, after the pitch document that we just looked at was created, as we saw yesterday in this I&R Capital chat, what was the next step between I&R Capital and the defendant and Yuan Ye according to this chat?

A.   According to the chat, there were discussions about meeting with potential investors.

Q.   Are some of those investors listed on this page?

A.   Yes.  That second message by Kunjie Jiao mentions scheduling IDG -- a meeting with IDG.

Q.   Did you find a separate chat involving the defendant, Yuan Ye, and representatives from IDG Capital?

A.   I did, yes.

Q.   Is that Exhibit 1127?

A.   Yes.

     MR. BOOME:  Ms. Hernandez, can we bring up 1127, please?  Let's go --

BY MR. BOOME:

Q.   Do you recognize this chat?

A.   I do, yes.

Q.   What is this chat?  Who's -- who's -- who's in it, and when does it start?

A.   So the chat has Yuan Ye, Mr. Ding, members of the I&R Capital from the previous chat, and then one member from IDG.  And this chat was started on April 12, 2023.

Q.   The same date as the I&R Capital message we just saw?

A.   That's right, yes.

MR. BOOME:   Your Honor, we move 1127 into evidence.

MR. FONDO:   No objection.

THE COURT:   Admitted.

(Trial Exhibit 1127 received in evidence.)

MR. BOOME:   Ms. Hernandez, can we go to the bottom of page 3, please?

BY MR. BOOME:

Q.   Special Agent Valladao, can you direct us to the part of this chat where a meeting is discussed, particularly the schedule of an upcoming meeting?

A.   Yes.  So the third message from the bottom, the user suggests [as read]:

"How about 3:00 p.m. today, or 10:00 a.m. on Friday?"

MR. BOOME:   Let's go to the top of the next page, please, Ms. Hernandez.

BY MR. BOOME:

Q.   The sender is cut off, but the answer says [as read]:

"OK, I will go to your office at 3:00 p.m. today."

A.   That's right, yes.

Q.   And what is the date?

A.   That is April 17th, 2023.

**Q.**   Special Agent Valladao, in China on April 17th, 2023, at 3:00 p.m., what time was it United States Pacific Time?

**A.**   I believe it was 12:00 p.m. -- 12:00 a.m.

**Q.**   3:00 p.m. Beijing time?

**A.**   That's right.

**Q.**   Okay.

         **MR. BOOME:**  Let's go back to Exhibit 1155, please, Ms. Hernandez.  Bottom of page 31.

**BY MR. BOOME:**

**Q.**   Can you tell the members of the jury --

         **MR. BOOME:**  Thank you.

**BY MR. BOOME:**

**Q.**   Can you tell the members of the jury what you see in these two pages regarding the meeting with IDG Capital?

**A.**   Yes.  So on the left-hand side, Yuan Ye asks on April 17th [as read]:

         "Which line we're using for the IDG call later?"

     And then on the right-hand side, there appears to be a link, Zi Xiong IDG Capital, that is sent, and then Mr. Ding responds [as read]:

         "Thank you.  Got it."

         **MR. BOOME:**  Okay.  I want to now bring up Exhibit 780, not in evidence.

**BY MR. BOOME:**

**Q.**   What is Exhibit 780, Special Agent Valladao?

**A.**   It's a summary exhibit that I created listing the files uploaded to Mr. Ding's Google Drive account on April 17th, 2023.

**Q.**   And the column on the right-hand side, what does that indicate?

**A.**   That's the time of upload.

        **MR. BOOME:**   Your Honor, the Government moves 780 into evidence.

        **MR. FONDO:**   No objection.

        **THE COURT:**   Admitted.

    (Trial Exhibit 780 received in evidence.)

        **MR. BOOME:**   Can we go to page --

**BY MR. BOOME:**

**Q.**   So let's show it to the jury and give them a quick orientation before we jump to page 7.

**A.**   So this is the list of all the files uploaded on April 17, 2023.  On the left-hand column, the originating subfolder, that is the folder that that file was found on Mr. Ding's Google-issued laptop.  Then you have a file name, and then the time of upload on UTC time.

    And I do want to point out, there's some files that are highlighted, and those are alleged trade secret files.  And I've included the exhibit number as well.

**Q.**   So the ones that are highlighted are the alleged trade secret files.  The other ones are the other Google files that

were uploaded at the same time?

**A.** Correct.

**MR. BOOME:** Let's go to page 7, please, Ms. Hernandez.

**BY MR. BOOME:**

**Q.** Special Agent Valladao, can you tell us whether there was anything significant about the timing of these uploads in your investigation?

**A.** Yes. So some of the files, the ones that you see up in the top portion under TPU, the time of upload UTC time is 7:00 in the morning, which corresponds to 3:00 p.m. Beijing time.

**Q.** The same time as the meeting we just discussed?

**A.** That's right.

**MR. BOOME:** Ms. Hernandez, can you bring up Exhibit 1029, please, just for the witness.

**BY MR. BOOME:**

**Q.** Do you recognize 1029?

**A.** I do, yes.

**Q.** At a high level, what is it?

**A.** It is a document with a set of questions regarding Zhisuan.

**Q.** Where did you find it?

**A.** In Mr. Ding's Google Drive account.

**Q.** Do you know how he got it based on your review of the chats?

**A.** I did, yes. He received it on the I&R Capital chat.

**MR. BOOME:**   Your Honor, Government moves 1029 into evidence, not for the truth but for its effect on the defendant.

**MR. FONDO:**   No objection, Your Honor.

**THE COURT:**   Admitted.

(Trial Exhibit 1029 received in evidence.)

**BY MR. BOOME:**

**Q.**   Okay.  Based on the I&R Capital chat and what you reviewed from that chat, can you orient us with some context about when the defendant received this document in context of the other things that were happening in that chat at the time?

**A.**   Yes.  So the chat, they created the teaser; and then after that, they scheduled investor meetings.  And sometime after those meetings, then a member of the I&R Capital chat sent these documents to the members of the chat.

**MR. BOOME:**   Ms. Hernandez, can we blow up Number 2, technology?

**BY MR. BOOME:**

**Q.**   Can you walk us through the information provided here in Section 2, technology?

**A.**   Yes.  So it states [as read]:

"The content should clearly articulate what we are doing, for example, we can describe in detail the work done at Google and how that is replicated at Zhisuan."

Q.   In your review of the chats and all the evidence that you collected in this case, did you find any evidence that this fundraising effort -- the initial fundraising effort in April of 2023 was successful?

A.   No, I didn't.

Q.   What did the defendant do shortly after April 2023?

A.   He resigned from -- from Rongshu.  Excuse me.

Q.   What did he do next with regard to the company that he and Yuan Ye had started to form?

A.   Soon after that, he submitted an application to MiraclePlus.

Q.   What evidence did you find indicating that the defendant applied for the MiraclePlus program?

A.   There were emails that he received confirming that he had submitted an application.

         MR. BOOME:  Can we bring up 1009, Ms. Hernandez?

BY MR. BOOME:

Q.   What is this, Special Agent Valladao?

A.   This is an email from Mr. Ding's -- Linwei Ding's Gmail account, and it's from a member of MiraclePlus.

Q.   Is this the first time that you found any evidence of any communication between somebody from MiraclePlus and the defendant?

A.   I did, yes.

         MR. BOOME:  Your Honor, the Government moves 1009 into

evidence.

MR. FONDO:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 1009 received in evidence.)

BY MR. BOOME:

Q.   I want to ask you about Xuwen -- Xuwen Cao.  Do you recognize that name?

A.   I do, yes.

Q.   Can you tell us where -- where from?

A.   It's in various communications in WeChats, as well as emails, and then also from the InfiniCompute video.

Q.   Tell us about the InfiniCompute video.

A.   It's a video that Mr. Crain talked about and found on Mr. Ding's drive -- Google Drive account, and when -- it was accessed by a person by the name of Xuwen Cao.

MR. BOOME:  Ms. Hernandez, let's bring up 1010 and 1011 just for the witness.

BY MR. BOOME:

Q.   Do you recognize these, Special Agent Valladao?

A.   I do, yes.

Q.   What are they?

A.   They're the confirmation email from Mr. Ding's MiraclePlus application submission and then his invitation for the entrepreneurship camp.

Q.   Where did you find these in?

A.    In his email account.

Q.    Are Exhibits 1014 and 1013 similarly emails you recovered from Mr. Ding's account regarding his application process to MiraclePlus?

A.    That's right, yes.

            MR. BOOME:  Your Honor, Government moves 1010, 1011, 1014, and 1013 into evidence.

            MR. FONDO:  No objection.

            THE COURT:  Admitted.

        (Trial Exhibits 1010, 1011, 1014, and 1013 received in evidence.)

BY MR. BOOME:

Q.    Okay.  Let's go through --

            MR. BOOME:  Let's start with 1010, please, Ms. Hernandez.

BY MR. BOOME:

Q.    Okay.  What information did Mr. Ding receive in this email?

A.    So this email is dated May 30th, 2023.  And Mr. Ding is being congratulated for applying for the MiraclePlus camp -- entrepreneurship camp.

            MR. BOOME:  Let's move ahead to 1011, Ms. Hernandez.

BY MR. BOOME:

Q.    The date on this exhibit is May 30th.  Can you give us the date of this -- the next email that you found?

**A.**   Yeah.  So the email is dated July 22nd, 2023.  And in this email, he -- Mr. Ding is being invited to apply to interview for the MiraclePlus autumn entrepreneurship camp.

**Q.**   And the date here, July 22nd, 2023, for that invitation?

**A.**   That's right, yes.

        **MR. BOOME:**  Let's move ahead to 1014, please, Ms. Hernandez.

**BY MR. BOOME:**

**Q.**   And I want to ask you to start with the Friday, August 25th, 2023, email.

        Can you tell us what information the defendant is receiving in this email regards -- in regards to the MiraclePlus camp?

**A.**   Yes.  So in this email, he's being congratulated into -- being accepted to the camp, and then they're sending him the entrepreneurship camp schedule and to-do list.

**Q.**   Let's take a look at that.  Starting with "Things to Do."

        And according to this email, what were the steps in the process for moving from here to -- through the camp schedule?

**A.**   Yeah.  So team members would need to register an online account, especially the link here is build.miracleplus.com which is in -- it's stated as the internal tool for the entrepreneurship camp.

        And then they would submit questionnaire to collect information about that camp.

**Q.** Can you tell us, at the bottom, what information is Mr. Ding receiving about an actual camp event?

**A.** Yes. So this was a two-day start-up event, so it was the two days to introduce the camp, and members were asked to be there in person on August 31st and September 1st, 2023.

**MR. BOOME:** And let's go to 1013, please, Ms. Hernandez.

**BY MR. BOOME:**

**Q.** This is the last email regarding the application that we're going to look at.

Can you tell us what the August 26, 2023, email conveys to Mr. Ding?

**A.** Yes. So it, again, congratulates him for being selected for the camp. And then it attaches -- it says that they -- in order to be part of the camp, they need -- team members need to sign an entrepreneurship camp entry commitment letter in which they agree to the deal of being part of the camp, meaning that they would agree to the fund investment specific.

**Q.** In your review of the contents of this email account, did you find something called a camp commitment letter?

**A.** I did, yes.

**MR. BOOME:** Ms. Hernandez, can you bring up 1167, please.

I'm sorry. I misspoke, 1176.

\\\

BY MR. BOOME:

Q.   Is this the camp commitment letter that you found?

A.   It is.

MR. BOOME:   Your Honor, Government moves 1176 into evidence.

MR. FONDO:   No objection.

THE COURT:   Admitted.

(Trial Exhibit 1176 received in evidence.)

MR. BOOME:   Can we look at the middle of the first page, please, Ms. Hernandez, under "Entrepreneurship Camp Cooperation."

BY MR. BOOME:

Q.   According to this, what is the investment structure that's being proposed in this camp commitment letter?

THE COURT:   Hold on a second.   Can the jurors see that okay?

Yeah?   Okay.

THE WITNESS:   Yes.   According to the letter, if you agree to be part of the camp, then MiraclePlus would invest in the company by obtaining 7 percent equity in the company in exchange for the investment funds, which is 300,000 U.S. dollars, or the equivalent in Yuan.

BY MR. BOOME:

Q.   I want to ask you about a couple of things that happened during this time period around the time that Mr. Ding was

receiving these emails about the MiraclePlus application process.

**MR. BOOME:**  Ms. Hernandez, can you bring up Exhibit 1170, please.

**BY MR. BOOME:**

**Q.**   Do you recognize this, Special Agent Valladao?

**A.**   I do, yes.

**Q.**   What is it at a high level?

**A.**   It's an Apple Note from Mr. Ding's Google-issued laptop with information about MiraclePlus.

**Q.**   And the date, the creation date of the note, please?

**A.**   August 13, 2023.

**Q.**   About 12 days before Mr. Ding received the congratulations email from MiraclePlus?

**A.**   That's right.

**Q.**   And at a high level, what does it discuss?

**A.**   It lists a number of questions for due diligence information.

**MR. BOOME:**  Your Honor, the Government moves 1170 into evidence.

**MR. FONDO:**  No objection.

**THE COURT:**  Admitted.

(Trial Exhibit 1170 received in evidence.)

**BY MR. BOOME:**

**Q.**   Okay.  Where did this note come from?

**A.**   From Mr. Ding's Google-issued laptop.

         **MR. BOOME:**   Okay.   Let's go -- let's zoom in on "Dear entrepreneur."

     Just give the jurors a minute to read.

                         (Pause in proceedings.)

**BY MR. BOOME:**

**Q.**   As part of this note, does it discuss product demonstration videos and professional references?

**A.**   It does, yes.

**Q.**   Can you direct us to -- let's start with the product demonstration video.   Can you direct us to the portion of the note where the product demonstration video is discussed?

**A.**   Yes.   If we can zoom out, that would be the next page and Section 4.   It says here [as read]:

         "If the application form includes a product
     video, please provide the product test account and
     link."

**Q.**   And below that is a link?

**A.**   Correct.

**Q.**   Is there a file identifier in this link?

**A.**   Yes.

**Q.**   Did you recover, during your search of Mr. Ding's devices and accounts, a video file with this file identifier?

**A.**   I did, yes.

**Q.**   What was the name of that video file?

A.    It's "InfiniCompute Demo."

        MR. BOOME:  Ms. Hernandez, can we bring up, please, 1175S just for the witness.

        Actually, let's not play it.  Thank you.

BY MR. BOOME:

Q.    Is this the video that you found -- and I'm sorry.

        Did you say where you found it?

A.    Mr. Ding's personal Google Drive account.

Q.    Matching the file ID in the note?

A.    That's right.

        MR. BOOME:  Your Honor, Government moves 1175S into evidence.

        MR. FONDO:  No objection.

        THE COURT:  Admitted.

        (Trial Exhibit 1175S received in evidence.)

        MR. BOOME:  And just for the record, this is overlaid -- there are English subtitles with the Mandarin audio for this video.  We're not going to play it at this time.

        THE COURT:  Okay.

        MR. BOOME:  Ms. Hernandez, can you pull up 1175, please.

BY MR. BOOME:

Q.    Special Agent Valladao, is this English translation a written English translation of the audio and the video that you received in this case?

A.    It is, yes.

MR. BOOME:  Your Honor, we also move 1175 into evidence.

MR. FONDO:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 1175 received in evidence.)

BY MR. BOOME:

Q.    Special Agent Valladao --

MR. BOOME:  I want to now go back to 1170, please, Ms. Hernandez.

BY MR. BOOME:

Q.    We just talked about the product demonstration video.  Can you tell us now about the professional reference section of that note?

A.    Yes.  If you go to the second page and under Section 3, the question there states [as read]:

        "Please provide contact information for two
    references for the CEO."

Q.    And the first name listed is [as read]:

        "Aamer Mahmood.  Relationship:  Supervisor at
    Google."

Have you met a person named Aamer Mahmood?

A.    I have, yes.

Q.    Who is he?

A.    He is a vice president of engineering at Google.

**Q.** And below his title, supervisor at Google, there's an email address listed, aamermmood@gmail.com.

Did you obtain a search warrant for the contents of that account?

**A.** I did, yes.

**MR. BOOME:** So, Your Honor, the stip- -- there was a stipulation to the accuracy of the copy of that account that Special Agent Valladao received, and so based on that stipulation, I'm now asking to move -- or first let's show 869 to the witness, please.

**BY MR. BOOME:**

**Q.** Special Agent Valladao, what is this?

**A.** This is an email string from the aamermmood@gmail.com account.

**MR. BOOME:** Your Honor, the Government moves 869 into evidence.

**MR. FONDO:** No objection.

**THE COURT:** Admitted.

(Trial Exhibit 869 received in evidence.)

**MR. BOOME:** Ms. Hernandez, if there's any way you can get both pages of this on the same screen.

**BY MR. BOOME:**

**Q.** And can you orient us as to which messages come first in time?

**A.** Yes.  So the bottom message says, Saturday, August 19th,

at 11:59 a.m.  That would be the first message in this string.

Q.   Before we look at the messages, can you tell us, when was the aamermmood@gmail.com account created?

A.   That account was created on August 19th, 2023.

Q.   The same day as the first message?

A.   That's right, yes.

Q.   Okay.  Let's -- now, the first message is split up between pages.

          MR. BOOME:  Perhaps, Ms. Hernandez, we can blow up the first page, the August 19th message, so we can see both halves of it.  Thank you.

BY MR. BOOME:

Q.   I think I'm going to ask you to read these messages, Special Agent Valladao.

A.   Okay.  First message says [as read]:

          "Hi Mr. Mahmood.  I am Eric, an intern at MiraclePlus.  Mr. Ding Linwei has applied for our Autumn Entrepreneurship Camp, and his project has performed exceptionally well.  Currently, the project has entered the reference check phase, and he has recommended you as his referee.

          "We hope to learn more about his professional abilities, character, and potential.  For this reason, we would be extremely grateful if you are willing to assist us with a short interview!  Given

the time constraints, we plan a 20- to 30-minute

meeting with you according to your availability.

This interview will allow us to get a more in-depth

understanding of Mr. Ding's strengths and potential

from your perspective.  Please let me know when

you're available, and we'll schedule a Zoom meeting

accordingly."

**Q.**   Thank you.  And let's go up to the response by the user of

the aamermmood@gmail.com account.

**A.**   The response says [as read]:

"Hi Eric.  I would be happy to help.  I would

prefer a phone call to a video interview.  Feel free

to let me know if that works for you."

     **MR. BOOME:**  Let's keep going, Ms. Hernandez.  And we

can go to a single screen, if possible, so it can be a little

larger.

     **THE WITNESS:**  The response says [as read]:

"Hi Mr. Mahmood.  No problem!  Thanks for

getting back to me.  A phone call would be great.

When would be a good time?"

**BY MR. BOOME:**

**Q.**   And this is all August 19th.

     **MR. BOOME:**  Let's go to the next message, please,

Ms. Hernandez.

     **THE WITNESS:**  It says [as read]:

"Hi Eric.  I can call you anytime after 4:00 p.m. on Monday.  How about calling you at 4:00 p.m. on Monday?  5:00 p.m. is also fine to me."

And the response is [as read]:

"Hi Mr. Mahmood.  4:00 p.m. tomorrow works!

Thanks so much!"

BY MR. BOOME:

Q.   Was that the last message in this exchange?

A.   It was, yes.

Q.   Were there any other messages at all in the aamermmood@gmail.com account other than the ones we just looked at?

A.   There were not.  The last login for that account was on August 20th of 2023.

Q.   Tell us what you mean, the last login.  How are you able to tell that?

A.   We were able to get information about when an account is -- someone logs into that account, and we have the dates for that.  And so the last time this account was used was August 20th of 2023.

        MR. BOOME:  Ms. Hernandez, can we bring up Exhibit 6 in evidence, please.  Around Row 25,452.

BY MR. BOOME:

Q.   What is Exhibit 6, Special Agent Valladao, just to remind the members of the jury?

**A.**   That is the Santa logs.

**Q.**   What do they show?

**A.**   It shows any events that are happening on Mr. Ding's Google-issued laptop, like write events.

**Q.**   Okay.  Can you tell the members of the jury -- and so what type of event is being recorded here on December -- in the row that Ms. Hernandez has highlighted?

**A.**   That is a delete event from the Trash application.

**Q.**   What application do you see being deleted in the highlighted row?

**A.**   An app called Voicemod.

**Q.**   V-o-i-c-e-m-o-d?

**A.**   Correct.

**Q.**   Voicemod.

Are you familiar with what the Voicemod app is?

**A.**   Yes.

**Q.**   Can you tell us what it is?

**A.**   Yes.  It's an application that can be downloaded to, for example, a MacBook computer, and it can be used with any -- any apps that let you make a phone call, and it lets you change your voice, so sound like someone different or change the pitch of your voice.  It gives you options.

**Q.**   Did Mr. Ding ultimately -- did you find any evidence that Mr. Ding was actually accepted into the MiraclePlus program?

**A.**   I did, yes.

MR. BOOME:  Can we bring up 1149, please, Ms. Hernandez?

BY MR. BOOME:

Q.   Special Agent Valladao, are you familiar with, based on your investigation in this case, a person named Lu Qi, L-u-k-i -- excuse me -- L-u-q-i?

A.   Yes.

Q.   Can you tell us what you know about him and how you know?

A.   Both from the evidence as well as open-source research, Lu Qi is the CEO and founder of MiraclePlus.

Q.   So looking now at 1149.  Do you recognize it?

A.   I do, yes.

Q.   What do you recognize it to be?

A.   An Apple Note found on Mr. Ding's Google-issued laptop.

Q.   What is the creation date of this note?

A.   September 17, 2023.

Q.   How does that fit in with the MiraclePlus application and acceptance emails?

A.   Yes.  So that -- the opening camps from that email were August 31st and September 1st.  So this is about two weeks after that.

MR. BOOME:  Your Honor, Government moves to admit 1149.

MR. FONDO:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 1149 received in evidence.)

**BY MR. BOOME:**

Q.   Let's go to the ten-fold return over ten years section.

[As read]:

"Become a unicorn in about five years.
Valuation 1 billion U.S. or annual revenue reaching
100 million."

Is Google mentioned in this note?

A.   I don't believe -- actually, in the bottom part, yes.

MR. BOOME:  Ms. Hernandez, can we go to the bottom section of the note?

**BY MR. BOOME:**

Q.   Okay.  Special Agent Valladao, I want to ask you now about whether you found any evidence that Zhisuan was founded as a legal entity, as a company?

A.   I did.

Q.   What evidence did you find?

A.   We found a picture of the business license as well as legal documents.

MR. BOOME:  Ms. Hernandez, can we bring up 1051?

**BY MR. BOOME:**

Q.   Can you tell us what this is and where you found it?

A.   Yes.  This is a business license, and it was found as a photo on Mr. Ding's My Passport hard drive.

Q.   And a business license for what company?

**A.** Shanghai Zhisuan Technology.

> **MR. BOOME:** Your Honor, Government moves 1051 into evidence.

> **MR. FONDO:** No objection.

> **THE COURT:** Admitted.

(Trial Exhibit 1051 received in evidence.)

**BY MR. BOOME:**

**Q.** Can you point out for us the date of establishment, the name of the company, and the legal representative of the company?

**A.** Yes. It's on the left-hand side. It says the name of the company Shanghai Zhisuan. Legal representative is listed as Linwei Ding. And then on the right-hand side, date of establishment, October 17th, 2023.

**Q.** Sometime after October 17th, 2023, did you find a document called "MiraclePlus Investment Agreement"?

**A.** Yes.

> **MR. BOOME:** Ms. Hernandez, can you bring up 101 -- I'm sorry. 1001, please.

**BY MR. BOOME:**

**Q.** Is this the investment agreement that you found?

**A.** It is, yes.

**Q.** Where did you find it?

**A.** In Mr. Ding's phone.

**Q.** And at a high level, what is this agreement -- who is this

an agreement between and what is it about?

**A.**   An agreement between Zhisuan and MiraclePlus, and it's an investment agreement.   So...

   **MR. BOOME:**   Your Honor, the Government moves 101 -- 1001 into evidence.

   **MR. FONDO:**   No objection.

   **THE COURT:**   Admitted.

   (Trial Exhibit 1001 received in evidence.)

**BY MR. BOOME:**

**Q.**   Let's go to the first two paragraphs, please.

   Can you walk us through the date and the parties to this agreement, Special Agent Valladao, before we get into some of the terms?

**A.**   Yes.   The signing date of the agreement is November 20th, 2023.   The company's listed as Shanghai Zhisuan Technology. And the founder of the company is listed as Linwei Ding.

**Q.**   And let's go down and see some of the other parties.

   There are a number-- can you walk us through -- let's go -- let's highlight 3 through 5.

   And can you tell us what you know about these three entities and how you know, Special Agent Valladao?

**A.**   Yes.   So these three entities, the first two seem to be consulting entities that are controlled by Mr. Ding.

**Q.**   How do you know they're controlled by Mr. Ding?

**A.**   We have agreements, shareholder agreements, that list him

as the signature for -- on behalf of these entities.

Q.   The Number 3 and Number 4?

A.   That's right.

Q.   Okay.  So Mr. Ding was listed as the Founder Number 2, and then 3 and 4, also based on your review of the evidence associated with him?

A.   That's right.

Q.   And what is Number 5?

A.   Number 5 is the venture capital arm of MiraclePlus.  So they're Beijing Qiji Chuantan Phase II.

     MR. BOOME:  Let's go to page 3, Ms. Hernandez.  Sections 1.2 and 1.3, please.

BY MR. BOOME:

Q.   Okay.  Can you walk us through what this section of the document shows us about the terms of the investment agreement?

A.   Yes.  So Section 1.2 lists the current investment for this agreement.  So it says, in accordance to the agreement, 7 percent of the company's equity corresponds to RMB, just a little bit over 5 million.  5,026,000.

Q.   So who's getting 7 percent of the company, and who's getting 5 million Chinese Yuan?

A.   MiraclePlus -- or their venture arm is getting 7 percent of the company in exchange for providing 5 million Yuan which is roughly 700 -- 700,000 U.S. dollars.

Q.   To Zhisuan?

**A.**   Correct.

          **MR. BOOME:**  Let's go to page 17, please,
Ms. Hernandez.

**BY MR. BOOME:**

**Q.**   This section lists core personnel.  Can you -- two other
individuals are listed other than Mr. Ding.

     Did you see anything else about these two individuals
during the course of your investigation?

**A.**   Yes.  There's employment agreements for both of them as
well as they were in various WeChat conversations with
Mr. Ding.

          **MR. BOOME:**  And, finally, page 18, please,
Ms. Hernandez.

**BY MR. BOOME:**

**Q.**   What does this appendix show?

**A.**   List of companies that are competitors to Zhisuan.

**Q.**   Okay.

          **MR. BOOME:**  Your Honor, in this instance, for this
document and the other legal agreements that we're about to
discuss, I am going to ask to admit both the source document
and the translation so the members of the jury can examine the
signatures if they would like to.

          **THE COURT:**  Okay.

          **MR. BOOME:**  I know we discussed that wouldn't
generally be how we would do it but if it's okay with

the Court, in these instances, I think it would be helpful since the signatures don't appear in the translated versions.

MR. FONDO:  Your Honor, I think we discussed this previously so our position stands on that.

THE COURT:  Okay.  That's fine.

And I'll just take this opportunity to give you an instruction about translations.  So normally, we are just giving you the English translation of a document; right?  And the reason we're doing that is because the English translation is what is in evidence.

In a couple of occasions, we'll need to give you both the original document in Mandarin and the English language translation.

I don't know whether any of you speak Mandarin, but what I want to emphasize is that the translated document is the document that is in evidence and the trans- -- the English translation is the document that you should consider when evaluating the evidence in the case and conducting your deliberations.

The transcript is the evidence, not the foreign language that's written.  Or if you hear a recording later on, the translation of the recording is what is evidence, not the foreign language in the recording itself.

And you're required to accept the English translation and disregard any meaning of the non-English words that you

think is different.

So with that, go ahead.  Those are admitted.

(Trial Exhibit 1001S received in evidence.)

**MR. BOOME:**  Thank you, Your Honor.

So let's pull up, please, Ms. Hernandez, 1001S.  And if we could go side by side with the translated and the original, page 8 of the Mandarin version and page 11 of the translated version.

**BY MR. BOOME:**

**Q.**  Now we're on to the signature pages of this agreement.

Can you tell us how to compare and understand the relationship between these two versions?

**A.**  Yes.  So on the left-hand side, you see the seal and the translation of that seal is in parentheses on the right-hand side that says "Shanghai Zhisuan Technology."

And then there's the signature on the Mandarin version, and then the name of that person on that translated version.

**Q.**  Linwei Ding?

**A.**  Correct.

**Q.**  So this is Mr. Ding here, do I understand correctly, signing on behalf of the company Zhisuan Technology?

**A.**  That's correct.

**MR. BOOME:**  Let's go to page 9 of the Mandarin and 12 of the translated version, please.

\\\

BY MR. BOOME:

Q.   We see Mr. Ding signing again as founder; is that correct?

A.   That's right.

Q.   All right.  Okay.  Can you -- can you summarize the other legal agreements that you found regarding MiraclePlus and its association with Zhisuan Technology?

A.   Yes.  There were, I believe, four other agreements.  One of them, articles of association, that just lists the founding of Zhisuan as a company.  And then there were three others that just are agreements that MiraclePlus can -- that Zhisuan can enter into this investment agreement with MiraclePlus.

Q.   We're not going to look at all those, but I would like to identify them and offer them into evidence.

        MR. BOOME:  Ms. Hernandez, can you bring up 1189 and 1190, please?

BY MR. BOOME:

Q.   Can you just tell us, what 1189 is?

A.   So that is the articles of association of Zhisuan.

Q.   And 1189?

A.   That's a Zhisuan's shareholder decision.

Q.   Did the defendant sign both of these agreements?

A.   He did, yes.

        MR. BOOME:  Your Honor, we offer 1189 and 1190 and the corresponding Mandarin source documents into evidence.

        THE COURT:  Further objection?

MR. FONDO:  Subject to my prior objection, no further objection.

THE COURT:  Okay.  Admitted.

(Trial Exhibits 1189, 1189S, 1190, and 1190S received in evidence.)

MR. BOOME:  And now let's go 1191 and 1192, please, Ms. Hernandez.

BY MR. BOOME:

Q.   So I think I see 1191 on the left.  Can you tell us, what is that document?

A.   Yes.  That is Zhisuan's Executive Director's Decision.

Q.   Did the defendant sign that document?

A.   He did, yes.

Q.   And 1192?

A.   It's a -- Zhisuan's Resolutions of the Shareholders' Meeting.

Q.   Did the defendant sign that as well?

A.   He did.

Q.   And at a high level, what do these documents pertain to?

A.   They confirm and agree that Zhisuan can enter into the investment agreement with MiraclePlus.

MR. BOOME:  Your Honor, the Government moves 1191, 1192, and the corresponding source documents into evidence.

THE COURT:  Further objection?

MR. FONDO:  No, Your Honor.

THE COURT:  They're admitted.

(Trial Exhibits 1191, 1191S, 1192, 1192S received in evidence.)

BY MR. BOOME:

Q.   Okay.  You mentioned employment agreements and confidentiality agreements.

Who signed employment agreements and confidentiality agreements?

A.   Mr. Ding, and then the two other people listed under core personnel, Shasha Guo and Luxi Li.

MR. BOOME:  Let's look at Exhibit 1184, please, Ms. Hernandez, just for the witness.

BY MR. BOOME:

Q.   What is this document, Special Agent Valladao?

A.   That is an agreement on confidentiality and intellectual property ownership between Zhisuan and Luxi Li.

Q.   When was it signed?

A.   November 23rd, 2023.

MR. BOOME:  Your Honor, the Government moves 1184 into evidence and the corresponding source document.

MR. FONDO:  No additional objection, Your Honor.

THE COURT:  Admitted.

(Trial Exhibits 1184 and 1184S received in evidence.)

MR. BOOME:  Let's focus on the parties to the agreement, please, and the date, just the top sections, Party A

and Party B, Ms. Hernandez.

BY MR. BOOME:

Q.   If you could just walk us through where you see the date that the document was signed and the parties to the agreement?

A.   Yes.  So on the top paragraph, you can see that it says it's signed by the following parties on November 23rd, 2023. Party A is listed as Shanghai Zhisuan Technology with Ding Linwei as the legal representative, and Party B is listed as Luxi Li.

Q.   Did this document that Zhisuan employees signed define "confidential information"?

A.   It did.

     MR. BOOME:  Let's go to -- let's zoom out, please, Ms. Hernandez.  And let's go to Section 2 defining confidential information.  "Party A's information," 2.1.  And I'd like to ask you to highlight Subsection 2 starting with "technical information."

BY MR. BOOME:

Q.   Can you read for us how Zhisuan's confidentiality agreement defined, in part, "confidential information"?

A.   Yes.  It defines it as [as read]:

          "Technical information, such as concepts,
     inventions, proposals, programs, techniques, reports,
     software, codes, products, designs, models, and
     operating instructions."

MR. BOOME: Let's go down to page 5, please, Ms. Hernandez.

I'm sorry. I've given you the wrong page. Let's go back up. Back up one page.

BY MR. BOOME:

Q. Section 8, "Return of Party A's documents."

What does Zhisuan's confidentiality agreement say about what its employees should do when they leave the company?

A. Yes. It says that Party B, which is the employee, would agree to return Party A, Zhisuan's, documents once -- and anything generated during the period of employment and copies of those items or any other information belonging to Party A upon Party B leaving the employment.

Q. Okay. Have you reviewed the confidentiality agreements for Mr. Ding that he signed for working -- for Zhisuan and for the other employee Shasha?

A. I did, yes.

Q. Are they substantially the same as this one?

A. They are.

Q. And are they 1184 and 1185?

A. They are.

MR. BOOME: Your Honor, we move 1184, 1185, and the corresponding Mandarin source documents into evidence.

MR. FONDO: No objection.

THE COURT: Admitted.

(Trial Exhibits 1184, 1184S, 1185, and 1185S received in evidence.)

**BY MR. BOOME:**

Q.   Okay.  And lastly, let's talk about the employment agreements.

MR. BOOME:  Let's go to 1187, please, Ms. Hernandez.

**BY MR. BOOME:**

Q.   Do you recognize this?

A.   I do, yes.

Q.   What is it?

A.   It's the employment agreement between Zhisuan and Luxi Li.

Q.   When was it signed?

A.   November 23rd, 2023.

Q.   And have you reviewed the employment agreements for the defendant and for Shasha, the other employee?

A.   I have, yes.

Q.   Are they substantially the same as this one?

A.   They are.

MR. BOOME:  Okay.  Your Honor, the Government moves 1187, 1188, and 1186 into evidence, along with the Mandarin source documents.

MR. FONDO:  No further objection.

THE COURT:  Admitted.

(Trial Exhibits 1187, 1187S, 1188, 1188S, 1186, and 1186S received in evidence.)

**MR. BOOME:**  Let's look at the parties and the date. And now let's go to page 2, please, Section 9.

**BY MR. BOOME:**

Q.   Does the agreement state whether the Zhisuan employees will be paid for their work?

A.   It does, yes.

Q.   What's the salary listed here?

A.   This one lists Party B's salary at 3,000 RMB -- 30,000. Excuse me.

Q.   Okay.  Let's talk a little bit more about MiraclePlus, Special Agent Valladao.

Was there an event that occurred in relation to MiraclePlus on November 24th, 2023?

A.   There was.

Q.   What evidence did you see in the chats or otherwise that you reviewed in this case that focused on that particular date?

A.   There were photos that we recovered.

Q.   Based on everything you reviewed in the case, chats and other evidence, what was the event that happened that day?

A.   It was an event where founders of the companies would present their projects to an audience of investors.

Q.   How would they present?  In what form?

A.   They went up on stage and gave a speech and they had slides on the background.

Q.   Did you find any evidence that there were rehearsals or

practice sessions available for the company founders before the actual day of the presentation?

A.   I did, yes.

Q.   What did you see?

A.   Founders, there were communications in which founders were asked to attend a rehearsal event where they would practice their presentation before actually presenting on November 24th.

MR. BOOME:  I'd like to bring up 1004S, please, Ms. Hernandez.

BY MR. BOOME:

Q.   Did you find a video file that appeared to be the defendant rehearsing his presentation?

A.   I did, yes.

Q.   Tell us about where you found this document and how -- based on your review of the evidence, how the defendant got it.

A.   The video file was found on Mr. Ding's personal laptop, and based on the hash value, we could determine that he received it from a WeChat conversation.

Q.   From who?

A.   From Shasha Guo.

Q.   Is that one of the employees we just discussed?

A.   Correct, yes.

Q.   When did he receive the practice video?

A.   November 23rd, 2023.

Q.   And at a general level, what does the video show?

**A.**   It shows Mr. Ding on a stage giving a presentation with some slides in the background.

**MR. BOOME:**   Your Honor, the Government moves 1004S and a written translation of the audio, 1004, into evidence.

**MR. FONDO:**   No objection.

**THE COURT:**   Admitted.

(Trial Exhibits 1004 and 1004S received in evidence.)

**MR. BOOME:**   Do we have our sound available, Ms. Hernandez?

**BY MR. BOOME:**

**Q.**   Okay.  Before we press play, Special Agent Valladao, can you tell us, where is Mr. Ding?

**A.**   He's up on stage, right in the middle.

**Q.**   And we see subtitles in English language behind him.  Were those in the original?

**A.**   They were not, no.

**Q.**   Okay.  So these have been added later to show the English translations of the Mandarin audio and Mandarin text behind Mr. Ding?

**A.**   Correct.

**MR. BOOME:**   Your Honor, with the Court's permission, we'd like to play the video.

**THE COURT:**   Go ahead.

(Video was played but not reported.)

\\\

BY MR. BOOME:

Q.   Special Agent Valladao, the slide presentation behind the defendant in the video, did you find a presentation that appeared to contain the same information that was in the slides behind him in the video?

A.   I did, yes.

Q.   Okay.  But before we talk about that, I want to talk about some of the WeChats involving the employees that we discussed.

        MR. BOOME:  Ms. Hernandez, can you bring up Exhibits 1135 and 1125, please, side by side?

BY MR. BOOME:

Q.   Okay.  On the left, 1135, and on the right, 11 -- 1125.

     Let's start with 1135.  Can you tell us about the participants in this chat?

A.   Yes.  This chat is -- has Mr. Ding and two other people. So Guo Shasha being one of them, and a second person by -- by the name of Wang Fei, self-identified, listed here as "shuzigui," as a WeChat username.

Q.   What's the name of the chat that's 1135?

A.   The chat was named Marketing Project Group.

Q.   Okay.  And what is this chat about at a high level?

A.   It is about creating marketing materials for Zhisuan.

Q.   When did it start?

A.   On October 17, 2023.

Q.   Is this chat about anything else other than

Zhisuan Technology?

A.    It is not, no.

Q.    What types of things are discussed?

A.    Creating a presentation deck, including presentation for the MiraclePlus event, as well as marketing materials for customers.

Q.    Okay.  And let's now go to the other side, Company Management Group.

Can you tell us -- there appears to be one additional person in this chat.  Can you tell us who that is?

A.    Yes.  Luxi Li.

Q.    When did this chat begin?

A.    This chat started November 11, 2023.

Q.    And what is the Company Management Group chat about?

A.    It is also about MiraclePlus, mostly coordinating on the event coming up and the design of the booth for the event.

Q.    Is the Company Management Group chat about anything else other than Zhisuan Technology and the MiraclePlus event?

A.    It is not, no.

MR. BOOME:  Your Honor, we ask to move both of these chats in in their entirety.

MR. FONDO:  No objection, Your Honor.

THE COURT:  Admitted.

(Trial Exhibits 1135 and 1125 received in evidence.)

\\\

**BY MR. BOOME:**

Q.   Okay.  You mentioned that -- you mentioned three total people other than Mr. Ding who are a part of these chats: Shasha Guo, Luxi Li, and Wang Fei.

You don't know any of these people in person, you've never met them; correct?

A.   Correct.

Q.   So everything you're about to tell us about them you learned from reviewing the evidence in this case?

A.   That's correct.

Q.   Can you give us some high-level background on Luxi Li first?

A.   Yes.  Luxi Li is -- Mr. Ding met her and she provided her business card, so she's more in the finance side, and was helping with financial management.

Q.   Shasha?

A.   Yes.  Shasha was a previous employee at Rongshu, and she joined Zhisuan full-time after her employment with Rongshu ended.

Q.   And Wang Fei?

A.   Wang Fei, according to WeChat conversations, she was working part-time for Zhisuan.

Q.   In what capacity?

A.   Helping with the -- creating the slide decks.

Q.   Okay.  And so, now, because the WeChat identifiers are

different than the actual names, I want to ask you, since these are both on the screen, can you tell us which ones belong to Luxi Li?

**A.**    Yes.  So Lucie-xixi, that's Luxi Li, so Lucie, dash, x-i-x-i.

**Q.**    Which one belongs to Shasha Guo?

**A.**    That one is suocao1022.

**Q.**    And which one belongs to Wang Fei?

**A.**    Shuzigui.  Right in the middle.

**Q.**    So when we discuss these chats from now on, can we agree to use the names that we discussed, Wang Fei, Shasha, or Luxi, for those individuals --

**A.**    Yes.

**Q.**    -- just to avoid confusion?

        **MR. BOOME:**  All right.  Ms. Hernandez, can we bring up 1158, please.

**BY MR. BOOME:**

**Q.**    Do you recognize 1158?

**A.**    I do.

**Q.**    Can you tell us where you found it?

**A.**    In Mr. Ding's phone.

**Q.**    And what is it?

**A.**    It is the slide deck presented at his MiraclePlus speech.

        **MR. BOOME:**  Ms. Hernandez, can we go to -- before we admit 1158, can we go to 1125, please, at page 198?

BY MR. BOOME:

Q.   Do you see 1158 being sent in this chat?

A.   I do, yes.

Q.   Who's sending it?

A.   Mr. Ding sends it.

Q.   Can you show us where?   Thank you.

Is the PowerPoint document that Mr. Ding is sending in this chat on November 2023, is that Exhibit 1158?

A.   It is.

MR. BOOME:   Your Honor, the Government moves 1158 into evidence.

MR. FONDO:   No objection.

THE COURT:   Admitted.

(Trial Exhibit 1158 received in evidence.)

BY MR. BOOME:

Q.   Now, the date when Mr. Ding sent this document to the group chat Company Management Group, how does that relate to the day of the MiraclePlus presentation?

A.   That was one day before the presentation.

Q.   Okay.

MR. BOOME:   Let's go to 1158, please, Ms. Hernandez. Let's look at page 5.

BY MR. BOOME:

Q.   [As read]:

"Why we can do it.   We develop Google's tens of

thousands of cards compute platform, replicate and upgrade it, and then build a platform adapted to domestic conditions."

The "replicate and upgrade it" text is red.  Was that something you and your team added or was that in the original?

A.   That was in the original.

MR. BOOME:  Let's go to page 6, please.

BY MR. BOOME:

Q.   Again, red text in the original?

A.   Correct.

MR. BOOME:  And page 10.

BY MR. BOOME:

Q.   I want to ask you to focus on the left-hand side [as read]:

"Customers already at the contract signing and cooperation stage."

Can you tell the members of the jury whether you're familiar with any of the entities listed here based on your investigation?

A.   I am, yes.

Q.   Tell us which ones.

A.   The first logo on the top, right on top of "government agency," that's Mingyue Lake Industrial Innovation Park, a high-tech zone.  And then right underneath that, the circle, the blue circle, it's Southwest University Science of

Technology Research Institute.

**Q.**   And we'll discuss those more later.

And then moving to the right-hand side, the blue and white and red logo, what is that for?

**A.**   That is Lingang Group.

**Q.**   And are you familiar with that from the chats and the rest of your investigation?

**A.**   I am, yes.

**Q.**   What is it?

**MR. FONDO:**   Objection.  Lacks foundation.

**THE COURT:**   Overruled.

**THE WITNESS:**   From the chats, Mr. Ding met with someone from this group.

**MR. BOOME:**   And can we go to the last page of this presentation, please?

**BY MR. BOOME:**

**Q.**   There's a booth referenced.  Did you find any photos that appeared to show a booth for Zhisuan Technology?

**A.**   I did, yes.

**Q.**   I'd like to discuss those now.  Where did they come from?

**THE COURT:**   Hold on a second.  Before we move on, it's probably a good time to take a morning break.  Does that sound about right?

**MR. BOOME:**   Sounds good, Your Honor.

**THE COURT:**   Okay.  Let's take a break.  We'll resume

at ten minutes after the hour.  Thank you.

(Proceedings were heard out of the presence of the jury.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  All right.  Thank you.

Anything to discuss?

MR. BOOME:  No, Your Honor.  Thank you.

THE COURT:  All right.  See you in a bit.

THE COURTROOM DEPUTY:  Court's in recess.

(Recess taken at 10:59 a.m.)

(Proceedings resumed at 11:15 a.m.)

(Proceedings were heard in the presence of the jury.)

THE COURT:  Okay.  You may resume.

BY MR. BOOME:

Q.  Special Agent Valladao, we ended by -- I ended by asking you about a booth that appeared to be related to Zhisuan at the MiraclePlus presentation.

Where did you find the photos showing this booth and some of the other MiraclePlus-related event activities?

A.  They were on Mr. Ding's My Passport hard drive that was recovered at his residence.

Q.  Do you know how he got them?  Did you see the photos in any chats?

A.  Yes.  He received them on one of the chats with the members of Zhisuan.

Q.  On what day did he receive them?

**A.**   November 24th --

**Q.**   The day of the conference?

**A.**   -- 2023?

Yes.

**Q.**   Okay.  Have you and I reviewed the series of photos that I'm about to list before your testimony today?  Exhibit 334, 340 through 342, 346 through 348, 1156 and 1136.  Have you and I looked at all those photos together?

**A.**   Yes.

**Q.**   Are they the copies of the photos that you found on the hard drive that were sent to Mr. Ding in the chats?

**A.**   Yes.

        **MR. BOOME:**  Your Honor, the Government moves those exhibits into evidence?

        **MR. FONDO:**  Your Honor, I apologize.  I didn't catch all those numbers, if counsel wouldn't mind repeating them.

        **MR. BOOME:**  Of course.  334, 340 to 342, 346 to 348, 1156, and 1136.

        **MR. FONDO:**  No objection, Your Honor.

        **THE COURT:**  Admitted.

     (Trial Exhibits 334, 340 to 342, 346 to 348, 1156 and 1136 received in evidence.)

        **MR. BOOME:**  Let's start with 340, please, Ms. Hernandez.

\\\

**BY MR. BOOME:**

**Q.**   Can you tell us whether, based on your investigation and review of the chats and other evidence, you recognize any of the people in the photo?

**A.**   I do, yes.

**Q.**   Can you point them out?

**A.**   Yes.  Mr. Ding is in the middle holding what looks like a certificate.  To his right-hand side is a woman.  That is Luxi Li.  Next to her in the white jacket is Shasha Guo.

**Q.**   Those are the two employees from the agreement?

**A.**   Correct.

And then next to Mr. Ding on the left-hand side of that photo, that is Lu Qi, who's the founder of MiraclePlus.

         **MR. BOOME:**  Now let's go to 341, please.

**BY MR. BOOME:**

**Q.**   Can you point out Mr. Ding?

**A.**   Yes.  He's on the left-hand side and wearing the orange shirt.

         **MR. BOOME:**  342, please, Ms. Hernandez.

**BY MR. BOOME:**

**Q.**   We see the word "Lyceum" on the booth graphics?

**A.**   Yes.

**Q.**   During your investigation, did you determine what "Lyceum" refers to?

**A.**   Yes.  That refers to Zhisuan.  On the lines next to it is

the logo, so that is Zhisuan's logo.

Q.   Specifically the product?

A.   Correct.

         MR. BOOME:  Let's go to 346, please, Ms. Hernandez.

         347.

         348.

         334.

         Let's go to 1156 now, please.

BY MR. BOOME:

Q.   Okay.  And, obviously, we have English translations of the Mandarin text; correct?

A.   Correct.

Q.   And can you identify the individuals you see, if you recognize them, from your investigation?

A.   Yes.  Starting from the left to right.  The woman on the left is Luxi Li, and then Mr. Ding in the middle, and Shasha Guo on his right-hand side.

         MR. BOOME:  Ms. Hernandez, can we zoom in on the text above Mr. Ding's head, please?

BY MR. BOOME:

Q.   Would you mind reading this for us, please.

A.   Yes.

         [As read]:

             "Why we can build a computing power platform of 10,000 GPU scale.  With the R&D experience and

technology of Google computing power platform of 10,000 GPU scale, a computing platform of 10,000 GPU scale that suits China's national conditions can be built through direct replication and upgrading

"Looking around the world, there are less than ten people who can build and have built a computer power platform of 10,000 GPU scale.  Our company happens to have one of them."

Q.   The underlining, was that something that you added?

A.   No.   That's in the original.

Q.   The original from the booth?

A.   Correct.

        MR. BOOME:   And then let's go to 1136, please, Ms. Hernandez.

BY MR. BOOME:

Q.   Based on your review -- I want to ask you about that language that we just saw, the replication and upgrading language.

     Based on your review of the chats that we discussed in preparation for this event, which member of the Zhisuan team suggested using the language "replicate" and "upgrade" as it relates to Google's technology?

A.   It was Mr. Ding.

        MR. BOOME:   Can we go to page 1135 -- I'm sorry. Exhibit 1135, page 253.   Bottom of 253 and top of 254.

BY MR. BOOME:

Q.   Do you recognize the graphic that is -- sorry.  I know I need to stay closer to the microphone.

Do you recognize the graphic that's at the top of 253?

A.   I do, yes.

Q.   What's that from?

A.   That's from the booth that we just saw in the previous photo.  Or --

MR. BOOME:  Can you zoom in on the top of 254, please, Ms. Hernandez?

BY MR. BOOME:

Q.   Can you read the message that Mr. Ding sends to the group on November 15th, 2023, at 2:17 p.m.?

A.   He says [as read]:

"How to do.  Replicate the experience of Google's ten-thousand-card computing power platform and update based on it."

Q.   Many of the Zhisuan-related materials that we've been discussing were in Mandarin language original and we've seen translations.

Did you find any Zhisuan-related documents that were in English to start with?

A.   Yes.

MR. BOOME:  Ms. Hernandez, can we pull up 353?

\\\

BY MR. BOOME:

Q.   Do you recognize this?

A.   I do, yes.

Q.   What is it?

A.   It is a document in English about Zhisuan, and it was found on Mr. Ding's phone.

Q.   Did you see any chats where Mr. Ding sent this to anyone?

A.   I see chats where he received it.

MR. BOOME:   I want to go to Exhibit 1038, page 41, just for the witness.

BY MR. BOOME:

Q.   Is this a chat discussing this English version of Exhibit 353?

A.   It is, yes.

MR. BOOME:   Your Honor, we move pages 41 and 42 of 1038 into evidence.

MR. FONDO:   No objection.

THE COURT:   Admitted.

(Trial Exhibit 1038, pages 41 and 42 received in evidence.)

BY MR. BOOME:

Q.   Can you point out for us in this chat where an English version of Zhisuan marketing material is discussed?

A.   Yes.   So on the left-hand side, the user is asking Mr. Ding to provide -- [as read]:

"Translate the content of the Demo Day speech script into English."

On the top of the chat, yes.

Q.   [As read]:

"Pay attention to professional terms"?

A.   Yes.

Q.   And on the next page, 1038, do you see Mr. Ding sending an English document --

A.   Yes.  On --

Q.   -- to the user?

A.   -- the middle portion of the chat on 11/29 at 1:37:16 p.m., Mr. Ding sends a document titled "CMSPPT-english."

MR. BOOME:  And let's go back to 353, please.

BY MR. BOOME:

Q.   Is this the document that they were discussing?

A.   Yes, it is.

MR. BOOME:  Your Honor, we move 53 -- 5 -- excuse me -- 353 into evidence.

MR. FONDO:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 353 received in evidence.)

MR. BOOME:  Ms. Hernandez, let's highlight the first paragraph.  Thank you.  And now let's go down -- zoom out, please, and let's go down to the "why we can do it" paragraph.

**BY MR. BOOME:**

**Q.**   Special Agent Valladao, do you see the "replicate and upgrade" language in the English version of the Zhisuan marketing material?

**A.**   I do, yes.

**Q.**   After the November 24th, 2023, investor conference, based on your review of the chats and other evidence in the case, can you describe what happened next for the development of Zhisuan Technology?

**A.**   Yes.  Mr. Ding met with potential investors.  He -- he had -- there were scheduled meetings with potential investors.

          **MR. BOOME:**  Ms. Hernandez, can we bring up 1077, please?

**BY MR. BOOME:**

**Q.**   What is this?

**A.**   This is screenshots of a calendar from Mr. Ding's -- they were found on Mr. Ding's My Passport hard drive.

**Q.**   And about what -- can you orient us about the date of these calendar invites that we're about to look at?

**A.**   Yes.  They start on the 4th of December and go through December 20th of 2023.

**Q.**   And what -- generally speaking, what are the events that are scheduled on the multiple pages of the calendar that we're about to look at?

**A.**   They're -- it lists names of investors in the PRC -- or

other companies in the PRC.  There's about 21 different names listed in these calendar screenshots.

MR. BOOME:  Your Honor, the Government moves 1077 to 1082, the calendar screenshots, into evidence.

MR. FONDO:  No objection.

THE COURT:  Admitted.

(Trial Exhibits 1077 through 1082 received in evidence.)

BY MR. BOOME:

Q.  Based on the calendar screenshots that you reviewed, approximately how many meetings with investors based in the PRC did you see on Mr. Ding's calendar?

A.  About 21.

Q.  Between what dates?

A.  December 4th and December 20th.

Q.  Did you recover any chats with PRC-based investment firms?

A.  We did, yes.

Q.  Is one of those Exhibit 1128 involving Monad Ventures?

A.  Yes.

MR. BOOME:  Can we bring up 1128, please, Ms. Hernandez?

BY MR. BOOME:

Q.  Is this a chat between Mr. Ding, other members of the Zhisuan team, and individuals who identify themselves as being associated with Monad Ventures?

A.  It is, yes.

MR. BOOME:  Your Honor, Government moves 1128 into evidence.

MR. FONDO:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 1128 received in evidence.)

MR. BOOME:  Let's go to page 3, please, Ms. Hernandez.

BY MR. BOOME:

Q.   And I'd like to ask you, Special Agent Valladao, whether there is a non-disclosure agreement discussed at all in this document?

A.   There is, yes.

Q.   Can you point it out?

A.   It's --

Q.   Walk us through the whole conversation --

A.   Yes.

Q.   -- as it pertains to the NDA.

A.   Yes.  So on December 1st, 2023, the second message from the top, the user asks [as read]:

"Do we have any more detailed performance test reports and cases of speed-up training for specific chips?"

Mr. Ding responds [as read]:

"Yes, we do, but it is classified and I could not share it here."

Then the user asks [as read]:

"How about we sign an NDA just for internal evaluation?"

And then on the bottom message from Mr. Ding, he states [as read]:

"This one is a case I personally did when I was working in Google.  It is not something for the current project, so it is not really proper to share it.  After we sign the NDA, we can let you read it on site, but you are not allowed to keep a copy of it."

Q.   During your investigation, did you submit a search warrant to GitHub?

A.   I did, yes.

Q.   What is GitHub?

A.   It is an online repository for code.

Q.   Why did you send a search warrant to GitHub in this case?

A.   There was indication from the chats that Mr. Ding had a GitHub account that was related to Zhisuan.

Q.   What types of things are stored in GitHub, generally?

A.   Source code, if you're -- it's an open-source online repository where you can build applications.

Q.   Did you receive anything in response from GitHub?

A.   I did, yes.

Q.   Were you able to understand it?

A.   No.

Q.   Why not?

**A.**   I'm not an expert on software code.

**Q.**   Did the FBI provide the results from the GitHub search warrant to Dr. Daniel Sanchez, the Government's technology expert in this case?

**A.**   We did, yes.

**Q.**   Okay.  We saw the slideshow from -- that Mr. Ding sent to a chat on November 23rd, the day before the presentation, with the slides from the -- that appeared to be from the presentation.

Was there more detailed Zhisuan marketing material that was created in the group chats?

**A.**   There was, yes.

**Q.**   Which chats were the more detailed material discussed in?

**A.**   On the Marketing Project Group chat.

        **MR. BOOME:**  Can we bring up 1143, please, Ms. Hernandez?

**BY MR. BOOME:**

**Q.**   Do you recognize 1143?

**A.**   Yes.

**Q.**   What do you recognize it to be?

**A.**   It is a PowerPoint presentation describing Zhisuan company and business.

**Q.**   Where did you find it?

**A.**   This one, I believe this was from his -- from his phone.

**Q.**   And do you remember how many copies of this document you

found on Mr. Ding's devices?

**A.** Yes. There were -- there were a lot. There were 64 different versions of this PowerPoint in his laptop. And by versions, I mean it's the same PowerPoint, it was just named with 64 different names.

**Q.** What were the -- what were the names, generally speaking?

**A.** They were all listed "To," and then the name of an investor company. So 64 different investor names.

**Q.** And do you recall which investor name was on the version that we're looking at now?

**A.** Yes. This was addressed to Hony Capital.

**Q.** And did Mr. Ding send it to Hony Capital in a chat that you saw?

**A.** He did, yes.

　　　　**MR. BOOME:** Okay. Your Honor, we move 1143 into evidence.

　　　　**MR. FONDO:** No objection.

　　　　**THE COURT:** Admitted.

　　(Trial Exhibit 1143 received in evidence.)

**BY MR. BOOME:**

**Q.** Now, on the top left of this document, we see two product names. Can you tell us what you know about those?

**A.** Yes, InfiniCompute was the original product name that Mr. Ding had suggested for the product for Zhisuan, and then Lyceum was the alternate name that was suggested later as a

logo.

MR. BOOME:  Let's go to page 4, please, Ms. Hernandez. And let's zoom in on the top half, the top two boxes, please.

BY MR. BOOME:

Q.   What is -- generally speaking, what does this page focus on?  There's a lot of information here.

A.   Yes.  It seems to list several PRC national policies regarding artificial intelligence development and governance.

Q.   I want to ask you about some of the government agencies that are referenced here on the left-hand side.

Can you identify for the members of the jury which government agency is cited on the left-hand rectangle?

A.   Yes.  The Cyberspace Administration of China.

Q.   And on the right-hand side?

A.   The State Council.

MR. BOOME:  Let's go to the bottom of page 7, please, Ms. Hernandez.

BY MR. BOOME:

Q.   [As read]:

"China is in urgent need for a computing power service platform that effectively supports AI models with tens of thousands of cards."

Did I read that correctly?

A.   You did, yes.

MR. BOOME:  Let's go to the -- page 19.

**BY MR. BOOME:**

**Q.**   Can you point out the individuals we've been discussing?

**A.**   Yes.  Mr. Ding is on the top.  And in the line with the smaller photos from left to right, the first woman is Shasha Guo, and then Luxi Li, and then the last woman to be shown on the right is Wang Fei.

**MR. BOOME:**  And, finally, page 28.

**BY MR. BOOME:**

**Q.**   The same logos that we saw in the other presentation?

**A.**   Correct, yes.

**Q.**   All right.  I want to now look at some of the chats that were exchanged between the Marketing Project Group in preparation before the MiraclePlus event.

**MR. BOOME:**  Let's go to Exhibit 1135, please, Ms. Hernandez.  Let's go to page 11.

**BY MR. BOOME:**

**Q.**   Can you orient us about the date here as it pertains to the big MiraclePlus event?

**A.**   Yes.  This is October 17, 2023, which is a little over a month before the presentation on November 24th.

**Q.**   We're on page 11.  Can you give us a summary of the chat leading up to this point for a little context?

**A.**   Yes.  The chat started with the group trying to create marketing materials and Mr. Ding suggesting some recommendations of how to create this slide deck.

**Q.** Can you read us the question that is asked above the graphic and Mr. Ding's response below it?

**A.** Yes.  The question is [as read]:

"What are the difficulties and advantages of this technology?  If it's distributed or parallel, many people might be doing it, so why can our solution achieve these?"

And Mr. Ding's answer is [as read]:

"The technical advantage lies in the fact that my team has done things of this scale before and I have mature solutions."

**Q.** A little bit later in the chat, do the participants discuss whether Zhisuan plans to manufacture computer chips?

**A.** They do, yes.

        **MR. BOOME:**  Can we go to page 79.

**BY MR. BOOME:**

**Q.** Can you identify the place in the chat where the possibility of manufacturing computer chips is discussed?

**A.** Yes.  On the bottom portion of that chat, Wang Fei asks at 3:18:46 a.m. whether -- yes, so the top question right there. So [as read]:

"The technologies that are used to build the computer power foundation for these AI models need the bottom level hardware such as Nvidia chips."

And then she asked [as read]:

"Do we own these technologies or do we purchase their products and use them directly?

MR. BOOME:  Let's go to the top of page 80 now, please, Ms. Hernandez, and zoom in on Mr. Ding's response.

THE WITNESS:  Yes.  Mr. Ding says [as read]:

"We are not -- for now, we are not going to do it ourselves.  If we do, then we need to seek investment in the future.  I myself is able to do GPUs."

MR. BOOME:  Let's zoom out, please, Ms. Hernandez.

Can you zoom in on Mr. Ding's response that starts with the Number 1.

Okay.  Let's move to a different section of this chat. We're going to go forward to November 15th, 2023, at page 237, please, Ms. Hernandez.

BY MR. BOOME:

Q.  Okay.  Can you walk -- we're going to go through a couple pages of this conversation now, starting with Wang Fei's comment, November 15th at 2:51 a.m.

A.  Mm-hmm.

Q.  Can you walk us through the conversation starting from that point?

A.  Yes.  She says that [as read]:

"It feels like we're about to take off after we succeed in this one."

And then Mr. Ding's response.  Then she asks [as read]:

"Where are the photos of the three of us from last time?"

Mr. Ding asked that.  And he then he says [as read]:

"They will become historical photos."

Q.  [As read]:

"Of Google or Apple?

A.  Correct.

Q.  Is there a photo sent in response on the next page?

A.  Yes.  Guo Shasha sends this next photo.

MR. BOOME:  Let's go down to page -40 and -41.

Okay.  Let's -- can you blow up the first half through Mr. Ding's comment, please, Ms. Hernandez.

BY MR. BOOME:

Q.  Okay.  Can you walk us through the -- why is the text on the top different?  Doesn't appear to be a chat.

A.  No.  That appears to be a screenshot, part of their pitch deck of why -- what can Zhisuan do and why they can do it.

Q.  Referencing Google in Point Number 2?

A.  That's right, yes.

Q.  [As read]:

"Only we can do it.  There are only a few talents and companies capable of developing such a compute power platform with 10,000 card.  I once led and I was in charge of such a project at Google and

the product of the project was adopted by the world's

top three large model companies."

What does Wang Fei say after that?

A.   She asks [as read]:

"When you see these three points, do you think

they are really amazing?"

Q.   And how does Mr. Ding respond?

A.   [As read]:

"Oh, I won't dare go back to the U.S. for some

time now."

Q.   I want to change gears now, Special Agent Valladao, and

ask you if you saw any evidence about a meeting at a place

called Chongqing, a high-tech zone?

A.   Yes.

Q.   Where did you see evidence of a meeting at that location?

A.   On the WeChats.

MR. BOOME:   Can we go to page 107 of Exhibit 1135,

please, Ms. Hernandez.   Okay.   And starting with the middle

comment by Wang Fei, "Chongqing is going to."

BY MR. BOOME:

Q.   Are you familiar with a high-tech zone in Chongqing called

Mingyue Lake?

A.   Yes.

Q.   Is that what's being -- appears to be being discussed

here?

**A.**   Yes, that's right.

**Q.**   Why do you say that?

**A.**   Because Mr. Ding asks [as read]:

        "What is the name of the base?"

     And Wang Fei replies [as read]:

        "Mingyue Lake."

**Q.**   And it's characterized here as a base for large artificial intelligence models?

**A.**   That's right.

        **MR. BOOME:**  Let's go to the next page, please, Ms. Hernandez.  And the following page.

**BY MR. BOOME:**

**Q.**   What does this map appear to show?

**A.**   This seems to be a screenshot of the location of this high-tech zone in Chongqing.

        **MR. BOOME:**  And, finally, page 110, please.

**BY MR. BOOME:**

**Q.**   Mingyue Lake Science and Technology Innovation Service Hall in Chongqing City.

     Special Agent Valladao, during Matt Linton's testimony, we looked at Exhibit -- the exhibit involving Mr. Ding's device location?

**A.**   Yes.

**Q.**   Have you looked at the device location spreadsheet from Google?

**A.** I did, yes.

**Q.** Can you tell us approximately where the defendant's device was -- I'm sorry. I should say, based on your review of the chats, what day did the meeting in Chongqing occur?

**A.** It took place on November 9th, 2023.

**Q.** According to Google's logs, where was Mr. Ding's Google-issued device around that time?

**A.** It was at Chongqing.

**Q.** Was there some targeted marketing material prepared for this meeting with Chongqing?

**A.** There was, yes.

**MR. BOOME:** Can you bring up 1034, please, Ms. Hernandez.

**BY MR. BOOME:**

**Q.** What is 1034?

**A.** It is Zhisuan's slide deck with -- that contains information specific to the high-tech zone.

**Q.** Where did you find this slideshow?

**A.** In Mr. Ding's iPhone.

**Q.** Was it also sent in a chat?

**A.** It was, yes.

**Q.** Do you recall who sent it?

Let's go to the chat.

**MR. BOOME:** Let's go to 1135, please, page 130.

\\\

BY MR. BOOME:

Q.   In the top middle of the page, can you tell us whether you see this document?

A.   Yes.  Mr. Ding sends this document, a PowerPoint presentation, "Copy of ten-thousand-card Large Model Service Platform V6," and he sends it on November 6, 2023.

Q.   Which is how many days before the meeting?

A.   Three days.

        MR. BOOME:  All right.  Your Honor, we move 1034 into evidence.

        MR. FONDO:  No objection.

        THE COURT:  Admitted.

   (Trial Exhibit 1034 received in evidence.)

BY MR. BOOME:

Q.   How does 1034 compare to the other larger Zhisuan slideshow that we saw?

A.   It is -- it is nearly the same except that it has added slides at the end that are specific to the high-tech zone.

        MR. BOOME:  Let's take a look at those high-tech zone-specific slides, starting with page 33, please, Ms. Hernandez.

BY MR. BOOME:

Q.   Okay.  Do you recognize the logo that we've seen before?

A.   I do, yes.

Q.   Can you point it out for us?

**A.**   Yes, it's on the top left-hand side.  It's the three boxes, vertical boxes in blue.  And it says "Industrial Innovation Park."

**Q.**   And in this presentation sent by the defendant in the chat, what is the first advantage listed on the lower left?

**A.**   Government care.

MR. BOOME:  Let's go to page 34, please.

And can you highlight, Ms. Hernandez, the red rectangle that says "Build AI ecosystem."

Thank you, Ms. Hernandez.

And now let's go to Point Number 4 on the left-hand side.

BY MR. BOOME:

**Q.**   Does this PowerPoint presentation discuss something called chip research and development?

Let's take a look.  Can you read for us what this says?

**A.**   Yes.  This one says that they can provide customized computer power services.  So [as read]:

"Customize the research and development of underlying chips and network structures according to the computing power requirements of large models to break through the domestic predicament in AI computing power."

MR. BOOME:  Okay.  Thank you, Ms. Hernandez.

Let's go to Exhibit 1018, please, just for the witness.

BY MR. BOOME:

Q.   Do you recognize this document?

A.   I do, yes.

Q.   Where did you find it?

A.   In Mr. Ding's personal laptop.

Q.   Do you know how he received it?

A.   He did.  He received it in a WeChat.

Q.   Let's go take a look at that WeChat.

        MR. BOOME:  Let's bring up 1178, please,

Ms. Hernandez, at page 33 through 35.

BY MR. BOOME:

Q.   Do you recognize this section of the chat?

A.   I do, yes.

Q.   Do you recognize the place in this chat where Exhibit 1018

was sent to Mr. Ding?

A.   I do, yes.

        MR. BOOME:  Your Honor, the Government moves pages 1,

the cover page, and 33 and 35 of 1178 into evidence.

        MR. FONDO:  No objection.

        THE COURT:  Admitted.

     (Trial Exhibit 1178, pages 1, 33, and 35 received in

evidence.)

BY MR. BOOME:

Q.   Okay.  So let's focus on this.  We're on page 33 now.  Can

you show us, based on your comparison of hash values, where is

Exhibit 1018 sent to Mr. Ding?

A.   Yes.  On the bottom portion at 3:17:15 a.m., Summer sends chat records of Chuangbei Wang based on metadata, this document was attached to those chat records.

Q.   So basically sending a chat within a chat?

A.   Correct.

Q.   And can you -- and Summer, again, what is her -- her true name?

A.   That's Shasha Guo.

Q.   Let's walk through what she says about the chat records that she sends.

A.   Yes.  She says [as read]:

     "When you have time, check these two..."

So there were two chat -- two files attached to that chat record, so she says [as read]:

     "When you have time check these two and see if there's a project overlap."

     MR. BOOME:  Let's go to her additional comments, please, Ms. Hernandez.  On the next page.

BY MR. BOOME:

Q.   At the top, she says "government fund."  And what else does she say about this particular...

A.   She says [as read]:

     "I need to verify whether our qualification meets the requirements, whether it must be a company

with a track record or anyone can do it."

Q.   All right.

MR. BOOME:   Your Honor, the Government moves to admit 1018, not for the truth but for its effect on Mr. Ding.

MR. FONDO:   No objection.

THE COURT:   Admitted.

(Trial Exhibit 1018 received in evidence.)

MR. BOOME:   Okay.  Let's show 1018 for the jury, please, Ms. Hernandez.

BY MR. BOOME:

Q.   And I'm not going to ask you to interpret this or tell us what it means, but have you reviewed it at a high level?

A.   I have, yes.

Q.   What's the general topic?

MR. FONDO:   Objection, Your Honor, to the extent she's going to be interpreting the document.

THE COURT:   Overruled.  It sounds like she's not being asked to interpret the document.

THE WITNESS:   It seems to be a notice by the Chongqing Management Committee regarding Mingyue Lake.

BY MR. BOOME:

Q.   The high-tech zone that we've been discussing?

A.   Correct.

MR. BOOME:   All right.  Ms. Hernandez, I want to change topics quickly and go to Exhibit 336, please.

**BY MR. BOOME:**

**Q.**   Do you recognize this photo?

**A.**   I do, yes.

**Q.**   What do you recognize it to be?

**A.**   It's a photo that was found on Mr. Ding's My Passport hard drive.

**Q.**   Is he in the photo?

**A.**   He is.

**Q.**   Do you recognize any other individuals in the photo?

**A.**   Yes.  Mr. Ding is on the left-hand side and next to him is Lu Qi, the CEO of MiraclePlus.  And then right in the middle, the woman in the blazer, she is the -- was, at the time, the deputy mayor of Shanghai.

          **MR. BOOME:**  Your Honor, Government moves 336 into evidence?

          **MR. FONDO:**  No objection.

          **THE COURT:**  Admitted.

     (Trial Exhibit 336 received in evidence.)

**BY MR. BOOME:**

**Q.**   Based on your review of the chats and Mr. Ding's device location history, approximately when -- can you tell us whether, and if so, when he was in Shanghai?

**A.**   Yes.  This was early November -- around November 3rd or 4th of 2023.

          **MR. BOOME:**  Ms. Hernandez, can we now go to

Exhibit 1150?

**BY MR. BOOME:**

Q.   Do you recognize the chat that is 1150?

A.   I do, yes.

Q.   Who are the participants?

A.   Mr. Ding and Lu Qi.

Q.   And who is he again?

A.   He's the CEO of MiraclePlus.

Q.   And at a high level, what's discussed in this chat?

A.   It's mostly the project for the MiraclePlus camp in Zhisuan.

        **MR. BOOME:**  Your Honor, the Government moves 1150 into evidence.

        **MR. FONDO:**  No objection.

        **THE COURT:**  Admitted.

    (Trial Exhibit 1150 received in evidence.)

**BY MR. BOOME:**

Q.   Let's go to page 3.

    I'm going to ask you to read this whole exchange, what Mr. Ding says to Lu Qi, beginning November 8th.

        **MR. BOOME:**  And if we could try to make that as big as possible.  It's very small on the screen.

**BY MR. BOOME:**

Q.   Please go ahead.

A.   The first message says [as read]:

"Hi, Qi.  I want to update you on our progress. Today in Shanghai I had a conversation with Mr. Wei Weng of Lingang Group.  He said they will co-invest RMB 10 million in our start-up.  His exact words were 'If Qi participates in some form in our company, Zhisuan Technology, they will provide compute and project support, including opportunities of various projects and support.  Our company can then serve as flagship enterprise.'"

Q.  Keep going to the next message on the following page, 2.

A.  [As read]:

"He then gave several suggestions, one of which was to split this effort into several steps.  The first milestone is quickly validating the heterogeneous support for domestic GPUs (Huawei) and overseas GPUs simultaneously as proof of our team's capability.  He believes this is a highlight. I think this can indeed serve as a milestone.  This task is relatively easy."

And then the next message says [as read]:

"Tomorrow I will go to the Industrial Innovation Park in Chongqing to meet President Yan Zhang mainly to discuss funding, compute, and project support.  I will update you afterwards."

And the last message [as read]:

"My overall personal impression is that

Mr. Wei Weng is very willing to help this project and

to help us young people."

MR. BOOME: Ms. Hernandez, let's briefly go back to page 10 of Exhibit 1158.

BY MR. BOOME:

Q.   We heard the defendant mention Lingang Group and the Industrial Innovation Park at Mingyue Lake.

A.   Correct.

Q.   Can you point out those organizations, if you see them here?

A.   Yes.  So, again, the Innovation Park, the high-tech zone is listed -- is the lowest on the left-hand side on the top -- right on top of government agency.  And Lingang Group is on the left-hand side, is blue and red circles.

Q.   Did you find any other evidence indicating that the defendant had contact with a person who identified themselves as Wei Weng from the Lingang Group?

A.   Yes.

MR. BOOME: Ms. Hernandez, can you bring up 1052, please.

BY MR. BOOME:

Q.   Do you recognize this?

A.   I do, yes.

Q.   What is it and where did you find it?

**A.**   It's a photo of a business card from Wei Weng of Lingang Group, and the photo was found on Mr. Ding's My Passport hard drive.

**MR. BOOME:**   Your Honor, Government moves 1052 into evidence.

**MR. FONDO:**   No objection.

**THE COURT:**   Admitted.

(Trial Exhibit 1052 received in evidence.)

**BY MR. BOOME:**

**Q.**   Okay.  And briefly back to page 10 of 1158.  I want to ask you now about the Tianfu Institute of Research at Southwest University.

**A.**   Mm-hmm.

**Q.**   Which logo is that?

**A.**   That is the blue logo, the circle on the left bottom.

**MR. BOOME:**   Let's go to 1135, in evidence, page 223, please, Ms. Hernandez.

**BY MR. BOOME:**

**Q.**   And can you point out for us if you see this research university discussed at this section of the chat, Exhibit 1135, 223?

**A.**   Yes.  On the bottom portion, Wang Fei at 10:27:54 a.m., November 14th, sends a document titled "Shanghai Zhisuan Strategic Agreement-Southwest University of Science and Technology Innovation Research Institute."

MR. BOOME:  Let's go to the next page, please.

BY MR. BOOME:

Q.   And what does this appear to be?

A.   That appears to be a screenshot with part of the -- the language in the agreement.

Q.   What agreement?

A.   The cooperation agreement between Zhisuan and the university.

Q.   Did you find a document that was entitled "Cooperation Agreement"?

A.   I did, yes.

Q.   We'll come to that in one second.  Let's just go to the next page.

Does the defendant respond to the screenshot?

A.   Yes.  He says [as read]:

"Okay.  I'll take a look right now."

Q.   Let's go to the document itself.

MR. BOOME:  Let's go to 1002, please.

BY MR. BOOME:

Q.   Is this the document that was sent in the chat that we just reviewed?

A.   It is, yes.

Q.   1002?

MR. BOOME:  Your Honor, the Government moves 1002 into evidence.

MR. FONDO:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 1002 received in evidence.)

BY MR. BOOME:

Q.  Okay.  What's the title of the document?

A.  "Tianfu Institute of research and Innovation, Southwest University of Science and Technology, Shanghai Zhisuan Technology Company Framework Agreement for Strategic Cooperation."

Q.  I'm not going to ask you to read the whole document, but I want to look at page 4, Subsection 2, "Cooperation for Conducting Research."

Can you just read for us the terms of the cooperation agreement in terms of research?

A.  Yes.  It says [as read]:

"The parties will engage in industry-university
research collaborations covering, but not limited to,
the fields of chips and compute scheduling, to
conduct research and tackle key challenges.  They
will jointly apply for and undertake technology
projects and research topics at the national,
provincial, municipal, and industry-related ministry
and commission levels to promote the development of
China's AI large model industry."

Q.  Was this agreement signed or unsigned, the copy you found?

**A.**   It was not signed.

**Q.**   Did you find any evidence in other documents indicating that there was an agreement between the university and Zhisuan?

**A.**   Yes.

      **MR. BOOME:**   Let's pull up 1003, please, Ms. Hernandez.

**BY MR. BOOME:**

**Q.**   Do you recognize this document?

**A.**   I do, yes.

**Q.**   What is it called?

**A.**   "Potential Customers of Zhisuan Technology."

**Q.**   For this particular version of this document that we're looking at now, can you tell us where it came from in the chats?

**A.**   Yes.  It was sent by Mr. Ding in one of the chats.

      **MR. BOOME:**   Let's go to 1125 at page 236, please, Ms. Hernandez.  1125 is in evidence.  And let's go to the top section, Mr. Ding's two remarks.

**BY MR. BOOME:**

**Q.**   Which document are we looking at here, the .docx?

**A.**   Yes.  "Copy of Zhisuan Technology Potential Customers."

**Q.**   Is that Exhibit 1003?

**A.**   It is.

**Q.**   What does Mr. Ding say about it when he sends it?

**A.**   He says [as read]:

         "I modified it a little and marked it in red."

MR. BOOME:  Your Honor, Government moves to admit 1003 in evidence.

MR. FONDO:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 1003 received in evidence.)

MR. BOOME:  Let's pull up 1003, please.

BY MR. BOOME:

Q.   Okay.  Can you walk us through the portions of this document that indicate to you what it's about, and then please direct us to where the university is referenced?

A.   Yes.  So this document lists potential customers of Zhisuan, and for each entity lists the progress of the negotiations, the pain points, and then the needs of that customer.

Q.   And the authors of the document, are they listed?

A.   Yes.  The authors are listed as Shasha Guo and Luxi Li, who are employees of Zhisuan.  And the document is dated December 14, 2023.

MR. BOOME:  Let's go to page 2, please.  And let's highlight Section 3, "Institutes of Higher Learning."

BY MR. BOOME:

Q.   What does this say about the status of agreement or negotiation between the research institute and Zhisuan?

A.   In -- on Progress, it says [as read]:

"A strategic cooperation agreement has been

signed."

Q.   And in Pain Points [as read]:

     "They are relatively weak in AI and are also tasked by the state with establishing compute centers in institutions of higher learning."

Correct?

A.   Correct.

Q.   And let's go to "Government Agencies," please, Section 2.

Do you see any reference here to the high-tech zone?

A.   Yes.  Point 1, it says "Industrial Innovation Park." That's a reference to Mingyue Lake.

Q.   From their logo, Industrial Innovation Park?

A.   Correct, yes.

Q.   Okay.  Different topic, Special Agent Valladao.

Based on your training and experience as an FBI agent investigating trade secret offenses, are you familiar with what a talent plan is?

A.   I am, yes.

Q.   Can you tell us what a talent plan is?

A.   They are programs by the PRC government where they encourage people to apply and go back to China to do research, development.

Q.   And generally speaking, what do -- if someone or a company agrees to come back to China, what do they get in return?

A.   It usually comes with some sort of funding, investment

resources.

Q.   Did you find any evidence that Mr. Ding and Zhisuan applied for a PRC talent program?

A.   Yes.

Q.   Can you tell us what evidence you saw that led you to that conclusion?

A.   There were WeChat conversations, as well as materials to -- for the talent program application.

Q.   What was the sponsoring part of the Government for the particular talent program that you saw evidence that Mr. Ding applied to?

A.   It was Xuhui District in Shanghai.

        MR. BOOME:   Can we bring up 1160, please.

BY MR. BOOME:

Q.   What is 1160?

A.   It is the personal statement of Mr. Ding to submit this talent program application.

Q.   Where did you find it?

A.   This came from Mr. Ding's phone.

Q.   Did you see this document discussed in a chat?

A.   I did, yes.

Q.   With who?

A.   Luxi Li.

Q.   Did Mr. Ding participate in editing this document based on your review of the Luxi Li chat?

**A.**   He did, yes.

        **MR. BOOME:**  Your Honor, Government moves 1160 into evidence.

        **MR. FONDO:**  No objection.

        **THE COURT:**  Admitted.

     (Trial Exhibit 1160 received in evidence.)

        **MR. BOOME:**  Let's go to page 11, please, Ms. Hernandez.

**BY MR. BOOME:**

**Q.**   If you can point out for us, as we go to page 11, whether you see any reference to the investment that MiraclePlus made in Zhisuan?

**A.**   Yes.  On the right-hand side at the bottom under "Company Financing Plan," it says that the [as read]:

        "Seed financing from MiraclePlus has been
     completed:  RMB 5 million for 7 percent equity."

**Q.**   The bottom number -- the second bullet is not about MiraclePlus; correct?

**A.**   It is not, no.

        **MR. BOOME:**  Let's go to page 10, please, Ms. Hernandez.  And can you highlight the "Technical highlights and scarcity" and "Innovative capability adapted to national conditions."

        Just give the jurors a second to read this portion.

        And let's go to page 9, please, Ms. Hernandez.  Can

you highlight "Work Plan."

BY MR. BOOME:

Q.   This talent application -- can you read this portion for us, please, Special Agent Valladao?

A.   Yes.  It says [as read]:

          "Upon returning to China, my first choice is
     Shanghai.  I plan to deploy a single-task,
     tens-of-thousands-of-cards large-model training
     acceleration platform there, helping China to develop
     world-class compute infrastructure capabilities in
     the wave of AI Infra."

          MR. BOOME:  Let's go to page 7.

BY MR. BOOME:

Q.   Can you walk us through here what you see in terms of Mr. Ding's description of his accomplishments while he worked at Google?

A.   Yes.  So this is a slide titled "Key project descriptions," and it has two projects there listed:  Google's GCP A3 and Google Internal H100.  And in both of them, Mr. Ding is listed as the technical director leading the project.

Q.   I want to go to now -- well, actually, we don't need to -- I'm not going to go to the chat, but did you -- did you learn from your analysis of the chats related to this PowerPoint presentation when Mr. Ding submitted the application?

A.   Yes.  So Luxi Li submitted an online application for him

and that was in late to -- late November to early December.

Q.    In late November, at the time of the MiraclePlus presentation, was the defendant still working for Google?

A.    He was, yes.

Q.    In December, at the time of this talent plan application, was the defendant still working for Google?

A.    He was.

MR. BOOME:  Can we bring up 1026, Ms. Hernandez.  And this one we're going to need to go side by side with the source, please.

BY MR. BOOME:

Q.    Do you recognize 1026?

A.    I do, yes.

Q.    What do you recognize it from?

A.    It is a document found on Mr. Ding's laptop.

Q.    Was it discussed in a chat?

A.    It was, yes.

Q.    Can you give you some context there and tell us which chat?

A.    Yes, it was in the chat with Luxi Li after -- this is regarding the talent plan application that was submitted on behalf of Mr. Ding.  And he -- part of that was that there was going to be an in-person defense of that application in Shanghai on January 4th which Mr. Ding could not attend, so this is a statement saying that Luxi Li would attend on his

behalf.

MR. BOOME:  Your Honor, the Government moves 1026 and 1026S into evidence.

MR. FONDO:  No objection.

THE COURT:  Admitted.

(Trial Exhibits 1026 and 1026S received in evidence.)

BY MR. BOOME:

Q.   January 4th is listed here as the date of the defense. Based on the context, what does "defense" mean?

A.   That means going in person and speaking about this application.

Q.   Was there discussion in the chat about whether Mr. Ding was able to be in China on January 4th?

A.   There was discussion and he said he could not be there on January 4th.

Q.   So what does this document say about that?

A.   It says that Mr. Ding cannot be there in person for the January 4th defense, and so Luxi Li would -- who is the operations department head, would perform the defense on his behalf.

Q.   Okay.  Special Agent Valladao, we've come to the end of the portion where I'm asking you about the evidence that you recovered about Zhisuan.

MR. BOOME:  And so I'd like to ask Ms. Hernandez to bring up, I believe it's Demonstrative 9, the single slide.

BY MR. BOOME:

Q.   Did you create a timeline reflecting some of the key dates that we've discussed during your testimony so far?

A.   Yes.

Q.   What types of information is contained in the demonstrative?

A.   It's just a key timeline about the trade secret files, as well as the activities that happen in -- that Mr. Ding undertook regarding Zhisuan.

        MR. BOOME:   Can the jury see this now, Ms. Sharma?

        Thank you.

BY MR. BOOME:

Q.   Okay.   Can you walk us through very quickly each item in the timeline, and then I'll ask you a question about the item at the bottom.

A.   Yes.   So on May of 2022, Mr. Ding met Yuan Ye.   On May 21st was the first batch of uploads that included alleged trade secret files.

        June 1st and June 3rd of 2022, two more batch of uploads.

        Then between January 30th and February 12th, approximately, Mr. Ding and Yuan Ye discussed starting Zhisuan and the business plan for Plan C.

        April 17th was the last batch of uploads that included alleged trade secret files.

        On May 30th, Mr. Ding applied to MiraclePlus.

On November 20th, Mr. Ding signed the MiraclePlus investment agreement.

November 24th, Mr. Ding presented at MiraclePlus.

December 8th, Mr. Ding signed the self-deletion affidavit from Google.

December 14th, Mr. Ding downloaded the trade secret files from his personal Google Drive account into his personal laptop.

And then on December 29th, that's when Google cut Mr. Ding's access to their internal systems, and that's when he deleted the trade secret -- the PDF versions that were stored at his Google-issued computer.

Q.   On the bottom, the rectangle indicated in red, can you tell us what that means?

A.   Yes.  So this indicates that between April 17th, 2023, the last time that Mr. Ding uploaded documents to his Google Drive account, and December 29th, when his access was cut off from the Google internal systems, he created over 13,000 new Apple Notes -- created or modified on his Google MacBook.

Q.   1,300.  Sorry.  I think you said 13,000.

A.   Yes, sorry.  1,300.

        (Reporter interrupts to clarify the record.)

BY MR. BOOME:

Q.   Can you correct the number, please, Special Agent?

A.   Yes, sorry.  It's 1,349 new Apple Notes that were either

created or modified.

Q.   Have you taken a detailed look at a small slice of this time period in terms of note creation?

A.   I did, yes.

Q.   What was that slice of time that you looked at in more detail?

A.   I looked at the notes created or modified between December 26 and December 29th.

Q.   Was there anything significant about December 26th in the investigation?

A.   Yes.  That's when Mr. Ding submitted his resignation from Google to his manager.

Q.   The message that we saw between the defendant and Yihua Ding --

A.   That's right.

Q.   -- his manager?

     How did you analyze the note creation on those three days, December 26, 27, 28, and 29, which is four days?

A.   Four days, yeah.  I looked at the creation -- the creation and modify dates of the Apple Notes on his Google-issued laptop, and then compared them with the footprints log, which shows his browser activity, and which internal Google source documents he was accessing during that time.

Q.   Did you create a summary exhibit that summarizes your findings comparing those two sources of information?

**A.**    I did, yes.

**Q.**    Is that Exhibit 774?

**A.**    It is.

        **MR. BOOME:**  Your Honor, the Government moves to admit 774.

        **MR. FONDO:**  May we see it, Your Honor?  Or -- I'm sorry.  Is this the timeline?

        **MR. BOOME:**  No.  Summary Exhibit 774, Ms. Hernandez, please.

        **MR. FONDO:**  No objection.

        **THE COURT:**  Admitted.

    (Trial Exhibit 774 received in evidence.)

        **MR. BOOME:**  Okay.  Can you -- let's zoom in a little bit so the jurors can see, maybe, the top half.

**BY MR. BOOME:**

**Q.**    And then can you orient us as to how you created this exhibit and what it shows?

**A.**    Yes.  So, again, I looked at the -- I looked at the Apple Notes that were last modified between December 26 and December 29th.  And then also I included the created day, time because although the majority of them were also created during this time, there were some that were created earlier than December 26th.

    So you can see the first column is the Apple Note title, and then the created and last modified times with a UTC

time stamp.  And then the next two columns on the far right are the source document title, as well as the last accessed date, and time of that internal Google source document title.

And the way I created them was -- this chart was by looking at the Apple Note title and then comparing it with the title of the source document, as well as the time in which those -- that source document was accessed on the Google systems.

**Q.**   Based on your analysis, how many Notes files did Mr. Ding create or modify based on Google's source documents in the four days between December 26th and December 29th, 2023?

**A.**   So there were 119 notes that are included here that I was able to match by name to Google's internal source documents.

**MR. BOOME:**  Ms. Hernandez, could you please pull up 656 and 674.

These are my last questions, Your Honor.

Side by side.

And I'm sorry, Ms. Sharma, I should have said, if we could flip the switch, please.  Apologize.

656 and 674.

**THE COURTROOM DEPUTY:**  Are these admitted?

**MR. BOOME:**  No.

**THE COURTROOM DEPUTY:**  Okay.

**BY MR. BOOME:**

**Q.**   Do you recognize these?

**A.**   I do, yes.

**Q.**   Are these documents on your summary chart on page 3, "PFC Pufferfish GRM" and "Ghostfish Software Review for Planning Entry"?

**A.**   Yes.

**Q.**   Are these the new Notes files that Mr. Ding created from your summary exhibit on December 28th, 2023, with respect to these two sources --

**A.**   Yes.

**Q.**   -- two source documents?

**A.**   Yes.

           **MR. BOOME:**   Your Honor, the Government moves to admit these two notes files into evidence.

           **MR. FONDO:**   No objection.

           **THE COURT:**   Admitted.

      (Trial Exhibits 656 and 674 received in evidence.)

**BY MR. BOOME:**

**Q.**   Okay.

           **THE COURT:**   And to be clear, does anybody need a repeat of the exhibit numbers or you got them?

           **MR. FONDO:**   No.

           **MR. BOOME:**   Thank you.

           Thank you, Special Agent Valladao.   I have no further questions right now.

           **THE COURT:**   Okay.   I think that it's probably a good

time for our lunch break.  Why don't we plan to resume at five minutes after 1:00.  We'll take a 45-minute lunch break.

Let me just repeat some instructions.  Bring your notebooks with you and leave them in the jury room.

Also, I want to really emphasize that you're not to do any outside research on anything at all that you hear about during this case -- right? -- and none of the technology, nothing else.

And you're to make sure to make your best effort to avoid any news coverage about this case; right?  And if you come across anything -- when you're outside the courtroom, if you come across anything that you believe has to do with this case, whether news coverage or something else, or if you have any reason to believe that any other juror comes across anything having to do with this case, please let us know -- let Bhavna know immediately.

Thank you very much.

**THE COURTROOM DEPUTY:**  All rise.

(Proceedings were heard out of the presence of the jury.)

**THE COURT:**  Okay.  You can sit down.

Anything to discuss?

**MR. BOOME:**  No, Your Honor.

**MR. FONDO:**  No, Your Honor.

**THE COURT:**  All right.  We'll see you at five minutes after the hour.

THE COURTROOM DEPUTY:  Court's in recess.

(Luncheon recess was taken at 12:22 p.m.)

**AFTERNOON SESSION**                                    **1:10 p.m**.

(Proceedings were heard out of  the presence of the jury.)

THE COURT:  So why don't you go ahead and repeat that just in case there's an objection to it.

MR. FONDO:  So I intend to get into some questioning relating to the FBI and other law enforcement officers coming into the house, sort of the manner of entry that was quick, that they did not observe Mr. Ding throwing any devices away or out the window or anything like that, that they found the devices generally where they would expect them to be.

So that's the sort of line of questioning.  I do not intend to ask them any questions about what he did or did not say.

THE COURT:  Getting into the house in a manner that was quick?

MR. FONDO:  Yes.

THE COURT:  What does that mean?

MR. FONDO:  Well, what it means is that they knocked and then they did a forced entry.  I'm not going to reference the battering ram, but they did a forced entry.

So that the purpose of this is to demonstrate that he did not have a lot of time to destroy evidence, get rid of evidence, et cetera.

**THE COURT:** So my gut reaction to what you're saying is that perhaps if you want to ask her whether any of the evidence appeared to be hidden, you could ask her that, but that would be about it. I'm not even sure that would be appropriate.

But certainly nothing about the manner of entry or the rapid entry or anything like that, none of that is relevant to the question of whether the Government can prove the elements of the offenses beyond a reasonable doubt.

**MR. FONDO:** Well, Your Honor --

**THE COURT:** You know, the question of whether it was hidden might be relevant to intent. I don't know.

**MR. BOOME:** I think if -- I was going to say that I think absent the opening statement, I think I may have a different reaction to some of these questions. If all it is is asking if Mr. Ding hid evidence --

**THE COURT:** We know that he did, right, because he deleted all those files?

**MR. BOOME:** Hid evidence. Hid his phone.

My concern, Your Honor, is that, given where the opening statement took us, that any reference to law enforcement standing in front of Mr. Ding and interacting with him is going to beg the question: Why didn't they give him a chance to explain himself? And that's my concern, is that if the Court is going to allow Mr. Fondo to get into the topic of

how Mr. Ding behaved during the search, that that leaves us vulnerable and exposes us more to the bell that was rung on opening, that the Government should have just asked him and he could have explained this away.

THE COURT:  I think that if -- first of all, was Agent Valladao there?

MR. BOOME:  Yes.

THE COURT:  Okay.  I think that the question about whether any of the materials taken, any of the devices seized from Mr. Ding appeared to be concealed or hidden, I think that question would be okay.  And I think that it would probably be fair to ask that question because it goes to intent.  It goes marginally -- it's marginally relevant to the question of intent.

But beyond that, I don't think any question about the search or the circumstances of the search would be appropriate.

MR. BOOME:  I'm wondering what the potential impact of Mr. Fondo's question would be, given that we saw photos of where the devices were recovered and they were completely not hidden.

THE COURT:  Oh, that's true.  But given that they were clearly not hidden, a question designed to confirm that, what would be the harm in that?

MR. BOOME:  I think that sounds fine, Your Honor.

THE COURT:  So I don't -- I don't think any other

question about the manner in which the search was executed, the circumstances of the search would be appropriate.

If you want to ask whether she saw any indication that his devices were hidden, that's fine.

MR. FONDO:  And, Your Honor, I also plan to ask whether any of the devices were encrypted with any special encryption software.  I assume that's not a problem.

THE COURT:  Any objection to that?

MR. BOOME:  No, Your Honor.

THE COURT:  That's fine.

Anything else that you are concerned might be -- might be close to the line?

MR. FONDO:  Not that I can think of at the moment, but to be honest with you, Your Honor, I did not expect that to be a concern either.

THE COURT:  Oh, that's a no-brainer concern.

MR. FONDO:  Well --

THE COURT:  Questions about how quickly they entered and stuff like that is clearly, clearly inadmissible.

MR. FONDO:  What about, Your Honor, about -- okay.

Would you mind if I just go through this, because I'm not trying to trip over this, but this is -- these are -- for defense, this is restrictive.  I understand why you're doing it.  But -- so I just plan to ask that they collected lots of data and documents from Google.

MR. BOOME:  She testified to as much.

THE COURT:  Yeah.

MR. BOOME:  I don't know about -- yeah, the Government received evidence from Google, the victim in the case, yes, that's a true fact.

MR. FONDO:  And then also that they found no evidence that he wiped any of the devices that they seized.

THE COURT:  That's an appropriate question.

MR. FONDO:  Sorry.  That is appropriate?

THE COURT:  That is appropriate.

MR. FONDO:  Thank you.

Okay.  I think that's it.

THE COURT:  Okay.  Great.

MR. FONDO:  Thank you, Your Honor.

(Proceedings were heard in the presence of the jury.)

THE COURT:  Okay.  Mr. Fondo, you can begin your cross-examination.

MR. FONDO:  Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. FONDO:

Q.   Good afternoon, Agent Valladao -- sorry -- Valladao.  I apologize.

A.   Good afternoon.

Q.   So my name is Grant Fondo, and I represent Mr. Ding.

So throughout your testimony, you were referring to a

number of people in China that you indicated you believed interacted with Mr. Ding; correct?

A.   That's right.

Q.   Now, you've never met any of those people; correct?

A.   I have not, no.

Q.   You've never spoke to any of those people?

A.   No, I didn't.

Q.   Never communicated with any of those people?

A.   No.

Q.   And then, also, you mentioned also a number of entities, like venture firms, investors, and things like that.  You never met -- never met any of those entities as well; correct?

A.   No, I did not.

Q.   So I want to bring you to January 6, 2024.  The search warrant was executed at Mr. Ding's townhome; correct?

A.   Yes.

Q.   All right.  You didn't see any indication that any of his devices were specially hidden or anything of that nature; correct?

A.   No, that was not observed.

Q.   That was not what?  Sorry?

A.   It was not observed, no.

Q.   Not observed.  Okay.  Meaning you didn't see any effort of hiding it?

A.   That's right.

**Q.**   Thank you.

So when you were testifying earlier, you mentioned that there were -- you analyzed a number of different forensic devices -- sorry -- a number of devices forensically; correct?

**A.**   Correct.

**Q.**   Those were a phone, laptop, et cetera?

**A.**   Correct.  Yes.

**Q.**   Isn't it true that none of those devices had any special encryption software on them?

**A.**   So I want to make clear that I didn't personally forensically did the extraction.  This is done by specialized agents.  But my understanding is that two of the hard drives were not able to be just opened.  They needed special processing to be able to extract the contents.

**Q.**   Now, that happens sometimes, depending on the type of device; correct?

**A.**   Correct.

**Q.**   Am I also correct, to the extent you know, that none of these devices were wiped clean?

**A.**   That's true.

**Q.**   Could you explain to the jury what wiping a device clean means?

**A.**   My understanding would be that that would mean restoring it to the default, so getting rid of all the data in the device.

**Q.**   So it's essentially just removing all the data?

**A.**   Correct.

**Q.**   Do you have an understanding, just generally, how long does that take?  Just approximately.  Does it take more than a day, for example?

**A.**   I really don't know.  That's not in my expertise.

**Q.**   Now, I believe you testified yesterday, you mentioned WhatsApp and Signal communications; correct?

**A.**   Correct.

**Q.**   Okay.  And I think you had said -- and if I misstate this, please correct me because that's not my intention.  But I think you had said that they are fairly similar communication tools?

**A.**   Correct.

**Q.**   Now, isn't it true that Signal is a more encrypted communication tool?

**A.**   I believe both of them have end-to-end encryption.

**Q.**   Isn't Signal generally known as a more sophisticated encryption manner of communication?

**A.**   I -- it's not my expertise in the field either.  I just know both of them as messaging platforms, and I do know that both of them have encryption capabilities.

**Q.**   And Signal also has -- is generally used to have automatically disappearing messages; correct?

**A.**   If you select it to automatically disappear, yes.

**Q.**   And that's a feature that is commonly used for that

communication; correct?

**A.**   I don't know.  People can choose to use that feature or they can choose not to.

**Q.**   You found no Signal app on Mr. Ding's devices; correct?

**A.**   Not that I recall, no.

**Q.**   All right.  During the course of your investigation, you issued quite a number of subpoenas; correct?

**A.**   Yes.

**Q.**   Could you explain for the jury what a subpoena is?

**A.**   Yes.  It's -- we do grand jury subpoenas, so they're approved by a grand jury, and it's a lawful document that allowed us -- allows us to search either accounts, like bank accounts, email accounts, depending on what we're looking for.

**Q.**   And you generally use those subpoenas to try to help collect as much information as you think might be relevant to your investigation; correct?

**A.**   That's correct.

**Q.**   And you did that in this case; true?

**A.**   That's true.

**Q.**   You also reviewed -- the WeChat messages have come up a lot.  You reviewed -- you obtained the WeChat messages from his phone; correct?

**A.**   That's right.

**Q.**   And there were literally thousands and thousands of WeChats?

A.    Yes.

Q.    And those -- and you reviewed all of them?

Let me rephrase that.  Your team, someone at your team reviewed all of them?

A.    We -- yes, we reviewed the ones that were relevant to Mr. Ding's activities with Zhisuan.

Q.    And so you also collected information from Google as well; correct?

A.    Can you be more specific?

Q.    Certainly.  You collected devices?

A.    That's correct.

Q.    Okay.  You collected, like, source documents and things like that?

A.    We did, yes.

Q.    So what I'm getting at is that you were able to -- if you needed information from Google, you were able to get it --

A.    That's right.

Q.    -- generally?

Okay.  So there was a lot of data to go through; correct?

A.    Yes.

Q.    Okay.  And your job -- your team did as thorough a job as possible; correct?

A.    That's true.

Q.    So, and it wasn't just you.  It was others on your team; correct?

A.   Yes.

Q.   It was also the global consulting firm BRG, Mr. Crain?

A.   So Mr. Crain was hired as a forensic expert --

Q.   I see.

A.   -- to analyze forensic data.

Q.   Okay.  So he assisted in that, but not solely the review of the data?

A.   That's true, yes.

Q.   Okay.  Thank you for clarifying that.

So despite all these investigative efforts, you found no evidence that Mr. Ding gave the alleged trade secrets to anyone; correct?

A.   We didn't explicitly see evidence of that.

Q.   And despite all your investigative efforts, the FBI found no evidence that Mr. Ding transferred the alleged trade secrets to a third party; correct?

A.   Not that we could see, no.

Q.   And despite all your investigative efforts, the FBI found no evidence that Mr. Ding sold the alleged trade secrets to anyone directly; correct?

A.   Not that we could see, no.

Q.   And you found no actual evidence that Mr. Ding used the alleged trade secrets to build a product?

A.   Not tangible evidence, no.

Q.   So you found no code, for example, that had Google trade

secrets in it; correct?

A.   That's right.

Q.   And usually -- well, okay.

     MR. FONDO:  All right.  I'd like to pull up Demonstrative 9, please.  Ms. Hernandez, if you wouldn't mind.

BY MR. FONDO:

Q.   All right.  So this was your timeline, correct, that you went through just maybe an hour ago or so?

A.   Yes.

Q.   And so nowhere throughout this timeline did you find any actual code using the trade secrets; correct?

A.   That's correct.

Q.   Relatedly, the Government investigate- --

     MR. FONDO:  You may put that down.  Thank you.

BY MR. FONDO:

Q.   Relatedly, the Government investigated whether any of the alleged trade secrets consisted of technology subject to U.S. export controls; correct?  Do you remember that?

A.   I -- can you -- I'm sorry.  Can you repeat the question?

Q.   Sure.  I'm happy to direct you to a report if that's helpful.  But you -- as part of the Government investigation, they wanted -- they looked into -- the Government looked into whether this alleged -- the alleged stolen technology was subject to U.S. export controls; correct?

A.   Not specifically the FBI, no.  I don't know what you're

referring to exactly.

**Q.** Okay.  Let me -- let me rephrase the question.

So you're not aware, in the course of your investigation, that these alleged trade secrets violated U.S. export controls?

**A.** Not that I'm aware of, but that's not my expertise.

**Q.** In the -- since you executed the search warrant, the FBI has not discovered any evidence that somebody else is using these alleged trade secrets; correct?

**A.** That's correct.

**Q.** Nobody in China, for example?

**A.** Not that we can tell, but our visibility -- we don't have visibility into activities in China other than Mr. Ding's WeChats.

**Q.** Okay.  But you haven't seen -- since he was arrested, you have no evidence that these have ever been used by anyone; correct?

**A.** Again, we have no visibility.

**Q.** You have no -- let me just ask the question again.

So you have -- as an investigative agency, you have no evidence currently that anybody has used these alleged trade secrets in the last two years since Mr. -- since the search warrant was executed; correct?

**A.** That's right.

**Q.** All right.  You also looked at Mr. Ding's bank records, correct, in the U.S.?

A.    Yes.

Q.    Okay.  You subpoenaed those records?

A.    We did.

Q.    And you also reviewed all his devices and communications for anything relating to financial transactions; correct?

A.    We did.

Q.    Through the information that you were able to obtain, you were not able to find any payments for the alleged trade secrets, correct, direct payments?

A.    For payment of the trade secrets?

Q.    Payment for the sale of the trade secrets.

A.    No.

Q.    You also did not find any evidence that in December, to example, that he was liquidating his money in the United States, did you?

A.    We did not, no.

Q.    No unusual large transactions or things of that nature; correct?

A.    Not that I recall, no.

Q.    Okay.  Same for January until the execution of the search warrant?

A.    Yes.

Q.    Same would be true for November, as well, of 2023?

A.    I believe so.

Q.    You also didn't see him -- you're not aware of him

suddenly putting his -- or not "suddenly."  Let me rephrase the question.

You're not aware that he put his townhome on the market, for example, in November of 2023?

A.   I don't recall seeing that, no.

Q.   And same question as to December 2023.

A.   Yes.

Q.   Same question as to January '23.

A.   Yeah, we didn't see that.

Q.   Previously, I think you testified that Mr. Ding used a headhunter to find a job in China; correct?

A.   Correct.

Q.   Now, using a headhunter is a pretty common approach for people, isn't it, to find a job?

A.   I think so.  Some people --

Q.   And there's --

A.   -- use it.

Q.   I'm sorry.  I didn't mean --

A.   Some people use them, yes.

Q.   Okay.  Well, there's plenty of professionals, that's what they do; correct?

A.   Correct.

Q.   And to the best of your understanding, the person that he was communicating with was a professional headhunter?

A.   I believe so, yes.

**Q.** During that headhunting process, you never -- you're not aware of any applications for government positions; correct? It was all private industry?

**A.** That's right.

**Q.** And there's nothing illegal about having a second job; correct?

**A.** Not that I'm aware of, no.

**Q.** And, actually, there's a term for it.  Isn't it called moonlighting?  Have you heard that term before?

**A.** I have heard the term, but I'm not familiar with it, to be honest.

**Q.** Well, there's a -- there's a show about that.

Okay.  So there's also nothing illegal about not telling your employer that you have a second job; correct?

**A.** I don't think so.

**Q.** And there's nothing illegal about having a second job in China; correct?

**A.** That's correct.

**Q.** So roughly from June to October of 2022 is roughly the time period that Mr. Ding negotiated with Rongshu; correct?

**A.** Correct.

**Q.** And that negotiation took some time.  There was some back-and-forth; correct?

**A.** That's right.

**MR. FONDO:** I want to pull up Exhibit -- Mr. Jay, if

you could pull up Exhibit 328, which has been previously admitted.

**BY MR. FONDO:**

Q.   So you went through this photo; correct?

A.   Yes.

Q.   So this appears to be a reception or a party; right?

A.   That's right.

Q.   Okay.  And there's lots of other people here other than Mr. Ding?

A.   That's right.

Q.   And you don't know who all those people are; correct?

A.   I do not, no.

Q.   There's -- and there's no Google trade secrets in this photo; correct?

A.   Not that I can see.

Q.   All right.  During his time at Rongshu, did you -- in the course of your investigation, was it discovered that Mr. Ding was listed as a co-inventor of a patent in China?

A.   Yes.

Q.   And isn't it true that that patent had no Google trade secrets in it?

A.   I think that was the assessment that was made, yes.

Q.   All right.  You mentioned that Mr. Ding did some fundraising with the CEO of Rongshu, correct, during your testimony?

**A.**   Correct.

**Q.**   Fair to say -- and this was roughly the spring of 2023?

**A.**   That's right.

**Q.**   Fair to say that they had little to no success raising any money?

**A.**   That's true.

**Q.**   And eventually, they stopped fundraising together?

**A.**   That's true.

**Q.**   And Mr. Ding officially left Rongshu approximately May, May 1st, 2023?

**A.**   Yes.  That's when he submitted his resignation.

**Q.**   I want to move to MiraclePlus, if we could.

So MiraclePlus -- MiraclePlus reached out to him, to Mr. Ding; correct?

**A.**   That first email was an email to invite him to join the MiraclePlus community.

**Q.**   And that was March 22nd, 2023?

**A.**   Correct.

**Q.**   To the best of your knowledge, he did not solicit that invitation; correct?

**A.**   Correct.  That's the first indication we saw of communication between him and MiraclePlus.

**Q.**   Okay.  And MiraclePlus is a -- it's an incubator; correct?

**A.**   It is.

**Q.**   All right.  And an incubator -- sorry.  An incubator is

generally -- well, MiraclePlus is an incubator for start-up companies; correct?

A.    That's right.

Q.    And that's usually a couple of people coming up with an idea and trying to make a business work?

A.    Yes.

Q.    An incubator provides resources for those entrepreneurs; correct?

A.    Correct.

Q.    And MiraclePlus was an offshoot of Y Combinator; correct?

A.    YC Combinator.

Q.    YC Combinator.  Thank you.

A.    YC China, yes.

Q.    Okay.  And YC Combinator is a very well-known start-up incubator in the United States; correct?

A.    It is, yes.

Q.    Based in Silicon Valley?

A.    Yes.

Q.    And so this was -- MiraclePlus was an offshoot of that through -- sorry.  Let me rephrase that.

        MiraclePlus was an offshoot of YC Combinator China?

A.    I don't actually know the equity structure.  I know that Lu Qi was part of YC China, and then he started MiraclePlus.  I don't know if their legal entities are tied.

Q.    I'm sorry.  What was the last part?

**A.** I don't know if they're tied as legal entities.

**Q.** Okay. But they're affiliated in some -- they have the same name, for example, YC Combinator? The prior -- so Mr. Qi came from YC Combinator China?

**A.** Correct. I was -- I'm sorry. I was saying that YC China and MiraclePlus, I don't know if those are tied.

**Q.** Oh, okay. I'm sorry. Thank you.

Okay. So he left -- Mr. Qi left MiraclePlus and started YC -- sorry -- MiraclePlus in China; correct?

**A.** He left YC China, yes --

**Q.** Yes.

**A.** -- and started --

**Q.** I'm sorry.

**A.** -- MiraclePlus.

**Q.** So let me rephrase so the record is clear. And I apologize.

He left YC China and formed MiraclePlus?

**A.** That's correct.

**Q.** Now, Mr. Qi is -- has a pretty extensive background in technology companies; correct?

**A.** He does.

**Q.** And he is -- for example, he is on the advisory board of the College of Computing Data Science and Society for Berkeley; correct?

**A.** I don't know. I know he has extensive -- he has an

extensive career in technology here in the U.S.  I don't know the full details.

Q.   Let me show you Exhibit 605 [sic], please.

And please don't publish it yet.

Is this Mr. Qi?

A.   Yes.

MR. FONDO:  Okay.  Your Honor, we'd like to admit 605 [sic].  It's just the biography of Mr. Qi.

MR. BOOME:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 6005 received in evidence.)

MR. FONDO:  All right.  Could you please publish?

Thank you.

BY MR. FONDO:

Q.   Okay.  So this is Mr. Qi?

A.   Correct.

Q.   So he is also -- he also worked at Microsoft; correct?

A.   That's right.

Q.   And he worked at Yahoo!?

A.   That's right.

Q.   And then IBM?

A.   Yes.

Q.   And then he also obtained his Ph.D. from Carnegie-Mellon in the United States; correct?

A.   Yes, that's correct.

Q.   And so with -- his work with MiraclePlus is to help entrepreneurs?

A.   Yes.

Q.   Now, the Government showed you -- showed, I believe, or referenced a video, a May video.  This is Exhibit -- one moment.

          MR. FONDO:  Your Honor, may I just check?

          THE COURT:  Sure.

                    (Pause in proceedings.)

          MR. FONDO:  So, sorry about that.

          So let me -- so you referred -- let me go to Exhibit 1170, please, which has been previously admitted.

          Mr. Jay, if you could pull that up.

BY MR. FONDO:

Q.   Now, this was a document that you went through on your prior testimony; correct?

A.   Correct.

Q.   All right.  I want to talk about some parts of it that were not discussed.

     I'd like to refer you to the bottom of the page.

          MR. FONDO:  At the very, very bottom, Mr. Jay, if you could blow that up.  And this is -- sorry.  This is page 2.

BY MR. FONDO:

Q.   At the very bottom, it says [as read]:

          "Currently there is no formal product."

Correct?

**A.**   Correct.

**Q.**   And the date of this application was August 13th, 2023; correct?

**A.**   That's the date of the note?

**Q.**   Yes.

**A.**   Yes.

**Q.**   And -- and as of this date, he had -- so the last upload of the alleged trade secrets took place in April of 2023 to his personal drive; correct?

**A.**   That's correct.

**Q.**   Okay.  So this is approximately three, four, five months later he states there's still no formal product?

**A.**   Correct.

**Q.**   I'd like to have you turn --

          **MR. FONDO:**  Mr. Jay, if you could pull up Exhibit 1176.  This has been previously admitted.

          All right.  And in this, if you could pull up -- there's a reference to a payment, 300,000.

**BY MR. FONDO:**

**Q.**   So this is the agreement -- it's paragraph 1.  So this is their -- this is, as you understand it, MiraclePlus's standard agreement; correct?

**A.**   That's right, yes.

**Q.**   And if someone is accepted to the program, they end up --

they will receive some funding and some assistance; correct?

A.   Correct.

Q.   Okay.  Thank you.

All right.  There was a -- so earlier you testified about Mr. Ding's use of a Mr. Mahmood email account?

A.   That's right.

Q.   And that was for the submission of an application to MiraclePlus?

A.   Yes, on the note that you just saw.

Q.   And in that application, there were no trade secrets transferred to MiraclePlus; correct?

A.   I don't know that.  We did not see -- it was an online application.  We just saw the email confirming.

Q.   So you're not aware that anything was transmitted as part of -- any trade secrets were transmitted as part of that application; correct?

A.   I cannot verify that with a "yes."

Q.   And Mr. -- this email account was used for the purpose of the reference; correct?

A.   Correct.

Q.   And then it was not used again?

A.   That's true.

Q.   Is it fair to say that Mr. Ding did not have a lot of success with Zhisuan from early 2023 through the fall of 2023?

A.   What do you mean by "success"?

Q.   He had no product; correct?

A.   Not that I'm aware of.

Q.   He had no revenue; correct?

A.   That's correct.

Q.   He had no customers?

A.   Well, the slides show that he had customers.

Q.   That's later, though.  That's in November, December; correct?

A.   Correct, yes.

Q.   I'm talking about early fall.  Thank you.  And I apologize if I wasn't precise enough.

All right.  So one of the benefits of joining an incubator is to get opportunities to meet investors; correct?

A.   Correct.

Q.   And that happens in the United States; correct?

A.   It does.

Q.   Okay.  And it happened with MiraclePlus as well --

A.   Yes.

Q.   -- correct?

MR. FONDO:  Mr. Jay, if you could pull up Exhibit 334, please.  This has been previously admitted.

BY MR. FONDO:

Q.   So you went through this photo before.  So is it your understanding that all these people here are other entrepreneurs with MiraclePlus?

**A.**   Yes.

**Q.**   And that the events of that weekend, there were hundreds of other entrepreneurs; correct?

**A.**   I cannot give you an exact number, but, yes, there were multiple other teams.

**Q.**   Well, does that look like more than a hundred?

**A.**   Maybe roughly.

**Q.**   And to the best of your knowledge, that was not a closed-door event; correct?

**A.**   Not that I know of, no.

**Q.**   And there was -- you went through a number of -- and we'll go through those.  But you're not aware that Mr. Ding displayed any of Google's trade secrets during this presentation; correct?

**A.**   That's right.

          **MR. FONDO:**  I'd like to pull up Exhibit 1156, please.

**BY MR. FONDO:**

**Q.**   All right.  And so this is -- this is kind of the core team of Zhisuan; correct?

**A.**   That's correct.

**Q.**   And could you -- could you explain what the -- what the roles are of the two people standing next to Mr. Ding?

**A.**   Yes.  So I believe Luxi -- and you'll have to look at the agreement to look at the actual role, but I believe she was more in charge of finance.  And then Shasha was more of the

marketing person.

Q.   And financing, did you mean like financing, like trying -- investors, trying to get investment money?

A.   And in charge of finances for the company, yes.

Q.   And you said Shasha was for marketing; correct?

A.   Correct.

Q.   Neither of them were engineers building a product; correct?

A.   That's correct.

Q.   And you mentioned there was -- you went through a lot of WeChats earlier today.  Many, many, many of those WeChats were relating to trying to get investors interested in the product; correct?

A.   Correct.

Q.   And as those -- and as they were presenting, so those presentations, those presentations tend to try to attract investors; correct?

A.   Yes.

Q.   And they try to be as attractive as possible by referencing, like, marketing opportunities -- market opportunities for investors, essentially why investors might want to invest with them; correct?

A.   I believe so, yes.

Q.   And sometimes they overstate -- sorry.  Sometimes entrepreneurs will overstate things; correct?

**A.**   I cannot speak to that.  I have no expertise in what start-up companies will say or not say.

         **MR. FONDO:**  So let's go to Exhibit -- let's see -- 340 as well.  And this has been previously admitted.

**BY MR. FONDO:**

**Q.**   You referenced a couple of the people here.  Do you know who the other people are that are there?

**A.**   I mentioned Lu Qi.  I don't know who the other people are, no.

**Q.**   Thank you.

         Now, you never attended any of the MiraclePlus events; correct?

**A.**   No.

         **MR. FONDO:**  I'd like to pull up Exhibit 336, please, Mr. Jay, which has been previously admitted.

**BY MR. FONDO:**

**Q.**   All right.  This was a photo that you had discussed previously.  And that's the Deputy Mayor in there?

**A.**   Correct.

**Q.**   And this was mentioned in a number of WeChats; correct?

**A.**   That's right.

**Q.**   Okay.  Exhibit 1124 is a series of WeChats?

         I'll refresh your memory.

**A.**   Yes.

         **MR. FONDO:**  Sorry.  So let's actually go to this.  So

let's go to 1124, please.  Now, portions of this I do not think have been admitted, Mr. Jay, so...

**BY MR. FONDO:**

Q.   I'd like to direct you to pages 51 through 56.  All right.  If you could -- okay.  All right.  So it says here you -- why don't you take a minute to read it, save some time.

And what I'm going to ask you is:  Isn't it true that it was not Mr. Ding's idea to take the photo with the Mayor, but it was someone else's suggestion?

Do you want to take a look through, read those pages?

A.   Yes.

Q.   We can stop there for a second.  For example, it says [as read]:

"Try to get a photo with the Deputy Mayor."

Correct?

A.   That's what it says, yes.

**MR. FONDO:**  Okay.  And if we could scroll a little bit further.

**BY MR. FONDO:**

Q.   And he even asks [as read]:

"What do I need the photo for?"

Correct?

A.   That's what he says, yes.

**MR. FONDO:**  All right.  Keep going.

\\\

BY MR. FONDO:

Q. And then a little bit later, he references Mr. Qi; correct? So here's that photo.

A. Correct.

MR. FONDO: Jay, if you could scroll through to fifty- -- I think it's 55.

All right. And then if we go to 56, there's a reference -- scroll down a little bit.

BY MR. FONDO:

Q. Okay.

[As read]:

"I want to get a chance to talk to Dr. Qi, again."

Correct?

A. (No response.)

Q. So that was -- and he was asking him to join him officially; correct?

A. Yes, although that says "Dr. Lu."

Q. Okay. Is that Lu Qi?

A. Possibly, yes.

Q. And that's -- assuming that's correct. And that's the Mr. Qi we've been talking about; correct?

A. Correct.

MR. FONDO: Your Honor, at this time I'd like to move in pages 51 through 56 of 1124.

MR. BOOME:  No objection, Your Honor.

THE COURT:  Admitted.

(Trial Exhibit 1124, pages 51 through 56, received in evidence.)

BY MR. FONDO:

Q.  All right.  So in the fall of 2023, Zhisuan started meeting with private investors; correct?

A.  Correct.

Q.  Mostly through MiraclePlus, meaning through their affiliation with MiraclePlus as part of the program?

A.  I assume so.  I don't know where they met each other, but possibly.

Q.  And the marketing materials you saw focused a lot on the experience of the team; correct?

A.  Yes.

Q.  Including Mr. Ding?

A.  Correct.

Q.  And they also focused on what the product might be; right? Because they didn't have a product; correct?

A.  It described the product, yes.

Q.  And the three individuals that you described as the core of that team, that was a lot of their focus, was kind of revising these PowerPoints; correct?

A.  Correct.

MR. FONDO:  So I'd like to -- if you could pull up

1168, please.  I believe this has been admitted into evidence, but can we verify that?

I'm sorry.  It's 1068.  I apologize.

Let's not publish it for now.

BY MR. FONDO:

Q.   But do you recognize this?

A.   I do, yes.

Q.   And this is one of the messages with a venture capital firm; correct?

A.   Correct.

Q.   And this is one of the venture capital firms that you've never met with?

A.   That's correct, yes.

Q.   And this one's called Dinosaur Fund?

A.   Little Dinosaur Fund.

Q.   Little Dinosaur Fund.  Thank you.

And so you had mentioned during your prior testimony that he had set up roughly -- there had been -- you identified roughly 21 different names that were on his calendar for investment meetings?

A.   Correct.

MR. FONDO:  So, Your Honor, at this time I'd move Exhibit 1068 into evidence.

MR. BOOME:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 1068 received in evidence.)

MR. FONDO:  Thank you.

BY MR. FONDO:

Q.   And so Mr. Ding was setting up a lot of meetings to try to get investors; correct?

A.   Correct.

Q.   And you haven't seen 21 term sheets signed, have you?

A.   I have not, no.

Q.   Okay.  He, in truth, did not have a ton of success with all these investors that he was meeting, the 21 that you mentioned; correct?

A.   We did not see any follow-up, no.

Q.   I want to walk through with you some of these exhibits that you went through a little bit earlier.

MR. FONDO:  So if we could -- Mr. Jay, if you could pull up Exhibit 90, please.

Your Honor -- before you pull that up -- this may -- I don't recall.  This may be confidential.  So maybe we should not publish it, actually.

THE COURT:  Okay.

MR. FONDO:  Let me just verify.  It's Exhibit 90.

MR. BOOME:  Ghostfish.

MR. FONDO:  It's the fish, yeah.  It's the first page.

MR. BOOME:  Just the first page?

MR. FONDO:  Yeah, just the first page.

Let's pull it up without the...

MR. BOOME:  Page 1 is okay.

MR. FONDO:  Okay.  And that's all I'm going to --
okay.

And I think this has been previously admitted, so if
you could publish that, Mr. Jay.

BY MR. FONDO:

Q.  All right.  There's a date in kind of the middle left
portion of this document.  Could you read the date to the jury,
please?

A.  Yes.  It's March 10th, 2022.

Q.  And so as of December 2023, this document was
approximately 18 months old?

A.  Correct.

MR. FONDO:  You can put it down.  Thank you.

Mr. Jay, if you could pull up Exhibit 1025, which was
previously admitted.

BY MR. FONDO:

Q.  All right.  You went through this previously as well;
correct?

A.  I did.

Q.  So there is -- and this is "Ideas on Plan C."

So there is -- if you go to paragraph I.1(1).

A.  Yes.

Q.  There's the discussion of publicly available chips from

Nvidia; correct?  The A100s and the H100?

A.   Yes.

Q.   All right.  There's also a reference to North America and AWS.

AWS is who?  Do you know who that is?

A.   Amazon Web Services.

Q.   Okay.  Can you briefly describe what Amazon Web Services does?

A.   It provides storage solutions, is my understanding.

Q.   And that's publicly available?  Anyone can purchase that?

A.   It is, yes.

Q.   And then there's also another reference here to Nvidia's AI cloud infrastructure that can be used as well?

A.   Correct.

Q.   And that's something you pay for; correct?

A.   I believe so.

Q.   There's no mention in this document about Google's infrastructure; correct?

A.   Not that I can see, no.

Q.   There's also mention of Cadence Systems, which is a U.S. technology company; correct?

A.   It is, yes.

Q.   And this was -- at the time that this document was created, the company didn't have any product; correct?  Zhisuan?

**A.**   It did not, no.

**Q.**   And it had no revenue?

**A.**   Not that we know of.

        **MR. FONDO:**  All right.  If you could take that down, please.

        I'd like to -- Mr. Jay, if you could pull up Exhibit 1034, which has been previously admitted.

**BY MR. FONDO:**

**Q.**   This was one of the PowerPoints that you went through before.  And if we -- and this is -- many of the PowerPoints had sort of similar points; correct?

**A.**   Yes.

**Q.**   And they kind of somewhat evolved but generally stayed the same for a number of months; correct?

**A.**   Correct.  There were multiple versions of these PowerPoint.

**Q.**   And they were marketing their supposed experience; correct?

**A.**   Correct.

**Q.**   And marketing what they had hoped to build; correct?

**A.**   Correct.

**Q.**   But they were not marketing what they had built; correct?

**A.**   I believe part of it has product demonstration screenshots.  Some of the slides do.

**Q.**   But they had no product at the time; correct?

**A.**   Not that I'm aware of.

**Q.**   Okay.  And they -- and they did not get a lot of traction with these presentations, did they?

**A.**   Again, we didn't see any follow-up from any of the firms that they met with.

        **MR. FONDO:**  I'd like to have you pull up Exhibit 1130, please, page 34, Mr. Jay.  It's been previously admitted.

    All right.  And if you could focus on the time entry at 1:06.

**BY MR. FONDO:**

**Q.**   All right.  There's a reference -- just going to the top of that.  Do you recall this -- talking about this document?

**A.**   Yes.

**Q.**   And there's a reference to the library of Google; correct?

**A.**   Correct.

        **MR. FONDO:**  All right.  Mr. Jay, if you could go back a page.

**BY MR. FONDO:**

**Q.**   All right.  And if you see in the middle paragraph of that page, there's a reference to Private Join -- Google's Private Join & Compute library; correct?

**A.**   Correct.

**Q.**   And that wasn't discussed yesterday; correct?  You didn't go through this?

**A.**   We did not mention that, no.

MR. FONDO:  Okay.  Let's go back to page 34.

All right.  And if you go down -- all right.  Go down a little bit more, one more.

BY MR. FONDO:

Q.   So there's a reference here [as read]:

"The documents related to it are subject to such requirements."

So, one, you're not aware that whatever documents are related to that prior page are any of the alleged trade secrets; correct?

A.   No.  That's true.

Q.   And, in fact, that's a different technology they're talking about on the prior page?  It's encryption technology; correct?

A.   Different from the alleged trade secrets?

Q.   Yes.

A.   I believe so, yes.

Q.   And, actually, isn't -- are you aware that -- are you aware that the Private Join & Compute library is an open-source project?

A.   I am not aware of that.

MR. FONDO:  Thank you.

I'd like to have you, Mr. Jay, please pull up Exhibit 1132, page 15, please.  And I'd like to have you look at entry number 7:12.

Yeah, right there.  Perfect.  Thank you.

BY MR. FONDO:

Q.   So this was an entry that you went through before; correct?

A.   Correct.

Q.   All right.  And this was a statement from May 2021.

A.   (Nods head.)

Q.   So this was two years prior to essentially roughly the time he started Zhisuan; correct?

A.   Correct.

Q.   And your focus on this, I take it, was he didn't have enough experience?  That's why you referenced it?

A.   He didn't get the job, yes.

Q.   And his recruiter says "Speechless."

Do you have -- isn't it true the recruiter, that's a reference to being surprised that they got that comment back?

A.   I think that's accurate.

THE COURT:  Can I ask a question?  We've seen a number of those words in brackets, and I don't know if we've received an explanation for what the brackets represent.  Could you tell us that?

THE WITNESS:  So that's an emoticon, an emoji, and that's just a translation of that emoji.

MR. FONDO:  Okay to continue, Your Honor?  Your Honor, okay to continue?

THE COURT:  Yeah, yeah, yeah.

MR. FONDO:  Mr. Jay, if you could put this down -- sorry.  Excuse me.  If you could go to page 293 of the same exhibit, 1132.

BY MR. FONDO:

Q.   All right.  Yesterday you walked through this screenshot; correct?  Or this --

A.   Yes, I did.

Q.   -- image; correct?

All right.  And you testified and discussed it in the context of recruiting and hiring; correct?

A.   Correct.

Q.   I want to direct your answer to the middle of the message, the message in the middle of the screen, please.

And that's from a user; right?  It's not from Mr. Ding; correct?

A.   Correct.

Q.   And it says [as read]:

"Google's internal infra is mainly self-deployed, with a high degree of integration and maturity."

It says [as read]:

"Its employee may not be well adapted when going to other companies."

Correct?

**A.**   Correct.

**Q.**   And you understand what this person is saying; correct? You testified about it; correct?

**A.**   Correct.

**Q.**   Okay.  And isn't it that people who work with Google, it's very proprietary and sort of integrated so that it's not easy to go work for other places; correct?

**A.**   That is not my expertise.  That's what this comment seems to imply, though.

**Q.**   All right.  And so it references in here maturity, they use the word "maturity," and that the systems are advanced and well developed.

Do you have an understanding that's to mean they've been around for a while?  It's not a new product?

**A.**   I think that's fair, yes.

**Q.**   And this statement relates to that the infrastructure typically is not the same set of internally developed, tightly integrated systems as Google's; right?  Meaning the person that he was interviewing with.

**A.**   I'm sorry.

**Q.**   They have a different --

**A.**   Can you ask that again?

**Q.**   Sure.  So they were referencing another company where he didn't get the position; correct?

**A.**   Yes.

Q.   All right.  And that's because at the other company, the infrastructure typically isn't the same set of internally developed, tightly integrated systems as Google's?

MR. BOOME:  Objection.  Calls for speculation.

THE COURT:  Sustained.

MR. FONDO:  I want to refer you to Exhibit 349, please.  Mr. Jay, if you could -- and if you could blow up the section, right in the middle, Number 2.

BY MR. FONDO:

Q.   See the reference to -- sorry.  See the reference there to "Tech island.  Like Google"?

A.   Yes.

Q.   So is it your understanding that the reference here is that Google is a tech island?

A.   That's what he seems to imply, yes.

Q.   And do you have -- and do you have an understanding as to what tech island is?

A.   I do not, no.

Q.   Does it -- and you -- but you reference this phrase -- you referenced this exhibit when you were talking about the prior message.  So what was the point of referencing these two together?

A.   Sorry.  When I was referencing what?

Q.   So when you were talking to the Government, the Government showed you the WeChat 1132, page 293, and then they referenced

Exhibit 349 --

A.   Correct.

Q.   -- with the idea that Google is -- referencing to Google and sort of their tech island or their technology.

What was the purpose of that, as far as referencing those two things together?

A.   I'm not sure that we referenced them tied to each other. I think that was just the way the conversation was flowing but...

Q.   Isn't it true that Google's technology -- based on these statements, that the point coming across is that Google's technology is somewhat Google-centric and so it's just not readily transferable for people who are familiar with that product?

A.   That's what the screenshot seemed to imply, yes.

Q.   Thank you.

MR. FONDO:   Mr. Jay, if you could pull up Exhibit 1150, page 3.  And it's in the middle there, kind of middle bottom.  And this has been previously admitted.

BY MR. FONDO:

Q.   Okay.  This references the potential $10 million investment; correct?

A.   Correct.

Q.   All right.  To the best of your knowledge, this investment never happened; correct?

**A.**    That's right.

**MR. FONDO:**  Mr. Jay, you may put that -- take it down, please.

All right.  Mr. Jay, if you would please pull up Exhibit 1160, page 12.  And I believe this has been previously admitted.

**BY MR. FONDO:**

**Q.**    All right.  So these -- if you look at the right-hand side of this exhibit -- and you recall going through this exhibit before?

**A.**    I do, yes.

**Q.**    And this is one of Zhisuan's PowerPoints; correct?

**A.**    This is actually the talent plan application for Mr. Ding.

**Q.**    But it's repeated to Zhisuan; correct?

**A.**    Correct.

**Q.**    Thank you for the clarification.  I appreciate it.

So in this context, there is a three-year financial forecast; correct?

**A.**    Correct.

**Q.**    And it says "unit:  RMB."  What is RMB?

**A.**    Yuan.  It's the currency in the PRC.

**Q.**    And you mentioned the exchange rate yesterday.  And it's roughly .14?  Is that about right?

**A.**    Roughly.

**Q.**    Roughly.  Okay.  And so this is -- so the revenue

projections in this PowerPoint is 25 million times .14,
correct, for U.S. dollars?

A.   Yes, I'll take your word for it.  I don't know the
currency exchange rate but...

Q.   So let's assume it's -- for purposes of this, let's assume
it's .14.  So it's roughly about $3 1/2 million
in U.S. dollars; fair?  Is that a fair estimate?

A.   Again, I'll leave the math to you; but yes, I can agree
with you.

Q.   All right.  Well, that's not always the best decision, but
that's fine.

So assuming this is roughly $3.5 million, that's the
entire revenue forecast for 2024; correct?

A.   Correct.

Q.   That's a pretty small amount for a company that's trying
to supposedly replicate Google, isn't it?

A.   For a start-up company, I don't think that's a bad amount.

Q.   Okay.  Well, you remember the testimony of some of the
Google employees.  They were talking about data centers?

A.   Yes.

Q.   Those data centers, they showed the photos of the data
centers.  They were huge?

A.   Yes.

Q.   Okay.  And those aren't cheap to build; correct?

A.   No, they're not.

**Q.** Okay. And within those data centers, there's tons of servers; correct?

**A.** That's right.

**Q.** And each one of those servers is highly specialized?

**A.** Correct.

**Q.** And the servers have multiple chips and units in each one of them?

**A.** Correct.

**Q.** Literally thousands and thousands of them; correct?

**A.** Yes.

**Q.** And each one of those are not cheap; correct?

**A.** That's right.

**Q.** Thank you.

And also, so -- and also, at the time of this PowerPoint, this was a forecast; correct?

**A.** Yes.

**Q.** Because at this point, Zhisuan had no revenue; correct?

**A.** Not that we're aware of, no.

**Q.** And it had no contract signed saying "We've bought your product, we're going to subscribe to it, and we're using it"; correct?

**A.** We didn't see any contracts that said that.

**MR. FONDO:** All right. You can take that down, Mr. Jay.

\\\

BY MR. FONDO:

Q.   So you spent some time with the Government discussing certain PowerPoints, including referencing replicating Google's 10,000-card computing platform.  Do you remember that?

A.   Yes.

Q.   Powerpuffer.

MR. FONDO:  So I'd like to have you, Mr. Jay, please pull up Exhibit 1125, page 254.

THE COURT:  While Mr. Jay is doing that, do you have a rough estimate of how much longer you have?  I'm just trying to figure out when to take our afternoon break.

MR. FONDO:  We could do that now.  I'm probably going to go for a while longer.  So certainly, not 15 minutes or anything.

THE COURT:  Okay.  Why don't you go ahead and deal with this exhibit, and then we'll take a break.

MR. FONDO:  Thank you, Your Honor.

So, Mr. Jay, if you could pull that up, please.  And, again, it's 1135, page 254.

All right.  And can you blow up the middle one where it says 2, Number 2 in there.

BY MR. FONDO:

Q.   Could you read Number 2, please?

A.   [As read]:

"How to do:  Replicate the experience of

Google's ten-thousand-card computing power platform."

Q.   Okay.  So it says replicate -- and this is from Mr. Ding; correct?

A.   He sent that, yes.

Q.   And it says "Replicate the experience."  That's a different statement than replicate Google's ten-thousand-card computing power platform; correct?

A.   This is different, yes.

Q.   I'm sorry.  What?

A.   Yes, this is different.  The language here is different.

Q.   Okay.  Because experience relates to sort of the -- sort of the user experience when using a product; correct?

          MR. BOOME:  Objection.

          THE COURT:  You can answer if you're able.

          THE WITNESS:  It's not my area of expertise.

BY MR. FONDO:

Q.   But, so this was -- and this was in reference to some of the PowerPoints that were being drafted; correct?

A.   They're discussing drafting the materials, yes.

Q.   And that's Mr. Ding's language, "Replicate the experience"; correct?

A.   Yes, I can see it here.

Q.   All right.  And then isn't it -- okay.

          MR. FONDO:  Actually, now is a good time.

          THE COURT:  Okay.  All right.  We'll take a break.

We'll resume at 2:20.  2:20.  Make sure to bring your notebooks.  Thank you.

THE COURTROOM DEPUTY:  All rise.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Okay.  Step down.  See you in a bit.

MR. FONDO:  Thank you.

THE COURT:  2:20.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 2:07 p.m.)

(Proceedings resumed at 2:19 p.m.)

(Proceedings were heard out of  the presence of the jury.)

MR. CHANG:  Your Honor, can we discuss a scheduling issue with you?

THE COURT:  Sure.

MR. CHANG:  So I understand from talking to Mr. Fondo that he still has some time on cross.

We have the two next witnesses waiting in the building.  We are getting towards the end of the day.  And so we were wondering if we could ask for your permission to release them to come back tomorrow morning.

THE COURT:  I think that makes sense, yeah.

MR. CHANG:  Okay.  We'll work on that.  Thank you, Your Honor.

THE COURT:  Okay.

(Pause in proceedings.)

(Proceedings resumed at 2:21 p.m.)

(Proceedings were heard in the presence of the jury.)

THE COURT:  Okay.  You can resume.

MR. FONDO:  Thank you, Your Honor.

I'd like to refer you to -- Mr. Jay, if you could please pull up Exhibit 1135, page 70 to 80.  And I believe it's been previously admitted.

All right.  If you could blow it up a little bit.

All right.  And if you could go to the next page, please.

Ah, okay.

BY MR. FONDO:

Q.   So at the top there, there is -- do you know who that is at the top, s-h-u-z-i-g-u-i?

A.   Yes.  That's the person identified as Wang Fei.

Q.   Okay.  Thank you.

And they're talking about Nvidia chips; correct?

A.   Yes.

Q.   Okay.  And Nvidia chips generally can be purchased in the open market; correct?

A.   Correct.

MR. FONDO:  All right.  If we could go down a little bit.

One more.  Sorry.

BY MR. FONDO:

Q.   Okay.  So you see the entry at the top?  That's from

Mr. Ding; correct?

**A.**   Correct.

**Q.**   All right.  And Mr. Ding said -- if you could read that for us, just that first sentence?

**A.**   [As read]:

"For now, we are not going to do it ourselves."

**Q.**   Okay.  What does that sentence relate to?  What is he saying that they're not doing themselves?

**A.**   If you can go to the previous message, I believe they're talking about chips.

If you can scroll up a little bit more.

So, yes, they're asking about purchasing chips.

**Q.**   Okay.  All right.  And so they're not going to make them. They're just going to purchase them; correct?

**A.**   He says that for now, that's correct.

**Q.**   Okay.  And the date of this is October 30th, 2023?

**A.**   Correct.

**Q.**   And to your knowledge, they never made any chips; correct?

**A.**   Not that I'm aware of.

**MR. FONDO:**  I'd like to refer you to page -- or, Mr. Jay -- excuse me -- could you please go to page 241.

All right.  If you could blow up sort of the bottom half of that page.

Okay.  Just up a little bit more.

\\\

BY MR. FONDO:

Q.   All right.  Do you remember talking to the Government with this entry?  The one that says [as read]:

     "Oh, I won't dare to go back to the U.S. for some time now."

A.   Yes.

Q.   Okay.  What's the date of that message?

A.   November 15, 2023.

Q.   Now, isn't it true that he actually did go back to the U.S. about three weeks later?

A.   Correct.

Q.   On December 9th?

A.   Correct.

     MR. FONDO:  Thank you.

All right.  If you could take that down, please, Mr. Jay, and go to 1143.  And go to page 4.

BY MR. FONDO:

Q.   At the top of it, it says [as read]:

     "Under the clear encouragement of the national policy, the domestic market is expected to exceed One Trillion yuan by 2030."

Correct?

A.   Yes.

Q.   So that is a reference to just what a government has said they expect the market in their country to be; correct?

**A.**    Correct.

**Q.**    Okay.  And in the U.S., the U.S. makes projections as well about certain types of markets; correct?

**A.**    Correct.

**Q.**    Fair to say that businesses look to that to see:  Okay. Should I pick an industry that is growing versus an industry that is small?

**A.**    Not my expertise.  It seems to be referenced here, though.

**Q.**    When you say "It seems to be referenced here," you're saying that that's what they're referencing it, that it's a growing market?

**A.**    This slide is talking about that, yes.

        **MR. FONDO:**  Mr. Jay, if you could turn to page 28, please, of this same slide.

        Actually, let's take this down.  I think we've covered that.

    All right.  I'd like to have you pull up Exhibit 1018, please, Mr. Jay.

**BY MR. FONDO:**

**Q.**    All right.  And this is what you call as a notice; correct?

**A.**    Yes.

**Q.**    And it's just a notice about different types of technologies that they're referring to; correct?

**A.**    I think this is a notice about the high-tech zone Mingyue

Lake.

Q.   And there's a number of different industries mentioned in this document; correct?

A.   I don't know for sure.  I'd have to reread it.

Q.   Okay.  Well, let's go to page 4, paragraph 9, for example.

All right.  And so if you could read that first sentence, please.

A.   [As read]:

"Promote the integration and application of digital technology in the field of culture and tourism."

Q.   Okay.  And this is just one of the topics within this document; correct?

A.   Seems to be so, yes.

Q.   All right.  And if --

MR. FONDO:  That's fine.  You can take that down. Thank you.

BY MR. FONDO:

Q.   So this also -- this notice also potentially identifies market opportunities, industries that may be growing in the future; correct?

A.   Again, I'd have to reread it to confirm that.

Q.   All right.  Do you have just a general understanding?  I don't want to make you go reread it.  If you're -- yeah.  So do you have a general understanding?

**A.**   My understanding from the notice was that it was about the development of these high-tech zone.

**Q.**   Okay.  And when you develop high-tech zones, you're usually trying to develop industries that people think will grow; correct?

**A.**   I believe so, yes.

         **MR. FONDO:**  I'd like to refer you -- or, excuse me.

         Mr. Jay, if you could pull up 1178, page 34.

         All right.  If you could blow it up a little bit, please.

**BY MR. FONDO:**

**Q.**   You'll see a reference to track record.  All right.  So there's a reference -- see where it says "summer" there?

**A.**   Yes.

**Q.**   All right.  And could you read that sentence for us, please?

**A.**   [As read]:

             "I also need to verify whether our qualification
         meets the requirements, whether it must be a company
         with a track record or anyone can do it?"

**Q.**   Okay.  And at this time, Zhisuan did not have a track record; correct?  No product?

**A.**   No product.

**Q.**   No revenue?

**A.**   Not that we're aware of.

MR. FONDO:  Okay.  Thank you.

All right.  I'd like to -- Mr. Jay, if you could pull up Exhibit 838, please.

All right.  And if you could focus just to the left of that yellow item, please.

BY MR. FONDO:

Q.   All right.  So you referenced this photo yesterday and you spoke a little bit about it; correct?

A.   Correct.

Q.   All right.  There appears to be an airline ticket in the -- underneath -- right there.  Do you see that?

A.   Yes.

Q.   All right.  And you see where it says "PEK - SFO"; correct?

A.   That's probably likely, yes.  I see the SFO.

Q.   Okay.  And this is usually -- this is -- if you look at the bottom lower a little bit, can you see the United and the United sign?

A.   Not clearly, no.

MR. FONDO:  Could you blow it up a little bit more, if you can?

Maybe pull down a little bit more.  Maybe pull away, actually.  It's a little blurry.

BY MR. FONDO:

Q.   While he's doing that, let me ask you.  So Mr. Ding came

back to the United States on December 9th; correct?

A.   Correct.

Q.   And he came from Beijing to SFO; correct?

A.   I believe so, yes.

Q.   And PEK is the symbol for Beijing; correct?

A.   Yes.

Q.   And he flew on United; correct?

A.   I can't confirm that.  I don't remember.

Q.   You mentioned a ticket the other day that he had purchased.  That was -- that ticket is not a United Airlines ticket; correct?

A.   Again, I wouldn't -- I cannot confirm the airline.  I don't recall.  I know the date of the ticket.

Q.   Would it refresh your memory if I showed -- let me show -- would it refresh your memory, potentially, if I showed you a document?

A.   Yes.

Q.   Okay.  Take a look at Exhibit 322, please, page 5.

     This has not been admitted.

A.   And you're asking about --

Q.   So is the -- two things.  One is the flight -- actually, let's focus on the January 7th flight.  That is not a United flight; correct?

A.   That's correct.

Q.   The carrier code is CZ?

**A.**    That's correct.

**Q.**    Which is China South -- Southern; correct?

**A.**    Correct.

**Q.**    And usually, when -- you can put that down.

And usually, the ticket that we saw, that you identified, that said Peking -- sorry -- Beijing to SFO, that's usually the type of ticket you get once you board the plane; correct?  It's not something you get in advance?

**A.**    It looked like a boarding pass.

**Q.**    Boarding pass.  Thank you.  That's a better way to say it.

At the time -- you had mentioned you had looked into his travel shortly before the search warrant; correct?

**A.**    (Nods head.)

**Q.**    Did you review to determine whether Mr. Ding commonly booked one-way flights?

**A.**    I would have to relook at the travel records.  I'm sorry.

**Q.**    Do you -- fair to say that it's not uncommon for people to buy one-way tickets internationally?

**A.**    I think people do that.

**Q.**    People do do that; correct?

**A.**    Sometimes, yes.

**Q.**    And fair to say that you did not examine whether, as of January 1st, 2024, Mr. Ding also had booked -- a flight booked for a trip to Las Vegas that was scheduled to take place in February 2024?

**A.**   We did not see that on our travel records, no.

**Q.**   If he had purchased that ticket and was scheduled to fly to Las Vegas in February 2024, he'd have to return to the United States first from his trip from China; correct?

**A.**   That would be the assumption, yes.

**Q.**   I'd like to refer you -- all right.  So during the course of your investigation, you mentioned you talked about a lot of GitHub -- sorry -- WeChats; correct?

**A.**   Correct.

**Q.**   And one of -- one of the WeChats was related -- you came across related to open -- had a lot of discussions about open-source software; correct?

**A.**   You have to -- can you reference the exact WeChat?

**Q.**   Sure.  So it's Exhibit 1169.  It's not in evidence yet.

So, but if you'll take a moment, you can refresh it.  It's called R&D, if that helps refresh your memory.

**MR. FONDO:**  If you could pull up 1169, but not publish it.

**BY MR. FONDO:**

**Q.**   And then feel free to ask for him to scroll down as you --

**A.**   Yeah, if you can show the first page.

**Q.**   Sure.

**A.**   Yes, I do remember this chat.

**Q.**   And this is a chat you reviewed as part of your investigation?

**A.**   I did.

**Q.**   Okay.  And within this chat, there's multitude references to open-source software; correct?

**A.**   They reference Kubernetes, which I know is open source.

**Q.**   And they reference many others as well; correct?

**A.**   I --

**Q.**   Happy to refer you to -- so let me refer you, take -- look further down on page 2.  You see PyTorch?

**A.**   Yes.

**Q.**   That's open source; correct?

**A.**   I don't actually know.

**Q.**   What about NCCL?  That's open source for Nvidia; correct?

**A.**   I believe so, yes.

**Q.**   All right.  And then let's go to page 4, please.  There's a reference to github.com.

Sorry, Your Honor.  I don't think I've admitted this. Your Honor, at this time I'd like to admit Exhibit 1169.

**MR. BOOME:**  No objection.

**THE COURT:**  Admitted.

(Trial Exhibit 1169 received in evidence.)

**MR. FONDO:**  If you could please publish that.

All right.  So we're on page 4 now; correct?  And so does that -- do you recognize that github.com reworked AgentGPT as an open-source product?

**A.**   I know GitHub is an open-source repository.  I don't know

the rest of that link.

Q.   Okay.  When you say "GitHub is an open-source repository," tell the jury what you mean by that.

A.   My understanding is that it's a place where people can collaborate and create software, write code.

Q.   And, in fact, it's a very common source for software developers; correct?

A.   It's a well-known site for developing code.

Q.   For developing what?  Sorry.

A.   For developing code.

Q.   Okay.  And it's based in the United States; correct?

A.   Correct.

Q.   Actually, probably a few miles from here in San Francisco; correct?

A.   I don't know where they're based, but I know they're U.S. based.

Q.   Okay.  Thank you.

     And it's fair to say it's probably the largest repository for collaborating on code?

A.   I don't know that.

Q.   You know it's one of the largest, though?  It's a big player in the space; right?

A.   It's a big player, yes.

Q.   And remind the jury, what is open-source software, generally?

A.   It's publicly available.

Q.   Meaning anybody can access it; correct?

A.   Correct.

Q.   And, in fact, many software -- many software developers use open code -- open-source software -- sorry -- to develop their products; correct?

A.   I think people do, yes.  I don't know -- I can't quantify it.  It's not my area of expertise.

Q.   And when you -- and when you publish your open-source software, you're allowing anybody to use it; correct?

A.   Again, I don't know what the terms of the site are.  I -- I can't speculate.

Q.   I'm just asking open-source, generally, software?

A.   I understand.  But I generally know that open source means publicly available.  I don't know if there's terms aside from that.  I can't speak to that.

Q.   Well, you looked through this WeChat; correct?

A.   I did, yes.

Q.   And if Mr. Ding was building a product with open-source software and not using Google's alleged trade secrets, that would be of interest to you, wouldn't you, in part of your investigation?

A.   As I mentioned before, I'm not an expert in software code.  So we got a warrant for the GitHub account and we gave it to our expert.  I can't speak more than that.  I don't know

exactly what's in there, what was used to build that, whatever was in that repository.

Q.   Did you -- so you don't know whether, in the course of your investigation, it was important to look into the discussions of open-source software that Mr. Ding was having?

A.   We looked into the repository, yes.

Q.   I'm talking about -- sorry.  We'll get to that in a second.  But I'm referring to this WeChat.

A.   Can you ask your question again?

Q.   Certainly.  So in the course of your investigation, you didn't think it was important to dig into what open-source sources -- open-source software sources that Mr. Ding was using, potentially using?

MR. BOOME:  Asked and answered a couple of times.

THE COURT:  Overruled.

THE WITNESS:  We did, which is why we got the GitHub warrant.

BY MR. FONDO:

Q.   Okay.  Did you -- so there is -- there is multiple articles referenced in Exhibit 1169.  How many of those articles did you pull?

A.   I don't remember reading them.

Q.   So this was -- and isn't it true that this GitHub was the R&D -- sorry.  Isn't it true this WeChat was the R&D WeChat for Zhisuan?

**A.**    It is -- my understanding is the people in this chat were developing the product for Zhisuan.

**Q.**    Okay.  And so you didn't think it was important to review the articles that the engineers were passing back and forth as they're talking about the product they're building?

**A.**    We didn't do it.

**Q.**    You didn't do it?

**A.**    No.

**Q.**    Okay.  And this WeChat is how many pages -- approximately how many pages?

**A.**    I don't recall.

**Q.**    Sorry.  You don't have it in front of you.  I apologize.

        **MR. FONDO:**  If we could go to the last page, please. And just blow the bottom right hand up, please.

**BY MR. FONDO:**

**Q.**    So it's approximately 198 pages of communications with people building Zhisuan's product; correct?

**A.**    Correct.

**Q.**    All right.  And if we could look at the bottom, just focus on the last date, please.  12/26/23; correct?

**A.**    Correct.

**Q.**    Okay.  So that's shortly before you issued the search warrant; correct -- executed the search warrant; correct? About a week before?

**A.**    Correct, yes.

MR. FONDO:  Let's go to the first page, please.  Let's pull up the first date.

BY MR. FONDO:

Q.   And so this WeChat started approximately October 3rd --

A.   Correct.

Q.   -- two thousand --

So this is a WeChat on product development at Zhisuan from October through the end of December?

A.   Right.

Q.   And you did not fully investigate the links that were provided in this WeChat; correct?

A.   We didn't look at the articles, no.

Q.   So let's look at what you did look at.  So let's -- so you mention GitHub; correct?

A.   Yes.

Q.   All right.  And you actually issued subpoenas and executed a search warrant at GitHub; correct?

A.   Correct.

Q.   All right.  And you did that because software developers often store their code there; correct?

A.   Because it's a site that is used for, yes, to develop code.

Q.   You also did it because it was referenced in some of these WeChats; correct?

A.   Partly, yes.

**Q.** And, in fact, you obtained a number of different files from GitHub that you believe were Zhisuan related; correct?

**A.** Correct.

**Q.** Now, one of those accounts was called Cluster Model Service; correct?

**A.** Correct.

**Q.** And GitHub -- GitHub ultimately produced to you 15 git.bundled files; correct?

**A.** Roughly. I don't remember the exact number.

**Q.** If it's helpful, I'm happy to have you take a look at a report if it'll refresh your memory.

**A.** Sure.

**Q.** So if you could take a look at Exhibit 7090, page 1 and 2. And I'll direct your attention to the middle, to the bottom.

**A.** Yes.

**Q.** Okay. Does that refresh your memory that GitHub produced 15 git.bundled files?

**A.** Correct.

**Q.** And what are those, just generally?

**A.** Again, they're source repositories for code. You can open one, and then you have code embedded in it.

**Q.** And it was your understanding that the code that was in these files was code that Zhisuan engineers had built; correct?

**A.** That's correct, yes.

**Q.** And these were part-time engineers; correct? You have no

reason to believe they were full-time engineers?

A.    Not by -- I mean, there was no employment agreement, so we don't know if they were full-time or part-time.

Q.    And so you mentioned that -- so this was part of your investigation because you believed that this GitHub -- these GitHub repositories might have information relevant to your investigation; correct?

A.    Correct.

Q.    All right.  And so -- and you thought it would tell you whether Google's alleged trade secrets were being used to build that code; correct?

A.    Correct.

Q.    All right.  And the truth was there was no Google trade secrets in any of that code; correct?

A.    We did not see indication of that.

Q.    Okay.  And, in fact, you forwarded this to your expert Dr. Sanchez; correct?

A.    Correct.

Q.    Okay.  And he told you there was none; correct?

A.    I believe so.  I don't remember his exact words but...

Q.    Okay.  And isn't it also true that these GitHub files had open-source technology in them?

A.    Again, I don't know.  That is not my expertise.

Q.    Isn't it also true that the product that was being built in those GitHub files was not similar to the technology that

was referenced in the various PowerPoints that you've gone through the last two days?

A.   I don't want to keep repeating myself, but I don't know. I cannot -- I'm not an expert on the source code, so I cannot tell you for sure whether it was or not.

Q.   Okay.  So you are the lead expert -- sorry -- lead agent in this case; correct?

A.   I am, yes.

Q.   Okay.  And you've spent a lot of time looking through a lot of documents, and you never had found a product; right --

A.   Correct.

Q.   -- that was built?

And then you go to a GitHub repository because you subpoena it, correct?

A.   Yes.

Q.   And you issue a search warrant; correct?

A.   Yes.

Q.   And you try -- because you believe that maybe that's where the product is; correct?

A.   We believe that that could be part of Zhisuan development.

Q.   Okay.  And so you get the product, and then you don't -- you get the repository, and you don't really know what's on there?

        MR. BOOME:  Objection, Your Honor.  How many times are we going to ask Special Agent Valladao what's in the GitHub

account?

THE COURT:  Overruled.

THE WITNESS:  Again, we provided it to our expert, and we -- I would like to -- if you have his actual words, I don't want to put words on what he said.  But I believe it was a very barebones product.

BY MR. FONDO:

Q.    Was it important for you to know, as the lead agent, whether the information found there was consistent or inconsistent with the various PowerPoints that we've spent the last two days going through?

A.    Was it important?  Yes.

Q.    But you don't know the answer, as you sit here today; correct?

A.    Again, so some of the PowerPoints had screenshots of this product, and it was -- they were screenshots of a, like, Web application.  So, again, very simple product.  And it's included in the PowerPoints.

Q.    Okay.  So you said it was a very simple product that was found on GitHub; correct?

A.    Correct.

Q.    The product that was described that they were saying they might build in those PowerPoints was not a simple product, was it?

A.    No.  What -- they were showing the screenshots as the

proof of concept of that product.

Q.   And there were no Google trade secrets found in any of those GitHub files; correct?

A.   Not that I'm aware of.

        MR. FONDO:  Thank you.

        THE COURT:  All right.  Thank you.

        Any redirect?

        MR. BOOME:  Yes, Your Honor.

                (Discussion off the record.)

        MR. BOOME:  Sorry, Your Honor.  I'm just asking for the R&D chat exhibit number and the Lu Qi -- the Lu Qi bio exhibit number.

        MR. FONDO:  I'm sorry.  What's that?

        MR. BOOME:  The exhibit you entered about Mr. --

        MR. FONDO:  6005.

        MR. BOOME:  6005.

                    **REDIRECT EXAMINATION**

BY MR. BOOME:

Q.   Special Agent Valladao, I want to start where Mr. Fondo left off regarding the GitHub account.

     He was very concerned that you hadn't read publicly available articles in the chat.  Did you get the code that they were talking about in that chat?

A.   The GitHub code?

Q.   Yes.

**A.**    Yes.

**Q.**    You sought a search warrant for the code in that account?

**A.**    I did.

**Q.**    That was the product of that discussion in the chat?

**A.**    Correct.

**Q.**    That's the reason Mr. Fondo is able to ask these questions, because you obtained a copy of what was in the account?

**A.**    Yes, I did.

**Q.**    But why did you give it to Professor Sanchez instead of try to interpret it yourself?

**A.**    I tried to interpret it myself, and I couldn't because I'm not an expert.

**Q.**    Mr. Fondo asked you about what Professor Sanchez told you about the product, so I'm going to ask you similar questions.

Based on what you learned from Professor Sanchez after he analyzed the product, was it a -- was it a cluster management system that could manage tens of thousands of chips?

**A.**    It was not.

**Q.**    How did he characterize it?

**A.**    I believe he said it was --

**Q.**    Did he use an analogy about a car brochure?

**A.**    Yes.  He said it was like describing a car without the engine.

**Q.**    Like a brochure of a car, but not how you make the engine?

**A.**   That's right.

**Q.**   And we'll hear from Professor Sanchez later in this trial.

Okay.  I'd like to ask you now about Exhibit 1170 that you and Mr. Fondo discussed.

**MR. BOOME:**  Can we bring up 1170, please, Ms. Hernandez.

**BY MR. BOOME:**

**Q.**   You and -- Mr. Fondo pointed out the answer that said there's currently no product.

**A.**   Correct.

**Q.**   Let's go back to the part about a product demonstration video on page 2, paragraph 4.

We discussed how there was a video submitted; right?

**A.**   Yes.

**Q.**   And you found that video?

**A.**   I did.

**Q.**   We haven't watched it yet, but have you watched it?

**A.**   I have.

**Q.**   Does Mr. Ding claim that the product in that video is his product?

**A.**   He does.

**Q.**   And Mr. Fondo repeatedly asked you about the fact that he said Zhisuan had no product.

**MR. BOOME:**  Let's go to page 34 of 1134, in evidence, please, Ms. Hernandez.

1143.  Sorry about that.  Page 34.

1143?

(Discussion off the record.)

**MR. BOOME:**  Let's go to page 34, please, 1034.  Third time's the charm.

I'm sorry, Ms. Hernandez.  I'm going to change topics.  I'm sorry.  I'm having trouble finding the page.

**BY MR. BOOME:**

**Q.**   Mr. Fondo asked you about investment in Zhisuan.  You discussed -- you and I discussed a number of investor meetings.  Did you find any evidence that those investor meetings resulted in any investment?

**A.**   No.

**Q.**   What partnerships did Mr. Ding claim to have for Zhisuan?

**A.**   That document with potential customers listed various partnerships, including with a research institute.

**Q.**   Mingyue Lake --

**A.**   Yes.

**Q.**   -- Research Institute?

**A.**   Correct.

**Q.**   Any private entities?

**A.**   I have to reread it.  I'm sorry.

**Q.**   Let's go to 1003.  Can you walk us through the companies and entities that this document claims that Zhisuan has partnered with?

**A.**   Yes.  So under "Enterprise customers," VNET, it says that the progress is, detailed discussion have been held and the strategic cooperation agreement is being advanced.

BaishanCloud and then Kingsoft Cloud, preliminary discussions have taken place with positive intent.

And then last point there, SuperSymmetry, discussions are ongoing regarding the future specific cooperation model.

**Q.**   Next page, please.  We've discussed these.  Can you tell us about Sugon?

**A.**   Yes.  It says in "Progress" that [as read]:

"Strategic cooperation is currently being discussed with the company's senior management."

**MR. BOOME:**  Okay.  And my colleagues have found the page I was looking for.

1035 at page 19, please, Ms. Hernandez.

**BY MR. BOOME:**

**Q.**   Can you tell us about this page?

**A.**   Yeah.  So this is what I was referring to about the proof of concept screenshots of the GitHub account.  And so this is screenshots detailing what that proof of concept product is.

**MR. BOOME:**  Okay.  I'd like to now go back to the signature page of 1001, please, Ms. Hernandez.

Let's go to page 13, 14.  Keep going to Lu Qi.

One more.  Thank you.

And if you could pull up -- let's zoom in on the --

BY MR. BOOME:

Q.   So this is -- remind us what this document is and what it says.  This is the investment agreement.

A.   Yeah.  So this is the investment agreement detailing that MiraclePlus will take 7 percent ownership of Zhisuan in exchange for about 5 million RMB.

Q.   Which you said was worth about 700,000 U.S. dollars at the time?

A.   Correct.

     MR. BOOME:  Let's go to the exhibit that Mr. Fondo introduced, 6005.

     Oh, Mr. Jay, can I ask you a favor, sir?

BY MR. BOOME:

Q.   Is the person described in 6005 the same person who signed the investment agreement to purchase 7 percent of Zhisuan for $700,000?

A.   It is, yes.

     MR. BOOME:  Can we zoom in on his experience.

BY MR. BOOME:

Q.   Can we agree that he is someone who knows how to properly value a business?

A.   Yes.

Q.   If 7 percent of the company -- if Mr. Qi agreed to pay $700,000 for 7 percent of the company, what does that equate to in terms of the valuation of the company?

**A.**   I think it means that he thinks that company is valuable.

MR. FONDO:   Objection.

MR. BOOME:   Your Honor, can we agree --

THE COURT:   That objection will be sustained, and that answer will be stricken.

MR. BOOME:   Can we take judicial notice, Your Honor, that $700,000 is 7 percent of $10 million?

THE COURT:   I don't know.

BY MR. BOOME:

**Q.**   Special Agent Valladao, if I gave you a calculator, could you calculate the valuation of the company based on $700,000 for 7 percent of the equity?

**A.**   I believe so.   You're asking me to do math here.

THE COURT:   Better than me doing math.

BY MR. BOOME:

**Q.**   $700,000 divided by .07.

**A.**   That would be 10 million.

MR. BOOME:   Thank you.

Nothing further, Your Honor.

MR. FONDO:   Your Honor, just a brief follow-up.

THE COURT:   Okay.

MR. FONDO:   Thank you, Your Honor.

### RECROSS-EXAMINATION

MR. FONDO:   So I want to go to Exhibit 1035, page 18, Mr. Jay.

I apologize I must have written down the exhibit number wrong.  Okay.  That's fine.

**BY MR. FONDO:**

**Q.**   So you had -- when the Government just was asking you a couple of questions, they referenced a proof of concept; correct?

**A.**   (No response.)

**Q.**   Okay.  That proof of concept was not in the GitHub repositories; correct?

**A.**   I believe the GitHub repository had a product similar to that proof of concept.  I didn't run it.  We can -- I didn't run the code.

**Q.**   Okay.  All right.  So I'm sorry if I asked you to -- so we'll skip that question.

So you had mentioned -- you were also asked about whether you reviewed the entirety of Exhibit 1169, which is the WeChat that we were talking about as the R&D WeChat.

**A.**   Yes.

        **MR. FONDO:**  If you could please pull that up, Mr. Jay, and go to page 109 in the middle.

**BY MR. FONDO:**

**Q.**   If you could take a look there, there's a reference to a github.com cluster model service.  Do you see that?

**A.**   Correct.

**Q.**   Okay.  And the Government tried to obtain that; correct?

**A.**   Correct.

**Q.**   Okay.  But GitHub never actually produced it to you; correct?  You never followed up on it?

**A.**   We got the search warrant for the GitHub.

**Q.**   Okay.  All right.  So you received everything that you believed you requested from GitHub?

**A.**   Correct.  Yes.

**Q.**   And you didn't find any Google trade secrets there; correct?

**A.**   Correct.

        **MR. FONDO:**  All right.  Thank you.

        No further questions, Your Honor.

        **THE COURT:**  Okay.  Thank you.

        That'll wrap up our day for today.  We will see you all tomorrow morning.  Please remember that we're trying to keep a schedule that is as respectful of all your time as possible.  So in exchange, if everybody could please be ready to come in right at 9:30, I'd appreciate it.

        Thank you.

        **THE COURTROOM DEPUTY:**  All rise.

   (Proceedings were heard out of the presence of the jury.)

        **THE COURT:**  All right.  You can step down.

                        (Witness excused.)

        **THE COURT:**  Anything further to discuss right now?

        **MR. BOOME:**  Not from us, Your Honor.  Thank you.

PROCEEDINGS

MR. FONDO:  Nothing from the defense, Your Honor.

THE COURT:  Okay.  And the plan regard- -- the plan for the documents was that we would -- you've made your filing now.  And is the idea that we were going to talk about them tomorrow morning?  I can't remember what we said.

MS. PRIEDEMAN:  Yeah, that's what we discussed, Your Honor.

THE COURT:  Okay.  So should I come in -- should I come into the courtroom earlier than 9 o'clock?  I don't have a great sense of how long it's going to take to talk through these documents.

MS. WALSH:  I think 9 o'clock should be sufficient, provided there's not really anything else of significance on that we need to discuss.

MS. PRIEDEMAN:  I think that's fair, Your Honor.

And we still have several witnesses to go before Dr. Sanchez too, so --

THE COURT:  So we don't have to complete the discussion by then.

MS. PRIEDEMAN:  I think that's right, Your Honor.

THE COURT:  All right.  Sounds good.  Thank you.

MR. FONDO:  Thank you, Your Honor.

MS. PRIEDEMAN:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  Court is in recess.

(Proceedings adjourned at 3:02 p.m.)

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Friday, January 16, 2026

_Ana Dub_

_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter