**Volume 5**

**Pages 853 - 1067**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

```
UNITED STATES OF AMERICA,        )
                                 )
          Plaintiff,             )
                                 )
   VS.                           )  NO. 3:24-CR-00141-VC
                                 )
LINWEI DING, a.k.a. LEON DING,   )
                                 )
          Defendant.             )
_____)
```

San Francisco, California
Friday, January 16, 2026

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

> CRAIG H. MISSAKIAN
> UNITED STATES ATTORNEY
> 450 Golden Gate Avenue, Box 36055
> San Francisco, California 94102-3495
> **BY:  CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
> **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**
>
> CRAIG H. MISSAKIAN
> UNITED STATES ATTORNEY
> 1301 Clay Street, Suite 340S
> Oakland, California 94612-5217
> **BY:  MOLLY K. PRIEDEMAN**
> **ASSISTANT U.S. ATTORNEY**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant:
                    GOODWIN PROCTER LLP
                    525 Market Street
                    San Francisco, California 94105
              BY:   **DARRYL M. WOO, ATTORNEY AT LAW**
                    **DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
                    **RACHEL M. WALSH, ATTORNEY AT LAW**
                    **COLETTE A. LOWRY, ATTORNEY AT LAW**
                    **NICHOLAS C. WILEY, ATTORNEY AT LAW**

                    GOODWIN PROCTER LLP
                    601 Marshall Street
                    Redwood City, California 94063
              BY:   **GRANT P. FONDO, ATTORNEY AT LAW**
                    **FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

                    GOODWIN PROCTER LLP
                    601 South Figueroa Street, Suite 4100
                    Los Angeles, California 90017
              BY:   **LORA J. KRSULICH, ATTORNEY AT LAW**


Also Present:       **Andrea Valladao, Federal Bureau of**
                       **Investigation**
                    **Veronica Hernandez, Paralegal**
                    **John Jay, Trial Technician**

# I N D E X

Friday, January 16, 2026 - Volume 5


| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **REN, YUQING** | | |
| (SWORN) | 876 | 5 |
| Direct Examination by Mr. Chang | 877 | 5 |
| Cross-Examination by Ms. Lowry | 884 | 5 |
| | | |
| **MA, ZHIYAO "MAZY"** | | |
| (SWORN) | 886 | 5 |
| Direct Examination by Mr. Chang | 887 | 5 |
| Cross-Examination by Ms. Krsulich | 896 | 5 |
| | | |
| **SEGAL, ADAM M.** | | |
| (SWORN) | 899 | 5 |
| Direct Examination by Mr. Chang | 899 | 5 |
| Cross-Examination by Mr. Fondo | 941 | 5 |
| Redirect Examination by Mr. Chang | 959 | 5 |
| | | |
| **SANCHEZ, DANIEL** | | |
| (SWORN) | 962 | 5 |
| Direct Examination by Ms. Priedeman | 962 | 5 |

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 6703 | | 953 | 5 |
| 6704 | | 956 | 5 |
| 6705 | | 955 | 5 |
| 6717, pages 1, 3, and 20 | | 959 | 5 |

**Friday - January 16, 2026**                                    **9:01 a.m.**

**P R O C E E D I N G S**

**---o0o---**

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Okay.  Before we talk about the, quote/unquote, publicly available documents or information, is there anything more time sensitive that anyone needs to discuss about the next witness?

MR. FONDO:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. FONDO:  Grant Fondo for the defense.

Your Honor, this is with regards to a witness who I assume will be testifying this morning, maybe even possibly before the break.

So, Dr. Segal.  It relates to a demonstrative.  It's Slide Number 4.  The demonstrative, I have it here.

Go ahead.

MR. CHANG:  You can...

MR. FONDO:  Yeah, I'm happy to pass it up.

But it has listed on it -- at the top it says "PRC entities."

THE COURT:  Yes.

MR. FONDO:  And we believe that that is in contradiction to the Court's order, Docket Entry 264.

MR. CHANG:  And, Your Honor, just for the record,

we've removed the investment fund, so it's just the Innovation Park, The Research Institute, and the Lingang Group on this slide now.

THE COURT:  Okay.  No, I think this is okay.  This is the kind of thing that is -- I mean, that's sort of the most normal word to use in this context.

MR. CHANG:  Thank you, Your Honor.

THE COURT:  That's overruled.

Anything else?

MR. CHANG:  Nothing from the Government.

MR. FONDO:  Nothing else on this issue, Your Honor.

THE COURT:  Okay.  Let's start talking about these documents.

Okay.  So we have -- maybe we can start just with the ISA documents.  I think that there are a couple of video ones, and then there is the -- I don't know if you call it RISC-V, or R-I-S-C-V, ISA.  Is that right?  There are two Nvidia ones and two RISC ones -- or one RISC one?

MS. WALSH:  There is one RISC-V one.

THE COURT:  RISC-V?

MS. WALSH:  Yeah, I think so.

THE COURT:  So I guess maybe -- I mean, I've read what you have in your disclosure, but maybe I could just have you articulate, try to do your best to summarize why these documents show that the stuff in Google's ISA documents are

publicly available.

MS. WALSH: So I think our argument there is basically that it's the same type of information that other people have made public.

THE COURT: But why -- I just don't understand that argument. There are open-source ISAs, like RISC-V, and there are proprietary ISAs. Just like there's open-source software and proprietary software.

And the fact that open-source software will share code that performs a particular function doesn't mean that the proprietary software's code that performs a similar function is not proprietary or not a trade secret. And so that argument seems facile. And, frankly, it just seems like classic misdirection that should be excluded under 403.

MS. WALSH: So I think the other portion of the argument is that we understand that the Government's argument with respect to the ISAs is that somebody with these documents could just replicate the chip.

THE COURT: Or use them to replicate the chip; right?

MS. WALSH: Exactly.

THE COURT: I mean, I don't know if the Government is saying that you need only those documents to replicate the chip, but they will help you. You would use them in replicating the chip, I think is what they're saying.

MS. WALSH: And one thing that these documents do is

that they demonstrate that other people have made the same kind of information available, particularly Nvidia.

THE COURT:  But I'm still not understanding why that's relevant.

MS. WALSH:  So, basically, the argument boils --

THE COURT:  Is my software analogy apt?  Right? There's open-source ISAs and proprietary ISAs; right?

MS. WALSH:  That is correct, but I think the point is that:  Why would Nvidia make this kind of information public if it were so sensitive that you could make a chip from it? I think that's what that boils down to.

THE COURT:  Okay.  And, so does Pflaum say anything more than what you say in your proffer?

MS. WALSH:  So...

THE COURT:  And did Pflaum testify about this at the *Daubert* hearing?  I can't recall.

MS. WALSH:  I don't believe that he testified about this during the *Daubert* hearing.  I believe his report does talk about information that's available in ISAs.

THE COURT:  Okay.  I think -- here, let's look at Pflaum's report.

(Pause in proceedings.)

THE COURT:  I don't think it was in the first notice, but I think the second notice, there might have been a little something.

**MS. PRIEDEMAN:**  Your Honor, while we're looking for this, can I just make one point about the Nvidia ISA?

**THE COURT:**  Yeah.

**MS. PRIEDEMAN:**  So I think another layer here that we put in our response is that the Nvidia ISAs that are mentioned are not machine-level ISAs, which is a meaningful distinction. So they're PTX-level ISAs, which is another layer above a machine-level ISA.

The ISAs here are machine-level ISAs which disclose more details.  Nvidia has not published their machine-level ISAs, and, in fact, I believe those would be considered proprietary.

So there's just another -- there's another layer, I think, of confusion here and misunderstanding with Mr. Pflaum that I think needs to be addressed, that these are just -- these are not equivalent to the ISAs.

**THE COURT:**  Okay.  And do you recall whether Pflaum testified about this during the *Daubert* hearing?

**MS. PRIEDEMAN:**  I believe he touched on it very briefly, just essentially making the argument that Ms. Walsh said, that this is the same type of information --

**THE COURT:**  Right.

**MS. PRIEDEMAN:**  -- that has been published.

**THE COURT:**  Right.  I think that that -- I mean, my pretty strong tentative reaction is that that is just simply

misdirection, and it highlights the possibility that Pflaum is not -- does not have the expertise in this area -- right? -- that his opinion is not trust- -- is not reliable.

But let me see.  I'm looking at page 55, paragraph 149, I think is where Pflaum touches on it in his supplemental report.

**MS. WALSH:**  Yes.

**THE COURT:**  I want to stare at it for a second.

(Pause in proceedings.)

**THE COURT:**  Okay.  Yeah, so it does seem to be just a brief discussion, similar -- similar to what we've already discussed.

Now I want to go back to the disclosure.

Sorry.  I'm still dealing with my new document management system, which is making me slower than usual.

Okay.  So the documents we're talking about are Exhibit 5109, which is the RISC-V instruction set manual; and 5119, which is an Nvidia ISA; and 5142, which is an Nvidia ISA; right?

**MS. PRIEDEMAN:**  Yes, Your Honor.

**THE COURT:**  And so for the RISC-V instruction set manual -- and RISC-V is an open-source ISA developed by, like, some professors at Berkeley or something like that; right?

**MS. PRIEDEMAN:**  Yes, Your Honor, for a CPU.

**THE COURT:**  Okay.  I think it's -- the Nvidia point

that you just made doesn't apply to this; right?  This is just a -- kind of the way I -- you would just agree with what I said, which is that there's open-source ISAs; there are proprietary ISAs.  This is an open-source ISA, and it doesn't really have anything to do with whether Google's ISA documents contain trade secrets regarding Google's AI computing infrastructure.

**MS. PRIEDEMAN:**  That's correct, Your Honor, along with the fact that defense is not suggesting that there are portions of the trade secret documents that are included in this open-source ISA.

**THE COURT:**  Right, or the same information.  I would think that the mere fact that one is open source and the other is proprietary would not automatically preclude the open-source material from being irrelevant; right?

If the open-source material did include some information that could be used to replicate Google's system, then it could be relevant.  But I don't see them having identified anything like that.

Their argument seems to be:  This kind of stuff is disclosed by other entities sometimes, and therefore, it's not a trade secret.  And that seems, like, completely wrong.

And so I don't know.  I mean, unless you have anything else -- I'm happy to hear more about the Nvidia point that you just made; but, I mean, unless you have anything else, 5109

will be excluded.  And it doesn't even seem like a close question.

MS. WALSH:  I think it's --

THE COURT:  Like I said, it raises some real concerns. I don't know if Pflaum relied on this.  Did Pflaum rely on this in his report?

MS. PRIEDEMAN:  Yes.

MS. WALSH:  It is cited in his report, yes.

THE COURT:  Okay.  I think that -- again, that's going to be something Pflaum needs to explain at the further *Daubert* hearing because, unless I'm missing something, that is a major red flag about Pflaum, to assert that this open-source IA -- ISA reveals Google's trade secrets or helps somebody replicate Google's trade secrets.

MS. WALSH:  And just to be clear, that's not exactly the argument that we're making.  We're showing that other entities have made this kind of information available.  And so --

THE COURT:  Yeah, but why -- how is that different from what I'm articulating?

MS. WALSH:  So it's -- it's demonstrating that -- it goes to rebut the Government's argument that this kind of information is so secret that no one would release it and it's something that you can use to basically recreate a chip.

THE COURT:  But has the Government argued that this

type of information is so secret that no one would release it?

I mean, if somebody is -- has -- I mean, people release -- I mean, it's just like software.  Like I said, there's open-source software and proprietary software; and some people make the choice, for whatever reason -- I don't understand exactly but -- some people make the choice to release their source code, and other companies make it proprietary because they want to capitalize on the function that it performs and they want to make money off of that.

**MS. WALSH:**  And, again, this kind of goes to the idea that if this information was so sensitive that you could use it to build a chip, then why would anybody release it?  Particularly in the Nvidia case.

**THE COURT:**  Okay.  So that's -- so, okay.

So 5109, which is the RISC-V instruction set manual, is excluded under 403 and, I think, also 401, frankly; right?  But even if it has some marginal relevance that I'm not appreciating, it's excluded under 403.

And I want to hear from Pflaum why he thinks that that is an appropriate thing to rely on in support of his opinion.  And if Pflaum convinces me that it is an appropriate thing to rely on in support of his opinion, then my ruling can be revisited, of course.  But I think the bigger concern is that it's yet another red flag about Pflaum and the reliability of his opinion.

So on the Nvidia point, I mean, as I sit here right now, I don't have the ability to assess what you've said to me about the difference between Nvidia's ISA documents that it published and Google's ISA documents that Ding took; right?  So what more can you tell me about that, or where do you want to point me to, to learn about that, to understand that?

**MS. PRIEDEMAN:**  I believe that Dr. Sanchez addressed this in his rebuttal report, Your Honor.  I don't have that in front of me, and I would have to check, but I believe that's a point he made.

It's also -- it's in the notes that we attached.  I know it's not a declaration, but we attached his notes in our motion, saying it's not a machine-level ISA.  It's basically --

**THE COURT:**  And so is Nvidia -- Nvidia's ISA is not open source?

**MS. PRIEDEMAN:**  So their -- my understanding is that the machine-level ISA is not publicly available.

So what defense has cited is -- it's called a parallel thread execution, PTE.  Sorry.  Maybe I'm misconstruing phrases.  But my understanding is it's called a PTX, which is a level of abstraction above the machine-level ISA, which masks the underlying implementation details that are present in the ISAs at issue here.

**THE COURT:**  Okay.

**MS. PRIEDEMAN:**  So it's not an apples-to-apples

comparison.

THE COURT:  And then -- so what if -- is there an argument that the ruling should be -- as it relates to these ISA documents, that the ruling should be that the defense is precluded from using 5109, Exhibit 5109; the defense is precluded from arguing that just because some ISAs are open source and just because some entities make that type of information available, that that means that Google's ISA documents are not valuable -- right? -- and are not secret? Sort of preclude that argument, but leave for cross-examination the question of whether Nvidia has disclosed something at a higher level of abstraction than the documents -- the ISA documents that Google is and that the Government is asserting are trade secrets.

MS. PRIEDEMAN:  Your Honor, I think that second point -- I still don't think it's relevant.  I think all of the points that you addressed with the first exhibit, Exhibit 5109, are still present with the Nvidia ISA issues.

THE COURT:  I mean, again, it depends whether there is a colorable argument -- right? -- that the stuff in the Nvidia documents discloses -- would help somebody replicate Google's technology; right?

MS. PRIEDEMAN:  Right.

THE COURT:  And so I guess I would just -- I need to hear -- I mean, if you -- I'm looking back at the defense's

disclosure.

**MS. PRIEDEMAN:** Yes. So, Your Honor, if you look at defense's disclosure, what they're saying is just at a high level, Nvidia has published certain types of operations and Google has also described their operations. That's -- that has -- they're not -- they're not suggesting that it's the same operations or things that are present in Google's trade secret documents. Again, it's just the fact that Nvidia's documentation includes some similar type of information --

**THE COURT:** Uh-huh.

**MS. PRIEDEMAN:** -- which I think is wrong at multiple levels.

But I think just to your first point about the relevance, they're not making a colorable argument that there's anything in these documents that discloses Google's trade secrets. And --

**THE COURT:** Were there anything in these documents that somebody could use to replicate Google's trade secrets?

**MS. PRIEDEMAN:** I don't think they're making that argument, and I don't, frankly, know how they could. It's a different processor. It's a GPU. It's a totally different -- instruction sets are different depending on the processor. So Nvidia's ISA is going to be -- even the machine-level ISA is going to be fundamentally different because it's for that specific processor.

**THE COURT:** Ms. Walsh, is there anything else you want to say about the Nvidia documents?

**MS. WALSH:** So with respect to the level of abstraction argument that's made by counsel, there are different levels to, sort of, what's disclosed in a chip.

Even taking as true that those different levels are different -- the two different documents, they kind of build on each other and they tell you things about -- the level above tells you what's below and what's below that on down to the gates in the chip eventually.

So just the idea that it's a different level of abstraction doesn't mean that it's not relevant.

**THE COURT:** But could you give me an example of something in the Nvidia documents that is disclosed that would help one replicate Google's AI computing infrastructure or the secret aspects of Google's AI computing infrastructure?

**MS. WALSH:** They do disclose similar instructions, as we listed in our proffer. They're not necessarily the same instructions. But, again, this goes to show the kind of information that's available publicly.

**THE COURT:** Yeah. But why is that not -- why is that any different from my software analogy, the analogy to open-source software and proprietary software?

**MS. WALSH:** I think it kind of goes back to the idea of what you can use the Google documents for and can you

actually use it to replicate a chip.  And so that's sort of what we're looking at.  And, I mean, it's also --

THE COURT:  So what you're saying is -- so there are kind of two different arguments.  One argument would be that the Nvidia documents would help you replicate Google's technology.  But you're kind of pivoting away from that, I think, and saying that the public availability of the Nvidia documents shows that if the Google documents were also public -- if the Google ISA documents were also public, that would not assist anyone in replicating Google's AI computing infrastructure.

MS. WALSH:  It essentially kind of goes to economic value because it's essentially that, you know, this information, you know, it's disclosed by other people.  You know, it's -- it's not the thing that will enable you to replicate Google's chip.  So it goes to --

THE COURT:  But are you saying that disclosure of Google's ISA documents would not assist somebody in replicating Google's technology?

MS. WALSH:  So the sort of -- it goes to show sort of the same instructions that are disclosed.

And also part of the argument --

THE COURT:  Same type of instructions?

MS. WALSH:  Same type of instructions, that's correct.  And the basic ones, they don't seem to vary all that much.

And part of the argument here is, you know, there's similar technology available.  It also goes to sort of the larger aspects in trade secrets here with respect to intent because there were alternatives available.  There was information out there that you could either buy Nvidia chips or, you know, build something using Nvidia or look to that kind of information to build an AI system.

THE COURT:  Okay.

MS. PRIEDEMAN:  Your Honor, just one more point.  I think, again, this goes to Mr. Pflaum's reliability.

He cited both of the Nvidia PTX ISAs in his report on page 37, in Footnote 46, or at least one of them.  And he seems to not understand the distinction between the PTX layer and the machine layer ISA, which I think is very problematic and just goes to his lack of understanding of all these issues.

THE COURT:  Right.  But I guess I need to understand it before ruling in your favor on that point; right?  And so the question is:  Where do I look to understand that?  You're saying Sanchez's rebuttal report?

MS. PRIEDEMAN:  Yes, Your Honor.  But I think to rule on this, you really don't even have to get to the second point.  I think it's the first point.

And defense, I think they've clarified that they're not arguing that it's disclosing Google's information; and they're -- the fact that -- I'm not totally following the

argument that -- even if Nvidia published machine-level ISAs, which they don't, I'm not fully following the trail of why that would be relevant to the value of Google's trade secrets.

THE COURT:  But I think there's kind of a different argument that they're pivoting to, which is that even if you disclosed Google's ISA documents, that would not assist anybody in replicating Google's AI computing architecture.

MS. PRIEDEMAN:  Sure.  And they can make that argument.  But Nvidia's ISA for a completely different processor is irrelevant to that question, Your Honor.

THE COURT:  Uh-huh.

MS. PRIEDEMAN:  Even if you couldn't replicate the Nvidia chip from their ISA, that does not bear on the question of what you could do with Google's ISA because ISAs, by definition, differ depending on the processor.

THE COURT:  Yeah.

MS. PRIEDEMAN:  So --

THE COURT:  Okay.  Well, so as it relates to the ISAs, the RISC-V document is definitely excluded, and my pretty strong tentative inclination is that the Nvidia documents are excluded as well.

One question I had was:  Have these other ISA documents, whether it's the RISC-V or the Nvidia ones, have they come up at trial at all?  I have a vague recollection of them coming up, but discussions in the presence of the jury and

outside the presence of the jury are a little blurred in my mind right now.  I feel like this might have come up in cross-examination at some point.

(Co-counsel confer off the record.)

**MS. PRIEDEMAN:**  I don't think so, Your Honor.  I think just generally ISAs came up.

**MS. WALSH:**  Yeah.  There have been discussions of ISAs, and there's definitely been discussions of Nvidia technology more generally, like things like availability of the H100, you know, Zhisuan's plans to, you know, buy or build something using Nvidia technology.

**THE COURT:**  Okay.  So I'm going to think about it a little more, but my pretty strong inclination is that also the Nvidia ISA documents should be excluded under Rules -- again, quite possibly Rule 401, but definitely under Rule 403.

So I'll think about it a little more.  If there's anything you want to say about that at a later time, at the lunch break or something like that, I'm happy to hear it, because I don't want -- you know, if there is a colorable argument that there's relevance, that these documents are probative, I don't want to be excluding them, obviously, but I haven't seen it so far.

And then I guess we'll talk about the other documents later because it's 9:30 now.  We should bring the jury in.

Do you know if everyone's here, Bhavna?

THE COURTROOM DEPUTY:  No, not yet.

THE COURT:  You don't know or --

THE COURTROOM DEPUTY:  I don't know.

THE COURT:  Okay.  Well, we'll assume they are, and you can go bring them in.  Let us know if there's an issue.

MR. FONDO:  Your Honor, excuse me.  May I just -- one brief --

THE COURT:  Yeah.

MR. FONDO:  Going back to Dr. Segal -- and I apologize I didn't raise it earlier -- in his *Daubert* testimony, he referenced events that took place after 2023, talking about events in China and things like that.  I'm assuming his testimony is going to focus on events prior to the arrest of Mr. Ding, since I don't think they're relevant.

THE COURT:  Yeah, I don't know.  I suppose it's sort of -- kind of like the patents, it sort of depends what the event was after 2023 and if it sheds light on something that -- the state of affairs before then.

Do you plan to elicit testimony from him about anything that happened after 2023, and if so, how is it relevant?

MR. CHANG:  Can Mr. Fondo direct me to what testimony he's referring to?  I don't have that.

MR. FONDO:  The testimony generally was in the context of, like, China has issued a new plan in 2025, for example, or

2024, talking about -- yeah.  So this is from page 188 of the transcript [as read]:

> "From early reporting inside of China about what's going to be in the 2025 -- excuse me, in the 15th five-year plan, China seems to be doubling down on those themes."

And so that postdates the events.

THE COURT:  Yeah, I think that sounds right.  I'm not sure why that would be relevant to Mr. Ding's knowledge or intent.

MR. CHANG:  What page are you referencing?

MR. FONDO:  188, lines 6 through 8, of his transcript.

MR. CHANG:  Yeah.  We can focus on the plans that are referenced in the defendant's documents.

MR. FONDO:  Likewise, Your Honor, there's another reference a few lines down, 15 through 18, about the 2005 domestic market, how large it's going to be.

(Reporter interrupts to clarify the record.)

MR. FONDO:  Sorry.  2025.  Thank you.

THE COURT:  Yeah, I think that's right.  Those references should be excluded.

MR. CHANG:  The second reference -- I just want to make sure the record's clear.  So the second reference -- we agree on the first one because there's going to be a new five-year plan -- or there was a new five-year plan last year,

2025, so we won't reference that in Dr. Segal's testimony.

The second reference, as I can see it in the transcript, relates to goals laid out in the 2017 plan, the 2017 State Council New Generation Artificial Intelligence Plan, which is specifically cited in the defendant's documents.

**THE COURT:** The goal for what market share should be by 2025?

**MR. CHANG:** Exactly.

**THE COURT:** If that's the case, then that's fine.

**MR. CHANG:** Yeah.

**MR. FONDO:** Your Honor, counsel is correct about that reference, so I apologize.  So --

**THE COURT:** Okay.  All right.  Sounds like we have a meeting of the minds.

**MR. FONDO:** Thank you, Your Honor.

**MR. CHANG:** We do, Your Honor.

**THE COURT:** Do you need to instruct the witness or --

**MR. CHANG:** Will there be a morning break between -- the two first witnesses -- we have two additional witnesses before Dr. Segal.

**THE COURT:** Oh, I didn't realize that.

**MR. CHANG:** And then I will --

**THE COURT:** Okay.

**MR. CHANG:** I assume we'll have a morning break.  I'll tell him then.

THE COURT:  Absolutely.

MR. CHANG:  All right.  Thank you, Your Honor.

THE COURT:  Who are the two morning witnesses?

MR. CHANG:  Our first two witnesses, Your Honor, will be Yuqing Ren and Mazy Ma.  M-a-z-y, M-a, Ma.

THE COURT:  And who are those people again?

MR. CHANG:  Yuqing is Mr. Ding's former intern.

THE COURT:  Uh-huh.

MR. CHANG:  And Mr. Ma is Mr. Ding's former mentor.

THE COURT:  Okay.

(Recess taken at 9:33 a.m.)

(Proceedings resumed at 9:35 a.m.)

(Proceedings were heard in  the presence of the jury.)

THE COURT:  Okay.  Welcome back, everyone.

The Government can call its next witness.

MR. CHANG:  The United States calls Yuqing Ren.

(Witness enters the courtroom and steps forward to be sworn.)

THE COURTROOM DEPUTY:  Please raise your right hand.

**YUQING REN**,

called as a witness for the Government, having been duly sworn, testified as follows:

THE WITNESS:  Yes.

THE COURTROOM DEPUTY:  Thank you.

Please state and spell your full name for the record. You can sit.

**THE WITNESS:**  Oh, sorry.  Yuqing, Yuqing Ren.  My last name is Ren.

**THE COURTROOM DEPUTY:**  Spell it, please.

**THE WITNESS:**  The first name is Y-u-q-i-n-g, and the last name is R-e-n.

### DIRECT EXAMINATION

BY MR. CHANG:

Q.   Good morning, Ms. Ren.  Thank you for being here.

A.   Thank you.

Q.   Can you tell the members of the jury where you went to school?

A.   I went to CMU in August 2021.

Q.   Can you repeat that answer for the benefit of the court reporter?  Thank you.

A.   Carnegie-Mellon University in 2021, August.

Q.   Can you put the microphone a little bit closer?  Sorry, Ms. Ren.  We have a court reporter here.  Thank you.

     What degree did you receive at Carnegie-Mellon University?

A.   Master of computer science, engineering.

Q.   You said you graduated in 2021?

A.   Oh, sorry.  I entered the university in 2021 and graduated in 2022, December.

Q.   Thank you.

     Did you previously work at Google?

A.   Yes.

**Q.**   Can you tell us what you did for work at Google?

**A.**   The project is about matrix --

(Reporter interrupts to clarify the record.)

**THE WITNESS:**  The project.  Yeah, the project is about matrix collection pipeline.  It was my internship project.

And after I returned to work, my main work is to onboard GPU and maintain the system's stability.

**BY MR. CHANG:**

**Q.**   What was your job title at Google?

**A.**   Software engineer.

**Q.**   Was working at Google your first job after graduating?

**A.**   Yes.

**Q.**   Are you represented by counsel today?

**A.**   Yes.

**Q.**   Let's talk about this case now.

Do you know the defendant Linwei, or Leon, Ding?

**A.**   Yes.

**Q.**   How do you know Mr. Ding?

**A.**   He's my mentor during the internship and the project later after I returned to work.

**Q.**   Let's talk about your internship first.  Was the internship at Google?

**A.**   Yes.

**Q.**   When was that?

**A.**   It's in -- it's from March 2022 to August -- to

August 2022.

Q.   Okay.  How did you first --

A.   Oh, sorry.  It's from May to August.

Q.   2022?

A.   Yes.

Q.   When did you first meet Mr. Ding?

A.   When I started to work as an internship.

Q.   You said you were his intern.  What kind of work were you doing with him?

A.   The matrix collection pipeline.

Q.   Did you also interview with Mr. Ding to get your internship?

A.   Yes.

Q.   When you were interning for him, was he your supervisor?  Was he watching your work or seeing what you were doing?

A.   Yes.

Q.   Okay.  Were you the only intern working with him or were there others?

A.   I'm the only intern in the team.

Q.   After you worked as an intern at Google, did you get an offer to join the company full-time?

A.   Yes.

Q.   What was the position that you were offered full-time?

A.   Software engineer.

Q.   When you became a full-time software engineer, did you

also work with Mr. Ding?

A.    Yes.

Q.    Can you explain the work that you did with him?

A.    To -- he made the design.  I followed the documents.  The main work is to onboard the --

        (Reporter interrupts to clarify the record.)

        **THE WITNESS:**  Yes.  And the main work is to onboard the Nvidia GPU and maintain the whole system.

**BY MR. CHANG:**

Q.    Did you report to him on your work?

A.    He's not my manager.  He's just the direct project leader.

Q.    He was your project leader?

A.    Yes.

Q.    Okay.  Before winter of 2023, how would you describe your relationship with Mr. Ding?

A.    Co-worker.

Q.    Okay.  Did you guys spend any time outside of work?

A.    No.

Q.    Did you guys ever hang out?

A.    No.

Q.    Before winter of 2023, did Mr. Ding ever mention to you that he had started as the chief technology officer at another company?

A.    No.

Q.    Did he ever mention that he had started an artificial

intelligence start-up?

A.   No.

Q.   At some point in late 2023, did Mr. Ding give you his Google security badge?

A.   Yes.

Q.   Tell the members of the jury about that conversation.

A.   He came to my desk and asked me to help him badge, because we just have the return-to-office policy and he preferred to work from home.

Q.   Did he tell you about whether he had asked his manager Yihua about giving you his badge?

A.   Yes.  He said Yihua knew about it.

Q.   Did he tell you anything else?

A.   No.

Q.   When Mr. Ding gave you his badge, did you think he was trying to get you in trouble?

A.   No.

Q.   When he gave you his badge, did you think it was a big deal at the time?

A.   No.

Q.   Okay.  Did Mr. Ding give you instructions on how often to swipe the badge?

A.   No.

Q.   And when he gave you that badge, did he tell you he was going to China to raise money for an AI start-up he had

started?

A.    No.

Q.    Okay.  So you have Mr. Ding's badge.  Did you end up using it in the late 2023 time period?

A.    Yes.

Q.    Did you tell anyone else about the badge?

A.    No.

Q.    Approximately how many times did you use Mr. Ding's badge?

A.    Maybe five or six times.

Q.    I'm going to show you a video now that we've watched together before, Ms. Ren.

        MR. CHANG:  Ms. Hernandez, if you could pull up Exhibit 18.

BY MR. CHANG:

Q.    Ms. Ren, if you could watch the video in front of you.

            (Video was played but not reported.)

        MR. CHANG:  You can stop, Ms. Hernandez.

BY MR. CHANG:

Q.    Ms. Ren, is that you in the video?

A.    Yes.

Q.    Okay.  You have the badge.  Did you ever give the badge to someone else to use?

A.    I handed it to my friend guest to badge once.

Q.    Okay.  At some point in late 2023, did you give the badge back to Mr. Ding?

**A.**   Yes.

**Q.**   Tell us about that conversation.

**A.**   It was after a team building, an off-site team event, and we returned to the office.  After we returned to the office, I gave his badge back, and he said "Thank you."

**Q.**   Did he tell you that he was in China raising money for his AI start-up?

**A.**   No.

       **MS. LOWRY:**  Objection, Your Honor.  Leading the witness.

       **THE COURT:**  Overruled.

**BY MR. CHANG:**

**Q.**   Did anything happen to you because you used Mr. Ding's badge for him?

**A.**   Sorry?

**Q.**   Did anything happen to you at Google because you used Mr. Ding's badge for him?

**A.**   Yes.  After around a month, my computer was locked up -- or locked down.

**Q.**   Did Google's investigations team talk to you at some point?

**A.**   Yes.

**Q.**   What happened because of that?

**A.**   He -- he tell me why my computer was locked down and asked whether I helped Linwei to badge.

**Q.**   And what happened because of that meeting with the investigators?

**A.**   I was let -- I was fired because of that.

**Q.**   After Google's investigations team reached out to you, did you try to reach out to Mr. Ding?

**A.**   Yes.

**Q.**   How did you reach out to him?

**A.**   I texted him and asked what happened and why.

**Q.**   Did he ever respond to you?

**A.**   No.

          **MR. CHANG:**   Thank you.

          No further questions at this time.

          **THE COURT:**   Okay.   Thank you.

          Any cross-examination?

          **MS. LOWRY:**   Yes.   Thank you.

                         **CROSS-EXAMINATION**

**BY MS. LOWRY:**

**Q.**   Good morning, Ms. Ren.   My name is Colette, and I'm an attorney for Mr. Ding.   I just have a few questions for you.

**A.**   Sure.

**Q.**   So starting in the summer of 2023, Google began implementing a return-to-office policy; correct?

**A.**   Yes.

**Q.**   And can you describe that policy a little bit more?

**A.**   I don't remember the exact details, but we need to go back

to the office three times a week.

Q.   And was there a punishment for not complying with that policy?

A.   If we did not badge enough times, our manager or director will receive tons of emails.

Q.   And you swiped Mr. Ding's badge because he asked you to?

A.   Yes.

Q.   And around that time, you were aware that other Google employees were also swiping badges for one another?

A.   I heard about it, but I didn't know who did that.

Q.   Fair to say that because others might have been doing it and you had heard about it, you didn't think it was necessarily a big deal when Mr. Ding asked you?

A.   Yes.

Q.   And as you said earlier, you, in fact, gave Mr. Ding's badge to another person to swipe as well; correct?

A.   Yes.

Q.   And you did that on your own?

A.   Yes.

Q.   Mr. Ding didn't ask you to do that?

A.   No.

        MS. LOWRY:   Thank you.

        Nothing further.

        THE COURT:   Okay.

        MR. CHANG:   No questions, Your Honor.

THE COURT:  All right.  Thank you.  You can step down.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  And the Government can call its next witness.

MR. CHANG:  The United States calls Mazy Ma.

(Witness enters the courtroom and steps forward to be sworn.)

THE COURT:  You can go ahead and have a seat.

THE COURTROOM DEPUTY:  Please raise your right hand.

**ZHIYAO "MAZY" MA**,

called as a witness for the Government, having been duly sworn, testified as follows:

THE WITNESS:  Yes, I do.

THE COURTROOM DEPUTY:  Thank you.

Please state and spell your full name for the record.

THE WITNESS:  My name is Zhiyao Ma or also, like, Mazy.  That's the name I use at work.

THE COURTROOM DEPUTY:  Can you speak into the mic, please?

THE WITNESS:  Oh, yeah.

So my legal name is Zhiyao Ma, and I also known as Mazy.

THE COURT:  How do you spell your name?

THE WITNESS:  Z-h-i-y-a-o.  Last name Ma, M-a.

THE COURT:  Thank you.

You don't need to keep your hand up.

THE WITNESS:  Okay.

### DIRECT EXAMINATION

BY MR. CHANG:

Q.   Thank you for being here, Mr. Ma.  If you don't mind, there's a court reporter here taking down your words.  So if you could --

A.   Oh.

Q.   -- just make sure you, yeah --

A.   Okay.

Q.   -- talk into the microphone.

A.   Can I move the chair a little bit?

Q.   You can totally move the chair, yes.

A.   All right.

Q.   Comfortable?

A.   Yeah.

Q.   Okay.  Good morning.

     Can you provide the members of the jury with an overview of your educational background?

A.   My educational background?

Q.   Yes.

A.   I graduated from Beijing University of Posts and Telecommunications, undergraduate, and then Tsinghua University as my graduate, Ph.D. degree.

Q.   What was your Ph.D. in?

**A.** It's EE, electronic engineering. To be more specific, it's more about, like, cellular network.

**Q.** Again, the microphone.

**A.** Wireless -- wireless communications.

**Q.** You can just move it a little closer, yes. Sorry about that.

**A.** Does this work better now?

**Q.** Much better.

**A.** Okay.

**Q.** Thank you. Thank you.

Okay. Can you repeat your answer again, just to make sure the jury heard it?

**A.** Sure.

**Q.** What did you receive your Ph.D. in Tsinghua from?

**A.** Okay. So just to repeat, I -- my undergraduate was from 2000-2004 from Beijing University of Posts and Telecommunications, or known as BUPT. And my graduate is from 2004 to 2009 from Tsinghua University, Ph.D. degree. And my major is wireless communications.

**Q.** Where do you currently work?

**A.** I'm working at Google right now.

**Q.** How long have you been at the company?

**A.** I joined September 2019, so it has been over six years.

**Q.** What is your job at Google?

**A.** I'm currently a senior engineering manager, working at

Google Shopping.  So I have been working on multiple different teams, but I've been the engineering manager, managing a couple of teams that are responsible for acquiring and process and serve some merchant signals and then that will enhance the shopping experience for shoppers who search on Google for shopping.

**Q.**    Do you work on Google's TPUs at all?

**A.**    No, not at all.

**Q.**    Google's GPUs?

**A.**    No.

**Q.**    Do you work on anything related to Google's AI supercomputers?

**A.**    So how it works is because gen AI, generative AI, is becoming a very popular area, so I think all teams in Google are leveraging Gemini.  Gemini is basically the gen AI solution of Google to -- basically to power their products.

And for my team, I use gen AI to extract signals, basically, from -- in the merchant app side, more for crawling.

But just to be clear, this is to use the Gemini models, like many teams are doing, but I don't kind of involve into any development of the model or anything.  So...

**Q.**    You use Gemini; you don't develop it?

**A.**    Use the model, yeah.

**Q.**    Do you know the defendant Linwei, or Leon, Ding?

**A.**    I do.

**Q.**   How do you know Mr. Ding?

**A.**   Okay.  So in 2020, I actually sign up a program called G Mentor.  So it's a Google program where I wanted to become a mentor to help, basically, mentees to -- for a few different things, whatever they want.

But, so how it works is I -- on the platform, I identify, saying, like, okay, I can be helpful in terms of their career development or communications, leadership, you know, a few tasks, basic skills that if they're interested.  And then I say I have -- I can, you know, hold up to three mentees.

And then for people who want to find a mentor, they go to same platform, and then they use the -- the -- you know, the keywords to search and then find, you know, a list of maybe mentors and then pick one.

After that, I get notification saying, "Hey, someone pick you as a mentor and you guys should start chat."  And that's how I was kind of notified, saying, like, Leon Ding and then two others, actually, at the moment -- because I sign up for three -- wanted to become my mentee.  So that's where we started kind of the mentorship program.

So it's from second half of 2020 through 2023 where we had roughly -- we meet -- we met roughly, like, once every two to three months; and then we have -- we had oral about roughly a dozen times that we meet, have the mentorship sessions.  That's how I know Mr. Ding.

**Q.**   I'd like to make sure we break down your answer --

**A.**   Oh, yeah.  Sure.

**Q.**   -- because you mentioned a lot there.

You said you signed up for a program called Google Mentor?

**A.**   Yeah, or G Mentor.

**Q.**   And Mr. Ding became one of your mentees?

**A.**   Yes.

**Q.**   And then you became his mentor?

**A.**   Yes.

**Q.**   How many times did you meet with Mr. Ding as his mentor?

**A.**   Yeah.  I think roughly a dozen times across three years, from the second half of 2020 until 2023.

**Q.**   Were those meetings in person or via video or phone call?

**A.**   They were over the -- virtual meetings, what we call the GVC.  And that was during pandemic, so I think people were mostly working from home.

**Q.**   Did you also meet with him once in person?

**A.**   I actually do.  So that was the second-from-the-last in 2023 where Ding said, "Hey, you know, we have met a few times" -- I mean, "We have chatted a few times.  We haven't met in person.  Do you want to have a lunch together?"

I said, "Yeah, sure, let's do that."

And then he came to my office, like the area of my office, and we had a lunch together in the Google cafeteria.

**Q.**   If you could tell the members of the jury about those

mentoring sessions you had with him.  What types of topics did you talk about?

A.   Sure.  So it's about a few topics around, like, career growth, and then I think that started from, like, he said he wanted to change team.  So he was asking me, like, "Hey, you know, what I should look at when I try to look for new team?"  I gave him some advice, I think, after that.  And he said, like, "Hey, how can I get good ratings?"

So, and then also I think he asked, like, how to improve, like, communication skills and then how to get promotion.  I think it's around that.

Q.   Did he ever mention to you that he had started working as the chief technology officer of another company?

A.   No.

MS. KRSULICH:  Objection.  Leading.

THE COURT:  Overruled.

BY MR. CHANG:

Q.   Did Mr. Ding ever mention that he had started an artificial intelligence start-up as the co-founder and CEO?

A.   Nope.

Q.   Other than these mentoring sessions that you just explained for us, did the two of you work together at work?

A.   Nope.

Q.   What about hanging out outside of work?

A.   No.

**Q.**   Did you ever do that?

**A.**   No.

**Q.**   I'd like to show you a couple of documents now.

          **MR. CHANG:**  Ms. Hernandez, if you could please pull up Exhibit 1025.  It's in evidence.

**BY MR. CHANG:**

**Q.**   Okay.  Mr. Ma, this document is in evidence.  It's in front of you.

          **MR. CHANG:**  Ms. Hernandez, can you please go to the last paragraph of page 2 of Exhibit 1025 and highlight that. Or page 3.  My apologies.

**BY MR. CHANG:**

**Q.**   Mr. Ma, is that your name there?

**A.**   Yeah.  I see the initial, initial of my first name and then my last name.

**Q.**   Before you met with the Government, had you ever seen this document before in your life?

**A.**   No.

**Q.**   Okay.  Is the information in this document correct about you?

**A.**   So it looks similar, but not 100 percent matching.

**Q.**   Can you --

**A.**   I --

**Q.**   -- explain what's correct and what's not?

          Sorry for interrupting you.

**A.**    Sure.  So I did not graduate from CMU.  I never worked at Alibaba or Amazon.  And I do -- I did, like, work in Meta and I'm now working in Google, so that part is correct.

I do have about roughly 20 years of working experience at this point, but I don't know what -- you know, the year of -- I mean, at this moment, I think I have roughly 20 years.

And then, so Google Shopping is not part of Google Search. It's two separate orgs, or we call it PA, product areas; but I -- but the work we are doing do help Google Search experience.

And then the rest of the, I think the statement are pretty similar.  Like, I do responsible for Google Shopping applications, systems.  And then I do have experience in, like, full-stack development, both clients and servers.  Yeah, I think things about that are -- are matching my background, I think.

**Q.**    Would it be fair to say that some of this information is correct?

**A.**    Yes.

**Q.**    And then some is incorrect?

**A.**    Yes.

**Q.**    Did Mr. Ding ever ask for your permission to put your name on a document?

**A.**    No.

**Q.**    Did he ever tell you that he was listing you as an

employee for his AI start-up Zhisuan?

**A.**   No.

          **MR. CHANG:**  All right.  Let's turn to Exhibit 1137, Ms. Hernandez.

          If you could go to the bottom of page 2 and highlight the "Core technical team."  This document's already in evidence.

**BY MR. CHANG:**

**Q.**   Mr. Ma, do you see your name on the bottom right-hand corner of that document?

**A.**   Yes.  My initial first name and last name.

**Q.**   Okay.  Same questions as before.  Did you give Mr. Ding permission to put your name on a document for his start-up Zhisuan?

**A.**   Nope.

**Q.**   Before meeting with the Government, had you ever seen this document before?

**A.**   Nope.

**Q.**   Did he ever reach out to you and ask for your permission to put your name on the document?

**A.**   No.

          **MR. CHANG:**  Thank you.

          No further questions.

          **THE COURT:**  Any cross?

          **MS. KRSULICH:**  Briefly.

**CROSS-EXAMINATION**

**BY MS. KRSULICH:**

**Q.**   Good morning, Mr. Ma.

**A.**   Good morning.

**Q.**   My name is Lora Krsulich.  I represent Mr. Ding.

Your name is Zhiyao Ma?

**A.**   Yes.

**Q.**   You also go by Mazy?

**A.**   Yes.

**Q.**   Did you know Mr. Ding as Linwei or Leon?

**A.**   Leon.

**Q.**   It is not uncommon for people with non-English names to use an English name; correct?

**A.**   Yeah, that's true.

**Q.**   In your experience, why do people with non-English names use English names?

**A.**   I don't know.  I mean, I cannot represent, like, other people; but they may have their preference or they like certain English.  I don't know.  I just have to guess.  And there were some cases, maybe probably the English is easier to pronounce. Yeah, probably easier for the colleagues to remember names or pronounce their names, I guess.

**Q.**   In 2003 -- 2023, you were a senior engineering manager at Google?

**A.**   Yes.  I was engineering manager at Google, yes.

**Q.** You were at a higher level at Google than Mr. Ding?

**A.** Yes.

**Q.** And participation in the mentoring program was optional; right?

**A.** Yes.

**Q.** You had a typical mentor-mentee relationship with Mr. Ding?

**A.** Can you define "typical"?

**Q.** Sure. You had a reasonably good relationship with him over the three years that you were his mentor?

**A.** Yeah, I think so.

**Q.** Okay. And your last meeting with Mr. Ding was on October 27th, 2023?

**A.** I don't exact -- know the exact date, but -- I have to look it up, but sounds about right. I think around that time probably.

**Q.** And Mr. Ding told you at that time that he intended to leave Google?

**A.** Yes, he did.

**Q.** He also mentioned his plan for a start-up to you?

**A.** No, he didn't. So I -- or I just, I don't have that in my memory; but I think he mentioned, saying, "Hey, you know, thanks for the mentorship over, you know, the last three years and it's really helpful, and then now I'm leaving Google and then doing start-ups."

So I don't recall exactly what he said, was, like, you know, building up his own start-up or working in a start-up, something.  But I think he mentioned the term "start-up."  So he was -- but I don't remember, like, the details, mm-hmm.

MS. KRSULICH:  Thank you, Mr. Ma.

No further questions.

THE COURT:  Any redirect?

MR. CHANG:  No redirect, Your Honor.

THE COURT:  Okay.  Thank you.  You can step down.

THE WITNESS:  Okay.

(Witness excused.)

THE COURT:  And the Government can call its next witness.

MR. CHANG:  Your Honor, can I get one minute to confer with the witness on an issue --

THE COURT:  Sure.

MR. CHANG:  -- we discussed?

THE COURT:  Meanwhile, Bhavna, why don't you pull the microphone back a little bit so that doesn't happen when the next witness sits down.

(Witness enters the courtroom and steps forward to be sworn.)

THE COURT:  Go ahead and have a seat.

THE WITNESS:  Please raise your right hand.

\\\

**ADAM M. SEGAL**,

called as a witness for the Government, having been duly sworn, testified as follows:

**THE WITNESS:**  I do.

**THE COURTROOM DEPUTY:**  Thank you.

Please state and spell your full name for the record.

**THE WITNESS:**  Adam Mitchell Segal, S-e-g-a-l.

**DIRECT EXAMINATION**

BY MR. CHANG:

**Q.**   Good morning, Dr. Segal.

**A.**   Good morning.

**Q.**   Can you provide us with a brief overview of your educational history?

**A.**   Yes.  I have a B.A. in political science from Cornell University, a master's in international affairs from the Fletcher School at Tufts University, and a Ph.D. in political science with a focus on China from Cornell University.

**Q.**   Can you move the mic a little bit closer to you.  We're having some --

**A.**   Sorry.

**Q.**   Perfect.

What was the topic of your dissertation for your Ph.D.?

**A.**   I studied the first generation of Chinese software and computer companies and the support that the Chinese government gave those companies and, in particular, was focused on the use

of high-tech zones to support Chinese technology development.

Q.    When did you receive your Ph.D. from Cornell?

A.    2000.

Q.    As part of your dissertation, was one of the high-tech zones that you did research on related to the city of Shanghai?

A.    Yes.

Q.    Where do you currently work?

A.    The Council on Foreign Relations.

Q.    What is the Council on Foreign Relations?

A.    We are an independent, nonpartisan foreign policy think tank.  So we take no U.S. government money or foreign government money, and we take no official positions.

Q.    If I use the acronym CFR to refer to the Council, will you understand me?

A.    Yes.

Q.    What is your current position at CFR?

A.    I'm the Ira A. Lipman Chair in Emerging Technologies and National Security, and I direct our digital and cyberspace policy program.

Q.    How long have you worked at CFR?

A.    Except for a 14-month stint in the State Department, since 2001.

Q.    You just mentioned a 14-month stint at the State Department.  What was your job there?

A.    I was a senior advisor in the bureau's cyber and digital

policy department.

**Q.** That sounds like a lot. What does that actually mean? What were you doing there?

**A.** My main job, my only job was to write the 2024 international strategy for cyberspace and digital policy.

**Q.** Were you the primary drafter of that document?

**A.** I was.

**Q.** What was it?

**A.** It essentially lays out the U.S. government's policy towards cyberspace, cyber operations, how we should talk to our friends and potential adversaries about these issues, as well as issues around digital trade and Internet freedom.

**Q.** Did the policy address issues related to the People's Republic of China?

**A.** Yes.

**Q.** Let's turn back to your day job at CFR. Can you explain to the jury what you do on a day-to-day?

**A.** It's like being a professor but without the students and all of the meetings. So, essentially, I write about issues that touch on U.S. foreign policy; I speak publicly; I talk to the press; and I consult and talk to U.S. government officials.

**Q.** Is there a particular area of research that you focus on at CFR?

**A.** I focus primarily on cybersecurity, Chinese behavior in cyberspace, Chinese technology development, and then U.S.-China

relations around those two issues.

Q.   Have you been working and researching these issues for the last 30 years?

A.   Yes.

Q.   How do you conduct research at CFR?

A.   So I do what I would call qualitative work.  I look at Chinese sources on the Web.  I read Chinese press reports.  I look at Chinese government documents.  Before COVID, I would travel to China twice a year to do interviews with Chinese officials.  I talk to U.S. officials, and I read other scholars' work.

Q.   Is understanding the relationship between the government of the People's Republic of China and entities an important part of your qualitative research?

A.   Yes.  It's a central part of my research, trying to understand the relationship between Chinese government policies and private companies, research institutes, universities inside of China.  And the focus of my next book is on the role of the private sector in the U.S. and China in U.S.-China technology competition.

Q.   If I use the term "PRC" to refer to the People's Republic of China, will you understand me?

A.   Yes.

Q.   Do you currently hold any teaching positions, Dr. Segal?

A.   Yes.

Q.    Can you explain that?

A.    Yes.  Sorry.  I am an adjunct professor at the School of International and Public Affairs at Columbia University.

Q.    Have you ever held any visiting scholar positions?

A.    Yes.  I'm currently affiliated with Stanford University, and in the past, I was a visiting scholar at MIT and, in China, at the Shanghai Academy of Social Sciences and with Tsinghua University, which is considered China's MIT.

Q.    Have you written any books related to PRC technology policy and cyber-strategy issues?

A.    I've written three books.

Q.    Can you describe them at a high level?

A.    Yes.  My first book, called *Digital Dragon*, came out of my dissertation.  So it looked at the support that four Chinese cities gave to Chinese tech companies.

My second book was called *Advantage:  How American Innovation Can Overcome the Asian Challenge*.  So it looked at science and technology policy in China, India, South Korea, and Japan.

And my most recent book was called *The Hacked World Order*.  So it looks at global cyber and digital policies.

Q.    Have you written any articles on technology and cybersecurity issues related to the PRC?

A.    I've written in the tens of articles on Chinese technology policy.

**Q.**   What kind of publications do they appear in?

**A.**   *Foreign Policy*, *Foreign Affairs*, *China Leadership Monitor*, numerous edited volumes.

And then for the popular press, *The New York Times*, the *Washington Post*, *The Wall Street Journal*, and *Financial Times*.

**Q.**   Have you ever testified to Congress regarding technology in the PRC?

**A.**   Yes.  Six times.

**Q.**   Have you ever briefed any U.S. governmental agencies regarding Chinese cyberspace policy and technology issues?

**A.**   Yes.  The State Department, the Department of Commerce, the Department of Defense, Central Intelligence Agency, the National Security Agency, and then various staffers for congressional and Senate committees.

**Q.**   As part of your CFR job, do you also on occasion meet with Chinese government officials on technology and cybersecurity issues?

**A.**   I do.  Chinese officials often stop by CFR on their visits to the United States.

**Q.**   Were you recently in Beijing, meeting with Chinese government officials?

**A.**   I was in China in November for the first time since before COVID, and I met with officials from the Ministry of Foreign Affairs and the National Development Research Council.

**Q.**   Do you have any foreign language skills that assist you

with your research and experience?

**A.**   I read and speak Mandarin, although it's pretty rusty these days, given the inability to travel to China.

MR. CHANG:   Your Honor, the Government moves to qualify Dr. Adam Segal as an expert witness on PRC technology, policy, and cybersecurity, including governmental entities.

MR. FONDO:   Your Honor, generally, we do not object. I don't think the cybersecurity portion is relevant.

THE COURT:   Well, I think it's probably true that the cybersecurity portion is not relevant; but otherwise, he's -- but he's, nonetheless, qualified to testify about that to the extent it's relevant.

MR. FONDO:   Thank you, Your Honor.

MR. CHANG:   Thank you, Your Honor.

BY MR. CHANG:

**Q.**   All right.  Let's turn now to this case.

Have you been hired by the United States as an expert witness in this matter?

**A.**   Yes.

**Q.**   Have you been retained previously by the Government in any other economic espionage cases?

**A.**   Three other cases.

**Q.**   The most recent time that you testified as an expert witness in an economic espionage case, was it in this courtroom -- or courthouse?

**A.**   Yes.

**Q.**   What -- generally, what kinds of topics have you been asked to provide expert opinions on?

**A.**   Similar to as in this case, I've been asked to talk about Chinese technology policies and how they support China's development goals; I've been asked to speak about why China is interested in developing specific types of technologies; and I've been asked to talk about the relationship of specific entities in China to the Chinese government.

**Q.**   What is your hourly rate in this matter?

**A.**   $650.

**Q.**   Let's turn now to your testimony in this case, Dr. Segal.

Have you prepared a demonstrative to assist with your testimony today?

**A.**   Yes.

        **MR. CHANG:**   Ms. Hernandez, if you could please pull up Demonstrative Number 8.

**BY MR. CHANG:**

**Q.**   Dr. Segal, is this the demonstrative that you prepared for today's testimony?

**A.**   Right now it's just the front slide, but I'm going to say yes.

        **MR. CHANG:**   Ms. Hernandez, can you turn to the next slide of the demonstrative.

\\\

**BY MR. CHANG:**

**Q.**   Do you see that in front of you?

**A.**   Yes.

**Q.**   Okay.  Dr. Segal, what is this?

**A.**   It is an administrative political map of the People's Republic of China.

**Q.**   Let's talk a little bit about geography to orient everyone.

Can you explain, at a high level, how the PRC is governed administratively?

**A.**   So at the center is the central government, like the United States central government, federal government located in Washington.  So the central government is located in Beijing in China.

And then underneath the central government are what are called 22 provinces, which are similar to states in the United States, and five autonomous regions, which are essentially also like states.

**Q.**   I notice in the demonstrative you prepared that you listed some provincial-level municipalities.  Can you explain what that is?

**A.**   Yes.  So there are four cities -- Beijing, Shanghai, Tianjin, and Chongqing -- that are in red on the map that are essentially treated like states, like provinces, because they're so big and so important to Chinese economic and

political development.

So, for example, Chongqing is an urban center of about 30 million people.  Beijing and Tianjin and Shanghai are between 10 and 20 million people.

MR. CHANG:  For demonstrative purposes, Ms. Hernandez, can you please highlight Beijing, Shanghai, and Chongqing. They're all in red.

Or you can -- actually, go back, and we'll have Dr. Segal highlight it because he has a touch screen in front of him.

THE COURTROOM DEPUTY:  I don't think it works.

MR. CHANG:  It's not working?  Okay.

BY MR. CHANG:

Q.   Can you just point, then, to generally where these -- these --

THE COURT:  They're in red.

THE WITNESS:  They're in red.

BY MR. CHANG:

Q.   They're in red.

A.   They're in red.

Q.   Got it.  Okay.  So much for the graphics.

All right.  And then out of the provinces, was there one in particular that you focused on as part of your expert work in this case?

A.   Sichuan Province.

**Q.**    And where is that located geographically?

**A.**    It's basically right in the middle of China there.  You can see it to the left of the red of Chongqing.

**Q.**    I notice in the right side of the graphic, you have the central PRC governmental agencies with an arrow pointing down to the provinces and the municipalities.  Can you explain why you did that?

**A.**    Because the central government in China essentially dictates what everybody else does.  So unlike in the United States where, you know, states might have a Democratic or a Republican governor compared to a Democratic or Republican president, a province's mission and responsibility is to do what the central government tells them.

And that is true for the municipalities, the cities as well.  They are under the control of the administrations on top of them.

Also, it gives you an idea about how you move up in the Chinese system, the promotion system.  So, essentially, what happens is you get promoted based on how well you do at a specific level.  So if you do very well as a mayor, then you'll get picked to be at the provincial level.  If you do very well at the provincial level, you then go to Beijing.

So China's current leader, Xi Jinping, started off in Hubei Province, moved to a different province called Fujian, went to Shanghai, and then eventually to Beijing.

**Q.**   Let's move on to the next slide in your demonstrative, Dr. Segal.

           **MR. CHANG:**  Ms. Hernandez, yes, thank you.

**BY MR. CHANG:**

**Q.**   What does this slide convey, at a high level?

**A.**   This is the government structure of the People's Republic of China.

**Q.**   Let's walk through the three different branches, so to speak.

      At a high level, can you explain how the PRC government works?

**A.**   Yes, so the People's Republic of China is a one-party state run by the Chinese Communist Party.  So, essentially, the Chinese Constitution says that the Chinese Communist Party is the most powerful and the only legitimate authority in China. It, in fact, says that it has authorities over the state, so there can be no conflict between what the party wants and what the state does.

      And so this demonstrative is showing us that the party is basically central and controls the other two branches.

**Q.**   Let's start with the party, then.  How does the Chinese Communist Party work from a governance and organization perspective?

**A.**   So at the top is Xi Jinping, who I mentioned earlier.  He is the head of the party, and he is the most powerful leader in

China right now.

Directly below him is what's called the Politburo Standing Committee, and those seven members basically make up the most important decisions in China and staff the most important government agencies. So you can see on the right there in the second box, there's a premier, Li Qiang. He's Number 2 on the Politburo Standing Committee.

Then we have below a number of other important groups that govern China and help select the leaders. So as I described before, essentially, what the party is doing is picking leaders and promoting them up through the system and supervising and inspecting and sometimes removing them for corruption or other reasons.

Q. I notice that in this demonstrative, you also have the same arrow structure pointing down from the center for the party. Can you explain that?

A. Yes. So, again, it's the people above you, the party structure that's on top of it that is maintaining control, removes people, assigns people, and determines their careers.

Q. Let's talk about the branch to the right, the "Government" branch. Can you explain how the government works in the PRC?

A. Yeah. The government is, you know, similar to a government in any other country. It has all of the ministries and agencies that you would find anywhere. So at the top, again, Xi Jinping is dual-hatted, so he's both head of the

party and head of the state, so he's president of China.

Below him, Li Qiang is premier, which is equivalent to a prime minister, and he's in charge of all of the agencies that actually implement policy inside of China.

And below that is the State Council.

Q.   We are going to spend some time talking about the State Council today.  What is that?

A.   The State Council is kind of like the cabinet in the United States.  It's where all of the most important agencies come together; so, for example, the Ministry of Commerce, which covers business and trade issues; the Foreign Ministry, which is like the State Department; the Cyberspace Administration of China, which deals with the Internet; the Ministry of Information and -- excuse me -- the Ministry of Industry and Information Technologies.  So all of those agencies are part of the State Council and come up with policies and plans that reflect State Council development issues.

Q.   Are you familiar with the term "party state" when referring to the PRC?

A.   Yes.  So party state captures that idea I was talking about earlier, which is that there's a huge amount of overlap between government officials and party officials.  At this level that we're talking about, no one is going to be in the government and not also be a member of the Chinese Communist Party.  And the party, essentially, as I said before,

is the most powerful force and controls the government agencies.

Q.   Would you characterize the government in the PRC as one with a high or low degree of centralized control?

A.   It has a high degree of centralized control and direction. And then it is incumbent on everyone below the center, the provinces and the cities, to interpret those policies and implement them.

Q.   Let's say the State Council issues a plan.  Is that something that provincial or municipal government officials could disobey or disagree with?

A.   No.

Q.   Why not?

A.   They have to, under the structure, follow all of the policies and plans.  Their -- as I mentioned before, promotion is based on how successfully you implement those policies and how well you demonstrate you follow through on them.

Q.   Let's talk about the last branch in your demonstrative, the legislature.  How does that work in the PRC?

A.   It essentially is a rubber stamp, so it approves of everything that the party and the government gives it.  For example, the last fifth-year plan, the legislature approves; but historically, it has approved these things in the high 98, 99th percentiles.

Q.   Let's turn now to the PRC economy.  At a high level, can

you describe how the PRC economy works?

A.   Yes.   The Chinese themselves describe the economy as a socialist market economy.

Q.   Let's break down that term.   Can you explain the socialist component of it?

A.   So a socialist in the Chinese context means state ownership.   So there are still parts of the Chinese economy that are owned by the state, managed by the state.   We have state-owned enterprises.   Decisions are made by the state.

Also, highly reliant on government policy.   So the policies tell the provinces, the state-owned enterprises what they have to do and how they're going to do it and where government money is going to be invested.

Q.   Let's talk about the second part of that term, the "market" part.   Can you explain that for the jury?

A.   Yeah.   So socialism made China poor for the first 30 years of its -- after independence, establishment of the People's Republic of China.   So in 1978, when China began a reform process and opening up to the rest of the world, it started allowing more and more market pressures, more private capital.

So it started off with allowing farmers to have their own plots, and then that grew into allowing to have private companies and private enterprises.   And that now is the most important part of the Chinese economy.   It provides most of the growth, most of the employment, and most of the important

technological innovation.

Q.   How does that differ from the United States?

A.   We are a capitalist economy.  We don't have state-owned enterprises.  Government issues policies about development, but those don't tell specific firms what to do or states what to do.  We try to move private sector through things like tax breaks and R&D, research and development subsidies; and, you know, states can choose to participate or not.  There may be political costs, but they don't have to do it.

Q.   What is the role of the PRC government in the PRC economy?

A.   So it essentially sets the direction and highlights the areas that it thinks it's most important to develop.

Q.   How does it do that?

A.   Mainly through a document called the five-year plan.

Q.   What is a five-year plan?

A.   Five-year plans, not surprisingly, come out every five years.  They set the high-level goals for the Chinese economy, the Chinese society, Chinese polity.

They tend to be around 65 to 80 pages.  They're at a fairly high level of abstraction.  But the responsibility of the State Council and others is to fill in the details after the policies came out.

But, for example, the 14th five-year plan is the one we just finished in 2025, sets as an important --

MR. FONDO:  Objection, Your Honor.

**THE COURT:**  Overruled.

**THE WITNESS:**  -- sets as an important goal that China should be working towards self-reliance and autonomy in technology.

**BY MR. CHANG:**

**Q.**  Which -- looking at your demonstrative, which of these entities issues or sends out the five-year plan?

**A.**  The party -- so in the middle -- writes and issues the five-year plan.  The legislature approves it, so the National People's Congress.  And then the State Council, the provincial governments, the municipal governments are responsible for coming up with follow-up plans to implement it.

**Q.**  In addition to the five-year plan that you just described, does the State Council also issue separate plans on specific areas of the economy?

**A.**  Yes.  The State Council will issue follow-up plans and specific technology plans, given Chinese leader's focus on specific technologies.  So artificial intelligence, electric vehicles, solar, all of those areas would be places where the State Council would issue follow-up policies.

**Q.**  You mentioned state-owned enterprises earlier.  Can you explain what those are in more detail?

**A.**  Yes.  So there are about 95 state-owned enterprises at the national level; so these are companies that are owned by the Chinese government, by the Chinese state.  They've tended

historically to be in, like, big industrial sectors like steel or aviation, but that has slightly changed over time.

But the important point is that they're owned by the state. The decisions on their management are all made by what's called the State Asset Supervision and Administration Commission, which is part of the State Council. They appoint the managers. They approve things like mergers and acquisitions.

Q. Okay. Let's turn now to the concept of high-tech zones, which you mentioned you did your dissertation on. What are those?

A. In the 1980s and '90s, the Chinese became worried that they were going to miss the next wave of technological revolution. So the '80s was the beginning of the Information Technology Revolution. And they saw what was happening in Silicon Valley and places like Route 128 around Boston, so they sent delegations to come study it and learn from it. And then they went back to China to try to recreate what they saw in Silicon Valley.

And the lesson that they learned, what they, you know, saw was happening in the Bay was that you need to have universities, venture capital, and start-up companies all located together; right? The closeness on geography was extremely important for the flow of ideas and exchange of -- flow of people and having meetings so you can invest. And so

they created high-tech zones to try and do this through policy, basically to tell universities to locate there, to have companies locate there.

Q.   Approximately how many high-tech zones are there in the PRC today?

A.   I don't -- I don't know.  Probably every province has several.  Every municipality probably has a couple.  It's a reflection of, once China decided to do something, that every province decided, "Oh, we're going to follow through," even if there was no technology there.

Q.   Are there certain types of high-tech zones that focus on specific technologies?

A.   Yes.

Q.   Are there ones focused on artificial intelligence, for example?

A.   Yes.

Q.   Okay.  You mentioned that high-tech zones have three components, and one of them that you mentioned was universities.

     Can you explain how universities work in high-tech zones?

A.   So, essentially, they work like they do in the States; right?  The role of the university is to train students, to help design curriculum that would reflect the technologies that they're interested in.  The hope is that, you know, university graduates will then start companies, that some professors will

leave the university and start companies.  And they provide specialized research that would support the focus of that specific high-tech zone.

Q.   Are the universities in the PRC public or private?

A.   Public.

Q.   And how do public universities work in the PRC as opposed to ones here in the United States?

A.   So very top-down.  The Ministry of Education in China supervises all public universities in China.  Every Chinese university will have a party committee on it that is in charge of appointments.  The president of a university will be a Chinese Communist Party member.  And the university's responsibility is, again, to follow the policies and talk about how they're going to support specific technology or industrial goals.

Q.   Are public universities also expected to help implement the five-year plans we have been discussing?

A.   Yes.

        MR. CHANG:  All right.  Ms. Hernandez, if you could take down these slides for now.  We'll turn back to them in a little bit.

BY MR. CHANG:

Q.   Dr. Segal, were you asked to provide several different expert opinions in this case?

A.   Yes.

Q.    Before we get into the specifics of those opinions, can you talk the jury through your process for coming to these opinions?

A.    Yes.  So I am a qualitative researcher.  I don't run numbers or big models or anything like that.  I essentially read Chinese documents.  I read Chinese press reports.  When possible, I do interviews with people that are involved in the decisions to make the policies or to implement the policies.

I look at what we call open source, so anything that's generally available on the Web or publicly published in China, and then look at what other scholars and academics produce in the United States.

Q.    Did you undergo that process for your opinions in this case?

A.    Yes.  Plus the documents that came from the defendant's device.

Q.    In addition to all those sources of information that you just talked about, did you also rely on your 30 years of training and experience in this field?

A.    Yes.

Q.    Okay.  Let's talk through some of these opinions.  First, were you asked to provide an opinion explaining the role of artificial intelligence in the PRC today?

A.    Yes.

Q.    At a high level, can you explain what is the role of

artificial intelligence in the PRC economy and government?

**MR. FONDO:**  Your Honor, objection just as to the time period.

**THE COURT:**  Well, I mean, I think this question is fine; but I think the important thing for everybody to understand is that this testimony is relevant only to the extent that it's describing conditions in China at the time Mr. Ding was engaged in his activities in China.

**MR. CHANG:**  That's correct, Your Honor.

**THE WITNESS:**  So the Chinese leadership has signaled at the highest levels that artificial intelligence is of strategic interest to China's economic, political, and military goals.  There have been numerous speeches from Xi Jinping and other top Chinese leaders about the importance of artificial intelligence and the competition around artificial intelligence.

BY MR. CHANG:

**Q.**  Has the Government mentioned artificial intelligence in any of the plans that we've talked about?

**A.**  So in 2017, the State Council issued what they called the Next Generation Artificial Intelligence Development Plan.

**Q.**  What is that plan?

**A.**  It broadly talks about the goals for AI development inside of China.  So it talks about developing a domestic market of artificial intelligence inside of China that would be worth

$100 billion by 2025, and says that it wants to make China a world leader in artificial intelligence by 2030.  It talks about some specific areas of hardware and software that it thought China needed to develop and, in particular, focused on what they saw as a significant weakness around chips.

Q.   We'll talk about chips more in a little bit.

But other than the 2017 plans, has the Government issued other follow-up plans related to artificial intelligence?

A.   Yes.  There's been, both at the State Council and provincial and municipal level, numerous policies that put more meat on the bones of what the State Council 2017 plan said, including a 2023 plan from the Ministry of Industry and Information Technology and the Cyberspace Administration of China that focused on compute and energy infrastructure.

Q.   What does that 2023 plan talk about?

A.   About the increasing energy demands for building data centers and running models and other types of AI systems, and the need for -- to build those out and support them.

Q.   Okay.  Separately, Dr. Segal, were you asked to provide an opinion on PRC governmental policies related to technology transfer and development?

A.   Yes.

Q.   Can you explain that opinion?

A.   Yes.  So the opinion has two parts, a domestic part and an absorption, attraction part.

The domestic part is that the Chinese, for the last 30 years, have decided that they don't want to be what we all think of them as, the factory to the world; right?  They don't want to continue selling all of the cheap stuff that we all have in our homes.

They want to be able to compete on iPhones and electric vehicles and semiconductor and artificial intelligence.  And the way to do that was to invest a huge amount in science and technology.  So China now spends, second in the world, only second to the United States, in total spending on research and development.

It expanded university education massively, mostly in the science and engineering fields.  It now produces more scientific papers than the rest of the world.  And so -- and then had a number of specific industrial policies around specific technology.

So it just invested a vast amount of resources in making sure that it could be a scientific power.

**Q.**    You mentioned that there's two pieces to those policies, the internal one, which you just described.

What's the external piece of that policy?

**A.**    So the absorption side was, in the '80s and '90s when China was behind in technology, it essentially made a deal with companies that wanted to do business in China, which was, if you want to sell to Chinese consumers, you have to have a

Chinese partner and you have to help that Chinese partner and teach that Chinese partner and have a joint venture with that Chinese partner, which meant that technology would be transferred.  Right?  If you help a Chinese company set up a factory line, they're going to learn how to do things the way that the foreign company did.

And then there was pressure on companies, again, if you wanted to continue selling into the China market, to move research and development that was typically done in the United States or in Europe to China.

And so a lot of those people who were trained, for example, at Microsoft's R&D center went off to found some of the most famous Chinese technology and AI companies.

**Q.**   Earlier you mentioned the concept of chip constraints when you were talking about artificial intelligence plans by the PRC government.  What does that term mean in the context of AI?

**A.**   So China has been trying to develop a semiconductor industry since the 1950s.  It's very hard.  It requires incredible amounts of technological sophistication that very few countries have managed.

And then starting under the first administration of President Trump and then going through President Biden and now continuing with the second administration of President Trump, the United States has issued export controls, essentially told U.S. companies that they cannot sell chips to China, first

for human rights and military reasons, to prevent those chips to go to the Chinese military, and then essentially to slow down China's AI development.

So that means that the chips that are needed to train models and develop models are harder to come by.  And some of the most sophisticated ones are illegal from these -- based on these laws, to get inside of China.  So that is a significant constraint for Chinese developers.

**Q.**   All right.  Next, as part of your work for this case, did you also research the relationship between the PRC government and certain entities in the country?

**A.**   Yes.

**Q.**   The process that you used for this research process, was it similar to the one you've described a couple of times this morning?

**A.**   Yes.

**Q.**   What sources, in particular, did you review and analyze for coming to these next set of opinions?

**A.**   The documents that the Government gave me from the defendant's device; the websites of the entities themselves, how they talked about themselves, how they described themselves; Chinese government documents and policies that referred to the entities; Chinese press reports about the entities.

**Q.**   Did you also rely on your training and experience?

**A.**   Yes.

**Q.**   And the type of materials that you relied on for these opinions, were they typical for the type of research that you've been doing in this field?

**A.**   Yes.

         **MR. CHANG:**  Ms. Hernandez, if you could please pull up Slide 4 of Demonstrative Number 8 for the jury and Dr. Segal. Thank you.

         Let's start with the first bullet point, if we could go back.

         Yeah.  Okay.

**BY MR. CHANG:**

**Q.**   Let's start with the Chongqing Mingyue Lake International Intelligent Industry Science and Technology Innovation Base and Park.  For the benefit of Madam Court Reporter, we'll call that the Industrial Innovation Park.  Is that okay?

**A.**   Yes.

**Q.**   Was this one of the entities that you did some research on?

**A.**   Yes.

**Q.**   Before we get into the specifics, what is the Industrial Innovation Park?

**A.**   It is one of the high-tech zones that we were talking about, focused on intelligent industries, which means digital technologies and artificial intelligence.

**Q.** Where is it located geographically?

**A.** It's outside of Chongqing. So that was the -- in the middle of the country, one of the municipal-level countries we talked about earlier.

**Q.** Based on your research, what were you able to determine about how the Industrial Innovation Park was created?

**A.** The park was created by a -- by the municipality, by Chongqing municipality. It created the park and has an administrative committee that manages the park.

**Q.** Okay. And when you say the "Chongqing municipality," is that the government of Chongqing?

**A.** Yes, the municipal government.

**Q.** Okay. And is that Industrial Innovation Park within any specific area of Chongqing?

**A.** It's in a part of Chongqing that's called the Liangjiang New Industrial Area, which was created by the State Council as part of Chongqing.

**Q.** What is a new area?

**A.** So this area was created in 2010, so this probably was farmland, so before the massive expansion of Chongqing that we've seen over the last 15 years. And the idea was to take that farmland and turn it into a place where factories and high-tech zones and other places would locate.

**Q.** And this Industrial Innovation Park is within this new area?

**A.**   Yes.

**Q.**   Based on your review of the documents and your research, what were you able to determine about the governance structure of the Industrial Innovation Park?

**A.**   It has a management committee that is part of the municipal government.  Officially, it is part of Liangjiang New Industrial Area.

**Q.**   When you say there's a committee that's part of the government, how does that actually work for a high-tech zone?

**A.**   So it set up the zone.  It determines the policies for the zone.  It provided some investment in the zone and basic oversight of the zone.

**Q.**   Is this kind of governance structure by the government, is that unusual for a high-tech zone in the PRC?

**A.**   No.

**Q.**   As far as you're aware, are you aware of a single high-tech zone that's not controlled by the Government?

**A.**   Not that I'm aware of.

**Q.**   Next I want to talk a little bit about how this high-tech zone is structured.

Are there investment funds that are affiliated with the zone?

**A.**   This zone, in particular, had a specialized venture capital fund.

**Q.**    Explain what that is.

**A.**    So a venture capital fund is an investment entity that, you know, looks for early technological -- generally, technological investments that are big bets that could have 10 or 20 or 100 times rewards and often involve kind of a -- more than just the money, has a relationship of trying to instruct the entrepreneurs and help them develop markets.

**Q.**    This venture capital fund that you referenced related to the park, is it controlled by the government or is it a private fund?

**A.**    It's controlled by the government.  This fund is owned by the Liangjiang New Industrial District.

**Q.**    Are there also private venture capital funds in the PRC?

**A.**    Yes.

**Q.**    Explain how those work.

**A.**    They work like they work here.  I mean, actually, many of the private companies in Silicon Valley on Sand Hill Road used to have investment in -- very high investment in China and have branches in China, and there are Chinese companies that operate the same way.

            **MR. FONDO:**  Your Honor, permission to approach?

            **THE COURT:**  Sure.

                (Discussion held at sidebar, not reported.)

            **THE COURT:**  You can proceed.

            **MR. CHANG:**  Thank you, Your Honor.

BY MR. CHANG:

Q.   All right.  We were talking about private venture capital funds.  So, Dr. Segal, are there both public and private investment funds in the PRC?

A.   Yes.

Q.   Are you familiar with a private investment fund by the name of IDG Capital?

A.   Yes.

Q.   Can you describe what that is?

A.   IDG was founded in Boston and then located in China and was an extremely important player for many of the big technology companies in the 2000s and 2000 aughts, like Xiaomi and Qihoo 360 and, I think, Tencent.

Q.   Is it possible for an artificial intelligence to go into China and succeed without interfacing in a meaningful way, a significant way with the Chinese government?

A.   When you're small, but not when you're big.  So you can start off without interface, but once you grow to a certain size and show success, then you're going to attract the attention of the Chinese government.

Q.   Can you elaborate on that?  Can you give an example of an AI start-up in the space that started without support from the government?

A.   A good example would be DeepSeek, which caused a lot of attention in the United States, a lot of headlines because

DeepSeek released a model that seemed to be competitive with, for example, ChatGPT or Claude.  It did it under those conditions of constraint I talked about.  So it didn't have access to all of the high-level chips.  It seemed to do it more cheaply and with less energy.

DeepSeek was started by a hedge fund.  So the head of the hedge fund has an interest in artificial intelligence and so created DeepSeek from his own investments.

Q.   Let's turn back to the demonstrative slide.

MR. CHANG:  Ms. Hernandez, if you could move on to the next bullet point.

BY MR. CHANG:

Q.   Dr. Segal, was the Sichuan Tianfu New Area Innovation Research Institute another one of the entities that you conducted research on?

A.   Yes.

Q.   Again, for the benefit of the court reporter, can we call it the Research Institute?

A.   Yes.

Q.   What is the Research Institute?

A.   It is a research institute that was created by the Tianfu New Area and the -- and Southwest University to bring business and academia together to help generate ideas and commercialize technologies.

Q.   Were you able to determine any facts about when this

Research Institute was created?

**A.**    I don't remember when it was created.

**Q.**    Okay.  You mentioned that it's affiliated with the Southwest University.  What's Southwest University?

**A.**    So Southwest University is a mid-tier university in Sichuan.  It has a focus on science and technology issues.  It is, like all Chinese universities, under the auspices of the Chinese Ministry of Education.

**Q.**    What other facts were you able to determine related to the Research Institute and its governance structure?

**A.**    So it -- as I said, the Tianfu New Area helped found it. So the Tianfu New Area is like the new area we were talking about before, but this is in a different city in China, in Chengdu, so that is a branch of the municipal government.  And then it worked with the university to set up this institute. It provided some initial investment in the Research Institute, as well as gave it some preferential policies.

**Q.**    Be helpful to go back to the Demonstrative 1.  If you could just point out where this is on the map of China, that would be helpful for everyone.

        **MR. CHANG:**  Ms. Hernandez, can you go back?  Yes.

        **THE WITNESS:**  So, again, Sichuan is basically right in the middle there, to the left of the big red Chongqing, and Chengdu is the smaller red dot.

        **MR. CHANG:**  Okay.  Thank you.

Ms. Hernandez, back to Slide 4, please.

BY MR. CHANG:

Q.   You talked a bit about Southwest University.  Is that a public or private university?

A.   Public university.

Q.   And are all public universities controlled by the PRC government?

A.   Yes.

Q.   Are you aware of a single public university that's not controlled by the PRC government?

A.   No.

Q.   Let's move on to the next point in your demonstrative.

     MR. CHANG:  Ms. Hernandez?

BY MR. CHANG:

Q.   Dr. Segal, were you also asked to conduct research on the entity Lingang Group?

A.   Yes.

Q.   What is that?

A.   Lingang Group is a state-owned enterprise at the municipal level.  So unlike those central ones that I discussed, Lingang is owned by the Shanghai municipal government.

     MR. CHANG:  Again, for those of us who may not be as familiar with the geography of China, Ms. Hernandez, if you could go back to the first slide with the map.

\\\

BY MR. CHANG:

Q.   Where is Shanghai?

A.   It's on the seaboard, so on the far right there in the middle with that red -- the big red dot.

MR. CHANG:  Back to Slide 4, please, Ms. Hernandez.

BY MR. CHANG:

Q.   You said Lingang Group is a state-owned enterprise.  Is there a particular sector of the economy that it focuses on?

A.   Yes.  It develops new industrial sites and high-tech zones.

Q.   And based on your research, what were you able to determine about the ownership structure of Lingang Group in particular?

A.   Lingang is a state-owned enterprise.  It says so on its website.  It has a link on its website back to the Shanghai state-owned Asset Supervision and Administration Commission, so the Government agency that runs it.

Its managers are all from the Communist Party.  All of the Chinese press reports and public databases all talk about Lingang as being a state-owned enterprise.

Q.   Dr. Segal --

MR. CHANG:  We can take down the slide now, Ms. Hernandez.

THE COURT:  Is now a good time for the morning break?

MR. CHANG:  Perfect.  Thank you, Your Honor.

THE COURT:  Okay.  All right.  Let's take our morning break, and we will resume at 11:15 a.m.  Thank you.

THE COURTROOM DEPUTY:  All rise.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Okay.  You can step down.  If you could be back here on the stand at 11:15, that would be great.

Anything to discuss?  Do you want to go ahead?

MR. FONDO:  Yes, Your Honor.

THE COURT:  Put your objection on the record?

MR. FONDO:  Yes, Your Honor.  Thank you.

So the objection that we stated -- or that I raised during the testimony was that we believe that Dr. Seg- -- there was an order issued by the Court, it's Docket Number 264, relating to Dr. Segal's testimony.  The order stated [as read]:

"Dr. Segal will not be allowed to state that certain entities were 'substantially owned, controlled, or managed' by the PRC."

And we objected because we believe Dr. Segal crossed that line and referenced that they were controlled by the -- I think it was the local municipality.

THE COURT:  Right.  And what I said in response, I overruled the objection because -- excuse me -- the ruling was intended to prevent the witness from repeating the statutory definition of an instrumentality of the government, but it was not meant to prevent the witness from using any word from that

statutory definition.  The point is just to permit the witness to testify in plain English without crossing the line into intoning the statutory phrase that the jury will be required to find.

And I said that I didn't think that the witness had come close to crossing that line.  It is a fuzzy line.  It's hard to -- it's hard to know exactly where the line is, but I don't think the witness has come close to crossing it.

MR. FONDO:  Understood, Your Honor.

MR. CHANG:  We agree with Your Honor.

THE COURT:  Okay.  Thank you.

MR. CHANG:  Thank you.

MS. PRIEDEMAN:  Your Honor, just one quick thing in case we get to Dr. Sanchez before the lunch break.

THE COURT:  In case we get to what?

MS. PRIEDEMAN:  To Dr. Sanchez --

THE COURT:  Okay.

MS. PRIEDEMAN:  -- before the lunch break.

Exhibit 775, which has been already admitted, which is just the list of the trade secret files by category, I'd like to give the members of the jury a printed copy and the witness to avoid going back and forth.

THE COURT:  Sounds fine.

Any objection?

MS. WALSH:  No objection.

THE COURT:  Okay.

MS. PRIEDEMAN:  Thank you.

THE COURT:  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 11:01 a.m.)

(Proceedings resumed at 11:17 a.m.)

(Proceedings were heard in the presence of the jury.)

THE COURT:  You can resume.

MR. CHANG:  Thank you, Your Honor.

Ms. Hernandez, if we could go back to the fourth slide, second bullet point.  Thank you.

BY MR. CHANG:

Q.   Dr. Segal, I wanted to make sure we clarified this on the record.  As part of your research into the Research Institute, were you able to identify any facts about the approval process for that institute?

A.   Yes.  It was approved by the municipal government.

Q.   You mentioned that both of these entities that we talked about, the Industrial Innovation Park and the Research Institute, were controlled by the PRC government.

Can you explain how that actually works in real life for members of the jury?

A.   So in these instances, the municipal government decided to create the zones.  It provided some investment for the Research Institute.  It provides policies that they thought would help

the park grow, so tax breaks and some investments.  And they manage the day-to-day operation of it.

Q.   Give us a real-world example.  If the Institute wants to do something, is the Government involved in that decision-making process?

A.   I would suspect it's a kind of give-and-take between the director of the Research Institute and the university and the management committee about how those research plans respond to, reflect the municipality's, the province's, the country's development plans and technology issues.

Q.   What about for the Innovation Park?  How is the governance -- how is the PRC government involved in the governance of the Innovation Park?

A.   It manages the park.  So a similar type of circumstances where it would make decisions about how to build out the park, which type of companies to try to attract, and other decisions about how the park is managed.

Q.   Could any decisions be taken from either of these entities without the approval of the PRC government?

A.   No.

Q.   Let's turn now to the Shanghai International Talents Plan or Program.  Was that another entity that you were asked to look into?

A.   Yes.

        MR. CHANG:  Ms. Hernandez, if we could take down the

slides.  Thank you.

BY MR. CHANG:

Q.   Before we get into the specifics of the Shanghai Talents Program that you conducted research on, what is a talent program or plan in the PRC?

A.   So in the 1990s, the Chinese government decided that it wanted to create a reverse brain drain.  So hundreds of thousands of Chinese students and engineers and scientists had come to the United States, had gone to Australia, to Europe and Britain to study at universities and to work in American companies.  And China decided that it wanted to bring these people back and have them contribute to Chinese economic growth and technological development.

So it created these plans to provide incentives to these people to come back and transfer technology.

Q.   Have different provinces and municipalities like the ones we looked at on that map, have many of them created talent programs?

A.   Yes.  So the first ones that started were national plans, and then provinces and municipalities created their own talent plans.

Q.   Is the Shanghai International Talents Program one of these talent programs or plans?

A.   Yes.

Q.   Based on your research, what were you able to determine

about the Shanghai International Talents Program?

**A.** So Shanghai has its own five-year plan that reflects the national five-year plan. That five-year plan has an entire section on talent and expertise. It talks about using talent plans to try and get people to move to Shanghai and set up companies or work in research institutes.

The talent plan that we're discussing was created by the Shanghai municipal government and is administered at a district level.

**Q.** What district?

**A.** Xuhui.

**Q.** And what is the Xuhui District?

**A.** So districts are like -- I'm from New York, so like a borough of Manhattan. So it's essentially a branch of the municipal government below the municipality.

**Q.** How does the governance of the Shanghai Talents Program work? Who manages the program on a day-to-day?

**A.** The Xuhui District government will have a person who is from the Ministry of Science and Technology, and they will administer that plan.

**Q.** And how do these plans work? Do people apply for them?

**A.** Yes. They're a relatively competitive application process.

**Q.** And what -- let's say, hypothetically, someone's accepted into a talent program. What kinds of benefits would they

expect to receive in return?

**A.**   It depends on the expertise and the area, but generally, if you're a scientist, access to research labs, some funding for the research you want to do.  If you're an entrepreneur, often it's access to real estate.  You may get a couple of years rent-free in a high-tech zone and other types of government support.

**Q.**   Are you aware of any talent programs in the PRC that are not controlled by the PRC government?

**A.**   No.

          **MR. CHANG:**  Thank you.

          No further questions at this time.

          **THE COURT:**  Actually, can we have a brief sidebar before the cross?

               (Discussion held at sidebar, not reported.)

                         **CROSS-EXAMINATION**

**BY MR. FONDO:**

**Q.**   Good morning, Dr. Segal.

**A.**   Good morning.

**Q.**   My name is Grant Fondo, and I represent Mr. Ding.

          I'm going to be asking you a few questions -- more than a few questions today, but hopefully not too many.

          So I just want to verify.  You don't have any training or experience starting a business; correct?

**A.**   No.

**Q.** And you have no experience starting a business in China; correct?

**A.** No.

**Q.** And nor do you have any experience in raising funds for a start-up in China?

**A.** No.

**Q.** So you mentioned -- you mentioned a number -- a couple of different plans, I think, through your testimony in response to questions by the Government.

So, for example, the 2017 plan, now that covers many different aspects of the economy; correct?

**A.** The AI plan?

**Q.** No, no. Sorry. I believe you testified about either the 2021 or the 2017 five-year plan.

**A.** Oh, the five-year plan. Yes.

**Q.** Okay. And so regardless of whether it's the 2017 or 2021 plan, they cover a variety of different industries; correct?

**A.** Yes.

**Q.** And all types of industries throughout China; correct?

**A.** Yes.

**Q.** And China economy has literally hundreds, if not thousands, of different industries; correct?

**A.** Yes.

**Q.** All right. And so the goal of those plans is to cover many, many areas; correct?

**A.**   Yes.

**Q.**   And so -- and those plans provide some insight to industry about growth areas; correct?

**A.**   Correct.

**Q.**   And those plans also provide information to investors, for example, about what might be growth areas in the economy?

**A.**   Correct.

**Q.**   And the U.S. publishes plans as well or guidance about areas of interest that ends up providing industry with guidance about potential growth areas?

**A.**   Different structures, but yes.

**Q.**   And then -- and then investors will target companies that are potentially in growth areas regard- --

Sorry.  Go ahead.

**A.**   Correct.

**Q.**   -- regardless of what the particular industry is?

Let me rephrase the question.

So and that point crosses many different industries; correct?

**A.**   I'm sorry again.  That point?

**Q.**   So -- yeah.  So I asked you about -- so investors target companies in growth areas; correct?

**A.**   Correct.

**Q.**   Okay.  And those growth areas can cover many different industries, not just AI; correct?

**A.**    Correct.

**Q.**    So China has a fairly vibrant private sector?

**A.**    Correct.

**Q.**    And fair to say that they have a lot of tech start-ups and incubators?

**A.**    Yes.

**Q.**    And those are privately funded?  Like MiraclePlus, for example.  Are you familiar with MiraclePlus?

**A.**    I am.

**Q.**    And that's a funded -- it's a private incubator; correct?

**A.**    Correct.

**Q.**    So that being said, is it fair to say that it's hard to do business in China without interacting in the government on some level?

**A.**    I'm sorry.  You're asking --

**Q.**    Let me --

**A.**    Is it hard -- yeah.

**Q.**    Sorry.  Let me --

**A.**    Yeah, it is hard to do business in China without interacting with the government.

**Q.**    So, for example, banks are controlled by the government?

**A.**    Yes.

**Q.**    Mass transit, controlled by the government?

**A.**    Yes.

**Q.**    Okay.  Things like that; correct?

**A.**   Yeah.

**Q.**   You had brought up before, when the Government was questioning, you mentioned the word "partner," companies having to partner in China.  And one of the companies you mentioned was Microsoft.

That was -- and was that in relation to an R&D center in China that was built by Microsoft?

**A.**   Yes.  But that center did not have a partner.

**Q.**   Okay.

**A.**   Yeah.

**Q.**   Did -- and then -- so, but there are a number of large U.S. tech companies that operate in China?

**A.**   Less now, but yes.

**Q.**   Google's one of them, for example?

**A.**   Yes.

**Q.**   All right.  You mentioned an entity called Chongqing; correct?

**A.**   Chongqing?

**Q.**   Yes.

**A.**   Yes.

**Q.**   Or Mingyue Lake is another?

**A.**   Yes.

**Q.**   Prior to being retained by the Government, were you familiar with that entity?

**A.**   No.

Q.   And so you learned about it by essentially searching open-source resources?

A.   Yes.

Q.   Essentially surfing the Internet, among other things?

A.   Looking at the Internet and government documents and Chinese press reports on the Internet, yes.

Q.   And that -- so you mentioned the Innovation Park.  We discussed that a little bit; correct?

A.   Yes.

Q.   All right.  Now, that has a lot of small, private start-ups that interact with that hub; correct?

A.   Yes.

Q.   And you've never spoken to anyone at the Innovation Park; correct?

A.   No.

Q.   Never visited any of their offices?

A.   No.

Q.   Next I want to ask you about the venture fund.  And that's the Mingyue Lake Venture Fund.

     So lots of small companies apply to that fund as well; correct?

A.   Yes.

Q.   And you've never spoken to anyone at that fund, have you?

A.   No.

Q.   Never visited their offices in China?

**A.**   No.

**Q.**   You also mentioned the Sichuan New Area Innovation Research Institute or Southwest University.

So there's a lot of students who go to Southwest University; correct?

**A.**   Yes.

**Q.**   Lots of professors?

**A.**   Yes.

**Q.**   And to conduct research on -- you conducted the same type of research on this entity as you did with the prior two entities that I asked you about; correct?

**A.**   Yes.

**Q.**   And then the next one -- the next one is the Lingang Group?

**A.**   Yes.

**Q.**   So prior to being retained on this case, you were not familiar with that group, were you?

**A.**   No.

**Q.**   And to learn about it, you did the same open-source research?

**A.**   Yes.

**Q.**   So it's common for start-ups to apply to that group as well?

**A.**   That, I would not be as familiar with, but I would assume, yes.

**Q.** But you're not familiar with it, so you're not sure?

**A.** I don't know, yeah.

**Q.** And you've never spoken to anyone at that group; correct?

**A.** No.

**Q.** Never visited any of their offices?

**A.** No.

**Q.** You also mentioned the Shanghai Talents Program; correct?

**A.** Yes.

**Q.** Fair to say -- well, there's -- do you know how many entrepreneurs apply to that program?

**A.** I don't.

**Q.** And you've never spoken to anyone at that talent program, have you?

**A.** No.

**Q.** So the Government is paying you $650 an hour for your testimony in this case; correct?

**A.** Yes.

**Q.** And approximately how much have you billed through today? How much have you billed to the Government in total, approximately?

**A.** I haven't billed yet, but it's approximately $30,000.

**Q.** And as you mentioned in questioning from the Government, it's not the first time that you've been retained by this office in -- the U.S. Attorney's Office; correct?

**A.** Correct.

**Q.** All right. I think you said three times?

**A.** This office once before. I'm currently working -- advising on a case with Pangang Group. And then I worked a case in New Jersey.

**Q.** Was there also a -- and I'll spell it. It's F-u-j-i-a-n.

**A.** Fujian Jinhua?

**Q.** Yes. Was that a case in this district?

**A.** That was the court in this case.

**Q.** I'm sorry. What?

**A.** The case in this court. Sorry.

**Q.** So is that two other ones in this court besides this one? I'm not sure I understand.

**A.** Pangang is ongoing.

**Q.** Yep.

**A.** And then Fujian Jinhua was the one in the past.

**Q.** Okay. But that was in this court as well?

**A.** That was in this court.

**Q.** Thank you.

And so let's go through both of those. And those, generally, you were testifying sort of similar topics as you did today, generally, at a very high level?

**A.** Similar topics. Pangang, I haven't done anything yet except look at some documents.

**Q.** Okay. But you've been retained by the Government for that case?

**A.**   Yes.

**Q.**   And that case is ongoing?

**A.**   Yes.

**Q.**   And you may be doing work in the future for that?

**A.**   I may be, yes.

**Q.**   And any other case?

**A.**   In Fujian Jinhua, as you said, I did similar testimony about the types of technology, why China was interested in the semiconductor industry, and government entities.

**Q.**   And how much did you -- how much did the U.S. Attorney's Office pay you for the testimony in that case?

**A.**   I think it was around -- well, $650 an hour.  I think it was around $25,000.

**Q.**   Now, you testified that CFR -- that's your employer; correct?

**A.**   (No audible response.)

**Q.**   -- is nonpartisan?

(Reporter interrupts to clarify the record.)

**THE WITNESS:**  I'm sorry?

**BY MR. FONDO:**

**Q.**   I'll reask it.  Sorry.

So you testified earlier that CFR is a nonpar- -- let me rephrase that.

You testified earlier that your employer, CFR, is nonpartisan; correct?

A.    Correct.

Q.    And that's because you don't accept money from different governments; correct?

A.    That, and we don't take any official positions.  So I have colleagues who worked in Republican administrations, and I have colleagues who worked in Democratic administrations.

Q.    So you don't take Democratic or Republican positions?

A.    Correct.

Q.    But you do take money from big tech, don't you?

A.    We have a corporate program which big tech is members of, but they are not allowed to give to specific programs, so they are not allowed to be involved in any of the research.

Q.    Okay.  But they're allowed to provide money to your employer; correct?

A.    Correct.

Q.    Okay.  And, in fact, you have a specific corporate program for them to provide money to CFR?

A.    Yes.

Q.    Okay.  And that is -- it's actually called the Corporate Member Program; correct?

A.    Correct.

Q.    And there's different tiers of that program?

A.    That is correct.

Q.    And there is a gold, silver, and bronze tier; correct?

A.    Correct.

Q.   Kind of like the Olympics?  The biggest contributor gets the gold?

A.   That is correct.

Q.   And Google is one of those big contributors, isn't it?

A.   I'm not aware of all of the big contributors, but I'll take your word on it.

Q.   Well, I'm happy to show you a document.

MR. FONDO:  So let's turn to -- if we could show the witness Exhibit 6703.  And if we could --

BY MR. FONDO:

Q.   So this is corporate members.  You see in the sort of left-middle side it says "Gold"?

A.   Yes.

MR. FONDO:  Go to the next page, please.

BY MR. FONDO:

Q.   And this is your website; correct?

A.   Yes.

Q.   CFR's website?

And then "Google" is in the middle right-hand side of that; correct?

A.   Yes.

Q.   And so it is a gold corporate member?

A.   Yes.

MR. FONDO:  Your Honor, we move to admit Exhibit 6703.

MR. CHANG:  No objection, Your Honor.

**THE COURT:** Admitted.

(Trial Exhibit 6703 received in evidence.)

**MR. FONDO:** If we could publish that to the jury.

BY MR. FONDO:

Q.   So, again, this is your -- CFR's website?

A.   Yes.

Q.   And it identifies -- the corporate members is that corporate membership program.  And you have to provide money to be a member of it; correct?

A.   Correct.

Q.   And this is the gold page, the highest level?

A.   Yes.

Q.   All right.  And Google is on the second page of that; correct?

A.   Correct.

Q.   And there's a lot of other corporations on this page as well; correct?

A.   Correct.

Q.   So you've got Meta; you've got Visa.  You've got a number of other ones; correct?

A.   Correct.

Q.   Okay.  So you're nonpartisan as to governments, but these are one of the many -- these are one of the many corporations that fund your company's operations; correct?

A.   In part, yes.

Q.   And so let's -- and we mentioned the gold level.  So isn't it true that the gold -- to become a gold corporate member, you're required to pay $100,000 a year?

A.   Correct.

Q.   And so Google has paid at least $100,000 a year to get on this webpage; correct?

A.   Yes.

Q.   And is it true that Google's been a gold corporate member for a number of years?

A.   Yes.

Q.   And been a gold member through the time you were hired for this case?

A.   Yes.

Q.   And through the present?

A.   Yes.

Q.   Now, you testified -- in addition to Google being a gold member -- do you know how much, by the way, they donate in total or how much they pay towards your employer in total?

A.   I do not.

Q.   So in addition to having Google as a gold member, CFR also has two Google board members, doesn't it, two members of Google who are on your board?

A.   Are there two now?  I don't know.  Yes.

Q.   Well, so you tell me what you recall.

A.   Ruth Porat, I think, was a board member for a good amount

of time.  I don't know who the second would be.

Q.   Do you recognize the name James Manyika?

A.   Ah, yes.  James Manyika, yes.

Q.   And so these are both board members of CFR?

A.   Yes.

Q.   And during their tenure as board members, their regular job was being executives at Google; correct?

A.   Correct.

MR. FONDO:  Your Honor, at this -- so I'd like to -- Mr. Jay, could you pull up 6705.

BY MR. FONDO:

Q.   Do you recognize that person?  Is that --

A.   That's Ruth Porat.

MR. FONDO:  Your Honor, we'd like to admit Exhibit 6705, please.

MR. CHANG:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 6705 received in evidence.)

MR. FONDO:  All right.  I'd like -- Mr. Jay, if you could pull up Exhibit 670- -- hold on one second.

BY MR. FONDO:

Q.   So just to be clear on who Ms. Porat is, could you read that first line of her bio there?

A.   Sure.

[As read]:

"Ruth has been President and Chief Investment Officer of Alphabet and Google since September 1st, 2023."

Q. That's a pretty high-level position at Google, isn't it?

A. Yes.

MR. FONDO: So if we could pull up Exhibit Number 6704, please.

BY MR. FONDO:

Q. Now, this is James Manyika; correct?

A. Correct.

MR. FONDO: Your Honor, at this time we'd like to move in Exhibit 6704.

MR. CHANG: No objection.

THE COURT: Admitted.

(Trial Exhibit 6704 received in evidence.)

BY MR. FONDO:

Q. And so if you could read the first two sentences of his bio.

A. [As read]:

"James Manyika is a Senior Vice President for Research, Technology & Society at Google where he focuses on advancing Google's most ambitious innovations in artificial intelligence, computing and science, and on areas with potential to benefit society. He is also responsible for leading and

overseeing Google Research and Google Labs."

Q.   So one of your board members works in Google's AI areas; correct?

A.   Correct.

Q.   And do you know how long he's been a board member for?

A.   I don't know.

MR. FONDO:   If we could pull up Exhibit 6717, Mr. Jay.

BY MR. FONDO:

Q.   All right.   Is this your 2023 annual report?

A.   Yes.

Q.   For CFR?

A.   Yes.

MR. FONDO:   I'd like to go to page 3, please.   And if you could blow up the middle of it by "Directors."

A little bit farther down.

Yeah, that's good, actually, right there.

BY MR. FONDO:

Q.   So there it says "Term Expiring 2025."   So do you see two Google executives on that list?

A.   Yes.

Q.   And who are those names?

A.   James Manyika and Ruth Porat.

Q.   And, in fact, Ruth Porat also was essentially the keynote speaker at CFR's 2023 annual national symposium; correct?

A.   I don't remember, but, again, I'll take your word on it.

Q.   Well, why don't we see what the annual report says.

So if we could go to page 20, please.  Is that her in the upper --

A.   Yes.

Q.   Okay.  And if you wouldn't mind reading what it says below her picture.

A.   [As read]:

"Senior Vice President and Chief Financial

Officer of Alphabet and Google and member of the

Council on Foreign Relations Board of Directors Ruth

Porat gives the opening remarks at the National

Symposium."

MR. FONDO:  Your Honor, at this time, we'd like to admit Exhibit 6717 in, please.

THE COURT:  Objection?

MR. CHANG:  I'd say objection; hearsay.  And I also haven't had a chance to look at the rest of the document to -- it's a very lengthy report.

MR. FONDO:  I'm sorry.  We're happy to have just admitted the relevant portions.

THE COURT:  The relevant portions being what?

MR. FONDO:  Meaning the pages that I cited.  First page and then the two pages.

MR. CHANG:  Objection.  Relevance.

THE COURT:  Overruled.  It's admitted.

(Trial Exhibit 6717, pages 1, 3, and 20, received in evidence.)

MR. FONDO:  Thank you.

No further questions.

THE COURT:  All right.  Anything on redirect?

MR. CHANG:  Yes, Your Honor.

#### REDIRECT EXAMINATION

BY MR. CHANG:

Q.   Let's start with the last topic that Mr. Fondo covered.

Before Mr. Fondo showed you the graphic of the gold members for CFR, did you know who they were?

A.   Yes.

Q.   Have you had any conversations with Google as part of this case?

A.   No.

Q.   Let's turn now to his questions about your research process.

He said you surf the Internet to come to your opinions.

How did you arrive at your opinions in this case, Dr. Segal?

A.   I looked at the documents that the Government gave me from the defendant's devices.  I looked at things on the website of the entities that I was asked to investigate.  I looked at Government documents that were on the Web -- on the Internet.  And I looked at Government reports and press things that are on

the Internet, as well as secondary literature and academic writing.

**Q.**   Did you consult both Mandarin- and English-language documents?

**A.**   Yes.

**Q.**   Was the type of research that you undertook in this case consistent with the type of research you've been doing for the last 30 years?

**A.**   Yes.

**Q.**   Did you also draw upon your 30 years of experience as an expert in this field?

**A.**   Yes.

**Q.**   Mr. Fondo asked you about the State Council plans.  Can you explain to the members of the jury how State Council plans differ from pronouncements from the U.S. Government?

**A.**   I think Mr. Fondo asked me about the five-year plans.

**Q.**   Yes, the five-year plans.  So how does a five-year plan differ in terms of importance to, for example, a policy pronouncement from the U.S. Government?

**A.**   So the five-year plans are at a very vague, often, level of specificity; but they do give you the sense of the larger themes of where China wants the economy to go -- right? -- what it thinks the big problems are or challenges it wants to address.

But the difference from that is that all Chinese agencies,

all the provinces, all the municipalities then have to talk about how they're going to fulfill that plan; right?  They have to fall in line.

And as we know, the U.S. Government does not work that way; right?  When we change -- often change government every four years, and so we may decide to do something completely different as a new administration comes in.  And governors have a choice if they're going to follow through on certain types of areas that are of interest to the administration.

So, you know, we can see now, you know, the Biden Administration was very interested in EVs, in electric vehicles.  California supported that.  Other states did not. That would never happen in China.

**Q.**   Are provincial and municipal officials able to disobey or disagree with the State Council's five-year plans?

**A.**   No.

**MR. CHANG:**  No further questions.

**THE COURT:**  Any recross?

**MR. FONDO:**  Nothing further, Your Honor.

**THE COURT:**  Okay.  You can step down.  Thank you.

(Witness excused.)

**THE COURT:**  And the Government can call its next witness.

**MS. PRIEDEMAN:**  The Government calls Dr. Daniel Sanchez.

(Witness enters the courtroom and steps forward to be sworn.)

THE COURT:  Go ahead and have a seat.

THE COURTROOM DEPUTY:  Please raise your right -- you can have water.

THE WITNESS:  Thanks.

THE COURTROOM DEPUTY:  Please raise your right hand.

DANIEL SANCHEZ,

called as a witness for the Government, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.

Please state and spell your full name for the record.

THE WITNESS:  Daniel Sanchez.

THE COURTROOM DEPUTY:  Can you spell it, please?

THE WITNESS:  D-e -- sorry.  D-a-n-i-e-l, S-a-n-c-h-e-z.

DIRECT EXAMINATION

BY MS. PRIEDEMAN:

Q.  Good morning, Dr. Sanchez.

A.  Good morning.

Q.  Where are you currently employed?

A.  At the Massachusetts Institute of Technology.

Q.  Is that sometimes called MIT?

A.  Yes.

Q.  How long have you worked at MIT?

**A.** Since 2012. So 13 years and counting.

**Q.** And what is your position at MIT?

**A.** I am a professor of electrical engineering and computer science and a principal investigator at the Computer Science and Artificial Intelligence Laboratory.

**Q.** And what is your educational background, Dr. Sanchez?

**A.** So I have a master's and Ph.D. degrees from Stanford University and also a bachelor's in telecommunications engineering from The Technical University of Madrid.

**Q.** And what are your master's and Ph.D. in from Stanford?

**A.** All in electrical engineering.

**Q.** And can you tell the members of the jury what electrical engineering is?

**A.** Sure. Electrical engineering is the branch of engineering that is concerned with designing systems that use electricity or process information, and that includes electronic systems like computers.

**Q.** What did your Ph.D. focus on?

**A.** So it focused on computer architecture, specifically on designing large-scale high-performance systems with many different cores.

**Q.** Did you have any internships during the time you completed your Ph.D. at Stanford?

**A.** Yes. I worked at both Intel in 2010 and at Google in 2011.

Q.   And just high level, what were those -- what did those internships involve?

A.   So those were related to my research at the time.  So working on high-performance computing systems at Intel.  And then at Google, I worked on applying some of the research that I had done at Stanford and seeing, you know, how that would -- that could translate to the applications, the systems inside Google.

Q.   So turning to your position at MIT as a professor, do you conduct research as part of your role at MIT?

A.   Yes.

Q.   What kind of research do you conduct?

A.   So I work in computer architecture on computer systems, and specifically the main role of -- or the main goal of my research is to design next-generation processors.  So, essentially, the hardware systems that power, you know, the computers that we use every day.

Q.   And as part of your research, do you research machine learning accelerators?

A.   Yes.

Q.   Can you tell the members of the jury a little bit about that?

A.   Sure.  So machine learning accelerators are a piece of hardware.  They're processors that are specialized to machine learning computations.  They are much faster than what are

called general-purpose processors, and so they're tailored, you know, to the kinds of computations that machine learning workloads need.

Q.   Are Google's TPUs an example of a machine learning accelerator?

A.   Yes.

Q.   Have you published research in your position as a professor at MIT, Dr. Sanchez?

A.   Yes.

Q.   Approximately how many publications have you published?

A.   Over 70 publications.

Q.   Can you touch on a few of your publications that are relevant to the subject matter of this case?

A.   Sure.  So I've published work on machine learning accelerators, looking at different techniques to make this hardware more efficient and leverage characteristics of machine learning computations to improve performance, improve efficiency.

I've worked on accelerators for other emerging applications and domains, like secure computation, that have similar characteristics to Google's TPUs.

Q.   A couple of vocabulary questions.  When you say "machine learning accelerator," is an accelerator the same thing as a chip?

A.   Yes.  It is a type of chip.

Q.   And when you say "machine learning computations," what are you referring to there?

A.   So I am referring to -- you know, machine learning is a kind of AI computation that basically performs tasks without explicit instructions.  And it is a kind of -- it is the dominant kind of AI system used today.

Q.   You also mentioned MIT's Computer Science and Artificial Intelligence Laboratory and your role within that laboratory.

Can you briefly explain what that laboratory is and what your role is?

A.   Yes.  So that is a large research laboratory within MIT. It has almost 100 principal investigators, and, you know, we carry research in different aspects of computer science and artificial intelligence.  So all of us advise Ph.D. students and train them to perform research in different areas of these fields.

Q.   As part of your role as a professor at MIT, do you advise Ph.D. students?

A.   Yes.

Q.   Approximately how many Ph.D. students have you advised?

A.   18.

Q.   And what have some of those students gone on to do after they've graduated?

A.   So they've gone to positions in both industry and academia.  A couple of my students have gone on to become

professors at other universities.  Others have gone on to multiple companies, including Nvidia, Google, and others.

Q.   Can you move the microphone a little bit closer so the jury can hear you?  Thank you.

A.   All right.

Q.   You mentioned that some of your students have gone on to industry.

When you say "industry," what are you referring to?

A.   So I'm referring to, you know, different positions related to research and development of computer systems and computer hardware.

Q.   As part of your role at MIT, do you also teach?

A.   Yes.

Q.   Can you tell the members of the jury what types of courses you teach at MIT?

A.   Sure.  So I teach graduate-level and undergraduate-level courses in computer architecture and computer systems, essentially covering the design of different types of processors, advanced techniques in processor design, as well as other topics like hardware design, operating systems, computer organization.

Q.   Do those courses touch on machine learning chips and technology?

A.   Yes, they include lectures on machine learning accelerators.

**Q.** As part of your position at MIT, do you collaborate with technology companies?

**A.** Yes. Computer architecture is a very applied field, so we have several collaborations with industry.

**Q.** What do you mean when you say "applied field"?

**A.** Well, we develop technologies that are directly useful to build chips that are faster, more efficient, more versatile, that enable many applications, and so companies are naturally interested in these kinds of technologies.

**Q.** Can you give an example of the types of companies that you've collaborated with?

**A.** Sure. So I've worked, for example, with Nvidia on developing certain kinds of accelerators for different workloads, including machine learning workloads.

I've worked -- Google has partially funded our work on designing processors optimized for cloud computing workloads.

I've also worked with Amazon on techniques to improve the sustainability of cloud computing systems.

There are a number of other companies: Samsung, Sony, ARM, Intel, AMD.

**Q.** You mentioned funding briefly. Have you received funding outside of MIT for your research?

**A.** I've received funding that goes through MIT but it is fund- -- yes, I mean, there's funding from a number of sources, including federal funding and funding from these companies.

**MS. PRIEDEMAN:**  Your Honor, at this time, the Government offers Dr. Sanchez as an expert in computer architecture and systems.

**MS. WALSH:**  No objection.

**THE COURT:**  Okay.  You can proceed.

BY MS. PRIEDEMAN:

**Q.**  All right, Dr. Sanchez.  Were you hired by the Government as an expert in this case?

**A.**  Yes.

**Q.**  What is your hourly rate?

**A.**  $900.

**Q.**  And at a high level, what were you asked to do?

**A.**  So I was asked to review documentation in this case, including several files from Google, Google documents.  And then I was asked to evaluate three things about these files.

First, whether the information in these files was not public or did they contain non-public information; second, whether this information would be valuable to a competitor; and, third, whether this information could be derived through, you know, for example, reverse engineering.

**Q.**  I want to ask you more questions about that later, but just briefly, when you said -- when you're referring to "the documents," are you referring to the alleged trade secret documents in this case?

**A.**  Yes.

Q.   All right.  So now I want to step back and ask you some --
to explain some basic background information about artificial
intelligence and supercomputers.  The jury has previously heard
a little bit about that, but I want to discuss a few of those
concepts with you.

Can you explain what the term "artificial intelligence
infrastructure" means?

A.   Yes.  So artificial intelligence infrastructure refers to
the computer systems, both hardware and software, that are used
and built to run these AI applications.

Q.   What's the relationship between the term
"AI infrastructure" and "AI supercomputer"?

A.   You know, they're -- basically, a supercomputer refers to
a -- to a computer that is very fast.

And so the kind of AI workloads that are used today
process huge amounts of data, they require very large amounts
of computation, and so they need to run on very sophisticated,
very large computer systems.  And so those are typically
referred to as supercomputers.

Q.   Who are the leading providers in the U.S. of
AI infrastructure?

A.   So generally, cloud computing companies.  Because they
have the ability to build and deploy very large numbers of
servers and, you know, a very large amount of computing
infrastructure, they've become the leading providers of these

kinds of systems.

Q.   Is Google one of those companies?

A.   Yes.   So Google, Amazon, Microsoft would be the main three.

Q.   How does Google's AI infrastructure compare to Amazon and Microsoft, for example?

A.   Well, so, at a high level, these companies share some common features.   They have -- they use things like accelerators, but Google is unique in a few ways.

One particular way where Google stands out is in that they have these accelerators called Tensor Processing Units, or TPUs, that are accelerators that are deeply specialized for machine learning for these kinds of AI workloads.

And Google has -- is a company that has been doing this for longer -- for the longest.   They've built many generations of TPUs.   They were the first to deploy these kind of accelerators at scale.

Q.   Dr. Sanchez, did you provide -- prepare a PowerPoint presentation in connection with your testimony today?

A.   Yes.

MS. PRIEDEMAN:   Ms. Hernandez, can you please pull up Dr. Sanchez's demonstrative.

BY MS. PRIEDEMAN:

Q.   Dr. Sanchez, is this the demonstrative you prepared?

A.   Yes, it is.

Q.   Would these slides help you describe your testimony to the jury?

A.   Yes.

MS. PRIEDEMAN:  Permission to publish to the jury, Your Honor.

MS. WALSH:  No objection.

THE COURT:  Go ahead.

BY MS. PRIEDEMAN:

Q.   All right, Dr. Sanchez.  Does this first slide describe the different components of an AI supercomputer?

A.   Yes.

Q.   All right.  So I want to have you first just walk through, at a high level, the different components and then we'll go individually through each component.  Okay?

A.   Mm-hmm.  Sure.

So I'll direct your attention to the bottom of the slide, which starts with the hardware components.

And so at the hardware level, an AI supercomputer consists of thousands of servers.  These are different, you know, individual machines.  And each of these servers generally has multiple accelerators with specialized chips that are very fast on machine learning computations.  Typically, around eight or so accelerators per server.

And so these are typically either GPUs or TPUs.  GPU stands for graphics processing units.  TPUs, as I mentioned

before, are Google's accelerators.  They're specifically designed for machine learning.

And so these are -- these accelerators are the elements of the system that carry most -- perform most of the computation in these very taxing, very challenging machine learning workloads.

Now, an important component of the system is also shown in the bottom here.  It's this, what's labeled as a "High-performance network."  This is essentially a network that enables servers and the accelerators within the servers to communicate effectively.

And this is very important because these computations run on many, many servers and many accelerators, and they require frequent communication.  So to make them efficient and make them use all of these computer resources efficiently, it is important for them to have this high-performance network.

Now, if you look at the top of this slide, you see that there are different kinds of software -- software systems.  And so, essentially, there's got some software that at a high level has the goal of making all of this hardware useful, making it easy to use, making it efficient, and then making it reliable.

Q.   Okay.  I want to talk more specifically about the software components in each layer.  But first, I want to go back to -- you've used the word "AI computations" a few times.

A.   Mm-hmm.

**Q.**   I know I asked you to define it, but I'm wondering if we can break it down a little bit further.

When you say "computations," what are you referring to and how is that relevant to the ultimate output?

**A.**   Right.  So, for example, if you think about one of these digital assistants or chatbots like Gemini or OpenAI's ChatGPT, when you type some question, that kicks out or, you know, starts or sends a request to these systems that perform a series of calculations and process large amounts of data to essentially produce an output.

And so whenever we are referring to this process of the systems performing these calculations in response to any -- in response to any input and then producing an output, that's what we call a computation.  Sometimes you call this a workload.  So there are different technical terms for this.

**Q.**   Thank you.

All right.  Let's talk about the different software components.  So I want to start with ML frameworks and compilers.  Does that stand for machine learning frameworks and compilers?

**A.**   Yes.

    **MS. PRIEDEMAN:**  All right.  Ms. Hernandez, can you go to the next slide, please.

**BY MS. PRIEDEMAN:**

**Q.**   All right.  Dr. Sanchez, can you explain what's depicted

on this slide, please?

**A.**   Yes.  So this slide shows the functionality of these -- this type of software, what we call machine learning frameworks and compilers.  And so within here, we generally distinguish between machine learning frameworks, which is, you know, what's sort of exposed to users of the system.

And the goal of these frameworks is to let programmers, let machine learning practitioners write these machine learning models that implement these AI computations in a simple way using high-level language where, with a few lines of code, you can express fairly complex programs or fairly complex machine learning models.

Now, you know, this language that these programmers use is very effective for humans; right?  It's easy to write code that performs a lot of computations.  But when you look at hardware, it's not a language that would be easy to understand or easy to run directly on hardware.

And so the second part of this technology is what we call a compiler.  A compiler is kind of like a translator that's converting from one language to another.  In this case, it's translating from this high-level language that programmers use to the language that computers actually understand.

And so here in this figure, you can see how what the compiler produces is this program that then runs across these thousands of servers and accelerators and actually implements

this computation that the programmer wrote.

Q.   All right.  Let's talk about the second layer of software, cluster manager.  Can you describe what's being depicted in this slide?

A.   Yes.  So a cluster manager is an important piece of these systems.  When you're looking at systems that are this large, they're often used by multiple users, multiple people who run multiple of these AI workloads on the system at the same time. And so the role of the cluster manager is to schedule and manage all of these AI workloads or other kinds of workloads on this supercomputer.

For example, here, you can see at the top that there are three different programs, three different workloads, and the cluster manager is assigning different amounts of resources to them.

For example, you might have a very complex computation, like a machine learning training job, that gets a lot of resources, like the blue job on the left here.  And then some other job that may be, you know, a simpler kind of model or some inference workload which is less taxing on training may run on fewer resources.

Q.   The jury has heard a little bit about how Google uses its AI infrastructure differently; so, for example, that it uses its AI infrastructure for its own product Gemini and also can rent out different parts of its AI infrastructure.

Can you explain how Google uses a software like cluster manager?

**A.**   Right.  So the cluster manager, in particular, is what enables that kind of sharing.

You have these different users.  They have all of these workloads with different requirements.  And it's also important that -- you know, that -- these users don't necessarily trust each other, and so they should get some privacy; right? Workloads from different users should not necessarily -- or should not be able to interact with each other.

And so the cluster manager is providing that safe sharing of resources, as well as -- you know, between, for example, internal Google workloads and, you know, workloads from other external third parties that use Google Cloud.

The cluster manager is also providing -- or, you know, it implements features that enable reliable operation.  So one important aspect in these systems is that when you have thousands of servers and thousands of accelerators, even though each component might last for years, as a whole, because you have thousands of each component, failures are happening every few hours.

And these computations often take months or weeks.  So it's important to ensure that the system keeps running reliably despite these occasional failures.

**Q.**   All right.  I'm going to go to the third software layer,

system software.  Can you talk a little bit about the functionality of system software as it relates to AI supercomputers?

**A.**    Yes.  So system software is low-level software that runs on each server and collaborates with a cluster manager.  Its key -- its key role is basically to configure the hardware to manage the execution of programs on its server, to manage its hardware resources, and essentially to communicate, for example, the health of a server to the cluster manager or schedule workloads as directed by the cluster manager.

**Q.**    And you touched on this a little bit, Dr. Sanchez, when you mentioned reliability, but can you talk about some of the challenges, both from a hardware and software perspective, that are faced by a company that has created an AI supercomputer?

**A.**    Right.  So there are multiple challenges.  I mean, first of all, these systems are quite expensive.  We're talking about hundreds of millions of dollars, if not more, in terms of worth of hardware.  And so it's important to use that hardware efficiently, to not have, you know, most of the hardware sitting idle for a good portion of the time.  So that's one important aspect.

And another key requirement is to have the ability to have applications use many, many accelerators.  It's what we call letting these -- or being able to scale these applications, to use all these many, many thousands of accelerators efficiently.

And so I touched some of these a little bit before with the high-performance network.  I mean, that requires coordinated management of a lot of different pieces of hardware.

And as I mentioned, a key third challenge is reliability. It is how to ensure that the system keeps operating despite individual components failing, which, at this scale, is a common occurrence.

**Q.**  So you mentioned that it's important to be able to connect together different pieces of hardware.  Can you touch a little bit more on why that is so important?

**A.**  Yes.  So I think, you know, maybe an example here, a concrete example would help clarify this.

So if you look at the state-of-the-art machine learning models that are used, that power systems like Gemini or ChatGPT, they take, you know, weeks to months to run using let's say 16,000 accelerators or tens of thousands of accelerators.  So if you were to run this computation in a single accelerator or even a single server, it would take hundreds of years.  And so it is really important to get to that scale, to get to these many thousands of accelerators.

So, of course, as part of that, you need to have support, hardware support for enabling sufficiently fast communication. If you do not have that, then you could add more and more resources, but the system -- you know, the programs running on

all of these -- on all of these servers would spend most of the time just waiting to send or receive data to each other rather than doing useful computations.

Q. Does connecting different accelerators require both hardware and software components?

A. Yes.

Q. All right. I want to shift to your work on this case and your analysis in this case.

A. Mm-hmm.

MS. PRIEDEMAN: Ms. Hernandez, can you please pull up Exhibit 779, which has been previously admitted.

And if you could zoom in a little bit, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q. Dr. Sanchez, as part of your work on this case, did you review the documents listed in Exhibit 779?

A. Yes.

Q. Can you describe at a high level what these files contain?

A. So these files contain information about a wide range of Google products, technologies, and services. Those include Google's AI infrastructure and AI supercomputers of different types, including those based on TPUs and GPUs, both hardware and software components. They include information about Google's cluster management technology. They include information about Google Cloud.

They also include information about other types of Google

hardware, for example, other types of custom Google hardware, like the design of their CPU servers, which are used for workloads beyond AI.  And there's other kinds of information, for example, on Google's privacy-preserving technologies.

And, overall, there are also, like, lots of operational details or internal details about Google's infrastructure and their use of that infrastructure.

Q.   And just to be clear, Dr. Sanchez, this list of documents is a broader set of documents than the alleged trade secrets in this case; correct?

A.   Yes.  There are many more documents here.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, can you please pull up Exhibit 775.

BY MS. PRIEDEMAN:

Q.   Dr. Sanchez, did your work in this case focus on the alleged trade secret documents listed in Exhibit 775?

A.   Yes.

Q.   And this document contains the 105 alleged trade secrets broken into seven different categories; is that right?

A.   Yes.

Q.   What were you asked to analyze with respect to this set of documents?

A.   So I was asked to analyze, again, those three features that I mentioned before.  So, first, whether these documents contain information that was not publicly available; second,

whether that information would be valuable to a competitor; and, third, whether that information could be, you know, found through some other means, for example, by reverse engineering.

Q.   How did you conduct your analysis?

A.   So I carefully analyzed each of these documents, and then I also looked at several, you know, different types of public information, including technical documentation about the systems, product announcements, papers and presentations that Google has published, as well as a number of patents that Google has published.

Finally, I also had some conversations with two Google engineers to ask some questions about this technology.

Q.   Approximately how many hours have you spent reviewing these 105 documents?

A.   Overall, it's around a hundred hours.

Q.   And at a high level, what do these -- does this set of documents contain?

A.   So these documents are organized in seven categories. Broadly speaking, they cover the hardware and software of Google's TPU-based AI supercomputer systems, the hardware and software for Google's GPU-based AI supercomputer systems, as well as the hardware and software components of Google's SmartNICs, which are an important component in enabling this high-performance communication that I described before. They're the system that enables fast communications between

servers and accelerators within those servers.

MS. PRIEDEMAN:  Ms. Hernandez, can you go back to the demonstrative, please.

BY MS. PRIEDEMAN:

Q.   So, Dr. Sanchez, going back to the first slide, the "Anatomy of a Supercomputer," what do the 105 documents -- where do they map on to this graphic that we just discussed?

A.   They cover all of these facets.  Would you like a more detailed mapping?

Q.   We'll get into a lot more detail in just a bit.

Dr. Sanchez, the jury has heard about the source documents in this case that Mr. Ding used to create the alleged trade secret documents.

Did your analysis focus on those source documents or the actual alleged trade secret documents that Mr. Ding created?

A.   No.  Just on the actual documents, the alleged trade secret documents.

Q.   The documents that were listed in Exhibit 775?

A.   Exactly.

Q.   Are any of the alleged trade secret documents you reviewed publicly available in their entirety?

A.   No.

Q.   Could any of the documents be reverse-engineered or otherwise reconstructed in their entirety using public information?

**A.**   No.

**Q.**   Has Google published or otherwise made public any information that relates to the seven categories of documents you've reviewed?

**A.**   Yes.  Google has published some high-level information about some of these systems.

**Q.**   What type of information?

**A.**   So they have published, in many instances, papers and other technical documents that explain some of the high-level features of these systems.

For example, if you look at Google's CPUs, there are several papers, presentations, patents where there is some information about the internal components of a TPU, how some of those components work, but, you know, those descriptions are high level.

**Q.**   How does the information in the alleged trade secret documents differ from the publicly available information you just mentioned?

**A.**   Right.  So the information in these documents is much more detailed.  It contains many implementation details, many features that Google has not publicly disclosed.  It contains information, for example -- again, just focusing on TPUs -- that would significantly reduce the effort required for a competitor to replicate this technology.

**Q.**   And you've mentioned patents a few times.  Can you tell

the members of the jury at a high level what a patent is?

**A.** Yes. So a patent is essentially a document that -- or a legal document that a company pursues and eventually publishes that it, when granted, prevents others from -- or this patent describes an invention, and it prevents others, when that patent is granted, to practice that invention for a limited period of time.

**Q.** Are patents tied to particular products?

**A.** No. Patents describe inventions and techniques, and so they're not tied to products. Moreover, patents are often written in fairly broad terms so that they cover, you know, many different implementations of an invention.

**Q.** Do you want to move the microphone maybe a little bit closer?

**A.** Okay.

**Q.** All right. So I want to start talking about some of the different categories of the trade secrets now, Dr. Sanchez.

**A.** Mm-hmm.

THE COURT: Is it a good time for our lunch break before we get into that?

MS. PRIEDEMAN: Yes. It is a perfect time, Your Honor.

THE COURT: Okay. Why don't we take our lunch break, and we will resume at five minutes after the hour, five minutes after 1:00.

Please remember all my instructions about not having any communications with each other or with anybody else about the case.  Don't do any of your own research, Internet or otherwise.  Bring your notebooks back with you.

And we'll see you at five after the hour.

THE COURTROOM DEPUTY:  All rise.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  All right.  Anything to discuss before we break?

MS. PRIEDEMAN:  No, Your Honor.

THE COURT:  No?  Okay.

THE COURTROOM DEPUTY:  Court is in recess.

(Luncheon recess taken at 12:23 p.m.)

**AFTERNOON SESSION**                                    **1:07 p.m.**

(Proceedings were heard in the presence of the jury.)

THE COURT:  You see you have a little gift waiting for you on your chair there.

THE COURTROOM DEPUTY:  Please be seated.

THE COURT:  Okay.  You can proceed.

MS. PRIEDEMAN:  Thank you.

BY MS. PRIEDEMAN:

Q.   All right.  Dr. Sanchez, we were just about to dig into the different trade secret categories.

MS. PRIEDEMAN:  Ladies and gentlemen of the jury, there's a copy of Exhibit 775 on your seats.  We're going to be

referencing this throughout the exam so I thought a printout would be helpful.

BY MS. PRIEDEMAN:

Q.   All right, Dr. Sanchez.

THE COURT:   Could I interrupt you and ask one question about that?

MS. PRIEDEMAN:   Yes.

THE COURT:   So this, I assume, will be collected.  The jurors should not be taking this back with them.  They should leave it on their seats during a break.  Is that correct?

MS. PRIEDEMAN:   Yes, Your Honor.

THE COURT:   Okay.  And then at some point you'll be collecting them back from them; right?

So don't take any notes on that exhibit that you were given.  Okay?

All right.  Thank you.

BY MS. PRIEDEMAN:

Q.   All right, Dr. Sanchez.  Let's start with Trade Secret Category 1.

Can you describe the type of information that is contained in these documents?

A.   Yes.  So Trade Secret Category 1 concerns Google's TPU Version 4.  It describes different kinds of information about the internals of this TensorCore, this TPU hardware.  And so, specifically, it contains information about the

implementation of different internal components of the TPU V4 chip.  It contains information about the interfaces of this chip and how different components interact with each other.

Q.   All right.  I want to first step back and talk about a couple of concepts that you talked about in that answer.

And first I want to talk about just what a computer chip is.  We've talked a lot about TPU chips and GPU chips.  And can you, just high level, give the members of the jury kind of an explanation of what a chip is?

A.   Right.  So a chip is essentially the hardware that implements these processors that power the devices that we all use every day.  Every computer has one or more, generally many chips.  And these are essentially devices that implement -- you know, they're fairly small slabs of silicon that have many, many components within them.

So if you take a chip like the kind of chip that you could buy from the store, see in a system, it's normally packaged like the picture shown on the left.  And so it has some metal on top, because chips generally consume a lot of power and so that heat needs to be dissipated.

But if you open it up, what you'll see is, essentially, you know, a small slab of silicon.  It looks kind of like a mirror.  So this is like an inch by an inch, a little bit less, and very thin.

And the picture here on the center shows a blow-up of

that -- of one particular chip.

If you look closely, even though it looks like a mirror, you'll see that there are some patterns there, and so those are all of the electronic devices, electronic components that are implemented in this -- in this piece of silicon.

Now, this is a 3-D structure.  So if you cut this slab of silicon vertically and then you put it under a microscope, you'd see the picture on the right, where what you see is there's, you know, multiple layers of different components.

So at the top, you have multiple levels of wires.  And then at the bottom, you have these tiny electronic devices called transistors.  These are -- basically act like light switches, except whether that switch is on or off is controlled by some -- you know, some signal that is carried through one of these wires.

And so, you know, at a high level, these chips are very simple.  They consist of just two components, the transistors and wires that connect them.

But the magic here is that high-end chips, chips that we all use today -- especially if you look at these high-performance chips which are larger, like the ones that are used in these AI supercomputers -- feature over a hundred billion of these transistors, these electronic devices, connected by hundreds of miles of microscopic wires.  And so these are by far the most complex devices made by man, by

mankind.

And not only that, these devices evolve very quickly.  So for the past few decades, the number of devices, the number of transistors in each of these chips has doubled every two years.

And so that's why you see, over time, how computers become much, much, much more powerful and capable of doing things that a few decades ago, you know, were unthinkable.

Q.   Thank you, Dr. Sanchez.

I want to -- you've mentioned different components within the chip, and you talked about internal components in relation to TPU Version 4.

Can you talk a little bit about what you mean when you talk about the components of a chip?

A.   Right.  So at a very low level -- right? -- like if you look at the individual devices, you're looking at 100 billion transistors, and it's not useful to think about the system that way.  You have to think -- to be able to design these systems, you have to think about organizing, you know, these little devices into larger groups.  And so that's what we generally refer to as components.

And so when you look at a processor chip, there are many, many types of chips -- chips that are specialized for different kinds of applications, that run on cell phones, that, you know, consume large amounts of power and are much faster -- but they all have the same high-level structure.  They all consist of

three kinds of components.

So those are shown in this slide.  If you look at the middle, this blue box here labeled "Cores," cores are basically the brain of the machine, the brain of the processor.  They're the piece that performs calculations.  They take some input data, they perform some operations, like adding numbers, multiplying them, some more complicated things, and then they produce some outputs.

And so, for example, if you're looking at, you know, asking Gemini or ChatGPT a question, ultimately, this is the part of the chip that is performing the calculations necessary to produce an answer.

Now, a key feature of these cores is that they're what we call programmable.  They're designed to execute a program, to execute software.

And so I think a useful analogy here is think of it like a chef.  It's given a sequence of instructions, like a recipe, and then it carries out that recipe and produces some result. But that recipe can change; right?  So you can load a different program and then perform a different set of calculations, a different computation.

This actually makes them much harder to design than if they were designed to carry just one calculation.  Like imagine designing something that just implements or runs -- you know, produces one recipe.  This needs to be designed to be fast on a

wide range of recipes, a wide range of programs.

So that's cores.  That's sort of the brain of the machine.

But another very important part is what's labeled at the top in this green block called a "Memory System."  So these programs, basically, they consume and they produce data, and that data must be stored somewhere.  And so the memory system is the part of the chip, the part of the system that stores data and serves it efficiently to these cores so that they can operate on this data.

And, finally, the box at the bottom that's labeled "Input/Output" or "I/O" is essentially the set of components that let the chip communicate with the outside world.  Of course, you need to be able to receive inputs from some other place, you know, somewhere outside the chip, produce some outputs, and then communicate them.  And so this is also an important part of these systems.

Q.   So you mentioned that chips are very complex.  Can you tell the jury a little bit about what goes into chip design?

A.   Right.  So because the design of a chip is a very complex endeavor, we break it up into different phases.  So a common way of thinking about the different phases in the design of a chip is to structure it into three main phases that are listed here.  Those are called architectural design, logic design, and physical design.  So let me present each of those in a little bit more detail.

Architectural design is essentially about determining what are the components within a chip; what is the internal design of its components.  So, for example, how many cores is that chip going to have?  What memories?  How large are those memories going to be?  How are they going to be connected?  What specific functions is its core going to be able to perform?  And so all of these questions about, essentially, what is the structure, what is the blueprint of the chip.

Once you have that, then design moves to a next phase that we call logic design, where essentially developers implement the functionality of the chip in a special kind of language that we call a hardware description language.

And so I mentioned before programs, software programs; right?  So there are a lot of programmers that are writing code that runs on these processors.  But when designing these processors, it's also useful to -- you know, it's crucial to write their description in a very precise way, using these languages that instead of for software, they're for hardware.

And so a key feature of these languages is that tools can then automatically translate those precise descriptions into actual circuits, actual -- you know, essentially, a graph of components like these transistors and wires.

So now you have this set of components and this very precise specification, but you don't know how they're placed in the chip; right?  A chip is a real thing.  It's a surface where

you need to decide where do all of these elements go.  And so that's the role of this last phase that we call physical design.

And so you can think of this as the design of a city; right?  So you can say, well, there will be some industry, some commercial areas, there will be some residential areas.  But where are those different areas placed; right?  Where do you build this type of housing, that type of housing?

And so that's the role of physical design, where you actually go and place all of these different components and all of these different parts of the chip so that the chip is efficient.  For example, components that communicate very frequently are placed very close together so that that communication is cheap.

Once you have finished with this step, you have something that you can send to a fab, who, essentially, a company that produces the chip, and a few months later you get an actual chip that you can use.

**Q.**   All right.  That was a lot of information, so I'm going to try to ask a couple of follow-up questions and see if we can break that down a little bit.

So when you talked about the architectural design phase, you described that basically as the phase where you're designing the different components that we just looked at in the prior slide; is that right?

**A.**   Yes.

**Q.**   Would that be looking at things like how to design the memory?

**A.**   Yes.

**Q.**   You mentioned how many cores there might be?

**A.**   Right.

**Q.**   And that's kind of the -- is that like a blueprint almost?

**A.**   Yes.

**Q.**   And then the second phase, the logic design, you mentioned that that's translating the architectural blueprint design into a more physical design; is that right?

**A.**   It's a more concrete design, right.  It's precisely specifying, precisely implementing that blueprint.

**Q.**   How does that relate to the slide we looked at earlier where you talked about the different transistors and how to connect the different components?

**A.**   Right.  So it's precisely specifying how each of those components that are in the blueprint -- right? -- in the architectural design, what is the set of transistors and wires that they -- you know, how are they physically implemented.

**Q.**   And then the last phase, the physical design phase, you said, is translating that into specific placements on the chip; is that right?

**A.**   Right.  So placement, and then things like sizing the components.  You can make larger and smaller transistors, so

things like -- very low-level things like that.

Q.   All right.  And turning back to category -- Trade Secret Category 1, is there other information -- is there information in Trade Secret Category 1 that relates to Google's chip design for TPU Version 4?

A.   Yes.

Q.   What phase does that information relate to as it pertains to the different phases of chip design that you outlined?

A.   The architectural design phase.

Q.   Can you give the members of the jury a little bit of a sense about how much time goes into the architectural design phase?

A.   Yes.  So architectural design is a very complex and intricate process, especially for something like a machine learning accelerator like Google's TPUs, because deciding all of these aspects of the chip -- what components, the internal structure of each component, how the components talk to each other, how is the chip programmed -- requires a lot of experimentation.  It requires a lot of knowledge spanning different areas of computer science and electrical engineering; so, ranging from hardware design -- right? -- how efficient are different design alternatives, to, for example, how machine learning workloads behave; right?  These chips are customized to the needs of these machine learning workloads, so it's really important to cater to them.

And there's a wide range of tools and methodologies that are used for carrying this design process.  For example, often designers write simulators, which are tools that model this hardware, so that we can evaluate many different design alternatives.  There's research going into new techniques to solve particular bottlenecks.

And overall, you know, this process takes, even in the best of cases, we're looking at, you know, perhaps years for a single chip.

But it is important to understand that this is an iterative process.  So when you're looking at Version 4 of the TPU, this reflects basically the learnings of the previous versions of the TPUs as well.  So what worked, what didn't work so well.

And so Google has designed, at this point, what it's publicly announced is seven different generations of TPUs; and the architectural design of these TPUs keeps evolving, keeps changing.

As new machine learning workloads come out, the requirements change, the technology changes.  And also, you know, very importantly, we learn more about techniques to improve performance, and we can apply those techniques.

Q.   I just want to clarify, Dr. Sanchez.  You said the architectural design phase could take years for a machine learning chip.  Is that what you said?

**A.**    Yes.

**Q.**    How expensive, approximately, is it to develop a machine learning accelerator chip?

**A.**    So developing a chip in the same technology process as what Google's TPU V4 is, is around $300 million by some reputable estimates.  I mean, Google does not disclose that cost, but that would be the cost to just design it from scratch.

Let me clarify that.  Actually building the chip is, you know, additional -- additional cost.

**Q.**    So the time and cost you just discussed, that's just for that first phase of architectural design?

**A.**    That would be the first and second one.

**Q.**    But the -- how long would it take, approximately, just for the architectural design phase, to design the different components and for a --

**A.**    So, again, years.  I mean, it is hard to quantify -- right? -- because it depends on the specific chip.  But relatively speaking, because the architectural design is the first phase, there are many more variables; there are many more things that can be changed.

Once you have the specific blueprint, you know, carrying out logic design and physical design, it does take some effort; but it is an effort that, for example, can be divided among multiple people much more easily because at that point, you're

about implementing specific components rather than thinking about the whole picture.

**Q.**    All right.  So we talked about the different components of a chip kind of overall.  I want to talk now about the different components of Google's TPU chip.

Can you walk the members of the jury through this slide?

**A.**    Yes.  So this slide shows the same three different kinds of components that we saw a couple of slides ago, but it adds more detail and adds details that are specific to TPUs, specifically on TPU V4.

And so on the cores, if you look at these different cores, you can see that there are two different kinds of cores.  Those are all TensorCore and BarnaCore.

So TensorCores are specialized to these machine learning workloads.  Each TensorCore can carry many, many operations at the same time.  They implement, you know, special support using a lot of hardware to run complex mathematical operations like multiplying large groups of numbers called matrices.  And they're the part of the system that runs most of the computation.  They're also relatively large.

Now, if you look here, there's another type of core that's called a BarnaCore.  So BarnaCores, which Google also has referred to externally as SparseCores, are specialized cores that run a particular type of machine learning computation.  They're smaller than TensorCores, but they're very, very

effective on that computation.

And so Google has disclosed that they get large performance benefits over other alternative implementations of that computation by having this specialized kind of core in TPUs.

So, again, you have this memory system at the top.  There are many unique characteristics about this memory system: how it's managed by software, the kinds of memories that it has.

But also at the bottom, you can see that there's two kinds of input/output systems or components.  First, you have this block labeled "Inter-chip Interconnect," or ICI.  And that inter-chip interconnect block is particularly important because it is the block that enables high-performance communication between TPUs.

So before, I mentioned that one of the distinguishing features of TPUs is that they're built from the ground up to operate in large groups so that you can take a machine learning workload and run it on collections of thousands of TPUs, thousands of TPU chips.  And so the inter-chip interconnect is, you know, key to the implementation of this high-performance network that enables these TPUs to work together.

And then you have this host interface which essentially provides communication to the rest of the server.  So these TPUs are designed to be plugged into a server and then managed

by the CPU, or the central processing unit, within that server, and so that's what provides that communication.

Q.   So looking at the TensorCore and BarnaCore in blue, are those kind of the brains of the chip that you discussed earlier when you were talking about different cores?

A.   Yes.

Q.   And has Google publicly disclosed the existence of these different components?

A.   Yes.

Q.   All right.  How do the documents in Category 1 relate to the different components of Google's TPU?

A.   So to explain that, this diagram shows -- this diagram was actually produced by Google and is in one of the Google files, but there is an equivalent diagram published in a 2023 presentation publicly by Google.

And so here, you can see, basically on the left, you have a picture of the TPU chip.  In particular, you see that there are different -- different blocks here.  That slab of silicon in the middle, that big one, that is the TPU V4 chip.  The ones on the sides, the smaller ones, are the memories, main memory.

And so here on the right, you have this block diagram that shows the different internal components of this TPU V4 chip. Everything that is under -- within this dotted line is what's in this chip.

And so you can see that these blocks are colored in

different ways.  That sort of matches the color scheme that I used in the previous slide.

But you can see TensorCores are at the top, BarnaCores in blue at the bottom.

The memory system, which is in the middle, implements memories and connects all of these different components, that's in green in the middle.

You have the ICI, the inter-chip interconnect, on the right, colored yellow.

And then you have the communication with the host, this unified host interface, color in purple to the left.

Q.   All right.  I want to just go through that a little more slowly, Dr. Sanchez.

So the TensorCore is the -- are the two units in blue on the top of this diagram; is that right?

A.   That's correct.

Q.   And within the TensorCore -- excuse me.  There are subcomponents within the TensorCore that you can see in this graph as well; is that right?

A.   Yes.

Q.   And again -- and then BarnaCore is in blue on the bottom?

A.   Mm-hmm.

Q.   And it kind of alternates between that and HBM; is that right?

A.   That's correct.

Q.   So everything that's in blue here is kind of the brains we talked about?

A.   Yes.

Q.   And the green is the memory system that you talked about?

A.   Yes.

Q.   And then the ICI link in yellow, is that the communication feature that you were discussing earlier?

A.   Yes.  So that implements high-performance communication between TPU chips.

Q.   That allows TPUs to communicate?

A.   Yes.

Q.   And then the host, can you point out where the host is?

A.   The host is -- you mean that bubble or that cloud called "Host"?  Or...

Q.   Yes.

A.   Yes.  So the host is outside the chip.  That refers to the CPU.  That is -- that is managing this TPU.

Q.   And what is the little purple box that says "Unified Host Interface"?

A.   That is the hardware block that enables that communication between the host and the rest of the TPU chip, some more resources of the chip.

Q.   All right.  Can you describe what we're looking at here, Dr. Sanchez?

A.   Yes.  So this diagram shows the same -- it is the same

diagram as in the previous slide, but it is annotated to show how the different documents in this category, in Category 1, map to the different components of the TPU V4 chip.

And so at the top here, you see this label of "TensorCore ISA documents."  And so that's an arrow that goes to a box that circles these two TensorCores.  And so there are nine documents here.  There's PFC - TensorCore Instruction Set Architecture 1 through 8.  Those are describing the instruction set architecture for TensorCores for TPU V4.

There's another document that includes the same information for the TensorCores in TPUs Version 2 and 3.  That's called TensorCore Instruction Set Architecture JFC and VFC.

THE COURT:  Dr. Sanchez, I'm going to remind you to try to speak a little bit more slowly for the court reporter and, frankly, for all of us --

THE WITNESS:  Okay.

THE COURT:  -- to be able to follow along.

THE WITNESS:  Thank you.

Okay.  So in the next -- the other blue block here, as you can see at the bottom, is the one that goes around the BarnaCores.  And there is a file called PFC - BarnaCore Instruction Set Architecture that describes -- you know, has the implementation details about this BarnaCore component.

If you look at the middle, there is a green box that

surrounds the different components of the memory system.  There is a file called PFC - Memory System that includes information and internal implementation details about the memory system.

So if you look at the yellow box on the right that surrounds the ICI router and ICI link, there are four files here that are listed at the bottom.  Those four files describe internal implementation of this ICI component, the I/O component, that enables high-performance communication between TPUs.

And, finally, there is this purple box that shows -- you know, goes -- surrounds these PCIe and Unified Host Interface blocks, and there's a file called PFC - Host Communication that describes the internals of those, those blocks.

BY MS. PRIEDEMAN:

Q.    So those files that you just touched on, do they relate to all the different components you were just discussing?

A.    Yes.

Q.    What does "PFC" stand for?

A.    It stands for Pufferfish chip.  So Pufferfish is the internal code name for TPU V4, and chip is just specific to a chip.

Q.    Does Google use different internal code names for each of their different versions of their TPU?

A.    Yes.  A few of those include Jellyfish, Dragonfish,

Pufferfish, Viperfish, Ghostfish.  Those correspond to versions through to 6 of the TPU.

Q.   Okay.  I want to get into some of the specific documents in just a minute.  But big picture, did anything stand out to you about this collection of documents in Category 1?

A.   Yes.  These are very detailed, long descript documents that include a lot of implementation details, choices. Essentially, they would allow someone to bypass most of the effort in architectural design.  And for several of these components, they entirely allow someone to go straight into the logic design phase.

That's the case, for example, for TensorCores, which are a particularly important component of the TPU.

Q.   When you say "implementation details," can you explain what you mean?

A.   Yeah.  So I mean internally, what are the techniques that are used to implement the hardware that provides the functionality that you ultimately want the chip to have.

Q.   Are any of the documents in Category 1 publicly available?

A.   No.

Q.   Could any of them be re-created using publicly available information?

A.   No.

Q.   Would these documents be valuable to a competitor?

A.   Yes.

**Q.**   How so?

**A.**   Well, because these documents reveal so much about the internal structure, behavior, and operation of this TPU chip, a competitor -- for example, any company who was building a machine learning accelerator -- would be able to adopt a similar design; would be able to replicate, you know, the actual implementation of the TPU chip; or, you know, if they were to just follow this template, again, they could jump into logic design and skip a large amount of the research and development effort to produce these chips.

**Q.**   All right.  Let's look at some specific documents.

I want to talk about the TensorCore ISA documents.  So that's -- if you look at Exhibit 775, those are -- I want to start with Exhibits 363 through 370.

Do you see where it says TensorCore 1 and it goes all the way through TensorCore 8?

**A.**   Yes.

**Q.**   And we also can see it in the diagram.

First, before we get into the substance, do these eight documents relate to each other in some way?

**A.**   Yes.  They're actually the same document.  So it's spread over eight files, but they are all logically a single document. And, in fact, if you look at the ninth document in this category, it is the same document for the previous version of TensorCores, and those are all in a single file.

**Q.**   So it's basically one document that was broken into eight different PDFs?

**A.**   Yes.

**Q.**   All right.  And what is contained in these eight documents?

**A.**   So this contains the instruction set architecture, or ISA, for TensorCores, for this particular type of core that is the largest component in TPUs.

**Q.**   What is an instruction set architecture?

**A.**   Right.  So an instruction set architecture is the contract between hardware and software.  It is a precise specification of how programs -- how these software programs, these recipes must be written to run on this hardware.

**Q.**   And you mentioned earlier that there's enough detail in the TensorCore documents to enable a competitor to replicate components.

Can you explain, just at a high level, what is contained in this information that would allow a competitor to replicate components?

**A.**   Right.  So this is a very important point here, which is that the style, you know, the kind of processor that a TensorCore is essentially exposes the internals of the hardware details to software.  And so because of that, the contract, this instruction set architecture, this contract between hardware and software is giving a lot of details about how

internally the processor works.

Now, it's important to realize that that's not true for all types of processors.  For processors like general-purpose CPUs or GPUs, the ISA reveals far less information about the internals of the core.  And, in fact, that is by design.  ISAs were initially invented precisely to decouple, to provide a layer of indirection between the implementation of a processor and how programs are written around that processor.

And, again, for those technologies like CPUs, that brings many useful benefits.  You can go and buy a new machine every few years and run the same software that you've run for years or decades without changing it, and yet, you know, it is running faster.

So for all three kinds of processors, like CPUs, again, the ISA essentially allows the implementation of the processor to evolve independently from how these programs are expressed.

Now, the problem is that that makes the operation of these processors inefficient.  And so for these kinds of processors, for TensorCore specifically, they're what we call exposed architectures.  The trade-off there is totally different.  Instead of using this ISA to decouple software and hardware, this is just saying:  Let's expose all of the internals of this component to software so that software can manage them and, you know, schedule operations, decide exactly when to run its operation.

And so, for example, these TensorCores can run multiple operations at the same time.  Each operation takes a given amount of time to run.  These documents tell you exactly how many operations can run at the same time, what kinds of operations, how do different operations communicate data between each other.  And so all of those, essentially, contain the internal implementation of the TensorCore --

THE COURT:  Can I ask a question?

THE WITNESS:  -- the architectural description.

THE COURT:  Sorry.  Can I ask a question, Dr. Sanchez?

A couple of times when you were describing an ISA, or an instruction set architecture, you used the word "contract" --

THE WITNESS:  Yes.

THE COURT:  -- contract between the software and the hardware.

I found that to be a curious word, and I'm not sure I understand it.  I'm wondering if you can explain it to me.

THE WITNESS:  Yes.  So we use that term in the field to refer to, well, this is a set of rules that software must abide by to be able to use the hardware.  You could think of it more like a language.  So that's another common description.  But it's a contract in the sense that if you go off the rails, you know, the program will just not work.

\\\

BY MS. PRIEDEMAN:

Q.   So you're saying, Dr. Sanchez, there's something specific about the TensorCore that reveals details about the underlying hardware in the ISA; is that right?

A.   Yes.

Q.   I want to look at -- well, first, let me ask.  You've been in this field for a while; right, Dr. Sanchez?

A.   Yes.

Q.   When you reviewed these -- the TensorCore ISA, were there features or things that stood out to you?

A.   Yes.  I mean, they go far beyond what Google has publicly disclosed about the functionality of TPUs, the kinds of instructions that they implement, how they implement them.

I found, you know, particular features surprising.  The use of particular features is not at all standard for these kind of processors.

Also, all of the performance-related data about these contains surprising figures that are things that I would not have expected from a conventional design.

Q.   In your research at MIT, have you ever tried to look at what Google has published about its TensorCores and tried to determine certain of its features?

A.   Yes.  So because of my work in -- you know, one of my areas of research is on the development of accelerators for machine learning workloads.

**THE COURT:**  Remember to slow down.

**THE WITNESS:**  Yes.  Apologies.

**THE COURT:**  You can start over.

**THE WITNESS:**  Yes.

**THE COURT:**  Answer that question again.

**THE WITNESS:**  So one of my research areas concerns developing accelerators for machine learning workloads.  And so as part of this work, I've read the public disclosures of technical papers and presentations that Google has, you know, published on TPUs, different versions of TPUs.

And in one of our projects, in one of our recent projects, we actually compare it to a TPU.  And so we built a model of one of the key components of TensorCores, that's the MXU block, based on the descriptions that Google has published about these TensorCores and these MXUs.

Now, MXUs are in charge of an important operation in these machine learning workloads.  They multiply matrices of numbers.  And so a matrix is a group of numbers arranged in rows and columns.  So think of it like a grid where each cell has a number.  So that requires quite a lot of hardware.  And a lot of the computations in machine learning can be expressed using matrix multiplication.  So TPUs and other systems devote a substantial amount of hardware to do this.

And our paper was, and this project was about developing a particular kind of matrix multiplication unit, and

so we, you know, compared against what we thought was -- you know, what the matrix multiplication unit did, based on our reading of these public -- and careful reading and analysis of these public materials.

Looking at these documents, what I found is that the MXU in Google's TPUs and, in particular, in TPU V4, has more features that Google has not publicly disclosed; makes trade-offs that are not standard and so they result in particular -- you know, particular operations having -- you know, taking place in ways that are not the standard way of building these kinds of components.

And so, overall, I found that quite surprising.

BY MS. PRIEDEMAN:

Q.   So you're saying, Dr. Sanchez, that in your prior work at MIT, you actually tried to look at one of the components of Google's TensorCore called the MXU, you looked at publicly available information about that MXU and tried to model what that looked like; is that right?

A.   Yes.

Q.   And are you saying that now that you've seen this TensorCore ISA document, there's features that you were not able to determine based on what you had looked at in the public domain?  Is that right?

A.   Exactly.  There are valuable features that are not publicly disclosed at all.

Q.   All right.  So I want to look at some specific examples in the TensorCore ISA documents.

First, are these documents over 100 pages combined?

A.   Yes.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, can you please pull up Exhibit 363.  And this is one of the alleged trade secret documents.

All right.  Ms. Hernandez, can you please go to page 5.

BY MS. PRIEDEMAN:

Q.   All right.  Dr. Sanchez, do you see the graph kind of in the middle of this page and it says "Architectural State"?

A.   Yes.

Q.   Can you describe in general terms to the members of the jury what we're looking at?

A.   Yes.  So architectural state refers to state -- to, basically, memories that are available to the program, that the program can read and write.  So these are basically the elements in the chip that store data that the programs use to run.

And so here, you can see a table that describes all of those elements, you know, all of those memories, what are their sizes, what are their purposes to the -- you know, within TensorCores.

MS. PRIEDEMAN:  And, Ms. Hernandez, if you can zoom

back out and then just scroll to the next page.

**BY MS. PRIEDEMAN:**

**Q.**    Does this table continue, Dr. Sanchez?

**A.**    Yes, this table continues for several pages.

**Q.**    And can you, just at a high level, explain what this information would be used for or what it's used for?

**A.**    Yes.  So this information encapsulates many important trade-offs.  For example, the sizes of the memories within a TensorCore have an effect on the functionality and performance of a TensorCore.

At a high level, you can think of a memory as kind of a library or a shelf.  You know, the larger you make it, the more books or data you can store in it but, also, the more expensive getting to one particular book it is going to be; right?  You need to reach out further or go further away.

And so the same thing is true for computer memories.  And so this table shows the memories, the internal memories of TensorCores and all of their sizes, including things that Google -- you know, memories whose size Google has not disclosed.

For example, the instruction memory row here at the top shows precisely the number of words, of locations -- think of this as like the number of books that you can put on a shelf -- and how large is one of those.

And so, for example, that determines how large a program

can be to run in the TensorCore directly with -- it needs to fit in this -- in this memory.

Q.   Would this information be valuable outside of Google and outside of the context of Google's TPUs?

A.   Yes, of course, because this relates generally to the development of machine learning accelerators and nothing here is specific to Google's infrastructure.  I mean, machine learning accelerators need to run machine learning computations, and those are -- you know, they have the same features or similar features, regardless of whether, for example, it's Google's large language model that powers Gemini or Anthropic's large language model that power, you know, their Claude system or OpenAI's large language models.  They have similar structures and similar needs.

THE COURT:  Ms. Priedeman, whenever you think is the right breaking point, let's take our afternoon break.

MS. PRIEDEMAN:  Let's just -- I was going to go to a couple more pages in this document, and then I think then would be a good time.

THE COURT:  Sure.

MS. PRIEDEMAN:  Ms. Hernandez, can you go to page 16, please.

BY MS. PRIEDEMAN:

Q.   Dr. Sanchez, can you describe what we're looking at in this document now?

**A.**    Yes.  So this -- in the middle of this page, you can see a table and a section that's called "Fields of the Instruction Bundle."

And so the way TensorCores work is that they essentially group instructions into what they call bundles.  And so instead of running one instruction at a time, they run all of the instructions in this bundle, in this group at the same time.

Now, this is important because at a high level, there are two reasons why these TensorCores are very fast.  The first reason is that they implement operations that perform a lot of work.  Each instruction here, each of these basic operations can operate on a lot of numbers and perform lots of basic calculations.  But a second and also very important reason is that the TensorCore can run multiple of these instructions at a time.

And so this table shows how many instructions can it run at a time, because it specifies the different groups or subgroups here, what are called the instruction slots, and each slot you can put one instruction.  It also gives the specific format of those instructions.

Now, the rest of the document, so you see here there are, you know, different bits.  That's essentially saying how large each of these fields is, each of these pieces of data is.

It's giving the name of the fields.  So each particular piece of data has a specific name.  And it is giving some

information about how that is used.

But it is important to emphasize that the rest of this document then is saying specifically about what values to put in these fields, in these pieces of information, to implement all of the different instructions of the TensorCore.

MS. PRIEDEMAN:  Ms. Hernandez, can you zoom back out and scroll down a little bit.

BY MS. PRIEDEMAN:

Q.   Does this table continue on, Dr. Sanchez?

A.   Yes.

Q.   Is the information in this table publicly available?

A.   No.

Q.   What --

A.   Google has not even published high-level information about this table, like the total size of this instruction bundle or the number of instructions in the bundle.

Q.   Would this information be valuable to a competitor?

A.   Yes, because this precise format is something that enables -- would enable a competitor to understand how information about programs is encoded, essentially how the recipe of, you know, how software is written is precisely encoded; and then, for example, what types of instructions are supported, how many instructions can run at the same time; and, you know, in combination with the rest of the document, precisely how -- what those instructions are and what they do.

Q.   And so you mentioned this a little bit when you talked about the rest of the document, but we just looked at a couple of examples.

Are there other examples contained in this document of information that is not publicly available and would be valuable?

A.   Yes.  Many.

Q.   These are just a few examples?

A.   Yes.  These are just very selected examples, but the whole document is revealing information that would be valuable.

MS. PRIEDEMAN:  All right.  I think now is a good time, Your Honor, for a break.

THE COURT:  Okay.  Very good.

We'll take a 15-minute break.  Plan on coming back at quarter after the hour.  Thank you.

THE COURTROOM DEPUTY:  All rise.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  All right.  Thank you.  You can step down.

Anything to discuss?

MS. WALSH:  Your Honor, will we be taking up the evidentiary objections again, either after court or on Tuesday morning?

THE COURT:  I think it would probably be worth continuing to discuss them a little bit this afternoon before we take off for the weekend.

MS. WALSH:  Okay.

THE COURT:  Okay.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 1:59 p.m.)

(Proceedings resumed at 2:16 p.m.)

(Proceedings were heard in the presence of the jury.)

THE COURT:  Okay.  You can resume.

BY MS. PRIEDEMAN:

Q.  All right.  Dr. Sanchez, so looking at the slide deck again in front of you, we just talked about the PFC TensorCore ISA Documents 1 through 8.  And in the blue underneath those documents, there's another document that says "TensorCore Instruction Set Architecture - JFC," and then in parentheses it says "for TensorCores in TPU Version 2 and Version 3."  And that's Exhibit 372 in Category 1.

Can you describe to the members of the jury what's contained in that document?

A.  Yes.  So this document contains the same ISA description, the same instruction set architecture description, but for the TensorCores that were used in TPUs Version -- Versions 2 and 3.

So the code name for TPUs Version 2 and 3 is -- are Jellyfish chip, or JFC, and Dragonfish chip, or DFC.  So those are -- that's why this is called JFC -- or includes the terms "JFC" and "DFC."

Now, this would be useful to someone implementing even

TPU V4 because it gives additional insight as to how the design of TensorCores has evolved over different generations of TPUs. There are some historical notes in the TPU V4 documents that give some -- you know, summarize the important changes; but this gives additional information because it is, again, the entire description.

**Q.**    Why would that be valuable to someone outside of Google?

**A.**    Well, it would be valuable to someone who is looking to implement a machine learning accelerator because it reflects how the design of these TensorCores has evolved over time.  And so it is important to understand not only what the component does, but also, if you get some insight into why or how that has changed, a designer can then ask questions about, well, why is V4 doing things in this particular way versus the previous versions are doing it in a different way or they're --
you know, this has changed between versions.  Why is that?  Is that a good -- why is that a good idea?

And so it gives -- it gives additional information that is useful for the design of these chips.

**Q.**    All right.  And we talked about, a little bit, the BarnaCore document PFC - BarnaCore Instruction Set Architecture.

Can you talk about, at a high level, what this document contains?

**A.**    Yes.  So this contains the instruction set architecture

description for BarnaCore, which is the second type of core in TPU V4.

Q.   And what type of information does it contain?

A.   So like the previous documents on TensorCores, this document explains how programs must be encoded to run on BarnaCores.  And like TensorCores, BarnaCores have -- you know, share this feature that the instruction set architecture reveals key implementation choices and features about how that core works that would substantially reduce the effort to replicate it or implement a similar type of core.

Q.   Like the -- does the BarnaCore ISA, like the TensorCore ISA, contain information about the hardware details of the BarnaCore component?

A.   Yes.

          MS. PRIEDEMAN:  Ms. Hernandez, can you please pull up Exhibit 371, which is the BarnaCore ISA, which is one of the alleged trade secret documents.

BY MS. PRIEDEMAN:

Q.   Dr. Sanchez, is this document over a hundred pages as well?

A.   Yes.  My recollection is this is 175 pages.

Q.   And we're not going to go through all 175 pages, but I'd like to look at just one example of the type of information you've been talking about.

          MS. PRIEDEMAN:  So, Ms. Hernandez, can you please go

to page 80.

**BY MS. PRIEDEMAN:**

**Q.**    All right.  Dr. Sanchez, can you explain what we're looking at here?

**A.**    Yes.  So this is a code listing or the beginning of a code listing that explains how a particular type of functionality in these BarnaCores is implemented.

Now, BarnaCores consist -- share some features with -- with TensorCores; but, you know, the defining characteristic is that they consist of different hardware blocks that are used in combination.  So those blocks exchange data to implement a particular set of functions.  And so what this code listing specifies is precisely how one of those functions is implemented.

Now, by having this be in code, you know, this enables -- or this gives a precise description of what is being implemented.  And so this code listing is -- you know, keeps going further.  It contains, essentially, what are the different steps in this particular computation, exactly what is being performed.  So it's not a high-level description that leaves some room for interpretation.  This basically tells you what the hardware does precisely.

**Q.**    Is this information publicly available?

**A.**    No.

**Q.**    Would it be valuable to a competitor?

A.    Yes.

Q.    What could a competitor do with this information?

A.    A competitor could adopt -- I mean, specific to this code listing, a competitor could use it to replicate this particular functionality and how it is split across different hardware blocks.  And more generally on this document, it would enable, you know, replicating or implementing a similar type of core to BarnaCores.

Now, before, I mentioned that BarnaCores are specialized to a particular type of computation that's called embedding layers.  This kind of computation is very important for certain types of machine learning models, and so Google has publicly released data showing that -- a performance analysis of, you know, why BarnaCores are effective.  And they quantify their performance improvements on a representative neural network to be between five and seven times the performance of a system that does not have these BarnaCores.

And so the performance advantages are substantial, and therefore, the economic advantages are substantial as well.

Q.    And would the information in the BarnaCore ISA allow a competitor to replicate some of those functionalities and advantages?

A.    Yes.

Q.    And, again, we're just looking at two pages of a 175-page document.  Is this just an example of some of the non-public

and valuable information in the document?

**A.**    Right.  This is a specific example.

This document explains the internal structure of BarnaCore.  It includes a precise description of its -- you know, all of its other functionality.  It includes tables analogous to the ones that we've seen before for TensorCores, showing the architectural state, all of those internal memories, what sizes, what their purpose is.

And Google has released very, very little information about BarnaCores.  They have short descriptions about them.  If you look at public disclosures, there are substantial differences.  And it's not only the level of detail.  It's just how things are implemented doesn't necessarily match what is in some of these public disclosures.

**Q.**    So you mentioned the public disclosures, Dr. Sanchez.  What could a competitor or someone in the public discern from these -- from this document that they could not discern from the publicly available information?

**A.**    Right.  So, you know, public disclosures include, for instance, in a paper published in 2023, Google gave, you know, a description of BarnaCore that is under one page.  And so they gave an overall rationale for why this kind of core is useful.  They actually disclosed that they had been -- that it had been used in previous Google -- previous versions of Google TPUs since 2017.  So for seven years, Google had not publicly

acknowledged even the existence of this hardware.

And the -- you know, the information there, again, in a description that's under a page, there's a high-level block diagram, there's some high-level principles of operation for how this is structured, but there's no detailed information that would enable a competitor to meaningfully, you know, replicate this.

**MS. PRIEDEMAN:** All right. Ms. Hernandez, can we go back to the demonstrative, please.

**BY MS. PRIEDEMAN:**

**Q.** All right. So I want to turn to the ICI documents that are in yellow here.

Can you remind the members of the jury what "ICI" stands for?

**A.** Right. So ICI stands for inter-chip interconnect. It is the part of the chip that enables TPUs to communicate at high performance with other TPUs. And so in this respect, TPUs are quite different from other accelerators like GPUs. TPUs can be connected with each other directly to form a network.

If you look at something like a GPU, it can communicate with other GPUs, but by going through other components. And so this communication between TPUs is more direct, and it is using a custom implementation that Google has developed and tailored for the needs of these machine learning workloads.

**Q.** How is inter-chip interconnect, at a high level, different

SANCHEZ - DIRECT / PRIEDEMAN

from some other technologies that might be available to connect chips?

A.   So it is much more direct.  It -- basically, TPUs just talk to each other directly.  It follows a different set of design trade-offs and choices than, for example, the networks that are used in data centers to communicate between different servers.  Those networks are closer to networks like the Internet, where, for example, data can be lost when it's sent from -- you know, from some machine to a different machine.

And so here -- I mean, that works well for the Internet.  That's not necessarily the right choice for a high-performance network.  It complicates several other aspects of the system.

And so Google has made trade-offs here that are different from those of other networks and that are customized for the needs of machine learning computations.

Q.   If you could look at Exhibit 775, Dr. Sanchez, and just point out which exhibits relate to ICI.

A.   Yes.  So there are the four exhibits that are listed in this slide.  So those would be 359, 360, 361, and then 373.

Q.   And are there things that stood out to you about the type of information contained in the combination of these documents?

A.   Yes.  I mean, this describes the implementation of this inter-chip interconnect and includes many types of information, as well as different techniques that Google has not disclosed.

Now, when you look at the design of a network, there are

several techniques that one could use; and different systems incorporate different combinations of these techniques, which lead to very different products or, you know, resulting networks.

So in several cases, those techniques, like individual techniques, they are well-known.  It's the combination of techniques or the specific parameters that Google has chosen that are surprising and that yield, you know, this particular network.

Q.   Does this combination of documents about inter-chip interconnect reveal information about how Google has used different techniques together that it has not previously disclosed?

A.   Yes.

Q.   Would the inter-chip interconnect technology described in these documents be valuable outside of Google's network?

A.   Yes.  This network is actually independent of Google's data center network.  And as I mentioned before, machine learning accelerators run these giant computations that need to use many, many accelerators.  They need to run on thousands or tens of thousands of accelerators.

So the ICI is what enables that high-performance communication among TPUs that enables these very large machine learning workloads to run efficiently on these thousands of TPUs.

But the same principles transfer to other types of accelerators. And so any company building a machine learning accelerator would benefit from knowing how Google has implemented this network, what trade-offs they've made, you know, what effect that has on performance.

Q.    Can you talk about that a little bit more? How would a competitor that doesn't have Google's TPUs, for example, benefit from or use this inter-chip interconnect technology?

A.    Right. So, I mean, maybe a way to explain this more easily is with an analogy. And for networks, a good analogy is a road network, is, you know, how you travel from Point A to Point B.

So there are different kinds of roads. There are different ways that you could structure a city -- right? -- and how you have the roads that connect different places -- right? -- in the city.

So by analogy, this is kind of like having the entire road network for TPUs. Now, you could swap out the individual buildings -- right? -- in a city and the network would be useful. And similarly, you could have this network and use it with a different machine learning accelerator and that would still be useful.

Q.    All right. So let's look at a specific document within this inter-chip interconnect category.

        MS. PRIEDEMAN: Ms. Hernandez, can you please pull up

Exhibit 373.

**BY MS. PRIEDEMAN:**

Q.    All right.  Before we look at a specific page, Dr. Sanchez, can you just explain, big picture, what this document contains?

A.    Yes.  So this document is a presentation of -- you know, that shows different aspects of the implementation of the TPU, ICI, the inter-chip interconnect.  It focuses on the router, which is the particular component in the TPU that interfaces or enables data to be sent from a particular -- from that particular TPU to other TPUs and then, you know, likewise, to receive data from other TPUs and pass that data along to, you know, this particular TPU.

Q.    So this document includes information about the router component of the TPU, and you're saying that component helps send information from one TPU to another and also receives information from other TPUs; is that right?

A.    Yes.

       **MS. PRIEDEMAN:**  All right.  Ms. Hernandez, can you please go to page 2.

**BY MS. PRIEDEMAN:**

Q.    Dr. Sanchez, can you explain what we're looking at here?

A.    Yes.  So this is a series of slides where -- that show different diagrams.

       So the slide at the top here shows the internal structure

of the ICI router.  Now, this is a fairly high-level block diagram, so there are some connections and some information about the different types of requests and different connections to other components of the system, but it shows some information about the internal organization of the router.

If you keep going down, there are slides here that show internal -- the internal data formats that are used to exchange data among TPUs.

So this diagram at the top shows specifically this hierarchy of, you know, units of data transfers.  So, for example, it starts showing, you know, a whole message that is sent from one TPU or another -- to another, and then how that is broken down into different units, different smaller units.  So it talks about packets, flits, and other units.

Now, some of this, again, is standard; but in the text on the right, you have choices that Google has made about how this is particularly structured that Google has not disclosed.  And this text also describes how -- or, you know, gives a little bit of insight into how those design choices have changed over different TPU generations.

If you keep going down, the next figure is more detailed.  It shows a more specific format for data -- for how this data that is sent from -- you know, between TPUs is -- is formatted -- right? -- like the specific encodings.

I think if you keep going down -- I mean, here you have --

this, again, is higher -- a little bit higher level.  There are some numbers on the specific sizes of some formats.  But if you keep going down here, you get more detailed diagrams about those units.  That would be one page up.

Q.   Go to page 3, Dr. Sanchez?

A.   Yeah.  So this one.

So here you start seeing, you know, the specific format for those -- those units of data transfer.

MS. PRIEDEMAN:  Can we zoom in on one of these diagrams, Ms. Hernandez, maybe the bottom diagram.

BY MS. PRIEDEMAN:

Q.   So you said this includes more specific information.  Can you talk a little bit about that?

A.   Yeah.  So this is starting to include specific sizes of the particular fields within each -- within these units of data transfer; and so that is conveying, basically, how large particular fields are.  Then this includes text about the efficiency of the communication protocol.

So, basically, think of this as if you're sending envelopes with some pieces of paper to somebody else; right? How much of the paper is, you know, the pieces of paper that are inside the envelope versus the envelope.  The envelope is adding some extra weight, some extra paper that you need to send to get the data from Point A to Point B.  And so that -- this is indicating how much is spent on that -- on that extra

**SANCHEZ - DIRECT / PRIEDEMAN**

overhead.  So that's what's called a header.

**Q.**   Let me see if we can break this down a little bit, Dr. Sanchez.

So earlier we talked about the role of the router and the TPU and how that sends information from one TPU to another TPU.

**A.**   Mm-hmm.

**Q.**   And then you've been talking about how particular figures and numbers in this document talk about how data is formatted.

**A.**   Yes.

**Q.**   Are you talking about how data is formatted when it's sent from one TPU to another TPU?

**A.**   Exactly.  So when data is transmitted over the network, it needs to carry additional data, that's sometimes called metadata, that tells that network how to process the data; right?  For example, where should that data be sent?  How large is the unit of data that is being transferred?

And so the limits there, you know, how large can each of these units be, those are valuable implementation details because they encapsulate different implementation choices.

**Q.**   And just big picture, stepping back, why do those different choices that you talked about of the different sizes and how data is packaged or sent, why is that important?

**A.**   Well, because different applications require different units of data transfer; right?  And so it's -- if you customize the design of the network to the needs of applications, this

results in a more efficient network.

There are -- I mean, I would, again, refer to an analogy to road networks.  This is kind of like saying:  Should you send data in -- or, you know, should you send -- let's say you're sending some product from Point A to Point B.  Should you use a large set of trucks; right?  Like, should you use one big truck?  Should you use small vans?  Those choices affect lots of things about the efficiency of how you get those products from Point A to Point B.

So this is just looking at -- like, by looking at those units of data transfer, that's conveying similar information.

**Q.**   Would the different choices in terms of how data is formatted or how it's packaged, depending on different choices that are made, would that affect the overall reliability of the AI supercomputers and the AI infrastructure, depending on those different choices?

**A.**   Yes.  So this would affect the reliability of the system, the performance of the system.  Again, components can fail. And, for example, when you're transmitting data between two different TPUs, sometimes bits are flipped, so zeros can become ones, ones can become zeros.  It's rare but it happens.

And so how large is the unit of data that is transferred has an effect on how to handle those errors to ensure reliable operation.

And there are other parts of these documents that go into

more detail into those error correction and error handling capabilities.

Q.   Has Google published some of those design choices that we were just talking about that are included in this document?

A.   No, not to this level.

Q.   And -- all right.  And just looking at this specific document, how the data is formatted, the things we talked about, would that be valuable to a competitor?

A.   Yes.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, can you go back to the PowerPoint, please.

BY MS. PRIEDEMAN:

Q.   All right.  So I want to talk about the memory system document, and that is Exhibit 362.

We're actually -- we're going to talk about that document in more detail later on, so I'm not going to go through that in detail, but is that an over 100-page document as well?

A.   Yes.

Q.   And big picture, what's contained in that document?

A.   So that document explains how -- I mean, different facets of how the memory system works.  It includes details about the performance characteristics of different memories.  It includes information about how different components of the system communicate with each other.

One important characteristic of the TPU memory system

**SANCHEZ - DIRECT / PRIEDEMAN**

that, again, is very, very different from most other computers is that this memory system is managed by software, so the programs themselves are moving data around.

And so it explains precisely how those data movement operations work: When one of these data transfers is invoked, what are the precise semantics; how -- when there are multiple data transfers going on or happening at the same time, how might those interact with each other; how -- you know, because these data transfers can take a very long time, I mean, relatively speaking to other operations, what happens or how can the program detect or be notified when one of these transfers is completed.

For example, TPUs are ultimately processing large amounts of data for these machine learning workloads; and so when that data is loaded, there are some computations that need to happen that depend on that data. And so that kind of synchronization.

**Q.** Let's take a step back a little bit, Dr. Sanchez.

So we've talked about a lot of the components. We've talked about TensorCore. We talked about BarnaCore, which are the two core processors of the chip. We talked about inter-chip interconnect, which is how the TPUs communicate with each other.

So big picture, when we talk about the memory system of Google's TPU, can you talk about what role the memory system is playing?

I think maybe it'd be helpful if we can go back.  And if we're thinking about a Gemini or another chatbot or something like that, when you're trying to train a model like that, can you kind of walk us through the role that the memory system would play in that type of function?

**A.**   Yes.  So the memory system is, as I mentioned before, the part of the processor that is in charge of storing data and then serving it to cores, to the brain of the machine.  And so this is really important because, ultimately, these machine learning computations are processing large amounts of data.

So, for example, when you type a query or, you know, try to use Gemini to perform some task, that computation uses a large amount of data that it goes through, basically the entire structure of the network, what are called the parameters or the weights.  This is gigabytes, sometimes terabytes of data, so it's a very large amount of data.  And so that needs to be stored somewhere in some memories.

And so at a high level, that all makes sense.  But the fundamental problem in the design of a memory system is that large memories are very expensive to access.  So each access takes a long time.  Each access takes a lot of energy.

One analogy that might help is, think of if you had to, for example you know, run some small errand -- right? -- like you had to buy a bottle of water; and then you had to, like, travel all across the city to get one bottle of water and then

all the way back.  That would not be very efficient.

And so that's the same thing with large memories.  You need to physically -- these memories are very large, and so the electrical signals need to just travel a long distance, and so that takes time, that consumes energy.

You know, what do we do in real life?  We have stores that get water in bulk; right?  And then if you need a bottle of water, you can just go to your nearest convenience store.

So the same principle applies in a memory system.  In a memory system, the idea is that each piece of data can be used multiple times.  And so these memories -- these memory systems incorporate a collection of memories of very different sizes.

And for this to be efficient, these memories must take some data out.  You must sort of copy data from these slow, large memories to these fast, but very small memories that are much more efficient, and then reuse that data many times so that you can amortize the cost of that very expensive copy.

Now, of course, that's quite tricky because that depends on how these machine learning computations use and access the data -- right? -- these very large amounts of data.  And so the design of the memory system heavily depends on how these machine learning computations behave.

**Q.**  So, again, I'm going to break that into a couple of different pieces.

Just the first point you made is that basically

TensorCores and BarnaCores, which are the processing parts of the TPU, they couldn't possibly hold all of the data that's necessary to train --

A.    Right.

Q.    -- a machine learning model, for example; is that right?

A.    Exactly.  So TensorCores and BarnaCores have some internal memories, but those memories are very, very small.

Q.    And so when you're talking about the memory system, you're talking about the system that's able to store a lot of the data that's required to train those machine learning models; is that right?

A.    Yes.  To train them and use them.

Q.    And use them.

All right.  Let's go to your -- your slide on memory systems.  So you mentioned that the TensorCore itself has some memory within it.

Actually, I'm going to go back to the other slide here. Can you see some of the memories that are actually within the TensorCores in this diagram?

A.    Yes.  So, for example, there's this block called Cmem that is what Google calls a common memory.  So that is the biggest memory within the chip.

And then there are these gray blocks called HBM stacks and then HBM Ctrl blocks.  So "HBM" stands for high bandwidth memory.  Those are the largest memories in the system, and

they're actually implemented using separate chips that are then placed very close to the TPU chip.

If you remember back from the previous picture of the chip, there were, like, four little, smaller chips on the sides.  Those are the HBM memories.

And so that's an even larger memory that holds most of the data.

Q.   So looking at this diagram, you mentioned Cmem.  That's the green bar kind of in the middle of the chip; is that right?

A.   That's correct.

Q.   And then you mentioned the -- is it HBM Ctrl.  Is that another type of memory?

A.   That is the component that accesses the memories that are outside the chip.  The actual memories are where labeled as "HBM Stack."

Q.   Okay.  And then HBM stack, those are the memories that are located outside the chip; is that right?

A.   That's correct.

Q.   And those are the ones that you were mentioning we saw earlier in the photograph?

A.   Yes.

Q.   All right.  So going to this diagram, "How to Design a Memory System," can you explain what this graphic is depicting?

A.   Yes.  So this is showing this hierarchy of memories, and it's showing just the subset of memories in TPU Version 4,

SANCHEZ - DIRECT / PRIEDEMAN

specifically the memories that are used to move data between TensorCores and other -- other parts -- other memories of the chip and of the system.

And so each of these blocks, you can see that, if you look at the green blocks, there are four different types of blocks. Each of the blocks has a name on the top and then a size.

And so going from left to right, that goes from smaller memories to larger memories.  So you can see that each TensorCore, within it, has two relatively small memories.

This Vregs memory, or vector register memory, that is 128 kilobytes.  And then this vector memory, or Vmem, that is 16 megabytes.  And those are relatively small, all things considered.  They're associated to each TensorCore.  And they're relatively fast to access, although here you can see also there's a difference of about 100 times between the size of these two memories so that Vregs memory is much more efficient to access.

Now, if you go to the right, there's this Cmem that is, on order of magnitude, ten times larger, roughly, than the vector memory; and then the HBM is 32 gigabytes, which is, again, much larger than the memories on chip.

Q.   I'm going to ask you just to slow down a little bit, Dr. Sanchez.

A.   Okay.  So as you can see here, if you go from the memories all the way to the left to the memories all the way to the

right, you know, they use -- there's almost a million times worth of difference.  So the HBM is not quite a million times but 250,000 times larger.  It holds 250,000 times more data than the vector register memory.

And so this just illustrates the need for having these combinations of memories of widely different sizes.

And so the system, you know -- in this case, software -- is moving data, collections of data, between all of these different memories to achieve an overall efficient execution.

Q.   And moving back to -- well, first of all -- sorry -- can you -- when you say "memory hierarchy," can you explain what that means?

A.   Right.  So, generally, these memories are managed as a hierarchy in the sense that you move data from the larger memories to the smaller memories progressively.  And so we'll talk, you know, here about a four-level hierarchy because looking from left to right, you have four different levels of memory, four different memory blocks of growing size and also growing cost.

Q.   And turning back to Exhibit 362, which we're not going to look at right now, but that's the memory system document, how does the information in that document relate to this discussion we've just been having about the memory hierarchy?

A.   Well, that document includes implementation choices and techniques that are used within the memory system.  It includes

information, for example, about the specific communication rates of different memories, so how fast can data move between all of these different memories in the system.  And it includes other implementation details about how those memory transfers are performed.

And so that is valuable implementation information, hardware-level information that would be useful to build a memory system for this kind of chip.

Q.  All right.  And like I said, we're going to return to that document in more detail later.

MS. PRIEDEMAN:  Ms. Hernandez, can we go back to the PowerPoint, please.

Sorry.  We're at the PowerPoint.  I don't know what I'm talking about.

BY MS. PRIEDEMAN:

Q.  All right.  Dr. Sanchez, this is the last document in Category 1 we're going to talk about.

The host communication document, which is Exhibit 358, can you just give us a little bit of a refresher on the significance of the host to the TPU chip?

A.  Yes.  So as we've seen before, TPUs are not designed to be stand-alone machines.  They are designed to be plugged into a server and then to be managed by that server.

And so this host communication describes the part of the chip that facilitates or implements that communication between

the host and the -- and the accelerator chip, the TPU chip.

Now, it's important to understand that there are a couple of different levels of detail here. Some of this is standard. So the protocol that is used at a high level, you know, the interface that is used to connect these TPU chips to a CPU is what's called -- in this case, it's shown as PCIe, stands for PCI Express, and it is a standard of -- a standard, you know, protocol and form factor. Basically, you know, gives you the specification of the connector and how things need to be connected to talk to each other. So that's, you know, the standard part of -- of this part of the system.

However, on top of this, there are many different protocols and many different functionalities that these chips like the TPU can implement to communicate with the host and to enable the host to perform management functions, load data into the TPU memories, talk to different components of the TPUs. And so this document is describing those features that are not standard, that are custom and, you know, they're specific to the TPU.

MS. PRIEDEMAN: Ms. Hernandez, can you pull up Exhibit 358, please.

BY MS. PRIEDEMAN:

Q. Dr. Sanchez, is this another document that's over 100 pages?

A. Mm-hmm.

**MS. PRIEDEMAN:** Ms. Hernandez, can you please go to page 14 of this document. We're just going to look at one example as well.

And can you zoom in a little bit, Ms. Hernandez.

**BY MS. PRIEDEMAN:**

**Q.** Can you explain what we're looking at here, Dr. Sanchez?

**A.** Yes. So this shows a block diagram of essentially the internals of this hardware block that enables this communication between the host and the TPU.

And so the particularly relevant part is the square in the middle. Like, if you look at the top half of this -- of this figure, that big square, or that big rectangle that has a bunch of other components within it, that is showing the internal organization of this block, this hardware block.

**Q.** And, again, this is the hardware block within the TPU chip?

**A.** Yes.

**Q.** Has Google published this information?

**A.** No.

**Q.** Would this information be valuable to a competitor?

**A.** Yes.

**Q.** How so?

**A.** Well, this, along with the rest of the document, which gives detailed descriptions of each of these components and how they interact with each other, would enable a competitor to

understand the kinds of operations that this block implements, the kinds of functionality that the host is allowed to perform or the TPU is allowed to perform within the context of the entire system, and then how those are implemented.  So, you know, details of how the hardware is structured to actually provide that functionality.

**Q.**   Would this document be valuable on its own as well?

**A.**   Yes.

**Q.**   How so?

**A.**   Well, there are multiple ways that you can implement these sorts of blocks.  And so it is describing different function- -- different types of functionality that -- you know, these accelerators, some of these are quite unique to TPUs.

**MS. PRIEDEMAN:**  All right.  Ms. Hernandez, can you go up to page 3 of this document, please.

**BY MS. PRIEDEMAN:**

**Q.**   Dr. Sanchez, do you see here that there's a number of what looks like hyperlinks?

**A.**   Yes.

**Q.**   Did you have access to the information contained at these hyperlinks?

**A.**   No.  These are PDFs, and these hyperlinks point to internal -- an internal Google website.  So I did not have access to any of these hyperlinks.

**Q.**   Did you need access to that information to determine

whether this document and other documents like it had value?

**A.** No.

**Q.** Why not?

**A.** Well, so, many of these hyperlinks actually point to or are -- you know, they have the same name or they're describing techniques or pointing to techniques that are -- or other specific information that are actually either in the same document, so these are presumably links within the same document, or they are within other documents in this set.

And so, for example, in some cases, it will -- you'll have something that points to:  Here is the descriptor for -- or the specific format for this piece of information.  And then in some other part of the document, there's that precise description.

Now, it's also important to state that for others -- for other links, those go to things that are not included in these documents.  And so, for example, this is one such case.  There are two references here to "Chip Management."  Chip management is the one part of the specification -- or the one component of the TPU that is not included in this -- in this set.

And so, you know, that's -- even though those are missing, you know, there are chip management functions in all sorts of -- all sorts of chips.  It would require some design effort to build one.  Sometimes, you know, companies use standard ones or purchase standard ones and then use them as is or with

little modification.  So there would be some design effort required to implement this part, but it does not make all of this other information any less useful.

Q.   All right, Dr. Sanchez.

MS. PRIEDEMAN:  Ms. Hernandez, can you go back to the PowerPoint, please.

BY MS. PRIEDEMAN:

Q.   All right.  Dr. Sanchez, we've talked about each of the individual documents in Category 1, and we talked about whether the information in each is publicly available.

Is the combination of all of the information contained in all of the documents in Category 1 publicly available or otherwise easy to determine using public information?

A.   No.

Q.   Can you talk a little bit about that second point about whether or not it's easy to recreate using public information?

A.   You mean about indiv- -- for individual components or for the combination?

Q.   For the combination.

A.   Well, I mean, this -- it's true for individual components; right?  Each of these files and these sets of files that we've been discussing have details and implementation techniques, performance figures, and all of this information about the internal workings of TPU V4 that are just not publicly available and would be hard to find.

Now, one of the reasons why this is hard to find is that when you're looking at TPUs specifically, TPUs are not devices that you can buy and use on your own.  Google offers access to third parties to the TPUs that are running on their data centers.  And so you only have certain interfaces, certain high-level interfaces to write programs that run on TPUs and use them; and as a result, you cannot observe these features or many of the features that are described in these documents.

**Q.**   So you're saying that these are internal details that Google doesn't disclose?

**A.**   Right.  So Google has not disclosed these details.  That's true for each of these.  For the combination, that also applies.

**Q.**   All right.  And we talked about the individual documents in Category 1 and their value.

Is there additional value based on the combination of all of the information in these documents that's different just from the value -- that is different from the value of just each document on its own?

**A.**   Yes, absolutely.

**Q.**   Can you talk a little bit about that?

**A.**   Yes.  So the design of these accelerators and, in general, of hardware and chips is always -- it always depends on trade-offs.  And so these components are not necessarily designed in isolation.

For example, a TensorCore is designed with a particular memory system in mind, and so designing those components independently would not yield an efficient system.  And so because all of these different files are describing all -- or the internals of all of these different interacting components, the combination is valuable because it reveals additional information about their code design and their interactions.

MS. PRIEDEMAN:  Thank you, Dr. Sanchez.

Your Honor, I don't know what you were thinking about timing today, but I'm about to move on to Category 2, unless --

THE COURT:  We'll do that on Tuesday.

MS. PRIEDEMAN:  That's what I was thinking, Your Honor.

THE COURT:  Okay.  All right.  So we have a long weekend coming; right?  We'll be back on Tuesday.

Next week, just to remind you, we'll go Tuesday, Wednesday, and Thursday.  I also may need to end a little bit early on Wednesday, just as a heads-up.  I'll give you more information about that next week.  But we'll go Tuesday, Wednesday, and Thursday next week.  Not Monday, obviously, because it's a holiday, and not Friday.  So it'll probably be a little easier to get through next week.

Please remember to leave your notes in the jury room. Don't bring them home with you.  And please remember over the weekend, do not talk to anybody about the subject matter of

this case or anything relating to it and don't do any of your own independent research.

And we will see you on Tuesday.  Thank you.

**THE COURTROOM DEPUTY:**  All rise.

(Proceedings were heard out of the presence of the jury.)

**THE COURT:**  And let the record reflect that the witness remembered to push the microphone back before standing up.

(Laughter.)

**THE COURT:**  All right.  Thank you.  You can step down.

(Witness excused.)

**THE COURTROOM DEPUTY:**  You may be seated.

**THE COURT:**  Okay.  Let's talk about scheduling.

So how much longer do you think you have on direct with Dr. Sanchez?  Do the next six categories --

**MS. PRIEDEMAN:**  They are not like that, I promise, Your Honor.

**THE COURT:**  Okay.

**MS. PRIEDEMAN:**  That is the longest and hardest category.

**THE COURT:**  Okay.  I figured, and I hoped.  All right.

**MS. PRIEDEMAN:**  I don't know.  I mean, definitely a good part, if not all, of Tuesday, I think.

**THE COURT:**  Okay.  And so I'm just trying to think a little more carefully about when we will do this *Daubert*.

I think, by the way, on Wednesday, I'll confirm with you on Tuesday, but I think that on Wednesday, I need to stop at about, like, between 2:00 and 2:15.  And then if we needed to do stuff in the afternoon on Wednesday, I would become available again at around 4 o'clock, just so you know.

But I think -- so I guess, does it still make sense to plow ahead on Tuesday, after the trial day, with the *Daubert* hearings, the further *Daubert* hearing?

**MS. PRIEDEMAN:**  I think so, Your Honor.

**MS. WALSH:**  I think that makes sense, provided Dr. Sanchez's direct testimony is in, because I think that's -- I believe that I remember Your Honor wanting that to happen before Mr. Pflaum.

**THE COURT:**  Ideally, his direct testimony would end before we would do the *Daubert* hearing.  But is it absolutely necessary?  I'm not certain.

What do people think about that?

**MS. PRIEDEMAN:**  I don't think it's necessary for the direct to be complete.

**THE COURT:**  Okay.

**MS. PRIEDEMAN:**  I think we'll be close, if not finished, by then.

**THE COURT:**  Does it make more sense to do it Wednesday as opposed to Tuesday?  Pick it up at 4 o'clock on Wednesday?

**MS. WALSH:**  That may, Your Honor.  I want to

double-check the witness's availability, Mr. Pflaum's availability. I believe he is, but I want to --

THE COURT: I mean, another possibility would be to do Sanchez on Tuesday and Pflaum on Wednesday -- right? -- so that I'm not keeping you and the court reporter and everybody here late on either of those days.

MS. WALSH: And so would that be their testimony in the -- that would be their testimony in the *Daubert* hearing?

THE COURT: Yeah. So, like, Sanchez at the end of the trial day on Tuesday, and then Pflaum at 4 o'clock on Wednesday. That's a possibility.

MS. PRIEDEMAN: I think it would make sense to try to do it all together, if we can, Your Honor.

THE COURT: Well, I'm not sure how long it takes.

And let me just ask for the record. I was going back and perusing the transcript of Pflaum's *Daubert* testimony. The defense still wishes to offer Pflaum as an expert?

MS. WALSH: Yes.

THE COURT: Okay.

MS. WALSH: We're taking a look at what issues we wish to offer him for, and that may depend at least a little bit on Dr. Sanchez's testimony.

THE COURT: Okay. I plan on reviewing the stuff over the weekend, so any advance notice you can give us on what you don't wish to offer Pflaum for would be appreciated. And if

you decide that you're not -- you decide not to call Pflaum at all, obviously, let us know as soon as possible.

All right.  Well, we can -- I mean -- all right.  Let's think about this.

So let's say Tuesday we go till sometime between 3:00 and 3:30.  And then Sanchez gets on the stand to testify about -- basically, as a rebuttal to Pflaum's *Daubert* testimony and, you know, to a lesser extent, his report, but mainly his *Daubert* testimony.

How long do you think you would want Sanchez on the stand for that?

**MS. PRIEDEMAN:**  I think we can do it in under an hour for sure, maybe 45 minutes.  I think it depends, Your Honor.  I think what we could do is just have a couple of topics prepared, depending on what Your Honor is interested in.  I mean, there's a lot of different areas, obviously, so we could just have --

**THE COURT:**  And part of it will depend on what they want to offer Pflaum for; right?

**MS. PRIEDEMAN:**  Yes, that is accurate, Your Honor.

I mean, to be -- to be honest, we could go for hours and hours.  I know that's not what the Court wants.  But -- or maybe the Court does.  We're happy to do that.  But there's kind of four or so topics that I had in mind based on the transcript and the briefing on this.

THE COURT:  Mm-hmm.  Well --

MS. PRIEDEMAN:  Or if there's particular things that the Court is interested, obviously, in as well.

THE COURT:  Yeah.  Well, I think that we have to consider the possibility that Sanchez testify on Tuesday and Pflaum testify on Wednesday after the trial days, because there may just not be enough time in the day to do both --

MS. PRIEDEMAN:  Yeah.

THE COURT:  -- on Tuesday.

But, you know, I don't know.  Is Pflaum going to be here on Tuesday?

MS. WALSH:  Yes, he'll be here on Tuesday.

THE COURT:  Okay.  So we could -- we could keep it a little bit open and see how things are going.  Maybe over the weekend, we'll learn what the defense is offering Pflaum for and what it's withdrawing about Pflaum's testimony.  And I may have more guidance for you about what I want to hear and what I don't need to hear about and we can decide on Tuesday.

But I think we need to be flexible and allow for the possibility that Sanchez will testify in the *Daubert* hearing on Tuesday and Pflaum might not be able to go until Wednesday.

MS. PRIEDEMAN:  Understood, Your Honor.

I think it's also possible that we go faster on Tuesday, and one option is if we're done with Dr. Sanchez's direct, we could let the jury go a little early and then try to

do both but...

**THE COURT:**  Yeah, that is another -- that's another possibility.  But, of course, there's Sanchez's -- you're saying if we're done with Sanchez's direct, and then we would go to *Daubert*, and then Sanchez's cross would be the next day?

**MS. PRIEDEMAN:**  Potentially.

**THE COURT:**  Wednesday?

Yeah, I mean, that's a possibility too.  I worry about cutting too much time off of the trial day because I don't want -- I don't want the jury to be here longer than it expects to be overall.

I mean, do you have a sense yet of whether you're ahead of schedule, behind schedule, in terms of the presentation of the Government's case?

**MS. PRIEDEMAN:**  We're kind of right on track, Your Honor.

**THE COURT:**  Okay.  Well, let's all ponder all of those options and we'll talk about it on Tuesday morning.

**MS. PRIEDEMAN:**  Your Honor, did you want to talk about the evidentiary --

**THE COURT:**  Yeah.  Let's spend at least a little time talking about that.  Maybe not too much because it's been a long week, I know.

**MS. PRIEDEMAN:**  I guess that is a good point, Your Honor.  In terms of having our next witness ready to go on

Tuesday, I think it's unlikely that that would happen.

THE COURT:  It doesn't seem like it because it would either be --

MS. PRIEDEMAN:  Yeah.

THE COURT:  -- it would either be Sanchez finishing direct and then going into *Daubert*, or Sanchez finishing direct and then going into cross and then doing *Daubert*; right?

MS. PRIEDEMAN:  Right.

THE COURT:  Yeah.

Okay.  Let's see.  Let me ask about Exhibit 5116, the textbook.  Is the analysis the same regarding the textbook?  It strikes me that the analysis is potentially the same regarding the textbook as it is the ISA documents.

If the analysis is different, how is it different?

MS. WALSH:  So Exhibit 5116 describes TPU V1.  It is our understanding that there are some features that are common that have kind of carried through, through the different versions.  And --

THE COURT:  So does it describe TPU V1 in anything resembling the same kind of detail that the Google ISA documents describe it?

MS. WALSH:  I would say it discloses -- it's a slightly different disclosure.  I mean, it's, you know, more focused on block diagrams and functionality.  Does it have the tables that we looked at today?  Not necessarily but...

THE COURT:  Okay.  What's your comment regarding 5116?

MS. PRIEDEMAN:  Your Honor, my understanding is it's pretty high level and there's huge differences in Version 1 and the later versions.  In fact, Version 1 of Google's TPU was inference only, so it wasn't even for training of machine learning models.  So it was a really different chip.

THE COURT:  Okay.  I think there has been some testimony from Dr. Sanchez that earlier versions were -- knowledge of how earlier versions work are relevant.  Now, he didn't specify about Version 1 -- he didn't give testimony about Version 1.

But I think in light of that, what I'm going to say is there's at least a colorable -- based on what the defense has offered, there's at least a colorable argument that the description of Version 1 sheds some light on it.

It seems like it's something that -- you know, in terms of jury confusion and in terms of the amount of time it could potentially waste, I have a suspicion that it could be a waste of time.  But in terms of the risk of jury confusion and in terms of the amount of time it'll take, I suspect it will be relatively small and relatively easy for Dr. Sanchez to be cross-examined about that and explain it.

So I'm going to allow --

MS. PRIEDEMAN:  Your Honor?

THE COURT:  Yeah.

MS. PRIEDEMAN: Just, it's a 600-page textbook and there's one chapter on Google's TPU.

THE COURT: Yeah, it can only be the stuff on Google's TPU, obviously.

MS. PRIEDEMAN: Okay.

THE COURT: That's the only portion of it that can be admitted.

Okay. And we'll stop at 3:30, since it's been a long week for everybody, but we'll get done as much as we can.

What about the academic paper, the 5140? Isn't it, like, kind of the same story as the -- again, as the ISA documents from other companies?

MS. WALSH: So 5140 describes some of the same information as what appears to be in some of the trade secret documents on Google RDMA GRT and some of the memory system and, also, some components of diorite architectural documents.

THE COURT: Okay. And this academic paper, who is that written by?

MS. WALSH: It is...

THE COURT: When was it published? Where did it come from? All that stuff.

MS. WALSH: It was published in 2022. Some folks from ETH Zurich, so it's an academic paper.

THE COURT: Okay.

MS. WALSH: And it describes an implementation of

**PROCEEDINGS**

RDMA, which is the subject of some of the trade secret documents.

THE COURT:  What trade secret category is that?

MS. WALSH:  Apologies.  I believe that is...

MS. PRIEDEMAN:  It's Category 6, Your Honor.

MS. WALSH:  The ones that are focused on transport. It may also be a little bit relevant to Category 7.

THE COURT:  Okay.  And what does it disclose -- what does it disclose -- can you be more specific about what it discloses that is contained in the Google alleged trade secret documents?

MS. WALSH:  Apologies.  My copy of the proffer has gotten away from me.

THE COURT:  All right.  Let's put that one over until Tuesday.

Exhibit 5173.  Right.  So this, as I understand it, is networking technology that sort of describes an alternative to Google's networking technology?

MS. WALSH:  Correct.  And --

THE COURT:  And what's the theory here?

MS. WALSH:  So both Dr. Sanchez and Mr. Pflaum discuss InfiniBand as a sort of different solution to RDMA functionality.  Basically, ways of transferring information kind of throughout the system.

And so this would be something that we would

potentially cross Dr. Sanchez on as something that shows -- or negates economic value because there's publicly available alternatives that work with publicly available solutions.

THE COURT:  Publicly available alternatives to what?

MS. WALSH:  To Google's RDMA.  Or to Google's implementation of RDMA.

THE COURT:  I mean, but the fact that there are publicly available alternatives to something does not deprive that thing of economic value; right?

I mean, again, going back to the source code analogy, I mean, there's open-source software and proprietary software, and there can be reasons why proprietary software is still of value to people.

So the fact that there are alternatives out there in the open does not -- it does not follow that that deprives the proprietary software of economic value.

MS. WALSH:  So --

THE COURT:  It might diminish the economic value, but that doesn't really matter, does it?

MS. WALSH:  So in this instance, it does because it both shows that there's more than one way to do this -- Google does not have the only way of presenting some similar solution -- and it's also coupled with --

THE COURT:  But is anybody arguing that there's only one way to do this?  I mean --

**MS. WALSH:**  No.  But it's also coupled with the fact that Google's way of doing this is very tightly coupled to Google's software and functionality at those systems.  And so without those, the value of Google's trade secrets diminishes considerably because, even if you sort of know what the stuff is and you have the documents on it, you can't use it because you don't have everything else.  And so that's kind of where the alternative technology comes in.

**THE COURT:**  Mm-hmm.

**MS. PRIEDEMAN:**  I don't really understand this argument, Your Honor.

Taking the analogy that Ms. Krsulich used in her opening statement about Coke being a trade secret, the fact that Pepsi exists does not diminish the value of Coke's recipe.

So I'm not really understanding the relevance or the argument.  I'm not -- if defense wants to ask about InfiniBand or ask about alternatives, that's fine; but introducing this manual about InfiniBand, I don't think that's relevant and I think it's prejudicial.

**THE COURT:**  Well, if the defense is asking about it, introduction of the document, how is that more prejudicial?

**MS. PRIEDEMAN:**  Well, okay.  Two things.  I don't think they should be able to ask him about it.  I don't think it's relevant, one.

And, two, even if there was some minimal relevance and

they were allowed to ask him about it, I think -- these documents are technical, and I think the point is just to get more technical documents in front of the jury and confuse them and make them think they need to review these and that this discloses Google's trade secrets, which is not the proffer that's being made.

THE COURT:  Okay.  Let's continue thinking about that one.

I didn't understand -- there are a bunch of these Chinese patents that are apparently duplicative of U.S. patents.  I didn't understand why we would be putting those in front of the jury, but I also didn't quite understand why we would care whether they're in front of the jury or not.

What's going on here?

MS. WALSH:  So, basically, the point that we're making is, you know, there's a lot of issues related to the economic espionage aspects of this and intent, things like that, and, you know, disclosure and dealings with China.

And so this basically just goes to show that, you know, Google has filed patents in China and it's disclosed its technology to the Chinese Patent Office, which is essentially an arm of the Chinese government.

THE COURT:  Would everybody agree that it's appropriate to elicit testimony that comparable patents -- Google has obtained comparable patents in China?

**MS. PRIEDEMAN:**  Yes.

**THE COURT:**  Okay.  So the documents don't need to come in, but you can elicit that testimony.

The patent -- so there's 5567.  I think that I need an artic- -- so this is going back to the same issue; right?  The patent was published in 2024.  The filing date is February 2022.  And the question is:  What was -- what is -- as I understand it -- right? -- the contents of the patent are not available to the public until the patent is published, until it's approved, I believe.  And so what is it about this patent that sheds light on the state of affairs during 2023 or 2022?

**MS. WALSH:**  Your Honor, I've taken a look at this, and we have something similar that's on the preadmitted list that we can use.  So I think we'll just do that.

**THE COURT:**  Okay.  So 5567 is withdrawn?

**MS. WALSH:**  Correct.

**THE COURT:**  Okay.

**MS. WALSH:**  And with respect to the ones that are duplicates or either family members, we'll use the ones that are on the preadmit list.

**THE COURT:**  Okay.  And so what else?  Is there anything else that we need to be discussing?

**MS. WALSH:**  I think the last one that we haven't discussed is 5609.

**THE COURT:**  Okay.

PROCEEDINGS

**MS. WALSH:** And this is another document that both parties' experts discuss in their reports. It is a description of Nvidia's sort of larger-scale data center design. It relates to, I think it's Trade Secret Category Number 5.

And this is kind of similar to the InfiniBand document in the sense that it's showing an alternative --

**THE COURT:** Similar to what?

**MS. WALSH:** The InfiniBand document.

**THE COURT:** Okay.

**MS. WALSH:** But basically what this is saying is, it describes an installation of Nvidia's H100 chips. And so it goes to show that there are publicly available alternatives to Google's implementations of its installations of H100 GPU chips.

**THE COURT:** Okay.

**MS. PRIEDEMAN:** Same argument, Your Honor. I don't know how it's relevant to either the public nature of Google's actual trade secrets or the value of Google's trade secrets.

**THE COURT:** So, in other words, this seems quite analogous to the ISA documents, like the Nvidia ISA documents, for example.

**MS. WALSH:** We would disagree, Your Honor, because I think it's -- it goes to show that, you know, there's a publicly available alternative with publicly available technology. And --

PROCEEDINGS

THE COURT: But why does that help you answer any of the questions that the jury has to answer?

MS. WALSH: So it goes to economic value because -- and also, to sort of back up a little bit, Google uses H100 chips from Nvidia. This testimony hasn't come in. It might be in Dr. Sanchez. But my understanding is that they are not off-the-shelf, and so their solution for installing these chips is also not off-the-shelf. And so it's not really something that anybody could use, absent access to whatever Google does with H100 chips.

THE COURT: Okay. Well, I think what we should do is, we're going to hear a lot more testimony on Tuesday about the other trade secrets and that'll help -- other trade secret categories and that'll help educate me further.

And the rest of these documents that I haven't ruled on we can kind of put on the shelf until after we hear the rest of Sanchez's testimony, and then maybe these explanations and these arguments will become a little less abstract for me.

MS. PRIEDEMAN: Okay.

THE COURT: And when in doubt, I'm going to allow -- if I'm in doubt, I'm going to allow cross-examination of an admission of these documents.

And the ones that I've excluded, I think it's very clear that the relevance is either zero or de minimis, and the possibility of confusion and waste of time is quite high. And

PROCEEDINGS

that'll be the standard that I apply.

MS. WALSH:  Understood.

THE COURT:  Okay.  Anything else to discuss right now?

MS. PRIEDEMAN:  Not from the Government, Your Honor.
Thank you.

MS. WALSH:  Not from defense.

THE COURT:  Okay.  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Proceedings adjourned at 3:33 p.m.)

---oOo---


CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.


DATE:  Sunday, January 18, 2026




_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter