**Volume 6**

**Pages 1068 - 1265**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,        )
                                 )
          Plaintiff,             )
                                 )
  VS.                            )   **NO. 3:24-CR-00141-VC**
                                 )
LINWEI DING, a.k.a. LEON DING,   )
                                 )
          Defendant.             )
_____)

San Francisco, California
Tuesday, January 20, 2026

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue, Box 36055
                    San Francisco, California 94102-3495
               **BY: CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
                    **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
              Ruth Levine Ekhaus, CSR No. 12219, RDR, FCRR
              Official United States Reporters

**APPEARANCES**:   (CONTINUED)

For Plaintiff:

           CRAIG H. MISSAKIAN
           UNITED STATES ATTORNEY
           1301 Clay Street, Suite 340S
           Oakland, California 94612-5217
    BY:   **MOLLY K. PRIEDEMAN**
           **ASSISTANT U.S. ATTORNEY**


For Defendant:

           GOODWIN PROCTER LLP
           525 Market Street
           San Francisco, California 94105
    BY:   **DARRYL M. WOO, ATTORNEY AT LAW**
           **DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
           **RACHEL M. WALSH, ATTORNEY AT LAW**
           **COLETTE A. LOWRY, ATTORNEY AT LAW**
           **NICHOLAS C. WILEY, ATTORNEY AT LAW**

           GOODWIN PROCTER LLP
           601 Marshall Street
           Redwood City, California 94063
    BY:   **GRANT P. FONDO, ATTORNEY AT LAW**
           **FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

           GOODWIN PROCTER LLP
           601 South Figueroa Street, Suite 4100
           Los Angeles, California 90017
    BY:   **LORA J. KRSULICH, ATTORNEY AT LAW**

Also Present:        **Andrea Valladao, Federal Bureau of
            Investigation**
         **Veronica Hernandez, Paralegal**
        **John Jay, Trial Technician**

**I N D E X**

Tuesday, January 20, 2026 - Volume 6


**PROCEEDINGS**

Sealed Proceedings, pages 1237 through 1252

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **SANCHEZ, DANIEL (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 1084 | 6 |
| Direct Examination resumed by Ms. Priedeman | 1084 | 6 |

**Tuesday - January 20, 2026**                                    **9:08 a.m.**

P R O C E E D I N G S

---o0o---

(Call to order of the Court.)

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:**  Remain seated.  Come to order.  Court is back in session.

**THE COURT:**  Okay.  Good morning.  I'm sure you all got a lot of rest this weekend.

I saw the -- I just saw the notification about Pflaum and withdrawing a number of his opinions.  Anything -- do we need to discuss that or is there anything else we need to discuss right now?

**MR. FONDO:**  Your Honor.  Grant Fondo for the defense.

This sort of is related to Mr. Pflaum.  So what it relates to is the U.S. -- the Government last night filed a motion to exclude our proposed rebuttal expert, Dr. Novak.

**THE COURT:**  Yeah.

**MR. FONDO:**  Your Honor, as I'm sure you're aware, we're not trying to play games with the experts.  We're just trying to have an expert --

(Reporter interruption for clarity of the record.)

**MR. FONDO:**  So we're trying to have an expert have the ability to testify before the jury to share the defendant's perspective about the issues raised in this case as to the

alleged trade secrets, and in particular to rebut what Dr. Sanchez is saying.

We would like to propose sort of an alternative, and what we're looking for, frankly, is certainty so we can kind of plan accordingly.

We would like to, frankly, have a conversation with the Court about essentially swapping out Mr. Pflaum so there's no need for the Daubert hearings today and tomorrow, and instead having Steve Novak just testify as a rebuttal expert.

As you know, we have as far as -- the Government has claimed that the notice was inadequate.  As the Court -- as I explained to the Government either during jury selection or last week, we haven't received funding for that next stage and we haven't received funding to provide the type of notice that the Government is looking for.  We are happy to do that.

And in particular, also at that time Professor Sanchez had not testified.  Now, admittedly, he had a pretty detailed report.  We can share with the Court that his testimony, meaning Mr. Novak's testimony, would be similar in context to the narrowed-down version that was shared with the Court over the weekend as to those topics, and so it would be similar in that context.

And so, Your Honor, we'd like to have permission to go forward with Mr. Novak, so we would be happy to provide an expert report by Friday.  I'm assuming Mr. Sanchez will be

off -- Dr. Sanchez -- excuse me -- will be off the witness stand by Wednesday, and then we would use him purely as a rebuttal expert, as previously disclosed.

THE COURT:  Okay.  So you're saying -- so you provided over the weekend a list of the Pflaum opinions that were being withdrawn?

MR. FONDO:  Correct.

THE COURT:  I think what remains is -- is it 1, 4, and 5?

MR. FONDO:  I think it was 7.

THE COURT:  1, 4, and 7?

MR. FONDO:  I think so.

THE COURT:  Okay.  Anyway, there are three opinions left.  You are proposing that -- that -- to withdraw Pflaum and swap the new -- Novak?  Is that the new person?

MR. FONDO:  Correct, Steve Novak.

THE COURT:  To offer those three opinions.

MR. FONDO:  Correct, Your Honor.

THE COURT:  Okay.  And -- and the Government, I'm assuming, continues to seek to exclude Pflaum's three remaining opinions; is that correct?

MS. PRIEDEMAN:  Yes, Your Honor.

THE COURT:  Okay.  And so I guess the question is -- so what you're proposing is that you sub in Novak for Pflaum on those three opinions.  You provide a disclosure -- by when?

PROCEEDINGS

MR. FONDO:  Friday.

THE COURT:  By Friday.  And if the Government wishes to move to exclude Novak's opinions on those three topics, how mechanically does that get done?

MR. FONDO:  Probably Monday, Your Honor.

THE COURT:  Okay.

MR. FONDO:  Meaning we would argue it Monday.

THE COURT:  Okay.  And what -- what does -- when what's your estimate about when the Government will rest?

MS. PRIEDEMAN:  I think it's very possible we would rest this week, Your Honor.

THE COURT:  Okay. All right.  And so -- do you have the same objections to Novak offering those three opinions?  I mean, in other words, I'm assuming you continue to object that Novak is late disclosed or hasn't adequately been disclosed?

MS. PRIEDEMAN:  Yes, Your Honor.  I think there's a Rule 16 issue, but also a Daubert and 702 issue that's completely unique to Mr. Novak.

I don't understand the idea of swapping him in.  These were Mr. Pflaum's opinions that Mr. Pflaum formed based on his supposed review of the documents.  So I think the reliability determination is completely different for Mr. Novak.

THE COURT:  Agreed.

MS. PRIEDEMAN:  And we have absolutely no information to even challenge it at this point.  I don't think they can

just swap in his opinions.

**THE COURT:** Well, I'm trying to think about it. I mean, again, this is a -- I'm just thinking out loud. I'm just hearing this for the first time. I'm not expressing a view one way or another, just spitballing.

But I guess what the defense would say is -- I don't know if they would say this out loud, but I think this is what's going on with the defense; right?

This is a criminal case. Our defendant is being accused of a crime that could get him up to 10 or 15 years in prison or more if the counts are consecutive, I guess.

We -- it's been a major -- we've had a couple of related struggles. One is it's very hard to find somebody to testify in a criminal case where Google is the victim; and two, we have been -- you know, CJA funds have been hard to come by.

And this has been an ongoing problem for us since back in -- what? -- July? June, July of '25. And we are now in a situation where we have discovered that there are some serious problems with Pflaum as an expert, and we want to sub somebody in last minute, and if we can find a way to get a disclosure -- produce a disclosure and give the opportunity to the Government to move to exclude this witness, it's -- he's going to be offering the same opinions as those three opinions identified by Pflaum. So it's not a, like, total surprise what he's going to be offering.

And it's a criminal case and somebody's liberty is at stake, and why can't we scramble to, you know, sub in a new expert, as long as the Government is given an opportunity to put him to the test in a Daubert hearing?

**MS. PRIEDEMAN:**  Your Honor, I would say this is not a case where this is, you know, a fingerprint expert or like a very discrete expert.  There is 105 trade secrets and thousands of pages of trade secrets.

**THE COURT:**  I know, but you know all of that stuff like the back of your hand; right?  And it's the -- it's the defense that's behind the eight ball here with this trying to bring in this new expert who, you know, is proposing to testify on these three topics.

**MS. PRIEDEMAN:**  Understood, Your Honor --

**THE COURT:**  How are you prejudiced by swapping in a different expert who is proposing to testify on the same three topics if you're given an opportunity to, you know, cross-examine him in a Daubert hearing?

**MS. PRIEDEMAN:**  Your Honor, I -- I mean, to get his opinions on these incredibly complex topic -- I don't -- it's not -- the opinions that are left are that none of these documents are valuable.  That's a huge opinion.  That's not -- this isn't -- you know, defense is saying they've narrowed it --

**THE COURT:**  But doesn't it also seem like something

from a 403 standpoint?  I know there's a 702 issue; right?  But there's also a 403 issue, and from a 403 standpoint, it seems like that is something that's fairly easily rebuttable without taking too much time or running too much risk of jury confusion.

**MS. PRIEDEMAN:**  I don't think that's right, Your Honor.  I mean, this is incredibly technical, and so to thoroughly test his opinions that we don't even have -- that's going -- that's going to take a long time and be extensive.  We have spent the last four months just litigating this with Mr. Pflaum.

So I just -- from a logistical standpoint, I'm not really seeing how this is going to play out, and, again, I don't think we can sub in Mr. Novak.  They're starting from scratch with a new expert, and they've had -- they've been on notice for the last four months that there was serious, serious problems with Mr. Pflaum.

**THE COURT:**  That's certainly true.

**MS. PRIEDEMAN:**  So I think this is -- I think this is a tactical decision that they've made.  I understand they've said they've struggled to find an expert.  I think the other real possibility is that they haven't been able to find an expert who will say these are not valuable and these are public.

And so I just -- the idea that we can spend four

months litigating this and then at the final hour, they can sub someone new in --

**THE COURT:** Well, I think -- I think they are no longer offering an expert to say that the stuff is public; right?

**MS. PRIEDEMAN:** I'm not sure, Your Honor.  When I look at the opinions that are left, part of Mr. Pflaum's opinion was that the reason that they're not valuable is that portions -- that the portions are public.  So we'd have to tease that out, but it's not entirely clear to me.

And I -- I don't know.  I just -- I think there's just a lot of issues here.

And I do think the Government -- I think someone coming in and saying wholesale these aren't valuable without the chance to really test the reliability of that opinion would greatly prejudice the Government.

**THE COURT:** I totally understand.  I mean, there has to be a way for you to test the reliability of the opinion.

Let me just make sure I fully understand what the defense is proposing here.  Okay?  So -- and I don't mean to put words in your mouth, so don't hesitate to correct me if I've got it wrong.

What you're proposing is that -- first of all, irrespective of Novak, you've withdrawn a number of Pflaum's opinions and you have these three opinions left from Pflaum.

Second, you -- if I approve the funding for you to work up those same opinions from Novak, you would withdraw Pflaum and sort of take your chances in a Daubert hearing for Novak if the Government decides they want to put -- put Novak to the Daubert test; is that accurate?

**MR. FONDO:**  Correct, Your Honor.

**THE COURT:**  Okay.  And then given that the Government believes that it may rest this week, is -- is it realistic for Novak to complete his disclosure sooner than Friday?

**MR. FONDO:**  Part of it depends on when Dr. Sanchez is scheduled to finish.  I don't -- between -- I don't know how much longer the Government has for him on direct.  My -- my rough understanding was most of today, but I don't -- but counsel says they would know much better than me.  So direct -- sorry -- cross and redirect clearly is going to probably go into tomorrow sometime.

So Friday is ambitious, as you know, but we'll -- whatever deadline the Court sets, we'll try to do the best we can with it.

**THE COURT:**  Okay.

**MR. FONDO:**  I want to also, if I could, address one other issue.  The Government said that we can't find somebody to testify about certain issues.  That's just flat-out wrong. In fact, the Government had an expert who we contacted -- who they contacted and had comments that were similar to our

theories, but he felt he was conflicted out, so we could not retain him.

The other issue is these people just don't want to talk to us. It's not only the Google issue. It's the Government issue.

It's also the China issue. We had someone specifically very qualified tell us that they do not want to go against this administration talking on the China issue. So there's -- and others just wouldn't tell us what the issue was.

And so it's not a question of -- of experts not like telling us the answer we didn't want to hear; it's a question of the experts not wanting to engage with us.

**THE COURT:** Okay. I'm going to give this thought and I'll give you an answer by lunchtime. Is that okay?

**MR. FONDO:** Yes. Thank you, Your Honor.

**THE COURT:** Okay. And then given what has happened with Pflaum, are there any documents that we still have disputes about? Documents that -- publicly available documents that the defense wishes to offer either on cross-examination or through an expert to show that -- that aspects of the trade secrets are publicly available, or is that dispute now -- is that mooted?

**MS. WALSH:** Your Honor, I don't believe so. I think there are still a couple that we may introduce with Dr. Sanchez on cross-examination.

THE COURT:  So what are the ones that are still in dispute?

MS. WALSH:  So I believe 5609, and then the InfiniBand specification that I don't have the exhibit number for, but I could find that out.

THE COURT:  You can just give that -- give me the list at the next break.

MS. WALSH:  Okay.

THE COURT:  And I'll make sure we're on the same page in terms of what I've said about those documents and what -- and make sure to get you a ruling on those.

MS. WALSH:  Certainly.  Thank you.

THE COURT:  Okay.  Anything else to discuss right now?

MR. FONDO:  No, Your Honor.  Just one other comment: We think that in criminal cases in particular, there's case law where the expert is not disclosed until -- until the Government closes their case.  And clearly I don't think this was -- our efforts here were anywhere close to a willful or strategic or gaming of the system.

THE COURT:  I will say that it's very clear to me that it was not any of those things.

MR. FONDO:  Thank you, Your Honor.

THE COURT:  And it was, you know, product of the difficult position that the defense is in from the combined effect of having difficulty finding an expert who's willing or

able to testify, and the funding problems that have plagued us for the last six months or so.  So I get that part.

**MR. FONDO:**  Thank you, Your Honor.

**THE COURT:**  Okay.  All right.

**MS. PRIEDEMAN:**  Your Honor, sorry.  Just one issue for Dr. Sanchez's testimony today that I wanted to flag for the Court.

**THE COURT:**  Yes.

**MS. PRIEDEMAN:**  I am planning on asking him some questions about some of the Zhisuan PowerPoints, and this was disclosed in his expert report.  I am very mindful of the Court's rulings as to the other experts and not having him testify about intent or getting in any argument through him, so it would just be interpreting technical language in the PowerPoints, and I think that's necessary for the jury to understand what the technical language means, but I just wanted to flag it for the Court.

**THE COURT:**  But why can't you just ask him about the term and say -- I assume these PowerPoint have already been admitted; right?

**MS. PRIEDEMAN:**  Yes.

**THE COURT:**  So what's wrong with just saying "The jury was shown a PowerPoint that had the term blah-blah-blah on it; can you explain what that means."

**MS. PRIEDEMAN:**  It's not just a word; it's phrases

that are very technical, and so I think unlike Dr. Segal, for example, where you can ask about it in the abstract, I think just seeing the PowerPoint and reading the language -- I just think out of context it's very --

THE COURT:  Without coming anywhere close to offering any testimony about what he thought the defendant was up to --

MS. PRIEDEMAN:  Yes.

THE COURT:  -- in China is what you're saying?

MS. PRIEDEMAN:  Yes.  Part of his opinion is the relevance of the alleged trade secrets to some of those topics, but not anything close to what the defendant was doing or why he took it or his intent or any of that.

THE COURT:  Okay.

MS. WALSH:  Assuming that those lines are respected and that's how the testimony comes in, that should be fine. But, you know, we have to see how it comes in and his testimony, so we'll preserve rights.

THE COURT:  All right.  Sounds good.

All right.  Bhavna, you want to go get the jury?

THE COURTROOM DEPUTY:  Yeah.

(Pause in proceedings.)

THE COURTROOM DEPUTY:  All rise.

(The jury enters the courtroom.)

(Proceedings were heard in the presence of the jury.)

(Daniel Sanchez steps forward to resume the stand.)

**DANIEL SANCHEZ**,

called as a witness for the Government, having been previously duly sworn, testified further as follows:

THE COURTROOM DEPUTY:  Please be seated.

THE COURT:  All right.  Welcome back, everyone.  Just a couple of scheduling notes.

Looks like we are either on schedule or a little bit ahead of schedule from what I told you at the beginning, so just to let you know that.

And this week, as you know, we will not be in Friday. In addition, we'll end at about 2:00 on Wednesday, tomorrow. I'll probably make the lunch break a little bit shorter and maybe our breaks -- morning and afternoon breaks a little bit shorter to make up for a little lost time, but we're doing good.  We're moving along quite well on the trial, just to let you know.

So with that, we'll resume with the Government's direct examination of Dr. Sanchez.  Dr. Sanchez is still under oath.  And you can proceed.

### DIRECT EXAMINATION (Resumed)

BY MS. PRIEDEMAN:

Q.   Good morning Dr. Sanchez.

A.   Good morning.

MS. PRIEDEMAN:  Ms. Hernandez, can you please pull up the demonstrative.

BY MS. PRIEDEMAN:

Q.   All right, Dr. Sanchez.  So last week we went -- we started going through the different trade secret categories, and we finished Category 1, so now we're on to Category 2.

     Can you describe to the members of the jury what type of information is contained in the documents in Category 2?

A.   Yes.  So Category 2 focuses on the hardware at different levels of TPU chips and systems.

     There are three key types of documents that reflect three key types of information.  First, there are documents that focus on the chip used in TPU Version 6E, which Google internally named GhostLite.

     Second, there are a number of documents that concern the design of the entire system for TPU Version 5E.  That is what Google calls a pod.  It's a collection of servers that integrates 256 TPU chips.  You can see it in the right -- in the picture on the right here of this slide.  And that system is internally named ViperLite or ViperLite pod.

     And finally, there is a document that discusses other Google accelerators, including accelerators that Google has not previously disclosed or discussed publicly.

Q.   Thank you, Dr. Sanchez.

     How do the documents in Category 2 differ from the documents and the information in Category 1?

A.   So they have substantial differences in scope.  They

target newer systems.  For example, TPU V6E had not even been announced by the time that -- you know, by January 13, 2024.  So, for example, whereas there was some public information available in the relevant time frame for TPU V4, which was the subset of Category 1, that was not the case for this TPU Version 6E chip.

They -- if you look at this Version 6E and Version 5E systems, they are a different class of TPU system, so Google builds, you know, super high-performance systems optimized for very large machine learning workloads, typically training workloads.  Those are internally called "fish" systems, so you'll see Ghostfish or Viperfish or Pufferfish.  So Pufferfish remember was the code name for TPU V4.

These ones are -- have the suffix "lite."  Right?  So these are called GhostLite or ViperLite.  So they're targeting more cost-effective applications focused on both inference and smaller -- slightly smaller training workloads.

And so the other aspect here is that this information compared to the information in Trade Secret Category 1 concerns the physical design of these systems.

So last week we discussed architectural design and how that is important to the design of these systems.

In the documents here, there is more information about physical design, which, remember, is the last step of the design process of a chip.  And if you extend this to servers

and racks and pods -- where collections of servers are housed -- they show the physical organization of these systems, how these chips -- not only how these chips are physically structured, what components they have, where -- where -- you know, what are the dimensions of those components, but then they show how these chips are integrated into servers, how these servers are placed into racks, how these racks are structured to form entire systems, what Google called pods -- calls pods.

**Q.** Okay.  I'm going to ask you again to slow down a little bit, Dr. Sanchez, because there's a lot of information both for the court reporter and so the jury can follow.

Let me talk about a couple of the differences you mentioned.

So when comparing Trade Secret Category 1 and Trade Secret Category 2, you said one of the differences is that they relate to different versions of Google's TPU; is that right?

**A.** Yes.

**Q.** And you said Category 1 relates to TPU Version 4 and Category 2 relates to what you called 6E and 5E; is that right?

**A.** Yes.

**Q.** Okay.  And so you mentioned that as of January 2024, Google had not publicly announced Version 6.

When did Google publicly announce Version 6?

**A.** May 15th, 2024.

**Q.**   Prior to Google's announcement of Version 6, had Google published any information about TPU Version 6?

**A.**   No.

**Q.**   All right.  And one of the other differences you talked about is you said that Category 2 relates to physical design whereas Category 1 related to architectural design.

I want to go back to the slide we were looking at earlier talking about the phases of chip design.  Can you talk about where Category 2 fits into the different phase of chip design?

**A.**   Yes.  So as a reminder, there are -- as listed here, there are three phases of chip design or three main phases.  You have architectural design, where the key goal is to determine what are the components in the chip, what is the internal design of those components.

There's logic design, which essentially consists of implementing the functionality of the chip with code that's written in a special language -- that's called a hardware description language -- that can be compiled, automatically translated by tools to hardware.

And then you have physical design, which produces -- essentially places all of these different components of the chip in the, you know, the different areas of the chip.

And so you have both the first phase, here, architectural design, covered in Category 1, and then physical design, which is the last phase in Category 2.

**Q.** And so does Category 2 include information about where the different components are placed?

**A.** Yes.

**Q.** All right. And you also mentioned that Category 2 contains information about system design. Can you talk a little bit more about that and explain how that's different than the physical design aspect of where the different components of the chip are placed?

**A.** Right.

So once you have one of these chips -- well, remember a chip is a fairly small device. It's a few centimeters on each side.

Now, those chips need to be put together, assembled, to form entire systems, and so that is done in a hierarchical way. Multiple TPU chips are placed together in a single machine, in a single -- what we call server. Typically, that is eight TPU chips per server.

And then to build larger systems -- because remember, these applications demand large amounts of computation, and so it is important to use a lot of TPUs -- multiple servers are integrated together.

And also remember -- you know, you might remember one of the key features of TPUs is that they're designed to be connected directly -- right? -- so that they can talk to each other without going through the other components of the server.

So these Google -- Google's pods use this interchip interconnect to connect TPUs that are housed on many different servers directly.

And so, for example, for TPU V5E, or ViperLite pod, you have 256 TPU chips that are housed on a number of servers. 8 TPU chips per server, and then 256 divided by 8, so 32 servers.

Q.   So when you said Category 2 contains information about the physical chip design and system design, you were talking about the actual chip and then also how to connect all the chips?

A.   Right.  How they're physically arranged in the machine, how they're connected, how different machines forming the same system are laid out and connected.

Q.   Was there anything that stood out to you about the information contained in Category 2?

A.   Yes, multiple things.  First of all, for TPU V6E, or GhostLite, this information is highly detailed physical design information.  Google has not published the physical design information of TPU chips, for example, floor plans, which we'll see later, which show the placement of components, the size of its component, even for the very first TPU chips.  So for no version of TPUs, they've published detailed floor plans.

This also includes information that is quite complementary, so it shows the design -- the physical design of the chip and then how those chips are integrated in -- to form

entire systems.

Q.   Are any of the documents in Category 2 publicly available?

A.   No.

Q.   Could any of these documents be reverse-engineered or otherwise easily reconstructed using publicly available information?

A.   No.  For example, they -- you know, the physical design information includes details about the chip, like its dimensions and the dimensions of many individual components, and third parties just do not have physical access to TPU chips, so this information could not be reverse-engineered.

Q.   Do the documents in Category 2 contain information that would be valuable to a competitor?

A.   Yes.

Q.   How so?

A.   Well, a competitor can use this information in multiple ways.  The information about physical design of its chip can be used or includes information about different technologies and techniques that Google uses, for example, the placement of different components.

A competitor building a similar accelerator can use this information to essentially copy the physical layout of -- that Google adopts in these TPU chips.

I will say that this physical design is quite complicated. Again, if you think of an analogy, a good one might be the

design of a city or any large, complex system like a factory. You have multiple different objectives when you are placing components close or far from each other.  So, for example, components that communicate frequently, you would like them to be close by.  At the same time, if a component consumes a lot of power, you probably want that in -- you know, you don't want components that are all of the components that consume a lot of power close together.

So this is quite complicated to come up with a layout that satisfies all of these objectives, which sometimes are competing objectives.  And in fact, Google has publicly said that they've -- they've developed machine learning-based techniques to optimize the physical layouts of TPUs, and they have used them to optimize these designs.

Now, publicly Google has disclosed that this has certain performance benefits, and they have discussed those benefits, but they have not disclosed what the actual layout is.

Q.   All right.  I want to look at a specific document now.

**MS. PRIEDEMAN:**  Ms. Hernandez, can you please pull up Exhibit 377, which is one of the alleged trade secret documents.

**BY MS. PRIEDEMAN:**

Q.   Dr. Sanchez, what is contained in this document?

A.   This document describes or contains information about GhostLite, which is, again, Google's internal code name for

TPU V6E.

Q.   Did anything stand out to you about the information in this document?

A.   Yes.  This document contains substantial implementation information about GhostLite.  It includes architectural details like the sizes of the memories of GhostLite, the performance of GhostLite, and it also includes detailed floor plans and other physical design information that reveals the physical design of GhostLite, essentially, how the chip is organized, how large this unit is, how these units are placed on the chip.

There are other physical design details here; for example, how power management is performed.  So it includes a description of the techniques to manage power consumption in the chip.

Q.   And, again, as of January 2024, had Google published any information about Ghostlight?

A.   No.  It had not disclosed its existence.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, can you please go to page 3 of this document.

BY MS. PRIEDEMAN:

Q.   Dr. Sanchez, can you describe what type of information is contained in this page?

A.   Yes.  So this page focuses on architectural level information.  So the tables on -- at the top of this page show the, you know, key performance figures.  So they include

information about the clock frequency of GhostLite.  You will see there are two columns here.  It is also comparing ViperLite chips, which are Version 5E -- so that's noted as VLC, with GhostLite chip, or GLC -- of figures.  So it includes the performance of key operations.  It includes the -- you know, basically some functionality of different -- different operations that are supported and -- as well as some key features of the memory system.

And so those are, again, compared across both generations.

Now, if you focus on the diagram on the bottom, this is what we commonly refer to as a block diagram.  And this is focused on the TensorCore of GhostLite.  It shows the different units within this TensorCore.  It shows most of the units.  You'll see that at the top it says "All but TCS."  There's one unit that is missing.  That's a small one, but it shows, you know, key units.

It shows the communication paths between these units, how they can exchange data and at what rate.  It shows the different memories within TensorCores and their sizes.

Moreover, it shows how those are organized.  So, for example, you'll see that there are boxes there that say "V reg" and "V mem," and you'll see that there are a number of -- there are several numbers that are multiplied, and so that is giving internal details about the organization of those memories.

Q.   And, Dr. Sanchez, just to take us back to what we talked

about last week, as a reminder, the TensorCore, is that kind of one of the brains of the TPU?

A.   Yes.

Q.   All right.

        MS. PRIEDEMAN:  Ms. Hernandez, can you please go to page 8.  And, Ms. Hernandez, if you can zoom in on the top diagram in this document, please.

BY MS. PRIEDEMAN:

Q.   Dr. Sanchez, we're going to talk about some of the specifics a little bit later on, but just for right now, at a high level, can you describe to the members of the jury what we're looking at.

A.   Yes.  So this slide contains the floor plans of GhostLite, the GhostLite chip, which is shown to the right, and the ViperLite chip, the previous generation, which is shown in the left as a comparison point.

     So a floor plan is kind of like a blueprint of a building -- right? -- it is showing where the different units are in the chip as well as if you -- if you see at the bottom, there is this text that says "die area" and it gives the specific dimensions of the chip.  And so because you have the specific dimensions of the entire chip as well as an annotated diagram showing the locations and sizes of all of the individual components of this chip, you can simply, just by measuring, determine the sizes, the physical sizes, of each of

these components.

And now you will see here there are blocks labeled VPU, MXU.  Those directly map to the blocks we have seen in the architectural diagram before.

And you see also that these blocks are colored differently.  So, for example, the blocks that are colored in red correspond to the TensorCore.  The blocks that are labeled in green correspond to the SparseCore or BarnaCore, that we also saw in Category 1 last week.

Q.   And you talked about the different sizes of each component.  Why -- why does the size of the components matter?

A.   That's a great question.

So you can have a very precise specification of what a component does, but there are a number of important tradeoffs in -- and design choices in how to build these components at a very low level.

For example, memories are a good -- are a good illustration of these tradeoffs.  You can have memories that are faster but less dense.  And so, for example, by knowing the density of these memories, that gives you a good -- you know, a very good insight about what are the tradeoffs made in the design of these systems.  You know, are these memories optimized for density or are they optimized for fast access or are they optimized for low power consumption, which is another tradeoff that can be made that also yields somewhat larger

memories.

MS. PRIEDEMAN:  And, Ms. Hernandez, if you can zoom back out and then zoom in on the chart underneath the word "power," please.

BY MS. PRIEDEMAN:

Q.   Dr. Sanchez, can you describe what is contained in this chart?

A.   Yes.  So this is describing the power consumption of the GhostLite chip.  It gives important figures.  So, for example, the text on the left talks about the GLC packet's TDP.  So TDP stands for thermal design power, and it is essentially how much power the system can consume in steady state without overheating.

It also gives other limits, which you can see in the -- in the table at the bottom, at the bottom right here, where it says "power type unlimit."

So, for example, that includes power at different time scales.  Sometimes for small periods of time, the system or the chip can afford to consume a little bit more power.

And finally, the table at the top is showing the predicted work -- the predicted power on different Google workloads, internal Google workloads as well as some external Google -- external benchmarks.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, can you please go to page 9 of the same document, and can you please

zoom in on the diagram at the bottom of this page.

BY MS. PRIEDEMAN:

Q.    Dr. Sanchez, what are we looking at here?

A.    So this shows a floor plan and additional information about one of the components that we saw earlier in the -- in the chipwide floor plan, and this component is called a "VPU tile."

So in this floor plan, you can see the entire floor plan of the clip in this little rectangle at the top left corner and how it's zooming in to this one particular tile.

And so here you can see how the specific components within that tile are laid out.

You will see different boxes.  Those -- that have different colors within this big rectangle.  This big red rectangle.  So those essentially are showing the memories that are within this tile.  And then this block labeled "ALU" shows the logic and how it is placed within the tile.

Q.    All right, Dr. Sanchez.  So we talked about several different aspects of this document.  Would the information that we just looked at be useful to a competitor?

A.    Yes.

Q.    How so?

A.    Well, there are many ways that a competitor can use this information.

There is information about how the memory hierarchy of

GhostLite is organized that Google has not disclosed, obviously did not disclose by January 2024, but has not even disclosed today.

There are plenty of details about how the different components are placed on the chip, how large they are.  And so, for example, if a competitor was building a chip with similar characteristics to the TPU, that competitor could look at whether their implementation was larger, smaller than, or, you know, roughly the same size as what Google has achieved.

And so when designing one of these chips, it's also important to understand that a lot of effort goes into optimizing the different components.  And you really don't know, often, how well can you do; right?

And so by having this information, you essentially know how well Google has done.  And if -- you know, if you have a particular design, you can just compare the features of that design.  For example, are these matrix multiplication units larger than what Google has achieved?  Then you can use this as a guide to optimize the design much more quickly.

Q.   Can you explain that a little bit more, Dr. Sanchez, about how a competitor could optimize their design by looking at Google's design?

A.   Yes.  So these chips are quite complex to design.  There are lots of different ways of producing, you know, the physical implementation of each component.

And so essentially you can think of these as a yardstick -- right? -- as a document that tells you here's not only how well Google has done in -- to packing all of this functionality within a chip and the size of that chip, but how each of the individual units is -- you know, what is the size of those units.

And so, for example, if a competitor had some initial design for one of these units, let's say the matrix multiplication unit, and it was 30 percent larger, well, now that the competitor knows that, they can -- they can actually optimize by 30 percent.

Without this information, a competitor might not know if there's 30 percent available or they're already at the best design point or there might be 50 percent. And so it's hard to -- you know, a competitor would just need to do more work to figure out where to optimize and by how much.

Q. Would it save time in the design process?

A. Absolutely.

Q. Would this information be valuable even without access to other information about Google's infrastructure or other components of Google's infrastructure?

A. Yes. This information is useful on its own for anyone building any type of chip in this technology. It reflects design choices, careful design choices that Google has made in optimizing these chips.

**MS. PRIEDEMAN:**  All right.  Ms. Hernandez, can you please pull up Exhibit 775, which is just the list of the different trade secret documents.

**BY MS. PRIEDEMAN:**

**Q.**   Dr. Sanchez --

**MS. PRIEDEMAN:**  If we can zoom in on Category 2, please, Ms. Hernandez.

**BY MS. PRIEDEMAN:**

**Q.**   So we just focused on Exhibit 377, which is the GhostLite document that ends in 18Z.

Are there other documents in Category 2 that contain information related to GhostLite?

**A.**   Yes.  376 and 375.

**Q.**   Okay.  And what type of information did those documents contain?

**A.**   So some of these documents contain similar information to the document that we have seen, but they also contain complementary information.

For example, they have additional information on the performance of GhostLite on internal Google workloads.

**Q.**   Does the combination of the information in each of the GhostLite documents provide additional value?

**A.**   Yes.

**Q.**   How so?

**A.**   Well, they're describing -- they're -- they include

additional information to the document we have seen, and so they give a more complete understanding of the capabilities of GhostLite.

Q.    Looking at the Category 2 documents, you mentioned there are documents related to ViperLite.  Can you identify which exhibits relate to ViperLite?

A.    Yes.  Those are 378, 379, and 380, all of those that start with "ViperLite" or "ViperLite pod."

Q.    We're not going to get into the specifics of these documents, but can you describe what type of information is contained in these documents?

A.    Yes.  So these documents describe the structure, physical structure, of these ViperLite pod systems, essentially looking at how chips are assembled into each system, into its server, how servers are connected and assembled together to form entire collections of TPUs that talk directly through these interchip interconnect, which, again, Google refers to as "pods."

Now, there is an important aspect of ViperLite, which is that this is a substantial change in the size of these systems compared to previous generations of these type of systems.

So as I mentioned before, Google has had for a few generations two different types of systems:  These super high-performance systems that Google internally code-names as "fish," like Viperfish or Ghostfish or Pufferfish then you have these more cost-efficient systems, and these are what Google

code-names "lite."  You'll see those as PufferLite, ViperLite, GhostLite.

Now, before ViperLite, these systems were very small. They had four or eight TPUs per system, and they were optimized only to run inference workloads.  Moreover, they were used only internally by Google, and they were not offered in the Cloud.

And so for ViperLite, Google decided to make a substantial change in the design of this cost-efficient class of TPU systems, and they decided to build a much larger system where instead of a single server with four or eight TPUs, you now have 32 servers with 256 TPU chips.

Now, that is important because it enables running a much larger set of machine learning workloads.  And so this set of documents contain not only the information about the final product -- for example, how these servers are assembled into racks, what connections are made at different points of the design -- but they also contain a lot of information about the development of the project, pilot studies that were performed during the development of the project, different prototype versions of the system and how they performed, different reliability targets and whether they were met or not.

And so this internal project development information, it makes sense that it is contained here because, again, this was the first subsystem that made this step change that became just much larger.

SANCHEZ - DIRECT / PRIEDEMAN

But, again, this would be useful for a competitor looking to build a similar type of system.

Q.   Why would it be useful to a competitor?

A.   Well, because it shows how Google structures the development of this -- of these kinds of projects.  This kind of hardware is quite complex.  It is important to ensure that, for example, different components have a certain level of reliability and, you know, that the performance of different components is adequate.

This document also shows things like development timelines that would be useful for a customer to structure that development.  And, of course, it shows the information of the final -- the final product.

Q.   And looking at Exhibit 775, do you see Exhibit 374 listed there that starts with "Accelerators"?

A.   Yes.

Q.   Can you describe what this document includes.

A.   Yes.  This document is a presentation and discussion of different projects that Google has carried out in building accelerators of different types, essentially customized chips that achieve very high performance on certain workloads.

So the significance of this document is as follows:  A lot of this information is public or talks about accelerators that Google has publicly disclosed.  Even for those accelerators, there are some details of how they're used internally that

Google has not publicly disclosed.

But what I found most striking about this document is that it describes accelerators that Google has not publicly disclosed.  They haven't said that they've built such a system at all.

And so these are just describing systems that are purely internal to Google, have never been publicized.

Q.   Would that information be available to a competitor?

A.   Yes.

Q.   How so?

A.   Well, understanding what Google does internally, why they do it is -- is useful.  Some of these projects, you know, they actually explain why they did what they did, whether it worked. And so understanding why something works or not, even for a -- for an accelerator that might not be the best design choice, is useful because other companies might do or might be doing precisely the same thing right now.

Q.   Again, what could a competitor do with that information about what worked or didn't work for Google?

A.   A competitor basically would get a more complete picture of how Google has structured the development of their accelerator projects, including their accelerators for machine learning computations, as well as, you know, get an insight of how Google has developed products that -- I mean, they've developed systems that they've used internally but they've not

disclosed the existence of.

**Q.**    All right, Dr. Sanchez.  We've talked about the individual documents and groups of documents in Category 2 and whether the information is publicly available.  Is the combination of all the information in Category 2 publicly available?

**A.**    No.

**Q.**    We also talked about the value of individual documents in Category 2 and some of the subcategories.  Is there additional value based on the combination of all the information in Category 2 that goes above and beyond the value from the individual documents?

**A.**    Yes.

**Q.**    Can you talk about that, please.

**A.**    Yes.  For example, these documents, as we've seen, discuss two different, successive generations of Google's TPU systems, closed optimized systems, and so they give a more complete picture of how to build such a system because they're describing complementary information.

So, for example, the GhostLite documents focus much more on the design of each chip.  And even though they also contain information about the design of servers and racks, that information is less detailed than the information in the ViperLite and ViperLite pod documents.

And so by combining the information in these two subcategories of documents, you get a more complete picture of

how Google's systems have evolved and how the physical design at different levels works together to deliver an efficient system.

Q.   So how could a competitor use the combination of information in these -- in these categories -- or in this category?  Sorry.

A.   Combination of the information in this category would help a competitor design the hardware for TPUs at a more -- in a more complete way because it, again, talks about this physical design information ranging from the chip level to the entire pod level.

Q.   All right.  My last question on Category 2.

So we've talked now about Category 1 and Category 2. Would the information in Category 2 combined with the information in Category 1 be valuable to a competitor?

A.   Absolutely.

Q.   Can you talk about that?

A.   Yes.  So as we have seen, the information in Category 1 was concerned with architectural design by the first phase in the process of designing a chip.  This information now concerns physical design.

Considered together, you have -- you know, they're essentially bookending the process of logic design.

So let me be clear.  There is no, you know, RTL, or registered transfer level, code in these documents, and that

logic design is a process that a competitor would need to perform to build and replicate this technology.

But on the one hand, you have the architectural design that would let our competitor jump into that logic design phase. And then, on the other hand, at the other end, you have the physical design information that would let a competitor evaluate the quality of their implementation, their logic design implementation, optimize it much more quickly, as well as adopt the physical design optimizations that Google discloses here -- or discusses here.

Q. All right. Thank you, Dr. Sanchez.

MS. PRIEDEMAN: Ms. Hernandez, can you please go back to the demonstrative slides.

THE COURT: Are we done with Trade Secret Category 2?

MS. PRIEDEMAN: We are, Your Honor.

THE COURT: All right. Let's take a ten-minute break and resume at 25 minutes after 10:00.

MS. PRIEDEMAN: Sounds good, Your Honor.

THE COURTROOM DEPUTY: All right.

(The jury leaves the courtroom.)

(Proceedings were heard out of the presence of the jury.)

THE COURT: All right. You can stand down.

Can I have a brief sidebar with the lawyers. Doesn't have to be on the record.

(Recess taken at 10:14 a.m.)

(Proceedings resumed at 10:25 a.m.)

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Okay.  While Bhavna is getting the jury, I am going to allow the defense proposal about subbing in Novak for Pflaum.

And just to be clear, again, just to make sure we're all on the same page, this is not me ruling that Novak can testify at trial.  This is allowing the defendant to sub in Novak for Pflaum on the three remaining opinions that the defense proposed to offer from Pflaum.

And there needs to be a disclosure from Novak, and the Government will have an opportunity to move to exclude Novak.

We can talk later about, like, the precise timing of all that, but my inclination is to require Novak to provide -- the defense to disclose a report from Novak by Wednesday evening, and we could have the *Daubert* on Thursday afternoon/evening.

MS. PRIEDEMAN:  Understood, Your Honor.

Just one thing.  And we can address this in more detail later.  But of the remaining opinions, one of the opinions is that the documents could not be used to replicate the technology.

THE COURT:  One moment.

MS. PRIEDEMAN:  And we've raised this previously in

our filings, but I don't think we've focused on this.  But we don't think that opinion is -- I think there's a relevancy issue there on the replication part of it.  And so I'm not sure that's as much a *Daubert* -- we're not saying that it could --

THE COURT:  You've been eliciting testimony from Dr. Sanchez that the documents can be used to replicate the technology.

MS. PRIEDEMAN:  We've been eliciting testimony that it's valuable and useful, but he just testified there would be additional steps.  We're not saying that you could replicate it.

And as I understood Mr. Pflaum's opinion is that there's missing RTL code, so you could not replicate it, so there is no value.  And I think there's a relevancy argument with that opinion.

THE COURT:  Okay.  And we can certainly explore that in the *Daubert* proceedings relating to Novak.

And I'm open to having a discussion about the appropriate timing, but that's my inclination, is to require the disclosure by Wednesday and have the *Daubert* proceedings on Thursday, given what the Government has said about its schedule.

MS. WALSH:  Understood, Your Honor.

I think, again, this probably is a little bit keyed off of when Dr. Sanchez's direct testimony is completed.

THE COURT:  Got it.

MS. WALSH:  So depending on how long that takes, I think that might -- we would ask for more time in order to get that together.

THE COURT:  Okay.  Yeah, and we can have a further discussion about that over the lunch break or after the trial day, whatever.

MS. WALSH:  Okay.

THE COURT:  Okay.

MS. WALSH:  I also have the exhibit numbers from --

THE COURT:  Oh, yeah.  Thank you.

MS. WALSH:  -- defendant's proffer.  5173 and 5609.

THE COURT:  5609, 5173, those are the ones that are still in dispute?

MS. WALSH:  Correct.

THE COURT:  Okay.  Great.

PJ you can tell Bhavna that the jury can come in.

(Proceedings were heard in the presence of the jury.)

THE COURT:  Okay.  You can resume.

BY MS. PRIEDEMAN:

Q.  All right, Dr. Sanchez.  We're going to move on to Trade Secret Category Number 3, but before we do that, I just had one more question about Trade Secret Category 2.

You talked a lot about how a competitor could use the information in Category 2.  Can you talk a little bit about how

much time and effort would be required to create the type of information contained in Category 2?

**A.** It is hard to say exactly; right? But, again, like architectural design, these sort of physical design optimizations are done over multiple generations of TPUs.

I think as one point of reference, these documents on GhostLite that we looked at is discussing several optimizations that are done versus the ViperLite design, the ViperLite chip design. And so that, you know, reflects learnings of an already optimized TPU physical design in Version 5. And so, you know, we're talking about years of work and design insights.

**Q.** Years of work to get to the point of the design choices reflected in Category 2?

**A.** Yes.

**Q.** All right. On to Category 3.

**A.** Mm-hmm.

**Q.** All right. So I've pulled back up the PowerPoints that you created, and we're looking at Category 3.

Can you describe what information is contained in Category 3?

**A.** Yes. So Category 3 focuses on the software used in Google's TPU systems and their TPU-based AI infrastructure.

And so in this diagram, on the left, you can see there's this red box that basically focuses in the software components

that are the subject of this category.

At the bottom, you can see, again, this notional diagram of this -- the hardware used in these TPU systems.  But as we've seen, this hardware has a number of unique characteristics, and so that requires custom software to make the system useful.  Specifically, there are three main types of information within this category.

First, this category discusses software technologies in a project that seeks to scale machine learning workloads to large collections of TPUs.  Before, we've looked -- or we've discussed the design of a pod of TPUs.  This actually looks at running large machine learning workloads across many pods of TPUs, comprising even tens of thousands of TPU chips.

It also discusses software techniques that are crucial to achieve reliable operation in these TPU pods.  So remember, because the systems have thousands of servers, thousands of components like TPUs, even if each component lasts years, you have failures on average every few hours, much shorter than the time that these computations, these large machine learning computations, take to run.  And so it's crucial to have software -- or to have techniques that enable the system to continue operating despite these components failing.

And, finally, this category describes a range of low-level system software and other internal software that Google uses to manage and control their TPU-based AI supercomputers.

SANCHEZ - DIRECT / PRIEDEMAN

Q.   Just a couple of follow-up questions on that, Dr. Sanchez.

Can you remind the jury, when you say "failures," what are you referring to?

A.   Right.  So whenever we're looking at systems, you know, being hardware or software, we have failures of different types.

At the hardware level, things break.  You might have experienced these with, you know, perhaps a cell phone that stopped working or a laptop that was just too old.  So these systems have the same issues too.  Even though they're built to be reliable and each component has a certain very high degree of, you know, reliability, again, lasting years, on average, you're going to have components that break much more quickly.

And so when those failures happen, an entire server might become unreachable.  The network might break, and so it might disconnect multiple TPUs or multiple servers.  A TPU within the server might break or might start misbehaving, producing the wrong results, and so on.

And so it is important to detect these failures and correct them, for example, by not using the failing components or configuring the system differently.

Q.   And when you talk about detecting failure or reconfiguring the system, does the software play a part of that reconfiguration?

A.   Yes.  Software, in this particular case, is in charge of

detecting when these components break and then acting upon those. For example, if the network breaks, well, there might be a different path that TPUs might need to follow to communicate. They might -- you know, just like in a road network in the city, you might have some road that is closed and so you might need to take a detour. And so, likewise, these systems need to organize those detours and figure out how to route around those failures.

Q. And big picture, why is it important to be able to fix those failures?

A. Well, if you do not fix those failures, then the system becomes unusable or at least it loses a lot of their -- of its functionality.

And so, for example, think about these very large TPU pods. If we go back to Category 1, that was describing this Pufferfish system, and that entire pod is 4,000 -- over 4,000 chips, 4,096, to be exact. And so that is a lot of hardware. That is, you know, substantial amount of investment. And if you cannot use that system to its full capabilities, there is substantial loss of economic value that results from that loss of functionality.

Q. And when you say "loss in economic value," can you explain that a little bit more?

A. Yes. So, for example, you might have a machine learning workload that Google is training internally, like Gemini. If

SANCHEZ - DIRECT / PRIEDEMAN

the system that is performing that training workload or running that training workload breaks, then, well, that training is just delayed, and so that Gemini model is not going to be available or it will be available later, and that has an economic impact.

Now, Google also offers this infrastructure to third parties.  And so if someone is renting this infrastructure, which is, again, very costly, and they cannot -- you know, this infrastructure breaks, then Google cannot offer it to other -- to other individuals or companies through Google Cloud, and they lose money by not being able to offer this product.

Q.   All right.  So turning back to the documents in Category 3, does each -- are any of the documents in Category 3 publicly available?

A.   No.

Q.   Could any of the documents in Category 3 be reverse-engineered or otherwise reconstructed using publicly available information?

A.   No.

Q.   Would each document in Category 3 be useful to a competitor?

A.   Yes.

Q.   How so?

A.   Each of these documents is describing or contains information that is valuable and Google has not disclosed.

You know, if you look at individual documents, they describe a range of techniques.  In combination, they give, you know, the picture -- a picture that encompasses all these different layers of software that Google uses to manage these AI supercomputers.

And, again, hardware might be very good and have a lot of potential, but without software to make that system useful and reliable and easy to use, hardware is really not that useful. And so software is a crucial component of this AI infrastructure.

**Q.**   All right.  I want to talk about a specific exhibit in Category 3, but before I pull that up -- so I want to talk about Exhibit 383, and it has a file name "ICI Resilient Slice."  I'm not going to pull it up quite yet.

But can you just, at a high level, describe what's contained in that document?

**A.**   Yes.  This document contains or describes a technology that enables the reliable operation of these very large pods of TPUs.  And specifically, it contains a technique or it describes a technique that enables these pods of TPUs to continue operating, even when an important component within these TPU pods breaks, and that is part of the network, this high-performance network.

**Q.**   Does that exhibit relate to a technology called optical circuit switching?

**A.**   Yes.

**Q.**   I'm going to go to the next slide.

Can you -- can you explain what optical circuit switching is?

**A.**   Yes.  So optical circuit switching or optical circuit switches are a fundamental part of the design and operation of TPU V4 pods.

Last week, we looked at the architectural design of the individual chips in TPU V4, but when you look at the entire collection, entire system, entire pod, you have a large number of chips, 4,096.

Now, the problem is that if you connect these many TPUs directly following a fixed topology, in a fixed way, that makes the system very inflexible.

For example, think about one of these TPUs breaking down. I mentioned that that's going to happen on the time scale of hours.  If all of these TPUs, these 4,000 TPUs, are connected in a fixed way, let's say -- you know, for simplicity, think of it as a large grid -- right? -- where each TPU is talking to its neighbors on the grid.  If some TPU in the middle of the grid goes down, then you cannot use the entire system if you're intending to use all or most of these TPUs, because essentially you have -- some part of the middle of the system has now become inoperable.

And so Google has solved this problem by using a more

flexible connection or enabling more flexible connections between groups of these TPUs.  So this TPU V4 pod is internally divided into smaller groups of TPUs, 64, that Google calls cubes.  And there is a high-performance network that connects these cubes.

Now, the nice benefit of this is that any machine learning workload can use any combination of these cubes, and if a cube breaks or a TPU within a cube breaks, well, then that becomes unavailable, but the whole system can continue operating.  And you can run very large workloads, very large machine learning computations on this.

Now, this introduces a problem, though, because connecting -- adding this network with conventional networking technologies would make communication between TPUs slower and would also add a lot of cost.

And so Google has also developed a technology called optical circuit switching.  There are multiple companies that have or are currently developing variants of this, but Google is a pioneer in developing this technology.  They are the first company to deploy this optical circuit switching devices within -- sorry -- within these large collections of machines.

And so at a high level, these devices are essentially just a network of tiny mirrors that move around to let these TPUs talk to each other through pulses of light.  And so you can see this diagram in the bottom right of this slide shows this,

where you have this TPU 1 sending pulses of light, and those pulses get reflected through a mirror and go through -- reach TPU 4.  Now, if that mirror moves around, that beam of light can hit TPU 2 or TPU 3 or TPU 4 or 5.

This is conceptually simple, but it's actually quite a complicated technology because there are a lot of mirrors, they're microscopic mirrors, that need to move in a certain way.  They need to be very precise.  And so it takes quite a lot of work to develop this technology.

Now, I have mentioned -- well, this is a classic trade-off of engineering.  By having this more reconfigurable, flexible interconnect, now we can tolerate these failures in the cubes -- right? -- in the TPUs, in the servers.

But what happens when these optical circuit switch devices break?  If one of these devices breaks, it brings down a large fraction of the network.  And so that itself introduces a reliability problem.  It fixes a reliability problem, but it introduces a new one.

**Q.**  So let me just -- let me just ask a few follow-up questions, because that was a lot of information.

So you talked about optical circuit switches.  Is that sometimes abbreviated as "OCS"?

**A.**  Yes.

**Q.**  All right.  And so you're saying that Google pioneered OCS to be able to connect different TPUs; is that right?

A.    Yes.

Q.    And the technology works, at a high level, by using tiny mirrors so that you can connect different TPUs?

A.    Yes.

Q.    And how does that solve the first reliability problem that you were talking about?

A.    So by letting each TPU talk to a larger set of other TPUs with these tiny mirrors that move around, if one of these collections of TPUs called cubes that's shown here breaks, then the system can just use a different cube.

And so it enables arbitrary collections of cubes to be combined to run these very large workloads.

Q.    So you're saying that if a TPU breaks or a collection of TPUs break or fail, Google can use the tiny mirrors to reconnect a different set of TPUs; is that right?

A.    Yes.

Q.    Okay.  All right.  So then you were going to talk about -- you talked about that solves one reliability problem related to when the TPUs break down, but then you were about to start to talk about this other problem about when the tiny mirrors break down; is that right?

A.    Exactly, yes.

Q.    All right.  So I'm going to go to the next slide.  And let's talk about this second problem, about what happens when the tiny mirrors break.

**SANCHEZ - DIRECT / PRIEDEMAN**

**A.**   Right.   So here you can see a simplified diagram that shows three of these OCS, or optical circuit switch, devices that are connecting groups of TPUs.   Each of the blue squares here is meant to be a single TPU chip, and they span multiple of these cubes.

And so suppose that this OCS2 device goes down, it becomes inoperable, it fails.   Now a number of these TPUs just cannot talk directly to each other.   And so suppose that the middle TPU of the left cube wants to talk to the middle TPU of the middle cube.   Now there's no direct communication path anymore.

And so that is the job of this ICI Resilient Slice technology that is described in this document.   It is a software technology that enables TPUs to communicate, even when one or some of these devices, these optical circuit switch devices, fail.

**Q.**   So we're going to look at the ICI Resilient document in just a second.   But you're saying that that is a software technology that when one of the tiny mirrors break down and the TPUs can't use it to connect anymore, this is a software solution that can kind of step in and help those TPUs connect?

**A.**   Exactly.

     **MS. PRIEDEMAN:**   All right.   Ms. Hernandez, can you please pull up Exhibit 383.

**BY MS. PRIEDEMAN:**

**Q.**   And this is one of the trade secret documents.

All right, Dr. Sanchez.  You talked about this at a high level, but can you go into a little bit more detail about how this software solution in this document solves the tiny mirror problem we were just talking about?

A.   Yes.  So this describes a way to reconfigure the connections, essentially change the route that different TPUs follow to communicate to each other to enable them to communicate even when they cannot communicate directly.  And so it describes the algorithm that enables this.  It specifies or it describes that it is correct, which is a hard thing to get right in these algorithms.

And then it describes several optimizations that improve performance, for example, by choosing good routes.  Think of these as choosing the right detour when a particular street is closed.  And so it describes a number of techniques that minimize the performance impact, minimize the loss of performance and capabilities of the system when these failures happen.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, can you please go to page 6 of this document.

BY MS. PRIEDEMAN:

Q.   All right.  Dr. Sanchez, we're going to talk about this document again a little bit later in more detail, but at a high level, can you talk about what we're looking at here?

A.   Yes.  So the slide on the top includes information about

**SANCHEZ - DIRECT / PRIEDEMAN**

how Google is -- essentially finds these good detours, finds these alternative routes.  It gives a sense of when it performs different phases of these optimizations.

It also describes the routing algorithm, basically the technique that enables this communication by sending -- by sending this information through a different path.

And so at a high level, you might think, well, these detours -- what is so hard about finding a detour?  Given the way that these networks work, you cannot choose arbitrary paths to follow.  If information was not restricted in the set of paths that were being followed, essentially the network would not work.

Again, with an analogy to a road network, basically, you could get into a situation that's analogous to a gridlock where, you know, you have cars that go into the intersections of all of the roads around a block, and then the cars just cannot move anymore.

And so this computer network solved this by restricting the kind of paths that information must follow so as to avoid this condition.

And so this basically describes that algorithm, explains that it is correct, and then starts describing optimizations.

The slide at the bottom, in particular, includes information about what is the performance, what is the speed relative to a healthy system, meaning a system where there's no

failed OCS device; and then it gives, essentially, the amount of performance lost compared to, you know, that system under different configurations.

Q.   So what we're looking at here is -- contains information about the different routes or the different methods that can be used to reroute the TPUs when the tiny mirrors or the optical circuit switches fail; is that right?

A.   Yes.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, can you please go to page 7 of the same document, and can you zoom in on the top portion.

BY MS. PRIEDEMAN:

Q.   Dr. Sanchez, what are we looking at here?

A.   So this describes an algorithm for what is called collective communication or All-Reduce, which is a particular type of collective communication.

As we've seen before, TPUs need to communicate with each other to implement these machine learning computations; and one of the operations or one of the communication patterns that they need to implement is called -- apologies -- is called All-Reduce.

So this describes the algorithm that is used in -- when the system is healthy and working normally, and then how that algorithm changes when the system is in this degraded state where there's -- there are failed OCS devices.

**MS. PRIEDEMAN:**  And, Ms. Hernandez, can you please zoom out and then go to the slide on the bottom of this document.

**BY MS. PRIEDEMAN:**

**Q.**   What is this showing, Dr. Sanchez?

**A.**   This is showing the performance of both following the default algorithm, basically the algorithm that is normally used when the system doesn't have failed OCS devices, which is shown on the top row here, and then when you use this optimized algorithm that Google has developed for this particular case. And you can see that performance is higher with that optimization.

**MS. PRIEDEMAN:**  All right.  And, Ms. Hernandez, can you please go to page 8 as well.

**BY MS. PRIEDEMAN:**

**Q.**   Do you see a number in yellow on the page here?

**A.**   Yes.

**Q.**   What does that number reflect?

**A.**   That is the amount of money that Google estimates to lose per day that one pod, one group of 4,096 TPU V4 chips, is down or is inoperable due to one of these failures.

**Q.**   Can you give the jury a sense of how much work and time and effort would go into solving this problem that's reflected in this document?

**A.**   This -- this kind of work requires, first, identifying the

issue, which is not easy because these devices, these OCS devices are emerging technology and so it is hard to know ahead of time how they're going to fail, whether they're going to fail.

You know, another important number in this page is actually the one two lines below that shows that those failures are relatively common.  And so you're losing a certain amount of money per day, and then that's happening for a substantial amount of days.

So first of all, you would have to identify a problem, and then this requires coordinated development of software techniques, algorithms that improve performance.  The basic technique itself is not easy to develop, and it actually relies on features of the TPU hardware that Google has not disclosed.

And so there is also an important interaction with hardware.  There are a number of hardware features that enable this software technology to work.

So overall, you know, a competitor who doesn't have access to this but wants to use OCS devices might not even see the problem.  And then if they identify this slide, they might not even have the right hardware to solve the problem.

Q.    Can you give a sense of how much time or effort it might save a competitor to have access to this type of information?

A.    I mean, if a competitor had access to this, they could foresee the problem in advance and essentially develop the

right hardware for it and the right software techniques for it.

If, you know, you're looking at the development of hardware where you introduce a new product generation every two years, that would be two years' worth of hardware having low reliability and being not very useful, so that's substantial.

Q.   This is technology that Google uses for its TPUs; right?

A.   Yes.  They also use OCS devices elsewhere in their own networks.

Q.   Would this -- would the information in this document be valuable to a competitor that didn't have access to Google's hardware and the rest of Google's infrastructure?

A.   Yes, in two ways.

First of all, there are now other companies who are building these OCS devices.  So, again, Google was first, but, you know, a competitor could acquire these OCS devices from a third party or could even build them themselves with a substantial amount of investment.

The other aspect that's also important to understand is that even if a competitor was not using OCS and they were using conventional networking hardware, this technology would be useful because that conventional hardware also breaks.

And so the key aspect is if, for these kinds of collections of TPUs that are connected in a particular way, essentially in this grid -- I'm talking about it as a grid.  It

really is like a 3-D grid.  Some links go around.  So the technical term is a 3-torus.  But really, other accelerators could be structured with the same kind of arrangement, with the same kind of network; and even if OCS was not used, you would need to handle failures of these switches.

Q.   And the software solution would be helpful to determining a solution to the failures or reliability issues that you're talking about?

A.   Yes.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, can you please go back to Exhibit 775.  And if you could zoom in on Category 3, please.

BY MS. PRIEDEMAN:

Q.   Dr. Sanchez, I want to focus on some other subcategories of documents within Category 3.

Are there documents in Category 3 related to technology called XOR and MegaScale XLA?

A.   Yes.

Q.   Which exhibits relate to that technology?

A.   So in order here, those would be 390, 397, 398, 399, as well as the last two, 392 and 391.  Basically, everything that starts with either XOR or MegaScale.

Q.   And can you describe, at a high level, what this technology is?

A.   Yes.  This is a technology that enables running large

machine learning workloads that span multiple pods of TPUs.

So as we've seen before, Google structures these collections of TPUs in these systems called pods.  We've seen, for example, that TPU Version 5E, or ViperLite, has 256 chips, 256 TPUs that talk together or talk with each other directly with this -- through this ICI, inter-chip interconnect, this high-performance network.

And then Google also has these larger systems like TPU V4 where there are multiple thousands of chips.

Initially, Google structured its machine learning computation to run only within a pod, but eventually it became advantageous to scale to multiple pods.  So, for example -- sorry -- with this technology, you can use thousands of TPUs, even though -- of ViperLite TPUs, even though each pod of TPUs only has 256.  So this is economically advantageous because it enables using tens of thousands of TPUs, even though each individual pod has -- is much smaller and it has a much smaller set of ICI -- basically, TPUs that communicate through the ICI.

Now, what's the problem?  Right?  The problem is that now you have two different networks.  So each server communicates -- can communicate with other servers using Google's data center network.  And that network is different.  It has a different arrangement of machines, what we call a different topology.  It is generally a lower performance.  TPUs have to go through the CPU in the server to talk to other TPUs,

and so there's -- there are more steps that are required.

And so to make this work, it's important to structure these machine learning computations so that most of the computation -- or most of the communication happens through this very high-performance ICI network, and then relatively little communication or at least relatively less communication happens through this data center network.

And so this is a complex problem, and Google has invested substantial effort in developing this system.

Q.   And what do the documents in Category 3 that relate to this technology -- what do they contain about this technology that you just explained?

A.   So there are two subsets of documents here.  The XOR documents are describing the overall umbrella program to enable this capability, and so this involves changes to different types of software as well as hardware and the development of certain types of hardware.

For example, these documents describe that a motivation for the development of ViperLite systems, ViperLite pods, was precisely this kind of feature.

And then the MegaScale documents describe or focus on the compiler changes.  Remember, the compiler is this piece of software that translates this high-level code that's easy for humans to write into the actual code that application -- that hardware runs and that would be very tedious to write by hand.

**SANCHEZ - DIRECT / PRIEDEMAN**

And so this describes the different technologies that are used within this compiler to enable this functionality.

Q.   Would this information be valuable to a competitor?

A.   Yes.

Q.   How so?

A.   Well, it is important for this machine learning infrastructure, for this AI infrastructure to run large models and large machine learning workloads; and the more TPUs or the more accelerators that you can involve in these operations, the faster this process is going to be and the larger the models and the more powerful these machine learning models are going to be.

And so by enabling these much larger collections of TPUs to work together on the same problem, Google can essentially, you know, obtain economic advantages, both, again, by training larger models, training them faster, using cheaper hardware like these TPU Version 5E systems rather than, you know, these much larger pods.

Q.   What could a competitor do with this type of information?

A.   A competitor could use this information to structure -- I mean, to understand what changes are required at different layers of the system, both hardware and software, to structure the development of a similar feature, and, you know, basically to understand how Google addresses this problem.

Q.   And I think you mentioned that Google had spent a lot of

effort developing this solution.  Can you give a sense of how much time and effort it would be -- it would take to kind of recreate the information created in these documents?

A.   I mean, it's hard to say exactly, but it involves non-trivial -- like it involves a substantial amount of development effort on different types of software, different types of hardware.  I don't know the exact dates, although -- from the top of my head -- or off the top of my head, but there are development timelines that I think go well over a year in these -- in these documents.

Q.   All right.  So looking at Exhibit 775 again, we talked about the ICI Resilient document and then this XOR and MegaScale XLA document.  I'm not going to go through all the other documents, but I'm hoping you can explain, for the other documents that we haven't gone into detail, what other type of information is contained in those documents.

A.   Yes.  So at a high level, these other documents that we have not discussed concern different types of software that is used to manage TPUs.  For example, it describes algorithms to choose collections of TPUs when -- to run a particular workload.  And so, for example, if a user wants to use, let's say, 16 TPUs out of a group or a pod of 4,000, which 16; right? How should those be chosen?  So there are documents that explain which algorithms Google uses.

     There are documents that concern how these TPUs are

SANCHEZ - DIRECT / PRIEDEMAN

Case 3:24-cr-00141-VC   Document 376   Filed 01/31/26   Page 67 of 182   1134

exposed to third parties in Google Cloud.

There are documents that discuss, for example, aspects of how the different layers of software in TPUs are structured and organized.

Q. All right. And stepping back and looking at the combination of all the documents in Category 3, is the combination of all of the information in Category 3 publicly available?

A. No.

Q. And we talked about the individual value of different documents. Is there additional value based on the combination of all these documents that goes above and beyond the value of the individual documents?

A. Yes.

Q. Can you talk a little bit about that?

A. Well, each of these documents is describing particular techniques, technologies. And so as an instance, we've looked at ICI Resilient Slice in some detail. That is valuable by itself.

But the combination of these documents gives a more complete picture of what is the custom software that Google uses in managing these TPU-based systems, in making them useful, in making them reliable, in making them able to run these really large machine learning workloads.

Q. Would the combination of this information be -- you said

that it gives insight into what Google does.  Can you explain a little bit more about how it would be valuable to a competitor and what a competitor could do with the combination of the documents in Category 3?

A.   Yes.  A competitor could use these documents to structure the software used for their machine learning accelerators in a similar way, to foresee problems that happen when these accelerators are used in very large numbers.

That's an example where the ICI Resilient Slice document is really one such problem, to structure the development of techniques to scale these very large machine learning workloads, which is a common and important requirement for this kind of AI infrastructure, to understand the importance of different kinds of networks.

And so this could also be used to choose the right kind of hardware to deploy or -- you know, for example, decide to build systems with different kinds of networking technologies, because these documents give an understanding of what are the requirements of Google's networks and how these machine learning workloads use them.

Q.   Would it save a competitor time and resources?

A.   Absolutely.

Q.   All right.  We're going to move on to Category 4. Before -- sorry.

MS. PRIEDEMAN:  Ms. Hernandez, can you go back to the

PowerPoint, please.

**BY MS. PRIEDEMAN:**

**Q.**   All right.   So before we dig into Category 4, I want to orient us a little bit.

So we just talked through categories -- we've gone through Categories 1, 2, and 3, and each of those relate to different aspects of Google's TPU supercomputers; right?

**A.**   Yes.

**Q.**   So now we're going to turn to Categories 4 and 5.

Can you tell the jury, at a high level, where we're headed with Categories 4 and 5?

**A.**   Yes.   So we're heading -- we're changing the type of AI supercomputers that these categories are focused on. Categories 4 and 5 focus on Google's GPU-based AI supercomputers.

So GPUs are a different type of accelerator from TPUs. They are also used to accelerate machine learning computations.

GPU actually stands for graphics processing unit, and that is because, originally, these kinds of accelerators were developed to accelerate graphics applications, graphics rendering applications, things like gaming.   So producing very detailed pictures for games in real time.

Now, as it turns out, the kinds of computations that are required for these graphics applications are also useful -- or the kinds of hardware that is -- that accelerates this is also

useful for other types of applications.  Among those are machine learning computations.

And so this focuses on Google's custom GPU systems.  Now, of course, Google is also building their own TPU-based systems, but there are advantages to building GPU-based systems as well.

Q.   And so for the TPU supercomputers, we talked about the chip level and then the system level, how the different chips are connected.

A.   Mm-hmm.

Q.   When we now are talking about the GPU systems, can you just give a little preview of what we're talking about in Categories 4 and 5?

A.   Yes.  So I think one very important difference between Google's TPU- and GPU-based systems is Google builds their own TPU chips, but they don't build their own GPUs.  They are integrating GPUs from -- that are sold by a different company that's called Nvidia.

And so even though those GPUs, those chips, are provided by a third party, Google does build custom servers, custom hardware, custom network, and custom software to enable these AI supercomputers and then to make them efficient, to make them easy to use, to make them reliable.

Q.   So in Categories 4 and 5, we're not going to be talking about the actual design of the chip; we're going to be talking about the system design and how the GPUs are connected; is that

right?

A.    Exactly.

Q.    All right.  Let's start with Category 4.  Can you describe what type of information is contained in Category 4?

A.    Yes.  So most of Category 4 is concerned with the design of Google's custom GPU systems called AdAstra.  Externally, these are known as A3.

There's also a little bit of information on Google's earlier GPU servers that are called externally A2.  Internally they're called BigRig.

Now, there is an important characteristic that differentiates these two systems, which is that AdAstra was the first GPU system that was designed to run large machine learning workloads.  So earlier generations of Google's GPU servers were essentially offered in small collections.  You could, as a user, rent or use one server or a few servers.  But these servers lacked sufficiently high communication performance.  They didn't have a very high-performance network, and so they could not be used very effectively to, for example, train large machine learning models.

And so this changed with AdAstra.  So a key feature of AdAstra is that the whole system is designed to enable this very high-performance communication between GPUs that are physically on different servers in the data center.  And so there's a lot of focus on that, you know, high-performance

network cloud in the bottom.

And so in Category 4 specifically, there is information about the design of each individual server, including on custom components that enable that high-performance communication, and then on the network that connects the servers. So there are -- there's essentially the implementation, information about what devices are used to connect these, how are different servers organized to provide this high communication performance that is crucial to run these large machine learning workloads.

Q. All right. I want to talk a little bit more about that, but first I kind of have a big-picture question.

Can you talk a little bit about how much work and effort goes into what Google does after it buys the Nvidia chip, basically what goes into the GPU systems we've been talking about and why that's important?

THE COURT: And, you know, before we get an answer to that question, I'll have you reask it after a break.

Let's take another break of about ten minutes. We'll resume at 11:30.

MS. PRIEDEMAN: Sounds good.

THE COURTROOM DEPUTY: All rise.

(Proceedings were heard out of the presence of the jury.)

THE COURT: Okay. You can step down. See you at 1130.

THE COURTROOM DEPUTY: Court is in recess.

(Recess taken at 11:18 a.m.)

(Proceedings resumed at 11:32 a.m.)

(Proceedings were heard in the presence of the jury.)

**BY MS. PRIEDEMAN:**

**Q.**   All right.  Dr. Sanchez, I'm going to see if I can remember the last question I was asking before break.

I believe I asked you about -- so once Google purchases the GPU chips from Nvidia, then they create this system, GPU system.  And I was hoping you could, high level, explain to the jury how much time and resources and effort go into creating that GPU system.

**A.**   Right.  So Google purchases these GPUs, actually, on a board from Nvidia, but then Google builds an entire custom server around these GPUs.  And so Google builds their own custom hardware servers because doing so yields substantial economic benefits.  They can optimize the size of those servers, the functionality of those servers to contain precisely the kinds of features that they need in their systems.

So, for example, they can avoid having components that are not useful in a data center but are useful in other contexts, like in a normal server room.  But more importantly, they can optimize key aspects of these systems, for example, to enable this high-performance connectivity between GPUs and different servers or to enable them to be cooled in a cheaper way and in

a better way which makes the system cheaper to operate.

Now, it's important to emphasize that designing and building custom servers is expensive.  It's something that normal companies do not do.  They instead buy servers from other companies.  Those are sometimes called commodity or off-the-shelf servers.

But by doing this custom design, Google can reduce the cost to operate these machines and at a scale that saves money.

**Q.**   Are there other -- so you mentioned that you can buy certain servers.  What are -- can you talk about some of the differences between Google's custom server and a server that you could, for example, purchase?

**A.**   So at a high level, yes.  Those servers, like the servers that you can buy on -- you know, from companies that make them publicly available, have a different form factor, have a different cooling system, have a different set of components that is not optimized for these kinds of applications.

Now, it is also the case that there is a wide range of different servers with very different features.  And so even if you cannot get the same features as -- and the same efficiency as Google servers, one way that these documents are useful is that they would enable somebody who's building this kind of infrastructure to select the right kind of commodity parts to approach or try to get some of the benefits of these custom servers.

Q.   When you say "commodity parts," what are you referring to?

A.   I'm referring to servers that are -- that are offered to the public by companies like Dell, SuperMicro, Hewlett-Packard, and others.

Q.   So are you saying that even if a competitor can replicate Google's entire system, this would be helpful in terms of optimizing or picking certain components?

A.   Yes.  There's a wide range of servers.  For example, we have servers that are, you know, small; servers that can be three or four times as large, that fit more or fewer components, that have different cooling systems.

     And so understanding, you know, what the impact of those choices is, which is shown in these documents, would enable a competitor to adopt a similar set of choices if they were to build custom hardware; but if they weren't, they could at least choose among those existing servers.

Q.   So you've answered this a little bit already, but would this set of documents in Category 1 be useful to someone who was trying to buy -- trying to build an AI supercomputer with GPUs?

A.   Yes.

Q.   How so?

A.   So as I mentioned before, they could either adopt these techniques, for example, in the design of the cooling system, which for these systems is very important because each server

consumes a lot of power and so that actually costs a lot to dissipate and to manage.

And then even if they were not to build custom servers, they could adopt and choose parts that try to get some of these benefits.

Q.   So you've mentioned cooling systems a little bit, and I don't want to get into the specifics, but can you just, big picture, talk about why -- what a cooling system is and why it matters for building an AI supercomputer?

A.   Yes.  So when you're looking at personal computers, like if you think about your laptop or your phone, they barely consume any power, so it might seem like this is not such an important problem.

But these machines consume much, much more power, hundreds of times more power.  We're talking about thousands of watts. This is more than your typical household appliance, more than an oven, more than a microwave.

And so, you know, the right analogy, in terms of is this something that is complicated to heat -- or to cool, is actually a car engine.  A car engine actually burns roughly the same amount of power when traveling down the highway as one of each -- of these servers.

Now, cooling a car engine is easier because you have air going in; right?  You're going at, like, 60 miles per hour. These machines are sitting in a data center, and so they

need -- cooling them is trickier.

And there's a lot of design effort and different choices in making that cooling system efficient.  First, it needs to be sufficiently capable so that it can dissipate all the power that these systems are producing, and then it should be cheap. And that's not easy to achieve.

Q.   All right.  Stepping back a little bit, has Google published information about AdAstra or BigRig, the two hardware systems that you described?

A.   Very little.  So unlike Google's CPU systems where there are more technical publications, when it comes to their GPU systems, there are product announcements, but there is -- you know, there aren't technical descriptions to the level that you have in the other information about, for example, Google's CPU systems.

Q.   Are any of the documents in Category 4 publicly available?

A.   No.

Q.   Could any of the documents be easily reverse-engineered or otherwise reconstructed using publicly available information?

A.   No.

Q.   Why not?  Can you explain that a little bit?

A.   Yes.  So these documents describe characteristics of the hardware that is used within Google's data centers.  So, for example, how effective the cooling solution is, is something that Google, or whoever is operating the infrastructure, is --

really cares about because that determines how much their electricity bill is going to be.

But as an external user, it's not possible to observe how much power is being spent, let's say, cooling these systems. Likewise, it's not possible to observe what are the physical features of the system, how tall is it, how is it organized.

**Q.**   All right.  I want to next talk about some specific documents in Category 4.  But before I do that, you've mentioned different components of Google's GPU systems.  I'm hoping we can kind of just, high level, walk through the different components.

So you talked about that Google purchases the GPUs on a board from Nvidia.

**A.**   Mm-hmm.

**Q.**   Can you talk about what components Google builds around that and kind of the different layers of Google's GPU systems?

**A.**   Yes.  So Google builds multiple types of custom hardware to -- basically around this board.

First, there is a CPU component.  So each server has essentially a general-purpose processor that is managing all of these accelerators.  And that is similar to how these TPU servers are also organized.  That component is custom designed by Google.

But importantly, there is a board -- sorry -- there's a board that provides connectivity between this GPU board that

Nvidia provides or that Google purchases from Nvidia and then the rest of the system.

And so other peripherals that are called smart network cards, or SmartNICs, are connected directly to this board to enable this high-performance communication between GPUs and different servers.

Those SmartNICs are also custom hardware that is using AdAstra.  These SmartNICs are described in more detail in Category 6 and 7.  So the other -- this category focuses on other kinds of hardware that's built around.

And so we're talking about sort of electrical components, but there's an important mechanical aspect about how the system is housed, all of these electrical components, all of these chips, all of these boards, where these chips are mounted, are housed in a chassis that has certain dimensions, that has a certain cooling system, power supplies, and so on.

And so that also is custom and described here.

Q.    All right.  Let's take a look at a specific document.

MS. PRIEDEMAN:  Ms. Hernandez, can you please pull up Exhibit 407.  This is an alleged trade secret document.

BY MS. PRIEDEMAN:

Q.    All right.  Dr. Sanchez, this document is called "Endurance-B Hardware Design Spec."

Can you explain to the members of the jury what is contained in this document?

**A.**   Yes.   So this is a very detailed document that contains information about the implementation of, first of all, the system, the AdAstra system as a whole; but then it quickly focuses on one part of the system that's called the fabric tray board.   And so this is a board that incorporates -- that is custom designed by Google that incorporates different components and whose role is to provide adequate connectivity between these GPUs that, again, Google purchases from Nvidia and the rest of the system.

And so that involves both connecting to other servers and providing the ability to have lots of these network cards that provide a lot of connectivity to other GPUs in other servers, as well as to the CPU part of the system.

**Q.**   Is this document over a hundred pages, Dr. Sanchez?

**A.**   Yes.

**Q.**   At a high level, what stood out to you about this document?

**A.**   Well, this document contains a lot of implementation details.   This is something that, when reading this document, my initial hunch was that this -- this would be the document that Google actually uses to actually build the system.

Basically, Google employs or hires the services of other third parties called OEMs, or original equipment manufacturers. These are companies that are specialized in building hardware designed by other companies.   And so it looked to me like it

would be a document that would be used by these OEMs.

There's also a disclaimer that, you know, starts with that type of disclaimer that says, "This is secret information and this is under a nondisclosure agreement." Moreover, it has that level of detail.

I asked one of the Google engineers that I met with about whether that was used that way, and he confirmed that this is indeed the main document from which information is derived and then sent to these OEMs.

MS. PRIEDEMAN: All right. Ms. Hernandez, can you go to page 6, please.

BY MS. PRIEDEMAN:

Q. We're just going to look at some specific examples in this document. Dr. Sanchez, can you explain what we're looking at here?

A. Yes. So this is a block diagram that shows the different components of the server. It is colored by -- in different ways. And so those colors denote the different components.

The one that's shown in green, right, everything that is under this green box, is the board that houses all of these GPUs that Nvidia sells to Google and to others. And so that is the part of the system that Google purchases from third parties.

The rest of the system, the rest of the components are -- the rest of the colored boxes here are showing other parts of

the system that are custom built by Google.

And so you have, you know, this fabric board on the top that's showing this blue rectangle.  And so that's the key focus of this document.  But you have these yellow components on the right.  You have these CPUs at the top in a separate box.  And so all of those are also custom built by Google.

The Endurance chassis that contains these components, which is shown in this big gray box on the bottom, that's also custom built by Google.

Q.   And what do the different arrows indicate?

A.   So those indicate communication paths between the different components that are housed or placed in these boards.

Q.   Would this information be valuable to a competitor?

A.   Yes.  I mean, this gives a high-level diagram, but the rest of the document explains in much more detail how this -- which components are used, how they interact, how to essentially wire the different components and, essentially, gives valuable implementation information.

Q.   So this diagram is kind of, big picture, showing where the different components are, and then there's a lot more detail about each of the custom components in the rest of the document; is that right?

A.   Yes.

Q.   Can we --

MS. PRIEDEMAN:  So there's some text underneath the

diagram on the bottom of page 6, and then if we can go to
page 7 as well, Ms. Hernandez.

**BY MS. PRIEDEMAN:**

**Q.**   What are these bullet points reflecting here?

**A.**   Yes.  So this is -- this is showing -- this is listing all
of the different components of the different chips and
different electrical -- electronic devices that are used in
this fabric board.

And so that is useful implementation information because
when developing a board like this one, where there needs to be
high-performance connectivity, there are a number of important
features, there's a wide range of choices in which components
to use.  And so this -- you know, selecting the right
components requires having the right functionality.  The wrong
component might not provide the right functionality or might be
too expensive.  And so this reflects an optimized selection of
components that would be useful to a competitor.

**MS. PRIEDEMAN:**  Ms. Hernandez, can you go to page 8 of
the same document as well.

And can you zoom in on the top diagram, please.

**BY MS. PRIEDEMAN:**

**Q.**   What are we looking at here, Dr. Sanchez?

**A.**   This diagram is a more detailed diagram of this fabric
tray board that was the blue block in the previous diagram, and
so it shows in more detail what the connection between these

different components are and what those different components are.  I mean, that's, again, reflected in the list of components before, but this shows this more graphically.

Q.   So this is kind of zooming in on one of the components that we looked at in the other diagram?

A.   Yes.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, you can zoom out of that.

And then can you please go to page 24.

BY MS. PRIEDEMAN:

Q.   Dr. Sanchez, what are we looking at here?

A.   So this shows a block diagram that goes into additional detail for one of the subsystems, one of the subset of components in the -- in this board.

And so this board incorporates a range of components with different functionalities; for example, delivering power or managing parts of the system.

This one, in particular, is focused on the management components of this board.

Q.   Dr. Sanchez, would the information in this document be valuable to a competitor that didn't have access to all of the custom components that Google has?

A.   Yes.  I mean, if a competitor wanted to build a board like this one, the selection of components -- you know, those components are available -- at least both of those components

are publicly available.  And so a competitor could just use this selection to build a similar system.

**Q.**   So this isn't dependent on having access to other proprietary components within Google?

**A.**   No.

          **MS. PRIEDEMAN:**  Ms. Hernandez, can you go to page 148 of the same document.

**BY MS. PRIEDEMAN:**

**Q.**   What are we looking at here, Dr. Sanchez?

**A.**   So this is a diagram showing the actual physical layout of this board.  And so it shows where each of the electronic components, where each of the chips is located.  It also shows, at a high level, what the electrical connections or traces between these components are.

     And so these kinds of boards are electrically very complex devices, and the placement of these components matters.  For example, just like we were looking at floor plans of a chip, two components that need very fast communication or that communicate at very high performance should be placed close by. And so this shows where all of the components are placed, their physical dimensions, and so on.

     Now, this diagram was derived from what's called a computer-aided design program.  So there are programs that are specialized to design these boards, and then the result is a file that you can send to a manufacturer to produce the actual

physical board.

Let me just be clear that the actual file that you would send to this manufacturer is not present in the Google files. However, this picture alone is showing the -- you know, the location of all the components, and so it would substantially reduce the design effort required to just reproduce that -- that file that could be sent to a manufacturer.

Q.   Dr. Sanchez, like you said previously, this document is over a hundred pages.  We're on page 148.  I'm not going to go through each page.

But are there other detailed specifications included in this document that would be valuable to a competitor?

A.   Absolutely.  So we've looked at just one of these block diagrams for one of the set of components that perform important functionalities in this board.  There are several such diagrams, along with detailed text descriptions that show, basically, how these components interact with each other.

They explain, for example, when the system turns on, what is the right sequence of steps that need to happen for the system to start operation.  They detail the generation of important electrical signals that are necessary for the system to function.  They explain how the different parts of the system are connected using different types of physical connectors.  They include other board diagrams like this one for the other custom components in the system.

And so, yes, there's much more information here that is valuable and would be useful to produce a similar system.

Q.   Can you give a sense of how much time and effort it would take to recreate some of the design choices included in this document?

A.   So these design choices are, you know, important to enable these kinds of functionalities, and they depend on the design of the rest of the server.  And so, again, there's a lot of co-design that happens.  This board is not designed in isolation.  It's designed looking at the entire server and the entire system that consists of multiple servers.

And so, again, off the top of my head, I don't recall the exact timeline; but these documents also have detailed, basically, product development plans and timelines, project development timelines that span well over a year.  I don't remember the exact number of months, but it is a substantial amount of design effort.

Q.   All right.  Let's take a look at one other document in this category.

        MS. PRIEDEMAN:  Ms. Hernandez, can you please pull up Exhibit 401.

BY MS. PRIEDEMAN:

Q.   This document is called "AdAstra-Hardware," Dr. Sanchez. Can you describe, at a high level, what's contained in this document?

**A.** Yes. So this document describes the organization of each AdAstra server, as well as of the network that connects the servers.

And the network, in this case, is a very important component of the system, because without a sufficiently fast network, these servers would not be able to communicate at a high enough rate.

There are many types of information in this document. One of -- one of the characteristics of this document that is remarkable and also is shared with similar documents in this category is that it shows different versions of the AdAstra system as the design evolved. So you don't just get here's what the final product is, but there are also -- there's also a discussion of how the design changed over time.

So you have block diagrams, you have information about the cooling system, the kinds of, you know, different network structures, different rack organizations that were designed and considered during the development of the system.

**Q.** So, Dr. Sanchez, the exhibit we just looked at, Exhibit 407, the Endurance-B hardware document, that was focused on the hardware of a particular server; is that right?

**A.** Yes.

**Q.** And this document we're looking at now, it goes beyond one server and talks about how to connect different servers to create a supercomputer?

**A.**   Yes.  So to be precise, the document before discusses or mostly focuses on that one board within the server, and this is talking about the whole server and then the network that connects them.

**Q.**   Got it.

        **MS. PRIEDEMAN:**  All right.  Let's look at some specific pages within this document.

        Ms. Hernandez, can you go to page 15, please.

**BY MS. PRIEDEMAN:**

**Q.**   Dr. Sanchez, what are we looking at here?

**A.**   So this shows the -- basically, part of the network topology, as well as the organization of each server.

        So the diagram on the top shows the different components of the server, as well as how they are connected.  You can see that there are eight green boxes that are labeled as GPUs, and then there are different other boxes.

        As I mentioned before, these GPU boxes, as well as this block in the middle called "NVLink Fabric," that is within the board that Nvidia provides or that Google purchases from Nvidia.  The other components are part of Google's custom design.

        Now, focusing on the diagram on the bottom, that starts describing the network topology, and so that is a technical term that refers to how different systems, multiple servers are connected.

And so the way the system is organized is hierarchical. Essentially, the network consists of multiple levels, so machines are grouped into racks, and so those are first connected to another network device.

You can see this label here as "ToR."  That stands for top of rack.  And so it's a component called a switch that connects the machines within the rack and provides them connectivity to outside the rack.

So that's just sort of the first lowest-level part of the network.

If you keep going through this document, in the next page or few pages, there are additional diagrams that show the rest of the network.

Q.   Let's go to page -- let's stop on page 17 for a second. Can you explain what we're looking at here, Dr. Sanchez?

A.   Yes.  So this is a diagram that shows how the rest of the network is organized.  It gives two different kinds of organizations with different sizes, but the part that is -- that is new and different from the previous diagrams is you can see each of these boxes.

So there's, like, a gray box that comprises a large group of machines.  This is called a superblock.

Then there are white boxes and, within those, that are labeled "Rack."  And so this tells you first how many racks and, therefore, how many servers are there within each of these

large collections called a superblock.

And then the white boxes at the top show the specific network that is used to support and provide connectivity between these -- all of these machines within this group, this superblock.

This might seem high level, but this shows the specific topology.  Each of these blue boxes has a label that corresponds to the particular chip that is used to implement this functionality.  And so this is showing, it is sufficient to understand what the capabilities and the actual physical implementation of the network is.

**MS. PRIEDEMAN:**  Ms. Hernandez, can you --

I want to go to your point where you said that the blue boxes have the specific chip.

Ms. Hernandez, can you zoom in on --

**BY MS. PRIEDEMAN:**

**Q.**   Are you talking about the little blue squares that are attached to each other?

**A.**   Yep.

**MS. PRIEDEMAN:**  Ms. Hernandez, can you zoom in on one example of that.

**THE WITNESS:**  That's the one.

**BY MS. PRIEDEMAN:**

**Q.**   Okay.  So that has the specific chip and the connections between them?

A.    Mm-hmm.

MS. PRIEDEMAN:  Okay.  You can zoom out, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.    All right.  Dr. Sanchez, would the information contained in this document be valuable to a competitor?

A.    Yes.

Q.    How so?

A.    Well, this document shows the organization of the AdAstra servers.  It shows the network that is used to connect the servers, which is a crucial part of AdAstra.  It also shows how the design changed over time.

This is crucial or it would be important and useful information to see the set of design choices that Google considered, the design trade-offs that they faced, how they negotiated those choices, how they chose different approaches over time and, as they learned more about the different characteristics, how they eventually arrived at this final design.

So for a competitor who is looking to structure the development of a similar piece of infrastructure, a GPU-based AI supercomputer, this kind of information would all be valuable.

Q.    All right, Dr. Sanchez.

MS. PRIEDEMAN:  Ms. Hernandez, can you please pull up

Exhibit 775 again, please.

And if you could zoom in on Category 4, please.

**BY MS. PRIEDEMAN:**

**Q.** All right. Dr. Sanchez, we talked about two examples within Category 4, and I'm not going to go into all of the other specific documents right now.

Can you describe to the members of the jury what the other documents in this category that we didn't talk about relate to?

**A.** Yeah. So at a high level, these documents give additional information about the mechanical aspects of the design of these AdAstra servers; for example, the design of their cooling systems, which is a very important aspect of making the system sufficient.

They give additional information about their storage components, essentially the parts of the servers that store data and provide them to applications.

They give information about the racks that are used to house these servers.

They give information or compare the performance of different systems, including these GPU systems, as well as other Google GPU and TPU systems.

They compare the performance on relevant workloads, as well as the cost of operation and the cost to build them and deploy them.

And they contain other internal details about Google's

**SANCHEZ - DIRECT / PRIEDEMAN**

infrastructure.

**Q.**   Do each of these documents contain information that would be valuable to a competitor?

**A.**   Yes.

**Q.**   All right.  We've talked about the individual documents in Category 4 and whether the information is publicly available. Is the combination of information in Category 4 publicly available?

**A.**   No.

**Q.**   And, again, we've talked about the value of some individual documents.  Is there additional value that comes from the combination of all the documents in Category 4 that goes above and beyond the value just from each individual document?

**A.**   Yes.

**Q.**   Can you talk a little bit about that?

**A.**   Yes.  So there are multiple dimensions in which the combination of these documents is more valuable than each document in isolation.

First of all, there are documents that, together, give more details and more useful implementation information about particular aspects.

So, for example, if you look at the cooling system that is used in AdAstra, that information is contained in several of these documents.  Like, for Exhibits 402 and 406 give very

complementary information.

When you consider the whole collection of AdAstra documents, they are giving information about the different aspects of the system, the servers, the individual components within the servers, all the way up to the network that is used to connect the servers.  And so all of those are part of the same integrated system, and again, these reflect design decisions that are made together for the whole system to work well.

And then when you look at the document that is describing similar information for Google's earlier GPU systems, this BigRig document, Exhibit 405, it gives additional information because it shows how the design of these systems has evolved over time.  And so understanding how these systems have evolved over time would be useful to a competitor because it allows them to see how the trade-offs have changed over time, how design decisions have been optimized or made differently over time.

**MS. PRIEDEMAN:**  All right.  Ms. Hernandez, can you go back to the PowerPoint, please.

**BY MS. PRIEDEMAN:**

**Q.**   All right.  So I'm going to turn to Category 5.  What information -- what type of information is contained in the Category 5 documents?

**A.**   Category 5 focuses on the software used in Google's

GPU-based AI infrastructure, in particular on the software used in AdAstra.  You'll see that in this picture, this focuses on the cluster manager and system software parts.

Unlike for Category 3, where there were aspects relevant to machine learning frameworks and compilers, those are not contained here.

But like in previous software -- in the previous software category, it's important to emphasize that because this is a custom piece of hardware and a high-performance system, it relies on custom software to make good use of it, make it useful, make it reliable.

Q.   And what stood out to you about the information contained in Category 5?

A.   So Category 5 discusses several important types of information that would be useful to make these systems -- to make these systems usable, really.

So on the one hand, they discuss information about software technologies used to enable high-performance communication between GPUs that reside on different servers. And as we've discussed before, this is a really important aspect of -- you know, of these systems because multiple GPUs are all used to run the same workload, to run the same large machine learning computation.  And so you might have thousands or tens of thousands of GPUs that are all collaborating in solving the same problem, so they need to communicate very

frequently to do that well.  And there are some software technologies that leverage Google's custom hardware to make that possible.

There's also information about system software that enables some important aspects of the operation of AdAstra. But another important feature -- or important kind of information in this category is there's a set of documents that concern Google's work on a project that sought to acquire a large cloud computing customer that would run very large machine learning workloads on Google's GPU-based as well as their TPU-based systems.

And so these documents are very important because they reveal operational information about how cloud computing -- cloud computing companies like Google are willing or able to customize their infrastructure to meet the needs of very large customers.

Q.   Does each document in Category 5 contain information that is not publicly available?

A.   Yes.

Q.   Could any of the documents in Category 5 be reverse-engineered or easily reconstructed using publicly available information?

A.   No.

Q.   Does each document in Category 5 contain information that would be valuable to a competitor?

**A.**   Yes.

          **MS. PRIEDEMAN:**  All right.  Ms. Hernandez, can you go to Exhibit 775 again, please.

          And if you could go to the next page, please, and zoom in on Category 5.

**BY MS. PRIEDEMAN:**

**Q.**   All right.  So I want to talk about a subset of documents.

     Are there documents related to a technology called "TCPDirect" within this set?

**A.**   Yes.

**Q.**   Which exhibits relate to TCPDirect?

**A.**   There are multiple exhibits that relate to this technology.  So you have essentially all of the documents that start with TCPDirect, so those are 434, 435, 433, and 432. There are related technologies as well, so 418 is also relevant to the technology discussed here.

**Q.**   And can you explain to the members of the jury what TCPDirect is, at a high level?

**A.**   Yes.  So at a high level, TCPDirect is an implementation of a protocol that is widely used that is a custom implementation that Google has developed to enable direct communication or high-performance communication between GPUs in different servers.  And so an important -- as I mentioned before, a really important part of these systems is enabling this high-performance communication.

And when we talk about a protocol, we're essentially talking about the language that these machines need to speak, how they need to exchange information to understand each other.

There are a wide range of protocols that are used.  And TCP is a protocol that was originally developed for the Internet and is not meant to be very high performance in its normal -- its conventional implementations.  And in those conventional implementations, one characteristic is that the CPU, basically the general-purpose processor within each server is in charge of mediating the communication between components like the GPU and then other servers.  So all of the data that a GPU wants to exchange with some other GPU in a different server needs to first go through the CPU.

Now, even with optimizations that are typical in the development of these protocols, the CPU and the memory of the CPU would become a complete bottleneck.  It would not -- it would dramatically reduce the performance of this communication.

And so TCPDirect is a technology that enables these GPUs to skip the CPU for most, but not all, of the data that is exchanged between machines.  So this enables the GPUs to send most of the data directly to the network card that sends data over the network, and then the CPU is in charge of the management functions of essentially tagging that data appropriately so that it is sent correctly to the right

machine.

One analogy here that might be helpful is, think of when you want to send a large document over mail.  You might not be able to fit that document in an envelope, so you might distribute this over a number of envelopes.  And so in this case, think of the GPU is sending the data -- right? -- the actual pieces of paper that have all the information, directly to the network card, but the CPU is in charge of putting together those envelopes and so making sure that the data is transferred to the right place.

Q.   So, Dr. Sanchez, you mentioned the TCP protocol.  Is the protocol different than the TCPDirect technology that Google has developed?

A.   Yes.

Q.   And you explained that the TCP protocol is like the language that's used to -- the language that the different GPUs speak to each other; is that right?

A.   Yes.

Q.   And TCPDirect is a software that Google has developed to make the TCP protocol more efficient?

A.   Yes.  So it is software that relies on Google's custom hardware, both the components of the Endurance -- you know, like the Endurance fabric board that we discussed before that provides adequate connectivity between the GPUs and these network cards, and then the network cards themselves, which are

also custom and -- you know, custom Google technology.

Q.   And what type of information do the different TCPDirect documents contain?

A.   So they contain information about how this protocol is implemented, what hardware features it relies on and then, you know, as a whole, how it operates.

It also -- apart from just the technical description of the protocol, they contain the rationale for introducing these. Google actually considered a different protocol, initially not TCPDirect, and TCPDirect was introduced to address some of the issues or problems that happened during the development of this system.

And so TCPDirect has things that are different from other high-performance protocols but has also some advantages.  For example, it's more compatible with other machines.  It can talk to more kinds of hardware.

MS. PRIEDEMAN:  Ms. Hernandez, can you pull up Exhibit 434, please.

BY MS. PRIEDEMAN:

Q.   Dr. Sanchez, this document is called "TCPDirect for AdAstra System Architecture."  Is this one of the documents that relates to TCPDirect?

A.   Yes.

Q.   Can you explain what kind of information this document includes?

A.   So this -- this document contains an overview of the technology.  It explains how it works.  It explains its motivation.

But also, if you scroll through the document, you'll see that it starts discussing the actual implementation features that are required.  It tells the reader how those features are used.  And so that is information that Google has not disclosed.

Q.   And you mentioned that information about Google's motivation or rationale for using TCPDirect would be useful to a competitor.  Are there different networking decisions and choices that someone who is trying to create an AI supercomputer is faced with?

A.   Absolutely.  There are different kinds of networking technologies that can be used, and they have different cost and performance trade-offs.

Q.   Can you talk a little bit about how the documents related to TCPDirect that talk about Google's design choices would be useful for a competitor who is faced with those different design choices?

A.   Yes.  So they explain how to use a cost-optimized set of hardware and technologies to achieve high performance.  And so, for example, there are alternative networking technologies like InfiniBand which one can buy and that provide high-performance communication, but those are more expensive than the kinds of

networks that are being used here.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, can you go back to Exhibit 775, please.

Can you zoom in on Category 5, please.

BY MS. PRIEDEMAN:

Q.   Dr. Sanchez, there's a number of documents here that start with the word -- or that include the word "Astrophel."  Can you -- can you talk about what those documents relate to?

A.   Yes.  So these documents that are labeled with "Astrophel" concern this project that Google carried out to onboard a large customer on Google Cloud.

Google Cloud is the product that Google has that essentially offers access to third parties to their infrastructure.  And so anyone can rent machines from Google Cloud, but most users are using just one or a small number of machines.

But some companies have very large computing needs.  And so, for example, this customer wanted to run both large machine learning training workloads as well as inference workloads, and so these large customers pay enormous amounts of money to use this infrastructure, and at the same time they have unique requirements.

And so these documents describe how Google approached, you know, developing and customizing their infrastructure to meet the requirements of this particular customer.

**SANCHEZ - DIRECT / PRIEDEMAN**

**Q.** Would the information contained in this set of documents related to Astrophel be valuable to a competitor?

**A.** Yes. So specifically, when you're looking at a competitor who's looking to build an AI supercomputer or AI infrastructure that would be offered to third parties like a cloud computing provider, these kinds of implementation information about how these cloud computing customers customize and adapt their infrastructure for these large customers are just not public. It's a competitive advantage, you know, to understand how a company like Google is willing to adapt their systems to meet the needs of a large customer.

**Q.** And without getting into the specifics, what do you mean by "adapt their systems"?

**A.** Well, so Google built AdAstra with a configuration of servers on the network. But this particular customer had certain needs that could not be met with that infrastructure and so thus demanded, actually, a different hardware organization.

And so there are, for example, changes to the network, there are changes to software that schedules workloads to use this particular hardware configuration, and there are other challenges that arise, like reliability, that need to be addressed. And so there's a large amount of changes induced by this configuration, this, essentially, variant of the system.

**Q.** So you're saying that these documents include information

about how Google kind of customized its hardware infrastructure and networking infrastructure to meet the demands of a large cloud customer?

A.    Yes.

MS. PRIEDEMAN:    All right.    Ms. Hernandez, can you please pull up Exhibit 429.    We're just going to look at an example of one of these documents.

BY MS. PRIEDEMAN:

Q.    This document is called "Fabric Topology for Astrophel." Can you explain what is contained in this document?

A.    Yes.    So this document focuses on the changes to the network, essentially how different machines in AdAstra are connected.    And so that is different from the conventional networking topology that Google has, and it seeks to meet the requirements of this -- the training, the machine learning training workloads that this large customer had.

MS. PRIEDEMAN:    Ms. Hernandez, can you go to page 2, please.

Actually, let's go to page 4, please.

BY MS. PRIEDEMAN:

Q.    Dr. Sanchez, what are we looking at here?

A.    So this is a diagram that describes at a high level how groups of machines are networked, are connected together, and then how work is mapped to these collections of machines.

And then it -- the diagram on the bottom is showing what

needs to happen when some of those machines become inoperable. Again, there are failures in these systems, and so some complex activities need to take place to ensure that the system stays functional.

MS. PRIEDEMAN: Ms. Hernandez, can you zoom out a little bit.

And can you go to page 5, please.

BY MS. PRIEDEMAN:

Q.   All right.  What are we looking at here, Dr. Sanchez?

A.   So this diagram describes precisely how different groups of machines are connected.  It shows the bandwidth, the amount of information per second that these different groups of machines can exchange, and it's labeling the specific data center that Google is using to house this -- this particular set of machines and shows how, you know -- what particular group of machines is being used within that data center.

MS. PRIEDEMAN: Ms. Hernandez, can you zoom in on the graphic on the top of this document, please.

BY MS. PRIEDEMAN:

Q.   So, Dr. Sanchez, there's a lot of numbers and letters in this chart.  Can you just orient us on what those represent?

A.   Yes.  So this is showing -- each of these rows and columns shows an individual group of machines, and then the cells denote the communication performance between each pair of machines.

And so you can see that this -- there are cells that are labeled or they're actually colored differently, depending on the number that they contain.

And so that's just showing that there's a certain -- there's a certain way that these groups of machines are connected to enable the kind of workload that this customer wanted to run.

Q.   And, Dr. Sanchez, you said that these documents reflect modifications that Google made for a particular customer. Would this information be valuable for a competitor, even if they weren't marketing to that particular customer?

A.   Yes.  I mean, this customer wants to run large machine learning workloads.  Understanding the requirements of those workloads is actually valuable if you're building this kind of infrastructure because it reflects the trade-offs and the requirements of a state-of-the-art training application for a large machine learning model.

In addition, this information, you know, also shows -- or these documents show the amount of effort that Google was willing to put.  There's a different document within this set where there are specific requests, personal requests, on how to make possible each particular feature that Google wanted to develop here.

Q.   Would this information be relevant to someone who was trying to build an AI supercomputer to target large language

models?

A.    Yes.

Q.    You mentioned that this -- there's indications in these documents that reflect how much effort Google put into creating these modifications.  Can you give a sense of how much effort and time and resources it would take to create this type of customization?

A.    Yeah.  I mean, it would require coordinating with -- of multiple engineers for months.  So, again, I don't recall the exact numbers off the top of my head, but that document has a table that shows the requests for personnel based on the requirements that were needed.

        MS. PRIEDEMAN:  All right.  Ms. Hernandez, can you go back to Exhibit 775, please.

        And if you could zoom in on Category 5 again, please.

        THE COURT:  Is now a good time for our lunch break?

        MS. PRIEDEMAN:  I'm almost done with Category 5, Your Honor, if you'll bear with me for a few more minutes.

        THE COURT:  Sure.

BY MS. PRIEDEMAN:

Q.    All right.  Dr. Sanchez, I -- we talked about TCPDirect, we talked about Astrophel, but we didn't talk about all the documents in this category.

        At a high level, can you just give the jury a little bit of a sense of what's contained in the other documents that we

SANCHEZ - DIRECT / PRIEDEMAN

didn't specifically talk about?

**A.**    Yes.   So those documents contain additional information about software components that are used in these AdAstra systems.  For example, they describe software whose role is to manage the connectivity between different collections of servers, and so when some of those connections fail, to reconfigure the system to enable reliable operation.

They describe other aspects of how Google manages this workload -- these systems; for example, you know, different aspects of maintenance events or how to make the systems more stable or more -- their operation more predictable so that third parties renting this infrastructure are able to deal with maintenance events better.

**Q.**    All right.  Dr. Sanchez, we've talked about individual documents and whether or not they're publicly available.  Is the combination of all the documents in Category 5 publicly available?

**A.**    No.

**Q.**    We've also talked about the value of individual documents and combinations of smaller subsets of documents.  Would the combination of all the information in Category 5 be valuable to a competitor?

**A.**    Yes.

**Q.**    How so?

**A.**    Well, it gives additional information or it gives a more

complete picture of the software and the technologies that Google uses in this AdAstra system to make it useful.

And so, of course, knowing how AdAstra achieves high-performance communication, in and of itself is one example, is valuable; but knowing how that is used within the broader set of software components in the system conveys additional value.

Knowing how those components are adapted to particular -- to a particular customer conveys additional value.

Q.   All right.  And so we just -- we just went through Categories 4 and 5.  We talked about the value of each.

Is there additional value based on the combination of the information in Categories 4 and 5?

A.   Yes.

Q.   Can you talk a little bit about that?

A.   Well, Category 4 is describing the hardware parts of this GPU-based AI infrastructure.  Category 5 is describing the software components.

Although these are different layers of the system stack, they're designed to work together.  This discussed some software that is used or is developed with this particular hardware in mind.

And so, for example, again, looking at the TCPDirect documents, those rely on particular hardware features.  Understanding those hardware features from the information in

Category 4 yields additional value.

**MS. PRIEDEMAN:** All right, Your Honor. I think now is a good time for the break.

**THE COURT:** Okay. Very good.

We'll resume at quarter after 1:00. Remember to bring your notebooks in and remember not to have any discussions with anyone or do any research of any kind.

Thank you.

**THE COURTROOM DEPUTY:** All rise.

(Proceedings were heard out of the presence of the jury.)

**THE COURT:** Okay. You can step down.

See you at quarter after the hour.

Anything to discuss?

**MS. PRIEDEMAN:** Not from the Government, Your Honor.

**MS. WALSH:** No.

**THE COURT:** No? Okay.

**THE COURTROOM DEPUTY:** Court is in recess.

(Luncheon recess taken at 12:32 p.m.)

**AFTERNOON SESSION**                                          **1:16 p.m.**

(Proceedings were heard out of the presence of the jury.)

**THE COURT:** While Bhavna is getting the jury, can we chat briefly about at least one of these documents of the two disputed documents that remain?

So maybe we can start -- I think that maybe Exhibit 5173 is easier.

**MS. PRIEDEMAN:** Okay.

**THE COURT:** So maybe we can knock that out.

So I read through the document. I didn't read every word of it --

Oh, are you ready? Give me like two minutes.

Okay. I didn't read every word of the document, but I went through it. And I'm looking at your proffer, your offer of proof; and according to your own words, this is a document that bears the publication date of 2003.

I mean, do I need to read any further than that? I mean, how does a document that was published in 2003 have any bearing on Google's AI supercomputer infrastructure?

**MS. WALSH:** It -- well, so, basically, the purpose --

**THE COURT:** And I'll just add that you write that it was backed by -- that this is a new standard backed by companies such as Compaq and Sun Microsystems, which no longer exist.

**MS. WALSH:** So, generally, we were using this document to show that alternatives were available to Google's technology.

**THE COURT:** Right. But how does -- I mean, by definition, how could a document from 2003 show that there are alternatives to Google's technology?

**MS. WALSH:** So Dr. Sanchez mentioned --

**THE COURT:** That's like five centuries in Silicon

Valley time; right?

MS. WALSH:  It is a standard, and so it's been widely adopted, and so it's likely been built upon a little bit, but it is --

THE COURT:  A little bit?

MS. WALSH:  -- used as a --

THE COURT:  Okay.  Well, unless you can explain with specificity how -- unless you can show me something in the document that actually discloses an aspect of Google's trade secrets, this document from 2003, that's excluded under 401 and 403, on 401 and 403 grounds.

The other one I found -- I'm leaning towards not excluding it, but we can talk a little bit more about that later.

Okay.  You can have them come in.

(Proceedings were heard in the presence of the jury.)

THE COURT:  Okay.  Welcome back, everyone.

You can resume.

MS. PRIEDEMAN:  Ms. Hernandez, can you please pull up the slides.

BY MS. PRIEDEMAN:

Q.   All right.  Dr. Sanchez, we're going to turn to Category 6.

Can you explain to the members of the jury what type of information is contained in Category 6?

**A.**   Yes.   Category 6 covers the hardware implementation of Google's custom SmartNICs.  Most of this document focuses on -- or most of this category focuses on one particular SmartNIC card shown here called Diorite.

**THE COURT:**  Called what?

**THE WITNESS:**  Diorite.

**BY MS. PRIEDEMAN:**

**Q.**   And can you explain to the members of the jury -- you mentioned this a little bit before, but what is a SmartNIC?

**A.**   Yes.   So, first of all, a NIC is a network interface card.  It is the component within a computer that enables that computer to connect to a network.  And so all computers, every computer you use -- cell phones, laptops, desktops -- they have one or more of these cards.  They're, for example, used to provide wireless connectivity over Wi-Fi.  That's just one kind of NIC.

But a SmartNIC is a particular kind of NIC that is highly sophisticated and capable.  And so just to give you some context for why that is important, within, let's say, a cell phone or a laptop, all of those machines connect to a network.  Let's say you connect to your home network over Wi-Fi, but that connection is relatively slow.  If you look at the amount of communication -- right? -- the speeds of the connections that happen in servers in data centers, we're talking about hundreds of times more capacity, more bandwidth, more information

exchanged each second.

And so in a normal network card, there's some functionality that is done by the CPU within each machine.  So, for example, your laptop, every time you communicate over Wi-Fi, the CPU within that laptop is running some computation.  It's managing that network, that communication.  That doesn't consume a lot of the CPU.

But if you're communicating hundreds of times faster, that would overwhelm the CPU.  It would consume a lot of its processing power.

And so SmartNICs are specialized devices.  They're, in a way, accelerators, but for communication, where a lot of the functionalities that normally these general-purpose processors do are performed instead by these SmartNICs.

Q.   And how does Google use its SmartNICs in its AI supercomputers?

A.   So Google uses SmartNICs, as well as other companies. They're used to provide high-performance communication, and they're a key aspect of implementing this high-performance networking.  So, for example, they're used in AdAstra.  They're also used in some of Google's CPU systems.

But this is not something that is specific to Google. Cloud computing providers have developed their own SmartNICs. So, for example, Microsoft has some information, some publicly available information about their SmartNICs.  Amazon, which is

another big cloud provider, has developed their own, in fact, multiple versions of SmartNICs.  So, likewise, Google has their own SmartNIC cards.

Q.    Why do companies like Google create their own custom SmartNIC?

A.    Because they have unique requirements.  Basically, they need to operate in a data center environment with a very fast network.  They need to support protocols, basically communication languages between machines that are not used in normal machines, although they are very useful within, you know, this class of machines.

Q.    And you mentioned the term Diorite.  Is that the internal name for Google's custom SmartNIC?

A.    That is the internal name of Google's custom SmartNIC, yes.

Q.    Did Google co-design Diorite with Intel?

A.    Yes.  So Diorite is the name of the card that is shown in this picture, and that card has a chip.  That's the big gray block shown here.  And that chip was developed in collaboration between Intel and Google.

Q.    And that chip that was designed on the basis of a collaboration between Intel and Google, does that chip contain components that were custom designed by Google?

A.    Yes.  That contains components that were designed by Google and then provided to Intel, who would then implement

them in this chip.

Q.   Can you talk about the Google-designed components of that custom chip?

A.   Yes.  So the main component of these cards that is specific to Google is -- or was designed by Google is a hardware block that is designed to enable high-performance communication on these kind of data center networks.  It is called a GRT block.  GRT stands for Google Reliable Transport.  This is a protocol that Google has publicly released as Falcon.

Q.   All right.  So let's break that down a little bit.

So the chip, overall, that we're looking at in this image here, that was co-designed between Google and Intel; is that right?

A.   Yes.

Q.   And then you said that there's a Google specifically designed component called Google Reliable Transport, or GRT?

A.   Yes.

Q.   And then you mentioned that Google has published a protocol called GRT protocol?

A.   Yes.

Q.   And you mentioned that there's a GRT block on the chip. Can you explain what you mean when you say a GRT hardware block?

A.   Right.  So that is the hardware that implements the protocol.  As an analogy to language, we all speak the English

language, and so that language is public, and we have grammar books and we have dictionaries, and so that is all relatively well-known.  But how you, you particularly yourself, speak or write is not -- it's specific to you.

So this would be the equivalent of -- you know, Shakespeare is the equivalent of this GRT block; right?  It's the part of the system that speaks, implements this protocol.

Q.   And you talked about protocols earlier on and we talked about this analogy of language.  And so you're saying that Google has published the GRT protocol.  But have they published or disclosed all of the details about how they make that GRT hardware block?

A.   No.

Q.   And, again, just kind of -- can you talk a little bit more about the difference between the hardware block and the protocol?

A.   Well, the protocol is designed to enable this high-performance communication in a data center network, but within this protocol, you essentially have a description of what are the messages, what do they mean, but not how a machine has to implement these.

So there is a wide range of techniques that could be used to build different types of hardware that -- or even software implementations that speak this language.

Q.   So are there -- are there different ways that hardware

could be built or adapted to use the GRT protocol that Google has published?

A.    Right.    There are many, many possible implementations of this protocol.

Q.    And Google has a specific way that they have decided to implement the GRT protocol on their hardware; is that right?

A.    Yes.

Q.    And do the documents in -- is there information in Category 6 that reveals information about how Google has built that GRT block that we just talked about?

A.    Yes.

Q.    All right.    I'm going to look at one of those documents in just a minute.

But before I do that, big picture, does each document in Category 6 contain information that is not publicly available?

A.    Yes.

Q.    Could any of the documents in Category 6 be reverse-engineered or otherwise easily reconstructed using publicly available information?

A.    No.

Q.    Does each document in Category 6 contain information that would be valuable to a competitor?

A.    Yes.

Q.    All right.    I want to look now at a specific document related to Google's implementation of that GRT hardware block

that we were talking about.

MS. PRIEDEMAN:  Ms. Hernandez, can you please pull up Exhibit 438.

BY MS. PRIEDEMAN:

Q.   And just big picture, Dr. Sanchez, can you explain what is contained in this document?

A.   So this document focuses on the implementation of this Google design hardware block that implements the GRT protocol.

Q.   And if you look at the diagram on top here, what is this depicting?

A.   So the diagram on top is a block diagram that shows the overall structure of the chip that is used within Diorite.  It shows several of the key components in -- the key hardware components.  It shows the connections between these components.

And then these different boxes that you see here have two different colors.  They're either colored in green -- and if you look at the legend on top, that corresponds to what's called "Vendor IP" -- and then in blue, those blocks correspond to "Google IP."

Now, "IP" there stands for intellectual property.  It's basically who is the -- who designed these blocks, these hardware blocks.  And so -- well, who implemented them as well.

And so vendor here refers to Intel.  So the green blocks are the ones that are designed primarily by Intel but with some input from Google to meet certain requirements, and then the

blue ones are the ones that are designed by Google and then given to Intel to include in this chip.

Q.   And one of the blue blocks says "Google Reliable Transport."  Is that the GRT hardware block that we've been talking about?

A.   Yes.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, can you zoom out.

BY MS. PRIEDEMAN:

Q.   And then the diagram below, it says "GRT protocol overview."  Can you describe what we're looking at here?

A.   Yeah.  So this is a figure that relates to the GRT protocol, or Falcon.  This is a publicly available figure that just, at a very high level, shows some connections between three different machines.

Q.   And is this part of what you were talking about earlier about the language that Google has published related to GRT?

A.   Yes.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, can you zoom out of that.

And then if you can go to page 5, please.

BY MS. PRIEDEMAN:

Q.   All right.  What are we looking at here, Dr. Sanchez?

A.   So here you have two different types of information.  This is the part of the document that transitions from referring to

the protocol, which is necessary to understand or gives context for what is this hardware block doing, and the actual hardware implementation of this block.

And so the table on top of this page shows or lists the performance targets of different operations that are different kinds of operations that this -- that this hardware can perform, and they have particular performance targets.

And then the diagram on the bottom and the information associated with it is describing the -- how this block is connected to other parts of the chip.  So it shows, still at a reasonably high level but adding progressively more detail, what connections there are to other blocks.  And this -- you know, this is important because this block is not used in isolation.  It's used in combination with other blocks in the SmartNIC.

MS. WALSH:  And, Ms. Hernandez, can you go to page 8, please.

Q.   And can you explain to the members of the jury what we're looking at here?

A.   Yes.  So this diagram shows the internal structure of the GRT block.  You have different portions of this diagram are shaded in distinct blue blocks, and so you see them labeled with different blue text.  So that's referring to the names of those blocks.

And within each of those blocks, there's already some

information about the internal implementation.  So it includes

block diagrams that basically include the types of memories

that are used, as well as in some cases the sizes of those

memories.

And so, for example, if you look at the big teal block in

the bottom, it is including numbers that explain how many

entries this memory has, what size each entry, the total size

of the memory, and it gives a little bit of information about

the particular data structure that this implements, which is

essentially how this manages information, how this stores

information in this memory.

**Q.**   And just to be clear, this diagram is no longer talking

about the GRT protocol that's public; it's transitioned to the

details of the hardware block on GRT; is that right?

**A.**   Yes.

MS. PRIEDEMAN:  All right.  And can we go to pages --

page 11, please, Ms. Hernandez.

**BY MS. PRIEDEMAN:**

**Q.**   And what are we looking at here, Dr. Sanchez?

**A.**   So this -- this page shows additional detail.  I mean, the

later parts of this document focus on each of these components.

This diagram on the bottom, in particular, is showing the

specific pieces of data that are stored in the memories of one

of these blocks.  This component of the GRT block happens to be

the component where all of the different messages that arrive

at this block first go through this component and then are sent to other components along with some relevant information that is necessary to -- for the whole block to operate correctly.

And so this shows -- if you see, there are a number of dotted arrows that show where do different types of messages go in this -- in this hardware -- in this hardware block.

MS. PRIEDEMAN: And, Ms. Hernandez, can you go to page 12, please.

BY MS. PRIEDEMAN:

Q.   And what are we looking at here?

A.   So this shows more information about the internal organization of two of the other blocks within -- within this GRT block or two of these components.  And, in particular, it is showing how some of the data in this -- in this block is managed.

It is important to highlight that there is essentially data that is passed between these blocks, between these different, you know, components to manage this information overall.  And so this is highlighting how one of those particular pieces of data is represented across these two different components and how the information in one memory relates to the information in the memory of a different component.

Q.   Dr. Sanchez, so we talked about how Google has published the GRT protocol and has not published the hardware

implementation of GRT.  Has Google disclosed some of the techniques that are used in the implementation of GRT in patents?

A.    In patents, yes.

Q.    How does the information contained in this document compare to what has been disclosed in some of those patents?

A.    Right.  So, first of all, it is important to understand that patents describe individual techniques or inventions, but they do not describe in general, and in this particular case, they do not describe a product.  And a product or a particular implementation of this protocol needs to incorporate a combination of several different techniques.

So what you have is a collection of several patents that, together, have some information that relates to the implementation of each of these components within the GRT block.  However, these patents taken together do not explain the characteristics -- you know, several important characteristics of each of these blocks.  They do not explain how these blocks interact with each other, which is a crucial part of making the whole block work; and they also omit specific implementation information, for example, the sizes of memories, which is very useful to, you know, basically build the right amount of functionality.

So memory -- we covered this a little bit in Category 1 last week.  But large memories are more expensive.  They take

more chip area.  They take longer to access.  And so a memory that's too large is just adding cost for no good reason.  A memory that's too small may reduce the functionality or performance of the chip.

And so this shows the memory sizes that are used and internal details of how those are structured that are not available in those patents.

Now, one final important thing about these patents is that, of course, it is easy to, after having seen these documents, go and look at all of the patents that Google has published on this topic and fish out, you know, specific examples that, you know, relate to techniques described here. But that is not what someone without access to this information would have -- would be able to do.

If you look at the collection of patents that Google has published on this, you first don't get a clear picture of what -- of how this block is structured; and moreover, if you take all of the patents and actually use all of the techniques that are disclosed in those patents, you would end up with a substantially different implementation.  So only a subset of those patents contain techniques that are actually used here.

Q.   So you're saying, Dr. Sanchez, that there are patents that could relate to the hardware implementation of the GRT block, but Google doesn't actually use those techniques in their hardware implementation?

**A.**    At least in Diorite.  They could be used in some other product.  They could not be, you know, used in any product.  This could be some implementation that Google decided not to use or weren't meant to use in the first place.

**Q.**    Would the -- would the information in this document be valuable to a competitor?

**A.**    Yes.

**Q.**    How so?

**A.**    Well, high-performance communication is a very important aspect of building AI supercomputers.  If you look at this block, it is showing how to implement this kind of high-performance communication protocol in a sensible and efficient way.

And so there are a number of ways that a competitor could use this information.  Of course, the obvious one would be to build their own SmartNIC.  And so that, however, might be complicated.  Building chips, as we've discussed, is a cost-intensive endeavor.  It takes a lot of effort.

Now, for SmartNICs in particular, something to take into account is that there are a family of SmartNIC systems that are built on what we call reconfigurable logic or field-programmable gate arrays.  This is essentially a chip that can be configured to implement multiple hardware circuits.

And so companies can use this type of SmartNIC to build their own protocols, build their implementations of those

protocols, or build high-performance implementations of existing protocols. And specifically to this document, they could develop the hardware techniques described here and the organization of this block to build -- you know, to build these in the SmartNIC without actually building chips.

Q. Can you explain that a little bit more about how this would be useful to someone, even if they weren't building a SmartNIC?

A. Right. So this has to do with, you know, the kind of chip technology that is used in some of these SmartNICs. There is -- there is a kind of chip that consists of lots of small blocks and memories that can be configured in whatever way necessary to implement circuits.

And so those chips, because they're reconfigurable, they -- that implementation is generally slower and it takes a larger amount of area than if you were to build a custom chip just with that functionality in mind.

However, for this kind of application, this specific type of device would be sufficient to achieve high performance.

Q. Would the information in this document be valuable to someone that was trying to build an AI supercomputer?

A. Yes.

Q. How so?

A. Well, as I mentioned before, because SmartNICs and high-performance communication are a key component of these

AI supercomputers. And so a competitor who had access to this information could build a similarly high-performance implementation of the GRT block or of similar -- you know, similar protocols to the GRT protocol.

Q. And is the value -- is the value that you just talked about, is that value that is separate and apart from what someone could discern from the patents that are publicly available?

A. Yes.

Q. And what -- just can you talk a little bit about that. What's the added value from the information in these documents that's not publicly available?

A. Right. So the patents, again, concern particular techniques that are used in individual components within this block. You've seen that this GRT block has multiple components that interact with each other. Data is sent across these different components. The internal memories are managed with information that comes from different components. That kind of information is not reflected in the patents.

There are other implementation details here, other implementation-level information, size of memories, and the way particular components are managed that are not at all disclosed in the patents.

And, again, someone who just took all of the patents that are describing things similar to GRT or related to GRT that

Google has published would end up with a substantially different implementation.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, can you please go back to Exhibit 775, please.

And can you scroll down to Category 6 and zoom in on Category 6.

BY MS. PRIEDEMAN:

Q.   Dr. Sanchez, we just talked about the Exhibit 438, and there's a couple of other documents in this category.  Can you talk about what is contained in those other documents?

A.   Yes.  So 437 concerns more of the overall organization of the chip used within Diorite, and so it gives additional information about the organization of the chip, the components within the chip but, more importantly, how those components are used within Google.  And so it describes internal implementation, internal uses that show how this functionality actually is used by a cloud computing provider.

The RDMA document here contains -- despite its name, it is similar -- like, it shares some information with the Exhibit 438 we just looked at.  It has some additional diagrams that provide some additional information at the same level.

And, finally, Exhibit 440, Terrazzo V2, describes the development of a different SmartNIC, describes -- so this is a project where Google, again, is engaging some other third party and working with them to develop a different SmartNIC.

It also describes Google's strategy for developing SmartNICs, as well as their road map of SmartNICs up to 2026.

Q.   That last document you just talked about, talking about Google's SmartNIC strategy, why would that information be valuable to a competitor?

A.   So just looking, for example, at the road map, it is important -- very useful to a competitor who is building high -- systems that rely on high-performance communication because it would allow that competitor to intercept what Google is planning to do in the future.  We're talking about, you know, three years in the future and several generations of SmartNICs ahead.

And so the characteristics that are discussed in that road map essentially would enable a competitor to tailor the characteristics of their planned SmartNICs or the SmartNICs they develop for products into 2026, not only at the time of, let's say, 2023 or where previous Google systems were being developed.

Q.   All right.  And we talked about the public -- that none of the individual documents are publicly available.  Is the combination of the information in the documents in Category 6 publicly available?

A.   No.

Q.   And we talked about the value of different of these documents.  Would the combination of the information from all

SANCHEZ - DIRECT / PRIEDEMAN

the documents in Category 6 be valuable, separate and apart from the individual value from the individual documents?

A.   Yes.

Q.   Can you explain that?

A.   Yes.  So, for example, the architecture overview document gives complementary information about the structure and use of this chip at Google.  And so for any company who is looking at, you know, perhaps implementing or customizing a SmartNIC, these two documents, 438 and 437, give complementary levels of information about what the hardware is doing, how it is organized, how it can be used.

     If you combine this with Exhibit 440, the Terrazzo V2 exhibit, now you have a more complete picture of what the road map is for Google -- for Google's products -- or for Google's SmartNIC devices, as well as what their strategy is for producing these -- these components.

Q.   Can you talk a little bit about how a competitor could use the combination of these documents together?

A.   It would reduce the amount of effort needed to build a SmartNIC with similar functionality.

Q.   And can you talk a little bit about how much effort would go into -- let's focus on the GRT block that we spent a lot of time talking about.  How much time and effort would it take to design a custom GRT hardware block?

A.   Years.

**MS. PRIEDEMAN:** All right. Ms. Hernandez, can we go back to the slides, please.

**BY MS. PRIEDEMAN:**

**Q.** All right. We're in Category 7. Dr. Sanchez, can you explain to the members of the jury what type of information is contained in Category 7?

**A.** Yes. So Category 7 focuses on the software used in Google's custom SmartNICs. It mostly focuses on the software used in Diorite, the SmartNIC that we were just discussing.

And so, again, because Diorite is a custom card that uses some particularly important hardware blocks, it requires software to make it useful.

Now, you'll see that here, this category focuses on system software. Recall that that is low-level software that runs in each server and is used to manage this -- this hardware and provide crucial functionality to other types of higher-level software.

One important feature of, in particular, Diorite, but in general these kinds of advanced SmartNICs, is that they are programmable devices. We have talked, for example, about TPUs, and we've seen that they have cores and they can run programs. Likewise, SmartNICs have processors. They have processing cores that can run software.

And so there is software here that actually runs in these cards that implements functionality that enables this

SANCHEZ - DIRECT / PRIEDEMAN

high-performance communication.

Q.   And what stood out to you about the information contained in these documents?

A.   It covers a wide range of implementation techniques.  It is quite detailed.  And specifically to this kind of software, Google does not disclose the internal organization and structure of this software.

And so a lot of these documents actually focus on implementing this high-performance communication through what's called remote direct memory access, or RDMA, and so these documents are looking at the different components of software running both within these cards and in the server or the CPUs within the server that enable this functionality.

Q.   So you mentioned RDMA.  Is that another type of protocol?

A.   That is another type of protocol, yes.

Q.   And what's the -- high-level, what is the purpose of RDMA?

A.   It is to enable high-performance communication between servers.  This functionality -- so if you look at what the acronym means, it stands for remote direct memory access.  And so unpacking that, basically, the way this protocol works is by letting a server write data to a memory located in a different server.  So that enables more direct communication than through other protocols like TCP.

Q.   And what are some of the benefits of using the RDMA protocol over other protocols?

**A.**    It reduces the amount of work that software has to do, especially with something like a sophisticated SmartNIC that is doing a lot of the heavy lifting in moving data and handling that protocol directly.

**Q.**    And going up a couple of levels, can you talk about why the RDMA protocol is important for use in AI supercomputers and for machine learning?

**A.**    Well, many of these machine learning computations, again, rely on high-performance communication between different accelerators housed in different servers.  And so by implementing this RDMA protocol at high performance, the programs running on all these different accelerators can directly send data and essentially have that data appear in memories of other accelerators, and so that enables the system to operate faster.

**Q.**    And so we've talked about how protocols are like a language, and there's different ways to implement different protocols.  Are there also different ways to implement the RDMA protocol?

**A.**    Yes.

**Q.**    Do these documents include information about how Google has developed software to implement the RDMA protocol?

**A.**    Yes.

**Q.**    How does -- how does Google's implementation differ from other types of implementations of the RDMA protocol?

**A.**    So there are substantial differences.  One aspect is that this implementation of RDMA is designed to work on the data center networks that are different from, you know, custom-built, super-high-performance networks like the ICI or other networks like InfiniBand, which is a high-performance network but that is used by other supercomputers.

For example, Nvidia offers a product that uses InfiniBand. Nvidia also manufactures cards that speak -- or are designed for this InfiniBand network.  But those are more expensive, and so they have different characteristics.

At a high level, the networks that are using data centers in general, and Google's data centers in particular, evolve from the Internet.  They're more closely related to the trade-off and design decisions in protocols and systems used to communicate over the Internet.  And so that results in cheaper kind of networks, more cost-effective.

At the same time, there are unique requirements that come from, you know, building a system that is shared by multiple users.  And so, for example, there is a good amount of information in this category that concerns how to expose this functionality to cloud computing customers.

Now, in a cloud computing system, if the infrastructure is exposed to the cloud, it is going to be used and shared by users that do not trust each other.  And so imagine that you had two users who did not trust each other who were able to

write data to each other's programs -- right? -- to the memories of those machines.  That would completely break security.

And so maintaining secure operation and ensuring that, you know, information from one user does not leak into a different user's machines is important.

And that's something that's different from many of these previous implementations of RDMA which are more geared for users -- you know, a single user; for example, a national lab who is building these very large supercomputers, but where all users trust each other and there's no such need to enforce security.

Q.   So would Google's technology be helpful for someone who was trying to build an AI supercomputer to provide services to multiple other machine learning models, for example?

A.   Yes.

Q.   All right.  I want to ask about some specific documents. But before I do that, does each document in Category 7 contain information that is not publicly available?

A.   Yes.

Q.   Could any of these documents be reverse-engineered or otherwise easily reconstructed using publicly available information?

A.   No.

Q.   Does each document in Category 7 contain information that

would be valuable to a competitor?

A.   Yes.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, can you pull up Exhibit 448, please.

BY MS. PRIEDEMAN:

Q.   All right.  So, Dr. Sanchez, this document is called "CloudRDMA-DeepDive Datapath."  Does this relate to some of the concepts we were just talking about?

A.   Yes.

Q.   Can you describe what this document includes?

A.   So this document describes several of the implementation characteristics of the software that is -- that Google uses to provide this high-performance communication.

The specific product that is named here is called CloudRDMA, and so that concerns how this RDMA functionality is exposed or is enabled for users running in Google Cloud.

MS. PRIEDEMAN:  Can we go to page 10, please, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   What are we looking at here, Dr. Sanchez?

A.   So this page, as well as the following pages, describe important implementation details about the congestion control algorithm used in Diorite and how it interacts with the hardware GRT block.

Now, congestion control is a very important aspect of

these protocols and of these implementations of these protocols.

Think about what happens when, you know, everybody is leaving work at roughly the same time. We get rush hour. And so you're sitting in your car. Maybe if you had left an hour later, a ride that would have taken you 20 minutes takes you an hour. So you don't save much time because you're basically waiting in traffic.

The same thing happens in networks that connect machines. When these machines are all trying to talk to each other, they can create congestion in the intermediate networking resources, and that causes these pieces of information, this information to wait at those intermediate nodes.

In these particular kinds of networks, it's even worse because when those intermediate resources are overwhelmed, they will eventually discard some information and force the machines to retransmit that information. And so there's a lot of time wasted when that happens.

And so the goal of this congestion control functionality is to essentially send data at the right rate so as to not overwhelm those intermediate network resources. Think of a company who's sending people home at the right rate so that the highway doesn't get congested and everybody can get home more quickly.

Now, what's important here is that we're talking about a

protocol and sort of time scales that are really, really fast.

These cards and these networks communicate really, really

quickly, and so they need to react to changes in the amount of

traffic at the scale of microseconds.  And so doing that is

complicated.  It requires a sophisticated implementation.

MS. PRIEDEMAN:  Okay.  And can you go down to page 11,

please, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   Is this a continuation of what you were just talking

about?

A.   Yes.

Q.   And what about page 12?

A.   It continues to describe this -- I mean, the earlier pages

start laying out the performance requirements, how fast --

you know, how many events per second need to be processed, how

fast that processing needs to -- needs to happen.

And then this -- you know, the later parts of this

description talk about implementation techniques to enable that

level of performance.

Q.   Would this information be valuable to a competitor?

A.   Yes.

Q.   How so?

A.   Well, there are a wide range of choices to implement these

kind of congestion control protocols.  Just at a high very

level, you could implement these protocols in hardware

entirely, in software, or in some combination of the two.

THE COURT: Remember to slow down.

THE WITNESS: Yes.

Hardware, software, or in some combination of both.

And so there's a particular set of choices that Google has made to implement this kind of congestion control in a way that is flexible, and yet it is fast enough and it is effective.

And this document is discussing those implementation techniques. It's discussing how it is implemented, how that implementation is made sufficiently fast.

BY MS. PRIEDEMAN:

Q. And what exactly could a competitor do if they had this information?

A. They could copy the organization of this congestion control algorithm in their own SmartNIC and their own protocols.

And let me just clarify that this congestion control, while this is described in the context of GRT, where congestion control is an important part, congestion control is crucial to these types of protocols. And so even if a company -- if this company or this competitor was not using GRT, it could benefit from adopting this implementation of congestion control.

Q. And how much time and resources would it take to develop the type of design choices and algorithms that are contained in this document?

SANCHEZ - DIRECT / PRIEDEMAN

**A.**   So it's substantial.  It is hard to quantify how much. But you have to take into account that this is targeting the specific hardware within Diorite; right?  And so within there, even though Diorite shares some features with other SmartNICs -- for example, they all have different cores -- there's -- there are a number of optimizations here that are, you know, particularly well-suited to these protocols and that reflect, you know, learnings of what can be done to achieve a good level of performance over time.

Again, when we're discussing these sorts of optimizations, sometimes the problem is not even how much effort would it take to do it; it's can you even find the right combination of techniques to do it.

**Q.**   And I think you said this a little bit, Dr. Sanchez, but would this -- would the information in this document be valuable even to someone who didn't have access to Google's custom SmartNIC?

**A.**   Yes.

**Q.**   How so?

**A.**   Well, they could implement this congestion control protocol on a different SmartNIC.

**MS. PRIEDEMAN:**  Ms. Hernandez, can you pull up Exhibit 462, please.

**BY MS. PRIEDEMAN:**

**Q.**   All right.  And this document is called "RDMA on-NIC

Software Architecture."

Can you describe what's contained in this document, Dr. Sanchez?

A.   Yes.  So this document focuses on the software components that are running on Diorite.  This is what's meant by "on-NIC." And within those components, it focuses on the ones that are used to provide this RDMA functionality, this high-performance communication.

Q.   All right.  Let's look at a particular page of this document.

MS. PRIEDEMAN:  Can we go to page 7, please.

BY MS. PRIEDEMAN:

Q.   What are we looking at here?

A.   So this diagram shows how -- basically, it has a picture that shows the components, the software components that implement or work together to implement this RDMA functionality, and it shows how those components are grouped into processes, essentially into different programs, and where those programs are actually running.

So Diorite has different types of cores, and it's showing where each of those -- within those different types of cores, where each of those programs is running.

Q.   I'm going to try to ask you to speak a little more slowly. I know we've been going for a while now, but a lot of information in here.

Are there other aspects of this document that stood out to you?

A.   Yes.  Of course, this is a high-level diagram.  The rest of the document is explaining the functionality of each of these components.  It explains how these components interact with each other.  And then it gives -- for several use cases, it also gives some more sort of end-to-end explanation of how these different components interact to implement each particular piece of functionality.

Q.   So if we look at the text as we start to go down, is that just -- that's explaining essentially the functionality of all the different components you're seeing in the diagram?

A.   Yes.

Q.   Would the information in this document be valuable to a competitor?

A.   Yes.

Q.   How so?

A.   So this document show the architecture, the organization of the software.

Now, it is -- I think it's important to highlight here that just like for TPUs, there is no RTL code for this -- in this category; there is no source code.  You don't actually have the particular implementation of this -- of this functionality; right?  Like the code that would enable a competitor to run this on Diorite.

However, this information about how software is structured and organized is valuable in and of its own because this is complex software that takes a lot of ingenuity and design effort to structure correctly.

This performs a set of complex functions.  It needs to interact closely with hardware.  And incorrect organization could be too slow, could be too complex, could cause or introduce errors, could take too much time to develop.

And so fundamentally, this kind of information is reducing the amount of effort that a competitor would need to implement a similar technology.

Q.   And you talked about that this is complex software.  Can you give a sense of how much time and effort would go into developing these types of techniques and organization?

A.   Again, that's hard to quantify precisely, but I would imagine that this takes multiple person-years of effort to develop.

Q.   And same question that I asked with the last document. Would this information be valuable even to a competitor that didn't have access to Google's custom SmartNIC?

A.   Yes, because SmartNICs other than Diorite also have these programmable cores, and they can be -- you know, they can support software like the software shown here to implement functionality like RDMA.

And so, of course, if you have some custom hardware like

the GRT block, this kind of implementation is something you can adopt as is.  But one of the value -- one of the types of -- like, the value of this type of information also is that it is easier to adapt; right?  If you had something like source code, that could be quite specific to Diorite.  This is something that you can take this organization and adapt it to a different type of SmartNIC.

Q.   All right, Dr. Sanchez.

         MS. PRIEDEMAN:  Can we go back to Exhibit 775, please.

         All right.  And can you zoom in on Category 7.

BY MS. PRIEDEMAN:

Q.   All right.  Dr. Sanchez, so we talked about a couple of examples in Category 7.  Can you give the members of the jury a little bit of a sense of about what else is contained in this category?

A.   Yes.  So several of the documents here, for example, if you look at the ones that start with CloudRDMA, concern different aspects of this CloudRDMA functionality, how it is exposed to cloud computing customers, how it is implemented.

     There are other documents here that describe different aspects of software that is running on Diorite; for example, management software that controls the low-level operation of the card or the software that is in charge of establishing connections between machines and making sure that those connections are secure and stay secure.

There is some other information in other documents that concerns internal uses of high-performance communication protocols within Google and that contain sensitive information about, for example, how many requests per second different services are providing, the size of information that they manage and so on.

**Q.** All right. Dr. Sanchez, so we talked about the individual documents. Is the combination of all the information in the documents in Category 7 publicly available?

**A.** No.

**Q.** Is there additional value that comes from the combination of all of the documents in Category 7 that goes above and beyond the value of the individual documents?

**A.** Yes.

**Q.** Can you talk about that, please?

**A.** Yes. So, for example, when you look at all of the CloudRDMA documents in combination, they are describing -- focusing on different aspects of this technology, and so considering them together gives a more complete picture of what this technology is and how it is implemented.

If you consider all of these documents, they're describing different complementary aspects of the software that runs on these cards. And so, for example, if you look at how connections are managed, well, that document is valuable on its own, but in combination with other documents that explain other

SANCHEZ - DIRECT / PRIEDEMAN

aspects of how data is sent or how other parts of this connection -- these connections in these protocols work, that yields additional value.

Q.    Would the combination of all of these documents be valuable to a competitor that was trying to start an AI supercomputer?

A.    Yes.

Q.    How so?

A.    Well, they show a high-performance implementation of this RDMA functionality, which, again, is a crucial -- high-performance communication is a crucial component of AI supercomputers.

They also show an implementation that has interesting, valuable characteristics for a competitor; for example, the fact that it is secure in the face of a system that is shared among users that are not -- that do not trust each other.  It prevents security problems among those users, for example.

Q.    So we talked about Category 6 relates to the hardware implementation of the GRT hardware block and Category 7 relates to software.  Can you talk about if there's added value when you take the combination of all of those documents in each category together?

A.    Yes.  Just like with the previous combinations of hardware and software categories, there is added value because, just as one example, some of these documents are describing

implementations that use the GRT block, and the GRT block and its internals are discussed in Category 6, as well as performance -- the relevant performance metrics for this GRT block.

And so understanding how hardware and software works together yields additional value.

**MS. PRIEDEMAN:**  Is now a good time for a break, Your Honor?

**THE COURT:**  I think probably, yeah.

All right.  Why don't we break for 15 minutes.  We'll be back at 2:30.

**THE COURTROOM DEPUTY:**  All rise.

(Proceedings were heard out of the presence of the jury.)

**THE COURT:**  Okay.  You may sit down.

Do you have a rough sense of how much longer you have with this witness?

**MS. PRIEDEMAN:**  I don't think I will finish today, but I think I will be close.

**THE COURT:**  Okay.  And are you still planning on closing the courtroom at some point?

**MS. PRIEDEMAN:**  Yeah.  So I have the next section, which is kind of pivoting, talking about the documents we talked about this morning and some other topics, and then the last section is the under-seal portion.

So I think -- I don't think I'll finish the under-seal

portion, so I don't know if it makes sense to start today or to move that till tomorrow.

THE COURT:  I think it maybe just depends on what time it is when you get there.

MS. PRIEDEMAN:  Sure.  Do you want me to just ask for a break at the point we get to the sealing portion or just ask to seal the courtroom at that point?

THE COURT:  I think you can just ask to seal the courtroom, and I'll instruct the jury again, and it'll be on you-all to look out in the audience and determine who belongs here and who doesn't, who's on your team, who's not, and sort of signal to me that it's -- or let Bhavna know that everybody's who's in here is allowed to be in here.

MS. PRIEDEMAN:  Sounds good.

THE COURT:  Okay.  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 2:17 p.m.)

(Proceedings resumed at 2:30 p.m.)

(Proceedings were heard out of  the presence of the jury.)

MS. WALSH:  Your Honor, very briefly on testimony regarding Zhisuan, I just wanted to confirm that the Government cannot publish documents to the jury with respect to his testimony on Zhisuan, and his testimony is limiting to talking about what terms mean and refer to and not commenting on what Mr. Ding was intending to do.  That's --

THE COURT:  Well, certainly, the latter.  But I thought that our discussion earlier today established that they could publish to the jury Zhisuan documents for the sole purpose of enabling the witness to testify to the meaning of certain phrases in the documents.

MS. WALSH:  Apologies, Your Honor.  That was not our understanding and -- because that was not consistent, I don't believe, with what Mr. Segal did, but -- so I think we object.

THE COURT:  Okay.  I understand.  That objection is overruled, and the documents can be used for that very limited purpose.

Okay.  They can bring in the jury.

(Proceedings were heard in the presence of the jury.)

THE COURT:  Okay.  Ms. Priedeman, you can continue.

MS. PRIEDEMAN:  Thank you.

BY MS. PRIEDEMAN:

Q.   All right.  We're going to take a break from the technical documents for a second.  We're going to revisit some of those in just a bit.

But I want to pivot a little bit, and I'm going to ask you to define -- to look at some documents and talk about some different technical terms.

MS. PRIEDEMAN:  So, Ms. Hernandez, can you please pull up Exhibit 1137 and go to page 2, please.

Can you zoom in on the upper right-hand corner under

"Efficient and high-speed communications between systems,"
please.

**BY MS. PRIEDEMAN:**

Q.   Have you reviewed this document, Dr. Sanchez?

A.   Yes.

Q.   Okay.  Do you see where it says that the solution for high
communication in China is that the host communicates through
the TCP/IP protocol?

A.   Yes.

Q.   What does that mean?

A.   That is talking about conventional implementations of TCP
and IP, which are, as we discussed before, the protocols that
are used for machines to communicate over the Internet.  And
conventional implementations of those protocols allow for a
limited performance in communication between different
machines.  They cost too much overhead, and so that limits --
as related to machine learning computations, that limits the
performance of those computations.

        **THE COURT:**  Remember to slow down.

        **THE WITNESS:**  Thank you.

**BY MS. PRIEDEMAN:**

Q.   And do you see above that where it says, "Reduce the
training of LLM from the day level to the hour level"?

A.   Yes.

Q.   What does that mean?

**A.**   So, first of all, LLM stands for large language model. Large language models are the dominant type of machine learning models used today.  They are the types of models that power digital assistants like Gemini or OpenAI's ChatGPT.

Specifically, when it says "reduce the training," training, as we have discussed, is a key phase of the execution of these machine learning models.  These models are first trained and then used for inference.  Training is the most computing-intensive part.  It is the part that requires very large collections of systems, servers, and accelerators working together.

**Q.**   All right.  And so going back, so we talked about that first bullet about TCP/IP protocol.

And then that next bullet, it says [as read]:

"Through Nvidia, GPUDirect RDMA, Zhisuan achieves Peta-level non-blocking communication; through the optical circuit switch, its supercomputer can dynamically reconfigure the inter-chip connections, which helps to avoid problems and make real-time adjustments to improve performance."

What is Nvidia GPUDirect RDMA?

**A.**   So Nvidia GPUDirect RDMA is a technology that allows GPUs to directly communicate with other peripheral devices within the same machine.  Specifically, this is useful for GPUs and SmartNICs to talk to each other without involving the CPU.

Now, Nvidia has their own proprietary implementation of this technology.  Google has a different implementation of this technology as well.

Q.   What is that implementation called?

A.   So GPU -- Google refers to it as GPUDirect, and that is one component that is used within TCPDirect to enable high-performance communication in AdAstra.

Q.   And did you -- did we discuss documents related to TCPDirect that were in the set of alleged trade secret documents?

A.   Yes.

Q.   And then can you talk about the next part of that sentence starting with "achieves Peta-level non-blocking communication" and explain what that means?

A.   Yes.  So Peta-level is referring to petabits per second or petabytes per second, maybe.  Peta is simply a prefix that means 10 to the power of 15, or one followed by 15 zeros.  It's essentially a quadrillion, or a million billion.

And so that's referring to the amount of bits exchanged per second between machines in a given system.

If you look at a system that has thousands of servers, each of those servers, as listed in the bullet below where it talks about a single machine can achieve the particular numbers, gigabits per second and it's 3200, and so if you multiply by thousands of servers, you get two petabits per

second of communication.

Q.   And so when it says "achieves peta-level non-blocking communication through the optical circuit switch," what does that mean?

A.   First of all, those are separated with a semicolon, so I would say that those are different parts of the sentence.

Q.   Okay.  Let me ask a better question.

A.   Yes.

Q.   Then let's start with the second part of the sentence that says "through the optical circuit switch" through the end of the sentence.  What does that mean?

A.   Yes.  So that is referring to capabilities of a system that implements a network using optical circuit switches, which, as we discussed earlier today, are devices that are, for example, used in Google's TPU pods.

Q.   And did you see information in the alleged trade secret documents that relates to technology that could be used in an optical circuit switch?

A.   Yes.

        MS. PRIEDEMAN:  All right.  Ms. Hernandez, can you go to Exhibit 1034, please.

        And can you go to page 12, please.

BY MS. PRIEDEMAN:

Q.   All right.  Dr. Sanchez, the first text in blue at the top says [as read]:

"Create a large model training acceleration platform of 10,000 GPU scale to support enterprises to independently develop models and build their own AI applications."

What does "a large model training acceleration platform of 10,000 GPU scale" mean?

**A.**   So this is a different name or different terminology for the kinds of GPU-based AI supercomputer infrastructure that we have been discussing earlier.  This is talking about a system that supports on the order or at the scale of 10,000 GPUs and whose goal is to accelerate the training of large machine learning models.

**Q.**   And do you see the first bullet that says [as read]:

"Integrate the heterogeneous computing resources in the hardware layer, come out with different solutions for hardware layer resources of different manufacturers or performances"?

What does that mean?

**A.**   Yes.  So when we talk about heterogeneity or heterogeneous resources in the context of a computer system, this means making different types of components work together; so, for example, having a system that has GPUs and other machine learning accelerators, integrate those different kinds of processing resources to work together.

**Q.**   Would the -- would the information that we've been

discussing in the alleged trade secret categories be relevant to a heterogeneous computing platform?

A.    To the degree that it refers to -- you know, it includes systems that have machine learning accelerators in particular TPUs and systems with GPUs, yes.

Q.    It would be relevant to a system with GPUs?

A.    Yes.

MS. PRIEDEMAN:  All right.  If we can go to page 20, please.

Actually, let's go to page 34.  Sorry, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.    All right.  Do you see there's different numbers, 1, 2, 3, 4 -- I'm sorry.  Let's start with 3 where it says [as read]:

"Build a MaaS service platform of 10,000 GPU scale."

What does that mean?

A.    So, first of all, MaaS is an acronym that was defined in the previous slide that we saw that refers to model as a service.  And that, again, refers to the primary purpose of this AI infrastructure is to enable the creation and development of machine learning models.  Again, this refers to this 10,000 GPU scale.

MS. PRIEDEMAN:  Can you close that, please, Ms. Hernandez.

And then can you zoom in on Number 4.

**BY MS. PRIEDEMAN:**

**Q.**   All right.  It says [as read]:

"Customize the R&D of underlying chips and

network structures . . . ."

What does it mean to customize the R&D of underlying chips

and network structures?

**A.**   So R&D, as used here, refers to research and development.

And so this refers to the development and research, basically

investigating techniques to build hardware.  And this talks

about chips, which we've talked about different kinds of chips

before, as well as network structures.  So this concerns the

network that connects different chips or parts of a computer

system.

**Q.**   What would it mean -- what does "research and development

of chips" mean, or what does that refer to?

**A.**   I mean, it refers to developing those chips.

**MS. PRIEDEMAN:**  All right.  And then can you go to

page 35 of this same document, Ms. Hernandez.

All right.  And then can we look at Number 4 on the

right-hand side, please.

**BY MS. PRIEDEMAN:**

**Q.**   It says [as read]:

"Plan the solution, including planning of

hardware deployment, planning of network

architecture, and planning of the whole large model

service platform."

In the context of an AI supercomputer, AI infrastructure, what does it mean to plan hardware deployment?

A.   Right.  So when building this AI infrastructure, it is important to see that, you know, there are software components and there are hardware components; but without the appropriate hardware, no amount of software is going to make up for inadequate hardware.

And so this point talks about planning of hardware deployment.  That means -- when we talk about deploying hardware, it means how that hardware is configured and actually installed in, for example, a data center or a server room for a particular purpose.

This bullet continues talking about planning of the network architecture, and that, again, refers as to how this network hardware is configured to provide adequate performance and connectivity between the different machines.

Q.   During your review of the alleged trade secret documents, did you see documents that are relevant to hardware deployment for an AI supercomputer?

A.   Yes.

Q.   Which documents would those be?

A.   So, for example, on Category 2, there are documents describing how TPUs are organized and deployed in entire systems and how those systems are structured, how they're

connected in different ways.

Looking at Category 4, for example, that involves the configuration of servers, how those servers are deployed in racks, how they're connected with a network of a particular type, a particular performance, and hardware implementation.

Q.   And what about, did you see alleged trade secret documents related to planning of the network architecture?

A.   Yes.

Q.   And what documents would those be?

A.   So, for example, in Category 4, we discussed earlier -- as we discussed earlier, that includes the network architecture in the AdAstra AI supercomputer.

In Category 5, this includes customizations to the network architecture to target a particular cloud computing customer.

In Category 2 and Category 3, there are different documents that refer to the inter-chip interconnect of TPUs, so how this high-performance network between different TPU chips is laid out and how different TPUs are connected.

MS. PRIEDEMAN:   All right.  Ms. Hernandez, can you pull up Exhibit 1128, please.  And can you scroll down, please.

And then can you zoom in on where it says, "Do we have any more detailed performance test reports?"

BY MS. PRIEDEMAN:

Q.   Dr. Sanchez, what is -- what is detailed -- what does "detailed performance test reports and cases of speed-up

training for specific chips" mean?

A.    Yeah.  So there's a lot of terminology used here, so let me unpack this a little bit.

When building or deciding what kind of infrastructure to use, often we rely on different experiments that show the performance or compare the speed of different systems.

The term "speed-up" refers to the -- you know, how much faster a particular system is compared to a different system. So, for example, if I was to say that this TPU-based system has a speed-up of two times over this GPU-based system, that means that this TPU-based system is two times faster.

And, again, training is referring to the training of machine learning models.  Now, when you look at specific chips, this -- within the context of the rest of this -- of the sentence, that, because it's talking about training and performance, it's referring to different machine learning accelerators.  Could be TPUs or GPUs or some other machine learning accelerator chip.

Q.    During your review of the alleged trade secret documents, did you see any documents that would meet the definition of performance test reports or cases of speed-up training for specific chips?

A.    Yes.  There are multiple documents that have performance information and compare the performance of different GPU- and TPU-based systems.

For example, in Category 4, there is one document called "H100 Competitive Analysis" that compares the performance of multiple generations of Google's GPU- and TPU-based systems.

In Category 2, there are performance results showing the performance of different generations of Google's TPU systems.

So, yes, there's several documents that fit this criteria.

MS. PRIEDEMAN:  Ms. Hernandez, you can take that down.

BY MS. PRIEDEMAN:

Q.   All right.  Dr. Sanchez, stepping away from the documents for a second, would the alleged trade secrets in Category 1 through 7 be relevant to a company that planned to build an AI supercomputing platform?

A.   Yes.

Q.   All right.  Let's kind of take this in categories.

So let's start with Categories 1 through 3 that relate to TPUs.  How would those documents be relevant to someone who was trying to build an AI supercomputer?

A.   So TPU-based systems, as we have discussed, are deeply specialized accelerators for machine learning.  They have substantial economic advantages over other types of systems, accelerators built by other companies, like startups, over GPUs as well.

These documents cover both the hardware aspects and the software aspects of developing such systems.  And so, for example, they explain the architectural design of a recent TPU

in detail, in sufficient detail to jump straight to logic design.  They explain the physical design of chips, the physical design of hardware systems, the software that is used to manage these systems, including features like how to enable the reliable operation of the systems.

And so all of those documents in combination, they're giving a blueprint for how these highly optimized machine learning, you know, TPU-based supercomputers work.

**Q.**  All right.  And what about Categories 4 through 5?  Would the documents in those categories be relevant to someone who was trying to build an AI supercomputer?

**A.**  Yes.  So those categories concern a GPU-based AI supercomputer.  And so, again, we're looking at hardware aspects and software aspects that reflect a highly optimized design that meets the key performance criteria and the key needs of machine learning workloads:  having high-performance communication between GPUs in different servers, having the software to enable that communication, having a system that is highly optimized to reduce power consumption and to work at a large scale, along with a network that provides sufficient communication, that provides sort of the right hardware to enable that communication.

**Q.**  All right.  And, finally, Categories 6 and 7.  Would the information in Categories 6 and 7 be relevant to someone who was trying to build an AI supercomputer?

**A.**   Yes.   Because Categories 6 and 7 concern SmartNICs, which are -- even though they are a specific component within these systems, they're a very important component that is key to enabling this high-performance communication.

And so these hardware documents reflect a highly optimized implementation of these high-performance communication protocols that contain multiple valuable techniques that a competitor could adopt, including in smart -- smart implementations that don't require building chips to achieve the same functionality.

The documents in Category 7 concern the software to make those useful.   And so those SmartNICs are used, as we've seen, in -- within AdAstra, as well as within several generations of TPU-based systems.

**Q.**   Okay.   I want to switch gears a little bit.

Dr. Sanchez, were you asked to review several software repositories that were recovered from the defendant's GitHub account?

**A.**   Yes.

**Q.**   Is it your understanding that the FBI obtained these repositories via a search warrant?

**A.**   Yes.

**Q.**   What is a software repository?

**A.**   Software repository is a collection of files that includes the source code of a software program, a software application,

essentially the code that is written by a programmer, by a

human, that is then translated or compiled to run the program,

as well as the development history of this source code, so how

the files changed over time.

          MS. PRIEDEMAN:  Ms. Hernandez, can you pull up

Exhibit 1035 and go to page 18, please.

          Sorry.  Page 19, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   All right.  Dr. Sanchez, how does what you reviewed in the

software repository compare to what's on the screen in

Exhibit 1035 at page 19?

A.   So among the software repositories that I reviewed, there

was one repository that implements a Web application that is

essentially what is being shown in this slide.  The slide shows

different pictures, different screen captures of different

pages within this Web application.

Q.   And how could you tell that what was contained in the

software repository is reflected in the slide that we're

looking at here?

A.   So I looked at the source code for this Web application,

and then I matched the different text, as well as the

functionality that is being described here, and it matches what

is being shown in this -- in this slide.

Q.   Did you review other documents related to Zhisuan's

product goals?

**A.** Yes.

**Q.** How does what was contained in the software repository compare to those product goals?

**A.** It has negligible relationship.

**THE COURT:** Has a what?

**THE WITNESS:** It has negligible relationship.

**BY MS. PRIEDEMAN:**

**Q.** And what was the product that was being described in the Zhisuan documents?

**A.** It is essentially the product that we saw a few slides ago, this Web stack diagram and this model as a service platform.

So those product development goals include the development of a large-scale computing system, using, again, 10,000 or around on the scale of 10,000 GPUs to train machine learning models. That's the goal.

And then -- so that infrastructure is meant to be used in two ways, according to those goals. The first one is that that infrastructure can be offered to third parties for the -- like companies, for them to build and train their own large language models and AI applications on top of these models. So think, for example, of Gemini or, you know, other applications that essentially use and are developed using this infrastructure.

But then an additional goal stated in these documents is that this company would develop models themselves and then

SANCHEZ - DIRECT / PRIEDEMAN

offer access to this model to third parties.

Q.   And the software repository that you reviewed, did it include -- did it show a large-scale computing system on par with what was described in the other documents?

A.   No.

Q.   Did it show a model as a service platform?

A.   No.

Q.   Did it show a cluster management platform?

A.   No.

Q.   What did it show?

A.   Well, so some of the functionalities shown here. Basically, it shows basic functions where users can type questions and then select among a small number of open-source, relatively small machine learning models and then run the model and get an answer for that question.

Q.   Did it appear to be a finished product?

A.   No.

Q.   Did it appear to be a product that could have been marketed or sold to customers?

A.   No.

Q.   How long would it take to create something like what you reviewed in the software repository?

A.   An experienced developer would take a week, maybe two. I -- also, because it's a software repository, it includes the development history.  The first -- you know, this repository

was created on October 12th.  So I believe that this slide is from early to mid-November of 2023, so at most, we're talking about three weeks to a month.

Q.   Okay.  Dr. Sanchez, how much work would be entailed to turn this into a finished product?

A.   This requires the development of entirely new functionality.

Let me just be clear that this is not -- does not match the functionality that is being described in the stated goals that I mentioned before.  For example, there is nothing here that concerns cluster management or management of large-scale computing platforms.

There are some pages here that show, for example, monitoring statistics of a single server that is basically running open-source monitoring tools, so it's not -- nothing of the same scale of single servers.  Something that's quite easy to set up.

MS. PRIEDEMAN:  Okay.  Your Honor, at this point, I would move to seal the courtroom.

THE COURT:  Okay.  I gave you an instruction on this a while ago, but I'll give it to you again.

So now the Government wishes to ask the witness some more specific questions about the alleged trade secret documents; and the answers to those questions, the Government contends, would themselves constitute trade secrets.  So we are

going to seal the courtroom, which means anybody who's not involved in the case will be held out of the courtroom, and the transcript of this portion of the trial will be redacted from the public record.

Now, you are not to draw any conclusions about the Government's allegations about these documents being trade secrets from the fact that I am ordering the courtroom closed. Okay?  I'm just doing it in an abundance of caution, to make sure that if the Government's allegations are correct, that the information isn't revealed to the public.

But you should not view my decision to seal the courtroom as reflecting any view on my part one way or another on whether these alleged trade secrets are, in fact, trade secrets.  The defense contests that they are trade secrets, and that is ultimately for you to decide.

But with that, I'm going to order the courtroom sealed, which means that anybody who's not on either -- on either team must leave the courtroom now, and we'll lock the courtroom after that's done.

(Pages 1237 through 1252 were placed under seal by Order of the Court and bound separately.)

PROCEEDINGS

(The following proceedings were heard in open court.)

THE COURT:  And if somebody back there could unlock the courtroom door for me, I'd appreciate it.

And that'll be it for today.  We'll resume tomorrow. We'll have you ready to come in right at 9:30.  Remember all the admonitions about not learning anything about what you've seen here today or doing any research or having any conversations with anybody about it.

And we'll see you tomorrow morning.  Thank you.

THE COURTROOM DEPUTY:  All rise.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  You can step down.

All right.  Ms. Priedeman, how much longer do you think you have with the witness on direct?

MS. PRIEDEMAN:  I'm very close.  Under an hour and probably less than that, Your Honor.

THE COURT:  Okay.  And then does the defense -- I'm guessing you probably don't yet have a great estimate of how long your cross will take.

MS. WALSH:  Not a great estimate.  Probably somewhere in excess of two hours.

THE COURT:  Okay.  And then who's the Government's next witness?

MS. PRIEDEMAN:  Prashant Chandra.

THE COURT:  And who's that again?

**MS. PRIEDEMAN:**  He's a Google software engineer.

**THE COURT:**  Okay.  And then after that?

**MS. PRIEDEMAN:**  Ravi Kavuri, another Google software engineer.

**THE COURT:**  Okay.  And then?

**MS. PRIEDEMAN:**  Aamer Mahmood, another Google software engineer.

**THE COURT:**  Okay.  Is that it?

**MS. PRIEDEMAN:**  Yes.

**THE COURT:**  Okay.  And how long do you anticipate those witnesses will take?

**MS. PRIEDEMAN:**  I think Mr. Chandra will be a couple of hours, and then Mr. Kavuri and Mr. Mahmood are both pretty short.

**THE COURT:**  Okay.  So it does seem like the Government will be -- will be able to rest on Thursday?

**MS. PRIEDEMAN:**  Yes, I think that's right, Your Honor.

**MS. WALSH:**  Your Honor, with the caveat that we have Mr. Pooley, who is slated to go on Thursday.

**THE COURT:**  Oh, yeah.  What was the -- what did we arrange?

**MS. WALSH:**  So I think we were willing to take him out of order, if necessary.

**THE COURT:**  I see.  Okay.  So because Pooley's not available after Thursday?

MS. WALSH:  Correct.

THE COURT:  Is that right?

MS. WALSH:  Yes.

THE COURT:  Okay.  So should we -- I mean, we could decide -- we could decide at the end of the day tomorrow, but -- and sort of see how far we get tomorrow.  But I'm sort of wondering if we should -- just in an abundance of caution, we should plan on Pooley testifying first thing Thursday morning to make sure we get that out of the way.

MS. WALSH:  Understood, Your Honor.  That works.

THE COURT:  Does that make sense?

MR. BOOME:  Yes.

THE COURT:  Okay.  All right.  Should we briefly chat about this final document that is in dispute?  Did the defense have anything else they wanted to say about the one we were talking about earlier?  I can't remember the exhibit number.

MS. WALSH:  No, Your Honor.

THE COURT:  Okay.  That was Exhibit 5173.  So that is excluded for the reasons previously stated.

And then the last disputed document, I think, was Exhibit 5609.  And I guess what I'll say, Ms. Priedeman, about this is I'm sort of skeptical that it has much relevance, but as I said, it's sort of a lenient test.

Does the defense have a colorable argument that it sheds light on the value or the public availability of these

trade secrets?

And I think the defense's theory is, you know, Nvidia is disclosing its system in pretty significant detail, and its technology is not being replicated as a result of that disclosure.  And the information contained in the alleged trade secrets is less detailed.

I'm not really -- again, like I said, it's dubious, but the idea is if this information in the Google trade secrets were disclosed, it would not be replicable.

Do I understand your argument correctly or have I misstated it?

**MS. WALSH:**  I think that largely covers it.

I think it's also worth noting that the testimony on the documents about connecting the chips into a larger pod, there's a lot of testimony elicited that said things like, you know, there's many other, you know -- there's many -- there's other confidential information in this document.  The testimony is very broad, and so I think that sort of brings other ways of doing this into relevance.

**THE COURT:**  Okay.  So why hasn't the defense at least made a colorable argument that this -- that the witness can be cross-examined about this document?

**MS. PRIEDEMAN:**  I think, Your Honor -- I think that the witness can be -- our position would be that the witness can be cross-examined about the fact that there are alternative

systems; right?  But the fact -- this document also has other technical details.  And so I think it's more of a 403 argument, that to the extent the defense is going to try to argue this is similar, this is the same thing, and just confuse the issues.

I don't think defense is making the argument that it contains the same technology; right?

THE COURT:  I don't think they're arguing that. I think what they're arguing is that Nvidia discloses this in a very detailed way, and it's not -- there's no -- the fact that the company is willing to disclose it in such detail shows that it's not valuable to keep this kind of information secret.

And they're saying that, you know, the disclosure -- Nvidia's disclosure is at a level of specificity that's greater than what's contained in the trade secret documents.

Like I said, I'm quite skeptical of that, but that, I think, is their argument.

MS. PRIEDEMAN:  Yeah.  I think we would just make the 403 argument.

THE COURT:  Okay.  So I'll permit some cross-examination about this document.  I mean, if it -- you know, I may very well cut it off if I think the relevance is substantially outweighed by the amount of time it's taking or the amount of confusion it's creating.

MS. WALSH:  Understood, Your Honor.

THE COURT:  Okay.  So that's that.  Is there anything

else we need to discuss?

MS. PRIEDEMAN:  Just the timing of the disclosure for -- and the *Daubert* hearing, Your Honor.

THE COURT:  Oh, yeah.  So did anybody have any comments about that, the timing that I proposed?

The Government is going to -- may rest on Tuesday, may not rest until Monday, given Pooley; right?

MS. PRIEDEMAN:  Yeah.

THE COURT:  I mean, may rest on Thursday or may not rest until Monday, given Pooley.

MS. PRIEDEMAN:  Yeah.  I think it's very likely -- I don't think Pooley will take all day.  Maybe I'm wrong on that.  But I think it's very, very likely that we will rest on Thursday.

THE COURT:  Okay.  So the disclosure could be made on Wednesday, and then the *Daubert* hearing could take place on Thursday.  I think I could make it in -- I will -- I'm not available Friday morning.  I think I could make myself available Friday afternoon, if that's better for people.  And probably we shouldn't wait till Monday; right?

MS. PRIEDEMAN:  No, Your Honor.

MR. FONDO:  You're right.

THE COURT:  So --

MS. PRIEDEMAN:  And, Your Honor, just in terms of the logistics of this *Daubert* hearing, do you anticipate

Dr. Sanchez being able to testify as well?

THE COURT:  If the Government wishes to have Dr. Sanchez testify about -- I think in this case, because we don't have testimony yet from --

MS. PRIEDEMAN:  Right.

THE COURT:  -- who is it?

MS. PRIEDEMAN:  Mr. Novak.

THE COURT:  Novak?  I don't think it makes sense to have Sanchez testify first.

MS. PRIEDEMAN:  No.

THE COURT:  But if the Government wishes to call Dr. Sanchez to support its argument against the admission of Novak's opinions, it's free to do so.

MS. PRIEDEMAN:  Okay.  Thank you, Your Honor.

THE COURT:  So Thursday afternoon?

MR. FONDO:  So, Your Honor, so just a -- so Wednesday for the report, with the understanding that's obviously a very quick turnaround, and --

THE COURT:  Wednesday 7:00 p.m.

MR. FONDO:  Okay.  That's even a quicker turnaround than midnight.  Okay.

THE COURT:  That's not really fair to have to have the Government --

MR. FONDO:  I know.

So, then, Your Honor, we would propose Friday for

PROCEEDINGS

the -- Friday afternoon for the *Daubert*.

THE COURT:  Okay.  Let me take a really good look at whether it's realistic for me to come in on Friday afternoon, because I'll be elsewhere in the morning.  So let me take a look at that, and I'll get back to you --

MR. FONDO:  Okay.  Thank you, Your Honor.

THE COURT:  -- by tomorrow morning.

MS. PRIEDEMAN:  Thank you, Your Honor.

THE COURT:  Okay.  Anything else for now?

MR. BOOME:  Yes, Your Honor.  One quick point.

Since we're kind of eyeing the end of the Government's case and thinking about the defendant's witnesses, I wanted to step away from the trade secrets and revisit your order granting the Government's motion in limine on Google legal counsel and on -- on excluding evidence of our charging decisions.

We understand that there's more than a dozen Google employees that are still under trial subpoena from the defense, including two in-house counsel -- two in-house attorneys.

The Government moved in limine in our Motion Number 4 to exclude evidence from Google's legal counsel.  You granted it, excluding emails from Google counsel summarizing other employees' descriptions of the documents stolen by the defendant.  You also excluded evidence and arguments related to the process undertaken by Google to analyze the documents

stolen by the defendant.

THE COURT:  And if I recall correctly, I sort of left open the possibility that the defendant could make a showing as to a particular document that might have particular relevance.

MR. BOOME:  That's exactly right, Your Honor.  I'm just getting there.

So you directed the defendant, if he wishes to identify specific evidence from Google's legal counsel that he contends is especially probative of intent, perhaps because it underscores Google's own difficulty in determining which of the stolen materials actually meets the definition of a trade secret, he may do so before or at the next pretrial conference, which was in December.

So --

THE COURT:  Right.

MR. BOOME:  -- we're past that now.

And you made a similar ruling in Motion in Limine Number 5, excluding evidence of the Government's charging decisions.  You excluded all of that under 403 and said if Mr. Ding has any specific examples of evidence that should be admitted, he can raise those before or at the next pretrial conference.

So he hasn't raised anything indicating how or why these Google witnesses will be -- what admissible testimony that's consistent with your orders these Google witnesses will

be offered to elicit.

And given that we have more than a dozen, including two lawyers, I think it's time to clarify a little bit -- or we would ask Your Honor to clarify these orders. And the defendant should, I think, at least -- if there's going to be questioning on these topics, we think it should be excluded since they didn't raise it as you directed them to.

THE COURT: Why don't we -- why don't I cut you off there, and why don't we just find out who the defendant is planning on calling as of now.

MR. FONDO: Well, so, Your Honor, we have not made a final decision on that. And they're going to have two witnesses or three, actually, I think Google witnesses. So, as I'm sure you're aware, we often don't make final decisions, and we haven't made a final decision.

What we can do, if there's any likely decisions that we think it seems very unlikely, we can let the Court know tomorrow on that. But I'm reluctant, without seeing all the evidence, to suddenly start releasing people. And we have as -- well, Government counsel may or may not know, we did release a number of people roughly a week ago, two weeks ago, something like that. I don't remember the exact timing.

THE COURT: Mm-hmm. Yeah. Well, I mean, I guess what I'm saying, as I sit here now, is I question what you are going to be able to call those witnesses for, given what Mr. Boome

just read.  But, you know, obviously, we can have a conversation about that at the appropriate time.

And you're right to point out that three Google witnesses have yet to testify for the Government.

But what else can you tell me about witness testimony from the defense?

**MR. FONDO:**  Well, so --

**THE COURT:**  Pooley on Thursday?

**MR. FONDO:**  Correct, Your Honor.  And then we have Mark Eskridge and then also Steve Novak.  And there is --

**THE COURT:**  Remind me who Eskridge is.

**MR. FONDO:**  So he is a forensic expert.

**THE COURT:**  Okay.

**MR. FONDO:**  And then we met with the Government today about certain travel records, additional travel records.  The parties were not able to stipulate, but they're not objecting to the admission.  So we may have somebody come in to talk about those.

**THE COURT:**  Okay.

**MR. FONDO:**  So that should get us through Monday or Tuesday, I would think.

**THE COURT:**  Okay.  And then do you have a decision yet as to whether Mr. Ding is testifying?

**MR. FONDO:**  Your Honor, I don't disclose that until -- I mean, I'm not -- unless you're forcing me to answer the

question, it's not a question I ever answer and it's a decision I never make until the very end.

THE COURT:  That's fine.  But I'll just go ahead and take the opportunity now to advise Mr. Ding about his right to testify.

MR. FONDO:  Please.

THE COURT:  So, Mr. Ding, as you know, you have the right to testify at your trial.  You also have the right not to testify, and if you choose not to testify, that cannot be used against you here at trial.

You will, obviously, receive advice from your lawyers and have discussion with your lawyers about whether to testify. They will offer you advice, but it is ultimately your decision whether or not to testify.  It's not your lawyer's decision; it's your decision.

So, ultimately, I'm sure you'll get advice from your lawyers, but the final decision is yours about whether to testify or not.  Okay?

THE DEFENDANT:  Got it.

THE COURT:  You understand that?

THE DEFENDANT:  Thank you, Your Honor.  Yeah, I do.

THE COURT:  Okay.  All right.

Anything else?

MR. BOOME:  No, Your Honor.  Thank you.

MR. FONDO:  No, Your Honor.  Thank you.

PROCEEDINGS

THE COURT:  All right.  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Proceedings adjourned at 3:41 p.m.)

---o0o---


**CERTIFICATE OF REPORTERS**

We certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


DATE:   Wednesday, January 21, 2026


_Ana Dub_
_____

Ana Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
Official Reporter, U.S. District Court


_Ruth Levine_
_____

Ruth Levine Ekhaus, CSR No. 12219, RDR, FCRR
Official Reporter, U.S. District Court