**Volume 7**

**Pages 1266 - 1418**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,        )
                                 )
          Plaintiff,             )
                                 )
   VS.                           )   **NO. 3:24-CR-00141-VC**
                                 )
LINWEI DING, a.k.a. LEON DING,   )
                                 )
          Defendant.             )
_____  )

                    San Francisco, California
                    Wednesday, January 21, 2026


**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**


**APPEARANCES:**

For Plaintiff:
                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue, Box 36055
                    San Francisco, California 94102-3495
              **BY:  CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
                    **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
              Ruth Levine Ekhaus, CSR No. 12219, RDR, FCRR
              Official United States Reporters

**APPEARANCES**: (CONTINUED)

For Plaintiff:

CRAIG H. MISSAKIAN
UNITED STATES ATTORNEY
1301 Clay Street, Suite 340S
Oakland, California 94612-5217
BY:  **MOLLY K. PRIEDEMAN**
     **ASSISTANT U.S. ATTORNEY**


For Defendant:

GOODWIN PROCTER LLP
525 Market Street
San Francisco, California 94105
BY:  **DARRYL M. WOO, ATTORNEY AT LAW**
     **DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
     **RACHEL M. WALSH, ATTORNEY AT LAW**
     **COLETTE A. LOWRY, ATTORNEY AT LAW**
     **NICHOLAS C. WILEY, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 Marshall Street
Redwood City, California 94063
BY:  **GRANT P. FONDO, ATTORNEY AT LAW**
     **FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 South Figueroa Street, Suite 4100
Los Angeles, California 90017
BY:  **LORA J. KRSULICH, ATTORNEY AT LAW**

Also Present:       **Andrea Valladao, Federal Bureau of**
                       **Investigation**
                    **Veronica Hernandez, Paralegal**
                    **John Jay, Trial Technician**

<u>**I N D E X**</u>

Wednesday, January 21, 2026 - Volume 7

<u>**PROCEEDINGS**</u>

Sealed Proceedings, pages 1270 through 1273
Sealed Proceedings, pages 1282 through 1338

| <u>**GOVERNMENT'S WITNESSES**</u> | <u>**PAGE**</u> | <u>**VOL.**</u> |
|---|---|---|
| <u>**SANCHEZ, DANIEL (RECALLED)**</u> | | |
| (PREVIOUSLY SWORN) | 1283 | 7 |
| Direct Examination resumed by Ms. Priedeman | 1283 | 7 |
| Cross-Examination by Ms. Walsh | 1339 | 7 |

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 5122 | | 1360 | 7 |
| 5133 | | 1383 | 7 |
| 5227 | | 1380 | 7 |
| 5229 | | 1366 | 7 |

**Wednesday - January 21, 2026**                                    **9:02 a.m.**

**P R O C E E D I N G S**

---o0o---

(Call to order of the Court.)

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:**  Remain seated.  Come to order.  Court is back in session.

**THE COURT:**  Okay.  Good morning.

I can do the *Daubert* on Friday at 2:00 p.m.

Anything else to discuss?

(Pages 1270 through 1273 were placed under seal by Order of the Court and bound separately.)

(The following proceedings were heard in open court.)

**THE COURT:** Okay.  I understand the objection.  It's overruled.

How much longer do you think you have with Dr. Sanchez under seal?

**MS. PRIEDEMAN:** Like I said yesterday, Your Honor, under an hour, probably less.

**THE COURT:** Okay.  And so his testimony will end under seal.

**MS. PRIEDEMAN:** So I have one kind of final conclusion question that I'd like to ask not under seal, and then we can go right into cross, if that is okay with Your Honor.

**THE COURT:** So you want to like open the courtroom again for one final conclusion question?

**MS. PRIEDEMAN:** I don't have to, but the last question I don't think has to be under seal, and I just --

**THE COURT:** It's okay.  You can just finish up with that last question under seal, and then we'll unseal it later.

**MS. PRIEDEMAN:** Okay.

**THE COURT:** So you think under an hour.

And then as far as the defense cross-examination goes, do you want to start with the under-seal stuff?  Do you want to put that off?

**MS. WALSH:** So we would rather not, and there are also some sealing issues with that.  There are several places -- and

this is going off Dr. Sanchez's report -- that are under seal that discuss publicly available -- excuse me -- publicly available patents.

THE COURT:  But I assume that what he's going to say is that this is what's publicly available in the patent, and these are the aspects of Google's trade secret documents that are not disclosed by this patent.  And in explaining that, that might need to be under seal; right?

MS. WALSH:  He may do so, but many of the questions will just deal with publicly available documents, and we think that the defense is prejudiced by the presenting something that's publicly available but it's under seal.  And we understand that --

THE COURT:  It depends on his answer.  I mean, I assume that he's -- I mean, it depends on how you ask the question; right?

If you say, "Doesn't this patent disclose blah-blah-blah," yes or no answer, and he says yes or no, then that's fine.  But if -- if you ask the question in a way that requires him to explain what is -- what from Google's trade secret documents is and is not disclosed in this patent, that may need to be under seal.

So, you know, I just -- I think that what I think would be most problematic and quite possibly more prejudicial to the defense is going in and out; right?  Is sealing and

unsealing, unsealing and unsealing, throughout his testimony, and that's why we are, you know, being a little bit overinclusive in sealing for the trial and then unsealing what we can unseal shortly after the trial.

And that's the guidance that you should be following in your cross-examination.

**MS. WALSH:**  Understood, Your Honor.

**THE COURT:**  Okay.  Anything else?

**MS. PRIEDEMAN:**  Just to be clear, Your Honor, for -- we significantly reduced the number of redactions in the report, and so I would just ask that we use that as a guide for what needs to be sealed or doesn't.

**THE COURT:**  Yes, I agree.

**MS. PRIEDEMAN:**  As just as Dr. Sanchez testified, even a question about, you know, this patent reveals blah-blah-blah about this product, because he said that -- for example, for Diorite, there's a number of patents that disclose techniques that could be used in Diorite, and what he was able to do is look retrospectively after he saw the trade secrets and determine which ones were used and which ones weren't.

So in that context, even questions about this patent discloses this technique used in Diorite, that would disclose --

**THE COURT:**  If you didn't have access to the trade secret documents, you wouldn't know that the technique that's

disclosed in the patent is used in Diorite?

MS. PRIEDEMAN:  Exactly.  So we'd ask that those questions be under seal.

THE COURT:  Yes.  And your narrowed sealing -- your narrowed redactions can serve as a guide.

MS. PRIEDEMAN:  Okay.  Thank you.

THE COURT:  Okay.  Anything else?

MR. BOOME:  Very briefly, Your Honor, regarding Dr. Sanchez's testimony, the Government is requesting that the Court either at some point now or during the Court's final instructions to the jury mentions that it was part of your order regarding the protection of trade secrets at trial that the witness should speak at a high level about the trade secrets while court -- while the courtroom is open.  We think it's important for the jury to understand that because without that instruction, that that was the way the Court has guided the witnesses to talk about the trade secrets in open court, they may be left with the impression that this is only high-level information, without knowing that the witness was instructed to speak that way.

THE COURT:  I mean, my -- if the defense is okay with it, I guess I can do that, but my gut is that that's sort of obvious, and it was encompassed by the instruction that I gave them yesterday.

MR. BOOME:  About closing the courtroom?

**THE COURT:** Yeah, that now he needs to speak at a -- at a level deeper; right? Or at a -- with more granularity or whatever, and we need to seal the courtroom.

**MS. WALSH:** So we would object to giving any instruction along that line. We think that what the Court has already said and the lines that have been drawn are sufficient to explain to the jury sort of what --

**THE COURT:** I agree.

**MR. BOOME:** Would it be in bounds, then, given the Court's feeling that it's already clear from your instruction at courtroom closing for the Government in closing argument, for example, to mention that during these portions of Dr. Sanchez's testimony, we discussed the trade secrets at a high level, and then during these other portions, because the courtroom was closed, he got into more detail?

**THE COURT:** I don't see any problem with that.

**MR. BOOME:** One other final issue, Your Honor, separately. This is just a housekeeping matter about some of the exhibits that I wanted to put on the record.

I -- during Special Agent Valladao's testimony last week and during Dr. Sanchez's testimony yesterday, Ms. Priedeman and I both referenced and showed to the jury page 19 of Exhibit 1035, which is that screenshot of the proof of concept, the proof of concept slides in the Zhisuan presentation. We have multiple versions of this slideshow on

our exhibit list.

1035 is not in evidence.  1143, which has an identical page showing the slideshow, is in evidence, so we should have been using 1143 at page 16 when instead -- which is in evidence -- when instead we were referencing 1035, page 19, in --

**THE COURT:**  As long as it's clear that they're identical, I don't see why it matters.  And if you need to make some sort of statement on the record in front of the jury to correct it, that's fine.

**MR. BOOME:**  Okay.  We don't think it's necessary, but we wanted to bring it to everyone's attention that there was a mistake.  But we've corrected it internally, and from now on we will be referencing the exhibit that's in evidence.

Thank you.

**THE COURT:**  Anything else?

**MR. BOOME:**  No, Your Honor.

**MR. FONDO:**  Yes, Your Honor.  From the defense, Grant Fondo.

The defense -- we are anticipating that Mr. Pooley testifies tomorrow.  As you know, he's CJA appointed, and we wanted to just sort of -- we anticipate questions about how much he's being paid, et cetera, and we're happy to bring -- and likely will bring that out.

But we wanted to make sure that we did it in a manner

that's appropriate, and so we were just going to propose that they say that our experts say that their normal rate for private clients is X; in this case they've been retained pursuant and paid by the Criminal Justice Act panel, and thus they're charging Y.

THE COURT:  Any objection?

MR. BOOME:  No, Your Honor.  I think that's fine.

THE COURT:  Okay.  I think that's fine too.

MR. FONDO:  Okay.  And we can lead them through that if that's helpful.

THE COURT:  Okay.

MR. FONDO:  Yeah.  Thank you, Your Honor.

THE COURT:  All right.  We'll see you at 9:30.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 9:16 a.m.)

(Proceedings resumed at 9:31 a.m.)

(Proceedings were heard out of the presence of the jury.)

MS. PRIEDEMAN:  There's one issue I'd like to raise quickly if you have a moment.

So Mr. Feyzi was just talking about certain techniques in open court.  Those are sensitive techniques that have not been disclosed that were discussed in the under-seal portion. It is --

THE COURT:  One sec.

MS. PRIEDEMAN:  It is true that in isolation, they are

well-known techniques, but the fact that Google uses them in the TensorCore units or in their TPUs is not well-known and it's highly confidential.

So we would ask that we move to seal that portion of the transcript.

And we would also ask that Mr. Feyzi refrain from speculating about what is or is not confidential.

THE COURT:  Okay.  That motion is provisionally granted, so that portion will be sealed, and we'll revisit it all after trial.

Is the courtroom sealed right now, by the way?  Did Bhavna exclude everybody yet who's not connected to the case?

Okay.  So we have about another 45 minutes to an hour of testimony from Dr. Sanchez that will be under seal, and then the courtroom will be open again.

So anybody who's not associated with one side or another should leave the courtroom, and then, Mr. Boome, if you could lock it for me, I'd appreciate it.

(Pages 1282 through 1338 were placed under seal by Order of the Court and bound separately.)

(The following proceedings were heard in open court.)

**CROSS-EXAMINATION**

**BY MS. WALSH:**

**Q.**   Good morning, Dr. Sanchez.

**A.**   Good morning.

**Q.**   I am Rachel Walsh, and I represent the defendant, Mr. Ding.

Dr. Sanchez, you're being compensated for your time here today?

**A.**   Yes.

**Q.**   And for your time working on this case in general; correct?

**A.**   Yes.

**Q.**   And that rate is $900 per hour; correct?

**A.**   Yes.

**Q.**   You've estimated that you've billed about 300 hours to this case from the time you were retained to about last Friday; is that correct?

**A.**   Yes.

**Q.**   And so that's a total of about $270,000; correct?

**A.**   Yep.

**Q.**   You have also worked with Google in the past; correct?

**A.**   Yes.

**Q.**   And you had an internship with them in 2001?

**A.**   2011.

Q.   2011.  I'm sorry.

And Google has also partially funded some of the work that your research lab has done at MIT; correct?

A.   Yes.

Q.   And what were the amounts of those grants?

A.   So there are -- they were under $300,000 in total.  These were different research awards in 2014, 2015, and 2019.

Q.   And you've been at MIT since about the fall of 2012; correct?

A.   Yes.

Q.   Before that, you were a research assistant at Stanford from about 2008 to 2012; correct?

A.   Yes.

Q.   That's where you were getting your Ph.D.?

A.   That's correct.

Q.   And then your internship at Google occurred while you were a Ph.D. student; correct?

A.   Yes.

Q.   And the internship lasted about three months?

A.   No.  It was a shorter internship.  It was about a month and a half.

Q.   Okay.  Then while you were getting your Ph.D., you also had an internship at Intel Labs; correct?

A.   Yes.

Q.   So that was something that lasted about three months or

so?

A.   That is correct.

Q.   Then before that, you were a research assistant at the University of Wisconsin at Madison; correct?

A.   Yes.

Q.   So other than your internships at Intel Labs and at Google, you haven't held any positions at a company like Google; correct?

A.   I mean, those internships are positions, but, yeah.  Other than those two internships, no.

Q.   So you haven't worked at a company who's building a large data center; correct?

A.   I mean, I have worked at Google.

Q.   Other than Google; correct?

A.   And, I mean, I do work in my capacity as a professor with, you know, companies that develop data centers, so that gives me experience on these topics.

Q.   But other than your work at Google, you haven't worked at a company who's built a large data center; correct?

A.   Directly at a company that has built a large data center, no, other than Google.

Q.   And then besides your internship at Google, you haven't worked at a company that's deployed a product at a data center; correct?

A.   No.

Q.   And you haven't worked -- besides for your work at Google at -- or excuse me.

Besides your work at Google and Intel, you haven't worked at a company who's creating a chip from scratch; correct?

A.   Yeah, you're correct.

Q.   And you also haven't -- leaving aside your internships at Intel and Google, you haven't worked at a company who's developing engineering requirements for a commercial ASIC; correct?

A.   Other than all of the companies I have worked with in my capacity as a professor at MIT, yeah.

Q.   And you also haven't worked at a company who's developing the electrical specifications for a commercial ASIC, leaving aside your internships at Google and Intel; correct?

A.   Correct.

Q.   And you haven't reviewed the electrical specifications for a commercial ASIC, have you?

A.   What do you mean?

Q.   So the sort of pin-out diagrams, things like that.  Have you reviewed those?

A.   I mean, I use ASICs and I have used electronic components in my capacity as a researcher.  That's something that we do often.  So I can understand those documents.

Q.   And you haven't developed the physical specifications for a commercial ASIC; correct?

A.    If you're -- for a commercial ASIC, correct.

Q.    You're familiar with something called a GDS2 file; correct?

A.    Yes.

Q.    And what is that, briefly?

A.    That is a file that is sent to a fab, to a silicone fabrication company like DSMC, to build a chip.

Q.    And you haven't worked to deliver a GDS2 file to a chip fabricator for a commercial ASIC; correct?

A.    Meaning I have not produced GDS2 files?

Q.    Correct.

A.    We've designed chips within my research group at MIT to the level of we could send it to a fab.  Of course, because that is tens of millions of dollars, we don't actually build it, but we have done -- you know, we have carried out the design of chips.

Q.    But you haven't worked with the fab and sent it to the fab; is that correct?

A.    We have not worked with the fab, no.

        MS. WALSH:  Mr. Jay, could you pull up Dr. Sanchez's demos at Slide 1.

BY MS. WALSH:

Q.    And, Dr. Sanchez, this is one of the demonstratives that you used in your testimony; correct?

A.    Yes.

Q.   And just generally, it's a representation of Google's AI supercomputers; correct?

A.   It's a representation of AI supercomputers that are representative of Google's but could also represent dozens of other companies.

Q.   So looking a little bit closer at this diagram, there's a box called "Server," and within that there's something that says "accelerators."

     Do you see that?

A.   Yes.

Q.   And in the middle of that box, that says "TPU/GPU."

     Do you see that?

A.   Yes.

Q.   And looking at a TPU, Google is the only company who makes TPUs currently; correct?

A.   Specifically chips named TPU, true, but there are many other companies building machine learning accelerators.

Q.   But Google does not offer its TPUs to the public?

A.   They do.  They do -- you cannot buy them, but you can use them.

Q.   And so the interfaces that those TPUs use to communicate with each other are unique to Google; correct?

A.   Those particular interfaces are useful and could be adopted by other machine learning accelerators.

     Now, you know, Google has made a number of decisions that

are sensible and that make those very likely different from other commercial accelerators, but because those other accelerators don't have public specifications, that question would be hard to answer.  Right.

Q.   But Google maintains the interfaces that it uses for TPUs to communicate with one another -- Google maintains that as something that's proprietary; correct?

A.   I think -- can you be more specific as to what you mean by "interfaces"?  There are multiple interfaces in the systems.

Do you mean the inter-chip interconnect or the ISAs?

Q.   The inter-chip interconnect.  Google maintains that as something that's proprietary to Google; correct?

A.   Yes.

Q.   And so a TPU cannot use Google's inter-chip interconnect to communicate with a -- for example, a GPU from Nvidia; correct?

A.   Not directly, but that's -- you know, they can communicate with other TPUs.  There's -- the TPU could communicate with a GPU through, for example, the host's communication interface.

Q.   So that would require a different interface?

A.   No.  Those interfaces are already present there.  It's just not through the ICI.

Q.   And so it's not communicating through the ICI; correct?

A.   Yes, but it could communicate through interfaces that are already present there.

Q.   And the inter-chip interconnect -- excuse me.

The inter-chip interconnect is customized to Google's TPUs; correct?

A.   It is customized to the needs of machine learning workloads, and to the degree that TPUs are optimized for machine learning workloads, you know, it's a good fit for Google's CPUs.

Q.   So my question is a little bit different.

The Google inter-chip interconnect is designed to allow one Google TPU to communicate to another TPU or multiple Google TPUs?

A.   Yes.

Q.   And then the TPUs are housed in a server; correct?

A.   Yes.

Q.   And Google custom designs those servers; correct?

A.   Yes.

Q.   And those servers have to be customized to work with Google's TPUs; correct?

A.   Those servers have some characteristics that make them more efficient, but TPUs are using standard interfaces to connect to the host CPU and the host server.

So earlier, you know, last week, actually, we saw diagrams showing, you know, PCIE, which is a standard communication protocol.  So you could take -- you know, because those chips support that protocol, you could plug them into a server that

is not necessarily Google's server.

Q.   But that wouldn't be optimized to make the TPUs run fast and efficiently; correct?

A.   No, that's not correct.  These are standard interfaces. You could plug it into a server.  You know, they're using -- those CPUs are also industry standard.  They're using Intel and AMD CPUs.  So you could take, you know, a TPU or a system like -- you know, with the same structure as a TPU and use it in a system that's not Google's.

Q.   But that's not what Google does in its AI supercomputers; correct?

A.   That's not what Google does, but that doesn't mean that it wouldn't be useful outside Google.

Q.   And that's not what Google's servers and TPUs are optimized for; correct?

A.   They're optimized to -- I mean, again, to the degree that there are some optimizations in those servers that are useful for those kind of workloads and the foreign factors that Google uses in those servers, yeah, there are a number of choices that Google makes in the design of these servers that involve -- you know, that reflect the use of TPUs and their physical characteristics.

Q.   And then the TPUs -- looking at the bottom of the diagram, the TPUs have to communicate through the high-speed network that's shown at the bottom; correct?

A.  Yes.

Q.  And that's done through the host interface connection; correct?

A.  For TPUs, that's done through the ICI.  And then there is a technology discussed in Category 3 or -- that is -- you know, there are documents in Category 3, as we discussed yesterday, that concern the use of data center networks and more conventional interconnects, and that communication happens through the host.

But those systems -- you can think of them as having two high-performance networks, and the ICI is higher performance.

Q.  And so the host interface connection is specific to Google; correct?

A.  The host interface connection?

Q.  Correct.

A.  No.  As I mentioned before, that's PCIE.  Standard.

Q.  And so Google does not do anything -- so Google's host interface connection is a standard PCIE connection; is that correct?

A.  The connection itself, yes.

Q.  And so looking back at the diagram above the server, you've listed the system software; correct?

A.  Yes.

Q.  And Google creates its own system software; correct?

A.  Yes.

**Q.**   Google doesn't offer that system software as it uses it in its own data centers to the public; correct?

**A.**   Most of it, it doesn't.  There is some custom Google system software that is offered -- that's meant to be offered to the public.

But, yeah, there's a good amount of system software that is used only internally with Google and not offered -- it's not open source.  It's not offered to the public.

**Q.**   Google optimizes its system software to work with its TPUs; correct?

**A.**   Because those TPUs are custom accelerators, yes.  It needs to develop that system software to -- yeah, make them useful.

**Q.**   And if that system software was not optimized to work with the TPUs, it would not work; correct?

**A.**   I mean, if it's not optimized -- your question is kind of inconsistent; right?

So there's what functionality it enables, and then optimized means, you know, meeting some performance requirements or cost requirements.  So if it wasn't optimized, it just wouldn't be fast enough, I guess, but it could still work.

Maybe -- is there a different way?

**Q.**   That wouldn't be desirable in a system if it weren't optimized -- if the system software were not optimized to work with the TPUs; correct?

A.    Yeah, the system would have lower performance.

Q.    Then above the system software is the cluster manager.

Do you see that?

A.    Yes.

Q.    And Google has its own software for cluster -- for the cluster manager; correct?

A.    Yes.

Q.    And at least as Google uses it in its data centers, that software is proprietary; correct?

A.    Correct.

Q.    And it does not offer that cluster management software as it's used in its data centers publicly; correct?

A.    Correct.

Q.    And so the cluster manager has to be optimized to work with the system software; correct?

A.    Yes.  The cluster manager and system software interact closely.

        THE COURT:  Could you repeat that a little more slowly.

        THE WITNESS:  Yes.  The cluster manager and system software interact closely.

BY MS. WALSH:

Q.    Then on top of that is the ML frameworks and compilers.

Do you see that?

A.    Yes.

**Q.**   Google has developed its own machine learning framework and compilers; correct?

**A.**   Yes.   They have developed multiple machine learning frameworks and several compilers as well.

**Q.**   And so the machine learning frameworks and compilers that Google developed, those have to be customized to work with the cluster manager; correct?

**A.**   Not necessarily.   The cluster manager is orchestrating the execution of workloads, and when you're looking at, for example, machine learning frameworks like TensorFlow or PyTorch.   Those are more about letting programmers express computations in a productive way.   And, in fact, Google supports a wide range of machine learning frameworks in their infrastructure.   So, for example, you can use PyTorch or TensorFlow these days to write machine learning models that run on Google's CPUs or GPUs.

**Q.**   But the compilers need to be customized to work with the cluster manager; correct?

**A.**   The compilers have some interaction with the cluster manager.   Some -- you know, a large part of them is also independent from the cluster manager.

**Q.**   And just generally, the interrelation between the ML frameworks and compilers, the cluster manager, the system software, and the servers, that is something that makes Google's AI supercomputers run more efficiently; correct?

**A.**   To the degree that there is some -- you know, there are optimizations that span layers of the stack, that's correct. But an important principle -- design principle in computer system is modularity, and so it is -- you know, these systems are very complex, and they are built in such a way that it is -- you know, coupling of different components is not done unless it is necessary, unless it actually yields some tangible good benefit.

And so, for example, this is why TPUs use standard interfaces to connect to the host, because there's no or little benefit that could be achieved by using a more custom interface.  However, you know, by customizing the right -- at the right places, you can get, you know, the benefits that -- that are required here.

**Q.**   So one of the trade secret categories that you discussed was referred to as Category 1, and that referenced something called an ISA.

At a high level, what is an ISA?

**A.**   An ISA is the interface or the contract between hardware and software.  And so programmable cores, which are a key component of processors, as we have seen like the TPU but also many other types of processors including GPUs and CPUs, they have cores that have -- that run programs that essentially run a set of -- you know, a recipe, or they perform that sequence of instructions to carry out some computation, to take some

input data, process it, and produce some result, something like a machine learning computation.

And so -- and instructions and architecture contains essentially, you know, the set of operations that the hardware can perform, the kinds of memory locations and the types of sort of storage locations that software can access, and then how software can invoke all of the functionality of the processor of the core.

Q.   The ISA does not specify hardware in a chip; correct?

A.   No, that's incorrect.  The ISA, specifically as it relates to Google's CPUs, is giving the blueprint of the hardware because these kinds of processors are designed to be managed by software.

And so this is something that we went over back last week, but at -- there are many different types of processors with different types of ISAs.

And so the statement that you made about the ISA not revealing information about the hardware is true for other types of processors, but it is absolutely not true for the processors used in TPUs.

MS. WALSH:  Let's go to Slide 11 in Dr. Sanchez's demonstratives.  A couple more.  Two ahead of that, Slide 9. Slide 9.

(Pause in proceedings.)

MS. WALSH:  Apologies.  Two after that, actually.  So

phases of chip design.  Two more.

THE WITNESS:  I think that is earlier.

MS. WALSH:  Let's take that down for a moment.

BY MS. WALSH:

Q.   One of the things that you discussed in your testimony is phases of chip design, and the first phase you discussed was architectural design.

A.   Yes.

Q.   So is it your contention that the ISA specifies the entire architectural design?

A.   The ISA in these processors, and specifically in Tensor Cores, is the architectural design.  That's how many details, how much of the implementation is revealed in these -- in these processors.

Q.   And so the ISA is basically the set of documents that you'd need to move to the second step, which is logic design; is that correct?

A.   For this particular type of processor, yes.  For this particular type of core.

Q.   And so normally in chip design, going from architectural design to logic design would require many months of work by many engineers; correct?

A.   Can you describe what you mean by "going from architectural design to logic design"?

Q.   So getting from the phase where you have the architectural

design set to the logic design.

A.   So having implemented -- like actually finishing architectural design to finishing logic design?

Q.   Correct.

A.   Depending on the kind of processor, yeah, it could take months -- several engineers months to write and optimize an implementation.  But different processors have different levels of complexity, and relatively speaking, architectural design is -- because there are many more free variables, it is a more complex and iterative process that requires more experimentation.

So logic design, once you have the architectural design, is something that, you know, you can -- it's a more piecemeal process.

Q.   And so in design work and making an architectural design, it requires a set of trade-offs; correct?

A.   Yes.

Q.   And those trade-offs are intertwined with one another; correct?

A.   The trade-offs in architectural design?

Q.   Correct.

A.   Yes.

Q.   And so if you change one thing, then it's likely to change something else within that design; correct?

A.   Depending on what you change, but, yes, there are

trade-offs that have ripple effects throughout the design.

Q.   And so, for example, if you change the size of the memory when you're designing a chip, that would have ripple effects throughout the rest of the design; correct?

A.   Yes.

Q.   Or if you change how, for example, addressing works within the chip, that would have ripple effects throughout the design; correct?

A.   Can you explain what you mean by "addressing"?

Q.   So, for example, the method of memory addressing.

A.   That's not specific.  What do you mean by that?

Q.   So if you changed, for example, a component on the chip, like the size of a component, that would have ripple effects throughout the rest of the design; correct?

A.   Yes, but that's not addressing.  That's the previous question you asked.

Q.   So my question is:  If you change a component on the chip, then that would have ripple effects throughout the chip design; correct?

A.   Depending on the component but, yes.  In many cases you need to be careful about how these components are designed together, which is why architectural design is a complex process.

Q.   And then you discussed logic design.  Generally, the files for logic design for an ASIC would run to many hundreds or

thousands of pages; is that correct?

A.    Yes.

Q.    Possibly more; correct?

A.    It depends on the language used and the complexity of the chip, but yes.

Q.    And then the step below that is the physical design in your -- in your demonstrative.

The ISA does not specify the physical design for an ASIC; correct?

A.    That's correct.

Q.    And so in the step from getting to the logic design to the physical design, that's even -- that's an even more significant amount of time and money for a company that's trying to do that; correct?

A.    I mean, it's -- yes.  If you look at the ISA in isolation, the ISA is further away from physical design, but as I mentioned before, in Category 2, there are documents that cover the physical design of these chips as well.

Q.    Then after that, the physical design has to be converted to a specific type of file that a semiconductor fab will accept in order to make a chip; correct?

A.    That's correct.

Q.    And that process requires a significant amount of testing and validation in order to make something that's usable; correct?

A.   Testing and validation need to happen throughout the -- all of the phases of design, and so it's something that I did not emphasize in these slides, but it happens not only in physical design, also in logic design and in architectural design.

Q.   When you're making a chip with a semiconductor fab, at least a portion of the physical design depends on what process you're using at that fab; correct?

A.   Correct.

Q.   And so, depending on the process, that dictates what kind of physical design you have on your chip; correct?

A.   That's correct.

Q.   And so the process used for fabricating a chip is not necessarily indicated in the -- in an ISA; correct?

A.   It is not indicated in the ISA, but it is indicated in some of the other documents here that refer to physical design.

Q.   And I'm talking about the ISA.  It's -- the process used to fabricate a chip is not indicated in the ISA?

A.   Correct.  If you're looking exclusively at the ISA document, it doesn't tell you anything about the silicon fabrication process.

THE COURT:  Doesn't tell you anything about the?

THE WITNESS:  The silicon fabrication process.

BY MS. WALSH:

Q.   And then looking at trade secret Category 1, at a high

level, it's related to Google's TPU V4 chips; correct?

A.    Yes.

Q.    And Google has publicly released at least some information about those TPU V4 chips; correct?

A.    Sure.

Q.    And that includes things like the overall design; correct?

A.    Yes.  It includes the components that are present in the chip and the high-level organization of those components.

So, for example, this figure that we saw earlier in these slides, that actually is something that Google has publicly shown diagrams.  That particular diagram.

Q.    And Google has also made information public about performance characteristics for these chips; correct?

A.    Correct.

Q.    And then drilling down a little bit into the chip, that's true for Tensor Cores that Google has released information on high-level design and performance correct?

A.    Yes.  And let me be specific that we're talking about TPU Version 4; correct?

Q.    Correct.

And then for BarnaCores in TPU Version 4, Google has also made public the high-level design available on chip memories, sizes, and operations that it supports; correct?

A.    At a very high level.  If you look at the high-level disclosures about BarnaCore, specifically the most detailed

accountings, a paper published in June 2023, there are differences in -- yeah, even the blocks that are described in that diagram, in the diagram that is publicly available, with what the actual documents about BarnaCore show.

MS. WALSH:  Mr. Jay, can I have Exhibit 5122, please.

BY MS. WALSH:

Q.   Then, Dr. Sanchez, I believe in your testimony you just referred to an article by Jouppi?  Is that the person who's listed here?

A.   Yes, Norm Jouppi has written multiple articles on TPUs.

Q.   And it -- was this the article that you're referring to?

A.   No.

Q.   Is this a document that you reviewed in forming your opinions?

A.   Yes.

MS. WALSH:  Move to admit Exhibit 5122.

MS. PRIEDEMAN:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 5122 received in evidence.)

BY MS. WALSH:

Q.   So this is an article titled "Ten Lessons from Three Generations Shaped Google's TPUv4i"; correct?

A.   Correct.

MS. WALSH:  And then if we go into this document at page 7, and can we go to Figure 5, please.

**BY MS. WALSH:**

**Q.**   So the text below Figure 5 says (as read):

        "TPU V4i chip block diagram."

     Do you see that?

**A.**   Yes.

**Q.**   So Figure 5 shows a document -- a block diagram of TPU V4 that shows the general organization and architecture of a TPU V4; correct?

**A.**   Correct.

**Q.**   And, for example, that shows memory; correct?

**A.**   Yes, it shows -- I mean, I told you this is public.  This is -- like there's no contention on this.  These diagrams and the diagram for -- I mean, this is PufferLite or the external code name for what's the PufferLite chip, and these diagrams have been published.  As I mentioned, there's one diagram that is the diagram that I used in my demonstratives for Pufferfish published in a summer 2023 doc, again, by Norm Jouppi.

     So like, yeah, this is a -- reflective of the level of information that's publicly available.  There's even somewhat more detailed information.  Like there's some articles on TPUs Version 2 and 3 that discuss some additional information about the organization of Tensor Cores.  But, again, that's high-level information.

**Q.**   And then going to Figure 6 in Exhibit 5122, the text in the caption says (as read):

"TPUv4i chip floor plan."

Do you see that?

A.    Yes.

Q.    And then after that, it specifies (as read):

"The die size is less than 400 square

millimeters."

Do you see that?

A.    Right.  So that is not -- that's a good example of how the
floor plans that are contained in this -- in the Google files,
like the one we saw in Category 2, are much more detailed than
this notion of floor plans.

Let me tell you a couple of reasons why --

Q.    That was not my question, Dr. Sanchez.

A.    Well, it's not even giving you the size of the chip.  It's
just giving you a bound.

Q.    So it is giving an approximate size of the die for the
chip --

A.    It's saying it's less than some value, yes.

Q.    And then it also -- below that, it says (as read):

"CMEM is 28 percent of the area."

Do you see that?

A.    Yes.

Q.    And the CMEM is the common memory; correct?

A.    Correct.

Q.    And so that gives you an approximation of how much space

SANCHEZ - CROSS / WALSH

within the chip die the common memory takes up; correct?

A.    To the extent that all we have is a bound and the size of a chip, I can't really tell how much this memory is, because all I know is that it's less than 28 percent of 400 square millimeters.

Q.    But the floor plan that Google published in Figure 6, Google wouldn't have published this if it didn't reflect the TPU V4 chip floor plan at least at a high level?

A.    That's -- I don't quite agree.  Google has, for example, published papers on TPUs Version 2 and 3 and not said anything about BarnaCore, and those TPUs had BarnaCores.  And one of those papers actually includes a floor plan, notional floor plan, at the same level of detail as this.

So, you know, in public, Google is -- if it's not strategically beneficial for Google to disclose the existence of some components, they don't need to tell you about them.

Q.    So is it your contention that the floor plan that's published in Figure 6 is somehow incorrect?

A.    This floor plan?  I don't -- I mean, it's approximate. It's at a much higher level.  I mean, if you look at the VPN and VMEM, it's a single block.  We saw that -- you know, there's a specific organization of those blocks, the memories within those blocks.

So, I mean, this is a very high-level, you know, notional orientative figure that, yeah, sure, some general

characteristics of the chip, and we can take Google at their word that these sizes and sort of where they're placed is -- you know, sort of maps the actual chip.  But there are key aspects missing, including, you know, the level of detail of these components, including, you know, the sizes, which are not given.

Q.   So, again, that was not my question.

Google would not have published Figure 6 if it didn't reflect the TPU V4 chip at least at some level; correct?

A.   At some level.  But, again, I mean, I've told you that Google has published floor plans that omitted key components before, so...

Q.   But as you sit here today, do you have any understanding of whether that's the case for Figure 6?

A.   After having read the files in Category 1, yes.

Q.   So another one of the trade secret documents is an ISA for something called a BarnaCore; correct?

A.   Yes.

Q.   And a BarnaCore is an accelerator that's used along with a Tensor Core; correct?

A.   It is used to accelerate a particular type of machine learning computation.  So sometimes some types of machine learning models use it; sometimes some types do not.

Q.   But a BarnaCore generally works along with a Tensor Core; correct?

**A.**   Not necessarily.  They're running -- they're independent cores.  They're running different programs.  They could communicate, but they don't need to.

**Q.**   But at least as Google implements them and in the documents that we've seen, BarnaCores don't exist outside of Google's TPUs; correct?

**A.**   Yes, but that's a different question.  Like how they interact -- how Tensor Cores and BarnaCores interact -- I mean, are you now asking about whether BarnaCores exist only inside TPUs?

**Q.**   So I'll ask a slightly different question.

A BarnaCore is customized to work with Google's other product offerings; correct?

**A.**   A BarnaCore is customized to an important type of machine learning computation that's called "embedding layers."  It can train those layers much more quickly, but this is common to, you know, a wide range of machine learning models.

**Q.**   But no one else besides Google offers BarnaCores; correct?

**A.**   To my knowledge, no.

**Q.**   And BarnaCores are designed to work along with Tensor Cores; correct?

**A.**   BarnaCores are part of -- they're included in TPUs because Tensor Cores would not be particularly good at the type of computation that BarnaCores are accelerating.  So systems that have other types of accelerators that don't have these

BarnaCores run these computations, for example, in the CPU.

Q.   And so Google has published some patents that relate to BarnaCore; correct?

A.   Yes.

MS. WALSH:  Mr. Jay, can you go to Exhibit 5229, please.

BY MS. WALSH:

Q.   And, Dr. Sanchez, is this one of the documents that you reviewed in order to form your opinions?

A.   Yes.

MS. WALSH:  Move to admit Exhibit 5229.

THE COURT:  Any objection?

MS. PRIEDEMAN:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 5229 received in evidence.)

BY MS. WALSH:

Q.   And so this is a patent that's titled "Load Balancing for Memory Controllers"; correct?

A.   Memory channel controllers, yes.

Q.   And this is a patent that Google filed that relates to BarnaCores; correct?

A.   Potentially.  Again, patents describes inventions, not -- you know, not particular products.

Q.   And so this patent concerns load balancing for a memory channel controller; correct?

A.    Yes.

Q.    And BarnaCores contain channel controllers; correct?

A.    You're matching the name.  A channel controller is a type of processing element in -- within -- within BarnaCore, but that's not the typical use of the term.

Q.    And so BarnaCores contain channel controllers; correct?

A.    Yes.

Q.    And then it shows -- it discloses something called a "modified round robin scheme" to assign work to channel controllers; correct?

A.    Yes.

Q.    And if we go to Figure 2, this figure generally describes the channel controllers; correct?

A.    It contains -- it includes, yeah, components labeled "channel controllers," yes.

Q.    And Exhibit 5229 describes a design where channel controllers can access an arbitrary memory and are not tied to a particular memory channel; correct?

A.    Correct.

Q.    And it discloses a modified round robin scheme to assign work to channel controllers; correct?

A.    Yes.

Q.    And this information has been made public by Google; correct?

A.    Of course.

Q.    Then you also discussed something called an "ICI," or an inter-chip interconnect, which we touched on earlier; correct?

A.    Yes.

Q.    And that is something that, at a general level, facilitates communication between TPU chips; correct?

A.    Correct.

Q.    And at least as it's described in the alleged trade secret documents for that implementation of the ICI, that would only work with TPU V4s; correct?

A.    Again, this design of the ICI reflects the needs and trade-offs of machine learning workloads and accelerators that process them, so --

        THE COURT:  Hold on a second.  I'm going to give you this sign.

        THE WITNESS:  Thank you, Your Honor.

        THE COURT:  I'll put it right here.

                    (Laughter.)

        THE WITNESS:  So this ICI is designed with machine learning workloads in mind as well as the accelerators that run them efficiently.

BY MS. WALSH:

Q.    I think my question was a little bit different.

      An ICI for a TPU V4, that wouldn't necessarily work with a TPU V6; is that correct?

A.    No.

Q.   How is that not correct?

A.   Well, the ICI over different generations of -- of TPUs has changed in different ways, but many of the characteristics are similar or are the same, and so you could use the implementation of the ICI in TPU V4 for a chip with the characteristics of TPU V6.

Q.   But the ICI would not allow a TPU V4 to communicate with, for example, an off-the-shelf Nvidia GPU; correct?

A.   Yes.  You asked that question before.  They can't connect. Electrically that is -- they're not compatible that way.  You would have to communicate through the host.

Q.   And that would be less efficient than communicating through an ICI; correct?

A.   Yes.

Q.   And the documents that you discussed about the ICI relate at least somewhat to something called "OCS," or optical circuit switching technology; correct?

A.   Correct.

Q.   And the fact that Google uses OCS in its ICI is not -- not secret; correct?

A.   It is well known.

Q.   And Google has also publicly disclosed performance features about their OCS devices; correct?

A.   Correct.

Q.   And those OCS devices that are used in Google's TPU V4

systems -- those are custom parts to Google; correct?

A.    Yes.

Q.    And Google does not sell those to the public; correct?

A.    Google themselves does not, although, as I mentioned earlier, there are other companies that are now producing similar devices.

Q.    But to your knowledge, those devices are not the same as Google's OCS systems; correct?

A.    I mean, I could go and look at the technical capabilities of some of those, but at a high level, they're providing optical connectivity between groups of machines, and so the basic functionality is similar.

Now, if you get into, you know, specifics, there are probably some differences.

Q.    But Google makes its own custom OCS switches; correct?

A.    Yes.  Google has been a pioneer in this technology.

Q.    And I'm sorry.  Was that a "yes," that Google makes their own custom OCS switches?

A.    Yes.

Q.    And Google has also disclosed some of the performance features of its OCS systems; is that correct?

A.    Yes.

Q.    And it's also discussed the topology that it uses in its OCS systems; correct?

A.    Correct.

Q.   And that's generally the arrangement of the different nodes and how they're interconnected in a network; correct?

A.   Correct.

Q.   The documents that we've discussed don't describe how to build one of Google's OCS switches; correct?

A.   No.

Q.   And so the ICI that we've discussed is specific to Google's OCS switches; correct?

A.   The ICI, you know, is not necessarily specific.  It can be used without OCS.  So, in fact, if you look at the, you know, GhostLite and ViperLite pod systems, they do not use OCS.

Q.   And so Google's OCS switches are specific to TPU V4; is that correct?

A.   No, that's not correct.

Q.   And there are other -- strike that.

     There are other forms of ICI, or inter-chip interconnect systems, that are available; correct?  Aside --

A.   Yes.

Q.   And those include publicly available standards like InfiniBand; correct?

A.   Yes, although InfiniBand is substantially different from the ICI and OCS, and Google has actually published information showing how much more advantageous it is to use their own implementation of ICI and OCS.

Q.   But Google's own implementation of ICI relies on its OCS

technology; correct?

A.    No.  As I said before, the ICI can be used without OCS, and there are Google TPUs that don't use -- they use ICI, but they do not use OCS.

Q.    I'm looking at little bit back at ICI.  Many of the individual techniques that are used in ICI are publicly known or have been used in other systems; correct?

A.    Of course.

Q.    And so the value of Google's ICI comes from the combination of those techniques; correct?

A.    The combination and the specific implementation.  I mean, when you're building a complex system that incorporates many techniques, they interact in nonobvious ways.  So there are many different ways to approach solving a problem or to achieve high performance, and so combination of techniques, even though those techniques may be very well known, is still very valuable and not obvious.

Q.    And the value from the ICI documents also comes from the way in which those techniques are optimized to work with one another; correct?

A.    Yes.

Q.    But if you're building an ICI and you choose a different technique than what's described in the documents, then you would have to change other elements of the ICI; correct?

A.    You might need to, depending on the technique.

Q.   For example, if you chose a different error correction scheme, you would have to make other changes to the ICI; correct?

A.   To some degree, yes.  You might need to add other capabilities like, you know, other forms of, you know, protecting data in transit, data that is sent between TPUs.

Q.   If you chose, for example, a different modulation scheme to use with your inter-chip interconnect, that would require changes to the overall scheme; correct?

A.   To other -- no, that's fairly independent.  I mean, that would affect the performance of its link, and it would require other sort of physical-level changes.

But, for example, you could have different modulation standards being used, even the same ICI or other multiple versions of the ICI, but something that controls how fast its link is, which has some implications on the performance of the overall system but doesn't mean that you need to go redesign the entire ICI.

Q.   But it would change the performance characteristics of the system; correct?

A.   It would change the performance, yes.

Q.   And then turning to trade secret Category 3, this generally relates to some software that manages Google's TPU systems; is that correct?

A.   Yes.

Q.   And this is software that's unique to Google; correct?

A.   Yes.

Q.   And this is because, at least in part, the TPUs that we've been discussing use a custom instruction set architecture and have some unique features; correct?

A.   Correct.

Q.   And this software is also unique because Google's TPU servers use a custom high-performance network; correct?

A.   Correct.

Q.   And then they're also unique because TPU systems are very large and include -- I think your estimate was thousands of TPUs; correct?

A.   Yes.  I mean, that's -- that number is publicly available information.  But, yes, there are facets here that are specific to TPU systems.

     Now, of course, other machine learning accelerators that took similar design choices, like including an interconnect like an ICI, would have similar features and require similar software.

Q.   But not the same software; correct?

A.   If they had the same features, same software.

Q.   But it would not be the exact same code; correct?

A.   But it would be -- you know, the exact same techniques that are discussed here would be useful.

Q.   So you're saying there's no work involved between using

the software that manages Google's TPU systems versus software that would be used to manage a different kind of accelerator; is that correct?

A.   Of course, there's work involved.  If -- you know, first of all, as I mentioned before, these documents are not including source code or at least not the entire source code for this -- for this software, and so you would have to take these design documents and implement these techniques, either for example, you know, write the software from scratch, you know, from the beginning, or take some open source software and add those techniques.

Q.   And so even though it may have the same functions, you cannot just transfer the software from -- or the management software from Google's TPU V4 to a different kind of accelerator; is that correct?

A.   That's correct.

          THE COURT:  Is now a good time for our lunch break?

          MS. WALSH:  Yes.

          THE COURT:  Okay.  Why don't we break for lunch.

          We'll resume at 1:00.

          Remember we're leaving early.  We're going to finish at about 2:00.  So let's plan to resume at 1:00 today.

          THE COURTROOM DEPUTY:  All rise.

               (The jury leaves the courtroom.)

     (Proceedings were heard out of the presence of the jury.)

THE COURT:  Anything else to discuss?

MR. FONDO:  Sorry, Your Honor.  Grant Fondo for the defense.

We have a rebuttal report due at 7:00 p.m.  In light of the change of the hearing, we were wondering if we could get some additional time to submit it to the Court and the Government.

THE COURT:  Okay.  When do you want to submit it?

MR. FONDO:  Excuse me?

THE COURT:  When do you want to submit it?

MR. FONDO:  Could we submit it by tomorrow by noon?

THE COURT:  I mean, the concern with that is we have a -- well, I guess that's probably fine.  Then they have Thursday evening and Friday morning to prepare for the Daubert hearing.  I think that's probably fine.

MR. FONDO:  Thank you, Your Honor.

THE COURT:  Okay.

MR. FONDO:  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 12:25 p.m.)

AFTERNOON SESSION                                    1:00 p.m.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Do you have an estimate of roughly how much longer you have?

MS. WALSH:  I will definitely go through the end of

today and probably an hour, maybe more, the next day.

THE COURT: Okay.

MS. PRIEDEMAN: On that note, we just want to make sure we can release our next witness for today.

THE COURT: Sounds like it.

MS. PRIEDEMAN: Yes.

THE COURT: And then will we still plan on having Pooley testify -- is it Pooler? Pooley?

MS. WALSH: Pooley.

THE COURT: -- Pooley testify first thing in the morning?

MS. WALSH: We can do that. I think -- I understand that his direct is about an hour. I don't know if that changes things or...

MS. PRIEDEMAN: I think our preference, Your Honor, would be to -- seeing where we are at the end of the day and, if the estimate changes, would be to let Dr. Sanchez finish. We'd also like him to go home.

THE COURT: Yeah. And I assume redirect will be pretty short.

MS. PRIEDEMAN: Oh, sorry. For Dr. Sanchez? Or for --

THE COURT: Yes.

MS. PRIEDEMAN: At this point, relatively short. I think it depends, obviously, on the rest of cross.

THE COURT:  Okay.  Well, we'll talk about it at the end of the trial day.

MS. PRIEDEMAN:  Okay.  Thank you, Your Honor.

(Proceedings were heard in the presence of the jury.)

THE COURT:  All right.  You can resume.

BY MS. WALSH:

Q.   Welcome back, Dr. Sanchez.

A.   Thank you.

Q.   So before the break, we were discussing the software that manages Google's TPU systems.

At least for portions of this software, Google has provided the software as open source; is that correct?

A.   Can you be more specific?

Q.   Some of Google has pub- -- or Google has published some of its software that's related to the management of its TPU systems as open source; correct?

A.   It's hard to say.  There are machine learning frameworks, for example, that are open source; but the compiler itself is not, the compiler for TPUs.  So I think you have to be more specific on what software you would be referring to.  There's a lot of software here.

Q.   So, for example, Google has made the TensorFlow platform open source; correct?

A.   Yes, but that's a machine learning framework.

Q.   And it's also made the JAX platform --

THE COURT:  Did you say that's a machine learning framework or --

THE WITNESS:  Yeah.

THE COURT:  -- that's not a machine --

THE WITNESS:  It is, yes.

THE COURT:  Okay.

BY MS. WALSH:

Q.   And Google has also made the JAX platform open source; correct?

A.   Yes.

Q.   And just briefly, what does "open source" mean?

A.   So open source means that the source code that is used to build these applications is publicly available and it can be used by others.  There are certain rights that open-source software has.  For example, users can extend those programs or that software to implement other functionality and use them free of charge.

Q.   And Google has open -- or also made the OpenXLA compiler open source; correct?

A.   There's an OpenXLA compiler that targets CPUs and GPUs, but not TPUs, and that is open source but, again, doesn't target TPUs.

Q.   And so OpenXLA is a program that translates the machine learning framework to the CPU or GPU; is that correct?

A.   It produces code that is lower level, generally, that is

compiled down to CPU or GPU code, yes.

Q.   And then turning back to Google's use of optical circuit switching in its networks, Google has filed some patents that relate to using OCS; correct?

A.   Correct.

        MS. WALSH:   Mr. Jay, can you bring up 5227, please.

BY MS. WALSH:

Q.   Dr. Sanchez, is this document one that you reviewed in forming your opinions?

A.   Yes, it is.

        MS. WALSH:   I move to admit Exhibit 5227.

        MS. PRIEDEMAN:   No objection.

        THE COURT:   It's admitted.

    (Trial Exhibit 5227 received in evidence.)

BY MS. WALSH:

Q.   And so this is U.S. Patent 11,042,416.   This patent generally relates to reconfigurable computing pods using optical networks; correct?

A.   That's correct.

Q.   And OCS is an example of an optical network; correct?

A.   Yes.

Q.   And this generally relates to ways of connecting the computing resources in an AI -- excuse me -- AI supercomputer?

A.   Yes.

Q.   And if we go into this document at Figure 3, this

illustrates an example of how computing resources can be connected using OCS; correct?

A.    Correct.

Q.    And this is not necessarily the way the chips are laid out physically; it's a representation of how they're connected logically?

A.    Correct.

Q.    And this patent also discloses a high-level description of the OCS manager; correct?

A.    Yes.

Q.    And what is the OCS manager?

A.    The OCS manager is software that is in charge of configuring the OCS devices to connect the right set of TPUs or the right set of, you know, communicating processors.

Q.    And so in the context of Figure 3, that would be setting up the connections that we see in those figures.  Is that fair to say?

A.    Yes.  Those connections that span multiple cubes.  Not all of them, not the internal ones, but the ones that go across these individual cubes.

Q.    And just to move back a little bit, the date of this patent is June 22nd, 2021; correct?

A.    That is when it was granted, yes.

Q.    And so this information was public at least as of that date; correct?

**A.**   Oh, information about this system was public -- most of the information here is described in more, you know, clear terms and more detail in, for example, the June 2023 paper where Google specifically explains how OCS devices are used in TPU V4 pods.

As I mentioned before, patents don't contain that much into products; but this is a case where, at least for that information relevant to how OCS devices are used, at least most of that information, it has been disclosed by Google in more -- you know, more specific to TPU before.

**Q.**   So it's correct that the information in this patent was publicly available as of June 22nd, 2021; correct?

**A.**   Correct.   Even probably earlier, because this was published -- as you can see here, there's "Prior Publication Data," so in 2020.

**Q.**   And Google has disclosed even more information about its OCS manager and how it configures the states of its OCS devices in other articles; is that correct?

**A.**   Google has not disclosed much about the OCS manager, at least not to the degree that is shown in these -- in the documents in Category 3.

As I mentioned before, patents are describing techniques in isolation.   So, for example, here, there is a description of an OCS manager, but it doesn't contain or show the relationship to other parts of Google's systems and software that is shown

in, you know, one of the documents in Category 3.  At least not to the same level of detail or specificity.

Q.   And then you referenced an article in 2022 that you said has even more detail.

MS. WALSH:  I'd like to pull up Exhibit 5133.  5133.

BY MS. WALSH:

Q.   And, Dr. Sanchez, is this a document that you reviewed in forming your opinions?

A.   Yes.

MS. WALSH:  And move to admit Exhibit 5133.

MS. PRIEDEMAN:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 5133 received in evidence.)

BY MS. WALSH:

Q.   And if you look very, very far down on the bottom left-hand corner of the front page, it bears a date of copyright 2022.  Do you see that?

A.   Yes.

Q.   Is this the 2022 article that you were referring to?

A.   No.  I was referring to a June 2023 article that is specific to TPU V4.  This article comments on other uses of OCS devices within Google's networks.

Q.   And so this article provides additional information that Google publicly disclosed as of 2022 about its use of OCS devices.  Is that fair?

**A.**    Yes.

**Q.**    And if we go in here to Figure 2, that describes some additional ways of connecting resources within these layer -- or within these networks using optical circuit switches; correct?

**A.**    Correct.

I will note that this is different from the way that OCS devices are used in TPU V4.

**Q.**    And then with respect to Trade Secret Number -- or Trade Secret Category 4, that, at a high level, describes hardware and implementation of some custom systems by Google called AdAstra; correct?

**A.**    Correct.

**Q.**    And the documents in this category focus on AdAstra servers and the high-performance networks that connect them. Is that fair to say?

**A.**    Yes.

There's an additional document that also describes or contains information about a previous version, but most of the documents are specific to AdAstra.

**Q.**    And so both the AdAstra servers and the high-performance network that connects them are custom designed by Google; is that correct?

**A.**    Yes.

**Q.**    And neither the AdAstra server nor the high-performance

network that connects them is commercially available; correct?

A.   Correct.

Q.   And so part of the benefit that this category of alleged trade secrets described is that the AdAstra hardware and the high-speed network -- or, excuse me -- high-performance network are being used together; correct?

A.   They're being used together, yes.

Q.   And part of the benefit that's described in this category of trade secrets is -- comes from those two things being used together; correct?

A.   Yes.  For example, if you had those servers with a slow network, you wouldn't be able to achieve the performance that's needed.

Q.   And so Google designs these servers described in AdAstra to optimize them for its own needs.  Is that fair to say?

A.   It optimizes those servers, in particular AdAstra, to run large machine learning computations.

     Yeah, the needs of Google include running machine learning computations, so to that degree, yes.

Q.   In AdAstra, Google uses something called an H100 GPU from Nvidia; is that correct?

A.   Correct.

Q.   But in addition to the H100 GPUs, Google also designs and builds its own networking hardware that's specific to Google; correct?

**A.**    Correct.  That hardware would be useful more generally, but yes, Google builds its own custom networking hardware.

**Q.**    And that networking hardware is not commercially available; correct?

**A.**    That -- the chip that was used in that card, it can be -- can be purchased as part of a commercially available SmartNIC; but the functionality that is specific to Google, like the GRT block, is not publicly usable or available.

**Q.**    And so you stated that something called a GRT block is not publicly available; correct?

**A.**    Correct.

**Q.**    And that is something that Google adds to the H100 GPU?

**A.**    It adds?  No.  The GRT block is within the Diorite SmartNIC.

**Q.**    And so the AdAstra server contains -- or, as designed by Google, contains parts that are not publicly available; correct?

**A.**    Correct.

**Q.**    And so someone who is trying to replicate the functionality of the AdAstra server would not have access to those parts; correct?

**A.**    Without the information in these documents, yeah, it would be very hard to replicate that -- that technology.  Of course, that's where these documents reduce that effort.

**Q.**    And I'm just speaking of the documents that relate to

AdAstra.

A.    Mm-hmm.

Q.    So someone trying to replicate that system would have difficulty doing so because they don't have access to those Google-specific components; correct?

A.    Is your question including these documents or without these documents?

Q.    I am just speaking of Trade Secret Category Number 4.

A.    Right.  So are you asking whether someone with access to these documents would not be able to replicate AdAstra or someone without access to these documents?

Q.    I am asking -- well, just to back up a little bit, AdAstra includes parts that are not commercially available; correct?

A.    Yes.

Q.    So even if you had the documents, you can't obtain those components?

A.    But you can build them.

Q.    And so is it your testimony that only the trade -- or only the documents in Trade Secret Category 4 would enable you to build all of the custom components in the AdAstra server?

A.    It would still require some design effort, but it would reduce the amount of effort required to build, you know, a GPU system like AdAstra and adopt its features.

Q.    A server design like AdAstra, it also depends on the size of the project that you're designing the server for; correct?

A.    To some degree.

Q.    And so features and functionality would change depending on what size of project you were approaching with the AdAstra server?

A.    That's -- that really depends on the specific numbers; right?  So if you're looking at a single -- building something like a single server or two, you know, that's very different than looking at hundreds of servers or thousands of servers.  At that scale, you know, the design that's described here would be advantageous.  There's nothing that's tied to the scale that AdAstra is being used at.

Q.    But you would have to adjust the parameters in AdAstra in order to achieve an optimized design for a different size project; correct?

A.    I mean, to the degree that you're focusing on the server.  Let's say that you have a design of the server where, you know, the cooling system is more efficient.  That is going to deliver economic savings, you know, cost savings at all scales.

      Of course, the more servers you use, the larger those savings are going to be.  But it's a linear relationship.

Q.    So I think my question was a little bit different.  So if you're changing the size of the project, the size of the server's design, that changes as well; correct?

A.    The size of the servers?

Q.    Or the scale of the servers and the parameters and the

design.

A.   Not necessarily.

Q.   And so another trade secret category that we discussed is Category 5.

A.   Yes.

Q.   And that, at least at a high level, involves high-performance networking technology such as TCPDirect, which you discussed; correct?

A.   Yes.

Q.   And Google has made some of the components for those technologies open source as well; correct?

A.   Right.  TCPDirect needs to -- needs some software running in, you know, the operating system that the customers use, and so that part of the software is open sourced, but how it is implemented under that layer of software is not.

Q.   And that open-source software that Google has made available, that includes drivers for something called TCPXO; correct?

A.   TCPXO is one of the names that Google externally has for TCPDirect.  There are -- there's at least one other technology developed by a different company called TCPDirect, and so TCPDirect is the internal Google code name, but their external name is either TCPX or TCPXO.

Q.   And the open-source TCPXO drivers, that includes some of the information that is included in the trade secret documents

for Category 5; correct?

A.    In general, these documents have some public information, and yes, the TCPDirect documents include some of the information about how the open-source software is used within the whole set of software.

Q.    And with respect to Category 5, you discussed a document that relates to a deployment called Astrophel.  Do you recall that?

A.    Yes.

Q.    And Astrophel is specific to a particular customer; correct?

A.    It is for a customer that has specific needs for training large machine learning models and performing inference on them. So, I mean, it is representative of these kinds of computations.

Q.    But if you were to be designing a system for any purpose other than a large machine learning model, that would require changes to what's described in the trade secret documents; correct?

A.    Other than a large machine learning model?

Q.    Correct.

A.    I mean, this kind of infrastructure can run other types of applications.  But can you be more concrete?  I mean, do you mean like scientific computing?  Other types of workloads that are not machine learning?

Q.   We can take scientific computing as an example.  That would require changes to the deployment that's described in Astrophel; correct?

A.   Actually, that's a great point, because this kind of system can be used and is used for scientific computing workloads as well.  There are scientific computations that run very well on GPUs, like solving large systems of linear equations, running simulations, physics simulations, and those can use these types of systems as well as this.

Q.   And so you're saying that no changes would be required to Astrophel to go from a large machine learning language model for a very large customer to, for example, predicting the weather?  Is that your testimony?

A.   I would have to look at the specific weather prediction application, but there are applications in scientific computing that work very well in these kinds of GPU-based systems like AdAstra, where you have multiple GPUs and high-performance communication between servers.

Q.   So my question was not whether that would work very well.  My question is whether you would have to make changes to go from a large machine learning model to, for example, predicting the weather.

A.   Google offers access to these systems and they're used for these purposes as well.  So it's -- it's a good platform for this, and there are no changes.  So I think you have your

existence proved there.

Q.   Category 6 of the alleged trade secrets generally deals with something that's referred to as a SmartNIC; correct?

A.   Correct.

Q.   And there are publicly available SmartNICs; correct?

A.   Correct.

Q.   And just to back up, a SmartNIC is a network interface card that has additional hardware or configurable blocks to basically work faster.  Is that fair?

A.   Yes.

Q.   And so SmartNICs are publicly available from, for example, a company called Mellanox or Nvidia; correct?

A.   Today that's Nvidia, and Nvidia acquired Mellanox a few years ago.

Q.   And other cloud computing companies build their own SmartNICs; correct?

A.   Correct.

Q.   And so Google has their own version of a SmartNIC; is that correct?

A.   Yes.

Q.   And Amazon AWS, who's another cloud computing company, they have their own SmartNIC; correct?

A.   Correct.

Q.   And Microsoft Azure also builds their own SmartNIC.  Is that fair to say?

A.    Yep.

Q.    And each of these designs is tailored to that specific company's network; is that correct?

A.    There are similarities between the networks of different cloud computing providers.  So multiple of the techniques that are discussed here would translate.

Just as one example, we've talked about the GRT protocol, or Falcon.  Amazon has developed a high-performance communication protocol that they use within their data centers as well.

Now, there aren't many public implementation details about Amazon's protocol, but they're solving similar problems.

Q.    And so Amazon has their own protocol, is that correct, for communication?

A.    They have their own protocol, but, again, those have similarities.

Q.    And that protocol is different from GRT, which is Google's protocol; correct?

A.    Yes.

Q.    And so it is highly unlikely that you'd be able to just plug an Amazon AWS SmartNIC into a Google network and it would -- expect it to work; is that correct?

A.    It would not work out of the box.  But, again, the techniques that are used in these hardware blocks, many of them would translate.

Q.   So it wouldn't work out of the box; is that correct?

A.   Out of the box, probably not.

Q.   And so the Google SmartNIC at issue in the alleged Trade Secret Category 6 is called something -- or is something called Diorite; correct?

A.   Yes.

Q.   And Diorite was designed, at least in part, by Intel; is that correct?

A.   No.  Diorite is the name of the card, the network card which was custom-built by Google.  That card has a chip, and that chip was produced by Intel and designed together by Intel and Google.

Q.   Okay.  So the components were designed by Google.  Is that fair to say?

A.   The card, right, where the chip is placed, was designed exclusively by Google.

Q.   But the chip itself was designed by Intel; correct?

A.   It was co-designed by Intel and Google.

Q.   And Diorite is specifically tailored to AdAstra or -- sorry.  Strike that.

Diorite is specifically designed for AdAstra; correct?

A.   No.

Q.   In what sense is that not correct?

A.   Diorite provides functionality and performance and features that are used -- are useful for a wide range of

computer systems, and Diorite cards are, in fact, used in other computer systems within Google besides AdAstra.

Q.   And so Diorite cards are used in other computer systems; is that correct?

A.   Yes.

Q.   And so what are you referring to when you say a "Diorite card"?

A.   That's the physical assembly of, you know, the card that is plugged into the server.

Q.   Okay.  And Diorite has some Google-specific blocks; correct?

A.   It has some blocks that are designed by Google and are specific -- performing functionality that is useful to Google.

Q.   And it is your understanding -- or -- and so Intel refers to this externally as Intel IPU E2000.  Is that fair to say?

A.   Correct.

Q.   And it's your understanding that Intel has also released to the public a SmartNIC called IPU E2100?

A.   Yes.

Q.   And that uses the same silicon chip as Diorite; correct?

A.   Correct.  The interfaces to the Google-specific blocks are not exposed to users, but it -- it is the same -- the same physical silicon within the same chip.

Q.   And as released publicly by Intel, the IPU E2100 lacks some of the software that would make those Google-specific

blocks usable; is that correct?

A.    Correct.

Q.    But those blocks are still present on the IPU E2100; correct?

A.    Correct.

Q.    And the IPU E2100 is publicly available and sold by Intel; correct?

A.    Correct.

Q.    And so you're familiar with the term "a teardown analysis"?

A.    Yes.

Q.    And so since those Google-specific blocks are present on the IPU E2100, somebody could conduct a teardown analysis of those blocks; correct?

A.    That would be quite complicated.  Let me tell you a little bit why.  You would have to put the chip in an acid bath.  You would have to go through with something like a scanning electron microscope.  You would have to find where those blocks are, and we're talking about billions of transistors and a very complex chip.

    And so identifying the blocks that implement Google's functionality and reverse-engineering their implementation from the physical chip is not something that's feasible.

Q.    But a teardown analysis is a fairly common way of reverse-engineering a semiconductor; correct?

A.    Let me give you a more specific example.  Nvidia sells GPUs.  Many other companies sell processors.  And you can do the same thing I described.  You can take the chip, you can pull it apart, you can analyze any which way you want, but these designs are so complex that you can't recover the actual hardware design.  We're talking about billions of transistors, billions of wires connecting these transistors.

You can get an overall sense of the structure of the chip by doing that, but you cannot, you know, get the implementations.  Otherwise, you know, Nvidia would release a chip or any other manufacturer would release a chip and immediately people would just jump and do that teardown analysis and sell a clone of that chip.

Q.    The Trade Secret Category 7 deals with software for the SmartNICs that we were just discussing?

A.    Yes.

Q.    The documents in that trade secret category focus on something called RDMA; is that correct?

A.    Correct.

Q.    And that is remote direct memory access; correct?

A.    Correct.

Q.    Google is not the only company that does RDMA; correct?

A.    That's correct.  There's a -- there are multiple protocols, multiple implementations of this kind of functionality.

Q.   And Google's implementation of RDMA is tailored to its GRT transport protocol; correct?

A.   It uses the GRT block.

Q.   And so Google's implementation of RDMA is designed to use the GRT block.  Is that fair to say?

A.   Let me be more precise.  Google has multiple implementations of RDMA.  The ones that are described in this category concern the implementation in Diorite, but that's not the only implementation that Google has.

Q.   And so Google's implementation of RDMA is also customized to machine learning workloads.  Is that fair to say?

A.   No.

Q.   In what sense is that wrong?

A.   Google's implementation of RDMA, as described in this category, is used and actually exposed to cloud computing customers on other types of machines that are not even related to machine learning.  So these can be used, again, for high-performance computing, for other workloads that require high-performance communication.

Q.   But these other workloads are done in the context of Google Cloud; correct?

A.   Some of them are, yeah.  Google also uses -- has internal needs for RDMA, and they use it internally.

Q.   Okay.  So the two uses that you just identified for Google's implementation of RDMA are Google Cloud and Google's

internal use; correct?

A.    Correct.

Q.    And those are not exposed to the public?

A.    Google Cloud is exposed to the public.

Q.    But RDMA is not exposed to the public?

A.    RDMA is exposed to the public.  Cloud RDMA is a technology that enables provide- -- you know, exposing that RDMA functionality to cloud computing users, to Google Cloud users running applications in Google Cloud.

Q.    And then other aspects of the documents in Trade Secret 7 deals with the software that runs a Diorite SmartNIC to implement RDMA functionality.  Is that fair to say?

A.    Correct.

Q.    And the documents generally relate to how the software is organized?

A.    Yes.

Q.    And so that basically refers to the split between what's running in Diorite versus the server's CPUs.  Is that fair to say?

A.    As well as how the software within Diorite also in the CPU is organized.  So the internal organization of those components is something that's also covered in -- in this category, as well as techniques to, as we saw yesterday, enable sufficient performance of key functionality.

Q.    And so the documents that deal with RDMA in Category 7,

they don't actually describe the software itself; is that correct?

A.   No, that's incorrect.  They describe the organization of the software.  They describe the software.

Q.   But it does not include the code for the software.  Is that fair to say?

A.   It is a description of the software.  It is not the source code.

Q.   Dr. Sanchez, I'd like to switch gears for a little bit.
     Yesterday you discussed a company called Zhisuan; correct?

A.   Correct.

Q.   And in forming your opinions on Zhisuan, you did not interview any of its engineers about what they were building; correct?

A.   Correct.

Q.   You didn't speak with any customers or prospective customers of Zhisuan; correct?

A.   Correct.

Q.   And you did not identify any revenue from any released products from Zhisuan; correct?

A.   Correct.

Q.   And kind of as we've covered a little bit, the alleged trade secrets that are at issue here are not generic software product materials; correct?

A.   They're software that implements relevant functionality

and features to Zhisuan.

Q.   But they're centered on AI accelerator and supercomputer infrastructure; correct?

A.   Yes.

Q.   And they include concepts about managing and orchestrating infrastructure for AI supercomputers; correct?

A.   Yes.

Q.   And they include data center networking components, including SmartNICs that we just discussed; correct?

A.   Right.  All of those are relevant.

Q.   And as far as you know, Zhisuan didn't build a product that contained any of those; correct?

A.   As far as I know, yeah, they didn't build that product.

Q.   And Zhisuan never launched a commercial product; correct?

A.   As far as I know, they did not launch or commercialize a product.

Q.   As part of your analysis, you reviewed some GitHub files that were obtained by the Government that related to Zhisuan; correct?

A.   Correct.

Q.   And your opinion is that what existed at GitHub was, at most, kind of a proof of concept or pitch stage prototype; correct?

A.   Pitch stage would be accurate.  It is, you know, a small demo.  It's not something that could be productized.

**Q.**   And I'm sorry.  That was not something that could be productized?

**A.**   It could not be sold as a product.

          **MS. WALSH:**  Mr. Jay, can we go to Exhibit 1137.

     And can I have the box on the right-hand side at the top, "Efficient and high-speed communications between systems."

**BY MS. WALSH:**

**Q.**   And in this box here, nothing references Google; correct?

**A.**   Yeah, nothing references Google, although as I mentioned before, several of the techniques here are used by Google, like optical circuit switches or GPUDirect RDMA, something that Google has an implementation of.  And so, you know, there's no direct mention of Google, as you can see here, though.

**Q.**   But in the second bullet, it refers to Nvidia GPUDirect RDMA.  Do you see that?

**A.**   Yes.

**Q.**   And that is not referring to Google's GPUDirect RDMA; correct?

**A.**   This is a good question.

     So GPUDirect RDMA is something that Nvidia, you know, enables to have GPUs be able to communicate with other peripheral devices like network cards.  And so, you know, there are different implementations of -- think of the other side of this protocol.  Essentially, the GPU is communicating with something else, but that other thing needs to be ready to

receive that data and perform its part of the job.

And so, for example, Nvidia has high-performance network cards that are able to exchange data directly with GPUs, and another example of a network card that is able to do that is Diorite.

Q.   But, again, this reference in the second bullet here refers to Nvidia GPUDirect RDMA; correct?

A.   Yes.

Q.   There's no mention of Google?

A.   There's no mention of Google.

Q.   And further on in the second bullet, it refers to optical circuit switches.  Do you see that?

A.   Yes.

Q.   And companies besides Google use optical circuit switches; correct?

A.   There are companies that offer these switches now, yes.

Q.   And so those optical circuit switches are not only used in Google products; correct?

A.   No.  Other companies can develop this technology now.

MS. WALSH:  Mr. Jay, can I have Exhibit 1034, please.

And can we go to page -- or we're already at page 12.

BY MS. WALSH:

Q.   And in the middle in blue here, this refers to something as "MaaS."  Do you see that?

A.   Yes.

Q.   Below that it reads [as read]:

          "Model as a service."

     Do you see that?

A.   Yes.

Q.   "Model as a service" is not a term that's specific to Google; correct?

A.   No.

Q.   And it generally means hosting a model and serving it to users; correct?

A.   That would be a reasonable interpretation, yes.

Q.   And so that is a concept that involves an application and then a layer below that that serves that application to a user. Is that fair to say?

A.   A layer below, yes, but, I mean, there's software that would run on hardware to offer this functionality.

Q.   But model as a service does not refer to any physical chip design; correct?

A.   Physical chip design?

Q.   Correct.

A.   I mean, to the degree that the system can use accelerators, including custom machine learning chips, those would need to have physical design done.

     The term itself obviously does not refer to the physical design of chips.

Q.   And so model as a service can be run on a variety of

accelerators and machine learning infrastructure; correct?

A.   It would need to be run on some AI infrastructure that is optimized for these workloads for this to be effective.

Q.   But that's not specific to Google; correct?

A.   No.   There could be a number of other platforms that could be used.

MS. WALSH:   Mr. Jay, can we go to Exhibit 1143, please, at page 16.

BY MS. WALSH:

Q.   So this is a slide titled "Proof of Concept."  Do you see that?

A.   Yes.

Q.   And it is a proof of concept that depicts a user system; correct?

A.   Yes.

Q.   And that is the box that is on the left side?

A.   Mm-hmm.

Q.   And then in the middle, it also depicts a "Chat AI" box; correct?

A.   That is how it's labeled, yes.

Q.   And that is a chatbot-style interface; correct?

A.   Yes.

Q.   And then on the right side, it depicts a screen for fine-tuning or configuring a model; correct?

A.   That's how it's labeled, although nothing in this actual

interface conveys that there's fine-tuning going on. Fine-tuning refers to a phase of the training process of machine learning models.  This is not reflecting that.

Q.   And so in terms of fine-tuning or configuring a model -- strike that.

So in the text below, it's referring to (as read):

"A large model developed by us mainly focuses on the development of the pretrained decoder model . . . ."

Do you see that?

A.   Yes.

Q.   And so that's referring to a model that has already been trained and is then deployed.  Is that fair to say?

A.   So when you talk about pretraining and fine-tuning, these are different phases of the training process for machine learning models.  These models can be trained to perform a certain set of tasks, and then essentially specialize with some additional training to perform better at particular tasks.  And so that's what's -- what's referred to as fine-tuning.  But that's still a phase of training.

Q.   But this is a software-layer product concept.  Is that fair to say?

A.   Fine-tuning, as it is a phase of training machine learning models, is a type of software.  Everything that we've been discuss- -- discussing, you know, consists of applications that

run on hardware, software that runs on hardware.

Q.   And so this is referring to an application layer that runs on top of the model; is that correct?

A.   No.  This is referring to -- you know, fine-tuning specifically refers to specializing the model to perform better on particular tasks.  It is not something that's run on top of the model.

Q.   But in any event, this is not a plan to manufacture, for example, GPUs; correct?

A.   No.  This is describing functionality related to training and using machine learning models.

Q.   And this does not indicate that it would be deploying a proprietary data center fleet; correct?

A.   This slide says nothing about the kind of infrastructure that would be used, this particular slide.

Q.   And so nothing in this proof of concept slide says that Zhisuan will own thousands of servers; correct?

A.   If you're looking to this particular slide.  There are other slides in this deck that -- where my answer would be different, but to this particular slide, no.

Q.   And nothing in this particular proof of concept slide says Zhisuan will be designing its own TPU or GPU chips; correct?

A.   Correct.

Q.   And nothing in this proof of concept document says that Zhisuan will be implementing a SmartNIC hardware -- or, strike

that.

Nothing in this proof of concept document says that Zhisuan will be implementing SmartNIC hardware; correct?

A.   You've gone from the slide to the document.  Are you referring to this specific slide?

Q.   This specific slide.

A.   Yes, you're correct.

Q.   In modern AI systems, it's common to use open-source components; correct?

A.   Correct.

Q.   And those open-source models and frameworks can be used legally; correct?

A.   Of course.

Q.   And those are -- those open-source materials are, by definition, publicly available; correct?

A.   Yes.

Q.   And those publicly available open-source materials don't contain proprietary alleged trade secret documents from Google; correct?

A.   Correct.

Q.   And some of the materials that you referred -- excuse me -- you reviewed for purposes of forming your opinions included open-source components; correct?

A.   You mean open-source code?

Q.   Correct.

A.    There is open-source -- I mean, the code is not directly in these files, but there are open-source projects that are related and sometimes discussed in some of these documents.

Q.    Okay.  I'll ask you a slightly -- slightly more focused question.

As part of forming your opinions, you reviewed code repositories that you understood were associated with Mr. Ding's GitHub account; correct?

A.    Correct.

Q.    And GitHub is a site where people can store and collaborate on code; correct?

A.    GitHub allows both private and public repositories.  So I would imagine that those repositories would be private.  They could -- some of those could have been public, but the fact that they were hosted on GitHub implies nothing about the public availability of that code.

Q.    Okay.  But GitHub does contain some public repositories; correct?

A.    GitHub allows users to keep repositories public or private.

Q.    And on GitHub, a repository is a project folder that stores code and documentation; correct?

A.    Yes.

Q.    And turning to the materials you reviewed, you understand that those were obtained by the Government through a warrant

process; correct?

A.   Correct.

Q.   And you did not personally execute the warrant; correct?

A.   Execute the warrant?

Q.   Correct, yes.  You didn't go to GitHub and obtain files?

A.   No.

Q.   You relied on what you were provided in terms of what was collected from GitHub?

A.   Yes, correct.

Q.   In your review of the GitHub repositories, there were more than one repository that was provided to you; correct?

A.   Yes.

Q.   And can you tell the jury how many repositories you reviewed?

A.   I don't remember that number off the top of my head.  I would say around 10 to 15.  All of those repositories except one, as far as I could tell, were open-source pieces of software, maybe with some modifications, but were open-source projects.

Q.   And did you review each of those repositories?

A.   I looked at all of those repositories, yes, although I did focus on the one that is related to the slide that we have just seen.

Q.   You did not find any alleged trade secret documents in the GitHub repositories; correct?

**A.**   Correct.

**Q.**   And then there was a specific repository called Friday Ming-packaging.bundle; correct?

**A.**   Yes.

**Q.**   And is that the one that you were referring to with respect to the slide we just showed?

**A.**   No.  I think that was called clustering model service.

**Q.**   And what was your understanding of what cluster model service did?

**A.**   As I explained yesterday, this is the source code for a Web application that implements the functionality that we have seen in this slide.  It includes something like an AI chatbot, as was shown in the picture at the center of this slide, where one can ask questions and get answers using -- selecting from a set of language models that my understanding is were open source.

**Q.**   And that repository did not contain any of the alleged trade secret documents; correct?

**A.**   Correct.

**Q.**   And it didn't contain any TPU or GPU hardware or software design; correct?

**A.**   Correct.

        **THE COURT:**  Is now a good time to wrap up, or do you have anything more on this topic you're on right now?

        **MS. WALSH:**  I have more on this topic, but it might

take a while, so...

THE COURT:  Okay.  Why don't we call it a day.

Please remember all of my instructions, including about not discussing the case or the witnesses or anybody involved in the case or anything involved in the case with anybody else.  And don't conduct any of your own research on any of the people involved or anything involved in the case.

And we'll see you back here tomorrow, ready to bring you in at 9:30 for a full day.  Thank you.

THE COURTROOM DEPUTY:  All rise.

THE COURT:  "Full day" meaning until between 3:00 and 3:30.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  You may step down.

All right.  Anything to discuss?

MS. PRIEDEMAN:  Just briefly, Your Honor.

We will not talk to Dr. Sanchez, obviously, about the content of his testimony while he's on cross, but just wanted to make clear and sure that we can talk to him about logistics, particularly of the *Daubert* hearing and prepping for that.

THE COURT:  Sure.  Of course.

And so you made reference to Sanchez wanting to go home.  Were you planning on having him testify at the *Daubert* hearing remotely?

MS. PRIEDEMAN:  No.  So his flight currently is on

Saturday morning.  I think the hope would just be that he doesn't have to testify further on Monday.

THE COURT:  Got it.

And do you have a rough sense of how much longer you have with him?

MS. WALSH:  So I have a sealed portion, which should be in excess of an hour.

THE COURT:  Okay.

MS. WALSH:  Up to two, and that's my best estimate.

THE COURT:  Okay.  So you're saying you think you have a total of two hours left?

MS. WALSH:  Correct.

THE COURT:  About two hours left?

MS. WALSH:  Yes.

THE COURT:  Okay.  And I can't remember how long you all said Pooley would take.

MS. WALSH:  So Mr. Pooley's direct should be about an hour.

THE COURT:  Okay.  So we want to make sure we're done with -- we need to make sure -- I guess the most important thing is to make sure we're done with Pooley by Thursday.

MS. WALSH:  Correct.

THE COURT:  But we'd also like to try to be done with Sanchez on Thursday.

So I guess the question is:  Should we -- who should

we be calling first tomorrow?

I mean, we probably have about four hours -- between four and four and a half hours of trial time tomorrow.

MS. WALSH:  So I think we would prefer Pooley, just to get him up and down.

MS. PRIEDEMAN:  Our preference would be Dr. Sanchez. He's been here with his family for a while and would like to get home.  And I -- it's possible we would need him back for a rebuttal case as well.  And he lives in Boston, obviously.

THE COURT:  Yeah.  But the problem is that if we don't get Pooley in, there's no more Pooley; right?

MS. WALSH:  Correct.

MR. BOOME:  I'm surprised that his testimony is going to take an hour, given the constraints that the Court has put on it.

THE COURT:  I don't even remember what Pooley is testifying about.

MR. BOOME:  And pos- --

MS. PRIEDEMAN:  Reasonable measures, Your Honor.

MR. BOOME:  He's the defendant's reasonable measures expert.

Your Honor, after the *Daubert* hearing, limited his testimony to talk about basically general principles of information protection.  He testified during the *Daubert* hearing that he's not an expert in any data loss prevention

systems that involve the type of things that Google deployed.

And given the issue with the opening statement that we flagged regarding no one talked to Mr. Ding, I think that if Mr. Pooley were to testify about the lack of an exit interview, I think we would have additional requests about the defendant's statement.

So given those constraints, an hour seems like a lot, but it's obviously a defense call.

**MS. KRSULICH:**  Your Honor, may I respond?

**THE COURT:**  Yeah.  I was just pondering the lack of an exit interview thing.  It's not clear to me that -- as we discussed last time, the lack of an exit interview in isolation is not, I think, problematic.  It's when it's coupled with this concept of the Government and Google barreling ahead without giving him a chance to explain himself.

**MS. KRSULICH:**  Yes.  And, Your Honor, we're aware of the Court's orders and where the Court has drawn the line, and we're not planning to go into anything with exit interviews with Mr. Pooley.

However, we did hear two days' worth of testimony from HR about -- from Google HR about their labeling policies --

**THE COURT:**  You don't have to defend your estimate of an hour of testimony.

**MS. KRSULICH:**  It's quite reasonable, given what we've been going through, Your Honor.

**MR. BOOME:**  But it was clear that the testimony can't relate to what Google did.  It can relate to general principles.

**THE COURT:**  Right.  Yes.

So I guess what I will say is, I think that in an abundance of caution, we should call Pooley -- we should have Pooley testify first tomorrow.

I would like to suggest, with respect to the cross of Mr. Sanchez -- Dr. Sanchez, it may be that tonight you can sort of go through and make it more efficient, because there have been a number of repetitive questions and a number of asking him very basic questions, like "This document says this; right?"  And he says "Right."  And you don't need to ask that question.  You can just get right to the question, the substantive question that you have.

So I'm hopeful that you can spend the evening kind of streamlining your cross of Dr. Sanchez so that we can get through Dr. Sanchez tomorrow as well as Pooley.

**MS. KRSULICH:**  Thank you.

**THE COURT:**  Okay.  Thank you.

**MR. BOOME:**  Thank you.

**MR. FONDO:**  Your Honor, sorry.  One more thing.

**THE COURT:**  Oh.  Yeah, sure.

**MR. FONDO:**  I apologize.  This will be brief.

Sorry.  Do you want to go first?

**MR. BOOME:** Yes. I'm sorry.

Thank you, Your Honor. I mentioned briefly regarding the Google witnesses who are still under subpoena. We understand that a few of them are still under trial subpoena by the defense, and the Government would like to confirm that none of those witnesses will be asked about the topics that you've excluded regarding the process that Google undertook to identify the trade secrets in this case and the Government's charging decisions.

**THE COURT:** I assume not. I mean, it depends what -- as Mr. Fondo said yesterday, it depends what comes in from the Google witnesses; right? I mean, I've made my pretrial rulings, and those are always subject to change, depending on how the evidence comes in, so...

**MR. BOOME:** Understood.

**MR. FONDO:** Your Honor, just quickly, it looks like we may not get to -- the Government may not be closing tomorrow, their evidence, anyways.

But I just wanted to raise, there's a rebuttal witness that is expected to testify. He's going to be a summary witness about certain flight records that the Government's already stipulated are admissible.

And so I think it'll be short testimony, but he hasn't been disclosed previously, and so he has not been disclosed to the jury either. So I just wanted to flag that for the Court.

**PROCEEDINGS**

His name is Scott Compton.  He's a private investigator used by the CJA panel.

But, so I just wanted to alert the Court that in case the Court wants to ask the jury if they're aware of him.  I'm not aware that he knows any of them.  But anyways, I just wanted to identify that issue for the Court.

THE COURT:  Okay.  Bhavna, why don't you just ask them tomorrow.  Say there's another witness who may be testifying and give his name and ask them if anybody thinks they know somebody by that name.

MR. FONDO:  Thank you, Your Honor.

THE COURT:  All right.  Thanks.

MR. BOOME:  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Proceedings adjourned at 2:07 p.m.)

---o0o---

**CERTIFICATE OF REPORTERS**

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Wednesday, January 21, 2026




———————————————————————————————————————

Ana Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
Official Reporter, U.S. District Court




———————————————————————————————————————

Ruth Levine Ekhaus, CSR No. 12219, RDR, FCRR
Official Reporter, U.S. District Court