**Volume 8**

**Pages 1419 - 1604**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )   **NO. 3:24-CR-00141-VC**
                               )
LINWEI DING, a.k.a. LEON DING, )
                               )
          Defendant.           )
_____)

                              San Francisco, California
                              Thursday, January 22, 2026


          **TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue, Box 36055
                    San Francisco, California 94102-3495
              BY:   **CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
                    **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    1301 Clay Street, Suite 340S
                    Oakland, California 94612-5217
              BY:   **MOLLY K. PRIEDEMAN**
                    **ASSISTANT U.S. ATTORNEY**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**: (CONTINUED)

For Defendant:

GOODWIN PROCTER LLP
525 Market Street
San Francisco, California 94105
BY:  **DARRYL M. WOO, ATTORNEY AT LAW**
**DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
**RACHEL M. WALSH, ATTORNEY AT LAW**
**COLETTE A. LOWRY, ATTORNEY AT LAW**
**NICHOLAS C. WILEY, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 Marshall Street
Redwood City, California 94063
BY:  **GRANT P. FONDO, ATTORNEY AT LAW**
**FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 South Figueroa Street, Suite 4100
Los Angeles, California 90017
BY:  **LORA J. KRSULICH, ATTORNEY AT LAW**


Also Present:        **Andrea Valladao, Federal Bureau of**
**Investigation**
**Veronica Hernandez, Paralegal**
**John Jay, Trial Technician**

<u>**I N D E X**</u>

Thursday, January 22, 2026 - Volume 8

<u>**PROCEEDINGS**</u>

Sealed Proceedings, pages 1487 through 1522

| <u>**GOVERNMENT'S WITNESSES**</u> | <u>**PAGE**</u> | <u>**VOL.**</u> |
|---|---|---|
| <u>**SANCHEZ, DANIEL (RESUMED)**</u> | | |
| (PREVIOUSLY SWORN) | 1483 | 8 |
| Cross-Examination resumed by Ms. Walsh | 1484 | 8 |
| Redirect Examination by Ms. Priedeman | 1512 | 8 |
| Recross-Examination by Ms. Walsh | 1534 | 8 |
| | | |
| <u>**CHANDRA, PRASHANT**</u> | | |
| (SWORN) | 1537 | 8 |
| Direct Examination by Ms. Priedeman | 1537 | 8 |
| | | |
| <u>**DEFENDANT'S WITNESSES**</u> | <u>**PAGE**</u> | <u>**VOL.**</u> |
| <u>**POOLEY, JAMES**</u> | | |
| (SWORN) | 1433 | 8 |
| Direct Examination by Ms. Krsulich | 1433 | 8 |
| Cross-Examination by Mr. Boome | 1459 | 8 |
| Redirect Examination by Ms. Krsulich | 1474 | 8 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1195 | | 1546 | 8 |
| 5234 | | 1503 | 8 |
| 5257 | | 1493 | 8 |
| 5263 | | 1491 | 8 |
| 5268 | | 1504 | 8 |
| 5278 | | 1488 | 8 |
| 5281 | | 1508 | 8 |
| 5282 | | 1510 | 8 |
| 5285 | | 1506 | 8 |
| 5290 | | 1490 | 8 |

**Thursday - January 22, 2026**                              **9:09 a.m.**

## P R O C E E D I N G S

---o0o---

(Proceedings were heard out of the presence of the jury.)

**THE COURT:**  Okay.  Good morning.

So I'll tell you what happened with Ms. Johnson, Juror Number -- I guess she's now -- she was Juror Number -- she had become Juror Number 10.

She had her car broken into last night, and all the windows were shattered and all her credit cards and driver's license and juror badge and all that kind of stuff was stolen. So she's been scrambling around trying to deal with that.

And in light of that -- I spoke with her directly this morning to explore whether it was realistic for her to come in despite all that, and she did not feel that it was, and I agreed with her.  So I went ahead and excused her.

So we're down to -- it's nervous time.  We're down to two alternates and that's that.

So does anybody have any comment or objection relating to that that they want to make?

**MR. BOOME:**  No, Your Honor.

**MR. FONDO:**  No objection, Your Honor.

**THE COURT:**  Okay.  Anything else you-all need to discuss with me?

**MS. KRSULICH:**  Yes, Your Honor.  Lora Krsulich for the

defense.

We have a concern related to Dr. Sanchez's testimony and the way he testified as to compilations and combinations.

**THE COURT:**  Okay.

**MS. KRSULICH:**  So as Your Honor is aware, there are seven counts in the case, each correlating with a different category of trade secrets.  And Dr. Sanchez yesterday testified in multiple places where if you combined the categories, there would be additional value or combined value.

**THE COURT:**  If you combine the categories --

**MS. KRSULICH:**  Yes.  So --

**THE COURT:**  -- or all of the documents in one category?

**MS. KRSULICH:**  No.  It was two categories together, so --

**THE COURT:**  Okay.  Yeah, I remember that.

**MS. KRSULICH:**  He talked about Categories 1 and 2; 1, 2, and 3; 4 and 5; and 6 and 7.

**THE COURT:**  Yeah.

**MS. KRSULICH:**  So, Your Honor, we're concerned because those combinations were never disclosed as trade secrets, the combined categories.  And it also exceeds the scope of Mr. -- Dr. Sanchez's opinion -- or disclosure.

But also, there's a concern related to this multiplicity of convictions.  If this were presented to the

jury as combinations across counts, there's a risk that Mr. Ding could be convicted for documents in one category multiple times.

THE COURT: Okay. Well, I mean, we'll make sure that the jury instructions and the verdict form do not allow for that. And I've been working on those and have some ideas that are designed to protect against the kind of concern you're expressing now, and so I'll file those probably -- I don't know if I'll be able to file my proposed instructions and verdict form tomorrow but certainly over the weekend, if not tomorrow. So I'm not too worried about the multiplicity of conviction thing that you're raising.

As far as testimony that the combination of the different categories has even greater economic value, even if the Government has not disclosed sort of the totality of all seven categories as a trade secret in and of itself, it strikes me that testimony like that is relevant because it goes to -- I mean, I assume the point the Government is trying to make -- the point that the defense is trying to make is: Look, any one of these things -- if you get this document, you can't do anything with it on its own. And the Government's point is: Yeah, but if you're somebody who has all the documents and if you have the means to implement what's in those documents, you've got them all and, like, having them all is immensely valuable.

And even if they haven't identified all of them together as one single trade secret, it seems like that sort of argument and testimony going to that is quite relevant to the issue of intent and to the issue -- to the issue of whether any of these parts have value to somebody who has the ability to do -- to implement the other parts.

MS. KRSULICH:  Your Honor, I agree it's relevant had they charged their case that way.  But we've been pushing the Government to identify what their combinations are.  And I remember arguing before the Court that, you know, are they arguing that it's the collection of information together that is a combination, and the Government said, "No, it's not that way.  It's within each individual category."

THE COURT:  And I understand that they haven't charged it that way, and the verdict form is not going to ask the jury -- assuming you're right that they haven't charged it that way -- I haven't looked at the indictment in a while -- but the verdict form is not going to allow the jury to identify the totality of the documents as a single trade secret.

But the concept of Category 1 having more value if you also possess the documents or the know-how associated with Category 2, that concept seems totally relevant on a number of levels, and it's not like -- it's not some great surprise that the Government would be eliciting testimony about that and making that argument.

**MS. KRSULICH:** Your Honor, the defense's position would be, because you're looking at the trade secrets one by one -- right? -- so Category 1, the argument would be that category of trade secrets has no independent economic value because it is secret outside of -- right? -- just looking at that combination as a whole.

And what the Government is trying to do is say: Well, if you take that and Category 2, then you actually do have independent economic value.

But that's not how you're supposed to assess the trade secret. Each of the trade secrets is supposed to be independently assessed as to whether it meets each of the elements.

**THE COURT:** And I think that we can make that clear in the jury instructions, and I think we can make that clear in the verdict form. But -- and it's a good point. But I don't think that means that evidence about -- testimony to the effect that if somebody has the capabilities -- the capability of doing what is represented in Trade Secrets 2 through 7 -- right? -- that Trade Secret Category 1 will become even more valuable to them; right? I don't think there's anything improper about testimony to that effect.

**MS. KRSULICH:** Well, it doesn't go to --

**THE COURT:** It goes to intent. It goes to -- I think it would go to any number of things in the case.

**MS. KRSULICH:** So, Your Honor, we would like to file a motion in limine so that the Court has our briefing and is able to consider it. We'd plan to do that by Monday, to exclude this evidence of --

**THE COURT:** Sure.

**MS. KRSULICH:** -- the combinations together, 1 and 2; 1, 2, and 3; 4 and 5; and 6 and 7.

**THE COURT:** Yeah, you're welcome to do that.

**MS. KRSULICH:** Thank you.

**MS. PRIEDEMAN:** Your Honor --

**THE COURT:** And I'll consider it. And if I conclude you're right, I'll instruct the jury to disregard those portions of Dr. Sanchez's testimony.

**MS. KRSULICH:** Thank you.

**MS. PRIEDEMAN:** Your Honor, just briefly, just to clarify and make sure we're all on the same page, the Government is not going to argue that the combination of all the documents in all the categories is a trade secret. We are not intending to do that. We have not changed the position.

As Your Honor has pointed out, the value of the different categories together is relevant to intent, particularly intent to use the trade secrets, the fact that he took more than one category.

**THE COURT:** Right. And it counters the defense

argument that one category on its own has no value because you don't have the infrastructure to do the rest of the stuff or whatever; right?

MS. PRIEDEMAN:  Right.  But we are also -- we are going to argue that each category has independent economic value and meets the definition of a trade secret, and we're not going to argue that the combination of multiple categories or all of the categories has additional value that makes it a trade secret.

THE COURT:  Got it.

MS. PRIEDEMAN:  So...

THE COURT:  Okay.  Understood.

All right.  So the objection is overruled for now.

Anything else -- anything else to discuss?

MR. FONDO:  Yes, Your Honor.  Just an administrative question.

So we're filing Mr. Novak's disclosure this morning or by noon, and we just wanted to check.  Did the Court want us to file it with the Court?

THE COURT:  Yeah.

MR. FONDO:  And we'll file it provisionally under seal for the Government to identify --

THE COURT:  Great.

MR. FONDO:  -- portions.

Okay.  Thank you.

MR. BOOME:  Your Honor, just one point on Mr. Pooley's expected testimony.

The Government received a demonstrative for Mr. -- slideshow for Mr. Pooley's testimony, and it included four slides on his legal background and treatises on trade secrets and one slide on his opinions.

We're not necessarily objecting to the demonstrative itself, but we have a concern that Mr. Pooley's legal experience and legal expertise in what trade secrets are and litigating trade secret cases may be overemphasized and suggest to the jury that he's here to give them legal advice.

And so not necessarily asking for anything right now. I just want to flag for the Court that we have this concern and that he's here testifying not as a legal expert but as an advisor to companies about trade secret protection principles.

THE COURT:  Got it.

MS. KRSULICH:  That is understood.

THE COURT:  Okay.  Anything else?

MR. BOOME:  No, Your Honor.

THE COURT:  All right.  We'll see you in ten minutes.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 9:19 a.m.)

(Proceedings resumed at 9:31 a.m.)

(Proceedings were heard out of the presence of the jury.)

MS. KRSULICH:  We have a brief issue to address with

the Court, Your Honor, before the jury arrives.

THE COURT:  Okay.

MS. KRSULICH:  We received some materials from the Government related to Mr. Pooley's testimony.

One of those materials raises concerns because it talks about China's legal regime and their cybersecurity efforts, and we don't think that would be --

THE COURT:  One sec.

MS. KRSULICH:  That's an unduly prejudicial topic for Mr. Pooley's testimony, which has nothing to do with China or its legal system.  So we wanted to raise that concern with the Court before we get into this with Mr. Pooley.

MR. BOOME:  I don't expect it will come up, Your Honor.  We provided the Court with a binder and defense with a binder in an effort to comply with your ruling on impeachment with prior statements of the witness --

THE COURT:  Okay.

MR. BOOME:  -- sorry -- your standing order.

So that's all.

THE COURT:  Okay.  Well --

MR. BOOME:  Unless it comes up, I don't intend to raise it.

THE COURT:  Well, we can do a sidebar if it does come up, or we can talk about it during a break if the Government thinks that it becomes fair game.

MR. BOOME:  Thank you.

THE COURT:  Okay.

MS. KRSULICH:  Thank you.

THE COURT:  Thanks.

(Proceedings were heard in the presence of the jury.)

THE COURTROOM DEPUTY:  Please be seated.

THE COURT:  Okay.  Welcome back, everybody.

Ms. Suazo, congratulations on no longer having to sit at the kid's table.

And we're going to resume, but let me -- we have a little bit of a scheduling glitch that I want to talk to you about.

So normally, the way it works -- right? -- is the Government puts on its case, the Government calls all its witnesses, and then the Government rests; and then if the defense wishes to call any witnesses, of course the defense is not required to do so, but if the defense wishes to call any witnesses, it begins calling its witnesses.

We are going to take one defense witness out of order because that witness is not available after today.  So we're interrupting Dr. Sanchez's testimony.  He will take the stand and resume his testimony, his cross-examination, later today; but we're going to hear out of order from one defense witness right now to accommodate his travel schedule.

So with that, does the defense wish to call its first

witness?

MS. KRSULICH:  Yes.

Good morning.  Lora Krsulich for Mr. Ding.

The defense calls Mr. James Pooley.

(Witness steps forward to be sworn.)

THE COURT:  Go ahead and have a seat.

THE COURTROOM DEPUTY:  Please raise your right hand.

JAMES POOLEY,

called as a witness for the Defendant, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.

Please state and spell your full name for the record.

THE WITNESS:  James Pooley.  Thank you.  P-o-o-l-e-y.

DIRECT EXAMINATION

BY MS. KRSULICH:

Q.  Good morning, Mr. Pooley.

Please introduce yourself to the members of the jury.

A.  Yes.  My name is Jim Pooley, and I'm here to give expert testimony.

Q.  What type of expert testimony are you giving?  What's the topic?

A.  My topic is what businesses do to protect and maintain control over the confidentiality of their information, something that we sometimes refer to as reasonable measures.

**Q.**   Have you prepared a set of slides to assist with your testimony today?

**A.**   Yes.  Yeah.

          **MS. KRSULICH:**  I will pull them up.

**BY MS. KRSULICH:**

**Q.**   Are these your slides, Mr. Pooley?

**A.**   Appear to be, yes.

**Q.**   Yes.

**A.**   Sorry.

**Q.**   Mr. Pooley, your normal hourly rate for private clients is $1200?

**A.**   Yes.

**Q.**   In this case, you have been retained pursuant to and paid by the Criminal Justice Act Panel and, thus, your rate for this case is $300; correct?

**A.**   That's my understanding, yes.

**Q.**   Would you please briefly summarize your educational background?

**A.**   Yeah.  After my -- after graduating from college, I went to law school and graduated in 1973 and came out here to have my first job, and it happened to be in Palo Alto, and I arrived not long after Silicon Valley was named.  So that's -- that was the extent of my formal education.

**Q.**   Please tell the jury about your professional background and about your work helping companies with information

security.

**A.**   I started out as a trial lawyer doing whatever happened in a courtroom; but because I started in the early 1970s in what became Silicon Valley, I did a lot of trade secret litigation. It was just the way the Valley grew, people leaving one company and going to another and there were all these disputes.

And in 1982, having done a lot of those sorts of things, I published a small book that had -- where I tried to lay out some of the rules of the road in the hopes that maybe these cases would kind of go away; and instead, I ended up getting -- making a career out of trade secrets as a specialty.

I also did a lot of patent litigation as the trade secret person on the patent case.

And so that formed, you know, kind of the cornerstone of my work as a lawyer.

I ended up teaching about this issue at law schools and to state and federal judges.  I ended up writing more books and a lot of articles about this.  It just -- it just became a real focus of mine.

And then in -- well, and along the way, I participated in some national organizations and commissions where the issue was about public policy around intellectual property.  And as a result of that, in 2009, I received an appointment from the White House to become the senior U.S. diplomat in charge of intellectual property for the -- for the U.N.  So I went to

this agency of the U.N. in Geneva, Switzerland, called the World Intellectual Property Organization; and there, for five years, I ran the international patent system as a manager.

And that was -- you know, up until that time, I had a great deal of experience and my focus was on helping people with trade secret disputes of various sorts, either in court or as an advisor; in other words, how to -- how to avoid these kinds of problems and how to -- how to run a trade secret protection program.

But when I was in -- at WIPO, as we called it, the job that I had besides the diplomatic part, the main job that I had was running this patent system where we received every year about 200,000 unpublished secret patent applications representing the world's most advanced technology of various sorts, and a big part of my job was making sure that none of that information got prematurely published.  Every patent application remains confidential for 18 months and then it gets published.

And so we, as I said, had a couple of hundred thousand of those applications filed with us every year, and I had to run the systems that we had in place to make sure that access was controlled and that we didn't experience any leakage or loss of any of that.

And so having had that experience with running a program for controlling confidential information, when I came back from

that experience about ten years ago, I decided that I would focus entirely my efforts on trade secrets and from a management point of view, and I started taking fewer and fewer assignments as a -- as a lawyer, courtroom lawyer, and focusing my efforts on advising companies and on doing this, where I explain -- help explain to juries how businesses actually do this kind of function.

**Q.**   Please tell the jury about your work with The Sedona Conference.

**A.**   Yeah.  When I got back from Geneva, one of -- I was approached by some people from The Sedona Conference, which is a -- it's a volunteer think tank, if you will, that attracts sort of thought leaders in various aspects of intellectual property litigation and management, and includes lawyers and judges and others who are involved in that process from across the country.  And we meet annually and, in between, virtually. And the -- and I was asked to organize the working group on trade secrets, which I did.

And that became -- that became a process for issuing a number of what we call commentaries, long white papers about various aspects of trade secret issues, including the management of trade secrets.

So I'm no longer the chair of that one, but I'm the -- I'm what they call the chair emeritus, so...

**Q.**   Mr. Pooley, you were inducted into the IP Hall of Fame?

**A.**   I was, yes.

**Q.**   And you received a Lifetime Achievement Award from Managing IP?

**A.**   Yes.

**Q.**   Please tell the jury briefly about some of your publications involving information security.

**A.**   Well, the one you see up here in the left-hand -- upper left-hand corner is the one I referred to earlier that I published.  Not a very long book, and it -- that's what it looked like.  I published that back in 1982, and then in 1989, there was another edition of that book.

Then in the '90s, I was asked by a law publisher to create a book for lawyers, to teach them about trade secrets and including trade secret management; and so that became this -- this thing you see on the right-hand upper side, which is a treatise, which is the name we give to a book for lawyers that deals with the law in a particular area.  And so I've kept that up.  Every six months we do a revision of it.  And I've done that since 1997.

But then when I came back from Geneva in 20 -- in 2015, yeah, the old books I had, they didn't treat the Internet or anything like that; so I decided to kind of rewrite this book for non-lawyers, this business book on secrets, and that came out in 20 -- in the summer of 2015.

And following that, I was asked by the Senate Judiciary

Committee to work with them on a new statute that was being considered at the time for federal cases, disputes over trade secrets, and so I worked on that and worked with them.

And then since that time, I've been doing this sort of thing, advisory work and expert witness.

And also, we see here the *Computer and Information Security Handbook*.  I was asked to write the chapter on managing -- managing information assets and security.

Q.   Mr. Pooley, who are your clients and what type of work do you do for them?

A.   Well, my clients -- these days my clients are either companies that want to have my advice on how to set up or improve their trade secret protection programs or, you know, the law firms that hire me to do what I'm doing right now. Those are the -- those are the main clients I have now.

Over -- over the years, I've represented a whole, you know, array of companies, from small start-ups to some of the biggest organizations in the country.

Q.   What experience do you have advising large technology companies?

A.   Well, a fair amount.  I mean, one of the -- my advisory work, because most -- most companies hire me in part because I happen to be a lawyer and so the work that we do, if they hire me as a lawyer, will be protected by an attorney-client privilege.  So, unfortunately, I can't name the advisory

clients, but -- all of them, but some of them have given me permission.

One of those is American Express I'm currently working with.  Another I have worked with is Corning, which has a very complex manufacturing business.

And over the years, I have worked as a combined kind of lawyer/advisor in cases where I've actually appeared so it's not -- I don't have to keep it confidential, with companies like Qualcomm and Applied Materials, companies that are in the semiconductor industry but also producing a lot of software.

**MS. KRSULICH:**  Your Honor, the defense offers Mr. Pooley as an expert in information security measures.

**MR. BOOME:**  No objection.

**THE COURT:**  Okay.  Proceed.

**BY MS. KRSULICH:**

**Q.**   Mr. Pooley, what is your general approach to helping clients protect trade secrets?

**A.**   The methodology that I use, and I think is broadly used, is a variation of a sort of classical business risk management in the sense that companies have a lot of things that represent risks or opportunities, and they have to have kind of a strategic way of looking at them and kind of controlling the risks or reducing risks.

And so in information security, we start with what's the information that's most valuable to you.  If I sit down with a

company to work with it, I'll get with their senior managers and ask them:  What do you lose sleep about at night?  What are you concerned that the competition might learn?  And let's have an understanding about what that is; the secret sauce, the crown jewels, whatever you want to call it.

And then from that, we start this process of identifying what sort of risks exist in your business.  And it's unique, usually, to each organization because it has to share information that it considers very valuable.  It shares with some of its employees.  Sometimes it has to share with companies outside the organization, like if they have long supply chain vendors that -- and business partners.  And so how do you manage all of that against the risks that you'll lose control over the information because somebody lets it out or uses it in a way that you don't want?  So you have to identify all those kinds of risks.

Companies, for example, that engage in an awful lot of acquisition or merger activity, there are information flows that happen that aren't really -- don't really happen in other places.  So they identify what the risks are, and then they look at how -- with respect to the most valuable information with the highest risks, how can we reduce those risks?  What are the -- what are some of the techniques that we have to do that?

And so going through that exercise and getting people to

pay attention to exactly what it is that they care about and the methods that they have available to them to reduce risk and maintain control, that's the process that we go through.

And I try to help companies understand that investing in this kind of effort is really useful. And they have to, obviously, look at the resources that they have. Some companies can afford and others companies can't afford to do certain things. Some things, some methods that will reduce risk are costly. Some are very annoying or inconvenient.

Like, for example, you probably have experienced dual-factor authentication. They -- you have to get a call back to your cell phone in addition to having some -- having some password to get into something.

And so we recognize that, and we try to balance the issues of control and access so that the company's approach is optimized and they have the best chance of maintaining control over the most valuable information.

Q.   What is the greatest risk of loss that a company faces in terms of its information security?

A.   Well, in the information security industry, it's very broadly accepted that the primary source of loss is through employees, through the workforce, because that's the broadest area of exposure. Those -- there are people that have access to very important information; and if there's a lot of them, then that becomes the most, they call it, vector for loss.

Q.   What measures can companies use to protect trade secrets?

A.   Well, primarily, it's about access because, again, the more -- the more places, people, and organizations that you allow to have access to the information, the more risk there is.  And so if you can control access, then you -- that's a primary way of reducing risk.  And you can do it -- I guess the most common way is role-based access where, you know, you get access to certain information depending on what your job is, and so the system knows that.

Sometimes there are systems that they even call this zero trust, where the system looks at who you are in that moment, looks at the nature of the information, and gives you permission or not to get access to it.

So access is a big part.

Training is also very, very important because people don't naturally understand about secrets and confidential information, and so you want them -- you want them to know what your organization's expectations are for their behavior.  So training is really very important.

Documents that circulate with trade secret or confidential information in them usually are labeled in some way, and that's an important method for reducing risk because it shows, on the face of the document, the concern that the company has about keeping it in a certain classification that is available to only certain people.  So we try -- we try to do that as well.

And I'm speaking now in the -- in the context of employees, the employee relationships.  Outside -- dealing with outside organizations, it really is about business-to-business contracts and understandings and then trying to keep control over how they -- how they actually roll out.

Q.   So, Mr. Pooley, let's talk first about the access and access restrictions.

A.   Sure.

Q.   Why is it important to limit access to confidential information?

A.   Well, it's because risk -- the risk, which is the main thing that we're dealing with, the risk of loss of control, the risk goes up with the number of people that you give access to the information.

I mean, we kind of learned this in elementary school; but in business, it really does play out that way.  You need to be -- every business needs to be keenly aware that the more people that are given broader access, the greater risk that there is that somebody is going to make a mistake or the information's going to migrate somewhere, someone's not going to, you know, put a label on a document, what have you.

There may be a lot of things that happen; but if you can control access at the beginning and just limit it to the people who are really familiar with that information, know how to protect it, appreciate its value, then you will have done a lot

to reduce the risk that otherwise happens in the corporate environment.

Q.    What are some of the options that companies have if they want to limit access to confidential information?

A.    Well, one way -- one option is to set -- and I think the most common option that I've seen major companies use is what I've referred to earlier as role-based access.  In other words, you have a system where the information resides, but only certain people are given access to certain parts of it because those parts relate to what it is that they're doing, and they're familiar with it.  They can understand and appreciate its sensitivity.  But, you know, other people don't have access to that information if that's not part of their job.

So, for example, financial information about the company will be available to the people in the Audit Department, but it's not going to be available to some engineer.  And there's other, you know, very sensitive information about potential acquisitions and so forth.  Maybe just a few people in the executive suite will be given access to that.

And now that we live in a digital environment where everything happens within digital systems, it's very possible to do that effectively.  Back when I started and there weren't those kinds of systems, really everything was about labeling; and you had things, you know, in colored envelopes, and so forth, because you needed to -- you needed to watch over how

the paper was distributed.  But now, it's -- now, it's all digitized and it's a lot easier to do that.

Q.    Let's talk about some of the trade-offs.

Mr. Pooley, how would you advise a company that wants to encourage collaboration while maintaining control over their confidential information?

A.    Yes.  And this is -- this is a decision that a number of companies make because they're convinced that in their environment, in order to get the kind of innovation that they want from their workforce, it's important that those employees collaborate with each other and share ideas, have access to information about what others are doing and so on, and that's a -- that's a very legitimate business decision.

Other companies that I'm familiar with will create project teams, and they don't -- they don't allow conversations or collaboration between those teams.  They want them to focus on that.  They don't want to risk information from one team getting out.

So if you want -- if you want collaboration, obviously, there's many flavors of this; but, generally speaking, most companies and what I advise companies to do is to maintain as much control as you can while still encouraging collaboration between groups that are working on related items.

For example, if you have a product that has to go through various cycles or stages of development, you may want the

people at the back end of that process to be talking to the people at the front end so that they can coordinate and share information and not have something appear at the back end that, you know, is a surprise to anybody.

But the -- but the sharing is controlled to some degree or another because the lack of control in an environment where there is a great deal of access necessarily raises risk to a very high level.

So I advise companies:  Find ways that you can implement controls in a way that's acceptable for the -- you know, for the process that you have and the culture that you have in your company, and -- but know what you're doing.  And in that way, you can get both collaboration and a certain level of information security control.

Q.    Let's turn now to talk about labeling and the role of labeling.

What is the role of labeling, Mr. Pooley, in designing an effective information security management system?

A.    Well, labeling of information -- and that happens, by the way, on electronic documents as well as physical documents -- that's -- that's very important in almost every organization because the information is flowing through the company and it's being accessed by multiple people, many of whom may not know exactly how sensitive the information is or whether there is any sensitive information somewhere inside the document.

And so labeling is a way that you can kind of address risk that comes from having fairly broad access by putting on the document itself a statement that tells whoever it is that comes into contact with this:  This is how we want you to behave as to this document.  So labeling -- as we allow more and more access, labeling becomes more important as a way to reduce risk.

So that's -- and as we are indicating here, the labels need to be clear so that people can understand.  This is a method of communication to the workforce.  It's got to be clear and it needs to be consistent.

This is, again, part of the advice that I give to organizations, because you have a whole bunch of different people from vastly different backgrounds and experience levels dealing with this information, and so they need to know pretty precisely what it is that they're supposed to be doing.

Q.   How do you advise your clients to set up their labeling systems?

A.   Well, I always suggest that their system for classifying documents, which ends up creating the labels, be simple for the same reasons we've been talking about here, so that people can understand it.  If you -- if you create too many categories of sensitivity, people get confused, they forget what one means versus the other.  And so usually, it's most effective to have a simple system, three, maybe four categories at the most, and

then, of course, use them consistently so that people see those terms and they're not confused or potentially confused by seeing different terms.

Q.   What are some of the risks of having different business units within the same company have different kinds of confidentiality labels?

A.   Well, the danger, the risk comes from people in one group coming across documents from another group, and it's just like, you know, you're reading a foreign language.  If you see some other system, if it's not something that you are directly familiar with, then you can make mistakes.  You could -- you may end up ignoring it because you don't know what it is.

And that's what I mean by "consistency."  If you have -- if you have completely siloed, cut-off groups that are working on a project, then it's probably not much of a risk for them to come up with their own systems because they will know how to talk to one another and be understood by each other.

But if there is any information flow among groups, then it creates an additional layer of risk if you use different kinds of labels from one group to another.

Q.   In your experience, Mr. Pooley, what are the practical effects of having a policy that states that all information is confidential?

A.   Well, there's a -- there's a saying in the industry, that is, the security industry:  If everything is confidential, then

nothing is confidential.

And that represents the observation that professionals have made over many years that if you -- if you try to just say "Everything we do is confidential," then there's kind of an overwhelm among the workforce and people get cynical about it because they see things marked as confidential that couldn't -- in their view, couldn't possibly be, and so it diminishes the significance of the label.  And that's -- and that becomes, then, another level of risk or an abandonment of your effort to control risk.

So it's very -- it's very important -- as part of the notion of consistency, it's very important that we give people the opportunity and the -- and the understanding to make distinctions between information that matters and information that might not matter so much at all.

Q.    A slightly different question.  What are the practical effects of a policy that states that both labeled and unlabeled information should be treated as confidential?

A.    Well, that's a -- that takes the potential for confusion I just talked about and raises it to yet another level, because if people see documents that are unlabeled and they're -- and I think, by your question, you're suggesting that they're told that if it's unlabeled, it should actually be confidential, even if it doesn't have a confidential label on it.  Well, that, you know, I think the potential for confusion there is

pretty obvious.

You know, people looking at a document without any label on it, particularly if you're in an organization where there's lots of information flow, you know, you see a lot -- a lot of documents, they're most likely to conclude if there's nothing on a document, that it's not protected at all, that no one cared enough to put a label on it; it's probably public.

And so getting them to actually treat it the same way as the documents that someone has taken the time and effort to just put a label on, that's hard.  That's hard, and that can lead to a lot of mistakes.

That's, again, part of why I tell companies:  Be consistent about this.  Enforce -- if you have a process for identifying information as it flows through the organization, enforce that so that everyone is -- understands what you want.

Q.   Mr. Pooley, if an executive of a large, complex company hires you as a specialist in this area and tells you that their information security system relies on the common sense of their employees, how would you respond?

A.   This is a big company?

Q.   Big, complex company, thousands of employees.

A.   I would tell them that doesn't work because common -- common sense has to be common, and it has to rest on shared understanding and experience.

I mean, we all have common sense not to walk across a

crowded freeway, I mean, thanks to our parents and observations we've all made growing up.

You can have common sense of the sort you're talking about in a small organization, you know, a start-up, maybe 10 or 12 people, because they all know what each other is doing. They're all part of the same thing.  They all understand the company's mission and the sensitivity of every piece of information that goes in there.

But once you get into a big, complex organization, then you have a whole array of people with different backgrounds, different experiences, different jobs; and what's common to them, particularly in trying to look at a document and look at its content and trying to figure out what inside this document is sensitive and so forth, you're not going to have any common understanding of that unless you have trained people very specifically on how to do that.

I mean, if you spend the time to put together real training that tells people, "These are the kinds of documents you're going to run into and here's how to tell what parts are really sensitive," then -- then maybe you will, at least as to those people, have developed a common experience that can lead to common sense.  Right?  But otherwise, that by itself just can't work.

Q.   Let's move on now to talk specifically about training.

A.   Okay.

**Q.** What is the role of training in the design of an information security system?

**A.** Training is very critical. I mean, a lot of what we've been talking about so far is different aspects of communication; the company communicating to the workforce, to the employees what it is that they expect.

And I've often told companies that training is the most effective way of reducing, you know, the risk of loss. It's inexpensive. It takes -- it takes some level of effort; but compared to some of the other things, it's fairly low cost. And depending on what sort of training you want to do, it can be really effective for the sorts of things we're talking about.

Now, training -- training can happen when people come on, they join a company and they get orientation, and so there's -- they're being given a lot of information at first, and so you can plug in your information security into that program. And most companies do that. That makes sense to do.

But the sort of training that I've been talking about here is the kind that happens after the orientation, where you're trying to help people -- because it matters to the company -- you're trying to help them understand what is it that they can do and what should they know about in order to be able to appreciate the sensitivity of information that they come across in their job.

Generally, what I tell people is, you know, try to get together if you can.  Certainly, do it in person rather than, you know, on the Internet.  An awful lot of companies do do both, but in person is best if you can do it.  And try to pull together people that are likely to be working with one another so that the process can sort of spread to the people who are likely to encounter the same issues, the same things.

So you would -- you would train -- you would train people in the HR Department differently than you would train some engineers differently than you would train some financial people, et cetera.

Anyway, I think that answers your question.

Q.   So in a large complex company -- and this is related to what you said, Mr. Pooley -- is it a best practice to offer the same type of training to all employees?  And why not?

A.   Well, you anticipated.  I haven't said "no."

Q.   Sorry.

A.   Well, no, I wouldn't say that that's a best practice for the reasons I just already described.  You want your training to land with people.  You want it to -- you want them to take it into account, to internalize what you're trying to tell them.  And so if they have -- if they have a shared area of responsibility, then you're much more likely to get the effect of the training that you would want rather than trying to give everybody the -- you know, the same training all the time.

Certain basic training, everyone should get; but as I say, I'm talking about the kind that is really meant to reduce -- reduce risk of misunderstanding, sloppiness, mistakes, and all of that. So you want people to know. That requires a little more effort in training.

Q. Mr. Pooley, based on your experience, how effective are employment or confidentiality agreements at communicating the company's confidentiality requirements?

A. Not very effective at all. I mean, they're not really designed for that. The kind of agreement, the typical employee non-disclosure agreement that's signed at the outset of employment is written by lawyers, has a long -- typically has a long list of things that represent confidential information. And it's there for a purpose, a good purpose, but it's mostly of concern to the lawyers.

It's not -- those documents don't really communicate in any meaningful way to someone who's not a lawyer how they should be handling information in their job. That's not the purpose of those sorts of things.

Q. Why don't they communicate effectively?

A. Well, they -- if you just take the typical -- and this happens in a lot of them, and I've read, as you might imagine, hundreds and hundreds of them -- the definition of what is considered confidential or sensitive goes on and on with 20 or 30 examples of things, and it uses phrases that people don't

necessarily understand.

I've seen modern non-disclosure agreements with the term "mask works" in them, which is a reference back to the semiconductor industry of the '70s and '80s. It doesn't have relevance anymore. And they usually use the term "trade secret" too, and, you know, that can be confusing to people. That has meaning to lawyers, but for the purposes we're talking about, it's important to speak to employees in terms that they can understand and retain, and that's just not the purpose of a non-disclosure agreement.

Q. Let's turn now to the final topic of your testimony, Mr. Pooley, data loss prevention systems.

What are data loss prevention systems and what is your experience with them?

A. My experience is high level in the sense that I'm familiar with these tools in a general sense and I've talked to many clients about how they -- how they use them and what functionality they want. I've never built one. I don't know how they -- how they're logically organized, but we've had lots of discussions, I have had, with many companies about how to use them effectively for the function they're intended.

And data loss prevention is a system that basically gives you a flag or a warning of some sort when information is moving in a place or has landed in a place where it's not supposed to be. And so the system is set up to have access to, basically,

all information within the company and to watch over it; and if something happens according to the settings that isn't quite right, that seems suspicious, then it'll put up a flag.

And what happens -- and these are just settings like you have on your phone or your computer. You can change the settings to be sensitive to this or that thing.

And then what happens after the flag goes up is somebody has to pay attention to it in order for it to be meaningful, and this is where most of my advice and experience comes with these systems.

They have a lot of flexibility in terms of how you manipulate the settings to produce a -- to produce a result, a flag. And sometimes you can get too many flags because the system is pretty sensitive. The dial has been turned in a way, the settings have been put together in a way that results in the system calling something as -- calling attention to something that really doesn't need attention. We might call that a false positive.

And, in any event, there are typically many, many flags that go up at any given period of time. And so even though this is an automated system, what I tell my clients is: You have to be ready to oversee it and understand what's happening in it and have the resources -- the human resources to interpret what's going on so you can follow up on something that has been identified by this automated system as

suspicious.  You have to have a number-- you know, the number of people properly trained that can look at this, understand what the system is saying, and can follow up and investigate themselves to find out the facts.

Q.    In general, what are a company's choices if a data loss prevention system is generating more alerts than the company can reasonably address?

A.    Well, at a high level, like any other system, you either -- you either adjust the settings so as to reduce the number of false positives you're getting or you add more people.  You know, whatever you're able to do.

Q.    How could adding more people help solve the problem?

A.    Well, you get more information inputs that need attention, somebody's going to have to look at them and decide what to do with them.  And so if you find that you can't handle all the inputs that are coming in, you either have to adjust the system to reduce those inputs by making it a bit less sensitive or sensitive in a different way, or you need to add more people to do that work.

        MS. KRSULICH:  Thank you.

        No further questions for Mr. Pooley.

        THE COURT:  Thank you.

        Any cross-examination?

        MR. BOOME:  Yes, Your Honor.

        Your Honor, I do expect to reference some topics in

the binder.  I'm confident I can lay the foundation for them; but if the Court would like a preview, then I'd request a break.

THE COURT:  Sure.  Are you expecting to raise the one that we discussed --

MR. BOOME:  No.

THE COURT:  -- before the start of the trial day?

MR. BOOME:  No.

THE COURT:  Okay.  You can proceed.

MR. BOOME:  Okay.

#### CROSS-EXAMINATION

BY MR. BOOME:

Q.   Good morning, Mr. Pooley.

A.   Good morning.

Q.   I want to ask about something you and Ms. Krsulich discussed involving common sense.

You discussed that you were surprised that any manager at a large company could expect to rely on the common sense of their employees when it comes to recognizing the sensitivity of information; right?

A.   Only exclusively, yes.  I mean, if you try to rely on common sense exclusively without giving people the training and understanding so that they can make distinctions, then, yes, that doesn't work, in my view.  It is -- once you have people trained who know what they're doing, then sure, common sense is

a big part of it.

Q.   Because you'd agree that in many cases, the protected status or the sensitivity of information in a document can be obvious just by looking at it?

A.   It can be, certainly.

Q.   Especially if you are a subject-matter expert in that field; right?

A.   In the kind of information that's in that document, sure.

Q.   Exactly right.

So, for instance, a software engineer looking at an engineering document is going to have a better idea of the sensitivity of that information than somebody in the Marketing Department, you'd agree?

A.   Of course.

Q.   And, in fact, Mr. Pooley, isn't it reasonable -- you'd agree no system of controls is perfect for information security; right?

A.   That's absolutely true.

Q.   There's going to be mistakes.  There's human beings involved in the process; right?

A.   Yes.  Yes.  No system is perfect.

Q.   And because no system is perfect, people will forget to do the things that they're supposed to do; right?

A.   That sometimes happens.  That's why we do training and why we have enforcement programs, is to try to minimize that, yes.

Q.   And one of the things that people might forget to do, among others, is put a label on a document; right?

A.   Yes, indeed.

Q.   And isn't it true that the lack of a label doesn't necessarily mean that the information is not valuable?

A.   That's correct.  It just raises the risk about that -- whatever information is in that document.

Q.   And, in fact, isn't it a good idea for employers and companies to tell their employees that just because something doesn't have a label, that doesn't mean it's not sensitive?

A.   Yes, it's a good idea to do that if you also couple it with the kind of training and communication that I talked about so as to minimize those circumstances.  Yes.

Q.   Isn't it also a good idea for companies to explain to their employees that the company is depending on the employees to exercise their good judgment and common sense when it comes to taking confidential information outside the company?

A.   Well, yes, of course.  It's always a good idea to do that, as long as you're also doing the things that I described earlier.

Q.   You and Ms. Krsulich also discussed document -- document markings, and one of the things you mentioned about document markings was that they're helpful to avoid confusion; right?

A.   Yes, that's one of the advantages of them.

Q.   You said, for instance, if there's no marking on a

document, it may be hard for someone to tell the sensitivity of the information in the document; right?

**A.** Yes, particularly, as I said, the information within the document that might be sensitive. If you have no indication on the face of the document that there's something in there that's sensitive, it becomes more difficult.

**Q.** You'd agree, though -- let's go back to our software engineer example -- that a software engineer looking at a technical engineering document is less likely to be confused by the lack of a marking. We can agree on that; yes?

**A.** Well, that's slightly different than the question you asked before; and that will depend -- whether there was any difference in confusion will depend, in large part, on whether the kind of information -- engineering information in the document is the sort that that engineer is familiar with or not. There's a lot of different kinds, and so it depends.

Will they -- will they be, perhaps, more likely to be in the ballpark than someone who's in the Marketing Department? Maybe. But it may -- it may appear to one engineer to be gibberish. It's just -- it depends on what their level of familiarity is with the information and the kind of information in the document.

**Q.** And so for an engineer who's looking at an engineering document and it looks like gibberish, a marking might be useful for that person who's trying to do the right thing and treat

that document appropriately; correct?

**A.** Marking is always useful -- that's the point I was trying to make -- for everyone as a reminder, even if you are really familiar with what's in the document.

**Q.** Well, but markings are not helpful if someone is intentionally trying to steal confidential information from the company?

**A.** It's been -- it's been my experience that marking is helpful in all measures of trying to maintain control over information. I can't speculate about what an individual with malevolent intent, you know, might or might not do; but I can say that when companies are vigilant about the kinds of practices that I've talked about, they just don't have anywhere near the level of information loss that others who are not as careful experience. That's just been --

**Q.** Most information loss comes from mistakes; right? Employees acting in good faith who just make a mistake about the sensitivity of something?

**A.** Yes, that's fair.

**Q.** And markings are useful for employees who are acting in good faith, trying to do the right thing?

**A.** Well, I -- you know, when I talk about this subject with companies, I take the position and have expressed that markings that are prominent and get across to people what the sensitivity is of the information are effective for all actors;

and -- because, you know, even -- even people who don't want to play by the rules, if that's what you're talking about, they're sometimes, you know, put off by seeing that label on a document.

And so, I mean, we can't ever know for sure what might not have happened if we had had a label on a document, but I think the experience that we've had shows that across the board, companies that do consistent, careful labeling are better able to hold on to their information.

Q.   I think my question was a lot simpler than that, Mr. Pooley.  It was --

A.   I'm sorry.

Q.   It was:  Markings help employees who are acting in good faith, who aren't trying to steal -- they want to follow the rules -- markings help those employees understand which documents are sensitive and which are not; right?

A.   They certainly do help those employees.  I just -- not exclusively them, though.

Q.   And for an employee who is not trying to follow the rules and who is interested in stealing confidential information, markings are not going to be effective for that employee?

A.   I don't know.  I can't speculate about that.  That's what I was trying to tell you earlier.  I can't go into the heads of those kinds of people that are thinking that way.

But I have consistently advised the companies that I've

been working with that markings help across the board, because you want everyone, before they deal with a document, to have a clear indication of what it is that the company expects around that document.

So I don't know how else to be clear about that.

Q.   You and Ms. Krsulich discussed access restrictions, and I'd like to ask you a little bit about that.

Restricting access to information in a company makes it more difficult -- I think you said it was annoying; right?

A.   I said almost all security restrictions or techniques come with some inconvenience, and some of them can be annoying.  I mean, I found dual-factor authentication to be annoying when I first experienced it, so...

THE COURT:  You don't still find it to be annoying?

THE WITNESS:  I still -- yes, Your Honor, I still do.

THE COURT:  Okay.

THE WITNESS:  I still do.

THE COURT:  I don't want there to be any misimpression.

(Laughter.)

THE WITNESS:  Yeah.  Yeah, I haven't gotten to that stage yet.

BY MR. BOOME:

Q.   No argument from me there, Mr. Pooley.

A.   Yeah.

**Q.**  So stricter controls on access make things less efficient and less productive, generally; is that accurate?

**A.**  They can, but they don't necessarily.

You can -- there are many things you can do that do not affect efficiency, but occasionally they do, and then it becomes a matter of the cost-benefit analysis.

**Q.**  Because that's what you and Ms. Krsulich discussed -- right? -- are the trade-offs between access and control?

**A.**  They're -- at a high level, you can look at it that way, that things that give you more control in most organizations result in restricted access of some sort.

**Q.**  And so it's for the managers of the company to balance those trade-offs between locking things down more and potentially restricting innovation and productivity versus having more control over the information.  That's the challenge for managers; right?

**A.**  At a general level, that's exactly right, yes.

**Q.**  Broad access to a given document or a set of documents doesn't necessarily mean that those documents are less sensitive.  Would you agree with that?

**A.**  Not necessarily because, again, the company makes a choice; and if it gives -- a company can choose to give broad access to a document or set of documents that are very sensitive.  It's up to the company.  It's just how much risk is it going to take.

**Q.**   Okay.   So I'm going to ask one more time because I wasn't quite sure what your answer was.

I asked if broad access -- broad access to a document, it doesn't necessarily mean that the document is less sensitive; right?

**A.**   And I answered your question not necessarily, but it's up -- it's up to the company what it wants to -- how much it wants to control a given document or not.   And you can have a document with very sensitive information that the company makes broadly available.   That's a choice.

**Q.**   For instance, a document describing information about a product that is just a brand-new idea, that document, for instance, might be more tightly restricted to a smaller group of people.   Do you agree?

**A.**   It might be or it might not.   I mean, you have to have more information.   But typically, at the birth of an idea in an organization, there's a small group that -- relatively small group that knows about it; and depending on a whole slew of factors, maybe nobody else knows about it for a long period of time, maybe a whole bunch of people find out about it quickly. It depends on the information flows within the company.

**Q.**   And as that idea gets closer and closer to being deployed in the world as a product, naturally the circle of people who need access to that information is going to grow wider.   Would you agree with that, Mr. Pooley?

**A.**    Sometimes.  Certainly, the groups of people that will need access will change over time because you have different stages in the development of a product.  And so, again, speaking, you know, very generally, there might be a handoff from one group to another, and the next group that has the product might work on aspects of it that the first group didn't know anything about and doesn't need to.

But if you're adding up all the people sequentially that get access to the information, then necessarily, of course, that number grows over time.

**Q.**    And if a product, say a piece of technology, ends up being deployed around the world and needs a large group of people to make it work, to keep it running, to improve performance and innovate, the circle could get even larger; right?

**A.**    It could, but it depends on what all those people are doing around the world and what information they need to have about the product in order to improve it or service it. There's just a huge amount of variation there.

**Q.**    You agree it could get larger?  I think that was a "yes."

**A.**    Of course it could get larger, sure.

**Q.**    And you would agree also that if that product is owned by a particular company, it doesn't make it any less secret or valuable just because there's more people with access now?

**A.**    It only means there's more risk.

**Q.**    You mentioned also, Mr. Pooley, with Ms. Krsulich, you

discussed levels of access developed by a particular unit within a company.  Do you recall that portion of your discussion with Ms. Krsulich?

A.   I think so.

Q.   And isn't it true, Mr. Pooley, that you believe that giving employees some level of ownership and agency in the data protection program of a company is a good thing and can lead to better security?

A.   Absolutely.  It's a part of -- a really good training program does that, as I've described.

Q.   So if a particular unit within a technology company that deals with a certain aspect of the company's technology thinks it's best for them to develop a complimentary access control system, that would be one manifestation of giving greater agency and control over employees to participate in the data protection process; right?

A.   I just want to get clear with your question because you used "access control system."  Are you saying the data classification system --

Q.   Yes.

A.   -- that --

Q.   Yes.

A.   -- results in labeling?

Q.   Yes.

A.   Well, no.  There -- if -- as I said during my other

examination, if that group kind of exists on its own and doesn't have a lot of cross-communication with other groups, sure, that kind of system can work; but to the extent that they deal at all with other groups, you don't want documents going around with labels on them that other groups don't know about. That's not consistent.

Q.   But you would expect a person who is a member of that group to understand the markings for that group; right?  We're not talking about the rest of the company or the Marketing Department.  We're talking about somebody working in that group.

A.   Potentially.  It depends on what the messaging is from the company generally about its other systems of classification. So it's a little hard to give a definite answer there.  But I suspect they would know more -- the people inside the group would know more about that unique system than people outside the group.

Q.   I think what I'm getting at is:  You believe it's true, Mr. Pooley, don't you, that if a company designs its systems in a way that distributes authority to determine what is confidential and how to protect it, employees are more likely to be engaged and effective in that process?

A.   Yes.  As long as they have the training and communication that I talked about earlier, yes.

Q.   And regarding access restrictions, isn't it true,

Mr. Pooley, that even if information isn't immediately required for a certain task, that doesn't mean that that information shouldn't be widely accessible?

A.   I think that, as a matter of logic, that's true.  If it may be needed later on a broader scale, then that can happen.

Q.   And, generally speaking, don't you think it's good advice for companies that more restrictive access controls are not always better?

A.   I think I'd agree that more restrictive access controls are not always better, but that's a pretty extreme statement. But, yes, that's true.

Q.   A pretty extreme statement?

A.   Anything that uses the word "always," it makes it easier to agree with that.  It's not always better because every situation is unique and every company is unique, and you need to balance, as we've talked about here, the inconvenience and cost of risk reduction with the positive effects of it.

Q.   Mr. Pooley, don't you also believe and haven't you also advised companies that trusting people with broader information can improve performance?

A.   Yes.  Again, so long as they have the appropriate training and understanding, yes, absolutely.

Q.   I would like to ask you now, Mr. Pooley, about the data loss prevention topic that you discussed with Ms. Krsulich.

And, respectfully speaking, your expertise does not

include the implementation of a digital data loss prevention system; correct?

A.   That's correct.  I depend -- even when I was at WIPO, I depended on the IT people that worked in my group to do that. I never put my hands on a keyboard to code something.

Q.   But you would agree that a data loss prevention tool -- right? -- the one that raises flags like you said --

A.   Yeah.

Q.   -- is usually part of a broader system for threat detection; right?

A.   Typically is, I think that's right.

Q.   And your expertise, you don't advise your clients on how they should use automated threat detection tools, like algorithmic threat detection tools, to monitor their data loss prevention systems?

A.   Only at a very high level, where I suggest that they explore that with their chief information security officer or others about what's available that -- in behavior analytics that will allow them to, you know, automate their view of what's happening in the enterprise.

Q.   So your advice would be that companies should consider using a system like this, but you're not in the weeds, telling them which dials to turn where on the automated system; correct?

A.   That's right.  That's right.

Q.   At a general level, Mr. Pooley, you would agree that there's no -- there's no check-the-box checklist system for data protection at a modern technology company; right?

A.   That's correct.  It's all contextual.

Q.   Every company is different and has different needs and priorities; right?

A.   Generally speaking, that's right.

Q.   And the people who are in the best position to strike the balance that you've described during your testimony are the people who are closest to the technology and the workforce; right?

A.   Those are the ones that have to make the decision because they're running the company.

Q.   Because they know what technology they have and they know the people they have; right?

A.   That gives them a -- you know, a comprehensive view of the organization.  So my contribution to them is just understanding the information security bits that they may not appreciate as well.

Q.   But we can agree that the managers and the subject-matter experts in the technology are in the best position to strike the balance that's best for the company; right?

A.   Yes, those are the people that I talk to, indeed.

          MR. BOOME:  Thank you, Mr. Pooley.

          THE COURT:  Okay.  Any redirect?

MS. KRSULICH:  Yes, Your Honor, briefly.

## REDIRECT EXAMINATION

BY MS. KRSULICH:

Q.   Mr. Pooley, what are the benefits to a company of dropping access to documents to people who no longer need that access?

A.   Can you say that again?  I'm sorry.

Q.   Sure.

What are the benefits to a company of dropping access to information to people who no longer need access to it?

A.   Aah.  Well, taking your question most generally, I think it reduces, obviously, the risk that attends that particular access, that person's access.

So most commonly, we see this when people leave an organization and they -- and their access to company systems is terminated by making their password and credentials inactive. So that's an example of one.  And so that approach has the effect at least of reducing that kind of risk.

Q.   And Mr. Boome asked you about software engineers and how you would expect them to handle documents.

What are some considerations that you advise companies about for software engineers and handling of documents?

A.   Well, the advice I give is really the same as what I indicated before, that the company needs to be very thoughtful, careful about this, understanding what the risks are and, with respect to software engineers, being keen to the fact that they

tend to move around and the information that they know, much of it is -- they may consider to be their general skill or knowledge.  And so you have to be really careful if you care about what they take with them when they go to their next job.

Q.   Mr. Boome also suggested that labeling might be ineffective to someone intent on stealing a document.

Would labeling be useful for someone who lacks that intent?

A.   I think labeling is useful, as I said, across the board. I try not to speculate about intent.

Q.   And it is possible an employee would be confused about whether something is confidential or not if it doesn't have an accurate label on it?

A.   Oh, indeed.  I mean, that's one of the reasons why we -- that's one of the main reasons why companies -- I suggest companies work hard at consistency and enforcement on labeling so that we eliminate, to the extent we can, the possibility of confusion.

Q.   Is it possible that engineers may become desensitized to the confidentiality of documents that they deal with all day?

A.   Sure, if they -- if they keep seeing the same kind of information.  And, again, where this becomes a real problem is they see documents that are designated and they look at the information -- they have a label on them.  They look at the information and they think, "Well, this is not really that

sensitive," and so they start becoming a little cynical about it.  And then they see documents without labels on them, and they look at the two documents and it looks like the same thing to them, and all of a sudden their respect for the integrity of the system goes way down.  And that's something we try -- we try to avoid when we're managing the workforce on confidentiality.

Q.    Mr. Pooley, people hire you because organizations don't always do a good job; right?

A.    I guess I might say they hire me because they realize they might be able to do a better job than what they're doing.

        MS. KRSULICH:  Thank you.

        MR. BOOME:  Your Honor, can we approach briefly?

        THE COURT:  Sure.  Do you want to -- maybe -- I mean, now is a good time to take a break.  Why don't we just take our morning break, and then you don't have to listen to all the static.

        So we'll take a 15-minute break, resume at five minutes after the hour.

        THE COURTROOM DEPUTY:  All rise.

    (Proceedings were heard out of the presence of the jury.)

        THE COURT:  Okay.  You can step down.

        Do you want the witness out or in --

        MR. BOOME:  Yes, please.

        THE COURT:  -- for this discussion?

MR. BOOME:  I think out would be better.

THE COURT:  Okay.  Mr. Pooley, if you could leave the courtroom and be back and ready to get on the stand five minutes after the hour.  Okay?

THE WITNESS:  Yes, Your Honor.  Thank you.

THE COURT:  Thank you.

(Witness exits the courtroom.)

THE COURTROOM DEPUTY:  Please be seated.

MR. BOOME:  So, Your Honor --

THE COURT:  Hold on one sec.

(Pause in proceedings.)

THE COURT:  Okay.

MR. BOOME:  So I wanted to preview and ask permission to pursue a line of recross about the new testimony that Mr. Pooley offered for the first time on redirect about software engineers taking things to the next job, engineers becoming desensitized to certain things and losing respect for the integrity of the system, et cetera, et cetera.

THE COURT:  Did he -- the part about taking things to the next job, I missed that.  Did he say that also?

MR. BOOME:  Yes.

THE COURT:  Okay.  Go ahead.

MR. BOOME:  So what I would like to ask is, if I could ask Your Honor to turn to Tab Number 3 in the binder, which is Mr. Pooley's treatise.  It's towards the end.  I'm sorry.  The

treatise pages are not sequentially numbered, so it's Section 9.06 called "The Employee's Perspective."

THE COURT:  One second.  So let me make sure I've got the right binder here.

Okay.  This is --

MR. BOOME:  It says "Pooley Exhibits."

THE COURT:  Okay.  And you said Tab 3?

MR. BOOME:  Tab 3, towards the end.

THE COURT:  I don't have anything in Tab 3.

MR. BOOME:  That's not ideal.

THE COURT:  It goes straight to Tab 8.

MR. BOOME:  Hmm.  I'll hand up my copy, Your Honor.

THE COURT:  Okay.

MR. BOOME:  Sorry about that.

(Document handed up to the Court.)

MR. BOOME:  Starting at the top in the highlighted section, I'd like to ask Mr. Pooley about --

MS. KRSULICH:  Sorry.  What page, Counsel?

MR. BOOME:  It's page 5.

MS. KRSULICH:  Page 5.

MR. BOOME:  [As read]:

"Perhaps the most damning and surprisingly common evidence against departing employees consists of their downloading large amounts of data from the company's systems in the period just before their

resignation.  Frequently, the effort extends to areas outside the employee's direct responsibilities; but even if nominally authorized to have access, pulling down an unusually large collection of documents will support an inference of improper intentions.  Of course, the inference is even stronger if the information has been transferred to the employee's home computer or cloud storage account."

This is necessary to counter Mr. Pooley's suggestion that this is all totally normal, software employees take things to the next job, they become desensitized, which is implying and suggesting that Mr. Ding's conduct here is all part of an innocent mistake.

And Mr. Pooley has written down in his treatise that the types of behaviors that -- these types of behaviors are not indicative of somebody just innocently taking things to the next job but, instead, having a different intent.

**THE COURT:**  All right.  Hold on.  Let me --

**MR. BOOME:**  It's at the top of the page.

**THE COURT:**  I'd be interested in reading the previous page for context.  Do you have the previous page?

**MR. BOOME:**  Yes.

(Document handed up to the Court.)

**THE COURT:**  Okay.  Ms. Krsulich, what's your --

**MS. KRSULICH:**  Yes.  So --

THE COURT:  -- reaction to this?

MS. KRSULICH:  -- redirect was in response to Mr. Boome's questions regarding how engineers would be expected to evaluate a document, and so redirect was targeted to that specific focus about how engineers would be expected to handle documents that they see every day, and I was not -- you know, it was just in response to Mr. Boome's question.

The witness stated that he does not opine on intent and that that would be speculative.  So this line of questioning goes to that issue of intent, and I think it is outside the bounds of redirect.

It is also not about how employees handle -- like, when they're viewing documents, how they would handle those documents.  It's about downloading, which is a different behavior.

THE COURT:  Yeah.  I mean, I think this is a close question.  And obviously, there is -- it's sort of gotten past the 401 hurdle, given what the witness said on redirect.

And the question is whether -- in my mind, the question is whether it should still be precluded under Rule 403 because it opens up a can of worms and all of a sudden puts this witness in the position of kind of endorsing the Government's theory of intent when he has said that he's not here to testify about intent.

I think -- as you can see, I'm kind of thinking out

loud; right?

MS. KRSULICH: Yes.

THE COURT: And I think that this is an example of the benefit of the more limited approach to the role of the expert witness in these trials that I tend to take and that I discussed on the day of Mr. Pooley's *Daubert* testimony.

I think, obviously, if Mr. Pooley were testifying about what happened at Google, that would make this proposed recross even more fair game; right? Because Mr. Pooley would have gotten much closer to the ultimate facts in the case.

And this statement in his treatise is kind of contrary to his characterization of the ultimate facts in this case that he gave during his -- in his expert disclosure and his *Daubert* testimony.

But having limited him so strictly to sort of generalizations about best practices in protecting data, I think that allowing recross on this statement would create a significant 403 problem, and so I'm not going to allow it.

I'll hand it back.

MR. BOOME: Okay. Thank you, Your Honor. I'm glad I asked in that case, and I won't have any recross.

THE COURT: Okay. And I do -- for what it's worth, I do think it's a very close question. I think it's certainly an appropriate thing to ask about.

All right. So no further recross for you?

MR. BOOME:  No, Your Honor.

THE COURT:  Okay.  So why don't you have Dr. Sanchez ready to resume.

Why don't we take a break until ten minutes after, just so that staff can have a proper break as well.

MS. KRSULICH:  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 11:01 a.m.)

(Proceedings resumed at 11:12 a.m.)

(Proceedings were heard out of the presence of the jury.)

THE COURT:  I was going to offer to the Government, if you want me to tell the jury to disregard that final bit of testimony regarding the mentality of engineers towards documents as they're -- one minute -- and you can think about this too, but if you want -- you know, I think it would probably be appropriate to tell the jury to disregard the testimony about engineers becoming cynical about the confidentiality labels or at least the part about engineers taking documents to other jobs.

MR. BOOME:  We agree, Your Honor, and we'd request that instruction.  Thank you.

THE COURT:  Okay.

MS. KRSULICH:  We don't think that instruction is necessary, Your Honor.  It just opens the door -- because they opened the door to it on cross.

THE COURT:  I don't think they opened the door to the concept of engineers taking documents to their next jobs and the intentions associated with that.  So I'm going to instruct the jury to disregard that last bit of testimony.

MS. KRSULICH:  Very well, Your Honor.

THE COURT:  Okay.

(Proceedings were heard in the presence of the jury.)

THE COURT:  Okay.  Welcome back.

As you can see, Mr. Pooley is no longer on the stand. We're resuming with Dr. Sanchez.  The Government did not have any recross of Mr. Pooley, but I am going to instruct you to disregard a small portion of Mr. Pooley's testimony.

At the very end of redirect, Mr. Pooley gave some testimony about engineers taking documents to their next job and intentions associated with that.  That is beyond the scope of his expertise and was not an appropriate thing for him to testify about, so I'm going to instruct you to disregard that last bit of testimony.

Okay.  And with that, we can resume with the cross-examination of Dr. Sanchez.

**DANIEL SANCHEZ**, called as a witness for the Government, having been previously duly sworn, testified further as follows:

\\\

\\\

<u>**CROSS-EXAMINATION**</u>    (resumed)

**BY MS. WALSH:**

**Q.**    Good morning, Dr. Sanchez.

**A.**    Good morning, Ms. Walsh.

         **MS. WALSH:**  Can we pull up Exhibit 1169, please, and go to page 2.

**BY MS. WALSH:**

**Q.**    Dr. Sanchez, if you scroll through the first few pages of this document, do you see references to open-source software?

**A.**    (Witness examines document.)  Yes.

**Q.**    And what would those be?

**A.**    Pytorch and terraform.

**Q.**    Anything else?

**A.**    There is -- there's NCCL below, which the interface of NCCL is open source but implementation aspects of it are not.

**Q.**    Okay.  And if you scroll through the next few pages, do you see additional references to open-source software?

**A.**    (Witness examines document.)  Not -- okay.  That's the next page.  So it could be that GitHub repository could be open-source software.

     NeMo is a model from Nvidia.

     This comment that says github.com blah-blah-blah, it says "an open-source Jira."  I'm not familiar with that particular software, but it mentions the term "open source."

**Q.**    Okay.  And the next few pages, do you see any references

to open-source software?

A.    (Witness examines document.)  I mean, GitLab can be used to host open-source repositories, but that's the one reference that I can see there.  I don't -- I'm not familiar with the other software mentioned here.  I couldn't tell you if it's open source.

Q.    Dr. Sanchez, as part of forming your opinions, you spoke with a couple of Google engineers; correct?

A.    Correct.

Q.    And that was Mr. Prashant Chandra; correct?

A.    Yes.

Q.    One of them.

And Mr. Alireza Ghaffarkhah; is that correct?

A.    Yes.

Q.    In the course of forming your opinions, did you review what's been referred to as the source documents for the alleged trade secret documents?

A.    No.

MS. WALSH:  And I think we're getting into the under-seal portion.

THE COURT:  Okay.  So, again, as I've instructed you a couple of times, we are sealing portions of Dr. Sanchez's testimony because he gets into the detail of documents that the Government contends are trade secrets.

You should not read anything into the decision to seal

the courtroom other than the Government contends that his testimony, if given in open court, would reveal trade secrets; but ultimately, what is a trade secret is entirely up to you.

So we will now seal the courtroom and ask anybody who's not on either side of the case to leave the courtroom.

We anticipate that this portion will be done by the lunch break; and so after the lunch break, which usually is around at 1:15, we'll be back in open court unless the Government has any redirect about stuff that's under seal.

So is everybody in the courtroom associated with either side?

**MR. BOOME:** Yes.

**MS. PRIEDEMAN:** Yes.

**THE COURT:** Yes?

Okay. You can proceed, and this portion of the transcript will be under seal.

(Pages 1487 through 1522 were placed under seal by Order of the Court and bound separately.)

(The following proceedings were heard in open court.)

THE COURT:  We're good.

MS. PRIEDEMAN:  Okay.

BY MS. PRIEDEMAN:

Q.   All right.  Dr. Sanchez, so I want to go back a little bit to the beginning of your testimony with Ms. Walsh.  She asked you some questions about whether or not you had worked at large companies that had built data centers or that have developed chips.

I want to ask you more broadly, have you -- in your role as a professor at MIT, have you worked with large companies that are building data centers or developing chips?

A.   Yes.

Q.   Can you talk a little bit more about that?

A.   Yes.  Because the technologies that we develop in my research group are useful to companies, both companies that build and operate data centers as well as companies that build chips, much of the work that we do is, you know, in consultation or at least we're talking with companies.  They're aware of the work we do.  In some cases, they financially support the work we do.

And so we have research projects that are motivated by the specific needs and problems that industry is facing.

Q.   And why is it in your field that you work so closely with industry?

**A.** Well, industry is great at finding good research problems because, as I discussed at the beginning of my testimony, computer systems have evolved very quickly and so the problems that they solve also evolve -- our understanding of these systems and how to build them better evolves.

And so companies are always interested in finding new techniques and useful techniques to build better products.

**Q.** All right. And you mentioned -- I think you just mentioned again now that sometimes you get research funding from companies in the industry, and you mentioned on your cross-examination that your lab has received funding from Google.

Have you received funding from other companies as well?

**A.** Yes.

**Q.** What companies?

**A.** Let's see, there are quite a lot of them. So we have funding -- if you look specifically at, you know, companies that are building chips, we get some funding through the Semiconductor Research Corporation that involves many companies that build chips. Those include AMD, ARM, Intel, as well as others.

We have projects with companies, including Samsung, Nvidia, Google, as I mentioned before, also Amazon, which also is a big player in this space, Jane Street and others.

**Q.** And when your lab receives money, where does that money

go?

**A.**   So that money is given to MIT, and it funds, for example -- I mean, mainly, it's dedicated to funding students, you know, their stipends and tuition.  Some of it is also used for travel and buying equipment.

**Q.**   When you say it goes to funding students, do you mean Ph.D. students?

**A.**   Ph.D. students, yes.

**Q.**   Dr. Sanchez, have you ever testified as an expert witness before?

**A.**   No.

**Q.**   All right.  So, Dr. Sanchez, when you were speaking with Ms. Walsh, you talked a little bit about how Google uses standard PCI connections for its host systems.

**A.**   Yes.

**Q.**   Do you remember we talked about one exhibit, Exhibit 358 from Category 1, which is called "PFC - Host Communication"?

**A.**   Yes.

**Q.**   Does that document include information beyond information about the standard protocols that Google uses for its host?

**A.**   Yes.  So the connection, the protocol that is used, basically how you electrically plug in a board or a peripheral component to a host system, that is standard.

However, on top of that standard, you can implement a wide range of functionality.  And so that document is -- discusses

the specific operations that are implemented on top of that standard.

Q.   All right.  And Ms. Walsh also asked you, I think, a couple of different times about whether or not the documents that were taken included silicon fabrication process information and other information that's needed to send it to the actual manufacturer.  Do you remember that?

A.   Yes.

MS. PRIEDEMAN:  Actually, Ms. Hernandez, can you please pull up the demonstrative for Dr. Sanchez, please.

Can you go to the design phase slides, please.

All right.  So, go back one.  Thanks.

BY MS. PRIEDEMAN:

Q.   All right.  Dr. Sanchez, so the silicon fabrication process information, where does that fit into the different phases of chip design?

A.   It fits mainly in physical design.  I will say that you need to have an understanding of, for example, how big the chip is going to be and roughly how much each component is going -- you know, how large it is going to be, all the way up to architectural design that helps design better systems.

However, we generally use models about how large each component is going to be to get good estimates before the physical design phase.  So, for example, how large each memory is going to be is something that we can estimate for different

processes, you know, just with different tools or with tools that are provided by the particular silicon fab, the manufacturer.

Q.   Can you talk a little bit about, Dr. Sanchez, big picture, how much work goes into the design of a chip before it gets to the silicon fabrication process?

A.   Yes.  It's generally years of work.  And, again, this happens over multiple generations, and those generations of products are actually built over different fabrication processes.  So while the silicon fabrication process makes some differences, think of these as -- sorry.

THE COURT:  I think what Dr. Sanchez is signaling to us is that now is a good time for lunch.

So we'll break until 1:15.  Remember to bring your notebooks and not to have discussions or do any research about the case.

We'll see you at 1:15.

THE COURTROOM DEPUTY:  All rise.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Okay.  You can step down.

See you back at 1:15.

Anything to discuss?

MS. PRIEDEMAN:  Not from the Government, Your Honor.

MS. WALSH:  No, Your Honor.

THE COURT:  So I guess you still need to have at least

that one Google witness ready to go this afternoon; right?

MS. PRIEDEMAN:  Yeah.  He's ready.

THE COURT:  Okay.  All right.  And you said that witness would take about two hours?

MS. PRIEDEMAN:  I think I said three hours, would be my estimate.

THE COURT:  Oh, okay.

THE COURTROOM DEPUTY:  Court is in recess.

(Luncheon recess taken at 12:27 p.m.)

**AFTERNOON SESSION**                                    **1:22 p.m.**

(Proceedings were heard in the presence of the jury.)

THE COURT:  Go ahead.

BY MS. PRIEDEMAN:

Q.   All right.  Dr. Sanchez, so we ended, we were talking about silicon fabrication process information.  And so I think I was about to ask the question, if you can please explain -- so you said that the information in the Category 1 trade secret documents doesn't include that silicon fabrication process information.

Can you explain how the information in Category 1 is valuable without that information?

A.   Yes.  So the silicon fabrication process determines the size of individual components, small electronic components like the transistors that we discussed before or the wires that connect those transistors.  And different technology processes

have different sizes.

But for many of the features that are discussed in these documents, that has -- I mean, those features translate across different processes.  For example, for a chip of a given physical size, a given amount of millimeters on each side or inches, with smaller transistors, you can fit more components.  But the design of each component is something that can be carried out across different technology processes, and architectural techniques are valuable across different technology processes.

Now, some -- when things change in size, sometimes different components change in different ways.  For example, memories might become smaller at a different rate than other types of logic; for example, the logic that performs operations.

And so those are some important considerations that affect the sizing of specific structures and things like that, but the actual techniques that are used can be used across a wide range of technology processes.

Q.   So even if someone didn't have the silicon fabrication process information, it would help them with the architectural design process.  Is that what you're saying?

A.   Absolutely.

Q.   And how much time would that save, roughly?

A.   I mean, again, it would -- because this phase takes years

SANCHEZ - REDIRECT / PRIEDEMAN

and is done across multiple product generations, that would be years of effort.

Q.   All right.  Dr. Sanchez, Ms. Walsh also asked you about whether or not some of the software documents contain source code, and you said they didn't contain source code.

Can you explain a little bit about the difference between the type of information that's contained in the software documents and source code, please.

A.   Yes.  So source code is the code that programmers write to implement a particular piece of software.  And so, for example, if you want to write a program that trains a machine learning model, that requires writing some code specifying precisely what operations need to be performed.

The information in the software categories, those are Categories 3, 5, and 7, concerns the design of this software. It's higher-level information than the source code.

But it is very important to understand that these programs are complex, and designing them, structuring them into multiple components, multiple modules, deciding what functionality, what particular responsibilities each module has, how those modules interact with each other, that in and of itself is valuable information that reduces the amount of time that it would take to implement this.

The other type of information that is highly valuable and that is present in these categories discusses techniques that

**SANCHEZ - REDIRECT / PRIEDEMAN**

Google has not disclosed before.  Examples include the ICI resilient slice, which, again, without that technique, without that information, a competitor might not even understand or identify that there is a problem or understand how -- what is a good solution to that problem.

And so even though a competitor would still need to write some source code to implement this technology, the amount of work is clearly reduced, as well as the risk of missing the problem and then just simply being unable to solve it, unable to address it.

**Q.**   Can you talk a little bit about, if a competitor had the information in the software categories and they wanted to create a program to create source code, what would that look like, and would they be able to do that?

**A.**   With the information in these categories?

**Q.**   Right.  What would it require to go from the design-level information in these categories to the source code that could actually implement a program?

**A.**   It would require this programmer or programmers to write the implementation of each of these components, but they would have to follow the specific -- I mean, the information here, that specifies the functionality of each component as well as how components interact, how they work together to implement particular functions.

And so that information is something that clearly saves

design time.  It is often the case with software that it takes multiple iterations, multiple tries to get -- to find the right design.  And so that iteration and those sort of failed attempts would just not necessarily -- you know, a competitor would not incur that extra time because it could adopt this design that Google follows.

Q.   I mean, you're talking about the design efforts.  That's before you even get to writing the source code; right?

A.   Right.  But that's essentially what I am saying, is that this design information facilitates writing the source code.

Q.   All right.  I want to move on to the last topic.  I want to talk a little bit about the Zhisuan documents that Ms. Walsh covered with you.

        MS. PRIEDEMAN:  Ms. Hernandez, can you please pull up Exhibit 1143, page 16.

BY MS. PRIEDEMAN:

Q.   All right, Dr. Sanchez.  So Ms. Walsh asked you about this slide in particular, and she asked you whether anything in this slide suggests that Zhisuan would be developing machine learning hardware, and you said no, but your answer would be different based on other slides or other information.

     Can you explain how your answer would be different if you were answering it based on all the documents you saw about Zhisuan, for example?

A.   Yes.  Just within this document, as we saw yesterday,

there are other slides that discuss the development of a model as a service platform that comprises on the order or about 10,000 GPUs.  That is discussing hardware.  There were particular points that discussed provisioning, networking, hardware, and that are specific to the hardware organization of this -- of this platform.

So even though this particular slide does not talk about hardware, considering this document, there's plenty of information that goes into the goals of Zhisuan.

There are other documents beyond this slide deck that also include the stated goals of creating an AI platform, again, with similar features, with thousands of servers, tens of thousands of GPUs, with high-performance communication, with the use of optical circuit switching, both to offer it to other companies and for those companies to enable them to train and use their own machine learning models, as well as for Zhisuan to create models internally and then offer those machine learning models to other companies so that they can build AI applications or use those models themselves.

Q.    Did you see references to Zhisuan becoming involved in the research and development of chips?

A.    Yes.

MS. PRIEDEMAN:  No further questions, Your Honor.

THE COURT:  Okay.  Any recross?

\\\

## RECROSS-EXAMINATION

BY MS. WALSH:

Q.   Good afternoon, Dr. Sanchez.

A.   Good afternoon.

Q.   Going back to the code that you reviewed from GitHub, that did not contain any code that related to hardware; correct?

A.   That code runs on hardware, but it is not related to using a large-scale platform like the one I just described or the one that is described in these materials.

Q.   And so the code that you reviewed from GitHub did not relate to running a model as a service; correct?

A.   Correct.

Q.   And, Dr. Sanchez, the information in patents is public; correct?

A.   Correct.

Q.   And patents have to contain enough information in them to enable an engineer, for example, to make and use the inventions that are disclosed in the patent; correct?

A.   To make the invention, to practice the invention, but not to replicate products that use that invention.  So that is an important distinction.

Q.   But the patent must contain enough information to enable engineers to make and use the inventions that's disclosed in a patent; correct?

A.   But only the specific invention, yes.

Q.   And so to the extent that one of the alleged trade secret documents contained an imple- -- excuse me -- implementation of what's publicly disclosed in a patent, the principles underlying that implementation have also been disclosed in the public patent; correct?

A.   The -- what is being described in the documents in these categories concerns many different inventions and their combination, and that is not contained in any of these individual patents or even in combinations of these patents.

Q.   Dr. Sanchez, so my question was:  To the extent that one of the alleged trade secret documents contains an implementation of what is publicly disclosed in a patent, the principles underlying that implementation have also been disclosed in a patent; correct?

A.   That question is very hard to answer because you're describing different things.  Could you be more specific?

Q.   So if one of the alleged trade secret documents contains an implementation that is publicly disclosed in a patent, then that patent contains the principles that underlie that disclosure in the trade secret document; correct?

A.   Your question is too general.  Right?  This is not a question that I can answer in a general sense.  Let me just give you an example for why.

     When you say "an implementation" -- right? -- the implementation that is being discussed in the patents, even of

that specific technique, has substantial differences with --
even if you look at that technique in isolation -- right? -- in
each of these trade secret documents.

And so, you know, we can nitpick this; but even if you
slice and dice this -- the information that is in these
trade -- in these documents in these categories, you are
looking at implementations that have differences.

Now, you're asking about the principles.  Obviously, there
are some principles in general within each of those individual
techniques that, yes, are present in the patent as well.

**Q.**    But, Dr. Sanchez, the Patent Office wouldn't have granted
a patent if it didn't give enough information to an engineer to
make and use whatever invention is disclosed in the patent;
correct?

**A.**    Again, that implementation of the invention does not need
to be the same or even, you know, substantially similar to the
implementation of the invention that is used in products.

And I will note that patents often, as is the case in
these ones, include what they refer to as multiple embodiments
or variants.  And so the nature of a patent is that inventions
are described in broad terms so as to maximally cover multiple
implementations of the invention.

**Q.**    Dr. Sanchez, my question was:  The U.S. Patent Office
would not grant a patent if it did not contain enough
information to enable an engineer to make and use the invention

that's disclosed in the patent; correct?

**A.**   Correct.

          **MS. WALSH:**  Thank you, Dr. Sanchez.

          **THE COURT:**  Okay.  You can step down.

                    (Witness excused.)

          **THE COURT:**  The Government can call its next witness.

          **MS. PRIEDEMAN:**  The Government calls Prashant Chandra.

   (Witness enters the courtroom and steps forward to be sworn.)

          **THE COURTROOM DEPUTY:**  Please raise your right hand.

                    **PRASHANT CHANDRA**,

called as a witness for the Government, having been duly sworn,

testified as follows:

          **THE WITNESS:**  I do.

          **THE COURTROOM DEPUTY:**  Thank you.

          Please state and spell your full name for the record.

          **THE WITNESS:**  Prashant Chandra.

          **THE COURTROOM DEPUTY:**  Pull that mic down, please, and

spell your name.

          **THE WITNESS:**  P-r-a-s-h-a-n-t.  Last name

C-h-a-n-d-r-a.

                    **DIRECT EXAMINATION**

BY MS. PRIEDEMAN:

**Q.**   Good afternoon, Dr. Chandra.

**A.**   Hello.

**Q.**   Can you pull the microphone a little closer to you?  I can

tell already that you need to speak up.

Q.    Where are you currently employed?

A.    I'm employed by Google.

Q.    And how long have you worked at Google?

A.    11 years.

Q.    What is your current position at Google?

A.    My current title is distinguished engineer.

Q.    How -- how many levels of engineers are there at Google?

A.    There are level -- ten levels of engineers.  Distinguished engineer is Level 9.

Q.    So you're a Level 9 engineer; is that right?

A.    Yeah.

Q.    Just briefly, can you tell the members of the jury what your educational background is?

A.    I have a Ph.D. in computer engineering from Carnegie Mellon University.

Prior to that, I got my master's, also in computer engineering, from West Virginia University.

And prior to that, I did my undergrad in electronics engineering back in India in Bangalore University.

Q.    And you said you've been at Google for the last 11 years. Can you talk a little bit about what you did and where you worked prior to joining Google?

A.    Prior to joining Google, I spent about 12 years at Intel right after I did my Ph.D., and then I left Intel and went to a

start-up called Calxeda Systems for about 15 months; and then after that, I joined Google.

Q.   All right.  And let's talk a little bit about what your role is at Google.  Can you -- you've been there for the last 11 years.  Can you just briefly describe the different roles you've held at Google?

A.   Sure.  So I started off as a senior staff software engineer.  Initially, I worked in Google Cloud as a software engineer, helping to develop products in Google Cloud networking.

Then I worked as a -- what is called as a tech lead, building infrastructure for Google Cloud.  And then I was -- in that role, I became a principal engineer.

And then after that, I started the SmartNIC development at Google and led the development of the Diorite SmartNIC.  For about four to five years, I was in that role, leading Google's SmartNIC development.

Then after that, more recently I've taken on a role leading Google's machine learning systems development, specifically the TPU systems.  I have been in this current role for about two years.

Q.   And how many people are currently in your reporting chain or your organization, Dr. Chandra?

A.   So the extended team that works on building Google's machine learning infrastructure is fairly large.  I would say

around 10,000 engineers overall.

Q.   And you're the lead of that organization?

A.   I lead the systems development, and that -- again, the cross-functional team there is also several thousand engineers, yes.

Q.   Dr. Chandra, do you know the defendant Linwei Ding?

A.   I don't.

Q.   Did you ever work with him?

A.   No, not to my knowledge.  I've never had a meeting with him.

Q.   All right.  Dr. Chandra, the jury has heard a lot about the trade secret documents that were taken in this case -- that were alleged to have been taken in this case.  I want to spend some time with you today talking about some of the -- what we've been calling the source documents, so the documents that the defendant used to create the alleged trade secret documents.

But before we do that -- I'm going to start with Category 1; but before we do that, can you just talk a little bit about how Google uses TPUs as part of its machine learning infrastructure?

A.   Sure.  So at Google, TPUs are used both internally for us to build our own applications and machine learning products that are offered as part of Google's own products; for example, Google Search.

Google TPUs are also used in Google Cloud.  We offer them as products in Google Cloud for external customers who want to use them to build their own machine learning products.

Q.    Dr. Chandra, does Google limit access within the company to information about its TPUs?

A.    Yes.

Q.    Can you talk a little bit about that?

A.    Yeah.  So I think -- so there are different levels of access control.  TPUs are especially considered sensitive information, given that it's in the machine learning domain and machine learning is such an important, you know, field with lot of investment in the industry.

So the most restrictive access control is called Deepsea Restricted.  It includes engineers who are actually building the TPUs themselves or they're involved indirectly building TPUs.

The next level up is Deepsea access, which is a slightly broader access control group that involves engineers who use TPUs or who build tools that allow other engineers to use TPUs. So that's the next level of access.

Q.    And can you talk a little bit about how someone would get access to one of those groups, what the process is?

A.    So the process is that you have to explicitly request access, and there is a membership group that you're to say, "okay.  I either need Deepsea Restricted access or Deepsea

access."

And then it goes through approval, and there are people who are chartered with reviewing the request and approving it. And once you're approved, then you get access to the group.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, can you please pull up Exhibit 777.

And if you could zoom in on the table up top.

BY MS. PRIEDEMAN:

Q.   So, Dr. Chandra, this is an exhibit that shows the alleged trade secret file on one side and then the source documents that relate to those trade secret documents on the other hand.

Have you reviewed this document previously?

A.   Yes.

Q.   All right.  So I want to -- first, can you explain what type of information is contained in Category 1?

A.   So Category 1 is basically the architecture specification of a TPU.  Within the TPU -- if you look at the TPU as a chip, there are several components within it.  For example, TensorCore is one component.  BarnaCore is another component. ICI, which stands for inter-chip interconnect, is another component.  So these documents are specific architecture specifications of those components.

Q.   All right.  So I want to look at some specific source documents in this chart.  Let's start with Exhibit 43, which is the TensorCore ISA for Pufferfish.

MS. PRIEDEMAN:  Can you pull that up.

Thank you, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   Do you recognize this document, Dr. Chandra?

A.   Yeah.

Q.   What is this?

A.   So this is the TensorCore instruction set architecture specification.  So this document describes what the instruction set architecture is, what are the various architectural state of the TensorCore, and what you can do with the TensorCore.

Q.   Can I ask you to speak a little more loudly and maybe a little bit closer to the microphone?

A.   Okay.

Q.   Thank you.

Okay.  So looking at Exhibit 43, this kind of looks like a website.  Can you talk about where this document is stored at Google?

A.   So we have a document storage system called G3 Docs, and most of the TPU specifications are written and stored in that G3 Doc system.

Q.   And if you look at Exhibit 43, there's a fish on top and it says "Pufferfish."  What is that reflecting?

A.   That's the logo for this particular generation of TPUs. We use a naming scheme called Deepsea, and every generation picks a specific fish.  So this happens to be Pufferfish.

Q.   Aah.   So that's why there's the code name Deepsea; is that right?

A.   Yeah.

Q.   All right.  So if you look on the left-hand side under the Pufferfish icon -- if you could zoom in, Ms. Hernandez -- do you see how it says "Overview," then "TensorCore," then "TensorCore ISA" is in blue, and then there's different components listed under there?  What is -- are those different links you can click on?

A.   Yeah.  Those are different links to the specifications of the corresponding components of the Pufferfish TPU chip.

Q.   And they're all housed on this kind of intranet page; is that right?

A.   That's right.  They are all in individual specifications in this G3 Doc system, yeah.

Q.   And so if you clicked on BarnaCore ISA, for example, would you get the ISA for BarnaCore?

A.   Yeah, you will get the BarnaCore ISA.  And the blue is just showing which document is currently clicked.

Q.   So you talked about the TensorCore ISA a little bit.  Can you explain how Google uses the TensorCore ISA?

A.   Yeah.  So the -- the TPU is a chip that is essentially programmable and usable by software engineers.  So the TensorCore ISA describes the instruction set architecture, which is basically what are the types of instructions you can

give the TensorCore and, when you give it a specific instruction, what does it do.

So, for example, you can ask it to add two numbers or multiply two numbers.  So all of the details of the instruction set architecture is -- of the TensorCore is in that document.

Q.   Are there different instruction set architectures for the TensorCore for the different versions of Google's TPUs?

A.   Yes.  So each version of the TPU will have its own set of architecture specifications.  They build on top of each other. We don't start from scratch with each generation.  So Pufferfish instruction set architecture will be built on top of the prior generation, and the next generation will build on top of this.

MS. PRIEDEMAN:  Ms. Hernandez, can you please pull up Exhibit 1195.

BY MS. PRIEDEMAN:

Q.   Dr. Chandra, this is a summary exhibit that contains the different trade secret files and the access control levels at the time of the alleged theft.  Are you familiar with this document?

A.   Yes.

MS. PRIEDEMAN:  Your Honor, I believe this was previously shown to the jury but has not yet been admitted, and I would move to admit 1195 at this time.

THE COURT:  Admitted.

(Trial Exhibit 1195 received in evidence.)

**BY MS. PRIEDEMAN:**

**Q.**   So looking at this summary exhibit, Dr. Chandra, do you have an understanding of who had access to the TensorCore ISA in late 2023, early 2024 based on this document?

**A.**   So the TensorCore instruction set architecture document was broadly visible to the software engineers at Google.  The Piper-Group-Default-Access refers to a group that includes all of the software engineers at Google.

**Q.**   Do you have an understanding of why the TensorCore ISA was open to all the software engineers?

**A.**   Yeah.  So back, you know, in the Pufferfish generation, at this time, the predominant user of TPU was Google itself; and so in order to support innovation and get software engineers to write applications for TPUs, a decision was made to make this instruction set architecture document visible so that the software engineering community can see what the TPU offers and they can understand how they can take advantage of the TPU to develop machine learning applications.  So in order to spur innovation, the decision was made to open this up.

**Q.**   To open it up to the software engineers within Google; is that right?

**A.**   That's right, yeah.

**Q.**   Dr. Chandra, do you have an understanding of whether the TensorCore ISA document that we were just looking at is

something that should be shared outside of Google?

**A.**   No, none of these architecture specs should ever be shared outside of Google.

**Q.**   And how do you know that?

**A.**   Because I think -- so these are describing components of a TPU, and these are design specifications that are intended to be used by Google engineers who build the TPU or who use the TPU.   It's not intended for -- and it has sensitive information in that it describes Google's intellectual property; right?   So I think there is no reason to make this available outside of Google.

**Q.**   All right, Dr. Chandra.

        **MS. PRIEDEMAN:**   Ms. Hernandez, can you please pull up Exhibit 46.

**BY MS. PRIEDEMAN:**

**Q.**   Do you recognize this document, Dr. Chandra?

**A.**   Yeah.   This is instruction set architecture for BarnaCore, which is another component of the TPU.

        **MS. PRIEDEMAN:**   And if you zoom on the left under the Pufferfish, again, Ms. Hernandez.

**BY MS. PRIEDEMAN:**

**Q.**   So is this -- are we kind of moving down the links on the left-hand side of this document?

**A.**   That's right, yeah.

**Q.**   And is this stored in the same location as the TensorCore

ISA for the Pufferfish?

**A.**   Yeah, it's also stored in G3 Docs.

**Q.**   And how does Google use this document?

**A.**   So BarnaCore is another type of computer that is built into the TPU.  So TensorCore is good at certain types of operations, and BarnaCore is good at a different set of operations.  So it's used in the same way.  If somebody wants to write applications for the TPU, they will try to figure out what they can use the TensorCore for and what they can do with the BarnaCore.  So, yeah, it's just a different type of computer within the TPU chip.

         **MS. PRIEDEMAN:**  And then, Ms. Hernandez, can you please pull up Exhibit 96.

**BY MS. PRIEDEMAN:**

**Q.**   And what are we looking at here, Dr. Chandra?

**A.**   So this is the architecture specification for the TPU -- Pufferfish TPU's memory subsystem.  So this is -- what this is showing is how the various computers inside the TPUs TensorCore and BarnaCore have access to memory.  Every computer needs memory in order to store results and do computations, so this is specifying the memory system of the TPU.

**Q.**   And same question.  Is this stored in the same location of the other documents we were just looking at?

**A.**   Yes.  It's stored in G3 Docs.

         **MS. PRIEDEMAN:**  And then can you please pull up

Exhibit 95, Ms. Hernandez.

**BY MS. PRIEDEMAN:**

Q.   What is this, Dr. Chandra?

A.   So this is a specification for what we call as inter-chip interconnect.  This ICI describes how two different TPU chips can communicate with each other.

And when we build these machine learning systems, they usually involve thousands of TPU chips working together on a single application, and so all of these TPU chips have to communicate with each other, and the way they do it is using this ICI, inter-chip interconnect.

And this specification is describing how the ICI is implemented in the Pufferfish TPU.

Q.   Is this Google's technology?

A.   Yes, this is Google's technology.

MS. PRIEDEMAN:  And if you could pull up Exhibit 94, please.

**BY MS. PRIEDEMAN:**

Q.   What is this document, Dr. Chandra?

A.   So this document is talking about how the ICI interconnect is initialized.  So when you connect two TPUs together, before they can start communicating, you have to initialize the interconnect, and this is just a document describing how the interconnect is initialized in order to enable communication.

Q.   And same thing, if you go on the left-hand side under

"Pufferfish," is this located in the same -- on the same intranet location?

A.   Yes.

MS. PRIEDEMAN:  And then, Ms. Hernandez, can you pull up Exhibit 93, please.

BY MS. PRIEDEMAN:

Q.   What is this document, Dr. Chandra?

A.   So this is another of the specifications for the Pufferfish TPU.  In this document, we describe how a TPU can connect to a host.  A host here is a regular computer; for example, any computer with an Intel processor in it or an AMD processor in it.

So the TPU has a connection to this computer, and that connection is through what is called as PCI Express, PCIe, so this chapter here or this document is describing how the TPU implements that communication with the host.

Q.   And is this -- is this also located in the same intranet page?

A.   Yes, it is.

MS. PRIEDEMAN:  Ms. Hernandez, can you go back to Exhibit 1195, please.

BY MS. PRIEDEMAN:

Q.   Dr. Chandra, we talked about how the TensorCore ISA was open to Piper at the time of the alleged theft.

Do you see for the other exhibits we looked at --

Exhibits 93, 94, 95, 174, and 96 -- those all say "Deepsea access"?  What does that mean?

A.   So that means that is restricted to the set of engineers who are building this particular component of the TPU, as well as the set of engineers who have to write software.  For example, when we said ICI has to be initialized, that involves some software.  So those engineers need to understand how the ICI would work.  So they are included in that Deepsea access group.

Q.   Do you have an understanding of why the TensorCore ISA was open to a broader set of engineers and the other documents in this section were more restricted?

A.   Yeah.  So the other documents in this section are more restricted because they only -- they're only relevant to either the people who are actually building that particular component or the people who are writing software for that particular component.

     As we've talked before, for the TensorCore instruction set architecture, it was more broadly opened up because if you're writing an application for the TPU, that's the component that you would want to understand in order to see how you can take advantage of the TPU to -- for example, to do some machine learning in your own domain.  And so that -- it was sort of to spur innovation across Google.  That was the conscious choice made at that time.

MS. PRIEDEMAN: And, Ms. Hernandez, can you go to Exhibit 47, please.

BY MS. PRIEDEMAN:

Q. Dr. Chandra, what is this document?

A. So this is also the TensorCore instruction set architecture but for the prior generation, which is called Jellyfish. So there are two generations, Jellyfish and Dragonfish.

Q. So that little icon in the left-hand corner, is that a Jellyfish?

A. Yes, Jellyfish.

Q. And is this also located in G3 Docs or Google's intranet?

A. Yes.

Q. So is this -- does this reflect kind of similar architectural information, but related to the Jellyfish version of the TPU?

A. That's right. It's similar architectural information for the prior generation of the TPU.

Q. And so, Dr. Chandra, I asked you about whether or not the TensorCore ISA for Pufferfish was the type of information that should be taken outside of Google.

Do you have an understanding of whether the information in these other documents we just looked at is the type of information that should be taken outside of Google?

A. No. All information related to TPU architecture

specifications are sensitive information that have Google intellectual property, so they should not be taken outside of Google.

MS. PRIEDEMAN:  If you can go back to Exhibit 777, please, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   So we talked about a number of the documents in Category 1, but not all of them.

Can you tell me how Google uses the documents in Category 1 together?

A.   So together, they describe --

MS. KRSULICH:  Objection.  Foundation.

THE COURT:  Sorry?

MS. KRSULICH:  Objection.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  So together, the set of documents describe the complete architectural specifications for a particular generation of TPUs.  So, for example, here we are looking at the architectural specifications for Pufferfish.

So together -- so you need to build all of these components in order to build the whole TPU chip.  So they are used together by the respective teams working on building these components when we build the entire TPU product.

BY MS. PRIEDEMAN:

Q.   And taken together, what do these documents tell you about

Google's TPU chip?

**A.**    Together -- if you look at the set of documents together, this will tell us everything we need to know about how the Pufferfish chip is built:  What are its capabilities; what can it offer a user.  And not only that, but how do you go about building such a TPU; how do you build its individual components; how do they work together.  And, yeah, it's all you need to know to build a TPU.

**Q.**    How long did it take Google to develop the information that's contained in these documents?

**A.**    So this is already, I think, the fourth or fifth generation of the TPU.  So taken -- if you look at multiple generations of TPUs, it has taken Google multiple years, I think over a decade of innovation to build TPUs.

**Q.**    Approximately how many people have worked on the information that's contained -- how many people have worked on TPUs to get it to the point of the information that's contained in these documents?

**A.**    So if you just look at the set of engineers who are responsible for building TPUs and the set of engineers who are directly responsible for building tools that enable others to use TPUs, I think that itself will be in maybe thousand to couple of thousand engineers.

**Q.**    And do you have a sense of how much of an investment Google has made in developing its TPUs?

**A.**   In terms of dollars?

**Q.**   Yes.

**A.**   In terms of dollars, I think each TPU is a very significant investment in its own right.  Hundreds of million to maybe even billions of dollars.

          **MS. PRIEDEMAN:**  All right.  Ms. Hernandez, can you go to the -- go to the second page to Category 2, please.

          If you could zoom in on Category 2.

**BY MS. PRIEDEMAN:**

**Q.**   All right.  Dr. Chandra, let's focus on the information in Category 2.  What type of information is contained in Category 2?

**A.**   So Category 2 is more about the system.  So what we looked at Category 1 was a TPU chip, but the chip doesn't exist in isolation, so you have to build a whole system around it before it can be used.

          So this Category 2 talks about machine learning systems -- some of the machine learning systems of different generations.

**Q.**   All right.  I want to talk about one -- I want to talk about a couple -- one specific trade secret document with two different source documents.

          So I want to look at -- if you look at, in the chart, Exhibit 3 -- sorry -- Exhibit 377, the trade secret file is called Ghostlite and ends in 18Z.  And then you can see that there's two source documents associated with that, Exhibit 90

and Exhibit 172.  So I want to take a look at both of those.

MS. PRIEDEMAN:  I'm going to start with --

THE WITNESS:  Okay.

MS. PRIEDEMAN:  -- Exhibit 172, please, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   Dr. Chandra, are you familiar with this document?

A.   Yes.

Q.   What is this?

A.   So this is -- this is a presentation to get approval to proceed with the development of the Ghostlite TPU chip.

So we have an internal process at Google where every project goes through multiple phases.  There's -- initially, there's a concept phase.  And you have to get approval at each phase before you can go to the next phase.

And this is what is called as a dev entry, which means that if you pass through this approval, that means all of the engineering resources needed to build this chip are committed. Google is committing and putting the investment to continue with the development of this chip.

So this is a presentation that has been prepared for that approval meeting.

Q.   And who would be the audience for this type of approval meeting?

A.   It's usually the one or more VPs who are committing resources to build this chip.  So they are -- in this case,

there's an organization called Platforms within Google that is responsible for building TPUs, and the VP of that organization would be one of the approvers. Similarly, if you are building software to enable others to use TPUs, the VP of software would be another approver.

Q.   And so you said this is the dev entry phase; is that right?

A.   Yeah.

Q.   How much time and resources would have gone into developing Ghostlite by the time it got to this presentation?

A.   By the time it got to this presentation, pretty much all of the architecture design work would already be complete because once this approval is given, then the whole project moves towards actually building it and creating this product. So I would say a significant amount of development work would already be done by this time.

Q.   And do you see, Dr. Chandra, it says here "Shared with Level 3 Restricted" in red on the bottom?

A.   Yeah.

Q.   What does that mean?

A.   So what that means is that this presentation and the content within this presentation is restricted to a set of engineers who are part of that Level 3 Restricted access control group.

        And like I said before, all TPU information is sensitive,

and so that underlying sentence is just saying -- is just saying that this is sensitive information.  It cannot be shared with -- outside of Google or with customers.

Q.   So you're talking about the second line here that says [as read]:

"Important:  Like other internal eng docs, this content cannot be shared with customers!"?

A.   Yes.

Q.   And what does "internal eng docs" mean?

A.   That stands for internal engineering documents.  So what you were showing earlier with the various architecture specifications for Pufferfish, those are examples of internal engineering documents.

Similarly, this document, it goes through -- goes into detail about what the Ghostlite TPU chip looks like and what is its performance.  All of that information is internal engineering information.  So, yeah.

MS. PRIEDEMAN:  Is the screen off?

Can we go to page 10, please, Ms. Hernandez?

Actually, let's go to page 11, please.

BY MS. PRIEDEMAN:

Q.   Dr. Chandra, what is being depicted in this diagram?

A.   So this is an internal architecture picture of the TensorCore component.  So we talked about TensorCore, but the TensorCore itself has multiple subcomponents.  And this is an

architectural drawing showing how -- what are the importance of components, how they're connected together, and how they work together.

Q.   And how does this relate to the type of information that's in the TensorCore ISA?

A.   So what this information shows is that -- for example, you see the MXU0, MXU1, et cetera.  So those represent matrix multiplication units.  And part of the TensorCore instruction set architecture would define how would you go about doing a matrix multiplication on these units.

Similarly, on the left, you see the VPU, which stands for the vector processing unit.  That's another type of computer.

And the ISA document would say, "Okay.  If you want to use the VPU, here are the set of instructions you will use."

So it's -- yeah.

MS. PRIEDEMAN:  And, Ms. Hernandez, can you go to page 21, please.

BY MS. PRIEDEMAN:

Q.   And, Dr. Chandra, what is -- what's being depicted here?

A.   What is being depicted here is what we -- what is commonly called as a floor plan.  A floor plan is when you build these chips, ultimately, when the chip gets manufactured, it's basically a set of transistors put together.  And this is basically a picture of what the chip looks like if you look from the top.

And what it's showing here is that, on the left side is the Viperlite chip, which is a prior generation, and the right side is a Ghostlite chip, which is the topic of this presentation. And it's just comparing them side by side and just saying the next generation is so much bigger than the prior generation.

Q. And is this the type of information that should be shared outside of Google?

A. No. Again, this is sensitive information related to TPUs. It cannot be shared outside.

MS. PRIEDEMAN: And can you go to page 2022 -- sorry -- 22, Ms. Hernandez?

Actually, 24, please.

Q. And, Dr. Chandra, what are we looking at here?

A. So what this is showing is a specific phase in the design of the chip called physical design, where you -- basically whatever the chip is defined and implemented, ultimately it has to get converted into transistors before it can be manufactured. And that process, the last step when the IDS in the chip get converted to transistors is called physical design.

And this is basically saying that -- the customer owned physical design says that this physical design phase was done by Google, and because it is done by Google engineers, these are some of the advantages we get as a result.

**MS. PRIEDEMAN:**  All right.  And, Ms. Hernandez, can you go to Exhibit 90, please.

**BY MS. PRIEDEMAN:**

**Q.**   So, Dr. Chandra, this is the other source document.  Can you explain what this document is?

**A.**   Yeah.  So this is also the development entry presentation.  This time, for the system.  What we looked previously was for the chip.

And now that the chip is already approved, at some point later in time we also have to get approval for the system because significant Google resources get committed to building the system, so we go through a formal approval process.

And the system is called Ghostlite, and this presentation is describing what that Ghostlite system is, what does it take to build the system in terms of people and time, and asking for approval.

**Q.**   So the last exhibit we just looked at, that was approval for the chip, and this is approval for the system?

**A.**   Yeah.

**Q.**   And when you say "system," what do you mean?

**A.**   A system is -- you can think of the system as a supercomputer that has hundreds of thousands of these chips interconnected together.

**Q.**   And do you see it says "Shared with Level 3 Restricted," and then it also again says "Important:  Like other internal

eng docs, this content cannot be shared with customers!"?

Again, what does that signify?

A.    That's basically saying the same thing, that the information in this presentation should only be shared with engineers who are in the Level 3 Restricted group.  And this is, again, another internal engineering document.  It's not intended to be shared outside of Google.

Q.    And you talked a little bit about how much time and resources that would have gone into just the first PowerPoint we looked at.  But can you talk about how much time and resources went into the development of Ghostlite and the Ghostlite system based on the combination of these two PowerPoints?

A.    I think the Ghostlite -- so every TPU system product is a pretty large project at Google.  I would say Ghostlite was several hundred people working for a couple of years, maybe three years, to build this.

MS. PRIEDEMAN:  All right.  So if you can go back to Exhibit 777, please, Ms. Hernandez.

THE COURT:  Is now a good time for our afternoon break?

MS. PRIEDEMAN:  Yeah.

THE COURT:  Okay.

Why don't we break until 2:30.

THE COURTROOM DEPUTY:  All rise.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  You can step down.  If you could be back on the stand at 2:30 ready for the jury to come in.  Appreciate it.

And, by the way, if I ask you if it's a good time for a break, if the answer is no, don't be shy about saying so.

MS. PRIEDEMAN:  Yeah, it's fine.  It was a good time.

THE COURT:  Okay.  Anything to discuss?

MS. KRSULICH:  Your Honor, maybe, but we'll take a break and then come back and discuss it --

THE COURT:  Okay.

MS. KRSULICH:  -- with the Court, if that's okay.

THE COURT:  All right.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 2:17 p.m.)

(Proceedings resumed at 2:30 p.m.)

(Proceedings were heard out of the presence of the jury.)

THE COURT:  All right.  What have you got?

MS. KRSULICH:  We're consulting with counsel, but right now I have a concern that some of the information that the witness is testifying about was not disclosed in a 302 report to the defense.

So we're going to just go back and forth and try and figure out what's happening, and then we may have an update for the Court on Monday when we resume with this witness.

THE COURT:  Okay.

MS. PRIEDEMAN:  I will say, Your Honor, we've produced all 302s for conversations with Dr. Chandra.  He's not an expert, so --

THE COURT:  Right.

MS. PRIEDEMAN:  -- we don't, like, write down verbatim everything that is talked about in a meeting, obviously.  And I don't know.

MS. KRSULICH:  Yeah.  So we'll look into it, Your Honor, and then -- but I just want to flag that for the Court.

THE COURT:  Okay.

(Proceedings were heard in the presence of the jury.)

THE COURT:  Okay.  You can proceed.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, can you please pull up Exhibit 777, please.

BY MS. PRIEDEMAN:

Q.   All right.  Dr. Chandra, we just talked about a couple of documents in this category.

Can you -- can you tell me if Google uses the combination of the documents in this category together?

A.   So if you look at this category, there are documents describing TPU systems of different generations.  But for a given generation, yes, I think the documents that describe, for example, Ghostlite would all -- can all be used together

because they describe different aspects of the system -- of the same system.

And, again, if you look at Viperlite, for example, as a prior generation, then all the documents that are describing the Viperlite system are used together because they're describing different aspects of that system.

Q.   Is there a value in the combination of the Viperlite and Ghostlite documents, considering those together?

A.   So there is some value because every generation builds upon the prior generation, so we have some learnings from the prior generation that we try to incorporate in the next generation.  So from that standpoint, it's useful to see what has changed from the prior generation and what new capabilities are available in the current generation.

Q.   Dr. Chandra, should any -- based on your understanding, should any of these source documents be taken outside of the Google network?

A.   No.  All of these documents are, again, TPU information which is considered sensitive.

MS. PRIEDEMAN:  All right.  And if we can go to Category 3, please, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   Dr. Chandra, what does the information in Category 3 relate to?

A.   So the Category 3 is more about the software side of the

TPU system.  And so as I said, TPU system can be considered as a supercomputer of hundreds and even thousands of TPU chips connected together.  In order to make that supercomputer work and be usable, there's a lot of software that has to be written.

So this set of documents here is talking about several software systems, sort of software components that are developed as part of TPU systems.

Q.   And I want to just focus on a few example source documents from Category 3.

MS. PRIEDEMAN:  If we can look at Exhibit 92.

BY MS. PRIEDEMAN:

Q.   So if you look on the chart, Exhibit 399, which is a trade secret document called "XOR Horizontal Scaling," you can see that there's a source document Exhibit 92 called "XOR S2 Infra Review Horizontal Scaling."

Let's take a look at Exhibit 92, please.

Dr. Chandra, what is this -- what is this document?

A.   So this document is describing a software system and a project called XOR.  The horizontal scaling part refers to how do we connect hundreds of thousands of TPUs together and build an even larger system and how do we scale that system to such a large number of chips connected together.

So this is a document that's a review, basically an engineering review within Google, and the presenters are

describing what they're building and why it's important and why it's useful.

Q.   And do you see it says "Shared with Level 2 TI"?

A.   Yeah.

Q.   What does that mean?

A.   So Level 2 TI is a group, access control group, that includes a set of engineers in Google who either use machine learning systems like these to build applications or are actively working on building the system themselves.  It's a lower level of classification compared to Level 3, but it's still a restricted set of engineers.

And what this document is saying is that the information contained in this document is intended for engineers within that Level 2 classification.

And, again, the second sentence, like before, is just saying the same thing; that this is an internal engineering document, it cannot be taken outside of Google.

Q.   And do you have a sense of how much time and resources went into creating the techniques that are described -- that are related to this document?

A.   So this is also a large project, and I would estimate on the order of maybe couple of hundred engineers working on this for a period of two to three years.

MS. PRIEDEMAN:  And, Ms. Hernandez, if you can go back to Exhibit 777, please.

And if we can go to Exhibit -- if you can see Exhibit 383, "ICI Resilient Slice," that has two source documents, Exhibit 58 and Exhibit 114.

**BY MS. PRIEDEMAN:**

**Q.**   So I want to look at both of those source documents, Dr. Chandra.  Let's start with Exhibit 58, please.

And what is this document, Dr. Chandra?

**A.**   So this is describing a specific feature of a TPU system called ICI resiliency.  So just at a high level, these systems contain really large number of TPUs connected together; and when you build such a large system, something or other fails all the time.  And despite, let's say, a TPU chip failing, you still have to make that whole system work.

And ICI resiliency is a feature where -- is a software feature where we can welcome the failure of one or more components of the larger supercomputer and still keep the supercomputer up and running.

And this is, again, sort of an engineering review presentation that is targeted at an internal audience, explaining what this feature is, how we are building it, and what does it take to build it.

**Q.**   And do you have a sense of -- well, actually, sorry.  It says "L2 TI."  Again, what does that mean?

**A.**   That's -- it's, again, saying that this is -- the content in this document is intended for engineers who are within that

L2 level classification.

**MS. PRIEDEMAN:**  And if you go to page 41, please, Ms. Hernandez.

If you could zoom in a little bit.

**BY MS. PRIEDEMAN:**

**Q.**   What is this reflecting, Dr. Chandra?

**A.**   So this is just requested -- what this is showing is, in order to build that ICI resiliency feature, you need work from several components of software.  And for each row there is a particular component.

For example, the first row, ASIC software, is saying that that particular team has to do the tasks that are listed there; and in order for them to do those tasks, they need so many people or so many -- so much hours of work and how long it takes.  So it's sort of a roll-up of the overall effort that is needed to build this feature.

**MS. PRIEDEMAN:**  And can you zoom out, please, Ms. Hernandez.

**BY MS. PRIEDEMAN:**

**Q.**   So on the left it says "Parent Work Stream," and then there's multiple different names beneath that.  Are you saying those are different teams that are working on this?

**A.**   Yeah, these are different teams or even subteams that have to do the work in order to implement the feature.

So, yes, it's like a plan.  You can think of this as,

okay, if you are to build this ICI resilience feature, I need Team A, B, C to do the following things, and each team has estimated how much time and resources they need in order to build that.  So that's just sort of an overall accounting of what it takes to build.

MS. PRIEDEMAN:  And if you go to -- can you go to page 43, please, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   And what is this chart reflecting?

A.   So this chart is also reflecting resource commitments needed cross-functionally.  That is, not just within the TPU software team, but also the teams that are working in partnership with those teams in order to build this feature and make it available to the users.

So, for example, here there is, you know, XLA Compiler and TPU Runtime.  That's a separate team, and they would have to do some work.  And they are saying -- in this particular case, they're saying they're committing one person -- the "HC" stands for headcount -- one headcount working 100 percent of the time for a period of 12 weeks to do this.

Q.   And then on the far right column it says "Committed Effort (Calendar Weeks)."  Is that the amount of weeks that the different teams are committed to working on this project?

A.   That's right, yeah.

MS. PRIEDEMAN:  All right.  Can you go to the second

source exhibit, Exhibit 114, please, Ms. Hernandez.

**BY MS. PRIEDEMAN:**

Q.   What is this document, Dr. Chandra?

A.   So this document is a presentation that was prepared for a VP by our product management people listed there, and they wanted to give an update on how will this feature be perceived from a customer standpoint.  So suppose we build this feature and make it available.  What do we think the customers would say about this feature?

So it's an internal customer update presentation for a VP in charge of the organization that's building this.

Q.   Do you have an understanding -- well, so for this document and Exhibit 58, both of the ICI resilient slice documents, do you have an understanding of whether those documents should be shared outside of Google?

A.   No, they should not be shared outside of Google.  They're describing a specific feature and a specific component of a TPU system that we are building and all the engineering details on how we go about building it, how many resources we need to build it, and when we will build it.  This is all intended for internal engineering reviews and execution.  It's not intended for -- to be taken outside of Google.

MS. PRIEDEMAN:  All right.  Can you go back to Exhibit 777, please, Ms. Hernandez.

\\\

BY MS. PRIEDEMAN:

Q.   So I didn't -- we just touched on two source documents for one of the trade secret documents, and so we didn't go through all the source documents.

But can you talk about the combination of the different documents in Category 3, please?

A.   Sure.  So the documents in Category 3 describe various components of software -- our software projects that we build for TPU systems.  So the combination of those documents would give you an understanding of all of the software involved in building these large TPU supercomputers and the scale of the effort that Google is taking on in building this, as well as what is the end user benefit that these particular software projects will bring.

Q.   Do you have a sense of how many people at Google have been involved in the creation of the information in Category 3?

A.   It's a pretty large set of people.  I would estimate it may be a couple of thousand working over multiple years to build this software capability in these set of software projects.

Q.   And stepping back, so we talked about Categories 1, 2, and 3, which are all related to Google's TPUs.

Is the TPU technology all Google's inventions?

A.   Yes.  The TPU is -- was invented at Google, and all the related technology is also Google technology.

**Q.** All right. So I want to ask you about some of the source documents from Categories 4 and 5. But before I do that, I want to ask you some background questions about Google's GPU systems.

Does Google have its own GPU systems?

**A.** Yes. Google builds GPU systems and makes them available to customers through Google Cloud.

**Q.** And why did Google create its own GPU systems?

**A.** So the simple reason is that, I think, we buy GPUs from outside, but the GPU systems that are offered outside are not compatible with Google's data centers and Google's softwares. So we have to build -- we have to take what's available outside and innovate in order to bring that technology into Google. And in the process, we also try to optimize for cost and we try to improve performance so that we can differentiate our Google systems comparing to Google's -- GPU systems offered by competitors.

**Q.** Does Google gain any advantages by having its own custom GPU systems?

**A.** Yeah. We are always looking to gain advantages, either in terms of performance or in terms of cost or in terms of timeline. So we try to get better performance than what GPU system might be available outside. We try to lower the cost or we try to do it faster -- right? -- to gain an advantage in time.

MS. PRIEDEMAN:  All right.  Can you zoom in on Category 4, please, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   Can you describe what is contained in Category 4, please, Dr. Chandra?

A.   So the Category 4 is describing some of the hardware components of GPU systems of different generations and associated documents related to GPU -- GPU systems hardware.

Q.   All right.  And I want to look at a specific source document.

MS. PRIEDEMAN:  Can you zoom in on the row that says Exhibit 407 for the alleged trade secret file?  Thanks, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   All right.  So I want to look at Exhibit 70, which is the Endurance-B hardware design document, please.

What is this document, Dr. Chandra?

A.   So this is a design specification for the Endurance-B hardware.  The Endurance-B is a code name for a particular version of a GPU system, and this is the hardware design specification.

Q.   What is this document used for?

A.   So this document is used for describing in detail exactly how this particular hardware will be built, and it's used so that we -- different engineers within Google can review the

design and give their input on the design.

It's also used with -- so Google uses contract manufacturers to build the hardware, and so we give them detailed specifications under NDA.  An example of this is the specification we give them under NDA so they know what to build -- what we're asking them to build.

Q.   And do you see in the upper right-hand corner it says "Access Level 2"?

A.   Yes.

Q.   What does that mean?

A.   So this is, again, referring to the Level 2 access that we saw before.  It is restricted within Google to the set of engineers that are in Level 2.

Q.   And do you have an understanding of whether this is the type of document that should be taken outside of Google's network?

A.   So, no, it should not be taken outside of Google.  This is a document that is shared with our contract manufacturers.  In that sense, it is given to them, but it is given to them under NDA.  So it cannot be taken -- again, it's describing the detailed design of Google's GPU system.  As such, it has sensitive information and cannot be taken outside.

Q.   And you mentioned an NDA.  What is an NDA?

A.   NDA is a non-disclosure agreement.  It's a legal contract we sign with another company in order -- we give them

information that has Google intellectual property, and they're required to keep it secret.

MS. PRIEDEMAN:  Can you go to page 2, please, Ms. Hernandez, and can you zoom in on this paragraph.

BY MS. PRIEDEMAN:

Q.   What is this, Dr. Chandra?

A.   So this is just saying that the information contained in this document is Google Confidential and is subject to the non-disclosure agreement that I was just talking about between Google and the company that is -- that we are talking to or contracting with to build this hardware.

MS. PRIEDEMAN:  You can zoom out, please, Ms. Hernandez.

All right.  Can you go to Exhibit 777, please.

BY MS. PRIEDEMAN:

Q.   All right.  So we just talked about the Endurance-B hardware design document.  There's obviously other source documents, other trade secret files in this category.

Can you -- can you talk about how Google uses this category of information?

A.   So just like I was saying for TPU systems, all the documents that relate to a particular generation -- so, for example, the Endurance generation is describing a GPU system that uses H100 GPUs; so all of those documents that are talking about that particular generation system can be used together

because they describe different aspects of that particular system.

There are also documents here, for example, the BigRig document, which is describing the prior generation of a GPU system.

Q.   Is there added value in considering the BigRig plus the AdAstra documents and all of the documents in this category together?

A.   Yeah.  If you look at all of the documents together, you get a sense of how Google's GPU systems have evolved over the years and what capabilities we are providing to customers in each generation.

And, yeah, so it gives you essentially the road map of Google GPU systems.  So taken together, I think they give you -- it's valuable in the sense that it's a more comprehensive picture on what Google GPU products look like.

Q.   And can you give a sense of how much Google -- how many people have worked on Google's GPU systems?

A.   Again, it's a large number.  These are large projects. Again, I would estimate, overall, again, about a couple of thousand people.  Each generation of a GPU system takes about two years to build, and we have been building GPU systems for a long time now.  So I would say over the last four or five years, couple of thousand people overall working at Google.

**Q.** And can you give a sense of how much Google has invested, from a financial perspective, in creating its GPU systems?

**A.** It's -- it's, again, a large number. I would estimate it as several hundred million dollars.

**Q.** Is the information in Category 4 the type of information that should be shared outside of Google?

**A.** No. I think -- so these are Google-specific products. They contain Google Confidential information. So I would say that, yeah, none of these documents should be taken out of Google.

**MS. PRIEDEMAN:** All right. If you can go to Category 5, please, Ms. Hernandez.

**BY MS. PRIEDEMAN:**

**Q.** Dr. Chandra, what does the information in Category 5 relate to?

**A.** So this category and the documents contained in this category describe more the software part of the GPU systems and all of the different software projects and the software components that we have built in order to operate these GPU systems.

I would just say that just like the TPU systems, the GPU systems are also large supercomputers; and in order to run them, you need significant amount of software. As you can see here, there's a lot of software innovation and investment from Google to build these GPU supercomputers.

Q.   And do you see in Category 5 there's some documents related to TCPDirect?  Can you talk about what TCPDirect is?

A.   Yes.  So a GPU system is also a supercomputer, as I said, so it has hundreds and thousands of GPUs connected together, and these GPS need to communicate with each other in order to run the application that the user wants to run on them.  And that communication requires what we call as a protocol so that a GPU can speak to another GPU.

And TCPDirect is a communication protocol that was invented at Google in order to enable fast communication between GPUs.

Q.   All right.  So let's look at an example source document from Category 5.

MS. PRIEDEMAN:  I want to look at -- if you go to -- yes, thank you, Ms. Hernandez.

So Trade Secret Exhibit 434 is "TCPDirect for AdAstra System Architecture," and the source document is Exhibit 82, "TCPDirect for AdAstra System Architecture."

Can we look at Exhibit 82, please, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   What is this document, Dr. Chandra?

A.   So this document is describing the TCPDirect concept and the detailed architecture that we built for this particular GPU system.  So the name -- the name of the system, it is referred to here as AdAstra because it was built for a specific

customer, and AdAstra is a code name for that system.

So this document is our detailed architecture specification of the TCPDirect protocol.  It says -- it describes why we have to do this, what are the advantages, how would we do it, and how would we go about building it and how long it would take.

Q.    And how long did it take to develop TCPDirect?

A.    I believe it took about 12 to 18 months to build this software.

Q.    And how many people were working on that, approximately?

A.    I would say about maybe 20 to 50.

Q.    Dr. Chandra, I don't see any markings on this document. Is this the type of document that should be taken outside of Google's networks?

A.    No, it should not be taken outside of Google network. Again, it's a very specific document describing a specific software system that is part of a GPU system and contains -- it's a new Google invention, so it contains Google sensitive information.

I would just say that I think whether the document has any markings or not, if it's an engineering document, the default assumption should be that it contains Google sensitive information.

MS. PRIEDEMAN:  All right.  And can you go back to Exhibit 777, please.

BY MS. PRIEDEMAN:

Q.   And do you see that there are some documents related to Astrophel, Dr. Chandra?

A.   Yes.

Q.   What is Astrophel?

A.   Astrophel is the code name for a specific customer for which we built the AdAstra GPU system.

Q.   Is information related to Astrophel considered sensitive within Google?

A.   Yes.  Again, I think it's -- it's sensitive because it's a machine learning system that we built for a specific customer and contains Google sensitive information.

        MS. PRIEDEMAN:  And can we go to Exhibit 53, please, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   What is this document?

A.   So as I said earlier, these GPU systems are supercomputers and they have thousands of GPUs connected together.  When you connect them together, the net- -- the network that connects the GPUs together, internally we call that network a fabric.

    And then so one question comes up:  How do you connect this?  There are multiple ways in which you can connect them together, and the way a specific supercomputer is connected together is called its fabric topology.

    So what this document is talking about is:  Okay.  For

this particular customer when we are building this GPU supercomputer, what sort of fabric topology are we going to design?

And so this is a design -- again, an engineering design document that lays out:  Here are all the requirements, here is how we are going to connect these GPUs together, and these are the pros and cons if you connect this way versus another way.

So this is sort of a road map of how we would initially connect these GPUs together, how we would improve it over time.

Q.   And how many people -- how many engineers at Google would have worked on a solution like this?

A.   So this would involve our fabric team.  I would, again, estimate it as maybe 20 to 30 engineers working over a period of 12 to 18 months.

MS. PRIEDEMAN:  All right.  Can you go back to Exhibit 777, please, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   So we just talked about a couple of different source documents in Category 5.  How does Google use the combination of documents in Category 5?

A.   So the combination of documents, especially, for example, if you look at all the documents related to Astrophel, would say:  How -- what are all the different components we are building for this customer?  Everything that, you know, has a title "AdAstra," we'd say:  Okay.  What are we doing for this

GPU system?  What are the different components of the GPU system and how are they being built?

So together, it would -- if taken together, it would give a clear picture as to what Google is building as a GPU product for this specific large customer.

Q.   What about the combination of all of the documents in Category 5?

A.   If you look at all of the components together overall in Category 5, that would give a pretty good understanding of all of the GPU software that we are building in each generation and what are we changing and sort of a road map of our GPU products, software road map of GPU products.

Q.   Is the information in Category 5 information that should be taken outside of Google's network?

A.   No.  This is, again, sensitive information.  This discloses internal details of our GPU products and should not be taken outside.

Q.   And how do you know that information is sensitive, Dr. Chandra?

A.   I think the best way is just by context.  These documents are describing GPU systems which fall under the machine learning umbrella.  These are internal products -- these are products that we are building, we are engineering for specific customers.  So just from that context, you know that this is -- this contains Google sensitive information.

**MS. PRIEDEMAN:** All right. If you can zoom out, please, Ms. Hernandez, and go to Category 6.

**BY MS. PRIEDEMAN:**

Q. All right. I'm going to talk about 6 and 7 just big picture first.

Can you talk about what the information in Category 6 and 7 relates to?

A. Category 6 and 7 contains documents that describe our SmartNIC product development. Specifically, the first SmartNIC that we built is called Diorite. Category 6 talks about the hardware components of the Diorite SmartNIC and Category 7 talks about the software components of the Diorite SmartNIC.

So it's generally a description of why we decided to build a SmartNIC, a custom SmartNIC; what are the advantages; what components did we design in detail ourselves; what did we leverage from our industry partner working with our industry partner; and what products we intend to offer in Google Cloud using the SmartNIC.

Q. And before we look at some specific source documents, can you just -- I want to ask you some just background questions about Google's use of the custom SmartNIC.

Why does -- first of all, big picture, why does Google use a SmartNIC?

A. So the reason Google uses a SmartNIC is not much different from the reasons why other cloud service providers use a

SmartNIC.

So in cloud, what you are doing is you are creating a product that -- you are providing computing for other customers.  So the other customers come and they want to run their applications in Google Cloud.  And so what the SmartNIC allows us to do is to manage these computers, and it gives a place where Google can run its own software.  So it provides that sort of a separation between the computers that customer uses versus the computers that Google has to use for its own use.

So for that reason, all large cloud service providers use a SmartNIC to provide the separation between themselves -- sort of a security separation, as well as a performance separation, between themselves and their customers.

Q.   Are there commercially available SmartNICs?

A.   There are commercially available SmartNICs from a small set of vendors, but every large cloud service provider have built their own customized version.

Q.   And how does Google's SmartNIC compare to the commercially available SmartNICs?

A.   It's different in the sense that it is customized for Google Cloud.  So if we could use a commercially available SmartNIC, we would have used it.  It's a lot of work to build a SmartNIC.  But for the same reasons other large companies made a decision to build their own, we have to build our own -- we

build our own because the software that we run in Google Cloud is custom to Google and we need a SmartNIC that can work with our custom software, and that's why we had to engineer a custom SmartNIC.

Q.   Who -- and is the custom SmartNIC called Diorite?

A.   Yeah.  That's the first custom SmartNIC we built.  That's called Diorite, yes.

Q.   Who designed Diorite?

A.   So I led the Diorite project.  I was the lead architect for it.  So Google designed all of the custom parts of Diorite, and then we partnered with Intel to build it.  We partnered with Intel to build it.

Q.   Does Diorite have different components?

A.   Yes.  If you look at the Diorite chip, it has multiple components within it, each doing a different specific function.

Q.   Does Diorite contain components that were designed by Intel?

A.   Yes, Diorite contains several components that were designed by Intel and customized for us.

Q.   And does it also contain components designed by Google?

A.   Yes, it contains components designed by Google.

Q.   Is one of the Google custom components called Google Reliable Transport, or GRT?

A.   Yes.

Q.   Who developed GRT?

**CHANDRA - DIRECT / PRIEDEMAN**

**A.**    So I was the inventor of GRT.  We have a team at Google who builds the GRT component.

**Q.**    And how does Google use GRT?

**A.**    So GRT -- so earlier we were talking about TCPDirect as a way of communicating between GPUs.  So GRT is also a protocol, a communication protocol, that can be used to communicate between SmartNICs, and it is used in a variety of ways at Google.  It is used in our high-performance computing products in Google Cloud, where we have -- we can have a set of computers use GRT to communicate faster than what is otherwise possible.

We are also using GRT in our TPU systems for TPU-to-TPU communication as well.

**Q.**    When did Google develop GRT?

**A.**    The work started in 2018, and it took several years to mature it and build it and bring it to production.  Google launched a product with GRT, I believe, in 2024.

**Q.**    Who owns the GRT technology?

**A.**    It's owned by Google.

**Q.**    Does Google license that technology to Intel?

**A.**    Yes, we license it to Intel for use in their own products.

**Q.**    And can you talk a little bit about that?  How can Intel use GRT technology?

**A.**    So Intel has access to our implementation of GRT, so they can take that component and incorporate it into some other

product.  Maybe they're building a different SmartNIC or even a regular NIC that they want for a different customer.  They're welcome to use the component that we built.

They also have access to the GRT design documents and the specifications.  So if they wanted, they can reimplement GRT from scratch and use it.

And, finally, in order to use GRT, you also have to write software for it.  So they're -- and they have sufficient information to develop their own software to enable GRT.

Q.   Are there limitations in what Intel can do with the information about GRT that Google has provided to it?

A.   So Intel -- the information that we have provided to Google is under NDA, so they can -- they can build products with GRT that they can sell to other customers.  They can educate customers on how to use GRT.  They are not allowed to disclose the internal details of GRT with other customers without using an NDA.

Q.   And why has Google limited how Intel can use that information about GRT?

A.   It's Google technology, and Google -- we want to be in control in how that technology evolves in the future.  And so if -- so we didn't want to be in a situation where Intel exports -- exposes that technology to the broad industry and discloses how Google has implemented that technology.

Q.   Approximately how many people worked on the development of

GRT?

A.   Across software and hardware, I would estimate about hundred people working for three to four years.

Q.   And can you talk a little bit about what the GRT protocol is?

A.   Yeah.  So the GRT protocol is -- we can think of it as a language that two computers can use to communicate with each other.  It's sort of a -- it's a documentation of that language, maybe the alphabets and the syntax and the semantics of the language, so that when one computer is talking, the GRT protocol, the other side, other computer can understand and respond to it.

Q.   Has Google published details about the GRT protocol?

A.   Yeah.  So we opened up the GRT protocol, I believe, in 2023 to the industry in order to spur multiple NIC vendors to incorporate it in their products.

Q.   What do you mean by that, when you say "so other NIC vendors can incorporate it"?

A.   So what I mean by that is that other SmartNICs, as we discussed, built by Intel; right?  And if we wanted, let's say tomorrow, to buy a SmartNIC from some other vendor, it would be very advantageous for us if it already had the GRT technology.

So by publishing the GRT protocol, it allows the other vendors to look at the language and implement the GRT component themselves in their products if they choose to do so.

Q.   Does Google have an implementation of the GRT protocol on its Diorite SmartNIC?

A.   Yeah.   That's what I was referring to as a component, which is the hardware component that implements the GRT.  Yes, we have built it, and our own design -- we have our own design for it.

Q.   And how is that hardware block different than the publicly available protocol?

A.   The hardware block implements the publicly available protocol, but there is one part of it, it's like the protocol defines the alphabets and the grammar of the language, but how do you use the language to communicate?  How do you form sentences?  How do you communicate intelligently with that language?

So that entity that does that is that hardware component. That's what we have designed.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, can you -- sorry.  Can you go to 777 again, please.

And can you zoom in on where it says "Dorite-uArch," that row.

All right.  So let's look at Exhibit 126, please.

BY MS. PRIEDEMAN:

Q.   Dr. Chandra, do you recognize this document?

A.   Yes.

Q.   What is it?

**A.**   So this document is a -- is describing what we call as a microarchitecture.  The "u" actually stands for the micro symbol, the Greek letter.  Microarchitecture is the next level of detail on how we are building the GRT hardware component.

So this is a presentation that was prepared by the authors to describe here is how we are building the GRT component.  And this is an engineering review, and they were presenting it to a group of engineers to solicit feedback.

**Q.**   And it says April 1st, 2019.  So what phase of Diorite would this have been?

**A.**   This is very early in the Diorite development.  So Diorite development started in 2018, and in 2018, we had the specification of the GRT protocol.  And this is later on in 2019, we've gotten to a point where we know how we want to build this hardware component and we have the next level detail, which is a microarchitecture specification, and that's what this document is talking about.

**Q.**   And even though this is from 2019, would this still be relevant as of 2023?

**A.**   Yeah, it's still relevant today because we use the same design in our current generations of SmartNICs as well.

        **MS. PRIEDEMAN:**  And can you go to page 1, please, Ms. Hernandez.

        Or, sorry, page 2.

        And go to page 3.

Actually, let's go to page 17, please.

**BY MS. PRIEDEMAN:**

**Q.** What are we looking at here, Dr. Chandra?

**A.** So what we are looking at here is the blue box in the middle is a GRT hardware component; and within the Diorite chip, it sits in the middle and it communicates with other hardware components surrounding it.  So this picture is showing:  Here is the external components of GRT that we are communicating it.  And those names, the text that you see here are what is called as the interface definitions.

So, for example, the RDMA block is one hardware component that communicates to GRT block using a set of interfaces that are defined by those names there, rdma_grt_something.  That says that here all the -- here are all the interfaces between this RDMA block and the GRT block.

**MS. PRIEDEMAN:**  And can you go to page 21, please, Ms. Hernandez.

**BY MS. PRIEDEMAN:**

**Q.** What's being displayed in this?

**A.** So this is the next-level detail look into the internals of that blue box that we saw before.  So if you look inside that blue box, there are subcomponents.  And this diagram is showing:  Here are the important subcomponents of the block and how they connect to each other and what is the role that they play.

Q.   And so is this getting into the internal details of the GRT hardware block?

A.   Yeah, it's the next level of detail.  So I think this presentation is structured such that you look at the -- you look at it from outside first, and then you go one level deep and what you see here.  Then you will go next level deep and dive into one of the blue blocks in this picture.

So it progressively gives more details about how the GRT hardware block is built.

MS. PRIEDEMAN:  And let's go to page 23, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   And so what's being depicted here, Dr. Chandra?

A.   So this is, again, one of the -- is a more detailed look at one of the blue blocks on the previous slide.  So this is talking about:  Okay, if you look at the connection context, which is one of the hardware subblocks, within that, we have these hardware structures and how they're connected to others.  It's just a next level of detail.

MS. PRIEDEMAN:  And can you go to page 25, please, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   And what's being depicted here?

A.   So what's being depicted here is specifically with respect to the RDMA block that we saw in the first diagram, how does

the RDMA block and the GRT block communicate.

So we said earlier that GRT communicates with the blocks that are surrounding it, and this is talking about how the -- what sort of information transfer happens between RDMA and GRT.

Q.   Does this document contain information that should not be taken outside of Google's networks?

A.   Yes.  This is a detailed look into the implementation of the GRT block.  So it's sensitive information that should not be taken outside.

MS. PRIEDEMAN:  And, Ms. Hernandez, can you go back to -- sorry -- Exhibit 1195, please, and can you go to Category 6, please.

Can you scroll -- yeah.  Sorry.  If you can scroll down to this document.  Sorry.  Scroll up.

All right.  You can stop right there.

BY MS. PRIEDEMAN:

Q.   Do you see this document here?  It's listed at Exhibit -- sorry -- Source Document 126.

Do you see that this had -- do you have an understanding of who this document was open to at the time it was taken?

A.   Yeah.  So I think it was open to the set of groups and access control groups that are listed there.

"Diorite Dev" stands for a group that -- all the developers of Diorite within Google.  That is all the engineers who are working to build Diorite.  That's that group.

CI2 team.  So we have an organization that builds chips, custom chips, for Google.  That organization is called CI2. And because this is a component of a chip, that is shared with the engineers within that organization.

Level 3 Restricted we talked about before.  It's a set of engineers who are at that level of classification.

And, yeah, I think those are -- and it's listed with some individual employees, and -- yeah, that's basically what I see here.

MS. PRIEDEMAN:  All right.  Can you go back to Exhibit 777, please, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.  All right.  So we just looked at that first source document, and there's some other documents in this category.

Can you talk a little bit about the other documents in this category, please, Dr. Chandra.

A.  Sure.  So the first document was about the GRT hardware block.

The second document is -- is overall Diorite.  GRT is just one block inside Diorite, but Diorite is a complex chip with other blocks in it, and the next document is describing what is the overall architecture of the Diorite SmartNIC.

And --

MS. PRIEDEMAN:  Let's take a -- can we look at Exhibit 122, please, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   What is this document, Dr. Chandra?

A.   So this is a document that is just providing an overview of the architecture of the Diorite SmartNIC.  So it's sort of -- it's intended to tell the engineering community within Google Cloud what we are building with this SmartNIC and what are its important components and how it might impact them.

Q.   And do you see up top there's the little bar with the different steps and there's a blue line in the middle of "Devel"?

A.   Yeah.  So that's just signifying that this -- this Diorite project is in the development phase.

Q.   And so if you can -- and is that your name right there, Dr. Chandra?

A.   That's my name, yes.  That's -- yeah.

Q.   Did you prepare this presentation?

A.   Yes.  This is my presentation, yes.

Q.   Do you have an understanding of whether or not this is something that should be taken outside of the Google network?

A.   No.  Again, I think -- so this is a custom SmartNIC product that we are building especially for Google Cloud.  It contains sensitive information about the product, about the chip, so it should not be taken outside Google.

Q.   And how does it complement the document we just looked at before that was focusing on the particular GRT block?

A.   So this is sort of zooming out and looking at the whole product.  This is saying:  Okay.  Here is the SmartNIC we are building, why we are building it, what sort of products we want to offer with this SmartNIC in Google Cloud.

And the earlier document is zooming in on one specific component of it.

MS. PRIEDEMAN:  And if you can go back to 777, please, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   And then can we -- can you talk a little bit about the RDMA document as well, please, Dr. Chandra.

A.   Yes.  So the RDMA document is describing how that RDMA blocks -- the block that we saw before, which is right next to the GRT block, is going to work with the GRT block to provide an overall high-performance networking capability to our Google Cloud customers.

So within that subcategory, you can see on the right there are three docs.  The first one is the microarchitecture specification of GRT.  So it's a document form of the presentation that we just saw.

And the next document, that is talking about Basalt, is talking about the next-generation SmartNIC.  So the first one was Diorite, and the next one is called Basalt.  And this is talking about:  Okay.  How will GRT be implemented in Basalt?

And the third one is just talking about Diorite,

specifically a particular version of Diorite which we call C0, which had the GRT capability in it.  And it's saying:  Okay. Where are we with implementing that?  How far along are we?  Is it ready?  And so forth.

**MS. PRIEDEMAN:**  All right.  And if you can zoom back out.

And then what about that last -- let's look at Exhibit 84, please, Ms. Hernandez.

**THE COURT:**  Ms. Priedeman, unless you can get done with Category 6 in two minutes, we'll stop here.

**MS. PRIEDEMAN:**  Okay.  That's fine.

**THE COURT:**  Okay.  All right.  Let's stop for the day and for the week.

Remember, we're not coming in tomorrow, so you'll be back here Monday.  Tomorrow we will be doing work to prepare the case for you.

I am cautiously optimistic about the prediction I made at the beginning of trial.  Remember at the beginning, during jury selection, we talked about how it would last through -- the trial would last three or four weeks.

We're done with the second week now, and we're about to enter the third week, and I sort of predicted that I thought we had a decent chance of being done during the -- by the end of the third week.

I'm cautiously optimistic that we're on schedule to do

that, but it's very hard to predict, and it depends on how things go next week.  So no guarantees, but we're making good time, and hopefully, you'll be able to hear closing arguments towards the end of next week.

But until then, we'll see you Monday.  Please remember, now that you're going off on a three-day weekend, to leave your notepads in the jury room.  Please remember not to do any sort of outside research at all about anything to do with the case, and please remember not to have any conversations with anybody about the case.

And we'll see you on Monday morning.  Thank you.

**THE COURTROOM DEPUTY:**  All rise.

(Proceedings were heard out of the presence of the jury.)

**THE COURT:**  You can step down.  We'll have you back here at 9:30 sharp Monday morning.

(Witness stands down.)

**THE COURT:**  All right.  Anything to discuss?

**MS. KRSULICH:**  Your Honor, out of an abundance of caution, the witness is sequestered over the three-day weekend?

**THE COURT:**  Yes.

Mr. Chandra, you're not to discuss your testimony with Government counsel or Google counsel over the weekend.  Okay?

**THE WITNESS:**  Okay.

**THE COURT:**  All right.  Anything else?

**MS. KRSULICH:**  Nothing further from the defense.

THE COURT:  All right.  We'll see you -- oh.

MS. PRIEDEMAN:  Just one thing, Your Honor.

Our last witness has a narrow window of availability, from 2:00 to 4:00 on Monday.

THE COURT:  Okay.

MS. PRIEDEMAN:  So I think that should be doable. He's our last witness.

THE COURT:  Well, then I guess my concern is that you might be done before then.

MS. PRIEDEMAN:  Yeah.  Our hope would be that we can move things around or maybe -- that's the window that he's available is from 2:00 to 4:00.

THE COURT:  Okay.  Which witness is this?

MS. PRIEDEMAN:  Mr. Mahmood.

THE COURT:  Okay.  Well, I don't know.  The answer might be that Mr. Mahmood needs to make himself available earlier and rearrange his schedule.

But what is the -- let's see.  The next defense -- the first defense witness or I guess the second defense witness would be Eskridge; is that right?

MR. FONDO:  Your Honor, we have -- we have Eskridge, we have Novak, and then we have the summary witness.

THE COURT:  Right.  The travel record witness --

MR. FONDO:  Correct.

THE COURT:  -- right?

**MR. FONDO:**  And then possibly the defendant, obviously.

**THE COURT:**  Right.  And do you have a rough estimate of how long Eskridge would take?

**MR. FONDO:**  Not particularly long.  One to two hours maybe.

**THE COURT:**  Okay.  And Novak, if he's allowed to testify on all of the opinions he's apparently by now disclosed?

**MR. FONDO:**  So that's harder to say because we still have to digest today's testimony, but I'm assuming several hours -- a couple of hours for sure.

**THE COURT:**  A couple hours?

**MR. FONDO:**  Yeah.

**THE COURT:**  Okay.  And the travel record witness?

**MR. FONDO:**  That'll be short.

**THE COURT:**  Okay.

**MR. FONDO:**  That's 20 minutes, I think.

**THE COURT:**  Okay.  Do you have any objection to having Eskridge ready and calling him out of order once Chandra -- I don't know how long you plan to cross-examine Chandra for.

How much longer do you have with his direct?

**MS. PRIEDEMAN:**  Not much, Your Honor.

**THE COURT:**  Okay.  Any objection to calling Eskridge out of order, if necessary, or shall I have Mr. Mahmood

rearrange his schedule?

MR. FONDO:  We would have an objection.  But what I would say is:  Why don't we talk about it tomorrow?  Let us think about it a little bit and think about -- think through the scheduling.

THE COURT:  Okay.

MR. FONDO:  But conceptually, yeah, we would object, but I understand the concerns.

THE COURT:  Okay.  Well, you might want to put that witness on notice that a two-hour window of availability is not sufficient and that he may need to be here earlier than that on Monday if Google and the Government wish for him to testify.

MS. PRIEDEMAN:  Thank you, Your Honor.

THE COURT:  Okay.

MR. FONDO:  Thank you.

THE COURT:  By the way, what is the substance of his testimony?  Just that he didn't have a conversation with --

MS. PRIEDEMAN:  Very short.

THE COURT:  -- the people in China?

MR. BOOME:  Yes.  He'll be ten minutes or less on direct examination.  His testimony is isolated to that one incident or lack thereof.

THE COURT:  Okay.

MR. BOOME:  So I don't --

THE COURT:  I mean, do you think anybody thinks that

he did have a conversation --

MR. BOOME:  We'd like the jury --

THE COURT:  -- with anybody in China?

MR. BOOME:  Probably not, Your Honor.  We'd like the jury to hear from him.  I can't see any possible overlap or reason why Mr. Eskridge's testimony would be any different depending on when --

THE COURT:  Okay.

MR. BOOME:  -- Mr. Mahmood testifies.  So...

THE COURT:  We can talk about it tomorrow further, and the defense can think about it.

But Mr. Mahmood may need to --

MR. BOOME:  Understood.

THE COURT:  -- be ready to take the stand earlier than 2 o'clock tomorrow -- or Monday.

MS. PRIEDEMAN:  Your Honor, just logistics-wise for tomorrow's *Daubert* hearing.

So, obviously, Mr. Novak will testify.  And then can we get -- can I get, like, a quick break to talk to Dr. Sanchez before we put him up, or what's the --

THE COURT:  Sure.  Yeah.

MS. PRIEDEMAN:  Okay.  Great.

THE COURT:  And will Sanchez be here in the courtroom?

MS. PRIEDEMAN:  Yes.  That's the plan.

THE COURT:  Okay.  All right.  Okay.

PROCEEDINGS

MR. FONDO:  Thank you.

THE COURT:  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Proceedings adjourned at 3:32 p.m.)

---o0o---


**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Friday, January 23, 2026




*Ana Dub*

_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter