**Volume 9**

**Pages 1605 - 1884**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                )
  VS.                           )   **NO. 3:24-CR-00141-VC**
                                )
LINWEI DING, a.k.a. LEON DING,  )
                                )
          Defendant.            )
_____)

                    San Francisco, California
                    Monday, January 26, 2026


        **TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue, Box 36055
                    San Francisco, California 94102-3495
               BY:  **CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
                    **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    1301 Clay Street, Suite 340S
                    Oakland, California 94612-5217
               BY:  **MOLLY K. PRIEDEMAN**
                    **ASSISTANT U.S. ATTORNEY**

        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant:

GOODWIN PROCTER LLP
525 Market Street
San Francisco, California 94105
BY:   **DARRYL M. WOO, ATTORNEY AT LAW**
**DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
**RACHEL M. WALSH, ATTORNEY AT LAW**
**COLETTE A. LOWRY, ATTORNEY AT LAW**
**NICHOLAS C. WILEY, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 Marshall Street
Redwood City, California 94063
BY:   **GRANT P. FONDO, ATTORNEY AT LAW**
**FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 South Figueroa Street, Suite 4100
Los Angeles, California 90017
BY:   **LORA J. KRSULICH, ATTORNEY AT LAW**

Also Present:       **Andrea Valladao, Federal Bureau of**
**Investigation**
**Veronica Hernandez, Paralegal**
**John Jay, Trial Technician**

**I N D E X**

Monday, January 26, 2026 - Volume 9

| PROCEEDINGS | PAGE | VOL. |
|---|---|---|
| Sealed Proceedings, page 1745 | | |
| Government Rests | 1783 | 9 |
| Charging Conference | 1805 | 9 |

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **CHANDRA, PRASHANT (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 1615 | 9 |
| Direct Examination resumed by Ms. Priedeman | 1615 | 9 |
| Cross-Examination by Ms. Krsulich | 1624 | 9 |
| Redirect Examination by Ms. Priedeman | 1674 | 9 |
| Recross-Examination by Ms. Krsulich | 1686 | 9 |
| | | |
| **MAHMOOD, AAMER** | | |
| (SWORN) | 1687 | 9 |
| Direct Examination by Mr. Boome | 1687 | 9 |
| Cross-Examination by Mr. Rapp-Kirshner | 1692 | 9 |
| Redirect Examination by Mr. Boome | 1697 | 9 |
| | | |
| **KAVURI, RAVI** | | |
| (SWORN) | 1698 | 9 |
| Direct Examination by Ms. Priedeman | 1698 | 9 |
| Cross-Examination by Mr. Feyzi | 1731 | 9 |
| Redirect Examination by Ms. Priedeman | 1771 | 9 |
| Recross-Examination by Mr. Feyzi | 1773 | 9 |

| DEFENDANT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **COMPTON, SCOTT** | | |
| (SWORN) | 1784 | 9 |
| Direct Examination by Mr. Feyzi | 1784 | 9 |

<u>**I N D E X**</u>

| DEFENDANT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **NOVAK, STEVE** | | |
| (SWORN) | 1788 | 9 |
| Direct Examination by Ms. Walsh | 1789 | 9 |

<u>**E X H I B I T S**</u>

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 223 | | 1713 | 9 |
| 5114 | | 1656 | 9 |
| 5149 | | 1660 | 9 |
| 5187 | | 1664 | 9 |
| 5213 | | 1666 | 9 |
| 6250 | | 1693 | 9 |
| 6254 | | 1696 | 9 |
| 6478 | | 1736 | 9 |
| 6480 | | 1741 | 9 |
| 6481 | | 1755 | 9 |
| 6504 | | 1645 | 9 |
| 6511 | | 1647 | 9 |
| 7368 | | 1610 | 9 |
| 7369 | | 1610 | 9 |
| 7370 | | 1610 | 9 |
| 7372 | | 1610 | 9 |

**Monday - January 26, 2026**                                    **9:10 a.m.**

**P R O C E E D I N G S**

---o0o---

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:**  Remain seated.  Come to order.
Court is back in session.

**THE COURT:**  Okay.  Good morning.

**MS. PRIEDEMAN:**  Good morning, Your Honor.

**THE COURT:**  I understand you-all have things you need
to discuss with me.

**MR. FEYZI:**  Good morning, Your Honor.

**THE COURT:**  Good morning.

**MR. FEYZI:**  For the testimony, the direct testimony of
the investigator, Scott Compton, who will talk about the
airline records, the business records from the airlines --

**THE COURT:**  Okay.

**MR. FEYZI:**  -- we just wanted, for efficiency, to move
to admit the four exhibits we'll be using, three of which are
the business records from the airlines and one is a summary
exhibit.

From our understanding, the Government doesn't have
any objections to this, so...

**THE COURT:**  No objection?

**MS. PRIEDEMAN:**  No objection, Your Honor.

**THE COURT:**  Okay.  Those will be admitted.  What are

the exhibit numbers?

MR. FEYZI:  Sure thing.  It is 7368, 7369, 7370, and 7372.

THE COURT:  Okay.

MR. FEYZI:  Thank you.

(Trial Exhibits 7368, 7369, 7370, and 7372 received in evidence.)

THE COURT:  Great.  Anything else?

MS. PRIEDEMAN:  Your Honor, just one thing as to Mr. Novak's testimony, who is our new expert.

I understand the Court's ruling on the opinion due to replication.  But Opinion 4, which basically, as I understand it, is that the information would be less valuable years later once a full copy could be made, we would move to exclude that opinion due to relevance, because I don't -- given the Court's ruling and reasoning last week, I'm not sure how that would be relevant to the economic espionage charge in terms of feasibility.

THE COURT:  Let me pull it back up and refresh my recollection.

MR. FONDO:  And, Molly?

MS. PRIEDEMAN:  What is his opinion on this, you mean?

MR. FONDO:  Yeah.

MS. PRIEDEMAN:  Basically that, as I understand it, not that the trade secret documents were not valuable when

they're stolen, but by the time that it could be replicated in 18 to 24 months, by 2025, 2026, it would be obsolete or no longer valuable.

So, again, don't think that's relevant; and then also, I think there's a risk of jury confusion because, as discussed, the question is the value at the time it was stolen, not years after the theft.

**THE COURT:** How much did he testify on this in the *Daubert* hearing? I think -- I feel like this didn't come up much, if at all; is that right?

**MS. PRIEDEMAN:** I don't think it came up, Your Honor, in part because I was focused on other parts during cross; and then on redirect, I don't think this -- he didn't really explain his opinions on redirect.

**THE COURT:** Right. Well, I think -- I think the answer is probably my -- I don't know. Let me hear from Mr. Fondo.

What's your --

**MR. FONDO:** Certainly. A couple things, Your Honor.

One is it goes to intent. So part of an argument oftentimes in theft-type issues is that if you're going to steal something, you would steal something more valuable than less valuable; and if you're going to replicate something, you're going to replicate it with the most current information possible. And so that's one aspect of it.

Two, as to the benefit of China, I think we would dispute that something that's old, outdated, et cetera doesn't have the same kind of -- any benefit, really, to China or the same type of value. And it also goes to --

THE COURT: The less likely it could have benefited China, the less likely it is that he knew that it would benefit China.

MR. FONDO: Correct. So I think, for example, if he took something that was dated in 2015, even if it had some marginal value, it's pretty hard to argue that he was doing that to build a computer. And a lot of these documents are quite old. So that -- it goes to those issues, Your Honor.

THE COURT: Okay.

MR. FONDO: And the other thing I would say is they've had witness after witness talk about how important these documents are, how valuable they are, et cetera, and that's part of the disagreement.

THE COURT: Yeah, I agree with everything you said. That motion to exclude that opinion is denied.

And, of course, the instruction on trade secrets, we'll make very clear that it's value at the time the product was stolen, and that can be emphasized. And if there needs to be some sort of, you know, pinpoint instruction on that, we can talk about that too.

MS. PRIEDEMAN: Understood, Your Honor. I don't think

that's in the draft jury instructions, so we would request that.  And, again --

THE COURT:  Well, we can talk about that this afternoon when we're going over jury instructions.  And if you have a specific instruction you want to propose, you can do that.

MS. PRIEDEMAN:  Understood.

And I want to see how Mr. Novak's testimony comes in, but, again, the Government is concerned about the emphasis on how much value and is concerned that it will be argued as to the value element of trade secret theft, and so continues -- we continue to believe that it may be appropriate to have a jury instruction making clear that that is not the test and the jury does not have to decide how much value it's --

THE COURT:  I think that -- I think that that -- I think that it may make sense, given the way the evidence has come in/will come in, to have an instruction along those lines. But, obviously, we can discuss it this afternoon.

MS. PRIEDEMAN:  Thank you, Your Honor.

MR. FONDO:  Your Honor, just two other matters.

So, one, we just want to alert the Court, we will be filing a Rule 29 motion.  We're going to wait until all evidence is closed unless the Court has an objection to that, since Sanchez is going to be doing rebuttal, likely to have rebuttal testimony anyways.

THE COURT:  Yeah.  So my only question about that, I am not familiar with the rules of how to preserve your Rule 29 motion.  Right?  If you file one at the close of all evidence, does that still give me the ability to consider what evidence the Government put on in its case-in-chief to assess whether there was sufficient evidence for the jury to conclude this beyond a reasonable doubt or that beyond a reasonable doubt based only on the Government's case-in-chief?

MR. FONDO:  So we believe it does, but if there's any doubt, we'll just argue it.  And then we intend to file a written motion along with that.

THE COURT:  Yeah.  I mean, what you can do -- like I said, I don't know the rules.  I assume you do.  And if you have any doubt about whether -- about preserving the argument, you can make an oral motion alone --

MR. FONDO:  Yeah.

THE COURT:  -- after the close of the Government's case-in-chief.

MR. FONDO:  Okay.

THE COURT:  And we can maybe have a little discussion about it, and I'm sure I'll take it under advisement.

MR. FONDO:  Okay.  Thank you, Your Honor.

THE COURT:  All right.  Anything else?

MR. FONDO:  No.  Just one update as to a witness which we alerted to the Government.  Mark Eskridge is likely not to

testify.  He was our forensic expert.

THE COURT:  Okay.

MR. FONDO:  Just want to alert the Court to that.

THE COURT:  Okay.  So your first evidence will -- I mean -- excuse me.  Your first witness will be the travel record witness or Novak?

MR. FONDO:  Correct, Your Honor.

THE COURT:  Okay.  All right.  And then once the Government has rested, I'll be asking you to give us notice whether the defendant will be testifying or not.

MR. FONDO:  Okay.  Thank you.

MS. PRIEDEMAN:  Thank you, Your Honor.

THE COURT:  All right.  See you in a few minutes.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 9:18 a.m.)

(Proceedings resumed at 9:31 a.m.)

(Proceedings were heard in the presence of the jury.)

THE COURT:  Okay.  Welcome back, everyone.  We are ready to resume with Mr. Chandra.

**PRASHANT CHANDRA**,

called as a witness for the Government, having been previously duly sworn, testified further as follows:

**DIRECT EXAMINATION  (resumed)**

BY MS. PRIEDEMAN:

Q.  Good morning, Dr. Chandra.

**A.** Good morning.

**Q.** So last week we left off, we were talking about Category 6. Do you remember that?

**A.** Yes.

**Q.** Before we -- since it's been a little bit, I'm not going to ask you to go back and testify to everything you already did, but can you just give the jury a brief reminder of what Category 6 relates to?

**A.** Category 6 relates to the Diorite SmartNIC hardware architecture and related documents.

**Q.** And as a reminder, you testified that you were the lead architect for Diorite; right?

**A.** That's correct.

**Q.** And you were the inventor of the Google reliable transport technology?

**A.** Correct.

**Q.** And I believe -- did you testify that -- sorry. Let me scratch that.

How long did it take engineers, including you, to develop Diorite?

**A.** We started in 2018, and by the time it entered production, it was about 2022. So I would say about four years for an overall team of maybe 200 to 300 engineers.

**Q.** And how long did it take to develop the GRT hardware block?

**A.**   About the same time.  It was in parallel with all of the Diorite development.  It was in parallel to the rest of the development, and -- yeah.  Around the same time.  Maybe a team of about 40 to 50 engineers on the hardware side.

**Q.**   And do you have a sense of how much Google invested, from a financial perspective, into developing Diorite and GRT?

**A.**   I would say Diorite overall was probably couple of hundred million dollars' worth of investment for the development, and GRT was a fairly significant part of that.  I would estimate about maybe 40 to 50 million.

**Q.**   And do you have a sense of whether the information in Category 6 is information that should be taken outside of the Google network?

**A.**   No, it should not be taken outside of Google.  The documents in Category 6 are detailed engineering specifications of the GRT implementation.  They're intended for use by Google engineers working on building GRT.

**Q.**   And I -- Dr. Chandra, I want to just return briefly to one of those documents.

        **MS. PRIEDEMAN:**  Ms. Hernandez, can you pull up Exhibit 126, please.

**BY MS. PRIEDEMAN:**

**Q.**   Dr. Chandra, do you have an understanding of whether or not this document was at some point inadvertently opened to a large number of employees at Google?

**A.** Sorry. I don't remember the permissions of the document and whether it was -- it was intended for an engineering review. As you can see here, it says here the audience was managers who -- who are funding the Diorite development, as well as fellow engineers, to educate them about what we are building. So it should really be shared with the people working on Diorite. But I'm not -- I don't remember the permissions of the document.

**Q.** If it was open to everyone at Google, for example, do you have an understanding of why that would be?

**A.** It may just have been an oversight. So the document -- the authors maybe didn't realize that they had shared it more broadly.

**Q.** And looking at this document, do you have an understanding, based on the content of this document, of whether or not this is the type of information that should be taken outside of Google's network?

**A.** Yeah. I think, as I said, this document should not be taken outside of the Google network. This is talking about microarchitecture, which is deep into the guts of the GRT implementation. There is really no reason to take this outside of Google.

**Q.** Is it something that should be emailed, for example, to a personal email account?

**A.** No.

**Q.** How do you know that?

**A.** I mean, as a general policy, I think every engineer who joins Google is made aware of how to safeguard Google's intellectual property and documents, and one of the things that we are told very clearly is that we cannot share these documents to our personal Gmail addresses.

**Q.** All right, Dr. Chandra. I want to move to Category 7.

**MS. PRIEDEMAN:** Ms. Hernandez, can you please pull up Exhibit 777, please.

And can you scroll down all the way to Category 7, please.

**BY MS. PRIEDEMAN:**

**Q.** Dr. Chandra, can you explain the information that's contained in Category 7?

**A.** Yes. So Category 7 is more about the software that is associated with the Diorite SmartNIC. And the various documents here describe the software specifications of the different functions that we've implemented on the Diorite SmartNIC.

**Q.** And what is the purpose of this software?

**A.** So the purpose of this software is -- in order to operationalize Diorite in Google Cloud, there is significant amount of software that we have to write.

And the way the work is structured is there are multiple small teams working on different aspects of the software, and

CHANDRA - DIRECT / PRIEDEMAN

the leads in those teams write documents describing "Here is what we need to build" so that the engineers working on this software have an idea of what we are doing.

It also serves as a review, to educate the broader team about what each team is doing as well.

Q.   Can you talk a little bit about how much work goes into the software design process before the source code is even written?

A.   A lot of the work goes into the design and review process. The coding is actually not -- not the part that takes a long time.

So the design process, you have to first agree on the requirements to come up with a design, document a design, get it reviewed by other partner teams; and then once we have a solid design, then I think the coding -- coding can start or go forward in earnest.

So I would say, I think, if you look at from 2018, when we started working on Diorite, say probably a year, year and a half was solid design time for both hardware and software.

Q.   And so you said, Dr. Chandra, that coding actually doesn't take a long time.  Can you explain a little bit what you mean by that?

A.   So what takes a long time is trying to understand what you have to code, and that involves consultation with other engineers, trying to figure out what products we want to offer

in Google Cloud, how to translate that into requirements, how to translate those requirements into a design, and then how to get consensus on the design with other teams.  So this is a very collaborative process.

Once all that is -- once we have a good idea of the design, engineers go off and write code.  And then the writing code is actually -- once they have a good idea of the design, is pretty fast.  And then once after that, you have to test the code and make sure it works as per the design.  That takes a little bit longer.

**Q.**   And do the documents in Category 7 include information about that design and collaborative process that you were just talking about, Dr. Chandra?

**A.**   Yeah.  Actually, all of these documents here, they're talking about different aspects of the software design.  So, for example, if you look at documents that have RDMA in the name, so these documents refer to a specific type of product that we built and offered in Google Cloud.

And then if you look at the documents that have Andromeda in the name, that refers to a different set of -- a different type of product.

And so all of these products come together in one SmartNIC, but they're individual products that we build and offer customers.

**Q.**   So what you're saying, Dr. Chandra, is that the documents

in this category relate to different parts of the software for Google SmartNIC, but together, they provide a more complete picture of the type of software designs that Google is using for its SmartNIC?

**A.**   That's right.  So together, they give a more complete picture of all the products and the features that we want to offer customers in Google Cloud.  So taken together, you can get a sense of, okay, what is Google trying to do with its SmartNIC strategy and what products are they trying to build.

**Q.**   All right.  Let's look at an example source document from Category 7.

    **MS. PRIEDEMAN:**  Ms. Hernandez, can you please pull up Exhibit 65.

    And can you go to page 2, please, Ms. Hernandez.

**BY MS. PRIEDEMAN:**

**Q.**   Do you recognize this document, Dr. Chandra?

**A.**   Yes.

**Q.**   What is this?

**A.**   So we talked about the GRT hardware component.  This document is talking about a product that offers RDMA capability to our customers and uses RDMA in conjunction with the GRT block.  And what this document is saying is:  Okay, how are we -- how is that whole thing coming together?  How does RDMA work with GRT?  What does the end-to-end picture look like?

**Q.**   Can you remind members of the jury what RDMA is, at a high

level?

A.    Yeah.  So RDMA stands for remote direct memory access. It's an industry standard technology that is used primarily to transfer data from one computer to another much faster than you can do with alternative technologies.  It's been there for a long time, and is increasingly more and more important in machine learning applications.

Q.    And RDMA is the -- is a protocol; right?

A.    Yes.

Q.    And do these documents discuss Google's own implementation and use of RDMA?

A.    Yes.  So this is talking about how the RDMA functionality is implemented in the Diorite SmartNIC; what are the various pieces of software that bring it to life, basically; and how do we put this whole functionality together, taking RDMA as well as the GRT that we designed, how do we put them together and make it sort of a cohesive product.

Q.    And how does Google use the information in this document?

A.    So this is, again, one of the software design documents. It's aimed primarily at software engineers who are working in this field, as well as software engineers who are sort of adjacent to this area but need to know how this -- how this product is implemented.

Q.    Dr. Chandra, do you have an understanding of whether this document is something that should be taken outside of Google's

network?

A.   No.  I think, again, this is another engineering specification design document that is not intended to be taken outside.

Q.   And, Dr. Chandra, you talked about this a little bit; but can you talk about, looking at all of the documents in Category 7, how much work and effort and how many engineers would have worked to create the combination of software designs in Category 7?

A.   I think the software effort is typically larger than the hardware effort.  I would estimate about a couple of hundred engineers working over the four years of Diorite development.

Q.   And do you have a sense of how much investment, from a financial perspective, Google put into developing this software?

A.   Maybe -- I would say maybe about around a hundred million dollars, roughly.

        MS. PRIEDEMAN:  Nothing further, Your Honor.

        THE COURT:  Okay.  Ms. Krsulich, any cross-examination?

                    **CROSS-EXAMINATION**

BY MS. KRSULICH:

Q.   Good morning, Dr. Chandra.

A.   Hello.

Q.   My name is Lora Krsulich.  I represent Mr. Ding.

**A.**    Okay.

        **MS. KRSULICH:**  Mr. Jay, would you please bring up Exhibit 777, please.

**BY MS. KRSULICH:**

**Q.**    Dr. Chandra, the column on the right shows the name of the file in Google's system; correct?

**A.**    Yes.

**Q.**    And the column on the left shows the name of the file in Mr. Ding's notes; correct?

**A.**    Yes.

**Q.**    You testified about the documents on the right; correct?

**A.**    Yes.

**Q.**    The documents that you testified about are not the alleged trade secret files; right?

**A.**    I was asked about the documents, source documents, so that's what I answered, yes.

**Q.**    And you understand that the source documents are not the alleged trade secret files; correct?

**A.**    That's right.

**Q.**    What's on the right column is not the same as what's on the left column; right?

**A.**    I mean, the content is similar.  So it's not a one-to-one mapping.  There's content from multiple documents copied to the documents on the left.  The names of the files are obviously different, but I think the -- if you look at the content, then

you will see a lot of overlap.

Q.   A lot of overlap, but the content is not the same; correct?

A.   No, it's not exactly the same, yes.

MS. KRSULICH:  Mr. Jay, would you please go to page 6 of Exhibit 777.

BY MS. KRSULICH:

Q.   For example, Dr. Chandra, Exhibit 439 is a combination of Exhibits 69, 181, and 182; correct?

A.   That's right.

Q.   You do not know why those three documents were put together into one document; right?

A.   I don't -- I don't know how the documents on the left were created from -- all I know is the content is -- exists in the document on the left, but I don't know why these particular three were combined together.

Q.   The three documents on the right, Exhibits 69, 181, and 182, were not kept in one place at Google; right?

MS. PRIEDEMAN:  Objection, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  So there is -- when we say -- when we talk about one place in Google, Google stores all its documents in what is called as Google Docs system.  It's stored somewhere in the cloud.  Basically, every document -- all we know is we have a link to that document.  It's all stored in Google Cloud.

So you could say, yes, they're all in Google Cloud.

So I don't know how to interpret that "one place." It's not a physical place, right, because it's distributed across all Google storage systems.

BY MS. KRSULICH:

Q.   How many documents are stored in the Google Cloud?

A.   Oh, I -- I don't know.  Hundreds of thousands, maybe. It's a very large number.

Q.   Are these documents stored in the same folder?

A.   No.  I think that you can organize the documents into different folders.  So, typically, Diorite documents would be organized into folders and subfolders based on a particular category, and then -- yeah, and other documents.  So we try to organize documents by projects.

Q.   Sitting here today, can you tell us the file paths for the documents on the right?

A.   I -- I don't know.

Q.   Okay.  Let's -- so we've talked about how the three documents on the right were used to create the document on the left.  I'd like to take a closer look at the document on the left.

MS. KRSULICH:  Mr. Jay, would you please pull up Exhibit 439.

BY MS. KRSULICH:

Q.   A few lines down in Exhibit 439, you see where it says

"RoCE," pronounced "rocky"?

A.   Yeah.

Q.   It also says "OOB," out of bound -- out of band.  Excuse me.

A.   Yes.

Q.   It says [as read]:

      "OOB is like BMC control."

Do you see that?

A.   That's right, yeah.

Q.   Those lines are Mr. Ding's typed notes; correct?

A.   I believe so, yeah.

Q.   Those lines are not cut and paste from the Google source document; correct?

A.   Yeah, I think so.  I don't -- I don't think these are from the source documents.

Q.   The portion of the notes that Mr. Ding typed up are not alleged to be trade secrets; correct?

A.   I believe so.  I'm not hundred percent sure, but yes, I -- yeah.

        MS. KRSULICH:  Mr. Jay, would you please go back to Exhibit 777.

BY MS. KRSULICH:

Q.   Dr. Chandra, looking back at this chart, the notes on the left sometimes have less information than the documents on the right; correct?

**A.**   Yeah, in some cases, they have less information, yes.

          **MS. KRSULICH:**  Let's see Category 7, please, Mr. Jay.

          Please zoom in on the document titled "CloudRDMA Top."

**BY MS. KRSULICH:**

**Q.**   Exhibit 446 is a combination of Exhibits 118, 67, 187, 188, 112, 168, 189, 65, and 73; correct?

**A.**   Yeah.

**Q.**   You do not know why those nine documents were put together into one; correct?

**A.**   No, I don't.

**Q.**   And you understand that not all of the information in the documents on the right made it into the documents on the left?

**A.**   Yeah, I believe so.  I think -- but some information in the documents, such as the Datapath_Deep_Dive or RDMA_GRT, they are -- they did make it to the left --

          (Reporter interrupts to clarify the record.)

          **THE WITNESS:**  -- such as the RDMA_Datapath_Deep_Dive document and the RDMA_GRT document, did make it to the document on the left, and these are detailed engineering internal specifications.

**BY MS. KRSULICH:**

**Q.**   So sometimes it's hard to tell with the documents in digital format.

     I'm holding here the documents in Exhibits 118, 67, 187, 188, 112, 168, 189, 65, and 73.

I'm holding here the alleged trade secret document, Exhibit 446.

In my right hand is the alleged trade secret document; in my left are the source documents.  Which stack is bigger?

A.   The one in your left hand is bigger.

MS. KRSULICH:  May the record reflect it's about an inch and a half?

BY MS. KRSULICH:

Q.   Is that right?

A.   Yeah, I think so.

Q.   You didn't compare the original source documents to the alleged trade secret documents; right?

A.   I have looked at the alleged trade secret documents, and I did see a lot of information in those documents that were from the source documents that we would consider Google internal information.

MS. KRSULICH:  Mr. Jay, please pull up Exhibit 438.

BY MS. KRSULICH:

Q.   Dr. Chandra, there is a link at the top of this document that says "go/grt_mas."

Do you see that?

A.   Yeah.

Q.   That link is to the microarchitecture specification for GRT?

A.   Correct, yeah.

Q.   The microarchitecture specification itself was not cut and paste into Exhibit 438?

A.   The full specification document wasn't, but there's quite a bit detailed microarchitecture information that was in the trade secret documents that I've seen.

Q.   That wasn't my question, Dr. Chandra.

So the microarchitecture specification was not cut and paste into Exhibit 438; correct?

A.   Yeah, that's right.

Q.   Only the link appears in Exhibit 438?

A.   So I -- I have to look at the whole document -- sorry -- to see if there is -- so I don't want to give the impression that this document does not have any microarchitecture specification-related material without looking through the whole document, but -- because I don't remember.

But, yes, at this point in this particular thing that's highlighted, that's just a link.  But the rest of the document I think we have to look at to see if there's microarchitecture information.

Q.   So focusing in on the link, Dr. Chandra, someone who was no longer an employee could not use the link in Exhibit 438 to access the microarchitecture specification; correct?

A.   That's right, yeah.

Q.   You looked with Ms. Priedeman at Document 126, which was the original source document for this file.

**MS. KRSULICH:** Mr. Jay, could we please go to Document 126.

**BY MS. KRSULICH:**

**Q.** We're looking here at the Google source file. Was this document shared with Mr. Ding's personal email?

**A.** I don't believe so.

**MS. KRSULICH:** Thank you.

You can take that down, Mr. Jay.

**BY MS. KRSULICH:**

**Q.** Dr. Chandra, Google encourages learning among its engineers; correct?

**A.** Yes.

**Q.** It encourages learning on many topics?

**A.** Yes.

**Q.** Including on topics not necessarily directed to the employee's job?

**A.** Yeah. I think employees are free to learn about other projects, provided they can get access to the information, yes.

**Q.** One of the ways that Google encourages learning is through Platforms University?

**A.** Yes.

**Q.** Please describe Platforms University for the jury.

**A.** So Platforms University is -- you can think of it as a weekly seminar where experts come and give an hour- to two-hour presentation on a particular project with the -- with the goal

to educate the set of engineers who are in the Platforms organization.

So we -- we constantly have new people joining Google, and by having sort of a rotating set of topics, engineers can go to these seminars and get up to speed on all the projects that are happening within that organization.

Q.   How often do the Platforms University meetings take place?

A.   It usually takes place once every week for a period of three months, and then they take a break, and then they continue again, yeah.

Q.   And you said they're experts.  Are the experts within Google or are they outside of Google?

A.   Google experts.  This is only for Google engineers.

Q.   Are the meetings virtual or in-person?

A.   They're a mix of both.  We have conference rooms at various buildings where we have people attending in person, and also the talk is streamed across multiple sites.

Q.   Who all is invited to attend the Platform University events?

A.   Typically invited to the engineers within the Platforms organization, and also, we have a couple of partner organizations that we work with closely, and those engineers may be invited as well.

Q.   Who are the partner organizations?

A.   Partner organizations, there is one organization called --

which mainly focuses on deployment.  Their acronym is CSCO.  So those engineers work with us very closely, as an example, and they could come and attend these talks.

There are also software organizations that can come and attend the talks as well.

Q.   What type of software organizations?

A.   Software that -- for example, we talked about Diorite software, so that's an example.

Any kind of software that we write for Google Cloud, that we offer products Google Cloud that have -- that rely on what Platforms is building, so those engineers can come and attend the talks.

Q.   You said CSCO is one of the organizations?

A.   Right, yeah.

Q.   Are those -- is that a Google organization?

A.   That's a Google organization.

Q.   And the software organizations, are those Google organizations?

A.   Those are also Google organizations, yeah.

Q.   And how many people typically attend the Platforms University talks?

A.   It varies.  I think I would say, overall, maybe about a hundred people, yeah.

Q.   And the purpose of those talks is educational?

A.   Yes.

**Q.**    How are the slides for those talks shared?

**A.**    The slides may or may not be shared.  If the topic is somewhat sensitive, it's just presented, but not shared.

Sometimes the -- if engineers need to get access to the slides, they will request it explicitly, and then the owner of the document makes a decision as to, okay, whether I should grant access to a particular engineer or not.

Sometimes they're shared -- so we have various access control groups, Level 2, Level 3, et cetera, differing levels of access control.  Sometimes they're shared with that group.

But most of the time, the purpose is just to present the material for educational purposes, answer questions; and then we don't usually share the slides unless some engineer says, "Okay.  I really liked what you presented.  I want to learn more.  Can you please give me access to the slides?"  And based on their need to know, we give them access.

**Q.**    Those slides are available to people who attend the presentations?

**A.**    No, no.  That's what I'm saying.  So because the presentation audience is broader, we don't typically share the slides.  We just present the slides.  And if somebody from the audience wants it, they have a way to request access to the slides, and then we can give them access.

**Q.**    And in certain instances, they may be available to the people who are listening in?

**A.**    Yeah, in some cases, yeah.  I think, you know, we may decide to share it with Level 2 or Level 3, something.

            **MS. KRSULICH:**  Mr. Jay, would you please bring up Exhibit 130.

**BY MS. KRSULICH:**

**Q.**    Exhibit 130 is a Platforms University talk on BaMM2, Pony Express, and use cases?

**A.**    Yeah.

**Q.**    The talk was given in 2023?

**A.**    Yeah.

**Q.**    The purpose of this talk was educational?

**A.**    Yes.

**Q.**    The slides from this talk are part of the alleged trade secret Exhibit 444?

**A.**    Okay.  I'm sorry.  I don't have the list.  I -- probably, yes.

            **MS. KRSULICH:**  Okay.  Mr. Jay, could you please pull up Exhibit 777, page 7.

            Please highlight the row with Exhibit 444.

            **THE WITNESS:**  Okay.  Yeah.

**BY MS. KRSULICH:**

**Q.**    So Exhibit 130, the Platforms University talk, that's the only basis for the alleged trade secret Exhibit 444?

**A.**    Yeah.

**Q.**    There are other Platforms University talks among the

source documents; right?

**A.** I don't remember all the source documents, but I wouldn't be surprised if there are others.

**MS. KRSULICH:** Mr. Jay, would you please go to page 1 of Exhibit 777.

**BY MS. KRSULICH:**

**Q.** In Category 1, Exhibit 210 --

**A.** Yeah.

**Q.** -- is a recording of a Platforms University talk?

**A.** Yeah.

**Q.** And that is the only basis for the alleged trade secret Exhibit 373?

**A.** Yes.

**Q.** In Category 2, Exhibit 78, these are the slides for a Platforms University talk on accelerators?

**A.** Mm-hmm, yeah.

**Q.** That's the only basis for trade secret Exhibit 374?

**A.** Right.

**Q.** And Category 3, Exhibit 152, those are the slides for a Platforms University talk on XLA for TPUs?

**A.** Yes.

**Q.** That is the only -- Exhibit 152 is the only basis for alleged trade secret Exhibit 385?

**A.** Yes.

**Q.** In Category 7, Exhibit 165, that is the slides from a

Platforms University talk on Andromeda, USPS_Promethium, and Network Visualization?

A.   Yes.

Q.   And that is the only basis for the alleged trade secret Exhibit 442?

A.   Yes.

MS. KRSULICH:   Thank you, Mr. Jay.   You can take that down.

BY MS. KRSULICH:

Q.   The AdAstra Tech Summit is another series organized by Google; correct?

A.   It's not an ongoing summit, like -- or a seminar series like the Platforms University.   It just was organized at one time for that particular project.

Q.   It took place in 2021?

A.   I believe so.   I don't remember the date.

Q.   When in 2021?

A.   Sorry.   I don't know.

Q.   It was a while ago?

A.   Yeah.   It's in 2021; right?   So it's a while ago, yes.

Q.   And what was the purpose of the AdAstra Tech Summit?

A.   I believe the purpose was to bring the engineers working on the project together and get everybody in the same room because it's a -- it was a fairly complex project.   And getting engineers together to get them on the same page as to what we

are doing and when -- by when we have to get this project done, so I believe that was the purpose.

Q.    How many people attended the AdAstra Tech Summit?

A.    I don't know.  I did not attend that tech summit, so I'm not sure.

Q.    If someone attends and presents at an event, they typically would have the slides from that event; right?

A.    So, again, I think the slide access is sort of -- should be considered decoupled from the audience that sees the presentation, because at Google, we give presentations and we choose not to share the slides.  In fact, when we give the presentation, we say that we cannot share these slides because there's sensitive information.  We cannot broadly share them.

I have given many such presentations myself.  So it's on a need-to-know basis.  Some of the material, if it is not very sensitive, can be broadly shared; but if the material is sensitive, we do give the talk, we agree to verbally describe the material and tell the audience that this is sensitive material, and we don't share the slides afterwards.

Q.    What about if you're a presenter at the event?  Would you typically have the slides then?

A.    I would have created the slides if I'm the presenter. Yes, I would have the slides.

Q.    You are aware that Mr. Ding presented at the AdAstra Tech Summit?

**A.**   I did not know that.  As I said, I did not attend the summit, so I have no firsthand information of that.

          **MS. KRSULICH:**  Mr. Jay, would you please bring up Exhibit 184.

**BY MS. KRSULICH:**

**Q.**   Exhibit 184 are the slides from the AdAstra Tech Summit presentation on HW hardware architecture; correct?

**A.**   That's right.

**Q.**   This is from 2021?

**A.**   Yes.

**Q.**   It's more than two years before December 2023?

**A.**   Yes.

**Q.**   These are not labeled confidential?

**A.**   It's not labeled confidential, yes.

**Q.**   Mr. Ding would have had access to these slides as a presenter and an attendee; correct?

**A.**   So, again, I think he would obviously have created his own presentation, but it's not necessarily the case that he should have access to other presentations.  He may have had access in this case.  I don't know.  But I think, yeah, it's not normally the case that every presenter has access to every other presenter's presentations.

**Q.**   This is one of the AdAstra Tech Summit slide decks among the source documents; yes?

**A.**   Yes.

Q.   But there are others; right?

A.   Yes.  I'm sure there were multiple presentations at the summit.  I just -- like I said, I don't know all the presentations.

        MS. KRSULICH:  Mr. Jay, would you please pull up Exhibit 777.

BY MS. KRSULICH:

Q.   In Category 5, Exhibits 108, 112, 133, 134, 162, 163, and 164 are slide decks from the AdAstra Tech Summit; correct?

A.   Yes.

Q.   These slide decks are also from 2021?

A.   Yeah.  I assume it's the same tech summit, so it should be the same date.

Q.   In Category 7, Exhibits 65, 112, 121, 135, 169, and 189 are slide decks from the AdAstra Tech Summit?

A.   I don't think, other than 112, the rest don't seem to be related to AdAstra Tech Summit because they are talking about RDMA technology.  And 112 is -- they are talking about something else, cloud networking.

        MS. KRSULICH:  Mr. Jay, could you please pull up Exhibit 112.

BY MS. KRSULICH:

Q.   This is a slide deck from the AdAstra Tech Summit; correct?

A.   Yes.

MS. KRSULICH:  Mr. Jay, would you please pull up 189.

THE WITNESS:  This...

BY MS. KRSULICH:

Q.   Okay.  This is different, but it has the same markings.
Also from 2021?

A.   Yeah.  It has the same template of the first slide, but I
don't think this is part of that same tech summit.

MS. KRSULICH:  Okay.  Exhibit 65, please.

BY MS. KRSULICH:

Q.   Do you know what the date on this document is?

A.   I -- I think the year probably is 2021.  If I look at all
these RDMA documents, they look like they're part of a
different set of presentations unrelated to the AdAstra Summit.
But, yeah, I would -- I would assume it's around the same time,
2021.

MS. KRSULICH:  Okay.  Mr. Jay, could you please pull
up Exhibit 777, the category -- or page 7.

BY MS. KRSULICH:

Q.   So you talked about, Dr. Chandra, some of these documents
are related to the AdAstra Summit and some are related to a
different presentation; right?

A.   Yeah.  The 189, 65, 121, 169, and 135, they are describing
CloudRDMA technology and GRT, which had no relationship to the
AdAstra program, I believe.  So I think -- so it could be a
different set of presentations.

CHANDRA - CROSS / KRSULICH

Q.   Do you know why these documents were put together in the same category?

A.   In the same oral category?

Q.   Yeah.

A.   Yeah.  So -- so this is, basically, Category 7, which is talking about all of the software associated with the Diorite SmartNIC.  I think that's how these documents were categorized. I think everything -- all the software that we built that was for the Diorite SmartNIC is in this category.

Q.   And you testified that AdAstra is not related?

A.   AdAstra is a GPU system that was -- I believe we saw earlier it was Category 5.

Q.   Let's talk about some other types of internal reviews at Google.  Google does internal reviews so a broad set of engineers can give feedback; correct?

A.   Yes.

Q.   And software engineers create design documents to explain to other Google employees how they would write software?

A.   Yes.  How -- yeah, how they're building the system, yeah.

Q.   Google also has a dev entry meeting?

A.   Yeah.

Q.   What does -- what is that meeting?

A.   So dev entry -- so for every project, we have several gates the project should go through to get full approval and funding.  Dev entry is the final gate.

If the project is approved at that dev entry meeting, then it gets appropriate funding in terms of dollars, as well as the people to work on it.  That means that the project is committed and Google is going to execute on that project.

MS. KRSULICH:  Mr. Jay, would you please pull up Exhibit 90.

BY MS. KRSULICH:

Q.   This is the slide deck for the GhostLite development entry meeting?

A.   Yeah.

Q.   And this is from March 10th, 2022?

A.   That's right.

Q.   What does "IPPR" mean on this page?

A.   IPPR is -- I think the acronym stands for infrastructure project planning and review, I believe.  I'm not hundred percent sure what the acronym stands for.

But it's all the various project gates that we have to go through, starting from a concept to planning to development and so on.  This is the full life -- this is describing the full life cycle of the project and the various approvals that the project has to go through.

MS. KRSULICH:  Mr. Jay, would you please pull up Exhibit 6504.

And please zoom in so Dr. Chandra can see a little bit better.

BY MS. KRSULICH:

Q.   Dr. Chandra, what is Exhibit 6504?

A.   Just a second.   (Witness examines document.)

It looks like meeting invite for the GhostLite dev entry meeting.

Q.   And the date on the meeting invite is March 10th, 2022. That's the same date as the slide deck?

A.   Yeah.

Q.   And the subject is "IPPR:  GhostLite Development Entry"?

A.   Yeah.

MS. KRSULICH:  Move to admit Exhibit 6504.

MS. PRIEDEMAN:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 6504 received in evidence.)

BY MS. KRSULICH:

Q.   This is the type of calendar invitation you would typically receive to attend the dev entry meetings?

A.   Yes.  I believe so, yeah.

Q.   Mr. Ding is listed as a required attendee at the IPPR GhostLite dev entry meeting on March 10th, 2022; correct?

A.   Yes.

Q.   That means he was invited to attend the meeting?

A.   Yes.

Q.   There are other slide decks from the development entry meetings among the source documents; correct?

**A.**   Yes.  We have other development presentations, yes.

         **MS. KRSULICH:**  Mr. Jay, could you please go to Exhibit 777, Category 6.

         And Exhibit 440.

         Then please pull up Exhibit 84, which is the source for Exhibit 440.

**BY MS. KRSULICH:**

**Q.**   This is a Terrazzo V2 concept phase CFR meeting?

**A.**   That's right.

**Q.**   Dated August 2nd, 2022?

**A.**   Yeah.

**Q.**   What is CFR?

**A.**   CFR stands for cross-functional review.  It's a presentation we prepare and we give to a set of teams that have to come together to work on the project if the project gets approved.

         So this is sort of a heads-up to those teams, saying this is a concept that -- that is being thought of and could result into a project, and it helps them to plan ahead in case this project comes through.

         **MS. KRSULICH:**  Mr. Jay, could you please pull up Exhibit 6511.

**BY MS. KRSULICH:**

**Q.**   Dr. Chandra, what is Exhibit 6511?

**A.**   Again, it looks like a calendar invite for the Terrazzo V2

planning entry meeting.

Q.   What is the date on the calendar invite?

A.   August 2nd, 2022.

Q.   This is the same date as was on the slide deck?

A.   Yes.

Q.   And the subject is "Platforms Cross-Functional Review - Terrazzo V2 Planning Entry"?

A.   Yeah.

        MS. KRSULICH:  Move to admit, Your Honor.

        MS. PRIEDEMAN:  No objection.

        THE COURT:  Admitted.

    (Trial Exhibit 6511 received in evidence.)

BY MS. KRSULICH:

Q.   Mr. Ding is listed as a required attendee at this meeting as well; correct?

A.   That's right.

Q.   That means he was invited to attend the meeting?

A.   Yeah.

        MS. KRSULICH:  Mr. Jay, could you please pull up Exhibit 777 again.

BY MS. KRSULICH:

Q.   In Category 2, Exhibits 150, 161, and 172 are slide decks from dev entry meetings?

A.   Yeah, that's right.

Q.   In Category 3, Exhibits 58 and 88 are slide decks from

dev entry meetings; correct?

A.    Yes.

Q.    In Category 4, Exhibits 136 and 208 are slide decks from dev entry meetings?

A.    That's right, yes.

Q.    And Mr. Ding would have been invited to attend those meetings?

A.    I believe so, yeah.

        MS. KRSULICH:  Mr. Jay, would you please pull up Exhibit 1195, page 7.

        MR. JAY:  Could you repeat that, please?

        MS. KRSULICH:  Yes.  Would you please pull up Exhibit 1195, page 7.

        I'm making Mr. Jay work today.

        MR. JAY:  I don't seem to have it right now.

        MS. KRSULICH:  Okay.  We can go back to it.  That's okay.

        This is also Government Demonstrative 2.

        Thank you.

        Page 7, please.

BY MS. KRSULICH:

Q.    Exhibit 88 is one of the dev entry PowerPoints?

A.    Yes.

Q.    It was shared with a group called Alphabet?

A.    Yes, looks like, yeah.

Q.   What is the Alphabet group?

A.   I assume it's a set of engineers working for Google.

Q.   How many people are in the Alphabet group?

A.   I don't know.  I think the number of engineers -- total people working for Google is around 190,000.

Q.   So 190,000 people would have access to this document?

A.   Yeah.

Q.   There are other documents that were also shared with the Alphabet group.  Do you understand that?

A.   Yeah.

Q.   You testified about Exhibit 82 on Thursday last week.

     MS. KRSULICH:  Mr. Jay, could you please pull up Exhibit 82.

BY MS. KRSULICH:

Q.   Dr. Chandra, you're not the author on this document; correct?

A.   That's right.

Q.   You are not one of the contributors on this document?

A.   Yes.

Q.   The document was last updated on October 13th, 2022?

A.   Yeah, according to the -- what's written there, yes. Sometimes people forget to update that, but yeah.

Q.   And this document is not the final draft?

A.   I -- I don't know.  I'm just say- -- I'm just pointing out that that last updated is not automatically updated when the

document is updated.

Q.   You do not know how long it took to create this document; right?

A.   No.

Q.   So you testified on Thursday about how long it took to build TCPDirect?

A.   Yeah.

Q.   And how many people were involved?

A.   Yeah.

Q.   That testimony was not about this specific document but about TCPDirect generally; right?

A.   As a whole product, yes.  Yeah.

Q.   How many documents were created in the process of building TCPDirect?

A.   I -- I'm not hundred percent sure.  I -- I think it's more than this document, but I think there are -- it's -- I don't have a number.  It won't -- it's not a huge number, but I'd be surprised if this was the only one.

Q.   Okay.  Let's move on to another exhibit.

         MS. KRSULICH:  Mr. Jay, would you please bring up Exhibit 122.

BY MS. KRSULICH:

Q.   And, Dr. Chandra, this is a document that you authored; correct?

A.   That's right, yeah.

Q.   There's no label on the document?

A.   There's no label, yes.

Q.   Dr. Chandra, you reviewed some of the alleged trade secret documents in this case; correct?

A.   Yes.

Q.   And you concluded that as to the alleged trade secrets you reviewed, some access was too broad due to oversight by Google engineers?

A.   Yes.

Q.   What does that mean?

A.   Sometimes I think engineers create documents using a template, and maybe they didn't pay attention to how it was shared by default, how broadly the document was shared by default.

     Most of the times, it's not the case.  In some cases, yeah, there are -- there's oversight.

          MS. KRSULICH:  Mr. Jay, you can take down this document, please.

BY MS. KRSULICH:

Q.   Dr. Chandra, not all information about TPUs is sensitive; right?

A.   The information that we publicly disclose, for example, on Google Cloud for TPU products, that's public information. Everything else about TPUs is sensitive.

Q.   But Google does disclose some information about TPUs;

correct?

A.    Yes.    When we are ready to offer a TPU as a product in Google Cloud and we want our customers to, obviously, use the product, we disclose some information about the product to help them use it.

Q.    You said when you want customers to use the product.    Can you explain that a little further?

A.    Yeah.    So, typically, we launch a TPU every 12 months. And when the new TPU generation is launched, there is usually sort of a blog post explaining it; there are a set of product-related documents that pop up on the Google Cloud website; and there's usually a big announcement saying that this is a new version of the TPU we have built and what's -- how is it better than the previous version and why should customers care about it.

Q.    What are the types of product development documents you post on- -- product documents you post online?

A.    We -- we typically don't post any of the internal information.    What we post is what a customer would need as a user of the TPU.

So, for example, we may say:    Here is this version of the TPU.    It's 3X faster than the previous version.    It has so much more memory than the previous version.    Here is how big of a system we can build with it.    Here is how much it will cost you on a per hourly basis to buy this new product.

Yeah, I think, yeah, some of the -- just to sort of -- whatever the customers would need, broad set of customers would need to understand what the product is about, that's what we share, yeah.

MS. KRSULICH:  Mr. Jay, would you please pull up Exhibit 5114.

And go to the second page.  I think it's a little easier to read.

BY MS. KRSULICH:

Q.   Dr. Chandra, what is Exhibit 5114?

A.   So this looks like a research paper that Google published about the performance analysis of a TPU.

Q.   And how do you recognize it?

A.   Just from the title, as well as the set of authors that are involved in the publication.

Q.   And the date on the publication is 2017?

A.   Yeah.

MS. KRSULICH:  Move to admit Exhibit 5114.

MS. PRIEDEMAN:  Objection.  Relevance.

THE COURT:  We didn't go through this document in advance, did we?

MS. KRSULICH:  We did, Your Honor.

THE COURT:  All right.  Why don't we briefly -- why don't we take a morning break.  We'll get this sorted out.

And why don't you plan on coming back at 10:45,

15-minute break.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Okay.  You can step down.

Do you want Dr. Chandra out of the room for this discussion?

MS. KRSULICH:  I don't think it's necessary.

THE COURT:  Doesn't matter?  Okay.

MS. KRSULICH:  So I'm planning --

THE COURT:  You're free to go wherever you like.

THE COURTROOM DEPUTY:  Please be seated.

THE COURT:  Okay.  Sorry.  Go ahead.

MS. KRSULICH:  Sure.  So Exhibits 5114, 5149, and 5187, which I'm planning to discuss with this witness --

THE COURT:  5114.

MS. KRSULICH:  5114, 5149, and 5187, Your Honor.

THE COURT:  5187.  Okay.

MS. KRSULICH:  These exhibits were cited in Dr. Sanchez's report, and the Government did not object to relevance.  So they were preadmitted in Docket 266, and now we're just moving them into evidence.

THE COURT:  Okay.

MS. PRIEDEMAN:  If counsel is representing they were in the footnote and they were in Sanchez's report, then I won't object.  I didn't realize that counsel was admitting patents and don't have my list with me.

THE COURT:  Okay.

MS. KRSULICH:  I understand.

THE COURT:  All right.  Great.

MS. KRSULICH:  Thank you.

THE COURT:  Do you have a rough estimate of how much longer you have with --

MS. KRSULICH:  Yes.  It's not much longer.

THE COURT:  Not much longer?

MS. KRSULICH:  Maybe 10, 15 minutes.

THE COURT:  Okay.  Good.

So I assume the next witnesses are ready.

MS. PRIEDEMAN:  Yes, Your Honor.

THE COURT:  And what did you say?  You said you have two more Google witnesses, both of whom will be short?  Is that what I recall?

MS. PRIEDEMAN:  Mr. Mahmood is next, and he's quite short, and then Mr. Kavuri is probably under 45 minutes.

THE COURT:  Okay.  All right.  Thank you.

MR. BOOME:  What time should we come back, Your Honor? I'm sorry.  I didn't --

THE COURT:  Quarter to.

MR. BOOME:  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 10:30 a.m.)

(Proceedings resumed at 10:42 a.m.)

(Proceedings were heard out of  the presence of the jury.)

MR. FONDO:  Your Honor, if I may.

THE COURT:  Yes.

MR. FONDO:  I just want to alert the Court, we will want argument on the Rule 29.

THE COURT:  Sure.  Okay.

(Off the record at 10:43 a.m.)

(Proceedings resumed at 10:48 a.m.)

(Proceedings were heard in the presence of the jury.)

THE COURT:  Okay.  You can resume.

BY MS. KRSULICH:

Q.   Dr. Chandra, before the break, we were looking at Exhibit 5114.

MS. KRSULICH:  Mr. Jay, could you please pull that up.

Move to admit Exhibit 5114 into evidence.

MS. PRIEDEMAN:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 5114 received in evidence.)

BY MS. KRSULICH:

Q.   Dr. Chandra, Google published about TPUs at least as early as 2017; correct?

A.   Yes.

Q.   And there were earlier publications?

A.   I'm not aware of all the publications.  Sorry.  But could have been.

MS. KRSULICH: Mr. Jay, could you please go to page 3 of the document, about halfway down the column where it says (as read):

"Space limits the amount and the level of detail on the TPU in this paper.  See 46, 47, 48, 49, 57, and 60."

THE WITNESS: Okay.  Yeah.

MS. KRSULICH: All right.

Mr. Jay, could you please go to those footnotes.

BY MS. KRSULICH:

Q. Footnotes 46, 47, 48, 49, 57, and 60 are patent applications related to TPUs; correct?

A. Yes.

Q. And these patent applications would have been published prior to 2017?

A. Yes, looks like.

Q. The document that we're looking at is public; correct?

A. Yeah, that research paper looks -- yeah, it should be public.

MS. KRSULICH: Okay.  Mr. Jay, could you please go to Figure 1 in the paper at page 4.

BY MS. KRSULICH:

Q. In 2017, Google published a TPU block diagram; correct?

A. Yeah.

MS. KRSULICH: Mr. Jay, please go to Figure 2.

**BY MS. KRSULICH:**

**Q.**   In 2017, Google published a floor plan of TPU die; correct?

**A.**   Yeah.  This is -- I have to say, this is a cartoon of a floor plan, what we published in the research paper.  It's not the real floor plan, but yes.

**Q.**   Why do you say it's a cartoon?

**A.**   Because a real floor plan is much more detailed and it won't have all these white spaces that you see here.  It's an actual floor plan of a chip.

This is more to give an idea of what are the big blocks in the TPU.  So it's sort of a -- it's intended for research publication.

        **MS. KRSULICH:**  Mr. Jay, please go to Figure 3.

**BY MS. KRSULICH:**

**Q.**   In 2017, Google published a picture of a TPU printed circuit board; correct?

**A.**   Yeah.

        **MS. KRSULICH:**  And, Mr. Jay, please go to Figure 4.

**BY MS. KRSULICH:**

**Q.**   In 2017, Google published the systolic data flow for the matrix multiply unit; correct?

**A.**   Again, I think it's a high-level drawing, explaining the concept of a systolic array, not a detailed specification of how the systolic array can be built.

Q.   And these types of high-level drawings are appropriate to publish?

A.   These are appropriate for this particular research paper, yes.  I think we were trying to explain the overall concept at a high level, yes.

Q.   And what was the purpose of this research paper?

A.   I believe it's just to show that Google is being innovative and has developed an interesting processor that is unlike anything else and, you know, just to share that with the broad -- with the broader community.

Q.   Have you heard the phrase "tech island" referred to in conjunction with TPUs?

A.   Yeah.

Q.   What does that mean?

A.   Tech island, I think, is a general term that we use at Google to identify technology that Google has built that is not technology that companies -- that others outside of Google or the broader industry is using.  So it's sort of a new technology that we built that we use, but it's only used in Google.

Q.   The rest of the technology -- the rest of the industry uses GPUs, and Google is the only company that uses TPUs; correct?

A.   Google is the only company that builds TPUs right now.  We make it available through Google Cloud, so a lot of other -- a

lot of the industry and other companies are using TPUs too.

But, yes, I think Google is the only company that builds TPUs.

Q.   And Google designs custom solutions for TPUs; correct?

A.   Yes.

        MS. KRSULICH:  Mr. Jay, would you please pull up

Exhibit 5149.

BY MS. KRSULICH:

Q.   Dr. Chandra, what is Exhibit 5149?

A.   This is -- this is a paper talking about the Version 4 of

the TPU and basically talking more about the TPU system, which

has thousands of TPU chips connected together, and that's what

they're calling here as an optically reconfigurable

supercomputer.

Q.   And the date of this publication is June of 2023?

A.   Yes.

Q.   And this document is public?

A.   Yeah.  This is a conference publication, yeah.

        MS. KRSULICH:  Move to admit Exhibit 5149, Your Honor.

        MS. PRIEDEMAN:  No objection.

        THE COURT:  Admitted.

     (Trial Exhibit 5149 received in evidence.)

BY MS. KRSULICH:

Q.   This paper discussed optical circuit switches; correct?

A.   Yes.

Q.   It also discussed SparseCores?

**A.**   Yes.

**Q.**   And SparseCores are also known as BarnaCores?

**A.**   The prior version of the SparseCore was called BarnaCore. It's different, but it's -- yeah, it's the evolution of the BarnaCore.

**Q.**   What are the dates for the BarnaCore technology?

**A.**   I believe it was in the Pufferfish generation and prior. That would be around 2022.

**Q.**   Is BarnaCore still used at Google?

**A.**   BarnaCore has been replaced by the SparseCore in the newer generation of TPUs.

**Q.**   So BarnaCore is no longer used at Google?

**A.**   It is used in -- if -- in the sense that we still have Pufferfish systems, older systems that we still use, so it's used there.  But, yeah, in the newer systems, it's been replaced by SparseCore.

**Q.**   And TPU V4, the fourth version of the TPU, has been deployed since 2020?

**A.**   Yeah.

          **MS. KRSULICH:**  Mr. Jay, would you please pull up Exhibit 5187.

**BY MS. KRSULICH:**

**Q.**   Dr. Chandra, what is Exhibit 5187?

**A.**   So I have not seen this document before, but it looks like it's a document explaining how Google's TPUs are designed.  I

have to look through the whole document to be able to say.

Q.   And what is the date on the document?

A.   2021, February.

Q.   So as of February 2021, Google was publishing at least some information about the design process for Version 2 and Version 3 of the TPU?

A.   Yeah.  I think these are sort of high-level design -- how do we go about designing TPUs.  It's kind of a high-level description, I believe.

Q.   The designs for the different TPUs build on one another; correct?

A.   Yes.  Each generation builds on the prior.

Q.   At the same time as Google published this article in 2021, it also published a companion paper describing the supercomputers built from TPUs, the compiler, and its performance in detail; correct?

A.   Yes.  I think -- just to be clear, I think when we say "detail," this is intended for somebody outside of Google to understand what we are doing.  It's not to the level of detail that Google specifications have, because these are -- the audience is not expected to build TPUs.  They won't have enough detail in here to be able to build TPUs on their own.  But internal documents do.

Q.   Fair to say, though, Google did publish some detail about its TPU systems?

**A.**   Yes, some detail, yes.

**Q.**   What was the purpose of this paper?

**A.**   So all of these, I think, around this time, I think Google was trying to show what it had built and that it could be used for interesting machine learning applications.  It was just to showcase the innovation that's happening at Google.

**Q.**   Why would Google want to show what it had built?

**A.**   So Google publishes -- so after a system is built and deployed and we have some learning from it, Google publishes some information of the system to show that it is -- it is one of the innovative companies in the industry and that it is driving innovation in different areas.  And so we do publish a lot of research publications based on our findings.

But, again, I think these research publications don't have the -- any kind of sensitive information that we would consider sensitive that -- you know, it's more about, okay, here we built this computer, it performs amazing, it's 10X faster than the prior computer, et cetera.  So that kind of information.  Not about how do we go about building this computer in detail, what are all the different internal components of it, and so forth.

            **MS. KRSULICH:**  Your Honor, to the extent I haven't already, move to admit Exhibit 5187.

            **THE COURT:**  I don't think you have.

            **MS. PRIEDEMAN:**  No objection.

**THE COURT:** Admitted.

(Trial Exhibit 5187 received in evidence.)

**MS. KRSULICH:** Thank you.

Mr. Jay, could we please go to Figure 1.

**BY MS. KRSULICH:**

Q. Dr. Chandra, Figure 1 describes how Google transformed the TPU Version 1 data path into the TPU V2 data path; correct?

A. Yeah.

**MS. KRSULICH:** Please go to Figure 2, Mr. Jay.

**BY MS. KRSULICH:**

Q. Figure 2 shows the TPU V2 data path in more detail, showing both cores; correct?

A. Yes.

**MS. KRSULICH:** Please go to Figure 4, Mr. Jay.

**BY MS. KRSULICH:**

Q. Figure 4 has the TPU V2 floor plan; correct?

A. Yeah.

Q. And this was all public as of 2021?

A. Yeah.

**MS. KRSULICH:** Okay. Mr. Jay, you can take that document down.

**BY MS. KRSULICH:**

Q. Let's turn now to Diorite and related technology.

The Google Reliable Transport protocol, or the GRT protocol, is an RDMA-based transport protocol; correct?

**A.**    Yeah.  It's a transport protocol that supports RDMA, but it also supports protocols other than RDMA too.

**Q.**    And Intel has access to the implementation for the GRT; correct?

**A.**    Yes.  We have licensed the implementation to Intel, yes.

**Q.**    Intel could use the GRT technology to build a different SmartNIC or even a regular network interface card that they want for a different customer; right?

**A.**    That's right.

**Q.**    Intel can reimplement the GRT from scratch and use it; right?

**A.**    Yes.

**Q.**    The GRT specification is publicly known as the Falcon Reliable Transport specification?

**A.**    That's right.

         **MS. KRSULICH:**  Mr. Jay, would you please pull up Exhibit 5213.  This is for Dr. Chandra only.

**BY MS. KRSULICH:**

**Q.**    Dr. Chandra, what is Exhibit 5213?

**A.**    It's the "Falcon Transport Protocol Specification."  So this is describing how the GRT protocol works.

**Q.**    Did you create this document?

**A.**    Yes.

**Q.**    Does this document relate to the specification that Google provided to Intel?

**A.**   This is one of the specifications that Google provided to Intel.  So there are a few different specifications.  So these are -- these specifications are now open.  But there are also other internal design documents that we provided Intel that are not open.

MS. KRSULICH:  Move to admit Exhibit 5213 into evidence.

MS. PRIEDEMAN:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 5213 received in evidence.)

**BY MS. KRSULICH:**

**Q.**   Dr. Chandra, Falcon is what Google calls its GRT protocol?

**A.**   Yes.

**Q.**   And this is public now, meaning anyone can access it?

**A.**   The protocol specification is public.  The implementation is not public.

**Q.**   Google made the Falcon Transport Protocol specification public through the Open Compute Project?

**A.**   Yes.

**Q.**   What is the Open Compute Project?

**A.**   Open Compute Project is a consortium of all the major companies in the industry.  And each -- the companies contribute their own work as specifications that they make open in the hopes of inspiring other companies to use it.

**Q.**   And Google is part of the Open Compute Project?

A.    Yes.

Q.    And do you recall that Google has a member on the board of directors for the Open Compute Project, Amber Huffman?

A.    Yes.

Q.    And Google has two members on the steering committee for the Open Compute Project, Mr. Iyengar and Mr. Lagar-Cavilla?

A.    Yeah, I believe so.

Q.    Okay.  How does Google benefit from making information public through the Open Compute Project?

A.    So in this particular instance, I think the reason we wanted to make the GRT protocol public was in order to inspire other NIC vendors to implement it.

So we have implemented it, and it's part of the NICs that we build with Intel.  But if we had the broad industry, other NIC vendors implement it as well, that gives us additional options in case we wanted to buy a NIC from a different vendor.

Q.    So Google wanted to develop multiple suppliers in addition to Intel?

A.    Yeah.

Q.    And that's one of the reasons why it made the GRT specification open?

A.    Yeah.

Q.    How would making the protocol open lead to multiple suppliers?

A.    It gives them information about what this protocol is, how

it can be used with RDMA, and gives them an idea, if they want to implement the protocol from scratch, the GRT from scratch, it has sufficient detail for them to do that.

But I think, again, more importantly, I think it gives them an idea of, okay, what does Google -- what is Google using in its own data centers.  And if they want to become a NIC supplier to Google, what is the kind of thing -- what they would need to implement in their own NICs.

Q.   Why would Google want to share what it's using in its own data centers?

A.   Google is only sharing the protocol.  Like I said, I guess earlier, the protocol is just the alphabets and the grammar of the language.  How you use that to create sentences and paragraphs and stuff, that is the implementation piece that we don't open.  We just open up the protocol part.

Q.   And the Diorite microarchitecture document that's one of the alleged trade secrets, that has the GRT protocol specification in it; correct?

A.   That's more about the implementation of the protocol, not the protocol specification itself, because the protocol specification was a different document.

So that microarchitecture is talking about, okay, how do we implement the protocol and how do we use it with RDMA in the Diorite SmartNIC.

Q.   However, the document also showed the protocol

specification, the information which is public now; right?

**A.**    It includes some part of the protocol specification as sort of a preamble to explain how we implemented it.  So I think the document is written such that here is where, for example, a particular aspect of the protocol, here is how we designed it.  And so it has -- it's more about the implementation, not so much about the protocol.

**Q.**    So some parts of the document do, though, include the specification for the protocol which Google has now made public?

**A.**    That's correct, yes.

**Q.**    And you are familiar with the license agreement between Intel and Google?

**A.**    Yes.

**Q.**    And Google shared certain information with Intel about how to build its GRT block; correct?

**A.**    Yes.

**Q.**    Google provided Intel with RTL design source code?

**A.**    Yeah.

**Q.**    What is the purpose of RTL design source code?

**A.**    So that RTL is about implementation of the GRT protocol, and we licensed it to Intel so that in case they wanted to implement it in a different NIC product, they can take our implementation, they can modify it or use it as is in the different NIC product.

Q.    Why did Google provide Intel with the RTL design code?

A.    It's just to -- Intel expressed an interest in wanting to use GRT protocol more broadly with their other customers, and so they requested us to provide our implementation.  So we licensed it to them under specific terms, and we gave them the option to use our implementation as is in a different context, in a different product, or they were free to modify it as well.

Q.    Was the RTL design code given to Intel because it was necessary to -- for them to build what they were going to --

A.    No.  They could -- they could have attempted to build GRT from scratch using the protocol specification.  But the RTL implementation is our implementation, and they know that it's an implementation that we have proven to work in Google Cloud. So it helps them to kick-start their own effort as a -- maybe they can look at it as a reference design or they can use it as is.

It's quite a lot of work to take a protocol and convert it into an implementation, and since we have already done that work, Intel, I think, was thinking that they could benefit from that rather than redesign everything from scratch.

Q.    But you're saying that you could take the protocol that is now public and come up with the implementation?

A.    You can take a protocol and come up with an independent implementation.  Okay?  So I think -- yeah, and our implementation is one implementation of the protocol.

But the good thing about our implementation is, is that we've invented this technology, we have built it over the years, we have it in production, we know it works well; right?  So I think -- so from that standpoint, I think Intel, starting from a proven implementation, they probably saw that as an advantage as opposed to trying to interpret what's written in a document and trying to redo the whole thing.

MS. KRSULICH:  Mr. Jay, can we please look at Category 4 in Exhibit 777.

BY MS. KRSULICH:

Q.   Dr. Chandra, this category includes information about two different GPU systems; correct?

A.   That's right.

Q.   BigRig is the earlier version of GPU than AdAstra?

A.   That's right, yeah.

Q.   And it includes a presentation from the AdAstra Tech Summit that we already talked about?

A.   Yeah.

Q.   And this category includes engineering review presentations; correct?

A.   Yes.

Q.   You don't know where the documents in this category were stored on Google systems?

A.   They were stored in Google Docs, so -- which, as I said before, it's a cloud-based storage system.  All documents are

stored in Google Docs.

Q.   Some documents, though, are stored in G3 systems; right?

A.   G3 Docs is a variant of Google Docs.  It's still part of the cloud storage system, yes.

Q.   And some documents in this category were stored on the Google internal wiki?

A.   Google internal wiki as in G3 Docs or...

Q.   Is that G3 Docs?

A.   That's G3 Docs, which is, again -- Google Docs is the overarching document storage system, and then there are specialized versions.  Like G3 Doc is a way to document -- to write documents, whereas, you know, just regular Google Docs is another way of doing it as well.  But they all ultimately get stored in our cloud-based storage system.

Q.   Could you please explain for the jury what the internal wiki is?

A.   G3 Docs?  So -- okay.  So G3 Docs is -- you can think of it as a way to write web pages.  So normally -- so when you write a document, you can write it as -- for example, in the case of outside Google, you typically use Microsoft Word.  You write a document or you create a PDF document.

     G3 Docs is a document that is returned in the style of a web page, so with links.  You can click on a link and go to the next section.  So that's a -- another way to document -- to write our engineering documents that certain teams prefer to

use because it's easier to navigate.

Q.   So the documents in Category 4 have different authors; correct?

A.   Yes.

Q.   And different dates; correct?

A.   Yeah.

Q.   And they were stored in Google systems among thousands of other documents; correct?

A.   Yeah.

Q.   Same with Category 5?

A.   Yeah.

Q.   These documents were stored on Google systems with thousands of other documents?

A.   Yes.

Q.   And they have different authors and different dates?

A.   Yeah.

Q.   And if I go through each of the different categories, the answer is the same; right?  They're different dates, different authors; correct?

A.   Yeah.

Q.   Different GPU systems?

A.   Yeah.  I mean, as you have mentioned here, I think we're talking about two different GPU systems of different generations.

        MS. KRSULICH:  Thank you, Dr. Chandra.

No further questions.

THE COURT:  Okay.  Any redirect?

MS. PRIEDEMAN:  Yes, Your Honor.

### REDIRECT EXAMINATION

BY MS. PRIEDEMAN:

Q.   All right.  Dr. Chandra, I want to start with one of the papers that Ms. Krsulich was showing you.

MS. PRIEDEMAN:  Ms. Hernandez, can you please pull up Exhibit 5114.

BY MS. PRIEDEMAN:

Q.   And, Dr. Chandra, I believe the date on this paper was 2017; is that right?

A.   That's right.

Q.   Did this relate to Google's TPU Version 1, then?

A.   Probably did.  I cannot exactly remember whether it's 1 or 2, but, yeah, I think one of the early versions, yeah.

Q.   And TPU Version 1 was only designed for inference; is that right?

A.   That's right, yeah.

Q.   Can you explain to the members of the jury what that means?

A.   So inference is -- is, basically, you ask a question and you get an answer.  So it's -- it's like you already built something that is intelligent, and now we are only asking it questions.

So this first version of the TPU was designed to only answer questions.  It was not designed to be something that can be trained to become intelligent.  It was already assumed that you used something else to train -- to train, if you will, artificial intelligence type of a model.  And then you run it on the first TPUs, and you ask it questions, and it gives you answers based on what was already learned from somewhere else.

So that's what it means by -- it's inferring answers to the questions you're asking.

Q.    And the later versions, including TPU Version 4, was designed for both inference and training; right?

A.    That's right, yeah.

Q.    So did TPU Version 1 -- was the design of it pretty different than the later versions of TPUs?

A.    Yeah.  It was the very first one; right?  So I think we were just -- it was very new to us.  So it was designed for a different application.  Yeah, it was very different than the TPUs that we are building, yeah.

MS. PRIEDEMAN:  And, Ms. Hernandez, can you go to Figure 1 on page 4 of this document.

Sorry.  Maybe scroll down to -- I'm not sure where Figure 1 was.

Yeah, right there.  Sorry.

BY MS. PRIEDEMAN:

Q.    You called this a cartoon of a floor plan; right,

Dr. Chandra?

**A.**   Yeah.

         **MS. PRIEDEMAN:**  So, Ms. Hernandez, I'm hoping we can do a split screen of Exhibit -- with Exhibit 172 at page 21, which is one of the trade secret documents.

**BY MS. PRIEDEMAN:**

**Q.**   Dr. Chandra, so on the left is the paper which you called the cartoon of a floor plan, and on the right is one of the floor plans we discussed earlier; right?

**A.**   Right.

**Q.**   Can you describe, at a high level, the difference between these two floor plans?

**A.**   So -- sure.  On the left, this is a research paper.  So you're trying to explain to the audience what are the main components of a TPU, and you want to show them in proportional to their rough size.  So that's what is shown on the left. It's talking about a matrix multiply unit, for example, accumulators, et cetera.  These are big components of a TPU chip.

     On the right side is the real floor plan of the chip. That is, if you look at the chip top down with a high-resolution camera or whatever, this is what you would see. You cannot tell here, by looking at this, where the matrix multiply unit is directly, but what you can figure out from this is how much does this TPU cost Google to build, what's the

rough size of it, how many transistors does it have.

So you can get an estimate from the floor plan, some of the competitive information that we -- typically, we will not disclose because we don't want anyone else to know how big of a chip we are building and how much it's going to cost us.  And with that information, somebody can reverse-engineer and say, okay, if I want to do a better product, then I will have to build an even bigger chip; right?  So I think that is -- so this is a real sort of a photo of the actual chip.

The left is more about conceptual picture, trying to explain, okay, here is what the TPU chip contains and these are the big pieces inside it.

**MS. PRIEDEMAN:**  And, Ms. Hernandez, can you zoom in on the Exhibit 172 on the, kind of, right diagram.

**BY MS. PRIEDEMAN:**

**Q.**   And so, Dr. Chandra, can you see the MXUs in this diagram?

**A.**   Yeah.  I think it's highlighting that the top -- so the text there highlights that the top red area is an MXU.  But if you didn't have the text, you wouldn't know where the MXU is or what is even -- what's the yellow part of the picture and what's the red part of the picture, and you wouldn't know what -- functionally what they do.

**Q.**   But with the text, it tells you about the placement of the different components in the chip?

**A.**   Yeah.

**Q.**   Okay.  And then --

          **MS. PRIEDEMAN:**  You can take that down, Ms. Hernandez.

**BY MS. PRIEDEMAN:**

**Q.**   I'm not going to look at the other articles that Ms. Krsulich showed you, but at a high level, can you just describe the difference in the type of information that's contained in the papers versus the trade secret documents?

**A.**   Yeah.  So the paper -- the key thing to note about the paper is that we publish the paper after we have built the chip and we have the chip in production and we have some learning from it that we want to share with the broader research community.

       So it's more about what did we build, how did it work, what were our lessons.  So that's the kind of information that's in these research papers.  And, in fact, you need to have that information if you want a research paper accepted to a conference or a journal.

       In contrast, the information that we have seen in the trade secret documents or the source documents, those go into detail as to how do we actually go about building this chip. These are engineering specifications that are intended for our own internal engineers in building -- in building a TPU, let's say, or building a particular component of a TPU.

       So that's the kind of information that is not only sensitive, but it's also of really no interest to the research

audience.  They are not looking to see how to build a TPU. They're interested to see what did you learn from it, how did it work.

So we kind of -- these are two different categories. I think we always -- for every product that we build, we have detailed internal design documents that are aimed at Google engineers who are building the product.

And then once we have some experience at using the product, we will publish papers because we want to tell the broader community here is an interesting piece of technology we developed, here it how it worked, here are the lessons.  Right? I think that's the distinction, I think.

Q.   All right.  I want to ask about a slightly different topic.  Ms. Krsulich pointed out dates on several of the source documents that showed that some of them were created in 2021 or 2022.

Does the technology that you've discussed in your testimony, does it take a while to create and invent that technology?

A.   Yeah.  Like, I mean, we talked about the Diorite timeline. So we started building it in 2018.  It took a while and went into production in 2022.  And we are still improving the technology; right?

So I think you may have -- if I were to write a Diorite concept presentation dated 2018, we may -- that doesn't mean

the technology is not relevant now.  It's still being used.
It's still -- we build on top of what we have done in the next
generation.

Q.   And Category 1 relates to TPU Version 4.  Is Google still
using some of its TPU Version 4s in its data centers?

A.   I believe we still have TPU Version 4 in the data center,
yes.

Q.   And why is that?

A.   These TPUs, they usually have a deployed lifetime of about
six to seven years.  Google spends an enormous amount of money
building these TPUs, and we put them in the data center when we
launch the TPU, and then it stays there for six to seven years
doing useful work.  Right?  So every year we have a new TPU,
but we -- you know, we continue using the older ones.

Q.   And in that same vein, is Google continuing to use
TPU Version 5 and 6 in its data centers?

A.   Yes.

Q.   And you mentioned Diorite.  Is Google still using Diorite
in its data centers?

A.   Yes.

Q.   And AdAstra came up as well.  It's one of Google's GPU
systems.  Is Google still using --

A.   Yeah.

Q.   -- AdAstra?

A.   Yeah, Google is still offering the AdAstra product, and

it's still -- it's still in Google Cloud data centers, still being used by customers, yeah.

Q.   What about BigRig?

A.   BigRig, I wouldn't be surprised if it is still being used. Usually, when -- you know, when customers buy these, they are also making an investment, and they want to use it for several years.  So, yeah.

Q.   Okay.  I want to talk about Exhibit 438.

MS. PRIEDEMAN:  Can you please -- that's one of the trade secret documents, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   So, Dr. Chandra, Ms. Krsulich pointed out here the link that says "go/grt_mas," and you discussed that that's a link to the microarchitecture.

A.   Yes.

MS. PRIEDEMAN:  Can you please go to page 8, Ms. Hernandez, of this same document.

BY MS. PRIEDEMAN:

Q.   Is this a portion of the GRT microarchitecture?

A.   Yes.  It's one of the drawings from the GRT microarchitecture specification that shows how the internals of the GRT block is designed.

Q.   And are there other excerpts from the GRT microarchitecture in this document?

A.   I believe so.  I think it goes into successive level of

detail.  So, for example, here, we are -- you know, we are showing roughly four boxes and how they're connected together, and then the subsequent drawings go deeper into each box and show the internals of that box.

Q.   And what does that microarchitecture tell you about how the GRT hardware block is designed?

A.   I mean, it's basically the blueprint to the GRT implementation.  So, you know, you can see that the engineers who worked on it, they go outside in.  So they're going one level deep each step and describing what each block does.

So, yeah, it's -- this is how the, you know, implementation comes together.  It's sort of a blueprint for the implementation.

Q.   And Ms. Krsulich spent some time talking to you about the GRT protocol versus the GRT implementation.

A.   Yeah.

Q.   Does the microarchitecture that we're looking at now relate to the implementation?

A.   Yeah, it is the implementation.

Q.   And that's not information that Google has open sourced?

A.   No.

Q.   And Ms. Krsulich also mentioned that under a licensing agreement, Intel can use the GRT block on its chip or other chips; right?

A.   That's right.

Q.   Are there limitations on whether or not -- can Intel disclose the details of the GRT hardware block to anyone else?

A.   So, only under NDA.  So it is licensed as Google intellectual property, and there is an agreement overall between Intel and Google on how we protect each other's intellectual property.

So in this instance, if there was a need for Intel to disclose the microarchitecture details with their customer, they can do that, but it has to be under an NDA.

MS. PRIEDEMAN:  And, Ms. Hernandez, can you please pull up Exhibit 126.

And can you -- sorry.  Can you go to page 21 and then do a comparison of 438 at page 8 as well.

BY MS. PRIEDEMAN:

Q.   So, Dr. Chandra, on the left is Exhibit 126, which is the source document for this trade secret document, and then on the right is the trade secret document.  Do you see that?

A.   Yeah.

Q.   And is that the same microarchitecture diagram from the original source document?

A.   Yeah, it is.

MS. PRIEDEMAN:  Okay.  You can take that down, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   All right.  Dr. Chandra, Ms. Krsulich asked -- also asked

you a number of questions about Platforms University and the AdAstra Summit.

**A.**    Yeah.

**Q.**    Is Platforms University designed only for Google employees?

**A.**    Yeah.  It's, yeah, designed for Google employees and specifically for engineers who are in the Platforms organization or a couple of partner organizations, like we talked about.

**Q.**    So the audience is limited within Google?

**A.**    Yeah.

**Q.**    And you said -- do some of those presentations cover sensitive or confidential information?

**A.**    Yeah.  I mean, a lot of the times we do cover sensitive and confidential information, but we preface the presentation by saying that there is sensitive information in this; it cannot be shared outside of Google.  We go over that.  We answer questions.

But, again, as I was telling earlier, that we don't necessarily share the slides because in case the information is sensitive, we don't share the slides.

Some engineers will ask for it because they want to learn more, and then we can make a determination as to whether they need to know, and then if they need to know, we'll share it with them.

**Q.** You wouldn't invite, say, a competitor company to a Platforms University presentation?

**A.** No. It's a Google internal presentation, yeah.

**Q.** And do you have an understanding of whether or not the Platform presentations can be taken outside of Google?

**A.** No. I think -- again, I think these contain Google sensitive information. It should not be taken outside of Google.

**Q.** And also -- so for the AdAstra Tech Summit, who is the -- is that also an internal Google presentation?

**A.** Yeah. I think the tech summit was sort of an organizing summit for the engineers working on the project because I think the project was a critical project and we had very short amount of time to work on it. And I think when -- they try to bring all the engineers together in a room to quickly go through the technology, what we are building, and get everyone on the same page.

**Q.** And so, again, that was just Google engineers attending that summit?

**A.** Yes.

**Q.** There weren't competitors invited?

**A.** No.

**Q.** All right. And then Ms. Krsulich also showed you several calendar invitations for dev entry meetings --

**A.** Yeah.

Q.    -- that Mr. Ding was invited to.

Does being invited to attend a dev entry meeting give you permission to send materials from that meeting to your personal account?

A.    No, of course not.  I think the meeting invite is sent to a set of engineers who are -- who may be involved with the project.  They can come and attend the meeting.

But, of course, everything that is presented there, just like we talked about Platforms University, there's a -- these are internal Google documents that cannot be taken outside.

MS. PRIEDEMAN:  No further questions, Your Honor.

THE COURT:  Okay.  Any recross?

MS. KRSULICH:  Briefly.

### RECROSS-EXAMINATION

BY MS. KRSULICH:

Q.    Dr. Chandra, hello.  Is TPU V4 still being built?

A.    No, it's -- I don't believe it is being built.  It's already been built and deployed in our data centers, and we are just using it.

Q.    And you testified that Google is still improving its technology, always improving?

A.    Yeah, always, yeah.

Q.    As a general rule for Google technology, 2023 technology is more current than 2021 technology; right?

A.    Yeah.

MS. KRSULICH:  No further questions.

THE COURT:  Okay.  You can step down.  Thank you.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  And the Government can call its next witness.

MR. BOOME:  Your Honor, the Government calls Aamer Mahmood.

(Witness enters the courtroom and steps forward to be sworn.)

THE COURTROOM DEPUTY:  Please raise your right hand.

**AAMER MAHMOOD**,

called as a witness for the Government, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.

Can you state and spell your full name for the record.

THE WITNESS:  First A-a-m-e-r, M-a-h-m-o-o-d.

**DIRECT EXAMINATION**

BY MR. BOOME:

Q.   Good morning, Dr. Mahmood.  Thank you for being here.

A.   Sure.

Q.   Would you please tell the members of the jury how you're currently employed, sir?

A.   I work for Google.

Q.   What's your role?

A.    I'm the VP of engineering in Google.

Q.    Can you give the members of the jury a very high-level overview of your education and earlier employment before you joined Google?

A.    Okay.  I did my master's and Ph.D. from Stanford.  And in the last 29 years, I've been working for ten years for Cisco and at Google for 19 years.

Q.    You mentioned your role is VP of engineering.  Is there a particular segment of Google's technology with regards to engineering that you oversee?

A.    Yeah.  I'm responsible for Google's data center infrastructure, which is the infrastructure that is used by all Google applications.  That includes Search, Cloud, YouTube, AI.  Anything that Google runs on, that's the infrastructure I manage.

Q.    Does that include, Dr. Mahmood, Google's GPU- and TPU-based supercomputers?

A.    Yes, it does.

Q.    Can you estimate for the members of the jury about how many other Google employees work in the organization that you manage?

A.    I have about 3,000 employees that report to me.

Q.    Dr. Mahmood, at some point in 2025, did the FBI contact you to ask you about the defendant, Linwei Ding, who went by Leon Ding at Google?

**A.**   Yes, they did.

**Q.**   Before the FBI approached you to ask you about the defendant, did you know him at all?

**A.**   Not at all.  That doesn't mean that he didn't work in my org.  I just did not know him.

**Q.**   Before you learned about the defendant in connection with this case, were you aware of his specific job duties at Google?

**A.**   Not at all.

**Q.**   Were you familiar with his work quality or his performance?

**A.**   Not at all.

**Q.**   Do you ever remember meeting with him or speaking with him on any occasion?

**A.**   I actually have no recollection.  That doesn't mean I didn't meet him.  But -- in fact, when I looked at my record, it shows that I had a meeting with him, and it was about career development, but I don't have any recollection of it.

**Q.**   And we'll come back to that in one second.

        **MR. BOOME:**  Ms. Hernandez, can you bring up, please, Exhibit 1170, page 2, in evidence.

        And if we could highlight Mr. Mahmood's and the information below it.

**BY MR. BOOME:**

**Q.**   Mr. Mahmood, is this your name here?

**A.**   That's my name.

**Q.**   Were you the defendant's supervisor at Google?

**A.**   Not direct, but I was the VP for the org he worked in. There are about three levels or more managers between him and me.

**Q.**   There's an email listed, aamermmood@gmail.com.  Is that your email address?

**A.**   No, that's not.

**Q.**   Was it ever your email address?

**A.**   No, it never was.

**Q.**   How about the phone number?

**A.**   It's not my phone number.

**Q.**   Was it ever your phone number at any time?

**A.**   No, it was not.

        **MR. BOOME:**  Ms. Hernandez, can we go to Exhibit 869, please.

        And if you could somehow get both pages on the screen, that would be great.

**BY MR. BOOME:**

**Q.**   Mr. Mahmood, we reviewed this email together before your testimony today; right?

**A.**   Yep.

**Q.**   And it's an email between an individual called Eric Dong, who represents they work for MiraclePlus; correct?

**A.**   That's what it says, yeah.

**Q.**   And Mr. Dong is communicating with somebody using the

email aamermmood@gmail.com.  Was that you?

A.   No, it was not.

Q.   The most recent date of the email on the first page, do you see August 20th, 2023?

A.   Yes.

Q.   And in that communication (as read):

     "Hi, Mr. Mahmood.  4:00 p.m. tomorrow works!

Thanks so much!"

Did you have a conversation with anyone named Eric Dong on August 21st, 2023?

A.   No.

Q.   Mr. Mahmood, three days after this email exchange on August 23rd, 2023, did there come a time when the defendant reached out to your assistant to schedule a meeting with you?

A.   That's what the record shows, yes.

Q.   According to the records that you reviewed in preparation for your testimony today, did you find a calendar invitation showing a meeting between you and the defendant?

A.   I did.

Q.   Do you recall the date of that meeting?

A.   August 23rd.

Q.   Was it -- was it September 22nd, 2023?

A.   It was rescheduled to it, yes.

Q.   Do you have any memory of meeting the defendant on that day?

**A.**   No, I don't.  That doesn't mean it didn't happen, but I just don't remember it.

          **MR. BOOME:**  Thank you, Mr. Mahmood.

          No further questions.

          **THE COURT:**  Any cross?

          **MR. RAPP-KIRSHNER:**  Briefly.

                    **CROSS-EXAMINATION**

**BY MR. RAPP-KIRSHNER:**

**Q.**   Good morning, Mr. Mahmood.  Thank you for your time.

**A.**   Sure.

**Q.**   My name is David Rapp-Kirshner.  I'm an attorney for Mr. Ding, and I'll be asking you a series of questions, but I'll try to keep this brief.

**A.**   All right.

**Q.**   You testified that you have about 3,000 people that report to you; correct?

**A.**   Yep.

**Q.**   You must get asked for career advice quite a bit?

**A.**   Pretty normal.

**Q.**   Pretty normal.  And it's normal that you don't recall every single time someone has asked or discussed career advice with you?

**A.**   Unless that's somewhere very weird or strange, it's just the usual -- unless they are asking something very strange or bizarre, there is usually the regular stuff that I tell

everybody.

Q.   And you testified that you reviewed documentations and saw a calendar invitation for a meeting with Mr. Ding; is that correct?

A.   Correct.

MR. RAPP-KIRSHNER:  Mr. Jay, would you please pull up Exhibit 6250.

BY MR. RAPP-KIRSHNER:

Q.   Mr. Mahmood, is this the calendar invitation that you reviewed?

A.   Yep.

Q.   And that's your work account on top in the "from" line; is that correct?

A.   Yep.

Q.   And this is a meeting for Friday, September 22nd, at -- 2023 at 3:30 p.m.; correct?

A.   Yep.  Yes.

MR. RAPP-KIRSHNER:  Thank you.

I'd like to move this into evidence.

MR. BOOME:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 6250 received in evidence.)

BY MR. RAPP-KIRSHNER:

Q.   And it also says, beneath the header, that you have accepted the invitation; correct?

A.    Yep.

Q.    So this would have appeared on your calendar?

A.    Yes.

Q.    And you have no record that this meeting was ever canceled; correct?

A.    No, I have no record this was canceled.

Q.    And you have no personal knowledge that it was canceled?

A.    No.

        MR. RAPP-KIRSHNER:  Mr. Jay, could we scroll down to page 2, please.

BY MR. RAPP-KIRSHNER:

Q.    In that little message which appears to be from Mr. Ding, it says that he had just met you near the MK.

      What is the MK?

A.    The micro kitchen.

Q.    And that's within Google's office building that you worked?

A.    Yeah.  Each floor in Google has food where you can go and have coffee and stuff, so that's called micro kitchen.

Q.    And then in the next line, he states he'd like to ask some questions for mentorship about his career development for the long term.

      You testified that you don't recall whether or not this conversation happened?

A.    That's correct.

**Q.**  Dr. Mahmood, what was the Astrophel exec leadership group?

**A.**  The what?  I have no idea.

**Q.**  Astrophel exec leadership?

**A.**  I don't know.

**Q.**  Let's pull up an exhibit.

**MR. RAPP-KIRSHNER:**  Mr. Jay, would you please show Exhibit 6254 just to the witness.

**BY MR. RAPP-KIRSHNER:**

**Q.**  Dr. Mahmood, this is a calendar invite with the subject line "Astrophel Exec Leadership Review/Dev Entry (m)."

Do you see that?

**A.**  Yeah.

**Q.**  And it was scheduled for December 15th, 2022; correct?

**A.**  Okay.  That's what it says, yeah.

**Q.**  Now, if you look into the second line of required attendees, your name appears third from the end of the second line.  Do you see that?

**A.**  Yeah.

**Q.**  So this would be a calendar invite for this Astrophel exec leadership review where you're a required attendee; correct?

**A.**  Yes.

**MR. RAPP-KIRSHNER:**  I'd like to move to admit this document.

**MR. BOOME:**  No objection.

**THE COURT:**  Admitted.

(Trial Exhibit 6254 received in evidence.)

**BY MR. RAPP-KIRSHNER:**

Q.   Do you recall the purpose of this meeting?

A.   No, I have no idea.

Q.   You don't recall whether you reviewed any documents as part of this meeting?

A.   No, not at all.  It doesn't mean I actually attended it. It just says "Required."  Doesn't mean I went there, so...

Q.   For this type of meeting, would you expect that documents were discussed during the course of it?

A.   In some meetings, some documents are discussed, yes.

Q.   And Mr. Ding served on this group alongside you; correct?

A.   He was in my organization.

Q.   For this specific Astrophel exec leadership review, Mr. Ding was a listed attendee; correct?

A.   Yes.

       **MR. RAPP-KIRSHNER:**  Mr. Jay, would you highlight Mr. Ding's name right there?

       Perfect.

       **THE WITNESS:**  Yeah, I can see it.

       **MR. RAPP-KIRSHNER:**  Okay.  Great.

       No further questions.

       Thank you.

<u>**REDIRECT EXAMINATION**</u>

**BY MR. BOOME:**

**Q.**   Dr. Mahmood, the meeting that you found in reviewing your calendar for September 23rd, 2023, that was a little more than a month after the email exchange we reviewed just now -- right? -- between aamermmood@gmail.com and the MiraclePlus representative?

**A.**   Yes.

**Q.**   And I know you said that you don't remember whether that meeting happened or not; right?

**A.**   Correct.

**Q.**   Do you think that if the defendant had told you at that meeting that a month earlier he had impersonated you to give himself a professional reference, do you think you might have remembered that?

        **MR. RAPP-KIRSHNER:**  Objection.  Calls for speculation.

        **THE COURT:**  Overruled.

**BY MR. BOOME:**

**Q.**   If he had told you --

**A.**   I don't think anybody would come and tell me they impersonated me, so...

**Q.**   Because you probably would remember that if he had told you that; right?

**A.**   Yes.

        **MR. BOOME:**  No further questions.

MR. RAPP-KIRSHNER:  No further questions.

THE COURT:  Okay.  You can step down.

Thank you.

(Witness excused.)

THE COURT:  And the Government can call its next witness.

MS. PRIEDEMAN:  The Government calls Ravi Kavuri.

(Witness enters the courtroom and steps forward to be sworn.)

THE COURT:  Go ahead and have a seat right there.

THE COURTROOM DEPUTY:  Please raise your right hand.

**RAVI KAVURI**,

called as a witness for the Government, having been duly sworn, testified as follows:

THE WITNESS:  Yes, I do.

THE COURTROOM DEPUTY:  Thank you.

Please state and spell your full name for the record.

THE WITNESS:  My name is Ravi Kavuri, R-a-v-i, K-a-v-u-r-i.

**DIRECT EXAMINATION**

BY MS. PRIEDEMAN:

Q.   Good morning, Mr. Kavuri.  I can already tell you're going to need to move the microphone closer and speak up.  Thank you.

A.   Yes.  Okay.

Q.   Where are you currently employed, Mr. Kavuri?

A.   I'm employed by Google.

Q.   And how long have you worked at Google?

A.   Since 2018.

Q.   I'm going to ask you to speak up even more.  You might just have to --

A.   Since 2018.

Q.   That's better.  Thank you.

And what is your current title at Google?

A.   I'm a senior director of engineering.

Q.   And the jury has heard a little bit about the different levels of engineers.  What level engineer are you?

A.   I'm considered an L9.

Q.   And briefly, what is your educational background?

A.   I have a bachelor's in electronics and telecommunications, and I have a master's in software engineering.

Q.   And where are those degrees from?

A.   My bachelor's was in the University of Madras, and my master's was in University of St. Thomas.

Q.   And so you said you're a senior director of engineering.  What are your job responsibilities at Google?

A.   I manage a team of engineers that are responsible for a subsystem called Borg and also special flexibility.  So I have about 600 or so team I'm responsible for.

Q.   About 600 or so engineers on your team?

A.   About 650 engineers, managers, things like that.

Q.   And at a high level, can you explain what Borg is?

A.   Yeah.  Borg is a cluster management system.  I think the best way to think about it is, at the scale that the Google operates, we don't have one massive computer that does everything.  So we take a look at a lot of the computers.  Think of like your laptop.  Maybe ten times that is like one of those servers.  We assemble tens and thousands of those into what is called a cluster.

So the idea is, we make a lot of computers look like one large computer, but that also gets divided up and used by Google.  So anytime you use Search or YouTube or any, you know, of Google's applications, a lot of those applications run on top of Borg.

Q.   And is Borg a type of software?

A.   Yes.  It is a software layer.

Q.   And you said it's used across Google.  Is it also used within Google's AI infrastructure and AI computers?

A.   Correct.

Q.   So you said that there's about 600 people in your larger group.  Are there -- are there different areas or teams within the Borg group?

A.   Yes.  So the cluster management I talked about, that -- the layer of software that makes all the computers look like one large computer, that is called Borg Prime or Borg Control Plane.  There is computers that make up that very large cluster, and each of those, we -- there's a layer of software

called Borglet.  That is also part of my team.

In addition to that, we have other teams that deal with capacity and ML-related scheduling and things like that.

Q.   So you said Borg Prime is kind of the software layer that's connecting the different computers, and then you said Borglet is the software that's kind of closer to the machines; is that right?

A.   Closer to the machine layer, correct.

Q.   And does the -- does Borglet communicate with the larger Borg software system?

A.   Correct.  So pretty much all the software layers are interconnected.  So at the lowest level, things like "Is the machine working okay," that is one layer of software.  And then Borglet, once it knows that it is working, it works with other computers and communicates to the cluster management system that it is ready to do processing and things like that.

Q.   All right.  Do you know the defendant, Linwei Ding?

A.   I -- I do.

Q.   Do you also know him by the name Leon Ding?

A.   Correct.

Q.   How do you know him?

A.   Leon is an engineer within the Borglet team that I just talked about.  He was -- he was in the same group that I was managing.

Q.   Was he in your reporting chain?

KAVURI - DIRECT / PRIEDEMAN

A.    Yes.

Q.    Where was he in the reporting chain?

A.    He's an L4 engineer.  He joined the Google working in the performance team, working on storage layer.  He transferred to the Borg team.  And so he was an L4 engineer that's reporting to a manager that reported to a director who reported to me.

Q.    So you were kind of his boss's boss's boss; is that right?

A.    Yeah.

Q.    So you said he started out as an L4 engineer, and then at some point was he promoted to L5?

A.    Correct.

Q.    Do you know when that was, approximately?

A.    That was, I believe, twenty- -- 2022, late 2022.

Q.    And we talked about the fact that you're an L9 engineer.  How senior is an L5 engineer in comparison?

A.    I'd say L5 -- usually, when you first come out of college, people either start with an L3.  If you have a Ph.D., sometimes you start as an L4.  They usually get promoted within a few years to L4 and then to L5.

      L5 is considered a senior engineer.  They tend to be a tech lead for about a few L4s and L3s, so about four or five.  They oversee the technical work of about four or five people.

Q.    And roughly, what percentage of your organization is made up of L5 engineers?

A.    So I think L4s are about 32 percent, L5s I would say are

about 16 percent, and L3s are another about, like, 20 percent. So between L3 to L5, that occupies about 65 percent of the population of the engineers.

Q.   All right.  Mr. Kavuri, are you familiar with what Mr. Ding's job responsibilities were when he was at Google?

A.   Yes.  He was responsible for the Borglet that I talked about.  He is especially responsible to work on the GPU software.  Google started investing in GPUs about a decade ago. So he worked on the Nvidia-specific version called H100.  He was responsible to make the -- use the driver software to tune GPU frequency.  So, yeah, largely making the GPUs available for the cluster management system that I talked about.

Q.   So he was mostly focused on a particular software component of Google's GPU supercomputers?

A.   Correct.

Q.   And given that you were Mr. Ding's boss's boss's boss, how were you -- how are you familiar with what his job responsibilities were?

A.   I don't always keep track of, on the daily basis, what they're working on; but any large project that gets approved to work on, on things like that, I have a general sense about how that particular project is going on.

     I also, as a part of the evaluation -- we do an annual review -- so I review most of the candidates that are either at the top of the curve, that they're getting ready to be

promoted, or if they're having trouble with performance issues, I generally get a chance to look at deeply into making sure that we are being fair to them.

So I'm familiar from that standpoint with Mr. Ding's specific work and their contributions.

Q.   And prior to your involvement in this case, did you -- did you have a memory of reviewing Mr. Ding's work experience as part of those performance reviews?

A.   Yeah.  Usually, any promotion candidate that is going up, I would have a chance to review those particular cases to make sure that they -- sometimes people get promoted.  Sometimes they may not get promoted, waiting for one more cycle or two more cycles sort of a thing.

So generally, for the people that get promoted, I look at it.  So I remember looking at Leon's promotion case.

And further, when their performance was impacted a little bit, so I also had a chance to look at it based on their rating.

Q.   So let's talk about that a little bit.  Can you talk about what his performance was like at Google?

A.   Yeah.  For the first couple of years -- so Google has gone through a couple of different variations, but it's usually about a five-point scale.  So if somebody is not -- most people fit into the category of meeting expectations.  That is called CME, "Consistently meeting expectations."

If somebody is below that, it would be "Not meeting expectations." If somebody is above that particular one, it's referred to as "Exceeding expectations." One above that is called "Strongly exceeding expectations." There's one more layer reserved for about 1 to 2 percent of the population that's called "Superb." And so that's the five-point scale that we generally look at.

So, yeah, nowadays, it's -- a different terminology is used, but the scales are the same.

"Strongly exceeding" is replaced with "Outstanding impact," and "Superb" is replaced with "Transformative impact."

If you are not meeting the expectations, it's called "Medium impact."

Q. And generally, how did Mr. Ding perform at Google?

A. For the first couple of years, he was on the standard trajectory. He did get "Meeting expectations" for the first couple of years. He started demonstrating "Exceeding expectations." And I think prior to his promotion, he got "Strongly exceeding expectations." He was promoted.

After the promotion, for a year or so, his performance dropped a little bit.

Q. And when was that when his performance dropped?

A. I think end of '23.

Q. End of 2023?

A. Yeah. We do the review at the end of the year. If I

remember correctly, that was at the end of '23.

Q.   And how did his performance drop at that point?

A.   The -- the amount of work expected at the L5 level is less than what it was, and if I recall correctly, communication style is also -- was needed to be improved.

As you start to grow in the -- in the ladder, I mentioned that L5s tend to look after, like, three to four people.  So it's super important to make sure that the communication is clear and unambiguous when it comes to communicating with the junior members of the team.

Q.   I'm going to -- Mr. Kavuri, I'm going to ask you to speak a little bit louder.  I know it's --

A.   I'm so sorry.

Q.   That's better.  You have a very soft voice.

Okay.  Do you have an understanding of whether or not Mr. Ding had any direct reports?

A.   As far as I can remember, no, he didn't have any direct reports.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, can you pull up Exhibit 794, please.  This has been previously admitted.

And, Ms. Hernandez, can you zoom in on "Work Experience" on the, kind of, bottom half of that page.

BY MS. PRIEDEMAN:

Q.   Mr. Kavuri, looking at this, based on your understanding

of Mr. Ding's job responsibilities at Google, is this -- as of 2021, is this an accurate -- does this accurately reflect his job responsibilities at Google?

A.   It is the general vicinity of the work that he has done, some aspects of it.  I think he largely worked on the GPU-related aspects of it.  I wasn't sure about the TPU.

Yeah, I think it's in the general area of his responsibility or the experience that he had.

Q.   So largely accurate?

A.   Yeah, with the exception of maybe, you know, TPU and a few things like that.

Q.   So your understanding is that he didn't work on TPUs; is that right?

A.   Not that I remember at all, yeah.

MS. PRIEDEMAN:  All right.  You can take that down, Ms. Hernandez.

Can you pull up Exhibit 778, please, Ms. Hernandez.  This has been previously admitted as well.

BY MS. PRIEDEMAN:

Q.   Mr. Kavuri, you see that there's different folder names listed here?

A.   Yeah.

Q.   Do you recognize any of the terms that are in this document?

A.   Quite a few.

Q.   Can you tell me what you mean by that?

A.   It's a very large amount of software and documentation for the Google infrastructure.  For example, everything that you see with Borglet and Borg, that is all code, software, actual software and documentation applies to that.

I also see quite a few relating to the -- unrelated to my area that we work on, especially Search and YouTube and -- yeah.

I also see things around machine learning and the ML compiler.  That's not the area that our team works on, but it's a very large area of software.

Q.   And Borglet and Borg, are those both internal Google names?

A.   Yeah, absolutely.

Q.   Does -- as far as you know, does anyone on your team work on machine learning frameworks?

A.   Not frameworks.  We interact with that particular software.

For the prior question about the Borg, there was a paper that was published long before I joined Google, so the name Borg is known outside.  But anything related to how that is constructed, how that is used, what the code, that's all local to inside Google.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, can you pull up Exhibit 779, please.

And can you zoom in a little bit.

BY MS. PRIEDEMAN:

Q.   And, Mr. Kavuri, we're not going to go through -- this is multiple pages, this document.

Have you previously reviewed the files listed in this document?

A.   I have.

Q.   And can you explain, at a high level, what these documents relate to?

A.   Again, a very large area of software and documentation regarding how the software is constructed.  Yeah, a very large surface area of software within Google.

MS. PRIEDEMAN:  Can you scroll down a little bit, Ms. Hernandez.  Just scroll through some of these pages.

BY MS. PRIEDEMAN:

Q.   Mr. Kavuri, was there anything that stood out to you about particular folders or file names in this document?

A.   It's a very vast set of documents, large set of documents.  Some are related to Borg, but some goes the link to our cloud, which is our -- where our external customers use our services.  It also goes into quite a bit of ML-related documents, network-related documents.  An extremely vast array of documents and code.

Q.   And given what you know about Mr. Ding's scope of work at Google, how do these documents relate to his scope of work?

**A.**   Very few.  Mostly in the Borg and maybe some platform-related things like AdAstra and things like that. Largely, these are unrelated to his work.

**Q.**   And can you explain why someone like Mr. Ding would have had access to these documents?

**A.**   At Google, we are a pretty open company.  We generally thrive on having open access to our code and documents.  Part of that is both for learning opportunity, also collaboratively working with other teams within the Google.  It expands your horizon to learn things.  You can contribute if you would like.

So we're a pretty open culture, and -- yeah.  So having access, I have access to so much of the information at Google if I want to learn and contribute.  So most engineers at Google has access to a lot of information.

        **MS. PRIEDEMAN:**  All right.  And, Ms. Hernandez, can you pull up Exhibit 775, please.

**BY MS. PRIEDEMAN:**

**Q.**   Mr. Kavuri, have you reviewed the documents contained in this exhibit?

**A.**   I have.

**Q.**   And given what you know about Mr. Ding's scope of work at Google, how do these documents relate to his work?

**A.**   Some of the things, like, for example, part of Category 4 where you see AdAstra and things like that, that one Mr. Ding worked on from what he worked on.

But things related to TPU or, for example, XOR, which is -- that is enabling large-scale TPU training, those were unrelated to his work.

So I would say GPU is related to his work, but anything on -- you see PFC, Viperlite, those are all unrelated to his work.

Q.   And, Mr. Kavuri, do you have an understanding of whether any of the documents in this exhibit should have been taken outside of Google?

A.   No.

Q.   And what is that understanding based on?

A.   This is a lot of intellectual property that we worked on, a lot of creative work that goes into our infrastructure. Unless something is published in an industry-published paper or it was a sanctioned blog post outside that we have decided to do, I consider the rest of it to be not -- not to be shared with the public.

Q.   And should -- do you have an understanding of whether any of these documents should have been emailed to a personal email account, for example?

A.   Absolutely not.

        **MS. PRIEDEMAN:**  All right.  Ms. Hernandez, can you pull up Exhibit 774, please.

**BY MS. PRIEDEMAN:**

Q.   Mr. Kavuri, have you reviewed the files contained -- the

file names contained in this exhibit?

A.   I have.  Some of them, yes.

Q.   And given what you know about Mr. Ding's job responsibilities, how do these files relate to his work?

A.   Not really related to his work.

MS. PRIEDEMAN:  And if you can scroll down, Ms. Hernandez.  You can stop right there.

BY MS. PRIEDEMAN:

Q.   Do you see on the bottom half of this page, there's documents related to Gemini?

A.   Yes.

Q.   Did Mr. Ding work on Gemini?

A.   No.

MS. PRIEDEMAN:  You can scroll down a little bit to the next page.

BY MS. PRIEDEMAN:

Q.   And do these documents appear to contain sensitive Google information, Mr. Kavuri?

A.   Absolutely.

Q.   And how do you know that?

A.   A lot of creative engineering work went into producing these designs documents, and I -- yeah.  Like, PFCs is a -- a TPU-related document that is -- we have spent a lot of energy and engineers' time designing very high-performant TPUs.

Q.   And do you see, Mr. Kavuri, on this page there's a source

document title that says "Chip Management - Pufferfish"?

A.   Yes.

Q.   Was Google able to determine what this document was that Mr. Ding used to create a note?

A.   Yes.

MS. PRIEDEMAN:  Ms. Hernandez, can you please pull up Exhibit 223.

BY MS. PRIEDEMAN:

Q.   Mr. Kavuri, is this the document that Google was able to identify?

A.   Yes.

MS. PRIEDEMAN:  Your Honor, I'd move to admit Exhibit 223.

MR. FEYZI:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 223 received in evidence.)

BY MS. PRIEDEMAN:

Q.   Just at a high level, Mr. Kavuri, what is this document?

A.   This is a very detailed aspect of the chip design and the -- how the internal clock mechanism and how the chip operates, works.

Q.   And does this relate to Google's TPU Version 4?

A.   It's related to the Pufferfish, yes.

Q.   Do you have an understanding of whether Mr. Ding was working on Google's TPU chip manager on December 28th, 2023?

A.    No.

MS. PRIEDEMAN:  All right.  You can take that down, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.    I want to switch gears a little bit, Mr. Kavuri.

MS. PRIEDEMAN:  If you can pull up Exhibit 1175S, please, Ms. Hernandez, and we'll play it in just a minute. This has been previously admitted.

BY MS. PRIEDEMAN:

Q.    Mr. Kavuri, did you previously review this video?

A.    I have.

Q.    Can you describe at a high level what occurs in the video we're about to watch?

A.    Yeah.  This is a demonstration of -- this demo seems to have been taken -- we had software running inside the Google. And what I see is a demonstration of running a software program, which is a benchmark, and it is running on a Google-built GPU system, and a narrative that is talking about how this system is constructed and also how the software is running.

What I can tell is that it is taken inside of the Google because of the environment that we all operate in, and it also shows a graphical user interface of tools that we use inside the Google.

Q.    Can you expand on that a little bit more?  How could

you -- how you could tell that it was using internal Google tools?

A.   It is referring to specific software structure within the Google.  And also, the tool that shows the details about what just ran is only available within the Google.  And that's related to what our team works on at Google, and it's not available anywhere else.

Q.   So, in other words, this video we're about to watch shows an internal Google tool that's only used in Google?

A.   Correct.

Q.   And you mentioned that this system is running a job.  Did you mean a machine learning job?

A.   Yes.  The Borg that I talked about before, which is the cluster management system, everything that runs in Borg is called a job.  And so even a machine learning application or a benchmark or anything running, it's also called a job.

Q.   And could you tell what type of chips the machine learning job is running on?

A.   This one is running on GPUs, and it is one of the systems that we have built.  And on the right-hand side, it shows how many of those GPUs are there and showing any activity that's going on.

Q.   What's the purpose of running one of these kind of benchmark tests?

A.   Sometimes the benchmarks are run to see how well the

system that we have particularly is working.  Oftentimes knowing if there is a problem with the benchmark, in other words, the results are lower, it gives us an opportunity to go take a look and see if something needs to be improved, how we can tune it better, how the benchmarks improves the scores and things like that, yeah.

Q.   So is the benchmark kind of proof that the underlying GPUs are working the way they should?

A.   Yeah.

Q.   That they're --

A.   That is correct.

Q.   -- they're connected the way they should and running the job the way they should?

A.   Yeah, that is correct.

        MS. PRIEDEMAN:  All right.  Ms. Hernandez, we're going to start it.

BY MS. PRIEDEMAN:

Q.   I'm going to stop at various points and have you explain, Mr. Kavuri.

    So, actually, before we get started, Mr. Kavuri, do you see on the left-hand side, upper hand side, it says "InfiniCompute"?

A.   Yeah.

Q.   Do you know what InfiniCompute is?

A.   No, I don't.

**Q.**   Is that a Google term?

**A.**   No.

        **MS. PRIEDEMAN:**  All right.  You can press "Play," please, Ms. Hernandez.

                (Video was played but not reported.)

        **MS. PRIEDEMAN:**  Ms. Hernandez, can you stop here for a minute.

**BY MS. PRIEDEMAN:**

**Q.**   So, Mr. Kavuri, can you explain what we're seeing now on the screen?

**A.**   Yeah.  So the right-hand side is that system, that GPU system that the software is going to run on.  What is being displayed is a -- details about how many of those GPUs are in that system.  And it is basically -- as you can tell, it is showing the GPU is made by the Nvidia and -- yeah.  So what is the physical addresses of those GPUs are.

     Yeah, it's basically describing the right-hand system as having GPUs and some details.

        **MS. PRIEDEMAN:**  Okay.  And, Ms. Hernandez, can you stop at about the 223 mark.

        **THE COURT:**  Before you continue, maybe I'll take this opportunity to --

        I think I may have given you an instruction along these lines at some point previously, but I'll say here that you're obviously hearing somebody speak in the Mandarin

language.  There is a transcript of it.  It's transcribed in English.  And the English language transcription is the evidence that you are to consider in this case -- okay? -- and not -- if any of you know any Mandarin, you're not to consider your interpretation of what you hear.  The evidence is the written transcript in English.

(Video was played but not reported.)

BY MS. PRIEDEMAN:

Q.    So, Mr. Kavuri, what are we seeing here now?

A.    It's basically going into more details about each of the GPUs within that particular system and -- yeah.

The initial version showed that we have 16 GPUs.  This one is talking about for each of the GPUs, what are the details, looks like, uh-huh, yeah.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, can you press "Play" and stop at 4:19, please.

(Video was played but not reported.)

MS. PRIEDEMAN:  Can you pause here, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.    Mr. Kavuri, what are we seeing here now on the left-hand side of the screen?

A.    On the left-hand side, it is showing the -- remember I mentioned the job?  So this is showing the details about that particular job.

This particular one is -- I'm familiar with it.  Like

"Borg config" is a good example of how before you run a job, what is the -- you're specifying how it should be running, where it should be running and, you know, which program do you pick up to run.

So what you're seeing is on the right-hand side, the system -- so sorry --

THE COURT:  Happens all the time.

THE WITNESS:  -- the right-hand side, a system that is -- has, like, 16 GPUs waiting for something to run.

On the left-hand side, what we're seeing is a job that is going to be running on that system and details about that job.

BY MS. PRIEDEMAN:

Q.   And is there anything on the left-hand side that stood out to you about -- that signaled whether or not this was being run on a Google internal system?

A.   Absolutely.  So anything that talked about the Borg config, et cetera, that is clearly showing Google internal system.

Q.   "Borg config" is a Google-specific term?

A.   Absolutely.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, you can play again and stop at 5:47, please.

(Video was played but not reported.)

\\\

BY MS. PRIEDEMAN:

Q.   Anything that stood out to you here, Mr. Kavuri?

A.   Again, on the left-hand side, this is the actual submission of that particular job.  And "Blaze" that you see there is another local Google term that is usually not -- I'm not sure exactly it's ever used outside of Google, but that's also a familiar term.

Yeah, it's about to run that job, and it is submitted.  It hasn't started running yet, but it was submitted.

Q.   And you said Blaze is another internal Google tool?

A.   Yeah.  Usually, it's a built -- our own built environment, and so to -- writing software is one thing.  Then you compile it and make it ready for machine readable.  So Blaze is heavily used within the Google as a development environment.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, you can play for a while now, and we'll stop at 10:47, please.

(Video was played but not reported.)

MS. PRIEDEMAN:  Can you actually pause, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   You see here it says (as read):

"I'll continue introducing our product and product form while it runs."

Do you know what that's referring to, Mr. Kavuri?

A.   No.  I mean, this is -- this is all running within the Google, so I don't know what it means by "our product and

product form while it runs."

MS. PRIEDEMAN:  Okay.  You can play, Ms. Hernandez.

(Video was played but not reported.)

MS. PRIEDEMAN:  Ms. Hernandez, can you pause, please.

BY MS. PRIEDEMAN:

Q.   Mr. Kavuri, do you know what framework or product is being referenced here?

A.   I -- there's quite a few terms that we use internally. Like JAX is -- I think it stands for, actually, "Just another XLA."

You might be asking what is XLA, but it's a machine learning compiler which takes ML models and convert them to machine code and things like that.  Pathways is something that we use inside.

So it's a combination of externally used terms.  The "K8S" you see stands for kubernites.  It's a short way of referring to it sometimes.  But, again, Pathways and JAX are -- we use it quite a bit internally.  So it seems to talk a little bit about what is being used inside, but is also what could be used outside.  That's -- yeah.

MS. PRIEDEMAN:  You can press "Play," please, Ms. Hernandez.

THE COURT:  Well, before you do that, let me just ask. Unless you have just a couple of minutes left, maybe this would be a good time to take our lunch break.

**MS. PRIEDEMAN:** Sure.  That's fine.  We have the rest of the video, so we can...

**THE COURT:** Okay.  Let's plan on taking a lunch break until 1:15.  Remember to bring your notes with you, and remember not to have any conversations or do any outside research.

Thank you.

**THE COURTROOM DEPUTY:** All rise.

**THE COURT:** Well, you can have conversations, just not about the case.

(Proceedings were heard out of the presence of the jury.)

**THE COURT:** Okay.  You can step down.  We'll have you back up here at quarter after.

Anything to discuss?  No?  All right.

**THE COURTROOM DEPUTY:** Court is in recess.

(Luncheon recess taken at 12:30 p.m.)

**AFTERNOON SESSION**                                        **1:15 a.m.**

(Proceedings were heard out of the presence of the jury.)

**THE COURT:** So one quick comment for you-all.

On jury instructions, on the issue of whether the defendant has to know that the items meet the definition of trade secret, I want to make sure you've read *United States vs. Nosal* out of the Ninth Circuit from 2016.

For me, a big -- I think -- I'm not sure -- I mean, *Nosal* assumes that the defendant has to know that stuff.  I'm

not sure that's correct.  But one big question is whether our instructions need to be dictated by *Nosal* or not.

So I just wanted to make sure everybody had a chance to look at it.

Did you all have something?

**MR. BOOME:**  Yes, Your Honor, something quick.

On Friday, Your Honor proffered a theory that the defense hasn't yet raised so far.  I'll try to characterize it as follows:

I think you said it's plausible, based on the evidence, that the defendant was a B.S. artist out to defraud investors in China and kind of make a quick buck in China by saying he could do things that he really didn't believe he could do.

And in the event that the defense is going to adopt that theory, which they haven't so far, we would like to ask Your Honor to reconsider allowing us to introduce evidence of his Google salary and other compensation.

Mr. Ding was making between 3- and 400,000 dollars in 2022 and 2023, every year from Google.  And if the defense is going to pursue the theory that you proffered, introducing that evidence would help us rebut that by showing that he had a fairly good situation going and that it would be a lot to risk to walk away from that just to make a quick scam buck in China.

**THE COURT:**  Okay.

MR. FONDO:  So, Your Honor, setting aside whether we intend to pursue that theory or not, I don't think they're related.  I think every alleged scam artist, et cetera, has different financial circumstances, and putting into this evidence doesn't change that.  It also -- the facts that we've alleged previously and the assertions and arguments we made previously still apply equally as before.  So I don't think there's a correlation that allows them to get that information in.

THE COURT:  Well, putting aside the whole scam artist narrative, a significant part of your case, I think, is that it was unrealistic for anybody to expect that Mr. Ding could convert any of these trade secrets to a useful product in China; right?

MR. FONDO:  Yes.  I understand that.

THE COURT:  And it is the case -- whether you pursue the theory or not, it is the case that the more unrealistic it is to expect Mr. Ding to succeed in creating a product that would succeed in China, the less likely it is that he intended or knew that he would be benefiting the Chinese government and the less likely that he intended to convert trade secrets, I guess.

And so given the way the evidence has come in -- I mean, even if you put aside my characterization of what the evidence could suggest that Mr. Ding was doing, it does seem

like his compensation may be more relevant, given how the evidence has come in, than what I assumed when I precluded it before trial.

MR. FONDO:  So may I address that?

So one is he was gainfully employed.  It's a big company.  I don't think there's any confusion that he was probably making a decent living.  So the exact amount I don't think is relevant.

And, in fact, I would say the converse is true.  So if he was faking it, so to speak, people do that when they have debt.  They don't have money.  They're trying to get quick money.  I don't think it's the context.  So I don't think there's that correlation.

People try to build companies all the time, and they leave good jobs, good salaries, good situations all the time.  And so I don't think there's the correlation that the Government is making.

And --

THE COURT:  It's not a necessary correlation, but it seems relevant.  It seems more relevant than it was before the evidence started coming in.

MR. BOOME:  In opening statement, I recall the defense --

THE COURT:  You don't -- I'm going to allow --

MR. BOOME:  Thank you.

THE COURT: -- you to elicit testimony about his compensation.

MR. BOOME: So we -- the parties have stipulated that -- it was one document that summarized his compensation over the course of his employment at Google. The parties have stipulated that it's authentic. The witness who would have introduced that was Ms. Tortorici, who's already testified.

Since the document has been stipulated authentic, perhaps we could recall Special Agent Valladao for just one question.

THE COURT: Yeah. Or get it in through this witness. I don't know if it's possible to get it in through this witness.

MR. BOOME: He was in his chain of command, so maybe if we could have one minute to step out in the hallway.

THE COURT: Either one sounds reasonable to me.

MR. BOOME: Okay.

THE COURT: I mean, if this witness didn't have any personal knowledge of his compensation, if he can testify that this looks about right, "This is what I would expect his compensation to have been," I think that's probably fine.

MR. BOOME: Okay.

MR. FONDO: Your Honor, one point on that. I don't think his historic compensation is relevant. At most that is relevant is the compensation in 2023.

THE COURT:  I think that is fine.

MR. FONDO:  So I think that document, if I'm not mistaken, if I'm thinking of the right document, has much broader --

MR. BOOME:  I would just ask --

THE COURT:  '22 and '23 or '23 is fine.

MR. BOOME:  Exactly.  I think he started -- you know, thoughts on Plan C and the beginnings of Zhisuan was 2022, so I think that's fair game.

THE COURT:  Yeah.  '22 and '23.

MR. FONDO:  So we can also stipulate to what's in that document so we don't have to recall witnesses.

THE COURT:  Okay.

MR. BOOME:  That might be better because the document lists all four years.  So if we want to isolate it to 2022 and '23, we could come up with something.

THE COURT:  Okay.

MR. FONDO:  And, Your Honor, when I say "stipulate," given you overruled our objection --

THE COURT:  Understood.  Your objection is preserved.

MR. FONDO:  Thank you.

THE COURT:  Okay.  Sounds good.

(Proceedings were heard in the presence of the jury.)

THE COURT:  All right.  You can resume.

\\\

BY MS. PRIEDEMAN:

Q.   All right.  Mr. Kavuri, hello again.

A.   Hi.

Q.   All right.  We're going to get started where we stopped off with the video.

MS. PRIEDEMAN:  If you can press "Play," Ms. Hernandez, and we'll stop at 10:47, please.

(Video was played but not reported.)

BY MS. PRIEDEMAN:

Q.   Mr. Kavuri, can you explain what's happening here?

A.   So I think the -- I still see the system on the right-hand side.  There was a window that kind of came in and floated on the screen and kind of went off.

That is a tool that we use internally at Google to -- remember I talked about the job?  So it gives you the details about what the job was, how it ran.  If you want to know more details about it, it will have certain timelines, date and time when it ran and things like that.

So as I mentioned, this was done within the Google. That's another example of that one.

It also shows there are certain terminology that we use. "GCU," which is a Google compute unit, so it's only used inside the Google.

Q.   Can you speak a little closer to the mic.  Sorry.

A.   Sorry about that.  Yeah.

Q.   What is that, the Google tool you just mentioned?  What is that called?

A.   It's called Sigma.

Q.   And, again, these were indicators that this was being run on Google's systems?

A.   Inside the Google, yes.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, you can press "Play" and we'll watch all the way through.

(Video was played but not reported.)

MS. PRIEDEMAN:  Can you pause, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   Can you see the date that's up in the left -- upper left-hand corner, Mr. Kavuri?

A.   I do.

Q.   What does it say?

A.   August 19, at 5:50 a.m.

Q.   Does it say what year?

A.   I think it showed before that particular one, but it's covering that up now.

Q.   That's okay.

MS. PRIEDEMAN:  You can press "Play," Ms. Hernandez.

(Video was played but not reported.)

THE WITNESS:  I'm sorry.  I was looking at the --

MS. PRIEDEMAN:  Pause, Ms. Hernandez.

What did you say, Mr. Kavuri?

THE WITNESS:  My apologies.  I was looking at the black screen on the left-hand side.  The front window clearly is showing it's 2023, August 19th.

MS. PRIEDEMAN:  Thank you.

You can press "Play," Ms. Hernandez.

(Video was played but not reported.)

MS. PRIEDEMAN:  All right.  Ms. Hernandez, you can take that down.

BY MS. PRIEDEMAN:

Q.   Mr. Kavuri, can you explain what happened in the rest of the video we just watched?

A.   Yeah.  It largely showed that the benchmark that they ran on the left-hand side has successfully completed.

The benchmark is an image generation benchmark, and they basically showed this is how many images it worked.  It demonstrated that the system on the right has done the job to run that particular benchmark.  So, yeah.

Q.   Okay.  Mr. Kavuri, I'm going to switch gears a little bit. I want to ask you some questions about Mr. Ding's experience.

Did Mr. Ding lead all of Google's cloud accelerator systems?

A.   No.

Q.   Is it accurate to say he led the research and development of large language models based on supercomputers?

A.   No.

**Q.**   Did he lead the team to support machine learning projects across Search, Maps, and YouTube?

**A.**   No.

**Q.**   Did he work on large language models at all?

**A.**   No.

**Q.**   Is it accurate to say that Mr. Ding was the lead architect of Google's GPU supercomputing project?

**A.**   No.

**Q.**   Did Mr. Ding lead Google's TPU supercomputing project?

**A.**   No.

**Q.**   Is it accurate to say that Mr. Ding is one of ten people in the world who has built a 10,000-card platform?

**A.**   No.

**MS. PRIEDEMAN:**  No further questions, Your Honor.

**THE COURT:**  Okay.  Thank you.

Any cross-examination?

**MR. FEYZI:**  Yes, Your Honor.

### CROSS-EXAMINATION

**BY MR. FEYZI:**

**Q.**   Good afternoon, Mr. Kavuri.

**A.**   Good afternoon.

**Q.**   My name is Fred Feyzi.  I'm one of the attorneys for the defense, Mr. Ding.

Mr. Kavuri, you're currently a senior director of engineering at Google; is that correct?

**A.**    That's correct.

**Q.**    And you're testifying here today at request of the United States Government; that's right?

**A.**    Correct.

**Q.**    You've met with the Government to prepare for testifying today; correct?

**A.**    Yes.

**Q.**    All right.  You met with the Government at least eight times?

**A.**    Possibly.  Sounds about right.

**Q.**    You met with the Government yesterday?

**A.**    I don't believe so.

**Q.**    Okay.  Google counsel attended all the meetings you had with the Government as well; is that correct?

**A.**    That's correct.

**Q.**    You have never met with me, though, before today; correct?

**A.**    No.

**Q.**    And you've never met with anyone from the defense team as well; is that right?

**A.**    I don't believe so.

**Q.**    Okay.  Mr. Kavuri, you understand that the Government alleges Mr. Ding took 105 alleged trade secret documents; is that correct?

**A.**    I'm sorry.  Could you repeat that again?

**Q.**    Sure thing, and I'll talk a little slower.  So, my

apologies.

You understand that the Government alleges Mr. Ding took 105 alleged trade secret documents; is that right?

A.   That could be correct.

Q.   Okay.  You didn't personally collect evidence from Mr. Ding's devices; right?

A.   I did not.

Q.   You were provided with a list of these documents; right?

A.   That's correct.

Q.   You didn't conduct a full document-by-document technical review of every single one of those 105 documents, though; is that correct?

A.   I have gone through quite a few documents.

Q.   Did you go through all 105 documents?

A.   I don't recall.

Q.   Mr. Kavuri, you spoke a little bit about it, but I'd like to just refresh the jury's recollection as well.

You managed the Borg team at Google; is that right?

A.   That's correct.

Q.   And can you remind the jury what Borg is?

A.   Borg is a cluster management system, and the cluster management system is -- takes a lot of different computers, bring them together into one large computer system where things like our Search and YouTube and Cloud runs on top of.

Q.   And that group consisted of over 300 employees; is that

right?

A.   Yes.

Q.   Is it 600 or 300?

A.   Currently, it is around 400.

Q.   Okay.  So at the time in 2023, you were around 300 then?

A.   That sounds about right.

Q.   All right.  Mr. Ding was in the Borg group; is that right?

A.   Correct.

Q.   And you knew who Linwei Ding was?

A.   I'm aware of him, yes.

Q.   You knew the type of work he was doing; right?

A.   Yes.

Q.   You knew Mr. Ding was in the Borglet subgroup of Borg; is that right?

A.   That's correct.

Q.   Okay.  You knew Mr. Ding's manager, Yihua Ding; is that right?

A.   Yes.

Q.   Okay.  Did Yihua Ding report to you?

A.   Yihua reported to a director.

Q.   And the director reported to you?

A.   Correct.

Q.   Okay.  You received emails from Mr. Ding; correct?

A.   Possibly.

Q.   And to confirm your email at Google, it's

rkavuri@google.com; is that right?

A.    Correct.

        MR. FEYZI:  Okay.  Mr. Jay, I'd like to introduce Trial Exhibit 6478 for the witness at this time.

BY MR. FEYZI:

Q.    Mr. Kavuri, do you recognize this document?

A.    Seems like an email sent out.

Q.    Okay.  And please look at the "cc" field at the top.  It reads "Ravi Kavuri <rkavuri@google.com>."  That's you; correct?

A.    Correct.

Q.    All right.  And please look at the signature in that email at the top.  It says Leon and Vinod.

    And I apologize if I botch any kind of pronunciation. Feel free to correct me.

    But that's Leon and Vinod; right?

A.    I'm sorry?  Which one?

        MR. FEYZI:  Mr. Jay, can you scroll down a little bit.

BY MR. FEYZI:

Q.    Right there, where it says [as read]:

        "Regards, Leon & Vinod."

    Is that --

A.    Correct.

Q.    Okay.  Leon is Linwei; right?

A.    Correct.

        MR. FEYZI:  Your Honor, at this time I'd like to admit

Trial Exhibit 6478.

      **MS. PRIEDEMAN:**  No objection.

      **THE COURT:**  Admitted.

      **MR. FEYZI:**  Thank you.

   (Trial Exhibit 6478 received in evidence.)

**BY MR. FEYZI:**

**Q.**  This email appears to be from a vpandari@google.com.  Who is that?

**A.**  He's a program manager.

**Q.**  This email is Linwei and Vinod providing an update to the team; correct?

**A.**  Correct.

**Q.**  Let's focus on the part that says "AdAstra key features."
   Mr. Ding's work involved AdAstra; is that right?

**A.**  Yes.

**Q.**  And AdAstra, just for the jury's sake, AdAstra is the GPU project name at Google that uses Nvidia's H100 chips; correct?

**A.**  It's one of the projects.

**Q.**  Okay.  Anything that I missed that you'd like to add to that other than Nvidia's H100 chips?

**A.**  I'm sorry?

**Q.**  What else -- I guess I'll rephrase my question.
   What else does AdAstra cover other than the GPU project that involves Nvidia's H100 chips?

**A.**  It covers a lot of the software that was written by

various teams across the Google.

Q.   And this is the team Mr. Ding worked on?

A.   One of the teams.

Q.   All right.  AdAstra encompassed, at least in some capacity, A3; right?  It says right there "encompassing A3." Is that right?

A.   Yes.

Q.   All right.  Could you remind the jury what A3 is?

A.   I'm sorry?

Q.   Could you tell the jury what A3 is?

A.   It's an NPI program, which is a hardware -- a system to build the GPU system, yes.

Q.   Got it.  GPU-based; right?  Fair to say A3 is GPU-based?

A.   Yes.

Q.   All right.  The subpoint under A3 mentions four Diorites in the Endurance fabric, followed by complex accelerator system, followed by TCPDirect and cluster management for large-scale training.

     Fair to say those are all relevant in some capacity to Mr. Ding's work?

A.   It is describing the AdAstra system, not what Mr. Ding has contributed to.

Q.   Okay.  That still says "Regards, Leon & Vinod," and it's an email to the team providing an update; right?

A.   But if you notice above, it says "AdAstra key features."

Q.   Right.

A.   It doesn't say anything about who worked on it.

Q.   Okay.  We'll get into that.

The first bullet point reads (as read):

"Up to 100 Gbps Networking bandwidth per GPU via 4 Diorites in the Endurance fabric (Raptor project)."

Did I read that right?

A.   Correct.

Q.   And, Mr. Kavuri, again, if I've mispronounced any of those names, feel free to correct me.

But Diorite, as used here, refers to the SmartNIC that Google makes; is that correct?

A.   Correct.

Q.   Endurance is just the internal name for the AdAstra project; is that right?

A.   Yes.

Q.   The next bullet point reads (as read):

"Complex accelerator system software . . . ."

What is that?

A.   It's a Borglet code.

Q.   The next bullet point here reads (as read):

"TCPDirect (software for direct-to-device data transports through GPU memory instead of host memory, at scale)."

Right?

A.    Yes.

Q.    And TCPDirect is related to AdAstra?

A.    AdAstra uses -- is one of the users of the TCPDirect.

Q.    All right.  Great.

Mr. Kavuri, I'd like to switch gears.  You already testified regarding the performance review process for members of the Borg team; is that correct?

A.    Yes.

Q.    Okay.  Can you describe what the performance review process entails for the jury, please?

A.    So the way the performance review works is the manager collects the feedback and documents the work done by the individual.  Along with the feedback that they have collected, they propose a certain rating, and it gets reviewed by fellow managers and other technical leaders within the organization to make sure that their rating represents the work that they have done.

Q.    And these records are maintained electronically by the HR department at Google; is that correct?

A.    They're maintained, yes.

Q.    Reviews are taken seriously; right?

A.    Yes.

Q.    Written performance reviews, are they done quarterly?

A.    Quarterly we do something called check-ins, expectation check-ins.  Some of them are optional; some of them are

required.

Q.   And these reviews are expected -- whether check-in or overall review, they're expected to be accurate and thoughtful; right?

A.   Yes.

Q.   This is done for almost all employees at Google; correct?

A.   That's correct.

Q.   They're done in an online system?

A.   Yes.

Q.   And so once the performance reviews are compiled, a team member or members would maybe meet with the employee to provide the feedback to them; is that correct?

A.   Could you repeat that again?

Q.   Sure.   Once all the reviews are collected, someone or some people present this information to the individual; is that correct?

A.   It's usually the manager.

Q.   Okay.   And you review performance reviews from members of the Borg team; right?

A.   I do.

      MR. FEYZI:   All right.   At this time, I'd like to put up Trial Exhibit 6480, please, Mr. Jay.

BY MR. FEYZI:

Q.   Mr. Kavuri, this is a performance review for Mr. Ding; is that correct?

**A.**    Correct.

**Q.**    And this is one of the standard reviews we were just discussing?

**A.**    Yes.

        **MR. FEYZI:**  If we go to the last page, Mr. Jay.

**BY MR. FEYZI:**

**Q.**    You'll see comments from Yihua Ding, Guangyu Shi, and Albert Ma.  And you already mentioned Yihua Ding is a manager and, you know, he reports to his superior who reports to you; is that right?

**A.**    Correct.

**Q.**    They're all part of the Borg team?

**A.**    Yes.

        **MR. FEYZI:**  At this time, I'd like to admit Trial Exhibit 6480, please.

        **MS. PRIEDEMAN:**  No objection.

        **THE COURT:**  Admitted.

    (Trial Exhibit 6480 received in evidence.)

**BY MR. FEYZI:**

**Q.**    Let's go back to page 1.  Moving to the top, under "Leon Ding," it says "L5 Software Engineer."

    Do you see that?

**A.**    Yes.

**Q.**    What's an L5?

**A.**    L5 is the senior engineer.

**Q.** Right below it, the rating says "Outstanding Impact"; is that right?

**A.** That's correct.

**Q.** What does that mean?

**A.** It is -- it is one of the rating above the SI, as I mentioned. We have "Not meeting expectations; "Medium-level impact," which is below the expectations; "Meeting expectations," which is SI. Above that is "Outstanding impact." There is one above this one called "Transformative impact."

**Q.** It's a pretty good --

**A.** So he received the one which is the fourth.

**Q.** Understood. Thank you.

Let's turn to the end, just to orient the jury with date here. The feedback appears to be provided in December 2022 and January 2023. Do you see that?

**A.** Yes.

**Q.** Okay. So this review would have been for the end of 2022?

**A.** Correct.

**Q.** Let's go to page 1. It says (as read):

"He leads multiple cross-org NPI projects and drives them independently with landings (e.g. AdAstra MVP support, A2 plus GA, A100 on internal Borg Pilot."

What does NPI stand for?

**A.**    New product introduction.

**Q.**    And what does it mean to "drive them independently with landings"?

**A.**    When you are at an L5, you're expected to work without requiring too much supervision from other technical leaders.

**Q.**    All right.  Further down, it says (as read):

        "GPU NPIs:  Independently leading Borg support

        for three multi-quarter NPIs efforts (AdAstra, A100

        on internal Borg, A2Plus) . . . ."

        These are projects that Mr. Ding led; right?

**A.**    The -- what he did is he added the Borg support for that.

**Q.**    Okay.  It also says (as read):

        "All of those NPI efforts are cross org (BCP,

        Borg-" --

        It says "Borglert" here, but I believe they were trying to say "Borglet.

        [As read]:

        -- "SSW) efforts with unique challenges."

        Do you see that?

**A.**    Yes.

**Q.**    Okay.  What does cross org mean?

**A.**    When -- Google is -- as you can tell, is quite large, and something like AdAstra requires a hundred-plus people to do things.  We have a Platforms team that builds the hardware.  We have a Platforms Software team that builds the software for

that hardware.  We have Borg team that adds the Borg support. We have upper layers of software that actually makes use of the GPUs.

Cross org is you're crossing the organizational boundaries and bringing all of that together.

What this particular one is talking about is Leon's contribution from the Borg side, from all of those other teams.

Q.    To be clear, this isn't a self-assessment; right?

A.    I'm sorry?

Q.    This isn't a self-assessment?

A.    This is an asses- -- most likely an assessment by his manager.

(Page 1745 placed under seal by Order of the Court and bound separately.)

(The following proceedings were heard in open court.)

BY MR. FEYZI:

Q.    It's just related to large-scale GPU and TPU training; right?

A.    Yes.

Q.    Okay.  Fair to say it's an umbrella program that encompassed both the GPU effort and the TPU effort at Google?

A.    That's not the right characterization.

Q.    Okay.  How would you characterize it?

A.    The effort around Astrophel involved multiple layers of software that is made available to work across any accelerators, which could be TPUs, GPUs, or any other accelerators that we deem necessary.

Q.    Fair enough.

And so the GPU effort was called AdAstra at 16K; right?

A.    Again, that is -- the AdAstra is one platform.

Q.    Okay.  What efforts are described within your organization as being initiated on top of a program like AdAstra?  That means at least -- that means they are at least related to the program?

A.    I'm sorry?

Q.    Simpler terms.  What does "initiated on top of" mean?

A.    Let me take a look.

(Witness examines document.)  These are not efforts initiated by the Borg team.

Q.   Okay.  You're familiar with major objectives initiatives in your org like AdAstra, TCPDirect?

A.   Among many.  This is one of those.

Q.   Okay.  And these initiatives aren't, you know, isolated silos; right?

A.   These are Google efforts.  Like you said, the large customer that we talked about, Borg team, did not initiate that.

Q.   Okay.  That wasn't really my question.

It was:  There are different initiatives, and they don't really work in independent silos; is that right?

A.   It depends on the type of the initiative, but generally, things can cross boundaries.

Q.   Okay. Fair enough. Let's -- page 2.  Let's go down.  It says [as read]:

"Leon repre-" --

MR. FEYZI:  Mr. Jay, if you could -- oh, there it is, yeah.

BY MR. FEYZI:

Q.   [As read]:

"Leon represented the Borg team, drove cross-team discussions, and scoped the Borg support for the TCPDirect and AdAstra at 16K . . . ."

Do you see that?

A.   Yes.

Q.   So when driving these cross-team discussions, is it fair to say it helps to review documents about some of the other teams' product areas and domain?

A.   It depends on which area that they are talking about.

Q.   Okay.  Do people go into meetings and just, you know, don't review the different products and domains if they're in a cross-team meeting?

A.   Generally, you tend to review the areas of software that you interact with.

Q.   Okay.  What does the term "scoped" mean here?

A.   What does it take to implement the Borg support for something.

Q.   So this indicates he was involved in some capacity with TCPDirect; right?

A.   He is involved in enabling the support for that in the Borg system.

Q.   He drove cross-team discussions; right?

A.   Again, the program is so large.  He's not driving all the cross-team discussions.  He only drove the support for the Borg team and what is the work that the Borg team needs to do.

Q.   It also says [as read]:

         "He is now scoping the Borg support for

     Astrophel."

     Is that correct?  The final sentence in that paragraph.

A.   (Witness examines document.)  It says for the H100.

Q.   The sentence right above that.

A.   [As read]:

     ""He is now scoping the Borg support for" --
Sure.  Yeah, for the H100s, yes.

Q.   All right.  So he was -- is it fair to say he was assisting with Astrophel in some capacity?

A.   For the GPU support.

Q.   Then it says [as read]:

     ". . . Leon is currently scoping the Borg support for the H100 on internal Borg effort."
H100 is the next-generation GPU after A100; right?

A.   Correct.

Q.   And the corresponding GPU project at Google is AdAstra; right?

A.   Yes.

Q.   Further down --

     MR. FEYZI:  If you can zoom back out to the document.

BY MR. FEYZI:

Q.   It says Linwei [as read]:

     ". . . set the roadmap for enabling GPU clock tuning for future GPU machines."
Right?

A.   (Witness examines document.)  Yes.

Q.   What is GPU clock tuning?

A.   Any hardware -- quite a few hardware items have an

operating range, and a clock is what determines the type of the performance that it has.  And Nvidia has enabled us to be able to tune that particular clock.

Leon worked on, from the Borg, how to enable that clock to be tuned.

Q.   Fair to say clock tuning is software-controlled changes to hardware operating points?

A.   For the particular GPU, yes.  But the hardware has to enable that.

Q.   What does setting the road map entail?  You see it says "he set the roadmap"?  What does that entail?

A.   It's basically what is the work to be done in a quarterly basis, what do we do this quarter, what do we do next quarter.

Q.   So if someone's setting the road map to enable GPU clock tuning, they'd need to understand at least the basics of the GPU hardware operating points they're trying to tune; right?

A.   This particular capability is something that Nvidia has already published.  They don't need to know all the details of the hardware.  They just need to know how to use that capability.

Q.   That information is in documents; right?

A.   Usually.

Q.   Where would you go to find this information?

A.   What's that?

Q.   Where would you find that information?

**A.** It would be in the -- the particular project repository.

**Q.** Mr. Kavuri, on the last page -- let's go to page 3 -- it says [as read]:

". . . he collaborates effectively with multiple cross-org teams by proactively syncing with teams on designs, identifying and addressing gaps, offering help . . . ."

I won't read the rest. Just cut it off at et cetera.

But do you see that?

**A.** Yes.

**Q.** This reflects Mr. Ding was involved with multiple cross-functional teams; right?

**A.** That pretty much represents every L5 in the organization.

**Q.** Okay. Do you recall which teams?

**A.** The teams -- Borg is a middle software layer that works with many, many teams across the Google; and whatever was at that particular time Leon was interacting with, he was -- all it says is he was working very well with that. We were happy with that, and we expect our L5s to do that.

**Q.** Astrophel was a cross-functional team, cross-functional project. Is that fair to say?

**A.** Yes.

**Q.** And cross-functional, again, means many teams working together, sharing information to hit a goal; right?

**A.** Yes.

Q.   So, for example, there was a Borglet team involved; right?

A.   Borg team is involved, yes.

Q.   There was no Borglet team involved?

A.   Borglet is part of the Borg team.

Q.   Okay.  And Mr. Ding was a part of that; right?

A.   Yes.

Q.   And --

A.   Along with many other people, yes.

Q.   Okay.  And that Borg -- that Borglet work would relate to the infrastructure team -- right? -- generally?

A.   It is to enable the GPUs for anybody to use, yes.

Q.   And so part of a project like this, there's probably a core ML foundations team as well; right?

A.   I'm not aware of that one.

Q.   Does that word ring a bell, "core ML foundations"?

A.   I am very familiar with that.

Q.   Okay.  So would that be a team that would be involved maybe in a big project like this?

A.   They might be involved in a project like this, yes.

Q.   Okay.  And probably a separate GKE team; right?  Does that ring a bell?

A.   Yes.

Q.   Okay.  Can you just, for the sake of the jury -- I know, a lot acronyms going on here -- what is a GKE?

A.   It's a Google Kubernites, K-u-b-e-r-n-i-t-e-s, Engine.

**Q.** So there is this infrastructure team that consists of Borg. There's these core ML teams. There is a Google GKE engine. The point is, there's a lot of these cross-functional teams that have to work together to pull off a project like Astrophel; right?

**A.** Sometimes we have thousand people working on it.

**Q.** All right. And so cross-functional scoping, that means the tech leads or project leads meet in planning to decide some of the features and scope; is that correct?

**A.** Usually, the program leads are at a much higher level than the L5s.

**Q.** Okay. So are L5s limited to just being, you know -- I think earlier you testified L5s --

**A.** For their areas of work.

**Q.** -- carry tech leads.

**A.** For their area of work.

**Q.** Okay. Understood. So just let's -- for the record, just to make it clear for the record, L5s can be team leads; right?

**A.** L5s can be team leads of up to three or four people, yes.

**Q.** Understood. And these team leads have to talk to each other with other teams to kind of scope and orient the project together; is that right?

**A.** Generally, with their peers in the immediate vicinity of the software that they work on.

**Q.** Okay. They define their own tasks and integration plan;

right?

A.   I'm sorry?

Q.   Do tech leads define their own kind of tasks and the integration plan?

A.   They work with the other tech leads, but they work with their managers, and they work with their tech leads.

Q.   Okay.  And so when they're meeting these other folks, is it -- they would have to, you know -- is seeing documents from adjacent teams ordinary?

A.   Generally, you use the interface specifications.  So if I'm trying to use a network card, I would like to know how to use it.  I don't necessarily need to know everything there is to know about it.

Q.   Mr. Kavuri, I want to turn to another performance review for Mr. Ding.

     MR. FEYZI:  Mr. Jay, could you please put up Trial Exhibit 6481, please.

BY MR. FEYZI:

Q.   Mr. Kavuri, you see the URL at the bottom?  It says "perf.googleplex.com."  Do you see that?

A.   Yes.

Q.   And is Googleplex -- do you recognize that link?

A.   Yes.

Q.   If you go to page 2 real quick, you'll see there is a peer assessment from Yihua Ding; right?

**A.**    Yes.

**Q.**    And Yihua, as you mentioned, was part of the Borg organization?

**A.**    Correct.  He was --Yihua is his manager.

**Q.**    All right.

           **MR. FEYZI:**  Your Honor, at this point, I'd like to admit Trial Exhibit 6481, please.

           **MS. PRIEDEMAN:**  No objection.

           **THE COURT:**  Admitted.

      (Trial Exhibit 6481 received in evidence.)

**BY MR. FEYZI:**

**Q.**    On page 1, the overall rating is "Exceeds Expectations"; right?

**A.**    Yes.

**Q.**    This is from -- and just to orient the date, this is from 2021 Q3; right?

**A.**    Correct.

**Q.**    All right.  This is just more than a year before that review we just saw; right?

**A.**    That is correct.

**Q.**    And at this time, Linwei is an L4; right?

**A.**    Correct.

**Q.**    But the review we just saw before this, he was an L5?

**A.**    Correct.

**Q.**    So there was a promotion in the middle of this.

Now, the format followed in this review appears to be the person being reviewed does a self-assessment and then peers comment; right?

A.   Correct.

Q.   And you're familiar with this format?

A.   Yes.

Q.   On page 1 it says [as read]:

"Read and learned the CloudRDMA and BigRig projects for the preparation of AdAstra project as the reference."

Fair to say reading and learning is necessary in order to prepare for projects?

A.   It depends on -- some people can do that as a part of the preparation for a project.  Some people can read it because it's something interesting to them, yes.

Q.   That makes sense, though; right?  BigRig was a GPU project name for the V100 and A100 chips; right?

A.   Yes.

Q.   Fair to say it made sense to review documents from a preexisting product to learn more before working on the next iteration of a product?

A.   How one prepare itself -- we have a lot of information available.  How one prepare itself is up to them to decide how they want to do that.

Q.   Just to be clear, Google follows an iterative process with

their chips; right?

**A.**   It depends.  We do -- we don't always follow iterative.

**Q.**   Okay.  So when you build TPU V4 and you moved on to TPU V5e, did you scrap all the lessons from TPU V4 and just build TPU V5 by itself?

**A.**   That doesn't necessarily mean it's iterative.

**Q.**   Okay.  We learn lessons from prior technologies and versions as we move on.

**A.**   Of course.

**Q.**   Is that fair?

**A.**   Sure, but we had a lot more capabilities on top of that.

**Q.**   All right.  On the same page, it says [as read]:

"Presented our Borg for AdAstra plan and AdAstra Tech Summit."

Do you see that?

**A.**   Yes.

**Q.**   Are you familiar with the AdAstra Tech Summit?

**A.**   I'm not familiar with that particular summit, no.

**Q.**   Okay.  Fair enough.  On page 2, his manager, Yihua Ding, notes (as read):

"AdAstra is a NPI project to launch a GPU ML/DL/HPC Supercomputer product . . . ."

He then says (as read):

"He was able to quickly ramp up on this project and then become a Borg lead who has been collocating

with partner teams to scope the Borg support . . . ."

Do you see that?

A.   Yes.

Q.   "ML" here just means machine learning?

A.   Yes.

Q.   What does "DL" mean?

A.   I don't know what it means.

Q.   "HPC" just means high-performance computing?

A.   High-performance computing.

Q.   So Linwei assisted with a project related to machine learning, DL, and high-performance computing; right?

A.   I think "DL" probably means directed learning.

Q.   So sounds like he became a Borg lead who worked with other partner teams.  Is that fair to say?

A.   He's a Borglet lead.

Q.   At the bottom of page 2, it notes (as read):

     "Worked with ML fleet team about the status

     presentation and for the rollout plan."

Do you see that?

A.   Yes.

Q.   Fair to say he had to be knowledgeable when interacting with these other teams?

A.   I'm sorry.  What does that mean?

Q.   Just should it -- fair to say he has to be brushed up when talking to other teams?

A.    For his area of expertise, yes.

Q.    Is one of the ways to become knowledgeable to attend trainings?

A.    Yes.

Q.    To review documents available to engineers on these products?

A.    Yes.

Q.    Trainings oftentimes come with slide decks?

A.    Slide decks, documents, code, yeah.

Q.    On page 3, the review notes [as read]:

        "Piloting implementation and rollout on V100,
P100, and P4."

        V100 is an Nvidia chip; right?

A.    Yes.

Q.    This is part of the BigRig family, I believe?

A.    Yeah, it was used in BigRig.

Q.    P100 is another Nvidia chip?

A.    Yes.

Q.    What is P4?

A.    I believe it is a different variation of the chip, yes.

Q.    Let's go a little further.  It says (as read):

        "Gsys update metrics temperature and power usage
in HardwareMeasureInfo."

        What is that?

A.    Gsys is our software layer that collects information from

the hardware so the upper layers of the software can use it to make decisions.

Q.   The peer assessment on page 4 notes (as read):

        "Leon independently drove all aspects of GPU clock tuning . . . ."

     And then it notes that he won a Perfy Editors Award Choice -- Choice Award.

     What is a Perfy Editors Award?

A.   Perfy Awards are given to engineers that have done something to speed up certain pieces of code and things like that.

Q.   Let's look at the next manager assessment on page 5, please.  It notes (as read):

        "Leon initiated the accelerator telemetry effort; he drove the designs and performed the experiment and prototyping.  This is a forward-looking project with huge potential impact."

     You see that?

A.   Yes.

Q.   Fair to say one would need to review some -- would review documents relevant to that project to be able to manage a forward-looking project?

A.   If it is referring to the GPU frequency tuning one, when you do tuning, think of it like running a very -- you're pushing the boundaries to see how far you can go.

And so what it is talking about is really the forward-looking project with huge potential, how far you can tune it up to potentially get it.  But it could also be very harmful to the hardware, so we take very careful steps to proceed with that.

So what that is referring to is doing some analysis to see how far we can push the frequency tuning.

Q.   Let's go to page 7.  It notes [as read]:

"He completed 21 interviews and was the top interviewer in GCI during Q2.  This is very impressive.  I don't even know how he managed to make that happen.  Thanks, Leon," with a smiley face.

Is 21 interviews in a quarter impressive?

A.   It could be, yes.

Q.   At the bottom of page 7, you can see that there are some quick survey results.

Let's go to page 8.  The question was [as read]:

"How well does Leon foster a culture of respect in the workplace?"

You can see there's ten responders, eight of which said "Extremely well" and two said "Very well."

A.   Yes.

Q.   After this, Linwei was promoted to L5; right?

A.   Yes.

Q.   Are you aware that the alleged trade secret documents are

derived from underlying source documents?

A.   I don't understand the question.

Q.   Sure.  You were shown a list of around 105 alleged trade secret documents; right?

A.   Yes.

Q.   And these were derived from somewhere else; right?

A.   They look like documents from -- available at Google, yes.

Q.   I think the Government calls them "source documents"; is that right?

A.   They are Google documents.

Q.   Did you review every single one of those Google documents for -- that corresponded to each trade secret document?

A.   I went through quite a few of them.  I don't remember if I went through all of them.

Q.   Fair to say some of them were planning and development documents?

A.   Some of them were, yes.

        MR. FEYZI:  I'd like to put up Trial Exhibit 58, just the first page, please.  It's been admitted previously.

BY MR. FEYZI:

Q.   Mr. Kavuri, on the screen is one of the source documents for one of the alleged trade secret documents.  Again, I don't want to go into the contents of this document, but I would call your attention to the very top, that timeline.

     Do you see the timeline?

**A.**    Yes.

**Q.**    Fair to say this document is within the planning to development stage?

**A.**    Yeah.  Yes.

**Q.**    Now, in an engineering project, planning and development stage documents can change over time; right?

**A.**    Potentially, yes.

**Q.**    Fair to say some of the planned features don't make it into the final product?

**A.**    Sometimes, yes.

**Q.**    And other features could be, you know, revised substantially before -- before being shipped; right?

**A.**    It's possible, yes.

**Q.**    In other words, there are different iterations; right?

**A.**    Usually, when we commit to a development, it has to go through an exception process if we are changing it.  Between planning and development, potentially there could be a change.

Development is a pretty serious commitment at Google that we're moving forward with the capabilities.  Any changes to that plan goes through a plan of record change.

**Q.**    Do you see an approved stamp anywhere on this document?

**A.**    What I'm seeing on the screen, I don't see it.

        **MR. FEYZI:**  Mr. Jay, do you mind -- yeah, just right there.

\\\

BY MR. FEYZI:

Q.   Is there an approved stamp here?

A.   Sometimes it's in this page; sometimes it's in the next page.  But --

Q.   Okay.  So if you were -- to know what made it into the final system, you might need to see this doc at a later stage in this timeline; right?

A.   It depends on when this particular project went to the dev entry.  If the document is just before it went to the dev entry, it would not have that stamp.  If it was approved, it will have that stamp.

Q.   Okay.  Fair to say that, you know, sitting here today looking at this, you're not able to tell whether the underlying source material for each alleged trade secret document accurately reflects the final implemented design shipped to production?

A.   Could you repeat that again?

Q.   Sure.  Is it fair to say that sitting here today, you can't tell the jury whether the underlying source material for every single one of those alleged trade secret documents made it into the final shipped product?

A.   They might have made it in.  They might not have made it in.  I don't know.

Q.   All right.  We were shown a video over ten minutes in length earlier today; is that right?

**A.**    Yes.

**Q.**    So you reviewed what this video has been referred to as the InfiniCompute video; right?

**A.**    Yes.

**Q.**    To be clear, this video is not one of the alleged trade secret documents in this case; is that correct?

**A.**    I don't know that.

**Q.**    You reviewed the list of 105 alleged trade secret documents; right?

**A.**    Yes.

**Q.**    You clicked through some of them; right?

**A.**    Yes.

**Q.**    Was any of them an .mp4?

**A.**    The video showed what is running inside at Google.

**Q.**    Okay.  So did you see one of the alleged trade secret documents in that video?

**A.**    On the right-hand side, I saw a GPU system that is running the software that the Google has produced.

**Q.**    Was that one of the 105 alleged trade secret documents?

**A.**    There is technology used in those documents that is running in the demo.

**Q.**    Okay.  The video was showing Google's internal environment; right?

**A.**    Correct.

**Q.**    It's not really showing a Google product; is that correct?

**A.** It is showing the Google product, which is the GPU on the right-hand side.

**Q.** Okay. None of the alleged trade secrets, though, you know were used to make that video; is that right?

**A.** The systems that were shown in the video had the systems that we built at Google.

**Q.** Is it your testimony today that mere use of a GPU system is an alleged trade secret?

**A.** I don't know what the legal definition of a trade secret is, but it clearly showed the GPU systems built by Google. The software that is running within the Google, built by Google, were used to take the video.

**Q.** So your testimony today -- I'm just trying to make this very clear -- is that this video is a part of or consists of one of the alleged trade secrets in this case?

**A.** I did not say that. What I said was the video showed systems that were built at Google, using some of the technology that is part of the GPUs and Borg and other ML software.

**Q.** None of the alleged trade secrets, though, trade secret documents was displayed in that video; right?

**A.** Let me repeat what I said.

**Q.** That's not my question. My question is: Was there a document pop-up that was the alleged trade secret -- one of the alleged trade secret documents --

**A.** I did not see a document pop-up.

Q.   Okay.  Thank you.

Now, to the best of your knowledge, was this video used by Mr. Ding?

A.   I don't know that.

Q.   You're not aware that anything in this video was ever used by Mr. Ding to build a product; right?

A.   I don't know.

Q.   You have no knowledge whether what -- you know, what Mr. Ding was doing with this; right?

A.   I have no knowledge of that.

Q.   Mr. Kavuri, do you know who Alireza Ghaffarkhah is?

A.   He's one of the engineers at Google.

Q.   Okay.  Is he on your team?

A.   No.

Q.   How about Mukarram Tariq?  Do you know who that is?

A.   Yes.

Q.   Is he on your team?

A.   Not at the moment.

Q.   Was he on your team at some point?

A.   At some point.

Q.   Were you aware that these engineers reviewed portions of that video and determined there is nothing of high value there?

        MS. PRIEDEMAN:  Objection.

        MR. FEYZI:  I'm just asking if he was aware.

        THE COURT:  Overruled.

THE WITNESS:  I'm not aware.

BY MR. FEYZI:

Q.   Nothing in that video is about a TPU; right?

A.   None that I saw.

Q.   Mr. Kavuri, let's just change gears here.

You would agree that Google's engineering culture is generally collaborative; right?

A.   Yes.

Q.   Engineers are generally encouraged to learn?

A.   Yes.

Q.   You'd agree that Google had a pretty open culture regarding sharing information and access to information; right?

A.   Generally, we encourage that, yes.

Q.   Information's often shared internally across teams to get certain work done; right?

A.   Yes.

Q.   Mr. Kavuri, your organization includes a large team supporting GPUs in Google's compute environment; right?

A.   Correct.

Q.   And on the GPU side alone, we're talking about hundreds of engineers; right?

A.   You mean in my team?

Q.   Overall at Google.

A.   Overall, yes.

Q.   And just your team was roughly 300 full-time employees.

Now it's around 400; right?

A.    Correct.

        THE COURT:  That's been asked and answered already.
I'm going to ask you to move things along --

        MR. FEYZI:  Sure.

        THE COURT:  -- and avoid repetition.

        MR. FEYZI:  Very fair.

BY MR. FEYZI:

Q.    Borg itself has a very large code base; right?

A.    It's pretty decent size, yes.

Q.    Would you say it's more than a million lines of code?

A.    Possibly.

Q.    Would you say it's more than several million lines of
code?

A.    I don't have the exact details.

Q.    Google also builds internal libraries and tools to support
this work; right?

A.    Yes.

Q.    And so without continuous access to Google's internal
environment like those libraries, an outsider can't just simply
run or reproduce certain code; right?

A.    The -- that's a hard question to answer because there are
unique techniques one can follow to get advantage.  A good
example is the GPU frequency tuning that we just talked about.
It might not be a lot of lines of code, but somebody that

worked on it would know how to recreate that.  It doesn't need a Google environment.

Q.    So I think my question's a little different.

An outsider like me -- right? -- I can't just write a script and import five libraries from Google -- right? -- because I don't have access to those libraries; is that correct?  Fair to say?

A.    Generally, Google code is protected well.  No.

Q.    The alleged trade secret documents included hyperlinks to other internal materials; right?

A.    We use hyperlinks quite a bit in our documents.

Q.    The ones that you reviewed for this case, did you click through every single one of those?

A.    Every single one of what, sir?

Q.    Every single one of the hyperlinks.

A.    In every document?

Q.    Yes.

A.    No.

Q.    Did you -- some of them?

A.    It depends if it's clickable.

Q.    Did you assess how much additional internal context those documents rely on?

A.    Our culture generally is about linking material.  So if you're not familiar with the topic, rather than go research separately, you can just click on it and takes there.  If you

already have a context, you don't have to click on that.

Q.   Mr. Kavuri, none of the alleged 105 documents is a complete code base for all of Google's GPU and TPU; right?

A.   Complete code base?  No.

MR. FEYZI:  No further questions.

Thank you.

THE COURT:  All right.  Any redirect?

MS. PRIEDEMAN:  Yes, briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. PRIEDEMAN:

Q.   Mr. Kavuri, the Perfys Awards came up briefly.  Are the Perfys Editor Awards, are those the highest awards that Google offers?

A.   No.  Perfys are awards set up to generally encourage engineers to tweak things to get the most performance.  If I recall correctly, at the time that Perfy was awarded, we had almost 135 submissions, and about 800 engineers contribute -- gotten the Perfy award that quarter.

Q.   Can you move the microphone a little closer?

A.   Yeah.  So Perfy awards are set up to encourage people to do, you know, creative tuning of work and get the extra performance.  It improves the creativity that our engineers bring to the table.

That particular quarter, if I recall correctly, we had about 135 submissions, and about 800 people won the Perfy that

quarter.

Q.   So Mr. Ding won a Perfy Award, and he was one of 800 people from Google to receive the award that quarter?

A.   Yeah.  Roughly, yes.

Q.   Mr. Feyzi asked you about some of Mr. Ding's performance reviews.  And you discussed that he worked on Borg support for Astrophel, TCPDirect, and some AdAstra components; right?

A.   Correct.

Q.   Does Mr. Ding's contributions to that project -- does that explain why he may have had access to documents related to those projects?

A.   Yes.

Q.   Does having access to those documents give you permission to send those documents to your personal email account?

A.   Absolutely not.

Q.   Mr. Feyzi also asked you about the ICI resilient slice document.  Do you remember that?

A.   Yes.

         MS. PRIEDEMAN:  Ms. Hernandez, can you -- I want to show -- direct you -- we were just looking at the first page of that document.

         Ms. Hernandez, can you please go to Exhibit 58, which is ICI resilient slice, page 3.  And this doesn't have to be sealed.

         Can you go to page 3, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   Mr. Feyzi was asking you whether or not there was "Approved" stickers.  Do you see if there's an "Approved" sticker on this page?

A.   Yes, I do.

Q.   It's that green sticker right there?

A.   Yes.

MS. PRIEDEMAN:  No further questions.

### RECROSS-EXAMINATION

MR. FEYZI:  Mr. Jay, could you please put up Exhibit 58 again, please.  Exhibit 58, just the first page.

BY MR. FEYZI:

Q.   What's the date on that document?

A.   2021, 7/28.

Q.   Okay.  And, again, it's in still the development stage; right?

A.   Based on this particular page, it's going from planning to development.

MR. FEYZI:  No further questions.

Thank you.

THE COURT:  Okay.  Thank you.  You can step down.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  What's next?  I think you had one final stipulation you were working on.

MR. BOOME:  Yes.  Are we going to take an afternoon break?

THE COURT:  Yeah.

MR. BOOME:  Maybe this would be -- okay.

THE COURT:  Okay.  All right.  Why don't we take a break, and we will resume at quarter to 3:00.

Thank you.

THE COURTROOM DEPUTY:  All rise.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Okay.  So the Government is resting after the stipulation goes in; correct?

MS. PRIEDEMAN:  Yes.

THE COURT:  So in light of that, why don't you make your motion now.

Do you have agreement on the stipulation?

MR. FONDO:  Your Honor, I haven't had a chance to really look at it.  I'm happy to enter it at any time during the case.  I don't -- so --

THE COURT:  Okay.

MR. FONDO:  -- I won't -- the fact that their case hasn't ended yet won't -- I don't think it impacts the motion.

THE COURT:  Okay.

MR. FONDO:  So, Your Honor, at this time we would move, pursuant to Rule 29, for a dismissal of Counts 8 through 14.  We believe that the evidence has shown that no reasonable

juror could conclude beyond a reasonable doubt that he is guilty of those counts for economic espionage.

We think that the -- showing contact with the Chinese government is not enough, and that's essentially most of what they have shown. And doing things to try to benefit his business and himself are not sufficient to demonstrate benefit to the foreign government or foreign instrumentality.

The evidence has shown there's no money been exchanged. There has been no trade secrets shared, used, or discussed with Chinese governmental agency -- entities. I'll call them the instrumentalities. There is no product with any of the trade secrets. Again, this all evidence through their witnesses. And there's no evidence that he shared it with the Chinese government.

In addition, the only product that was built did not have any of the trade secrets in it, and there's no evidence that he shared that product with the Chinese government.

So for all those reasons, Your Honor, we would move at this time to dismiss those counts.

**THE COURT:** Okay. I guess maybe you seem to be arguing against something that they are not trying to prove.

You said there's no product. There's no indication that he shared any trade secrets with the Chinese government.

What is required is that the jury find that he stole the trade secrets or copied the trade secrets with the intent

to benefit the Chinese government or an instrumentality of the Chinese government or knowing that his theft of the trade secrets or copying of the trade secrets would benefit the Chinese government. So the fact that there is no evidence that he actually did benefit the Chinese government is really neither here nor there. The question is his intent.

And I think what you need to be arguing is: Is there any evidence from which a jury could infer beyond a reasonable doubt that he intended to benefit the Chinese government through his theft of the trade secrets?

**MR. FONDO:** So, I understand. Your Honor, I think all of those demonstrate a lack of intent because he had nothing that he could share.

He allegedly stole these trade secrets. These trade secrets were not accessed after the summer, I think May of 2023, in the sense they were uploaded on April 17th, 2023, and that was the last date of any uploading of trade secrets.

There's no evidence that he intended -- so there's no communications like, "I want to share this with the Chinese government. I want to use it to benefit the government."

We've seen thousands of WeChats, and there's no evidence indicating that intent to benefit or knowing that it would benefit.

We would also argue that because there was no intent to use those trade secrets for the product, that's the core of

this case -- right? -- which is the using of the trade secrets to build something in China.  And so we don't think they've demonstrated that intent when you have all the factors that I just referenced.  And, in fact, the one product that was built was open sourced and not related to the trade secrets.

So I think they all are intertwined.

And there's certainly no communications that directly discuss trying to -- that his intention was to benefit the U.S -- sorry -- the Chinese government.  His intent was to try to build a successful company.

The Court has alluded to, and I think there's right -- there's significant questions about whether he could have done that or not.  I think that's further evidence of a lack of intent to benefit.

And so for those reasons, Your Honor, I think they all are intertwined.

THE COURT:  Okay.  I understand the argument, and I think you have some good points.  And I'll take it under advisement, and I'll rule on it at the post-trial stage.

MR. FONDO:  Thank you, Your Honor.

THE COURT:  All right.  Anything further before I leave the bench?

MR. BOOME:  No, Your Honor.

Thank you.

THE COURT:  Okay.  See you at quarter to.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 2:31 p.m.)

(Proceedings resumed at 2:45 p.m.)

(Proceedings were heard out of  the presence of the jury.)

THE COURT:  So does the defense have its first witness ready to go?

MR. FONDO:  We do, Your Honor.

I apologize to do this, but I want to revisit -- because we're about to read the stipulation, and I think there's case law.

Well, let me make sure that we're ready to go.

THE COURT:  Okay.

MR. FONDO:  So I think there's case law that says the salary is not relevant because the scheme alleged does not implicate a defendant's salary.  So that's *United States vs. Kail*, K-a-i-l, 2021 Westlaw 261135.

Also *U.S. vs. Unruh*, that wealth of a defendant should not be offered unless clearly connected to the specific charges or conduct at issue.

So we don't think it's specifically connected or even really, frankly, remotely connected to it.  So we just wanted to raise that case law for the Court's consideration.  I apologize for not doing it earlier, but I wanted to do it --

THE COURT:  No.  It's okay.

MR. FONDO:  -- before we do the stipulation.

THE COURT:  What was the first case?

MR. FONDO:  It is *United States vs. K-a-i-l*.  It's a Northern District of California case.

You know what?

THE COURT:  What was the second?

MR. FONDO:  So, Your Honor, hold on.  I apologize.  Give me a second.

I'm going to withdraw that cite.  I think I may have slightly misstated it.

*United States vs. Unruh*, 855 F.2d 1363, 1377.

THE COURT:  Give me the cite one more time.  855?

MR. FONDO:  855 F.2d 1363, 1377.  It's a Ninth Circuit case.

The other thing, Your Honor, we're happy to, like, briefly brief it.  And then we'll certainly allow them to present that stip -- or we can present the stip in our case if your objection is sustained -- or, sorry -- yeah, if their -- my objection is overruled.

THE COURT:  It doesn't seem like it rises to the level of something that needs to be briefed.  I mean, I'm guessing that when I read this case, I'm going to find that it's very fact-dependent, and it depends on how related it is to the conduct alleged and the defendant's defenses and that there's obviously no categorical rule that a defendant's compensation can't come in.

But I'm happy to read the case.  I mean, they're saying they're happy to put the stipulation in during their case if I rule against them.

Is that okay?

MR. BOOME:  That's fine, Your Honor.

THE COURT:  Okay.

MR. BOOME:  If I could just mention, I -- in addition to the argument that I raised earlier about the fraudster theory, I think the statement in the defense's opening statement about this was mostly a business fantasy, implying that he didn't really believe that he could pull this off, that's less likely to be true if he's walking away from a good salary.  He believes in himself and that he can pull this off.  So that's how we would use --

THE COURT:  And that's a theme that's been hit throughout the trial --

MR. BOOME:  Right.

THE COURT:  -- is that this isn't something that could have been pulled off.

MR. BOOME:  Exactly.

THE COURT:  Okay.  So I'll be happy to read that case and then rule on it after I do.

MR. FONDO:  All right.  Thank you, Your Honor.

THE COURT:  Okay.

MR. BOOME:  So in that case, Your Honor, I'm just

going to ask to read the parties' remaining two factual stipulations, and then we'll be resting.

THE COURT: Okay. Very good.

MS. WALSH: And then, Your Honor, the defense's second witness is Steve Novak. He is going to get into some of the details of the alleged trade secret documents. I don't think that's going to happen today, but we will be requesting that the courtroom be closed because of, you know, the way this has gone with the Government.

THE COURT: Okay. But you're going to get him started in open court?

MS. WALSH: Yes.

THE COURT: Qualify him and all that?

MS. WALSH: Yes.

THE COURT: Okay. Very good.

(Proceedings were heard in the presence of the jury.)

THE COURT: Okay. So now, you remember you heard a couple of factual stipulations earlier. The parties have a couple more factual stipulations to give you now.

Go ahead.

MR. BOOME: Thank you, Your Honor.

Stipulation Number 7 is about Mr. Ding's international travel.

The parties agree Mr. Ding traveled internationally from the United States during 2022 and 2023. Mr. Ding's dates

of departure from the United States and dates of return to the United States during that time period are specified below.

The defendant departed from San Francisco International Airport to Edmonton International Airport, Canada, on June 18, 2022, and returned from Edmonton International Airport, Canada, to San Francisco International Airport on July 2nd, 2022.

The defendant departed from San Francisco International Airport to Hong Kong International Airport on October 29th, 2022, and returned from Incheon International Airport, South Korea, to San Francisco International Airport on March 25th, 2023.

Mr. Ding departed from Daniel K. Inouye International Airport, Honolulu, Hawaii, to Narita International Airport, Japan, on June 15th, 2023, and returned from Incheon International Airport, South Korea, to San Francisco International Airport on July 24th, 2023.

Mr. Ding departed from Daniel K. Inouye International Airport, Honolulu, Hawaii, to Incheon International Airport, South Korea, on August 27th, 2023, and returned from Incheon International Airport, South Korea, to San Francisco International Airport on September 8th, 2023.

Mr. Ding departed from San Francisco International Airport to Haneda Airport, Tokyo, Japan, on November 1st, 2023, and returned from Beijing Capital International Airport to

San Francisco International Airport on December 9th, 2023.

Additionally, Mr. Ding booked a flight scheduled to depart on January 7th, 2024, from San Francisco International Airport to Wuhan International Airport, China, but Mr. Ding did not board that flight.

Stipulation Number 8 is about Mr. Ding's immigration status.  The parties agree that Linwei Ding is a citizen of the People's Republic of China.  He moved to the United States legally in 2010 and is currently a legal permanent resident.

Your Honor, that concludes the parties' remaining factual stipulations, and at this point the Government rests its case.

**THE COURT:**  Okay.

So you've heard now that the Government has rested its case.

The defense has an opportunity to put on a case if it wishes.  It's not required to.  You know that the defense has already called one witness.

Does the defense have any other witnesses it wishes to call?

**MR. FEYZI:**  Yes, Your Honor.  The defense calls Mr. Scott Compton.

**THE COURT:**  Okay.

(Witness enters the courtroom and steps forward to be sworn.)

**THE COURT:**  Go ahead and have a seat.

THE COURTROOM DEPUTY:  Please raise your right hand.

**SCOTT COMPTON**,

called as a witness for the Defendant, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.

Please state and spell your full name for the record.

THE WITNESS:  Scott Nicholas Compton.  Last name C-o-m-p-t-o-n.

### DIRECT EXAMINATION

BY MR. FEYZI:

Q.   Good afternoon, Mr. Compton.

A.   Good afternoon.

Q.   What do you do?

A.   I am a private investigator.

Q.   And, Mr. Compton, your normal hourly rate for private clients is $250 an hour; right?

A.   Correct.

Q.   In this case, you have been retained pursuant to and paid by the Criminal Justice Act panel, and thus, your rate for this case is $100 an hour; right?

A.   That's correct, yeah.

Q.   What were you asked to do in this matter?

A.   Among other things, review documents that were subpoenaed by the defense.

Q.   And so have you reviewed a number of subpoenaed documents?

A.   I have.

Q.   I'd like to show you Exhibit 7368, which has been preadmitted.  These are business records of Asiana Airlines; is that right?

A.   That's correct.

Q.   And what do they show?

A.   These -- this is a subset of records from the airline that include flights booked and flights taken by Mr. Ding.

     MR. FEYZI:  Your Honor, may I approach and just hand the exhibits as well?

     THE COURT:  Sure.

     THE WITNESS:  Thank you.

BY MR. FEYZI:

Q.   And this one shows some statistics as well; right?

A.   That's correct, yes.  Asiana Airlines also provided some statistics about passenger travel, one-way versus return tickets.

Q.   Let's turn to Exhibit 7369, please, which has also been preadmitted.  These are business records at Southwest Airlines; is that correct?

A.   That's right.

Q.   And at a high level, what do they show?

A.   Flights booked by Mr. Ding.

Q.   And Exhibit 7370, these are business records at

United Airlines; right?

A.   That's correct.

Q.   At a high level, what do they show?

A.   Again, flights booked and taken by Mr. Ding.

Q.   I understand that you have put together a summary chart for the jury; is that right?

A.   That's right.

        MR. FEYZI:  Can we please pull up Exhibit 7372, which has also been preadmitted.

BY MR. FEYZI:

Q.   Mr. Compton, did you personally review the airline records before preparing your summary exhibit?

A.   I did.

Q.   What steps did you take to make sure your charts accurately reflect what is in the underlying records?

A.   Yeah.  I looked to make sure the name matched, the dates of travel matched the airports, departure and arrival matched, that we had correctly summarized the record in these tables.

Q.   And so based on your review of Exhibits 7368, 7369, and 7370, do the charts accurately summarize the information on the airline records?

A.   That's right, yes.

Q.   Let's start with Asiana Airlines, please.  Please explain what this chart shows and how it's organized.

A.   These are -- this is a summary that shows two flights

taken by Linwei Ding in 2023.  Both were one-way flights or one-way on Asiana.  The first was March 25th of 2023, from Beijing through South Korea, arriving in San Francisco.

Again, the second record is also a one-way ticket that involved travel on July 24th of 2023, this time leaving from Dalian, China, again flying through South Korea and arriving in San Francisco.

Q.   And what do the statistics show?

A.   The statistic there was -- those figures were provided by Asiana Airlines about the number of passengers on those flights who were traveling on one-way tickets.

Q.   And this is for all passengers; right?

A.   That's my understanding, yes.

Q.   Thank you.

Let's go to Southwest next.  Please explain what's in this chart and how it's organized.

A.   This is a record of two flights reserved by Linwei Ding. The first was booked on December 29th of 2023, with a scheduled travel date of February 10th of the following year, 2024.  That ticket was Long Beach -- departing Long Beach and arriving in Las Vegas, and that was booked as a one-way ticket.

It was then canceled, or you might consider it rebooked, on January 5th of 2024, again, with an intended departure date of February 10, 2024.  This time it was booked as Los Angeles to Las Vegas.

**Q.**   February 1, 2024, is after January 6, 2024; right?

**A.**   Yes.  So that right-hand column is the date that the flights were canceled.  And the first flight was canceled/rebooked on January 5th.  The second flight was canceled on February 1st.

And yes, February 1st is after January.

**Q.**   All right.  And the last one is United.  Please explain what this chart shows and how it's organized.

**A.**   This is a flight that Linwei Ding took, again, in December of -- again, in 2023.  This was in December, traveling December 9th of 2023, again, on a one-way ticket departing Beijing, arriving San Francisco.

           **MR. FEYZI:**  Thank you, Mr. Compton.

           No further questions?

           **MS. PRIEDEMAN:**  No questions.

           **THE COURT:**  All right.  You can step down.

           Does the defense have any other witnesses?

                         (Witness excused.)

           **MS. WALSH:**  The defendant, Linwei Ding, calls Mr. Steve Novak.

  (Witness enters the courtroom and steps forward to be sworn.)

           **THE COURTROOM DEPUTY:**  Please raise your right hand.

                         **STEVE NOVAK**,

called as a witness for the Defendant, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.

Please state and spell your full name for the record.

THE WITNESS:  Steve, S-t-e-v-e; Novak, N-o-v-a-k.

### DIRECT EXAMINATION

BY MS. WALSH:

Q.   Good afternoon, Mr. Novak.  Where are you currently employed?

A.   I'm currently employed at a company called Bay2Sierra Silicon Services that I started with a business partner and I partially own with him.

Q.   What are silicon services?

A.   Yeah.  So we provide digital services for design and verification of chips:  SoCs, which are system on chips; FPGAs, field-programmable gate arrays.  We do a wide spectrum, from architecture all the way down to implementation of various chips that we work on.

Q.   And your company is based in the Bay Area?

A.   One of us is in the Bay Area.  The other is in the Sierras.

Q.   And is that you?

A.   That is me.

Q.   Can you briefly describe for the jury your educational background?

A.   Sure.  So I got both my undergraduate degree in electrical

engineering and my master's in computer science with emphasis in computer architecture at UCLA.

Q.    After finishing your master's degree, what did you do?

A.    I actually got a job with AMD, Advanced Micro Devices, working with them to do a teardown on -- at that point, it was a leading edge microprocessor called the Intel 486.

Q.    And after AMD, where did you work after that?

A.    So after AMD -- I was working with them almost seven years -- and I started working for multiple start-ups.  I worked for, in total, about three start-ups after that, working more on communication devices.

Q.    What kind of chips and systems did those start-ups work on?

A.    Various.  Various generations of primarily Ethernet bridges and switches and -- primarily those two items during that time period.

Q.    And then after those start-ups, what did you do after that?

A.    So I started a company with my business partner to work basically providing services to companies that needed our help, to provide from architecture all the way to verification.  We can go through all the steps that are required for that.

But we came in, and I've worked for probably over 20 companies since starting with Bay2Sierra, helping them develop chips.

Q.   And that's Bay2Sierra where you currently work; correct?

A.   That's correct, yes.

Q.   Mr. Novak, can you describe for the jury your experience in computer architecture?

A.   Yes.  I think, you know, I specialized that in my master's because I really enjoyed that aspect of the discipline.  And so starting at AMD, over 30 years ago, I've been working on computer architecture throughout my career up to this point.

And I started working on microprocessors with AMD.  I started working with memory systems with AMD.  And then I transferred to communication interfaces later.

And then as a contracting company, I've worked on all three of those throughout the last 18 years.

Q.   And then you mentioned earlier a specific project at AMD that dealt with the Intel x86 chip.  Can you explain that to the jury?

A.   Yeah, absolutely.  I see it as kind of three phases.  So I started working with the 486.  So AMD had rights to the 486. And so when I started working there, AMD was actually tearing down, doing a teardown of that chip and completely reverse-engineering it.  They had the rights to do so.  And so I started working on the effort and that teardown process.

And after that, I moved to my kind of second phase, which is helping them add a feature to that microprocessor called the SLE, which was adding a cache memory to it; and I worked on the

microcode for it, which is a type of VLIW.

And then the third phase was starting to work on the memory infrastructure off-chip from that processor that I was -- we started -- we created the first northbridge and southbridge for AMD at that time.

Q.   And then you referred to something called a teardown. What is a teardown?

A.   So a teardown is when you take a bare -- you take a chip, a physical chip, and you actually reverse-engineer all the logic from it by taking each layer and stripping it, taking a photograph of it, and actually recreating that logic internally and being able to recreate it.

Q.   How easy or difficult was this task at AMD?

A.   So I wasn't doing it by myself, obviously.  It was a very long process and very arduous process.  It took multiple years for us to get something that was actually usable.  It was not quick at that point at all.

And today it might be a little bit easier, but the chips are much more complex.

Q.   And how many people worked on this design?

A.   Probably on the order of over 200 people.

Q.   And then on that project, did you work on a specific part?

A.   I started working in verification, so verifying that all the functionality was actually working.  So just because we reverse-engineered it didn't mean that we didn't make mistakes

and that there was -- that the chip was working.  So I was working on verification and creating a test environment and test cases for it.

And then I switched to working on adding this additional functionality in microcode.

Q.   And what was that additional functionality?

A.   So the additional functionality was creating a cache so that the processor could get data quicker.  And it was a new design.  It wasn't something that we got from Intel.  It was something that we had to create on top of their copy design.  And so it was incredibly difficult.  I literally had a book of about 2,000 pages that I had to look through to create this VLIW, essentially, microcode.

Q.   And, Mr. Novak, do you have experience in AI chip design?

A.   I do.

Q.   Can you tell the jury about that?

A.   Sure.  So I worked on chips for a company called Cerebras for three years.  And so I've been involved with their aggregation chip that aggregated all the massive amount of data that needs to go in and out of that chip, and then I worked on some of the routing inside of this wafer scale.  Yes, actually, the whole wafer was the chip.

Q.   Mr. Novak, have you filed for patents relating to your work?

A.   Yeah, I have.  There's 13 in total.

Q.   And can you briefly describe what areas they're in?

A.   Yes.  They're processor design, memory design, and communication protocols.  So all three aspects of computer architecture.

Q.   Mr. Novak, what did you do to prepare your opinions in this matter?

A.   So I was focused on the 105 files at question here.  I read Dr. Sanchez's report and his transcripts, and then I think there's two other exhibits I read through.

Q.   And did you apply your knowledge and experience in system and chip design to those documents?

A.   Yes, absolutely.  Yep.

Q.   Your normal rate for private clients is $475 per hour; correct?

A.   That's right.

     For legal cases.  Sorry.

Q.   And in this case, you have been retained pursuant to and paid by the Criminal Justice Act panel, and your rate is $375 per hour; correct?

A.   Yes.

Q.   Mr. Novak, have you formed any opinions that are relevant to the issues in this case?

A.   Yes, I have.

     MS. WALSH:  I tender Mr. Novak as an expert in chip hardware design and computer architecture.

MS. PRIEDEMAN:  No objection.

THE COURT:  Okay.  Proceed.

BY MS. WALSH:

Q.   Mr. Novak, have you prepared any demonstratives to help illustrate your testimony?

A.   I have.

MS. WALSH:  Mr. Jay, can you bring up Mr. Novak's demonstratives.

BY MS. WALSH:

Q.   And at a high level, what does this slide show?

A.   Well, it shows -- after reviewing the 105 documents and from my experience, I came up with kind of six responses to my task at hand, which is to look at those documents and understand, from a person with technical knowledge, how much -- if they could be used to replicate or recreate a part or the full system at question here.

Q.   And let's focus on Opinion Number 1.  What is your first opinion?

A.   So I think it's really important to understand that this is not just a single chip.  It's a whole collection of not only chips, but interconnectivity which is proprietary to Google. You can't just reproduce one item without reproducing all of them for them to have value.  If you reproduce one part and you don't have the other parts, it's -- it's not very useful.  And so that's my first opinion.

Q.   And what role does customization play, if any, in your opinion here?

A.   Right.  So, actually, there's one aspect of my experience where I had to work on a custom multiplier.  So you think a multiplier, like a calculator, when you multiply two numbers.  It was a 64-bit multiplier.  And you can actually synthesize it in a matter of -- I don't know -- currently about hours.  Back then, maybe a week you could get a finished result.

     I spent six months on a project to optimize a multiplier, just a multiplier and adder, and it took six months and three people to do that.  So it's really important to know the quality that you're aiming for.

Q.   And, Mr. Novak, why does it matter for the 105 alleged trade secret documents that Google's technology is interconnected?

A.   Because the bar for usefulness makes it more difficult if there's multiple pieces that work together and you're only defining parts of different pieces.

     It's really difficult to just, for instance, reproduce one piece and have it have meaningful value without all the rest of the pieces of the puzzle.

     I view it kind of like if you have a very large puzzle, like a 100,000-piece puzzle, and you have only 105 pieces that are scattered through that puzzle, and you don't have any other pieces, and you just know what the picture should be in a very

hazy fashion.

Having the 105 pieces don't really help you when the scope is 100,000 pieces.  And it's difficult to create a nice picture with it.  It's almost, in some ways, a barrier, in some ways, to create a finely tuned system when you have these dependencies you have to deal with.

MS. WALSH:  And let's flip to Slide 3, please.

BY MS. WALSH:

Q.   And, Mr. Novak, what does this illustrate?

A.   So this is one chip out of one of the two systems that are in question here.  And this shows the TPU Version 4 from Google, and it shows kind of a high-level breakdown of what logically the chip will look like at the top level.

So on the left-hand side, you see the host, which is a proprietary custom-made host made by Google that the PCIe, which is a standardized interface, communicates to.

On the right, you see the ICI, which is the inter-chip interface, which is a Google proprietary protocol, and how it communicates to other chips.

And then you will see the TensorCores, which are the custom optimized Google modules.  They're replicated twice.

In the bottom you have the BarnaCore, which we will be seeing some evidence from, which is also a custom module there.

And all these pieces on this diagram except for the PCIe and the HBM controller are custom pieces that Google has

designed and need to be carefully crafted.

Q.   So based on your experience, would each of these pieces in this slide be a separate design effort?

A.   There'll be a separate set of engineers working on each, yes.  It'll be under the same effort, but there'll be potentially hundreds of engineers working on this one chip for sure.

Q.   And do those different pieces of the chip need to coordinate with one another?

A.   Yes, absolutely.  I mean, it's like a domino.  One domino out of place will make the whole thing not work.  And so there's lots of work and effort that goes into this, not only in design, but also in the verifying, to make sure it's actually working properly.

Q.   What kind of effort is involved, in your experience, in getting all the components working together properly?

A.   It's a painstaking effort.  It takes, for a chip like this, it would be, you know, a year and a half, two years to get from start to finish and make sure it's not only working functionally, but it also has to be optimized for power and area and timing.  And, you know, the time in the market is always a pressure item here.  So there's a lot of effort and detail that goes into this.

Q.   What is time to market?

A.   Time to market is the time when you can actually start

selling this -- typically a chip.  In this case, it would have to be the system -- or using the system, because Google doesn't sell the system or this chip.  So it would be the time to when they can start using this whole system together.

Q.    And can changes in one part of the design process for one component affect other components?

A.    It almost always does, actually.  It's very rare -- if it's a major change, it's very rare, especially for an interconnected system like this, that you change one part without actually having to optimize all the other pieces, because you lose some of the optimization.

If you increase your memory bandwidth, for instance, or how fast your memory goes, you have to make sure everything else scales with it for it to be effective.

Q.    So could you swap out any of the components listed on this slide with a component from another system?

A.    Well, besides the -- like, the PCIe is a standardized part.  Any of the -- I'm not sure if that really makes sense. All these are proprietary custom-made, custom-crafted pieces that are made by Google.  I'm not sure where you'd get another piece to put in there.

Q.    And can you do the opposite?  Can you take a Google customized part and use it outside of Google in another system?

A.    You mean this whole device or the individual pieces inside?  Sorry.

**Q.**   For example, one of the pieces.

**A.**   Not easily.  I mean, it would definitely be a full -- a difficult effort.  These aren't plug-and-play block -- it might look like LEGO blocks, but they are not LEGO blocks.  Certainly not.

Except, oh, the HBM controller is somewhat of a standards based.  There's items on this -- specifically the PCIe and the high-bandwidth memory controller, not the controller, but the interface to the memory, which is the HBM stack that's at the bottom -- that are standards.  They're industry standards.  But everything else is customly made by Google.

**MS. WALSH:**  Okay.  And can we flip to the next slide, please.

**BY MS. WALSH:**

**Q.**   And what does this depict?

**A.**   So this is depicting the complexity going up into the aggregation of this TPU.  So you take these TPUs and you put them together onto a server, which is a board.  And in this case, they are put into a server tray.  And those trays, just like a shelf in your house, goes into a rack.

And so you can see it just keeps multiplying up, and these racks -- we'll see a picture later where these racks are put side by side into a data center.  And it's an extremely difficult and complicated endeavor to do.

**Q.**   And does that require coordination between the different

parts that go into the server?

A.   Yes.  Yes, absolutely.  There'd be coordination not only between people, but people are going to be leaving behind documents to try to document every little aspect of this process to make sure that they have something to remember when they come back and look at it or someone else comes back and looks at it to try to give them a clue of what they've done.

          MS. WALSH:  And then let's turn to Slide -- or to the next slide, please.

BY MS. WALSH:

Q.   And what does this depict?

A.   So this is showing that whole rack that we just looked at and how it gets put into a data center.

     And you can see that they're lined up.  And not only are they lined up, but you see all the infrastructure going around it, the electrical power and the cabling, because all these have to be interconnected, and the cooling on this.

     You see the fan on the very top.  This would be potentially a very noisy environment because those fans are whirling along.  This is not really a great spot for humans, but this is built for these data centers.

     And I would like to add, this complexity of aggregating all this all the way to the top, it's just as complicated to create all the layers below the TPU.  Everything you see on that diagram is -- there's a lot of complexity in creating

everything down to the chip level.

And then all of the software and firmware that runs on this is just another third dimension of complexity.

So this is an extremely complex system.  It's not an easy task at all.

Q.    Does the software need to be optimized to work in tandem with the other parts of the system?

A.    Absolutely.  The software is what kind of orchestrates everything together and makes everything work together.  The hardware is giving you the ability to create really fast operations, but it's not the actual intelligence.  The intelligence comes from the software.  And that's the -- like I said, it's the third pillar of complexity here.

Q.    Are you familiar with the phrase "tech island"?

A.    I am.  It shows up in one of the documents I read.

Q.    And what is your understanding of that term?

A.    So the more you can own of your infrastructure, the more you can optimize it, the more you can have control of your processes.

So, for instance, if you're a cook and you control all the ingredients that come to you, and actually grow all your ingredients, then you can create a product that's really exquisite and has really high quality.  And I believe -- and it also prevents other people from replicating what you've done.

So essentially, what Google's doing here is they're

creating -- from ground up, they're creating all the complete solution, and they believe and it seems pretty optimized for what they're doing.  And they own all of it.  A lot of it is just proprietary; right?  So that's the advantage.

Q.   And what effect does that have on the value of documents that are used to create an AI supercomputer?

A.   First of all, there's a lot of documents.  Like, I would think -- there's -- I don't know how many because I've only looked at 105, but there'd be lots more than 105 documents. That's for sure.  And they quickly come out of date.  And there's a lot of people, and there's lots of analysis documents, a lot of briefs going through the system.

I think it's -- to me, it would be almost uncountable how many documents there would be floating around to work on a system from the chassis, firmware, and the chip design.  It's just a massive effort.

Q.   And --

THE COURT:  Whenever you think is a good time to break.  We just have a few minutes left until we get to 3:30.

MS. WALSH:  Like one or two questions.

THE COURT:  Sure.

BY MS. WALSH:

Q.   And, Mr. Novak, does the tech island concept have an effect on the value of the documents that are used to create an AI supercomputer?

**A.**   Well, they're, in general, very specific to what Google has.  In fact, it's almost like having your own -- in some places, almost your own language, because they have their own infrastructure.  They have their own isolated community, essentially, of a solution space.

        **MS. WALSH:**  And I think that's a good place to pause.

        **THE COURT:**  Okay.  Great.  So we'll break for the day.

        Let me give you an update on scheduling.  We are ahead of schedule.  We've been moving along at a nice clip.  What I expect is that you will be done hearing the evidence tomorrow.  The evidence will all be in tomorrow, and then -- and it might be before the end of the day tomorrow, which would mean that we would finish early tomorrow.

        You'll come back Wednesday morning and hear closing arguments from the lawyers, I'll give you your instructions, and then it seems like you'll be able to begin your deliberations on Wednesday around lunchtime.

        Now, there are always curveballs during trial.  You never know; right?  Something may change, and it may end up taking longer or shorter than what I'm anticipating.  So please don't hold me to it.  But that is my best guess of what the schedule is going to be, that you'll be able to begin your deliberations on Wednesday around lunchtime.

        So with that, remember all of my admonitions, and we'll see you tomorrow at 9:30 sharp.

Thank you.

THE COURTROOM DEPUTY:  All rise.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Okay.  You can step down.

By the way, just while it's on my mind, in closing arguments, you-all are not going to be putting up any of the trade secrets; is that correct?  Or maybe?

MS. PRIEDEMAN:  Maybe, Your Honor.

THE COURT:  Okay.  But if you put them up, will you need to clear the courtroom or --

MS. PRIEDEMAN:  No.

THE COURT:  We just need to make sure we're not showing them to the gallery?

MS. PRIEDEMAN:  Yes.

THE COURT:  Okay.  Great.

All right.  See you at 4:00.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 3:26 p.m.)

(Proceedings resumed at 4:09 p.m.)

THE COURT:  Sorry for the delay.

Okay.  So what I would propose we do is just go through each instruction one by one.

Any objection to Number 1?

MR. CHANG:  None from the Government, Your Honor.

THE COURT:  Objections or suggestions.

**MR. CHANG:**  None from the Government, Your Honor.

**MS. KRSULICH:**  No, Your Honor.

**THE COURT:**  Number 2?

**MR. CHANG:**  No.

**MS. KRSULICH:**  No, nothing from the Defense on 2.

**THE COURT:**  Okay.  Number 3, we'll delete the "if applicable."

And we'll remove Number 4.

Number 5?

**MR. CHANG:**  No objection.

**MS. KRSULICH:**  No objection.

**THE COURT:**  Number 6?

**MR. CHANG:**  No objection.

**MS. KRSULICH:**  No objection.

**THE COURT:**  Number 7, I think I'll just -- I'll probably cross out that last paragraph and just refer back to my earlier comments about it rather than reading it again.

**MS. KRSULICH:**  Your Honor, we were thinking that this paragraph was more precise than what you had read earlier, and so we --

**THE COURT:**  Oh, yeah.

**MS. KRSULICH:**  We would ask the Court to keep this in.

**THE COURT:**  Yeah.  Sure, that's fine.  I mean, it's more precise in the sense that it offers the "turned-on garden hose" example.  Okay.  That's fine.  I'll leave it in.

Number 8, I was going to delete -- there are three references to race, gender, unconscious bias in these instructions.  So I was going to delete reference to two of them to avoid being repetitive.  It's in the first.  It's already in the first instruction.  So I was going to delete the paragraph right below Number 8, "other factors that bear on believability."

Any objection to that, or any other objections or suggestions on this instruction?

**MR. CHANG:**  No objection from the Government.

**MS. KRSULICH:**  No objection.

**THE COURT:**  Okay.  Number 9?

**MR. CHANG:**  No objection.

**MS. KRSULICH:**  No objection to 9.

**THE COURT:**  10, I'll delete the words "Expert Witness" from the title, just because it's not necessary, and then we'll delete Mark Eskridge's name.

Anything else on that instruction?

**MR. CHANG:**  No objections from the Government.

**MS. KRSULICH:**  Your Honor, other than deleting Mr. Eskridge, no objections.

**THE COURT:**  Yes, we'll do that.

Number 11?

**MR. CHANG:**  No objections.

**MS. KRSULICH:**  No objections.

THE COURT:  Number 12?

MR. CHANG:  Your Honor, before we move on to the substantive instructions, we do think it's important to have an instruction about the Mandarin language evidence, very similar to the one that you offered orally, and so we have a proposed instruction along those lines.

THE COURT:  Okay.  Why is it important, just out of curiosity?

MR. CHANG:  Just making sure the jurors know, when they're back there deliberating, that the English translation controls as opposed to any other evidence, because there are some Mandarin language documents and then the recordings are also in Mandarin as well.

THE COURT:  Okay.  So what's your instruction?

MR. CHANG:  This is the proposed instruction is, quote --

THE COURT:  Do you have an extra copy of it?

MR. CHANG:  I don't, other than my notes.

THE COURT:  Okay.  That's okay.

MR. CHANG:  I apologize.

[As read]:

   "Documents and recordings that are written or
   spoken in Mandarin Chinese have been admitted into
   evidence.  English language translations of this
   evidence have also been admitted into evidence.

Although some of you may know the Chinese language, including the Mandarin or Cantonese dialects, it is important that all jurors consider the same evidence. The English language translations are the evidence, not the foreign language written or spoken in the admitted evidence.  Therefore, you must accept the English translations of the evidence and disregard any different meaning of non-English words."

THE COURT:  Okay.

MS. KRSULICH:  No objection.

THE COURT:  All right.  That sounds fine.  Why don't you give me your -- you want to give me your copy?

MR. CHANG:  Can I email it to the Court after this or to Bhavna?

THE COURT:  Yeah.  So that'll be New Instruction Number 12.

MS. KRSULICH:  Your Honor, I don't know if now is an appropriate time to offer two additional instructions as well.

THE COURT:  Go ahead.

MS. KRSULICH:  The first is about activities not charged.  It was Proposed Instruction Number 31.

THE COURT:  Yeah.

MS. KRSULICH:  We would propose that the Court include that in the instructions.  I have a copy, if you'd like it.

THE COURT:  I don't really -- I mean, what activities

are you referring to?  Usually, that instruction is given when we have -- when the Government offers other acts evidence, 404(b) evidence.  And per the pretrial rulings, the badge and the impersonation of Mahmood, I ruled are not -- don't qualify as -- it's not really other acts evidence.

So I'm not sure why that instruction would be appropriate in this case.

**MS. KRSULICH:**  So we would be concerned that the jury would interpret those acts as part of the crimes being charged in the case, and so the instruction makes clear that those are not to be considered as part of the crimes in the case.

And this instruction is for activities not charged; it's not for other acts.  So I know there's a separate instruction for that, Your Honor.  So this is just talking about the other activities that were discussed and that are not part of the underlying crimes.

**THE COURT:**  Yeah.  But, I mean, the problem is all of those activities go to intent and so they go to those crimes; right?

**MS. KRSULICH:**  Yeah.  And the instruction makes clear -- right? -- that you can consider it for intent, but you can't consider that as the basis of the crime.  And so that's what we would have the Court consider.

**THE COURT:**  Thoughts?

**MR. CHANG:**  We agree with the Court that the

instruction is not necessary here.

THE COURT:  I don't think it's necessary.

What else?  Did you have another proposed instruction?

MS. KRSULICH:  Yes.  The other is to define owner of the trade secret.  The Court took that -- removed that.  It would be Instruction Number 40.

THE COURT:  Yeah.  Why is that necessary?  It just struck me as -- I mean, I don't have strong feelings about it, but is it in -- I mean, either Google is the owner of the trade secret and that element is satisfied, or Google is not the owner of the trade secret and that element isn't satisfied.  And it seems obvious.  Like, what more do we need?  What more does the jury need?

MS. KRSULICH:  That's fair, Your Honor.

The ownership definition we want to highlight because it goes to this compilations issue as to whether the documents were maintained together as a collection and whether they were protected as a trade secret.  And ownership --

THE COURT:  What does that have to do with ownership?

MS. KRSULICH:  Well, ownership would go to whether Google took protections, took measures to protect the collection of documents as they were presented in this case.

THE COURT:  Well, first of all, I've already ruled that, you know, the documents don't have to be -- the owner doesn't have to have kept the documents together for them to

qualify as a compilation trade secret.  So you can't argue -- you can make an argument about how they were stored as it relates to reasonable measures, but you can't make an argument that they -- you know, documents were stored in different places and, therefore, they can't be considered a compilation trade secret.

But I don't understand how any of what you're saying right now relates to the issue of ownership and why -- I mean, I'm just always looking to avoid giving the jury unnecessary instructions because they're so long, to begin with, and I don't see what is in issue with respect to ownership here.

**MS. KRSULICH:**  That's fine, Your Honor.  And we want to make sure we're preserving all of our objections related to the compilations, so that's one of them.

**THE COURT:**  Okay.

**MS. KRSULICH:**  And we do have some language to propose as we go through the more substantive instructions.  So we can get into that.

**THE COURT:**  Okay.  Any comments on the ownership instruction?

**MR. CHANG:**  We agree with Your Honor that that's not a necessary instruction.

I do think that last point that you made is important, though, that you have ruled on the compilation, combination issue and that defense is not going to be permitted to argue

those types of arguments in closing that are contrary to your order.

THE COURT:  Yeah.  But the fact that a bunch of different documents could be obtained from different locations could be relevant to whether Google was taking reasonable measures to protect them.  I mean, it's just that what the defense cannot argue is that the fact that they were in different locations means that they cannot be considered compilations.

MR. CHANG:  We agree, Your Honor.

THE COURT:  Okay.

MS. KRSULICH:  And, Your Honor, one of the issues that came up related to the compilations is just, so the law says they have to have reasonable measures to protect the compilation.  And you saw the evidence coming in saying, well, there were different labels on different documents in the compilation; there were different access groups.

So there wasn't one reasonable -- one measure that was designed to protect the entire compilation.  And so that element isn't satisfied; right?  Reasonable measures to protect the compilation as it is.  So we're proposing some language later on in the instructions that cover that topic.

THE COURT:  Okay.  While we're on that topic, maybe we should wait, but was there -- okay.  So there were all of the documents in the seven trade secret categories, each of the

documents on that list -- what is it?  Exhibit 177?

MS. KRSULICH:  777.

MR. CHANG:  777.

THE COURT:  777.

Each of the documents is offered by the Government as a trade secret.  And then each of the categories has been identified to the jury as a compilation trade secret.

MR. CHANG:  Correct, Your Honor.

THE COURT:  So Category 1, Category 2.

Are there any other categories that I missed of categories that were presented to the jury as trade secrets, aside from -- sorry -- compilations of documents that were presented to the jury as trade secrets other than those seven compilations?

MR. CHANG:  No, Your Honor.

THE COURT:  Okay.  All right.  I wanted to make sure I wasn't missing anything.

MS. KRSULICH:  And, Your Honor, the Government has alleged that there are additional compilations, but there was no evidence --

THE COURT:  Right.

MS. KRSULICH:  -- of those additional compilations.

THE COURT:  Sounds like what they're saying is they're not presenting that -- it might be in the indictment, but the only seven compilations that they are presenting -- have

presented to the jury and will be presenting to the jury are 1 through 7.

MS. KRSULICH: Correct. That's what I understand counsel to say.

(Co-counsel confer off the record.)

MR. CHANG: Just to clarify, Ms. Priedeman reminded me that the documents themselves are also compilation or combination trade secrets.

THE COURT: What do you mean, "the documents themselves"?

MR. CHANG: The individual trade secret documents.

THE COURT: Is it Priedeman?

MS. PRIEDEMAN: Yes.

THE COURT: Sorry. I've been saying "PREED Man" the whole trial.

MS. PRIEDEMAN: Honestly, they both sound right.

THE COURT: Priedeman. Okay.

MR. CHANG: Yes. So the individual trade secret documents are also compilation or combination trade secrets.

THE COURT: Sorry. One more time. I'm a --

MR. CHANG: Yeah.

THE COURT: -- little tired.

MR. CHANG: It's okay. We all are, Your Honor.

That the individual trade secret documents are also compilation or combination trade secrets.

THE COURT:  So you're saying that each individual document is both a trade secret and a compilation of trade secrets?

MR. CHANG:  You can --

MS. PRIEDEMAN:  Just to clarify, Your Honor, to the extent that a trade secret document has public information in it, we're not claiming that the public information itself is a trade secret.  It's the combination of the public and proprietary information in the document.

So we do think there needs to be an instruction that clarifies that a trade secret can be a combination of public and proprietary information.

THE COURT:  Yeah, I thought that was in there, but we can look at it when we get there.

MS. PRIEDEMAN:  Yeah.  So that's all that -- it's not a separate theory.

We will be arguing to the jury that all of the documents themselves are trade secrets, and then the combination of the documents in each category together are trade secrets.

THE COURT:  Okay.

MS. KRSULICH:  Your Honor, if I may be briefly heard on this compilation issue?

THE COURT:  Yes.

MS. KRSULICH:  So two points.

It highlights the ownership issue that we've been talking about.  So we heard evidence that each document was compiled together by Mr. Ding.  So the idea that this would be somehow a compilation owned by Google because the documents were put together by Mr. Ding into a note seems at odds with -- I mean, that's unusual.

And then the idea that you would have a document asserted both as a trade secret, meaning that it has to be established as a secret, and then the same document asserted as a compilation, where all of the information could be public, is very confusing.

THE COURT:  I don't think they're saying as to any document that all of the information in the document could be public.  I think they are saying that for a number of the documents, some of the information in the document could be public.

I don't recall any testimony or evidence that there is a trade secret document whose information is entirely public.

MS. KRSULICH:  So just so I understand, so the documents themselves are being presented as compilations, compilation trade secrets, each document.

THE COURT:  That's what I'm hearing -- I mean, I don't remember -- I remember testimony that there is some information in this document that's public and there's other information in this document that is secret.  Right?

And so I guess that is -- I mean, I never -- until just now, I never thought of that as a compilation trade secret. I thought of a compilation trade secret as different documents from different places coming together, some of which may be public and some of which may be private, coming together to constitute a trade secret.

So I guess I'm feeling a little confused now about this concept of a single document being both a trade secret and a compil- -- and something called a compilation trade secret.

**MS. PRIEDEMAN:** I don't think it needs to be called a compilation or not called a compilation.

I think just the point is that the trade secret documents do include -- some of them include some public information. And under -- it's very clear black-letter law that a trade secret can be a mix of proprietary and public information.

**THE COURT:** Right.

**MS. PRIEDEMAN:** So I think that needs to be clear. I don't think we need to identify it or call it a compilation trade secret.

The Government's theories are that the documents are trade secrets themselves, each document, and the combination of the documents are separately a trade secret. I think that's been clear from the very beginning. We've been litigating this for a year at this point.

**THE COURT:** Right. So I wonder if this concept of -- let's go to that -- I mean, I wonder if we should -- I wonder if we need to sort of be more clear about that in this trade secret instruction; right? Because you'll see that this language about the term "trade secret" can include compilations.

What you-all submitted had very little to do with the evidence that came in in this case; right? The language of the model instruction is almost entirely about a situation where you have, like, 15 different documents that are all public documents and they're compiled together by the owner in a way that makes it a trade secret; right? And that's not this case.

And so this was my kind of first effort at trying to conform the language more to this case.

But now that we're talking about it, it seems like we could do better on that front. And I don't even know if we need to use the word "compilations" at all; right? We could just say -- and we could just say that a document -- we can say, number one, a document that has some public and some proprietary information -- I don't know about the exact words we'd use, but the first point is a document that has some public and some proprietary information can be considered a trade secret.

And, number two, there can be -- a compilation of trade secret documents can be a separate compilation trade

secret if it has greater value than the sum of its parts.

Those are the two concepts we want to convey to the jury; right?

MS. KRSULICH:  Yeah.  And, Your Honor, the instructions talk about information and not documents, so information that is secret and not secret.  And I'd submit that's the appropriate way to talk about the material that's been presented.

So if the Government can prove that information is secret and what information in the documents is secret --

THE COURT:  Yeah.

MS. KRSULICH:  -- okay, then it would meet the definition of a trade secret.

But kind of waving at a document as to whether it's a trade secret or not, that's not sufficient; right?

THE COURT:  Right.  Absolutely.

So let's rewrite this paragraph right now.  Let's say that --

MS. KRSULICH:  Your Honor, I apologize.  What are we looking at?

THE COURT:  Well, we're getting a little disorganized because I skipped over Instruction -- what is currently Instruction Number 12.

MS. KRSULICH:  Okay.

THE COURT:  And went to Instruction Number 13.

MS. KRSULICH: Okay. Thank you.

THE COURT: And I don't know if maybe we should go back to 12 and knock that out.

Are there comments or suggestions or objections on Number 12?

MS. KRSULICH: Yes, on Number 12.

THE COURT: There are. Okay. Well, we're on 13. We're thinking about it. Let's stick with Number 13.

So that paragraph, "The term 'trade secret' can include compilations of documents," that paragraph, what if we got rid of that and we said, "A document" -- I'm thinking out loud -- "can be a trade secret, even if some information" --

How about something more along the lines of: Just because a document contains public information does not preclude it -- preclude a finding that it is a trade secret if it also has information that meets the definition above.

This is -- I'm just spitballing. We'll have plenty of time to pore over the wording.

Also has information -- meets the definition above.

In addition, a group of trade secret documents can be separate -- can be a separate compilation trade secret if the compilation is more valuable than the total of each individual document, or something like that.

What do you think about something roughly along those lines?

**MS. KRSULICH:**  One comment, Your Honor.

For the Court's consideration, the use of "document" may not be necessary.  I think that if the Court instructs the jury to look -- to say that information -- looking for information that is secret -- right? -- and then a compilation of information that is both public and private or public and secret can be a trade secret, assuming that the compilation is more valuable than the total of the individual information.  So talking about information rather than documents, Your Honor.

**THE COURT:**  What's the benefit of doing that?  Or what are you trying to -- what harm are you trying to avoid by doing it that way?

**MS. KRSULICH:**  So because the document itself is not considered a trade secret but the information within the document is considered a trade secret, I want to make sure that we're not confusing the jury into thinking, well, they have to find -- they have to be evaluating it document by document but, rather, paying attention to the information within the document and whether that information was protected or is, in fact, secret.

**THE COURT:**  Okay.  What do you-all think?

**MS. PRIEDEMAN:**  I think, Your Honor, it might make sense to make clear that a trade secret can contain a mix of public and proprietary information and that that combination can be a trade secret.

So I think your proposal made sense, but it misses, I think, a little bit, that it can be the combination of proprietary and public information.

But I'm -- but I do think your proposal made sense.

THE COURT:  Yeah.  I mean, but was there any testimony -- I mean, it seems to me that now what you are saying is that there are, like, three kinds of trade secrets. One is -- or four or something.  I'm not sure.

One is that there is a document and that document is a trade secret; right?  And that's mostly what you've been saying to the jury or perhaps exclusively what you've been saying to the jury.  This is a trade secret document.  This document is a trade secret.  You haven't been saying this document contains information that is a trade secret.  You've just been saying this document is a trade secret document.

MS. PRIEDEMAN:  Mm-hmm.

THE COURT:  Right?

But now what you seem to be saying is that a document -- a document could be considered a trade secret on its own, or it could be considered a trade secret because of the fact that it combines public with private information, like that the addition of the public information makes it more of a trade secret.  That seems to be what you're saying now.

So am I misunderstanding?

MS. PRIEDEMAN:  I think I was saying that there are

some documents where there is some aspects that have been public, but the combination of the information that is in the document that -- some of which is public, combined with the other non-public information together, is valuable and proprietary.

So I can give you an example of Mr. Chandra's testimony about the Diorite document, for example. It included information about the GRT protocol, which is public, and he said that gave context to the proprietary GRT microarchitecture.

So there, you have a mix of both public and proprietary information, but the combination is more valuable than just the proprietary information alone.

THE COURT: Okay. So...

All right. So do you have -- do you have a proposal for how to capture that in an instruction?

MR. CHANG: Yeah. So we liked your language, Your Honor. We were just going to suggest additional sentences after your first paragraph after the elements. And so our suggestion was going to be same language the Court proposed, and then, after the second sentence in that paragraph [as read]:

"For example, compilations or combinations of proprietary and public information can be considered a trade secret. It is the secrecy of the claimed

trade secret as a whole that matters.  The fact that some or all of the components of a trade secret are well-known does not preclude protection for a secret combination or compilation of the individual elements."

THE COURT:  Well, I think that that language is just really begging the question of:  Are we asking the jury -- what are you going to be asking the jury to find is a trade secret?

Are you going to be saying:  Here's this list of documents.  Right?  And we're going to -- and, for example, Exhibit 361, or whatever it is, we're asking you to find -- the jury has to agree unanimously on what is a trade secret. Here's an example of a trade secret that you can agree unanimously on.  It's Exhibit 361.  Or are you going to be saying it's the portions of Exhibit 361 that say X, Y, or Z?

MR. CHANG:  It would be Exhibit 361, as well as the category of documents for a specific category.

THE COURT:  Those are the two things you're going to be arguing are trade secrets.  One is Exhibit 361, or whatever the number is.

MR. CHANG:  Individual documents.

THE COURT:  And two is the category that it's in, all of the documents in that category combined is a trade secret.

MR. CHANG:  Correct, Your Honor.

THE COURT:  Okay.  So read me again your language.

**MR. CHANG:**  [As read]:

"For example, compilations or combinations of proprietary and public information can be considered a trade secret.  It is the secrecy of the claimed trade secret as a whole that matters.  The fact that some or all of the components of a trade secret are well-known does not preclude protection for a secret combination or compilation of the individual elements."

**THE COURT:**  "For a secret combination or compilation of the individual elements"?

**MR. CHANG:**  Yes.

**THE COURT:**  What individual elements?

**MR. CHANG:**  The individual elements of the trade secret.

So if individual elements are proprietary or public, the fact that some or all of them is public doesn't mean you can't protect the compilation as a whole.

It's nearly -- I know Your Honor doesn't love the Ninth Circuit language in some instances, so we tried to use the *Nosal* opinion and shape it in Your Honor's preference.  And so that was our first crack at it.

**THE COURT:**  From your standpoint, why wouldn't we refer to them as documents?  I mean, you spent the whole time referring to these things as "trade secret documents."

MR. CHANG:  I certainly think --

THE COURT:  Each individual document as a trade secret.

MR. CHANG:  I don't think we would be opposed to including that document language as well in addition, but just making it clear that the compilation and combination can be a trade secret, but with reference to the documents.

MS. PRIEDEMAN:  We just want to make clear, Your Honor, that if there is a document that's a 100-page document and one technique in isolation is well-known -- like, that technique is not secret by itself; right? -- that doesn't defeat the status, the trade secret status of that entire document.

THE COURT:  Right.  And what you have alleged is that this entire document --

MS. PRIEDEMAN:  Yes.

MR. CHANG:  Yes.

THE COURT:  -- these 105 documents, the entire documents, are trade secrets.

MR. CHANG:  Yes.

MS. PRIEDEMAN:  Yes.

THE COURT:  And that's what you're presenting to the jury, and that's what the jury has to decide.

So it seems very confusing to speak just in terms of the combination of public information and private information

and multiple sources and all that.

Why don't we just say that a document can be a trade secret, even if it has public information in it, as long as it also has trade secret information in it?

MR. CHANG:  That's fine.

THE COURT:  And then documents can -- multiple trade secret documents can combine into a different trade secret if the sum is greater than the value of its individual parts.

MR. CHANG:  That works for us, Your Honor.

THE COURT:  Doesn't that seem a lot less confusing to the jury, given the way this case has been presented to the jury?

MS. PRIEDEMAN:  I think I would just make clear that -- I think when you said "as long as it contains other trade secret information," I think the point here is that it contains other non-public information, because we're saying the whole thing is a trade secret.

THE COURT:  Right.

MS. PRIEDEMAN:  So I just would be careful with that language --

THE COURT:  Non-public information.

MS. PRIEDEMAN:  -- but other than that --

THE COURT:  Yeah.

MS. PRIEDEMAN:  -- I think that makes sense.

THE COURT:  Yeah.  Public and non-public information.

MS. PRIEDEMAN:  Yes, Your Honor.

THE COURT:  Okay.  So now let's go back to you. You're going to tell me what's wrong with that.

MS. KRSULICH:  Okay.  So, for the record, is the Government asserting that each document is a compilation trade secret?  Is that --

THE COURT:  That's the part that confused me.

MS. KRSULICH:  So just for the record, you know, that will depend on how we argue.

So is each document a compilation trade secret, or is the Government identifying trade secrets within the documents?

MS. PRIEDEMAN:  I think we've been very clear that we are alleging that the entire document is a trade secret.

MS. KRSULICH:  So all that's left in this case at this point are compilation trade secrets?

MS. PRIEDEMAN:  I don't know that you need to use the word "compilation."  I think it's just a trade secret.

THE COURT:  But whether we need to use the word or not --

MS. PRIEDEMAN:  Yeah.

THE COURT:  -- I think we probably don't need to use the word, but that's certainly what I've been hearing for the last three weeks; right?

The Government is arguing that each of these 105 documents is a trade secret, and it's a trade secret because of

the totality of what's in the document despite the fact that some of the stuff in the document may be publicly known.

MS. KRSULICH:  Yes.

THE COURT:  And so if that's what the law calls a compilation trade secret, then that's what they're arguing.  I don't think we need to confuse the jury with that type of language.

MS. KRSULICH:  I agree, Your Honor.

For the record, we're objecting that these are proper compilation trade secrets.  We've made that objection throughout.

THE COURT:  Yes.

MS. KRSULICH:  However, to be clear in the jury instructions, I do think that we need to emphasize that the combination of information must have additional value on top of the trade secret information that's in it.  So -- or it must -- the value of the document as a totality must be greater than the individual parts.

So the Government can't be arguing that the individual section that is secret has more value than the document as a totality.  So we should articulate that in the instructions.

THE COURT:  What do you think about that?

MS. PRIEDEMAN:  I think that we're going to argue it meets the definition of a trade secret, and I don't think anything else is required.

**THE COURT:** Well, but we have -- what I was contemplating is that when we're talk- -- that we would give the jury an instruction that when we're talking about a combination of multiple documents -- right? -- when we're talking about all the documents in a category, they need to conclude that the whole is greater than the sum of its parts for it to be a separate trade secret; right?

**MS. PRIEDEMAN:** Right.  But when you're talking about that on a document-by-document basis, it just doesn't meet the definition of a trade secret, period.  I don't know what sum of parts we would be talking about in what context.

**THE COURT:** Well, but what Ms. Krsulich is saying is that if you look at the legal definition of a compilation trade secret in the case law -- right? -- it seems to be contemplating that the public information is combining with the private information to create a trade secret; right?

**MS. PRIEDEMAN:** I think most of the case law that is talking about the novel combination is when it's all public information; right?  And so that makes sense.  You can take --

**THE COURT:** That's what the model instructions seem to --

**MS. PRIEDEMAN:** Right.  That's not --

**THE COURT:** -- be contemplating.

**MS. PRIEDEMAN:** -- this situation.

As Your Honor said at the beginning of this

conversation, we're not alleging that any of the trade secrets are just public information.

THE COURT:  Mm-hmm.

MS. PRIEDEMAN:  So I don't think that -- if you look at the model instruction, I think that's what it's trying to fit, and I don't think it makes sense in this context.

THE COURT:  That's not this situation.

MS. PRIEDEMAN:  Yeah.

THE COURT:  Right?

MR. CHANG:  Yeah.  That's the *Nosal* opinion, which is, customer list is a pretty common fact pattern in trade secrets. So the customer information may be public, but the combination of that is that context for that specific case.

THE COURT:  Right.

MS. KRSULICH:  And, Your Honor, this is why these documents do not qualify as compilation trade secrets, because what's valuable in the documents, as the Government has been arguing, are the specific information within the documents that is secret.  That is what the Government's been arguing is the value.  It's not the combination.  And that's not how the evidence has come in.

And so that's why we've been asserting throughout that these are not proper compilation trade secrets.  They're not a collection of public information as in *Nosal*.  So...

MS. PRIEDEMAN:  Your Honor, I point you back to --

THE COURT:  And if you're right, then I think the answer is you've got a great legal issue in post-trial motions and on appeal; right?  Because the way the Government charged this case and the way the Government has argued this case is Exhibit such-and-such is a trade secret.  Exhibit such-and-such is a trade secret.  Not specific snippets of these exhibits are trade secrets.  Right?

MS. KRSULICH:  Yes.

THE COURT:  And so if that's a problem with the way the Government charged the case and the way the Government argued the case, then you have a great issue in post-trial motions and on appeal.  I think that's the answer.

MS. KRSULICH:  Yes.  And I want to make sure that that's preserved for the record.

THE COURT:  Yeah.  But I think that as it relates to these instructions, the point to make to the jury is as it relates to an individual document, the fact that it has public information does not preclude it from being a trade secret.  And then to the extent the Government is trying to combine documents into a trade secret, it has to be something greater than the sum of its parts.

MS. KRSULICH:  Yes, Your Honor, yes.

THE COURT:  Okay.

MS. KRSULICH:  There is some additional language we would propose, Your Honor.  And not to overcomplicate, but we

would say for the compilation -- for the combination of different documents, we would propose that the Court instruct the jury that [as read]:

"The owner must have taken reasonable steps to maintain the secrecy of the collection of documents as a whole rather than the secrecy of the individual pieces of information that were used to create the compilation."

THE COURT:  Right.  And I appreciate that argument, but that's kind of one I've already rejected.

MS. KRSULICH:  Okay.

THE COURT:  I understand where you're coming from on that.

MS. KRSULICH:  Thank you.

THE COURT:  Okay.  So I think that I -- but I think there's value in speaking to the jury in terms of documents because of the fact that -- I mean, and that's what we do in the previous instruction; right?

MS. KRSULICH:  Yes.  And, Your Honor, couple points.

We'd like the Court to consider a Ninth Circuit case, *Barrett Business Services vs. Colmenero*, which is where the language comes from about the protection of the combination of documents.  The citation is at page 2 on that -- on the opinion.

THE COURT:  *Barrett Business Services*?

**MS. KRSULICH:** *Barrett Business Services vs. Colmenero.*

**THE COURT:** Okay.

**MS. KRSULICH:** And if Your Honor would permit, we would appreciate the opportunity to review the draft of this instruction, given the complexity of it --

**THE COURT:** Of course.

**MS. KRSULICH:** -- and to submit comments.

**THE COURT:** Oh, yeah, yeah. I'll put out another draft, Version 2, tonight.

**MS. KRSULICH:** Thank you, Your Honor.

**THE COURT:** Okay.

**MR. CHANG:** I will simply note for the record, so it's clear, Your Honor, this is the same argument they've made in their prior briefing, and that *Barrett* case was cited in the prior briefing and --

**THE COURT:** Fine. I'm happy to look at the case again --

**MR. CHANG:** -- has been considered by Your Honor.

**THE COURT:** -- whether or not I looked at it the first time, I can't remember now.

Okay. I had another -- I had another proposal for this instruction, trade secret defined, and it speaks to the issue the Government raised earlier today about whether the value is great or small --

MR. CHANG:  Yes.

THE COURT:  -- of the information; right?

So what I was going to propose -- what I came up with kind of as I was sitting here during the testimony was, after listing the elements, we could say [as read]:

"For purposes of the first and third elements, it does not matter whether the economic value is large or small."

So the economic value piece is relevant to both the first and the third elements.  So the simplest way I thought to -- I came up with to put it was [as read]:

"For purposes of the first and third elements, it does not matter whether the economic value is large or small."

I think that gives you what you need to argue what you want to argue to the jury about how, in large part, the difference between Sanchez's testimony and Novak's testimony doesn't really matter.

MR. CHANG:  Yeah, we're okay with that, Your Honor.

We also think it's important that just given the way the evidence has come in or may come in tomorrow, that it's clear to the jurors that independent economic value should be assessed at the time of the alleged theft.  So we think that should also be made explicit.

THE COURT:  I think that's right.

Any objection to that?

**MS. KRSULICH:**  No objection to that.

But an objection to calling to the -- calling attention to large or small value.  That seems unnecessary.  And the statute does highlight the economic value so that it can't just be any value; it has to be, you know, economically valuable.

**THE COURT:**  But it can be a small economic value; right?

**MS. KRSULICH:**  It can be a small economic value, but it has to be an economic value, and I think that adding some language or adjectives is unnecessary.

**THE COURT:**  Okay.  I don't agree with that.  I think that the way the evidence has been coming in, that language is appropriate.

**MR. CHANG:**  Could we provide one more suggestion for Your Honor's consideration on this definition?

**THE COURT:**  Yes, but before you do that --

**MR. CHANG:**  Yes.

**THE COURT:**  -- what was the sentence -- you said independent economic value is measured at the time of the -- what did you say?

**MR. CHANG:**  "Should be assessed at the time of the alleged theft."

**THE COURT:**  I'm going to say "must be assessed."

MR. CHANG:  "Must be assessed."  Even better.

THE COURT:  Okay.  And you had another suggestion.

MR. CHANG:  Yeah.  Just given the discussion about Intel today and how some of the other evidence has come in, we do think it's important to instruct the jurors that disclosure under an NDA doesn't -- or a license agreement doesn't defeat secrecy.  And so we have language that is taken from *Nosal* but simplified.

[As read]:

"Confidential disclosures to third parties or licensees via a non-disclosure agreement will not destroy the information's status as a trade secret."

THE COURT:  I mean, it doesn't seem controversial. I'm just wondering if it's really necessary.

What are your comments on that?

MS. KRSULICH:  Yeah, it doesn't seem necessary, and I don't think we intend to argue that disclosure to Intel made the information public.

THE COURT:  Well, there was a fair bit of cross-examination implying that.

MS. KRSULICH:  The implication was that they provided Intel with the RTL design code, which was not in any of the trade secret documents, and the reason that they did that was because that's what you need to build a chip.  They didn't provide them with the presentations that they gave.

So we're not intending to argue that by providing that information, it somehow became public to Intel.  And so I think that highlighting it in the trade secret -- or, sorry -- in the jury instructions would be unnecessary.

THE COURT:  What was the proposed sentence again?

MR. CHANG:  [As read]:

"Confidential disclosures to third parties or licensees via a non-disclosure agreement will not destroy the information's status as a trade secret."

And this is taken --

THE COURT:  "Confidential disclosures to third parties or licensees..."

MR. CHANG:  [As read]:

-- "via a non-disclosure agreement will not destroy the information's status as a trade secret."

And this is taken from 1043 and 1044 of *Nosal*, which cites the restatement.

THE COURT:  All right.  I'll give that some thought, and you can look for it in the new draft and reraise it with me if it's not in there and you think it should be.

MS. KRSULICH:  And there are two comments related to that.  So that sentence that the Government has proposed presumes that the information that was shared is trade secret. I think that's in dispute.  That is in dispute.  Not "I think."

And it also depends on what the NDA says, and the NDA

has not been admitted into evidence.  So, you know, talking about what it does say or any obligations isn't, you know, relevant.

THE COURT:  Okay.  Well, there's been testimony that it's pursuant to a non-disclosure agreement.

MS. KRSULICH:  But the terms of that are not in evidence.

THE COURT:  Okay.  All right.  Anything else on Number 13 before we go back to Number 12?

MR. CHANG:  Nothing further from the Government.

MS. KRSULICH:  There is one suggested addition to the first sentence after the elements are listed, where it says [as read]:

"The term 'trade secret' can include compilations of documents that together are more valuable than the total of each individual document."

The Court may be rewriting that but...

THE COURT:  But the concept of together, I'll make a note of that.

MS. KRSULICH:  Yes.

THE COURT:  Okay.

MS. KRSULICH:  One addition also.  So to add the word "and" after the first element to make clear that the Government needs to prove each of the three elements.

THE COURT:  Sure.

Okay.  Here's a question:  That first paragraph, that ridiculous first paragraph, are there any words that we can cross out?

MR. CHANG:  Given how broad the documents that we're alleging in this case that were taken by the defendant, my preference would be to keep those just because --

THE COURT:  Are there any prototypes?

MR. CHANG:  There's chips that haven't been released, for example.

THE COURT:  Is that a prototype?  I mean, a document describing a chip, is that a prototype?

MR. CHANG:  We can do without "prototypes."  My co-counsels have --

THE COURT:  All right.  What else?

MS. KRSULICH:  Financial.

MR. CHANG:  There's financial information in some of the trade secret documents.

THE COURT:  Yes, I remember that.

MS. KRSULICH:  For example, devices.

THE COURT:  Yeah, I was going to ask about that.

Delete "program devices"?

MR. CHANG:  Yes, that's fine with the Government.

THE COURT:  So what if we just said, "The term 'trade secret' means all forms and types of financial, business, scientific, technical, economic, or engineering information,"

period?

MR. CHANG:  I do think the examples are helpful, given the breadth of alleged trade secrets in this case.  I understand the Court's preference for brevity, and so I do think striking "program devices" and "prototypes" makes sense, but I guess my initial inclination would be to preserve those examples if the Court's amenable to that.

THE COURT:  Okay.

[As read]:

". . . whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing."

Any words we can get rid of in that ridiculous phrase?

MR. CHANG:  We can remove "graphically."

THE COURT:  What about "photographically"?  Are there any photographs?

MR. CHANG:  There's screenshots.  That depends how literal you want to be.  But the notes were created through taking screenshots in the electronic sense from source documents, so we would ask that that remain in.

THE COURT:  All right.  Okay.  Anything else on this one?

MR. CHANG:  Not from the Government, Your Honor.

MS. KRSULICH:  No.

THE COURT:  Shall we go back to Number 12?

MS. PRIEDEMAN:  Yes.

MR. CHANG:  We have no objections to the Court's proposed instruction.

THE COURT:  Okay.

MS. KRSULICH:  Your Honor, we would propose adding the words "The Government alleges that the seven categories are as follows," because there is disagreement about what is, in fact, within the categories.

THE COURT:  The seven -- sorry.  There's disagreement about what?

MS. KRSULICH:  What the documents are within the categories, whether they are, in fact, protocols, internal specifications, implementation-level details, for example.  So we would add "The Government alleges that the seven categories are as follows."

THE COURT:  Okay.  Any objection?

MR. CHANG:  No objection.

MS. KRSULICH:  Further, in the last paragraph, Your Honor, where it says "The Government alleges that Categories 1 through 7," we would add "each contain at least one trade secret."

THE COURT:  That makes sense.

No objection?

MR. CHANG:  No objection.

THE COURT:  Okay.

MR. CHANG:  Ms. Krsulich, that's the first sentence of the second-to-last paragraph?

MS. KRSULICH:  Yes.

MR. CHANG:  Okay.  No objection.

THE COURT:  Anything else?

MS. KRSULICH:  No.

THE COURT:  I was also wondering if -- nothing else on this instruction?

I was also wondering if we should make them a chart, like Category 1, 2, 3, 4, 5, 6, 7; Trade Secret Count 1, 2, 3, 4, 5, 6, 7; Economic Espionage Count 8, 9, 10, blah-blah-blah-blah-blah.

MS. KRSULICH:  Where was Your Honor contemplating doing that?

THE COURT:  I don't know.

MS. KRSULICH:  Okay.  I think it may be for the parties to decide how to close.

THE COURT:  Okay.  That's fine.

All right.  So we did 13.

"Labeling Information a Trade Secret."  The one edit I made, as I was reviewing these this afternoon, is just deleting -- from the second sentence, deleting the words "within the meaning of the statute."

Any other objections or suggestions to this?

MS. KRSULICH:  One suggestion from the defense,

Your Honor.

THE COURT:  Go.

MS. KRSULICH:  In the second-to-last sentence, where it says "conversely" --

THE COURT:  Yeah.

MS. KRSULICH:  -- adding at the end, "so long as the owner took other reasonable measures to protect it."

And this is proposed because one of the measures we've been talking about is labeling.  And so if the document is not labeled, it's not -- doesn't mean that it's not a trade secret, but as long as the owner took other reasonable measures to protect the document.

THE COURT:  I think that makes sense.  Any objection?

MR. CHANG:  We don't think that's necessary, Your Honor.  We think your proposed language captures that concept correctly.

THE COURT:  Let's see.  I think if we added "so long as the owner took other reasonable measures to protect the document," we would want to delete the word "necessarily" from that sentence.  But I don't have a -- I don't mind doing that if that's what you prefer.

MR. CHANG:  Just let me make sure.

THE COURT:  So it would say [as read]:

"Conversely, the absence of a marking or label does not preclude the information from being a trade

secret so long as the owner took other reasonable measures to protect the document."

**MR. CHANG:**  Don't have a strong objection.  I think the way you wrote it was -- we liked it, and we didn't have any --

**THE COURT:**  It's shorter, which is good.  I sort of give you the choice between those two.  But it doesn't make sense to keep the word "necessarily" in if we're adding what you're suggesting.

**MS. KRSULICH:**  That sounds fine, but we'd love to see the written instructions, and we'll think about it and comment further if --

**THE COURT:**  Okay.

All right.  15.  Okay.  15.  Take a deep breath.

**MR. CHANG:**  I had a feeling Your Honor was going to want to talk about this one.

**THE COURT:**  Yes.  So let me ask first, does the Government object to what I've proposed?

**MR. CHANG:**  So our position would be the same one that we've asserted in our papers, which is that the second element, the knowledge element, Mr. Ding, the defendant, did not have to know that the information was a trade secret.

We cite to the Sixth Circuit opinion in *You*, and that's our position.

**THE COURT:**  Yeah.  And I think that I agree with you

on that.  Right?  I think that -- I think that it is wrong to say that the defendant needs to know the legal definition of a trade secret.

And I think the problem is that a defendant will sometimes have no way of knowing whether the owner took reasonable measures to protect the secrecy of the document; right?

You can imagine a janitor working at Google -- right? -- and the janitor sees a backpack sitting in somebody's office and steals the backpack and later opens the backpack and sees a document that's marked "Highly Valuable Secret Information" and says, "Oh, good, I'm going to try to sell this information."

The janitor has no knowledge of what measures Google took to protect the secrecy of that information.  That document might be sitting in that backpack because Google does a bad job of protecting the secrecy of the information, or that document might be sitting in the backpack despite the fact that Google does a good job of protecting the secrecy of the information and there's just some employee who blew it by leaving the document in their backpack; right?

And so to hinge a conviction under the trade secret statute on whether a defendant happens to be familiar with the measures that the owner took to protect the secrecy of the document seems to make no sense to me.

So I think, as a matter of law, that you are likely correct that the defendant -- the Government should not have to prove that the defendant knew that the document met the legal definition of a trade secret; right?  And I think if we were on a blank slate, I would say, let's sit down and let's figure out a way -- let's make sure that the other elements adequately protect the defendant against being convicted for something less than the *mens rea* that is required by the statute.

I do think that probably the cases that you cite are correct, that what a defendant does need to know is that the information is proprietary -- right? -- or the defendant needs to know that this is their stuff and I shouldn't be taking it and they keep it confidential; right?

And it may be that the other elements of the instruction kind of adequately capture that, or it may be that some language would need to be added to adequately capture that.  But that's a long way of saying I think you're right.

And let me just double-check for a second and just -- do you agree that the defendant has to know that the information is proprietary?

**MR. CHANG:**  Yes.

**THE COURT:**  Okay.  You agree with that.

All right.  So then the question, I think, is whether this Ninth Circuit case, this decision by Judge McKeown -- what's the name of the case again?  The one I mentioned to you

earlier today.

**MS. KRSULICH:**  *Nosal*.

**MR. CHANG:**  *Nosal*.

**THE COURT:**  Oh, that's *Nosal* also?

**MS. KRSULICH:**  Yeah.

**THE COURT:**  The question is whether that stands for the proposition -- whether that case requires the district court to instruct the jury that the defendant has to know -- the Government has to prove that the defendant knew that the document met the definition of a trade secret.

And I guess the way I interpret *Nosal* is -- or at least this is my tentative interpretation of it -- is that *Nosal* kind of took the district court's instructions as they came; right?  The district court instructed the jury that it needed to find that the defendant knew that the document met the definition of a trade secret.

I don't think the Government objected to that in the district court.  I think that may be what the Government proposed in the district court in *Nosal*.  But it was not -- there was no fight about it.  As I understand it, there was no fight about it in the district court in *Nosal*, and so that's how the district court instructed the jury.

And then it goes up to the Ninth Circuit, and the Ninth Circuit assumed that that was what the Government was required to prove, and it just sort of took the district

court's instructions as it got them and analyzed the evidence and concluded that there was enough evidence to support a conclusion that the defendant knew that the documents met the definition of a trade secret.

But I don't think the issue was joined at the Ninth Circuit. I don't think anybody was fighting about whether the Government -- in these trade secret cases, the Government has to prove that the defendant knew that the document met the definition of a trade secret, the legal definition. And so there wasn't a fight about it. The Ninth Circuit assumed that that is an element of the offense.

But I'm not sure that it's a binding Ninth Circuit holding because it wasn't -- it wasn't an issue that was presented to the Ninth Circuit.

MS. KRSULICH: Your Honor, the issue was presented in *Nosal I*. So that was a Judge Kozinski opinion that was on appeal before the issue went back down to the district court.

THE COURT: Okay.

MS. KRSULICH: And there, the issue in an *en banc* order was that -- the Court was concerned about extending the scope of the "without authorization" language to include people who had access to the computer and were exceeding the scope of their access rather than hacking into it. And that --

THE COURT: Wait. Was that a trade -- was that opinion discussing the trade secret statute or the computer

fraud, whatever it's called?

MR. CHANG:  CFAA, Your Honor.

MS. KRSULICH:  No.  It was discussing the CFAA, but it went down back to the district court with that decision in mind, where the Court was concerned about expanding the scope of the CFAA and the liability beyond what Congress had contemplated in the statute.

THE COURT:  Right.  But that's a very different statute with a very different set of considerations.  I guess I'm not -- I haven't read *Nosal I*; right?  But I'm not seeing how a discussion of what you have to prove or what you don't have to prove to convict somebody under that statute is relevant to a trade secret charge.

MS. KRSULICH:  I think it's an important backdrop to how the district court was considering, then, the trade secret jury instructions.  And so when the issue came back up to the court, they had the instructions that the district court gave, but the Ninth Circuit went on to assess whether the evidence was sufficient to prove that the defendant had knowledge that the information was trade secret.

So the Ninth Circuit went beyond just adopting the jury instruction that the district court gave and went on to assess whether there was sufficient evidence and --

THE COURT:  Right, right.  I mean, the Ninth Circuit -- that's why I said it the way I said it, which

is the Ninth Circuit recited the instructions that the district court gave on the trade secret count.

I think it was an economic espionage count; right?

**MS. KRSULICH:**  Yes, that's right.

**THE COURT:**  So the Circuit in *Nosal II* recited the district court's instructions and then said that the evidence was sufficient to support a conviction under those instructions, and the Government argued that the evidence was sufficient to support a conviction under those instructions. And there was never a fight, I don't think, either in the district court or in the circuit about whether those instructions were correct.

And I think that -- my opinion is that that second element that the district court gave in that case and that I've put in these draft instructions, my tentative view is that it's not correct for the reasons that I've stated, because it cannot possibly be that the Government has to prove that the defendant knew about the measures that the victim took to protect the trade secret.

And I'm guessing that if the Government in *Nosal* had led with the argument that "Look, all the stuff the defense is arguing doesn't matter because the Government didn't need to prove that in the first place at trial," the Ninth Circuit probably would have said yes.  I mean, I don't know, but...

So what I'm struggling with is, is *Nosal* -- does *Nosal*

require district courts to give that instruction?  And I'm not sure the answer is yes.

Anybody else have anything to say about that?

MR. CHANG:  Two points, Your Honor, because I've been thinking about this issue quite a bit as well.

We agree with Your Honor and your interpretation of the law.  And the Sixth Circuit case in *You* cites a similar example -- right? -- the hacker example of how -- you know, the direct quote from that case is [as read]:

"It would not have made sense for Congress to criminalize economic espionage and trade secret theft but exempt those defendants who know that they have taken proprietary information without permission, yet lack knowledge of the legal definition of a trade secret or whether the information happens to meet each element of that definition."

THE COURT:  Yeah.

MR. CHANG:  And so that's the Government's position.

With respect to *Nosal II* -- I will admit I haven't read *Nosal I*, and so I can't comment on that.  But our read of *Nosal II* is the same as Your Honor's, which is that Judge Chen gave that instruction.  The instruction he gave was "Nosal knew that the source list was a trade secret."

That went up on appeal, and the issue on appeal in front of the Ninth Circuit was whether the evidence was

sufficient to prove up the elements of those charges, not whether --

**THE COURT:**  I will say the Government did have in its brief on appeal, the Government had a passing comment about how:  "Oh, and by the way, you don't really have to know."

**MR. CHANG:**  Okay.  I have not read the Government's brief in *Nosal* recently, Your Honor.

**THE COURT:**  But it was really an afterthought, and I don't think the issue was presented in the district court.

And the Government's -- and that afterthought was part of a section which was titled "The evidence was sufficient to conclude that the defendant knew that it met the definition of a trade secret."

So I think the Ninth Circuit didn't respond to that passing comment by the Government in its brief.  I think probably the Government waived the argument in that case anyway.

So it's a little -- it's a little weird, but I don't -- I don't think that the issue was squarely joined or joined at all in *Nosal*.

So can I ask you to respond to the substance of the argument?  I mean, I just -- I don't understand how it could possibly be that to get a conviction under the trade secret statute, the Government has to prove that the defendant knew that the victim failed to take reasonable measures to protect

the information.

MS. KRSULICH:  So, Your Honor, I think this goes to the concern that you would convict someone when they don't have the intent to do what they were doing; right?  And so that's why that --

THE COURT:  Why isn't that covered by some language which makes clear that the defendant does have to know that the information was proprietary?

MS. KRSULICH:  That the information was proprietary.

Well, to speak directly to reasonable measures, it goes to whether the defendant knew that the information was proprietary, because if there was -- like in your example, Your Honor, with the backpack -- right? -- the janitor -- it was marked "Trade Secret"; right?  And there's --

THE COURT:  It was marked "Proprietary" or whatever.

MS. KRSULICH:  Whatever.

And the janitor would have known; right?  Like, there's some element of --

THE COURT:  But as we are instructing the jury in what I believe is the next instruction, labeling is not dispositive; right?  You can label something a trade secret and that doesn't make it a trade secret, in part because you might not have taken reasonable measures to protect the trade secret; right?  And you can not label something a trade secret and it can be a trade secret because you took reasonable measures or whatever.

So I just don't see how -- the fact that the janitor sees that it says "Trade Secret," that's not dispositive on whether the janitor knew whether the victim took reasonable measures to protect the trade secret.

**MS. KRSULICH:** I think it just goes to the defendant's state of mind.

So in your example, if the janitor came across a document that was unlabeled as he was cleaning and it was on the coffee table, for example, unlabeled, took that document and removed it, if there's no evidence of reasonable measures to protect the document, doesn't that go to lack of intent? And I think that's what --

**THE COURT:** I think there, the janitor might have an argument that he did not know that it was proprietary, or the Government was not proprietary to prove that he knew that it was proprietary.

**MS. KRSULICH:** And I think that those elements are intertwined, whether they know it's proprietary and whether they -- whether they know about the reasonable measures is part of the way that you know that it's proprietary. And one of the reasonable measures is labeling, for example.

**THE COURT:** If we were to -- if we were to change it to encompass the concept that, you know, the defendant knew that it was proprietary, not that the defendant knew that it meets the definition of a trade secret, how would we do that?

I don't love using the word "proprietary" because it's --

You know, is the Government's argument that this is captured by the other elements or that something more is needed to make sure that the jury doesn't convict on something less than that?

MR. CHANG:  We gave it a first shot, Your Honor.

THE COURT:  Okay.

MR. CHANG:  So it would be [as read]:

"Second, the defendant knew that the category of information in the particular count was confidential information that he had no right to take."

THE COURT:  I mean, that concept seems to be already captured in the sixth -- what I've listed as the sixth element; right?

[As read]:

"The defendant knowingly took the trade secret information without authorization or (b) without authorization copied, downloaded . . . ."

MS. KRSULICH:  As I read the sixth element, that's the actus reus element.  So this would go to the intent.  The second element would go to intent.

THE COURT:  Okay.  So I guess another question, then, would be, assuming we had -- assuming the second element was as the Government suggests, do you then -- like, that wording makes sense to me and it seems better than what I scribbled

down here.

I wonder, then, if you can -- if you remove the "without authorization" from the sixth element.

So, in other words, we are already saying that the defendant knew that the category of information in the particular count was confidential information that he had no right to take.  And then the sixth element would be [as read]:

"The defendant knowingly took the trade secret information or knowingly copied, downloaded, uploaded, or transmitted the trade secret information."

MS. KRSULICH:  Your Honor, I don't think that works.

So the sixth element "knowing" is about what the act was that the defendant took, so that the defendant without authorization copied, downloaded, or uploaded.

THE COURT:  Yeah.

MS. KRSULICH:  Whereas the second element, as proposed by the Government, is whether the defendant knew, so whether the defendant had knowledge or intent.

THE COURT:  Okay.  I mean, it might have a little bit of an element of belt and suspenders to it, but it seems worth including that to make sure that it's -- the full protection is in there.

And I know you don't agree that the full protection is in there because it would not include requiring a finding that

the defendant knew that it met the legal definition of a trade secret.

But short of that, I think it's good to -- it's good to include the "without authorization" in the sixth element for the reason that you're stating.

MS. KRSULICH:  Thank you.

And we'll just reserve the right to comment on this next draft.

THE COURT:  Yep.

MS. KRSULICH:  There is one additional -- some additional language we also want to add, but not relevant to what we've been discussing.

So defense have proposed to add "The defendant intended to convert" in the third element.

[As read]:

"The defendant intended to convert one or more trade secrets from that category to benefit someone . . . ."

THE COURT:  Yeah.  Yes, I removed that just because I don't think anybody -- regular people know what "convert" means.

MS. KRSULICH:  Yeah, but it's an important word, Your Honor, because it would mean that "convert" meaning the information is transformed in some way into a different format, to convert from one format into another.

And it's part of the statute language, and so we think it's a necessary word to include in there and an important one.

THE COURT: I think "convert" is just shorthand for taking the trade secrets without authorization, without authorization copying, downloading, uploading; right?

MS. KRSULICH: I don't think the word means the same thing as to take, because "convert" means -- right? -- you're changing it. I would think that taking is not the same thing as converting. "Convert" means that you're transforming it.

THE COURT: So that's precisely why I took it out, because I don't think -- I think that is a layperson understanding of the word "convert," but I don't think that's a legal understanding of the word "convert."

MS. KRSULICH: Okay.

THE COURT: So that's what I was thinking there.

Let me look it up in Black's Law Dictionary.

(Pause in proceedings.)

THE COURT: Yeah. So what "convert" means in the law is taking something for your own use; right? It does not mean transforming something.

And I was worried that the jury would see the word "convert" and they would think that it means transforming something, which it doesn't.

And I think that's an example of how we need to be careful before we just use phrases from case law or statutes in

a jury instruction without thinking about how ordinary people will understand it.

So I'm open to different suggestions, but the reason I removed the word "convert" is because I think it will mislead the jury in precisely the way you just described.

**MS. KRSULICH:**  Thank you.

Okay.  So we will think about some other words, but we do think it's necessary to put something in there that -- because there's an element in this case -- right? -- the facts have come in saying that the defendant didn't do anything with the documents.  And so these words are important to show that, you know, there's an additional requirement.

And so we'll think through it.

**THE COURT:**  But there's not an additional requirement.  That's the thing.  I mean, you've spent all this time cross-examining on whether he did anything with the documents, but there's not a requirement that he do -- the requirement is that the Government show that he stole the documents, not that he did anything with them.

**MS. KRSULICH:**  Or he intended to do something with them; right?

**THE COURT:**  Right.

**MS. KRSULICH:**  And that's what the element is.

So we'll think through it, Your Honor, and propose something that would be easy to understand.

THE COURT:  What's your view of this?

MR. CHANG:  We like the Court's formulation of the language, and we think it makes sense.

THE COURT:  Okay.  Yeah, I'm definitely open to -- I'm open to other suggestions, unless the suggestion is designed to make the jury think that he -- you know, that he needed to do something else.

MR. CHANG:  Yeah, that would be our main concern as well, Your Honor, is using the more colloquial use of "conversion" and suggesting to the jury that Mr. Ding had to do something --

THE COURT:  Convert.  Yeah.  Transform.

MR. CHANG:  -- convert it, to transform it into a --

THE COURT:  Right.

MR. CHANG:  -- product, hypothetically.

THE COURT:  Right.  I mean, I think Ms. Krsulich's argument sort of underscores --

MR. CHANG:  Exactly.

THE COURT:  -- exactly why I made the change that I did.

I mean, it could be the defendant intended to use one or more trade secrets from that category to benefit someone other than Google.  That might be okay.

MS. KRSULICH:  Mm-hmm.  That makes sense, Your Honor.

MR. CHANG:  Let me confer with my colleagues.

(Co-counsel confer off the record.)

MR. CHANG:  Your Honor, let me make sure I understand the proposal.  So it's [as read]:

"Third, the defendant intended to use one or more trade secrets from that category to benefit someone other than Google"?

THE COURT:  Yeah, that's what I was throwing out there.

MR. BOOME:  Okay.  We're fine with that language.

THE COURT:  Okay.  Like I said, I'll put out another draft tonight and you'll have time to think about it further.  And if you see a problem with it that we're not thinking about now, you can let us know.

MS. KRSULICH:  Yeah.  And notwithstanding our objection as to "convert," we're fine with the "use" language.

THE COURT:  Okay.

All right.  Anything else on that instruction?

MS. KRSULICH:  Yes, Your Honor.  Sorry.  Could we add an "and" after fifth?

THE COURT:  Yeah.

MS. KRSULICH:  And then we would propose also reminding the jury that they must unanimously agree on which particular information in the category constitutes the trade secret.

THE COURT:  Do you want to -- that was in a previous

instruction you --

**MR. CHANG:**  It's in Instruction Number 12, Your Honor, the unanimity instruction.  We don't think it's necessary to repeat it again.

**MS. KRSULICH:**  And the reason, Your Honor, we would put it here is because we see this Instruction 15 as where the jury's working from when it's deliberating; and so we would like to remind the jury, so that they have clear guidance, that they need unanimous agreement on the definition.

**THE COURT:**  Should I move it there, then?

**MS. KRSULICH:**  I think that would be fine, Your Honor.

**THE COURT:**  What if I just -- hmm.  I don't mind reminding them there.  It's an important matter.  I don't mind reminding them there that they -- keeping the language in the previous instruction and reminding them that "You must agree unanimously."

What was the language you proposed?

**MS. KRSULICH:**  "You must unanimously agree on which particular information" --

**THE COURT:**  Which particular document; right?

**MS. KRSULICH:**  -- "on which particular document constitutes the trade secret."

**THE COURT:**  So that -- so, okay.  So this gets us back to the discussion we were having earlier.

But I'm wondering -- I'm looking back at 12.  It says

[as read]:

"You must unanimously agree on which

particular" --

Should it say "which particular information in that category," or should it say "which particular document in that category"?  Now I'm looking back at Number 12, down at the bottom.

MS. KRSULICH:  Yes.  This is what I was looking at before when -- how Your Honor was talking about documents and information.

So because the Government's now alleging -- I think it's changed a little bit; that if they're now talking about information, but about specific documents, then to avoid confusion, it seems like that would be fine to put "documents" there.  We're consistently talking about documents throughout the instructions.

MR. CHANG:  We're fine with "documents."

I would simply say, our position has not changed, respectfully; but if we do include the unanimity instruction, we also include that second sentence that Your Honor includes [as read]:

"However, you do not have to find that all of

the documents . . . ."

THE COURT:  Yes.  So let me just start here by reading -- let me just start by reading the bottom of

Instruction Number 12.

MR. CHANG: Okay.

THE COURT: Okay? So I think that what everybody is contemplating here, but correct me if I'm wrong [as read]:

"The Government alleges that Categories 1 through 7 each contain at least one trade secret. To find the defendant guilty of any count, you must find that the category associated with that count contained at least one trade secret and you must agree unanimously on which particular document in that category constitutes a trade secret."

Now, what Ms. Priedeman is going to get up and say is that this doesn't account for the compilations. This doesn't account for the compilation in each category; right?

MS. PRIEDEMAN: Yeah, the compilation of all the documents in --

THE COURT: Yeah.

MS. PRIEDEMAN: -- each category.

THE COURT: So is that to say that you think the word "information" is better? Or --

MR. CHANG: "Document" or "information."

MS. PRIEDEMAN: Sorry. Can I see it again? It's right here.

Yeah, I think "information" is better. I think it's just too clunky then to say "document or collection of

documents in each category."

THE COURT:  I mean...

MS. PRIEDEMAN:  Or --

THE COURT:  The other -- sorry.  Go ahead.

MS. PRIEDEMAN:  Sorry.  I was going to say "agree on which particular document or combination of documents."

MS. KRSULICH:  But there's only one combination.

MS. PRIEDEMAN:  Or "the combination of documents in each category."

THE COURT:  Right.

The other thing I'm thinking about here is, in this -- okay.  So shouldn't we -- this discussion makes me feel like, after we lay out the seven categories, we should say, "The Government alleges that each document in each category is a trade secret on its own.  The Government also alleges that all documents" -- I don't know exactly how to say it, but "The Government also alleges that all documents in each category combine to constitute a separate trade secret."

And then the remaining language can kind of build off that language and describe it that way.

MS. PRIEDEMAN:  I think that makes sense, Your Honor.

THE COURT:  Okay.  I'll work on it.  I'll put it out.  I think I get it.

MS. PRIEDEMAN:  Do you want to reference the 105 documents somewhere, or is that --

THE COURT:  Yeah, that's kind of what I was --

MS. PRIEDEMAN:  Yeah.

THE COURT:  That's kind of what I was thinking.

Well, I don't know if it makes sense to reference the 105.  You're suggesting something like, "The Government contends that each of the 105 documents in these seven categories individually constitutes a trade secret. The Government also alleges that each of the documents in each category combine to constitute a separate trade secret," or something along those lines?

MS. PRIEDEMAN:  Yes, Your Honor.

THE COURT:  Hard to make it not clunky, but...

Yeah, okay.  I'll play with that and I'll put something out.

Okay.  So then 15, you're suggesting, remind them of unanimity?

MR. CHANG:  Yes.  But we should include the last sentence of that paragraph as well.

THE COURT:  Which is what?

MR. CHANG:  [As read]:

"However, you do not have to find that all of the information in the particular category is a trade secret."

THE COURT:  Okay.  I mean, whether it's in two places or one, you will be able -- obviously, you're going to be able

to highlight it for the jury in your closing arguments.  So I'm not sure it is important to repeat it.

But let me take a look at it.  After making all these changes and thinking about how it flows, I'll think about whether it's worth reminding them.

MS. KRSULICH:  Yeah.  And the reason is just that I think the jury will be working off this page.

THE COURT:  Right.  Yeah.  Okay.

All right.  So for economic espionage --

Sorry.  Were we done with 15?

MS. KRSULICH:  Yes.

MR. CHANG:  No more objections from the Government, Your Honor.

THE COURT:  Okay.  For economic espionage, should we add the same element that we added to trade secrets?

MR. CHANG:  The knowledge element?

THE COURT:  Yeah.

MR. CHANG:  We don't have an objection to that.

THE COURT:  So it would be second -- it would be that this was confidential info that he had no right to take.

MR. CHANG:  Yes.

THE COURT:  Okay.  Anything else on this instruction?

MS. KRSULICH:  Your Honor, I know that the Court had a note to the parties regarding this instruction.

THE COURT:  Oh, yeah.

Could we talk, first, about my second note?

MS. KRSULICH:  Yeah.

THE COURT:  About this alternative?

MS. KRSULICH:  Yes.  And that's what triggered me to look, because if the Court was considering adding -- it just seems like it would simplify the instruction if the Court gave its proposed in the alternative, rather than including all of that additional language from the theft.

THE COURT:  So you like that proposal better?  As long as we've added the element that we talked about to the trade secret instruction, you like this formulation better.

It would be very simple [as read]:

"First, the defendant committed the crime of

trade secrets from the category at issue in the

particular count; and, second, the defendant intended

or knew that his actions would benefit any foreign

government or foreign instrumentality."

MS. KRSULICH:  Yes.  Yes.

MR. CHANG:  The Government's position would be that the current proposed instruction with the addition of that second element would be the better language.

And we actually think it creates some issues because, although the statutes are very similar, 1831 and 1832, as we just talked about, 1832 includes these additional elements about intent that the -- or knowledge that the offense would

injure the owner.  We also have intent to convert it to the benefit of someone other than Google.

So the elements don't map on identically, and we think that it creates --

THE COURT:  Well, other than someone -- someone other than Google is covered, because it's intent to benefit China. So I think that one is covered.

But knowledge that it would harm Google --

MR. CHANG:  Intended or knew that it would harm Google, which is another element.  And so --

THE COURT:  That's not -- that is not an element -- I mean, it's weird; but that is not an element -- does not appear to be an element of the economic espionage statute.

MR. CHANG:  That's correct, Your Honor --

THE COURT:  Let me just look at the statute --

MR. CHANG:  -- as I recall.

THE COURT:  -- one more time, because I think if that's right -- right? -- if knowledge that it would harm Google is not an element of that statute, then I think you're right that we need to do it this way rather than my alternative formulation.

And I suppose there could be a rational explanation for the difference.  It does not appear that the espionage statute requires intent or knowledge that it would harm Google.

MR. CHANG:  Correct, yeah.  The subsection (a) of 1832

has that element, and subsection (a) of 1831 does not have that element.

THE COURT: And I suppose there's a rational explanation for that; right? Because even if you steal the information -- if I steal information from Google, even if it doesn't harm Google, if I take it to China and I use it to help the Chinese government, then even if it doesn't directly harm Google, I'm still committing a crime; right? I've stolen this trade secret from Google to help the government.

And that's the whole point of this separate statute is, if you're stealing a trade secret to help a foreign government, you're guilty of this crime as opposed to the theft of trade secrets crime.

MR. CHANG: Yes, Your Honor.

THE COURT: I think that probably is right, yeah.

MS. KRSULICH: And just pointing out that the theft of trade secrets is a common element in both. However, I do see that that language is not in the economic espionage, so...

THE COURT: Yeah. It's appropriating or copying or possessing a trade secret, but it's not with the knowledge or intent that the owner is going to be harmed by it.

MS. KRSULICH: However, the trade secret does have to have independent economic value for both the statutes.

THE COURT: Right. But I think that doesn't -- I don't think that takes away from Mr. Chang's point that even --

if you were to successfully argue to the jury -- right? -- that this did not harm and could not have harmed Google economically -- right? -- Mr. Ding could still be found guilty of the espionage charges, assuming the other elements of the espionage -- assuming there's enough evidence to show that he knew or intended that it would benefit the Chinese government. Right?  He could still be found guilty of the espionage charges.

So I think that what we need to do with the economic espionage is leave it in its clunkier version and add the knowledge -- add the knowledge element to that.

Anything else on this one?

**MS. KRSULICH:**  Your Honor, adding the "and" after the second element.

**THE COURT:**  Okay.

**MS. KRSULICH:**  And then we would propose changing the third element to "would benefit a foreign government" rather than "any foreign government or instrumentality."

**THE COURT:**  That's fine.

**MS. KRSULICH:**  And then in terms of the benefit --

**THE COURT:**  Is that okay?

**MR. CHANG:**  That's fine.

**THE COURT:**  Okay.

**MS. KRSULICH:**  In terms of the benefit, we would strike the "tactical or reputational benefit," as there's been

no evidence related to those aspects of benefit and the Government hasn't put in their case related to tactical or reputational benefits.

THE COURT:  Okay.  I mean, there are two issues there. One is whether the Government has put in any evidence, and two is whether that should be part of the instruction ever; right?

I mean, I think particularly with respect to "reputational" -- I don't really worry about tactical, but I think there's a real argument that "reputational" is just too vague and overbroad.  And I know that the House Committee Report used language -- used this language, but it's a House Committee Report.  And it may be that broadening -- making the statute so broad as to include any kind of reputational benefit would create constitutional problems.

MS. KRSULICH:  We agree, Your Honor.  And in this case, in addition to that, there has been no evidence submitted supporting that.

THE COURT:  Yeah.  I think that's right.

What does "tactical" mean?  I mean, I sort of think of it as not too much different from "strategic."  It's a military connotation.

MS. KRSULICH:  I can see that.

MR. CHANG:  Yeah.  On that point, we're not arguing reputational, so we're fine.

I will say that it's the House Committee Report that

you've cited in your pretrial orders and also that the *Zheng* second opinion -- Second Circuit Court cited also included that language.

THE COURT:  Yes.

MR. CHANG:  And so our preference would be to include it, but it's not something we'll be arguing here.  So we don't -- we're not going to oppose --

THE COURT:  Okay.  So I'm definitely going to take out "reputational."

Are you going to be arguing "tactical"?  I mean, "strategic" and "tactical" are sort of the same thing; right?

MR. CHANG:  Yeah.

THE COURT:  Are you going to be arguing anything other than economic benefit?

MR. CHANG:  I would say "strategic" should be included.  And I do think the broader context matters -- right? -- in terms of the five-year plans and the other state development plans cited in the Zhisuan PowerPoint --

THE COURT:  My inclination would be to --

MR. CHANG:  -- presentations.

THE COURT:  -- say "benefit" means any kind of benefit, including economic, strategic, or tactical benefit, and leave it at that.

And maybe you're not arguing tactical, but it helps provide a workable definition for the jury.

MR. CHANG:  That works for us, Your Honor.

THE COURT:  Okay.  Anything else on this instruction?

MR. CHANG:  Yeah.  So we're generally fine with the other language that the Court has proposed.

I do think it's important, given the new language in the paragraph before the benefit definition, that we make it explicit to the jury that intent to benefit oneself is not mutually exclusive from the other definitions of "benefit." And so we think that concept should be captured in that paragraph before the "benefit" paragraph.

And so our proposal would be [as read]:

"For the third element, the Government is not required to prove that the defendant intended to benefit the Chinese government or an instrumentality of the Chinese government exclusively.  However, it is not enough for the Government to prove that the defendant intended to benefit himself or Zhisuan."

And then the rest of the language, we would keep it in.

MS. KRSULICH:  So --

MR. CHANG:  Alternative- -- sorry, Ms. Krsulich.

Alternatively, we had proposed in our initial instructions, "Intent to benefit oneself is not mutually exclusive of intent to benefit another," as an additional sentence after --

THE COURT:  Yeah.  I mean, I don't like that language just because, again, that's more like a court writing.

MR. CHANG:  Yes.

THE COURT:  And I know it came straight from that Second Circuit case.

Hold on.  I'm writing something.

(Pause in proceedings.)

THE COURT:  Can you read me again what you proposed?

MR. CHANG:  Which version, Your Honor?

THE COURT:  The first version.

MR. CHANG:  [As read]:

"For the third element, the Government is not required to prove that the defendant intended to benefit the Chinese government or an instrumentality of the Chinese government exclusively.  However" --

And then it's your sentence, Your Honor.

[As read]:

"However, it is not enough for the Government to prove . . . ."

MS. KRSULICH:  I'm just not following where we're at, where the additional sentence is.

MR. CHANG:  So it would be [as read]:

"For the third element, the Government is not required to prove that the defendant intended to benefit the Chinese government or an instrumentality

of the Chinese government exclusively.  However, it is not enough for the Government to prove that the defendant intended to benefit himself or Zhisuan."

THE COURT:  The concept you want is a finding that the defendant intended to benefit himself or Zhisuan does not preclude a finding that he also intended to --

MR. CHANG:  Correct, Your Honor.

THE COURT:  -- benefit the Chinese government.

MR. CHANG:  And we're open to suggestions.  We just think that concept needs to be covered, given the other language in that paragraph.

THE COURT:  And you're only arguing instrumentality of Chinese government; right?

MR. CHANG:  Correct.

THE COURT:  I think what I would be inclined to do is leave that paragraph the way it is --

MR. CHANG:  Okay.

THE COURT:  -- and then, afterwards, say [as read]:

"A finding that the defendant intended to benefit himself or Zhisuan does not automatically preclude a finding that he intended to benefit an instrumentality of the Chinese government."

MR. CHANG:  That's okay with the Government.

THE COURT:  Any objection?

MS. KRSULICH:  We will reserve until we see the

written, but at this point, no objection.

THE COURT:  Okay.  Anything else on that instruction?

MR. CHANG:  Nothing further from the Government.

MS. KRSULICH:  No, Your Honor.

THE COURT:  All right.  Number 17, I'm going to strike the paragraph that begins "Perform these duties fairly and impartially" because it's, again, repetitive of the early instruction.

MR. CHANG:  No objection.

MS. KRSULICH:  Your Honor, we think it's important to keep it in there, given the issues that have come up in this case related to China, and it is an important reminder to the jury.

THE COURT:  Okay.  I understand what you're saying, but I instructed them at the beginning.  They saw a video on unconscious bias in the jury room before they came down.  And so I think it's beating a dead horse at this point.  So I'm going to take that paragraph out.

Anything else on 17?

MS. KRSULICH:  Yes.  One addition to the second -- paragraph second -- or third sentence [as read]:

"Your verdict, whether guilty or not guilty, must be unanimous as to each count."

THE COURT:  Okay.  No objection, I assume.

MR. CHANG:  No objection.

THE COURT:  All right.  Anything else on that one?

MR. CHANG:  Nothing from the Government.

MS. KRSULICH:  Nothing further.

THE COURT:  I just noticed that it jumped from Instruction Number 17 to Instruction Number 19, so we'll fix that numbering.

MS. KRSULICH:  We're just making sure we're not missing 18.  We're not missing 18?  Just a numbering?

THE COURT:  That's a good question.  Let me see -- do you have 18 in the version that we filed last night?

MR. CHANG:  No.  It jumps from 17 to 18 -- or 19.

THE COURT:  17 to 19?  Okay.  Yeah.  So it's just a numbering issue.

MS. KRSULICH:  Okay.

THE COURT:  I think it's just a numbering issue. We'll make sure.  We'll go back and make sure.

MS. KRSULICH:  Okay.

THE COURT:  Okay.  Anything on 19?

MR. CHANG:  No objections from the Government.

MS. KRSULICH:  No objections.

THE COURT:  20?

MR. CHANG:  No objections.

MS. KRSULICH:  No objections.

THE COURT:  21.  I thought 21 should go before 20.  It felt a little out of place here for some reason.

MR. CHANG:  That works for us.

MS. KRSULICH:  That's fine, Your Honor.

THE COURT:  Okay.  Or it'll become 20 and the other one -- well, I don't know what the numbering will be, but it'll go before the previous one.

All right.  22?

MR. CHANG:  No objections.

MS. KRSULICH:  No objection.

THE COURT:  23?

MR. CHANG:  No objections.

MR. FONDO:  No objection.

THE COURT:  Okay.  Anything -- I didn't put out a draft verdict form.  Any comments?  Any further comments on the issue of the verdict form?

MR. CHANG:  Not at this time, Your Honor.  We'll obviously --

THE COURT:  Your verdict form -- I looked at them. They were fairly similar, I think.

MS. KRSULICH:  Yes.  We have no further comments at this point.  We've submitted a different verdict form, so we can take that up.

THE COURT:  When you say you submitted a different -- you mean you two have submitted different forms?

MS. KRSULICH:  Yes, we've submitted different verdict forms.

THE COURT: Okay. Yeah, I'll put one of those out tonight too. I think it'll probably be some -- I mean, I don't think there were any material differences between your verdict forms. It was just more of like a formatting thing; right? You probably had "Not guilty" before "Guilty."

MS. KRSULICH: And I do think it is important, Your Honor, to instruct the jury about the relationship between the economic espionage and theft of trade secret counts so that there's no risk of confusion among the jury.

THE COURT: Yes.

MS. KRSULICH: And so that was what our verdict form was intended to do.

So we could take it up once we have a draft --

THE COURT: Okay. Let me go back and look at that.

MS. KRSULICH: Okay.

THE COURT: All right. Anything else for now?

MR. CHANG: Nothing from the Government at this point, Your Honor. Thank you.

THE COURT: It seems like we'll probably wrap up early tomorrow. Does that seem right?

MR. BOOME: I'm not sure how much more testimony Mr. Novak has. We're not anticipating a lengthy cross.

I do think -- I would just like to know from the defense. It sounds like they're not calling any other witnesses, although it would be helpful for us to know at this

point.

MR. FONDO:  Your Honor, Mr. Chang asked me this before we came back, and I forgot, but we will tell him within five minutes.

THE COURT:  Within five minutes if there's another witness?

MR. FONDO:  Yes.

THE COURT:  These are the Google witnesses you're contemplating?

MR. FONDO:  Yeah.  I just want to confirm with the team.  I was supposed to do that earlier today, and I just forgot.

THE COURT:  Okay.  So, yeah, let him know.  But I'm operating on the assumption, unless I hear otherwise, that this is the last witness.

And then you have -- are you still calling Sanchez in rebuttal or not sure yet?

MR. CHANG:  We are still evaluating whether to call him.  It depends in part, of course, on Mr. Novak's remaining testimony.

MR. BOOME:  He's here, listening, obviously, and he'll be here again tomorrow.  And so once Mr. Novak is done testifying, the Government is going to ask the Court for just a brief recess to speak to Professor Sanchez and decide whether to call him in rebuttal.

THE COURT:  That's fine.

So it sounds like we have -- there's a decent -- do you have a rough estimate of how much longer you have with Novak?

MR. FONDO:  I'm not the best one to assess that, Your Honor, but I would estimate roughly two hours, something like that.

THE COURT:  Okay.  All right.  Seems like we might have -- we may very well wrap up early tomorrow, which will be nice for the jury and for you guys.  Yeah.

Okay.

MS. KRSULICH:  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Proceedings adjourned at 5:57 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Tuesday, January 27, 2026

*Ana Dub*

_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter