**VOLUME 10**

**PAGES 1885 - 2087**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
v.                                  ) **No. 3:24-CR-00141-VC**
                                    )
LINWEI DING, a.k.a. LEON DING,      )
                                    )
            Defendant.              )
_____ )


San Francisco, California

Tuesday, January 27, 2026

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
               CRAIG H. MISSAKIAN
               UNITED STATES ATTORNEY
               450 Golden Gate Avenue, Box 36055
               San Francisco, California 94102-3495
        BY:  **CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
             **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

               CRAIG H. MISSAKIAN
               UNITED STATES ATTORNEY
               1301 Clay Street, Suite 340S
               Oakland, California 94612-5217
        BY:  **MOLLY K. PRIEDEMAN**
             **ASSISTANT U.S. ATTORNEY**


            **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE.)**

REPORTED BY:  April Wood Brott, RPR, FCRR, CRG
              CSR No. 13782, Official United States Reporter

**APPEARANCES (continued):**

For Defendant:

GOODWIN PROCTER LLP
525 Market Street
San Francisco, California 94105
BY:   **DARRYL M. WOO, ATTORNEY AT LAW**
      **DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
      **RACHEL M. WALSH, ATTORNEY AT LAW**
      **COLETTE A. LOWRY, ATTORNEY AT LAW**
      **NICHOLAS C. WILEY, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 Marshall Street
Redwood City, California 94063
BY:   **GRANT P. FONDO, ATTORNEY AT LAW**
      **FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 South Figueroa Street, Suite 4100
Los Angeles, California 90017
BY:   **LORA J. KRSULICH, ATTORNEY AT LAW**

Also Present:   **Andrea Valladao, Federal Bureau of Investigation**
                **Veronica Hernandez, Paralegal**
                **John Jay, Trial Technician**

**W I T N E S S   I N D E X**

Tuesday, January 27, 2026

**PROCEEDINGS**

Sealed Proceedings, pages 1911 - 1962
Sealed Proceedings, pages 1994 - 2001

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **DANIEL SANCHEZ, PhD** | | |
| Direct Examination By Ms. Priedeman | 2015 | 10 |
| Cross-examination By Ms. Walsh | 2022 | 10 |
| **DEFENDANT'S WITNESSES** | | |
| **STEVE NOVAK (resumed)** | | |
| Direct Examination By Ms. Walsh | 1888 | 10 |
| Cross-examination By Ms. Priedeman | 1963 | 10 |
| Redirect Examination By Ms. Walsh | 2009 | 10 |
| **CHARGING CONFERENCE** | 2027 | 10 |

**Tuesday - January 27, 2026**                                    **9:31 A.M.**

**P R O C E E D I N G S**

---o0o---

THE COURT:  Good morning.

MS. WALSH:  Good morning.

MR. CHANG:  Good morning, Your Honor.

THE COURTROOM DEPUTY:  All rise.

(The jury entered the courtroom.)

THE COURTROOM DEPUTY:  Please be seated.

THE COURT:  Okay.  Good morning, everyone.  You can resume.

**STEVE NOVAK,**

called as a witness by the defense, having been previously sworn, testified as follows:

**DIRECT EXAMINATION (RESUMED)**

BY MS. WALSH:

Q.  Good morning, Mr. Novak.

A.  Good morning.

Q.  I'd like to go back to your demonstratives at slide 2.

So yesterday, we described your first opinion.  Can you briefly describe your second opinion?

A.  Yes.  So based on the fact that this is a very large system or set of systems and -- with a lot of moving pieces that all have to be interconnected -- and from my review of the 105 documents, I find it very implausible that someone could

replicate the whole system or parts of the system in a reasonable fashion.

Q.   And why is that?

A.   Well, first of all, the documents are not complete.  There are many links that you can't follow that fill in a lot of needed details, and they're very high-level.  They're not what I would call design documents.  They're architectural or even, you know, briefs essentially that don't allow you to implement the pieces of the system.

Q.   And looking at the 105 alleged trade secret documents, what did you find with respect to implementation details in those documents?

A.   So these documents are mainly high-level architectural documents that don't have the details you need to actually create an implementation.  Many of them are briefs that kind of give you a high-level concept, but as an engineer who has implemented these sort of chips, I would not start from any of these documents as my starting point for actually starting my coding from.

Q.   And now let's switch to slide 6.

Mr. Novak, can you give us an overview of what's depicted on this slide?

A.   Right.  So this is a standard kind of design cycle for a chip.  That's what an ASIC is, an application-specific integrated chip.  And you first start with your marketing

requirements, which is essentially how fast and what the system needs to do or the chip needs to do, in this case.

And it would be similar to saying, "We need a car that has this price point and can go -- has this kind of performance." It's very high-level.  It's creating kind of a high-level requirements document for the architecture team.  So then the architecture team says, "Okay.  We need these kind of high-level pieces to make this work."

But then the microarchitecture is really the first place where it's all broken down into individual pieces that have interfaces defined, that have requirements for each one of those sub blocks to find in, and it's detailed in a way that a person who designs this can actually use it and start designing the product in question.

In all these, there's feedback loops in all these.  So it's not a purely sequential process.  One element starts, and all the other elements also are kind of starting in parallels. It's called a waterfall process.  Where the marketing starts, the water flowing over the waterfall, and all the other pieces start flowing soon afterwards, and they're all working together to try to get this product to market as soon as possible.

After the microarchitecture is actually where you create the implementation.  So Verilog and RTL, registered transfer language, is a way of describing the microarchitecture in a way that can be manufactured or can be actually implemented.

And of course, then you have to verify this design.  And the verification actually typically requires more people than the design requires.  It's very complicated to make sure that the RTL or the Verilog meets the requirements of the microarchitecture, not the architecture, but the microarchitecture.

And then the synthesis step down in the right-hand corner takes the RTL and actually implements the gates or transistors and all the wiring required to connect this chip up.  And then the next set of tools -- and these tools are very expensive tools, they're not something that a person typically has a hold of -- places and routes all these transistors and the wires connecting the transistors.

And then this place-routed database -- and by the way, anywhere along this route where you find issues, which you do all the time -- you might have to go all the way back and recreate this whole process and redo parts of it, so it's very complicated, and that it keeps going around, and that's why it takes multiple years potentially to get an optimized product.

Take the place and route of database, and you send it to a fab to get processed into a chip.  The chip comes back, and at that point, you need to validate the chip actually works as you expect.  And you -- at that point, you might find really issues that don't work with it, in which case you might have to go all the way back and recreate this whole flow.

And after -- validate it, in this case because Google's kind of a self-contained environment, you would put it into your system, and make sure within your system it works as you expect. And, again, you go all the way back through and correct any issues you see.

Q. Okay. So this process is iterative. It doesn't just proceed straight through these steps, correct?

A. Yes. Absolutely.

Q. And you mentioned some changes that may happen throughout this process. Does that mean that components in software may have to be changed as the product design is developed?

A. It's highly likely. In fact, some of the issues might stem from the fact that the firmware or software might find a better way or more optimal way of doing something, and it's significant enough that you have to change the microarchitecture or the RTL to make that happen.

Q. And the different parts of this process are happening in parallel, correct?

A. Yeah. There is a sequence to this, but as soon as you can, you start the next step in this process, yes.

Q. Okay. And then turning to the 105 alleged trade secret documents, in your opinion, where do those fit into this diagram?

A. So as I was going through, I was tasked with understanding where they fit into this whole cycle, and as I was going

through, they were all fitting into the essentially architecture, and some of them were kind of briefs or analysis documents, which I would also kind of put into the higher level marketing requirements or architecture stage.

There was one document titled "microarchitecture," but it happened to only have very high-level details and not any details I would expect in a full microarchitecture document. So I would also put that into some kind of review document or a higher-level category that wasn't going through the full details needed to implement anything.

Q.   And so the documents that you reviewed are fairly early on in this process, correct?

A.   I only saw the 105 documents, so I can't tell.  But I would imagine it -- I don't -- it didn't look like a lot of them were finished.  A lot of them seemed to have a lot of missing pieces if they were a finished product.  So I have no way of determining that for sure.  But they -- yeah.

Q.   And then some of the documents that you reviewed related to something called an ISA.  Where in the design flow discussed in this slide does an ISA fit?

A.   So an ISA is an instruction set architecture, and it defines essentially the interface between the software and what the hardware needs to execute.  And that's typically put in the architecture phase in its development cycle.  From that ISA -- and ISA's are developed for not just TPUs but also for CPUs and

GPUs.  It basically doesn't determine the implementation.  It determines what that implementation needs to ultimately execute, the instructions it needs to execute.

Q.    And doesn't ISA tell you how to build a chip?

A.    No, it does not.

Q.    Why not?

A.    Well, same way that, for instance, a PCIe, express standard, which is huge, doesn't tell you how to build it but rather what's required of it, just like an architecture is not telling you how to build that car or exactly how to build the engine.  It's telling you it needs to have an engine.

So in this case, it's telling you what this processor needs to be able to support.

Q.    And is there a particular project in your past experience that informs your opinion here?

A.    Yes.  So I worked for AMD working on multiple generations of their x86 CPU that had ISAs, and we developed both, as I mentioned yesterday, a replica of another company's version of it, and we also did basically a scratch design.  And so I know the difference and know the complexities in developing an implementation for an ISA.

And they were vastly different, the two implementations.  One was completely different from the other, and one had a 10x improvement over the other version.

Q.    And which one was which?

**A.**    Well, one was later than the other.  So you would expect that the clean implementation would have a better result just because it was later and had better processes in technology. But it was better because we reinvented the wheel for how to implement that ISA.

There wasn't just one way of implementing it, and the way we implemented it was actually superior to what Intel did.  And Intel later actually followed a similar example that -- approach that we did, but they had a totally different implementation.

So it's important to understand the ISA doesn't constrain you on how you implement it.  It describes what you need to -- your final result is but not how you do it.

**Q.**    So somewhat surprisingly, reinventing the wheel was a -- led to a better result?

**A.**    Yes, as it often does because when you re -- as time goes on, you have access to better tools, better processes, and different ways of thinking about the problem.  And often by simplifying, we actually simplify the problem.  It actually made it better.  And often when you think a problem in a new way, you can make it better in an unexpected way.

**Q.**    And then you also mentioned documentation besides the ISA. What other kind of documentation is necessary for building a chip?

**A.**    Oh, yes.  So you have to define all the interfaces that

the chip is going to be talking to.  In this case, it's the host processor and the ISI, which is the interconnect.  And you have to define in a very fine way all the pieces.  So we saw that block yesterday.  It had all those LEGO pieces, which weren't LEGO pieces, but all those pieces would have their own microarchitecture specification to them, and they would take probably an engineering team of 10 to 20 to implement.

So each one of those, just to do design, not to talk about verification and all the other steps.  So all of these would have to be very well-defined in order for someone to start implementing this product.

**Q.**    What would microarchitecture specifications provide that's not in a ISA?

**A.**    How to design the hardware that actually implements the ISA.  So it's similar to saying it needs to have an engine.  Well, what is -- how do you do -- how do you make the engine of a car?  Well, that's the microarchitecture.

You know, all the -- you know, is it a V6?  A V4?  Exactly how it's put together is defined by the microarchitecture, and you could use different implementations to create more optimized or less optimized versions of the architecture, or the ISA.

**Q.**    And so to sum up, what is your opinion regarding how helpful the alleged trade secret documents would be in implementing an AI supercomputer system?

**A.**    So the whole system or just this TPU chip?

**Q.**    Let's take the TPU chip first?

**A.**    All right.  So I think there's a lot missing.  The documents themselves, I personally would not start -- I don't see how they're useful to start a design from them in any meaningful way.  They're full of -- they're not complete, and they are full of, you know, links that don't -- that I can't follow.

**Q.**    Okay.

**A.**    So they wouldn't be very useful to any engineer that I know of to start an implementation or design from.

**Q.**    And let's go back to slide 2.  Turning to your third opinion, "primacy of expertise over documents."  What do you mean by this?

**A.**    The documents are -- especially these documents are kind of a snapshot of time of someone's understanding of how this system or this specific chip will work.  And having the person who actually came up with those concepts or understands those concepts from a perspective of developing them is way more important than these documents.

And so I think it's really important to understand the significance of these documents.  These documents are not a complete set of how to create a products.  They're kind of a -- from my perspective, a random set of documents that I would rather have someone that understood the system over these

documents any day. So it's just -- it's a matter of perspective.

Q. And why would you prefer to have somebody who understood the system over documentation?

A. Well, first of all, the documents are not complete, and so it's hard to get kind of a complete understanding of the context and the environment from them.

But even if they were complete, which they're not, a person who actually wrote these documents and understood the system understands at a higher level why different tradeoffs were made, why decisions were made for the interdependency from different pieces.

Like, why is the -- what creates advantages to the firmware or the compiler with respect to the ISA? How do you implement something so you improve the power, the area, and the timing and time to market? All those things are in someone's head, and this is just a -- the documents are kind of a snapshot of someone's attempt to document them.

Q. And would documents like the ones at issue here actually act as a constraint on engineers and designers?

A. They could very well. I mean, in my view of these documents, I see it as this massive puzzle that, you know, broadly shows maybe a top-level picture of a car, and you have 105 pieces of this puzzle, and you have to fill in the rest of the 99,900 pieces of this puzzle and create the finished

picture of the car.  Not the implementation of the car, but just the high-level -- you know, the picture of the car.

And I find it implausible that that would be useful.  In fact, it would kind of hinder your creativity to be able to create a car that is actually useful.

Q.   And how does this interact with the concept of the interconnectedness of Google's technology?

A.   I think it's directly -- I mean, I think I've been stating that.  The fact is it's such an expansive system, it has to be all interdependent.  You can't do one piece and kind of use it with all the other complementary pieces.  So it's really important to understand the size of the system.

And it's not just one system.  We'll probably see there's two systems that we're talking about here that are completely separate.

Q.   And then turning to opinion number 4, rapid obsolescence. Can you give a description of how quickly the semiconductor industry moves?

A.   Yeah.  It's incredibly fast, and it's not just -- the system is probably being reinvented on a two-year cycle.  But the chips themselves are probably on a yearly or less cycle to keep making small improvements to them.

So this is not -- this is a moving target.  It's not something that's static.  It's constantly changing.  It's changing at a quick pace because if you don't, your competition

will become better than you.

Q. And so how does this affect the ability to, for example, use existing documents to build similar products or to reverse-engineer chips and products?

A. So you never want to be targeting something that's in the rear-view mirror, right? You always want to be targeting something that's in the future, and if you happen to have something that's a generation or two old, you are going to create something that's not useful.

Q. And how does the time that it takes to develop a product kind of affect that analysis?

A. It's huge, right? So if the development cycle is every six months or a year or in the case of the system, two years, then it means after two years, you're a full generation behind your competition, and if you're two or three generations behind, it's -- maybe a best -- a good analogy would be, like, a CPU.

If you have a processor, like an Intel processor, that's two or three years old and your laptop has that, your laptop is really not going to be worth as much as a newer laptop with the newest technology in it, and that happens -- or an iPhone. Every year, if you have an older iPhone, it becomes less competitive with the market.

Q. So Mr. Novak, if 50 of the alleged trade secret documents were uploaded to Mr. Ding's Google Drive on April 17th, 2023,

about eight months after he was terminated from Google, what would that say about the value of those documents as of December 2023?

**A.**   So in December 2023, how old are they?

**Q.**   About eight months.

**A.**   Eight months.  So they're -- I mean, depending on what you're looking at.  So for the TPU, I would imagine they would have a year turnaround cycle between generations.  And for the system, they have two years.  So essentially a little bit over a half a generation old, and for the system, it would be a quarter generation old.

**Q.**   And if 51 of the alleged trade secret documents were uploaded to Mr. Ding's personal Google Drive on June 3rd, 2022, about 18 months before he was terminated, what would that say about the usefulness of those documents as of December 2023?

**A.**   So again, they would be, like, a generation old, one or two generations old.  So it's not -- it wouldn't be something that I would want to work with ideally.  You'd want the newest documents that you could get.

**Q.**   So let's move to opinion 5.

How does your opinion with respect to value to competitors apply to the alleged trade secret documents?

**A.**   So I was evaluating the 105 documents to see how useful they would be to implement or design a chip or a system with them.  And from that, I see very little value.

That doesn't mean that I couldn't -- you know, there wouldn't be some strategic or some kind of high-level value from a high-level perspective from a competitor, because they're always looking for an edge and seeing where their competitor is going.

So I can't say they have no value, but I think from an implementation recreating the system, I think they have very limited value.

Q.   And in your experience, are there better document requests or better kinds of documentation that would have been more useful to a competitor?

A.   Yeah.  Absolutely.  I would think, you know, the microarchitecture would be a great place to start if you're looking to recreate the chip.  I think there's some really -- probably some valuable multiplier and adder optimizations that are custom-done inside this chip that would be extremely valuable.

I would guess there's some nuggets like that inside that if I wanted something of real value, I would go for those real gems inside.

Q.   Did you find those in the 105 alleged trade secret documents?

A.   No, I did not.

Q.   Okay.  And then kind of focusing a little bit more on the alleged trade secret documents, what could a startup do with

this kind of information that's in these documents?

**A.**    Yeah.  I've thought about this a bit.

So a startup can't easily recreate what Google has done, right?  What Google has done requires a huge amount of time, huge amount of money and a huge amount of people.  Those are three things that a startup does not have, and so I find it unreasonable that a startup would try to compete head-on with a system that's of the same scale and approach that Google has created.

I'm sure that the solution is a great solution.  It's just not something I believe is reasonable for a startup to try to even pitch to investors to not even contemplate implementing.

**Q.**    And what kind of value would the alleged trade secret documents provide to a large competitor?

**A.**    I think a large competitor is always interested in any kind of pictures or any kind of strategic information it can get.  But even there, it's kind of disjointed information.  So I'm not sure.  Like, that's not my focus when I looked at these documents, but it's not clear to me what would really be compelling when they already have a solution that may be significantly different from this system.

**Q.**    But do these -- in your opinion, do these documents have value that would enable somebody to build an AI supercomputer?

**A.**    Well, I think the simple answer is no.  These documents themselves would not allow someone to develop a supercomputer,

no.

Q.    And did the alleged trade secret documents contain enough information to replicate Google's systems?

A.    No, and I don't think there's any possible way they could replicate them from just these 105 documents, no.

Q.    And then turning to opinion 6, Dr. Sanchez suggests that there's a synergy in each of the -- well, just to back up, when you reviewed the alleged trade secret documents, they were broken out into seven categories, correct?

A.    That's correct, yeah.

Q.    Now, Dr. Sanchez suggested that there's a synergy among the documents in those collections.  Do you agree with that assessment?

A.    I don't see any evidence of that.  I don't see how -- to me, again, it's this puzzle piece with this rather large -- just to see the high-level, you know, view of a car, for instance, and I only see 105 of -- you know, the scale would be, you know, a hundred thousand different pieces, and I'm only seeing a very small part.

And I don't -- the parts are not in one area.  So to create kind of synergy, they're pretty disconnected.  From chassises to chip design to board design, they seem very random to me, and I don't understand why they would be helpful together.

Q.    And so in your review of the documents, did you see any

additional value that came from considering those documents together as opposed to just separately?

**A.**    Well, I mean, each document, by definition, is another document of information.  It's another puzzle piece in that larger picture.  But I didn't see them connecting together.  I don't see them how they make the picture more clear by putting them all together.  They're not working together to create a significantly better view of the final product.

**Q.**    Okay.  Mr. Novak, let's switch gears briefly and discuss some documents that relate to Zhisuan.  What is your understanding of Zhisuan?

**A.**    My understanding of Zhisuan, from the two documents I've looked at, is it's a company that the defendant was trying to do a startup with a couple other people.

**Q.**    And did you see evidence that Zhisuan ever launched a commercial product?

**A.**    No.

**Q.**    And let's go to Exhibit 1034, please.  And then if you flip to page 21, Mr. Novak, is this one of the documents that you reviewed?

**A.**    Yes.  I reviewed this set of slides, yes.

**Q.**    And does this slide accurately reflect what you understood Zhisuan was building?

**A.**    Yes.  So my understanding what they were building came from a WeChat message chat that I looked through, and this is

exactly what they seem to be describing, a little AI app that would be running on an open AI system, and these are some of the elements that were in that chat.

Q.    And in that WeChat log, was there any discussion of the alleged trade secret documents or building a competitor to Google?

A.    No, not at all.

Q.    Okay.  Can we flip ahead a few pages to page 19.  And Mr. Novak, can you explain what the slide indicates to you?

A.    So this is related technologies that would be involved in an AI, a full AI stack.  So usually you decompose most technology into multiple layers to kind of be able to deal with the complexity.  So you start with layer 6, which is the very highest level of interfacing to the system, to the lowest level, which is the hardware and hardware platform.

     And it seems like there's a lot of -- kind of like on a resume where you put a lot of the keywords or catch words for each one of those layers out there to kind of show that you have familiarity with that technology.

Q.    And did anything stand out to you with respect to the technology that's described on the slide?

A.    Well, I mean, many of the items on here are kind of publicly available.  All of them are publicly available until you obviously get to layer one, which in the chat, they were talking about using publicly available AI systems to power

their solutions with.  So a lot of these names on here correspond to tools that they were hoping to use for their AI app.

Q.   And did some of these technologies appear in the WeChat logs that you reviewed?

A.   Yes.

MS. WALSH:  Okay.  Let's go to Exhibit 1169.  And Mr. Jay has helpfully put both of those up side by side.

THE WITNESS:  Yeah.

BY MS. WALSH:

Q.   And so on page 2, what did you see on this page of the WeChat log?

A.   Right.  So on the very top, Kubernetes is an open source or open -- publicly available way of sharing tools and containers, for instance.  As you go down on the bottom, there's NCCL, which is an NVIDIA library.

Oh.  And then there's -- it's not highlighted, but there's PyTorch and Terraform, which are ways of interfacing to an AI system.  And they're publicly available.  They're not proprietary.

Q.   Okay.  And now if we scroll to page 8, in the highlighted box about two-thirds of the way down, what do you see there?

A.   Yeah.  So docker-related -- Kubernetes, which is K8s-related users dockers and containers to create -- yeah, and it's also listed on their related technologies.

Q.   Okay.  And then if we go to page 13, just scrolling down.
Toward the bottom of that page, what do you see there?

A.   Sure.  So Llama is an open AI model from Meta that's
openly available.  I assume it's the Chinese version of it.
Hugging Face is another open source area to take tools and data
from.  So Hugging Face is the H face on the related
technologies involved, and llama is listed there.  So it's kind
of a lot of catch phrases.  Yeah.

Q.   Okay.  And then flipping over to page 25 up toward the top
in the first full chat, it refers to angular and react.  What
do those refer to?

A.   So those are ways of creating -- helping create AI
applications.

Q.   And are those publicly available tools?

A.   Yes, they are.

Q.   And then if we go to page 36, what does that refer to from
Exhibit 1169?

A.   So this appears to be a way to access an AI system, not to
build one, but to access an openly available AI system.

     On the left, you can choose to use a CPU-only environment
that uses PyTorch down below, or you can use a GPU environment,
which is CUDA, which is an NVIDIA-type interface with PyTorch.
So it looks like they're trying to point to exactly what
they're trying to do, which was an AI application that's
running on top of this AI system environment that's publicly

available.

Q.    Mr. Novak, we won't go through every page of this chat log, but did you see any discussion of the alleged trade secret documents?

A.    No, I did not.

Q.    And did you see any discussion of developing TPUs?

A.    No.  There wasn't any development of anything besides an AI app.

Q.    And was there anything in this chat that hinted at developing a 10,000-card platform?

A.    No.

Q.    Okay.  And then going back to page 19 of Exhibit 1034, if we go down to layer 1 --

A.    Yes.

Q.    -- at the bottom of what's listed there, what kind of conclusion can you draw from the hardware that's listed in layer 1?

A.    Well, I see this as a list of catch phrases -- machines, networks.  I mean, very generic kind of high-level catch phrases like someone put on a resume to kind of show that they understand what goes into this layer 1 platform.  SmartNICs, training and interference APUs.  I mean, it just seems like kind of a random list of the catch phrases.

Q.    And are any Google products listed under layer 1?

A.    No.

**MS. WALSH:** Now I'd like to turn to some of the specific documents that have been discussed in this case, and I think this is a good time to close the courtroom.

**THE COURT:** Okay. Sounds fine. So we are going to seal the courtroom again. Please remember my instruction about not reading anything into that about whether something is a trade secret or not. But anybody who is not associated with the court or one side or another must leave the courtroom now.

To make it easier for people, do you have a rough estimate of how long you think it will be under seal?

**MS. WALSH:** Probably about an hour.

**THE COURT:** About an hour. Okay. So people can anticipate that the Court will be closed until around 11, 11:15.

(Pages 1911 through 1962 were placed under seal by order of the Court and bound separately.)

(The following proceedings were heard in open court.)

**CROSS-EXAMINATION**

**BY MS. PRIEDEMAN:**

Q. Good morning, Mr. Novak.

A. Good morning.

Q. Mr. Novak, you were hired to work on this case about three weeks ago, right?

A. That's right, yes.

Q. And so you started reviewing these documents about three weeks ago?

A. Yes.

Q. So I wanted to ask you a question about -- just a little bit about your background. You mentioned -- when you were talking about the Tensor Core ISA, you referenced your experience with working on the AMD CPU; is that right?

A. That's right.

Q. And did your understanding and experience working with the AMD CPU inform your interpretation or understanding of the Tensor Core ISA?

A. Partially, yes. Yeah.

Q. And that work on the AMD CPU -- was that in about 1993; is that right?

A. Yeah. It was awhile ago.

Q. And is it your understanding that the Tensor Core ISA in this document doesn't include information -- doesn't include --

or sorry. It leaves the pipelines, buffers, arbitration, clocking, floor plan, power grid, instruction, scheduling, firmware, and system integration unspecified?

**A.** Yes. Yes.

**Q.** And is that based on your understanding of what a typical ISA would or would not include?

**A.** I mean, yes, but there's more to it than that. But okay. Sure. Yes.

**Q.** Okay. Switching gears a little bit, Mr. Novak, so Ms. Walsh asked you a lot of questions about different documents, and you answered frequently you said it wouldn't be valuable to implement. Can you explain what you mean by that?

**A.** Sure. So typically, I was asked to see if these documents could be used to replicate or reproduce a particular system, and that's what I was focused on.

**Q.** So when you said information would not be valuable to implement, you were answering that specifically in that it would not be valuable to replicate or copy wholesale component or system; is that right, Mr. Novak?

**A.** Or even in a reasonable way to reproduce the underlying technology, yes.

**Q.** You would agree, Mr. Novak -- and I think you've said this, that Google's systems are quite complex?

**A.** Yes, absolutely.

**Q.** And there's a lot of design decisions that go into the

different systems we've been discussing?

**A.** Yeah, the complex and multiple dimensions, right, chassises and firmware and hardware, and multiple pieces of hardware, yes.

**Q.** And you would agree that the 105 trade secret documents would provide valuable information to competitor companies that wanted to see how Google is -- has designed its systems?

**A.** I think it would be very marginal, but I can't say it has no value, no.

**Q.** You agree that all 105 trade secret documents have value, right, Mr. Novak?

**A.** I can't say they have no value, that's true.  When I was looking at it, I was looking at could I use this to implement something, and that was my focus.

**Q.** You agree, Mr. Novak, that competitors would love to see this type of information?

**A.** They love to see any information no matter how trivial it is.  I can attest to that firsthand, yes.

**Q.** But they would love to see this particular type of information contained in the 105 trade secret documents, right?

**A.** Yes.

**Q.** All right.  Let's talk about -- well, so first of all, let me talk about the different phases of design you spoke about with Mr. Chang.

So you talked about the architectural design phase.

**A.**    It was architecture.

**Q.**    Sorry.  The architecture phase.

**A.**    Because "architectural design" is a term that I think is misleading to a large degree, and I don't like it, right? Because it implies that from the architecture, you can go straight to the design, which I think is greatly misleading, especially from what I've heard in this case so far.  Yeah.

**Q.**    Well, so let's talk about the design process as a whole. Let's focus on category 1, right?  So the design of a machine learning chip.

**A.**    Okay.

**Q.**    There are a lot of complex design decisions that go into making a machine learning chip, correct?

**A.**    Yes.

**Q.**    You have to first decide what components the chip will have?

**A.**    That's not the first step, no.

**Q.**    One of the design steps is determining what components the chip would have?

**A.**    Yes.

**Q.**    You have to determine how the different components of the chip will interact?

**A.**    I mean, yes.  I mean, but that -- you're -- I mean, yeah, you're technically right, but that happens kind of well past the architecture stage where you're trying to put everything

together and trying to create an implementation.  That doesn't happen at architectural level at any reasonable depth.

So I'm not -- if you're trying to imply that that happens in architecture in a way that could be useful for implementation, I would disagree with that, right?  So.

Q.   I'm not focused on implementation at all right now, Mr. Novak.  I'm talking just about the design decisions about the different components of a chip.

A.   As soon as you talk about design, you're no longer talking about the marketing aspect or the architecture.  You're talking about something lower down.  You're talking about something that actually has real substance, that it actually has some value to create an implementation.  So that's why when you say design, to me, it's triggering that there's some value for implementation.

Q.   So I'm not talking about value for implementation.  I'm talking about the just -- I'm talking about the different components of the chip.  You have to make decisions about the functionality of the different components of the chip, right, Mr. Novak?

A.   So if you're telling me that at a high level, you need to specify kind of what your goals are and what you're trying to achieve with a system -- is that what you mean?

Q.   Yes, but then you also need to decide how a different -- let's talk about memory, for example, Mr. Novak, if you're

designing the memory system of a complex machine learning chip.

A.   Yep.

Q.   That's a complex process, correct?

A.   Yes.

Q.   And before you even get to the implementation phase, there is going to be a lot of conversations about how the memory should work, right?

A.   I don't know about how it works.  I think what it needs to achieve -- that's quite a bit different, and I think that's kind of part of the disconnect here is the concept, yes, needs to be generated, but that doesn't tell you the how.  The how is very different.

Q.   So I'm not talking about the how.  I'm talking about the tradeoff.  So if you're talking about designing a memory system, right, you could have -- there's a lot of decisions to be made.  You could have different -- you have to decide how many memory components you would have on a chip, correct?

A.   Yes.

Q.   You have to decide how big those memories will be?

A.   Right, but -- okay.

Q.   You have to decide where those memories are going to be located?

A.   That doesn't happen in architecture, right?

Q.   I --

A.   So -- okay.

**Q.**    I'm just --

**A.**    At some point -- yeah.  So at like, high-level views, that has to happen somewhere in that --

**Q.**    Right, but we --

**A.**    Okay.

**Q.**    We don't have to use the term "architecture."  I'm just --

**A.**    I'm sorry.

**Q.**    -- talking about the decisions have to be made --

**A.**    Yes.

**Q.**    -- about how the different components work and how they interact with each other.

**A.**    Absolutely.  They have to be made.  It's complex, and it takes a lot of work, absolutely.  The question is where they're done, in my opinion, makes a lot of difference.

**Q.**    And that process of determining the functionality and the different components -- that could take several years, correct?

**A.**    It does, yes.  To ultimately implement all of those, yes, absolutely.

**Q.**    And so it requires making a lot of complex tradeoffs, correct?

**A.**    Ultimately throughout that whole set of flows all the way down, yes, for sure.

        **MS. PRIEDEMAN:**  And Mr. Jay, can I trouble you to pull up his demonstratives, please, page 3.

///

**BY MS. PRIEDEMAN:**

**Q.** So Mr. Novak, you testified about this diagram previously, and you testified -- this is for Google's TPU version 4, correct?

**A.** Yes.

**Q.** And you testified this includes multiple proprietary components, correct?

**A.** Yes, it does.

**Q.** By proprietary, you mean this is Google's technology?

**A.** Yes.

**Q.** You testified that the ICI component is proprietary Google technology?

**A.** Yes.

**Q.** You testified that the BarnaCore component is proprietary Google?

**A.** Yes.

**Q.** You testified the Tensor Core component is proprietary Google technology?

**A.** Yes.

**Q.** And you would agree, Mr. Novak, that the information in trade secret category 1 includes information about the different design decisions that Google has made about each of these components, correct?

**A.** Can you clarify what design -- what do you mean by design here?

**Q.** So for example, with Ms. Walsh, you discussed Exhibit 362, which is the memory system document, correct?

**A.** Yes.

**Q.** And that you looked at a chart. I'm not going to get into the specifics here.

**A.** Okay.

**Q.** But you looked at a chart that showed how long it takes for information to go from each memory to another memory and the number of cycles it would take, correct?

**A.** Latency and bandwidth required.

**Q.** Right.

**A.** That's not a design. That's a high-level requirement. That's like saying a car needs to go 200 miles per hour. Great. How do you get there is really important.

**Q.** That information about the memory component that we just discussed, the latency and how long it would take would be information that a competitor would love to see, correct?

**A.** They would love to see any information, regardless of how trivial it is. But that doesn't mean it's useful to them, right? They just in general are curious and want to know where their competitors are, if they could.

**Q.** You would agree, Mr. Novak, that a competitor company would pay money for this information, correct?

**A.** I'm not sure. I would presume we're talking about a dollar? I don't know. I don't know. I haven't been in that

situation.  And that's not what I was asked to look at.

Q.   But you would agree that a competitor, let's say Meta, would be interested in this information and would pay for this information, correct?

A.   I mean, I can't say that there's no value -- yeah, I can't say there's no value.

Q.   If you could please answer my question, Mr. Novak.

You agree that Meta would pay money for the information in these trade secret documents, correct?

A.   I would think they would be interested at some level, right?  I don't know what level that would be, and I don't know how that would work.  So I can't -- I'm not really in that position to answer that question.  I'm saying there's -- I can't say there's no value in this.  I don't know how much value to quantify that as being.  It depends on the system. They already have their own system.  Are they curious on how other people have done things?  I'm sure they're curious about that.

Q.   I'm going to ask you yes or no to answer yes or no.

Would Meta pay money for the information contained in these 105 alleged trade secret documents?

A.   I presume no, because they're confidential documents, and they shouldn't have them, right?  If you want me to answer fully, I don't think Meta would pay money for this, no.

MS. PRIEDEMAN:  Your Honor, we'd like to -- can you

pull up the transcript, please, Ms. Hernandez.  Just the court and the witness, page 18.

THE COURT:  I know what it says.

MS. PRIEDEMAN:  May I read it into the record, please, Your Honor?

THE COURT:  Any objection?

MS. WALSH:  No objection.

THE COURT:  Go ahead.

BY MS. PRIEDEMAN:

Q.   Mr. Novak, you testified this past Friday in an under-oath proceeding related to this case, correct?

A.   Yes.

Q.   And were you telling the truth when you testified in that proceeding?

A.   Yes.

Q.   And I'm going to read into the record the statement you made in that proceeding.  You were asked about the trade secrets, 105 alleged trade secret documents in this case.

You were asked, "could Google sell them to Meta if Meta were willing to commit the crime of purchasing trade secrets?"

And you said, "I think they would, absolutely.  Working at these companies, they're interested in every little tidbit they could possibly get.  So there is absolutely value."

A.   Can I follow up with that?

Q.   That was your statement, correct?

**A.**   That is right, but I'm not saying there's no value.  I'm just saying I don't think buying it is a wise choice for a company like Meta, right?  I mean, they're confidential documents.  I don't think they'd want to buy them.  I'm not saying they don't have any value.  So I think that's consistent with what I'm saying.

          **MS. PRIEDEMAN:**  You can take that down Ms. Hernandez. Can you go back to page 3 of his demonstrative, please.

**BY MS. PRIEDEMAN:**

**Q.**   Now, Mr. Novak, so you testified that because each of these components are proprietary Google information, that by themselves it would be difficult -- it's not necessarily as valuable, correct?

**A.**   It's not reasonable to place value on one of these pieces by themselves because it's a lot of work to reproduce -- and you have to reproduce exactly all the infrastructure around it.

**Q.**   So setting aside reproduction and replicating it, would you agree, Mr. Novak, that having information about each of the components together -- that would be more valuable than having information about just one of these components?

**A.**   High-level information.  We're not talking about implementation level or low-level information.  You're saying having all these pieces put together has some value?

**Q.**   Yes.

**A.**   As I said, there is -- I can't say it has no value.

**Q.**   And --

**A.**   I can't assess the amount of value it has, right?  That's not what I'm here for.

      **THE COURT:**  She keeps asking you if they have value, and you keep saying, "I can't say it has no value."

      **THE WITNESS:**  Right.

      **THE COURT:**  I think the question calls for a yes or no answer.  Do you believe that it has value?

      **THE WITNESS:**  Yes, sir.  Yes, in a very marginal way.

**BY MS. PRIEDEMAN:**

**Q.**   And you would agree, Mr. Novak, that there is additional value when you consider information about each of the components combined together, correct?

**A.**   Like on this diagram here?

**Q.**   If information about the Tensor Core combined with information about BarnaCore combined with information about the ICI technology combined with information about how the host interface works -- all of that information together would be more valuable than the information about just one component, correct?

**A.**   So there's implication that there's information about the ICI router, for instance, or ICI connection, which there actually is very little information about that.  Yes, there is marginally more value in something where you see the bigger picture, yes.

**Q.** And that's because each of these components was designed together, so understanding how the different components interact brings additional value, correct?

**A.** But I think you're missing the fact that --

**THE COURT:** I need to ask you to listen to the --

**THE WITNESS:** Okay.

**THE COURT:** -- question and answer the question that is asked of you.

**THE WITNESS:** With a yes or no?

**THE COURT:** Would you like to repeat the question?

**MS. PRIEDEMAN:** Yes, if I can remember it.

**BY MS. PRIEDEMAN:**

**Q.** My question was there is additional value that comes from having information about how each of these components interact with each other because they were designed together --

**A.** Yes.

**Q.** -- and so information about all of these components would give additional value about those interactions, correct?

**A.** So I find the question misleading in terms of -- "interact" implies to me that there is some definition of the interfacing between them and how they operate together. That's where my anxiety comes from. There's these words like "interact," which has implications that you have some deeper understanding of this.

But I'm looking at them and seeing that there is the

BarnaCore, for instance, and a Tensor Core.  Sure, that gives you some additional value, but it's not -- there is not -- there's not information on how they interact, which actually would give you a lot more value, right?

So you're not -- the question to me -- sorry -- is I'm taking it literally.  If I knew the interaction between all these blocks, yes, but I don't have that definition of the interaction in this block diagram or in the documents.  And so I don't want to imply that that additional value is there.  So that's where my hesitancy comes from.

**Q.**    Well, Mr. Novak, your testimony on direct with Ms. Walsh is that having one of these components in isolation is not valuable because you don't have the context of Google's other proprietary components.

So my question, the follow-up question, is doesn't it follow that having information about each of the proprietary components of Google's TPU would bring additional value?

**A.**    If you knew how they interacted and how they worked together, that would be true.  In isolation, it's less true. Me knowing there is a BarnaCore and a Tensor Core has slightly more value, but not more than 1 plus 1.  It's not giving me the interaction between the two pieces that I would need to really leverage that.

**MS. PRIEDEMAN:**  All right.  Mr. Novak --

**THE COURT:**  Is now a good time for lunch break?

**MS. PRIEDEMAN:** Yes.

**THE COURT:** All right. Okay. We'll break for lunch. We'll resume at quarter after 1:00. Please bring your notes with you, and no discussions about the subject matter of the case or the people. No outside research. We'll see you a quarter after 1:00.

**THE COURTROOM DEPUTY:** All rise.

(The jury left the courtroom.)

**THE COURT:** Okay. You can step down, and I'll just remind you you're not to discuss your testimony with anybody on the defense team or anybody else during the lunch break.

**THE WITNESS:** Yes, sir.

**THE COURT:** Okay. Thank you.

**THE COURTROOM DEPUTY:** Court is in recess.

**THE COURT:** Anything to discuss before I go? No?

**MS. PRIEDEMAN:** I don't think so.

**MR. FONDO:** I don't think so, Your Honor. I couldn't tell if you wanted to use this time to further discuss the juror or if you want to do it later. That's all. But we don't have anything further to decide.

**THE COURT:** I think my plan would be to just excuse him at the end of the day.

**MR. FONDO:** That's fine with the defense.

**THE COURT:** Okay.

**MS. PRIEDEMAN:** No objection, Your Honor.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken.)

THE COURTROOM DEPUTY:  All rise.

(The jury entered the courtroom.)

THE COURTROOM DEPUTY:  Please be seated.

THE COURT:  Okay.  We can proceed.

BY MS. PRIEDEMAN:

Q.   All right, Mr. Novak.  I just have a few more questions about category 1.

So I just -- I want to be clear, your opinion as to category 1 for the Tensor Core ISA documents is that those documents do not include microarchitectural detail, correct?

A.   They are not the microarchitecture spec.  They do inform the microarchitecture on what it needs to do, so there are some interactions there, but they're all at high-level requirements.

Q.   Do you have an understanding of whether the details in the Tensor Core ISA provide enough detail that could inform your understanding of the microarchitecture?

A.   Well, you develop your microarchitecture, including those requirements.

Q.   So the information in the Tensor Core ISA would be valuable to creating a microarchitecture, correct?

A.   You would need the ISA absolutely, yes.

Q.   I just want to make sure I get an answer on that question, that it would -- the information in the Tensor Core ISA would

be valuable before creating the microarchitecture?

**A.** So that is one of the requirements to create the implementation is the definition of ISA, along with all the other interfaces. They need to be defined.

**Q.** So if a competitor, for example, had information to -- the information in the Tensor Core ISA, it could help inform their own development of a microarchitecture, correct?

**A.** So if they were creating the same architecture, yes, and they would have to have the same compiler and same infrastructure, yes.

**Q.** But even if it wasn't exactly the same, Mr. Novak, it would provide a helpful framework or benchmark, correct?

**A.** Without the compiler that's the other side of the equation, you don't have anything. So you'd have to have, at the very least, the same software and the same, you know, architecture for your processor for it to be valuable.

**Q.** So I think we're talking past each other again because I think you're talking about actual implementation, correct?

**A.** No, I'm not. I'm talking about it's a contract between the software and the hardware. You have to have both sides of the equation for it to have value. If you have only one side and don't have the software stacked to support it, it's of no value. So you have to have both sides.

**Q.** But it is your opinion, Mr. Novak, that all 105 of these documents have value, correct?

**A.** I think I answered that they have some intrinsic value, yes.

**Q.** And the Tensor Core ISA discloses important information about how the underlying hardware is structured in the Tensor Core, correct?

**A.** It does create requirements for the lower-level implementation, yes.

**Q.** And someone who is building a machine learning chip, for someone who is building a machine learning chip, it would be helpful to see how Google has structured the underlying hardware of its TPU chip, correct?

**A.** If they're willing to also create the firmware stack above it to interface in the same way to that chip, then yes.

**Q.** All right. And so I want to ask you, going back to the memory system document, which was Exhibit 362, you would agree the information in that document would provide a helpful benchmark for another company in this space, correct?

**A.** At a high level, yes.

**Q.** And just to distill that a little bit, it would be helpful because engineers are always learning from each other, correct?

**A.** Yes. It would be similar to if you're making a car, knowing how fast it could go, for instance.

**Q.** And so to take that analogy, if one car company had information about how another car company is making their engine, for example, that would be helpful information, even if

they weren't going to replicate exactly the same engine, correct?

A.   This is where I think -- the making is the problem.  I'm talking very high-level.  This is knowing that the car can go a certain speed, not how it goes that speed with a specific engine.  It's just the fact it can go that fast.  It's not telling you the how.

Q.   But the information in category 1 does have important design tradeoffs for the memory system in TPU version 4, correct?

A.   It has the bandwidth and latency requirements for specific memories that are -- can be used for a specific operation, which is a DMA operation, and it's very high-level.  So it's equivalent to saying, "How fast can that car go," but not tradeoffs.  Tradeoffs imply that there's some kind of implementation or some kind of tradeoff that, you know, you can trade one thing over another.

That's not what it's saying.  It's saying these are the speeds that it needs to go at, not how you get those speeds or why you would get those speeds.

Q.   But that level of detail, Mr. Novak, about the speed and how long it takes -- that discloses information about how the memory system is structured itself, correct?

A.   Not directly, but you would have to imply it.  You would have to kind of be creative about it.  I assume that someone

could try to back -- reverse engineer that into it if that's what you're asking, sure. Yes. But it's not clear from the document. It's not clear for me how you would do that either.

Q. But that would be helpful benchmark information, correct?

A. Bench -- yes.

Q. All right. I want to talk about category 2, and I want to talk specifically about Exhibit 377, which is the Ghostlite document that you spent --

A. The brief review. Okay.

Q. So that document includes both performance information and floor plans for Ghostlite and Viperlite, correct?

A. You mean a picture of a floor plan, which is completely different? I just want to be clear how calling that a floor plan is very misleading.

Q. So let's go to -- can we pull up Exhibit 377 and go to page 8, please.

Do you see on the left-hand side, it's cut off, but it says "AN" and then "comparison"?

A. Yeah, absolutely. I know this well.

Q. That's floor plan comparison, Mr. Novak, correct?

A. Yes, it is, but these are pictures of floor plans. Very misleading to call these floor plans. Floor plans have a lot of information in them, and to label them as floor plans without revealing that they are actually just a specific image of that floor plan, I think is very misleading in this case

because it implies you have a lot more information than what you have.

Q.    So big picture, let's talk about this document, Mr. Novak. Elsewhere in this document, it compares the performance of the Ghostlite and Viperlite chips, correct?

A.    In terms of improvement, yes.

Q.    And the Ghostlite chip was not announced by Google until May of 2024, correct?

A.    I don't know that.  From reading these documents, I don't think I got that information.

Q.    Assuming that Mr. Ding took this document before Ghostlite had even been announced --

A.    Okay.

Q.    -- the information comparing the performance of a yet-to-be announced chip and a prior version of that chip would be valuable to a competitor, correct?

A.    I'll just say yes.

Q.    A large competitor like Meta or Microsoft would absolutely love to see this document, correct?

A.    Yes.

Q.    And -- okay.  So you talked about how it includes the different performance measurements, and then we also have the -- I'll call it the picture of the floor plan for you -- the picture of the floor plan for Viperlite on the left and Ghostlite on the right.  This floor plan shows the areas of

both chips, correct?

**A.**    Yeah, but it's not for me.  These are literally pictures of a portion of a floor plan that is made for graphics purposes.  This is not a floor plan in any sense of the word besides that it's an image of some aspects of that floor plan to reveal kind of the marketing reason why they're touting their improvements here.

So I don't want to be -- you know, this is not a floor plan, right?  A floor plan has a lot more information.

**Q.**    And but -- sorry.

My question, I think, was that it has the area of both chips and compares the area of both chips, correct?

**A.**    Yes, for sure.

**Q.**    And it shows the size and placement of both components on each chip, correct?

**A.**    It does.  But I don't -- there's not that much information there because, again, there's a lot of detail here that's missing that can make differences that are significant.

**Q.**    You can see that between the Viperlite chip and the Ghostlite chip, there's changes in where the different components are changed and also the sizes of the different components, correct?

**A.**    That is true.

**Q.**    And so I think you testified on direct examination, Mr. Novak, that changing the size of components or changing the

placement of components can affect performance, correct?

**A.** Yes, absolutely, but you have to have context for it to be meaningful. Knowing there's change without the context is not very meaningful.

**Q.** Okay. So here, you have the context of the performance changes between Viperlite and Ghostlite as well as the changes in the positioning of the components and the size of the components, correct?

**A.** Well, because -- also different number of those components as well. They've gotten larger, they've optimized, the memory bandwidth has doubled, and that's -- you know, there's a lot of things going on here, and they're all interrelated. And so just taking one thing in isolation and getting a lot of information out of it is very misleading in terms of what you can do with this.

**Q.** Sure.

But Mr. Novak, you agree it would be valuable to a competitor to have the combination of both the changes that were made to the components, the size, and the placement as well as the performance metrics for a chip that hadn't even been announced yet, correct?

**A.** It is interesting always to see how competitors are improving, but there's no "how" here. It's just the fact that they've increased it and they've added more integration. That is true.

**Q.**   And by "interesting," you mean that a competitor could look at this and compare it to their own product and consider how Google has optimized different sizes of components, placements of components, and could make similar decisions or even decide not to do it based on how Google has done it, correct?

**A.**   The -- not to do it.  There would be very high-level concepts you'd get out of this, yes, if that's what you're getting at.

        **MS. PRIEDEMAN:**  All right.  I want to talk about category 3.

        You can take that down, Ms. Hernandez.

**BY MS. PRIEDEMAN:**

**Q.**   Category 3 relates to the software for Google's TPUs, correct?

**A.**   I don't have it on top of my mind, but I believe that's correct, yeah.

**Q.**   And Google's TPU software is quite complex, correct?

**A.**   Yes.  I think that's a fair assessment, yes.

**Q.**   And designing complex software like that can take quite awhile, correct?

**A.**   Yes.

**Q.**   And knowing the different tradeoffs and techniques that Google decided to use to solve different problems with its software -- that would be valuable to a competitor, correct?

**A.** Yes.

**Q.** And so you talked about one specific -- or a couple specific documents, but I'm going to focus on Exhibit 383, which is the ICI resilience slice document.

**A.** Okay.

**Q.** And so I want to understand your testimony, and I don't want to get into the specifics of the algorithm and the techniques because we're in open court, but I want to understand your testimony was that you were not able to determine the specifics of the algorithm based on the document itself; is that correct?

**A.** I couldn't tell you the specifics if I wanted to, yes. Correct.

**Q.** You just -- you weren't able to determine it from the document?

**A.** No.

**Q.** You would agree, Mr. Novak, that the -- it would be valuable for a competitor to have the information contained in the ICI resilience document, correct?

**A.** Yes.

**Q.** All right. I want to talk about category 4. So category 4 relates to the hardware, the custom servers and systems that Google has created for its GPU supercomputers, right? And when you design a custom GPU server or system, there's a lot of different tradeoffs you have to make, right?

A.    That's true.

Q.    For example, there's tradeoffs between cost, power, cooling techniques, among other things?

A.    Well, yes, but there's way more than that.  But okay. Sure.

Q.    There's a lot of tradeoffs to be made, correct?

A.    Yes.

Q.    And the documents in category 4 reflect some of those decisions and tradeoffs that Google has made for its custom GPU servers and systems, correct?

A.    At a high level, yes.

Q.    And this information would be valuable to a competitor that was trying to build an AI supercomputer because it would allow them to understand the different design decisions and tradeoffs that Google has made, right?

A.    No, because you said design decisions.  And again, those -- we're talking about high-level conceptual connections here, not design-level decisions.

        MS. PRIEDEMAN:  Ms. Hernandez, can you please pull up the transcript and go to the bottom of page 37.

    Your Honor, I'd like to read starting at that last question and then through the top of page 38.

        THE COURT:  Any objection?

        MS. WALSH:  No objection.

        THE COURT:  Okay.  Go ahead.

**BY MS. PRIEDEMAN:**

**Q.** Mr. Novak, again, you testified under oath in a proceeding this past Friday, correct?

**A.** I did, yes.

**Q.** Were you telling the truth when you testified in that proceeding?

**A.** Yes. I was trying to.

**Q.** All right. So during that proceeding, I asked, "The documents in category 4 reflect some of these design decisions and tradeoffs that Google has made, right?"

And you said, "Yes. Sure."

And then I asked, "And so, again, this information would be valuable to a competitor that was trying to build its own AI supercomputer because they could understand the different design decisions and tradeoffs that Google has made, right?"

And you answered, "Well, you know what I'm going to say, right? Because every document so far, every one, all 105 documents have value. It's just how much value they have."

You agree with that statement, right, Mr. Novak?

**A.** Well, I wasn't actually listening to -- again, these are the little nuances. The high-level, yes. I agree at the high levels of the case, but design decision and tradeoffs implies there's a lot more information, and I should have been more careful listening to you, and I'm sorry that I didn't -- I was trying to go with the flow.

But the details are important, and I wasn't listening to the details here.  I do not think there are low-level design decision tradeoffs in this document.  There are high conceptual ideas, but not those low-level ones.

Q.   So Mr. Novak, you testified under oath on Friday.  You made this statement.

A.   I did.

Q.   About the value of these design decisions.  This was Friday?

A.   Yes.  I --

Q.   It was under oath.

A.   I agree.  And my intent was to say that the high-level -- this is true at a high level.  I was not -- I didn't pick up the fact -- I'm trying to be careful to pick up on the fact that the low-level kind of decisions and tradeoffs require implementation to really be valuable.

The high level is there.  Yes, I agree with that.  The concept of being able to use a spare and routing, that concept is there, yes.

Q.   Mr. Novak, I want to talk a little bit more about what changed between Friday and -- it's Tuesday.

A.   Yes.

Q.   So what changed between Friday and Tuesday after you gave that testimony, Mr. Novak?

A.   My listening to your questions better.

**Q.** Did you have other conversations about how you should respond to my questions, Mr. Novak?

**A.** Actually, I did not, no. It's just because I'm trying to be more -- listening more and trying to be consistent with what I believe the documents are saying.

**Q.** So you said on Friday, you were going with the flow when I was asking questions. When you were answering Ms. Walsh's questions, were you just going with the flow because you were hired by Ms. Walsh?

**MS. WALSH:** Objection. Argumentative.

**THE COURT:** Overruled.

**A.** I was not. So I'm trying to be careful, more careful here. We were -- as you can see, as -- like, you know I'm going to say. We were going through and saying, "Is there any value?"

Like, there is intrinsic value here. It's the question of where that value is. There is high-level information. There's architectural information in these documents. I'm not denying that. I'm denying the fact that there's really this implication of this deeper design tradeoffs, and I'm catching on to that now, and I'm trying to make sure it's clear.

So I'm trying to clarify what I meant on Friday. I'm not trying to -- that's my belief, as these are high-level documents giving high-level conceptual ideas. These are not design tradeoffs to me.

MS. PRIEDEMAN:  All right.  Let's -- I want to talk about a specific document, Mr. Novak.

If you can bring up Exhibit 402, please, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.  And this is one of the trade secret documents.  I don't want to get into the specifics of numbers and measurements that are in this document, but can you, at a high level, tell me what's in this document, Mr. Novak?

A.  So I believe the Endurance is a PCB board, and it's talking about the mechanical and structural design of it, so the actual how rigid it would be potentially or, you know, how large it would be.

Q.  And this is -- Endurance is a custom server that Google has created for its GPU systems, correct?

A.  I thought Endurance was a PC board, but I could be wrong there.  I mean, if I could look at the document more.

MS. PRIEDEMAN:  Sure.  Let's go to page 8, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.  So this document, Mr. Novak, is talking about different tradeoffs in terms of measurements and also cooling decisions that Google made related to its GPU-based systems, correct?

A.  Yes.  So it looks to me -- let me get a little chance to look at this.

(Pages 1994 through 2001 were placed under seal by order

of the Court.)

(The following proceedings were heard in open court.)

THE COURT:  Okay.  We're good.  Thank you, Ms. Gilbert.  Thanks.

BY MS. PRIEDEMAN:

Q.   All right, Mr. Novak, I want to talk a little bit about category 5.

So category 5 is the software related to Google's GPU systems, correct?

A.   Yes.

Q.   And same question as for category 3.  This is complex software that requires design, correct?

A.   Yes, it does.

Q.   And information about how Google was willing to modify its infrastructure to meet the specific requirements of a large cloud customer would be valuable to a competitor, correct?

A.   It would have some value, yes.

Q.   All right.  And category 6, which relates to Google's custom SmartNIC, also contains valuable information for someone who is trying to build their own SmartNIC, correct?

A.   At a very high level, yes.

Q.   And category 7 focuses on the software using Google SmartNICs, correct?

A.   Say that again.

Q.   Category 7 focuses on the software using Google SmartNICs, correct?

**A.**    Yes.  Actually -- yes.

**Q.**    And again, this is the type of software that requires a lot of design decisions that have to be made even before someone starts writing the code for the software, correct?

**A.**    It would, but it's not included in the documents I looked at.

**Q.**    There's no design decisions in the software documents you looked at?

**A.**    So there's high-level structure and understanding that this feature needs to be there, but there's no low-level, you know, basically implementation there.

**Q.**    Right.  So my question was different.  I wasn't asking about implementation.  I was talking about the design decisions that had to be made before the implementation, correct?

**A.**    So to me, "design" is a little triggering because it means something maybe a little more low-level than for you.  So if you think of it as a high-level -- this is what gets me off, right?  So I'm trying to be careful.

So there are high-level -- there is high-level conceptual discussion in those documents, yes, that give you ideas of what -- how to bypass a CPU for some of these protocols.

**Q.**    And you agree that the documents in category 7 would be valuable to a competitor who is trying to design their own SmartNIC or software of their own?

**A.**    At a high level, yes.

**Q.** Mr. Novak, it's your opinion, isn't it, that the less sophisticated an engineer is, the more helpful these 105 documents would be in terms of helping them build their own system, correct?

**A.** Yes. I believe I said that, yes.

**Q.** All right. I want to talk -- I want to ask a little bit about your opinion about -- I think you testified that chips change really quickly, and so the value of these documents would change really quickly. Is that an accurate -- I think that was opinion number 4.

**A.** Yeah, that sounds right. Yes.

**Q.** You agree, Mr. Novak, that the development of these GPU and TPU systems that Google developed is an iterative process, correct?

**A.** Yes, by definition. There's multiple generations, yes.

**Q.** And each generation builds off the prior generation, correct?

**A.** Hopefully. Unless someone made large mistakes, yes.

**Q.** And Google has spent over ten years and millions of dollars building its systems?

**A.** I'd say more than that, but yeah. That's a lowball.

**Q.** Hundreds of millions of dollars?

**A.** I would have no way of knowing, but I would say more than that probably.

**Q.** And the process for creating, say, a TPU chip is a long

process, correct?

**A.** Relatively. You know, probably at least a year if you're lucky, extremely lucky. More like two years probably.

**Q.** And so for that reason, Google still uses its TPU versions 4, 5, and 6 in its data centers currently?

**A.** Well, I don't know if it's for that reason. I believe they do use them in their data centers, yes. But once you've amortized that cost, they basically don't cost anything. But I don't think they would redeploy them, for instance. I don't think that would be cost-effective.

**Q.** But given how iterative the design process is, it would be valuable for a competitor to see a prior version of Google's TPUs, correct?

**A.** I'm not sure how to quantify that actually, honestly.

**Q.** All right. Mr. Novak, Ms. Walsh asked you about a couple of documents related to Zhisuan. Do you remember that?

**A.** Yes.

**Q.** And she asked you about one document in particular.

**MS. PRIEDEMAN:** Ms. Hernandez can you pull up Exhibit 104, please. And can you go to page 34, please.

**BY MS. PRIEDEMAN:**

**Q.** So she asked you about one particular slide related to proof of concept.

**MS. PRIEDEMAN:** If you can zoom in on number 4 here, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   She didn't ask you about this portion of the slide, which stated that Zhisuan would customize the research and development of underlying chips and network structures according to the computing power requirements of large models, did she?

A.   She didn't ask me that, no.

MS. PRIEDEMAN:   And can you go to page 35 please, Ms. Hernandez.   And if you can zoom in on the right-hand side.

BY MS. PRIEDEMAN:

Q.   She also didn't ask you about the implementation steps listed in this diagram, which includes number 4, which says, "Plan the solution, including planning of hardware deployment, planning of network architecture, and planning of the whole large model service platform," correct?

A.   She did not ask me, no.

MS. PRIEDEMAN:   Can you take that down, please, Ms. Hernandez.   And can you pull up Exhibit 1158, please, and go to page 5.   Actually, sorry.   Can you go to the first page.

BY MS. PRIEDEMAN:

Q.   Mr. Novak, you haven't reviewed this document, correct?

A.   Doesn't look familiar, no.

Q.   And do you see it says, "CMS large model service platform, China's earliest and only single task, tens of thousands of cards compute platform for accelerating AI training and

inference."

Do you see that?

A.   I do see that, yes.

MS. PRIEDEMAN:  Can you go to page 5, Ms. Hernandez, please.

BY MS. PRIEDEMAN:

Q.   Do you see there it says, "Why we can do it:  We developed Google's tens of thousands of cards compute platform, replicate and upgrade it, and then build a platform adapted to domestic conditions."

Do you see that?

A.   I do see it, yes.

MS. PRIEDEMAN:  Can you take that down, Ms. Hernandez.

BY MS. PRIEDEMAN:

Q.   All right, Mr. Novak.  So I understand your opinions about the feasibility of replication.  And those are based on the 105 alleged trade secret documents that you reviewed, correct?

A.   Yes.

Q.   And I think you've said multiple times that it would be helpful to have additional context or see other documents, correct?

A.   Sorry.  Can you just --

Q.   Yeah.

A.   Yeah.  Sorry.

Q.   So you said -- your opinion, as I understand it, that

these documents are missing additional context.  They're missing information, correct?

A.    More than just the context.  Even -- there's missing links littered throughout these documents that would be needed to really understand them properly.

Q.    So just on that link point, Mr. Novak, did you look within the documents to see if some of those links were included within the document?

A.    Yeah.  I thought of that.  I tried several of them, and I didn't find them.  I'm not saying none of them go between the documents, but the ones I looked for were not.  So I'm willing to be corrected, but my -- from my research, I did not -- wasn't able.  And there's thousands.  You know, at least over a thousand of those.  So I don't know what percentage would be inside the document.  I didn't see any that were inside the document.

Q.    You mean -- did you look to see if the information that was related to that was inside the document?

A.    Oh, I did that too, yes.  I didn't see it.  Yeah.

Q.    All right.  So I want to go back to my last question.

You said that you agree that it would be helpful to have additional information related to these 105 documents, correct?

A.    I think the 105 documents go from cooling to chip design.  It's a huge spectrum, right?  It's an unusually large spectrum to even contemplate looking at, yeah.

**MS. PRIEDEMAN:**  Ms. Hernandez, can you pull up Exhibit 779, please.

**BY MS. PRIEDEMAN:**

**Q.**  Mr. Novak, this includes, I believe, over -- so the trade secret documents are over 2,000 pages, and this is an additional 12,000 pages of documents that Mr. Ding took.  Did you review the other documents other than the trade secret documents that Mr. Ding took?

**A.**  I was only asked to look at 105 documents.

**Q.**  Is it possible that some of the pieces of the puzzle that you said are missing are in this set of documents?

**A.**  I would have no idea.

**MS. PRIEDEMAN:**  No further questions, Your Honor.

**THE COURT:**  Okay.  Any redirect?

<u>**REDIRECT EXAMINATION**</u>

**BY MS. WALSH:**

**Q.**  Mr. Novak, you were asked a series of questions about Exhibit 402, about a series of tradeoffs that were found in this document.

**A.**  Yes.

**Q.**  Did that affect your opinion on the value of the information contained in Exhibit 402 with respect to implementing a system such as what's described there?

**A.**  No.

**Q.**  And you were also asked some questions about some

documents relating to Zhisuan.

A.    Yes.

Q.    In your review of the WeChats that we went through in Exhibit 369, did you see any reference to research on hardware?

A.    No.

Q.    Did you see any reference to replicating Google's AI supercomputer?

A.    No.

Q.    Did you see any reference to creating a system of 10 thousand cards?

A.    No, nothing close, even close to that.

Q.    Mr. Novak, you're not aware of any evidence that the alleged trade secrets have been sold to anyone, correct?

A.    No.

Q.    And more generally, you did not find that any specific category of documents when you considered them together added value over and above what was in the individual documents themselves, did you?

A.    No, I did not.

Q.    And Mr. Novak, you've -- besides the AMD project that you discussed on your direct today, you've worked with multiple other projects in chip design, correct?

A.    Yes.  As a contractor, over 20.

Q.    And those projects involved ISAs, correct?

A.    Yes, absolutely.

Q.   And beyond that, have you worked on other large semiconductor projects?

A.   Yes, many.

Q.   So throughout your career, the tools that you used may have changed, but generally, the same methodology pertains, correct?

A.   The standard flow hasn't changed, but underneath it, the tools have come much further, yes.

MS. WALSH:  Thank you, Mr. Novak.

THE COURT:  Any recross?

MS. PRIEDEMAN:  No.

THE COURT:  You may step down.  I think we will take a break now for about 15 minutes.  Why don't everybody plan to return at a quarter after 2:00.  Thank you.

THE COURTROOM DEPUTY:  All rise.

(The jury left the courtroom.)

THE COURT:  Okay.  Do you all need to have a powwow before you decide if you're calling the rebuttal witness?

MR. BOOME:  I think so, Your Honor, and if we do call him, it will be very brief.  We're wondering if we can get a few more minutes than the 15, if that's all right, because --

THE COURT:  Well, I just want to be clear.  Is the defense planning to rest now?

MS. WALSH:  Yes.  Yes, Your Honor.

THE COURT:  Okay.  So the defense will be resting.

You want to figure out whether you're going to call him.  If you do call him, it will be brief.

MR. BOOME:  We just have the one remaining issue on the stipulation of salary that we discussed.  I just want to confirm the Court's --

THE COURT:  People can sit down.

MR. BOOME:  Confirm the Court's ruling before we read that to the jury.

THE COURT:  Okay.

MR. BOOME:  That you were going to consider a case that Mr. Fondo provided yesterday about whether we could introduce evidence of the defendant's salary in the last two years at Google.

THE COURT:  All right.  I'll read that case during the break, because I forgot to read that.  What case was it again?

MR. FONDO:  I forget.  I think it was Unruh, Your Honor.

THE COURT:  Unruh, yeah.

MR. FONDO:  The concept being that unless it is related, salary, wealth, et cetera, unless it's related specifically to the charges, we think it's --

THE COURT:  Yeah.  Sorry.  I forgot to read that. I'll do that.

MR. FONDO:  It's a Rule 403 violation -- or sorry.  An issue under Rule 403.

**THE COURT:** Got it. So what? 20 after?

**MR. BOOME:** Thank you.

**THE COURTROOM DEPUTY:** Court is in recess.

(Recess taken.)

**THE COURTROOM DEPUTY:** Remain seated. Court is back in session.

**THE COURT:** Okay. So for starters, Mr. Fondo, you said that you have a further Rule 29 motion, or you want to renew -- I don't know exactly what it is you wanted.

**MR. FONDO:** You're right on both accounts.

**THE COURT:** Okay.

**MR. FONDO:** So we want to renew the motion as to economic espionage. I'm happy to reargue it, but we'd be making the same points as before. I don't think there's been any real evidence before.

**THE COURT:** I understand, I'll take that under advisement.

**MR. FONDO:** Thank you, Your Honor. And we also want to argue the other counts the trade secret counts 1 through 7 as well.

**THE COURT:** Okay.

**MR. FONDO:** My colleague will be arguing those.

**THE COURT:** Okay. Great. Thank you.

**MR. FEYZI:** Good afternoon, Your Honor. Under Rule 29, the defense believes the Court must enter a judgment of

acquittal on the theft of trade secret counts because the Government has failed to present any evidence that any reasonable juror could find beyond a reasonable doubt.  We will brief this in writing on any briefing schedule you'd like.  I'm happy to go through it now, but it will be quite long step through everything.  I can give you a preview of what it sounds like.

THE COURT:  I'm happy to just take it under advisement and have you brief it in connection with post trial proceedings.

MR. FEYZI:  Okay.  Sounds great.  Thank you.

THE COURT:  Okay.  Thank you.  All right.  What's the latest from the Government?

MS. PRIEDEMAN:  We will be calling Dr. Sanchez in rebuttal briefly.

THE COURT:  Okay.  Sounds good.

Bhavna, do you want to go get the jury?

THE COURTROOM DEPUTY:  Yep.

All rise.

(The jury entered the courtroom.)

THE COURTROOM DEPUTY:  Please be seated.

THE COURT:  Okay.  Any more witnesses from the defense?

MR. FONDO:  No, Your Honor.

THE COURT:  Defense rests?

MR. FONDO:  We rest, Your Honor.

THE COURT:  Okay.  Any rebuttal witnesses from the Government?

MS. PRIEDEMAN:  Yes, Your Honor.  The Government calls Daniel Sanchez.

THE COURT:  Come on up.  Have a seat.

Dr. Sanchez, I'll remind everybody that you're still under oath.  Also, I trust that since we last saw you, you've been practicing slowing down.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay.  Good.

**DANIEL SANCHEZ,**

called as a rebuttal witness by the Government, having been previously sworn, testified as follows:

**DIRECT EXAMINATION (REBUTTAL)**

**BY MS. PRIEDEMAN:**

Q.   Good afternoon, Dr. Sanchez.

A.   Good afternoon.

Q.   Were you in the courtroom while Mr. Novak was testifying?

A.   Yes.

Q.   Did you listen to his testimony?

A.   Yes.

Q.   I just have a few questions about his testimony.  Mr. Novak testified about the Tensor Core ISA documents in category 1, and he stated in his testimony, his understanding of the

Tensor Core ISA was based in part on his experience with working on a CPU in 1993. Is that an -- is the CPU for that -- sorry.

Is the ISA for that CPU from 1993 an accurate -- or is it analogous to the Tensor Core ISA?

A. No. It is an entirely different type of ISA.

Q. Can you explain a little bit more about what you mean by that?

A. Yes. This type of architecture, this type of ISA, is what is called a "very long instruction word" ISA. Its key characteristic is that it exposes the details of the hardware that is the microarchitecture to software. CPUs do not do that.

Q. So when you this, were you referring to the Tensor Core ISA in your answer?

A. Yes.

Q. So the Tensor Core ISA has the VLIW architecture you just explained?

A. Yes.

Q. And so Mr. Novak also testified that the information in the Tensor Core ISA would not be useful because it does not contain implementation details. Is that accurate?

A. That is completely wrong.

Q. Can you explain why?

A. If you know how to read this document, the Tensor Core ISA

documents, they give you a full specification of the microarchitecture of Tensor Cores.

Q. So can you explain a little bit about what that means? Because -- do you mean that the document includes microarchitecture diagrams?

A. It does not include microarchitectural diagrams.

Q. So what do you mean when you say it includes the microarchitectural specifications?

A. Because it includes all the information about what instructions can run at the same time, how fast instructions run for all of the instructions when those instructions produce values, when do those values become available for other instructions. All of that information is directly telling you how the microarchitecture is.

It is specifying, for example, the pipelines that are implemented in the Tensor Core. It is specifying instruction scheduling. It is specifying arbitration. All of those are details that, when Mr. Novak was asked whether this particular ISA document specified those details, he said no.

Q. And was that accurate when he said that this ISA does not include the pipeline details, instruction scheduling details, and other details?

A. Again, the diagrams are not there. The information to recreate these diagrams is all there. I actually went through this exercise just to see how long it would take, and so I took

one type of instructions that is described in this document. Those are called branches.

And just looking at this information, I was able to, in under one hour, derive not only the microarchitectural specification but the exact hardware, the exact logic gates, the exact registered transfer level code that implements the exact functionality just for those instructions. Of course there are more. Of course you would need more effort. But it goes to show that what Mr. Novak says -- said is simply not true.

Q. And so Dr. Sanchez, you just mentioned -- I think you said RTL code and a couple of other specifications. Are those the types of things Mr. Novak said were missing from the instruction set architecture in?

A. In general, from the Google files, they do not include register transfer level code.

Q. But you're saying that you could use the information in the Tensor Core ISA to generate that type of information relatively quickly; is that right?

A. Yes. If you know how to read this document, this just tells you how to implement the Tensor Core.

Q. And did you hear Mr. Novak testify that this information would not be useful outside of Google?

A. Yes.

Q. Is that accurate?

**A.**    That is wrong.

**Q.**    And why is that wrong?

**A.**    A Tensor Core is a processor that is useful to accelerate machine learning computations.  There are other companies that are building machine learning accelerators, some of which have similarities with Tensor Core, some of which are different. But for example, just as one example, Amazon builds accelerators that have several overlapping characteristics with Tensor Core.  Amazon, I'm sure, would find it valuable to understand how these implementations differ.

If you look at these documents, it does not state that this requires Google infrastructure.  Of course, a competitor would need to build a compiler or modify their compiler, but it does not have to be Google's compiler.

**MS. PRIEDEMAN:**  All right, Dr. Sanchez.  I want to ask you about specific documents.

Ms. Hernandez, can you pull up Exhibit 448 and go to page 10, please.

**BY MS. PRIEDEMAN:**

**Q.**    Dr. Sanchez, did you hear Mr. Novak testify about this congestion control algorithm and testify that this does not have the complete information that would be useful?

**A.**    Yes.

**Q.**    Is that accurate?

**A.**    If you narrowly look only at this document, that would be

the case.  The problem is that, you know, the reason why this statement is incorrect is because there is public information about the GRT or Falcon protocol, and these acronyms that Mr. Novak referred to as not being understandable are all publicly known if you look at the actual public information about the protocol.

So for example, Fcwnd is the fabric congestion window. Ncwnd is the NIC congestion window.  PLB, which he referred to as a hyperlink that he could not follow -- that refers to protective load balancing, which is one of the techniques that Google is using in this congestion control on which there is a whole paper.  Falcon specification has an entire description of the congestion control algorithm.

Q.   So in other words, this document would be understandable and would be valuable if you understood the publicly available Falcon protocol; is that right, Mr. Novak?

A.   If someone had the time and made the effort to understand the protocol and what Google has publicly disclosed about the protocol, all of this would be easy to understand.

MS. PRIEDEMAN:  All right.  Ms. Hernandez, just give me one minute.  Ms. Hernandez, can you go to Exhibit 383 at page 5, please.

BY MS. PRIEDEMAN:

Q.   Dr. Sanchez, this is the ICI resilience slice.  Did you listen to Mr. Novak's testimony about this document?

**A.** Yes.

**Q.** And when Mr. Novak testified that you could not understand how the algorithm works from looking at this document, is that accurate?

**A.** Not -- it's not accurate if you know how to read this information.

**Q.** And when you say "if you know how to read this information," do you know how to read this information?

**A.** Yes.

**Q.** And what is that based on?

**A.** My training and experience with interconnect and context about the kinds of algorithms that Google uses in their routing algorithm.

So specifically, Google uses dimension order routing. This is talking about wild first hop or wild last hop. The terms X-first are commonly understood in networking and interconnect design and routing algorithms. And so this is specifically saying that you take either the first hop or the last hop out of dimension order.

**MS. PRIEDEMAN:** Okay. You can take that down, Ms. Hernandez.

**BY MS. PRIEDEMAN:**

**Q.** Dr. Sanchez, how long did you spend reviewing the 105 trade secret documents?

**A.** In total, over a year.

Q.    And is it your opinion that there's enough information in these documents to entirely replicate Google's systems?

A.    No.

Q.    If you can't replicate Google's systems, how did you determine that they have value?

A.    Because they would give a competitor a meaningful head start in doing so in producing high performance implementation of a GPU, in optimizing GPU systems, in essentially either building or improving an AI supercomputer.

Now, one aspect of this is, you know, the techniques have value because they reveal useful techniques, useful implementation information.  For example, looking at the Tensor Core, they reflect many, many complicated design decisions. But it's also very important to understand that a huge factor is reducing risk.  The design space of possible accelerators is gigantic.  There are many, many places where, you know, design team could go wrong, could choose a set of techniques that reduce the performance of the final product.

And these files basically reduce risk by showing how a set of techniques work well together.

MS. PRIEDEMAN:  No further questions, Your Honor.

THE COURT:  Okay.  Any cross-examination?

**CROSS-EXAMINATION**

BY MS. WALSH:

Q.    Good afternoon, Dr. Sanchez.

**A.** Good afternoon, Ms. Walsh.

**Q.** You also heard Mr. Novak testify about his more recent experience since 1993, correct?

**A.** Correct.

**Q.** And he's had much more experience in chip design since 1993, correct?

**A.** Correct.

**Q.** You discussed on your direct with Ms. Priedeman, you discussed some of the ISA documents, correct?

**A.** Correct.

**Q.** And don't those ISA documents contain links that are only accessible to Google employees with credentials?

**A.** Some of those links -- I mean, those links, yes, they contain -- I mean, they go to an internal Google site. As I mentioned before, several of those links are within the same document.

**MS. WALSH:** Okay. Mr. Jay, can you pull up Exhibit 363, just the front page.

**BY MS. WALSH:**

**Q.** And so below the title there contains a link, correct?

**A.** Correct.

**Q.** And that link is not accessible to anybody outside of Google, correct?

**A.** Correct.

**Q.** And so earlier in the case, you had testified that as of,

I believe, last Friday, you had billed about $272,000 to this case, correct?

A.   Correct.

Q.   And how much time have you spent on this matter since that time?

A.   I think another 40 hours roughly.

Q.   Another 40 hours?

A.   Yes.

Q.   Okay.  And Google is the only company that makes TPUs, correct?

A.   TPUs by that name?  Yes.

Q.   And so amazon doesn't make TPUs, correct?

A.   But they make a machine learning accelerator called now Trainium that shares important characteristics with TPUs.

Q.   But it's not the same as the TPU, correct?

A.   Doesn't have the same name.

Q.   And so your understanding of Google's systems in these documents is also informed by your having talked to Google engineers, correct?

A.   My understanding, as I mentioned before, of how this technology is used within Google is informed with -- by conversations with Google engineers.

Q.   And so your understanding of how Google's information is used is informed by your conversations with Google engineers, correct?

**A.**    Yes.

MS. WALSH:  Thank you, Dr. Sanchez.

THE COURT:  Anything further?

MS. PRIEDEMAN:  No.

THE COURT:  Okay.  You can step down.  Thank you.

Does the Government have any other rebuttal witnesses?

MR. BOOME:  No, Your Honor.  Just one stipulation, if the Court will --

THE COURT:  Okay.  Yes, and I read the case.  I don't think it applies.

Go ahead.

MR. BOOME:  Both parties agree that for the year 2022, Mr. Ding's total compensation from Google was $329,197, including salary, bonus, and stock grants.

For the year 2023, Mr. Ding's total compensation from Google was $360,197, including salary, bonus, and stock grants.

Nothing further, Your Honor.  Thank you.

THE COURT:  Okay.  All right.  So as promised, we are wrapping up a little bit early, and that concludes the evidence presentation portion of this case.  That means that tomorrow you will hear closing arguments.  Before you hear closing arguments, I will read you the jury instructions, and you'll also each get your own copy set of the -- a written copy set of the instructions for your deliberations back in the jury room.

But we'll begin -- we'll bring you in at 9:30.  I will

read the instructions to you.  That will probably take 20 minutes or so, and then we'll hear closing arguments from the lawyers, and then the case will be yours to begin your deliberations.  So until then, remember all my admonitions, and we'll see you tomorrow at 9:30.  Thank you.

THE COURTROOM DEPUTY:  All rise.

(The jury left the courtroom.)

THE COURT:  Okay.  So can we resume at 3:00 o'clock to talk about jury instructions and verdict form, any further comments the parties have about that.

And just to be clear, I did my best to implement the changes that we talked about yesterday, and I made some additional changes.  So I'm hoping that you went through all of it again very carefully to make sure everything looks okay. All right.

MR. CHANG:  Thank you, Your Honor.

THE COURT:  See you at 3:00.

THE COURTROOM DEPUTY:  Court is in recess.

MR. FONDO:  Your Honor?

THE COURT:  On the record or off?

MR. FONDO:  On the record, yeah.

THE COURT:  Okay.

MR. FONDO:  It will be brief.  May I begin?

THE COURT:  Yeah.

MR. FONDO:  Your Honor, we wanted to -- defense

wanted, given the Government put on a rebuttal, we just wanted to renew our Rule 29 motion as to all counts.

**THE COURT:** Okay.  I'll take them under advisement.

**MR. FONDO:** Thank you.

**THE COURT:** Thank you.

(Recess taken.)

### CHARGING CONFERENCE

**THE COURTROOM DEPUTY:** Remain seated.  Come to order. Court is back in session.

**THE COURT:** Okay.  Let me ask it this way:  Any comments or objections or suggestions for any jury -- any of the first 11 jury instructions?

**MR. CHANG:** Sorry, Your Honor.  I'm having issues with my binder.

**MS. KRSULICH:** None from the defense, Your Honor.

**THE COURT:** Okay.

**MS. KRSULICH:** Your Honor, however, we do want to preserve the issue of other acts, the instruction related to other acts.  We think that is necessary, given the evidence that has come in about the other conduct that's not related -- or not the basis of the crimes that are charged in this case, and so we do think that that instruction is appropriate.

**THE COURT:** Okay.  I understand.  I don't think it's necessary based on how the evidence came in.

**MR. CHANG:** No objections from the Government to the

first 11 on Docket 345, which are the second draft of the jury instructions.

**THE COURT:** Okay. Let's start with number 12 then.

**MS. KRSULICH:** Your Honor, a suggestion here. In the last paragraph, the Court references Exhibit 777.

**THE COURT:** It's supposed to be 7775, right?

**MS. KRSULICH:** I think that's right.

**THE COURT:** Okay. I'll make that change. Anything else on this one?

**MR. CHANG:** Yes, Your Honor. So this is combined with our concerns related to the verdict form, but we don't think that last paragraph in proposed instruction number 12 is necessary.

**THE COURT:** Okay.

**MR. CHANG:** In particular -- yeah. Just that last paragraph about "If the jurors are unable to identify any document that unanimously agree is a trade secret, and if you are unable to unanimously agree that the entire set of documents in that category is a trade secret, not only must you find the defendant not guilty of the theft of trade secrets count, you must also find the defendant not guilty of the economic espionage count."

We just don't think that additional instruction is correct.

**THE COURT:** Why is it not correct? I mean, I

understand your argument that it's not necessary, but what's incorrect about that?

MR. CHANG:  Well, the jurors could potentially be deadlocked on that element.  That doesn't necessarily mean they have to find someone not guilty.  And so from that point of view, it's not 100 percent correct.

We also think it gives the misimpression to the jurors on which element is more important than another and also directs them towards a certain verdict, depending on how deliberations are proceeding.

THE COURT:  So what if -- let's imagine this instruction were not given and the jury acquitted on Count 1 and then convicted on Count 8.  Wouldn't there be a real concern that -- I mean, we don't know what the jury was thinking --

MR. CHANG:  Correct.

THE COURT:  -- right?  But wouldn't there be a real concern that the jury rendered inconsistent verdicts because it's entirely possible that the jury concluded that, you know, the jury was unable to unanimously agree on a trade secret in category 1?

MR. CHANG:  Well, we have the prior paragraph that makes it clear that you have to unanimously agree on either a specific document or a set of documents as a trade secret to find the defendant guilty of any count.  So that's just table

stakes as Your Honor has correctly instructed them on it.

I think to the extent -- let's hypothetically have that situation happen.  It just wouldn't be proper for us to query that they could have convicted or acquitted on a whole host of different reasons because there's all these different elements.  Although the elements of 1831 and 1832 have a lot of similarities, there are differences.  So I don't think that paragraph is necessary.  Or we don't think that paragraph is necessary.

THE COURT:  Well, if we are going to give the jury the standard instruction or a version of the standard instruction that there are separate counts and you have to consider each count separately, right, and one count is not to determine your verdict on the other count, I mean, that's not entirely true in this case, right?

That's only partially true in this case.  And so if we're going to be giving them the instruction that -- the standard instruction that your verdict on one count should not depend on your verdict on another count or anything along those lines, it seems like we have to have the caveat.

MR. CHANG:  Yeah.  I would also note that --

THE COURT:  I guess a different way of putting it is is the standard instruction about your verdict on one count not controlling your verdict on another count --

MR. CHANG:  Yes.

THE COURT: -- is incorrect in this case, right? That would be -- that would be -- we would be instructing them incorrectly because, in fact, if they -- if they find -- if they say not guilty because they couldn't unanimously agree on a trade secret, right, then -- I mean, we could talk about the wording of the instruction.

There may be a problem with the wording of the instruction, but if we don't tell them that a finding of no trade secret in category 1 mandates a not guilty verdict in category 8 -- what am I trying to say? I'm a little tired.

It is true a finding of no trade secret in category 1 mandates a guilty of not verdict -- guilty in category 8, right? That is true. So what's not true --

MR. CHANG: I don't think that's necessarily true, Your Honor.

THE COURT: Okay.

MR. CHANG: And look. We also -- you know, this is similar -- there's identical instructions also in the verdict form.

THE COURT: Right.

MR. CHANG: And maybe this will be the appropriate time to raise it. The Ninth Circuit has said that special verdict forms in criminal cases are generally disfavored. We recognize that this is not quite --

THE COURT: Yeah. This is not --

**MR. CHANG:** -- a special verdict form.

**THE COURT:** This is not a special verdict form.

**MR. CHANG:** But it's more in that flavor, I would say, and it just -- it gives the misimpression to the jurors that they have to find something a certain way, where we think the instructions as we discussed them yesterday generally lay that out pretty clear, and so to then repeat it after each count in the verdict form, we have some concerns about that because of the --

**THE COURT:** Well, let's --

**MR. CHANG:** -- Ninth Circuit precedent.  But maybe let's focus on the jury instruction for now.

**THE COURT:** Yeah.  Let's focus on the jury instructions first.  I mean, I assumed you were going to object to including that language in the verdict form, and we can talk about that separately.

**MR. CHANG:** Okay.

**THE COURT:** But let's figure out what is the right thing to say to the jury first.

So I guess what I would like to focus on first is whether there is anything incorrect about this instruction.  And if there is, I want to correct that and see what the correct instruction would be, and then we can go from there.  We can decide whether that correct instruction should be given or not.

So what -- is there anything wrong about what is said in

this last paragraph?

**MR. CHANG:** Yeah.  So number one, I would say if the jurors do not unanimously agree, that does not necessarily mean they have to find him not guilty.  They just may be deadlocked. I also think --

**THE COURT:** Okay.

**MR. CHANG:** -- "and" is incorrect there.  It should be an "or" in terms of the third -- fourth word in the second sentence.

**THE COURT:** Yeah.  That makes sense.

**MR. CHANG:** And maybe --

**THE COURT:** So if -- so --

**MR. CHANG:** And I would say the one idea we were thinking about was if you're going to say this, then you have to say the converse, which is that if you do unanimously agree that there is a trade secret, then you should find him -- you know, then that's not necessarily true either, right?  It's just --

**THE COURT:** Well, that's definitely not true, but what is untrue about this?

**MR. CHANG:** It's the element, and so -- look.  Maybe -- we like the language you had yesterday.  And look, the -- we're informed in part by the Ninth Circuit opinion in Read here, which is -- this is *USA v. Read*.  That's 147 F.3d 1178. And there, it's in the context of special verdicts, but

basically, the general principle is when you're asking the jury special questions or basically directing them, you know, "If X, then you must find Y," we have some concerns about that type of an instruction, and so those would be our concerns.

And let me confer with...

And later in the opinion, it says, "To ask the" -- let me just read the quote.

Quote, "To ask the jury special questions might be said to infringe on its power to deliberate free from legal fetters, on its power to arrive at a general verdict without having to support it by reasons or by a report of its deliberations, and on its power to follow or not to follow the instructions of the Court."

And so our concern would be this instruction makes -- directs the jury to deliberate in a certain way in which we feel like they should be given the correct instruction on the law, and then they can generally deliberate as they deliberate. That's their province.

THE COURT:  Okay.  I understand that point.

MR. CHANG:  Yeah.

THE COURT:  First of all, this is not a special verdict form.  It doesn't seem to me to be anything like a special verdict form.

Number two, as I said, you know, if we are to give the standard instruction about how your verdict on one count should

not dictate the outcome -- let's read -- let's look at the instruction that you proposed.

**MR. CHANG:** Okay.

**THE COURT:** Okay? Let's look at the instruction you proposed about separate counts.

Let's see. Where is that? 6.11. It's the model instruction. Okay. This is one of the most confusing table of contents I've ever seen. All right. First, it's the pleading paper, and then it looks like it's the instruction number maybe, instruction number 32. Let's see. Okay.

Okay. So what you've proposed, what the United States has proposed is "A separate crime is charged against the defendant in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count."

It seems to me that that is misleading or incorrect, inaccurate as applied to this case because if the jury concludes -- by the way, I understand your point about what about what about a hung jury, what about if the jury doesn't agree, and I think that needs to be -- if we give this language, if we include this language in the instruction, I agree that that needs to be addressed. I get your point about that.

**MR. CHANG:** Okay. Thank you, Your Honor.

**THE COURT:** Putting that aside for the moment, that

instruction that you have offered is not quite accurate or correct and potentially misleading as applied to this case, because if a jury finds, if a jury unanimously finds that the Government did not prove, if all 12 jurors believe that the Government did not prove a trade secret in category 1, it must acquit in Count 8, right?

MR. CHANG:  Yes.

THE COURT:  Okay.  So what's wrong with -- what's wrong with telling them that?

MR. CHANG:  But I think --

THE COURT:  Instead of -- I mean, it seems to me there's value instead in saying, you know, there's value in separate counts and you have to consider them separately, but it seems to me that in this case, given the peculiar nature of this case, there is value in flagging that one caveat.

MR. CHANG:  I would say it gives a misimpression, and the elements overlap with respect to the trade secret, right? So they do have to find the trade secret for both 1831 and 1832.  If we want to be more precise about that, I actually thought Your Honor's language that you had proposed yesterday --

THE COURT:  But that was so long ago.

What did I propose yesterday?

MR. CHANG:  Yesterday you had said, "A separate crime is charged against the defendant in each count, and you must

decide each count separately.  However, if you determine that an alleged trade secret category does not contain a trade secret, you must find the defendant not guilty of both the theft of trade secret count and economic espionage count corresponding to that trade secret" --

THE COURT:  I think that actually might be better because it doesn't create the problem that you identified about, you know, jurors disagreeing, right?  I think my new language sort of suggests that if they're deadlocked, they have to find the defendant not guilty.

MR. CHANG:  Yes.  That was part of our concern, Your Honor.

THE COURT:  And the language, yesterday's language, does not create that problem but, I think, addresses the issue that I'm concerned with.  So can you read it to me one more time?

MR. CHANG:  Yes.  It's your own language, Your Honor, but it's been a long couple of weeks.

It says, quote, "A separate crime is charged against the defendant in each count, and you must decide each count separately.  However, if you determine that an alleged trade secret category does not contain a trade secret, you must find the defendant not guilty of both the theft of trade secrets count and economic espionage count, corresponding to that trade secret category."

THE COURT:  Okay.

MR. CHANG:  End quote.

THE COURT:  Okay.  So -- and I think you -- you were good with that language yesterday.

MS. KRSULICH:  Yeah.

THE COURT:  I changed it, but are you still good with that language from yesterday?

MS. KRSULICH:  I am good with this language.  However, I understand the Court's changes add instructions as to what would happen if they don't agree, if the jury does not agree as to which document accounts -- is the trade secret, and I do think that that is -- some sort of instruction as to what happens if they don't agree as to which document is the trade secret should be communicated to the jury.

THE COURT:  Right, but isn't that the previous paragraph of the instructions that I filed last night?

MS. KRSULICH:  I'll read it one more time just to make sure.

And what happens, Your Honor, if the jury does not agree as to which document is a trade secret?  I think that there should be some sort of instruction on that.  I don't see it.  Maybe I missed it.

THE COURT:  What do you mean what happens?  To find the defendant guilty of any count -- any count -- you must find that the category associated with that count contained at least

one secret, one trade secret, and you must agree unanimously on which particular document in that category constitutes a trade secret.

**MS. KRSULICH:**  And I think the second paragraph that you added some guidance about what would happen if they're not able to agree.  So if you are unable to identify any document in a particular category, you must find the defendant not guilty of the theft of trade secrets.

**THE COURT:**  Right, but the problem is that they might deadlock on whether something is a trade secret, and so the way I've written it suggests that if you're deadlocked, you have to find not guilty, and that's not right.

**MS. KRSULICH:**  So could we provide some instruction to the jury as to what happens if they are deadlocked?

**THE COURT:**  If they send back a note saying that they're deadlocked --

**MS. KRSULICH:**  Then --

**THE COURT:**  -- then we can cross that bridge when we get to it.

**MS. KRSULICH:**  Okay.

**THE COURT:**  But I think you're right that I should replace this new paragraph with the old paragraph from yesterday's version of the instructions.

And then I'll just note, right, that the unanimity point reappears in instruction 15 in the first element, right, with

-- because it says "with each of you agreeing on which specific document or documents meets the definition."

So that was -- I think that that is an important point to emphasize to the jury, and that's why -- you had asked that I repeat this whole paragraph in instruction 15, and I thought that was a little much.  But I did incorporate the unanimity concept into that instruction to remind them of it.

MS. KRSULICH:  I see it, Your Honor.  Thank you.

THE COURT:  Okay.  So that -- so I will replace this final paragraph of this instruction with the one from the previous version, and it will be Exhibit 775.

Any other objections, suggestions, concerns about instruction number 12?

MR. CHANG:  None from the Government, Your Honor.

MS. KRSULICH:  It's fine, Your Honor.

THE COURT:  Okay.  Give me one second.  Let me make sure.  I was reading over them again this morning.  Let me make sure I didn't have any additional changes to the first 11.  I don't think I did.

No.  Okay.  So that's 12.

13?

MS. KRSULICH:  Your Honor, I may have a guest appearance on 13 with my colleague.

THE COURT:  Guest appearance.  Okay.  Let me identify for you a couple of the changes that I'm going to propose now.

Like I said, I went over these again this morning.

So for number 13, I circled the word "assessed."  The Government had proposed, for purposes of the third element, "Independent economic value must be assessed at the time of the alleged theft."

I want to flag that.  I'm not sure if "assessed" is the right word.  To me, "assessed" means assign a value to, and we're not asking the jury to assign a value to it.  We're just determining whether asking them to determine whether it had value.

**MR. CHANG:**  Okay.

**THE COURT:**  So I wanted us to think about whether there's a better word to use than "assessed."  So that's number one.

Number two, I proposed deleting some stuff from the "information acquired by an employee paragraph" just because it's kind of clunky and wordy and a lot of the stuff in it is not implicated by this case.

So what I was going to propose is in the first line of that paragraph where it says, "information by" -- "acquired by an employee, whether by memorization or some other means," I was just going to propose deleting "whether by memorization or some other means."

It's not really implicated in this case.  It doesn't help the jury.

MR. CHANG:  No objections.

MS. KRSULICH:  Is this part --

MR. CHANG:  Instruction 13.

MS. KRSULICH:  Yeah.

THE COURT:  Instruction 13, the paragraph down towards the bottom, which begins, "Information acquired by an employee."

MS. KRSULICH:  I see it, Your Honor.  I think we would just object to the deviation from the model, but otherwise --

THE COURT:  Okay.  But can you articulate a reason why the jury would need that phrase in this case?

MS. KRSULICH:  So Your Honor, evidence has come in saying that Mr. Ding built another product, and the jury will have questions about whether he used --

THE COURT:  Evidence came in saying that he built another product?  What evidence was that?

MS. KRSULICH:  Well, we talked about the GitHub, Your Honor, about source code that was found in the GitHub, and so the jury may be assessing whether Mr. Ding used his knowledge to develop that product, and so the memorization would -- may come into it in that respect.

THE COURT:  Wait.  There's no -- there was no trade secret information in the GitHub, right?

MS. KRSULICH:  That's right.  So what we're arguing -- what we would be arguing is that the product was built with Mr.

Ding's own skills and knowledge --

THE COURT:  What product?

MS. KRSULICH:  The GitHub.

THE COURT:  The GitHub is not being charged as a trade secret.

MS. KRSULICH:  Exactly, Your Honor.  And so the jury may have questions as to whether that was built with or without the trade secrets.  I think it's clear that it was not.

THE COURT:  I don't think anybody contends that it was.

MS. KRSULICH:  Okay.

THE COURT:  Right?

MR. CHANG:  Right, Your Honor.

THE COURT:  Okay.

MS. KRSULICH:  So we -- but there is that issue in this case about what was used from his own skills and experience to do what he was doing with Zhisuan.  And so this is a further description that would clarify for the jury that what he was doing was appropriate.

THE COURT:  Okay.  I'm going to delete that phrase, because I don't think it's necessary.

And then I was also going to propose deleting the last sentence of that paragraph, but I'm gathering you're going to make the same argument about that.

MS. KRSULICH:  Yes.

**THE COURT:** All right. I'll keep that. I'll keep the last sentence. I'm going to delete that phrase. And then we've got to talk about "assessed."

Anything else in this instruction, in number 13?

**MS. KRSULICH:** Yes, Your Honor.

**MR. RAPP-KIRSHNER:** Hi, Your Honor.

We also noticed I believe you made some changes to the paragraph concerning the combination of public and private --

**THE COURT:** Yes.

**MR. RAPP-KIRSHNER:** -- information, which was previously referred to as "compilation." We think for clarify, it would be necessary at the end of that just to remind the jury that in order to be a trade secret, each alleged combination must meet each individual element of a trade secret, and we'd still maintain that also includes that the owner took reasonable measures to maintain the secrecy of the combination as a whole.

**THE COURT:** Okay. So what are -- can you tell me what language you're proposing to add or what you're proposing to change to that paragraph?

**MR. RAPP-KIRSHNER:** Yeah. Precisely what I just mentioned. I think we're okay with the change from "compilation" to "combination" and the current wording there, but after the second sentence there that begins with "in addition," we just request a third sentence: "However, in

order to be a trade secret, each alleged combination trade secret must still meet each individual element of a trade secret, including that the owner took reasonable measures to maintain the secrecy of the combination as a whole."

THE COURT: Okay. I mean, there's nothing wrong with that, but I think it's just repetitive. I mean, we've already given the definition of a trade secret. So I don't think that's necessary.

MR. RAPP-KIRSHNER: I think because you're introducing a new concept of a combination of public and private information, it bears repeating.

And additionally, the way the second sentence is phrased, that it could presumably automatically be a new trade secret if existing trade secret documents were combined, I think that adds a little ambiguity, and it's not clear that the jury still has to make the analysis of whether or not this new combination meets all three elements.

THE COURT: So what if it -- so something like "If the value of the documents together is greater than the total of each individual document," comma, "and if the combination itself meets the definition of a trade secret as set forth above"?

MR. RAPP-KIRSHNER: I think that's fine, Your Honor. We would still prefer if there's reference to the fact that there are reasonable measures or as to the combination as a

whole.  I know we cited that case yesterday.

THE COURT:  Yeah.  I didn't find that case -- I didn't find that case relevant to this situation.  I mean, that whole discussion was about a compilation trade secret in the traditional sense, meaning a compilation of a bunch of items that are publicly available.

And of course, you don't -- a victim doesn't take means to conceal an item of public information.  So of course, when you have a compilation of pieces of public information that together constitute a trade secret, it's the means that -- the measures that the defendant -- that the victim takes to conceal that compilation.

But that's the whole -- that's part of the reason why I got rid of the word "compilation," because this isn't a compilation in the traditional sense of, like, a compilation of a bunch of public information being combined to create a trade secret.

But I do take your point that -- and so I don't -- you know, your argument -- and I'll -- your arguments are preserved about this, but your argument that Google needed to protect all of it together as a single trade secret is rejected, and you don't need to make that argument to me anymore.

MR. RAPP-KIRSHNER:  Okay.  Understood.

I would say one clarification that there's a little daylight between that argument and protecting it as a whole.

And it's actually something you identified in your order denying our motion in limine number 12.

You said, "In rejecting it, one could imagine a situation where the trade secret owner deliberately siloed documents that derived independent economic value when combined as an additional precautionary measure against theft of valuable information."

Even though --

**THE COURT:** I didn't mean to suggest that the Government had to prove that.

**MR. RAPP-KIRSHNER:** Yes, of course. But that's one mechanism in which the documents might not have literally been compiled in the same location, but the trade secret owner took reasonable measures as a whole over that whole of information to --

**THE COURT:** I totally understand your argument. I disagree with it.

**MR. RAPP-KIRSHNER:** Okay. Understood. Thank you.

**MR. CHANG:** So Your Honor, may Ms. Priedeman be heard on this for the tenth time?

**MS. PRIEDEMAN:** Sorry. Just very quickly, I want to make sure that that argument is not going to be made in closing because it's contrary to the law, and I've seen it come up a few more times, and so I just want to make clear that that is not happening.

THE COURT:  I thought we had made that clear as well, and that's not -- it's not an appropriate argument to make to the jury.

MR. CHANG:  Yeah.  Our position would be your language that you proposed is --

THE COURT:  In other words --

MR. CHANG:  -- accurate.

THE COURT:  -- "and if the combination itself meets the definition of a trade secret set forth above"?

MR. CHANG:  Is this the additional in last five minutes?  Sorry, Your Honor.  I didn't completely track that.

THE COURT:  Yeah.  This was -- I was kind of proposing kind of a compromise to what they were proposing.  So that paragraph, the final sentence of that paragraph would say, "In addition, a group of individual trade secret documents can combine to make a separate trade secret if the value of the documents together is greater than the total of each individual document and if the combination itself meets the definition of a trade secret set forth above."

MR. CHANG:  That's fine with the Government.

THE COURT:  Okay.  I'll add that.

MR. RAPP-KIRSHNER:  Thank you, Your Honor.

THE COURT:  Anything else on that instruction, number 13?

What about "assessed"?

MR. CHANG:  Definitely open to suggestions, Your Honor.  You must decide -- so for purposes of the third element, "You must decide an independent economic value at the time of the alleged theft."

MR. BOOME:  "You must decide whether the alleged trade secret had independent economic value at the time of the alleged theft."

I don't think "considered" or "determined" get the job done.  I think we have to kind of restructure.

THE COURT:  Yeah.  I just came up with something. What about "For purposes of the third element, the question is whether the information had value at the time of the alleged theft"?

MR. CHANG:  That works.

MS. KRSULICH:  Independent economic value at the time of the alleged theft?

THE COURT:  That's fine.  I knew you were going to say that.

MS. KRSULICH:  Really?  Okay.

THE COURT:  Okay.  So for purposes of the third element, the question is whether the information had independent economic value at the time of the alleged theft. All right.  Anything else on that instruction?

MR. CHANG:  Yes, Your Honor.  I do think given the way that Mr. Novak's testimony came in today that it's important

that the jurors are instructed that the Government is not required to prove that the defendant did or could replicate the technology at issue.

And so we would suggest adding that after a comma after "small" in the first sentence of that paragraph that we were just talking about.  So "For purposes of the first and third element, it does not matter whether the economic value is large or small," comma, "and the Government is not required to prove that the defendant did or could replicate the technology at issue."

THE COURT:  I guess two things.  One is I'm not really sure -- if we put that in, I'm not really sure this is the right place for it because it kind of -- it seems more like it would be appropriate in the instruction 15 potentially.

But can you tell me -- can you read it to me again, what you're proposing?

MR. CHANG:  Yeah.  "For purposes of the first and third elements, it does not matter whether the economic value is large or small," comma, "and the Government is not required to prove that the defendant did or could replicate the technology at issue."

THE COURT:  I think that probably falls into the category of -- you know, we could instruct the jury on a gazillion different things, right?  I mean, we could -- we could instruct the jury that, you know, the Government doesn't

have to prove that the defendant sold the technology.  The Government doesn't have to prove that the defendant actually made any money on the technology.

I mean, there are a gazillion things we could add to the jury instructions, and at some point you're just going to have to trust that the jury is going to follow the instructions as given, and the instructions as given make pretty clear that it doesn't matter whether he could have replicated it or not. What matters is that he took something from them that had independent economic value, and it harmed Google and all that kind of stuff.

So I would be inclined not to include that and not -- that it's sort of starting to open too large a can of worms in terms of all the different things that we're going to tell the jury in response to all the different things that were said by various witnesses in the trial.

MS. KRSULICH:  We agree with Your Honor on that position.

THE COURT:  Okay.  Anything else?

MS. KRSULICH:  I'm not sure if I'm reading this correctly, but in the third paragraph from the bottom, the one that starts with "A document" --

THE COURT:  Yeah.

MS. KRSULICH:  In the second sentence, I think maybe some words are missing.  So --

THE COURT:  "The."

MS. KRSULICH:  Yeah, the total value is --

THE COURT:  Yeah.

MS. KRSULICH:  Is that what --

THE COURT:  Well, I just added "the."  So, "If the value of the documents together is greater than the total of each individual document..."

MS. KRSULICH:  Would it be clearer to say "the total value of each individual document" rather than --

THE COURT:  I feel it kind of like -- it's circular because, like, the total value that -- the idea behind Sanchez's testimony is that the total value is greater than the sum of its individual parts.

MS. KRSULICH:  When I read it, it felt to me that a word was missing.

THE COURT:  Yeah.  Well, the word "the" was missing, but, you know, I'm happy to -- I don't like your suggestion, but I'm happy to tweak it if there's a way to make it more clear.

"If the value of the combination is greater than the sum of its parts".

MS. KRSULICH:  That would make sense, Your Honor, to me.

MR. CHANG:  We liked Your Honor's original language.

THE COURT:  What about "if the value of the

combination is greater than the sum of its parts"?

MR. CHANG: That sounds -- can you repeat the sentence, Your Honor? I just want to make sure I'm following.

THE COURT: Sure.

"In addition, a group of individual trade secret documents can combine to make a separate trade secret if the combination -- if the value of the combination is greater than the sum of its parts."

MR. CHANG: That seems fine.

THE COURT: I think that's actually a little more clear.

MS. KRSULICH: Mm-hmm.

THE COURT: Okay. Anything else on that instruction?

MS. KRSULICH: Nothing further.

MR. CHANG: Nothing from the Government.

THE COURT: All right. What about 14?

MS. KRSULICH: There's two words, "or file," in the last sentence that we don't think is necessary and could be --

THE COURT: Yeah. I crossed those out myself this morning.

And then it could say "or do not exist on a document in considering whether something is a trade secret. You may consider the fact that markings and labels exist or do not exist on a document in your considering whether" -- sorry -- "in considering whether something is a trade secret."

MS. KRSULICH:  Yes.

MR. CHANG:  That sounds fine.

THE COURT:  Okay.  Anything else on that one?

MR. CHANG:  Not from the Government.

MS. KRSULICH:  No.

THE COURT:  All right.  15?  One -- you may have comments about this, but what I intended to do in 15 and 16 is in the second element, where it says "item or items," I meant to change that to "document or documents" to match the first element, and that's true of 15 and also 16, the second element.  Where it says "item or items," I meant to say "document or documents."

MR. CHANG:  That edit makes sense.

MS. KRSULICH:  Mm-hmm.

THE COURT:  Any other?

MR. CHANG:  Yeah.  Our preference is that we don't include that language on the first element in parentheticals, but I understand Your Honor's decision on that, and --

THE COURT:  Yeah.  I think it's important.  I think the unanimity issue is important.  And it's worth reminding them of again in this instruction.

MS. KRSULICH:  On the third element, Your Honor, "intend to convert" is an essential statutory element of this crime, and so we do think that that needs to be preserved by putting in "intend to convert," "intended to convert."

If the Court does not like that word, as I understand we discussed yesterday, we would propose "to use," as we discussed, or "to take, "because otherwise, the sentence as written is confusing, and it doesn't encompass all of the essential elements of that --

THE COURT:  Intended to take.  So "intended to take the trade secret to benefit someone other than Google"?

MS. KRSULICH:  Yes.  That would be the proposal.

THE COURT:  I think that's probably fine.

MR. CHANG:  I'm fine with "take."

THE COURT:  Definitely not using "convert."

But so this would say, just to make sure we're all on the same page, "Third, the defendant intended to take the trade secret information to benefit someone other than Google"?

MS. KRSULICH:  Yes.

THE COURT:  Okay.

MS. KRSULICH:  I don't think I've ever been fact-checked in realtime by Black's Law Dictionary.  So that's a first.

THE COURT:  All right.  Anything else on that one?

MR. CHANG:  No, Your Honor.

MS. KRSULICH:  Nothing further.

I'm sorry.

Okay.  Nothing further on number 15.

THE COURT:  Okay.  Number 16, other than the "document

or documents" change I made?

   **MS. KRSULICH:**  Yes, so -- oh.  I don't know if --

   **MR. CHANG:**  You can go ahead, Ms. Krsulich.

   **MS. KRSULICH:**  There's an issue that we need to preserve related to the economic espionage count.  And I understand Your Honor has decided this in its decision on the motion to dismiss that was filed earlier in the case.  I think the decision was Docket 80 or 84, but we raised this issue that the Court -- that there is precedent in the Ninth Circuit under the *United States vs. Liu* as to the elements of economic espionage that are different than what the Second Circuit put forward in the *United States vs. Zheng*, Z-H-E-N-G.

  Liu controls, is our position, and so we would ask for that language to be included in the economic espionage instruction.

   **THE COURT:**  Okay.  Which language are you referring to?

   **MS. KRSULICH:**  Your Honor, just a moment.

  So in Liu, it indicates that Section 1831 is designed to apply only when there is evidence of foreign government-sponsored or coordinated intelligence activity.  So we would ask that that element be added to instruction 16.

   **THE COURT:**  Okay.  I mean, I -- you're saying that Liu -- that there's a Ninth Circuit called U.S. vs. Liu that says that you can't get a conviction under the statute unless you

have evidence of foreign intelligence activity?

**MS. KRSULICH:**  Yes, Your Honor, and your court -- you considered this when deciding the motion to dismiss and compared Liu to Zheng, which is the second circuit case, and Your Honor came down on in deciding that Zheng was the proper precedent, or --

**THE COURT:**  I declined to apply a Ninth Circuit case and applied a Second Circuit case?

**MS. KRSULICH:**  I hate to be definitive on this because I haven't reread it, like, in the last five minutes, but that's my understanding of the order, Your Honor.  And so we need to preserve that issue for appeal.

**THE COURT:**  Okay.  I'll go back and read Liu this afternoon.

**MR. CHANG:**  I'm not sure that's accurate.  I have the Liu jury instructions and the opinion here.  Which --

**MS. KRSULICH:**  So what I'm quoting from is the opinion.

**MR. CHANG:**  And I have Judge Chhabria's -- the Court's order as well.  So I'm just trying to make sure the record is clear on this.

**MS. KRSULICH:**  So the cite I have is 2013 Westlaw 2605126, which is a Northern District case.

**MR. CHANG:**  So not the Ninth Circuit?

**MS. KRSULICH:**  Which is not the one I'm thinking of,

no.  So it must be the Northern District case.

THE COURT:  That makes sense that I would have -- I might have rejected a Northern District case and agreed with a Second Circuit case.  You had me very concerned.

MS. KRSULICH:  I apologize for the misrepresentation, Your Honor.

THE COURT:  But I don't see how -- I don't see how it could require evidence of foreign espionage.  I just don't see how that could be right.  That's probably why I ruled the way I did back --

MS. KRSULICH:  And I see another -- sorry.  There's another Liu case.  I'll just put it on the record, and --

THE COURT:  Well, I mean, you've got to know what you're putting on the record.  Otherwise, we're wasting our time, right?

MS. KRSULICH:  Yeah.

So the Liu case from the Ninth Circuit says, "Section 1831 is designed to apply only when there is evidence of foreign government-sponsored or coordinated intelligence activity."

THE COURT:  Okay.  And that was the district court decision you're talking about?

MS. KRSULICH:  That's the Ninth Circuit decision.  And it's 856 F.3d 585 at 597.  And it's a 2017 decision.

THE COURT:  All right.  I'll go back and read it.  I'm sure I read it back at the motion to dismiss stage, but I'll go

back and read it again just to make sure.

MS. KRSULICH:  Okay.  Thank you.

THE COURT:  Anything else on instruction 16?

MS. KRSULICH:  Nothing further from Defense.

MR. CHANG:  I will just note on that quote the next part of that phrase is "and may involve any manner of benefit" from the Ninth Circuit, to make sure the record is clear on that.

THE COURT:  I'll read the case.

MR. CHANG:  Yeah.  All right.

Our -- we would ask the Court -- and this was an oversight on my part -- to insert "foreign government or foreign government instrumentality" because there is -- you know, evidence has come in that specific -- it's been a long case -- specifically the talent plan that the defendant applied to was controlled by the state, created by the state.

And so wanted to just make sure that the jury instruction matched the statute as well.

THE COURT:  Well, but isn't the talent plan an instrumentality?  I assume that's why you said the other day that you were just arguing that it was an instrumentality.

MR. CHANG:  Yeah.  I would say it's an instrumentality, and it's the Government just given the way that the testimony has come in.  It's -- obviously with the way Dr. Segal testified in explaining how certain governmental

entities are structured, we think it's important to have both the Government and the instrumentality piece for closing arguments.

THE COURT:  So you're just talking about put it back in the fourth element where I removed it from?

MR. CHANG:  Yes.  That's it.

THE COURT:  Okay.  Any objection?

MS. KRSULICH:  Yes.  We would object to adding foreign government.  We don't recall any testimony from Dr. Segal testifying as to the talent program being a government entity.  And it's also confusing, given "foreign instrumentality" and the definition there, and it's confusing that -- this idea that one organization could be both.

THE COURT:  I certainly agree that this concept of foreign instrumentality is confusing.

Okay.  Well, to me, this is more a question of is there any -- is there enough evidence from which a reasonable juror could conclude any of it beyond a reasonable doubt.  It's not so much a question of difference between government and government instrumentality.  And that's what the instruction -- that's what the model says.

So I will -- in other words, it's not a -- this is less a question of how to instruct the jury and more a question of the sufficiency of the evidence, and so I will put the Government back in as is reflected in the model instruction.  Okay?

MR. CHANG:  Other than that, we don't have any edits.

THE COURT:  All right.  Okay.  And then anything else on the rest of the instructions?

MR. CHANG:  No, Your Honor, not from the Government.

MS. KRSULICH:  Nothing further from us either.

THE COURT:  Okay.  And then the verdict form.  I mean, we've already established the language change, right?  And so but I gather that the Government has a further objection to including this reminder even with the different language, even with the language change.

MR. CHANG:  Yeah.

THE COURT:  Do you object to including this reminder?

MR. CHANG:  Yes, Your Honor.  I won't repeat the arguments that we made, but we think especially with the fact that --

THE COURT:  Well, but I want to make sure I understand it.

MR. CHANG:  Yeah.

THE COURT:  Because I don't think I fully understood it when you made it before.

MR. CHANG:  Okay.  So again, I -- the Ninth Circuit precedent and the Read case, which I cited, that special verdict forms are disfavored -- we completely agree with Your Honor that this is not a special verdict form.  However, it has elements that are akin to a special verdict form, specifically

directing the jury, "If you find X, you must find Y" in terms of not guilty on counts, you know, 1 and 7, 2 and 8, et cetera. And for those reasons, we don't think it's appropriate.

Separately, for the reasons we previously slated, this language, again, with a deadlock does not necessarily mean you have to find someone not guilty --

**THE COURT:** Right. I mean, it would be -- if anything goes in here, it will be the language we just agreed on --

**MR. CHANG:** Yes.

**THE COURT:** -- for the jury instruction.

**MR. CHANG:** And so we just think it's -- we have the instruction that we all agreed on, I think, instruction number 13 now with the new language. We have the parentheses that Your Honor has added for both the theft of trade secret and the economic espionage count. We don't think it is then necessary to repeat that seven times in the special -- in the verdict form, not the special verdict form, but in the verdict form for the jury, and we think a simple guilty/not guilty would be appropriate here.

**THE COURT:** Okay. But so I guess let me ask you this question: Is there -- we've kind of decided that it's going to go in the instructions. Is there some additional error by putting the same language in the verdict form, or is it, like, the same objection that you would have to including that language in the instructions?

**MR. CHANG:**  I think the addition --

**THE COURT:**  I just want to make sure I understand if there's some additional error to including it in the verdict form, that's what I want to make sure I understand, or potentially some additional error.

**MR. CHANG:**  Yes, and our position would be yes, because it gives the jurors the misimpression that that's the more important element or an element they should focus on. Obviously it's going to be a part of their deliberations.  It's an important element.  But it focuses solely on the trade secret element for both the theft of trade secret and the economic espionage charges, and we don't think that's appropriate in the verdict form.

And that's the reason why the Ninth Circuit -- again, this is not a special verdict form, but once you start going down that road with including specific instructions on a verdict form, it's, in our opinion, a perilous path and leads to unnecessary interference with their deliberations.

They'll have a copy of the instructions with them.  That's in your first instruction, Your Honor.  And so they'll have the law with them to the extent they need to refer to it, and of course, if they have questions, they can ask Your Honor and the parties as well.

**MS. KRSULICH:**  The nice thing about the language, Your Honor, is that it links the counts that go together.  So it's

not just about reiterating the unanimity, but it also is linking Count 1 to Count 8, for example, so that the jury knows that those counts do need to be consistent.

And this is confusing, right?  And so I think it's helpful to have this instruction to remind the jury that the counts are linked in that way and that if they find no trade secret as to Count 1, they do need to find the same not guilty as to Count 8.

**THE COURT:**  So you worry about -- let me go back to the jury instruction here.

Going back to instruction 12, you know, I know that we're not using this language anymore in the latest version of instruction 12.  We're going back to the old language, but you'll notice that I wrote, you know -- in the latest version, I wrote, "Beyond this, however, you must consider each count separately.  Your verdict on one count does not control your verdict on any other count."

That language is not included in the verdict form.  The reason I included that language is I was worried that, you know, without it, maybe the jury would develop a misimpression that the converse is true, that if you -- you know, if I say, "Hey, you know, if you find no trade secret in category 1, then you've got to acquit on category 8," I would be worried about them making a mistake and drawing an implication that if they convict on category 1, they would also have to convict on

category 8 -- on Count 8.

**MS. KRSULICH:**  Yes, Your Honor.

**THE COURT:**  And obviously that couldn't be further from the truth.

So does that worry you in terms of putting that kind of language in the verdict form?

**MS. KRSULICH:**  It worries me, and it's why we -- and I think in the verdict form that we proposed we tried to break out the determination of the trade secret apart from the separate counts so that the jury would have that common understanding as to both counts and then go into each one so it understood that that was not the only element for each count.

**THE COURT:**  What was your -- what did you -- here. Let me look at yours again.

If I remember correctly, you weren't proposing a special verdict form.

**MS. KRSULICH:**  No.

**THE COURT:**  You didn't propose a special verdict form, did you?

**MS. KRSULICH:**  No.

**THE COURT:**  Okay.  Let me see.

So you're asking guilty or not guilty, and then you say, "If you make a finding of not guilty as to Count 1 because the Government has not proven beyond a reasonable doubt that any of the information in category 1 are trade secrets, you must also

make a finding of not guilty as to Count 8."

Okay. So in other words, what you're saying is -- wanting to tell the jury is "If the reason you found not guilty on Count 1 is because the Government didn't prove beyond a reasonable doubt that any of the information is a trade secret, then you must also make a finding of not guilty on Count 8"?

**MS. KRSULICH:** Yes. That's what we wanted to make clear, Your Honor, just to avoid the issue that you raised.

**MR. CHANG:** Your Honor, I will say part of our concern is this discussion in and of itself illustrates how complicated and convoluted it is. And we have that same concern that you have, that if they find him guilty, they must find him guilty on why. That's also not the impression that they should be given.

And so that's why our position was that it should be just guilty/not guilty. We have instructions that all the parties and the Court have agreed on, and the jury will do what they will do.

**MS. KRSULICH:** That's -- I mean, we can do better to guide the jury, given the complexity of the counts. It's not just they're going to do what they're going to do.

**THE COURT:** So if we said something -- let's just come up with the ideal language to use and then decide whether to use it.

So I think what I would say is slightly different from the

way you said it, is "If you made a finding of not guilty and if the reason you found not guilty was because the Government did not prove beyond a reasonable doubt that any information in category 1 was a trade secret, you must make a finding of not guilty as to Count 8."

All right.  So let's go back to the economic espionage instruction.  So the economic espionage instruction says, "For the defendant to be found guilty of any count of economic espionage, the Government must prove each of the following elements beyond a reasonable doubt:  First, the category of information at issue in the particular count contained one or more trade secrets with each of you agreeing on which specific document or documents meets the definition."

So when the jury is going through the verdict form and they're at Count 8 and they've got an economic espionage instruction open and they're at Count 8, they're, like, "Okay. Count 8 relates to category 1," right?

It says that on the verdict form, and "We found that the Government didn't prove that category 1 contained a trade secret, and so the first element of economic espionage as to Count 8 is not met, and so we find not guilty."  I think that's clear enough.

I think that between the specific instruction that we give that, in fact, if you find no trade secret, then, you know, you need to find not guilty both of Count 1 and Count 8, the

corresponding espionage count, and between instruction number 15 and instruction number 16, both of which call out the need to find a trade secret in the category and to be unanimous about which trade secret it is, on reflection, I don't think it's necessary to include this in the verdict form.

MR. CHANG:  We agree, Your Honor.

THE COURT:  And the parties are going to be able to, you know, call that out, you know, and I'm guessing the Government probably will also, but the defense will be able to call that out in closing obviously.

MS. KRSULICH:  Your Honor, I didn't follow where the linking is happening in the verdict form.  I'm sorry.

THE COURT:  Yes.  So -- no.  That's okay.

MS. KRSULICH:  Okay.

THE COURT:  So if you go to instruction number -- what was it?  15?  Is that the economic espionage?

MR. CHANG:  16, Your Honor.

THE COURT:  16.  All right.  So I've got the elements of economic espionage up, and I've got -- Count 8 makes clear that it corresponds to category 1.

MS. KRSULICH:  Oh.  You're -- so --

THE COURT:  I've received the instruction that if I've -- you know, earlier that if I find no trade secret in category 1, that means not guilty as to the trade secret count and to the economic espionage count.

And then here I am with the economic espionage count, and the first element is you have to find that the category of information at issue in the particular count contains one or more trade secrets with each of you agreeing on which specific document or document meets the definition.

And I think that's enough.  I don't think that it's -- and than combine that with the lawyers being able to call that out during closing argument, I don't think it's necessary to give this reminder in the verdict form, and then I think, again, it opens a can of worms because it's like, "okay.  Well, do we need to remind them about that they have to be unanimous, you know, as well?"

Because in the one that you wrote, we didn't remind them that they had to be unanimous about the particular trade secret that they found in category 1.  So are we also going to remind them about the unanimity portion because we're afraid they're going to forget about that?  Are we going to remind them of something else because we're afraid that they're going to forget about that?

I think that it's hammered home well in the substantive instructions, and I think that it is unnecessary and probably takes us down not a great path to include it in the verdict form.

MS. KRSULICH:  Would Your Honor consider -- so as I understand the -- what you're proposing is to have -- the jury

will have 16 in front of it, the jury will have instruction 12 in front of it, and they will be able to use those to guide them through the verdict form without any specific statements on the verdict form?  And I apologize if I'm not following.

**THE COURT:**  Yes.

**MS. KRSULICH:**  Okay.  Would Your Honor consider a line in the verdict form that links the counts together, so Count 1 linking to Count 8?  I understand that they have it in instruction 12, but having it on one page in the verdict form may help them use the verdict form in guiding them through their decision, because it's just multiple pages, and just having it on one may be helpful.

**THE COURT:**  So we could have a discussion about that. I guess what I would want to think about -- I guess what you want to think about, right, is do you want to create that kind of proximity between the trade secret concept and the economic espionage concept?

Maybe you do.  Or, you know, are you going to -- is the main goal of closing argument to hammer home the differences between theft of trade secret and economic espionage, in which case maybe you don't want that kind of proximity between Count 1 and Count 8.

So I'm open to connecting the counts in the way that you're discussing, but I think we should, you know, all be thinking about that.

MS. KRSULICH:  Yeah.

MR. CHANG:  Our preference would be -- you articulated what I was thinking.  So whatever you said, Your Honor, I do think that's --

MS. KRSULICH:  Your Honor, and that makes sense to the defense.  We're fine with keeping them separate.

THE COURT:  Okay.  All right.

MR. CHANG:  Sounds like we have agreement.

THE COURT:  Okay.

MS. KRSULICH:  There is one other comment from the defense on the verdict form, however.

THE COURT:  Yes.

MS. KRSULICH:  We do think it's necessary to add some sort of indication as to which document or category the jury has unanimously agreed is a trade secret as to each count, and the reason for that, Your Honor, is that there are different arguments as to each of the trade secrets.

Some of them are protected in one way.  Some of them are protected in another.  Some of them are broadly accessible, and this is an issue for appeal, whether there's sufficiency of evidence as to each trade secret.  And so we do think that we need some sort of indication as to what the jury has unanimously agreed to.

So we would just propose a line in the verdict form that says, "List any document or category that you find is a trade

secret."

THE COURT:  So I understand why you're asking that. Can I just ask you why you're not asking for that until now? You proposed a general verdict form, right?  You made -- you know, at the close of the Government's case, you made a Rule 29 motion about the economic espionage counts, but not this -- but not these.

You didn't -- at the close of the Government's case, you didn't say, "Well, the Government hasn't proven its case, proven that, you know, there may be enough evidence for these documents to be considered trade secrets, but there's not enough evidence for those documents, so you should take those documents away from the jury --

MS. KRSULICH:  And my understanding, Your Honor, is that we're preserving this issue in a written brief that we're filing with the Court for Rule 29.  That is my understanding of our position.

THE COURT:  All right.  But for example, one of the things you could have done, right, is ask me to take away certain documents from the jury, right?  You could have said, you know, "The Government didn't present enough evidence to -- from which a juror could conclude that Exhibit 335 and 402" or whatever -- I'm making up the numbers -- "were trade secrets, and so you should take those away from the jury."

And you proposed a general verdict form.  So now all of a

sudden, you're proposing a special verdict form.  Why didn't this come up earlier?

MR. FONDO:  Your Honor, it was in preparing and looking through these and going through the issues of the last two days that it just flagged for us that issue, and that's why we raised it.  We weren't trying to sandbag anybody or anything like that.

Just as we were thinking about it, and particularly some of the changes last night, it occurred to us -- we were actually walking back late last night.  It occurred to us that there's that concern, that -- and so -- and just to go to the Rule 29 motion, our intention on the Rule 29 motion was not to exclude that argument, that they haven't -- we -- I thought we had said that we didn't concede as to any of the 105 trade secrets.  That was certainly our intention.

But we just understood that Your Honor was inclined to reserve it for briefing.  So --

THE COURT:  So do you have a proposed special verdict form?

MR. FONDO:  We don't have one.  We would have to draft it, Your Honor.

MR. CHANG:  Your Honor, for the reasons we stated earlier, this is a special verdict form that they're asking for now.  This is --

THE COURT:  Yeah, but a special verdict form is not

prohibited in a criminal case, right?  It's disfavored in certain circumstances, but there are other circumstances where, you know, in a criminal case, it would make sense to have a special verdict form.

And, you know, I sort of query whether the defense has waived this request by not having made it earlier.  But putting that aside for a moment, I mean, as I -- if I understand the argument correctly, right, the Government presented -- and I don't know if they would say this out loud, but I think what they -- the implication of their argument is that the Government presented a lot of evidence that some of these documents are trade secrets, right?

There were some documents that were pretty heavily emphasized at trial.  There was a pretty significant amount of testimony provided as to particular documents.  And the evidence, frankly, was pretty overwhelming that they are trade secrets.  There are other documents where, you know, less testimony was provided, and, you know, there -- or only very general, high-level testimony was provided about the documents.

And so the question would be, you know, if you were to -- you know, if you were read the trial transcript and read the -- you know, as it relates to the documents that didn't have any specific testimony about them, you know, could you look at the general testimony that was provided and look at the document and conclude from looking at the document and the general

testimony that that document also was a trade secret?

Maybe.  Maybe not.  I don't know.  I haven't gone through all 105 documents and gone through the trial transcript to, you know, compare the -- you know, to put each document up against the testimony.  Maybe the Government has presented sufficient evidence of all the 105, but maybe there's some that it hasn't presented sufficient evidence of.

And so in a -- let's take a hypothetical, right?  Let's say -- let's assume for the sake of argument that there is some subset of documents for which the Government did not prove that it's a trade secret, or the Government did not present sufficient evidence from which a jury could conclude that it was a trade secret.

Then we have a situation where we've given the jury a bunch of documents, and we're telling them to find one document and to agree unanimously on one document, but some of the documents, you know, wouldn't -- don't count because there's not enough evidence to support a conclusion they're a trade secret.

It's kind of like overt acts, right, when you -- if you have -- you know, if the Government is alleging 20 overt acts, and then at trial it didn't -- you know, it didn't present enough evidence of ten of the overt acts, then the judge is -- one of two things might happen, right?

One is that the judge might instruct the jury that you can

only consider these ten overt acts, or the judge might give the jury a special verdict form and ask them to identify the overt acts.

And I think what they are asking for is a special verdict form that asks the jury to identify the basis of the conviction. And in a circumstance where -- and, I mean, I'm assuming a lot in my question, but in a circumstance where you have some documents that they could convict on and some documents that they couldn't convict on, that seems like the time when it could potentially be appropriate for a special verdict form.

MS. PRIEDEMAN: Your Honor, I think you're aware of the Ninth Circuit precedent that special verdict forms are disfavored, understanding that the Court has discretion. I'm not going to go into all of that. I think if we were to do a special verdict form, the way to do it would be to list all documents per category as well as the combination trade secret document.

THE COURT: And ask them to check which ones the Government proved are trade secrets?

MS. PRIEDEMAN: That would be the appropriate way to do it. I think it's just -- I'm a little confused as to why it's coming up now, but --

THE COURT: Yeah. So am I.

MS. PRIEDEMAN: But that -- yeah.

So I don't think it's necessary.  There is precedent showing that where there's a unanimity instruction, special verdict form is not required.  There's I think Northern District of Illinois case, O'Rourke, that was pretty similar where there was categorical trade secrets, and the judge considered that issue.

THE COURT:  But were there -- was it a situation where the judge was concerned that the Government may not have proven that -- may not have submitted enough evidence as to some of the trade secrets that were being presented to the jury?

MS. PRIEDEMAN:  No, Your Honor, but -- I mean, I'd have to think a little bit more about that question, but here -- I mean, here, that way that that this case was charged is that it was charged at a categorical level, right?  So category 1 through 7.

So I just -- I honestly just -- I don't know how that would work with a sufficiency of evidence when it's for the whole -- it's category-wide, right?  So I just -- yeah.

THE COURT:  Right, but then if the jury were to convict on category 4, let's say, right, or category 6, if they didn't check any individual document but they checked category 6, a combination, then the defense can file a posttrial motion saying that the Government didn't put in enough evidence that category 6 as a combination was a trade secret.

And without that, we don't know what -- you know, without

that, we don't know.  Like, maybe, you know, there could be -- you could have an opportunity to -- you could say all or none or some, and if some, check the box for which documents.

MS. PRIEDEMAN:  Yeah.  I mean, I think the cleanest --

THE COURT:  I'm sort of thinking out loud.

MS. PRIEDEMAN:  Yeah.  I think the cleanest way to do it would just be to list all the documents per category and then -- say these are the documents per category that are alleged as a trade secret, and then the combination --

THE COURT:  We've said you need only find one in each category.

MS. PRIEDEMAN:  It's very clear, and then make a check, if that is what the Court is going to do.  Again, I think a unanimity instruction is sufficient, and I think on appeal, the question would just be if there's sufficiency of evidence for the category as a whole, not as to the individual.

THE COURT:  Well, the category as a whole -- you mean in the scenario where they checked the category?

MS. PRIEDEMAN:  No.  I'm just saying if the Court did not do a special verdict form on Rule 29 and on appeal, the question would be sufficiency of evidence per category, which is the way it was charged.

I don't -- again, I've not done research on this, given that there's the different trade secrets, but I think --

THE COURT:  Yeah, but the question is is there -- you

know, is there a significant risk of the jury convicting on a document that should -- you know, again, that's why I brought up the overt act analogy, right, because I think there's a case -- I think it's called Johnson, and I think it's from last year, and I think it's about overt acts. I think it's from the Ninth Circuit.

**MS. PRIEDEMAN:** Your Honor, I do think that O'Rourke opinion is instructive on this. The defendant there seems to have brought up a similar issue, and the Court basically said the jury saw the reports, listened to all the testimony, and was entitled to conclude that the reports highlighted by the Government were, in fact, representative of the other lab reports as a whole. So I think that would be the same issue. I think there is sufficient --

**THE COURT:** Can you say that one more time.

**MS. PRIEDEMAN:** Yeah. So same thing. It was a categorical trade secrets, and I think the defendant was raising similar issues about a special verdict form. And the Court basically said the jury was not required to sit through every single lab report and require one by one that each document was a trade secret.

To determine that a given category constituted a trade secret, the jury saw the reports, listened to the testimony, and was entitled to conclude that the reports highlighted by the Government were, in fact, representative of the lab reports

as a whole, and so the Court did not err in giving the unanimity instruction.

THE COURT:  Is the jury entitled to conclude that the documents highlighted by the Government here in a particular category were representative of the whole?

MS. PRIEDEMAN:  I think so, Your Honor, and there was testimony by Dr. Sanchez that every document had value.  Every document was secret in the combination of value and secret, and then he gave example documents and also gave kind of categorical testimony.

And so I think there is sufficient evidence as to each document and to each category.

MR. CHANG:  That was also buttressed by Google witnesses who testified along those lines with respect to the individual trade secret categories.  And the O'Rourke opinion is 417 F. Supp 3d 996.  It's a 2019 Northern District of Illinois case.

THE COURT:  417 F sup?

MR. CHANG:  3d 996.  It's a 2019 case from the Northern District of Illinois.

THE COURT:  Okay.  Anything else you want to say about this?

MR. FONDO:  Yes, please.

So one, we do think they did not submit sufficient evidence as to all 105 documents.  Not all the documents were

opened up.  They were not discussed.  There was not specific information shown in there, and we don't think a blanket statement that "Yeah, these were all similar and therefore trade secrets" is sufficient to meet their burden.

So to the extent that we did not articulate that we wanted to make that argument, Your Honor, that -- we -- that is our argument, and we've had this position from the beginning that they've overcharged the number of trade secrets.  How are you going to prove 105, et cetera.  And the Court warned the Government about that.

The other thing is there's also other elements that don't apply to Dr. Sanchez.  So for example, reasonable measures. Did they take reasonable measures to protect each one of these 105 trade secrets?  And so therefore, I think you have -- this issue for the particular motion is that you could knock out a bunch of these, and then the question is what goes back to the jury.

**THE COURT:**  Why didn't you ask me to knock out a bunch of these?

**MR. FONDO:**  So we thought we did, Your Honor.  We just -- we --

**THE COURT:**  When?

**MR. FONDO:**  So no.  I'm sorry.  When we made the Rule 29 motion, we asked to knock out all of them.  And so we did not -- so, again, I apologize, Your Honor.

We just -- you had indicated that you wanted -- you were reserving things, so we didn't want to waste the Court's time. But we do think there's concerns about whether all of them should go back, and so that's our position. And I apologize we didn't articulate it clear enough, but we do think there's concerns about it.

THE COURT: All right. Well, what I'm going to propose that you all do is submit proposed special verdict forms, right? And the idea would be that they're sort of an initial question about each of the seven categories of trade secrets, and you would be asking them to check boxes, and then we would go to the -- well, and then would the special verdict form also say -- I don't know.

We want to keep it as simple as possible. You could imagine some crazy decision tree sort of growing out of this, and we certainly don't want that. So what were you envisioning? Like, checking a bunch of boxes and then --

MS. PRIEDEMAN: I think it would just be -- it would have a list of the documents in each category, and then for each category, it would also say "combination of all the documents in this category."

And then they could check -- I mean, I think we'd have to make it clear that they don't have to go through -- like, we just have to find one, right? But then they could check which trade secret they found per category, either the combination or

the document.  I think that's the most straightforward way to do it.

THE COURT:  So list each exhibit?

MS. PRIEDEMAN:  Yeah.

THE COURT:  And then combination at the end of the list?

MS. PRIEDEMAN:  Yep.

THE COURT:  And then?

MS. PRIEDEMAN:  And then category 1, category 2. Yeah.

THE COURT:  And then would there be something in the special verdict form which said, "If you pick none, then not guilty on Count 1 and Count 8"?

MS. PRIEDEMAN:  No.  I think that's very clear from the jury instructions, and I think special verdict form is already getting into that, and I just -- I don't think that's necessary.

THE COURT:  Okay.  What happens then if the jury doesn't check a box for a category but then convicts on -- let's say check no box in category 1, and then they convict on Count 1 or Count 8?  Then what happens?

MS. PRIEDEMAN:  We could go back to them and say, "You didn't check the box."

THE COURT:  We can?

MS. PRIEDEMAN:  I don't know.  I think so.

THE COURT:  Well, think about that.

MR. CHANG:  I will say, just so -- I'm sure Your Honor is clear, but our position is still no special verdict form.

THE COURT:  I understand that.

MR. CHANG:  Okay.

THE COURT:  I understand that.  But as part of deciding on the defense's request, I'd like both sides to submit a proposed special verdict form.

MS. PRIEDEMAN:  I mean, if we're going to do a special verdict form, then we have to include the list of all the trade secrets.  Just being fill in the blank --

THE COURT:  Right.

MS. PRIEDEMAN:  -- "go find the exhibit" -- like, that doesn't make any sense.

THE COURT:  Right.  I think that's right, although -- you know, fill in the -- I think I agree with you, although fill in the blank, I mean, you're going to be emphasizing particular documents at closing, just like you've emphasized particular documents throughout the trial.

And so you can just tell them during closing, you know, "Here are five examples that you've heard a lot about" or whatever.  But I think if you're -- I think it makes more sense to list them all rather than having them go and try and sift through the documents to figure out which exhibit it is or whatever.

**MS. PRIEDEMAN:** There's also the -- if it's fill in the blank, they could put some random document that's not on the list, and then --

**THE COURT:** Yeah. They could put a Zhisuan document.

**MS. PRIEDEMAN:** Yes. So I think that introduces a whole other can of worms.

**THE COURT:** Right.

**MS. PRIEDEMAN:** If we do, like, a mad lib verdict form.

**THE COURT:** Yeah. Yeah.

Okay. Any other thoughts about this?

**MS. KRSULICH:** Briefly, Your Honor, on O'Rourke to the extent it's helpful to the Court as the Court looks through it, the first -- there were, I understand, five categories charged in O'Rourke.

The first had a single document, and the other categories had a collection that were of the same type. So, for example, experiment reports. They were all the same type. In this case, each category is comprised of different types of documents. So we do think O'Rourke actually emphasizes that we need a special verdict form.

**THE COURT:** Okay. All right. So why don't -- how soon can you get me your proposed special verdict form? What's a reasonable deadline to give it to me?

**MR. CHANG:** We do have to prepare closings, Your

Honor.  What is your preference for this evening?

**THE COURT:**  How about, like, 7:00 P.M.?

**MS. KRSULICH:**  Okay.

**MR. CHANG:**  We'll make it happen.

**MR. FONDO:**  Thank you, Your Honor.

**THE COURT:**  Okay.  And I will try and inform you as soon as possible.  You know, and I assume it will be helpful for your closing as well if you learn as soon as possible what the --

**MR. CHANG:**  Yes.

**THE COURT:**  -- verdict form.

**MR. CHANG:**  Thank you, Your Honor.

**MR. FONDO:**  So Your Honor, just clarity on two things.

So on the Rule 29 motion, do you want to hear any more argument on it, or...

**THE COURT:**  I mean, at this point -- I'll tell you candidly that I would have -- at the close of the Government's case, I would have been interested in hearing any argument you had about how maybe these documents -- maybe there was -- I mean, it's obvious, obviously that there are plenty of documents where there's sufficient evidence from which a jury could conclude that they were trade secrets.

But, you know, it might have been nice to hear some argument about why certain documents should not go to the jury, but I'm not -- I think it's, frankly, too late for that now.

MR. FONDO:  Okay, Your Honor.

The other thing, Your Honor, is I just wanted to just -- I think a final decision was made as to juror number 9.  I just wanted to --

THE COURT:  Yes.  I excused him.

MR. FONDO:  Okay.

THE COURT:  At the end of the trial day.

MR. FONDO:  Okay.

THE COURT:  Yeah.

MR. FONDO:  Thank you.

THE COURT:  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(The proceedings adjourned at 4:30 P.M.)

---o0o---

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Wednesday, January 28, 2026

_____

April Wood Brott, CSR No. 13782