VOLUME 11

PAGES 2088 - 2224

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
v.                                  ) **No. 3:24-CR-00141-VC**
                                    )
LINWEI DING, a.k.a. LEON DING,      )
                                    )
            Defendant.              )
_____)


San Francisco, California

Wednesday, January 28, 2026

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue, Box 36055
                    San Francisco, California 94102-3495
            BY:  **CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
                 **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    1301 Clay Street, Suite 340S
                    Oakland, California 94612-5217
            BY:  **MOLLY K. PRIEDEMAN**
                 **ASSISTANT U.S. ATTORNEY**


        **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE.)**

REPORTED BY:  April Wood Brott, RPR, FCRR, CRG
            CSR No. 13782, Official United States Reporter

**APPEARANCES (continued):**

For Defendant:

              GOODWIN PROCTER LLP
              525 Market Street
              San Francisco, California 94105
     BY:  **DARRYL M. WOO, ATTORNEY AT LAW**
          **DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
          **RACHEL M. WALSH, ATTORNEY AT LAW**
          **COLETTE A. LOWRY, ATTORNEY AT LAW**
          **NICHOLAS C. WILEY, ATTORNEY AT LAW**

              GOODWIN PROCTER LLP
              601 Marshall Street
              Redwood City, California 94063
     BY:  **GRANT P. FONDO, ATTORNEY AT LAW**
          **FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

              GOODWIN PROCTER LLP
              601 South Figueroa Street, Suite 4100
              Los Angeles, California 90017
     BY:  **LORA J. KRSULICH, ATTORNEY AT LAW**

Also Present:  **Andrea Valladao, Federal Bureau of Investigation**
                **Veronica Hernandez, Paralegal**
                **John Jay, Trial Technician**

**I N D E X**

Wednesday, January 28, 2026

| | PAGE | VOL. |
|---|---|---|
| **JURY INSTRUCTIONS** | **2092** | **11** |
| **GOVERNMENT'S CLOSING ARGUMENT** | **2110** | **11** |
| **DEFENDANT'S CLOSING ARGUMENT** | **2159** | **11** |
| **GOVERNMENT'S REBUTTAL ARGUMENT** | **2211** | **11** |

**Wednesday - January 28, 2026**                                    **9:31 A.M.**

**P R O C E E D I N G S**

---o0o---

THE COURT:  Okay.  Hi, everyone.  I had a brief chat with the jury about scheduling.  They prefer to take their lunch break a little earlier rather than a little later.  So I'll instruct them the Government will do its closing argument, then we'll do a lunch break, and then it will be defense and government rebuttal.  Okay?  Do about a 45-minute lunch break. All right?

MR. FONDO:  Thank you, Your Honor.

MS. PRIEDEMAN:  Thank you, Your Honor.

THE COURT:  And they're getting lined up right now.

THE COURTROOM DEPUTY:  All rise.

(The jury entered the courtroom.)

THE COURTROOM DEPUTY:  Please be seated.

THE COURT:  Okay.  Welcome back, everyone.  As you know, we're going to proceed with closing arguments this morning.  Before that, I'm going to read you the instructions, and as we just discussed back there, you'll hear from the Government, and then we'll do a lunch break after that.  Then you'll hear from the defense, and then you'll hear a brief rebuttal argument from the Government.  That's how it will go, and then you'll be ready for deliberations.

So first the instructions.

### **JURY INSTRUCTIONS**

**THE COURT:**  Now that you've heard all the evidence, I will instruct you on the law.  I see some of you already getting your pens ready, but I just want to remind you that each of you will have your own written copy set of these instructions with you in the jury room.  So you don't have to worry.  Some of these instructions are complicated, and you don't have to worry about taking them all down.  I just want to read them to you now so you have a general sense of the kinds of issues you'll be discussing in the jury room, but you'll have your written set to look at carefully once you get there.

It's your duty to weigh and evaluate all the evidence received in this case and, in that process, to decide the facts.  It's also your duty to apply the law as I give it to you to the facts as you find them whether you agree with the law or not.

You must decide the case solely on the evidence and the law.  You'll recall that you took an oath promising to do so at the beginning of this case.  You should also not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.

Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases, which we discussed at

greater length at the beginning of the trial and you saw a video about in the jury room.  You must follow all of these instructions and not single out some and ignore others.  They are all important.

Please do not read into these instructions as any suggestion as to what verdict you should return.  That matter is entirely up to you.  And please do not read anything that I have said or done during this trial as a suggestion of what the verdict should be.  That is entirely up to you.

Now let's talk a the presumption of innocence and the burden of proof.  The defendant is presumed to be innocent unless and until the Government proves the defendant guilty beyond a reasonable doubt.  In addition, the defendant does not have to testify or present any evidence.  The defendant does not have to prove innocence.  The Government has the burden of proving every element of every charge beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced the defendant is guilty.  It is not required that the Government prove guilt beyond all possible doubt.  A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation.  It may arise from a careful and impartial consideration of all the evidence or from a lack of evidence.

If, after careful and impartial consideration of all the

evidence, you are not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant not guilty.  On the other hand, if after careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty.

A defendant in a criminal case has the constitutional right not to testify.  In arriving at your verdict, the law prohibits you from considering in any manner that the defendant did not testify.

I gave you a couple of these instructions early on.  I'll give them to you again.

How you think about the evidence.  First of all, what is evidence?  The evidence you are to consider in deciding what the facts are in this case consists of sworn testimony of any witness, the exhibits received in evidence, and the facts that the parties have agreed to or stipulated to, and you heard a few stipulations throughout the course of the trial.

The following things are not evidence, and you may not consider them in deciding what the facts are:  Questions, statements, objections, and arguments by the lawyers are not evidence.  The lawyers are not witnesses.  Although you must, of course, consider a lawyer's questions to understand the answers of a witness, the lawyer's questions are not evidence.

Similarly, what the lawyers have said in their opening

statements, what they will say in their closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers state them, your memory of the facts controls.

In addition, any testimony that I have excluded, stricken, or instructed you to disregard is not evidence, and anything you may have seen or heard when the court was not in session is not evidence.  You're to decide the case solely on the evidence received here at trial.  As we discussed at the beginning, evidence may be direct or circumstantial.

Direct evidence is direct proof of a fact such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is indirect evidence. That is proof of one or more facts from which you can find another fact.  And you are to consider both direct and circumstantial evidence.  Either can be used to prove any fact.

The law makes no distinction between the weight to be given to either direct or circumstantial evidence, and it's for you to decide how much weight to give any evidence, and you may recall the example I gave you at the beginning of trial.  If you wake up in the morning and you see the sidewalk is wet, you may find from that fact that it rained during the night, and that is circumstantial evidence, right?

However, other evidence such as a turned-on garden hose

may provide an alternative explanation for water on the sidewalk.  So before you decide that a fact has been proven by circumstantial evidence, you must consider all of the evidence in light of reason, experience, and common sense.  In deciding the facts of this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness, you can take into account the opportunity and ability of the witness to see or hear or know the things they testified to, the witness's memory, the witness's manner while testifying, although please remember that different people react differently to the pressures of testifying in court; the witness's interest in the outcome of the case, if any; the witness's bias or prejudice, if any; whether other evidence contradicted the witness's testimony; the reasonableness of the witness's testimony in light of all the evidence; and any other factors that bear on the witness's believability.

Sometimes a witness may say something that is not consistent with something else they said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide the testimony is untrue just because it differs from

other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything the witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.  The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.  What's important is how believable the witnesses were and how much weight you think their testimony deserves.

You've heard testimony that the defendant made out-of-court statements.  It's for you to decide whether the defendant made the statements and, if so, how much weight to give them.  In making those decisions, you should consider all of the evidence about the statements, including the circumstances under which the defendant may have made them.

You've heard opinion testimony from a number of witnesses: Andrew Crain -- who knows if you even remember who that is at this point, Adam Segal, Daniel Sanchez, James Pooley, and Steve Novak, who testified about their opinions and their reasons for those opinions.  This opinion testimony was allowed because of the witnesses' specialized knowledge, skill, experience, training, or education of those witnesses.

Such opinion testimony should be judged like any other

testimony.  You may accept it or reject it and give it as much weight as you think it deserves, considering the witness's knowledge, skill, experience, training, or education, the reasons given for the opinions, and all of the other evidence in the case.

During trial, certain charts and summaries were shown to you to help explain the evidence in the case but were not admitted into evidence.  These charts and summaries will not go into the jury room with you.  They are not themselves evidence or proof of any facts, and if those charts and summaries do not correctly reflect the facts and figures shown by the evidence in this case, you should disregard the charts and summaries and determine the facts from the underlying evidence.

Now, other charts and summaries were admitted into evidence, and those will go back with you to the jury room. Even though they were admitted, they are only as good as the underlying supporting material.  You should, therefore, only give charts and summaries as much weight as you think the underlying material deserves.

Documents and recordings that are written and spoken in Mandarin Chinese have been admitted into evidence.  English language translations of this evidence have also been admitted. Although some of you may know the Chinese language, including the Mandarin or Cantonese dialects, it's important that all jurors consider the same evidence.  The English language

translations are the evidence, not the foreign language written or spoken in the admitted evidence.  Therefore, you must accept the English translations of the evidence and disregard any different meaning of the non-English words.

Okay.  Now we're going to get to the substantive instructions, the 14 counts that are charged in this case.  And again, it is complicated, but you will have as much time as you need to pore over your own copy of these written instructions in the jury room.  So the first instruction I'm going to give you is about the categories of alleged trade secrets, right?

And as you know, the Government has charged the defendant with seven counts of theft of trade secrets and seven counts of economic espionage.  So the seven counts of trade secrets are Counts 1 through 7, and the seven counts of economic espionage are Counts 8 through 14.

The seven theft of trade secret counts correspond to the seven categories of alleged trade secrets.  The seven economic espionage counts also correspond to the seven categories of alleged trade secrets, and the Government alleges that the seven categories are as follows:

Category 1, which relates to Count 1 for theft of trade secrets and Count 8 of economic espionage:  Instruction sets, protocols, internal specifications, and implementation-level details related to the four primary components of Google's custom-designed TPU chip, TensorCore, BarnaCore/SparseCore,

high-bandwidth memory access interface, and interchip connect, or ICI.

Category 2, which relates to Count 2, theft of trade secrets, and Count 9, economic espionage, is documents including details of the design, performance, and operation of Google's custom-designed TPU chips, TPU machines, and TPU systems.

Category 3, which relates to Count 3, theft of trade secrets, and Count 10, economic espionage:  Design documents for Google's TPU software that manage the hardware and resources within a TPU, facilitate communications between TPUs, and allocate and manage collections of interconnected TPUs to different workloads.

Category 4, which relates to Count 4, theft of trade secrets, Count 11, economic espionage:  Documents including details of design, performance, and operation of Google's custom GPU machines and GPU systems.

Category 5, relating to Count 5, theft of trade secrets, Count 12, economic espionage:  Design documents for Google's GPU software that facilitates communication between GPUs and allocates and manages collections of interconnected GPUs to different workloads.

Category 6, relating to Count 6, trade secrets, and Count 13, economic espionage:  Design specifications to implement Google's proprietary chip component designed to deliver low

latency and high-bandwidth transfers of data over large-scale networks on Google's SmartNIC.

Category 7, which relates to Count 7, trade secrets, and Count 14, economic espionage:  Design documents for Google software to implement its high performance and cloud networking on its SmartNIC.

The Government alleges that you saw a list of 105 documents.  The Government alleges that each of the 105 individual documents listed in Exhibit 775 is a trade secret. The Government also alleges that the documents in each category combined to make a separate trade secret.

To find the defendant guilty of any count, you must find that the category associated with that count contained at least one trade secret, and you must agree unanimously on which particular document in that category constitutes a trade secret, or you must agree unanimously that the entire set of documents in that category constitutes a trade secret.

However, you do not have to find that all documents in the particular category are trade secrets.  A separate crime is charged against the defendant in each count, and you must decide each count separately.

However, if you determine that an alleged trade secret category does not contain a trade secret, you must find the defendant not guilty of both the theft of trade secret count and the economic espionage count corresponding to that trade

secret category.

All right.  Now let's talk about the definition of a trade secret.  The term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, formulas, designs, methods, techniques, processes, procedures, programs or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, photographically, or in writing.

But all that stuff can be a trade secret only if first, the information is not generally known to or readily ascertainable through proper means by another person who can obtain economic value from it; second, the owner of the information has taken reasonable measures to keep such information secret; and third, the information derives independent economic value, actual or potential, from being secret.

For purposes of the first and third elements, it does not matter whether the economic value is large or small.

For purposes of the third element, the question is whether the information had independent economic value at the time of the alleged theft.  A document can be a trade secret even if it contains a combination of public and private information.

In addition, a group of individual trade secret documents

can combine to make a separate trade secret if the value of the combination is greater than the sum of its parts and if the combination itself meets the definition of trade secret as I have set forth.  Information acquired by an employee in the course of their employment may potentially be trade secrets, but only if the information meets the definition of a trade secret as I've described.

It's not a crime for an employee to independently develop technology through proper means or to leave an employer and use non-trade secret information and skills gained through that employment.  In addition, the personal skills, talents, or abilities that an employee develops at their place of employment are not trade secrets.  Confidential disclosure to a business partner does not necessarily prevent a document from being a trade secret.

As members of the jury, it's your responsibility to determine whether something constitutes a trade secret under the test that I've just given you.  Just because a witness referred to certain information or documents as trade secrets does not mean that they are necessarily trade secrets.

Similarly, just because a document refers to information as a trade secret or confidential or proprietary does not necessarily make that information a trade secret if it does not otherwise meet the three elements of the trade secret test.

Conversely, the absence of a marking or label does not

preclude the information from being a trade secret so long as the owner took other reasonable measures to protect the information. You may consider the fact that markings and labels exist or do not exist on a document in considering whether something is a trade secret.

Now, the elements of a crime of theft of trade secrets. For the defendant to be found guilty of any count of theft of trade secrets, the Government must prove each of the following elements beyond a reasonable doubt:

First, the category of information at issue in the particular contained one or more trade secrets. And again, that is with each of you agreeing on which specific document or documents meet the definition.

Second, that the defendant knew that the document or documents included confidential information that he had no right to take.

Third, the defendant intended to take the trade secret information for the economic benefit of anyone other than Google.

Fourth, the trade secret information is related to a product used in interstate or foreign commerce.

Fifth, the defendant intended or knew that the offense would injure Google.

And sixth, the defendant knowingly either took the trade secret information without authorization or, without

authorization copied, downloaded, uploaded, or transmitted the trade secret information.

Now let's talk about the elements of the crime of economic espionage.  For the defendant to be found guilty of any count of economic espionage, the Government must prove each of the following elements beyond a reasonable doubt, first -- and the first three overlap with the trade secret counts, and then the remainder are different.

First, the category of information at issue in the particular count contained one or more trade secrets, again, with each of you agreeing on which specific document or documents meet the definition.

Second, the defendant knew that the document or documents included confidential information that he had no right to take.

Third, the defendant knowingly either took the trade secret information without authorization, or without authorization copied, downloaded, uploaded, or transmitted the trade secret information.

Fourth, the defendant intended or knew that his actions would benefit a foreign government or a foreign instrumentality.  The term "foreign instrumentality" means any agency, bureau, ministry, component, institution, association or any legal, commercial, or business organization, corporation, firm, or entity that is substantially owned, controlled, sponsored, commanded, managed or dominated by a

foreign government.

For the fourth element, it is not enough for the Government to prove that the defendant intended to benefit himself or Zhisuan, nor is it enough for the Government to prove that the defendant intended or knew that his conduct would benefit the country of China or its economy in a way that might generally flow from engaging in business activity there.

Rather, to obtain a conviction for economic espionage, the Government must prove beyond a reasonable doubt that the defendant either intended his actions to confer a benefit on a Chinese government instrumentality or knew that his actions would confer a benefit on a Chinese government instrumentality.

A finding that the defendant intended to benefit himself or Zhisuan does not automatically preclude a finding that he also intended to benefit a Chinese government instrumentality. And benefit means any type of benefit, including economic, strategic, or tactical benefit.

Those are all the substantive instructions. Now, when you begin your deliberations, elect one member of the jury as your foreperson or presiding juror who will preside over the deliberations and speak for you in here in court.

You will then discuss the case with your fellow jurors and reach an agreement, if you can do so. Your verdict, whether guilty or not guilty, must be unanimous as to each count. Each of you must decide the case for yourself, but you should only

do so after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should, but do not come to a decision simply because other jurors think it is right.  It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision.  Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Because you must base your verdict only on the evidence received in the case and on these instructions, I will remind you of the admonitions that I've given you literally every day and multiple times a day during this trial.  And I won't read the entire instruction again because I've been pounding away at this.

But I just want to emphasize that, especially now that you're beginning your deliberations, it is even more important that you not have any communications with anybody else about the facts of this case or anybody to do with it.  Of course, once you begin your deliberations, you can start talking amongst yourselves now about the case and the facts.

But you're not to have any communications with anybody else, and you are not to do any of your own outside research on

the internet or anywhere else about the facts of this case or the people involved in the case or anything to do with this case.

You are to avoid any media coverage of the case. If you believe that you have been exposed to information about the case, you should immediately let Bhavna know. If you believe, if you have reason to believe that some other juror may have been exposed to outside information about the case, you should let Bhavna know immediately.

These rules are extremely important. These restrictions are extremely important. They are the only way that the parties can get a fair trial in this case, and if any juror is exposed to outside information or has outside conversations with anybody about the case, it would jeopardize the parties' right to a fair trial, and a mistrial may need to be declared, which would require the process to start all over again.

The punishment provided by law for these crimes is for the Court to decide. You may not consider punishment when deciding whether the Government has proved its case against the defendant beyond a reasonable doubt

Now, some of you have taken notes during the trial. Whether or not you took notes, you should rely on your own memory of what was said. Notes are only to assist your memory. You should not be overly influenced by your notes or the notes of your fellow jurors.

Also, although you won't have a trial transcript in the jury room, if you decide during your deliberations that it's important to hear certain testimony again, you can request that testimony to be read back to the jury.  And the way that works is we would bring you back in here, and the court reporter or somebody else would read the testimony back to you.  And if you request that a certain portion of testimony be read back, keep in mind that I may order that an additional portion of testimony may be read back to you to ensure that you get the proper context.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the courtroom deputy signed by any one of you or more than one of you.  No member of the jury should attempt to communicate with me during deliberations except by a signed note, and I will respond to the jury concerning the case only in writing or here in open court.  If you send out a question, I will consult with the lawyers before answering it, which may take some time.  So you may continue your deliberations while waiting for the answer to any question.

Remember that you are not to tell anyone, including me or the courtroom deputy, how the jury stands numerically or otherwise on any question submitted to you, including the question of the guilt of the defendant, until you have either reached a unanimous verdict or have been discharged.

A verdict form has been prepared for you.  You'll probably see it during closing arguments.  If you have reached a unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the courtroom deputy that you are ready to return to the courtroom.  Do not tell the courtroom deputy what your verdict is, and do not give her the verdict form.  And that -- those are your instructions

And with that, we will begin with closing arguments.  You will first hear from the Government, then the defense, and then Government will have a brief rebuttal.  We'll take a lunch break after you hear from the Government initially.

Take it away.

### GOVERNMENT'S CLOSING ARGUMENT

**MS. PRIEDEMAN:**  The defendant wanted more for himself than his own experience and knowledge could get him.  So he stole, he cheated, and he lied.  The technology in this case is complicated; what happened here is not.  From May 2022 to April 2023, the defendant stole over 2,000 pages of Google's cutting-edge AI trade secrets.

At the same time the defendant was stockpiling Google's trade secrets, he was secretly starting his own company in China with the explicit goal of copying Google's technology.  In mid-December 2023, about two weeks before the defendant resigned from Google and was on his way out the door, he

downloaded all of the stolen trade secrets to his personal computer.

The defendant took extensive steps to cover his tracks. He impersonated a senior Google executive, he deleted evidence, and he instructed his former intern to badge in for him at Google's offices. As my colleague, Mr. Boome, told you at the beginning of this trial, the defendant did not commit a crime when he started another company while working at Google, and he did not commit a crime by wanting the benefit the government of China.

But he did commit a crime when he stole thousands of pages of Google's trade secret technology, technology that was created by thousands of other engineers, technology that he had no right to take, to benefit himself and the government of China.

The defendant is charged in this case of committing seven counts of trade secret theft and seven counts of economic espionage. As you heard from the judge just now, each count corresponds to one of the seven categories of trade secrets that you've heard about throughout this trial. Today I'm going to go through the evidence you've heard and explain why it meets the elements for each of the crimes beyond a reasonable doubt.

One thing I want to flag for you before I get started is that I might summarize some elements or speak in shorthand, and

I want to remind you that what the judge instructed you controls. I also might talk about some of the witness testimony, and I want to remind you what I say is not evidence. If your memory conflicts with something, you should -- something that you remember -- something that I say, you should go with your memory.

I'm also going to use a PowerPoint this morning to talk about the evidence. You're not going to have the PowerPoint with you when you deliberate, so I would encourage you to take notes about the different evidence that supports each count.

I'm going to start this morning by walking through the evidence of how the defendant took the trade secrets. Then I'm going to talk about the evidence showing that the defendant intended to use the trade secrets for the economic benefit someone other than Google. Next I'll talk about the evidence that he intended to use the trade secrets to benefit the government of China. And finally, I'll talk about the different trade secret categories.

All right. So let's talk about how the defendant stole the trade secrets in this case. And that's important not just because it shows he took the trade secrets, but it also shows that he knew the documents were confidential and that he intended to use them.

Now, the Government's forensic expert, Andrew Crain, testified that he was able to tell from Google's forensic logs

that the defendant compiled information from multiple internal Google source documents and copied and pasted them into Apple Notes on his Google computer.  The defendant then PDF'd the notes and uploaded them to his personal account.

By taking this extra step of copying the information from the source documents and putting it into the Apple Notes, Google's VP of Security Engineering, Heather Adkins, testified it made it harder for Google's systems to detect the defendant's theft.

Mr. Crain testified that he was able to use the logs to see that during key times, the defendant was creating and editing those Apple Notes.  He was also accessing the source files on Google's internal networks.

In some instances, the defendant copied everything from one document into one Apple note, and in other instances, he used multiple documents in the Google system to create one trade secret note.

You also heard that using these same forensic logs, Google was able to actually identify the documents that the defendant was looking at when he made the notes, and you heard that Special Agent Valladao was able to compare those original internal source documents to the trade secret files and confirm that what the defendant took came from Google's documents. Those comparisons are in Exhibit 777, and you'll see here there's a red circle on the bottom.  As I go through this

PowerPoint, I'm going to point out different exhibit numbers.

This is one of these examples.  So you can see on the left, there's two internal Google documents, and on the right is the trade secret document that the defendant created using the original source documents.  Now, note when you look at the internal source documents, there's multiple confidentiality markings.  It says, "Level 3 Restricted."  It says, "This content" -- "Like other internal engineering documents, this content should not be shared with customers," and there's a proprietary and confidential marking in the upper right-hand corner.

I'm flagging this here because this is not -- if you look on the right, the defendant did not take any of those confidentiality markings.  In other words, prior to taking the information from Google, he stripped the document of the confidentiality markings.  And you can also see that there's authors listed on here, and it says "Google," and you see on the right, none of that is present in the actual trade secret document.

And this isn't the only time he did this.  The defendant took thousands of pages of internal Google documents, and in many instances, he purposely stripped away the confidential markings, the authors, and other identifying features that would show the documents were from Google.  So what does that tell you?

One, it tells you that the defendant absolutely knew these documents were confidential, and two, it tells you he was taking efforts to hide the fact that these documents came from Google by stripping them of the identifying features that would show they were from Google.  Why?  Because he knew what he was doing was wrong.

Now, after creating the notes using the Google information, the defendant PDF'd the notes, and starting on May 21st, 2022, he uploaded them in multiple mass uploads to his personal Google Drive account, where he then saved them to dozens of folders on his personal account that corresponded to different aspects of Google's business.  For example, he had a folder for TPUs, for machine learning frameworks, hardware, and TCPDirect.

I want to emphasize a couple of things here.  Despite the fact that the defendant was using an application called Apple Notes, he was not taking notes.  He was copying text word for word from Google's documents and taking screenshots of Google's confidential information.

Mr. Crain testified that the defendant uploaded over 14,000 pages of information from his Google laptop to his personal laptop, including the over 2,000 pages of trade secret documents.  And the defendant inserted over 4,000 screenshots from internal Google documents into Apple Notes, including over 600 screenshots that went into the trade secret documents.

I want to pause here for a moment and let that sink in. 4,000 screenshots.  That is not casual note taking.  That is calculated, careful, and selective theft, plain and simple. And the fact that the defendant PDF'd and cataloged all of the stolen folders on his personal drive corresponding to different aspects of Google's technology required careful planning and must have taken hundreds of hours.

All of this is evidence of both the value of the trade secrets and the defendant's intent to use them.  Why would he go through so much effort if the information was not valuable and he didn't intend to use it?

All right.  Next I want to focus on some of the evidence of the defendant's intent to use the trade secrets for the economic benefit of someone other than Google.

To do that, I want to start at the beginning.  You heard that the defendant started working at Google as a software engineer in May of 2019.  By August of 2022, he was talking to a recruiter about jobs in China.  In May of 2021, he sent this copy of his resume to a recruiter.

You heard from Google senior engineer, Ravi Kavuri, the defendant's boss's boss's boss, that this resume was largely accurate.  A little exaggerated, but mostly accurate.  And you heard that the defendant applied for a number of jobs in China using this resume, and he was rejected over and over and over again.  In other words, the defendant wanted a job in China, he

used his real resume, and he struggled to find a job.

On May 6th, 2022, the defendant met Yuan Ye for the first time. Remember, Mr. Ye is the CEO of a technology company in China called Rongshu. And later, Mr. Ye became Mr. Ding's business partner for Zhisuan, the company the defendant created in China with the goal of copying Google's technology.

About two weeks after that first conversation with Mr. Ye on May 21st, 2022, the defendant uploaded 129 documents from his Google computer to his personal account, including four of the trade secret documents.

Included in that same upload was a note on the defendant's Google computer stating that he wanted to create a company -- he had a vision to create a company with Google culture and management, a company like Google. In other words, the purpose of his uploads from the very beginning could not be more clear: He had a vision to create a company like Google, and he needed Google's trade secrets to make that a reality.

Between June 1st, 2022, and October 31st, 2022, the defendant uploaded hundreds more notes from his corporate computer to his personal account, including additional stolen trade secret documents.

On November 14th, 2022, the defendant started working at Rongshu. Remember, that's the company that Mr. Ye was the CEO of. By early 2023, Mr. Ye and the defendant had laid out a vision for the new company that would eventually become

Zhisuan.

You can see in this early Plan C document -- this is Exhibit 1025 -- that the defendant laid out a three-tier plan of a system that included a compute layer, a hardware layer, a model layer, and an application layer.

If this looks familiar, it should.  It basically maps on to the AI supercomputer framework that you've been hearing about through trial.  And I just want to note that this highlighting -- these are Mr. Ding's updates.  These aren't highlights that we added.

By early April, 2023, the defendant and Mr. Ye had started working with a consulting company called I&R Capital, which was essentially a company that helped early stage companies like Zhisuan try to get money.

In this business plan they created, Zhisuan was described as aiming to create an efficient, distributed artificial intelligence computing power platform that would meet the requirements of a large scale, stable, and high speed communication for large model training.

Now, remember, you heard from multiple witnesses, including Google executive Mark Lohmeyer and the Government's expert, Dr. Sanchez, that one of the challenges in building an AI supercomputer is that you need to make sure that it's reliable.  That's important so the system can work quickly and efficiently to train large language models.  The defendant was

basically saying he could solve that problem.

In this presentation, the defendant was listed as a CTO, and it said that he led the system, design, and development, of Google Accelerator, all of Google Cloud's Accelerator systems, as well as the research and development of large language models based on supercomputers.

Now, you heard from Mr. Kavuri -- again, that's the defendant's boss's boss's boss -- that none of this was true. The defendant worked on a very specific component -- software component called Borg, and he largely focused on Google's GPU supercomputers.

So why did the defendant feel so confident saying this if it wasn't true? Because remember, at this point, he'd already started stealing Google's trade secret information. His plan was now clear. After getting rejection after rejection after rejection using a resume that actually reflected his experience, he was trying a different strategy. He was lying about his experience.

And why did he feel comfortable lying about his experience? Because he had the trade secrets, and he was planning on using it to deliver on the promised technology.

This business plan also makes the connection between the stolen trade secrets and the defendant's company clear. Here you can see that Zhisuan was planning to use optical circuit switches. That's a technology to reduce the training time for

machine learning models that you heard a lot about from Dr. Sanchez.  That's the technology using the tiny mirrors that repositions the different TPUs.

And Dr. Sanchez explained that one of the stolen documents, which is the ICI resilient slice document -- that's Exhibit 383 -- solves a problem that comes up when those tiny mirrors break down.  In other words, the defendant stole documents that directly related to the technology he was trying to build.

Now, by mid-April, that business plan had been sent to investors.  On April 13th, 2023, the defendant received a message from one of the individuals from I&R Capital saying that the investor feedback was that many of the technical points still weren't covered.  They recognized market demand, but the implementation details need to be explained in more depth.  And this is Exhibit 1155.  In other words, they liked the idea, but they need more technical information.

So what did Mr. Ding do when he got this message saying he needed more technical details to get the investment money he was looking for?  He doubled down, and he stole more trade secrets.  Four days later, four days after receiving that message, on April 17th, 2023, the defendant uploaded 354 documents to his personal drive from his Google computer, including 50 trade secret documents, his biggest mass upload yet.

You can look at the documents he uploaded that day -- and that's Exhibit 780 -- and you can see that there are dozens of documents that relate to the -- the technology that the defendant was trying to pitch, including multiple TCPDirect documents that Dr. Sanchez told you about; the Endurance B document, along with other hardware documents related to Google's GPU systems; and most of the documents in Trade Secret Category 1 related to Google's TPUs, all of which was relevant to the defendant's business plan.

Now, the same day as that mass upload, the same day that he uploaded 354 documents, the defendant and Mr. Ye met with investors from a firm called IDG Capital, a private investment firm. Now, Special Agent Valladao testified that that meeting occurred at 3:00 P.M. in Beijing, which is 7:00 A.M. UTC time. If you look at Exhibit 780 again, you can see that as the meeting was starting with investors, the defendant was actively uploading dozens of trade secret documents, including all these documents related to Google's TPUs.

The timing here could not be more clear. The defendant was gearing up to start his company. He was busy meeting with investors, pitching ideas, and he needed Google's stolen trade secrets to provide the technical details that the investors had asked for.

On April 21st, 2023, again while Zhisuan was meeting with investors, the defendant received another document from a

member of I&R called "Key Questions."  In that document, one of the questions said, "We need to more clearly articulate what we are doing.  Overly broad statements are insufficient.  For example, we can describe in detail the work done at Google and how that is replicated at Zhisuan."

Now, this document and these questions didn't come out of nowhere.  In context, it's clear at this point the defendant was already telling I&R Capital and already telling investors that he could copy Google's technology.  Again, why would he be saying that?  Because at this point, he had already stolen all of the trade secrets, and he was planning on relying on using the stolen technology to build his own product.

Now, by early May, the defendant and Mr. Ye had parted ways, and the defendant started Zhisuan on his own.  By the end of May 2023, the defendant applied for a entrepreneurship camp hosted by MiraclePlus, which was -- MiraclePlus is basically a company that helps startups get money and invests in different startups in China.  He was invited to interview in July of 2023, and by August, he was interviewing with them.

As part of the application process, in mid-August the defendant was asked for two things, a reference and evidence of a proof of concept.  The defendant couldn't provide a real reference from Google.  If he had, it would have tipped them off to what he was doing, and they would have cut off access to his Google -- the Google network and trade secrets.

So instead, he gave Aamer Mahmood's name.  You've heard that Aamer Mahmood is a very high-level executive at Google, and you heard that this is not his email address, this is not his phone number, and you heard from Mr. Mahmood himself that he doesn't even remember ever meeting the defendant.  You also heard evidence that the defendant's work computer was used to log into this email account, which means you can conclude that the defendant created this phony email account to pose as Mr. Mahmood.

You also saw this email exchange between the Aamer Mahmood Gmail account and someone from MiraclePlus, and you can see that Aamer Mahmood responded saying -- after a request for a reference check for Mr. Ding, that he would prefer a phone call to a video interview.

Now, why would he say that?  Now, it's pretty obvious if there had been a video call, the gig would have been up.  So how did the defendant pull off a phone call to impersonate Mr. Mahmood?  You heard the defendant's voice in different videos, and you heard Mr. Mahmood testify, and they don't sound the same.

Well, you can look at Google's web protect logs, and this is Exhibit 5 -- remember, these are the logs that Mr. Matt Linton testified about and that Mr. Crain relied upon for his analysis.  And those -- again, those logs track uploads and downloads, basically all the activities on Google's network.

And you can see that August 20th, 2023, one day after the email on that last slide, the defendant downloaded something called "Voicemod."  And you heard from Special Agent Valladao that Voicemod is a voice changing software.

So in other words, not only did the defendant create a fake email and a fake phone number to provide a reference for himself, but he used a voice changing software to pretend to be Mr. Mahmood so he'd get into MiraclePlus.

I also mentioned that MiraclePlus asked the defendant for a proof of concept.  In other words, they asked for evidence that he could actually do what he was saying he could do.  So what did Mr. Ding do?  He uploaded a video recording.  And you saw this video.  This is 1175-S.  You saw this video recording of himself running a machine learning job on Google's systems.  In other words, he passed off as his own product Google's systems and shared that video with MiraclePlus.

Remember, the defendant is telling investors at this point that he can build an AI supercomputer, but he doesn't actually have a product.  So in the meantime, he records himself using Google's technology.  In other words, the defendant passed off Google's technology as his own, just like he intended to do with the stolen trade secrets.

Over the next several months, the defendant was accepted into MiraclePlus, and he started to hire other team members and meet with potential investors and customers.  The defendant's

company was not just a fantasy.  By November of 2023, he had secured a 700,000-dollar investment based on a 10-million-dollar valuation from MiraclePlus.  That's real money, and the defendant clearly had very real and very big goals.

In a note on his computer from September of 2023, he stated that he wanted to become a unicorn company in five years, and he defined a unicorn company as a company worth $1 billion.  He also referenced wanting to become Google yet again, and when he talked about the advantages, he said, "Our technical advantages are myself."

Again, he didn't have real technical advantages, so what he was obviously referring to here were the stolen trade secrets.  The defendant also took this picture, claming it would become a historical photo of Google or Apple, and it's clear the defendant intended to use Google's trade secrets to build his company.

When the defendant was asked what the difference between Zhisuan's solution was and other services that were available, he referenced Google's TPU projects, GPU projects, said they were all done by him and his team.  And again, he said, "The technical advantage lies in the fact that my team has done things of this scale before, and I have mature solutions."

Now, you know from Mr. Kavuri that it's absolutely not true.  He didn't work on Google's TPU projects, and he

certainly did not lead Google's GPU projects.  He didn't have mature solutions.  But what he did have by the time he sent this text on October 17th, 2023, were Google's stolen trade secrets on his personal account.

Fast-forward to November 24th, 2023, when the defendant presented Zhisuan at MiraclePlus.  You saw the defendant's practice presentation where his intent to use Google's trade secrets could not be more clear.  Let's watch that clip one more time.

(Video recording played.)

**MS. PRIEDEMAN:**  The defendant's intent could not be more clear in this video.  He's explicitly telling investors that he plans to copy and upgrade Google's technology.  You have the slide deck he presented at this presentation as well -- that's Exhibit 1158 -- and the defendant repeated this line of direct replication and upgrading in his boot at MiraclePlus, as well as in the English translation of his pitch deck.

In presentations that the defendant created for investors and customers, he also continued to lie about his experience.  Again, here he's saying that he built Google's TPU systems and GPU systems, and he said he was one of ten people in the world who could build a 10,000-card compute platform, basically an AI supercomputer.

Again, you know that the defendant did not do any of this.

Why is he so confident?  Because he stole Google's technology.
It's plain and simple.

There's also no question that the defendant knew what he
was doing was wrong.  That's why he gave his badge to his
former intern and instructed her to badge in for him at
Google's offices in Sunnyvale while he was in China presenting
at MiraclePlus.  It's also why, when he was preparing for the
MiraclePlus presentation and talking about his false claims and
abilities to create a supercomputer, he messaged, "Oh, I won't
dare to go back to the U.S. for some time now."

Why would he say that?  Because he had stolen at this
point dozens and dozens of Google's trade secrets and was
founding an entire company on the proposition that he could
copy Google's technology.  He absolutely knew what he was doing
was wrong.

The defendant's presentations and communications during
the same timeframe also make clear that the defendant intended
to use the stolen trade secrets not just to benefit Zhisuan
itself, but also to benefit the Government in China.  I want to
talk about that next.

You heard from the Government's expert, Dr. Adam Segal,
that the defendant intended to benefit the Government in China
and foreign instrumentalities, which we'll talk about that
definition in a little bit, in three different ways.  There's
applications to the talent plan and through pitching his

services through Zhisuan to two different entities controlled by the Chinese government, the Industrial Innovation Park and the Tianfu Research Institute.

Now, you heard from the Government -- you heard from Dr. Segal that the Chinese government issues multiple plans that lay out the economic and technological priorities for the country. You also heard that multiple different plans were in place at the time of the defendant's theft that made clear that the Chinese government wanted to prioritize making China a leader in AI technology, including by building and supporting AI data centers and encouraging the development of AI chips.

In presentations to investors like this one -- this is Exhibit 1143 -- the defendant specifically called out multiple of these national policies regarding artificial intelligence, making it clear the defendant planned to use the stolen trade secrets to solve the problems identified by the government of China and in turn benefit the government of China.

In late November to early December, the defendant applied for a talent plan in Shanghai. Dr. Segal explained that talent plans are programs set up by the government of China to encourage individuals to come back to China to promote the economic and technological growth.

You can see in the defendant's application, he stated that he planned to -- upon returning to China, he planned to deploy a single task, tens of thousands of cards, large model training

acceleration platform.  In other words, he planned to build a supercomputer, and he said he could do that by replicating and upgrading Google's tens of thousands of cards platform and building compute platforms adapted to China's national conditions.

In other words, he was quite explicit in stating that the way he could benefit the government of China through applying to this talent program was by copying Google's technology, using Google's trade secrets.

It's also clear that the defendant's business plan included using the stolen trade secrets to benefit government customers.  In the defendant's MiraclePlus presentation, he specifically stated that he intended to target government agencies with underlying compute.  And in a follow-up slide, he listed multiple government entities and customers that were already at the contract signing and cooperation stage.

I want to talk about the two customers that I mentioned earlier, Industrial Innovation Park and Tianfu Research Institute.  Let's talk about the Industrial Innovation Park first.

Dr. Segal testified that the Industrial Innovation Park is in a government-controlled, high-tech zone focused on artificial intelligence.  You heard that the defendant met with representatives of Innovation Park on November 9th, 2023, and you also heard that the park was created by the local municipal

government and that the management committee is part of that municipal government.

This is the PowerPoint presentation that the defendant helped create for that presentation.  That's Exhibit 1034.  And in this PowerPoint presentation, the defendant promised to help the Innovation Park build an AI ecosystem together and share the achievements of AI.

Specifically, the defendant told the Innovation Park that he could benefit them by helping, among other things, customizing the research and design of underlying chips and network structures according to the computing power requirements of large models.

All right.  Let's talk about the Tianfu New Area Innovation Research Institute next.  Dr. Segal testified that the research institute was created by Southwest University, which is controlled by the government of China and founded by Tianfu New Area, which is a branch of the local municipal government.

You saw a draft agreement between Zhisuan and Tianfu where Zhisuan was agreeing to collaborate with Tianfu including in the field of chips.  You also saw a document called "Key Customers," which included Tianfu and Innovation Park, and it promised that -- Zhisuan promised to assist Tianfu in the establishment of AI computing centers.

All right.  So now I want to talk about the different

trade secret categories.  This is a copy of the jury instructions, and you'll get this back with you when you deliberate.  And I want to focus on some of the key elements of what you need to find to find something is a trade secret before we dig into different categories.

So the judge read these instructions to you, but I just want to hit a few key points.  The first element that the information is not generally known or readily ascertainable basically means the information needs to be secret.

I want to emphasize one of the instructions that the judge read to you as well that a document can be a trade secret even if it contains a combination of public and private information, as long as it still meets the definition of a trade secret. What that means is the fact that a portion of a trade secret contains a diagram that also appears in a publication or a patent doesn't mean the document isn't a trade secret.

In this case, there's no dispute that none of the 105 alleged trade secret documents were publicly available.  The Government's expert, Dr. Sanchez, explained that while Google has published some information about this technology, the stolen documents contain much more detailed and valuable information that goes beyond anything that is publicly known.

The second element is that the owner of the information -- here that's Google -- has to have taken reasonable measures to keep the information secret.  I'm going to talk about the steps

that Google has taken to protect its -- that Google took to protect its trade secrets in just a bit after I cover the different categories.

And the third element is that the information has to derive independent economic value, actual or potential, from being secret.  So that basically means the information has to be valuable.  As the instructions point out, you don't have to determine how valuable the information is.  You just have to determine that it has some independent economic value.

So how do you measure value?  One clear measure is the time and resources invested by Google.  You heard testimony that Google spent more than ten years developing its AI supercomputers, custom TPU chips, and TPU and GPU systems, with thousands of engineers putting in real effort to build this cutting-edge technology.  This effort alone demonstrates the value of these trade secrets.

But you also heard from Dr. Sanchez about how valuable this information would be to a competitor, and even the defense's expert, Mr. Novak, admitted that all 105 of the trade secrets would be valuable.

And finally, you can consider the defendant's own actions.  He stole this information.  If it weren't valuable outside of Google, why would he have gone through such great lengths to take it?

Before we go any further, I want to emphasize something

important.  As the judge instructed you, you only need to determine that each relevant category contains at least one trade secret when you're talking about this first element.  And as the judge instructed you, each category actually contains multiple trade secrets.  Each category has multiple documents, and as Dr. Sanchez testified, each of those documents is secret and valuable, and the combination of all those documents in the categories is also a trade secret.

If you'll recall, Dr. Sanchez testified about how the combination of all the documents in each category is not publicly available and is even more valuable than each document on its own.

What that means is simple:  If you all unanimously agree that the documents in a category, taken together, constitute a trade secret, you do not then have to go document by document to also determine if all the other documents in the category are a trade secret.

And the opposite is also true.  If you together decide that one document in a category is a trade secret, you don't have to then determine if all the documents together are a trade secret, and you also don't have to consider whether all the other documents are a trade secret.

Let's take Count 1, for example.  So this is a screenshot of the verdict form you'll see.  This is just for Category 1.  And you'll -- so you'll see that if you determine that the

Government has proven every element of trade secret theft for Category 1 beyond a reasonable doubt, you'll be asked to indicate which trade secret you unanimously agreed was a trade secret.

But again, if you make that determination for one category, you don't have to then go through every document one by one. So for example, if you determine that the combination of all the documents in Category 1 is a trade secret, you could check that off, and you wouldn't have to -- and you found that all the other elements of trade secret theft are also satisfied, you wouldn't then have to go through each document individually.

Or for example, if you determined that one document in this category -- so Exhibit 362 as an example, the memory system document that you heard quite a bit about, if you determine that that document is a trade secret, then you wouldn't have to go one by one through all the other documents.

All right. So now I'm going to spend some time going over each of the categories, and I want to remind you that each trade secret category relates to one count of trade secret theft and one count of economic espionage. So we were just looking at Count 1, which is the trade secret theft, which relates to Category 1, and Count 8 of the economic espionage also relates to that same category.

And as a reminder, the seven categories, the first three

categories relate to Google's TPUs, Categories 4 and 5 relate to Google's GPU systems, and Categories 6 and 7 relate to Google's SmartNICs.

You sat through a lot of technical information, and I'm not going to go through everything you heard about from Dr. Sanchez and Dr. Chandra.  Instead, I'm going to summarize some of the key takeaways from each category and flag some of the key trade secret documents.  I'm also going to talk about some of the evidence showing why the combination of all the documents in each category is together a trade secret.

And I want to flag -- I'm going to talk about specific documents from each category, but remember, you heard testimony from Dr. Sanchez that each document in this category is secret and valuable.

So Categories 1 and 3:  1 through 3 deal with Google's TPU chips and TPU-based supercomputers, some of Google's most important technology.  Dr. Chandra told you that thousands of engineers have worked on Google's TPUs and that Google invested hundreds of millions of dollars to develop them.  Category 1 focuses on the internal architecture of Google's TPU chips, mostly focused on TPU Version 4.

Now, you heard -- I'm just going to talk about a couple of these categories and a couple of documents.  You heard about the TensorCore ISA documents quite a bit, and you heard that there's eight documents, but this actually came from one source

document at Google.

Dr. Sanchez testified that these documents disclosed low-level details about how Google's TensorCore is designed, which, remember, he told you is kind of the brain of Google's TPU. He said there's enough detail that a competitor like the defendant could skip huge parts of the design process with access to this information.

Dr. Sanchez also testified about Exhibit 362, which is the memory system document that I was just talking about. And remember, that document describes details about the different performance characteristics of the different memories of Google's TPU chips and information about how the different components communicate with each other.

Now, remember, in the under-seal portion, we looked at a specific...

Remember, in the under-seal portion, we looked at a specific portion of this document that included the exact amount of data that can be sent from each memory component to every other memory component in the system and how long it would take. Dr. Sanchez testified that this information is sufficient to actually determine how big each memory component is and where they're located on the chip, which would allow someone like the defendant, who wanted to customize his own machine learning chip, to basically copy large aspects of this design.

In the under-seal portion, Dr. Sanchez also discussed Exhibit 361, which is the PFC interconnect document.  This relates to Google's proprietary technology that allows different TPUs to talk to one another.  Dr. Sanchez told you this document includes the actual routes the different TPUs use to talk to each other.

Now, each of these documents are incredibly valuable on their own, but as Dr. Sanchez testified, they would be even more valuable together because these different components are not designed in isolation, and together, they reveal a combination of tradeoffs and design choices that would give someone like the defendant a several-year head start in developing their own chip.

Category 2 relates to the physical design of Google's TPU chips and systems.  And remember, a lot of the documents in this category relate to TPU Version 6 that hadn't even been publicly announced when the defendant stole these documents.  Dr. Sanchez talked a lot about Exhibit 377.  For example, he testified that this document includes detailed information about Google's TPU Version 6, including the sizes of the memories, performance metrics, and floor plans.

Remember, Dr. Sanchez testified that there are significant design tradeoffs that go into designing a machine learning chip, and someone like the defendant who had accessed this information could use it to optimize their own design by

bypassing those complicated design decisions that Google already made.

Dr. Sanchez testified that this category also includes information that goes beyond the chip level. It includes information about the servers and the racks, how Google's system connects together. And as Dr. Sanchez testified, the combination of all this information provides a more complete and valuable picture that would be valuable to someone like the defendant who had ambitions to build an AI supercomputer.

Category 3 relates to the software that Google uses in its TPU systems, and it discloses information about how Google actually connects all of its TPUs to create one giant supercomputer.

Dr. Sanchez spent quite a bit talking about Exhibit 383, and we also mentioned this document before. This is the ICI resilience slice document that's relevant to optical circuit switching technology that the defendant was touting he could use in the Zhisuan investment pitch.

Now, Dr. Sanchez -- as Dr. Sanchez explains, Google uses these tiny mirrors to connect different TPUs. So when one TPU fails, the tiny mirror can actually redirect the TPU so that different TPUs can talk to one another. As Dr. Sanchez explains, this solves one problem, one issue with failure, but it introduces another problem.

What happens when those tiny mirrors fail? What happens

when those tiny mirrors break down?  This document, Exhibit 383, solves that problem.  And you can see on the left, these are the internal source documents for this ICI resilient slice document, and on the right is the trade secret document.  And I just want to flag here again, you can see that the defendant is stripping -- when he took this information, he stripped it of confidentiality markings, the authors, and other things that would identify it as a Google document.

So this document, as Dr. Sanchez testified, provides an algorithm, or the solution that basically lets the TPUs communicate with one another even when these tiny mirrors break down.  Dr. Sanchez testified that this would be incredibly valuable for someone like the defendant who was trying to build a system using optical circuit switch technology.

For one thing, it would identify a problem.  So someone using optical circuit switching might not even know this would be an issue.  But then it also would provide the solution. This document also included the financial benefits of the solution, which would give a competitor like the defendant insight into how valuable the solution could be.

The other documents in this category relate to custom software that Google developed to make Google's systems useful and reliable.  As Dr. Sanchez testified, each document is valuable on its own, but taken together, the documents give a comprehensive view on how Google approaches solving reliability

issues and connecting thousands of TPUs to create a supercomputer.

Categories 4 and 5 relate to Google's GPU supercomputers. Now, you've heard a lot by now about the fact that Google buys the actual GPU chips from another company called NVIDIA, but Google invests millions of dollars into building custom servers and software around those chips to build custom GPU supercomputers.

Category 4 relates to the hardware of those systems, and Category 5 concerns the software.  Dr. Chandra testified that thousands of engineers have spent multiple years building these custom systems.  Dr. Sanchez testified that taken together, the documents in Category 4 contain significant design choices about Google's custom hardware.

These documents are particularly relevant to the defendant's plan to build Zhisuan, because as you know, he repeatedly said he was going to build a 10,000 GPU supercomputer.  So having access to this information about how to build custom hardware for a GPU supercomputer would be incredibly valuable.

I want to just talk about a couple example documents in this category.  So Exhibit 407, that's an over 100-page, very detailed document that gives information about how Google makes its custom GPU servers.  As you will recall, Dr. Sanchez testified that this document includes diagrams of the servers,

and you saw some of those diagrams, as well as a list of all the components that Google uses to make those servers.

Again, this would be incredibly helpful for someone who is trying to build their own AI supercomputer because, as Dr. Sanchez said, it would allow them to optimize the design of their own system and bypass the years of effort that Google designed in investing these systems.

And again, here you can see that the defendant -- you can see there's a Google sign, proprietary confidential, Access Level 2. You can see on the right, the defendant copied essentially everything else from this document except for the Google markings and the confidentiality markings.

One of the other documents in this category that Dr. Sanchez spoke about is Exhibit 402. Dr. Sanchez said this document read like a lab notebook and included information about how Google's design of its GPU systems changed over time, what type of cooling systems Google considered, different physical dimensions, and then the ultimate final design that they landed on.

Dr. Sanchez testified that all this information like this -- this is the comparison of the different dimensions that Google was considering. We talked -- Mr. Novak talked about this document quite a bit yesterday and admitted that this includes valuable design decisions about how Google was deciding to build its custom tray and systems.

And Dr. Sanchez testified that all this information would be incredibly helpful to someone like the defendant who was trying to customize their own GPU hardware.  And we just talked about a few examples in this category, but Dr. Sanchez also testified that these documents describe different aspects of the custom hardware that complement each other.

Google's GPU systems obviously consist of multiple parts, and so having more information to those different parts and how they interact is more valuable because it reflects design decisions about the whole system over time.

Category 5 concerns software that is critical to Google's GPU performance.  For example, Dr. Sanchez testified that these documents include information about a custom technology called TCPDirect, which is a custom implementation of a protocol called TCP and allows GPUs to communicate more effectively, which is important for reliability and speed.  Now, you saw in the defendant's presentations that is exactly what he was trying to accomplish.  He was trying to build a fast and reliable AI supercomputer.

Dr. Sanchez also discussed Exhibit 429, fabric topology for Astrophel, which, as he described, shows how Google modified its systems to meet the needs of a large cloud customer.  Now, this document includes information down to the amount of information per second that different machines could exchange and the exact topology of how those machines should be

connected.

Dr. Sanchez said this information would be valuable to a company that was trying to build an AI supercomputer because it would give them insight into how to structure their own machines.

And again, in addition to testifying about individual documents, Dr. Sanchez testified that the collection of the documents in this category are even more valuable together because they relate to different software components of the systems that complement each other and together make the system more reliable.

All right.  So Categories 6 and 7 relate to Google's custom SmartNIC called Diorite.  You heard from testimony from Dr. Sanchez and Dr. Chandra that explain a SmartNIC is like a specialized card that enables high performance communication in AI supercomputers.

Dr. Chandra, who is the inventor of Diorite, testified that hundreds of Google engineers worked on developing Diorite for four years, and Google invested millions of dollars into the creation of the SmartNIC.

Category 6 includes low-level microarchitectural details of a block called the Google reliable transport, which facilitates high-speed communication.

You heard testimony from both Dr. Sanchez and Dr. Chandra that while Google publishes the protocol, that's just like the

language that you need to use this technology.  But they have not published how they implement that language, how they use that protocol on their own hardware.

And the information in these documents, including Exhibit 438, discloses those details, those hardware implementation details.  Dr. Sanchez explained that high-performance communication is incredibly important for building AI supercomputers, and the information contained in this document essentially discloses an efficient and sensible way to implement this publicly available protocol.

In other words, a competitor like -- or another company like the defendant's could use the publicly available GRT protocol in combination with the sensitive information about the hardware implementation to implement a similar implementation on their own SmartNIC.

Dr. Sanchez testified that each document in Category 6 is valuable and secret, but then taken together, the information in this category gives even more information about how Google's SmartNIC is organized and how Google uses the SmartNIC at Google.

Category 7 focuses on the software that complements the hardware in the SmartNIC, and many of these documents focus on the software implementation of RDMA, which is another protocol that allows for fast communication in AI supercomputers.

Dr. Sanchez focused on a document called -- Exhibit 448,

which is the cloud RDMA deep dive data path document. Dr. Sanchez testified that this document includes the congestion control algorithm that interacts with the GRT hardware. He explained this algorithm determines the optimal rate for sending data, preventing traffic jams, and is a solution that would be extremely valuable for a competitor trying to build an AI supercomputer.

As with the other categories, Dr. Sanchez testified that each document in this category is secret and valuable on its own, but together, they disclose complementary and different aspects of the software that run on Google's SmartNIC that is even more valuable when considered together.

All right. I want to talk now about the steps that Google takes to protect its trade secrets. You heard from Heather Adkins, Google's VP of security engineering, about the company's layered approach to protecting its information. That means that Google doesn't rely on just one measure to protect its information; it uses multiple overlapping layers of protection.

Google takes physical security measures. That includes requiring employees to use badges and requiring visitor registration and surveillance cameras.

Google also trains its employees to mark sensitive documents with confidentiality labels and set access restrictions. Google employee Matt Linton testified that most

of the trade secret documents in this case had either access controls or markings, but not all of them did.

Now, the judge instructed you that just because something isn't labeled confidential doesn't mean it's not a trade secret, as long as Google took other reasonable steps to protect that information.

And Google doesn't rely just on marking or access restrictions to protect its trade secrets.  It knows its employees are human, and humans make mistakes.  That's why, as Ms. Adkins testified, Google trains its employees on the very clear golden rule that if it's an internal document, you don't take it outside the company.

You saw examples of that training.  That's Exhibit 885, that these are trainings that all Google employees have to take that makes clear that employees cannot share internal Google information with their personal email or take it outside the Google network.

This is another example of that training.  That's Exhibit 741.  And you have evidence that the defendant took these trainings, along with other trainings, and this is Exhibit 1196.

Google also takes extensive -- has extensive computer and network security measures.  Employees have to go through a two-step authentication process using a special security key just to get onto their computer, and then there are additional

steps to access different areas of the network, making unauthorized access incredibly difficult.

Google also keeps detailed digital logs, and you heard a lot about these logs throughout trial. Every time an employee accesses, prints, downloads, or uploads a document, Google keeps a record. These logs contain trillions of lines of data every day, far too much information for one human to review that information manually. Instead, that data is fed into an automated system that is designed to detect different internal or external threats.

Ms. Adkins testified that because the defendant copied information into Apple Notes rather than uploading the Google documents directly, the audit system had a harder time detecting the defendant's activity, which is why his actions weren't flagged immediately.

Finally, Google has a 24/7 security team with thousands of employees dedicated to protecting its sensitive information. When Google learned that the defendant had presented at MiraclePlus, for example, that team acted immediately. Within hours, they had analyzed forensic logs and suspended the defendant's access to Google's network.

Taken together, these steps show that Google's measures to protect its trade secrets are thorough, multifactorial, and reasonable.

I want to go back to our timeline. We're going to

fast-forward to December 2023.  You heard during Special Agent Valladao's testimony that she recovered screenshots from the defendant's calendar showing that he had scheduled meetings with 21 different potential investors for Zhisuan in the month of December.

Now, on December 2nd of 2023, the defendant uploaded documents from his corporate computer to his personal account. Because he uploaded those documents directly from his computer to his personal account, rather than copying it, it triggered an investigation from Google.

On December 8th, 2023, the defendant had an interview with a Google investigator, Brad Fuller.  And at that point, Mr. Fuller was not aware of the fact that the defendant had previously uploaded thousands of documents.  During that interview, Mr. Fuller reminded Mr. Ding of Google's policies, and he asked Mr. Ding to sign a self-deletion affidavit promising to delete all confidential Google information.  This is that affidavit.  That's Exhibit 280.

The defendant said he searched his personal possessions, including all devices, accounts, and documents for any non-public information originating from his job, and that he permanently deleted or destroyed all copies of that information.  This was signed on December 8th, the same day of that interview.

During that interview, the defendant had the opportunity

to come forward, to tell Mr. Fuller that he hadn't understood the policy, that he took these documents by mistake.  And in fact, Mr. Fuller testified that he told Mr. Ding if something came up, if he remembered something, he could always reach back out.

The defendant did not do any of that.  Instead, on December 14th, 2023, six days later, instead of downloading all the information like -- I'm sorry.

Instead of deleting all the information like he said he would, he downloaded all of the information he had stolen and stored on his personal account to his personal computer, over a thousand documents, including all of the trade secrets to his device.

Now, this was not just a backup.  The Government's forensic expert testified the defendant didn't download anything else from his personal account that day.  In other words, the defendant made a specific and deliberate decision to download all of the stolen trade secrets to his computer.

Just 12 days later, the defendant told his manager he was resigning.  If the defendant did not intend to use the stolen documents, why would he have downloaded them?  He was on his way out.  He had no conceivable reason to need them unless he was going to use them for Zhisuan.

On December 29th, 2023, Google learned about the defendant's presentation and cut off his access.  The defendant

was so desperate to get back on to the network that he went to the office at 7:00 in the morning, and when he couldn't get back on the network, he started mass deleting the trade secret documents that were still on his Google corporate computer.

Now, he did not delete any of the copies that he had stored on his personal account, and he did not delete any of the copies he downloaded to his personal account -- to his personal computer.  He only deleted the copies on his corporate computer, as well as deleting the Voicemod application he had downloaded.  Why?  He realized what was going on, and he was desperate to cover his tracks.

Now, it's worth noting here that from December 26th to December 29th, between when the defendant told his manager he was leaving and Google cut him off, he created more than a hundred new notes, again using Google's internal information. You can see those notes in Exhibit 774.

Think about what he possibly could have needed those notes for.  Again, remember, this is from December 26th.  He's told Google he's leaving, and in a three-day timeframe, he's made more than a hundred new notes.  He was clearly planning on uploading these, on using them, and Google caught them before he could.

All right.  So we've gone through the evidence of this case, and now I want to focus a little bit on the jury instructions that the judge has informed you and talk about how

the evidence fits into these different instructions.

Let's start with trade secret theft.  The first -- the first element, we've already talked about quite a bit.  You have to find that each category contains at least one trade secret, and each count corresponds to one category of trade secrets.  As I said before, each document in each category is a trade secret, and the combination of the documents in each category is also a trade secret.

Second, you need to find that the defendant knew the documents included confidential information that he had no right to take.

There's a reason that I pointed out repeatedly how many of these documents had confidentiality markings that he purposefully removed before taking them.  He knew these documents were confidential.  You also heard from multiple senior Google engineers that all of these documents are confidential and they knew it by looking at them.

It is clear that the defendant, as an engineer with an engineering background at Google, from looking at these documents, whether they're marked or not marked, would have known they were confidential.  It's also clear he knew he was not supposed to take them.  He took multiple trainings informing him of that, and he also took multiple steps to cover his tracks, indicating he knew what he did was wrong.

Third, you need to find the defendant intended to take the

trade secret information for the economic benefit of someone other than Google.

One thing I want to flag here is that the Government does not have to prove that the defendant actually used the trade secrets. The fact -- you heard a lot about the fact that the defendant had not yet built a product, and that doesn't matter. The fact that the defendant was caught before he could build a product, before he could use the trade secrets doesn't make what he did any less of a crime.

We spent a lot of time discussing the evidence of the defendant's intent to use the trade secret information, but I just want to flag a few key categories of evidence that go to the defendant's intent that I think you should focus on.

First, think about the timing of the defendant's actions. We talked a lot about this, the timing of the uploads and the downloads. The timing of this case directly corresponds to key events where the defendant was planning on leaving Google to start his own business. In other words, these notes were not for his job at Google. They were for what he planned to do after he left.

Second, you heard the defendant's own statements that he intended to copy Google's technology, and in August of 2023, when he was asked to actually demonstrate his products, his default was to film himself using Google's technology. You don't have to speculate about what the defendant intended to do

with the stolen trade secrets.  He said it and showed it to you himself.  He was planning on using Google's technology to build his own product.

Third, the defendant went to great lengths to hide his theft.  It's because he knew what he was doing was wrong, he knew it would harm Google, and he wanted to avoid accountability.

All right.  And the next element is that the trade secret information related to a product used in interstate or foreign commerce.  This basically means that the trade secret needs to relate to a product that's used across state lines or different countries.

Remember, the Government's witness, Mark Lohmeyer, testified that Google has data centers and customers all over the world, and those data centers and customers -- those data centers are used for Google's AI technology that's at issue in this case, and there's customers that use that technology all over the world.  So you can kind of check off that element.

The fifth element is that the defendant intended or knew that the offense would injure Google.  And again, the Government does not have to prove that the defendant's theft actually harmed Google.  We just have to prove that the defendant intended to injure Google or that he knew his offense would injure Google.

So let's talk a little bit about the evidence that shows

that the defendant intended to harm or knew that he would harm Google. You know that the defendant took some of Google's most sensitive trade secret information and was planning to start a company in China with that same information.

You heard from the Government's first witness, Google's VP of AI and Computing Infrastructure, Mr. Lohmeyer, that Google serves customers in China and competes with Chinese companies like Alibaba, and that if a competitor like Zhisuan were able to develop competing TPU or GPU products, it would harm Google because they would have to either reduce their price or lose customers.

And you saw -- this is Exhibit 1001, which is the MiraclePlus investment agreement, where the defendant has a list of company competitors companies including Alibaba. In other words, he intended to compete in the same market as Alibaba, one of Google's competitors. So if the defendant were to -- if he planned to create a competing product, it would harm Google by causing them to either reduce their price or lose customers.

All right. And finally, you have to find that the defendant knowingly took the trade secret information without authorization. This is not contested. You know that the defendant uploaded all of the stolen trade secrets to his personal e-mail account, which is against Google's policies. And then, as we talked about, he downloaded all of the trade

secrets on December 14th, just six days after Mr. Fuller reminded him of the policies and after he had sworn that he would delete all Google information from his accounts and devices.

All right.  Now I want to talk about the economic espionage charges.  Before I do, I want to reiterate what Mr. Boome told you at the beginning of this trial.  Despite the word "espionage," this is not a spying case.  The Government does not have to prove that he was a spy, that he worked for a foreign government, or that he gave secrets to the government of China.

This charge is about whether the defendant intended to use the stolen trade secrets to benefit not just himself and Zhisuan, but entities that are controlled by the government of China.

You will see that the first three elements of the economic espionage charge map on to the trade secret theft counts.  It's really that last element that is different.  Instead of finding that the defendant intended to benefit himself and Zhisuan, you need to find that the defendant intended or knew that his actions would benefit a foreign government or foreign instrumentality.

The term "foreign instrumentality" sounds fancy, but it basically just means an organization or entity that is substantially controlled by the government of China.

Here, we talked about the fact that the government of China sent out multiple plans prioritizing the development of AI technology in China and that the defendant applied for a program sponsored by the government of China to encourage people like the defendant to come back to China and contribute to the technological growth in China.

You also heard evidence that the defendant was marketing himself and Zhisuan to two entities that were controlled by the government of China.  That's the Innovation Park and Tianfu Institute.  Dr. Segal told you that both of these organizations are substantially controlled by the government of China and, thus, meet the definition of a foreign instrumentality.

And as we've discussed, he clearly intended -- the defendant clearly intended to use the trade secrets to benefit both of these entities.  He told the Innovation Park he could help them with the research and development of custom AI chips and infrastructure, and he told Tianfu that he could help them build AI computing centers, both of which directly relate to the stolen trade secrets.

I know we have asked you to absorb a lot of technical information throughout this trial, but at the end of the day, this case is simple.  This case is about the defendant's greed, his theft, and his lies.

You don't need a PhD in computer science to understand what happened here.  You can use your reason, your common

sense, and look at all the evidence together, the defendant's words, his actions, his lies, and his theft, and we are confident that when you do, you'll return a verdict of guilty on each and every count.

THE COURT:  Okay.  Thank you.

We'll take our early lunch break now.  We'll resume at noon, and we'll hear from the defense then.  Thank you.

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Let me just remind you your deliberations have not started yet, right?  And they're not starting over the lunch break.  It's only after you hear all the arguments from the lawyers that you begin your deliberations.  So all of my admonitions about not talking to one another about the case, as well as anybody else, still apply.

Thank you.

THE COURTROOM DEPUTY:  All rise.

(The jury left the courtroom.)

THE COURT:  Okay.  Anything to discuss before we break for lunch?

MS. KRSULICH:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  Please be seated.

MS. KRSULICH:  Lora Krsulich for the defense. Ms. Priedeman mentioned at the beginning of her opening statement that she may paraphrase some law, and she did some paraphrasing as to Element 3 of the trade secret definition,

which raised some concerns with the defense.

Counsel said, "Basically, the third element means that the information must be valuable."

That is not a correct statement of the law. The information must be -- must have independent economic value from being secret, so that is different -- that's different than it just being valuable. So we would ask for a corrective instruction from the Court on that.

**THE COURT:** I don't think that's necessary. I think it's a very small subtlety. And my instructions are what controls, and I've been very clear to the jury that, you know, if -- my instructions are what controls, and I'm quite sure you'll emphasize that in your closing as well.

**MS. KRSULICH:** Thank you, Your Honor.

**MR. CHANG:** We agree with the Court, Your Honor.

**THE COURT:** Okay. Anything else?

And I think Ms. Priedeman may have gone about 75 minutes is my rough count, but I think that the time was used very efficiently. The jury's time was not wasted with any aspect of that closing argument. So if you want 20 minutes for rebuttal, you can have that. And obviously, I won't be strict with the defense about its 90 minutes either, as long as the defense is also not wasting the jury's time.

**MR. CHANG:** We appreciate the extra time, Your Honor.

**MS. KRSULICH:** Thank you, Your Honor.

MR. CHANG:  Okay.  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken.)

THE COURTROOM DEPUTY:  All rise.

(The jury entered the courtroom.)

THE COURTROOM DEPUTY:  Please be seated.

THE COURT:  Okay.  Welcome back, Mr. Fondo.  Take it away.

MR. FONDO:  Thank you, Your Honor.

### DEFENDANT'S CLOSING ARGUMENT

MR. FONDO:  Ladies and gentlemen, the Government spent days and days of this trial talking about Google's technology, their AI supercomputer, and their data centers and their billions and billions of dollars that was spent developing that.

What they didn't focus on was the core of this case and the questions they can't answer.  The core of this case is the 105 alleged trade secret documents and what did he do and, more importantly, what did he not do with them.  The Government doesn't want to address that, because those facts are problematic for them.

You saw, during this course of this trial, they didn't mention those facts during the opening.  And their lead case agent, Special Agent Valladao, did not mention those facts either.  We brought those facts out, and let's talk about why.

And we want you to also think, as we think through that, has the Government always been upfront with you as we go through this case?

So if you remember in opening, the Government told you three things:  We do not have to prove that the defendant gave the trade secrets to anyone.  If they had been upfront with you, they would have also just told you, "And we can't.  We don't have that evidence."

They didn't share that with you.

"We don't have to prove that he shared them."

Again, if they were upfront with you, they would have said, "And we can't prove that he shared them with all these investors, these China instrumentalities.  We can't prove that.  We don't have that evidence."

They also said, "We don't have to prove that he actually used them."

If they were honest with you, they would have said, "Yes, he's had them, these documents, for more than 18 months, 6 to 18 months, somewhat longer, but he never used them."

They didn't share that with you.

Here's some of the other evidence that they didn't share, and we had to ask these questions:

"Did you find evidence that Linwei gave the alleged trade secrets to anyone?

"We didn't explicitly see evidence of that.

"Transfer the alleged trade secrets to a third party?

"No.

"Sold them?

"No.

"Use them to build a product?

"No.

"Found no actual code using the trade secrets?

"That's correct.

"You found no evidence that after this all happened, that anybody else used the trade secrets?

"That's correct."

So let's talk about what this case is about.  It's about the actual evidence, about what happened, and all the components of it.  It's what Linwei actually did versus the Government's speculation.  You heard a lot about what he intended to do, and you heard a lot about since April 2022, "He intended."

That's 18 months of intended to do something but never actually did anything with those alleged trade secrets.  That's an incredibly important point that I want you to focus on, and use your common sense as you go through this evidence.

I also want to focus on witness independence.  You heard -- we'll talk about that, that you heard from certain witnesses here, and also the charges.  That's what you're here to decide today.

I'll go through some of the jury instructions with you. Again, what the Government -- excuse me -- the Court shares with you in the instructions is what governs, but I'll try to go cover those to assist you in your deliberations, and then it's all about the Government's failure to prove each and every element beyond a reasonable doubt.

It's also not about whether Linwei breached Google policies. That's not what this case is about. This case is not about holding two jobs. That's not a crime.

It's not about starting a business in China. That's not a crime.

It's also not about having someone else badge swipe. We're not saying that was okay, but that's not a crime, and that's not what he's charged for here.

And possession is not a crime.

So I want to thank you first before we get into the rest of this. Thank you for your time. You've been an incredibly attentive jury. It's an incredibly important part of the process. My client, Linwei, would like to thank you. My colleagues would like to thank you. We greatly appreciate your time and your consideration.

So these are the topics we're going to cover, and I'll just get right into them. So the first one is the FBI's investigation is direct evidence that Linwei is not guilty.

So you heard evidence from the lead case agent, Special

Agent Valladao, that the Government did a through search, an exhaustive search.  They searched his house, found a bunch of devices.  They surprised him, as you know.  She testified he wasn't hiding things, throwing things out the window, things of that nature.

They seized a bunch of email accounts.  They had dozens of search warrants and subpoenas.  They interviewed a bunch of Google witnesses.  You heard from them during the course of this trial.  They also brought in three experts.  And they found nothing that matters, nothing that goes to the core of it, which is the intent.

No evidence that he gave, transferred, or sold the alleged trade secret to anyone, including the Chinese government; no evidence that he used any of the trade secrets; no product found with any of the trade secrets; not one Zhisuan or Rongshu document containing any of the actual, alleged trade secrets; not one message containing any of the alleged secrets.

If you recall, there were thousands and thousands of WeChats.  Not one.  He didn't hack into Google's system to take anything.  There's no evidence that the alleged trade secrets had any export restrictions, and there's no alleged trade secret uploads after April 17th, 2023.

They also spent a lot of time on the August 23rd, 2023 video.  That was the video application.  There were no trade secrets in that.  None of the alleged trade secrets were in

there.  The GitHub -- you heard a lot more about that when we started talking to Special Agent Valladao.

There were no trade secrets in there.  It was only open source technology.  There was simply no product that Linwei developed over the 18-plus months that he allegedly had these alleged trade secrets.

His company had no revenue.  There were no payments from China.  You heard from no witnesses from China, and you heard that he didn't liquidate assets at the end when he was terminated and supposedly running off to China.

So let's talk about the notes that Linwei kept from the beginning.  So Linwei is a permanent legal resident.  He was -- he came here to attend USC, and then he worked in tech for a number of years in California before he joined Google in May of 2019; in fact, May 13th, 2019.  When he was hired, the first thing he did was he uploaded some documents.  They were just work-related documents about training, things of that nature.

You also heard evidence about job responsibilities requiring cross-organization knowledge, about information that's available and useful for your job.  Also, you heard about trainings, which we'll get into.

So you heard one of the Google employees talk about Linwei.  When the witnesses were presented, Google witnesses first testified with the Government.  And remember, they had met with the Government multiple times.  You heard that during

the testimony.

They tried to give you the impression that all these 111 -- 105 -- excuse me -- alleged trade secret documents had nothing to do with his work.  And then when we showed them the reviews that they performed, that story changed.  The review talked about Borg.  They talked about working as a team leader.  They spoke about cross-organization.  He won the Perfy editor's choice award.

They also talked about the MPI products.  They talked about Astra MP support, MVP support, internal Borg pilot.  And you see these -- when you look at the alleged trade secrets, you see that these cover the same topic, and so these documents were related to his area, his general area of expertise.

And also, to expand, you heard the Google employees talk about working with cross-groups and how it can be helpful, and they admitted this.  It can be helpful to learn about some information about the groups that you're working with and talking with.  And that's common sense, right?  You're going to meet with different groups.  You want to learn a little bit more about what they're doing.

Now, let's talk about that super-secret way that Linwei supposedly was defeating Google and committing a crime.  He did this the same way every time for four years.  He was using Apple Notes.  He would copy and paste the Apple Notes onto his -- or copy and paste -- sorry -- information, and he would

paste it onto his Apple Notes.

The Apple Notes was a feature, a product that was provided as part of his work computer, just a standard feature, and then he converted it to PDF, and then he uploaded it to Google Drive.  Nothing super complicated about that.  He also did it pretty regularly, literally just about every single month that he was at Google.

So the Government likes to circle back and sort of backfill things by focusing on particular dates, but we ask you to look at the totality of the circumstances, the totality of the evidence about what he was doing.  Note taking was not an unusual thing for Mr. Ding.

He also told Brad Fuller that "I want to keep a record of my working experiences and update record."

You also heard from Google employee Heather Adkins that they do see an element of sentimentality, that people do tend to keep things at times.

You also look -- go to Exhibit 349.  If you look at that exhibit, there are -- it's not a document that he copied.  There's a note in there about how to pronounce a certain word.  He wrote it in how to do it phonetically.  Those are the types of notes also that you see here that he was doing.

So I talked about those cross-organizational projects previously.  And so this is what I want to show you.  So you see on the -- on your left-hand side is the information that

was in his reviews about what he was up to, meaning with these cross-organizational projects. And on the right, you see the same terms.

What does that tell you? That tells you that some of these alleged notes and trade secrets were part of his work and are covering the same topics. And it wasn't as originally described where this had nothing to do with his work.

He also had extensive training and development meetings, and it was Platforms University. You'll see a number of these documents relate to training materials. And that was part of his job in attending training materials.

Also, Google talked -- and you heard this. Google witnesses talked about how open a culture it was, sharing of information. And that's part of that process too. That is a Google decision, and it's fine. It's their choice how to run their business. But to then come in and say he didn't have access to -- this stuff was outside of his work scope, I think is unfair and contrary to the evidence that you ultimately heard.

So as we mentioned, he was a regular note taker. And if you look at this in context, he had roughly 3,400 notes that he took. Only 105 of those were the alleged trade secrets, which is the core of this case.

And if you look at what these notes include, they also include a bunch of other things -- personal information, travel

information, contact information, notes from summits and seminars, things of that nature.  So there was a variety of different notes.  There was a lot of work notes too, no question.  But it wasn't just these alleged trade secrets.

He also exported a lot of other documents as well.  It wasn't just the 105 alleged trade secrets.  It was 1,700 other documents.  Again, context matters.  Totality matters.

So let's talk about some of these notes in a little bit more detail.  So these notes are based on -- many of these are based on dated information.  The newest note is April 2023.  As you know, he was terminated about six, seven, eight months later.  Actually, almost eight months later.

And so these were not new information.  In fact, some of them went all the way back to four and a half years ago, back to 2018.  And as Steve Novak testified, technology changes rapidly.  And Dr. Sanchez, the Google engineers -- they also talked about the change in technology.  It's not a surprise, right?  Technology changes fast, particularly in cutting-edge technology.

So, again, let's, again, look at context.  50 percent of these alleged trade secret notes were created before his first contact with Rongshu.  The Government spent a lot of time with Rongshu.  85 percent of these notes were created before -- he started at Rongshu in November of 2022.

And a hundred percent of the notes were created before he

applied to MiraclePlus.  And then none of the notes were uploaded -- none of the 105 notes were created after April 17th, 2023.  And here you go.  Here's the upload.

So as expert Steve Novak testified, these documents were part of a complex puzzle, and they only represented a small portion of these 105 alleged trade secrets.  They were -- these things were randomly assorted.  They were extremely broad, and they were not functional to really replicate Google.  And you heard a lot of this -- and we'll get into it too -- about how impossible or how challenging it would be to try to recreate all that Google has done.

Linwei left a lot of information behind, and that's important when you look at intent.  What did he take?  What did he not take?  And let's look at what he did not take.  He left behind literally billions of code.  He left behind final specifications.  He left behind hyperlinks, all the hyperlinks in those source documents.  And he left RTL code.  So he left incredibly important information behind, and he left all the new stuff behind.

If someone had this master plan to go to China to start a company and use all of Google's technology, or use most of it, why wouldn't you take something after April 17th and upload it?  None of the alleged trade secrets postdate April 15th, 2023.  Why wouldn't you take some of the other stuff?  Why wouldn't you take new stuff?

That goes to intent, and it's common sense.  If you're going to do this, if you have this master plan, A, you would have started building something a long time ago because you had it for so long; and two, you would have taken the newer and better stuff.

So let's talk about these 105 notes.  But first, I want to go through the jury instructions.  This is jury instruction number 13, and it's -- first, the information is not generally known, meaning essentially it's not public.  Second, the owner of the information has taken reasonable measures to keep such information secret, and we're going to spend a fair amount of time talking about that.

And then to remind you, it's not a crime for an employee to independently develop technology through proper means or to leave an employer and use trade secret information or skills gained through that employment.  People leave companies all the time.  In addition, the personal skills, talents, or abilities that employee develops at their place of employment are not trade secrets.

So Dr. Sanchez admitted that many of the 105 alleged trade secrets do, in fact, contain public information in patents, and patents, again, are information published by companies to get a measure of protection for that technology.  And then also in articles.

Remember, it is the Government's burden to show that every

single one of these alleged trade secrets was, in fact, a trade secret. That's their burden. That's not ours, and we ask you to hold them to it as you look through this evidence.

So let's look at what the Government did not show you. There's 105 alleged trade secrets. They didn't even open up 86 of them for you by our calculation. 86 of them, they didn't open up and say, "Hey, there's the technology. We want you to see it. Okay? Here's that alleged trade secret technology that was taken."

They didn't even show that to you.

We believe you cannot conclude beyond a reasonable doubt that those 86 documents created -- excuse me -- contained alleged trade secrets if they didn't even show you what was in it and what specifically was alleged to be a trade secret. That's 82 percent roughly of the documents.

So you heard testimony about how valuable these alleged notes were and the information in them, and you heard -- I think it was Mr. Linton, one of Google's employees, talk about reference to that AI technology was one of the crown jewels or a crown jewel of Google. Well, they didn't protect it like that.

So you heard from the vice president of security engineering, Ms. Adkins.

"Question: There is no consistent label that tells an employee this document is a trade secret.

"That's correct.

"Each individual employee decides how it should be labeled?

"Yes.  If you created it, it's our policy that you should label it."

It's our policy that you, the employee, should label it. Google doesn't take responsibility for that.  They put it on the employees.

"And not every document is labeled accurately?

"That's correct.

"So Google's confidential information is shared with up to 190,000 of its employees?

"It could be."

So let's pause there for a second.  These are allegedly super-secret information, a crown jewel, and they are circulating it out to the 190,000 employees and also contractors and temporary employees?  That's not a reasonable measure of protection.

Google shared 32 of the source documents with over 160,000 people.  You heard that testimony from Adkins and Linton and also Chandra about what these email groups were.  That's an incredible distribution of information for something that is supposedly so important and so protected.

And then you heard testimony about how Google designated these documents, and to say it was confusing is probably an

understatement.  You heard a lot of different things, and their witnesses were confused.

"So proprietary is different than confidential?

"Proprietary is not part of our classification.

"Well, you saw through the course of this trial a number of documents that were labeled proprietary.

"There's another system now for proprietary.  I don't know where teams get proprietary from.  I'm sorry."

That's Google's security -- Vice President of Security Engineering.

You heard from one of the top experts in the field, Jim Pooley.  He was basically literally here as a Silicon Valley guru.  He's in the IP hall of fame.  And he talked to you about how he advises companies to protect important information and the tradeoffs companies make.  And tradeoffs are okay, but they're tradeoffs.

And so he told you that the labels need to be clear.  It's got to be clear and consistent for people to follow it.  This is particularly true when you have large groups of organizations and people come in from diverse backgrounds.  Everybody has different experience levels dealing with information.  So you need this to be clear and consistent.

You also heard from Google employees testimony about everything is confidential unless it's marked otherwise.  As Jim Pooley told you, that doesn't make any sense.  If

everything is confidential, then nothing is confidential, because you're not educating your employees. When they look at a document, you're not telling them what does this mean.

If there's nothing on a document -- this is, again, Mr. Pooley. If there's nothing on a document that is not protected at all, that no one cared enough to put a label on, it's probably public.

So we also talked about a tradeoff between collaboration and security. Google made a decision, and it's their decision to make. They made the decision that collaboration is very valuable to them. And I have no doubt that it is. But there are tradeoffs. Sharing things to 190,000 employees, there's tradeoffs. And that's one of the tradeoffs as security goes down. And then not only that, you also see that these policies were not followed. No labeling, different types of labeling.

You heard from Mr. Lohmeyer, an executive at Google. We showed him a video of him at a very public conference about AI with a number of industry players, where he displayed a Google PowerPoint that said proprietary and confidential. Okay?

Is that a reasonable measure when your top executives goes to a huge conference and displays this? Now, he said, "Oh, my team must have missed it."

Well, as you've seen through the course of this trial, the teams missed a lot of things, because they weren't labeling things. They had different types of labeling systems. No one

seemed to know what the system was.

So you heard testimony from Mr. Linton about a level 4 secret. Okay? The highest designation, highly restricted. And in Exhibit 57, you'll see their pyramid doesn't have the word "secret" there, but this is sort of one of their security documents related to labeling.

So let's look -- by our calculation, there were 148 source documents. Let's take a look at how Google labeled those source documents, those crown jewel-type documents.

That level 4, highly restricted, none.

Access level 2, one.

Access level 2, confidential and proprietary, one. You're already starting to see all the variation of all these different types of labels. Remember, proprietary is not a designation that Google's security -- engineering security recognizes.

Access level 2, confidential and proprietary, TI.

Confidential public, personal favorite of mine. Okay. So it's confidential, but it's public? How is that? What kind of labeling system is that?

Access level 3, confidential and proprietary. Confidential and proprietary.

No label at all, 78. By our calculation, 78 out of the 148 source documents were not labeled. That's a majority of those documents where Mr. Ding allegedly took information from

and put them in the 105 trade secrets.  You have the evidence. You can go back and check this.  This is just what we believe the evidence showed.

So you heard testimony that Google logs everything everywhere, something to the effect of almost every keystroke. Except their trade secrets.  Linwei, using a very simple method of just copying and pasting the same way for roughly four years, apparently didn't properly trigger this great system.

Mr. Linton testified it's fair to say --

"Question:  It's fair to say that Google logs nearly every action taken by its employees on Google-issued laptops?

"That's a fair statement."

Adkins testified that Google ignored all the DLP software warnings.  That was the -- DLP was a software warning where certain things happen, it triggers alarms, and then they analyze it.  Okay?  And they get lots and lots of different alarms.  Okay?

So Google's perspective is "There's just too many alarms. We can't chase them all down.  Not our problem."

Mr. Pooley said you have to make a decision.  You can either ignore them, like that was done here.  You can either adjust the system, kind of change the barometers of what gives rise to a level, or you can add more people to look at these things.  And certainly you can trigger the different way that software worked.

Google had -- you heard in this case Google has 300- to 400,000 employees, contractors, temporary workers.  Common sense.  Ask yourself, do you think they could have put a few more of those employees to handle this software to make their security system a little bit better so that they could trace the things that trigger their alarms?

They chose not to do that.  They chose to allocate their resources elsewhere.  And that's okay, but when we go to reasonable measures, that's a factor we believe you to consider, among the many other factors we talked about.

So let's talk about the reasonable measures.  It's one of the elements.  So we see no consistent labeling and confusion among their own employees regarding labeling.  And you saw all those different labels.

Google's vice president of security doesn't know about certain labels.  More than 50 percent of the source documents had no label.  Numerous documents are shared with over 160,000 people.  Google put the onus on its employees under this very confusing system.  They ignored their flags and chose not to allocate resources, and they take the policy that everything's confidential.

So Google chose openness and chose to allocate resources elsewhere.  And that's okay, but when you have a criminal case and when you're coming in here and saying Mr. Ding violated criminal laws, we assert that when you go back to that jury

room and assess this, the Government has not proven beyond a reasonable doubt that Google actually, in fact, in this circumstance exercised reasonable measures.

So these are all the alleged trade secrets. These are the notes. So trade secret Category 1, we just sort of cataloged for you, and you're welcome to take notes on this.

So one, not reasonably protected. We went through all of that, right?

Two, no confidential markings. Many of these had no confidential markings.

Three, 160,000 people had access to these. And then these are the documents the Government -- the exhibits the Government never showed you. And this is by our calculation. But again, you can go back and check our work.

Same for category 2. You see the dots, for example, where certain documents were never shown to you.

Category 3, and so it's the same for each one of these seven categories, same story. Remember, if they are not able to meet their high standard, their burden, as to whether something is a trade secret, you stop there. And you have to find not guilty as to the trade secrets counts as well as the economic espionage counts, and I'll get into those jury instructions in a little bit.

Okay. So jury instruction number 12, categories of alleged trade secrets. To find the defendant guilty of any

count, you must unanimously agree on which particular document in that category constitutes the trade secret. We want you to focus on that. So you're going to have to unanimously agree.

Also, a separate crime is charged against the defendant in each count, and you must decide each count separately. However, if you determine that an alleged trade secret category does not contain a trade secret, you must find the defendant not guilty of both the theft of trade secrets and the economic espionage. And that's corresponding. So Count 1, trade secrets, corresponds to Count 8 of economic espionage and so forth.

So let's look at the evidence and elements relating to theft of trade secrets. So the first element we want to focus on is that category of information. So we talked about that.

The second one, that the defendant knew that the document or documents included confidential information that he had no right to take. As we noted before, many of the documents had no confidential labels on them.

Three, the defendant intended to take the trade secret for the economic benefit of someone other than Google.

Fifth, the defendant intended or knew that the offense would injure Google.

And sixth, that the defendant knowingly took the trade secret information without authorization or that he, without authorization, downloaded or transmitted the trade secret

information.

So let's look at this evidence.  I want you to ask yourself using your common sense, how would you expect a person to behave if they had alleged trade secrets that they intended to use and economically benefit themselves or others?  How would they behave, and they had them for 6 to 18 months, and they were trying to find investor money, trying to build a company, trying to apply to MiraclePlus.  How would they use that information or not use it?  Okay.

So let's walk through that.  So as you heard, Linwei hired a headhunter to start looking for a job.  He looked at a number of different jobs and was not able to get them.  One of them related to the fact that he had sort of Google-type skills and not more transferable skills.  In May of '22, he gets introduced to Rongshu, and in the fall, he begins working there.

Okay.  This is Rongshu, right?  This is the picture the Government showed you.  This is just some kind of party.  There's no trade secrets in here.  He's an employee.  Now, maybe -- should he have told Google he was having a second job?  Maybe, but that's not what this case is about.  It's not about an employee who doesn't follow every policy.  It's about criminal acts.

So let's look at what happened at Rongshu because, again, the Government spent a fair amount of time on it.  So one,

nothing illegal about not telling your employer. Nothing illegal about having a second job. This is how Special Agent Valladao testified.

You also heard about a patent. We asked her, "Isn't it true that there was a patent that had no Google trade secrets in it during his time at Rongshu?

And the answer was "I think that the assessment was made, yes, that there was a patent, and there was no trade secrets in that patent."

Common sense. So Linwei is in China, files a patent, allegedly has these trade secrets and is allegedly intending to use them but doesn't use them for technology that he's building in China. That's a huge disconnect. Okay? And you're going to see that time and time again. He never uses these, never shares these, et cetera.

They also talked about him partnering up with the CEO of Rongshu. Well, as you saw time and time again, that went nowhere. So they eventually questioned, "Fair to say they had little to no success raising any money?

That's true.

And eventually they stopped fundraising together?

That's true.

Ask yourself if Linwei had these alleged trade secrets with the intent to use them, to build them, and they were out fundraising with investors, and this investor turned away and

that none of these investors invested in them, what does that tell you about whether he was using those trade secrets or not?

These were the trade secrets that were so incredibly value allegedly, these alleged trade secrets.  What it tells you is he never used them, never tried to sell them, never transferred them.

All right.  The Government also talked about I&R Capital. Again, nothing happened here, okay?  The Government tries to backfill their case.  They look at an upload and say, "Okay, something must have happened important here.  Let's see what we can figure out."  But when you dig into that event, it was a big nothing.

So on April 17th, they had this meeting with an investor. What happens?  Nothing.  The investor passes.  And then if you look in the WeChat, 1155, page 34, you'll see that the very next day, there's communications on that WeChat.  And what are they talking about?  They're talking about open source technology.

They're not talking about alleged trade secrets or Google information that was discussed during that meeting, or gosh, how that investor loved that Google information.  That's awesome.  They're talking about open source technology.  Again, that's Exhibit 1155, page 34.  That's the very next day.  And as Agent Valladao testified, this investor passed.

They also showed you the I&R Capital document.  It was

1137.  This references NVIDIA technology, and Dr. Sanchez conceded that there's no mention of Google in this document. Also tellingly, you'll see there's a financing demand about how much they were trying to raise, $5 to 8 million.

Okay.  So one way the Government is telling you these are incredibly valuable alleged trade secrets.  They're worth billions and took years and years to develop.  And then you have the evidence over here, "We're trying to raise a million dollars and we can't do it.  Nobody's interested."  Nobody's interested because he's not trying to use these alleged trade secrets to try to -- to impress investors, to show these investors all this technology that he has.

The MiraclePlus application.  If you recall, there was a couple of -- three, actually, MiraclePlus applications.  The one August 10th was a document.  This is 1170.  They ask him, "Do you have a product?"

He says no.  This is after 12, 13, 14 months of having these alleged trade secrets.  He's a -- he's a software engineer.  He's an engineer, AI engineer at Google, because he has no product.  Okay.  So he can't be using these trade secrets, right, alleged trade secrets?  Common sense.

And there's the video application, which we talked about before.  He didn't have a product, he didn't have anything to show, so he ended up using -- accessing some Google information.  Now, was that right?  No.  But that's not what

he's charged with.

There were no alleged trade secrets shared in that video, and there's no evidence that video was ever used again.  It was used for a MiraclePlus application.  That's where it began and where it ended.

Okay.  You heard about MiraclePlus and the CEO of MiraclePlus.  As you heard, Mr. Lu is a significant, experienced individual in the tech world.  He's been in a number of various technology companies, and he's also at the University of Berkeley -- University of California Berkeley.  Sorry.

So MiraclePlus was an incubator for startups.  This is a picture of many, many other entrepreneurs trying to build a business.  You have incubators in the United States as well.  During this presentation, no trade secrets were displayed.

I asked Agent Valladao, "You're not aware that Mr. Ding displayed any of Google's alleged trade secrets during this presentation, correct?

"That's right."

No trade secrets displayed here.  Now, this was the team that Linwei partnered up with to be using all these alleged trade secrets, Google trade secrets, to build this company, build this product, build this AI supercomputer, build the data centers.  You have a finance person, and you have a marketing person.  And what they spent that fall for was marketing,

trying to get investments.

So the Government relies -- because they have no actual evidence of use, sale, transfer, they rely on these investor decks. And you heard a lot from the Government in its closing argument about what he intended to do, all these things he intended to do.

Well, ladies and gentlemen, he had this information, at the latest, April 2023, and he had much of it as of April and May of 2022. So for months and months and months, apparently he intended to do stuff that happen he never did. And the Government wants you to speculate and take leaps, "Well, he was going to do it. At some point soon, maybe in January, maybe in February, maybe in March, he's going to actually use these trade secrets. He's going to transfer them, he's going to sell them, he's going to build them." But he never did.

Not one alleged trade secret is copied in the -- in the WeChats. You have investors and investors refused to invest time and time again. Use your common sense. When investors are not interested, then he must not be using these alleged trade secrets.

Agent Valladao testified that roughly 21 different investors passed during this fall to winter time period. 21. And they weren't asking for a lot of money. That's a lot of money maybe to most people, but for a company, a startup who allegedly had all these billion of dollars of Google's trade

secrets, they struck out time and time again.  The only investment they got was from MiraclePlus, who was part of that incubator system.

All right.  So let me go back to this for a second.  So, again, this is one of the PowerPoints, Exhibit 1034.  The Government spent a fair amount of time on this PowerPoint, okay?  And at the end of the day, the testimony from Mr. Sanchez was, "This is a proof of concept."  That the GitHub, the information in the GitHub, was a proof of concept about a product that was a nothing product.  He didn't even call it a product.  He called it a marketing demo.  We will get to that in a minute.

We are in the time period of October, November of 2023.  There's no product.  There's certainly no product with the alleged trade secrets in it.

Expert Steve Novak testified and showed you, on page 19, all -- these are the stacks of the AI technology, and they're all -- all those inferences -- all those -- sorry -- highlighted terms are public source technology.  You hear that time and time again through the WeChats, the GitHub, open source technology.  What you don't see is the alleged trade secrets.

So let's talk about what Zhisuan was and was not and how they could compete with Google.  During the Government opening, you heard -- you're going to hear that the technology that goes

into building these data centers is the result of decades of work by thousands upon thousands of Google engineers and a lot of investment by the company.

And it was.  This is a massive data center.  They have a hundred of them around the world.  That's not cheap to build.  It's not fast to build.  And look what's inside, incredibly complex servers.  I don't remember the exact number.  I think it was 30- to 40,000, something like that, per server, and there's racks as far as the eye can see, and there's a hundred of these all over the place.  That's a lot of technology, a lot of expense that a finance person, Linwei, and a marketing person were supposedly going to try to copy and make.

And you heard testimony from Google employees about how hard and expensive this was.  So Mr. Lohmeyer testified, "How much" -- excuse me.

"Do you have a sense of how much Google has spent on the deployment of its TPU chips?

"Tough to estimate, but easily in the billions."

Same question as to GPU.  Same answer, tough to estimate, but it's easily in the billions.

Google spends billions of dollars on its data center technology every year.  "We do invest significantly, yes."

Let's look at what Zhisuan was.  The Government focus with Mr. Sanchez about the value to competitors of these alleged trade secrets, the alleged 105 trade secrets.  Zhisuan was not

Meta.  Zhisuan was not Amazon.  They didn't have those types of resources.  That's not what they were ultimately starting to build.

The entire revenue forecast -- and this was the forecast on one of the PowerPoints, one the PowerPoints that the Government has criticized as potentially puffery -- the entire forecast for 2024 was $3.5 million, compared to billions of dollars to build these things.

And you heard from Dr. Sanchez.  You actually heard a lot from Dr. Sanchez.  So the software repository that you reviewed -- and as a reminder, GitHub was the software repository that Zhisuan was using -- did it show a large scale computing system on par with what is described in the other documents?

No.

Did it show a model as a service platform?

No.

Did it show a cluster management platform?

No.

Did it appear to be a finished product?

No.

Did it appear to be a product that could have been marketed or sold to customers?

No.

That's the actual evidence.  The actual evidence of what

he intended to do is what he did do, which is they were building something very different, and they were using open source technology.

Okay. Dr. Sanchez also told you, "And your opinion is that what existed at GitHub was, at most, kind of a proof of concept or pitch prototype, correct?

"Pitch stage would be accurate," he testified. "It is, you know, a small demo. It's not something that could be productized. It could be sold as a product."

So this is the actual testimony that we're showing you and we've shown you throughout this.

So we showed Agent Valladao one of the documents in the record, and it was Exhibit 1135, page 254, and it was a change that Linwei was making to a PowerPoint. It says, "How do you replicate the experience of Google's 10,000-card computing power platform, the experience of it?"

So I asked Agent Valladao, "It says 'replicate the experience.' That's a different statement than 'replicate Google's 10,000-card computing power platform,' correct?

"Yes, this is different."

Now, ultimately, that word did not end up in the PowerPoint. It got nixed. But that was Linwei who was adding that.

So let's talk about the GitHub -- sorry -- the R&D group WeChat that was related to the GitHub. So that's Exhibit 1169.

It's well over a hundred pages of conversation back and forth. There are a number of articles in that exhibit that reference open source technology.

And I asked Special Agent Valladao, as part of her extensive investigation, "Did you look at them?  Did you review them?"

She said, "No.  I don't remember reading them."

And then, "Isn't it true that this GitHub was the R&D" -- sorry.

"Isn't it true this WeChat was the R&D WeChat for Zhisuan?

"It's my understanding it is -- the people in this chat were developing the product for Zhisuan.

"Question:  Okay.  And so don't you think it was important to review the articles that the engineers were passing back and forth as they're talking about the product they're building?

"We didn't do it.

"You didn't do it?

"No."

Because they weren't interested in that.  They weren't interested in knowing what they were actually building.  Once they found out that there were no alleged trade secrets, they stopped.

All right.  And Agent Valladao admitted to you -- Special Agent Valladao -- excuse me -- admitted that there were no Google trade secrets in any of the code found on the GitHub

repositories.  I think there were roughly 14 different repository files found.  Dr. Sanchez also verified that.

So the alleged trade secrets at issue, according to Dr. Sanchez, the Government's own expert, relate to AI accelerator infrastructure, supercomputer infrastructure, concepts about managing for AI supercomputers, concepts about orchestrating infrastructure for AI, and data center networking performance.

And then when asked, "Was the code that they were using the purported product that they might be building?  Was that anything related to that?"  He said, "No.  Yeah.  They didn't build that product."

So all those things that those alleged trade secrets were not what was being built in the GitHub repository.  Again, look at what the facts show.  Look at what actually happened.  What they were actually building was not related to the alleged trade secrets.

So let's talk about Google "tech island" for a moment.  So you heard testimony through this trial about how complicated Google technology is.  It's proprietary.  It's referred to as a "tech island" because it's very hard to kind of get into it.  You can't just take a piece and it's interchangeable.  It's not off-the-shelf technology.

And Google develops that, and there's a lot of benefits to that.  And one of the things about it is how challenging it is

to replicate it, particularly when you just have pieces.

So here's that -- here's one of those messages we referred to, the message that I referred to earlier about where he did not get a job because Google's internal infra is mainly self-developed with a high degree of integration and maturity.

There's also a -- so, again, Google tech island.

All right.  So the Government showed you a WeChat where they said, "Oh, this is it.  This is the hot document," because there's a reference to an NDA and some type of performance test reports.  But when you look at what the actual text says, it says, "It's not something for the current project."

So whatever he was or was allegedly not showing, it's not for what they were building.  There's no allegation -- there's no actual evidence that it was one of the alleged trade secrets.  There's no allegation that this meeting -- there's no actual evidence that this meeting ever took place, and there's no actual evidence about what was shown.  Just speculation.  But whatever it was, it wasn't related to what he was building.

Mr. -- Dr. Chandra testified that the software they run is custom to Google, that the SmartNIC runs on custom software.  Again, custom, custom, specific.  Not easy to replicate.  And that's what expert Steve Novak spoke about.  I don't know if you recall, but he spoke about a recipe, and he said, "If you go out and get your own ingredients, you bring them back into the house, you make it, you cook it, and you store it, that's

your own proprietary product.  And it can be a wonderful thing, but it's also hard to replicate."

And that's what Google does, is they make very proprietary technology that is very Google-centric, and it makes it incredibly hard to replicate it, especially when you have pieces.

So let's go back to that 1169, which is that R&D WeChat. Again, no references to the alleged Google technology, multiple references to open source technology.  This is actually what they were doing.

Remember, the Government wants you to say he intended, he was going to get to it.  Trust us, he was going to get to it. Well, when was he going to get to it?  When was he going to use it?  And we'll get to that.

So, again, Agent Valladao confirmed that that WeChat had open source technology.

All right.  So the Government has focused on certain activities in December, and let's talk about that for a minute. So on December 14th, 2023, there was a drive backup to the personal MacBook.  The Government focused on the 105 trade secrets, alleged trade secrets, but there are actually a lot of other documents that were backed up as well.  It wasn't just those documents.

Let's talk about the deletion of the trash on December 29th.  So there were 34,000 items deleted from that trash.

That's 34,000.  Only 50 of them were alleged trade secrets.

Also, all the notes that are at issue were still on Apple Notes on his laptop.  They talked about Brad Fuller in that December 8th meeting.  That upload was related to biographical-type information.  There were never any trade secrets uploaded that related to that interview with Mr. Fuller.

And the November and December 2023 uploads that the Government referred to did not contain any of the alleged trade secrets.

So what you see is these events of significance, actually, there's a lot more to it.  So you look at the files in the trash that was deleted, there's personal type information in there, apps, et cetera, personal -- yeah -- personal apps, data, and files, not just alleged trade secrets.

And Mr. Crain testified.  He sort of cabined off things for you.  He said only four of the actual documents were ever viewed in Google Drive.  He had no evidence that any of the alleged trade secret documents were transferred once downloaded on the MacBook, and he saw no evidence that these trade secrets were viewed once they were downloaded onto his MacBook.

Let's look at also what Linwei did.  He used Google products.  To talk about economic espionage, doing secret things, he was using Google products, Google email, Google Gmail.

He did not change the file names when he put them up into the Google Drive.  Special Agent Valladao testified that no devices were hidden when they surprised him at his house.  None of the devices were wiped clean.  And during the closing, you just heard the Government talk about the November 2023 tweet where he said, "I won't dare to go back to the U.S."

But if you remember, that that came up during Agent Valladao's testimony as well.  And I asked her, "Isn't it true that he came -- he actually did come back three weeks later?"

And he did.  And you saw evidence of that, that he came back.  So whatever the insinuation the Government wants to make of that, it's a nonevent because he came back.

So when you look at intent, look at the facts.  He never used the alleged trade secrets.  Never sold them.  Never transferred them.  Never gave them.  No product.  The only product -- sort of product that developed, the demo, was October 2023, and it was open source technology.

Also, look at some other things that Mr. Ding did not do.  You didn't see him move any assets in December or November or January.  We asked Agent Valladao a number of questions relating to that, and they found no evidence of him selling his town home, moving cash, et cetera.

I want you to think about these three questions.  I know we've gone through it a lot, but it's important.

"So despite all these investigative efforts, you found no

evidence that Mr. Ding gave the alleged trade secrets to anyone, correct?

"We didn't explicitly see evidence of that.

"And despite all your investigative efforts, the FBI found no evidence that Mr. Ding transferred the alleged trade secrets to a third party, correct?

"Not that we could see, no.

"And despite all your investigative efforts, the FBI found no evidence that Mr. Ding sold the alleged trade secrets to anyone directly, correct?

"Not that we could see, no."

That, ladies and gentlemen, is not proof beyond a reasonable doubt of guilt.  They found no evidence of that through the entirety of the investigation, and they found no evidence that he used any of those alleged trade secrets to build anything.

Okay.  So let's use your common sense.  What was Linwei waiting for?  So let's look at these events.  So April 17th was the last upload of trade secrets.  There was a lot of significant events that took place.  We'll walk through some of those.

In May, he leaves Rongshu and submits an application to MiraclePlus.  He doesn't use the trade secrets for any investor meetings, doesn't use the alleged trade secrets for any applications.

August, he submits that video application.  That would have been a good time to use the alleged trade secrets if he was intending to do that.  He didn't.

In the fall, he's in China.  According to the Government's theory, that would have been an excellent time to use the alleged trade secrets, to transfer them, to sell them.  Nothing.

All these investor meetings, Special Agent Valladao testified about nothing.  More than 20 investor meetings where not one investor provided a signed agreement.  Again, MiraclePlus was the only one.

Use of GitHub begins in October.  Same thing.  No trade secrets.

Okay.  I want to walk through these elements briefly before you consider all this evidence.  The first element of theft of trade secrets is there were no trade secrets here, as we talked about, the reasonable measures in particular and the failure of the Government to show you 82 percent of these alleged trade secrets.

The second and sixth elements I want to cover a little bit.  So Linwei did not know these notes included confidential information.  You saw many of them were not labeled confidential or otherwise.  And so he also did not knowingly download this information knowing it was trade secret information.  You saw that he regularly kept notes, and that

these documents were widely -- many of these documents were widely dispersed throughout Google.

The third element, there is no evidence that Linwei intended the trade secret information to benefit someone other than Google. The Government wants you to speculate, to make that leap, of course he intended to benefit himself and Zhisuan. But he never used it.

He saved this information. Some of it was part of his job, learning about information. These documents were old. As we walked through, I showed you that buffet. All the stuff that he passed up and all the stuff that he took was old and incomplete. No uploads after April 17th. GitHub files contained only open source proof of concept.

And again, the best evidence for you of what the intent was was what actually happened, which was nothing. He did not use this stuff, and nobody benefitted from it because nobody got it.

All right. Fifth element. There's no evidence that Linwei intended or knew that Google would be injured. You don't see one communication about him focusing on Google, hurting Google or punishing Google or anything of that nature.

He had no ability to compete with Google. You saw what his team was. You saw how much they were trying to raise. You saw what the status of their product was or alleged product or the proof of concept, and he never used the alleged trade

secrets.

All right.  I want to switch gears for a second.  I want to move on to the economic espionage.  The Government can see there's no, like, you know, spies and things of that nature.  Concedes.  Far from it.  Let's take a real hard look at what this was.  Okay?

So first let's look at the instructions.  So one, you have to find that the information contained one or more trade secrets.  Those are the alleged trade -- alleged notes.  You have to find that he knew the documents included confidential information that he had no right to take.  We discussed the knowingly one.  That's similar to the trade secrets one.

And then, fourth, that he intended or knew that his actions would benefit a foreign government or foreign instrumentality.  And I want you to focus on the other part of this instruction, which is incredibly important.  For the fourth element, it is not enough for the Government to prove that he intended to benefit himself or Zhisuan.

So trying to build a business, trying to make money off of it, that's not enough, nor is it enough for the Government to prove that the defendant intended or knew that his conduct would benefit the country of China and its economy in a way that might generally flow from engaging in economic activity there.  So building a business there is not the type of benefit that constitutes economic espionage.

So let's look at the Government's case. So you have Dr. Adam Segal. He was not familiar with any of the alleged instrumentalities. His testimony was basically looking at the internet and looking at some other public documents. He never spoke to anyone in China about these instrumentalities. He never visited them. And he also testified that the Government has plans that address many, many other industries. It's not just AI.

Now, if you remember, Dr. Segal made an effort to tell you that he was nonpartisan. He said, "We're nonpartisan. We don't take money from either party." What he didn't tell you, and the Government didn't ask him was, "Okay. But do you take money from others? Do you take money from big tech? Do you take money from the victim, the alleged victim?" And he testified yes. The Government met with Mr. Segal on multiple occasions, yet they never shared that information with you.

When you look at these experts, I want you to think about the element of bias. It's in one of the jury instructions about the credibility of witnesses.

So here is a witness who is coming to testify, and his company, his employer, one of their largest donors is Google, and two of their board members are executives of Google. He's also worked for the Government in criminal cases on a number of other cases. Here's those board members.

Again, we had to share in information with you. We had to

ask the questions.  The Government chose not to share this information with you.

We also asked Agent Valladao about the investigation into China.  So I asked her, "You're referring to a number of people in China that you indicated you believe interacted with Mr. Ding, correct?

"That's right.

"Now, you've never met any of these people, correct?

"I have not, no.

"You've never spoke to these people?

"No, I did not.

"Never communicated with them?

"No.

"And you mentioned a number of entities, like venture firms, investors, things like that.  You never met any of those?

"No, I did not."

This is the totality, essentially, of the Government's evidence of economic espionage.  The Innovation Park, no contract, no money.

Zhisuan, there was a draft contract in his folder, but we never saw a signed one.

The Government referenced there was some reference to another document being signed, but they never actually showed you the signed contract, the one that actually says exactly

what was going on.  And there's no money.

Shanghai talent program, no money, no contract.  This is an economic espionage case.

The other thing I want to point out to you is timing.  So according to the Government, he's been scheming since April 2022 to steal these trade secrets, move them to China, benefit himself, et cetera.  You see no interaction with any of these alleged Chinese instrumentalities in 2022, April 2023, when the last upload took place, and the first actual meeting is not until roughly November 2023.  That timing doesn't work.

There's simply no intent to benefit here.  We walked through these elements before, right?  There's no interaction with alleged instrumentalities.  There's no benefit.  Identifying growth markets, "Hey, China thinks this is a growth opportunity," that's not intent to benefit a government.  There were no funds exchanged.  Zhisuan was not a successful company.  The GitHub was developed from open source technology, not from alleged trade secrets.

You have no information at all provided to you, no evidence, that any of these alleged trade secrets were ever transferred to the Chinese government.  Nothing, nothing, nothing.  There's no allegation that he met with the Chinese military or intelligence agencies.  That's the economic espionage case.

We believe when you go back into that room and consider

all the evidence and use your common sense, you'll find that the Government did not meet their burden beyond a reasonable doubt.

Let's talk about some of the other things the Government was not completely up front with you about.

So we went through this at the beginning of the presentation, three things that the Government mentioned but didn't tell you about, didn't tell you the whole truth about, and didn't ask Agent Valladao -- excuse me -- Special Agent Valladao questions. They had her on the stand for an entire day, and they didn't ask these questions because they didn't want you to know about, because it's devastating to their case.

Let's look at some other things. So the Government spent $300,000 and two-plus days on testimony from Dr. Sanchez, and that was all to talk about technology that Linwei never used. They spent $250,000 on testimony from Mr. Crain just to show you that Linwei never transferred or shared the alleged trade secrets. That's pretty amazing.

The Government spent over 30,000 on Dr. Segal so he could tell that you he's never heard of these entities and has no personal knowledge of any of the alleged instrumentalities at issue.

The Government deployed extensive resources for a very long time period, but they didn't tell you that they had failed to investigate the actual product that was being built. They

saw and they ignored it.  They didn't look at the GitHub -- excuse me -- the R&D design WeChat.  They didn't explore the articles.  They didn't explore the open technology to see, is this what's being actually developed at Zhisuan.

They also did not tell you about the bias of some of these experts.  So we talked little bit about that before. Dr. Sanchez has ties to Google.  He worked there, has been funded by them, and his opinions were formed in meetings with Google employees in preparation for this case.  He met with the Government many times, and he met with Google employees.

Dr. Segal, we talked about that too.  So his organization is funded at the highest level, and he has two board members. That was not shared with you.

Sorry.  And then we also -- so we went back to Mr. Crain too.  Google and Waymo, Google Waymo was a former client. Waymo is, I think, a subsidiary, the testimony came in, of Google, and he worked for them in the past.

Google, Google, Google.  Were there no other experts in the world that could come in and talk to you about a criminal case about these serious allegations, 14 felonies?  They could not find anybody that was not associated with Google?  Ladies and gentlemen, that's bias.  That's a lack of independence.

The Government also implied that he booked a one-way ticket to China.  When you looked at the evidence -- we actually brought the evidence into you during our case, and

this is what we showed you, that Linwei commonly booked flights to China.  If you look at the percentages to the right there, those particular flights, that's how many people took one-way flights back and forth to China.  80 percent, 4.9 percent, 63 percent, et cetera.

And then if you look at the evidence, Asiana Airlines, in 2023, over half of their ticket purchasers took one-way tickets from the United States to China.

And I asked Special Agent Valladao, "If he had purchased an airline ticket and was scheduled to fly to Las Vegas in February, he'd have to return to the United States first from his trip to China, correct?"

And she said, "Yes, that would be the assumption."

Well, he had that flight booked.  The Government didn't show you that.  We showed you that.  We showed you those records from Southwest, that he had booked a flight before the Government had executed a search warrant for him to depart in the U.S.  So he had to come back from China after that January flight that they were concerned about, had to come back here to take this flight.

All right.  As you go through that evidence, I want you to think about these things, think about the things that the Government didn't want to tell you.

This is an incredibly important instruction.  I know the Government -- I'm sorry -- the Court has spoken about it, but I

want to run it by you as well to remind you of it and for you to be thinking about it when you're back there.

The defendant is presumed to be innocent unless and until the Government proves the defendant guilty beyond a reasonable doubt.  It's an incredibly important standard.  It's a protection for the citizens and everyone here.

In addition, the defendant does not have to testify or present evidence.  We did present evidence.  But we want to get this case to you.  You've been here for three weeks.  You heard about the technology over and over and over again.  You didn't hear about all the stuff that didn't happen with the alleged trade secrets.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced that the defendant is guilty.  If you do not believe that the Government has met their burden, it is your duty to find the defendant not guilty.

I want to also emphasize Jury Instruction Number 3.  A defendant in a criminal case has a constitutional right not to testify.  In arriving at your verdict, the law prohibits you from considering in any manner that he chose not testify.

We want to get this case to you.  It's time.  And he exercised his right.  And that's the Government's burden. Remember, the Government has the burden to prove every element beyond a reasonable doubt.  And this is just a chart to help you sort of understand how high that burden is.  It is the

highest burden in our court system for a reason.  This is a criminal case.

You have to put the Government to its task.  You have to make them prove to you beyond a reasonable doubt that he committed every single element of every single crime that he is charged with.  And we believe when you consider all the evidence and the evidence that is not in this case, you'll find that he did not commit these crimes.

So let me talk about the verdict forms real quick.  So as I said before, there's Count 1 with trade secrets.  If you find not guilty, then you need to go to the corresponding economic espionage count and also find that not guilty.  If you found no trade secrets -- excuse me -- you find no trade secrets, then you go to the next one and find not guilty.  So it's 1, 8, 2, 9, et cetera.  And we want you to pay attention to this verdict form and as the Court will instruct you about how to fill it out.

So I'm about to leave you now, and the Government gets the last opportunity to talk to you.  But I want to leave you with something before I do.  No matter what the Government comes up and tries to say to you, whether they repeat what they've told you before or they tell you something new -- and if they tell you something new, you should ask yourself, "Why haven't I heard about this in the Government's closing statement or before?"

The Government's rebuttal cannot change facts.  So the defendant is presumed innocent, and the Government has to build that case all the way up to beyond a reasonable doubt, an incredible burden.  They're going to come in and say -- they've come in and said they did that, and they're going to say, "Ladies and gentlemen, we did that in spades."

Okay.  Let's look at that.  As you think about that and as you're listening to the rebuttal, I want you to keep in your mind as you listen and think about these questions and these facts.  There was no unauthorized access by Linwei.  There was deficient and confusing protection of the alleged trade secrets, all those different designations and "confidential" not being there -- or excuse me -- no designation on a majority of the source documents.

The buffet table left a lot of information behind.  The information was dated, so it wasn't state of the art, and it wasn't final.

The last upload took place April 17th, 2023.  Again, do you remember I showed you that calendar?  What was he waiting for?  If he was going to use these things for his economic benefit or Zhisuan's, what the heck was he waiting for?  Because he met failure after failure after failure.

The last document on the Google Drive was the video on May 9th.  We talked about all the MiraclePlus applications.  As you're listening to the rebuttal, think to yourself, "Why

wasn't there any of the alleged trade secrets on any of those, particularly the video?  Why didn't GitHub have any alleged trade secrets?  Why doesn't the R&D WeChat have any alleged trade secrets?  Why is it talking about open source technology, and why does the GitHub have open source technology?  Why do some of the PowerPoints have open source technology discussed?"

What were they building?  They were building an app, not an AI supercomputer worth billions of dollars.  You had investor and investor reject their plans.  Why would an investor reject their plans if he was showing them alleged trade secrets and planning to use them?

There was no benefit to China.  You saw none of that.  No transfer, no transfer, no use of the trade secrets with China, with the Chinese government.  And then you go back to those three questions that I talked to you about with Agent Valladao, Special Agent Valladao, the answer, which was no use, no sale, no transfer, no giving.  Okay?

When you look at all of that evidence, as you're listening to the rebuttal, and as you go back into the jury room to deliberate, there's a lot of evidence, direct evidence, that proves that he did not do it, and again, it's the Government's job to prove that he did, and there's a lot of gaps that the Government just can't fill.

They're going to ask you -- I'm quite confident they're going to get up here and ask you to speculate, to take that

leap. Of course he intended to do it. No, he didn't intend to do it in September, October, November, December, but he was going to do it. He was going to do it some time. But he never did.

So when you go back to that room, we believe that if you consider all the evidence in this case and all the things that the Government didn't show you, that the only reasonable verdict you can come back with is not guilty as to all counts.

Thank you so much for your time. We greatly appreciate it.

**THE COURT:** Okay. Thank you, Mr. Fondo.

Why don't we take a quick break, and we'll return 35 minutes after the hour for the Government's rebuttal argument. And remember, you're not to begin your deliberations yet. That's only after all of the arguments are done.

Thank you.

**THE COURTROOM DEPUTY:** All rise.

(The jury left the courtroom.)

**THE COURT:** Okay. Anything to discuss before I leave the bench?

**MR. BOOME:** Not from the Government, Your Honor.

**THE COURT:** Okay. I had a question. I was wondering -- please be seated.

I was wondering if it would be helpful to have -- for each juror to have a copy of the verdict form as well. Does

anybody -- does anybody see an issue with that?

MR. BOOME:  No, Your Honor.

MR. FONDO:  No objection, Your Honor.

MR. CHANG:  No, Your Honor.

THE COURT:  Given its complexity and all that.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken.)

(The jury entered the courtroom.)

THE COURTROOM DEPUTY:  All rise.

Please be seated.

THE COURT:  Okay.  Mr. Boome?

MR. BOOME:  Thank you, Your Honor.

### GOVERNMENT'S REBUTTAL ARGUMENT

MR. BOOME:  Good afternoon.  The most remarkable thing about Mr. Fondo's closing argument was how much time he spent arguing that there wasn't enough evidence for things that do not matter for the decision that you are required to make.  He spent half of his closing argument telling you there's no evidence that the defendant sold, transferred, or used the alleged trade secrets.

You now have -- you will have when you go back into the jury room the jury instructions.  These are what will guide your decisions.  Your decisions on these questions and these elements will guide your decision of whether the defendant is guilty or not guilty, and there is absolutely nowhere in these

instructions requiring the Government to prove that the defendant used, transferred, gave these trade secrets to anyone.

So why did Mr. Fondo spend so much time on things that don't matter?  I have to assume because if he had talked about the question you will actually be required to answer, which is what the defendant intended to do with these trade secrets when he stole them, there is no way around finding that the defendant is guilty on every single count of the indictment.

Here, you saw evidence that over and over and over again, the defendant told investors in China that he could build an AI supercomputer by replicating Google's AI technology.  The evidence is absolutely clear about what he intended to do with the technology.

It makes sense that he did not sell or transfer them, because what was his plan?  He told lies to investors in China about what he could do, about the knowledge and capabilities that he had.  He needed these documents to make himself valuable.  He was going to use these documents to close the gap between the lies that he told to investors and what was true.

As soon as he gave -- if he would have given or sold these documents to anyone, then he would no longer be valuable.  It wouldn't make sense for his plan to use these documents to benefit himself and Zhisuan.  And of course the defendant did not have the opportunity to use, actually use the trade secrets

because he got caught before he could.

The MiraclePlus presentation took place on November 24th, 2023.  That was when the defendant was on stage, telling the investors in China the product he could build to copy and replicate Google's technology.  Special Agent Valladao knocked on his door six days later.  He never had the opportunity to use the trade secrets because he got caught first.

But the question you have to answer is what he intended to do with them when he stole them, and the answer to that question has been proven beyond a reasonable doubt.  He intended to use them to build his company for his own benefit, to make himself rich, to make his company successful, and to help the entities controlled by the People's Republic of China.

Let's talk a little bit more about the evidence of his intent to use these trade secrets.  Mr. Fondo talked a lot about the GitHub repository, and what he said was -- first, Mr. Fondo asked Special Agent Valladao a lot of questions about Zhisuan had no product.  Zhisuan had no product.  Isn't it true Zhisuan had no product?  And then we started talking about the GitHub repository, and then the questions became, "Well, here's the product, and there's no trade secrets in it."

We know what product the defendant was promising to build, and this was not it.  The only witness who actually looked at the code that was in the GitHub repository was Professor Sanchez, and he testified clearly that this was a product

demonstration proof of concept for one of the defendant's marketing slides.  It was not the product he intended to build.

And we know exactly what product he was intending to build because he told us over and over and over again in that video, his speech to the investors, and in all the documents you saw about Zhisuan.

Mr. Fondo said during his closing argument that the defendant was building an app, not an AI supercomputer, as if we all haven't sat through this trial and heard him say over and over again, "I am one of ten people in the world who can build an AI supercomputer, and why can I do it?  Because I have the experience at Google.  I built Google's 60,000 TPU supercomputer, I built Google's 26,000 GPU supercomputer, and I can replicate that.  I can copy that here in China."

That's what he told investors over and over and over again, and the fact that Mr. Fondo stood up here and said he was building an app is remarkable.

At this phase, until the defendant got caught in -- on December 29th, he was not in the product development, the product building phase of his company because he was still in the "stealing as many Google confidential documents as I can" phase of his company.

You heard about all the documents that he continued to create by copying confidential internal Google materials from internal Google confidential documents and making new notes

right through the day that Google cut off his access on December 29th.

Ms. Hernandez, can we go to the Andy Crain slides, please?

Mr. Fondo talked a lot about the defendant's note creation and implied that this was just part of his normal practice, but I want to show you something you saw during Andy Crain's testimony. This graph shows the number of notes files that the defendant created across time. These are the notes files that ultimately he uploaded to his personal drive and then downloaded on December 14th to his personal computer. This graph shows when he created each of those notes that he eventually uploaded and then downloaded.

And let's look at the timing here. You see the first kind of meaningful spike around August or September of 2020. That is when, as you heard, the defendant first began speaking with the recruiter in China.

Moving ahead, in June of 2022, you see a large spike. What happened then? That was when defendant started speaking with Yuan Ye and started considering taking a job in China.

Now, move over to April. By this time, the defendant and Yuan Ye had developed a business plan. They were pitching to investors and getting feedback that they didn't have enough technical details in their business plan. They weren't clear enough about how the company could replicate Google's technology. And look at the spike right around this time.

This shows you clearly what the defendant had in his mind when he was stealing this information from Google, and it shows you clearly what he intended to do with it.

Let's go to the next slide, please, Ms. Hernandez.

This chart is similar. It shows you the notes that the defendant created on his Google laptop from April until December. Remember, Google cut off his network access on December 29th, so he never had the opportunity to steal these notes files that he was creating.

But the timing here is also significant, right? The MiraclePlus boot camp you saw took place on August 31st and September 1st, 2023. Go to about that time in the middle of the graph where there's a giant dip. That's when the defendant is in China attending the MiraclePlus boot camp. Look what happens when he comes back from that boot camp. Look at that giant spike in his note creation.

During this time, he was going to internal confidential Google files, continuing to copy more information, and pasting it into his Apple Notes. 160 notes at the top of this peak, right after he got back from the MiraclePlus boot camp.

Move ahead to late December. The second spike is after he resigns, realizes that he has limited time with access to this Google information, he continues to make notes at a very rapid pace.

Ms. Hernandez, can we go to the next slide, please?

Between the time he uploaded the last trade secret file, which was April 17th, and the time Google cut off his network access, the defendant created or modified 1349 additional notes.

December 26th, you remember, is the day he sent the email to his manager, telling his manager that he was going to resign.  Look at what -- look at how many notes he was creating and modifying on the day he resigned and through the end, until Google cut off his network access, 62 notes on December 28th alone.

There is absolutely no purpose for doing this unless he intended to use the information later.  Now, to be clear, he never had the opportunity to actually steal these, but his intent for making these notes was exactly the same as his intent for the trade secret documents that he had already stolen.  They were all part of the information he intended to use to build his company.

I want to talk a little bit now about Mr. Novak.  Mr. Fondo talked about Mr. Novak's testimony, and Mr. Novak's testimony that this information wouldn't be useful outside of Google because it's very integrated.

Mr. Novak had some difficulty testifying.  He had trouble answering basic questions with basic answers, and he actually testified differently to you than the way he testified three days earlier.  You'll remember the one instance when

Ms. Priedeman asked him, "Mr. Novak, isn't it true that a competitor like Meta would pay good money for the information in these trade secret documents?"

And when he was testifying here on Tuesday, he told you the answer was no.  But three days earlier, testifying under oath in this courtroom, he answered that question completely opposite.  When he was asked whether Meta would pay for this information, the answer he gave was yes.

So Mr. Novak's testimony, to the extent you credit it at all, the important thing to remember is that even he admitted that each and every one of these trade secret documents has value.

We are not required to prove that these documents could be replicated, that the alleged trade secrets in these documents could be replicated, but only that they have independent economic value.  If these documents were not useful outside of Google and didn't have value, the defendant would not have done the extraordinary things he did to steal them and keep them.

Remember, the documents that the defendant uploaded to his personal account contained 14,000 pages, right, including the alleged -- including the trade secret documents, over 2,000 pages of just trade secret documents.

Over 4,000 screenshots were included in those documents. Imagine the time that had to take.  It would have been so much easier for the defendant to just download the confidential

documents straight from the Google network, but he didn't do that because that would have triggered Google's security system.

The lengths that he took to get these documents, the lies he told to keep them, when he lied to Brad Fuller about having the documents at all, those show that the defendant knew that he wasn't permitted to take this material and that it was valuable and that he wanted to use it to build his company, Zhisuan.

Mr. Fondo also discussed reasonable measures, and that's the topic I want to cover now. Mr. Fondo mentioned markings on documents. It is undisputed that Google trained its employees that the best practice is to mark documents. It's also undisputed that Google trained its employees that when a document isn't marked, the content is what controls, the sensitivity of the content is what controlled.

And Mr. Fondo kind of suggested that if only some of these documents had been marked, maybe this whole -- that the defendant would have known that these documents contained confidential information.

Members of the jury, what you heard -- the defendant had a master's degree in computer -- in electrical engineering. In 2012, he got that master's degree. He knew what he was looking at when he was looking at these documents. He had seven years of experience before he came to Google working for other

technology companies in Silicon Valley.

He joined Google in 2019, and he worked on at least some aspect of Google's AI supercomputing technology. The idea that he could look at these documents and be confused about what was confidential is not credible.

The information in these documents is information that Google took years, invested millions of dollars to create, and the idea that if there had just been markings on a few more documents, the defendant might not have been so confused is just not credible.

I want to mention quickly the economic espionage charges in this case. Mr. Fondo mentioned that -- so the thing to remember about the economic espionage charges is that the -- the thing that is unique about them is the intent, what the defendant intended to do with the information.

As I said in my opening statement, this case is not about spying. It's a very direct and very simple economic espionage case. The defendant offered the services of his company to the Industrial Innovation Park at Mingyue Lake and the Sichuan Tianfu New Area Research Administration associated with Southwest University. He partnered with these two organizations and offered to do things for them that he could only do with the alleged trade secret documents.

Mr. Fondo mentioned that the -- that there was no evidence that the defendant knew these entities were part of the

Government, but you saw -- Ms. Hernandez, could we go to Exhibit 1158, page 9?

In his presentation to the MiraclePlus investors, the defendant -- page 10, please.  Sorry.

The defendant listed the Industrial Innovation Park as a government entity and said he had already signed a contract with the government entity and with the university.  He offered to help these organizations do research on chips.  He could only do that by using the alleged trade secret documents.

Ms. Hernandez, can we go to 1156, please.

I want to end by talking about what actually matters in this case for your decision, which is what the defendant intended to do with the trade secrets documents in this case, and I cannot sum it up any better than this slide.

This is November 24th, 2023.  The defendant has just given his speech at the MiraclePlus investor conference.  Four days earlier, he signed the contract for a 700,000-dollar-investment from MiraclePlus from Lu Qi.  He is now, in this moment, the CEO of a startup that has a 10-million-dollar valuation.  This is -- this is what he wanted.  He is now the CEO of that company, and the reason that he got that investment and the reason he became that CEO is because of the promises behind him.

"Why we can build a computing power platform of 10,000 GPU scale:  With the R&D experience and technology of Google" -- he

says "the technology of Google" -- "of 10,000 GPU scale, a computing power platform of 10,000 GPU scale that suits China's national conditions can be built through direct replication and upgrading."

Now, in this moment, the defendant knew that he did not have the experience to do these things. He knew he had faked his product demonstration video to get into MiraclePlus. He knew he had faked his professional reference from Aamer Mahmood to get into MiraclePlus. He knew that on his own, with his experience, he could not deliver on these promises.

He needed the alleged trade secret documents to build the company. He needed the alleged trade secret documents to make good on the promises he made to the investors. And so when you're back in the jury room, I'm going to ask you to -- don't throw your common sense out the window. You can use your common sense in your deliberations, common sense about why people lie, why people can steal things. They do that because they know the truth hurts them.

Trust your common sense, trust the evidence that you've seen in this case, and follow the law, and if you do those things, you'll return a verdict that the defendant is guilty on each count.

Thank you.

**THE COURT:** Okay. Thank you.

So now we are done, and the case is in your hands. You

can go back and begin your deliberations.

Ms. Suazo, I spoke with you about this a little bit this morning, but as you know, you're an alternate, so you will not participate in the deliberations, but it is very important.

I thank you for paying such close attention during closing arguments and throughout the trial.  It's very important that you continue to follow my instructions of not talking with anybody about the case or the people involved, not doing any of your own research, not looking anything up, because if we do lose a juror, we would bring you back, and deliberations would start all over again with you involved.  So Bhavna will be in touch with you promptly when there's a verdict, but until then, please remain under all of my instructions.

And for the rest of you, you can begin your deliberations. Regarding scheduling, you may or may not remember a few weeks ago when I talked to you about scheduling, I said that I will always promise to have you out of here no later than 3:30 with one exception, and that is when you start your deliberations.

If you collectively choose to stay here longer than 3:30, you're free to do so.  You're free to stay here until 5:00.  We don't really like people staying here much longer than 5:00. You know, we like to get you out of the building go while it's still light.  But if you decide you want to stay until 5:00 to do your deliberations, you're welcome to do that, or you can take off at 3:30.  That will be entirely up to you.

And with that, Bhavna will take you back to the jury room. Thank you.

THE COURTROOM DEPUTY: All rise.

(The jury left the courtroom.)

THE COURT: Okay. You can be seated.

I just wanted to say briefly, I would commend the teams on both sides -- not just the lawyers, but the entire teams on both sides -- for doing an excellent job in this case. You know, both -- you know, the presentation in front of the jury and your organization outside the presence of the jury was very, very impressive, and I want to commend you on that.

I also in particular want to commend Mr. Fondo with the way you distributed the work in this trial. It's not every day that you see a fancy partner from a fancy law firm distributing the work in the way that you did. And I -- obviously, it benefitted the lawyers who did the work, but it also benefitted your client. And so I wanted to commend you on that.

MR. FONDO: Thank you.

THE COURT: And everybody stay close. Stay within a few minutes of the courthouse in case we get a note or a verdict, and until then, go relax.

ALL: Thank you, Your Honor.

(The proceedings adjourned at 2:04 P.M.)

---o0o---

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Thursday, January 29, 2026

_____

April Wood Brott, CSR No. 13782