# EXHIBIT 6

**Volume 3**

**Pages 415 - 652**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,         )
                                  )
          Plaintiff,              )
                                  )
  VS.                             )   **NO. 3:24-CR-00141-VC**
                                  )
LINWEI DING, a.k.a. LEON DING,    )
                                  )
          Defendant.              )
_____  )

San Francisco, California
Wednesday, January 14, 2026


**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue, Box 36055
                    San Francisco, California 94102-3495
               BY:  **CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
                    **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    1301 Clay Street, Suite 340S
                    Oakland, California 94612-5217
               BY:  **MOLLY K. PRIEDEMAN**
                    **ASSISTANT U.S. ATTORNEY**

        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant:
                        GOODWIN PROCTER LLP
                        525 Market Street
                        San Francisco, California 94105
                   BY:  **DARRYL M. WOO, ATTORNEY AT LAW**
                        **DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
                        **RACHEL M. WALSH, ATTORNEY AT LAW**
                        **COLETTE A. LOWRY, ATTORNEY AT LAW**
                        **NICHOLAS C. WILEY, ATTORNEY AT LAW**

                        GOODWIN PROCTER LLP
                        601 Marshall Street
                        Redwood City, California 94063
                   BY:  **GRANT P. FONDO, ATTORNEY AT LAW**
                        **FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

                        GOODWIN PROCTER LLP
                        601 South Figueroa Street, Suite 4100
                        Los Angeles, California 90017
                   BY:  **LORA J. KRSULICH, ATTORNEY AT LAW**


Also Present:       **Andrea Valladao, Federal Bureau of**
                        **Investigation**
                    **Veronica Hernandez, Paralegal**
                    **John Jay, Trial Technician**

Q.   Does that include things like documents and videos and photos?

A.   That's correct.

Q.   Including metadata about those files?

A.   Yes.

Q.   Like hash values and creation date, et cetera?

A.   Yes.

Q.   Okay.  In this photograph that we're looking at now, what is just to the left of the My Passport hard drive?

A.   That's Mr. Ding's PRC passport.

Q.   When you say "PRC," can you explain what you're referring to?

A.   Yeah.  People's Republic of China.

Q.   What is Mr. Ding's citizenship status as it relates to the PRC?

A.   He's a citizen.

Q.   Citizen of China?

A.   That's correct.

Q.   And what is his status in the United States?

A.   He's a lawful permanent resident in the U.S.

Q.   During your search of the defendant's home, did you find any evidence of bank accounts in China belonging to Mr. Ding?

A.   We did, yes.

Q.   What evidence did you find?

A.   We found two things.  There were -- there was a notebook

that had passwords and accounts, and one of them was listed as Bank of China. And there was a separate document that also listed a China Merchants Bank account.

Q. Are you, as an FBI agent, able to obtain financial records from banks in China like China Merchants Bank or Bank of China?

A. I am not, no.

Q. Why not?

A. The FBI does not have jurisdiction outside of the United States, so any legal process needs to be done in the United States.

Q. In addition to searching Mr. Ding's residence and his electronic devices, the ones we just looked at, did you also obtain search warrants for some Google accounts that belonged to Mr. Ding?

A. We did, yes.

Q. Do those include linweidwork@gmail.com?

A. Yes.

Q. Linweidin@gmail.com?

A. Yes.

Q. Dingyong198608@gmail.com?

A. Yes.

Q. And aamermahmood@gmail.com?

A. Correct, yes.

Q. What types of accounts are those?

A. They're email accounts.

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Thursday, January 15, 2026

*Ana Dub*
_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter

**Volume 4**

**Pages 653 - 852**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    )
   VS.                              )   **NO. 3:24-CR-00141-VC**
                                    )
LINWEI DING, a.k.a. LEON DING,      )
                                    )
          Defendant.                )
_____ )

San Francisco, California
Thursday, January 15, 2026

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

          CRAIG H. MISSAKIAN
          UNITED STATES ATTORNEY
          450 Golden Gate Avenue, Box 36055
          San Francisco, California 94102-3495
     BY:  **CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
          **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

          CRAIG H. MISSAKIAN
          UNITED STATES ATTORNEY
          1301 Clay Street, Suite 340S
          Oakland, California 94612-5217
     BY:  **MOLLY K. PRIEDEMAN**
          **ASSISTANT U.S. ATTORNEY**

     **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:    (CONTINUED)

For Defendant:

GOODWIN PROCTER LLP
525 Market Street
San Francisco, California 94105
BY:    **DARRYL M. WOO, ATTORNEY AT LAW**
**DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
**RACHEL M. WALSH, ATTORNEY AT LAW**
**COLETTE A. LOWRY, ATTORNEY AT LAW**
**NICHOLAS C. WILEY, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 Marshall Street
Redwood City, California 94063
BY:    **GRANT P. FONDO, ATTORNEY AT LAW**
**FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 South Figueroa Street, Suite 4100
Los Angeles, California 90017
BY:    **LORA J. KRSULICH, ATTORNEY AT LAW**

Also Present:        **Andrea Valladao, Federal Bureau of**
**Investigation**
**Veronica Hernandez, Paralegal**
**John Jay, Trial Technician**

**Thursday - January 15, 2026**                                    **9:05 a.m.**

**P R O C E E D I N G S**

---o0o---

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:** Remain seated. Come to order. Court is back in session.

**THE COURT:** Okay. Hi. I understand that you all have a couple of things. I have a couple of things for you as well.

First of all, we have lost Juror Number 3.

**THE COURTROOM DEPUTY:** 2.

**THE COURT:** 2? Oh, sorry. Juror Number 2. She called this morning and was having morning sickness. She told Bhavna initially that she thinks she's going to be late because she has morning sickness, and she thinks she'll be ready to leave momentarily but she thinks she'll be late. And Bhavna said okay. And then she called Bhavna back and said that it got worse and that she was laid up and that she -- you know, she would try to come later if she's needed. And based on that, I told Bhavna to tell her that she's excused.

So we lost Juror Number 1. Everybody -- Juror Number 3 -- sorry. We lost Juror Number 2, and then everybody will move down one number accordingly. So that's Number 1.

Number 2, I was reading the defense's filing about the publicly available information. Not the one from last night, but the one from the night before. And I was really struggling

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Friday, January 16, 2026

*Ana Dub*

_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter

**Volume 5**

**Pages 853 - 1067**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    )
  VS.                               )   **NO. 3:24-CR-00141-VC**
                                    )
LINWEI DING, a.k.a. LEON DING,      )
                                    )
          Defendant.                )
_____ )

                         San Francisco, California
                         Friday, January 16, 2026


               **TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                         CRAIG H. MISSAKIAN
                         UNITED STATES ATTORNEY
                         450 Golden Gate Avenue, Box 36055
                         San Francisco, California 94102-3495
                    BY:  **CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
                         **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

                         CRAIG H. MISSAKIAN
                         UNITED STATES ATTORNEY
                         1301 Clay Street, Suite 340S
                         Oakland, California 94612-5217
                    BY:  **MOLLY K. PRIEDEMAN**
                         **ASSISTANT U.S. ATTORNEY**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant:

GOODWIN PROCTER LLP
525 Market Street
San Francisco, California 94105
BY:  **DARRYL M. WOO, ATTORNEY AT LAW**
**DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
**RACHEL M. WALSH, ATTORNEY AT LAW**
**COLETTE A. LOWRY, ATTORNEY AT LAW**
**NICHOLAS C. WILEY, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 Marshall Street
Redwood City, California 94063
BY:  **GRANT P. FONDO, ATTORNEY AT LAW**
**FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

GOODWIN PROCTER LLP
601 South Figueroa Street, Suite 4100
Los Angeles, California 90017
BY:  **LORA J. KRSULICH, ATTORNEY AT LAW**

Also Present:       **Andrea Valladao, Federal Bureau of**
**Investigation**
**Veronica Hernandez, Paralegal**
**John Jay, Trial Technician**

**ADAM M. SEGAL**,

called as a witness for the Government, having been duly sworn, testified as follows:

**THE WITNESS:**  I do.

**THE COURTROOM DEPUTY:**  Thank you.

Please state and spell your full name for the record.

**THE WITNESS:**  Adam Mitchell Segal, S-e-g-a-l.

**DIRECT EXAMINATION**

BY MR. CHANG:

Q.   Good morning, Dr. Segal.

A.   Good morning.

Q.   Can you provide us with a brief overview of your educational history?

A.   Yes.  I have a B.A. in political science from Cornell University, a master's in international affairs from the Fletcher School at Tufts University, and a Ph.D. in political science with a focus on China from Cornell University.

Q.   Can you move the mic a little bit closer to you.  We're having some --

A.   Sorry.

Q.   Perfect.

What was the topic of your dissertation for your Ph.D.?

A.   I studied the first generation of Chinese software and computer companies and the support that the Chinese government gave those companies and, in particular, was focused on the use

SEGAL - DIRECT / CHANG

of high-tech zones to support Chinese technology development.

Q.   When did you receive your Ph.D. from Cornell?

A.   2000.

Q.   As part of your dissertation, was one of the high-tech zones that you did research on related to the city of Shanghai?

A.   Yes.

Q.   Where do you currently work?

A.   The Council on Foreign Relations.

Q.   What is the Council on Foreign Relations?

A.   We are an independent, nonpartisan foreign policy think tank.  So we take no U.S. government money or foreign government money, and we take no official positions.

Q.   If I use the acronym CFR to refer to the Council, will you understand me?

A.   Yes.

Q.   What is your current position at CFR?

A.   I'm the Ira A. Lipman Chair in Emerging Technologies and National Security, and I direct our digital and cyberspace policy program.

Q.   How long have you worked at CFR?

A.   Except for a 14-month stint in the State Department, since 2001.

Q.   You just mentioned a 14-month stint at the State Department.  What was your job there?

A.   I was a senior advisor in the bureau's cyber and digital

policy department.

Q.   That sounds like a lot.  What does that actually mean? What were you doing there?

A.   My main job, my only job was to write the 2024 international strategy for cyberspace and digital policy.

Q.   Were you the primary drafter of that document?

A.   I was.

Q.   What was it?

A.   It essentially lays out the U.S. government's policy towards cyberspace, cyber operations, how we should talk to our friends and potential adversaries about these issues, as well as issues around digital trade and Internet freedom.

Q.   Did the policy address issues related to the People's Republic of China?

A.   Yes.

Q.   Let's turn back to your day job at CFR.  Can you explain to the jury what you do on a day-to-day?

A.   It's like being a professor but without the students and all of the meetings.  So, essentially, I write about issues that touch on U.S. foreign policy; I speak publicly; I talk to the press; and I consult and talk to U.S. government officials.

Q.   Is there a particular area of research that you focus on at CFR?

A.   I focus primarily on cybersecurity, Chinese behavior in cyberspace, Chinese technology development, and then U.S.-China

relations around those two issues.

Q.    Have you been working and researching these issues for the last 30 years?

A.    Yes.

Q.    How do you conduct research at CFR?

A.    So I do what I would call qualitative work.  I look at Chinese sources on the Web.  I read Chinese press reports.  I look at Chinese government documents.  Before COVID, I would travel to China twice a year to do interviews with Chinese officials.  I talk to U.S. officials, and I read other scholars' work.

Q.    Is understanding the relationship between the government of the People's Republic of China and entities an important part of your qualitative research?

A.    Yes.  It's a central part of my research, trying to understand the relationship between Chinese government policies and private companies, research institutes, universities inside of China.  And the focus of my next book is on the role of the private sector in the U.S. and China in U.S.-China technology competition.

Q.    If I use the term "PRC" to refer to the People's Republic of China, will you understand me?

A.    Yes.

Q.    Do you currently hold any teaching positions, Dr. Segal?

A.    Yes.

Q.   Can you explain that?

A.   Yes.  Sorry.  I am an adjunct professor at the School of International and Public Affairs at Columbia University.

Q.   Have you ever held any visiting scholar positions?

A.   Yes.  I'm currently affiliated with Stanford University, and in the past, I was a visiting scholar at MIT and, in China, at the Shanghai Academy of Social Sciences and with Tsinghua University, which is considered China's MIT.

Q.   Have you written any books related to PRC technology policy and cyber-strategy issues?

A.   I've written three books.

Q.   Can you describe them at a high level?

A.   Yes.  My first book, called *Digital Dragon*, came out of my dissertation.  So it looked at the support that four Chinese cities gave to Chinese tech companies.

     My second book was called *Advantage:  How American Innovation Can Overcome the Asian Challenge*.  So it looked at science and technology policy in China, India, South Korea, and Japan.

     And my most recent book was called *The Hacked World Order*.  So it looks at global cyber and digital policies.

Q.   Have you written any articles on technology and cybersecurity issues related to the PRC?

A.   I've written in the tens of articles on Chinese technology policy.

Q.    What kind of publications do they appear in?

A.    *Foreign Policy*, *Foreign Affairs*, *China Leadership Monitor*, numerous edited volumes.

And then for the popular press, *The New York Times*, the *Washington Post*, *The Wall Street Journal*, and *Financial Times*.

Q.    Have you ever testified to Congress regarding technology in the PRC?

A.    Yes.  Six times.

Q.    Have you ever briefed any U.S. governmental agencies regarding Chinese cyberspace policy and technology issues?

A.    Yes.  The State Department, the Department of Commerce, the Department of Defense, Central Intelligence Agency, the National Security Agency, and then various staffers for congressional and Senate committees.

Q.    As part of your CFR job, do you also on occasion meet with Chinese government officials on technology and cybersecurity issues?

A.    I do.  Chinese officials often stop by CFR on their visits to the United States.

Q.    Were you recently in Beijing, meeting with Chinese government officials?

A.    I was in China in November for the first time since before COVID, and I met with officials from the Ministry of Foreign Affairs and the National Development Research Council.

Q.    Do you have any foreign language skills that assist you

with your research and experience?

**A.**   I read and speak Mandarin, although it's pretty rusty these days, given the inability to travel to China.

MR. CHANG:   Your Honor, the Government moves to qualify Dr. Adam Segal as an expert witness on PRC technology, policy, and cybersecurity, including governmental entities.

MR. FONDO:   Your Honor, generally, we do not object. I don't think the cybersecurity portion is relevant.

THE COURT:   Well, I think it's probably true that the cybersecurity portion is not relevant; but otherwise, he's -- but he's, nonetheless, qualified to testify about that to the extent it's relevant.

MR. FONDO:   Thank you, Your Honor.

MR. CHANG:   Thank you, Your Honor.

BY MR. CHANG:

**Q.**   All right.   Let's turn now to this case.

Have you been hired by the United States as an expert witness in this matter?

**A.**   Yes.

**Q.**   Have you been retained previously by the Government in any other economic espionage cases?

**A.**   Three other cases.

**Q.**   The most recent time that you testified as an expert witness in an economic espionage case, was it in this courtroom -- or courthouse?

SEGAL - DIRECT / CHANG

A.    Yes.

Q.    What -- generally, what kinds of topics have you been asked to provide expert opinions on?

A.    Similar to as in this case, I've been asked to talk about Chinese technology policies and how they support China's development goals; I've been asked to speak about why China is interested in developing specific types of technologies; and I've been asked to talk about the relationship of specific entities in China to the Chinese government.

Q.    What is your hourly rate in this matter?

A.    $650.

Q.    Let's turn now to your testimony in this case, Dr. Segal.

Have you prepared a demonstrative to assist with your testimony today?

A.    Yes.

        MR. CHANG:  Ms. Hernandez, if you could please pull up Demonstrative Number 8.

BY MR. CHANG:

Q.    Dr. Segal, is this the demonstrative that you prepared for today's testimony?

A.    Right now it's just the front slide, but I'm going to say yes.

        MR. CHANG:  Ms. Hernandez, can you turn to the next slide of the demonstrative.

\\\

BY MR. CHANG:

Q.   Do you see that in front of you?

A.   Yes.

Q.   Okay.  Dr. Segal, what is this?

A.   It is an administrative political map of the People's Republic of China.

Q.   Let's talk a little bit about geography to orient everyone.

Can you explain, at a high level, how the PRC is governed administratively?

A.   So at the center is the central government, like the United States central government, federal government located in Washington.  So the central government is located in Beijing in China.

And then underneath the central government are what are called 22 provinces, which are similar to states in the United States, and five autonomous regions, which are essentially also like states.

Q.   I notice in the demonstrative you prepared that you listed some provincial-level municipalities.  Can you explain what that is?

A.   Yes.  So there are four cities -- Beijing, Shanghai, Tianjin, and Chongqing -- that are in red on the map that are essentially treated like states, like provinces, because they're so big and so important to Chinese economic and

political development.

So, for example, Chongqing is an urban center of about 30 million people.  Beijing and Tianjin and Shanghai are between 10 and 20 million people.

MR. CHANG:  For demonstrative purposes, Ms. Hernandez, can you please highlight Beijing, Shanghai, and Chongqing. They're all in red.

Or you can -- actually, go back, and we'll have Dr. Segal highlight it because he has a touch screen in front of him.

THE COURTROOM DEPUTY:  I don't think it works.

MR. CHANG:  It's not working?  Okay.

BY MR. CHANG:

Q.   Can you just point, then, to generally where these -- these --

THE COURT:  They're in red.

THE WITNESS:  They're in red.

BY MR. CHANG:

Q.   They're in red.

A.   They're in red.

Q.   Got it.  Okay.  So much for the graphics.

All right.  And then out of the provinces, was there one in particular that you focused on as part of your expert work in this case?

A.   Sichuan Province.

SEGAL - DIRECT / CHANG

Q.   And where is that located geographically?

A.   It's basically right in the middle of China there.  You can see it to the left of the red of Chongqing.

Q.   I notice in the right side of the graphic, you have the central PRC governmental agencies with an arrow pointing down to the provinces and the municipalities.  Can you explain why you did that?

A.   Because the central government in China essentially dictates what everybody else does.  So unlike in the United States where, you know, states might have a Democratic or a Republican governor compared to a Democratic or Republican president, a province's mission and responsibility is to do what the central government tells them.

And that is true for the municipalities, the cities as well.  They are under the control of the administrations on top of them.

Also, it gives you an idea about how you move up in the Chinese system, the promotion system.  So, essentially, what happens is you get promoted based on how well you do at a specific level.  So if you do very well as a mayor, then you'll get picked to be at the provincial level.  If you do very well at the provincial level, you then go to Beijing.

So China's current leader, Xi Jinping, started off in Hubei Province, moved to a different province called Fujian, went to Shanghai, and then eventually to Beijing.

Q.    Let's move on to the next slide in your demonstrative, Dr. Segal.

        MR. CHANG:    Ms. Hernandez, yes, thank you.

BY MR. CHANG:

Q.    What does this slide convey, at a high level?

A.    This is the government structure of the People's Republic of China.

Q.    Let's walk through the three different branches, so to speak.

      At a high level, can you explain how the PRC government works?

A.    Yes, so the People's Republic of China is a one-party state run by the Chinese Communist Party.  So, essentially, the Chinese Constitution says that the Chinese Communist Party is the most powerful and the only legitimate authority in China.  It, in fact, says that it has authorities over the state, so there can be no conflict between what the party wants and what the state does.

      And so this demonstrative is showing us that the party is basically central and controls the other two branches.

Q.    Let's start with the party, then.  How does the Chinese Communist Party work from a governance and organization perspective?

A.    So at the top is Xi Jinping, who I mentioned earlier.  He is the head of the party, and he is the most powerful leader in

**SEGAL - DIRECT / CHANG**

China right now.

Directly below him is what's called the Politburo Standing Committee, and those seven members basically make up the most important decisions in China and staff the most important government agencies. So you can see on the right there in the second box, there's a premier, Li Qiang. He's Number 2 on the Politburo Standing Committee.

Then we have below a number of other important groups that govern China and help select the leaders. So as I described before, essentially, what the party is doing is picking leaders and promoting them up through the system and supervising and inspecting and sometimes removing them for corruption or other reasons.

Q.   I notice that in this demonstrative, you also have the same arrow structure pointing down from the center for the party. Can you explain that?

A.   Yes. So, again, it's the people above you, the party structure that's on top of it that is maintaining control, removes people, assigns people, and determines their careers.

Q.   Let's talk about the branch to the right, the "Government" branch. Can you explain how the government works in the PRC?

A.   Yeah. The government is, you know, similar to a government in any other country. It has all of the ministries and agencies that you would find anywhere. So at the top, again, Xi Jinping is dual-hatted, so he's both head of the

party and head of the state, so he's president of China.

Below him, Li Qiang is premier, which is equivalent to a prime minister, and he's in charge of all of the agencies that actually implement policy inside of China.

And below that is the State Council.

Q.   We are going to spend some time talking about the State Council today.  What is that?

A.   The State Council is kind of like the cabinet in the United States.  It's where all of the most important agencies come together; so, for example, the Ministry of Commerce, which covers business and trade issues; the Foreign Ministry, which is like the State Department; the Cyberspace Administration of China, which deals with the Internet; the Ministry of Information and -- excuse me -- the Ministry of Industry and Information Technologies.  So all of those agencies are part of the State Council and come up with policies and plans that reflect State Council development issues.

Q.   Are you familiar with the term "party state" when referring to the PRC?

A.   Yes.  So party state captures that idea I was talking about earlier, which is that there's a huge amount of overlap between government officials and party officials.  At this level that we're talking about, no one is going to be in the government and not also be a member of the Chinese Communist Party.  And the party, essentially, as I said before,

is the most powerful force and controls the government agencies.

Q.   Would you characterize the government in the PRC as one with a high or low degree of centralized control?

A.   It has a high degree of centralized control and direction. And then it is incumbent on everyone below the center, the provinces and the cities, to interpret those policies and implement them.

Q.   Let's say the State Council issues a plan.  Is that something that provincial or municipal government officials could disobey or disagree with?

A.   No.

Q.   Why not?

A.   They have to, under the structure, follow all of the policies and plans.  Their -- as I mentioned before, promotion is based on how successfully you implement those policies and how well you demonstrate you follow through on them.

Q.   Let's talk about the last branch in your demonstrative, the legislature.  How does that work in the PRC?

A.   It essentially is a rubber stamp, so it approves of everything that the party and the government gives it.  For example, the last fifth-year plan, the legislature approves; but historically, it has approved these things in the high 98, 99th percentiles.

Q.   Let's turn now to the PRC economy.  At a high level, can

you describe how the PRC economy works?

A.    Yes.   The Chinese themselves describe the economy as a socialist market economy.

Q.    Let's break down that term.   Can you explain the socialist component of it?

A.    So a socialist in the Chinese context means state ownership.   So there are still parts of the Chinese economy that are owned by the state, managed by the state.   We have state-owned enterprises.   Decisions are made by the state.

Also, highly reliant on government policy.   So the policies tell the provinces, the state-owned enterprises what they have to do and how they're going to do it and where government money is going to be invested.

Q.    Let's talk about the second part of that term, the "market" part.   Can you explain that for the jury?

A.    Yeah.   So socialism made China poor for the first 30 years of its -- after independence, establishment of the People's Republic of China.   So in 1978, when China began a reform process and opening up to the rest of the world, it started allowing more and more market pressures, more private capital.

So it started off with allowing farmers to have their own plots, and then that grew into allowing to have private companies and private enterprises.   And that now is the most important part of the Chinese economy.   It provides most of the growth, most of the employment, and most of the important

technological innovation.

Q.    How does that differ from the United States?

A.    We are a capitalist economy.  We don't have state-owned enterprises.  Government issues policies about development, but those don't tell specific firms what to do or states what to do.  We try to move private sector through things like tax breaks and R&D, research and development subsidies; and, you know, states can choose to participate or not.  There may be political costs, but they don't have to do it.

Q.    What is the role of the PRC government in the PRC economy?

A.    So it essentially sets the direction and highlights the areas that it thinks it's most important to develop.

Q.    How does it do that?

A.    Mainly through a document called the five-year plan.

Q.    What is a five-year plan?

A.    Five-year plans, not surprisingly, come out every five years.  They set the high-level goals for the Chinese economy, the Chinese society, Chinese polity.

      They tend to be around 65 to 80 pages.  They're at a fairly high level of abstraction.  But the responsibility of the State Council and others is to fill in the details after the policies came out.

      But, for example, the 14th five-year plan is the one we just finished in 2025, sets as an important --

            MR. FONDO:  Objection, Your Honor.

THE COURT: Overruled.

THE WITNESS: -- sets as an important goal that China should be working towards self-reliance and autonomy in technology.

BY MR. CHANG:

Q. Which -- looking at your demonstrative, which of these entities issues or sends out the five-year plan?

A. The party -- so in the middle -- writes and issues the five-year plan. The legislature approves it, so the National People's Congress. And then the State Council, the provincial governments, the municipal governments are responsible for coming up with follow-up plans to implement it.

Q. In addition to the five-year plan that you just described, does the State Council also issue separate plans on specific areas of the economy?

A. Yes. The State Council will issue follow-up plans and specific technology plans, given Chinese leader's focus on specific technologies. So artificial intelligence, electric vehicles, solar, all of those areas would be places where the State Council would issue follow-up policies.

Q. You mentioned state-owned enterprises earlier. Can you explain what those are in more detail?

A. Yes. So there are about 95 state-owned enterprises at the national level; so these are companies that are owned by the Chinese government, by the Chinese state. They've tended

historically to be in, like, big industrial sectors like steel or aviation, but that has slightly changed over time.

But the important point is that they're owned by the state. The decisions on their management are all made by what's called the State Asset Supervision and Administration Commission, which is part of the State Council. They appoint the managers. They approve things like mergers and acquisitions.

Q. Okay. Let's turn now to the concept of high-tech zones, which you mentioned you did your dissertation on. What are those?

A. In the 1980s and '90s, the Chinese became worried that they were going to miss the next wave of technological revolution. So the '80s was the beginning of the Information Technology Revolution. And they saw what was happening in Silicon Valley and places like Route 128 around Boston, so they sent delegations to come study it and learn from it. And then they went back to China to try to recreate what they saw in Silicon Valley.

And the lesson that they learned, what they, you know, saw was happening in the Bay was that you need to have universities, venture capital, and start-up companies all located together; right? The closeness on geography was extremely important for the flow of ideas and exchange of -- flow of people and having meetings so you can invest. And so

they created high-tech zones to try and do this through policy, basically to tell universities to locate there, to have companies locate there.

Q.   Approximately how many high-tech zones are there in the PRC today?

A.   I don't -- I don't know.  Probably every province has several.  Every municipality probably has a couple.  It's a reflection of, once China decided to do something, that every province decided, "Oh, we're going to follow through," even if there was no technology there.

Q.   Are there certain types of high-tech zones that focus on specific technologies?

A.   Yes.

Q.   Are there ones focused on artificial intelligence, for example?

A.   Yes.

Q.   Okay.  You mentioned that high-tech zones have three components, and one of them that you mentioned was universities.

     Can you explain how universities work in high-tech zones?

A.   So, essentially, they work like they do in the States; right?  The role of the university is to train students, to help design curriculum that would reflect the technologies that they're interested in.  The hope is that, you know, university graduates will then start companies, that some professors will

leave the university and start companies.  And they provide specialized research that would support the focus of that specific high-tech zone.

Q.   Are the universities in the PRC public or private?

A.   Public.

Q.   And how do public universities work in the PRC as opposed to ones here in the United States?

A.   So very top-down.  The Ministry of Education in China supervises all public universities in China.  Every Chinese university will have a party committee on it that is in charge of appointments.  The president of a university will be a Chinese Communist Party member.  And the university's responsibility is, again, to follow the policies and talk about how they're going to support specific technology or industrial goals.

Q.   Are public universities also expected to help implement the five-year plans we have been discussing?

A.   Yes.

        MR. CHANG:  All right.  Ms. Hernandez, if you could take down these slides for now.  We'll turn back to them in a little bit.

BY MR. CHANG:

Q.   Dr. Segal, were you asked to provide several different expert opinions in this case?

A.   Yes.

Q.   Before we get into the specifics of those opinions, can you talk the jury through your process for coming to these opinions?

A.   Yes.  So I am a qualitative researcher.  I don't run numbers or big models or anything like that.  I essentially read Chinese documents.  I read Chinese press reports.  When possible, I do interviews with people that are involved in the decisions to make the policies or to implement the policies.

I look at what we call open source, so anything that's generally available on the Web or publicly published in China, and then look at what other scholars and academics produce in the United States.

Q.   Did you undergo that process for your opinions in this case?

A.   Yes.  Plus the documents that came from the defendant's device.

Q.   In addition to all those sources of information that you just talked about, did you also rely on your 30 years of training and experience in this field?

A.   Yes.

Q.   Okay.  Let's talk through some of these opinions.  First, were you asked to provide an opinion explaining the role of artificial intelligence in the PRC today?

A.   Yes.

Q.   At a high level, can you explain what is the role of

artificial intelligence in the PRC economy and government?

MR. FONDO:  Your Honor, objection just as to the time period.

THE COURT:  Well, I mean, I think this question is fine; but I think the important thing for everybody to understand is that this testimony is relevant only to the extent that it's describing conditions in China at the time Mr. Ding was engaged in his activities in China.

MR. CHANG:  That's correct, Your Honor.

THE WITNESS:  So the Chinese leadership has signaled at the highest levels that artificial intelligence is of strategic interest to China's economic, political, and military goals.  There have been numerous speeches from Xi Jinping and other top Chinese leaders about the importance of artificial intelligence and the competition around artificial intelligence.

BY MR. CHANG:

Q.    Has the Government mentioned artificial intelligence in any of the plans that we've talked about?

A.    So in 2017, the State Council issued what they called the Next Generation Artificial Intelligence Development Plan.

Q.    What is that plan?

A.    It broadly talks about the goals for AI development inside of China.  So it talks about developing a domestic market of artificial intelligence inside of China that would be worth

$100 billion by 2025, and says that it wants to make China a world leader in artificial intelligence by 2030.  It talks about some specific areas of hardware and software that it thought China needed to develop and, in particular, focused on what they saw as a significant weakness around chips.

Q.   We'll talk about chips more in a little bit.

But other than the 2017 plans, has the Government issued other follow-up plans related to artificial intelligence?

A.   Yes.  There's been, both at the State Council and provincial and municipal level, numerous policies that put more meat on the bones of what the State Council 2017 plan said, including a 2023 plan from the Ministry of Industry and Information Technology and the Cyberspace Administration of China that focused on compute and energy infrastructure.

Q.   What does that 2023 plan talk about?

A.   About the increasing energy demands for building data centers and running models and other types of AI systems, and the need for -- to build those out and support them.

Q.   Okay.  Separately, Dr. Segal, were you asked to provide an opinion on PRC governmental policies related to technology transfer and development?

A.   Yes.

Q.   Can you explain that opinion?

A.   Yes.  So the opinion has two parts, a domestic part and an absorption, attraction part.

The domestic part is that the Chinese, for the last 30 years, have decided that they don't want to be what we all think of them as, the factory to the world; right?  They don't want to continue selling all of the cheap stuff that we all have in our homes.

They want to be able to compete on iPhones and electric vehicles and semiconductor and artificial intelligence.  And the way to do that was to invest a huge amount in science and technology.  So China now spends, second in the world, only second to the United States, in total spending on research and development.

It expanded university education massively, mostly in the science and engineering fields.  It now produces more scientific papers than the rest of the world.  And so -- and then had a number of specific industrial policies around specific technology.

So it just invested a vast amount of resources in making sure that it could be a scientific power.

Q.    You mentioned that there's two pieces to those policies, the internal one, which you just described.

What's the external piece of that policy?

A.    So the absorption side was, in the '80s and '90s when China was behind in technology, it essentially made a deal with companies that wanted to do business in China, which was, if you want to sell to Chinese consumers, you have to have a

Chinese partner and you have to help that Chinese partner and teach that Chinese partner and have a joint venture with that Chinese partner, which meant that technology would be transferred. Right? If you help a Chinese company set up a factory line, they're going to learn how to do things the way that the foreign company did.

And then there was pressure on companies, again, if you wanted to continue selling into the China market, to move research and development that was typically done in the United States or in Europe to China.

And so a lot of those people who were trained, for example, at Microsoft's R&D center went off to found some of the most famous Chinese technology and AI companies.

Q. Earlier you mentioned the concept of chip constraints when you were talking about artificial intelligence plans by the PRC government. What does that term mean in the context of AI?

A. So China has been trying to develop a semiconductor industry since the 1950s. It's very hard. It requires incredible amounts of technological sophistication that very few countries have managed.

And then starting under the first administration of President Trump and then going through President Biden and now continuing with the second administration of President Trump, the United States has issued export controls, essentially told U.S. companies that they cannot sell chips to China, first

for human rights and military reasons, to prevent those chips to go to the Chinese military, and then essentially to slow down China's AI development.

So that means that the chips that are needed to train models and develop models are harder to come by. And some of the most sophisticated ones are illegal from these -- based on these laws, to get inside of China. So that is a significant constraint for Chinese developers.

Q. All right. Next, as part of your work for this case, did you also research the relationship between the PRC government and certain entities in the country?

A. Yes.

Q. The process that you used for this research process, was it similar to the one you've described a couple of times this morning?

A. Yes.

Q. What sources, in particular, did you review and analyze for coming to these next set of opinions?

A. The documents that the Government gave me from the defendant's device; the websites of the entities themselves, how they talked about themselves, how they described themselves; Chinese government documents and policies that referred to the entities; Chinese press reports about the entities.

Q. Did you also rely on your training and experience?

A.   Yes.

Q.   And the type of materials that you relied on for these opinions, were they typical for the type of research that you've been doing in this field?

A.   Yes.

MR. CHANG:  Ms. Hernandez, if you could please pull up Slide 4 of Demonstrative Number 8 for the jury and Dr. Segal. Thank you.

Let's start with the first bullet point, if we could go back.

Yeah.  Okay.

BY MR. CHANG:

Q.   Let's start with the Chongqing Mingyue Lake International Intelligent Industry Science and Technology Innovation Base and Park.  For the benefit of Madam Court Reporter, we'll call that the Industrial Innovation Park.  Is that okay?

A.   Yes.

Q.   Was this one of the entities that you did some research on?

A.   Yes.

Q.   Before we get into the specifics, what is the Industrial Innovation Park?

A.   It is one of the high-tech zones that we were talking about, focused on intelligent industries, which means digital technologies and artificial intelligence.

Q.   Where is it located geographically?

A.   It's outside of Chongqing.  So that was the -- in the middle of the country, one of the municipal-level countries we talked about earlier.

Q.   Based on your research, what were you able to determine about how the Industrial Innovation Park was created?

A.   The park was created by a -- by the municipality, by Chongqing municipality.  It created the park and has an administrative committee that manages the park.

Q.   Okay.  And when you say the "Chongqing municipality," is that the government of Chongqing?

A.   Yes, the municipal government.

Q.   Okay.  And is that Industrial Innovation Park within any specific area of Chongqing?

A.   It's in a part of Chongqing that's called the Liangjiang New Industrial Area, which was created by the State Council as part of Chongqing.

Q.   What is a new area?

A.   So this area was created in 2010, so this probably was farmland, so before the massive expansion of Chongqing that we've seen over the last 15 years.  And the idea was to take that farmland and turn it into a place where factories and high-tech zones and other places would locate.

Q.   And this Industrial Innovation Park is within this new area?

A.    Yes.

Q.    Based on your review of the documents and your research, what were you able to determine about the governance structure of the Industrial Innovation Park?

A.    It has a management committee that is part of the municipal government.  Officially, it is part of Liangjiang New Industrial Area.

Q.    When you say there's a committee that's part of the government, how does that actually work for a high-tech zone?

A.    So it set up the zone.  It determines the policies for the zone.  It provided some investment in the zone and basic oversight of the zone.

Q.    Is this kind of governance structure by the government, is that unusual for a high-tech zone in the PRC?

A.    No.

Q.    As far as you're aware, are you aware of a single high-tech zone that's not controlled by the Government?

A.    Not that I'm aware of.

Q.    Next I want to talk a little bit about how this high-tech zone is structured.

      Are there investment funds that are affiliated with the zone?

A.    This zone, in particular, had a specialized venture capital fund.

Q.    Explain what that is.

A.    So a venture capital fund is an investment entity that, you know, looks for early technological -- generally, technological investments that are big bets that could have 10 or 20 or 100 times rewards and often involve kind of a -- more than just the money, has a relationship of trying to instruct the entrepreneurs and help them develop markets.

Q.    This venture capital fund that you referenced related to the park, is it controlled by the government or is it a private fund?

A.    It's controlled by the government.  This fund is owned by the Liangjiang New Industrial District.

Q.    Are there also private venture capital funds in the PRC?

A.    Yes.

Q.    Explain how those work.

A.    They work like they work here.  I mean, actually, many of the private companies in Silicon Valley on Sand Hill Road used to have investment in -- very high investment in China and have branches in China, and there are Chinese companies that operate the same way.

            MR. FONDO:  Your Honor, permission to approach?

            THE COURT:  Sure.

                (Discussion held at sidebar, not reported.)

            THE COURT:  You can proceed.

            MR. CHANG:  Thank you, Your Honor.

SEGAL - DIRECT / CHANG

BY MR. CHANG:

Q.   All right.  We were talking about private venture capital funds.  So, Dr. Segal, are there both public and private investment funds in the PRC?

A.   Yes.

Q.   Are you familiar with a private investment fund by the name of IDG Capital?

A.   Yes.

Q.   Can you describe what that is?

A.   IDG was founded in Boston and then located in China and was an extremely important player for many of the big technology companies in the 2000s and 2000 aughts, like Xiaomi and Qihoo 360 and, I think, Tencent.

Q.   Is it possible for an artificial intelligence to go into China and succeed without interfacing in a meaningful way, a significant way with the Chinese government?

A.   When you're small, but not when you're big.  So you can start off without interface, but once you grow to a certain size and show success, then you're going to attract the attention of the Chinese government.

Q.   Can you elaborate on that?  Can you give an example of an AI start-up in the space that started without support from the government?

A.   A good example would be DeepSeek, which caused a lot of attention in the United States, a lot of headlines because

DeepSeek released a model that seemed to be competitive with, for example, ChatGPT or Claude.  It did it under those conditions of constraint I talked about.  So it didn't have access to all of the high-level chips.  It seemed to do it more cheaply and with less energy.

DeepSeek was started by a hedge fund.  So the head of the hedge fund has an interest in artificial intelligence and so created DeepSeek from his own investments.

Q.   Let's turn back to the demonstrative slide.

MR. CHANG:  Ms. Hernandez, if you could move on to the next bullet point.

BY MR. CHANG:

Q.   Dr. Segal, was the Sichuan Tianfu New Area Innovation Research Institute another one of the entities that you conducted research on?

A.   Yes.

Q.   Again, for the benefit of the court reporter, can we call it the Research Institute?

A.   Yes.

Q.   What is the Research Institute?

A.   It is a research institute that was created by the Tianfu New Area and the -- and Southwest University to bring business and academia together to help generate ideas and commercialize technologies.

Q.   Were you able to determine any facts about when this

Research Institute was created?

A.    I don't remember when it was created.

Q.    Okay.  You mentioned that it's affiliated with the Southwest University.  What's Southwest University?

A.    So Southwest University is a mid-tier university in Sichuan.  It has a focus on science and technology issues.  It is, like all Chinese universities, under the auspices of the Chinese Ministry of Education.

Q.    What other facts were you able to determine related to the Research Institute and its governance structure?

A.    So it -- as I said, the Tianfu New Area helped found it. So the Tianfu New Area is like the new area we were talking about before, but this is in a different city in China, in Chengdu, so that is a branch of the municipal government.  And then it worked with the university to set up this institute. It provided some initial investment in the Research Institute, as well as gave it some preferential policies.

Q.    Be helpful to go back to the Demonstrative 1.  If you could just point out where this is on the map of China, that would be helpful for everyone.

        MR. CHANG:  Ms. Hernandez, can you go back?  Yes.

        THE WITNESS:  So, again, Sichuan is basically right in the middle there, to the left of the big red Chongqing, and Chengdu is the smaller red dot.

        MR. CHANG:  Okay.  Thank you.

Ms. Hernandez, back to Slide 4, please.

BY MR. CHANG:

Q.   You talked a bit about Southwest University.  Is that a public or private university?

A.   Public university.

Q.   And are all public universities controlled by the PRC government?

A.   Yes.

Q.   Are you aware of a single public university that's not controlled by the PRC government?

A.   No.

Q.   Let's move on to the next point in your demonstrative.

MR. CHANG:  Ms. Hernandez?

BY MR. CHANG:

Q.   Dr. Segal, were you also asked to conduct research on the entity Lingang Group?

A.   Yes.

Q.   What is that?

A.   Lingang Group is a state-owned enterprise at the municipal level.  So unlike those central ones that I discussed, Lingang is owned by the Shanghai municipal government.

MR. CHANG:  Again, for those of us who may not be as familiar with the geography of China, Ms. Hernandez, if you could go back to the first slide with the map.

\\\

BY MR. CHANG:

Q.    Where is Shanghai?

A.    It's on the seaboard, so on the far right there in the middle with that red -- the big red dot.

        MR. CHANG:  Back to Slide 4, please, Ms. Hernandez.

BY MR. CHANG:

Q.    You said Lingang Group is a state-owned enterprise.  Is there a particular sector of the economy that it focuses on?

A.    Yes.  It develops new industrial sites and high-tech zones.

Q.    And based on your research, what were you able to determine about the ownership structure of Lingang Group in particular?

A.    Lingang is a state-owned enterprise.  It says so on its website.  It has a link on its website back to the Shanghai state-owned Asset Supervision and Administration Commission, so the Government agency that runs it.

      Its managers are all from the Communist Party.  All of the Chinese press reports and public databases all talk about Lingang as being a state-owned enterprise.

Q.    Dr. Segal --

        MR. CHANG:  We can take down the slide now, Ms. Hernandez.

        THE COURT:  Is now a good time for the morning break?

        MR. CHANG:  Perfect.  Thank you, Your Honor.

THE COURT:  Okay.  All right.  Let's take our morning break, and we will resume at 11:15 a.m.  Thank you.

THE COURTROOM DEPUTY:  All rise.

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Okay.  You can step down.  If you could be back here on the stand at 11:15, that would be great.

Anything to discuss?  Do you want to go ahead?

MR. FONDO:  Yes, Your Honor.

THE COURT:  Put your objection on the record?

MR. FONDO:  Yes, Your Honor.  Thank you.

So the objection that we stated -- or that I raised during the testimony was that we believe that Dr. Seg- -- there was an order issued by the Court, it's Docket Number 264, relating to Dr. Segal's testimony.  The order stated [as read]:

"Dr. Segal will not be allowed to state that certain entities were 'substantially owned, controlled, or managed' by the PRC."

And we objected because we believe Dr. Segal crossed that line and referenced that they were controlled by the -- I think it was the local municipality.

THE COURT:  Right.  And what I said in response, I overruled the objection because -- excuse me -- the ruling was intended to prevent the witness from repeating the statutory definition of an instrumentality of the government, but it was not meant to prevent the witness from using any word from that

statutory definition.  The point is just to permit the witness to testify in plain English without crossing the line into intoning the statutory phrase that the jury will be required to find.

And I said that I didn't think that the witness had come close to crossing that line.  It is a fuzzy line.  It's hard to -- it's hard to know exactly where the line is, but I don't think the witness has come close to crossing it.

MR. FONDO:  Understood, Your Honor.

MR. CHANG:  We agree with Your Honor.

THE COURT:  Okay.  Thank you.

MR. CHANG:  Thank you.

MS. PRIEDEMAN:  Your Honor, just one quick thing in case we get to Dr. Sanchez before the lunch break.

THE COURT:  In case we get to what?

MS. PRIEDEMAN:  To Dr. Sanchez --

THE COURT:  Okay.

MS. PRIEDEMAN:  -- before the lunch break.

Exhibit 775, which has been already admitted, which is just the list of the trade secret files by category, I'd like to give the members of the jury a printed copy and the witness to avoid going back and forth.

THE COURT:  Sounds fine.

Any objection?

MS. WALSH:  No objection.

THE COURT:  Okay.

MS. PRIEDEMAN:  Thank you.

THE COURT:  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Recess taken at 11:01 a.m.)

(Proceedings resumed at 11:17 a.m.)

(Proceedings were heard in the presence of the jury.)

THE COURT:  You can resume.

MR. CHANG:  Thank you, Your Honor.

Ms. Hernandez, if we could go back to the fourth slide, second bullet point.  Thank you.

BY MR. CHANG:

Q.   Dr. Segal, I wanted to make sure we clarified this on the record.  As part of your research into the Research Institute, were you able to identify any facts about the approval process for that institute?

A.   Yes.  It was approved by the municipal government.

Q.   You mentioned that both of these entities that we talked about, the Industrial Innovation Park and the Research Institute, were controlled by the PRC government.

Can you explain how that actually works in real life for members of the jury?

A.   So in these instances, the municipal government decided to create the zones.  It provided some investment for the Research Institute.  It provides policies that they thought would help

the park grow, so tax breaks and some investments.  And they manage the day-to-day operation of it.

Q.   Give us a real-world example.  If the Institute wants to do something, is the Government involved in that decision-making process?

A.   I would suspect it's a kind of give-and-take between the director of the Research Institute and the university and the management committee about how those research plans respond to, reflect the municipality's, the province's, the country's development plans and technology issues.

Q.   What about for the Innovation Park?  How is the governance -- how is the PRC government involved in the governance of the Innovation Park?

A.   It manages the park.  So a similar type of circumstances where it would make decisions about how to build out the park, which type of companies to try to attract, and other decisions about how the park is managed.

Q.   Could any decisions be taken from either of these entities without the approval of the PRC government?

A.   No.

Q.   Let's turn now to the Shanghai International Talents Plan or Program.  Was that another entity that you were asked to look into?

A.   Yes.

        MR. CHANG:  Ms. Hernandez, if we could take down the

slides.  Thank you.

BY MR. CHANG:

Q.   Before we get into the specifics of the Shanghai Talents Program that you conducted research on, what is a talent program or plan in the PRC?

A.   So in the 1990s, the Chinese government decided that it wanted to create a reverse brain drain.  So hundreds of thousands of Chinese students and engineers and scientists had come to the United States, had gone to Australia, to Europe and Britain to study at universities and to work in American companies.  And China decided that it wanted to bring these people back and have them contribute to Chinese economic growth and technological development.

So it created these plans to provide incentives to these people to come back and transfer technology.

Q.   Have different provinces and municipalities like the ones we looked at on that map, have many of them created talent programs?

A.   Yes.  So the first ones that started were national plans, and then provinces and municipalities created their own talent plans.

Q.   Is the Shanghai International Talents Program one of these talent programs or plans?

A.   Yes.

Q.   Based on your research, what were you able to determine

about the Shanghai International Talents Program?

A.    So Shanghai has its own five-year plan that reflects the national five-year plan.  That five-year plan has an entire section on talent and expertise.  It talks about using talent plans to try and get people to move to Shanghai and set up companies or work in research institutes.

The talent plan that we're discussing was created by the Shanghai municipal government and is administered at a district level.

Q.    What district?

A.    Xuhui.

Q.    And what is the Xuhui District?

A.    So districts are like -- I'm from New York, so like a borough of Manhattan.  So it's essentially a branch of the municipal government below the municipality.

Q.    How does the governance of the Shanghai Talents Program work?  Who manages the program on a day-to-day?

A.    The Xuhui District government will have a person who is from the Ministry of Science and Technology, and they will administer that plan.

Q.    And how do these plans work?  Do people apply for them?

A.    Yes.  They're a relatively competitive application process.

Q.    And what -- let's say, hypothetically, someone's accepted into a talent program.  What kinds of benefits would they

expect to receive in return?

**A.**   It depends on the expertise and the area, but generally, if you're a scientist, access to research labs, some funding for the research you want to do.  If you're an entrepreneur, often it's access to real estate.  You may get a couple of years rent-free in a high-tech zone and other types of government support.

**Q.**   Are you aware of any talent programs in the PRC that are not controlled by the PRC government?

**A.**   No.

          **MR. CHANG:**  Thank you.

          No further questions at this time.

          **THE COURT:**  Actually, can we have a brief sidebar before the cross?

          (Discussion held at sidebar, not reported.)

                         **CROSS-EXAMINATION**

BY MR. FONDO:

**Q.**   Good morning, Dr. Segal.

**A.**   Good morning.

**Q.**   My name is Grant Fondo, and I represent Mr. Ding.

          I'm going to be asking you a few questions -- more than a few questions today, but hopefully not too many.

          So I just want to verify.  You don't have any training or experience starting a business; correct?

**A.**   No.

Q.   And you have no experience starting a business in China; correct?

A.   No.

Q.   And nor do you have any experience in raising funds for a start-up in China?

A.   No.

Q.   So you mentioned -- you mentioned a number -- a couple of different plans, I think, through your testimony in response to questions by the Government.

So, for example, the 2017 plan, now that covers many different aspects of the economy; correct?

A.   The AI plan?

Q.   No, no.  Sorry.  I believe you testified about either the 2021 or the 2017 five-year plan.

A.   Oh, the five-year plan.  Yes.

Q.   Okay.  And so regardless of whether it's the 2017 or 2021 plan, they cover a variety of different industries; correct?

A.   Yes.

Q.   And all types of industries throughout China; correct?

A.   Yes.

Q.   And China economy has literally hundreds, if not thousands, of different industries; correct?

A.   Yes.

Q.   All right.  And so the goal of those plans is to cover many, many areas; correct?

A.    Yes.

Q.    And so -- and those plans provide some insight to industry about growth areas; correct?

A.    Correct.

Q.    And those plans also provide information to investors, for example, about what might be growth areas in the economy?

A.    Correct.

Q.    And the U.S. publishes plans as well or guidance about areas of interest that ends up providing industry with guidance about potential growth areas?

A.    Different structures, but yes.

Q.    And then -- and then investors will target companies that are potentially in growth areas regard- --

Sorry.  Go ahead.

A.    Correct.

Q.    -- regardless of what the particular industry is?

Let me rephrase the question.

So and that point crosses many different industries; correct?

A.    I'm sorry again.  That point?

Q.    So -- yeah.  So I asked you about -- so investors target companies in growth areas; correct?

A.    Correct.

Q.    Okay.  And those growth areas can cover many different industries, not just AI; correct?

A.    Correct.

Q.    So China has a fairly vibrant private sector?

A.    Correct.

Q.    And fair to say that they have a lot of tech start-ups and incubators?

A.    Yes.

Q.    And those are privately funded?  Like MiraclePlus, for example.  Are you familiar with MiraclePlus?

A.    I am.

Q.    And that's a funded -- it's a private incubator; correct?

A.    Correct.

Q.    So that being said, is it fair to say that it's hard to do business in China without interacting in the government on some level?

A.    I'm sorry.  You're asking --

Q.    Let me --

A.    Is it hard -- yeah.

Q.    Sorry.  Let me --

A.    Yeah, it is hard to do business in China without interacting with the government.

Q.    So, for example, banks are controlled by the government?

A.    Yes.

Q.    Mass transit, controlled by the government?

A.    Yes.

Q.    Okay.  Things like that; correct?

A.    Yeah.

Q.    You had brought up before, when the Government was questioning, you mentioned the word "partner," companies having to partner in China.  And one of the companies you mentioned was Microsoft.

      That was -- and was that in relation to an R&D center in China that was built by Microsoft?

A.    Yes.  But that center did not have a partner.

Q.    Okay.

A.    Yeah.

Q.    Did -- and then -- so, but there are a number of large U.S. tech companies that operate in China?

A.    Less now, but yes.

Q.    Google's one of them, for example?

A.    Yes.

Q.    All right.  You mentioned an entity called Chongqing; correct?

A.    Chongqing?

Q.    Yes.

A.    Yes.

Q.    Or Mingyue Lake is another?

A.    Yes.

Q.    Prior to being retained by the Government, were you familiar with that entity?

A.    No.

Q.   And so you learned about it by essentially searching open-source resources?

A.   Yes.

Q.   Essentially surfing the Internet, among other things?

A.   Looking at the Internet and government documents and Chinese press reports on the Internet, yes.

Q.   And that -- so you mentioned the Innovation Park.  We discussed that a little bit; correct?

A.   Yes.

Q.   All right.  Now, that has a lot of small, private start-ups that interact with that hub; correct?

A.   Yes.

Q.   And you've never spoken to anyone at the Innovation Park; correct?

A.   No.

Q.   Never visited any of their offices?

A.   No.

Q.   Next I want to ask you about the venture fund.  And that's the Mingyue Lake Venture Fund.

     So lots of small companies apply to that fund as well; correct?

A.   Yes.

Q.   And you've never spoken to anyone at that fund, have you?

A.   No.

Q.   Never visited their offices in China?

A.    No.

Q.    You also mentioned the Sichuan New Area Innovation Research Institute or Southwest University.

So there's a lot of students who go to Southwest University; correct?

A.    Yes.

Q.    Lots of professors?

A.    Yes.

Q.    And to conduct research on -- you conducted the same type of research on this entity as you did with the prior two entities that I asked you about; correct?

A.    Yes.

Q.    And then the next one -- the next one is the Lingang Group?

A.    Yes.

Q.    So prior to being retained on this case, you were not familiar with that group, were you?

A.    No.

Q.    And to learn about it, you did the same open-source research?

A.    Yes.

Q.    So it's common for start-ups to apply to that group as well?

A.    That, I would not be as familiar with, but I would assume, yes.

SEGAL - CROSS / FONDO

Q.   But you're not familiar with it, so you're not sure?

A.   I don't know, yeah.

Q.   And you've never spoken to anyone at that group; correct?

A.   No.

Q.   Never visited any of their offices?

A.   No.

Q.   You also mentioned the Shanghai Talents Program; correct?

A.   Yes.

Q.   Fair to say -- well, there's -- do you know how many entrepreneurs apply to that program?

A.   I don't.

Q.   And you've never spoken to anyone at that talent program, have you?

A.   No.

Q.   So the Government is paying you $650 an hour for your testimony in this case; correct?

A.   Yes.

Q.   And approximately how much have you billed through today? How much have you billed to the Government in total, approximately?

A.   I haven't billed yet, but it's approximately $30,000.

Q.   And as you mentioned in questioning from the Government, it's not the first time that you've been retained by this office in -- the U.S. Attorney's Office; correct?

A.   Correct.

Q.   All right.  I think you said three times?

A.   This office once before.  I'm currently working --
advising on a case with Pangang Group.  And then I worked a
case in New Jersey.

Q.   Was there also a -- and I'll spell it.  It's F-u-j-i-a-n.

A.   Fujian Jinhua?

Q.   Yes.  Was that a case in this district?

A.   That was the court in this case.

Q.   I'm sorry.  What?

A.   The case in this court.  Sorry.

Q.   So is that two other ones in this court besides this one?
I'm not sure I understand.

A.   Pangang is ongoing.

Q.   Yep.

A.   And then Fujian Jinhua was the one in the past.

Q.   Okay.  But that was in this court as well?

A.   That was in this court.

Q.   Thank you.

     And so let's go through both of those.  And those,
generally, you were testifying sort of similar topics as you
did today, generally, at a very high level?

A.   Similar topics.  Pangang, I haven't done anything yet
except look at some documents.

Q.   Okay.  But you've been retained by the Government for that
case?

A.    Yes.

Q.    And that case is ongoing?

A.    Yes.

Q.    And you may be doing work in the future for that?

A.    I may be, yes.

Q.    And any other case?

A.    In Fujian Jinhua, as you said, I did similar testimony about the types of technology, why China was interested in the semiconductor industry, and government entities.

Q.    And how much did you -- how much did the U.S. Attorney's Office pay you for the testimony in that case?

A.    I think it was around -- well, $650 an hour.  I think it was around $25,000.

Q.    Now, you testified that CFR -- that's your employer; correct?

A.    (No audible response.)

Q.    -- is nonpartisan?

          (Reporter interrupts to clarify the record.)

          THE WITNESS:  I'm sorry?

BY MR. FONDO:

Q.    I'll reask it.  Sorry.

      So you testified earlier that CFR is a nonpar- -- let me rephrase that.

      You testified earlier that your employer, CFR, is nonpartisan; correct?

SEGAL - CROSS / FONDO

A.    Correct.

Q.    And that's because you don't accept money from different governments; correct?

A.    That, and we don't take any official positions.  So I have colleagues who worked in Republican administrations, and I have colleagues who worked in Democratic administrations.

Q.    So you don't take Democratic or Republican positions?

A.    Correct.

Q.    But you do take money from big tech, don't you?

A.    We have a corporate program which big tech is members of, but they are not allowed to give to specific programs, so they are not allowed to be involved in any of the research.

Q.    Okay.  But they're allowed to provide money to your employer; correct?

A.    Correct.

Q.    Okay.  And, in fact, you have a specific corporate program for them to provide money to CFR?

A.    Yes.

Q.    Okay.  And that is -- it's actually called the Corporate Member Program; correct?

A.    Correct.

Q.    And there's different tiers of that program?

A.    That is correct.

Q.    And there is a gold, silver, and bronze tier; correct?

A.    Correct.

Q.    Kind of like the Olympics?  The biggest contributor gets the gold?

A.    That is correct.

Q.    And Google is one of those big contributors, isn't it?

A.    I'm not aware of all of the big contributors, but I'll take your word on it.

Q.    Well, I'm happy to show you a document.

        MR. FONDO:  So let's turn to -- if we could show the witness Exhibit 6703.  And if we could --

BY MR. FONDO:

Q.    So this is corporate members.  You see in the sort of left-middle side it says "Gold"?

A.    Yes.

        MR. FONDO:  Go to the next page, please.

BY MR. FONDO:

Q.    And this is your website; correct?

A.    Yes.

Q.    CFR's website?

      And then "Google" is in the middle right-hand side of that; correct?

A.    Yes.

Q.    And so it is a gold corporate member?

A.    Yes.

        MR. FONDO:  Your Honor, we move to admit Exhibit 6703.

        MR. CHANG:  No objection, Your Honor.

THE COURT:  Admitted.

(Trial Exhibit 6703 received in evidence.)

MR. FONDO:  If we could publish that to the jury.

BY MR. FONDO:

Q.   So, again, this is your -- CFR's website?

A.   Yes.

Q.   And it identifies -- the corporate members is that corporate membership program.  And you have to provide money to be a member of it; correct?

A.   Correct.

Q.   And this is the gold page, the highest level?

A.   Yes.

Q.   All right.  And Google is on the second page of that; correct?

A.   Correct.

Q.   And there's a lot of other corporations on this page as well; correct?

A.   Correct.

Q.   So you've got Meta; you've got Visa.  You've got a number of other ones; correct?

A.   Correct.

Q.   Okay.  So you're nonpartisan as to governments, but these are one of the many -- these are one of the many corporations that fund your company's operations; correct?

A.   In part, yes.

Q.   And so let's -- and we mentioned the gold level.  So isn't it true that the gold -- to become a gold corporate member, you're required to pay $100,000 a year?

A.   Correct.

Q.   And so Google has paid at least $100,000 a year to get on this webpage; correct?

A.   Yes.

Q.   And is it true that Google's been a gold corporate member for a number of years?

A.   Yes.

Q.   And been a gold member through the time you were hired for this case?

A.   Yes.

Q.   And through the present?

A.   Yes.

Q.   Now, you testified -- in addition to Google being a gold member -- do you know how much, by the way, they donate in total or how much they pay towards your employer in total?

A.   I do not.

Q.   So in addition to having Google as a gold member, CFR also has two Google board members, doesn't it, two members of Google who are on your board?

A.   Are there two now?  I don't know.  Yes.

Q.   Well, so you tell me what you recall.

A.   Ruth Porat, I think, was a board member for a good amount

of time.  I don't know who the second would be.

Q.   Do you recognize the name James Manyika?

A.   Ah, yes.  James Manyika, yes.

Q.   And so these are both board members of CFR?

A.   Yes.

Q.   And during their tenure as board members, their regular job was being executives at Google; correct?

A.   Correct.

MR. FONDO:  Your Honor, at this -- so I'd like to -- Mr. Jay, could you pull up 6705.

BY MR. FONDO:

Q.   Do you recognize that person?  Is that --

A.   That's Ruth Porat.

MR. FONDO:  Your Honor, we'd like to admit Exhibit 6705, please.

MR. CHANG:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 6705 received in evidence.)

MR. FONDO:  All right.  I'd like -- Mr. Jay, if you could pull up Exhibit 670- -- hold on one second.

BY MR. FONDO:

Q.   So just to be clear on who Ms. Porat is, could you read that first line of her bio there?

A.   Sure.

[As read]:

"Ruth has been President and Chief Investment Officer of Alphabet and Google since September 1st, 2023."

Q.   That's a pretty high-level position at Google, isn't it?

A.   Yes.

MR. FONDO:  So if we could pull up Exhibit Number 6704, please.

BY MR. FONDO:

Q.   Now, this is James Manyika; correct?

A.   Correct.

MR. FONDO:  Your Honor, at this time we'd like to move in Exhibit 6704.

MR. CHANG:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 6704 received in evidence.)

BY MR. FONDO:

Q.   And so if you could read the first two sentences of his bio.

A.   [As read]:

"James Manyika is a Senior Vice President for Research, Technology & Society at Google where he focuses on advancing Google's most ambitious innovations in artificial intelligence, computing and science, and on areas with potential to benefit society.  He is also responsible for leading and

overseeing Google Research and Google Labs."

Q.   So one of your board members works in Google's AI areas; correct?

A.   Correct.

Q.   And do you know how long he's been a board member for?

A.   I don't know.

MR. FONDO:  If we could pull up Exhibit 6717, Mr. Jay.

BY MR. FONDO:

Q.   All right.  Is this your 2023 annual report?

A.   Yes.

Q.   For CFR?

A.   Yes.

MR. FONDO:  I'd like to go to page 3, please.  And if you could blow up the middle of it by "Directors."

A little bit farther down.

Yeah, that's good, actually, right there.

BY MR. FONDO:

Q.   So there it says "Term Expiring 2025."  So do you see two Google executives on that list?

A.   Yes.

Q.   And who are those names?

A.   James Manyika and Ruth Porat.

Q.   And, in fact, Ruth Porat also was essentially the keynote speaker at CFR's 2023 annual national symposium; correct?

A.   I don't remember, but, again, I'll take your word on it.

Q.   Well, why don't we see what the annual report says.

So if we could go to page 20, please.  Is that her in the upper --

A.   Yes.

Q.   Okay.  And if you wouldn't mind reading what it says below her picture.

A.   [As read]:

"Senior Vice President and Chief Financial Officer of Alphabet and Google and member of the Council on Foreign Relations Board of Directors Ruth Porat gives the opening remarks at the National Symposium."

MR. FONDO:  Your Honor, at this time, we'd like to admit Exhibit 6717 in, please.

THE COURT:  Objection?

MR. CHANG:  I'd say objection; hearsay.  And I also haven't had a chance to look at the rest of the document to -- it's a very lengthy report.

MR. FONDO:  I'm sorry.  We're happy to have just admitted the relevant portions.

THE COURT:  The relevant portions being what?

MR. FONDO:  Meaning the pages that I cited.  First page and then the two pages.

MR. CHANG:  Objection.  Relevance.

THE COURT:  Overruled.  It's admitted.

(Trial Exhibit 6717, pages 1, 3, and 20, received in evidence.)

MR. FONDO:  Thank you.

No further questions.

THE COURT:  All right.  Anything on redirect?

MR. CHANG:  Yes, Your Honor.

### REDIRECT EXAMINATION

BY MR. CHANG:

Q.  Let's start with the last topic that Mr. Fondo covered.

Before Mr. Fondo showed you the graphic of the gold members for CFR, did you know who they were?

A.  Yes.

Q.  Have you had any conversations with Google as part of this case?

A.  No.

Q.  Let's turn now to his questions about your research process.

He said you surf the Internet to come to your opinions.

How did you arrive at your opinions in this case, Dr. Segal?

A.  I looked at the documents that the Government gave me from the defendant's devices.  I looked at things on the website of the entities that I was asked to investigate.  I looked at Government documents that were on the Web -- on the Internet.  And I looked at Government reports and press things that are on

the Internet, as well as secondary literature and academic writing.

Q.   Did you consult both Mandarin- and English-language documents?

A.   Yes.

Q.   Was the type of research that you undertook in this case consistent with the type of research you've been doing for the last 30 years?

A.   Yes.

Q.   Did you also draw upon your 30 years of experience as an expert in this field?

A.   Yes.

Q.   Mr. Fondo asked you about the State Council plans.  Can you explain to the members of the jury how State Council plans differ from pronouncements from the U.S. Government?

A.   I think Mr. Fondo asked me about the five-year plans.

Q.   Yes, the five-year plans.  So how does a five-year plan differ in terms of importance to, for example, a policy pronouncement from the U.S. Government?

A.   So the five-year plans are at a very vague, often, level of specificity; but they do give you the sense of the larger themes of where China wants the economy to go -- right? -- what it thinks the big problems are or challenges it wants to address.

     But the difference from that is that all Chinese agencies,

all the provinces, all the municipalities then have to talk about how they're going to fulfill that plan; right?  They have to fall in line.

And as we know, the U.S. Government does not work that way; right?  When we change -- often change government every four years, and so we may decide to do something completely different as a new administration comes in.  And governors have a choice if they're going to follow through on certain types of areas that are of interest to the administration.

So, you know, we can see now, you know, the Biden Administration was very interested in EVs, in electric vehicles.  California supported that.  Other states did not.  That would never happen in China.

Q.   Are provincial and municipal officials able to disobey or disagree with the State Council's five-year plans?

A.   No.

MR. CHANG:  No further questions.

THE COURT:  Any recross?

MR. FONDO:  Nothing further, Your Honor.

THE COURT:  Okay.  You can step down.  Thank you.

(Witness excused.)

THE COURT:  And the Government can call its next witness.

MS. PRIEDEMAN:  The Government calls Dr. Daniel Sanchez.

(Witness enters the courtroom and steps forward to be sworn.)

THE COURT:  Go ahead and have a seat.

THE COURTROOM DEPUTY:  Please raise your right -- you can have water.

THE WITNESS:  Thanks.

THE COURTROOM DEPUTY:  Please raise your right hand.

DANIEL SANCHEZ,

called as a witness for the Government, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.

Please state and spell your full name for the record.

THE WITNESS:  Daniel Sanchez.

THE COURTROOM DEPUTY:  Can you spell it, please?

THE WITNESS:  D-e -- sorry.  D-a-n-i-e-l, S-a-n-c-h-e-z.

DIRECT EXAMINATION

BY MS. PRIEDEMAN:

Q.   Good morning, Dr. Sanchez.

A.   Good morning.

Q.   Where are you currently employed?

A.   At the Massachusetts Institute of Technology.

Q.   Is that sometimes called MIT?

A.   Yes.

Q.   How long have you worked at MIT?

PROCEEDINGS

that'll be the standard that I apply.

MS. WALSH:  Understood.

THE COURT:  Okay.  Anything else to discuss right now?

MS. PRIEDEMAN:  Not from the Government, Your Honor.

Thank you.

MS. WALSH:  Not from defense.

THE COURT:  Okay.  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Proceedings adjourned at 3:33 p.m.)

---oOo---


## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Sunday, January 18, 2026


_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter

**Volume 8**

**Pages 1419 - 1604**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. 3:24-CR-00141-VC** |
| | ) | |
| LINWEI DING, a.k.a. LEON DING, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

San Francisco, California
Thursday, January 22, 2026

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

        CRAIG H. MISSAKIAN
        UNITED STATES ATTORNEY
        450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495
    BY:  **CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
        **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

        CRAIG H. MISSAKIAN
        UNITED STATES ATTORNEY
        1301 Clay Street, Suite 340S
        Oakland, California 94612-5217
    BY:  **MOLLY K. PRIEDEMAN**
        **ASSISTANT U.S. ATTORNEY**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
        CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant:

> GOODWIN PROCTER LLP
> 525 Market Street
> San Francisco, California 94105
> BY:  **DARRYL M. WOO, ATTORNEY AT LAW**
> **DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
> **RACHEL M. WALSH, ATTORNEY AT LAW**
> **COLETTE A. LOWRY, ATTORNEY AT LAW**
> **NICHOLAS C. WILEY, ATTORNEY AT LAW**

> GOODWIN PROCTER LLP
> 601 Marshall Street
> Redwood City, California 94063
> BY:  **GRANT P. FONDO, ATTORNEY AT LAW**
> **FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

> GOODWIN PROCTER LLP
> 601 South Figueroa Street, Suite 4100
> Los Angeles, California 90017
> BY:  **LORA J. KRSULICH, ATTORNEY AT LAW**

Also Present:        **Andrea Valladao, Federal Bureau of**
**Investigation**
**Veronica Hernandez, Paralegal**
**John Jay, Trial Technician**

**Thursday - January 22, 2026**                                    **9:09 a.m.**

                          P R O C E E D I N G S

                              ---o0o---

(Proceedings were heard out of the presence of the jury.)

          **THE COURT:**  Okay.  Good morning.

          So I'll tell you what happened with Ms. Johnson, Juror Number -- I guess she's now -- she was Juror Number -- she had become Juror Number 10.

          She had her car broken into last night, and all the windows were shattered and all her credit cards and driver's license and juror badge and all that kind of stuff was stolen. So she's been scrambling around trying to deal with that.

          And in light of that -- I spoke with her directly this morning to explore whether it was realistic for her to come in despite all that, and she did not feel that it was, and I agreed with her.  So I went ahead and excused her.

          So we're down to -- it's nervous time.  We're down to two alternates and that's that.

          So does anybody have any comment or objection relating to that that they want to make?

          **MR. BOOME:**  No, Your Honor.

          **MR. FONDO:**  No objection, Your Honor.

          **THE COURT:**  Okay.  Anything else you-all need to discuss with me?

          **MS. KRSULICH:**  Yes, Your Honor.  Lora Krsulich for the

PROCEEDINGS

MR. FONDO:   Thank you.

THE COURT:   Thank you.

THE COURTROOM DEPUTY:   Court is in recess.

(Proceedings adjourned at 3:32 p.m.)

---o0o---


**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Friday, January 23, 2026

*Ana Dub*

_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter

VOLUME 10

PAGES 1885 - 2087

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
v.                                  ) **No. 3:24-CR-00141-VC**
                                    )
LINWEI DING, a.k.a. LEON DING,      )
                                    )
            Defendant.              )
_____ )


San Francisco, California

Tuesday, January 27, 2026

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue, Box 36055
                    San Francisco, California 94102-3495
            BY:   **CASEY E. BOOME, ASSISTANT U.S. ATTORNEY**
                  **ROLAND CHANG, ASSISTANT U.S. ATTORNEY**

                    CRAIG H. MISSAKIAN
                    UNITED STATES ATTORNEY
                    1301 Clay Street, Suite 340S
                    Oakland, California 94612-5217
            BY:   **MOLLY K. PRIEDEMAN**
                  **ASSISTANT U.S. ATTORNEY**


            **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE.)**

REPORTED BY:  April Wood Brott, RPR, FCRR, CRG
              CSR No. 13782, Official United States Reporter

**APPEARANCES (continued):**

For Defendant:

            GOODWIN PROCTER LLP
            525 Market Street
            San Francisco, California 94105
   BY:   **DARRYL M. WOO, ATTORNEY AT LAW**
        **DAVID P. RAPP-KIRSHNER, ATTORNEY AT LAW**
        **RACHEL M. WALSH, ATTORNEY AT LAW**
        **COLETTE A. LOWRY, ATTORNEY AT LAW**
        **NICHOLAS C. WILEY, ATTORNEY AT LAW**

            GOODWIN PROCTER LLP
            601 Marshall Street
            Redwood City, California 94063
   BY:  **GRANT P. FONDO, ATTORNEY AT LAW**
        **FARZAD "FRED" FEYZI, ATTORNEY AT LAW**

            GOODWIN PROCTER LLP
            601 South Figueroa Street, Suite 4100
            Los Angeles, California 90017
   BY:  **LORA J. KRSULICH, ATTORNEY AT LAW**

Also Present:  **Andrea Valladao, Federal Bureau of Investigation**
              **Veronica Hernandez, Paralegal**
              **John Jay, Trial Technician**

MR. FONDO:  Okay, Your Honor.

The other thing, Your Honor, is I just wanted to just -- I think a final decision was made as to juror number 9.  I just wanted to --

THE COURT:  Yes.  I excused him.

MR. FONDO:  Okay.

THE COURT:  At the end of the trial day.

MR. FONDO:  Okay.

THE COURT:  Yeah.

MR. FONDO:  Thank you.

THE COURT:  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(The proceedings adjourned at 4:30 P.M.)

---o0o---

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Wednesday, January 28, 2026

April Wood Brott, CSR No. 13782