CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

CASEY BOOME (NYBN 5101845)
MOLLY K. PRIEDEMAN (CABN 302096)
ROLAND CHANG (CABN 271511)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6627
    casey.boome@usdoj.gov
    molly.priedeman@usdoj.gov
    roland.chang@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>LINWEI DING,<br><br>    Defendant. | No. 3:24-cr-00141-VC<br><br>**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, NEW TRIAL PURSUANT TO RULE 29(C) AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE[1]**<br><br>The Honorable Vince Chhabria<br>Courtroom 4, 17th Floor<br><br>**Hearing Date:** April 16, 2026<br>**Hearing Time:** 1;00 p.m. |

---

[1] The government shall refer to the Defendant's motion as "Motion" or "Mot." herein.

U.S.' OPP. TO MOT. FOR ACQ. OR NEW TRIAL
3:24-cr-00141-VC

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ..................................................................................................1

OPPOSITION TO RULE 29 MOTION ..................................................................................2

ARGUMENT ...........................................................................................................................4

I.    Ding's Claims of Legal Error, as Opposed to Sufficiency of the Evidence, Are Not Properly Before the Court in His Rule 29 Motion.................................................................................4

II.   The Evidence at Trial Was Sufficient to Support the Jury's Verdict on the Economic Espionage Counts (Counts Eight through Fourteen) .........................................................................5

      A.    Ding's Intent to Benefit the PRC Government or its Instrumentalities ............................6

      B.    Ding Had the Requisite Intent When He Committed Economic Espionage ....................10

III.  The Evidence at Trial Was Sufficient to Support The Jury's Verdict That Ding Stole The Trade Secrets to Benefit Someone Other than Google and That He Intended to Harm Google (Counts One through Seven)………………………………………………………………………13

IV.   The Evidence at Trial Was Sufficient to Support The Jury's Verdict Regarding The Existence of Trade Secrets in Each Category (Counts One through Fourteen)............................................15

      A.    Reasonable Measures ...................................................................................................15

      B.    Secrecy........................................................................................................................18

      C.    Combination Trade Secrets (Counts One-Three, Six, Eight-Ten, and Thirteen)..............19

            1.    The Jury's Verdict was Not Inconsistent ..............................................................23

OPPOSITION TO RULE 33 MOTION ..................................................................................24

ARGUMENT ...........................................................................................................................25

I.    The Government Adequately Identified the Trade Secrets Before Trial ....................................25

II.   The Court's Rulings on Defense's Expert Witnesses Did Not Result in an Unfair Trial..............26

      A.    Factual Background ......................................................................................................26

      B.    The Court's Pretrial Expert Rulings Did Not Prejudice Ding .........................................28

III.  The Court's Jury Instructions Were Correct and Did Not Affect Ding's Substantial Rights………………………………………………………………………………….............29

      A.    The Court's Holding That Section 1831 Does Not Require Foreign Government Sponsorship or Coordination of the Trade Secret Theft Was Right..........................................................................................................................30

B.     The Court Properly Instructed the Jury That Section 1831 Requires Knowledge That the Stolen Trade Secrets Included Confidential Information That Ding Had No Right to Take ................................................................... 32

C.     The Court Properly Instructed the Jury on Combination Trade Secrets ........................... 33

IV.     The Jury's Guilty Verdicts Were Consistent With The Evidence ................................................. 34

CONCLUSION .......................................................................................................................... 34

# TABLE OF AUTHORITIES

## Cases

*Barrett Bus. Servs., Inc. v. Colmenero*, 2025 WL 2048985 (9th Cir. 2025).............................................. 18

*Burks v. United States*, 437 U.S. 1 (1978) .......................................................................*passim*

*Freund v. Nycomed Amersham*, 347 F.3d 752 (9th Cir. 2003).................................................. 25

*Jackson v. Virginia*, 443 U.S. 307 (1979).................................................................... 2, 3

*Lagos v. United States*, 584 U.S. 577 (2018)................................................................. 15

*Neder v. United States*, 527 U.S. 1 (1999)................................................................. 29

*United States v. Adamson*, 291 F.3d 606 (9th Cir. 2002) .............................................. 11, 12

*United States v. Bunker*, 532 F.2d 1262 (9th Cir. 1976)................................................. 3

*United States v. Chung*, 633 F. Supp. 2d 1134 (C.D. Cal. 2009) ................................................ 33

*United States v. Chung*, 659 F.3d 815 (9th Cir. 2011)....................................... 5, 15, 17, 30, 33

*United States v. Cimera*, 459 F.3d 452 (3d Cir. 2006) ................................................. 25

*United States v. Crowe*, 563 F.3d 969 (9th Cir. 2009).................................................. 4

*United States v. Del Toro-Barboza*, 673 F.3d 1136 (9th Cir. 2012)............................................. 3

*United States v. Genovese*, 409 F. Supp. 2d 253 (S.D.N.Y. 2005)................................................. 33

*United States v. Gudino*, 432 F.2d 433 (9th Cir. 1970) ................................................. 3, 19

*United States v. Halali*, No. 14-CR-627-SI, 2017 WL 3232566 (N.D. Cal. July 28, 2017), *aff'd*, 950 F.3d 596 (9th Cir. 2020)................................................................. 25

*United States v. Holmes*, 163 F.4th 547 (9th Cir. 2025)................................................. 11

*United States v. Hui Hsiung*, 778 F.3d 738 (9th Cir. 2015)............................................... 5

*United States v. Jin*, 833 F. Supp. 2d 977 (N.D. Ill. 2012)................................................. 9, 31, 33

*United States v. Jinian*, No. 09-CR-1103-JSW, 2011 WL 5056978 (N.D. Cal. Oct. 24, 2011), *aff'd*, 725 F.3d 954 (9th Cir. 2013) ................................................................. 25

*United States v. Krumrei*, 258 F.3d 535 (6th Cir. 2001)................................................. 33

*United States v. Lan Lee*, No. CR 06-0424 JW, 2010 WL 8696087 (N.D. Cal. May 21, 2010)............... 9

*United States v. Liew*, No. 11-573 JSW, 2013 WL 2605126 (N.D. Cal. June 11, 2013) ....................... 26

*United States v. Navarro Viayra*, 365 F.3d 790 (9th Cir. 2004)................................................. 4

*United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010) ................................................. 3

*United States v. Nosal*, 844 F.3d 1024 (9th Cir. 2016)............................................ 15, 17, 18, 24

*United States v. Olson*, 925 F.2d 1170 (9th Cir. 1991)................................................. 11

*United States v. O'Rourke*, 417 F.Supp.3d 996 (N.D. Ill. 2019) ................................................. 18, 20, 24

*United States v. Rocha*, 598 F.3d 1144 (9th Cir. 2010) ............................................................ 3

*United States v. Shaffer*, 789 F.2d 682 (9th Cir. 1986) .............................................................. 24

*United States v. Shanshan Du*, 570 F. App'x 490 (6th Cir. 2014) .............................................. 13

*United States v. Shipsey*, 190 F.3d 1081 (9th Cir. 1999) ............................................................ 5

*United States v. Showalter*, 569 F.3d 1150 (9th Cir. 2009) ...................................................... 25

*United States v. Sullivan*, No. 20-cr-00337-WHO-1, 2023 WL 163489 (N.D. Cal. Jan. 11, 2023)..........4

*United States v. Thongsy*, 577 F.3d 1036 (9th Cir. 2009) .......................................................... 29

*United States v. Tuan Ngoc Luong*, 965 F.3d 973 (9th Cir. 2020) ............................................. 5

*United States v. Yossunthorn*, 167 F.3d 1267 (9th Cir. 1999) ................................................... 3

*United States v. You*, 74 F.4th 378 (6th Cir. 2023) .............................................................. 32, 33

*United States v. Zhang*, 590 Fed. App'x 663 (9th Cir. 2014) .................................................... 15

*United States v. Zheng*, 113 F.4th 280 (2d Cir. 2024) .......................................................... 31, 32

## Statutes

18 U.S.C. § 1831 ............................................................................................................... 5, 6, 32

18 U.S.C. § 1832 ..................................................................................................................... 13

18 U.S.C. § 1839 .................................................................................................... 15, 17, 25, 35

## Rules

Federal Rule of Criminal Procedure 29 .......................................................................... *passim*

Federal Rule of Criminal Procedure 33 .......................................................................... *passim*

Federal Rule of Criminal Procedure 52(a) ................................................................... 25, 29

## Other Authorities

142 Cong. Rec. S12212 (daily ed. Oct. 2, 1996) .................................................................... 31

142 Cong. Rec. 27,117 (1996) ............................................................................................... 33

H.R. Rep. No. 104-788, at 12 (1996), reprinted in 1996 U.S.C.C.A.N. 4021 .......................... 33

**INTRODUCTION**

The Court should uphold the jury's unanimous verdict finding Defendant Linwei Ding ("Ding") guilty of Counts One through Fourteen of the Second Superseding Indictment ("SSI") for theft of trade secrets and economic espionage, after a twelve-day trial with seventeen witnesses and over 500 admitted exhibits. When properly narrowed to cognizable Rule 29 claims, *i.e.*, challenging the sufficiency of evidence at trial, Ding argues that: (i) he did not have the intent to commit economic espionage; (ii) he did not intend to benefit someone other than Google and harm Google; (iii) Google did not take reasonable measures to protect the trade secrets; (iv) certain trade secret categories had public information; and (v) the combination trade secrets were not trade secrets. As described below, the Court should reject these arguments because the record overwhelmingly supports the jury's verdict.

Ding's Rule 33 motion also fails, in which he reargues legal arguments previously rejected by the Court, and separately argues that he was prejudiced by the Court's pretrial rulings on expert witnesses and the government's disclosure of the trade secrets before trial. None of these arguments have any basis in the law or factual record, and thus the Court should deny the motion for a new trial and affirm the jury's verdict.

**FACTUAL BACKGROUND**

On March 5, 2024, a federal grand jury in the Northern District of California issued an Indictment charging Ding with four counts of theft of trade secrets. Dkt. 1. On February 4, 2025, the grand jury issued a Superseding Indictment that charged seven counts of theft of trade secrets and seven counts of economic espionage. Dkt. 44. On September 9, 2025, the grand jury returned the SSI, which amended the date range for all counts but was otherwise identical to the Superseding Indictment. Dkt. 140. Specifically, the SSI expanded the date range to between May 21, 2022 and January 13, 2024, to include Ding's December 14, 2023 download of trade secrets to his personal computer and his continued possession of trade secrets through the execution of two federal searches on January 4 and January 13, 2024. *See id.* at 11-14.

The Court empaneled the jury on January 7, 2026, and trial commenced on January 12, 2026. *See* Dkts. 314 and 316 (minute orders), 369 and 371 (official trial transcript). The trial spanned twelve

days with more than 500 admitted exhibits. *See generally United States v. Ding*, Dkts. 316-403.[2] The government presented testimony from fourteen witnesses during its case-in-chief. *See id.* Ding presented three witnesses, including two expert witnesses. *See id.*

At the close of the government's case-in-chief, Ding orally made a Rule 29 motion on the economic espionage counts, which the Court took under advisement. Tr. 1774:23-1777:20. At the close of evidence, Ding orally renewed his Rule 29 motion on the economic espionage counts and separately moved for a Rule 29 motion on the theft of trade secrets counts. Tr. 2013:7-2014:11. The Court took both motions under advisement. *Id.*

On January 29, 2026, the jury reached a verdict and unanimously found Ding guilty of all fourteen charged counts in the SSI. Dkt. 367. For Counts One and Eight, the jury found that the combination of all documents in Trade Secret Category One was a trade secret. *Id.* at 1, 8. For Counts Two and Nine, the jury found that the combination of all documents in Trade Secret Category Two was a trade secret. *Id.* at 2, 9. For Counts Three and Ten, the jury found that the combination of all documents in Trade Secret Category Three was a trade secret. *Id.* at 3, 10. For Counts Four and Eleven, the jury found that TX 402, 407, 408, and 410 were trade secrets. *Id.* at 4, 11. For Counts Five and Twelve, the jury found that TX 429, 431, and 434 were trade secrets. *Id.* at 5, 12. For Counts Six and Thirteen, the jury found that the combination of all documents in Trade Secret Category Six was a trade secret. *Id.* at 6, 13. For Counts Seven and Fourteen, the jury found that TX 448, 451, 461, and 462 were trade secrets. *Id.* at 7, 14.

On February 19, 2026, Ding filed a Motion for a Judgment of Acquittal or, in the Alternative, New Trial Pursuant to Rule 29(c) and Rule 33 of the Federal Rules of Criminal Procedure.

## OPPOSITION TO RULE 29 MOTION

### LEGAL STANDARD

Federal Rule of Criminal Procedure 29 permits a court to set aside a jury's guilty verdict and enter a judgment of acquittal only if "the evidence is insufficient to sustain a conviction." Fed. R. Crim.

---

[2] The government will refer to the trial transcript using the page and line numbers from the official transcript ("Tr."). *See* Dkts. 368-387. The government will refer to admitted Trial Exhibits as "TX". *See* Dkts. 395-403.

P. 29(a).  Where a jury has returned a verdict, however, courts must accord great deference to the jury's determination.  *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979).  Indeed, "[t]he hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high."  *United States v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010).

The Ninth Circuit employs "a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence."  *United States v. Nevils*, 598 F.3d 1158, 1163-65 (9th Cir. 2010) (en banc) (citing *Jackson*, 443 U.S. at 419).  First, the evidence as presented at trial must be viewed "in the light most favorable to the prosecution."  *Id.* at 1164.  This "standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Jackson*, 443 U.S. at 319.  As such, the Court "must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *Nevils*, 598 F.3d at 1164 (quoting *Jackson*, 443 U.S. at 326).  Second, the Court must "determine whether this evidence, so viewed, is adequate to allow '*any* rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'"  *Id.* (quoting *Jackson*, 443 U.S. at 319) (emphasis in original).  "At this second step, however, a reviewing court may not 'ask itself whether *it* believes that the evidence at the trial established guilt[,]' . . . only whether '*any*' rational trier of fact could have made that finding[.]"  *Id.*; *see also United States v. Del Toro-Barboza*, 673 F.3d 1136, 1143-46 (9th Cir. 2012).

With respect to the weight of the evidence, the Ninth Circuit has held that the testimony of only a single witness can be sufficient when reviewing a Rule 29 motion for acquittal.  "The testimony of the one witness, if believed, was sufficient to support the conviction, and the resolution of any question as to his credibility was properly entrusted to the jury."  *United States v. Gudino*, 432 F.2d 433, 434 (9th Cir. 1970); *see also United States v. Yossunthorn*, 167 F.3d 1267, 1270 (9th Cir. 1999), *as amended* (Mar. 31, 1999) (holding that "uncorroborated testimony of an accomplice is enough to sustain a conviction unless the testimony is incredible or unsubstantial on its face" (quotation omitted)); *United States v. Bunker*, 532 F.2d 1262, 1264 (9th Cir. 1976) ("Credibility is exclusively within the jury's province.").

//

//

**ARGUMENT**

**I.    Ding's Claims of Legal Error, as Opposed to Sufficiency of the Evidence, Are Not Properly Before the Court in His Rule 29 Motion**

Rule 29 directs the Court to "enter a judgment of acquittal" where "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Nevertheless, the Motion goes far beyond the scope of Rule 29 and asks the Court to address various arguments about asserted legal errors that, even if meritorious, would only result in a new trial. The Ninth Circuit has held it to be reversible error for the Court to convert a Rule 29 motion into a Rule 33 motion. *See United States v. Navarro Viayra*, 365 F.3d 790, 793-95 (9th Cir. 2004). The core difference between the two Rules is grounded in the Double Jeopardy Clause: if the government presents insufficient evidence to support a conviction at trial, then the government is prohibited from retrying the case, whereas the government may retry cases if a trial error is found. *See Burks v. United States*, 437 U.S. 1, 15-17 (1978).

First, Ding's Rule 29 motion is not the proper forum to re-litigate legal arguments related to jury instructions. *See* Mot. at 5-7, 13-15, 21-24. These are all issues properly raised in a Rule 33 motion. While the government preserves its prior legal positions that economic espionage does not require foreign government direction, Ding only had to know the information he stole was confidential, and Ding's proposed combination trade secrets instruction lacks any basis in the law, the Court should not foray back into discussion of jury instructions in the Rule 29 context, given such arguments are the province of a Rule 33 motion—not a Rule 29 motion.

"A Rule 29 motion for judgment of acquittal . . . is not the proper vehicle for raising an objection to jury instructions" as "the very nature of" a Rule 29 motion for judgment of acquittal "is to question the sufficiency of the evidence to support a conviction." *United States v. Crowe*, 563 F.3d 969, 972 n.5 (9th Cir. 2009) (citations and quotation marks omitted); *United States v. Sullivan*, No. 20-cr-00337-WHO-1, 2023 WL 163489, at *3 (N.D. Cal. Jan. 11, 2023) (same). "There is only one ground for a motion for a judgment of acquittal. This is that 'the evidence is insufficient to sustain a conviction" of one or more of the offenses charged in the indictment [].'" 2A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Criminal* § 466 (4th ed. 2025). Thus, the government addresses the jury instruction arguments in its opposition to the Rule 33 motion.

Second, Ding's constructive amendment and variance arguments are likewise not properly before the Court because they should have been raised, if at all, in a Rule 33 motion. *See* Mot. at 9-10. Even if his claims had merit—they do not[3]—Ding would be entitled to a new trial, not an acquittal. *See, e.g., United States v. Shipsey*, 190 F.3d 1081, 1087-88 (9th Cir. 1999), *overruled on other grounds* (finding jury instructions constructively amended indictment warranting a new trial *but* sufficient evidence supported verdict). Therefore, the Court should disregard Ding's constructive amendment and variance claims in his Rule 29 motion.

Once narrowed to cognizable Rule 29 claims, the Motion challenges the sufficiency of evidence showing that: (i) Ding had the intent to commit economic espionage; (ii) Ding had the intent to benefit anyone other than Google and harm Google; (iii) Google took reasonable measures to protect the trade secrets; (iv) certain trade secret categories had non-public information; and (v) the combination trade secrets were trade secrets. *See* Mot. at 7-29. The record overwhelmingly supports the jury's verdict.

## II.    The Evidence at Trial Was Sufficient to Support the Jury's Verdict on the Economic Espionage Counts (Counts Eight through Fourteen)

The evidence at trial proved beyond a reasonable doubt that Ding committed economic espionage as charged in Counts Eight through Fourteen. To convict, the jury had to find that Ding "intended or knew that his actions would benefit a foreign government or instrumentality." Dkt. 362 ("Final Jury Instr.") No. 16. Specifically, the government had to prove "that the defendant either: (1) intended his actions to confer a benefit on a Chinese government instrumentality; or (2) knew that his actions would confer a benefit on a Chinese government instrumentality." *Id.*; 18 U.S.C. § 1831(a); *United States v. Chung*, 659 F.3d 815, 828 (9th Cir. 2011) (holding that "criminal liability under the EEA may be established on the basis of Defendant's intent alone").

//

//

---

[3] The Ninth Circuit has rejected similar constructive amendment claims that challenge the means of proving an element so long as the defendant received "fair notice of the charges against him." *See, e.g., United States v. Tuan Ngoc Luong*, 965 F.3d 973, 985-86 (9th Cir. 2020); *United States v. Hui Hsiung*, 778 F.3d 738, 757-58 (9th Cir. 2015) (holding that "magic words" "were not necessary to make clear that" a general topic "was a key focus of the indictment").

## A.    Ding's Intent to Benefit the PRC Government or its Instrumentalities

The Motion's contention that "there was no evidence at trial that [] Ding intended to benefit the Chinese government or an instrumentality" and "at best" the evidence showed he stole trade secrets only to benefit himself and his PRC-based artificial intelligence (AI) startup Zhisuan fails.  Mot. at 11. Specifically, Ding argues that: (i) there was no evidence that he shared, used, or was paid for the trade secrets; (ii) Zhisuan had not developed a product or used any stolen trade secrets yet; (iii) the trade secrets were not sufficient to replicate Google's AI technology; (iv) building an AI supercomputer requires substantial resources; and (v) there was no evidence of PRC government ownership or transfer of trade secrets from Zhisuan to the PRC government.  *See id.* at 11-12.

First, all these arguments are wholly irrelevant under the law.  *See* Final Jury Instr. No. 16; 18 U.S.C. § 1831.  Proving economic espionage does not require establishing sharing, transfer, use, or payment for the stolen trade secrets.  Nor does it require showing that the stolen trade secrets were sufficient to replicate the owner's technology, or that a PRC government instrumentality had received stolen trade secrets or taken an ownership interest in the defendant's company.  Indeed, Ding made these identical arguments to the jury at trial, which considered and rejected them.  *See* Tr. 2199:13-2203:3.

Second, the Motion's separate statement that "[i]t would not be enough for [] Ding to intend that the trade secrets benefit himself and Zhisuan" is accurate.  *See* Mot. at 12.  But that is exactly how the Court instructed the jury: "It is not enough for the government to prove that the defendant intended to benefit himself or Zhisuan."  Final Jury Instr. No. 16.  The Court further instructed that: "Nor is it enough for the government to prove that the defendant intended or knew that his conduct would benefit the country of China or its economy in a way that might generally flow from engaging in economic activity there."  *Id.*  Based upon these instructions, the jury returned a verdict of guilty on the economic espionage counts.  Dkt. 367 at 8-14.

At trial, there was substantial evidence to support that verdict.  As the Court previously held, evidence that Zhisuan "was marketing to and in communications with public universities and municipal governments for those entities to engage the company's services" "would satisfy section 1831."  Dkt. 105 at 2.  That is what the evidence at trial proved.  The government demonstrated that Ding intended to use the stolen trade secrets to benefit PRC governmental entities.  For example, in his presentation to

MiraclePlus, a PRC-based venture capital firm, Ding stated that he intended to "replicate and upgrade" Google's technology and that his intended customers would include "government agencies with underlying compute." TX 1158 at 9. In the same presentation, Ding listed multiple government agencies that were at the contract-signing and cooperation stage or were prospective customers. *Id.* at 10. The government, at trial, focused on two PRC instrumentalities listed as Zhisuan customers: the Industrial Innovation Park and Tianfu Research Institute.[4]

*Industrial Innovation Park.* The government's expert on PRC technology and policy, Dr. Adam Segal,[5] explained that the Industrial Innovation Park is a government-controlled high-tech zone focused on AI created by the municipal PRC government. Tr. 926:13-929:12. The government presented evidence that the Industrial Innovation Park was included on a list of "Potential Customers of Zhisuan Technology," under the "Government operations" category. TX 1003. That document stated that the Industrial Innovation Park expected Zhisuan to provide a "complete AI solution, including standardized AI application and an interconnection platform for heterogenous compute resources." *Id.* Further, Ding met with representatives of the Industrial Innovation Park on November 9th, 2023, and he created a presentation for that meeting. TX 1150 at 4; TX 1034; Tr. 754:20-755:3. In the presentation, Ding stated that Zhisuan could build an AI ecosystem for the Park and "[c]ustomize the R&D of underlying chips and network structures according to the computing power requirements of large models." TX 1034 at 33-34. The presentation also stated that Zhisuan would help plan "hardware deployment." *Id.* at 35. The government's expert MIT professor Dr. Daniel Sanchez testified that "R&D" in the context of this document referred to the development of the chips used in AI systems like the chips at issue in this case, and hardware deployment referred to the configuration of hardware that is used in a data center or server room. Tr. 1225:7-15; Tr. 1226:9-17. Dr. Sanchez further testified that he had reviewed multiple trade secret documents that were relevant to hardware deployment for an AI supercomputer, including documents in Category Two, Three, and Four. Tr. 1226:21-1227:18. Based on these presentations,

---

[4] "Industrial Innovation Park" shall refer to the Chongqing Mingyue International Intelligent Industry Science and Technology Innovation Base and Park. "Tianfu Research Institute" shall refer to the Sichuan Tianfu New Area Innovation Research Institute.

[5] Dr. Segal is the Ira A. Lipman chair in emerging technologies and national security and director of the Digital and Cyberspace Policy program at the Council on Foreign Relations.

along with the similarities between Zhisuan's purported solutions and the stolen trade secrets, the jury could reasonably infer that Ding intended to use the stolen trade secrets to benefit the Industrial Innovation Park, a foreign instrumentality.

*Tianfu Research Institute.* Likewise, Ding listed the Tianfu Research Institute as a government customer for Zhisuan in pitch decks, and in communications he discussed a draft strategic cooperation agreement between Zhisuan and the Institute. *See* TX 1002; TX 1103; TX 1158 at 10; Tr. 756:10-761:7. Dr. Segal testified that the Institute was created by a branch of the local government in the PRC and Southwest University, a public university located in Sichuan, China. Tr. 931:21-932:17. Dr. Segal further testified that all public universities are controlled by the PRC government. Tr. 933:6-11. The government also presented evidence that the Tianfu Research Institute was included on the list of "Potential Customers of Zhisuan Technology," along with a statement that the Tianfu Research Institute "hope[d] that [Zhisuan] can fully assist in the establishment of computer centers." TX 1003 at 2. In a draft strategic agreement between Zhisuan and the Tianfu Research Institute, Ding agreed to collaborate with the Tianfu Research Institute, including in the field of chips, and promised to assist the Tianfu Research Institute in the establishment of an AI computing center. TX 1002. The agreement also stated that one of the goals of the cooperation was "the transfer and transformation of scientific and technology achievements." *Id.* at 2-3. Given Ding's explicit statements about Zhisuan's efforts to help the Tianfu Research Institute develop their AI infrastructure, and the overlap between those goals and the stolen trade secrets, the jury could reasonably infer that Ding intended to use the stolen trade secrets to benefit the Tianfu Research Institute, a foreign instrumentality.

*PRC's AI Goals.* Separately, the government presented additional evidence of Ding's intent to benefit the PRC's AI goals. Dr. Segal explained that the PRC leadership "has signaled at the highest levels that artificial intelligence is of strategic interest to China's economic, political, and military goals." *See* Tr. 920:21-922:18. Ding was aware of the PRC's goals and was tailoring his company and products to help the PRC meet those goals. Dr. Segal further explained that several PRC governing bodies, including the highest administrative body, the State Council, issued AI-related development plans in 2017 and 2023 that targeted areas of AI hardware and software that China needed to develop. Tr. 921:18-922:18. Ding cited the 2017 and 2023 government plans in Zhisuan's presentations, making

it clear that he intended to use the stolen trade secrets to solve the problems identified by the PRC government and, in turn, to benefit the government.  *See* TX 1143 at 4.

***Shanghai Talent Plan.***  Also, in fall 2023, Ding applied to the Shanghai International Talent Plan, a program controlled by the Shanghai government.  TX 1160 (Talent Plan application); TX 1026; TX 1026S; Tr. 938:21-941:10 (Dr. Segal describing Shanghai Talent Plan).  Dr. Segal explained that talent plans are programs set up by the PRC government to encourage individuals to come back to China to promote economic and technological growth.  Tr. 939:3-24.  In his application, Ding stated that "[u]pon returning to China, I plan to deploy a single-task, tens-of-thousands-of-cards large-model training acceleration program there, helping China to develop world-class compute infrastructure capabilities."  TX. 1160 at 9.  Ding further stated he could do this because "he is fully capable of replicating and upgrading Google's [AI] platforms adapted to China's national conditions."  *Id.* at 10.  In other words, Ding explicitly stated that he could benefit the PRC government through applying to a government-sponsored talent program, where he stated he would copy Google's technology.  In sum, there was more than sufficient evidence to support the jury's verdict that Ding intended to benefit a foreign government or instrumentality.

The two cases cited in the Motion, *United States v. Lan Lee*, No. CR 06-0424 JW, 2010 WL 8696087 (N.D. Cal. May 21, 2010) (Ware, J.), and *United States v. Jin*, 833 F. Supp. 2d 977 (N.D. Ill. 2012), are both distinguishable.  In *Lan Lee*, the court granted a Rule 29 motion on economic espionage counts because the evidence only showed that the defendants intended to *receive* a benefit from the PRC government (*i.e.*, a cash grant), rather than evidence that the defendant intended to *provide* a benefit to the PRC government as required by the statute.  2010 WL 8696087, at *7-8.[6]  Conversely, here, there was evidence that Ding intended to use the stolen trade secrets to benefit PRC government instrumentalities by providing compute services and AI-related technology.  In *Jin,* the court found the defendant not guilty of economic espionage after a bench trial because there was no evidence that the defendant had any intent to benefit a PRC government instrumentality, as opposed to solely her private PRC employer and the court found any link between the private PRC employer and the PRC

---

[6] The *Lan Lee* court also erroneously held that Section 1831 requires activity sponsored or solicited by a foreign government.  *See* Dkt. 74 at 21-23.

government to be too speculative.  833 F. Supp. 3d at 1019-20.  Here, by contrast, as described above, the government provided more than sufficient evidence that Ding intended to use the stolen trade secrets to benefit the instrumentalities of the PRC.

**B.       Ding Had the Requisite Intent When He Committed Economic Espionage**

Ding's argument that he did not have the intent to benefit a PRC government instrumentality when he stole the trade secrets likewise fails.  Specifically, Ding contends that the only relevant acts are his uploads of Google documents between May 2022 and April 2023, and his intent at the time of those uploads.  That is wrong as a factual matter.  The SSI explicitly broadened the date range for the economic espionage counts to between May 21, 2022 and January 13, 2024—to include Ding's December 14, 2023 download of trade secrets.  *See* Dkt. 140 at 11-14.  The SSI also alleged that Ding "knowingly and without authorization . . . ***downloaded*** . . . trade secrets alleged in each of Counts Eight through Fourteen below belonging to Google."  *Id.* ¶ 46 (emphasis added).  Indeed, on September 22, 2025, the government produced to Ding the related grand jury transcript, which made it clear that the SSI's broadened date range included Ding's December 2023 download of trade secrets.[7]

Consistent with the SSI, the government presented extensive evidence at trial that in addition to his illegal uploads, Ding downloaded all 105 stolen trade secret files on December 14, 2023 from his personal Google Drive to his personal laptop.  *See, e.g.*, Tr. 443:18-22; Tr. 451:3-452:5; Tr. 478:5-15; Tr. 768:6-8.  As detailed above, by December 2023, Ding had plainly evinced an intent to "confer a benefit on a PRC government instrumentality" by, for example, targeting governmental entities as Zhisuan customers and applying to the Shanghai Talent Plan.  *See supra* at 5-10.  Thus, the Motion's arguments that Ding had no intent to benefit a PRC government instrumentality when he committed the charged crimes are factually wrong.

The Motion's argument that the government focused solely on Ding's uploads for its theory of the case in closing summations is similarly incorrect.  During closing, government counsel argued that Ding downloaded all the trade secrets on December 14, 2023, and that the only conceivable reason he would need the trade secret files was if "he was going to use them for Zhisuan."  Tr.  2149:19-23.

---

[7] *See* Declaration of Roland Chang in Support of United States' Administrative Motion to Seal, filed concurrently, Exhibit A at 6:12-8:14.

U.S.' OPP. TO MOT. FOR ACQ. OR NEW TRIAL
3:24-cr-00141-VC                                    10

Further, when the government addressed the "theft" element applicable to both trade secret theft and economic espionage, the government specifically argued that Ding "downloaded all of the trade secrets on December 14th, just six days after Mr. [Brad] Fuller reminded him of the policies and after he had sworn that he would delete all Google information from his accounts and devices." Tr. 2154:20-2155-4.

*No Constructive Amendment and Variance.* Ding separately contends that consideration of the December 14, 2023 downloads is an "impermissible constructive amendment to, or variance from, the [SSI]." Mot. at 9-10. As explained above, these are legal arguments not properly before this Court in a Rule 29 motion. *See supra* at 4-5. Because Ding failed to raise them in a Rule 33 motion, the Court should disregard them.

However, even on the merits, these arguments fail. No constructive amendment occurred here. "Discrepancies between an indictment and evidence presented at trial amount to a constructive amendment in two general situations[.]" *United States v. Holmes*, 163 F.4th 547, 571 (9th Cir. 2025) (cleaned up). First, when "'there is a complex set of facts distinctly different from those set forth in the charging instrument' such that the defendant lacked notice." *Id.* Second, when "'the crime charged was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved." *Id.* Neither circumstance applies here, nor does the Motion argue otherwise. *See* Mot. at 9-10. The SSI plainly alleged Ding's download activity. Dkt. 140 ¶ 46 (emphasis added) ("knowingly and without authorization . . . *downloaded* . . . trade secrets alleged in each of Counts Eight through Fourteen [] belonging to Google."). It also specifically broadened the date range for economic espionage to include Ding's December 2023 downloads. *See id.* at 11-14.

Nor was there a variance. "A variance [] occurs when [] the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Adamson*, 291 F.3d 606, 614-15 (9th Cir. 2002) (cleaned up). "[A] variance requires reversal only if it prejudices a defendant's substantial rights." *Id.* (quoting *United States v. Olson*, 925 F.2d 1170, 1175 (9th Cir. 1991)). As detailed above, the SSI alleged the illegal downloading of trade secrets during the same timeframe that the government alleged at trial and thus there was no variance between the SSI and the trial evidence.

Even if there was a variance (which there was not), it did not prejudice Ding's substantial rights as the government provided ample notice that the December 2023 downloads were part of the SSI's

economic espionage counts.  As described above, the SSI encompassed these downloads.  The government also referenced the December 2023 downloads in its pretrial briefings when summarizing the trade secret theft.  *See* Dkt. 142 at 2.  The government's forensic expert, Andy Crain, also included opinions regarding Ding's December 14, 2023 downloads based on his analysis of the forensic metadata, and this report was produced to Ding on August 26, 2025.  Dkt. 323-1 at 23-25.  In sum, Ding was on notice that the government intended to rely on evidence of the December 14, 2023 downloads as part of its case-in-chief, and thus his substantial rights were not prejudiced.

*Adamson*, cited by Ding, is distinguishable.  Mot. at 9-10.  That case involved wire fraud charges based on the defendant's misrepresentations to Hewlett-Packard.  *Id.* at 609-10.  The indictment had "charged the defendant with mispresenting the fact that [computer] servers had been upgraded," but the jury instructions allowed the jury to convict on a different misrepresentation.  *Id.* at 615-16.  Prior to trial, the government also represented "that the misrepresentation in the indictment was the only misrepresentation at issue."  *Id.*  On this record, the Ninth Circuit granted a new trial because there was a fatal variance between the indictment and trial evidence.  *Id.*  Here, unlike *Adamson*, there was no variance as the SSI broadened the date range and alleged the illegal downloading of trade secrets.  Even if there was one, unlike *Adamson*, the government made it clear in multiple pretrial filings and disclosures that the December 14, 2023 downloads were part of the economic espionage counts.

***Ding's Intent at Time of Uploads.***  Finally, a reasonable juror could conclude that Ding had the requisite intent to benefit the PRC government at the time of his uploads.  The trial evidence showed that no later than May 2022, *i.e.*, around the time of his first uploads, Ding already had a vision to create a company with "Google culture and management" and "Like [G]oogle."  TX 349; Tr. 621:18-623:13.  The purpose of his uploads from the beginning was clear: to build a company like Google—for which he needed Google's trade secrets.  Between June 1, 2022 and October 31, 2022, Ding uploaded hundreds more Apple Notes from his Google work computer to his personal Google Drive, including additional stolen trade secrets.  Tr. 447:21-451:2.  Several months later, in February 2023, Ding drafted a "Plan C" document that described a three-layer computing infrastructure that mirrored Google's AI/ML supercomputing infrastructure.  *See* TX 1025.  By April 2023, Ding had drafted a business plan for Zhisuan, which he described as "aiming to create an efficient distributed artificial intelligence

computing power platform that would meet the requirements of a large-scale, stable, and high-speed communication for large model training." Ex. 1137. As summarized above, Zhisuan explicitly targeted PRC governmental entities as part of its pitch decks and materials to investors. *See supra* at 5-10. Although there are no explicit statements of Ding's intent to benefit the PRC prior to uploading the stolen trade secrets, given that Ding was in the process of building Zhisuan, a rational fact finder could have concluded that at the time Ding was stealing trade secrets by uploading files from Google, *i.e.*, between May 2022 and April 2023, he possessed the intent to benefit a PRC instrumentality based on his later actions.

**III. The Evidence at Trial Was Sufficient to Support The Jury's Verdict That Ding Stole The Trade Secrets Someone Other than Google and That He Intended to Harm Google (Counts One through Seven)**

Separately, for the theft of trade secret counts, Ding argues that the evidence was insufficient to show that he stole the trade secrets for the economic benefit of anyone other than Google and intending or knowing that his conduct would injure Google. Mot. at 15-17. Specifically, Ding contends that because "there is no evidence that [he] disseminated or used the information," there was no proof of intent to harm Google. *Id.* That is not the law. The Economic Espionage Act of 1996 ("EEA") does not require use or disclosure of stolen information to prove theft of trade secrets. 18 U.S.C. § 1832; Final Jury Instr. 15; *see United States v. Shanshan Du*, 570 F. App'x 490, 502 (6th Cir. 2014) (finding intent to convert trade secrets and injure owner supported by sufficient evidence where defendants downloaded thousands of documents, including trade secrets, onto personal devices, and started competing business). Thus, Ding's factual arguments about the lack of disclosure or use are irrelevant. *See* Mot. at 16-17.

At trial, the government offered overwhelming evidence that Ding "intended to take the trade secret information for the economic benefit of anyone other than Google." Final Jury Instr. No. 15. Ding repeatedly stated in his own words that Zhisuan intended to "replicate and upgrade" Google's AI/ML technology. *See, e.g.*, TX 353; TX 1004S; TX 1156; TX 1158. When MiraclePlus asked Ding for a product demonstration video, he recorded himself using Google's technology and passed it off as his own. TX 1175S (MiraclePlus demonstration video). The timing of Ding's actions also made his intent explicit, as his illegal uploads and downloads corresponded to key events where Ding was raising money for Zhisuan, looking for other employment opportunities, and/or planning on leaving Google.

For example, while meeting with a private PRC investment firm to solicit funding for Zhisuan, Ding simultaneously uploaded dozens of trade secret files, including documents related to Google's Tensor Processing Units (TPU). *See* Tr. 681:3-684:12; TX 780 (summary exhibit of Ding's 4/17/23 Google Drive uploads). Likewise, on December 14, 2023, six days after signing an affidavit promising to delete all confidential Google information, Ding downloaded over a thousand documents, including all the trade secrets, to his personal device. TX 280 (self-deletion affidavit); Tr. 451:3-452:5 (forensic expert testimony).

The Motion's statement that "Ding did not use deceptive means in connection with the uploads" flatly mischaracterizes the record. Mot. at 16. The evidence at trial showed that Ding went to extraordinary lengths to conceal his theft. Instead of directly downloading and uploading Google documents, Ding copied and pasted data from internal Google trade secret files to Apple Notes. Tr. 143:16-144:14. Mr. Linton explained that Ding's indirect method of theft made his activity more difficult to detect by Google's systems. *See* Tr. 320:3:321:11. In many instances, Ding intentionally stripped confidentiality markings, document identifiers, and author information from internal Google source documents before he copied and stole them. *Compare, e.g.*, TX 90 and TX 172, *with* TX 377. In total, Ding created Apple Note files with Google information that totaled 14,721 pages, including 2,425 pages for the 105 trade secret files. Tr. 450:13-451:2. He created 4,374 screenshots with Google information, including 655 screenshots for the 105 trade secret files. *Id.* In other words, the evidence showed that Ding engaged in a deliberate and lengthy scheme to steal the trade secrets for his economic benefit.

Separately, as summarized below, the trial record was replete with evidence that the stolen trade secrets had independent economic value that would be lost or diminished if the information was disclosed or used by a third party. *See infra* at 19-23. Mark Lohmeyer, Vice-President/General Manager of AI and Computing Infrastructure at Google, also testified that Google competes with companies, including Alibaba, located in the PRC and that Google would be harmed if a competitor was able to sell a product that had same or similar capabilities at a lower cost. Tr. 110:1-111:9; Tr. 115:5-116:8. Moreover, the government introduced evidence that the defendant intended to compete with

companies located in the PRC, including Alibaba, one of Google's competitors.  TX. 1001.  Taken together, the jury had sufficient evidence to conclude that Ding intended to harm Google.

**IV.     The Evidence at Trial Was Sufficient to Support The Jury's Verdict Regarding The Existence of Trade Secrets in Each Category (Counts One through Fourteen)**

Finally, the evidence at trial proved beyond a reasonable doubt that Ding stole trade secrets as charged in Counts 1-14.  Information is a trade secret if: (1) it not generally known or readily ascertainable through proper means; (2) the owner of the information has taken reasonable measures to keep it secret; and (3) the information derives independent economic value, actual or potential, from being secret.  Final Jury Instr. No. 13.  A trade secret can contain a combination of public and proprietary information.  *Id.*; *United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016) (quoting Restatement (Third) of Unfair Competition § 39 cmt. f (1995)), *overruled in part on other grounds by Lagos v. United States*, 584 U.S. 577 (2018).

**A.      Reasonable Measures**

The government presented more than sufficient evidence that Google took reasonable measures to protect the trade secrets in this case.

The EEA requires that the trade secret owner "has taken reasonable measures to keep such information secret."  18 U.S.C. § 1839(3)(A); *see* 142 Cong. Rec. S12201, 12213 (daily ed. Oct. 2, 1996) (statement of Sen. Kohl) ("We do not with this definition impose any requirements on companies or owners . . . [O]wners need not take heroic or extreme measures in order for their efforts to be reasonable.").  In the Ninth Circuit, examples of sufficient reasonable measures in EEA cases include physical security (*e.g.*, locked rooms), electronic access restrictions (*e.g.*, usernames and passwords), document labels, company policies, and confidentiality agreements.  *See Chung*, 659 F.3d at 825-26; *Nosal*, 844 F.3d at 1043-44; *United States v. Zhang*, 590 Fed. App'x 663, 665 (9th Cir. 2014).

At trial, there was overwhelming evidence that Google took reasonable measures to protect its trade secrets.  Heather Adkins, Google's Vice-President of Security Engineering, explained that Google takes "a layered approach to security" to protecting internal company data.  Tr. 153:23-154:15.  First, Ms. Adkins and Matt Linton, Google's Regional Lead of Security Response for the Americas, both testified that Google took extensive physical security measures, including requiring physical badges for

building access and surveillance cameras.  Tr. 144:15-145:6 (describing physical badge access and badging records); Tr. 298:12-305:9 (summarizing physical security measures).  Mr. Linton stated that Google logged and saved all employee and visitor physical access information and history, including for Ding.  Tr. 296:20-300:13; *see* TX 1 (badge access log); TX 7 (device location log); TX 18 (surveillance camera footage).

Second, evidence admitted at trial showed that Google had comprehensive computer and network security measures.  Ms. Adkins explained that every Google employee received a company identity (*e.g.*, username) verified through "background checks, criminal history checks, [and] education checks."  Tr. 155:1-156:6.  She testified that to log onto the Google network, all employees needed a: (i) password, (ii) physical security token, and (iii) company computer purchased from qualified vendors installed with custom software.  Tr. 155:1-157:19.  Ms. Adkins further explained that Google custom sourced the physical security token with a manufacturer for additional security; and it required all employees to reauthenticate their presence via the token approximately once every twenty hours to maintain network access.  Tr. 157:20-158:17; Tr. 159:2-15.  She stated that Google implemented multiple layers of security for its databases, including keeping a digital record "of every time an employee accesses a document, if they print that document, download that document, [and] what they do with that document if it's on their local computer."  Tr. 160:5-161:2.  Due to the volume of data, *i.e.*, trillions of records, she stated Google developed systems to sift through this data "looking for anomalies and patterns," which are then elevated for human review.  Tr. 161:3-162:17; Tr. 213:7-215:12.

Third, the evidence demonstrated that Google had access control restrictions for company documents.  Ms. Adkins stated that "[n]ot everyone has access to all information at Google."  Tr. 160:5-20.  Ms. Adkins and Mr. Linton testified that Google limited access to certain documents based on sensitivity.  Tr. 183:6-184:23 (document access controls); Tr. 311:25-312:24 (same).  Fourth, Google had data security policies and trained its employees to mark sensitive documents with confidentiality labels.  *See* Tr. 162:18-181:4 (describing Google's policies); Tr. 222:16-238:15 (describing Google's trainings); TX 824 and TX 875 (Data Classification & Handling FAQs); TX 756 and TX 800 (Data Security Policy); TX 799 and TX 801 (Data Classification Guidelines); TX 741 and TX 885 (training materials).

Indeed, Mr. Linton testified that "[a]lmost all of the [trade secret] documents had either an access control explicitly set or a confidentiality marking." Tr. 363:18-22; *see* TX 1125 (summary exhibit of access restrictions and document markings for all Google trade secret files). As Ms. Adkins testified, Google recognized, however, that its employees are humans and mistakes happened. Tr. 165:9-165:19; Tr. 170:13-171:15; Tr. 278:8:8-20. She stated, as part of Google's mandatory training, all employees learn the golden rule that if a document is an internal Google document, you cannot take it outside of the company. Tr. 165:20-166:11; *see* TX 741 and TX 885 (training materials).

Fifth, Arianna Tortorici, Google's Employee Relations Director for the Americas, testified that all employees had to sign confidentiality agreements promising to protect and safeguard Google's confidential information. Tr. 528:10-536:12; TX 739 (Ding employment agreement); TX 737 (Google Code of Conduct). Sixth, Google has a 24/7 global security team dedicated to protecting its sensitive information. Tr. 291:3-20. When Google learned that Ding had presented at the MiraclePlus conference in the PRC about Google technology, it analyzed forensic logs and suspended Ding's access to Google's network within hours. *See* Tr. 333:19-344:7. In sum, there was more than sufficient evidence for a rational fact finder to conclude that Google had taken reasonable measures to protect the trade secrets.

Despite this evidence, Ding argues that Google did not take reasonable measures because: (i) some documents had broad access *within* Google; (ii) Google employees sometimes made mistakes on labeling and access restrictions; and (iii) some trade secrets did not have document markings. Mot. at 18. At trial, Ding made identical factual arguments to the jury, and they disagreed. Nor do any of these arguments matter under the law. For example, the Court instructed the jury that "the absence of a marking or label does not preclude the information from being a trade secret, so long as the owner took other reasonable measures to protect the information." Final Jury Instr. No. 14; *see Nosal*, 844 F.3d at 1043-44; *Chung*, 659 F.3d at 825-26. To the extent that Ding argues that the government did not offer sufficient reasonable measures evidence on specific trade secrets, as summarized below, that is simply not consistent with the trial evidence.

Separately, the Motion repeats Ding's combination trade secret arguments, rejected by the Court, to contend that the government needed to offer specific or different evidence on protective measures for the combination trade secrets. Mot. at 18-19. As explained here, the government presented more than

sufficient evidence that Google took reasonable measures to protect the stolen trade secrets, including the documents that made up each combination trade secret.  The jury could therefore reasonably infer that Google took reasonable measures to protect its combination trade secrets.  Ding's citation to *Barrett Bus. Servs., Inc. v. Colmenero*, 2025 WL 2048985 (9th Cir. 2025), does not suggest otherwise.  *Barrett* stands for the uncontroversial proposition that when considering a compilation trade secret made up of public components, the relevant question is whether the owner took reasonable steps to protect the compilation as a whole, rather than the individual components.   Finally, citing no law, Ding argues that the government needed to offer expert testimony on reasonable measures, but the EEA has no such requirement.  Mot. at 19; 18 U.S.C. § 1839.

## B.    Secrecy

The government presented more than sufficient evidence establishing that the alleged trade secrets were not generally known or readily ascertainable through proper means.

Ding's suggestion that the government was required to prove that portions of specific documents in Categories Three, Five, and Seven were not publicly available reflects his continued fundamental misunderstanding of the law and the nature of the trade secrets in this case.  As explained by the Ninth Circuit: "A trade secret may consist of a compilation of data, public sources or a combination of proprietary and public sources.  It is well recognized that 'it is the secrecy of the claimed trade secret as a whole that is determinative.  The fact that some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements.'"  *Nosal*, 844 F.3d at 1042; *see also United States v. O'Rourke*, 417 F.Supp.3d 996, 1006 (N.D. Ill. 2019) (agreeing with the protectability of compilations of information as trade secrets).  The trade secrets at issue in this case consisted of the 105 trade secret documents in their entirety and the combination of the documents in each category.  The government's burden at trial was therefore to prove that the document (or combination of documents) at issue *taken as a whole* was not publicly available or readily ascertainable.

The government presented testimony at trial that each of the asserted trade secrets were not publicly available or readily ascertainable.  The government's expert Dr. Daniel Sanchez,[8] testified that

---

[8] Dr. Sanchez is a Professor of Electrical Engineering and Computer Science at the

he performed a comprehensive review to determine whether the alleged trade secrets were publicly available or readily ascertainable, including by reviewing technical documentation, product announcements, presentations, and patents, and speaking with relevant Google employees.  Tr. 982:5-10.  Based on this analysis, Dr. Sanchez testified that none of the alleged 105 trade secret documents were available in their entirety and none of the documents could be reverse-engineered or otherwise reconstructed in their entirety.  Tr. 983:20-984:1.  He further testified that the combination of the documents in each category was not publicly available.  Tr. 1048:11-14; Tr: 1106:2-6; Tr: 1134:5-9; Tr. 1161:5-9; Tr. 1176:14-18; Tr. 1198:19-23; Tr. 1214:7-10. Contrary to Ding's suggestion, the government was not required to present evidence further parsing the "public" versus "proprietary" components contained within each trade secret document.

###### C.        Combination Trade Secrets (Counts One-Three, Six, Eight-Ten, and Thirteen)[9]

The government presented overwhelming evidence supporting the jury's verdict for the combination trade secrets in Counts One, Two, Three, Six, Eight, Nine, Ten, and Thirteen.  Ding argues that there is insufficient evidence as to each of these counts because the government did not elicit detailed testimony as to each document in these categories and that the government did not prove that the combination trade secrets had independent economic value.  Neither of these arguments have merit.

Ding's first suggestion that the government was required to elicit detailed testimony as to each and every document in each category is unfounded.  The Ninth Circuit has held that the testimony of only a single witness can be sufficient when reviewing a Rule 29 motion for acquittal.  *Gudino*, 432 F.2d at 434.

As detailed below, the government presented more than sufficient evidence supporting the jury's verdict regarding the combination trade secrets, including admitting each of the 105 trade secret documents into evidence, explaining the information in each documents at a categorical level, describing exemplar documents in more detail, and detailing the independent economic value derived from the

Massachusetts Institute of Technology (MIT) and Principal Investigator at MIT's Computer Science and AI Laboratory.

[9] As explained herein, Ding did not properly raise his jury instruction arguments regarding the combination trade secrets in his Rule 29 motion.  The government addresses these arguments in its opposition to the Rule 33 motion.  *See infra* at 33-34.

combination of information in each category.  The government was under no obligation to present comprehensive testimony regarding every detail contained in each and every of the documents in each of the relevant categories.  Nor would that approach have been feasible given the volume and breadth of the information stolen by Ding.  The government admitted all of the trade secret documents into evidence, the jury heard detailed testimony about the exemplar documents and the categories of documents as a whole from the government's expert and Google employees.  The jury was entitled to rely on that testimony.  *See O'Rourke*, 417 F. Supp.3d at 1007 ("The jury was not required to sift through every single lab report and declare, one by one, that each document was a trade secret in order to find that a given category of documents, such as the lab reports, constituted a trade secret.").

Below is a non-exhaustive summary of some of the evidence the government presented regarding the combination trade secrets in Categories One, Two, Three, and Six that form the basis for the jury's verdict on Counts One, Two, Three, Six, Seven, Eight, Nine, and Thirteen, including evidence related to the independent economic value of each asserted combination trade secret.

***Category One.***  Dr. Sanchez explained how each of the documents that made up Category One corresponded to different components of Google's TPU v.4 chip: TensorCore, BarnaCore, interchip interconnect (ICI), memory system, and host communication.  Dr. Sanchez described how each of the documents in Category One related to each of these components in detail, and walked through specific details for certain exemplar documents.  *See* Tr. 1007:11-25 (describing the TensorCore ISA (TXs 363-370)); Tr. 1014:5-1019:10 (testimony regarding specific portions of the TensorCore ISA (TX 363)); Tr. 1020:9-1021:19 (testimony regarding significance of prior version of TensorCore ISA (TX 372); Tr. 1021:20-1026:7 (describing the BarnaCore ISA (TX 371); Tr. 1026:11-1029:22 (describing ICI documents (TXs 359-361, 373)); Tr. 1030:1-1035:9 (describing particular portions of an ICI document (TX 373)); Tr. 1035:13-1043:10 (describing the memory system document (TX 362); Tr: 1043:16-1048:4 (describing particular portions of the host communication document (TX 358)).

Dr. Sanchez testified extensively about the value of the documents in Category One, including testifying that because the documents in Category One contained enough information about the internal structure and operation of Google's TPU chip, they would allow a competitor to skip a large amount of the research and design costs required to produce these types of chips.  Tr. 1007:2-10.  Dr. Sanchez also

specifically testified to the value of the combination of the documents in Category One by explaining that because the chip components were not designed in isolation, the combination of the design reflected certain tradeoffs that were even more valuable when considered together.  Tr. 1049:14-1050:7.

Google Distinguished Engineer Prashant Chandra further testified that the documents in Category One taken together described the "complete architectural specifications" for Google's TPU chip and they are "used together by the respective teams working on building these components when [Google] build[s] the entire TPU product."  Tr. 1553:16-23.  Dr. Chandra further testified that over a thousand engineers spent over a decade developing its TPU chips, and Google has invested hundreds of millions, if not billions of dollars, developing its TPU chips.  Tr. 1554:15-1555:5.

*Category Two.*  Dr. Sanchez testified that Category Two focuses on the hardware, *i.e.*, physical design for Google's TPU chips and systems and described three different types of documents contained within Category Two: (1) documents that focus on the chip used in TPU v.6; (2) documents that relate to the design of the system for TPU v.5; and (3) documents that discuss other accelerators designed by Google that have not been publicly disclosed.  Dr. Sanchez explained each of these categories in detail.  Tr. 1092:19-1102:3 (describing the documents related to the chip design of TPU v.6); Tr. 1102:3-1104:13 (describing the documents related to the design of the system for TPU v.5); Tr. 1104:14-1106:1 (describing the document related to Google's other accelerators).

Dr. Sanchez testified extensively about the value of the information contained in Category Two.  For example, Dr. Sanchez testified that the information in Category Two contained information about the physical design of Google's TPU chips and systems that a competitor could use to copy the physical layout of both the physical chip and the system, as well as important information about how Google has planned the development of its products and what worked or didn't work in Google's own development of its chips and systems.  Tr. 1098:23-1100:25; Tr. 1104:3-13; Tr. 1104:22-1105:25.  Dr. Sanchez also specifically testified to the value of the combination of the documents in Category Two by explaining that because the information in the documents includes information at the chip and system level that relates to different generations of TPUs, when considered together the information provides complementary information that provides a "more complete picture" of how to build a similar system.  Tr. 1106:7-18.

Dr. Chandra also testified that the information in Category Two is valuable when considered together because it provides how different components of Google's TPU systems are used together and discloses important information about different generations of TPUs compared to each other.  Tr. 1564:18-1565:14.  Dr. Chandra further testified that hundreds of Google engineers spent years developing the technology reflected in Category Three.  Tr. 1562:14-17.

*Category Three.*  Dr. Sanchez testified that the information in Category Three relates to the software used in Google's TPU systems.  Dr. Sanchez explained that there were three different types of software documents contained in Category Three (1) software technology used to scale machine learning workloads to large collections of TPUs; (2) software techniques to achieve reliable operations in clusters of TPUs; and (3) low-level software used to manage and control the TPU-based AI supercomputers.  Tr. 1113:8-25.  Dr. Sanchez described a specific technique contained in one of the exemplar documents contained in Category Three in detail, and further testified that each of each of the documents in Category Three describe a particular software technique or technology that is valuable on its own.  Tr. 1122:22-1129:9; Tr. 1134:16-19.  Dr. Sanchez also testified that the combination of all of the information contained in Category Three gives a more complete picture of the custom software that Google uses to manage its TPU-based systems to make them useful, reliable, and to run large machine learning workloads.  Tr. 1134:20-24.  Dr. Sanchez testified that the combination of the information in Category Three could be used by a competitor to structure their own software in a similar way, saving them time and resources.  Tr. 1135:1-22.

Dr. Chandra testified that the documents in Category Three describe various components of Google's TPU systems software and that the combination of the documents in this category discloses an understanding of the content, scale, and benefits of the software required to build large TPU supercomputers.  Tr. 1572:7-14.  Dr. Chandra also estimated that thousands of engineers spent multiple years to build the software capabilities reflected in the documents in Category Three.  Tr. 1572:15-20.

*Count Six.*  Dr. Sanchez testified that Category Six relates to the hardware implementation of Google's custom SmartNICs.  Dr. Sanchez described in detail a specific exemplary document in Category Six that focuses on the design of a hardware block on Google's custom SmartNIC.  Tr. 1187:5-1197:2.  Dr. Sanchez also explained that the other documents in Category Six contained

additional complementary information regarding Google's SmartNICs, namely additional information about the organization of Google's custom SmartNIC, as well as how the chip is used within Google and information about Google's strategy for developing custom SmartNICs, including Google's SmartNIC roadmap through 2026.  Tr. 1197:8-1198:18.  Dr. Sanchez also testified that the combination of all of the information contained in Category Six provides complementary information about the organization and strategy of Google's SmartNICs that taken together would give a competitor a more complete picture of Google's SmartNIC strategy that take together would reduce the amount of effort needed to build a SmartNIC with similar functionality.  Tr. 1199:1-20.

Dr. Chandra testified that the documents in Category Six relate to Google's custom SmartNIC, explained how the different documents in Category Six provide complementary information, and testified that hundreds of Google engineers spent multiple years and millions of dollars developing Google's custom SmartNIC.  Tr. 1590:21-1598:4; 1616:19-1617:10.

### 1.    The Jury's Verdict was Not Inconsistent

Ding's argument that the jury's verdict regarding the combination trade secrets was inconsistent because the jury "failed to find that the government had provided beyond a reasonable doubt that any of the individual trade secrets within these categories were trade secrets" misstates both the record and law.

The Court instructed the jury that to "[t]o find the defendant guilty of any count, you must find that the category associated with that count contained at least one trade secret, and you must agree unanimously on which particular document in that category constitutes a trade secret (or you must agree unanimously that the entire set of documents in that category constitutes a trade secret)."  Final Jury Instr. No. 12.  It further instructed the jury that they did "not have to find that all of the documents in the particular category are trade secrets." *Id.*  In other words, the jury did not have to go document by document to determine whether each and every document was a trade secret to reach a guilty verdict, as long as they unanimously agreed that at least one document (or the entire set of documents) was a trade secret.

Indeed, as the government explicitly argued in closing, if the jury were to "unanimously agree that the documents in a category, taken together, constitute a trade secret, [they did not] then have to go document by document to also determine if all the other documents in the category are a trade secret."

Tr. 2133:13-17.  As a result, the fact that the jury did not indicate unanimous agreement that additional specific documents were trade secrets does not mean that the jury determined they were *not* trade secrets, it merely means they did not unanimously agree they were trade secrets (likely because they did not feel the need to go document by document after determining that the combination itself was a trade secrets).  Moreover, even assuming that the jury did determine that the other documents were not independently trade secrets (which they did not), that would have absolutely no bearing on whether the combination of the documents were themselves a trade secret given that a combination trade secret can consist of components that are not themselves trade secrets.  *See e.g., Nosal*, 844 F.3d at 1042.

Ding's citation to *O'Rourke* for the contrary proposition strains credulity.   In *O'Rourke*, the defendant moved for a new trial arguing that the jury instruction related to the government's "unique combination" theory should have included additional language clarifying that a unique combination trade secret must still meet the other requirements of a trade secret under §1839.  *United States v. O'Rourke*, 1:17-cr-00495, Dkt. 123 (Defendant's Motion for a New Trial) at 16 (N.D. Ill. Mar. 28, 2019).  In denying the motion, the court rejected the defendant's argument, explaining that the jury was clearly instructed that to reach a guilty verdict regarding the combination trade secret count they "had to identify a trade secret . . . including finding that all of the criteria for defining a trade secret had been met." *O'Rourke*, 417 F. Supp. 3d at 1006.  The Court's opinion in *O'Rourke* does not, as Ding suggests, support the proposition that the components of a combination trade secret must independently be trade secrets.  In fact, the Court in *O'Rourke* clearly explained the opposite is true, confirming that a trade secret can "exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Id.*  at 1006.

## OPPOSITION TO RULE 33 MOTION

### LEGAL STANDARD

Federal Rule of Criminal Procedure 33 states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a). The burden of justifying a new trial rests with the defendant.  *See United States v. Shaffer*, 789 F.2d 682, 687 (9th Cir. 1986).  A motion for a new trial "should be granted 'only in exceptional cases in which the

evidence preponderates heavily against the verdict.'" *United States v. Showalter*, 569 F.3d 1150, 1157 (9th Cir. 2009) (quotation omitted). The district court "enjoys broad discretion with regard to a new trial motion" as it is "most familiar with the context of the trial" and the defendant. *Freund v. Nycomed Amersham*, 347 F.3d 752, 765 (9th Cir. 2003). However, courts in this district have acknowledged that Rule 33 still imposes a high bar requiring the district court to focus on assessing "whether failing to grant a new trial would result in manifest injustice" such as finding that "there is a real concern that an innocent person may have been convicted." *United States v. Halali*, No. 14-CR-627-SI, 2017 WL 3232566, at *2 (N.D. Cal. July 28, 2017), *aff'd*, 950 F.3d 596 (9th Cir. 2020); *United States v. Jinian*, No. 09-CR-1103-JSW, 2011 WL 5056978, at *7 (N.D. Cal. Oct. 24, 2011), *aff'd*, 725 F.3d 954 (9th Cir. 2013). The defendant bears a heavy burden in meeting the requirements to establish a new trial is warranted. *See, e.g.*, *United States v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006). "Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded" as harmless error. Fed. R. Crim. P. 52(a) & advisory committee's note.

## ARGUMENT

### I.      The Government Adequately Identified the Trade Secrets Before Trial

Ding's argument that the government did not "adequately and consistently identify the relevant trade secrets" has no merit. On May 15, 2025, eight months prior to trial, the government identified the 105 trade secret documents for trial. Dkt. 159-2. The government also consistently stated that at trial it would argue that: (1) the collection of information contained in the key documents for each trade secret category (specified in the key documents list of 105 documents), considered together, is a trade secret and (2) the information in each of the 105 trade secret documents, considered as a whole document, is a trade secret. *See* Dkts. 159-2, 159-5, 167; 394-5. At trial, the government presented these same arguments to the jury. Tr. 2133:3-8. Given these facts, there was no confusion either by Ding or the jury regarding the trade secrets alleged by the government.

Ding's repeated assertion that the government was further required to identify "particular portions" of documents that it deemed to be trade secrets reflects a misunderstanding of the law and the trade secrets in this case. As explained in prior briefing, because the government alleged (and proved) that each document and combination was a trade secret, a further bill of particulars was unnecessary.

*See* Dkt. 167; *United States v. Levandowski,* 19-cr-00377-WHA*,* Dkt. 66 at 2 (N.D. Cal. Dec. 4, 2019*)*; *United States v. Liew*, No. 11-573 JSW, 2013 WL 2605126 at *3 (N.D. Cal. June 11, 2013) (denying motion for bill of particulars where alleged trade secret was defined as a 407-page document).

There is also no question that Ding was on notice regarding the trade secret information that the government intended to focus on at trial.  In addition to the government's correspondence identifying the trade secret documents and theories, on August 26, 2025, the government produced a nearly 80-page report authored by Dr. Sanchez.  Dkt. 159-7.  The report contained detailed opinions about the trade secrets that the government intended to elicit from Dr. Sanchez.  *Id.*  Moreover, prior to trial, per the Court's instructions, the government identified the 33 specific trade secret documents that it intended to discuss "in greater detail" during trial.  Dkt. 394-5.  In other words, prior to trial, Ding had a roadmap of the specific trade secrets in this case, and as trial approached, he received an even more specific list of trade secrets that the government would focus on during trial.

In sum, the record is clear that the government repeatedly met its obligations under the law to properly identify the trade secrets at issue in this case.  Ding's Rule 33 arguments on this issue certainly do not meet the high burden necessary to grant a new trial.

## II.    The Court's Rulings on Defense's Expert Witnesses Did Not Result in an Unfair Trial

### A.    Factual Background

***Initial Expert Disclosures.***  On August 26, 2025, the parties exchanged expert disclosures pursuant to the Pretrial Order (Dkt. 114).  The government noticed Dr. Daniel Sanchez as an expert witness, and his notice included a nearly eighty-page report detailing his opinions and expected trial testimony.  Ding noticed several experts, including Isaac Pflaum, senior director of software litigation at Quandary Peak Research, as an expert in "reviewing software source code, and in source code architecture and design."  Dkt. 146-1 at 1.  The initial notice stated that Mr. Pflaum would provide expert opinions regarding the alleged trade secrets in this case related to Google's AI/ML supercomputing infrastructure.  *See id.* at 1-13.  Ding also noticed James Pooley as an expert in "trade secret strategy and management."  Dkt. 192-1 at 1.

***Daubert Motions.***  On September 9, 2025, the government moved to exclude Mr. Pflaum based on the unreliability of his opinions, lack of qualifications, and the notice's failure to comply with Rule

16. *See* Dkt. 146. The government also moved to exclude Mr. Pooley because he was offering improper legal conclusions, did not provide proper expert testimony, his opinions were unreliable under Rule 702, and his notice did not comply with Rule 16. *See* Dkt. 148. On September 22, 2025, Ding served its first supplemental notice for Mr. Pflaum. Dkt. 200.

***First Pretrial Conference and Supplemental Disclosures.*** At the September 23, 2025 pretrial conference, the Court "ordered defense to file supplemental expert disclosures" by October 24, "for all the disclosures to which the government objected, on the grounds that the opinion was not adequately disclosed." Dkt. 201. The Court also ordered *Daubert* hearings for Mr. Pflaum and Mr. Pooley in December 2025. *Id.* On October 31, 2025, Ding served his second supplemental notice for Mr. Pflaum. Dkt. 217-2. That same day, Ding served his supplemental disclosure for Mr. Pooley. Dkt. 217-3. On November 20, 2025, the government filed a supplemental motion to exclude Mr. Pflaum. Dkt. 229. On December 4, 2025, Ding served his third supplemental notice for Mr. Pflaum. Dkt. 252.[10]

***Daubert Hearings and Pooley Order.*** On December 5, 2025, the Court held a *Daubert* hearing on Mr. Pflaum. Dkt. 260. On December 9, 2025, the Court held a *Daubert* hearing on Mr. Pooley. Dkt. 262. At the hearing, the Court provided a tentative ruling that Mr. Pooley could not opine on Google-related evidence because these opinions were beyond the appropriate scope of his testimony, unreliable, and prejudicial under Rule 403. Dkt. 275 at 348:15-350:18. On December 10, 2025, the Court issued an order granting and denying in part the government's *Daubert* motion on James Pooley. Dkt. 263. The Court limited Mr. Pooley's trial testimony "to best practices relating to trade secret protection and the tradeoffs companies have to consider in designing systems to protect their trade secrets." *Id.* The Court precluded Mr. Pooley from testifying "on Google's practices or what Google did after being alerted to the exfiltration of documents by Ding" as "beyond the scope of appropriate expert opinion under Rule 702 and excludable under Rule 403." *Id.*

***Additional Briefing and Further Pretrial Conference.*** On December 11, 2025, the government filed a second supplemental motion to exclude Mr. Pflaum. Dkt. 272. The government included multiple declarations from Google employees that explained Mr. Pflaum made up a component on

---

[10] According to defense counsel, the only change was a new paragraph 196.

Google's TPUs during his *Daubert* hearing.  *See* Dkts. 272-5, 272-6.  At the December 19, 2025 pretrial conference, the Court expressed concerns regarding the reliability of Mr. Pflaum's opinions and informed Ding that he should prepare for the possibility that Mr. Pflaum might not testify at trial.  On December 23, 2025, the government filed its third supplemental motion to exclude Mr. Pflaum.  Dkt. 280.  On January 6, 2026, the Court indicated it remained undecided on Mr. Pflaum's testimony at trial and proposed holding additional *Daubert* hearings during trial.  Dkt. 313 (1/6/2026 Tr. at 57:10-65:6).

*Steve Novak Disclosure.*  On January 6, 2026, the evening before jury selection, Ding disclosed for the first time a new expert, Steve Novak, a principal engineer at Bay2Sierra Silicon Services, to testify in response to Dr. Daniel Sanchez.  Dkt. 328-3.  The morning of jury selection, on January 7, Ding sent Mr. Novak's curriculum vitae to the government.  *Id.*  On January 13, after the second trial day, Ding served its initial disclosure for Mr. Novak, which did not specify, summarize, or describe his purported opinions.  Dkt. 328-2.  On January 19, the government filed a motion to exclude Mr. Novak.  Dkt. 328.  The Court scheduled *Daubert* hearings for Mr. Pflaum for January 20 and 21.  On the morning of January 20, Ding offered to "swap[] out Mr. Pflaum so there's no need for the *Daubert* hearings [], and instead having Steve Novak [] testify as a rebuttal expert [on three opinions previously offered by Mr. Pflaum]."  *See* Tr. 1071:23-1073:3.  The Court allowed defense's proposal over the government's objection and ordered Ding to provide a disclosure from Mr. Novak, which the government could challenge.  Tr. 1109:3-18.  The defense disclosed Mr. Novak's opinions on January 22, 2026.  Dkt. 333.  The Court held a *Daubert* hearing on January 23 and denied the government's *Daubert* motion.  Dkt. 339.  Mr. Novak testified at trial on January 27, 2026.

### B.   The Court's Pretrial Expert Rulings Did Not Prejudice Ding

*Pflaum and Novak.*  The Motion's argument that the Court's pretrial rulings prejudiced his ability to hire Mr. Novak, which in turn, impacted that witness' credibility, contradicts the factual record.  The procedural history makes clear that Ding was given repeated opportunities to present a qualified expert at trial, and the Court went out of its way to give him repeated opportunities to put forth a qualified expert.  Ding was on notice for months that Mr. Pflaum was not qualified to testify in this case.  On September 9, 2025, the government moved to exclude Mr. Pflaum's testimony as unreliable and because he was not qualified to opine on the topics in his report.  Dkt. 146.  In response, recognizing

the deficiencies in Mr. Pflaum's opinions, Ding supplemented Mr. Pflaum's expert report three times, on September 22, 2025, October 31, 2025, and December 4, 2025. Dkts. 200, 217-2, 252. As summarized here, the Court then ordered a *Daubert* hearing, and both parties engaged in extensive supplemental briefing related to Mr. Pflaum's opinions and their reliability (or lack thereof). The Court expressed concerns regarding the reliability of Mr. Pflaum's opinions but scheduled an additional *Daubert* hearing during trial to give Ding the chance to rehabilitate Mr. Pflaum's testimony.

Then, during trial, the same day as a scheduled *Daubert* hearing for Mr. Pflaum, Court permitted Ding to "swap out" Mr. Pflaum for an expert disclosed the evening before jury selection. The government had 24 hours to review Mr. Novak's opinions and prepare for a *Daubert* hearing in the middle of trial.   Four days later, Mr. Novak was permitted to testify. Simply put, the Court provided Ding with multiple opportunities to rehabilitate an unreliable expert witness and then permitted Ding to withdraw the unreliable expert and allow a late disclosed expert to testify at trial.

***Pooley.*** Separately, Ding contends he was prejudiced because the Court limited the expert testimony of Mr. Pooley. Mot. at 33-34. The Court limited Mr. Pooley's testimony on Google evidence because it was improper under Rule 702 and prejudicial under Rule 403. Dkt. 263. As explained above, the EEA does not require expert testimony on reasonable measures. *See supra* at 18.

### III.    The Court's Jury Instructions Were Correct and Did Not Affect Ding's Substantial Rights

The Court should likewise deny the Rule 33 motion that challenges the final jury instructions, as these instructions were consistent with the law and accurate. To prevail on a motion for a new trial for an instructional error, Ding must show that the error affected substantial rights. "[A]n error in misdescribing or omitting an element of the offense in a jury instruction is harmless if it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *United States v. Thongsy*, 577 F.3d 1036, 1043 (9th Cir. 2009), (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)). "Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded" as harmless error. Fed. R. Crim. P. 52(a) & advisory committee's note.

//

//

### A. The Court's Holding That Section 1831 Does Not Require Foreign Government Sponsorship or Coordination of the Trade Secret Theft Was Right

First, Ding repeats his motion to dismiss[11] arguments to contend that "the government was required to prove that Mr. Ding coordinated with or was directed by a foreign instrumentality." Mot. at 7. The Court correctly held that "there is no requirement in section 1831 that the foreign government have sponsored or coordinated the trade theft." Dkt. 105 at 1. "The inclusion of the word 'espionage' in section 1831's title does not change the fact that the text requires no such government interaction." *Id.* As the Ninth Circuit stated in *United States v. Chung*, 659 F.3d at 818, an 1831 conviction does not "require[] evidence of a foreign government's direction or control" and "may be established on the basis of [d]efendant's intent alone." Likewise, in *United States v. Zheng*, 113 F.4th 280, 292-95 (2d Cir. 2024), the Second Circuit panel unanimously rejected arguments identical to Ding's. It is the only circuit court of appeals to squarely address this issue. The court explained that:

> [T]here is nothing in § 1831(a) that requires proof of a foreign government's involvement in the defendant's conduct. To the extent the statute makes any mention of foreign governments, it does so only in terms of the defendant's mental state: the defendant must intend or know that his misappropriation of a trade secret will benefit a foreign government or instrumentality. Far from requiring any action or involvement by another sovereign, under § 1831(a), 'criminal liability . . . may be established on the basis of [the] [d]efendant's intent alone.'

*Id.* at 292 (citation omitted). "In short, there is nothing in § 1831(a) that requires the intended beneficiary to take some action to bring about the crime." *Id.* at 293.

Because the text of Section 1831 is not ambiguous, the Second Circuit stated that it "need not consider [defendant's] arguments that go beyond the statutory text." *Id.* However, it considered and rejected arguments that "espionage" in the Section title and legislative history limited the statutory text of Section 1831 to foreign government directed activities. *Id.* at 293-95. On the use of "espionage," the court stated the EEA's structure made it clear that it "proscribes more than classic spy craft involving foreign government interference" and Congress understood "economic espionage" to "encompass much more conduct than [defendant's] limited—and outdated—conception of 'espionage' that only involves

---

[11] For judicial efficiency, the government incorporates by reference arguments from its Opposition to Ding's Motion to Dismiss and For More Particulars on Economic Espionage (Dkt. 74).

foreign government or coordinated intelligence activity." *Id.* The Second Circuit also rejected the argument that Section 1831 could only apply to foreign government sponsored activities because of the Senate Managers' Statement ("Managers' Statement") that explained the difference between Sections 1831 and 1832.[12] *Id.* First, the court explained "the context of the [Statement] clarifies that legislators were concerned about § 1831 being enforced against someone who misappropriates a trade secret intending to benefit a foreign corporation that has no nexus to a foreign government, that is, a foreign corporation that is not a foreign instrumentality." *Id.* at 294. Second, "even assuming that the 'princip[al] purpose' of § 1831 is to prosecute economic espionage done on behalf of a foreign government, that does not mean it is the only circumstance in which § 1831 may be utilized. 132 Cong. Rec. SS12212." *Id.* at 295.

The Motion incorrectly argues that there is a "split in authority." Mot. at 5. As argued in the government's prior briefing, none of the cases cited by Ding are binding on this Court. *See* Dkt. 74 at 20-23. All but one of the cases cited are *dicta*. *See id.* Other than the *Jin* case, all the cases rely on the use of "espionage" in the title of Section 1831 and/or the Managers' Statement, *i.e.*, the two arguments rejected by the Second Circuit in *Zheng*. *See id.* The only new case cited the Motion, *Jin*, is plainly inapposite. As explained above, the *Jin* court found a defendant not guilty of economic espionage after a bench trial because the evidence showed that she only intended to benefit her private PRC employer.[13] 833 F. Supp. 2d at 1019. Nowhere did the *Jin* court require proof of sponsorship or coordination with a foreign government. *See id.* Instead, it stated that the "[g]overnment need only prove that the defendant

---

[12] "This legislation includes a provision penalizing the theft [of] trade secrets (Sec. 1832) and a second provision penalizing that theft when it is done to benefit a foreign government, instrumentality, or agent (Sec. 1831). The principle [sic] purpose of this second (foreign government) provision is not to punish conventional commercial theft and misappropriation of trade secrets (which is covered by the first provision). Thus, to make out an offense under the economic espionage section, the prosecution must show in each instance that the perpetrator intended to or knew that his or her actions would aid a foreign government, instrumentality, or agent. *Enforcement agencies should administer this section with its principle [sic] purpose in mind and therefore should not apply section 1831 to foreign corporations when there is no evidence of foreign government sponsored or coordinated intelligence activity.*" 142 Cong. Rec. S12212 (daily ed. Oct. 2, 1996) (emphasis added).

[13] The Motion inaccurately states that the *Jin* court "granted a defendant's Rule 29(c) motion regarding Economic Espionage Charges . . . ." Mot. at 6.

intended that her actions would benefit the foreign Government, instrumentality, or agent 'in any way,'" which is exactly what the Court instructed the jury in this case. *Id.*; Final Jury Instr. No. 16. Because the Court correctly decided that Section 1831 does not require foreign government direction or control, the government will not address Ding's arguments that the evidence did not establish PRC government tasking. *See* Mot. at 7.

**B.    The Court Properly Instructed the Jury That Section 1831 Requires Knowledge That the Stolen Trade Secrets Included Confidential Information That Ding Had No Right to Take**

Second, Ding argues that the jury should have been instructed that he had to know "that the [stolen] documents included trade secrets." Mot. at 13-15; *see* Final Jury Instr. No. 16 ("the defendant [had to know] that the document or documents included confidential information that he had no right to take."). The EEA does not require this heightened knowledge element. The Sixth Circuit decision, *United States v. You*, 74 F.4th 378, 393-95 (6th Cir. 2023), is instructive and rejected arguments identical to Ding's. It is the only circuit court of appeals to squarely analyze the EEA's knowledge element. In *You*, the defendant argued that the EEA required the government to prove that the defendant knew the stolen files were trade secrets. The Sixth Circuit panel unanimously disagreed, holding that "[k]nowing that the stolen information is proprietary is enough . . . Knowing the facts that technically make the information a trade secret, as the district court put it, "puts a higher burden on the government than the law requires." *Id.* at 394-95. As the court explained:

> Reading the word "knowingly" to modify each definitional element of "trade secret" would do little, then, to "advance the purpose of scienter," [] by "separat[ing] those who understand the wrongful nature of their act from those who do not." A defendant who knowingly takes, without permission, confidential property that belongs to someone else, knowing that her act will injure the owner or benefit a foreign government, cannot reasonably claim that she acted innocently. It is true . . . that she cannot be convicted under §§ 1831 and 1832 unless the information at issue is in fact a trade secret. But the statutes' overall structure assures us that we do not risk criminalizing otherwise lawful conduct by declining to extend the requirement of knowledge to each element of § 1839(3).

*Id.* at 395 (cleaned up). The *You* court further explained that a heightened knowledge standard clashed with Congress' intent in enacting the EEA: "It would not have made sense for Congress to criminalize economic espionage and trade-secret theft but exempt those defendants who know that they have taken proprietary information without permission yet lack knowledge of the legal definition of a trade secret or

whether the information happens to meet each element of that definition." *Id.* The Court's instruction is also consistent with the EEA's legislative history, which provides that the government must only prove that the defendant "knew or should have known" the information was proprietary:

> It is not necessary that the government prove that the defendant knew his or her actions were illegal, rather the government must prove that the defendant's actions were not authorized by the nature of his or her relationship to the owner of the property and that the defendant knew or should have known that fact.

H.R. Rep. No. 104-788, at 12 (1996), reprinted in 1996 U.S.C.C.A.N. 4021, 4030-31 (emphasis added); 142 Cong. Rec. 27,117 (1996) (government must show the defendant was "aware or substantially certain" that it was misappropriating a trade secret)); *see United States v. Krumrei*, 258 F.3d 535, 539 (6th Cir. 2001) (holding that "defendant need not have been aware of the particular security measures taken by [the trade secret owner]. Regardless of his knowledge of those specific measures, defendant knew that the information was proprietary."); *United States v. Genovese*, 409 F. Supp. 2d 253, 258 (S.D.N.Y. 2005) (concluding "one can infer that Genovese knew not only that the source code was proprietary, but that any protective measures by Microsoft had been circumvented").

Neither case cited in the Motion is binding on this Court. *See* Mot. at 14-15. The government's position is that the unanimous Sixth Circuit decision in *You* correctly interpreted the EEA, and that both *United States v. Chung*, 633 F. Supp. 2d 1134, 1143-46 (C.D. Cal. 2009),[14] and *Jin*, 833 F. Supp. 2d at 1011-13, neither of which controls, were wrongly decided. However, even under Ding's proposed instruction, there was overwhelming evidence at trial that Ding knew that he stole trade secrets, including all the actions he took to intentionally conceal his theft and his knowledge of Google's reasonable measures. *See supra* at 13-23.

**C.      The Court Properly Instructed the Jury on Combination Trade Secrets**

Third, Ding's argues that the Court should have instructed the jury that it must find that Google "maintained the combination trade secrets as compilations" to conclude that they constituted trade secrets continues to be wrong on the law. Ding has raised this issue repeatedly, first as a motion *in*

---

[14] The Ninth Circuit affirmed the district court's judgment of conviction, but did not analyze the knowledge element on appeal, as the defendant primarily challenged the sufficiency of evidence supporting his economic espionage conviction. *Chung*, 659 F.3d at 823-28.

*limine*, and again as a proposed jury instruction.  This Court has considered and rejected these arguments, and they remain unpersuasive.  Ding's suggestion that Google must have maintained the combination trade secrets in a particular way or in a particular location to constitute a trade secret is contrary to the law and common sense.  Based on the plain language of the EEA, information can constitute a trade secret regardless of how it is "stored," or "compiled" by the trade secret owner as long as it meets the definition of a trade secret.  *See* 18 U.S.C. § 1839(3).

**IV.**  **The Jury's Guilty Verdicts Were Consistent With The Evidence**

Finally, the Court should deny Ding's Rule 33 motion on the basis that the verdicts were "against the manifest weight of the [cumulative] evidence." Mot. at 34.  As explained herein, the guilty verdicts in this case were consistent with the record presented at trial and the law as instructed by the Court.

<strong>CONCLUSION</strong>

For the foregoing reasons, the government respectfully requests that the Court deny Ding's Rule 29 Motion and Rule 33 Motion in its entirety and reaffirm the jury's proper verdict on Counts One through Fourteen.

DATED:  March 12, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*/s/ Roland Chang*
CASEY BOOME
MOLLY K. PRIEDEMAN
ROLAND CHANG
Assistant United States Attorneys