CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

CASEY BOOME (NYBN 5101845)
MOLLY K. PRIEDEMAN (CABN 302096)
ROLAND CHANG (CABN 271511)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6627
    casey.boome@usdoj.gov
    molly.priedeman@usdoj.gov
    roland.chang@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>LINWEI DING, aka Leon Ding,<br><br>    Defendant. | CASE NO. 3:24-cr-00141-VC<br><br>**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR A MISTRIAL AND NEW TRIAL PURSUANT TO F.R.C.P. 33 AND *BATSON V. KENTUCKY*** |

## TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................1

II.     BACKGROUND .................................................................................................1

        A.      Case Overview ...............................................................................1

        B.      Overview of Jury Selection............................................................2

        C.      Government's Strikes of Prospective Jurors 43, 45, and 84 ..............................4

                1.      Prospective Juror 43................................................................4

                2.      Prospective Juror 45................................................................6

                3.      Prospective Juror 84................................................................8

        D.      Defendant's Peremptory Strike of Prospective Juror 48...................................10

III.    ARGUMENT......................................................................................................11

        A.      Step One: Ding Fails to Make a Prima Facie Showing that the Government's Strikes were Based on Race ...........................................12

                1.      Comparative Juror Analysis Undercuts Any Inference of Racial Bias.................14

        B.      Step Two: The Government Cited Clear and Obvious Race Neutral Reasons for its Peremptory Strikes .........................................17

        C.      Step Three: Ding Fails to Show Purposeful Racial Discrimination ................................18

                1.      The Government's Stated Race Neutral Reasons Were Not Pretextual ...............19

                        (i)     Juror 43 .....................................................................19

                        (ii)    Juror 45 .....................................................................19

                        (iii)   Juror 84 .....................................................................20

                2.      The Government's Race-Neutral Justifications were Not Proxies for Race...........21

                3.      The Prospective Jurors' Statement Indicating Bias Were Not Negated by Their Later Statements of Impartiality.........................22

                4.      The Government Consistently Exercised its Challenges Based on the Substance of Prospective Jurors' Statements, Not Their Race ...........23

                        (i)     Strong Negative Opinions About Google..................................23

                        (ii)    Concerns About the Juror's Ability to Follow the Law...........................25

                        (iii)   Extreme Anti-Administration Views .......................................26

IV.     CONCLUSION .................................................................................................27

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Kesser v. Cambra,*
465 F.3d 351, 367 (9th Cir. 2006) .................................................................................. 26

*United States v. Mitchell*,
502 F.3d 931, 953 (9th Cir. 2007) .................................................................................. 21

*Cook v. Lamarque,*
593 F.3d 810, 820–21 (9th Cir. 2010) ............................................................................ 21

*Cummings v. Martel,*
796 F.3d 1135, 1147 (9th Cir. 2015) .............................................................................. 22

*Shirley v. Yates*,
807 F.3d 1090, 1102 (9th Cir. 2015) .............................................................................. 13

*United States v. Chinchilla,*
874 F.2d 695, 698 (9th Cir. 1989) .................................................................................. 13

*Infante v. Martel,*
953 F.3d 560, 566 (9th Cir. 2020) .................................................................................. 22

*Batson v. Kentucky*,
476 U.S. 79 (1986)........................................................................................................... 12

*Boyd v. Newland*,
467 F.3d 1139 (9th Cir. 2006) ........................................................................................ 12

*Burks v. Borg,*
27 F.3d 1424 (9th Cir.1994) ........................................................................................... 18

*Flowers v. Mississippi*,
588 U.S. 284 (2019).......................................................................................................... 18

*Freund v. Nycomed Amersham*,
347 F.3d 752 (9th Cir. 2003) .......................................................................................... 11

*Green v. LaMarque,*
532 F.3d 1028 (9th Cir. 2008) ........................................................................................ 12

*Hernandez v. New York*,
500 U.S. 352 (1991)........................................................................................ 11, 12, 17, 22

*Hoyos v. Davis*,
  51 F.4th 297 (9th Cir. 2022) ................................................................................................ passim

*Johnson v. California,*
  545 U.S. 162 (2005)................................................................................................................ 17

*Miller-El v. Dretke*,
  545 U.S. 231  (2005)............................................................................................................... 14

*Paulino v. Harrison*,
  542 F.3d 692 (9th Cir. 2008) ................................................................................................. 18

*Purkett v. Elem*,
  514 U.S. 765 (1995).................................................................................................... 17, 18, 20

*Tolbert v. Gomez,*
  190 F.3d 985 (9th Cir.1999) .................................................................................................. 22

*United States v. Christensen*,
  828 F.3d 763 (9th Cir. 2015) ................................................................................................. 22

*United States v. Collins*,
  551 F.3d 914 (9th Cir. 2009) ............................................................................................ 11, 12

*United States v. Daly*,
  974 F.2d 1215 (9th Cir. 1992) ............................................................................................... 18

*United States v. Hernandez-Garcia*,
  44 F.4th 1157 (9th Cir.) ................................................................................................ 11, 12, 18

*United States v. Shaffer*,
  789 F.2d 682 (9th Cir. 1986) ................................................................................................. 11

*United States v. Thompson*,
  827 F.2d 1254 (9th Cir. 1987) ............................................................................................... 18

*Uttecht v. Brown*,
  551 U.S. 1 (2007)................................................................................................................... 22

*Williams v. Runnels*,
  432 F.3d 1102 (9th Cir. 2006) ............................................................................................... 12

**<u>Statutes</u>**

18 U.S.C. § 1831............................................................................................................................ 4
18 U.S.C. § 1832............................................................................................................................ 4

**Rules**

Fed. R. Crim. P. 33(a) ............................................................................................................... 1, 2, 11

## I.   INTRODUCTION

After a three-week trial, on January 29, 2026, a unanimous jury found defendant Linwei Ding guilty of seven counts of theft of trade secrets, in violation of 18 U.S.C. § 1832, and seven counts of economic espionage, in violation of 18 U.S.C. § 1831.  Ding claims that the government violated *Batson v. Kentucky* during jury selection and asks this Court to undo the jury's verdict under Fed. R. Crim. P. 33(a).  Because his *Batson* claim fails, the interests of justice compel this Court to deny Ding's motion for a new trial.

## II.   BACKGROUND

### A.   Case Overview

The government's investigation of Ding began in January 2024 after the FBI received a referral from Google detailing the company's internal investigation of Ding's theft of confidential artificial intelligence (AI) infrastructure technology.

The evidence gathered through the government's investigation showed that, while working for Google as a software engineer, Ding stole Google's trade secrets about its AI supercomputers.  At the same time, Ding founded an AI company based in China and marketed that company to investors by claiming that he and his company could replicate Google's technology.  Ding also created partnerships with several instrumentalities of the government in China, promising to provide those entities with AI supercomputing services, which he could only provide by leveraging Google's stolen technology.

The government filed an initial Indictment charging Ding with theft of trade secrets on March 6, 2024.  Dkt. 1.  On February 4, 2025, the government filed a Superseding Indictment expanding the trade secret charges and adding economic espionage charges.  Dkt. 44.  On September 9, 2025, the grand jury returned a Second Superseding Indictment that amended the date range for all the counts but was otherwise identical to the Superseding Indictment.  Dkt. 140.

During pretrial litigation, defense counsel telegraphed that part of its trial strategy would be to portray Google as the driving force behind the government's prosecution of Ding.  For instance, defense counsel suggested that the government relied on "Google's word alone" to conclude that Ding "violated the law by exfiltrating trade secrets."  Def. Opp. to Gov. MILs 4-5, Dkt. 165 at 1.  The defense also argued that "[t]he government relied on and deferred to the technical expertise of Google throughout its

1

investigation" (*id.*) and that "Google instructed the government on what it believed constituted trade secrets after Mr. Ding was arrested and his devices seized" (Pooley Expert Discl., Dkt. 195 at 5). Moreover, on September 2, 2025, Ding filed his exhibit and witness lists, which included two Google in-house attorneys and emails between the government and Google counsel. *See* Dkts. 132-33.

Ding so clearly telegraphed this line of argument that the Court addressed it squarely in its Order deciding motions *in limine*.[1] "To the extent the defense wants to give the jury the impression that the prosecution is being driven by Google, that is not appropriate." Dkt. 205 at 4. The government's concerns about Ding's pursuit of this inappropriate strategy were justified when defense counsel ignored the Court's order by beginning her opening statement as follows:

> This case is about power. It's about what happens when two powerful entities come together and target a single individual. The Government and Google made up their mind about who Linwei Ding was, and then they went about getting the evidence to prove up what they had already determined.

Trial Tr. 59:2-7.

### B.    Overview of Jury Selection

The parties agreed that prospective jurors would complete questionnaires prior to jury selection. The jury questionnaire did not include any questions regarding race, ethnicity, or ancestry.[2] Anticipating that bias for or against Google, the victim in the case, would be a concern, the parties agreed that the questionnaire should include the following questions: "Have you or any close relatives ever worked at Google?" (Question 34) and "Do you have strong feelings (positive or negative) about Google?" (Question 35)  Dkt. 131 at 2; *see* Dkt. 206. Separately, Ding proposed, over the government's objection, the following questions: "Do you agree or disagree that China competes unfairly economically with the United States?" and "Do you agree or disagree that Chinese foreign nationals working at U.S. companies are more likely to steal from their employers than U.S. citizens are?"  Dkt. 131 at 3.  The Court declined to include the language Ding proposed, but included the following similar questions in the final jury questionnaire: "Do you have strong feelings about theft of U.S. intellectual

---

[1]  The government filed motions *in limine* to exclude communications from Google's legal counsel and to preclude argument regarding the government's charging decisions.  Dkt. 144.

[2]  The question nearest to these issues was Question 7, which asked the prospective jurors to state their place of birth.

property by China or Chinese nationals? If yes, please explain." (Question 40) and "Do you have strong feelings about China or Chinese nationals working in this country? If yes, please explain." (Question 41). Dkt. 206.

Approximately 110 prospective jurors submitted responses to the questionnaires. On January 5, 2026, the Court issued an Order Regarding Excusal Hearing that provided tentative rulings on the prospective jurors based on their questionnaire responses. Dkt. 295. The Court stated that it was "tentatively inclined to excuse for hardship Juror Nos. 1, 4, 6, 8, 12, 13, 15, 17, 20, 21, 22, 23, 24, 26, 27, 28, 35, 38, 46, 47, 50, 52, 56, 57, 59, 64, 65, 69, 81, 83, 84, 88, 91, 92, 93, 94, 95, 98, 100, and 114." *Id.* The Court further stated its inclination to "postpone [] service for Juror Nos. 53, 58, 68, 73, 74, 101, 102, and 106 in light of hardships . . . ." *Id.* Separately, the Court was "inclined to excuse Juror Nos. 2, 14, 82, 103, 105, and 107 for cause." *Id.* The Court instructed the parties to be prepared to discuss objections to any tentative rulings and "to bring up any other jurors should be excused on the papers alone." *Id.*

On January 6, 2026, the Court held an excusal hearing. The government raised for-cause challenges to Jurors 29, 42, 45, 46, 68, 76, and 84. January 6, 2026 Excusal Hearing Transcript ("Jan 6. Tr.") Dkt. 368 at 20-46. Defense counsel raised for-cause challenges to Jurors 2, 3, 14, 15, 53, and 105. *Id.* at 46-52. The Court affirmed its tentative ruling excusing Jurors 2, 14, 82, 103, 105, and 107 for cause (*id*. at 56:21-22) and postponing Juror 53's service (*id.* at 52:11) but otherwise denied the parties' other for-cause challenges.

On January 7, 2026, the Court conducted in-person *voir dire*, first by this Court, and then counsel. After the Court's initial questioning, the Court excused Jurors 18, 19, 33, 49, 63, 67, 77, 87, 89, 99, 111 and 113 for hardship. January 7, 2026 *Voir Dire* Transcript ("Tr.") Dkt. 369 at 45:24-25; 102:7-15. After counsel's questioning, the Court took for-cause challenges. Ding challenged Jurors 5, 48, and 95; the government challenged Jurors 36, 42, 45, 76, and 104. *Id*. at 228:22-241:1-24. The Court granted for cause challenges on Jurors 5, 42, and 76 but otherwise denied the parties' challenges. *See id.* The Court also excused Jurors 30 and 31 for hardship. *Id.* at 242:21-23.

Ding made *Batson* objections to the government's peremptory strikes of Jurors 43, 45, and 84, who had self-identified as having Chinese ancestry. After the government gave its race-neutral reasons

3

for each challenged strike, detailed below by juror, defense counsel then asked the Court to deny the government's strikes of Jurors 43, 45, and 84 and empanel those jurors.  Tr. at 252:25-253:1-21.  The Court responded, "I don't think I can deny their peremptory challenge unless I find that they were stricken because of their nationality" and denied Ding's challenge without prejudice to renewing it after trial.  *Id.* at 255:4-6.

In the motion now before the Court, Ding renews his challenges the government's peremptory strikes of Jurors 43, 45, and 84.

### C.    Government's Strikes of Prospective Jurors 43, 45, and 84

#### 1.    Prospective Juror 43

Juror 43's Questionnaire

In response to Question 35 on the Jury Questionnaire, which asked prospective jurors whether they had any strong feelings about Google, Juror 43 stated that "[he] hold[s] negative feelings to the extent that Google is a monopolist and that its reach impinges on its consumers and employers."[3]  Juror 43 Questionnaire.[4]

*Voir Dire* of Juror 43

During the Court's *voir dire*, the Court asked all prospective jurors whether the fact that the case involved Google caused any concern about any juror's ability to be fair and impartial.  Tr. at 106:3-6; 114:13-14.  Before Juror 43 responded to the Court's question, Juror 46, offered his opinion that "Google does a lot of terrible things. . . . I feel it's a very big, powerful entity that has a lot of control. . . Google is a very big, evil company."  *Id.* at 108:24-109:7; 111:18-19.  During the Court's discussion with Juror 46, the focus of the conversation shifted to Juror 46's deep skepticism of intellectual property laws, which he expressed as follows: "Well, if you take a cup from a stream of water, are you breaking the law?"  *Id.* at 109:12-13; *see also* 109:15-111:21.

Juror 43 raised his hand shortly after Juror 46's comments and stated to the Court: "It was after

---

[3] The government understood Juror 43 to mean that he believed Google's reach impinged on its consumers and *employees* (not employers).

[4] Prospective Juror Questionnaires are attached as Exhibit 1 to the Declaration of Lora Krsulich. Dkt. 393-3 (under seal).

Mr. Santa Cruz[5] here talked about the stream. I just want to -- I was just wondering, like -- or I'm just concerned about my own role as a juror, if there were to be laws that maybe I believe are unreasonable, like, personally and that's the reason why the person would be convicted, yeah." *Id.* at 114:20-24.

During government counsel's *voir dire*, he asked Juror 43 about his belief that certain laws were unreasonable. *Id.* at 173:15-19. Juror 43 responded:

> I think I, in that moment, just wanted more clarity on my role as a juror in the sense that, I mean, there are just laws that I would find unreasonable. I wouldn't put it past myself to hear some of -- some reasoning from either side and thinking, "Well, I don't agree with that law." But in having heard that the primary -- like, my role is to follow the instruction and listen to the facts and take the law as the law, that's something I think I can do on both sides equally, if that makes sense.

*Id.* at 173:20-174:4. The government then asked Juror 43 if he could follow the Court's legal instructions, even if he disagreed with the law. *Id.* at 174:6-9. Juror 43 responded:

> I think so. And I hesitate because I don't foresee myself disagreeing so, like – so vehemently with, like, all of the evidence. At the end of the day, I don't think that I would think that the final verdict is, like -- that I would disagree with every law that was presented to me. Does that make sense?

*Id.* at 147:10-15.

Finally, the government asked Juror 43 if he could provide an example of a law that he believed to be unreasonable, and he responded:

> No. I think that just I would echo a lot of what people have said here today in terms of -- I mean, I just think that inherently Google, as a monopoly, has powers that I myself can't even articulate; but just that inherently, in the power that it has, it has the capacity to be predatory. And also me being Chinese, I acknowledge that I have my own unconscious biases regarding, like -- like, in the back of my head, I also think about who's being targeted, why they're being targeted, why certain cases get this sort of treatment relative to others.
>
> But having said all of that, I -- again, I think that -- I didn't really answer your question because I just don't have specific laws in mind, but I do think that on both sides, I would -- I have biases on all ends, I believe, and I think that I could set aside -- or despite all of them, I would be able to follow protocol, follow my role as a juror.

*Id.* at 174:17-175:10.

---

[5] Juror 46 indicated that he graduated from the University of California, Santa Cruz. Tr. 76:15.

5

Defense counsel declined to ask Juror 43 any questions during *voir dire*.

Government's Race Neutral Reasons for Striking Juror 43

The government identified two reasons for its strike of Juror 43.  First, the government pointed to Juror 43's hostility towards Google and specifically referenced Juror 43's questionnaire response in which he characterized Google as a "monopolist" company that "impinges on its consumers and employers." *Id.* at 248:3-5.  Second, the government cited Juror 43's statements indicating that he would have difficulty following laws that he personally disagreed with.  Specifically, the government noted that "during questioning today when asked about whether he would be able to follow the law in certain circumstances, he expressed some concerns about that, some skepticism . . . he was one of the individuals who had some concerns about laws being unreasonable and whether he would be able to follow them." *Id.* 248:6-9; 14-16.

### 2.    Prospective Juror 45

Juror 45's Questionnaire

In response to Questions 27 (testimony of law enforcement officers), 28 (views on the criminal justice system), and 29 (views on criminal law in the U.S. as it relates to victims), Juror 45 stated that he would be less likely to believe law enforcement officers and that he believed that the law does not provide enough protection for people accused of crimes or for crime victims.  Juror 45 Questionnaire. More importantly, Juror 45 explained his answers to Questions 27, 28, and 29 by writing the following statement three times: "The current administration uses the law to favor their friends, punish their enemies, and enrich themselves. The military and law enforcement are blindly following corrupt orders." *Id*.

At the January 6th excusal hearing, the government moved to exclude Juror 45 based on his responses to questions 27-29 expressing his views on the current Administration.  Jan. 6 Tr. at 42:13-21. The Court denied the government's challenge for cause.  *Id*.

*Voir Dire* of Juror 45

The government questioned Juror 45 after a lengthy conversation between the Court, government counsel, and Juror 104, who expressed concerns about Ding being targeted by the government due to his nationality.  For instance, in response to a question about news coverage of the case that Juror 104 had

seen, she stated:

> So you have to think about the timing of the situation in that, also because I am Chinese and of -- how do I put this? The experiences that I've had, feeling like I've been targeted so much recently because of my nationality. I feel like there's been judgments made around being a Chinese person, even in the professional space, that I don't -- my immediate reaction of those kinds of articles was like: Well, there's another person getting targeted unfairly. How do you know that this is true, that he actually stole something or that – that someone isn't just saying, "Hey, he happens to be Chinese, and therefore, let's pin it on this person"?
>
> It was one of those reactions where it kind of – I was intrigued to see where it was going because you could see how the world was turning and how everything around me was about me just being -- having black hair and getting people looking at me, or walking in Chinatown and having those kind of sentiments around me.
>
> And so for me, it's where I don't know that I can honestly be able to look at this completely unbiased because it's the Government, again, coming in and trying to target another Chinese person, whether or not they're nationals.

Tr. at 163:4-25.  The Court then asked Juror 104 whether the fact that Ding is a Chinese national would interfere with her ability to find him guilty even if she were convinced that he was guilty beyond a reasonable doubt.  *Id.* at 164:19-165:1.  She responded, "To be honest, I don't know. And the reason why I'm saying that is because there's a part of me that will always still question whether or not this is just yet another situation where we're getting targeted unfairly." *Id.* at 165:2-5.  The Court tried to clarify Juror 104's answer by asking: "So what you're saying is that if you firmly believe beyond a reasonable doubt that the defendant committed a crime, you might not be able to vote to convict?" *Id.* at 165:13-15.  She responded:

> I think in certain situations, the answer would be yes. . . . So for me, it's where -- I want to say, yes, I would be able to; but at the same time, there's a certain part of me that's just like I don't know. I'm not really sure until, I guess, the case happens. I don't know how I would be able to answer.

*Id.* at 165:16-166:7.

Government counsel noticed Juror 45 appearing to nod in agreement as Juror 104 was speaking. After the Court's exchange with Juror 104 concluded, the government asked Juror 45 if he would share why he was nodding during Juror 104's remarks. *Id.* at 166:18-20.  He answered by saying:

> Yeah, I kind of agree with a lot of what she said. My feelings are maybe along the same lines. I question -- my question is about the genesis of this

case. Who brought it forward? When did all this happen? What are the motivations of all the parties involved? And is this -- can we look at it just as this one isolated case with the facts as presented, or is it really a reflection of very public politicized and sensitive topics of AI and China?

*Id.* at 166:21-167:3.  The government asked whether Juror 45 "would be able to come in and listen to the evidence, though, with a fair and open mind. *Id.* at 167:7-8.  He responded by stating, "I would, but at the back of my mind, I would question -- I would -- unless the motivations were made clear, I would wonder about that, and I would have maybe a dissenting opinion if I didn't agree with something." *Id.* at 167:9-12.  Juror 45 later stated that he believed he could set aside his concerns and reach a verdict and that he would not allow "outside biases" to influence him. *Id.* at 167:23-168:2; 168:22-169:1.

Defense counsel declined to ask Juror 45 any questions.

Government's Race Neutral Reasons for Striking Juror 45

After *voir dire*, the government moved to strike Juror 45 for cause and the Court denied the motion. *Id.* at 234:22-235:7.  The government exercised a peremptory strike excusing Juror 45 and offered two race neutral reasons justifying its decision.  First, the government noted Juror 45's "strong Administration views" articulated in his questionnaire, which government counsel read into the record. *Id.* at 148:24-249:7.  Second, government counsel explained that, during *voir dire*, Juror 45 expressed a desire to "know the motivation behind the prosecution's charging process how the government decided to bring the case." *Id.* at 249:8-13.

### 3. Prospective Juror 84

Juror 84's Prospective Juror Questionnaire[6]

In response to Question 35, which asked about strong feelings about Google, Juror 84 stated that he felt "Google is way too powerful in influencing our lives."  Juror 84 Questionnaire.  Additionally, Question 40 asked prospective jurors "Do you have strong feelings about theft of U.S. intellectual property by China or Chinese nationals?  In response, Juror 84 wrote, "Most cases of US IP theft against Chinese nationals were proven to be either witch-hunting or racial discrimination." *Id.* at 7.

---

[6] The Excusal Order stated the Court's tentative inclination to excuse Juror 84 for hardship.  Dkt. 295.  At the excusal hearing, the government stated that it "agree[d] with the Court's ruling on [Juror 84].  He has a 99-year-old mother, and Monday and Tuesdays are his responsibility to feed, cleanse, and keep her company."  Jan. 6 Tr. at 23:14-17.

8

During the January 6th excusal hearing, the Court denied the government's request to excuse Juror 84 for cause based on his response to Question 40.  Jan. 6 Tr. 24:12-16.

*Voir Dire* of Juror 84

The government asked Juror 84 whether his concerns about Google's power and influence would affect his ability to serve as a juror.  Tr. at 160:23-161:11.  He responded as follows:

> I don't have a specific or particular concern. It's just that, you know, I read a lot about, you know, these companies. And Google is so dominating. And in the situation now, they're controlling everything of – I do search every day, I use Google, and, you know, it's looking at what I – what I do, what I did. And so Google's influence on the society is so great, I'm just a little bit worried. That's my concern.

*Id.* at 161:4-11.  When asked a second time about whether his views about Google's influence on society would affect his ability to serve, Juror 84 responded, "I don't think so." *Id*. at 161:14-17.

Government's Race Neutral Reasons for Striking Juror 84

The government identified two reasons for its peremptory challenge of Juror 84.  First, government counsel pointed to Juror 84's Questionnaire response to Question 40, in which Juror 84 stated his belief that "Most cases of US IP theft against Chinese nationals were proven to be either witch-hunting or racial discrimination." *Id.* at 251:22-252:5 (*quoting* Juror 84 Questionnaire).  Second, the government explained that:

> [Juror 84] also had some strong views about Google in terms of its influence on society. I do think those two issues in combination -- he did walk them back today. We agree with Your Honor. That being said, how strong those opinions were, "witch hunt" is quite a strong word to use. And so for those reasons, in addition to the answers provided on the record, were why we decided to exercise a peremptory.

*Id*. 252:17-24.  After the Court expressed concern about the government's stated reasons for striking Juror 84, the Court and government counsel had the following exchange:

> MR. CHANG: I will say, Your Honor, I want to be careful about how I characterize what I said yesterday,[7] but we had some very serious concerns given the "witch hunt" language and racial discrimination under penalty of perjury. I do believe we moved for a cause strike yesterday based solely on the papers, and that's very strong language to call a criminal prosecution a witch hunt. I don't think anyone else used such

---

[7] That is, during the excusal hearing, when the government sought to strike Juror 84 for cause.

strong language.

THE COURT: Well, they weren't calling your criminal prosecution a witch hunt; right?

MR. CHANG: But our case is a case of IP theft against a Chinese national. It's exactly the kind of case he's calling a witch hunt.

THE COURT: And he is saying most cases of U.S. IP theft against Chinese nationals were proven to be either witch hunting or racial discrimination?

MR. CHANG: Correct, Your Honor.

*Id*. at 254:12-255:3.

### D. Defendant's Peremptory Strike of Prospective Juror 48

During the Court's *voir dire*, Juror 48 disclosed that he was employed as a principal engineer at NVIDIA and that he had "personal relationships with product managers at Google directly developing AI infrastructure technologies." *Id.* at 61:20-22; 112:4-7. Juror 48 ultimately stated that he did not think that these relationships would not make him uncomfortable "finding one way or another in this case." *Id.* at 113:13-21. Neither party asked Juror 48 any questions during *voir dire*. Defense counsel moved to exclude him for cause because "he's pretty close to the technology at issue in this case" and because "NVIDIA is also a very significant partner with Google." *Id.* at 237:20-238:3. The Court denied Ding's for-cause challenge (*id.* at 238:11-12) and defense counsel later exercised a peremptory strike excusing Juror 48 (*id.* at 235:48).

Ding struck Juror 48 immediately before raising his *Batson* challenge to the government's peremptory strikes of Jurors 43 and 45. Juror 48's surname is typically associated with Chinese ancestry and he appeared to be of Chinese descent (Declaration of Andrea Valladao at ¶ 12),[8] facts that the Court apparently recognized based on its exchange with defense counsel, which took place immediately after the government stated its race-neutral reasons for striking Jurors 43 and 45. The exchange began with defense counsel's response to the government's race-neutral reasons for striking Jurors 43 and 45 and continued with the Court pressing defense counsel to explain his excusal of Juror 48.

---

[8] FBI Special Agent Andrea Valladao is the lead case agent in the government's case against Ding. She was present for the entirety of trial and jury selection, including the January 7, 2026 *voir dire* and jury selection proceeding. Special Agent Valladao's declaration sets forth her personal observations of the characteristics of certain relevant jurors.

MR. FONDO: Yes, Your Honor. As to the first juror, 43, the juror actually sort of corrected their statement – "correct" is not the right word, but they stated that they could follow the law. They could not think of any law that he did not agree with and that he said he could follow the law, and he found no examples of any types of laws unreasonable. So I don't think that that -- their stated basis.  I would also note that the first -- two out of the first three are Chinese individual -- people, Chinese people that they've stricken.

THE COURT: Why did you strike [Juror 48]?

(Pause in proceedings.)

MR. FONDO: Oh, let me just check. Which juror number is that? Sorry. That's the Nvidia person, Your Honor?

THE COURT: Yeah.

MR. FONDO: For the same reasons that we expressed cause -- concerns about the cause. Very strong relationship between Nvidia and Google and he has very strong relationships there.

THE COURT: Okay. So the *Batson* challenge is overruled. And I will just remark that I found, both from my observation in the courtroom and from going through this list, there's actually a pretty high concentration of Asian American prospective jurors. I was surprised to hear you say that the percentage was very low. I thought it was unusually high, actually, just based on my history of observing jury pools here in federal court.

But, anyway, those challenges are overruled.

*Id.* at 249:15-250:19.

### III.   ARGUMENT

Ding fails to carry his burden to show a *Batson* violation warranting a new trial in the interest of justice.

Fed. R. Crim. P. 33(a) states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  The burden of justifying a new trial rests with the defendant. *See United States v. Shaffer*, 789 F.2d 682, 687 (9th Cir. 1986).  The district court "enjoys broad discretion with regard to a new trial motion" as it is "most familiar with the context of the trial" and the defendant. *Freund v. Nycomed Amersham*, 347 F.3d 752, 765 (9th Cir. 2003).

"When a defendant alleges a *Batson* violation, a three-part burden shifting test is used to determine if the potential juror was challenged on the basis of impermissible discrimination." *United States v. Collins*, 551 F.3d 914, 919 (9th Cir. 2009).  First, the defendant must "make a prima facie

11

showing that the prosecution exercised its strikes based on race." *United States v. Hernandez-Garcia*, 44 F.4th 1157, 1166 (9th Cir.), cert. denied, 143 S. Ct. 508 (2022) (*citing Hernandez v. New York*, 500 U.S. 352, 358–59 (1991)). "Second, if the trial court finds the defendant has made a prima facie case of discrimination, the burden then shifts to the prosecution to offer a race neutral reason for the challenge that relates to the case." *Green v. LaMarque*, 532 F.3d 1028, 1029 (9th Cir. 2008); *accord Batson v. Kentucky*, 476 U.S. 79, 97 (1986). Third, if the prosecutor offers a race-neutral explanation, "the district court must determine based on the record whether the 'defendant has carried his burden in proving purposeful discrimination.'" *Hernandez-Garcia*, 44 F.4th at 1166 (*quoting Hernandez*, 500 U.S. at 359).

### A. Step One: Ding Fails to Make a Prima Facie Showing that the Government's Strikes were Based on Race

"To state a prima facie case of discrimination at step one, a defendant must establish three elements: that '(1) the prospective juror is a member of a cognizable racial group, (2) the prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference that the strike was motivated by race.'" *Collins*, 551 F.3d at 919 (*quoting Boyd v. Newland*, 467 F.3d 1139, 1143 (9th Cir. 2006)). A defendant may rely on statistical disparities at step one of the *Batson* inquiry. *Williams v. Runnels*, 432 F.3d 1102, 1107 (9th Cir. 2006). But a statistical disparity alone is insufficient to raise an inference of discrimination at step one where the totality of circumstances undermines any inference of racial bias. *Hoyos v. Davis*, 51 F.4th 297, 311-15 (9th Cir. 2022).

Ding has failed to raise an inference that the government struck Jurors 43, 45, or 84 based on race. Although he suggests that the government struck a substantial percentage of prospective jurors of Chinese descent, Ding's claim that jurors of Chinese descent accounted for 16.67% of the venire is based on a warped statistical analysis that undercounts jurors of Chinese descent. *See* Def. Mot. at 10-12. Ding's analysis excludes jurors of Chinese descent who did not explicitly identify their heritage in their questionnaires or on the record during *voir dire*. *See id.* at 10-11. In fact, there is no accurate statistical record of the racial, ethnic, or ancestral makeup of the prospective jurors in this case, although the Court observed that "there's actually a pretty high concentration of Asian American prospective jurors. . . . I thought it was unusually high, actually, just based on my history of observing jury pools here in federal court." Tr. at 250:10-19. Therefore, Ding's exclusion of prospective jurors of Chinese

descent who did not self-identify makes his analysis incomplete. The most glaring omission from Ding's calculation of prospective jurors of Chinese descent is Juror 48, whom Ding struck with a peremptory challenge immediately before accusing the government of intentional racial discrimination based on its strikes of two other jurors of Chinese descent. *See id.* at 246:14-20. Ding's *Batson* motion is remarkable for its glaring omission of any mention or discussion of Juror 48. *See* Def. Mot. at 10-11. The Court should expect more candor from attorneys accusing other attorneys of racial discrimination.

As Ding acknowledges, two prospective jurors who self-identified as having Chinese ancestry, Jurors 61 and 104, were sworn as jurors. They may not be the only seated jurors of Chinese ancestry; Juror 24 did not identify her ancestry but by appearance, could have been of Chinese descent. Valladao Decl. at ¶ 7. Additionally, Juror 37, who was also seated on the jury, appeared to be of Asian descent (*id*. at ¶ 9) and stated that she was born in Mongolia (Question 7, Juror 37 Questionnaire), which neighbors China.

The totality of these circumstances is distinct from cases where the Ninth Circuit has found an inference that the government used its peremptory challenges to exclude jurors on account of race. In *United States v. Chinchilla*, for example, the prosecutor challenged all Hispanic jurors, used his first peremptory challenge to strike the only Hispanic juror, and exercised his sole challenge to the alternate pool to remove the only other Hispanic in the jury pool. 874 F.2d 695, 698 (9th Cir. 1989). Similarly, in *Shirley v. Yates*, the prosecutor used peremptory challenges to strike two of three black jurors and the court found that a comparative juror analysis showed that a seated white juror was "certainly similar enough—apart from race—to help support an inference of discrimination at *Batson* Step One." 807 F.3d 1090, 1102 (9th Cir. 2015), *as amended* (Mar. 21, 2016).

The Ninth Circuit's opinion in *Hoyos* is instructive. In that case, the defendant argued that his Equal Protection rights were violated because the prosecutor struck "all three Hispanic female prospective jurors." *Hoyos,* 51 F.4th at 309. Although the Court recognized that "striking two out of four prospective jurors or three out of five venire members could support a prima facie showing of discrimination," it found that that the presumption could be "dispelled by other relevant circumstances." *Id.* at 311. In *Hoyos*, the Court ultimately determined that any inference of discrimination was undercut by a comparative juror analysis between the struck and non-struck jurors and by the fact that the

13

prosecutor had previously articulated race-neutral reasons for striking the jurors when articulating a failed for cause challenge for two of the struck jurors. *Id.* at 310-12. The Court's analysis in *Hoyos* is apt here.

### 1. Comparative Juror Analysis Undercuts Any Inference of Racial Bias

Ding's threadbare attempt at a comparative juror analysis exposes the weakness of his *Batson* motion and undermines any inference of discrimination at step one.

A comparative juror analysis can be an important tool that Courts can use to assess the validity of a *Batson* claim at step one and/or step three. *See Miller-El v. Dretke*, 545 U.S. 231 241 (2005); *Hoyos*, 51 F.4th at 312 (finding that *Batson* supports the use of comparative juror analysis at step one). The analysis proceeds by comparing the government's reasons for striking the challenged jurors against the characteristics of the empaneled jurors. *Id*. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination[.]" *Miller-El,* 545 U.S. at 241. On the other hand, where the defendant fails to identify any seated jurors who expressed comparable biases to the struck jurors, the totality of the circumstances "undermines any inference of racial bias" at step one *Hoyos*, 51 F.4th at 312. Here, Ding fails to point to a single seated juror not of Chinese descent who made statements remotely comparable to the clear bias expressed by Jurors 43, 45, and 84.

Ding argues that "[n]on-Chinese Juror 71 expressed concerns about law enforcement and the criminal justice system similar to those of Jurors 43, 45, and 84." Def. Mot. at 16. As an initial matter, the government did not cite concerns about law enforcement or the criminal justice system among its reasons for striking Jurors 43 or 84, so Ding's comparison to Juror 71 is irrelevant as to Jurors 43 and 84.

Part of the government's justification for striking Juror 45 was his Questionnaire statement that "[t]he current administration uses the law to favor their friends, punish their enemies, and enrich themselves. The military and law enforcement are blindly following corrupt orders." Questions 27-29, Juror 45 Questionnaire. Comparing this statement to Juror 71's stated concerns about law enforcement and the criminal justice system strains credulity. Juror 71, an African American woman (Valladao Decl. at 14), specified that her concerns about law enforcement and the criminal justice were based on

"knowing [her] history and then just American history regarding people of color." Tr. at 184:5-16. Juror 71's concerns were general and related to what she described a "America's history regarding people of color," whereas Juror 45's opinion was specific to the current Administration, which includes the Department of Justice. Therefore, the nature of Juror 45's concerns indicate case-specific bias whereas Juror 71's concerns do not. Even if Juror 45's concerns about law enforcement were comparable to those of Juror 71, which they are not, the government cited another race-neutral reason for striking Juror 45 – his suspicions about the government's motivation in bringing the case against Ding. Juror 71 did not make similar statements, and as such, Juror's 71 and 45 are not similarly situated.

Next, Ding compares Juror 109's concerns about Google to those of Jurors 43 and 84. Again, this comparison fails. Juror 109's *only* statement about Google was, "I don't like all their use of artificial intelligence." Question 35, Juror 109 Questionnaire. In contrast, Juror 43 wrote in his Questionnaire that "Google is a monopolist" and that 'its reach impinges on its consumers and employers." Question 35, Juror 43 Questionnaire. During *voir dire*, Juror 43 stated that

> I think that just I would echo a lot of what people have said here today in terms of -- I mean, I just think that inherently Google, as a monopoly, has powers that I myself can't even articulate; but just that inherently, in the power that it has, it has the capacity to be predatory.

Tr. at 174:19-24. Characterizing Google as a predatory monopoly that impinges on its consumers and employees is qualitatively distinct from Juror 109's measured distaste for Google's use of AI. Similarly, Juror 84 stated that "Google is way too powerful in our lives" (Question 35, Juror 84 Questionnaire), and that Google "is so dominating . . . controlling everything" and "Google's influence on the society is so great." *Id.* at 161:4-11. Again, Juror 109's innocuous statement about Google's use of AI is easily distinguishable from Juror 84's more pointed and negative characterizations of the company. Moreover, the government cited additional race-neutral reasons for striking Jurors 43 and 84 in addition to their negative attitudes towards Google that do not apply to Juror 109.

Ding also compares Juror 109's concerns about AI to those expressed by Jurors 43, 45, and 84, but the government did not strike those jurors because of their opinions about AI. Because it ignores the government's race-neutral reasons for striking Jurors 43, 45, and 84, Ding's comparison of other

15

similarities in the questionnaire responses of Juror 109 and the challenged jurors is irrelevant.[9]

The only seated juror who made statements that indicated similar biases to those expressed by Jurors 43, 45, and 84, was Juror 104, a woman of Chinese descent whom the government elected not to strike even though her statements during *voir dire* more than justified a peremptory strike.  As set forth above, Juror 104 expressed serious concerns about her ability to be fair and impartial.  For instance, she stated that her immediate reaction to reading news articles about that case was:

> Well, there's another person getting targeted unfairly. How do you know that this is true, that he actually stole something or that – that someone isn't just saying, "Hey, he happens to be Chinese, and therefore, let's pin it on this person"?
>
> And so for me, it's where I don't know that I can honestly be able to look at this completely unbiased because it's the Government, again, coming in and trying to target another Chinese person, whether or not they're nationals.

*Id*. at 163:4-25.  She also stated, in response to a question from the Court, that she did not know if she could find Ding guilty even if she were firmly convinced that he was guilty of a crime because "part of me [] will always still question whether or not this is just yet another situation where we're getting targeted unfairly." *Id.* at 164:19-165:1-5; 13-15.  As Ding acknowledges, the government did not exercise a peremptory strike as to Juror 104 and she was seated on the jury. Def. Mot. at 19.  Ding goes on to suggest that the government nonetheless showed intentional discrimination when it attempted  to strike Juror 104 for cause.  *Id*.  Ding's logic is difficult to follow, but his point is not well taken given that the Court recognized the validity of the government's for-cause challenge of Juror 104, twice stating that "I think this one is a close question" and took time during a recess to consider the government's challenge.  Tr. at 233: 6-8, 24-25.

Ding's comparative juror analysis fails to identify a single sworn juror not of Chinese descent who expressed any biases qualitatively similar to those expressed by Jurors 43, 45, or 84.  This undermines any inference of discrimination and defeats Ding's *Batson* claim at step one.  As detailed above, the Ninth Circuit, on de novo review, upheld a state court's denial of a *Batson* claim at step one

---

[9] In this case, the victim company and Ding were both in the business of AI.  Google invented and developed the AI technology at issue, but Ding stole that technology and founded his own AI company.  Therefore, a prospective juror's feelings about AI do not necessarily predispose that juror to favor one side over the other.

16

under similar circumstances in *Hoyos*, where "a comparison of the struck jurors to the seated jurors undermines any inference of racial bias" even though the prosecutor struck three out of five Hispanic jurors. 51 F.4th at 311-15. The *Hoyos* Court not only relied on a comparative juror analysis at step one but also pointed to the fact that the prosecutor had unsuccessfully challenged two of the struck jurors for cause before using peremptory strikes to remove them. *Id.* at 310-12. The court noted that the stated justification for the prosecutor's for-cause challenges provided "contemporaneous indication of his reasoning," rebutting an inference of discrimination. *Id.* Here, the government's motions to strike Jurors 45 and 84 at the excusal hearing based solely on statements in their questionnaires further undermines any inference of discrimination by showing that the government's immediate concern was based on the jurors' own statements, not their race.

Ding does not meet his burden to establish a prima facie case of purposeful discrimination, and his *Batson* claim therefore fails at step one. Despite Ding's failure to show that the government's strikes were based on race, the government now proceeds to steps two and three of the *Batson* analysis in an abundance of caution.

## B. Step Two: The Government Cited Clear and Obvious Race Neutral Reasons for its Peremptory Strikes

"[O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two)." *Purkett v. Elem*, 514 U.S. 765, 767 (1995). "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez*, 500 U.S. at 360. *Batson*'s second step turns entirely on whether the proffered reason is facially race-neutral, and does not demand a "persuasive, or even plausible" explanation. *Purkett*, 514 U.S. at 767–68. While "[t]he first two *Batson* steps govern the production of evidence that allows the trial court to determine the persuasiveness of the defendant's constitutional claim," *Johnson v. California,* 545 U.S. 162, 171 (2005), "[i]t is not until the third step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Purkett*, 514 U.S. at 768.

17

Ding does not appear to contest that the government met its burden at step two of the *Batson* analysis. Nor could he, given the clear and obvious race-neutral reasons cited by the government in support of its peremptory challenges of Jurors 43, 45, and 84. The justifications articulated by the government easily qualify as race-neutral reasons considering Ninth Circuit precedent. Indeed, the Ninth Circuit has held a wide array of race-neutral reasons to be sufficient at step two of the *Batson* analysis. *Purkett*, 514 U.S. at 769 (finding "long, unkempt hair, a mustache, and a beard" to be race neutral because those characteristics are not specific to a particular racial group); *Burks v. Borg,* 27 F.3d 1424, 1429 (9th Cir.1994) (noting that prosecutors may "take into account tone, demeanor, facial expression" in exercising peremptory challenges); *United States v. Daly*, 974 F.2d 1215, 1219 (9th Cir. 1992) (striking a perceived "loner" is permissible because "a loner may hamper the jury's ability to reach a unanimous verdict"); *United States v. Thompson*, 827 F.2d 1254, 1260 (9th Cir. 1987) (the prosecution may legitimately strike a juror based on his casual dress because it conveys a possible lack of enthusiasm for jury service). Here, the government's reasons for striking Jurors 43, 45, and 84 were far more indicative of case-specific bias than the host of innocuous traits that have met the bar at step two in prior Ninth Circuit cases.

**C.    Step Three: Ding Fails to Show Purposeful Racial Discrimination**

At the third step, "[t]he trial court must consider the prosecutor's race neutral explanations in light of all of the relevant facts and circumstances, and in light of the arguments of the parties." *Flowers v. Mississippi*, 588 U.S. 284, 302 (2019). Within this inquiry, the trial court's "assessment of the prosecutor's credibility is often important." *Id*. "The trial judge must determine whether the prosecutor's proffered reasons are the actual reasons, or . . . pretextual and the prosecutor instead exercised peremptory strikes on the basis of race." *Id.* at 303. "The ultimate inquiry is whether the State was 'motivated in substantial part by discriminatory intent." *Id.* (quotation omitted). The Court's task at step three is to "decide whether a preponderance of the evidence establishes purposeful discrimination." *Paulino v. Harrison*, 542 F.3d 692, 702 (9th Cir. 2008). The "ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Hernandez-Garcia*, 44 F.4th at 1167 (*citing Purkett*, 514 U.S. at 768).

**1.      The Government's Stated Race Neutral Reasons Were Not Pretextual**

The government exercised peremptory challenges against Jurors 43, 45, and 84 because their statements under oath in their Questionnaires and/or during *voir dire* indicated clear bias against the government and its case.

**(i)      Juror 43**

The government struck Juror 43 because he expressed strong negative views toward Google and voiced concern that he would be unable to follow legal instructions with which he personally disagreed. Juror 43 made his beliefs about Google clear beginning in his Questionnaire, where he referred to the company as a "monopolist" whose "reach impinges on its customers and employers" (Juror 43 Questionnaire) and then later described Google as a company with "powers that I myself can't even articulate" that "has the capacity to be predatory" (Tr. at 174:19-175:10).  Juror 43's description of the victim company as a predatory monopoly was particularly concerning to the government in this case given the defense's telegraphed strategy to argue that the government relied on "Google's word alone" throughout its investigation and was merely doing Google's bidding when it filed charges against Ding.

Similarly concerning was Juror 43's hesitancy to commit to following the Court's legal instructions if he personally disagreed with the law.  During the Court's *voir dire*, Juror 43 raised his hand to endorse Juror 46's analogy comparing theft of intellectual property to taking water from a stream – "if you take a cup from a stream of water, are you breaking the law?" *Id*. at 109:12-13.  The government understood this analogy to express the opinion that intellectual property should be a public resource and should not be subject to laws that criminalize taking that resource.  After mentioning Juror 46's stream comment with approval, Juror 43 stated that he was "concerned about [his] role as a juror, if there were to be laws that maybe [he] believe[s] are unreasonable." *Id.* at 114:20-24.  Based on this record and given that all 14 of the charges in the Second Superseding Indictment involved intellectual property theft, the government concluded that Juror 43 may have difficulty following the Court's legal instructions as to the substantive offenses.

**(ii)      Juror 45**

The government struck Juror 45 because he expressed extremely negative opinions about the current Administration and acknowledged his skepticism about the government's motivations for

bringing the case against Ding.  In his Questionnaire, Juror 45 explained his answers to three separate questions by writing: "[t]he current administration uses the law to favor their friends, punish their enemies, and enrich themselves."  Questions 27-29, Juror 43 Questionnaire.  He continued, "[t]he military and law enforcement are blindly following corrupt orders."  *Id.*  On their face, Juror 45's comments suggested that he was predisposed to believe that the government initiated its case for improper reasons and that the FBI's investigation of Ding was the result of federal law enforcement following "corrupt orders."  During *voir dire*, Juror 45 acknowledged that if he served as a juror "at the back of [his] mind, [he] would question . . . unless the motivations were made clear."  Tr. at 167:9-12.  Taken together, Juror 45's statements indicated that he would have difficulty setting aside his belief that ulterior motives or "corrupt orders" may have motivated the government's case against Ding.

Furthermore, Juror 45 stated that he agreed with "a lot of what [Juror 104] said" and that his "feelings are maybe along the same lines."  *Id.* at 166:21-23.  Juror 104 expressed deep skepticism that the government may be targeting Mr. Ding because he is Chinese.  *Id.* at 163:22-25 ("I don't know that I can honestly be able to look at this completely unbiased because it's the Government, again, coming in and trying to target another Chinese person."); *see also id.* 165:3-5 (Juror 104 stating that she does not know whether she could convict if even if she were firmly convinced in Ding's guilt because "there's a part of me that will always still question whether or not this is just yet another situation where we're getting targeted unfairly.").  Juror 45's agreement with Juror 104, together with his mistrust of the Administration and skepticism of the government's motivation for charging Ding, show clear bias against the government and its case.

### (iii)     Juror 84

The government struck Juror 84 due to his belief that cases of intellectual property theft against Chinese nationals are most often based on "witch-hunting or racial discrimination" and his strong views about Google's power and influence on society.  Juror 84's response to Question 40 indicated that, before hearing any evidence, he was predisposed to believe that the government's case against Ding was a witch-hunt.  Juror 84 Questionnaire.  As government counsel explained on the record, "our case is a case of IP theft against a Chinese national. It's exactly the kind of case [Juror 84 is] calling a witch hunt."  Tr. at 254:22-24.  Juror 84's characterization of the government's case against Ding used

20

charged and powerful language, indicating a strongly held opinion. The government believed that Juror 84's answer to Question 40 indicated such clear bias against the government that the government moved to excuse Juror 84 for cause based solely on that answer. *See* Jan. 6 Tr. at 24:9-14.

Juror 84 also expressed concern that "Google is way too powerful in our lives" (Question 35, Juror 84 Questionnaire), that Google "is so dominating . . . controlling everything" and "Google's influence on the society is so great." Tr. at 161:4-11. These comments, like those made by Juror 43, indicated that Juror 84 was inclined to believe the defense's telegraphed theory that the government's prosecution of Ding was not based on the facts and the law, but rather the government's desire to follow fictional marching orders from the victim company.

### 2. The Government's Race-Neutral Justifications Were Not Proxies for Race

The government's reasons for each strike were supported by the record and further justified by the government's legitimate concerns about each juror's ability to be fair to the government in this specific case. Ding points to Juror 84's opinions about government discrimination against Chinese nationals in IP theft cases to argue that "striking a juror because of the juror's concerns about racial discrimination is not a race neutral reason. . . " Def. Mot. at 14. Ding is incorrect. In fact, the Ninth Circuit has repeatedly held that where a prospective juror makes affirmative statements indicating potential bias based on concerns about racial discrimination, the government does not discriminate by striking that juror, so long as the strike is based on the juror's statements rather than the juror's race.

For instance, in *Cook v. Lamarque*, the court found that a state court appropriately determined that a prosecutor's peremptory strike of an African American juror was not discriminatory where the juror had answered "yes" when asked whether he thought his experiences with racism might cause him to be unfair in the case. 593 F.3d 810, 820–21 (9th Cir. 2010). Similarly, in *United States v. Mitchell* the Ninth Circuit found that the district court's for-cause strike of a juror who stated that "having to sit in judgment of another Navajo would 'have a long-term affect on [him] . . . emotionally and to a certain extent spiritually'" was not based on the juror's race. 502 F.3d 931, 953 (9th Cir. 2007). The *Mitchell* Court reasoned that because the juror "himself injected race into the *voir dire*" striking that juror for cause did not violate the Equal Protection Clause because the district court was not "impermissibly drawing inferences from [the juror's] race, but permissibly from his own responses about his beliefs."

21

*Id.* In *Cummings v. Martel*, the Ninth Circuit considered a state court's decision to uphold the prosecutor's strike of a black prospective juror who stated "I would be less than honest if I said I was not aware that we are trying two black individuals, therefore I was going to make sure that we are fair in terms of the evidence as presented against those individuals" and further stated that "he had been 'victimized by racial prejudice being born and raised in this town.'" 796 F.3d 1135, 1147 (9th Cir. 2015). In upholding the state court's denial of the defendant's *Batson* motion, the Ninth Circuit noted that the prospective juror "made affirmative statements indicating potential bias, which is a far cry from when a prosecutor *assumes* a black juror will be partial to a black defendant." *Id.* (*citing Tolbert v. Gomez,* 190 F.3d 985, 989 (9th Cir.1999) (emphasis original); *see also Hernandez v. New York,* 500 U.S. 352, 375 (1991) (O'Connor, J., concurring) ("No matter how closely tied or significantly correlated to race the explanation for a peremptory strike may be, the strike does not implicate the Equal Protection Clause unless it is based on race.").

Here, after Juror 84 stated his concerns about the government targeting Ding because of Ding's Chinese nationality, the government did not impermissibly draw inferences based on Juror 84's Chinese descent, but permissibly from his own statements about his beliefs. The record in this case clearly establishes that the government's concern rested entirely with the substance of the opinions expressed and had nothing to do with the race of the person espousing them.

### 3.    The Prospective Jurors' Statement Indicating Bias Were Not Negated by Their Later Statements of Impartiality

Jurors 43, 45, and 84 each made clear and obvious statements indicating bias against the government and its case. Those statements and beliefs justified the government's peremptory challenges notwithstanding other statements suggesting that Jurors 43, 45, and 84 believed their concerns would not prevent them from being fair jurors. Indeed, the law is clear that neither the government exercising peremptory challenges nor a court considering for cause challenges is required to accept a prospective juror's assurances of impartiality that contradict other statements indicating bias. In *Infante v. Martel*, a habeas case decided under the Equal Protection Clause, the court determined that the trial judge was not required to accept a juror's eventual pledge to be impartial when deciding to strike the juror for cause. 953 F.3d 560, 566 (9th Cir. 2020). The court reasoned that a juror's assurance that he can be impartial

does not necessarily overcome a reasonable inference, drawn from other statements, that a juror will be unable to perform his duties. *Id.* (*citing Uttecht v. Brown*, 551 U.S. 1, 18, (2007)); *see also United States v. Christensen*, 828 F.3d 763, 812 (9th Cir. 2015) ("[a] juror's assurance that he or she can render a fair and impartial verdict is not dispositive.")  In *Hoyos,* the court found no inference of discrimination where the prosecutor struck a Hispanic juror who "persistently gave qualified answers to the judge's questions" even though the juror also stated that she "could be fair and open minded."  51 F.4th at 313.

Ding argues that the government's justifications for striking Jurors 45, 45, and 48 are "unsupported by the record" because each prospective juror made some statement indicating they believed they could be fair.  Def. Mot. at 14-15.  Not only is this argument legally and factually incorrect, as set forth above, but it is also undercut by Ding's strike of Juror 48, a person of Chinese descent who Ding struck because he was "pretty close to the technology at issue in the case" and because "NVIDIA [Juror 48's employer] is also a very significant partner with Google."  Tr. at 237:20-238-3.  Defense counsel struck Juror 48 even though he assured the Court that his relationship with Google employees would not affect his ability to be fair.  *Id.* at 113:13-21.  Ding chose not to rely on Juror 48's assurance of impartiality, yet he argues that the government committed intentional racial discrimination by making the same decision.

**4.    The Government Consistently Exercised its Challenges Based on the Substance of Prospective Jurors' Statements, Not Their Race**

The government consistently used its peremptory challenges to strike jurors, regardless of race, nationality, or ancestry, who expressed case-specific biases.  As the record shows, the government made challenges for cause and used peremptory challenges against prospective jurors, including Jurors 43, 45, and 84, irrespective of their race, based on the prospective jurors': (i) strong negative opinions about Google; (ii) concerns about the juror's ability to follow the law; and (iii) extreme anti-Administration views.

**(i)    Strong Negative Opinions About Google**

At the excusal hearing, the Government moved to exclude Juror 46, a white man, (Valladao Decl. at ¶ 11) for cause based solely on his questionnaire response that "Google is a big part of the fascist Tech Oligarchy that is moving to control all of U.S. society." (Jan. 6 Tr. at 16:21-17:15 (*quoting*

Question 35, Juror 46 Questionnaire)).  Likewise, the government moved to strike Juror 29, who was born in El Salvador (Question 7, Juror 29 Questionnaire) because he stated "I hate Google because they sell my personal information" and "I don't trust Google. Maybe all is a lie." (Jan. 6 Tr. 44:21-8).[10] Similarly, the government exercised a peremptory challenge to strike Juror 108 (Tr. at 257:22), a white and/or Hispanic woman (Valladao Decl. at ¶ 17), who in response to Question 44, which asked whether anything about that case "creates a question in your mind as to whether you can be a fair, objective, and unbiased juror in this case," responded, "[d]on't trust big tech – Google could be lying." (Question 44, Juror 108 Questionnaire).

The Government also moved to strike Juror 42, a white man (Valladao Decl. at ¶ 10), for cause based on his questionnaire responses describing Google as "[a] de facto monopoly with a great deal of unchecked power to mine general information" and noting that he had "little to no sympathy for Google." (Jan 6 Tr. at 44:23-45:6).  During *voir dire*, Juror 42 clear that he would consider jury nullification in a case where Google was the victim company because "considering the nature of Google, you can – whatever the laws may be, you can consider them not actually a victim from a political perspective." Tr. at 149:5-15.  The Court granted the government's second motion to excuse Juror 42 for cause after *voir dire* (*id.* at 230:17-25-231:1-6) with no objection from defense counsel (*id.* at 231:2).

Additionally, the government exercised a peremptory strike against Juror 68, a white and/or Hispanic man (Valladao Decl. at ¶ 13), who expressed negative views about Google during *voir dire* (Tr. at 158:8-15 (Juror 68 stating that he mistrusts Google because of "free speech limitations" and political contributions to the current Administration)).

The defense team recognized that a prospective juror's opinions about Google may be a source of bias in this case.  They made this clear by striking several jurors with connections to Google.  For instance, at the excusal hearing, Ding moved to strike Juror 15, a white man (Valladao Decl. at ¶ 6) for cause for the sole reason that he had "applied to positions at Google a number of times." (Jan 6. Tr. at 50:12-13).  The Court denied the for-cause challenge and Ding used a peremptory strike excusing Juror 15 without asking him any questions about his connections to Google during *voir dire*.  Tr. at 246:8.

---

[10] Based on the government's review of the January 7, 2026 *voir dire* transcript, it appears that Juror 29 failed to appear.

24

Ding also moved to exclude Juror 3, a white man (Valladao Decl. at ¶ 4), for cause because "they own Google stock." (Jan 6 Tr. at 49:13).[11]  During *voir dire*, Juror 3 stated that he did not believe that his ownership of Google stock would affect his decision as a juror.  Tr. at 199:2-13.  Ding struck Juror 3 with a peremptory challenge.  *Id.* at 244:11-12.

After *voir dire*, the defense team moved to strike for cause Juror 5, a white woman (Valladao Decl. at ¶ 5), who was in the process of applying for a job at one of Google's subsidiary companies (s*ee* Tr. at 238:13-2-228:19; 235:11-17. 224:23).  Furthermore, as discussed above, the defense also struck Juror 48, a Chinese-American man (Valladao Decl. at ¶ 12), based on his connection to Google through his employment at NVIDIA, despite his assurance that he could be fair (Tr. at 237:20-238:3; 235:48).  Finally, the defense team moved to strike Juror 95, a white man (Valladao Decl. at 16) for cause, which the Court denied, and ultimately used a peremptory strike excusing Juror 95 because his employer had ongoing contracts with Google (Tr. at 238:13-241:24).  The Court denied Ding's for-cause challenge to Juror 95, highlighting Juror 95's assurances that he could be fair and that his connections to Google would not affect his ability to be impartial:

> I have no concern about that. That was one thing that was clear from this juror's demeanor and everything he said, that he will do his job and he will not be trying to make his client happy in this case. That, I'm very confident about.

Tr. at 240:1-5.  Ding's motions to strike three white jurors and one juror of Chinese descent based on perceived bias in favor of Google, including Jurors 95 and 48 who gave unequivocal assurances of impartiality, reveals a glaring double standard that undermines the credibility of Ding's *Batson* arguments.

### (ii)    Concerns About the Juror's Ability to Follow the Law

The government moved to strike for cause Juror 76, who appeared to be of Hispanic descent (Valladao Decl. at ¶ 15), based on his apparent hostility to the concept of intellectual property laws.  As the government explained at the excusal hearing, Juror 76 stated in his questionnaire that he would

---

[11] Defense counsel argued that Juror 3 should be excused for cause because he stated in his questionnaire that the "U.S. innovates, China replicates, and Europe regulates" and further stated that Chinese nationals "need to be screened and monitored."  Jan 6 Tr. 49:8-18.

"object to the very notion of theft of intellectual property and would instead prefer it described more plainly as unauthorized copying." Tr. at 45:16-22 (*quoting* Question 39, Juror 76 Questionnaire). The government argued that, since "[t]he defendant's been charged with theft of intellectual property. If the juror does not even believe in that notion, we believe they should be struck for cause." *Id.* at 45:20-22. Court later granted the government's for cause challenge to Juror 76 after he reiterated his concerns about the concept of intellectual property laws during *voir dire*. *Id.* at 231:7-232:1-24; 150:25-157:25.

Similarly, the government moved to strike for cause and ultimately exercised a peremptory challenge excusing Juror 36, a white woman (Valladao Decl. at ¶ 8), who stated that she would have difficulty following laws that she believed were "immoral" (Tr. at 177:20-178:20). Juror 36 also stated that she could not follow the law if she believed a law was "very egregious" and conflicted with her "personal belief and moral system." *Id.* at 182:4-8.

### (iii)    Extreme Anti-Administration Views

At the excusal hearing, the government moved to strike for cause Juror 68, who appeared to be white and/or Hispanic (Valladao Decl. at ¶ 13), who stated the following in response to Question 44, which asked whether there is "anything else, which creates a question in your mind as to whether you can be a fair, objective, and unbiased juror in this case?":

> [G]iven we have a racist government in control currently, I don't have a lot of faith that this isn't necessarily a conjured-up charge or actually some excuse to offset some security shortcomings by the US Government. I'd like to take it at face value, but given the extremes of the current administration, it's hard to treat it with the attention it deserves and the impartiality.

Jan 6 Tr. at 21:23-22:15; Juror 68 Questionnaire. The government exercised a peremptory challenge excusing Juror 68 after the Court denied the government's for-cause challenge. Tr. at 250:25.

Unlike the prosecutor in *Kesser v. Cambra,* whose "facially plausible explanations were severely undercut by the prosecution's failure to object to other panel members who expressed [similar] views," 465 F.3d 351, 367 (9th Cir. 2006) (quotation omitted), here the government did the opposite by consistently using its peremptory challenges to strike jurors who expressed case-specific biases regardless of race. The government's consistent and race-neutral use of its peremptory strikes undermines Ding's *Batson* claim at step three by establishing that the government's concerns at every

stage of the jury selection process rested entirely with the substance of the opinions expressed, not the race, ethnicity, or ancestry of the person expressing them.

**IV.   CONCLUSION**

Because Ding fails to carry his burden to show a *Batson* violation, the interests of justice compel this Court to deny Ding's motion for a new trial.

DATED: March 12, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney


    */s/ Casey Boome*
CASEY BOOME
MOLLY K. PRIEDEMAN
ROLAND CHANG
Assistant United States Attorneys

27